# EXHIBIT 101



**Home** | **Setup an Account** Log In Public ▼ User Name: [____] Password: [____] LOGIN ☐ Remember Me Forgot Password /Forgot Username

## Search for a Contractor

Permits
- Apply for a New Permit
- Search for Permit
- Pay Fees
- View on Map

Projects
- Apply for New Project
- Search Projects
- Pay Fees
- View on Map

Contractor
- Apply for Contractor License
- Search for a Contractor
- Pay Fees

Properties
- Search Property
- View on Map

Inspections
- Schedule
- View on Map
- Cancel
- Scheduled

Licensing
- Apply for New Licenses
- Search Licenses
- Pay Fees
- Renew

Violations
- Search
- Pay Fees

Map
- View Map
- Locate My Address

Shopping Cart
- Pay All Fees
- Paid Items

**Search By:** Company name ▼
**Search Operator:** Contains ▼
**Search Value:** Toll

Click here for search examples

SEARCH

### Search Results

### Search Results

StLicNo
GC-005217-2023
GC-005317-2024

### License #GC-005217-2023

AEC Info     Contacts (6)

| | |
|---|---|
| Registration #: | GC-005217-2023 |
| Issue: | 11/21/2023 |
| Expire: | 12/10/2025 |
| Type: | GENERAL CONTRACTOR |
| Sub-Type: | CLASS B BUILDING |
| Status: | ISSUED |
| Company: | TOLL BROTHERS |
| Phone: | (808) 250-2826 |
| Cell: | (808) 250-2826 |
| Pager: | (303) 815-3760 |
| Fax: | |
| Owner Name: | |

**Linked Activities:**

**— Project(s)**

| AR2025-00009 | ARCHITECTURAL REVIEW | COMPLETENESS REVIEW |
|---|---|---|
| AR2025-00008 | ARCHITECTURAL REVIEW | COMPLETENESS REVIEW |
| AR2025-00007 | ARCHITECTURAL REVIEW | IN REVIEW |

**— Permit(s)**

| TEMP2025-00003 | COMMERCIAL TEMPORARY STRUCTURE OR USE | ISSUED |
|---|---|---|
| SFD2025-00051 | RESIDENTIAL SINGLE FAMILY NEW BUILD | RECEIVED |
| SFD2025-00050 | RESIDENTIAL SINGLE FAMILY NEW BUILD | RECEIVED |
| SFD2025-00049 | RESIDENTIAL SINGLE FAMILY NEW BUILD | RECEIVED |
| SFD2025-00023 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2025-00019 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2025-00018 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |

| | | |
|---|---|---|
| 00018 | BUILD | |
| SFD2025-00010 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2025-00005 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CANCELLED-DUPLICATE |
| SFD2025-00003 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2025-00001 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00599 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00598 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00597 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00596 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00595 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00594 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00593 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00582 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00581 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00580 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00579 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00558 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00557 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00556 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00493 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00492 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00491 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00490 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |

| | | |
|---|---|---|
| 00490 | BUILD | |
| SFD2024-00489 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00488 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00487 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00486 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00485 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00484 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00483 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| SFD2024-00437 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| SFD2024-00269 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| EXT_R2024-00025 | RESIDENTIAL ACCESSORY UNCONDITIONED | EXPIRED PERMIT |
| MFD2024-00001 | FACTORY BUILT STRUCTURES | DENIED |
| TEMP2024-00002 | COMMERCIAL TEMPORARY STRUCTURE OR USE | EXPIRED PERMIT |
| BPR-033982-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033981-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033980-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033702-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPC-033706-2024 | COMMERCIAL TEMPORARY STRUCTURE OR USE | ISSUED |
| BPR-033625-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033622-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033620-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033623-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033621-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |

| | | |
|---|---|---|
| 2024 | BUILD | OCCUPANCY |
| BPR-033587-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033586-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033585-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033584-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033583-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033401-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033400-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | ISSUED |
| BPR-033398-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033397-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033396-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033395-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033393-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033293-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033292-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033291-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033130-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | MODEL HOME LETTER OF COMPLETION |
| BPR-033129-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033128-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033127-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033126-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-033001-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-033000-2024 | RESIDENTIAL STOCK PLAN | ISSUED |

| | | |
|---|---|---|
| 2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032999-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032998-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032997-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032990-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-032989-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-032988-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-032986-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-032960-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPC-032952-2024 | COMMERCIAL TEMPORARY STRUCTURE OR USE | FINALED |
| BPC-032805-2024 | COMMERCIAL PLUMBING | ISSUED |
| BPR-032640-2024 | RESIDENTIAL SINGLE FAMILY NEW BUILD | CERTIFICATE OF OCCUPANCY |
| BPR-032394-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032287-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032264-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032262-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032260-2024 | RESIDENTIAL STOCK PLAN | ISSUED |
| BPR-032168-2024 | RESIDENTIAL STOCK PLAN | ISSUED |

The Town of Erie makes every effort to produce and publish the most current and accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use, or its interpretation. Utilization of this website indicates understanding and acceptance of this

statement.

Technologies

Town of Erie 645 Holbrook Street Erie, CO 80516

HOME | CONTACT

©1990-2025 CentralSquare Technologies, LLC. All Rights Reserved.

# EXHIBIT 102

| Business | License | Street | City_Zip | Phone_Number | Email |
|---|---|---|---|---|---|
| TOLL BROTHERS | Residential Building Contractor | 7100 E BELLEVIEW AVE UNIT 200 | GREENWOOD VILLAGE CO 80111 | (303) 529-5324 | abrandow@tollbrothers.com |

# EXHIBIT 103

Previous | Top | Paging Options | Main Menu

**License Number** CL-005667-2025

**Applied Date** 01/22/2025

**Period Start Date** 01/23/2025

**License Status** Issued

**Address**

**Company Type**

**Business Status**

**Description**

**Main Parcel**

**Opened Date**

**Last Audit Date**

**Company Name** Toll Brothers, Inc

**License Type** Contractor - General - Class B

**Expiration Date** 01/23/2026

**Industry Classification**

**DBA**

**Closed Date**

# EXHIBIT 104

# Pikes Peak Regional Building Department

## Contractor Details - TOLL BROS., INC.

Number of expired licenses: 1

| | |
|---|---|
| **Contractor Name** | TOLL BROS., INC. |
| **Address** | 536 CHAPEL HILLS DR, ste 150, COLORADO SPRINGS, CO, 80920 |
| **Phone** | (719) 528-6977 |
| **Licensed Since** | 9/15/1983 |

View License Definitions

### Licenses: 3

| | |
|---|---|
| **Licensee Name** | BRADLEY SCOTT NAVRKAL |
| **Status** | Active |
| **Department** | Building |
| **License Type** | B-C-L-2 "C" |
| **Exp. Date** | 9/29/2025 |
| **Licensee Name** | ERIK ISAACSON |
| **Status** | Active |
| **Department** | Building |
| **License Type** | B-C |
| **Exp. Date** | 4/29/2026 |
| **Licensee Name** | STACI EATON |
| **Status** | Provisional |
| **Department** | Building |
| **License Type** | B-C |
| **Exp. Date** | 6/26/2024 |

### Obligations: 2

| | |
|---|---|
| **Type** | Liability |
| **Agency** | National Fire & Marine Insurance Company |
| **Reference #** | 42-HBL-15044702 |
| **Exp. Date** | 8/31/2025 |
| **Type** | Workers Comp |
| **Agency** | Old Republic Insurance Company |
| **Reference #** | MWC30267710 |
| **Exp. Date** | 8/31/2025 |

# EXHIBIT 105



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
10/22/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | . | | |
|---|---|---|---|---|
| Marsh USA LLC | PHONE (A/C, No, Ext): | | FAX (A/C, No): | |
| 30 South 17th Street | E-MAIL ADDRESS: | | | |
| Philadelphia, PA 19103 | | | | |
| | **INSURER(S) AFFORDING COVERAGE** | | | **NAIC #** |
| CN101294894-Toll.-GAW-24-25          Munic. | INSURER A : Old Republic Insurance Company | | | 24147 |
| **INSURED** | INSURER B : National Fire & Marine Insurance Company | | | 20079 |
| Toll Southwest, LLC | INSURER C : | | | |
| 1140 Virginia Drive | INSURER D : | | | |
| Fort Washington, PA 19034 | INSURER E : | | | |
| | INSURER F : | | | |

## COVERAGES          CERTIFICATE NUMBER: CLE-007248744-01          REVISION NUMBER: 4

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A B | X COMMERCIAL GENERAL LIABILITY | | | MWZY 318815 10 - Comp. Ops. | 11/01/2024 | 09/01/2025 | EACH OCCURRENCE | $ 500,000 |
| | CLAIMS-MADE X OCCUR | | | 42-HBL-150447-03 - Prem. Ops. | 11/01/2024 | 09/01/2025 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X BI/PD | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | SIR: $3,000,000 Prem Ops. | | | PERSONAL & ADV INJURY | $ 500,000 |
| | | | | SIR (NY Only): $5,000,000 Prem Ops. | | | GENERAL AGGREGATE | $ 500,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 500,000 |
| | X POLICY PRO-JECT LOC | | | | | | | $ |
| | OTHER: | | | | | | | |
| A | AUTOMOBILE LIABILITY | | | MWTB 302678-10 | 09/01/2024 | 09/01/2025 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY        SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY        NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB        OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB        CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED        RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | X PER STATUTE        OTHER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?        N        N/A **(Mandatory in NH)** | | | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | If yes, describe under | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
*Evidence of coverage pertaining to city permitting.*

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Littleton 2255 W Berry Ave. Littleton, CO 80120 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** *Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** CN101294894

**LOC #:** Philadelphia

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page __2__ of __2__

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | Toll Southwest, LLC |
| **POLICY NUMBER** | 1140 Virginia Drive |
| | Fort Washington, PA 19034 |

| CARRIER | | NAIC CODE | |
|---|---|---|---|
| | | **EFFECTIVE DATE:** | |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___    **FORM TITLE:** Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 106



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
10/22/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | | |
|---|---|---|---|---|
| Marsh USA LLC<br>30 South 17th Street<br>Philadelphia, PA 19103 | **CONTACT NAME:** | | | |
| | **PHONE (A/C, No, Ext):** | | **FAX (A/C, No):** | |
| | **E-MAIL ADDRESS:** | | | |
| | **INSURER(S) AFFORDING COVERAGE** | | | **NAIC #** |
| CN101294894-Toll.-GAW-24-25    090126 | **INSURER A :** Old Republic Insurance Company | | | 24147 |
| **INSURED** | **INSURER B :** National Fire & Marine Insurance Company | | | 20079 |
| Toll Southwest, LLC<br>1140 Virginia Drive<br>Fort Washington, PA 19034 | **INSURER C :** | | | |
| | **INSURER D :** | | | |
| | **INSURER E :** | | | |
| | **INSURER F :** | | | |

## COVERAGES
**CERTIFICATE NUMBER:** CLE-006468892-17    **REVISION NUMBER:** 2

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A<br>B | X **COMMERCIAL GENERAL LIABILITY** | X | | MWZY 318815 10 - Comp. Ops.<br>42-HBL-150447-03 - Prem. Ops. | 11/01/2024<br>11/01/2024 | 09/01/2025<br>09/01/2025 | EACH OCCURRENCE | $ 5,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X BI/PD | | | SIR: $3,000,000 Prem Ops.<br>SIR (NY Only): $5,000,000 Prem Ops. | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | | | | PERSONAL & ADV INJURY | $ 5,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 5,000,000 |
| | X POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY    SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY    NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | **UMBRELLA LIAB** OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED RETENTION $ | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | X PER STATUTE    OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **(Mandatory in NH)** Y/N | N | N/A | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Evidence of coverage pertaining to the application for a Contractors License for the performance of all development and construction, including permits, for the project known as Ridge at Ward Station in Wheat Ridge, Co.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Wheat Ridge<br>7500 W 95th Avenue<br>Wheat Ridge, CO 80033 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>**AUTHORIZED REPRESENTATIVE**<br>*Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**    The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: CN101294894

LOC #: Philadelphia

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 2 of 2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | Toll Southwest, LLC |
| **POLICY NUMBER** | 1140 Virginia Drive |
| | Fort Washington, PA  19034 |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** 25   **FORM TITLE:** Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 107



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/22/2024 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | . | |
|---|---|---|---|
| Marsh USA LLC | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| 30 South 17th Street | E-MAIL | | |
| Philadelphia, PA  19103 | ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| CN101294894-Toll.-GAW-24-25        ONGOI    Y | INSURER A : Old Republic Insurance Company | | 24147 |
| **INSURED** | INSURER B : National Fire & Marine Insurance Company | | 20079 |
| TOLL BROS., INC. | INSURER C : | | |
| 1140 Virginia Drive | INSURER D : | | |
| Fort Washington, PA  19034 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER: CLE-005537478-65    REVISION NUMBER: 8

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A B | X COMMERCIAL GENERAL LIABILITY | X | | MWZY 318815 10 - Comp. Ops. | 11/01/2024 | 09/01/2025 | EACH OCCURRENCE | $ 5,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | 42-HBL-150447-03 - Prem. Ops. | 11/01/2024 | 09/01/2025 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X BI/PD | | | SIR: $3,000,000 Prem Ops. | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | SIR (NY Only): $5,000,000 Prem Ops. | | | PERSONAL & ADV INJURY | $ 5,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 5,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | X PER STATUTE ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N (Mandatory in NH) | | N / A | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Re: License #A02120
Evidence of coverage pertaining to the Renewal of Class A Contractor License held by Toll Bros, Inc. for all Toll Building Projects.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| DOUGLAS COUNTY BUILDING DEPARTMENT ATTN: CONTRACTOR LICENSING 100 3RD STREET, #20 CASTLE ROCK, CO  80104 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE    *Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: CN101294894

LOC #: Philadelphia

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 2 of 2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | TOLL BROS., INC. |
| | 1140 Virginia Drive |
| **POLICY NUMBER** | Fort Washington, PA  19034 |
| | |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: 25    FORM TITLE: Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

# EXHIBIT 108

 **ACORD**®

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/29/2024 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | . | | |
|---|---|---|---|---|---|
| Marsh USA LLC | | PHONE (A/C, No, Ext): | | FAX (A/C, No): | |
| 30 South 17th Street | | E-MAIL ADDRESS: | | | |
| Philadelphia, PA  19103 | | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| CN101294894-Toll.-GAW-24-25 | | INSURER A : | Old Republic Insurance Company | | 24147 |
| **INSURED** | | INSURER B : | National Fire & Marine Insurance Company | | 20079 |
| TOLL BROTHERS, INC. | | INSURER C : | | | |
| 1140 VIRGINIA DRIVE | | INSURER D : | | | |
| FORT WASHINGTON, PA  19034 | | INSURER E : | | | |
| | | INSURER F : | | | |

## COVERAGES

**CERTIFICATE NUMBER:** CLE-006779194-13     **REVISION NUMBER:** 5

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A B | X | **COMMERCIAL GENERAL LIABILITY** | | | MWZY 318815 10 - Comp. Ops. | 11/01/2024 | 09/01/2025 | EACH OCCURRENCE | $ 5,000,000 |
| | | CLAIMS-MADE  X  OCCUR | | | 42-HBL-150447-03 - Prem. Ops. | 11/01/2024 | 09/01/2025 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X | BI/PD | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | | SIR: $3,000,000 Prem Ops. | | | PERSONAL & ADV INJURY | $ 5,000,000 |
| | | | | | SIR (NY Only): $5,000,000 Prem Ops. | | | GENERAL AGGREGATE | $ 5,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | X | POLICY  PRO-JECT  LOC | | | | | | | $ |
| | | OTHER: | | | | | | | |
| | | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | **UMBRELLA LIAB**  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | **EXCESS LIAB**  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED  RETENTION $ | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | PER STATUTE  OTH-ER | |
| | | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **(Mandatory in NH)** | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
 Evidence of coverages pertaining to a New Contractor License Application.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Town of Erie Planning and Development, Building Division 645 Holbrook Street Erie, CO  80516 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** |
| | *Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION.  All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** CN101294894

**LOC #:** Philadelphia

*ACORD*®

# ADDITIONAL REMARKS SCHEDULE

Page  2  of  2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | TOLL BROTHERS, INC.<br>1140 VIRGINIA DRIVE<br>FORT WASHINGTON, PA  19034 |
| **POLICY NUMBER** | |
| **CARRIER**                          **NAIC CODE** | |
| | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:    25    FORM TITLE:  Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 109

 **ACORD**®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/4/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Marsh USA LLC<br>1717 Arch Street<br>Philadelphia, PA 19103 | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | **INSURER(S) AFFORDING COVERAGE** | **NAIC #** |
| CN101294894-Toll.-GAW-24-25 | INSURER A : Old Republic Insurance Company | 24147 |
| **INSURED** | INSURER B : National Fire & Marine Insurance Company | 20079 |
| Toll Bros. Inc.<br>1140 Virginia Drive<br>Fort Washington, PA 19034 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER: 53

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A<br>B | X COMMERCIAL GENERAL LIABILITY | | | MWZY 318815 10 | 11/01/2024 | 09/01/2025 | EACH OCCURRENCE | $ 7,000,000 |
| | CLAIMS-MADE X OCCUR | | | 42-HBL-150447-03 | 11/01/2024 | 09/01/2025 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X BI/PD | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | SIR: $3,000,000 Prem Ops.<br>SIR (NY Only): $5,000,000 Prem Ops. | | | PERSONAL & ADV INJURY | $ 7,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 7,000,000 |
| | X POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 7,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | MWTB 302678-10 | 09/01/2024 | 09/01/2025 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED  RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y / N | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | X PER STATUTE  OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N  N/A<br>(Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

Evidence of coverage pertaining to updated Liability and Workers Comp.

The insurance carrier shall notify the Department at least ten (10) calendar days in advance of the effective date of any reduction or cancellation of the policy.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pikes Peak Regional Building Department<br>2880 International Circle<br>Colorado Springs, CO 80910 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE**<br>*Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**        The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: CN101294894

LOC #: Philadelphia

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 2 of 2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | |
| **POLICY NUMBER** | 1140 Virginia Drive |
| | Fort Washington, PA 19034 |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** 25    **FORM TITLE:** Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

**ACORD 101 (2008/01)**    © 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 110



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/18/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA LLC<br>1717 Arch Street<br>Philadelphia, PA  19103 | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| CN101294894-Toll.-GAW-24-25   11/4/2024 | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| | **INSURER A :** Old Republic Insurance Company | | 24147 |
| **INSURED** | **INSURER B :** National Fire & Marine Insurance Company | | 20079 |
| | **INSURER C :** | | |
| | **INSURER D :** | | |
| | **INSURER E :** | | |
| | **INSURER F :** | | |

## COVERAGES          CERTIFICATE NUMBER:                    REVISION NUMBER: 39

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A<br>B | X  COMMERCIAL GENERAL LIABILITY | | | MWZY 318815 10<br>42-HBL-150447-03 | 11/01/2024<br>11/01/2024 | 09/01/2025<br>09/01/2025 | | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X  OCCUR | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,100 |
| | X  BI/PD | | | SIR: $3,000,000 Prem Ops.<br>SIR (NY Only): $5,000,000 Prem Ops. | | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | | GENERAL AGGREGATE | $ 1,000,000 |
| | X  POLICY  ☐ PRO-JECT  ☐ LOC | | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | ☐ OTHER: | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | **UMBRELLA LIAB**  ☐ OCCUR | | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB**  ☐ CLAIMS-MADE | | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y / N | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | X  PER STATUTE  ☐ OTHER | | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **(Mandatory in NH)** | N | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

Toll Bros. Inc.
1140 Virginia Drive
Fort Washington, PA 19034

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Evidence of coverage pertaining to updated Liability and Workers Comp.<br><br>The insurance carrier shall notify the Department at least ten (10) calendar days in advance of the effective date of any reduction or cancellation of the policy. | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>**AUTHORIZED REPRESENTATIVE**<br><br>*Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2016/03)          **The ACORD name and logo are registered marks of ACORD**

**AGENCY CUSTOMER ID:** CN101294894

**LOC #:** Philadelphia

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 2 of 2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | Pikes Peak Regional Building Department |
| **POLICY NUMBER** | 2880 International Circle |
| | Colorado Springs, CO 80910 |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** 25    **FORM TITLE:** Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

1140 Virginia Drive
Fort Washington, PA 19034

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 111



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
7/1/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA LLC | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| 1717 Arch Street | E-MAIL ADDRESS: | | |
| Philadelphia, PA  19103 | | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| CN101294894-Toll.-GAW-24-25  Muni | INSURER A : Old Republic Insurance Company | | 24147 |
| **INSURED** | INSURER B : National Fire & Marine Insurance Company | | 20079 |
| Toll Brothers, Inc. | INSURER C : | | |
| 1140 Virginia Drive | INSURER D : | | |
| Fort Washington, PA 19034 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER:                    REVISION NUMBER: 82

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A B | X **COMMERCIAL GENERAL LIABILITY** | X | | MWZY 318815 10 | 11/01/2024 | 09/01/2025 | EACH OCCURRENCE | $ 5,000,000 |
| | CLAIMS-MADE X OCCUR | | | 42-HBL-150447-03 | 11/01/2024 | 09/01/2025 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X BI/PD | | | | | | MED EXP (Any one person) | $ EXCLUDED |
| | | | | SIR: $3,000,000 Prem Ops. | | | PERSONAL & ADV INJURY | $ 5,000,000 |
| | | | | SIR (NY Only): $5,000,000 Prem Ops. | | | GENERAL AGGREGATE | $ 5,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | X POLICY PRO-JECT LOC | | | | | | | $ |
| | OTHER: | | | | | | | |
| A | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY | SCHEDULED AUTOS | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY | NON-OWNED AUTOS ONLY | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | **UMBRELLA LIAB** | OCCUR | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** | CLAIMS-MADE | | | | | AGGREGATE | $ |
| | DED RETENTION $ | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | MWC 302677-10 | 09/01/2024 | 09/01/2025 | PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **(Mandatory in NH)** | N | N/A | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

Evidence of coverage pertaining to a City Permit for the Town of Superior.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Town of Superior 124 E. Coal Creek Drive Superior CO 80027 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** *Marsh USA LLC* |

© 1988-2016 ACORD CORPORATION.  All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: CN101294894

LOC #: Philadelphia

*ACORD®*

# ADDITIONAL REMARKS SCHEDULE

Page  2  of  2

| AGENCY | NAMED INSURED |
|---|---|
| Marsh USA LLC | |
| **POLICY NUMBER** | 1140 Virginia Drive |
| | Fort Washington, PA 19034 |
| **CARRIER** | **NAIC CODE** | |
| | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:  25     FORM TITLE: Certificate of Liability Insurance

*The general liability policy evidenced above is subject to self-insured retentions for various perils covered. If you would like additional information regarding these self-insured retentions, please contact the insured at: 215-938-3009.*

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# EXHIBIT 112

**ENTITY INFORMATION**

**Search Date and Time: 9/14/2025 1:53:14 PM**

**Entity Details**

| | | | |
|---|---|---|---|
| Entity Name: | MARSH USA, LLC | Entity ID: | 23486387 |
| Entity Type: | Foreign LLC | Entity Status: | **Active** |
| Formation Date: | 2/14/2023 | Reason for Status: | In Good Standing |
| Approval Date: | 3/13/2023 | Status Date: | 3/13/2023 |
| Original Incorporation Date: | 4/2/1976 | Life Period: | Perpetual |
| Business Type: | Any legal purpose | Last Annual Report Filed: | |
| Domicile State: | New York | Annual Report Due Date: | |
| | | Years Due: | |
| Original Publish Date: | | | |

**Statutory Agent Information**

| | | | |
|---|---|---|---|
| Name: | CT CORPORATION SYSTEM | Appointed Status: | Active 3/13/2023 |
| Attention: | | | |
| Address: | 3800 NORTH CENTRAL AVENUE, SUITE 460, PHOENIX, AZ 85012, USA | | |
| Agent Last Updated: | 3/13/2023 | E-mail: | |
| Attention: | | Mailing Address: | 3800 NORTH CENTRAL AVENUE, SUITE 460, PHOENIX, AZ 85012, USA |
| County: | Maricopa | | |

**Principal Information**

| Title | Name | Attention | Address | Date of Taking Office | Last Updated |
|---|---|---|---|---|---|
| Manager | MARSH LLC | MARSH USA LLC | 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036, New York County, USA | | 3/13/2023 |

Page 1 of 1, records 1 to 1 of 1

**Address** 🔵

| | | | |
|---|---|---|---|
| Attention: | Address: | County: | Last Updated: |

**Entity Principal Office Address**

Attention: MARSH USA LLC    Address: 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036, USA    County: New York    Last Updated: 3/13/2023

**Foreign Jurisdiction Office Address**

Attention:    Address: 1209 ORANGE STREET, WILMINGTON, DE, 19801, USA    County: New Castle    Last Updated: 3/13/2023

Back    Return to Search    Return to Results    Document History    Name/Restructuring History    Pending Documents    Microfilm History

# EXHIBIT 113

**Marsh**

Industries ⌄

Services ⌄

Insights ⌄

About Marsh ⌄

🔍

⊕ US-EN ⌄

# Aviation insurance market overview H1 2025

Navigate the turbulence: Your essential guide to the aviation insurance market.

Learn more →

01

02

03

04

The Hull War market

Marsh
H1 2025
Aviation insurance market overview

# EXHIBIT 114



MarshMcLennan

Insights

Solutions

Investors

About

Media Center

Careers

Contact Us



# KNOW MORE. DO MORE.

Marsh McLennan helps businesses and communities know more, so they can do more.

Learn more

# EXHIBIT 115

**For assistance with TSDR**, email **teas@uspto.gov** and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.

**Upcoming Maintenance**
Trademark Office systems will undergo extended maintenance between 12:00 a.m. and 5:30 a.m. on Sep. 13, 2025. During this time, the Trademark Status and Document Retrieval (TSDR) system will be unavailable. We apologize for any inconvenience this causes.

STATUS     DOCUMENTS     MAINTENANCE                           Back to Search          Print

| | |
|---|---|
| Generated on: | This page was generated by TSDR on 2025-09-14 16:48:45 EDT |
| Mark: |  |

| | | | |
|---|---|---|---|
| US Serial Number: | 90139988 | Application Filing Date: | Aug. 26, 2020 |
| US Registration Number: | 6457644 | Registration Date: | Aug. 17, 2021 |
| Register: | Principal | | |
| Mark Type: | Service Mark | | |

| | | |
|---|---|---|
| TM5 Common Status Descriptor: |  | LIVE/REGISTRATION/Issued and Active<br><br>The trademark application has been registered with the Office. |
| Status: | Registered. The registration date is used to determine when post-registration maintenance documents are due. | |
| Status Date: | Aug. 17, 2021 | |
| Publication Date: | Mar. 16, 2021 | Notice of Allowance Date: | May 11, 2021 |

## Mark Information

## Related Properties Information

## Goods and Services

## Basis Information (Case Level)

## Current Owner(s) Information

| | | | |
|---|---|---|---|
| Owner Name: | Marsh & McLennan Companies, Inc. | | |
| Owner Address: | 1166 Avenue of the Americas<br>New York, NEW YORK UNITED STATES 10036 | | |
| Legal Entity Type: | CORPORATION | State or Country Where Organized: | DELAWARE |

## Attorney/Correspondence Information

## Prosecution History

## TM Staff and Location Information

## Assignment Abstract Of Title Information - Click to Load

## Proceedings - Click to Load

Feedback

# EXHIBIT 116

English

ICANN | LOOKUP (/en)

# Registration data lookup tool

Enter a domain name or an Internet number resource (IP Network or ASN)

Frequently Asked Questions (FAQ) (/en/faq)

marsh.com

Lookup

By submitting any personal data, I acknowledge and agree that the personal data submitted by me will be processed in accordance with the ICANN Privacy Policy (https://www.icann.org/privacy/policy), and agree to abide by the website Terms of Service (https://www.icann.org/privacy/tos) and the registration data lookup tool Terms of Use (unsafe:javascript:void(0)).

For additional information on ICANN Accredited Registrars including website and contact information, please visit https://www.icann.org/en/accredited-registrars, (https://www.icann.org/en/accredited-registrars).

If the registration data you are seeking is not provided in the lookup results, please use the Registration Data Request Service (RDRS) (https://rdrs.icann.org/) to submit a request for nonpublic registration data. RDRS is intended for use by requestors with a legitimate interest in accessing nonpublic registration data.

## Domain Information

**Name:** MARSH.COM

**Registry Domain ID:** 982886_DOMAIN_COM-VRSN

**Domain Status:**
clientDeleteProhibited (https://icann.org/epp#clientDeleteProhibited)
clientTransferProhibited (https://icann.org/epp#clientTransferProhibited)
clientUpdateProhibited (https://icann.org/epp#clientUpdateProhibited)

**Nameservers:**
NS01.MMC.COM
NS02.MMC.COM
NS03.MMC.COM
NS04.MMC.COM
NS05.MMC.COM

### Dates

**Registry Expiration:** 2026-07-10 04:00:00 UTC

**Updated:** 2025-06-08 10:24:22 UTC

**Created:** 1997-07-11 04:00:00 UTC

## Contact Information

### Registrant:

**Name:** Internet Services

**Organization:** Marsh & McLennan Companies, Inc.

**Email:** internet.services@marsh.com

**Phone:** +1.2123455000

**Fax:** +1.2123455000

**Mailing Address:** 1166 Avenue of the Americas, New York, NY, 10036-2774

**ISO-3166 Code:** US

**Contact Uri:** https://domains.markmonitor.com/whois/contact/marsh.com (https://domains.markmonitor.com/whois/contact/marsh.com)

**Technical:**

**Name:** Internet Services

**Email:** internet.services@marsh.com

**Phone:** +1.2123455000

**Contact Uri:** https://domains.markmonitor.com/whois/contact/marsh.com (https://domains.markmonitor.com/whois/contact/marsh.com)

## Registrar Information

**Name:** Markmonitor Inc.

**IANA ID:** 292

**Abuse contact email:** abusecomplaints@markmonitor.com

**Abuse contact phone:** +1.2086851750

## DNSSEC Information

**Delegation Signed:** Signed

**Delegation Signer Data:**
Key Tag: 43996
Algorithm: 8
Digest Type: 2
Digest: F5E2E4BD4A8E7AA9DD424EFAA71BF0239B1A4306A1210A1F63093997A5CE9634

Key Tag: 27199
Algorithm: 8
Digest Type: 2
Digest: 641E0E4A734384DA1C81E1D19990B38224CEED10294134F326DC60558E379226

## Authoritative Servers

**Registry Server URL:** https://rdap.verisign.com/com/v1/domain/marsh.com (https://rdap.verisign.com/com/v1/domain/marsh.com)

**Last updated from Registry RDAP DB:** 2025-09-14T21:05:32Z

**Registrar Server URL:** https://rdap.markmonitor.com/rdap/domain/MARSH.COM (https://rdap.markmonitor.com/rdap/domain/MARSH.COM)

**Last updated from Registrar RDAP DB:** 2025-09-14T21:05:32Z

## Notices and Remarks

### Notices:

**Terms of Use**

By submitting an RDAP query, you agree that you will use this data only for
lawful purposes and that, under no circumstances will you use this data to:
(1) allow, enable, or otherwise support the transmission by email, telephone,
or facsimile of mass, unsolicited, commercial advertising, or spam; or
(2) enable high volume, automated, or electronic processes that send queries,
data, or email to Markmonitor (or its systems) or the domain name contacts (or
its systems).
Markmonitor reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by this policy.
Markmonitor Domain Management(TM)
Protecting companies and consumers in a digital world.
Visit Markmonitor at https://www.markmonitor.com
Contact us at +1.8007459229
In Europe, at +44.02032062220

https://www.markmonitor.com/legal/domain-management-terms-and-conditions (https://www.markmonitor.com/legal/domain-management-terms-and-conditions)

**Status Codes**

For more information on domain status codes, please visit https://icann.org/epp

https://icann.org/epp (https://icann.org/epp)

**RDDS Inaccuracy Complaint Form**

URL of the ICANN RDDS Inaccuracy Complaint Form: https://icann.org/wicf

https://icann.org/wicf (https://icann.org/wicf)

Youtube (https://www.youtube.com/icannnews)

Twitter (https://www.twitter.com/icann)

Linkedin (https://www.linkedin.com/company/icann)

Flickr (https://www.flickr.com/photos/icann)

Facebook (https://www.facebook.com/icannorg)

Newletters (https://www.icann.org/resources/pages/global-newsletter-2018)

Community Wiki (https://community.icann.org/)

ICANN Blog (https://www.icann.org/news/blog)

**WHO WE ARE**    **CONTACT US**    **ACCOUNTABILITY AND TRANSPARENCY**    **GOVERNANCE**    **HELP**    **DATA PROTECTION**

© Internet Corporation for Assigned Names and Numbers.    Privacy Policy (https://www.icann.org/privacy/policy)    Terms of Service (https://www.icann.org/privacy/tos)    Cookies Policy (https://www.icann.org/privacy/cookies)

# EXHIBIT 117

English

ICANN | LOOKUP (/en)

# Registration data lookup tool

Enter a domain name or an Internet number resource (IP Network or ASN)

Frequently Asked Questions (FAQ) (/en/faq)

marshmclennan.com

Lookup

By submitting any personal data, I acknowledge and agree that the personal data submitted by me will be processed in accordance with the ICANN Privacy Policy (https://www.icann.org/privacy/policy), and agree to abide by the website Terms of Service (https://www.icann.org/privacy/tos) and the registration data lookup tool Terms of Use (unsafe:javascript:void(0)).

For additional information on ICANN Accredited Registrars including website and contact information, please visit https://www.icann.org/en/accredited-registrars (https://www.icann.org/en/accredited-registrars).

If the registration data you are seeking is not provided in the lookup results, please use the Registration Data Request Service (RDRS) (https://rdrs.icann.org/) to submit a request for nonpublic registration data. RDRS is intended for use by requestors with a legitimate interest in accessing nonpublic registration data.

## Domain Information

**Name:** MARSHMCLENNAN.COM

**Registry Domain ID:** 639094_DOMAIN_COM-VRSN

**Domain Status:**
clientDeleteProhibited (https://icann.org/epp#clientDeleteProhibited)
clientTransferProhibited (https://icann.org/epp#clientTransferProhibited)
clientUpdateProhibited (https://icann.org/epp#clientUpdateProhibited)

**Nameservers:**
NS01.MMC.COM
NS02.MMC.COM
NS03.MMC.COM
NS04.MMC.COM
NS05.MMC.COM

## Dates

**Registry Expiration:** 2026-08-12 04:00:00 UTC

**Updated:** 2025-07-11 10:20:03 UTC

**Created:** 1996-08-13 04:00:00 UTC

## Contact Information

### Registrant:

**Name:** Domain Adminstrator

**Organization:** Marsh & McLennan Corporation

**Email:** internet.services@mmc.com

**Phone:** +1.2123455000

**Mailing Address:** 1166 Avenue Of The Americas, New York, NY, 10036

**ISO-3166 Code:** US

**Contact Uri:** https://domains.markmonitor.com/whois/contact/marshmclennan.com (https://domains.markmonitor.com/whois/contact/marshmclennan.com)

**Technical:**

**Name:** Domain Adminstrator

**Email:** internet.services@mmc.com

**Phone:** +1.2123455000

**Contact Uri:** https://domains.markmonitor.com/whois/contact/marshmclennan.com (https://domains.markmonitor.com/whois/contact/marshmclennnan.com)

## Registrar Information

**Name:** Markmonitor Inc.

**IANA ID:** 292

**Abuse contact email:** abusecomplaints@markmonitor.com

**Abuse contact phone:** +1.2086851750

## DNSSEC Information

**Delegation Signed:** Unsigned

## Authoritative Servers

**Registry Server URL:** https://rdap.verisign.com/com/v1/domain/marshmclennan.com (https://rdap.verisign.com/com/v1/domain/marshmclennan.com)

**Last updated from Registry RDAP DB:** 2025-09-14T21:06:02Z

**Registrar Server URL:** https://rdap.markmonitor.com/rdap/domain/MARSHMCLENNAN.COM (https://rdap.markmonitor.com/rdap/domain/MARSHMCLENNAN.COM)

**Last updated from Registrar RDAP DB:** 2025-09-14T21:06:02Z

## Notices and Remarks

### Notices:

**Terms of Use**

By submitting an RDAP query, you agree that you will use this data only for
lawful purposes and that, under no circumstances will you use this data to:
(1) allow, enable, or otherwise support the transmission by email, telephone,
or facsimile of mass, unsolicited, commercial advertising, or spam; or
(2) enable high volume, automated, or electronic processes that send queries,
data, or email to Markmonitor (or its systems) or the domain name contacts (or
its systems).
Markmonitor reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by this policy.
Markmonitor Domain Management(TM)
Protecting companies and consumers in a digital world.
Visit Markmonitor at https://www.markmonitor.com
Contact us at +1.8007459229
In Europe, at +44.02032062220

https://www.markmonitor.com/legal/domain-management-terms-and-conditions (https://www.markmonitor.com/legal/domain-management-terms-and-conditions)

**Status Codes**

For more information on domain status codes, please visit https://icann.org/epp

https://icann.org/epp (https://icann.org/epp)

**RDDS Inaccuracy Complaint Form**

URL of the ICANN RDDS Inaccuracy Complaint Form: https://icann.org/wicf

https://icann.org/wicf (https://icann.org/wicf)

☐
Youtube (https://www.youtube.com/icannnews)

☐
Twitter (https://www.twitter.com/icann)

☐
Linkedin (https://www.linkedin.com/company/icann)

☐
Flickr (https://www.flickr.com/photos/icann)

☐
Facebook (https://www.facebook.com/icannorg)

✉
Newletters (https://www.icann.org/resources/pages/global-newsletter-2018)

"
Community Wiki (https://community.icann.org/)

✎
ICANN Blog (https://www.icann.org/news/blog)

**WHO WE ARE**          **CONTACT US**          **ACCOUNTABILITY AND TRANSPARENCY**          **GOVERNANCE**          **HELP**          **DATA PROTECTION**

© Internet Corporation for Assigned Names and Numbers.   Privacy Policy (https://www.icann.org/privacy/policy)   Terms of Service (https://www.icann.org/privacy/tos)   Cookies Policy (https://www.icann.org/privacy/cookies)

# EXHIBIT 118

## New York, New York

1166 Avenue of the Americas

New York, NY 10036 US | Map

P: +1.917.937.3000

F: +1.917.937.3500

## Pennsylvania

### Philadelphia, Pennsylvania

30 South 17th Street, 17th floor

Philadelphia, Pennsylvania 19103 US | Map

P: +1.215.864.3600

F: +1.215.636.9929

# EXHIBIT 119



**MarshMcLennan Agency**

About ⌄  Services ⌄  Industries ⌄  Insights  Locations  Events  Careers ⌄

marshmma.com/us/locations/pennsylvania/pcs-philadelphia.html

Locations / **Philadelphia, Pennsylvania**

# Philadelphia

The Philadelphia office provides the highest caliber of personal insurance and risk management consultation. We design customized insurance programs for high-net-worth individuals, Family Offices, and small commercial. Our practice areas include individual insurance (home, auto, liability, cyber, flood, earthquake, wind, wildfire, watercraft), specialty insurance (collections, yacht, fine art, specialty vehicles, sports & entertainment, farm & ranch, aviation) and Family Office (E&O, D&O, EPL, Fiduciary Liability, Fidelity Bond, Cyber Liability) and Commercial insurance.

Philadelphia
1717 Arch Street
Three Logan Square
Philadelphia, Pennsylvania 19103

(215) 246-1000




# EXHIBIT 120



Homeowners    Best Home Builders

# Toll Brothers Reviews

1.5    332 reviews ⓘ ⌄

Write a review

How we verify our reviews ⌄

Updated Sep. 18, 2025

# About Toll Brothers

This profile has not been claimed by the company    . See reviews below to learn more or submit your own review.

Toll Brothers constructs residential properties, including single-family homes, townhomes and condominiums. Founded in 1967, it offers customizable home designs and upscale amenities. Toll Brothers operates in 24 states.

| Pros | Cons |
|------|------|
| High-quality construction materials | Poor communication from builders |
| Attention to detail in building | Warranty issues and delays |

SHOP WITH CONFIDENCE

## Compare with top companies



View profile →    View profile →    View profile →    View profile →

Sponsored

## Looking to hire a builder?

Get connected with a professional near you on HomeAdvisor

Find Pros Now

## Toll Brothers Reviews

Write a review



**Filter by Rating**

- [ ] 5    (13)
- [ ] 4    (4)
- [ ] 3    (7)
- [ ] 2    (35)
- [ ] 1    (269)

**Popular Mentions**

Staff    Customer Service    Price    Installation & Setup

Contract & Terms    Punctuality & Speed    Sales & Marketing

Coverage

Filter by City, State

How do I know I can trust these reviews about Toll Brothers?

Sort by:

Recent

**R**

**Rick**
Brighton, CO

Coverage

Reviewed Aug. 31, 2025

We spent $15000 to repair sewage, which was loud incorrectly, causing backups in our basement. Toll Bros refused to cover any of it, even they laid it improperly. We had significant wall fountain cracks and expect no coverage. Terrible builder. Never buy their homes.

**C**

**Carsha**
Houston, TX

Customer Service    Installation & Setup    Contract & Terms    Punctuality & Speed    Staff

Reviewed Aug. 24, 2025

Warning for Potential Homebuyers – Toll Brothers (Sienna, Missouri City, TX). At first, my experience with Toll Brothers in Sienna, Missouri City, Texas, seemed positive. The sales team worked over the weekend to send me a contract, and I even left a review praising their professionalism. Unfortunately, shortly after my deposit, everything changed. I specifically requested that my ACH withdrawal be made from my savings account, but Toll Brothers processed it against my checking account, causing NSF fees. I was later told this was an internal error in their ACH system, which defaults to checking accounts without disclosing this to buyers — an unfair burden on consumers. I also noticed cheap hardware and lower-end materials being installed in the home. When I raised concerns and offered to pay for upgrades, I was told it was "too late in the phase" and denied any changes. More

## Not sure how to choose?

Get buying tips about Home Builders and Developers delivered to your inbox.



Email ▶

By entering your email, you agree to sign up for consumer news, tips and giveaways from ConsumerAffairs. Unsubscribe at any time.

**A**

Customer Service

**Andrew**
Frisco, TX

Customer Service

Reviewed Aug. 19, 2025

Horrible experience with this company. Overcharge for a very standard product. Their customer service when it comes to warranty is an absolute joke. They sell you the moon to then end up fighting you almost every step of the way when they don't "meet your expectations" (that they make you feel like is unreasonable despite paying millions of dollars for the house).   More

---

**B**

**B**
Reno, NV

Customer Service     Installation & Setup     Sales & Marketing     Staff

Reviewed Aug. 13, 2025

I purchased a Toll Brothers Home in 2021. The quality of construction is horrible. It took me over 3 1/2 years to get through all of the punch list items and things that needed to be repaired. In the time I've owned my home I've dealt with four different warranty representatives. The door to my den had to be completely reframed because the doors were warped, not framed properly, and would not close properly. My house was pre-wired for surround sound in the living room.   More

---

**S**

**Shon**
Mesa, AZ

Reviewed Aug. 11, 2025

This has been the worst purchase experience of my life! I have bought many brand new homes in the valley for over 25 years and my latest experience with Toll Brothers has by far been the absolute worst! Whatever you do please don't purchase a home with this builder unless you want consistent headaches and stress! Purchasing a home is suppose to be a great experience and something to be proud of but I would rather be a renter instead of own a home with Toll Brothers! I'm very disappointed, depressed, and sad about this purchase with Toll Brothers! One of the biggest mistakes of my life!

---

**M**

**Mary**
Sparks, NV

Price     Punctuality & Speed

Reviewed Aug. 7, 2025

We love our 55+ community. Wonderful neighbors and an unending schedule of events (coordinated by Toll Bros & even more by community members). This review is a head's-up for those considering purchasing a lot where no one can build behind it & has a view (of mountains/ farm land/ etc.). BEWARE! We selected a lot, which has a view of the rolling Hills, etc. Now that the house is built, we have no view. We chose a small backyard to minimize maintenance. At the back fence line the ground pitches towards the middle of the backyard for drainage in case there is water runoff from snow/rain. That mini slope adds about a foot of dirt height from the fence to mid back yard where it levels out flat to the back of the house.   More



R

**Robert**
New Orleans, LA

Customer Service    Staff

Reviewed Aug. 6, 2025

Extremely unprofessional warranty repairs! My new sod lawn in the backyard has standing water that they won't address plus I had to purchase a lawn maintenance program to try and keep it from dying!!! New plants in my front yard are dead and they refuse to replace them? WTH?! I have made so many phone calls to different people in management and have had a big fat ZERO reply!!! What a joke 😑

T

**Tathiana**
Spring, TX

Customer Service    Sales & Marketing    Punctuality & Speed    Staff

Reviewed Aug. 5, 2025

I don't normally leave reviews, but my experience with Toll Brothers has been nothing short of a nightmare, and future buyers deserve to be warned. From the start, the sales team promised luxury, quality, and professionalism. What we got was poor craftsmanship, and a complete lack of accountability. Communication was abysmal throughout the process. Weeks would go by without updates, and when we finally heard from someone, it was either a vague excuse or a new timeline that never stuck.    More

N

**Nicole**
Kansas City, MO

Contract & Terms

Reviewed July 31, 2025

RUN! And run FAST from this company! This company only thinks about themselves. Even if you fulfill and follow your contract, they will not follow what is in the contract. This has been the worst homebuying experience!

R

**Rafael**
Orlando, FL

Reviewed July 30, 2025

I had several issues with the service and warranty of the Alarm system. I don't recommend their service, too difficult to get a hold of and never solve the issues. Try other company for your alarm system. Don't use Toll Brothers.

First          1    2    3    4          Last

# Toll Brothers Company Information

Company Name:    Toll Brothers

Website:    www.tollbrothers.com

# EXHIBIT 121

# Toll Brothers Reviews

## Filter by Rating



- ☐ 5 ★★★★★ (13)
- ☐ 4 ★★★★★ (4)
- ☐ 3 ★★★★★ (7)
- ☐ 2 ★★★★★ (35)
- ☐ 1 ★★★★★ (269)

## Popular Mentions

- Staff
- Customer Service
- Price
- Installation & Setup
- Coverage
- Contract & Terms
- Punctuality & Speed
- Sales & Marketing

⊙ Filter by City, State

Write a review

# EXHIBIT 122

13 min read · Oct 2, 2019



Jeremy Smith (JeremySaid)    Following ⌄

( ▶ ) Listen        ⬆ Share        ••• More

## Our Dream Home By Toll Brothers That Turned Into A Nightmare



.   .   .

**Finding Our Dream Home**

Starting in 2017 and continuing for over a year into late 2018, my wife Tanya and I searched for our dream home. We looked at countless homes for sale. We were tired, jaded, and almost at the point of giving up on our house search for a while.

One morning on our way back from breakfast, we decided to pull into a new community that we had passed every day for the last several months. It was a Toll Brothers community in Apex, NC called Regency at White Oak. The sign out front said "New Homes Starting at $485,000" or something of that nature. I remember the number being in the high 400's. And that was within our budget.

We stopped in the sales office and looked at some of the floor plans. We soon realized that the majority of the homes were ranch-style homes, and some lots accommodated a basement. This was exactly what we wanted! That type of home is rare in the Triangle.

My wife and I both immediately knew that we had found what we wanted. Even though we both knew there were certain risks to building a home (vs. buying a spec home), we decided to take the plunge.

On October 21st, 2018, we signed a contract to build a home with Toll Brothers. We were very excited. We paid a total initial deposit of $72,023 dollars. 5 percent of this, 10 percent of that. 20 percent of total design center upgrades etc etc etc. It felt like all I was doing was stroking checks.

We knew we would have to get a loan to purchase the home. And we knew that there were lots of choices and decisions for us to make. And we learned that

the house would be ready in 9 to 12 months. What we didn't know, though, was that Toll Brothers would turn out to be the corporate version of Michael Myers from Halloween.

.   .   .

**Breaking Ground**

We had worked for many years trying to save money and had been looking forward to this very day and starting this process. My wife and I are fairly laid back and mostly try to live a drama-free life and make the most out of every day.

So, we were on our way to building our dream home. The home where we planned to spend the rest of our lives. We would get to pick out every detail to our own liking (meaning that I would get to go along with whatever my wife chose). Toll Brothers told us it would be 3 to 4 months before all the paperwork (permits) came back from the town. And then we would start to see the house going up.



Sometime in January or February, they broke ground. Even though we knew the building process would be slow, we started to see progress made faster and faster right before our eyes. We started to visit the house every few days. Our anticipation and excitement began to grow.

After completing the process of making selections at the Toll Brothers design center, our daily conversations at home started to shift to how we were going to decorate certain areas of our new home. From new furniture to different artwork to what we were selling on Craigslist because "it just won't fit in the new place." It was an exciting time for us.

### Things Start Slipping

Toll Brothers assigned us a construction manager to watch over the entire process. His name was Enzo Salidvar. At first, he communicated with us regularly by phone and seemed very nice. At first, we had a monthly phone

call, but later it became a weekly call once the construction broke ground.
Since it was mainly a status update, and I was often at work, my wife usually
took the calls.

However, around July 4th, we noticed that things they promised would be done
or that would be taken care of started to slip. My wife and I tried to stay on top
of things, but we started to notice more and more details that weren't being
handled or promises that weren't fulfilled. The more I read and investigated
online, the more I learned that some of these things are normal and it's part of
the stress that comes along with building a new house.

Again, my wife and I are laid back and normally go with the flow. We avoid
drama. But I had this feeling deep down that unless we started pointing out to
Toll Brothers the details that were being overlooked, they wouldn't get fixed.
For example, in the photo below, you will see where Toll Brothers installed the
wrong grout in the tile backsplash. I noticed that the fixes (like this one) were
getting more and more complicated.



Example of the grout used with backsplash — made the design look completely different



A view of the kitchen from the living room

. . .

**The Living Nightmare Begins**

In the middle of the summer, the journey of building our dream home, which up to then was bearable, turned into a living nightmare that I wouldn't wish on my worst enemy.

In addition to monitoring the construction process and making selections, as well as arranging to move into the new home, we learned that it is also important to stay on top of your credit during this process.

Around the second week of July, something popped up on our credit report. When I looked into it, the credit agency said it was due to a late payment. That was almost impossible since I was watching my credit like a hawk and knew that I could not afford any late payments.

Nonetheless, the item lowered my credit score by more than 100 points. In turn, that brought the loan approval process to a screeching halt. Luckily, one phone call to College Foundation quickly fixed the problem. The next day it came off of the credit report, and my credit score was back up to where it needed to be. Problem fixed.

I thought I would be proactive, so I discussed this with the Toll Brothers sales manager, Coleen Fairclough, and the Project Managers. I wanted to let them know that it had happened and that I had taken care of it. Looking back, though, from that point forward, the relationship with Toll Brothers seemed distant and even uncomfortable at times. Had I been blackballed by Toll Brothers?

At some point in late July, my wife received the weekly call from Toll Brothers. Unbeknownst to her, that was a very important call. About our closing date. Instead of proposing a closing date and asking us if it made sense, given any plans we might have, they simply told my wife the closing date would be August 26th.

You should know that my wife's native language is Spanish, and while she does ok with English, in a pressure situation like that, she didn't really know what to say. Unfortunately, I was unavailable because I was tied up with an urgent work issue. Had I been on the phone, I would not have agreed to that date, since we were planning to be out of town that week and the following week.

I firmly believe Toll Brothers took advantage of my wife and her inability to

understand what they were saying and what it meant for us.

. . .

**First Major Issue**

Around August 9th, another 30-day late payment showed up on my credit report. This time it was Toyota. Once again, it was another mistake by an automated system. This one, though, would take a bit more effort to resolve. Nonetheless, I started to gather all the information and bank records that I needed to show that it was an error.

The issue required me to send a written statement detailing what was going on and why it was incorrect. I had to fax the information to a resolution specialist at Toyota, who would then review it. Toyota told me that there were several other cases ahead of me, but that it would be assigned to someone on the credit review team and a decision would be made very soon. However, no one could tell me exactly how long that would take. Since I had all of the documentation they needed, and the computer mistake was obvious, it should be an easy resolution.

At that point, I felt it was prudent to have a face-to-face meeting with Toll Brothers. So I went to the Toll Brothers office. I reminded the senior PM that I quickly took care of the first issue with my credit (not my fault). I told him I was doing everything I could with the second issue with my credit (also not my fault).

It didn't seem to matter to him. Instead, he explained in very blunt terms what would happen if we didn't close on August 26th: Toll Brothers would send us a default letter; we would get 7 days to cure the default (in other words, to close); if we didn't close, they would terminate our contract and keep our deposit

money. Period.

I explained that we weren't asked, but told when our closing date would be. And that my wife would have said something during that phone call if she had known the closing date couldn't be moved, but again, English is not her first language. I asked if there was any way to move the closing date, since we had plans to be out of town that week, and we would have to cancel travel arrangements. He said it was impossible; there was nothing they could do. "Once it's in the system, it can't be changed under any circumstances." It was a firm No. I found all of that very hard to believe

It was clear that they were focused on THEIR closing, not what was happening in MY life. Although I had done nothing wrong, it felt a lot like I had been called to the principal's office and scolded (or suspended) for something I didn't do.

That's when I started to feel like just a number. There was a complete absence of any humanity in the process. I remember thinking to myself, "Am I really just dealing with soulless number crunchers?"

A few days later, in the midst of all of this upset and confusion, I got an email from the lender. It said that our closing date was set for August 30th, and they would need a few additional details, etc.



Now I was really confused! My anxiety was heightened and blood pressure was rising each day. I asked the Toll Brothers sales manager and project manager and neither told me if the closing date was the 26th or the 30th. Since my lender was one of Toll Brothers' preferred lenders, I just figured they had moved the closing date back a couple of days. Maybe everything would work out ok?

. . .

**The Punch To The Gut**

On Friday, August 23rd, I went to the Toll Brothers sales center and spoke to the Senior PM, Devereaux Hamilton. I asked him if there were any updates on the closing date. I also asked when we would do our final walkthrough of the house, given that August 26th was a Monday.

He asked if my lender was ready to close. I told him what they last told me: they were still gathering everything. Devereaux's reply was something along the lines of, "I guess we can't close until they have everything ready." That was actually a bit reassuring. It sounded like we had a little breathing room. He also mentioned that we would do the final walk through the same day as the closing. (I had heard that that is common.)

That evening, I received an email from Devereaux. He confirmed our discussion that my loan was in underwriting, and they hoped to be ready to close by the 30th. Oddly, he stated the closing was still set for the 26th. But when he next stated that they would send out paperwork on Monday pertaining to the next steps, I figured that that paperwork would settle the issue regarding closing sometime between the 26th and the 30th. Again, I thought things were ok.

. . .



Monday, August 26th arrived. I had no idea whether we were supposed to be closing that day or not. I didn't hear anything from Toll Brothers. I didn't hear anything from our lender. So I assumed we wouldn't be closing that day. Then, at 5:35 pm, my wife and I received an email with the subject line: "Notice Of Default."



.   .   .

My first thought was…



This was the "paperwork pertaining to next steps"?!

**Toll Brothers**

AMERICA'S LUXURY HOME BUILDER®

August 26th, 2019

**VIA ELECTRONIC AND OVERNIGHT MAIL**
Mr. Jeremy Smith and Ms. Tanya Daniela Lopez Ledesma

Re:    Regency at White Oak Creek
       Lot 54

Dear Mr. Smith & Ms. Ledesma

Please be advised that you are in default under your Agreement of Sale because of your failure to close as scheduled on August 26th, 2019.

The terms of the Agreement of Sale provide (7) seven days to cure your default. If you are unable to close on the home by Sept 3rd, 2019, Toll Brothers will be entitled to pursue its rights and remedies including, but not limited to, retaining all monies paid on account of the purchase price, collecting any outstanding promissory notes and conveying the property to others, free of any interest you may have had in the property. Please contact me as soon as possible to schedule closing.

Thank you for your prompt attention to this matter.

Sincerely,

Deveraux Hamilton
Senior Project Manager – Toll Brothers

Per the notice of default, my wife and I had 7 days to cure our default for failing to close. Otherwise, Toll Brothers would keep our deposit and maybe sell our house to somebody else. In other words, the clock was ticking and the race was on!

I started calling Toyota daily, seeking updates from their resolution specialist. I asked if there was anything else I could do or send. They told me it was assigned to someone but hadn't been closed out yet.

Just imagine the anxiety growing and growing as we sat and waited to hear back from Toyota. There was absolutely nothing we could do. It was not within our control. We begged and pleaded with Toll Brothers to give us just a few days extension, but our requests fell on deaf ears. Our lender asked Toll Brothers for a 10-day extension. The request was denied. Our lender asked Toll Brothers for a 5-day extension. It was also denied.

Labor Day fell on Monday, September 3rd, so nobody was around the Toll Brothers office. On September 4th, late in the afternoon, we got an email from Toll Brothers saying that they had terminated the contract. I was traveling for business and didn't open the email until the next morning, September 5th. It also happened to be my 45th birthday. I couldn't help but think, "Happy birthday to me 🥲."



It got worse. According to Toll Brothers, the contract says that they can keep

ALL of our deposit money (which totaled $72,023).

Then, on top of that, they enclosed another document, a promissory note, saying we owed the additional amount of $24,650. Thankfully, they wished me the best in the future.



**Toll Brothers**
AMERICA'S LUXURY HOME BUILDER®

**VIA ELECTRONIC AND OVERNIGHT MAIL**
(jeremy@jeremysaid.com and tanyalopezdesigns@gmail.com)
Mr. Jeremy Smith and Ms. Tanya Daniela Lopez Ledesma

Re:    Agreement of Sale dated October 15, 2018 between you and Toll NC II, LP
       ("Toll") for Lot 0054 in the community known as Regency at White Oak Creek
       (the "Agreement")

Dear Mr. Smith & Ms. Ledesma:

This letter is written in connection with the Agreement of Sale between you and Toll NC II, LP at Regency at White Oak Creek. This will confirm that the Agreement of Sale has been terminated as you have failed to cure your default and close on the home during the cure period.

Pursuant to the terms of the Agreement of Sale, Toll is entitled to retain all deposit money. Additionally, the Promissory Note that you executed in the amount of $24,650 is now due and owing. Please remit a check in the amount of $24,650 payable to Toll NC II, LP to my attention within ten (10) days to avoid any interest and fees that accrue with the Note.

I regret that this transaction did not work out and I wish you the best in the future.

Sincerely,

Deveraux Hamilton
Senior Project Manager – Toll Brothers

**The Knockout Punch**

On September 11th, I received a call from Toyota. Everything had been cleared up, and I would be getting something in the mail in a few days. Great! (Right?)

I immediately checked the credit reports. Yes, the late payment entry was gone, and the credit report was updated. My credit score was back up to where it needed to be!

My next call was to my lender. Within an hour I got the green light to move forward with the loan to buy the house. I was excited to say the least. I immediately emailed Toll Brothers and asked what the next steps would be and if we could get things back on track. Here was their response:



Not only did they cancel the contract and deny all of my requests for extensions, then keep all of the deposit money and ask for another $24k on top of that. The cherry on top: an email essentially saying, "Sorry, your house has been sold to another buyer. We wish you well."

If there was an international symbol for your heart being ripped out of your chest and stomped on, that would go here. My wife was in tears. I was speechless.

.   .   .

The picture of the house above is the finished product and the result of working for 10 months with Toll Brothers and many of the people that work there to get it just right. It's a one-of-a-kind.

I wish with all my heart that I could say that the picture above is our house. For 10 months and what seemed like almost every day, we stopped by and saw our house and how things were going. It was our house. For some reason, it still feels like our house.

Today, I sit here with a heavy heart, writing to you in hopes of finding some closure during this emotional rollercoaster. I also hope that my experience will help other homebuyers navigate the complexities of these extremely one-sided contracts with an understanding of the possible negative outcomes that can arise without much warning.

**In Summary**

- We signed a contract with Toll Brothers to build a house in Apex, North Carolina. The total price was approximately $805,000.

- During a call with Toll Brothers in late July, my wife was told (not asked) that the closing date was Aug 26th (a date we had plans to be traveling out of town).

- A reporting error by Totota to the credit agencies 30 days prior to the closing date delayed the loan process.

- I immediately went to Toll Brothers and told them of the situation and that I was working on a resolution.

- From that day on, instead of trying to work with us, Toll Brothers did the opposite. Without remorse or any feeling. It's as if we ceased to exist.

- From that day on, we stopped getting the weekly update call from Toll Brothers. We learned from neighbors and folks working on the house that Toll Brothers was showing it to other couples.

- Our lender asked Toll Brothers for a 10 day and a 5 day extension of the closing date. Toll Brothers denied both requests.

- Rather than working with us, Toll Brothers sent us a default letter and gave us 7 days to cure.

- I did everything in my power to as quickly as possible resolve the error caused by Toyota. And I kept Toll Brothers fully informed.

- Toll Brothers didn't care — they terminated the contract and kept our $72,000 deposit.

- Knowing we were close to fixing the problem, Toll Brothers sold the house to another couple — after we'd spent 10 months working with them to build it.

Today, we find ourselves without a new home. Instead, we have a canceled contract from Toll Brothers, which kept everything we put down, and which wasted no time in selling our house to somebody else.

Building our dream home with Toll Brothers turned out to be a nightmare.

Real Estate     Toll Brothers     Buying A Home     Home Buying



Following ⌄

# Written by Jeremy Smith (JeremySaid)

3.4K followers · 3K following

Analytics & CRO . We guide marketers that work in startups & SAAS businesses through a proven framework to save time doing only what works in digital marketing.

## Responses (10) 

To respond to this story,
get the free Medium app.

**Open in app**

 **Tom Dunson**
Mar 24, 2021                                                  •••

No where did I read any mention of having a real estate agent. You seem to do your due diligence in reading about the closing process of new construction but you didn't come across any articles about how you need a real estate agent to act in your... more

 60

**Phil Buckley**
Oct 3, 2019                                                   •••

Wow, and I thought our experience with CalAtlantic (now Lennar) was a lot of work. I guess the moral to the story is - if you are using a builder who makes their money off volume rather than happy

customers — beware. They are after the money and…, more

 6    1 reply

 Raj Kundra
Nov 13, 2023    •••

Hi Jeremy we are in the same situation We had to back out of a cotract because of the current interest rate hikes. The closing was supposed to be in a month. Wife was laid off from job. They are keeping the earnest deposit and 5% note that totals…, more

 3    1 reply

See all responses

## Recommended from Medium



Open in app ↗

# Medium

  

 In Long. Sweet. Valuable. by Ossai Chinedum

## I'll Instantly Know You Used Chat Gpt If I See This

Trust me you're not as slick as you think

 May 16    •••



 Jordan Gibbs

## ChatGPT Is Poisoning Your Brain...

Here's How to Stop It Before It's Too Late.

 Apr 29    •••





In The Pub by Smillew Rahcuef

## I'm 63—If You're Still in Your 40s (Or 50s), Read This

(it's a listicle)

✦ May 29 ⋯



 NidoDesigns

 NidoDesigns

## How Ordinary People Become High Performers: 10 Key Habits

"I used to think high performers were just 'lucky'—until I spent a month shadowing a CEO, a pro athlete, and a bestselling author. Turns…

May 28                                                                  •••



 In BeingWell by Michael Hunter, MD 

## 10 Tiny Habits That Make You Healthier, Calmer, and Harder to Ki

As a cancer doctor and over-60 bodybuilder, I live by simple, science-backed changes. Most people want better health, but they also need…

✦ May 9                                                                 •••





In The Startup by Divad Sanders

## 4 Boring Startup Ideas Screaming to Be Built (and How to Build Them)

Build the unsexy thing. Charge for outcomes. Repeat.

Apr 7                                                                              •••

See more recommendations

# EXHIBIT 123

r/RealEstate • 2 yr. ago
DISGRUNTLED_TB_BUYER

# TOLL BROTHERS FALLS SHORT AND COSTLY!

TOLL BROTHERS FALLS SHORT AND COSTLY!

BEWARE OF TOLL BROTHERS!!!

Buyer Beware, Toll Brothers is an amazing company to work with initially, but, unfortunately, after they get your money and commitment, it only goes downhill.

We never planned on buying a Toll Brothers home in Florida, but ended up buying through them because of their amazing service from the sales representative who was very attentive and patient.  This continued with the rest of the purchase process with picking options, etc. Unfortunately, once that was done, and they got our money and contracts, it all went downhill. Our new house, which was originally supposed to be a 14 month build, kept getting pushed back.  Every guesstimate was missed from 15 months to 16, then to 18, to 20, to 22 months, and we are still counting.  At this point we are looking at probably a 25+ month delivery.  We continued to stress over and over the consequences of these delays, i.e. us losing our 3.75% rate lock in a market with rates currently over 6%, but to no avail.  We have also tried for over 5 months to try to get someone higher up at Toll Brothers to work with us to make this right, and as you would expect, radio silence, not even a response.

In summary, Toll Brothers feels like any other scam, they get your money, and then it's all downhill from there.  I would not recommend going with them at this point given my experiences and that of others I know. I can't even imagine what the process will be to get them to fix things in the house that they messed up once its finished building. With the high dollar amount you pay for Toll Brothers, you expect a higher level of integrity and character, but this has not been the case!!

-UNHAPPY AND DISGRUNTLED TOLL BROTHERS BUYERS

⬆ 5 ⬇    💬 5    🏆    ↗ Share



Sort by:  Best ⌄        🔍 Search Comments

---

AsH83 • 2y ago

All builders are running behind due to shortages. You should be happy they are not cutting corners with the build.

We do have a TB house and very happy with the outcome. Luckily ours closed in 2021 but it also took them 20 months instead of 12 as promised.

⬆ 5 ⬇    ↩ Reply    ⇄    🏆 Award    ↗ Share    ⋯

AutoModerator **MOD** • 2y ago

Your comment was removed either because you do not have enough karma or your account is under a week old.

*I AM A BOT, AND THIS ACTION WAS PERFORMED AUTOMATICALLY. PLEASE CONTACT THE MODERATORS OF THIS SUBREDDIT IF YOU HAVE ANY QUESTIONS OR CONCERNS.*

⬆ 1 ⬇    ↩ Reply    ⇄    🏆 Award    ↗ Share    ⋯

novahouseandhome • 2y ago

It sucks, but they're probably operating within the contract terms, terms you agreed to.

If they haven't fulfilled the contract terms, it's time to get an attorney to help you enforce the terms, or help you exit the contract.

⬆ 2 ⬇    ↩ Reply    ⇄    🏆 Award    ↗ Share    ⋯

**New to Reddit?**

Create your account and connect with a world of communities.


Continue as Jeffrey
jeffwgu@gmail.com ⌄

✉ Continue with Email

📱 Continue With Phone Number



By continuing, you agree to our User Agreement and acknowledge that you understand the Privacy Policy.

---

r/RealEstate • 4 yr. ago
Toll Brothers experiences?
10 upvotes · 13 comments

r/RealEstate • 3 yr. ago
Are Toll Brothers really as bad as some people say?
80 upvotes · 136 comments

r/RealEstate • 3 yr. ago
How does Toll Bros fare as far as meeting promised completion dates?
2 upvotes · 18 comments

r/RealEstate • 5 mo. ago
Toll brothers denied my outside inspector
42 upvotes · 28 comments

r/RealEstate • 4 yr. ago
Toll Brothers
285 upvotes · 123 comments

r/RealEstate • 5 mo. ago
Toll Brothers
2 upvotes

r/RealEstate • 1 yr. ago
Toll Brothers home pricing
36 upvotes · 118 comments

r/bayarea • 2 yr. ago
For those of you who have bought a home from Toll Brothers, how has it been and is there interest rate for real?
19 upvotes · 11 comments

r/homeowners • 1 yr. ago
Toll Brothers builders
6 comments

r/orangecounty • 7 mo. ago
New toll brother homes in Placentia
20 upvotes · 27 comments

Skip to main content



 **r/RealEstate** ✕    Search in r/RealEstate



🔍    Get App    Log In

**Home**

**Popular**

**Answers**  BETA

**TOPICS**

Internet Culture (Viral)

Games

Q&As

Technology

Pop Culture

Movies & TV

See more

**RESOURCES**

About Reddit

Advertise

Reddit Pro  BETA

Help

---

**gksozae** · 2y ago

I think Toll Brothers is purposely delaying your home construction. Why wouldn't they

There's no way this isn't a scam and they're just trying to grab your money and run. They have no intention of building your home and they want you to cancel the agreement so they don't have to build it.

⬆ 1 ⬇    💬 Reply    ↪    🏅 Award    ↗ Share    ⋯

**TNLVZN** · 2y ago

I own a toll home and there's a no bad mouthing them on social media clause in the contract too.

⬆ 1 ⬇    💬 Reply    ↪    🏅 Award    ↗ Share    ⋯

---

🏠 r/RealEstate · 2 yr. ago

Y... ... ... you want a

🏠 r/RealEstate · 1 yr. ago

Pulte / Toll Brothers new home negotiations

3 upvotes · 24 comments

🏠 r/RealEstate · 4 yr. ago

How do you determine who are quality builders?

5 upvotes · 8 comments

🏠 r/RealEstate · 2 mo. ago

Nervous about buyer backing out

41 upvotes · 34 comments

🏠 r/RealEstate · 2 mo. ago

Don't think I'll ever afford a home

3 upvotes · 71 comments

🏠 r/RealEstate · 2 mo. ago

Buyers are a shitshow

90 upvotes · 41 comments

🏠 r/RealEstate · 2 mo. ago

Buyers financing didn't go through

120 upvotes · 97 comments

🏠 r/orangecounty · 2 yr. ago

Regrets on buying a new construction home?

59 upvotes · 94 comments

🏠 r/taxpros · 2 yr. ago

Successful biz turnaround

57 upvotes · 17 comments

🏠 r/lotus · 2 yr. ago

Another god damn delay for US & Canada Markets

21 upvotes · 26 comments

🏠 r/investing · 10 mo. ago

Thinking of adding $TOL to portfolio

21 comments

🏠 r/FirstTimeHomeBuyer · 2 yr. ago

A strong offer, but a weak foundation

17 upvotes · 9 comments

🏠 r/RealEstate · 18 days ago

Any Advice

6 upvotes · 8 comments

🏠 r/RealEstate · 1 yr. ago

Why are new construction homes so expensive?

expensive?

33 upvotes · 128 comments

 r/RealEstate · 4 yr. ago

Toll Brothers / New Construction: Can I really tell my lender to go pound sand?

6 upvotes · 22 comments

### r/RealEstate

HomeOwners & Investors

real estate investing landlords landlord borrowing lending mortgages foreclosure loan houses house apartment financing… loans buying a house foreclosures foreclosure forbearance home buying homebuying first time homebuyer

Show more

2.4M
Members

---

TOP POSTS

 Reddit

reReddit: Top posts of May 3, 2023

 Reddit

reReddit: Top posts of May 2023

 Reddit

reReddit: Top posts of 2023

Reddit Rules  Privacy Policy  User Agreement

Accessibility  Reddit, Inc. © 2025. All rights reserved.

# EXHIBIT 124



Cold_Ad103

Anyone from Sienna purchased from them what's your experience? What can I do? Simply heartbroken and tired of the pushback. They aren't listening. I have a bad feeling they're just going to do the minimum and patch it up.

⬆ 5 ⬇    💬 37    🔖    ↗ Share

Sort by:  Best ∨    🔍 Search Comments

bobbyDBLTHICCCkotick • 8mo ago

yeah I dunno dude, pick and choose. Lol there is some things that are probably a bit reasonable, but like the drips on the fuckin plentum? come on dawg, the fuckin lil dent, the tape? Like all I am saying is educate yourself on actual issues so you don't get dismissed immediately and cause yourself more issues dealing with getting the LEGIT ones takin care of. Best of luck.

⬆ 55 ⬇    💬 Reply    ↗    🏅 Award    ↗ Share    ⋯

  2 more replies

coolest35 • 8mo ago

Curious whom the group thinks makes good million+ dollar homes?

⊖ 13 ⊕    💬 Reply    ↗    🏅 Award    ↗ Share    ⋯

  Teutonic-Tonic • 8mo ago

  Small custom builders.

Continue as Jeffrey
jeffwgu@gmail.com

✉ Continue with Email

Phone Number

to our User Agreement
understand the Privacy

r/electricians • 4 mo. ago
Guys I think I found the problem.
141 upvotes · 32 comments

r/electricians • 2 mo. ago
First time seeing this is a home inspection
91 upvotes · comments

r/electricians • mo. ago
Came across this today. Homeowner apparently did this
600 upvotes · 165 comments

r/electricians • mo. ago
Who installed this
115 upvotes · 64 comments

r/electricians • 4 mo. ago
Homeowner Special
675 upvotes · 138 comments

r/electricians • 4 mo. ago
Do you guys ever sign equipment you install?
116 upvotes · 58 comments

r/electricians • 5 mo. ago
File this under, "There was a better way but I didn't see it… until I was commited
120 upvotes · 66 comments

r/electricians • 1 mo. ago
I hate working on old homes.
294 upvotes · 49 comments

⬆ 26 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**B1ack_Iron** • 8mo ago

We used a local architect then took those plans to a local well regarded custom design and build contractor. Our house was beautiful and sold a little over 1.3 when we decided to move. Still had tons of little issues on the punch list but they were super accommodating about everything that was wrong.

⬆ 5 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**OccasionOk8478** • 8mo ago

Interesting question - near me TriPointe homes and Empire homes make beautiful 1m homes (Charlotte NC).

⬆ 4 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

⊕ 1 more reply

**caveatlector73** • 8mo ago

Builders are required to install according to manufacturers specifications. If they did and there are still problems then the manufacturer is on the hook. If the builder did not install correctly that is on them. Some of the problems will not effect performance. The dent in the water heater is annoying in a new home, but not the worst thing.

Work is generally warranted for a period of time. No idea where you are in regards to that. What does your contract say? The contract is the legal document spelling out what is required of the builder, of you, and how disagreements are to be settled.

⬆ 18 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**ScrewJPMC** • 8mo ago

🐻

Lenar Ryan Toll

You got the fucking you signed up for

⬆ 35 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

⊕ 3 more replies

**66mindclense** • 8mo ago

File warranty claims and keep at it. Call corporate and be the squeaky wheel. I have a neighbor getting new stucco which I need due to shingles being improperly installed. It has been a nightmare but I trying to be the squeaky wheel.

⬆ 4 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**spentbrass1** • 8mo ago

Buying a Ford and expecting a BMW quality

⬆ 11 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

⊕ 1 more reply

**[deleted]** • 8mo ago

Holy first world problems Batman

⊖ 9 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**golfballthroughhose** • 8mo ago

God forbid they have expectations of the products they have spent their life savings on...

⬆ 2 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**Fit-Relative-786** • 8mo ago

What does your contract say?

⊖ 4 ⬇   💬 Reply   ↗ ⚡ Award   ↪ Share   •••

**Cold_Ad103** OP • 8mo ago

r/shitrentals • 5 mo. ago
landlord doubling as bob the builder
35 upvotes · 40 comments

r/electricians • 6 mo. ago
New construction. Spot the issue
307 upvotes · 159 comments

r/electricians • 3 days ago
Dumb homeowners
122 upvotes · 33 comments

r/ r/Homebuilding • 2 mo. ago
Contractor did not finish work and will not return calls/text - help needed.
23 upvotes · 44 comments

r/electricians • 3 mo. ago
In House Build
73 upvotes · 13 comments

r/AusRenovation • 17 days ago
[Update] Electrician installed external wiring - is this a good… job? Seems average..
91 upvotes · 99 comments

r/electricians • 3 mo. ago
Owner accepted quote to redo this beatdown I posted a coupl… weeks ago. New access point so that the new box is accessible.
46 upvotes · 5 comments

r/electricians • 3 mo. ago
Going din rail and terminal blocks for terminations
Just a small panel install today for a home
63 upvotes · 50 comments

r/GeneralContractor • 11 days ago
I am working on getting licensed as a general contractor. Wanted to make sure I am doin… this right & looking for advice. Thanks in advance
27 upvotes · 6 comments

r/electricians • 9 mo. ago
New to being a foreman. Need advice.
4 upvotes · 17 comments

r/Rollerskating • 10 mo. ago
Don't know how to fix my trucks?
1 upvote · 5 comments

r/askaplumber • 10 mo. ago
Need sump pump, don't know where to start
1 upvote · 3 comments

 **Cold_Ad103** OP · 8mo ago

It's being reviewed by someone to see what can be done, but I it may be subject to inspection. I'll know more tomorrow.

⬆ 5 ⬇    💬 Reply    ⤴    🏅 Award    ↗ Share    ...

6 more replies

 **Independent58** · 8mo ago

As some have indicated (and assuming you had the home built and within the first year since built) make a list (preferably in a spreadsheet) noting issue, location, type of issue (ie electrical, hvac, etc) and a column for when the issue was resolved. Being in a spreadsheet allows you and the builder to sort this way. The builder can hand the subcontractor (for example, the electrician) his list of fixes versus sifting thru a list of all, which should help expedite. As you find things, add to the list and send to the builder weekly or bi-weekly. The list and dating will also be helpful if you need to go to an arbiter or lawyer some day.

Persistence is key. And for the builder to know you are organized and focused on resolution. Yes, you may meet resistance or delays. Hopefully, initially, you would at least get some notice of activity for some. As things are addressed (and as they are speaking with builder and subcontractor as to how they will be resolved, so you are comfortable with the correction). With dings in the heater example, I would say confirm that the unit is working properly and comes with a manufacturer warranty first. If it's in fine order, then I say list it, but I wouldn't make it a high priority. If there was a ding on a refrigerator door, then that due to cosmetics and appearance in a kitchen is a bigger deal.

Your contract with the builder should have clauses as to issues, their remediation, timing and arbitration. If it's the builder's contract, then you should expect their lawyers allowed wiggle room for the builder or it was drafted based on your county, city or state's requirements by law.

We had a 3rd party inspector at every major phase of our home's construction (ie foundation, framing, electrical/plumbing), at prior to close and at 11 months post completion. Builder was given a copy of each report and any items went on the spreadsheet. Also for the items you have identified in your pictures, having a 3rd party opinion on each can give peace of mind of what to be concern with or add fuel to your original concern as you discuss with the builder. BTW, a 3rd party inspector is not super expensive.

Again, persistence is key with regular email status on progress (i.e., update spreadsheet with completed or added items). If you don't get a response after a reasonable amount of time or the time to remediate the agreed to items is overtly delayed, then you can resort to pulling the lawyer cord. The builder is already aware you are organized with your list, that you have documented emails on the topic and you have reached out to him with regularity. And rather then say at that point I am getting a lawyer (because you may not need one and empty threats only hurt your cause). You say in your final email, "I have not heard back from you on the remaining items on the list. If I don't hear back from you by the end of next week, I will assume you are disputing these items, and then I will take it from there." It indicates lawyering without saying it. It also could indicate going to the Better Business Bureau. Using the word dispute is key as that is a key word in most arbitting clauses in construction contracts.

⬆ 4 ⬇    💬 Reply    ⤴    🏅 Award    ↗ Share    ...

 **Royp212** · 8mo ago

Get a lawyer asap. Seeing quite a bit of shoddy work in Sienna by Toll, Perry, Lennar etc in the price range of $900k +

⬆ 3 ⬇    💬 Reply    ⤴    🏅 Award    ↗ Share    ...

1 more reply

 **Adorable-Address-958** · 8mo ago
📋 Top 1% Commenter

Hire a lawyer and go from there. Toll brothers makes a shit product.

⬆ 2 ⬇    💬 Reply    ⤴    🏅 Award    ↗ Share    ...

 **Zealousideal-Arm4892** · 8mo ago

I work for a water company in Maryland and we did a job with toll brothers, they used a contractor to install the water and sewer lines for the development which I oversaw. Good luck with them, they are greedy and will do everything they can to not come fix an

 r/NSUT_Delhi · 1 yr. ago

Nsut first year don't know what to do

20 upvotes · 17 comments

 r/BmwTech · 9 mo. ago

Help with my dads 435l

12 upvotes · 11 comments

 r/electricians · 10 mo. ago

Saw this gem at a job site today

479 upvotes · 62 comments

 r/electricians · 1 mo. ago

Client said his friend did electrical.

109 upvotes · 35 comments

r/HomeNetworking · 9 mo. ago

Having issues with roaming and dont know what else to do

4 comments

**r/Homebuilding**

Homebuilding

This sub is for discussion and questions concerning all aspects of the home building process - whether in a development by a large builder, custom homes, or DIY projects. While the perspective is generally that of the (future) homeowner, topics from Show more builders and contractors are welcome. NSFW content will result in a ban. Self-promotion and ads are not permitted. No politics.

227K
Members

TOP POSTS

 Reddit

reReddit: Top posts of November 15, 2024

 Reddit

reReddit: Top posts of November 2024

 Reddit

reReddit: Top posts of 2024

Reddit Rules  Privacy Policy  User Agreement

Accessibility  Reddit, Inc. © 2025. All rights reserved.

Skip to main content



issue and to shed their liability.

⬆ 2  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

1 more reply

Atleast you didn't get the Weyerhaeuser TJI formaldehyde lawsuit be thankful for that!

⬆ 2  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

Rispgiu01 · 8mo ago

Doubtful they would, but even if they were to fix all of these issues, would you still feel comfortable at buying this home?

⬆ 1  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

cantcatchafish · 8mo ago
🗂 Top 1% Commenter

I see two problem pictures.. the leak and the rust.

⬆ 1  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

g0bey0ndplusultra · 8mo ago

Cy Poter of Cy Fy Inspections on Instagram could be helpful. He just posted a video about Toll. Wish you the best of luck.

⬆ 1  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

Conscious-Rush-1292 · 8mo ago

Shawty work most likely using interior nails

⬆ 1  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

No-Establishment4039 · 8mo ago

If it's a new builds u should have an inspection before occupancy and then also another inspection at the one year mark.

⬆ 0  ⬇   💬 Reply   ⇄   🏆 Award   ↗ Share   ...

# EXHIBIT 125



**NEW YORK**

WILLIAMSBURG    TOLL BROTHERS

# Disgruntled Northside Piers Buyers Declare War on Toll Brothers

By **Joey Arak** | Mar 24, 2011, 10:55am EDT

Ever since buyers began moving into the first Northside Piers tower back in 2008, **complaints about the construction quality** of the Williamsburg waterfront condo complex (which now includes two towers with a third to come, eventually) have popped up on message board threads and in the occasional blog post. But now irate Northside Piers residents are taking things a step further. It seems they have **launched a full-on media offensive**. Two articles have just been published documenting a laundry list of complaints about the Toll Brothers-developed towers, including shoddy workmanship and Bianca Jagger's worst enemy, mold. Strap on a surgical mask, because we're diving in!

**Outlet**: *New York Post*
**Headline**: Williamsburg waterfront condo

residents complain of 'shoddy' construction

**Complaints**: leaky walls, poor insulation, mold, faulty plumbing, faulty sewage system, faulty heating, faulty air-conditioning. And the biggest: "The windows are thin and the seams between the panes allow wind and rain to easily come through, residents say. Some residents have taped around the window panes, but they say rain and air still blows in."

**Best resident quote**: "We were promised luxury living if we came across the River from Manhattan to be part of the resurgence of North Brooklyn. I was not expecting such shameful and shoddy workmanship."

**Toll Bros. response**: The company "is aware of these isolated situations and strongly disagrees with the allegations as they have been presented. It "will continue to honor its obligations and provide the quality and customer service for which it is known."

Now on to Northside Piers Takedown II, which is written by Williamsburg activist Phil DePaolo, who is quoted as a source in Northside Piers Takedown I.

**Outlet**: *Williamsburg Greenpoint News + Arts*
**Headline**: Luxury Living is Taking a Toll, Brother!
**Complaints**: Non-union labor, leaks, those darn windows, outrageous utility bills

because of those darn windows, "shit" floors, floods, mold, mildew and some sort of wide-ranging conspiracy between Toll Brothers and the property manager to engage in "bad faith, criminal negligence, and blatant disregard for the health and safety of residents and the public." Oh, and "The Board conducted a questionnaire and as many as 88 owners have some form of complaint regarding their units."

**Best resident quote**: "I'd be happy if I didn't hear my neighbors. I was told that what I was describing should not be the case. I'm not an expert, but this leads me to believe the wall is defective. I'm certainly not tearing down the wall and fixing this with my own dollars."

**Toll Bros. response**: "The Board apparently had a meeting with Toll Brothers this past Tuesday. They claimed Toll Brothers have 'changed their tune.' It seems during the meeting, Toll Brothers recognized that all the complaints are not isolated incidents, and are serious problems. They claim that Toll Brothers have agreed to remedy the complaints, not just with quick fixes."

There's even a Martin Act mention, which usually means one thing: Here comes a lawsuit! Any Northside Piers residents out there want to back up or refute these claims?

Especially *this guy*. We're *always* interested



Visit Website

# EXHIBIT 126

Recording Requested By:
First American Title Company
Homebuilder Services Division

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

22.00

* $ R 0 0 1 5 0 1 0 1 1 3 $ *

2024000156492 8:00 am 06/25/24
491 CR-SC06 G02   6 26
2127.13 2127.12 0.00 0.00 15.00 0.00 0.000.000.00 0.00

Order No. 6923749
Escrow No. 907410-SR
Loan No.

**WHEN RECORDED MAIL TO:**

Xian Feng Gu, Trustee
Di Lan Ge, Trustee
746 Country Club Ln
Fond du Lac, WI 54935

DOCUMENTARY TRANSFER TAX $ 4,254.25

✓  Computed on the Consideration or value of property conveyed; OR

___ Computed on the consideration or value less liens or encumbrances
remaining at time of sale. (X) City of Irvine

SPACE ABOVE THIS LINE FOR RECORDER'S USE

*Starling Rich, Escrow Specialist*

Signature of Declarant or Agent determining tax - Firm Name

APN: 591-781-57                    **GRANT DEED**

For valuable consideration, receipt of which is hereby acknowledged,

**THE NEW HOME COMPANY SOUTHERN CALIFORNIA LLC, a Delaware limited liability company**
(**"*Grantor*"**) hereby grants to Xian Feng Gu and Di Lan Ge, Trustees of The Xian Feng Gu and Di Lan Ge
Revocable Trust dated the 26th day of November, 2002

(**"*Grantee*"**) the real property in the City of Irvine, County of Orange, State of California, described on **Exhibit "A"**
attached hereto and incorporated herein by this reference.

Dated: **May 16**_____, 2024

Exempt from fee per GC 27388.1 (a) (2); This
document is subject to Documentary Transfer Tax.

**"GRANTOR"**

THE NEW HOME COMPANY SOUTHERN
CALIFORNIA LLC, a Delaware limited liability
company

By: _____

Its: Authorized Signatory    Lori Michel

**MAIL TAX STATEMENTS TO:  SAME AS ABOVE**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                             )
COUNTY OF ORANGE             )

On  May 16            , 2024, before me,  Sherry Ivery            , Notary Public, personally appeared  Lori Michel                          , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SHERRY IVERY
Notary Public - California
Orange County
Commission # 2403177
My Comm. Expires May 4, 2026

*(SEAL)*

**EXHIBIT "A"**

**PARCEL 1**:

Lot 88 of Tract No. 19176 as shown on a map recorded in Book 1000, Pages 27 through 37, inclusive, of the Miscellaneous Maps of Orange County, California (the "**Property**").

EXCEPTING THEREFROM all water rights as conveyed to Irvine Ranch Water District in the Quitclaim Deed recorded on June 21, 2006 as Instrument No. 2006000416403 in the Official Records of Orange County, California.

ALSO EXCEPTING THEREFROM all oil, minerals and other rights as reserved to The Irvine Company, its successors and assigns, per deed recorded on April 18, 2003 as Instrument No. 2003000436059 in the Official Records of Orange County, California, and per any other documents of record.

ALSO EXCEPTING THEREFROM all of those certain rights and easements for, among other things, a community antenna television system, communication and utility facilities and systems, vehicular and pedestrian access, and the construction and maintenance of certain other improvements, systems and facilities, all as more specifically described and reserved to Irvine Community Development Company LLC, a Delaware limited liability company ("Master Developer"), its successors and assigns, in the Grant Deed(s) from Master Developer to Grantor recorded in the Official Records of Orange County, California.

RESERVING THEREFROM unto Grantor, its successors and assigns, together with the right (without the consent of Grantee or any other owner of any interest in the Property) to grant or transfer the same, nonexclusive easements for the installation, maintenance and repair of utilities and related facilities (including, but not limited to, electrical, telephone, cable television, communication, gas, water and sewer lines, utility meters, storm drains, street lights, mail boxes, fire hydrants and traffic signs) as shown on the map of Tract 19176 or otherwise of record.

ALSO RESERVING THEREFROM for the benefit of the Portola Springs Community Association, a California nonprofit mutual benefit corporation (the "Master Association") nonexclusive easements for ingress, egress, access, encroachment, support, maintenance, repairs, drainage, enforcement and all other purposes as set forth in that certain "Restated Master Declaration of Covenants, Conditions and Restrictions, and Reservation of Easements for Portola Springs" recorded on September 18, 2006 as Instrument No. 2006000619895, as same may be restated and/or amended from time to time (the "Master Declaration"), and/or in that certain "Notice of Annexation to Portola Springs" recorded on April 11, 2024 as Instrument No. 2024000090939, as same may be re-recorded, restated and/or amended from time to time (the "Notice of Annexation"), both in the Official Records of Orange County, California.

ALSO RESERVING THEREFROM a nonexclusive easement for drainage and for the installation, maintenance, repair and replacement of a Retaining Wall Sub-

Drainage Pipe (the "Retaining Wall Sub-Drainage Easement") on, over, under, across and through the Property (as a "Downstream Property") in favor of each Upstream Property, as more particularly set forth in the Notice of Annexation, if applicable.

FURTHER RESERVING THEREFROM unto Grantor, its successors and assigns, together with the right (without the consent of Grantee or any other owner of any interest in the Property) to grant or transfer the same, nonexclusive easements for ingress, egress, access, encroachment, support, maintenance, repairs, drainage and all other purposes as set forth in the Master Declaration and/or in the Notice of Annexation.

**PARCEL 2:   Nonexclusive Easement for Retaining Wall Sub-Drainage:**

A nonexclusive easement appurtenant to the Property (as an "Upstream Property") on, over, under, across and through each "Downstream Property" for drainage and for the installation, maintenance, repair and replacement of the Retaining Wall Sub-Drainage Pipe (the "Retaining Wall Sub-Drainage Easement"), as more particularly set forth in the Notice of Annexation, if applicable.

**PARCEL 3:   Nonexclusive Easements for Access and Other Purposes under the Master Declaration and the Notice of Annexation:**

Nonexclusive easements for ingress, egress, access, maintenance, repairs, drainage, encroachment, support, use, enjoyment and for all other purposes as set forth in the Master Declaration and/or in the Notice of Annexation.

**SUBJECT TO:**

1.    Non-delinquent general and special real property taxes and assessments, if any, for the current fiscal year;

2.    The Master Declaration and the Notice of Annexation;

3.    That certain Declaration of Solar Energy Covenants and Restrictions for Olivewood recorded on March 14, 2024 as Instrument No. 2024000056634, and the Declaration of Annexation to Solar Energy Covenants and Restrictions for Olivewood (Phase 2) recorded on April 11, 2024 as Instrument No. 2024000090941, as same may be re-recorded, restated and/or amended from time to time, both in the Official Records of Orange County, California (collectively the "Solar Declaration");

4.    That certain Declaration of Dispute Resolution Procedures for Olivewood recorded on March 14, 2024 as Instrument No. 2024000056633, the Supplemental Declaration of Dispute Resolution Procedures for Olivewood (Phase 2) recorded on April 11, 2024 as Instrument No. 2024000090940, and the Individual Dispute Resolution Agreement recorded concurrently herewith, as same may be re-

recorded, restated and/or amended from time to time, all in the Official Records of Orange County, California (collectively the "Dispute Resolution Documents");

5.    All other covenants, conditions, restrictions, easements, rights, rights-of-way, dedications, offers of dedication and other matters of record or apparent.

THIS DEED is made and accepted and the real property conveyed hereby is granted subject to the covenants, conditions, restrictions, easements, reservations, rights, uses, limitations, equitable servitudes, liens, charges and all other terms and provisions (collectively the "Protective Covenants") set forth in the Master Declaration, the Notice of Annexation, the Solar Declaration and/or the Dispute Resolution Documents, and to all other matters referenced above, each and all of which are hereby made a part hereof and expressly imposed on said real property by this reference with the same effect as though fully set forth herein.

GRANTEE, by acceptance and recordation of this Deed, hereby (a) accepts and approves all of the foregoing in this Deed and (b) grants to Grantor, Master Developer and the Master Association such powers and rights as are set forth in the Master Declaration, the Notice of Annexation, the Solar Declaration and the Dispute Resolution Documents.  In furtherance thereof, Grantee is obligated to fully and faithfully comply with each and all of the Protective Covenants set forth in the Master Declaration, the Notice of Annexation, the Solar Declaration and the Dispute Resolution Documents for the benefit Grantor, Master Developer, the Master Association and each and every Owner bound thereby, and this obligation shall be binding upon Grantee and Grantee's successors, assigns and grantees.

**ACCEPTANCE**

Grantee hereby accepts the conveyance from Grantor of the real property described herein, subject to the Protective Covenants set forth in the documents referenced above and to all other matters referenced above.

Dated: _____June 24_____, 2024

_____
Xian Feng Gu, Trustee

_____
Di Lan Ge, Trustee

Page 3 of 4

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                             )
COUNTY OF ORANGE             )

On _June 24, 2024_____, 202_, before me, _Leakinna Choeum_____,
Notary Public, personally appeared __Di Lan Ge_____ and
_Xian Feng Gu Gu_____, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LEAKINNA CHOEUM
Notary Public - California
Orange County
Commission # 2367605
My Comm. Expires Jul 24, 2025

*(SEAL)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                             )
COUNTY OF ORANGE             )

On _____, 202_, before me, _____,
Notary Public, personally appeared _____ and
_____, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*(SEAL)*

Page 4 of 4

# EXHIBIT 127

18100 Von Karman Ave., Suite 700
Irvine, California 92612
p (949) 271-8700
f (949) 627-2611
www.phlklaw.com

Melanie S. Woodfin, Partner
mwoodfin@phlklaw.com

May 27, 2025

**<u>CEASE AND DESIST</u>**

**<u>VIA E-MAIL AND U.S. MAIL</u>**
Jeffrey Gu
129 Oakstone
Irvine, CA  92618
jeffwgu@gmail.com

Re:    **Gu, Jeffrey v. The New Home Company**
PHLK File No.:        0066-2818

Dear Mr. Gu:

**The New Home Company ("TNHC") hereby demands that you immediately cease and desist all harassing conduct.**  TNHC has attempted to address your claims in good faith and in response you have engaged in a pattern of bad faith conduct designed and intended to annoy, harass and offend TNHC.  Your conduct has now escalated to a level that is illegal, dangerous, and disruptive.  If this behavior continues, TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Your harassing conduct to date includes the following:

1. <u>Abuse Of The SB800 Prelitigation Process</u>: To date, you have provided **16 separate Notices** under Civil Code section 895, et seq. ("SB800"), which are dated April 2, 2025 (2), April 3, 2025, April 4, 2025, April 7, 2025 (3), April 14, 2025 (5), April 21, 2025[1], April 23, 2025, May 5, 2025, and May 12, 2025 (the "Notices").  TNHC timely acknowledged your Notices and inspected the claims on April 22, 2025 pursuant to Civil Code section 916, and after that date, you provided four additional Notices.  Several of the Notices address the very same issues.  For instance, you assert the same claim relating to the shower pan in the master bathroom in four separate Notices and you assert claims relating to the grout in three separate Notices.  Despite TNHC's timely response and inspection, evidencing TNHC's intent to complete the SB800 process in good faith, you continued to serve additional redundant Notices.  The obvious intent of repeated and duplicative Notices is to

---

[1] The April 21, 2025 Notice was not properly served under Civil Code section 910.  Accordingly, TNHC reserves all rights and defenses available as a result of the improper service.



harass and annoy TNHC.  It also bears noting that prior to the 16 Notices, TNHC was working in good faith with you to address your concerns through its customer service department.  Indeed, repairs were scheduled and in progress.  While those repairs were in process, you began serving the Notices, which contain many of the same issues which were in progress with the customer services department.  This taken in conjunction with your multiple and duplicative Notices demonstrates your harassment of TNHC and your bad faith in this process.  Until and unless you cease such abuse of the SB800 prelitigation process, TNHC will not respond to additional notices from you.

2. <u>Improper Bond Claim</u>: We have learned that you filed a claim with TNHC's bond company for "construction defects" at the Property, presumably for the same claims identified in the Notices which at the time were proceeding under the SB800 process.  At the time you filed a claim with the bond company, TNHC was investigating the Notices in good faith and adhering to the SB800 procedures.  In fact, TNHC's response was not due until May 22, 2025  – one week after you filed the claim with the bond company.  TNHC at all times proceeded in good faith in the SB800 process.  Given your numerous and duplicative Notices, that the duplicative Notices contained the same issues which were being addressed by TNHC through customer service, and that you filed this claim before the SB800 process was concluded, it is clear that it is your intent to harass TNHC.  As you know, TNHC offered to make courtesy repairs as outlined in our May 22, 2025 letter.  To date, we have not received any response.

3. <u>Improper Demands</u>: Following the inspection on April 22, 2025, you have contacted me multiple times requesting TNHC's inspector's insurance and license information, despite the fact that I advised you that SB800 only requires proof of insurance for the builder, which we provided.  Civil Code section 916 requires that "[t]he builder shall also provide written proof that the builder has liability insurance to cover any damages or injuries occurring during inspection and testing."  TNHC therefore satisfied this requirement.  TNHC is not required to provide proof of insurance for an inspector.  Your attempts to gain insurance and licensing information relating to TNHC's inspector (who performed a visual inspection only), presumably to pursue the inspector's bond company, further evidences your harassing conduct.

4. <u>Illegal And Dangerous Trespass At TNHC's Construction Site</u>: It has come to our attention that you intentionally trespassed at TNHC's active construction site at the Olivewood community on May 20, 2025.  While trespassing, you also harassed TNHC's contractors, interfering with the work being performed.  Your trespass was captured on video and photographed.  The images below depict your trespass and harassment of TNHC's contractors.  The photographs and videos also record you taking photographs of construction workers and the license plates of their vehicles.  Construction sites are dangerous and this property, which is owned by TNHC, is not open to the public for this reason, among others.  Not only is it dangerous for you to trespass on an active construction site, your presence was disruptive to the



construction operations.  We therefore demand that you immediately cease and desist from this unlawful activity, including both trespassing on TNHC's property and harassing TNHC's contractors.  If you continue to trespass on TNHC's property and harass TNHC's contractors, legal action may be taken against you and you may be subject to both civil and criminal penalties.

**Pursuant to the foregoing, we demand that you <u>immediately cease and desist</u> all harassing activities against TNHC and its contractors and from unlawfully entering TNHC's construction site at the Olivewood community**.  Please confirm in writing by close of business on **<u>May 30, 2025</u>** that you will cease trespassing on TNHC's property.  TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Sincerely,


Melanie S. Woodfin

MSW

cc:     Sam C. Plante, Esq.
        Janelle Launi, Paralegal

# EXHIBIT 128

CONTRACTORS STATE LICENSE BOARD

## Industry Bulletin

www.cslb.ca.gov    |    CheckTheLicenseFirst.com    |    SeniorScamStopper.com

September 17, 2020                                                                 CSLB #20-21

## Contractors State License Board Reminds Contractors to Include License Number on Vehicles and Advertisements

**SACRAMENTO** – The California Contractors State License Board (CSLB) is reminding licensed contractors to include their license number on all commercial vehicles and advertisements.  This includes online sales postings and websites, as well as newspaper, radio, and television advertisements. Advertising laws must be followed to avoid disciplinary action and fines (Business and Professions Code sections 7027, 7029.5, and 7030.5, and California Code of Regulations section 861).

Contractors should also remember:

- License numbers should be published on all business documents, including business cards, contracts, and promotional materials.

 

- Advertise within your classification. Licensed contractors are not allowed to advertise for construction work outside of the trade(s) for which they are licensed.

- Don't advertise about license bonding. Contractors, by law, are not allowed to advertise that they are bonded. It could lead the public to believe there is a higher level of protection than might actually be the case.

- According to Business and Professions Code (BPC) § 7029.6, your business name and contractor license number should be clearly visible on your commercially registered vehicle in print type of at least 72-point font, or three-quarters of an inch in height and width.

- Be aware of possible fines or penalties. The civil penalty for licensees who violate contractor advertising laws can range from $100 to $5,000.

"Licensed contractors must clearly display their contractor license number in their advertisements and on commercially-registered vehicles," said CSLB Registrar David Fogt. "Not only is it the law, it can help contractors generate business and let consumers know they're working with qualified professionals."

For more information on advertising rules, read CSLB's Advertising Guidelines brochure or watch CSLB's video on "Contractor Advertising Guidelines."

Contractors can stay up-to-date on CSLB news by visiting CSLB's website and following us on Facebook.

###

# EXHIBIT 129



CO.Gov

Department of
**Real Estate**

ⓘ Instructions        ＋ New Complaint        🏛 About DRE

⚙ Setting

## Page 6 of 8 - Supporting Documents

Complaint Number: 453238237?
City Name:
Expiration Date:

More Information

Click on the Files to Upload area to chose the files that you want to attach. Navigate to the files and select one or more of them. Click the Save button to transfer them. The attached files information will appear at the bottom of this page once they are transferred. Only files that end with: pdf, jpg, jpeg, png, gif, tif, docx, doc, xls, xlsx, wks, wks, wpd, or txt will be accepted. The maximum combined file size is 20MB per upload. Click the red Delete button to remove the file. Once you are finished, click on the Next button.

**Files to Upload**

Choose Files | no files selected

**Save**     Next

| File Name | Uploaded Timestamp | Delete File |
|---|---|---|
| Gmail_- MDF and Carpeting Padding.pdf | 4/21/2025 8:36:07 AM | Delete |

# EXHIBIT 130

18100 Von Karman Ave., Suite 700
Irvine, California 92612
p (949) 271-8700
f (949) 627-2611
www.phlklaw.com

Melanie S. Woodfin, Partner
mwoodfin@phlklaw.com

June 23, 2025

**CEASE AND DESIST**

**VIA E-MAIL AND U.S. MAIL**
Jeffrey Gu
129 Oakstone
Irvine, CA  92618
jeffwgu@gmail.com

Re:    **Gu, Jeffrey v. The New Home Company**
PHLK File No.:        0066-2818

Dear Mr. Gu:

As you are aware of based on our letter dated April 16, 2025, as well as all subsequent letters from our office, Plante Huguenin Lebovic Kahn LLP has been retained to represent The New Home Company ("TNHC") in connection with your construction defect claims.  It has come to our attention that you have been contacting TNHC directly.  As we previously advised, all further communication must be directed to our office, and not TNHC.  Accordingly, we again request that all communication go through our office.  Thank you for your cooperation.

Further, as stated in our letter dated May 27, 2025, TNHC demands that you immediately cease and desist all harassing conduct.  TNHC has attempted to address your claims in good faith and in response you have engaged in a pattern of bad faith conduct designed and intended to annoy, harass and offend TNHC, and is illegal, dangerous, and disruptive.  If this behavior continues, TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.  Your harassing conduct includes abuse of the SB800 prelitigation process, improper and duplicative bond claims, improper demands, and illegal and dangerous trespassing on THNC's construction sites.

As stated in our May 27, 2025 letter, you served 16 separate notices of claims ("Notices"), numerous of which contain identical claims or claims already being addressed through warranty and/or included in prior Notices, you filed a claim with THNC's bond company for the same claims as in the Notices, you made multiple demands for documents and information after we repeatedly advised that the documents and information requested are not required of TNHC, and you have intentionally trespassed on TNHC's construction site and harassed its construction workers.  Despite our demand that you cease and desist this abusive and harassing behavior, it continues.

Irvine • Roseville • Phoenix • Denver • Las Vegas • Dallas • Seattle • Washington D.C.



Page 2

Subsequent to the cease and desist letter dated May 27, 2025, you have continued with harassing conduct.  You submitted an additional bond claim on June 12, 2025 relating to the stair railing, which is a claim included in one of your 16 Notices.  In addition, you have contacted TNHC directly, despite our request that all communication go through our office as TNHC is represented by counsel, and requested documents which are irrelevant to your Notices and not required under SB800.  Finally, you have again intentionally and illegally trespassed on TNHC's construction site and harassed the construction workers.  This intentional trespass not only interferes with the work being performed, but is also extremely dangerous to both you and TNHC contractors.

**TNHC demands that all communication go through my office and that you <u>immediately cease and desist</u> all harassing activities against TNHC and its contractors and from unlawfully entering TNHC's construction site at the Olivewood community.**  TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Sincerely,

Melanie S. Woodfin

MSW

cc:     Sam C. Plante, Esq.
        Janelle Launi, Paralegal

# EXHIBIT 131



18100 Von Karman Ave., Suite 700
Irvine, California 92612
p (949) 271-8700
f (949) 627-2611
www.phlklaw.com

Melanie S. Woodfin, Partner
mwoodfin@phlklaw.com

August 5, 2025

**CEASE AND DESIST**

**VIA EMAIL & U.S. MAIL**

Jeffrey Gu
129 Oakstone
Irvine, CA  92618
jeffwgu@gmail.com

      Re:    **Gu, Jeffrey v. The New Home Company**
           PHLK File No.:     0066-2818

Dear Mr. Gu:

This letter follows our prior letters, including our letter dated May 27, 2025, wherein The New Home Company ("TNHC") demanded that you immediately cease and desist all harassing conduct.  Our May 27, 2025 letter, which identifies your harassing behavior, is attached as Exhibit "A."  Despite our demand that you discontinue your pattern of bad faith and harassing conduct against TNHC and its employees and contractors, your harassment continues.  **TNHC again demands that you immediately cease and desist your harassment of TNHC's employees, contractors, and now, its insurance brokers.**  If your harassment continues, TNHC will take all appropriate corrective actions, including seeking injunctive relief, restraining orders and both civil and criminal penalties, as appropriate.

On July 29, 2025, you emailed TNHC employee Chad Baker demanding information relating to his employer.  Your email provides:

> Hi Chad,
>
> Could you please send me information about who your employer is?  One way of figuring this out is looking at your W2, if this is what the employer provides to you.
>
> -Jeffrey

---

Irvine • Roseville • Phoenix • Denver • Las Vegas • Dallas • Seattle • Washington D.C.



Also on July 29, 2025, you emailed TNHC employee Dave Christensen demanding the same information relating to his employer.  Your email provides:

> Hi Dave,
>
> Could you please send me information about who your employer is?  One way of figuring this out is looking at your W2, if this is what the employer provides to you.
>
> -Jeffrey

On July 31, 2025, you emailed Mr. Christensen again stating that:

> Hi Dave,
>
> As a licensed realtor, I believe you should be able to give this information to me in a straightforward manner. Could you please provide me with the company that you have an employment relationship with?
>
> -Jeffrey

We have repeatedly asked that you refrain from harassing TNHC's employees.  There is absolutely no legitimate reason for you to request this information from TNHC's employees.  Please immediately cease and desist harassing TNHC's employees.

In addition, on July 30, 2025, you contacted TNHC's insurance broker, Alliant, asking for information relating to TNHC's insurance, as follows:

> Hello Ms. Coghill,
>
> I have a few questions about this COI and insured.  Could I please send them to you?
>
> -Jeffrey

There is likewise no legitimate purpose for contacting TNHC's insurance broker, nor are you entitled to any information relating to TNHC's insurance.  Indeed, you have no contractual relationship with TNHC whatsoever, nor are you an owner of a home constructed/sold by TNHC.  Please immediately cease and desist contacting TNHC's insurance broker.

*          *          *



Page 3

      **Pursuant to the foregoing, we demand that you <u>immediately cease and desist</u> all harassing activities against TNHC's employees, its contractors, and its insurance broker**. TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Sincerely,

Melanie S. Woodfin

SCP
Enclosure

cc:    Di Lan Ge
       Xian Feng Gu
       Sam C. Plante, Esq.
       Janelle Launi, Paralegal

# Exhibit "A"

18100 Von Karman Ave., Suite 700
Irvine, California 92612
p (949) 271-8700
f (949) 627-2611
www.phlklaw.com

Melanie S. Woodfin, Partner
mwoodfin@phlklaw.com

May 27, 2025

**CEASE AND DESIST**

**VIA E-MAIL AND U.S. MAIL**
Jeffrey Gu
129 Oakstone
Irvine, CA  92618
jeffwgu@gmail.com

Re:    **Gu, Jeffrey v. The New Home Company**
PHLK File No.:        0066-2818

Dear Mr. Gu:

**The New Home Company ("TNHC") hereby demands that you immediately cease and desist all harassing conduct.**  TNHC has attempted to address your claims in good faith and in response you have engaged in a pattern of bad faith conduct designed and intended to annoy, harass and offend TNHC.  Your conduct has now escalated to a level that is illegal, dangerous, and disruptive.  If this behavior continues, TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Your harassing conduct to date includes the following:

1. Abuse Of The SB800 Prelitigation Process: To date, you have provided **16 separate Notices** under Civil Code section 895, et seq. ("SB800"), which are dated April 2, 2025 (2), April 3, 2025, April 4, 2025, April 7, 2025 (3), April 14, 2025 (5), April 21, 2025[1], April 23, 2025, May 5, 2025, and May 12, 2025 (the "Notices").  TNHC timely acknowledged your Notices and inspected the claims on April 22, 2025 pursuant to Civil Code section 916, and after that date, you provided four additional Notices. Several of the Notices address the very same issues.  For instance, you assert the same claim relating to the shower pan in the master bathroom in four separate Notices and you assert claims relating to the grout in three separate Notices. Despite TNHC's timely response and inspection, evidencing TNHC's intent to complete the SB800 process in good faith, you continued to serve additional redundant Notices.  The obvious intent of repeated and duplicative Notices is to

---

[1] The April 21, 2025 Notice was not properly served under Civil Code section 910.  Accordingly, TNHC reserves all rights and defenses available as a result of the improper service.



harass and annoy TNHC. It also bears noting that prior to the 16 Notices, TNHC was working in good faith with you to address your concerns through its customer service department. Indeed, repairs were scheduled and in progress. While those repairs were in process, you began serving the Notices, which contain many of the same issues which were in progress with the customer services department. This taken in conjunction with your multiple and duplicative Notices demonstrates your harassment of TNHC and your bad faith in this process. Until and unless you cease such abuse of the SB800 prelitigation process, TNHC will not respond to additional notices from you.

2. <u>Improper Bond Claim</u>: We have learned that you filed a claim with TNHC's bond company for "construction defects" at the Property, presumably for the same claims identified in the Notices which at the time were proceeding under the SB800 process. At the time you filed a claim with the bond company, TNHC was investigating the Notices in good faith and adhering to the SB800 procedures. In fact, TNHC's response was not due until May 22, 2025 – one week after you filed the claim with the bond company. TNHC at all times proceeded in good faith in the SB800 process. Given your numerous and duplicative Notices, that the duplicative Notices contained the same issues which were being addressed by TNHC through customer service, and that you filed this claim before the SB800 process was concluded, it is clear that it is your intent to harass TNHC. As you know, TNHC offered to make courtesy repairs as outlined in our May 22, 2025 letter. To date, we have not received any response.

3. <u>Improper Demands</u>: Following the inspection on April 22, 2025, you have contacted me multiple times requesting TNHC's inspector's insurance and license information, despite the fact that I advised you that SB800 only requires proof of insurance for the builder, which we provided. Civil Code section 916 requires that "[t]he builder shall also provide written proof that the builder has liability insurance to cover any damages or injuries occurring during inspection and testing." TNHC therefore satisfied this requirement. TNHC is not required to provide proof of insurance for an inspector. Your attempts to gain insurance and licensing information relating to TNHC's inspector (who performed a visual inspection only), presumably to pursue the inspector's bond company, further evidences your harassing conduct.

4. <u>Illegal And Dangerous Trespass At TNHC's Construction Site</u>: It has come to our attention that you intentionally trespassed at TNHC's active construction site at the Olivewood community on May 20, 2025. While trespassing, you also harassed TNHC's contractors, interfering with the work being performed. Your trespass was captured on video and photographed. The images below depict your trespass and harassment of TNHC's contractors. The photographs and videos also record you taking photographs of construction workers and the license plates of their vehicles. Construction sites are dangerous and this property, which is owned by TNHC, is not open to the public for this reason, among others. Not only is it dangerous for you to trespass on an active construction site, your presence was disruptive to the



Page 3

construction operations.  We therefore demand that you immediately cease and
desist from this unlawful activity, including both trespassing on TNHC's property and
harassing TNHC's contractors.  If you continue to trespass on TNHC's property and
harass TNHC's contractors, legal action may be taken against you and you may be
subject to both civil and criminal penalties.

**Pursuant to the foregoing, we demand that you <u>immediately cease and desist</u> all
harassing activities against TNHC and its contractors and from unlawfully entering TNHC's
construction site at the Olivewood community**.  Please confirm in writing by close of business
on <u>**May 30, 2025**</u> that you will cease trespassing on TNHC's property.  TNHC reserves the right
to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and
both civil and criminal penalties.

Sincerely,

Melanie S. Woodfin

MSW

cc:    Sam C. Plante, Esq.
       Janelle Launi, Paralegal

# EXHIBIT 132



2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
p (480) 571-1717
f (949) 627-2611
www.phlklaw.com

Rae Richardson, Attorney
rrichardson@phlklaw.com

August 22, 2025

**CEASE AND DESIST**

**VIA EMAIL & U.S. MAIL**

Jeffrey Gu
129 Oakstone
Irvine, CA  92618
jeffwgu@gmail.com

Re:    **Gu, Jeffrey v. The New Home Company**
       **Immediate Cease and Desist-Willful Misuse of Confusingly Similar Entity Name;**
       **False Designation; Unfair Competition; Deceptive Trade Practices (Colorado)**
       PHLK File No.:        0066-2818

Dear Mr. Gu:

As you know, our office is outside counsel for The New Home Company.  We write regarding your recent formation and/or use in Colorado of "The New Home Company Inc" (the "Offending Entity"), a name that is confusingly similar to the trade name our company has used continuously in commerce since 2016, and nearly identical to our federally registered trademark, The New Home Company (U.S. Reg. No. 5,226,028; Serial No. 86948941).  Your conduct appears to be part of your ongoing, calculated efforts to harass and interfere with The New Home Company's ("New Home") operations.  Moreover, it is clear that your registration and/or use of the Offending Entity is intended to deceive and confuse the public.  Your conduct appears to violate at least five federal and state laws:

1.    <u>False designation / unfair competition (Lanham Act § 43(a))</u>. Using a word, term, or name in commerce that is likely to cause confusion as to affiliation, connection, or association, or as to the origin, sponsorship, or approval of commercial activities, is unlawful. 15 U.S.C. § 1125(a)(1).

2.    <u>Registered mark infringement (Lanham Act § 32)</u>. Because the Offending Entity incorporates, or trades on, New Home's registered mark, your conduct violates 15 U.S.C. § 1114(1)(a).  Injunctions are expressly authorized by 15 U.S.C. § 1116(a), and courts apply a presumption of irreparable harm upon a showing of likely success on the merits.

---

Irvine • Roseville • Phoenix • Denver • Las Vegas • Dallas • Seattle • Washington D.C.



3.    <u>Colorado Consumer Protection Act (CCPA)</u>. Your conduct violates C.R.S. § 6-1-105(1) (deceptive trade practices), including, without limitation, provisions prohibiting passing off, and causing likelihood of confusion or misunderstanding as to source, sponsorship, approval, or affiliation.  Remedies include damages, treble damages for willful bad faith conduct, and attorneys' fees. C.R.S. § 6-1-113.

4.    <u>Colorado common law</u>. Unregistered marks and trade names are protected where there is a likelihood of confusion.  Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941 (10th Cir. 1983) (stating, "One who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose: that is, that the public will be deceived.  All doubts must be resolved against him."); see also King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089–92 (10th Cir. 1999).

5.    <u>Colorado Harassment Statute</u>. In light of your documented campaign to harass New Home, your actions related to the Offending Entity may meet the elements of C.R.S. § 18-9-111.

As such, New Home demands that you immediately cease and desist from any use of the Offending Entity name and any variation of our trade name, including punctuation, spacing, and corporate suffix variations, in any channel (corporate records, websites, email, invoices, ads, social media, directories, and Secretary of State filings).

You are hereby placed on notice that any continued use of the Offending Entity name will be considered willful infringement and may result in immediate legal action without further warning.  Nothing herein shall be deemed a waiver of any kind whatsoever; to the contrary, New Home expressly reserves all rights, claims, and remedies in connection with this matter.

TNHC reserves the right to pursue all appropriate corrective actions, including injunctive relief, restraining orders, and both civil and criminal penalties.

Sincerely,

Rae Richardson

RR

cc:    Di Lan Ge
       Xian Feng Gu
       Melanie S. Woodfin, Esq.
       Sam C. Plante, Esq.
       Janelle Launi, Paralegal

# EXHIBIT 133



**Irvine**
2050 Main Street
Suite 1000
Irvine, CA  92614

(949) 851-2424 Tel
(949) 851-0152 Fax

**Writer's Direct Dial:**
(949) 798-2137
**Writer's E-mail:**
skingston@fisherphillips.com

August 11, 2025

**Via E-Mail and FedEx**

Jeffrey Gu (jeffwgu@gmail.com)
Yang Gu (yang.x.gu@gmail.com)

129 Oakstone
Irvine, CA  92618

**Re:    Cease and Desist / Bert L. Howe & Associates, Inc.**

Dear Jeffrey Gu and Yang Gu:

This firm represents Bert L. Howe & Associates, Inc.  ("BHA" or the "Company"). The purpose of this correspondence is to demand that you **immediately cease and desist** your attempts to enter the Company's facilities, as well as your ongoing efforts to harass and intimidate Company employees.

Our office understands that BHA was retained as defense experts on behalf of the New Home Company ("NHC")  in single-home construction claims relating to a property located as 129 Oakstone, Irvine, California ("Subject Property")("Construction Claims").  The complaints were drafted by Jeffrey Gu.  On April 22, 2025, BHA employee and licensed general contractor Chris Lopez facilitated a visual inspection of the Subject Property.

Since BHA's retention as experts in the Construction Claims in April 2025, you have engaged in months of harassing and inappropriate conduct toward BHA, as well as its employees. Your harassing conduct and attempted intimidation includes, but is not limited to: two inquiries on May 17, 2025 from Jeffrey Gu to BHA's email account seeking California State Licensing Board (CSLB) license status, followed by complaints initiated by Jeffrey Gu with the bonding companies for BHA employees Chris Lopez, Bradley W. Hughes, and David L. Suggs, which lacked any semblance of validity and were summarily closed on June 3, 2025, one day after the initial complaint was received by Mr. Lopez.  Moreover, on June 5,2025, BHA received a letter in response to a complaint initiated by Jeffrey Gu with the California Board for Professional Engineers, Land Surveyors, and Geologists. On June 17, 2025, an almost identical letter was received by BHA employee Mark Chapman. Importantly, none of Messrs. Hughes, Suggs, or Chapman had any interaction or dealings relating to the Construction Claims or 129 Oakstone. All matters were found to be deficient and were administratively closed by the respective boards.

**Fisher & Phillips LLP**

Atlanta · Baltimore · Boston · Charlotte · Chicago · Cleveland · Columbia · Columbus · Dallas · Denver · Detroit · Fort Lauderdale · Gulfport · Houston ne · Kansas City · Las Vegas · Los Angeles · Louisville · McLean · Memphis · Minneapolis · Nashville · New Jersey · New Orleans · New York · Orlando · Philadelp hoenix · Pittsburgh · Portland, ME · Portland, OR · Sacramento · Salt Lake City · San Diego · San Francisco · Seattle · Tampa · Washington, DC · Woodland Hil

Jeffrey Gu
Yang Gu
August 11, 2025
Page 2

BHA views the foregoing conduct as attempts to harass and intimidate BHA and its employees and attempts to interfere with BHA's business relationships with its employees, clients and state licensing boards.

Most recently, on August 5, 2025, Mr. Yang Gu attempted to enter the Company's corporate headquarters located in Anaheim Hills, California, by attempting to defeat the key fob security features. Video footage depicts Yang Gu parking more than 300 feet from the entrance of BHA's headquarters, approaching the front door, attempting to access the facility, then quickly returning to his vehicle when unsuccessful. Of note, Mr. Gu was wearing a heavy coat with a hoodie cap, at approximately 3:00 p.m. on a 90 degree Fahrenheit day. The vehicle Yang Gu was driving was consistent with the vehicle he drove to the April 22, 2025 site inspection.

BHA is taking preventive measures in response to the foregoing conduct. The Company is working with local authorities, having filed a police report, and is working through our office to obtain a restraining order.

Your harassing communications are unprofessional, unwelcome, and may subject you to serious legal liability for, among other things, defamation and tortious interference with business relationships. Moreover, the repeated unmeritorious claims are clearly intended to intimidate, harass, annoy, or alarm, and do not serve any legitimate purpose. Such communications violate California laws prohibiting intimidation and harassment and can **only** be viewed as attempts to adversely impact the Company's reputation and employment relationships. They will not be tolerated. Moreover, each of the above may constitute attempts to prevent or dissuade BHA employees from attending or testifying in pending litigation, a violation of the California Penal Code.

Accordingly, in the interest of avoiding swift litigation, we demand that you **immediately cease and desist** all attempts to enter BHA's facilities and contact of any nature with any Company employee, officer, director, or representative. In the event you make, or attempt to make, any further contact with any Company employee, officer, director, or representative, the Company, and/or these representatives individually, may pursue all available civil and criminal remedies against you to prohibit further contact.

Further, the Company forewarns that you not respond to the instant letter by making any disparaging and defamatory statements about the Company and its business practices to any third party, including the Company's customers, bonding companies, or state licensing boards. Should you do so, a civil action seeking all available relief, including monetary damages and injunctive relief, will be filed against you.

You are not welcome at the Company's headquarters in Anaheim Hills, CA, or any other Company facility, regardless of location. In the event that you are found on the premises of any Company facility, the Company will take all necessary action to have you immediately removed from the premises and will pursue all civil and criminal avenues available to prevent any further trespassing on Company property by you.

In short, the Company need not and will not stand idly by while you actively engage in harassing and disruptive conduct. To this end, the Company, through its leadership, will continue

Jeffrey Gu
Yang Gu
August 11, 2025
Page 3

to closely monitor this situation. Should the Company have reason to believe at any point its rights and/or obligations have been violated, the Company will not hesitate to take immediate legal action against you and pursue all available civil and criminal relief to which it may be entitled. Importantly, if any such further action is required, the Company will seek to recover all damages, costs, and attorneys' fees incurred in pursuing such relief against you. Individuals who are employed by or affiliated with the Company and who have been or who will be threatened or harassed by you may pursue civil and/or criminal relief against you in their own individual capacity.

This letter is not, and cannot be construed as, a waiver or relinquishment of the Company's right to bring claims and/or charges against you or any other person or entity for any unlawful conduct. **Please direct any communications regarding this matter, either directly or through any legal representative you may have retained, to me.**

Sincerely,

SEAN T. KINGSTON
For FISHER & PHILLIPS LLP

# EXHIBIT 134

HOME CARE

 Jeffrey Gu

Toll Brothers Home Care  >  My activities

## On-Hold: Large amount of LVP bubbling/unevenness in 2 areas

 **Nathaniel Emery**
1 year ago

Hello Jeffrey,

After careful review of your service request ID #1228317 we have determined that the item mentioned is beyond the scope of the warranty.

The uneven LVP on the second floor is caused by the weight of the pool table.

For comprehensive details of what's covered, refer to your warranty documents.

Thanks,

Toll Brothers Customer Care

---

 **Nathaniel Emery**
1 year ago

Hello Jeffrey,

In reviewing your request ID #1228317, we have determined that we need to place it on hold due to our trade partner's availability. For more information about service holds for trade partner availability, please see this article: On-Hold Service Requests.

We are working diligently to locate the right support for your service request, and will keep you apprised of any availability updates. Thank you for your understanding.

We are eager to find the support you need and get this matter resolved.

Respectfully,
Toll Brothers Customer Care

---

**Nathaniel Emery**
1 year ago

Thank you Jeffrey, I will keep you in the loop!
Toll Brothers Customer Care

---

| | |
|---|---|
| Requester | Jeffrey Gu |
| Created | December 28, 2023 at 1:03 PM |
| Last activity | August 26, 2024 at 4:02 PM |
| Assigned to | Nathaniel Emery |
| Id | #1228317 |
| Status | solved |
| Inspection Date | January 02, 2024 |
| Location | Near powder and near |
| Warranty Category | Floors & Carpet |
| Sub-category | Other |

Attachments

- IMG_9234.jpeg
  2 MB · Download
- IMG_9236.jpeg
  2 MB · Download
- IMG_9239.jpeg
  2 MB · Download
- IMG_9237.jpeg
  4 MB · Download
- IMG_9238.jpeg
  2 MB · Download



**Jeffrey Gu**
1 year ago

I won't be back for a while, so here are their numbers. I will give them yours.

Shin:  +1 (404) 983-3777
Peilin (pronounced Payleen):
+1 (720) 308-3928

You can def message them at the same time.

On Thu, Apr 25, 2024 at 7:46 PM Nathaniel Emery (Toll Brothers) <customercare@tollbrothers.com>
wrote:



**Nathaniel Emery**
1 year ago

Good afternoon Jeffery,

I need to get the engineer scheduled for an inspection. Please send over a date that works for you. If your
still out of the country, Please send me your renters information so I can schedule the workday with them.
You can share my number with them.

484-798-7743
Toll Brothers Customer Care



**Jeffrey Gu**
1 year ago

Any time between 10am-5pm should be good.



**Nathaniel Emery**
1 year ago

Hello Jeffrey,

Your request requires an [on -site inspection] . Can you please provide us with some dates and times that
work for you after 4/29?

Respectfully,
Toll Brothers Customer Care



**Nathaniel Emery**
1 year ago

Thank you Jeffrey,

I will be in touch!
Toll Brothers Customer Care



Jeffrey Gu
1 year ago

Hey Nate,

Any date between 3/4-3/14 will work for me.

-Jeffrey

On Tue, Feb 27, 2024 at 9:00 AM Nathaniel Emery (Toll Brothers) <customercare@tollbrothers.com>
wrote:

> ☐ **Nathaniel Emery [Toll Brothers Home Care]**
>
> *Good afternoon Jeffrey,*
>
> *I would like to schedule our engineer to inspect as well. Please let me know when you are available for the in-spection after 3/4.*
>
> *thank you,*
>
> *Toll Brothers Customer Care*





Nathaniel Emery
1 year ago

Good afternoon Jeffrey,

I would like to schedule our engineer to inspect as well. Please let me know when you are available for the
inspection after 3/4.

thank you,
Toll Brothers Customer Care



Jeffrey Gu
1 year ago

I'm not comfortable with closing this ticket.

 **Nathaniel Emery**
1 year ago

Hello Jeffrey,

After careful review of your service request ID #1228317 we have determined that the item mentioned is beyond the scope of the warranty.

Although we are closing the ticket now, we can always reopen it after the discussion with your private inspector in Friday 2/16.

For comprehensive details of what's covered, refer to your warranty documents.

Thanks,

Toll Brothers Customer Care

---

 **Nathaniel Emery**
1 year ago

Thank you for the pictures, We are working on getting a date schedule to meet with all the trades partners involved. I will be in touch.
Toll Brothers Customer Care

---

**Jeffrey Gu**
1 year ago

My own level readings.
 IMG_9234.jpeg
2 MB · Download

IMG_9236.jpeg
2 MB · Download

---

**Jeffrey Gu**
1 year ago

Cracks in front patio and garage. These cracks are near the same line where the floor is uneven.
 IMG_9239.jpeg
2 MB · Download

IMG_9237.jpeg
4 MB · Download

IMG_9238.jpeg
2 MB · Download

---

 **Madison Thomas**
1 year ago

Good morning,

We are in receipt of your Warranty Request that was submitted. Someone from our Warranty Department should be in contact with you shortly regarding this request.

Sincerely,

Madison Thomas
Toll Brothers Customer Care

 **Jeffrey Gu**
1 year ago

The floor feels very uneven with a large amount of bubbling in the entrance near the powder bath and in the kitchen in between the stairs and island. The effect is very pronounced, to the point it can affect how balanced you feel on the surface.

This request is closed for comments. You can create a follow-up.



Terms of Use    |    Privacy Policy

# EXHIBIT 135



investors.tollbrothers.com/resources/financial-faqs

INVESTOR STORY    NEWS & EVENTS ∨    FINANCIALS & FILINGS ∨    STOCK INFORMATION ∨    CORPORATE GOVERNANCE ∨    RESOURCES ∨

What are the geographic markets in which Toll Brothers operates?

How many years has Toll Brothers operated in its various states?

What companies has Toll Brothers acquired?

Toll Brothers has made thirteen acquisitions: Geoffrey H. Edmunds in Scottsdale, Arizona (1995), Coleman Homes' Las Vegas Division (1998), Silverman Homes in metro Detroit (1999), Richard R. Dostie (2003) and The Manhattan Building Company (2003) in northern New Jersey, the central Florida Division of Landstar Homes (2005), CamWest Development LLC in Seattle, Washington (2012), Shapell Industries, Inc. in California (2014), Coleman Homes in Boise, Idaho (2017), Sharp Residential in Atlanta, Georgia (2019), Sabal Homes in South Carolina (2019), Thrive Residential in Nashville and Atlanta (2020), Keller Homes in Colorado Springs (2020), StoryBook Homes in Las Vegas (2021), and Rialto Homes in San Antonio (2022).

Who is Toll Brothers' registered public accounting firm?

What public debt does Toll Brothers have outstanding?

Who is the trustee on these notes?

# EXHIBIT 136



Home    About    Divisions of MBC    Future Projects    Community Involvement
Lets Work Together

# About Sanford Weiss:

Sanford Weiss, the company's principal, has been active in Hoboken and Jersey City for over 2 decades.

 The Manhattan Building Company (MBC) was founded in February 1994 with the intent to create boutique, multi-family housing units in this high growth corridor bridging Manhattan.  Based on its initial success Sanford made the strategic decision to join forces with Bob Toll of the *Toll Brothers* to create a company called *City Living by Toll Brothers*, which today has a market cap in excess of 3 billion dollars.  In 2005 Sanford took a critical step in his career and parted from *The Toll Brothers* venture to refocus his energy on MBC. By doing so, in the last fifteen years MBC has been involved in over a billion dollars' worth of real estate ventures in both Hoboken and Jersey City.  With an additional billion dollars planned for the future and under construction.



# EXHIBIT 137



# Toll Brothers Announces Entry Into Seattle Market With Acquisition of CamWest Development LLC

November 21, 2011

HORSHAM, Pa., Nov. 21, 2011 (GLOBE NEWSWIRE) -- Toll Brothers, Inc., (NYSE:TOL) ( www.tollbrothers.com), the nation's leading builder of luxury homes, today announced its entry into the Seattle market through the acquisition of substantially all of the assets and operations of CamWest Development LLC ("CamWest"), one of the largest privately held home building companies in the Pacific Northwest. The purchase price, which was not disclosed, was paid in cash.

CamWest develops a variety of home types, including luxury single-family homes, condominiums, and townhomes, throughout the Seattle metropolitan area, primarily in King and Snohomish Counties. The firm has been recognized by the homebuilding industry through various awards for innovation in housing, green building practices, and excellence in marketing. Its homes typically sell from the mid $300,000s to $700,000's, with some homes selling for over $1 million. The average price of its homes currently in backlog is approximately $500,000.  The company was established in 1989 by Eric Campbell and has delivered more than 2,800 homes in the Seattle market since then. For calendar year 2011, CamWest anticipates delivering approximately 180 homes and producing revenues of approximately $90 million.

In addition to existing backlog, the assets acquired by Toll Brothers include approximately 1,300 lots owned and 200 lots controlled in King and Snohomish Counties. The acquisition will increase Toll Brothers' selling communities count by approximately 15 communities. Toll Brothers expects the acquisition to be accretive in FY 2012.

Douglas C. Yearley, Jr., Toll Brothers' chief executive officer, stated: "We are excited to enter the Seattle market with the acquisition of CamWest. It is one of the premier luxury homebuilders in the region with a long history of delivering exceptional quality and value to its homeowners. Seattle is a high barrier-to-entry home building market with a robust employment base and a concentration of affluence. Eric Campbell and the CamWest team provide a great management platform with a strong land position and well-established relationships with local land sellers and subcontractors."

Eric Campbell, founder and president for CamWest Development, stated: "Toll Brothers' brand name, reputation, and capital resources make it the ideal partner to expand upon the success that CamWest has achieved. Seattle is a market with many opportunities. We look forward to a great future as a member of the Toll family."

Zelman Partners LLC acted as exclusive financial advisor to CamWest.

Toll Brothers, Inc. is the nation's leading builder of luxury homes. The Company began business in 1967 and became a public company in 1986. Its common stock is listed on the New York Stock Exchange under the symbol "TOL." The Company serves move-up, empty-nester, active-adult, and second-home buyers and operates in 20 states: Arizona, California, Colorado, Connecticut, Delaware, Florida, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Virginia, and Washington.

Toll Brothers builds an array of luxury residential communities, principally on land it develops and improves: single-family detached and attached home communities, master planned resort-style golf communities, and urban low-, mid- and high-rise communities. The Company operates its own architectural, engineering, mortgage, title, land development and land sale, golf course development and management, home security, and landscape subsidiaries. The Company also operates its own lumber distribution, house component assembly, and manufacturing operations. The Company acquires and develops commercial properties through Toll Commercial and its affiliate, Toll Brothers Realty Trust, and purchases large distressed real estate portfolios through its wholly owned subsidiary, Gibraltar Capital and Asset Management.

Toll Brothers is honored to have won the three most coveted awards in the homebuilding industry: America's Best Builder from the National Association of Home Builders, the National Housing Quality Award, and Builder of the Year. Toll Brothers proudly supports the communities in which it builds; among other philanthropic pursuits, the Company sponsors the Toll Brothers Metropolitan Opera International Radio Network, bringing opera to neighborhoods throughout the world. For more information, visit www.tollbrothers.com.

Certain information included in this release is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, information related to: anticipated operating results; financial resources and condition; selling communities; home deliveries; average home prices; consumer demand and confidence; contract pricing; business and investment opportunities; and market and industry trends.

Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports, SEC filings, statements and presentations. These risks and uncertainties include, among others: local, regional, national and international economic conditions; fluctuating consumer demand and confidence; interest and unemployment rates; changes in sales conditions, including home prices, in the markets where we build homes; the competitive environment in which we operate; the availability and cost of land for future growth; conditions that could result in inventory write-downs or write-downs associated with investments in unconsolidated entities; the ability to recover our deferred tax assets; the availability of capital; uncertainties in the capital and securities markets; liquidity in the credit markets; changes in tax laws and their interpretation; effects of governmental legislation and regulation; the outcome of various legal proceedings; the availability of adequate insurance at reasonable cost; the impact of construction defect, product liability and home warranty claims, including the adequacy of self-insurance [text obscured] insurance coverage; the ability of customers to obtain financing for the purchase of homes; the ability of home buyers [text obscured] ents in various joint ventures to honor their commitments; the availability and cost of labor and building and [text obscured] nstruction delays; domestic and international political events; and weather conditions.

Any or all of the forward-looking statements included in this rel[ease] [text obscured] ay turn out to be inaccurate. Forward-looking statements speak only as of the date they are made. The Company undertakes no obligation to publicly update any forward-looking statements, whether as a result of new

By browsing this site, you consent to the use of cookies and our privacy policy

OK

information, future events or otherwise.

```
CONTACT: Frederick N. Cooper (215) 938-8312
         fcooper@tollbrothersinc.com
         Joseph R. Sicree (215) 938-8045
         jsicree@tollbrothersinc.com
```

Toll Brothers, Inc. Logo

GET TO KNOW US                                                                                              +

EXPLORE TOLL BROTHERS                                                                                       +

SERVICES                                                                                                    +

ACCOUNT INFORMATION                                                                                         +

© 2024 Toll Brothers Inc. All Rights Reserved.

Privacy    |    Legal    |    Site Map    |    TiC    |

Quality Homes by Design ®

By browsing this site, you consent to the use of cookies and our privacy policy

OK

# EXHIBIT 138

Business Search     Corporations and
Charities Filing System

## BUSINESS INFORMATION

Business Name: **CAMWEST DEVELOPMENT LLC**     UBI Number: **602 975 902**

## FILING HISTORY

| Filing Number | Filing Date Time | Effective Date | Filing Type | Action |
|---|---|---|---|---|
| 0022221291 | 05/03/2025 12:27:47 AM | 05/03/2025 | ADMINISTRATIVE DISSOLUTION | View Documents |
| 0021424938 | 01/01/2025 03:14:27 AM | 01/01/2025 | DELINQUENT ANNUAL REPORT NOTICE | View Documents |
| 0021104028 | 11/01/2024 02:17:45 AM | 11/01/2024 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0020289042 | 05/07/2024 11:59:42 AM | 05/07/2024 | REINSTATEMENT | View Documents |
| 0020274884 | 05/03/2024 12:16:40 AM | 05/03/2024 | ADMINISTRATIVE DISSOLUTION | View Documents |
| 0019558352 | 01/01/2024 01:27:31 AM | 01/01/2024 | DELINQUENT ANNUAL REPORT NOTICE | View Documents |
| 0019292605 | 11/01/2023 05:12:30 AM | 11/01/2023 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0017737035 | 12/19/2022 02:42:16 PM | 12/19/2022 | ANNUAL REPORT | View Documents |
| 0017515959 | 11/01/2022 08:20:35 AM | 11/01/2022 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0016104419 | 12/28/2021 05:01:47 PM | 12/28/2021 | ANNUAL REPORT | View Documents |
| 0015865340 | 11/01/2021 08:17:47 AM | 11/01/2021 | ANNUAL REPORT DUE DATE NOTICE | View Documents |

| | | | | |
|---|---|---|---|---|
| 0014403723 | 12/11/2020 10:31:59 AM | 12/11/2020 | ANNUAL REPORT | View Documents |
| 0014224425 | 11/01/2020 04:05:45 AM | 11/01/2020 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0012730299 | 11/25/2019 01:51:23 PM | 11/25/2019 | ANNUAL REPORT | View Documents |
| 0012652630 | 11/01/2019 05:27:49 AM | 11/01/2019 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0011317659 | 11/30/2018 11:12:59 AM | 11/30/2018 | ANNUAL REPORT | View Documents |
| 0011240365 | 11/01/2018 04:48:52 AM | 11/01/2018 | ANNUAL REPORT DUE DATE NOTICE | View Documents |
| 0009764289 | 11/16/2017 12:00:00 AM | 01/01/2018 | ANNUAL REPORT | View Documents |
| 0009373037 | 12/27/2016 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0009624003 | 11/30/2015 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0008521989 | 12/19/2014 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0008180042 | 12/16/2013 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0007803698 | 12/21/2012 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0007296879 | 11/29/2011 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0000498217 | 05/16/2011 08:05:32 AM | | AMENDMENT | View Documents |
| 0006837405 | 12/17/2010 12:00:00 AM | | ANNUAL REPORT | View Documents |
| 0001057272 | 04/01/2010 11:02:17 AM | | INITIAL REPORT | View Documents |
| 0000480027 | 12/31/2009 02:57:49 PM | | AMENDMENT | View Documents |

0000480024      12/14/2009  03:18:55                    CERTIFICATE  OF  FORMATION      View
                PM                                                                      Documents

Back

# EXHIBIT 139



RENEW YOUR
## Corporation or LLC



**CAMWEST DEVELOPMENT LLC**
UBI: **602 975 902**

## Thank you for renewing online

Your annual report has been completed and submitted. Please print this receipt for
your records and allow 14 days to receive your license document in the mail.

Completed date and time:     Dec 21 2012 10:31AM Pacific Time
Transaction number:          2012 356 4427
Credit card approval number: 3561146690200178147360

| Your company | | Your fees | |
|---|---|---|---|
| Company name: | CAMWEST DEVELOPMENT LLC | Domestic Limited Liability Company: | $  60.00 |
| Unified business ID: | 602 975 902 | Renewal application fee: | $   9.00 |
| State of formation: | Washington | Total fees: | $  69.00 |
| Date of formation: | 12/14/2009 | Previous payment: | $   0.00 |
| Expiration date: | 12/31/2013 | Total amount charged: | $  69.00 |

| Business information | |
|---|---|
| Principal place of business: | 11415 Slater Ave NE<br>Suite 100<br>Kirkland, Washington 98033<br>United States |
| Company telephone number: | (425) 298 0240 |
| Company email address: | None provided |
| My company is managed by: | Members |
| Does your company own land, buildings or other real property in Washington? | Yes |
| Has there been a transfer of stock, other financial interest change, or an option agreement exercised during the last 12 months that resulted in a transfer of controlling interest? | No |
| Has an option agreement been executed in the last 12 months allowing for the future purchase or acquisition of the entity, that, if exercised would result in a transfer of controlling interest? | No<br><br>If your company owns land, buildings, or other real estate in Washington State, you must contact the Washington State Department of Revenue to report a transfer of Controlling Interest. Failure to report the transfer is subject to the penalty provisions of RCW 82.45.220.<br><br>For more information please call the Dept. of Revenue at (360) 570-3265 and choose option 1, or visit their website at www.dor.wa.gov . |

| Nature of business | |
|---|---|
| Type: | Real Estate |

| Governing people | | |
|---|---|---|
| ERIC CAMPBELL | Member | 9720 NE 120TH PL STE 100 KIRKLAND, Washington 980344285 United States |

| Registered agent | |
|---|---|
| Agent type on file: | Business |
| Agent on file: | KELLY PRICE |
| Agent's office street address on file: | 9720 NE 120TH PL STE 100 KIRKLAND, Washington 98034 United States |
| Agent's mailing address on file: | Same as registered office address. |
| Request agent office street address change to: | 11415 Slater Ave NE Suite 100 KIRKLAND, Washington 98033 United States |

| Person completing this renewal | |
|---|---|
| Submitted By: | Jackie Hizzey |
| Title: | Employee Authorized to Complete |
| Renewal certification: | I am the person listed above and I certify under penalty of perjury that the renewal information submitted is true and correct to the best of my knowledge. I understand that deliberately submitting false information may be punishable as a gross misdemeanor. RCW 43.07.210 |

Home 



RENEW YOUR
# Corporation or LLC



**CAMWEST DEVELOPMENT LLC**
UBI: **602 975 902**

## Thank you for renewing online
Your annual report has been completed and submitted. Please print this receipt for your records and allow 14 days to receive your license document in the mail.

Completed date and time:    Dec 16 2013 11:18AM Pacific Time
Transaction number:    2013 350 4533
Credit card approval number: 3872215334630178147361

| Your company | |
|---|---|
| Company name: | CAMWEST DEVELOPMENT LLC |
| Unified business ID: | 602 975 902 |
| State of formation: | Washington |
| Date of formation: | 12/14/2009 |
| Expiration date: | 12/31/2014 |

| Your fees | |
|---|---|
| Domestic Limited Liability Company: | $ 60.00 |
| Renewal application fee: | $ 11.00 |
| Total fees: | $ 71.00 |
| Previous payment: | $ 0.00 |
| Total amount charged: | $ 71.00 |

| Business information | |
|---|---|
| Principal place of business: | 12332 NE 115th PL<br>Kirkland, Washington 98033<br>United States |
| Company telephone number: | (425) 298 0240 |
| Company email address: | None provided |
| My company is managed by: | Members |
| Does your company own land, buildings or other real property in Washington? | No |

| Nature of business | |
|---|---|
| Type: | Real Estate |

| Governing people | | |
|---|---|---|
| ERIC CAMPBELL | Member | 9720 NE 120TH PL STE 100<br>KIRKLAND,<br>Washington 980344285<br>United States |

| Registered agent | |
|---|---|
| Agent type on file: | Business |
| Agent on file: | KELLY PRICE |
| Agent's office street address on file: | 11415 SLATER AVE NE STE 100<br>KIRKLAND,<br>Washington 980334656<br>United States |
| Agent's mailing address on file: | Same as registered office address. |
| Request agent office street address change to: | 12332 NE 115th PL<br>KIRKLAND, Washington 98033 |

| United States |
| --- |

| **Person completing this renewal** |
| --- |

| Submitted By: | Jackie Hizzey |
| Title: | Employee Authorized to Complete |
| Renewal certification: | I am the person listed above and I certify under penalty of perjury that the renewal information submitted is true and correct to the best of my knowledge. I understand that deliberately submitting false information may be punishable as a gross misdemeanor. RCW 43.07.210 |

Home 🔒

WASHINGTON STATE DEPARTMENT of
LICENSING
Business Licensing Service

Washington
Secretary of State

RENEW YOUR
# Corporation or LLC

Print

**CAMWEST DEVELOPMENT LLC**
UBI : **602 975 902**

## Thank you for renewing online
Your annual report has been completed and submitted. Please print this receipt for
your records and allow 14 days to receive your license document in the mail.

Completed date and time: Dec 19 2014 11:49AM Pacific Time
Transaction number:     2014 353 4140
Payment type:     E-Check

| Your company | |
|---|---|
| Company name: | CAMWEST DEVELOPMENT LLC |
| Unified business ID: | 602 975 902 |
| State of formation: | Washington |
| Date of formation: | 12/14/2009 |
| Expiration date: | 12/31/2015 |

| Your fees | |
|---|---|
| Domestic Limited Liability Company: | $ 60.00 |
| Renewal application fee: | $ 11.00 |
| Total fees: | $ 71.00 |
| Previous payment: | $ 0.00 |
| Total amount charged: | $ 71.00 |

### Business information

| | |
|---|---|
| Principal place of business: | 12332 NE 115th PL Kirkland, Washington 98033 United States |
| Company telephone number: | (425) 298 0240 |
| Company email address: | None provided |
| My company is managed by: | Members |
| Does your company own land, buildings or other real property in Washington? | No |

### Nature of business

| | |
|---|---|
| Type: | Real Estate |

### Governing people

| ERIC CAMPBELL | Member | 9720 NE 120TH PL STE 100 KIRKLAND, Washington 980344285 United States |
|---|---|---|

### Registered agent

| | |
|---|---|
| Agent type on file: | Business |
| Agent on file: | KELLY PRICE |
| Agent's office street address on file: | 12332 NE 115TH PL KIRKLAND, Washington 98033 United States |
| Agent's mailing address on file: | Same as registered office address. |

### Person completing this renewal

| Submitted By: | Jacqueline Hizzey |
|---|---|
| Title: | Employee Authorized to Complete |
| Renewal certification: | I am the person listed above and I certify under penalty of perjury that the renewal information submitted is true and correct to the best of my knowledge. I understand that deliberately submitting false information may be punishable as a gross misdemeanor. RCW 43.07.210 |

Home



RENEW YOUR
# Corporation or LLC



**CAMWEST DEVELOPMENT LLC**
**UBI: 602 975 902**

## Thank you for renewing online

Your annual report has been completed and submitted. Please print this receipt for your records and allow 14 days to receive your license document in the mail.

Completed date and time: Nov 30 2015 10:03AM Pacific Time
Transaction number:    2015 334 3604
Payment type:    E-Check

| Your company | |
| --- | --- |
| Company name: | CAMWEST DEVELOPMENT LLC |
| Unified business ID: | 602 975 902 |
| State of formation: | Washington |
| Date of formation: | 12/14/2009 |
| Expiration date: | 12/31/2016 |

| Your fees | |
| --- | --- |
| Domestic Limited Liability Company: | $ 60.00 |
| Renewal application fee: | $ 11.00 |
| Total fees: | $ 71.00 |
| Previous payment: | $  0.00 |
| Total amount charged: | $ 71.00 |

| Business information | |
| --- | --- |
| Principal place of business: | 12332 NE 115th PL<br>Kirkland, Washington  98033<br>United States |
| Company telephone number: | (425) 298 0240 |
| Company email address: | None provided |
| My company is managed by: | Members |
| Does your company own real property (including leasehold interests) in Washington? | No |

| Nature of business | |
| --- | --- |
| Type: | Real Estate |

| Governing people | | |
| --- | --- | --- |
| ERIC CAMPBELL | Member | 9720 NE 120TH PL STE 100<br>KIRKLAND,<br>Washington  980344285<br>United States |

| Registered agent | |
| --- | --- |
| Agent type on file: | Individual |
| Agent on file: | KELLY PRICE |
| Agent's office street address on file: | 12332 NE 115TH PL<br>KIRKLAND, Washington  98033<br>United States |
| Agent's mailing address on file: | Same as registered office address. |
| Request agent type change to: | Business |

| Person completing this renewal | |
|---|---|
| Submitted By: | Jaqueline Hizzey |
| Title: | Employee Authorized to Complete |
| Renewal certification: | I am the person listed above and I certify under penalty of perjury that the renewal information submitted is true and correct to the best of my knowledge. I understand that deliberately submitting false information may be punishable as a gross misdemeanor. RCW 43.07.210 |

Home 

# EXHIBIT 140

10-K 1 tol-20121031x10k.htm 10-K

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# FORM 10-K

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended October 31, 2012**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT of 1934**

    **For the transition period from          to**

### Commission file number 1-9186

# TOLL BROTHERS, INC.

*(Exact name of Registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **23-2416878** |
| *(State or other jurisdiction of* | *I.R.S. Employer* |
| *incorporation or organization)* | *Identification No.)* |
| **250 Gibraltar Road, Horsham, Pennsylvania** | **19044** |
| *(Address of principal executive offices)* | *(Zip Code)* |

### Registrant's telephone number, including area code
### (215) 938-8000
### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock (par value $.01)\*** | **New York Stock Exchange** |
| **Guarantee of Toll Brothers Finance Corp. 4.95% Senior Notes due 2014** | **New York Stock Exchange** |
| **Guarantee of Toll Brothers Finance Corp. 5.15% Senior Notes due 2015** | **New York Stock Exchange** |

**\* Includes associated Right to Purchase Series A Junior Participating Preferred Stock**

    **Securities registered pursuant to Section 12(g) of the Act:   None**

**Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes☒ No ☐**

**Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Act. Yes☐ No ☒**

**Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes☒ No ☐**

**Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes☒ No ☐**

**Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒**

**Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):**

| | | | |
|---|---|---|---|
| **Large accelerated filer ☒** | **Accelerated filer ☐** | **Non-accelerated filer ☐** | **Smaller reporting company ☐** |

**(Do not check if a smaller reporting company)**

**Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes☐ No ☒**

**As of April 30, 2012, the aggregate market value of the Common Stock held by non-affiliates (all persons other than executive officers and directors of Registrant) of the Registrant was approximately $3,797,126,000.**

**As of December 24, 2012, there were approximately 169,041,000 shares of Common Stock outstanding.**

**Documents Incorporated by Reference:** Portions of the proxy statement of Toll Brothers, Inc. with respect to the 2013 Annual Meeting of Stockholders, scheduled to be held on March 13, 2012, are incorporated by reference into Part III of this report.

## <u>TABLE OF CONTENTS</u>

PART I

    ITEM 1. BUSINESS

    ITEM 1A. RISK FACTORS

    ITEM 1B. UNRESOLVED STAFF COMMENTS

    ITEM 2. PROPERTIES

    ITEM 3. LEGAL PROCEEDINGS

    ITEM 4. MINE SAFETY DISCLOSURES

PART II

    ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

    ITEM 6. SELECTED FINANCIAL DATA

    ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

    ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

    ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

    ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS

    ITEM 9A. CONTROLS AND PROCEDURES

    ITEM 9B. OTHER INFORMATION

PART III

    ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

    ITEM 11. EXECUTIVE COMPENSATION

    ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

    ITEM 13. CERTAIN RELATIONSHIPS, RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

    ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

PART IV

    ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES

SIGNATURES

Exhibit 12

Exhibit 21

Exhibit 23.1

Exhibit 23.2

Exhibit 31.1

Exhibit 31.2

Exhibit 32.1

Exhibit 32.2

Exhibit 99.1

Exhibit 99.2

EX-101 INSTANCE DOCUMENT

EX-101 SCHEMA DOCUMENT

EX-101 CALCULATION LINKBASE DOCUMENT

EX-101 LABEL LINKBASE DOCUMENT

EX-101 PRESENTATION LINKBASE DOCUMENT

EX-101 DEFINITION LINKBASE DOCUMENT

PART I

ITEM 1. BUSINESS

General

Toll Brothers, Inc., a Delaware corporation formed in May 1986, began doing business through predecessor entities in 1967. When this report uses the words "we," "us," "our," and the "Company," they refer to Toll Brothers, Inc. and its subsidiaries, unless the context otherwise requires. References herein to "fiscal 2012," "fiscal 2011," "fiscal 2010," "fiscal 2009," and "fiscal 2008" refer to our fiscal years ended October 31, 2012, October 31, 2011, October 31, 2010, October 31, 2009, and October 31, 2008, respectively. References herein to "fiscal 2013" refer to our fiscal year ending October 31, 2013.

We design, build, market and arrange financing for detached and attached homes in luxury residential communities. We are also involved, directly and through joint ventures, in projects where we are building or converting existing rental apartment buildings into, high-, mid- and low-rise luxury homes. We are also developing, through joint ventures, a high-rise luxury condominium/hotel project and a for-rent luxury apartment complex. We cater to move-up, empty-nester, active-adult, age-qualified and second-home buyers in the United States. At October 31, 2012, we were operating in 19 states.

In recognition of our achievements, we have received numerous awards from national, state and local home builder publications and associations. In 2012, we were named Builder of the Year by Professional Builder Magazine. We are the only two-time recipient of this award.

Our traditional communities are generally located on land we have either acquired and developed or acquired fully-approved and, in some cases, improved. We also operate through a number of joint ventures. At October 31, 2012, we were operating in the following major suburban and urban residential markets:

- Philadelphia, Pennsylvania metropolitan area

- Lehigh Valley area of Pennsylvania

- Central and northern New Jersey

- Virginia and Maryland suburbs of Washington, D.C.

- Baltimore, Maryland metropolitan area

- Eastern Shore of Maryland and Delaware

- Richmond, Virginia metropolitan area

- Boston, Massachusetts metropolitan area

- Fairfield, Hartford, New Haven and New London Counties, Connecticut

- Westchester, Dutchess, Ulster and Saratoga Counties, New York

- Boroughs of Manhattan and Brooklyn in New York City

- Los Angeles, California metropolitan area

- San Francisco Bay, Sacramento and San Jose areas of northern California

- San Diego and Palm Springs, California areas

- Phoenix, Arizona metropolitan area

- Raleigh and Charlotte, North Carolina metropolitan areas

- Dallas, San Antonio and Houston, Texas metropolitan areas

- Southeast and southwest coasts and the Jacksonville and Orlando areas of Florida

- Las Vegas and Reno, Nevada metropolitan areas

- Detroit, Michigan metropolitan area

- Chicago, Illinois metropolitan area

- Denver, Colorado metropolitan area

1

- Minneapolis/St. Paul, Minnesota metropolitan area, and

- Seattle, Washington metropolitan area

We operate our own land development, architectural, engineering, mortgage, title, landscaping, security monitoring, lumber distribution, house component assembly, and manufacturing operations. We also develop, own and operate golf courses and country clubs associated with several of our master planned communities. We have investments in a number of joint ventures to develop land for the sole use of the venture participants, including ourselves, and to develop land for sale to the joint venture participants and to unrelated builders. We are a participant in joint ventures with unrelated parties to develop luxury condominium projects, including for-sale residential units and commercial space, a single master planned community, and a high-rise luxury for-sale condominium/hotel project. In addition, we formed Toll Brothers Realty Trust ("Trust") and Toll Brothers Realty Trust II ("Trust II") to invest in commercial real estate opportunities. In fiscal 2010, we formed Gibraltar Capital and Asset Management ("Gibraltar") to invest in distressed real estate opportunities, which is different from our traditional home building operations.

We believe that, in fiscal 2012, the housing market began to recover from the significant slowdown that started in the fourth quarter of our fiscal year end October 31, 2005. During fiscal 2012, we and many of the other public home builders have seen a strong recovery in the number of new sales contracts signed. Our net contracts signed in fiscal 2012, as compared to fiscal 2011, increased nearly 50% in the number of net contracts signed and 59% in the value of net contracts signed. Although the number and value of fiscal 2012 net contracts signed increased over fiscal 2011, they were still significantly below what we recorded in fiscal 2005.

We are still affected by the slowdown in the housing market, which we believe started with a decline in consumer confidence, an overall softening of demand for new homes and an oversupply of homes available for sale. The slowdown was exacerbated by, among other things, a decline in the overall economy, increased unemployment, the large number of homes that were vacant and homes that had been foreclosed on due to the economic downturn, a fear of job loss, a decline in home prices and the resulting reduction in home equity, the inability of some of our home buyers, or some prospective buyers of their homes, to sell their current homes, the deterioration in the credit markets, and the direct and indirect impact of the turmoil in the mortgage loan market.

We believe our target customers generally have remained employed during this downturn. However, we believe many deferred their home buying decisions because of concerns over the direction of the economy, concerns over the direction of home prices, and their ability to sell their existing home. We believe that, as the national unemployment rate has declined and confidence improved, pent-up demand has begun to be released. Additionally, rising home prices, reduced inventory, and low mortgage rates have resulted in increased demand, although still below historical levels. We believe that the key to a full recovery in our business depends on these factors as well as a sustained stabilization of financial markets and the economy in general.

For information and analysis of recent trends in our operations and financial condition, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this Annual Report on Form 10-K ("Form 10-K"), and for financial information about our results of operations, assets, liabilities, stockholders' equity and cash flows, see the accompanying Consolidated Financial Statements and Notes thereto in Item 8 of this Form 10-K.

At October 31, 2012, we had 501 communities containing approximately 40,350 home sites that we owned or controlled through options. Of the 501 communities, 262 communities containing approximately 18,122 home sites were residential communities under construction ("current communities") and 239, containing 22,228 home sites, were future communities. Of our 262 current communities, 224 were offering homes for sale, 35 were sold out but not all homes had been completed and delivered, and 3 communities were preparing to re-open. Of the 18,122 home sites in current communities, 15,553 were available for sale and 2,569 were under agreement of sale but not yet delivered ("backlog"). We expect to be selling from 225 to 255 communities by October 31, 2013. Of the approximately 40,350 total home sites that we owned or controlled through options at October 31, 2012, we owned approximately 31,327 and controlled approximately 9,023 through options. Included in the 239 future communities are 39 communities containing 2,832 home sites that had previously been open but that we shut down due to the slowdown in the housing market.

At October 31, 2012, we were offering detached homes in 175 communities at prices, excluding customized options, lot premiums and sales incentives, generally ranging from $195,000 to $1,883,000 with some homes offered at prices higher than $1,883,000. During fiscal 2012, we delivered 2,128 detached homes at an average base price of approximately $537,400. On average, our detached home buyers added approximately 23.1%, or $124,000 per home, in customized options and lot premiums to the base price of detached homes we delivered in fiscal 2012, as compared to 21.8% or $124,000 per home in fiscal 2011 and 24.3% or $145,000 in fiscal 2010.

At October 31, 2012, we were offering attached homes in 49 communities at prices, excluding customized options, lot premiums and sales incentives, generally ranging from $165,000 to $982,000, with some units offered at prices higher than $982,000. During fiscal 2012, we delivered 1,158 attached homes at an average base price of approximately $477,000. On average, our attached home buyers added approximately 9.4%, or $45,000 per home, in customized options and lot premiums to the base price of attached homes we delivered in fiscal 2012, as compared to 12.6% or $52,000 per home in fiscal 2011 and 9.7% or $45,700 in fiscal 2010.

We had a backlog of $1.67 billion (2,569 homes) at October 31, 2012 and $981.1 million (1,667 homes) at October 31, 2011. Of the homes in backlog at October 31, 2012, approximately 96% are scheduled to be delivered by October 31, 2013.

Because of the length of time that it takes to obtain the necessary approvals on a property, complete the land improvements on it, and deliver a home after a home buyer signs an agreement of sale, we are subject to many risks. We attempt, where possible, to reduce certain risks by controlling land for future development through options (also referred to herein as "land purchase contracts" or "option and purchase agreements"), thus allowing the necessary governmental approvals to be obtained before acquiring title to the land; generally commencing construction of a detached home only after executing an agreement of sale and receiving a substantial down payment from the buyer; and using subcontractors to perform home construction and land development work on a fixed-price basis. Our risk reduction strategy of generally not commencing the construction of a detached home until we have an agreement of sale with a buyer was implemented prior to the 2006-2011 downturn in the housing market, but, due to the number of cancellations of agreements of sale that we had during fiscal 2007, 2008 and 2009, many of which were for homes on which we had commenced construction, the number of homes under construction in detached communities for which we did not have an agreement of sale increased from our historical levels. With our contract cancellation rates returning to the levels we experienced prior to the downturn in the housing market and the sale of these units, we have reduced the number of unsold units to more historical levels. In addition, over the past several years, the number of our attached-home communities has grown, resulting in an increase in the number of unsold units under construction.

### Acquisition

In November 2011, we acquired substantially all of the assets of CamWest Development LLC ("CamWest") for approximately $144.7 million in cash. The assets acquired were primarily inventory. CamWest develops a variety of home types, including luxury detached homes, condominiums, and townhomes throughout the Seattle, Washington metropolitan area, primarily in King and Snohomish Counties. CamWest's homes typically sell from the mid $300,000's to over $600,000. As part of the acquisition, we assumed contracts to deliver approximately 29 homes with an aggregate value of $13.7 million. The assets we acquired included approximately 1,245 home sites owned and 254 home sites controlled through land purchase agreements. This acquisition increased our selling community count by 15 communities at the date of acquisition. In fiscal 2012, our CamWest operations delivered 201 homes and produced revenues of $99.7 million.

### Our Communities

Our communities are generally located in affluent suburban areas near major highways providing access to major cities. We also operate in the affluent urban markets of Hoboken and Jersey City, New Jersey; New York City, New York; and Philadelphia, Pennsylvania. The following table lists the 19 states in which we were operating at October 31, 2012 and the fiscal years in which we or our predecessors commenced operations:

| State | Fiscal year of entry | State | Fiscal year of entry |
|---|---|---|---|
| Pennsylvania | 1967 | Texas | 1995 |
| New Jersey | 1982 | Florida | 1995 |
| Delaware | 1987 | Arizona | 1995 |
| Massachusetts | 1988 | Nevada | 1998 |
| Maryland | 1988 | Illinois | 1998 |
| Virginia | 1992 | Michigan | 1999 |
| Connecticut | 1992 | Colorado | 2001 |
| New York | 1993 | Minnesota | 2005 |
| California | 1994 | Washington | 2012 |
| North Carolina | 1994 | | |

We market our high-quality homes to "upscale" luxury home buyers, generally comprised of those persons who have previously owned a principal residence and who are seeking to buy a larger or more desirable home — the so-called "move-up"

3

market. We believe our reputation as a developer of homes for this market enhances our competitive position with respect to the sale of our smaller, more moderately priced, detached homes, as well as our attached homes.

We also market to the 50+ year-old "empty-nester" market, which we believe has strong growth potential. We have developed a number of home designs with features such as one-story living and first-floor master bedroom suites, as well as communities with recreational amenities such as golf courses, marinas, pool complexes, country clubs and recreation centers that we believe appeal to this category of home buyers. We have integrated certain of these designs and features in some of our other home types and communities.

We develop active-adult, age-qualified communities for households in which at least one member is 55 years of age. As of October 31, 2012, we were selling from 20 such communities and expect to open additional age-qualified communities during the next few years. Of the value and number of net contracts signed in fiscal 2012, approximately 8% and 10%, respectively, were in active-adult communities; in fiscal 2011, approximately 10% and 13%, respectively, were in such communities. In fiscal 2010, approximately 11% and 15% of the value and number of net contracts signed were in active-adult communities.

In order to serve a growing market of affluent move-up families, empty-nesters and young professionals seeking to live in or close to major cities, we have developed and are developing a number of high-density, high-, mid- and low-rise urban luxury communities. These communities, which we are currently developing or planning on our own or through joint ventures, are located in Dublin, California; Chicago, Illinois suburbs; North Bethesda, Maryland; Hoboken, New Jersey; the boroughs of Manhattan and Brooklyn, New York; Philadelphia, Pennsylvania and its suburbs.

We believe that the demographics of the move-up, empty-nester, active-adult, age-qualified and second-home upscale markets will provide us with the potential for growth in the coming decade. According to the U.S. Census Bureau, the number of households earning $100,000 or more (in constant 2011 dollars) at September 2012 stood at 25.4 million, or approximately 17.3% of all U.S. households. This group has grown at three times the rate of increase of all U.S. households since 1980. According to Harvard University's June 2012 "The State of the Nation's Housing," the growth and aging of the current population, assuming the economic recovery is sustained over the next few years, supports the addition of about one million new household formations per year during the next decade.

According to the U.S. Census Bureau, during the period 1970 through 2007, total housing starts in the United States averaged approximately 1.26 million per year, while in the period 2008 through 2011, total housing starts averaged approximately 0.66 million per year. In addition, based on the trend of household formations in relation to population growth during the period 2000 through 2007, the number of households formations formed in the four year period of 2008 through 2011 was approximately 2.3 million less than would have been expected.

We develop individual stand-alone communities as well as multi-product, master planned communities. We currently have 28 master planned communities. Our master planned communities, many of which include golf courses and other country club-type amenities, enable us to offer multiple home types and sizes to a broad range of move-up, empty-nester, active-adult and second-home buyers. We seek to realize efficiencies from shared common costs, such as land development and infrastructure, over the several communities within the master planned community. We currently have master planned communities in Arizona, California, Connecticut, Florida, Illinois, Maryland, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, Virginia and Washington.

Each of our detached-home communities offers several home plans, with the opportunity for home buyers to select various exterior styles. We design each community to fit existing land characteristics. We strive to achieve diversity among architectural styles within a community by offering a variety of house models and several exterior design options for each model, preserving existing trees and foliage whenever practicable, and curving street layouts to allow relatively few homes to be seen from any vantage point. Normally, homes of the same type or color may not be built next to each other. Our communities have attractive entrances with distinctive signage and landscaping. We believe that our added attention to community detail avoids a "development" appearance and gives each community a diversified neighborhood appearance that enhances home values.

Our traditional attached home communities generally offer one- to four-story homes, provide for limited exterior options and often include commonly owned recreational facilities such as clubhouses, playing fields, swimming pools and tennis courts.

**Our Homes**

In most of our detached home communities, we offer a number of different house floor plans, each with several substantially different architectural styles. In addition, the exterior of each basic floor plan may be varied further by the use of stone, stucco, brick or siding. Our traditional attached home communities generally offer several different floor plans with two, three or four

bedrooms.

We offer some of the same basic home designs in similar communities. However, we are continuously developing new designs to replace or augment existing ones to ensure that our homes reflect current consumer tastes. We use our own architectural staff and also engage unaffiliated architectural firms to develop new designs. During the past year, we introduced 68 new detached models, 16 new attached models and a significant number of designs in five of our high- and mid-rise communities.

In all of our communities, a wide selection of options is available to home buyers for additional charges. The number and complexity of options typically increase with the size and base selling price of our homes. Major options include additional garages, extra fireplaces, guest suites, finished lofts, and other additional rooms. On average, options purchased by our detached home buyers, including lot premiums, added approximately 23.1%, or $124,000 per home, to the base price of homes delivered in fiscal 2012, as compared to 21.8%, or $124,000 per home in fiscal 2011 and 24.3% or $145,000 per home in fiscal 2010. Options purchased by our attached home buyers, including lot premiums, added, on average, approximately 9.4%, or $45,000 per home, to the base price of homes delivered in fiscal 2012, as compared to 12.6%, or $52,000 per home in fiscal 2011 and 9.7% or $45,700 per home in fiscal 2010.

As a result of our wide product and geographic diversity, we have a wide range of base sales prices. The general range of base sales prices for our different lines of homes at October 31, 2012, was as follows:

| | | | | | |
|---|---|---|---|---|---|
| Detached homes | | | | | |
| Move-up | $ | 215,000 | to | $ | 860,000 |
| Executive | | 200,000 | to | | 915,000 |
| Estate | | 334,000 | to | | 1,883,000 |
| Active-adult, age-qualified | | 195,000 | to | | 583,000 |
| Attached homes | | | | | |
| Flats | $ | 182,000 | to | $ | 558,000 |
| Townhomes/Carriage homes | | 165,000 | to | | 825,000 |
| Active-adult, age-qualified | | 190,000 | to | | 496,000 |
| Mid-rise/high-rise | | 291,000 | to | | 982,000 |

A number of projects that we are developing are offering units at prices substantially in excess of those listed above.

At October 31, 2012, we were selling from 224 communities, compared to 215 communities at October 31, 2011 and 195 communities at October 31, 2010. We expect to be selling from 225 to 255 communities at October 31, 2013. In addition, at October 31, 2012, we had 42 communities that were temporarily closed due to market conditions. We currently expect to reopen 3 of these communities prior to October 31, 2013.

The following table summarizes certain information with respect to our residential communities under development at October 31, 2012:

| Geographic segment | Total number of communities | Number of selling communities | Homes approved | Homes closed | Homes under contract but not closed | Home sites available |
|---|---|---|---|---|---|---|
| North | 68 | 58 | 9,812 | 4,454 | 655 | 4,703 |
| Mid-Atlantic | 72 | 59 | 11,197 | 5,382 | 658 | 5,157 |
| South | 67 | 59 | 7,485 | 2,763 | 749 | 3,973 |
| West | 55 | 48 | 4,544 | 2,317 | 507 | 1,720 |
| Total | 262 | 224 | 33,038 | 14,916 | 2,569 | 15,553 |

At October 31, 2012, significant site improvements had not yet commenced on approximately 5,400 of the 15,553 available home sites. Of the 15,553 available home sites, 948 were not yet owned by us but were controlled through options.

Of our 262 communities under development at October 31, 2012, 224 were offering homes for sale, 35 were sold out but not all homes had been completed and delivered, and 3 communities were preparing to re-open. Of the 224 communities in which homes were being offered for sale at October 31, 2012, 175 were detached home communities and 49 were attached home communities. At October 31, 2012, we had 523 homes (exclusive of model homes) under construction or completed but not under contract, of which 188 were in detached home communities and 335 were in attached home communities. In addition, we

5

had 155 units that were temporarily being held as rental units. Of the 335 homes under construction or completed but not under contract in attached home communities at October 31, 2012, 301 were in high- and mid-rise projects and 34 were in two communities that we acquired and are converting to condominium units.

At the end of each fiscal quarter, we review the profitability of each of our operating communities. For those communities operating below certain profitability thresholds, we estimate the expected future cash flow for each of those communities. For each community whose estimated cash flow is not sufficient to recover its carrying value, we estimate the fair value of the community in accordance with U.S. generally accepted accounting principles ("GAAP") and recognize an impairment charge for the difference between the estimated fair value of the community and its carrying value. In fiscal 2012, 2011 and 2010, we recognized impairment charges related to operating communities of $13.1 million, $17.1 million and $53.5 million, respectively.

For more information regarding revenues, gross contracts signed, contract cancellations, net contracts signed, and sales incentives provided on units delivered; (loss) income before income taxes; and assets by geographic segment; see "Management's Discussion and Analysis of Financial Condition and Results of Operation — Geographic Segments" in Item 7 of this Form 10-K and Note 17 to the Consolidated Financial Statements in Item 15 of this Form 10-K.

**Land Policy**

Before entering into an agreement to purchase a land parcel, we complete extensive comparative studies and analyses on detailed internally-designed forms that assist us in evaluating the acquisition. Historically, we have attempted to enter into option agreements to purchase land for future communities. However, in order to obtain better terms or prices, or due to competitive pressures, we acquire property outright from time to time. We have also entered into several joint ventures with other builders or developers to develop land for the use of the joint venture participants or for sale to outside third parties. In addition, we have, at times, acquired the underlying mortgage on a property and subsequently obtained title to that property.

We generally attempt, where possible, to enter into agreements to purchase land, referred to in this Form 10-K as "land purchase contracts," "purchase agreements," "options" or "option agreements," on a non-recourse basis, thereby limiting our financial exposure to the amounts expended in obtaining any necessary governmental approvals, the costs incurred in the planning and design of the community and, in some cases, some or all of our deposit. The use of these agreements may increase the price of land that we eventually acquire, but reduces our risk by allowing us to obtain the necessary development approvals before acquiring the land or allowing us to delay the acquisition to a later date. Historically, as approvals were obtained, the value of the options, purchase agreements and land generally increased. However, in any given time period, this may not happen. We have the ability to extend some of these options for varying periods of time, in some cases by making an additional payment and, in other cases, without making any additional payment. Our purchase agreements are typically subject to numerous conditions including, but not limited to, the ability to obtain necessary governmental approvals for the proposed community. Our deposit under an agreement may be returned to us if all approvals are not obtained, although pre-development costs may not be recoverable. We generally have the right to cancel any of our agreements to purchase land by forfeiture of some or all of the deposits we have made pursuant to the agreement. We are currently evaluating many opportunities to acquire distressed properties from various sources. We believe that, in general, we will not be able to purchase these distressed properties through the use of purchase options, but will be required to purchase them outright.

In response to the decline in market conditions during the downturn in the housing industry since 2006, we have re-evaluated and renegotiated or canceled many of our land purchase contracts. In addition, we have sold, and may continue to sell, certain parcels of land that we have identified as non-strategic. As a result, we reduced our home sites controlled from a high of approximately 91,200 at April 30, 2006 to approximately 40,350 at October 31, 2012.

Based on our experience during prior downturns in the housing industry, we believe that attractive land acquisition opportunities arise in difficult times for those builders that have the financial strength to take advantage of them. In the current environment, we believe our strong balance sheet, liquidity, access to capital, broad geographic presence, diversified product line, experienced personnel and national brand name all position us well for such opportunities now and in the future. Based on our belief that the housing market has begun to recover, the increased attractiveness of land available for purchase and the revival of demand in certain areas, we have begun to increase our land positions. During the twelve-month period ended October 31, 2012 and 2011, we acquired control of approximately 6,100 home sites (net of options terminated) and, approximately 5,300 home sites (net of options terminated), respectively. At October 31, 2012, we controlled approximately 40,350 home sites, as compared to approximately 37,500 home sites at October 31, 2011 and 34,900 home sites at October 31, 2010. In addition, in November 2012, we entered into an agreement with one of our joint venture partners to acquire approximately 800 lots from the joint venture.

Our ability to continue development activities over the long-term will be dependent, among other things, upon a suitable economic environment and our continued ability to locate and enter into options or agreements to purchase land, obtain governmental approvals for suitable parcels of land, and consummate the acquisition and complete the development of such land.

The following is a summary of home sites for future communities that we either owned or controlled through purchase agreements at October 31, 2012, as distinguished from those communities currently under development:

| Geographic segment | Number of communities | Number of home sites |
|---|---|---|
| North | 51 | 4,722 |
| Mid-Atlantic | 85 | 8,599 |
| South | 40 | 4,337 |
| West | 63 | 4,570 |
| | 239 | 22,228 |

Of the 22,228 planned home sites at October 31, 2012, we owned 14,153 and controlled 8,075 through options and purchase agreements. At October 31, 2012, the aggregate purchase price of land parcels subject to option and purchase agreements in operating communities and future communities was approximately $747.0 million (including $4.1 million of land to be acquired from joint ventures in which we have invested). Of the $747.0 million of land purchase commitments, we paid or deposited $42.9 million and, if we acquire all of these land parcels, we will be required to pay an additional $704.1 million. The purchases of these land parcels are scheduled over the next several years. We have additional land parcels under option that have been excluded from the aforementioned aggregate purchase price since we do not believe that we will complete the purchase of these land parcels and no additional funds will be required from us to terminate these contracts; these land parcels have either been written off or written down to the estimated amount that we expect to recover on them when the contracts are terminated. In addition, in November 2012, we entered into an agreement with a joint venture partner to acquire approximately 800 lots from the joint venture.

We evaluate all of the land owned or optioned for future communities on an ongoing basis for continued economic and market feasibility. During each of the fiscal years ended October 31, 2012, 2011 and 2010, such feasibility analyses resulted in approximately $1.7 million, $34.8 million and $61.8 million, respectively, of capitalized costs related to land owned or optioned for future communities being charged to cost of revenues because such costs were no longer deemed to be recoverable or exceeded the properties' fair value.

We have a substantial amount of land currently under control for which approvals have been obtained or are being sought. We devote significant resources to locating suitable land for future development and obtaining the required approvals on land under our control. There can be no assurance that the necessary development approvals will be secured for the land currently under our control or for land which we may acquire control of in the future or that, upon obtaining such development approvals, we will elect to complete the purchases of land under option or complete the development of land that we own. We generally have been successful in obtaining governmental approvals in the past. Based upon our current decreased level of business, we believe that we have an adequate supply of land in our existing communities and proposed communities (assuming that all properties are developed) to maintain our operations at current levels for several years.

**Community Development**

We typically expend considerable effort in developing a concept for each community, which includes determining the size, style and price range of the homes; the layout of the streets and individual home sites; and the overall community design. After the necessary governmental subdivision and other approvals have been obtained, which may take several years, we improve the land by clearing and grading it; installing roads, underground utility lines and recreational amenities; erecting distinctive entrance structures; and staking out individual home sites.

Each community is managed by a project manager. Working with sales staff, construction managers, marketing personnel and, when required, other in-house and outside professionals such as accountants, engineers, architects and legal counsel, a project manager is responsible for supervising and coordinating the various developmental steps such as land approval, land acquisition, marketing, selling, construction and customer service, and monitoring the progress of work and controlling expenditures. Major decisions regarding each community are made in consultation with senior members of our management team.

The most significant variable affecting the timing of our revenue stream, other than housing demand, is the opening of the community for sale, which generally occurs shortly after receipt of final land regulatory approvals. Receipt of approvals permits us to begin the process of obtaining executed sales contracts from home buyers. Although our sales and construction activities vary somewhat by season, which can affect the timing of closings, any such seasonal effect is relatively insignificant compared to the effect of the timing of receipt of final regulatory approvals, the opening of the community and the subsequent timing of closings. In the recent housing slowdown, we have delayed the opening of new communities and temporarily shut down a number of operating communities to reduce operating expenses and conserve cash.

We act as a general contractor for most of our projects. Subcontractors perform all home construction and land development work, generally under fixed-price contracts. We purchase most of the materials we use to build our homes and in our land development activities directly from the manufacturers or producers. We generally have multiple sources for the materials we purchase and we have not experienced significant delays due to unavailability of necessary materials. See "Manufacturing/Distribution Facilities" in Item 2 of this Form 10-K.

Our construction managers coordinate subcontracting activities and supervise all aspects of construction work and quality control. One of the ways in which we seek to achieve home buyer satisfaction is by providing our construction managers with incentive compensation arrangements based upon each home buyer's satisfaction, as expressed by the buyers' responses on pre- and post-closing questionnaires.

We maintain insurance, subject to deductibles and self-insured amounts, to protect us against various risks associated with our activities, including, among others, general liability, "all-risk" property, construction defects, workers' compensation, automobile and employee fidelity. We accrue for our expected costs associated with the deductibles and self-insured amounts.

**Marketing and Sales**

We believe that our marketing strategy, which emphasizes our more expensive "Estate" and "Executive" lines of homes, has enhanced our reputation as a builder-developer of high-quality upscale housing. We believe this reputation results in greater demand for all of our lines of homes. We generally include attractive decorative features such as chair rails, crown moldings, dentil moldings, vaulted and coffered ceilings and other aesthetic elements, even in our less expensive homes, based on our belief that this additional construction expense enhances our image and improves our marketing and sales effort.

In determining the prices for our homes, we utilize, in addition to management's extensive experience, an internally developed value analysis program that compares our homes with homes offered by other builders in each local marketing area. In our application of this program, we assign a positive or negative dollar value to differences between our product features and those of our competitors, such as house and community amenities, location and reputation.

We expend great effort and cost in designing and decorating our model homes, which play an important role in our marketing. In our models, we attempt to create an attractive atmosphere, which may include bread baking in the oven, fires burning in fireplaces, and music playing in the background. Interior decorating varies among the models and is carefully selected to reflect the lifestyles of prospective buyers.

We typically have a sales office in each community that is staffed by our own sales personnel. Sales personnel are generally compensated with both salary and commission. A significant portion of our sales is also derived from the introduction of customers to our communities by local cooperating realtors.

We advertise in newspapers, in other local and regional publications, and on billboards. We also use color brochures to market our communities. The internet is also an important resource we use in marketing and providing information to our customers. Visitors to our web site, www.tollbrothers.com, can obtain detailed information regarding our communities and homes across the country, take panoramic or video tours of our homes and design their own home based upon our available floor plans and options.

Due to the weak market conditions over the past several years and in an effort to promote the sales of homes, including the significant number of speculative homes that we had due to sales contract cancellations, we increased the amount of sales incentives offered to home buyers. These incentives varied by type and amount on a community-by-community and home-by-home basis. As demand in the housing market has strengthened, we have been reducing the amount of sales incentives offered to our home buyers.

All of our homes are sold under our limited warranty as to workmanship and mechanical equipment. Many homes also come with a limited ten-year warranty as to structural integrity.

We have a two-step sales process. The first step takes place when a potential home buyer visits one of our communities and decides to purchase one of our homes, at which point the home buyer signs a non-binding deposit agreement and provides a small, refundable deposit. This deposit will reserve, for a short period of time, the home site or unit that the home buyer has selected and locks in the base price of the home. Because these deposit agreements are non-binding, they are not recorded as signed contracts, nor are they recorded in backlog. Deposit rates are tracked on a weekly basis to help us monitor the strength or weakness in demand in each of our communities. If demand for homes in a particular community is strong, senior management determines whether the base selling prices in that community should be increased. If demand for the homes in a particular community is weak, we determine whether or not sales incentives and/or discounts on home prices should be adjusted.

The second step in the sales process occurs when we actually sign a binding agreement of sale with the home buyer and the home buyer gives us a cash down payment which is generally non-refundable. Cash down payments currently average approximately 8.1% of the total purchase price of a home, although, historically, they have averaged approximately 7% of the total purchase price of a home. Between the time that the home buyer signs the non-binding deposit agreement and the binding agreement of sale, he or she is required to complete a financial questionnaire that gives us the ability to evaluate whether the home buyer has the financial resources necessary to purchase the home. If we determine that the home buyer is not financially qualified, we will not enter into an agreement of sale with the home buyer. During fiscal 2012, 2011 and 2010, our customers signed gross contracts for $2.67 billion (4,341 homes), $1.71 billion (2,965 homes) and $1.57 billion (2,789 homes) , respectively. During fiscal 2012, fiscal 2011 and fiscal 2010, our home buyers canceled home purchase contracts with a value of $107.3 million (182 homes), $102.8 million (184 homes) and $98.3 million (184 homes), respectively. Contract cancellations in a fiscal year include all contracts canceled in that fiscal year, whether signed in that fiscal year or signed in prior fiscal years. When we report net contracts signed, the number and value of contracts signed are reported net of all cancellations occurring during the reporting period, whether signed in that reporting period or in a prior period. Only outstanding agreements of sale that have been signed by both the home buyer and us as of the end of the period for which we are reporting are included in backlog. As a result of cancellations, we retained $3.2 million, $2.1 million and $11.2 million of customer deposits in fiscal 2012, 2011 and 2010, respectively. These retained deposits are included in other income-net in our Consolidated Statements of Operations.

While we try to avoid selling homes to speculators and generally do not build detached homes without first having a signed agreement of sale, we have been impacted by an overall increase in the supply of homes available for sale in many markets due primarily to the large number of homes that are or will be available for sale from increased foreclosures.

Our mortgage subsidiary provides mortgage financing for a portion of our home closings. Our mortgage subsidiary determines whether the home buyer qualifies for the mortgage he or she is seeking based upon information provided by the home buyer and other sources. For those home buyers that qualify, our mortgage subsidiary provides the home buyer with a mortgage commitment that specifies the terms and conditions of a proposed mortgage loan based upon then-current market conditions. Information about the number and amount of loans funded by our mortgage subsidiary is contained in the table below.

| Fiscal year | | Total Toll Brothers, Inc. settlements (a) | TBI Mortgage Company financed settlements*(b) | Gross capture rate (b/a) | Amount financed (in thousands) |
|---|---|---|---|---|---|
| 2012 | | 3,286 | 1,572 | 47.8% | $ 585,732 |
| 2011 | | 2,611 | 1,361 | 52.1% | $ 508,880 |
| 2010 | | 2,642 | 1,451 | 54.9% | $ 530,575 |
| | 2009 | 2,965 | 1,341 | 45.2% | $ 489,269 |

\*    TBI Mortgage Company financed settlements exclude brokered and referred loans which amounted to approximately 10.7%, 11.5%, 5.8% and 5.0% of our closings in 2012, 2011, 2010 and 2009, respectively.

Prior to the actual closing of the home and funding of the mortgage, the home buyer will lock in an interest rate based upon the terms of the commitment. At the time of rate lock, our mortgage subsidiary agrees to sell the proposed mortgage loan to one of several outside recognized mortgage financing institutions ("investors") who are willing to honor the terms and conditions, including the interest rate, committed to the home buyer. We believe that these investors have adequate financial resources to honor their commitments to our mortgage subsidiary. At October 31, 2012, our mortgage subsidiary was committed to fund $568.0 million of mortgage loans. Of these commitments, $111.2 million, as well as $85.0 million of mortgage loans receivable, have "locked-in" interest rates. Our mortgage subsidiary funds its commitments through a combination of its own capital, capital provided from us, its loan facility and from the sale of mortgage loans to various investors. Our mortgage

9

subsidiary has commitments from investors to acquire $191.9 million of these locked-in loans and receivables. Our home buyers have not locked in the interest rate on the remaining $456.8 million.

There has been significant media attention given to mortgage put-backs, a practice by which a buyer of a mortgage loan tries to recoup losses from the loan originator. We do not believe this is a material issue for our mortgage subsidiary. Of the approximately 15,700 loans sold by our mortgage subsidiary since November 1, 2004, only 31 have been the subject of either actual indemnification payments or take-backs or contingent liability loss provisions related thereto. We believe that this is due to (i) our typical home buyer's financial position and sophistication, (ii) on average, our home buyers who use mortgage financing to purchase a home pay approximately 30% of the purchase price in cash, (iii) our general practice of not originating certain loan types such as option adjustable rate mortgages and down payment assistance products, and our origination of few sub-prime and high loan-to-value/no documentation loans and (iv) our elimination, several years ago, of "early payment default" provisions from our agreements with our mortgage investors. In order for us to incur a loss, a mortgage buyer must demonstrate either (i) a material error on our part in issuing the mortgage or (ii) consumer fraud. In addition, the amount of any such loss would be reduced by any proceeds received on the disposition of the collateral associated with the mortgage.

The Dodd-Frank Wall Street Reform and Consumer Protection Act provides for a number of new requirements relating to residential mortgage lending practices, many of which require implementation by regulatory rule making. These include, among others, minimum standards for mortgages and related lender practices, the definitions and parameters of a Qualified Mortgage and a Qualified Residential Mortgage, future risk retention requirements, limitations on certain fees, prohibition of certain tying arrangements, and remedies for borrowers in foreclosure proceedings in the event that a lender violates fee limitations or minimum standards. The ultimate effect of such provisions on lending institutions, including our mortgage subsidiary, will depend on the rules that are ultimately promulgated.

**Competition**

The home building business is highly competitive and fragmented. We compete with numerous home builders of varying sizes, ranging from local to national in scope, some of which have greater sales and financial resources than we do. Sales of existing homes, whether by a homeowner or by a financial institution that has acquired a home through a foreclosure, also provide competition. We compete primarily on the basis of price, location, design, quality, service and reputation; however, we believe our financial stability, relative to most others in our industry, has become an increasingly favorable competitive factor as more home buyers focus on builder solvency.

We continue to see reduced competition from the small and mid-sized private builders that had been our primary competitors in the luxury market. We believe that many of these builders are no longer in business and that access to capital by the remaining ones is already severely constrained. We envision that there will be fewer and more selective lenders serving our industry as the market rebounds and those lenders likely will gravitate to the home building companies that offer them the greatest security, the strongest balance sheets and the broadest array of potential business opportunities. While some builders may re-emerge with new capital, the scarcity of attractive land is a further impediment to their re-emergence. We believe that this reduced competition, combined with attractive long-term demographics, will reward those well-capitalized builders that can persevere through the current challenging environment.

We believe that geographic and product diversification, access to lower-cost capital and strong demographics benefit those builders, like us, who can control land and persevere through the increasingly difficult regulatory approval process. We believe that these factors favor a large publicly traded home building company with the capital and expertise to control home sites and gain market share. We also believe that over the past five years, many builders and land developers reduced the number of home sites that were taken through the approval process. The process continues to be difficult and lengthy, and the political pressure from no-growth proponents continues to increase, but we believe our expertise in taking land through the approval process and our already-approved land positions will allow us to grow in the years to come as market conditions improve.

**Regulation and Environmental Matters**

We are subject to various local, state and federal statutes, ordinances, rules and regulations concerning zoning, building design, construction and similar matters, including local regulations that impose restrictive zoning and density requirements in order to limit the number of homes that can eventually be built within the boundaries of a particular property or locality. In a number of our markets, there has been an increase in state and local legislation authorizing the acquisition of land as dedicated open space, mainly by governmental, quasi-public and non-profit entities. In addition, we are subject to various licensing, registration and filing requirements in connection with the construction, advertisement and sale of homes in our communities. The impact of these laws tends to increase our overall costs, and may have delayed the opening of communities or caused us to conclude that development of particular communities would not be economically feasible, even if any or all necessary governmental approvals were obtained. See "Land Policy" in this Item 1. We also may be subject to periodic delays or may be precluded

entirely from developing communities due to building moratoriums in one or more of the areas in which we operate. Generally, such moratoriums relate to insufficient water or sewage facilities or inadequate road capacity.

In order to secure certain approvals in some areas, we may be required to provide affordable housing at below market rental or sales prices. The impact on us depends on how the various state and local governments in the areas in which we engage, or intend to engage, in development implement their programs for affordable housing. To date, these restrictions have not had a material impact on us.

We also are subject to a variety of local, state and federal statutes, ordinances, rules and regulations concerning protection of public health and the environment ("environmental laws"). The particular environmental laws that apply to any given community vary greatly according to the location and environmental condition of the site and the present and former uses of the site. Complying with these environmental laws may result in delays, may cause us to incur substantial compliance and other costs, and/or may prohibit or severely restrict development in certain environmentally sensitive regions or areas.

We maintain a policy of engaging independent environmental consultants to evaluate land for the potential of hazardous or toxic materials, wastes or substances before consummating an acquisition. Because we generally have obtained such assessments for the land we have purchased, we have not been significantly affected to date by the presence of such materials.

Our mortgage subsidiary is subject to various state and federal statutes, rules and regulations, including those that relate to licensing, lending operations and other areas of mortgage origination and financing. The impact of those statutes, rules and regulations can increase our home buyers' cost of financing, increase our cost of doing business, as well as restrict our home buyers' access to some types of loans.

### Employees

At October 31, 2012, we employed 2,396 persons full-time. At October 31, 2012, we were subject to one collective bargaining agreement that covered approximately 2% of our employees. We consider our employee relations to be good.

### Available Information

Our principal internet address is www.tollbrothers.com. We make our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 available on our web site, free of charge, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission ("SEC"). The contents of our web site are not, however, a part of this Form 10-K.

### Code of Ethics

The Company has adopted a Code of Ethics for Principal Executive Officer and Senior Financial Officers ("Code of Ethics") that applies to the Company's principal executive officer, principal financial officer, principal accounting officer, controller and persons performing similar functions designated by the Company's Board of Directors. The Code of Ethics is available on the Company's internet website at www.tollbrothers.com under "Investor Relations: Company Information: Corporate Governance." If the Company were to amend or waive any provision of its Code of Ethics, the Company intends to satisfy its disclosure obligations with respect to any such waiver or amendment by posting such information on its internet website set forth above rather than by filing a Form 8-K.

### FORWARD-LOOKING STATEMENTS

Certain information included in this report or in other materials we have filed or will file with the SEC (as well as information included in oral statements or other written statements made or to be made by us) contains or may contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. You can identify these statements by the fact that they do not relate to matters of strictly historical or factual nature and generally discuss or relate to estimates or other expectations regarding future events. They contain words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," "may," "can," "could," "might," "should" and other words or phrases of similar meaning in connection with any discussion of future operating or financial performance. Such statements may include, but are not limited to, information related to: anticipated operating results; home deliveries; financial resources and condition; changes in revenues; changes in profitability; changes in margins; changes in accounting treatment; cost of revenues; selling, general and administrative expenses; interest expense; inventory write-downs; unrecognized tax benefits; anticipated tax refunds; sales paces and prices; effects of home buyer cancellations; growth and expansion; joint ventures in which we are involved; anticipated results from our investments in unconsolidated entities; the ability to acquire land and pursue real estate opportunities; the ability to gain approvals and open new communities; the ability

to sell homes and properties; the ability to deliver homes from backlog; the ability to secure materials and subcontractors; the ability to produce the liquidity and capital necessary to expand and take advantage of opportunities; and legal proceedings and claims.

From time to time, forward-looking statements also are included in other periodic reports on Forms 10-Q and 8-K, in press releases, in presentations, on our website and in other materials released to the public. Any or all of the forward-looking statements included in this report and in any other reports or public statements made by us are not guarantees of future performance and may turn out to be inaccurate. This can occur as a result of incorrect assumptions or as a consequence of known or unknown risks and uncertainties. Many factors mentioned in this report or in other reports or public statements made by us, such as government regulation and the competitive environment, will be important in determining our future performance. Consequently, actual results may differ materially from those that might be anticipated from our forward-looking statements.

Forward-looking statements speak only as of the date they are made. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

For a discussion of factors that we believe could cause our actual results to differ materially from expected and historical results see "Item 1A — Risk Factors" below. This discussion is provided as permitted by the Private Securities Litigation Reform Act of 1995, and all of our forward-looking statements are expressly qualified in their entirety by the cautionary statements contained or referenced in this section.

## EXECUTIVE OFFICERS OF THE REGISTRANT

Information about our executive officers is incorporated by reference from Part III, Item 10 of this annual report.

## ITEM 1A. RISK FACTORS

**The home building industry has been in an extended period of slowdown. A further slowdown in the home building industry would likely further adversely affect our business, results of operations and financial condition.**

The downturn in the home building industry, which we believe began in the fourth quarter of our fiscal 2005, has been one of the most severe in U.S. history. We believe we have seen the beginning of the recovery in fiscal 2012. The downturn, which we believe started with a decline in consumer confidence, a decline in home prices and an oversupply of homes available for sale, was exacerbated by, among other things, a decline in the overall economy, high unemployment, fear of job loss, volatility in the securities markets, the number of homes that are or will be available for sale due to foreclosures, an inability of home buyers to sell their current homes, a tightening of standards in the credit markets, and the direct and indirect impact of the turmoil in the mortgage loan market. All of these factors have contributed to the significant decline in the demand for new homes. Moreover, it is still unclear whether the government's legislative and administrative measures aimed at restoring liquidity to the credit markets and providing relief to homeowners facing foreclosure have helped or will help to effectively stabilize prices and home values, or restore consumer confidence and increase demand in the home building industry.

As a result of this downturn, our sales and results of operations were adversely affected, we incurred significant inventory impairments and other write-offs, our gross margins declined significantly from historical levels, and we incurred substantial losses from operations, after write-offs, during fiscal 2011, 2010, 2009 and 2008. We cannot predict the continuation of the recovery, nor can we provide assurance that should the recovery not continue, our responses, or the government's attempts to address the poor economic conditions will be successful. If the recovery does not continue or the poor economic conditions persist or worsen, they may adversely affect our results of operations and financial condition.

**Adverse changes in economic conditions in markets where we conduct our operations and where prospective purchasers of our homes live could reduce the demand for homes and, as a result, could continue to adversely affect our results of operations and financial condition.**

Additional adverse changes in economic conditions in markets where we conduct our operations and where prospective purchasers of our homes live have had and may continue to have a negative impact on our business. Adverse changes in employment levels, job growth, consumer confidence, interest rates and population growth, or an oversupply of homes for sale may reduce demand and depress prices for our homes and cause home buyers to cancel their agreements to purchase our homes. This, in turn, could continue to adversely affect our results of operations and financial condition.

12

**Increases in cancellations of existing agreements of sale could have an adverse effect on our business.**

Our backlog reflects agreements of sale with our home buyers for homes that have not yet been delivered. We have received a deposit from our home buyer for each home reflected in our backlog, and generally we have the right to retain the deposit if the home buyer does not complete the purchase. In some cases, however, a home buyer may cancel the agreement of sale and receive a complete or partial refund of the deposit for reasons such as state and local law, the home buyer's inability to obtain mortgage financing, his or her inability to sell his or her current home or our inability to complete and deliver the home within the specified time. If the current industry recovery does not continue or a further decline in economic conditions occurs, or if mortgage financing becomes less available, more home buyers may cancel their agreements of sale with us, which would have an adverse effect on our business and results of operations.

**The home building industry is highly competitive and if others are more successful or offer better value to our customers, our business could decline.**

We operate in a very competitive environment, which is characterized by competition from a number of other home builders in each market in which we operate. We compete with large national and regional home building companies and with smaller local home builders for land, financing, raw materials and skilled management and labor resources. We also compete with the resale, also referred to as the "previously owned or existing," home market, which has increased significantly due to the large number of homes that are vacant, and homes that have been foreclosed on or will be foreclosed on, due to the current economic downturn. An oversupply of homes available for sale and the heavy discounting of home prices by some of our competitors could again adversely affect demand for our homes and the results of our operations. Increased competition could require us to further increase our selling incentives and/or reduce our prices. If we are unable to compete effectively in our markets, our business could decline disproportionately to that of our competitors.

**If we are not able to obtain suitable financing, our interest rates are increased or our credit ratings are lowered, our business and results of operations may decline.**

Our business and results of operations depend substantially on our ability to obtain financing for the development of our residential communities, whether from bank borrowings or from financing in the public debt markets. Our revolving credit facility matures in October 2014 and $2.09 billion of our senior notes become due and payable at various times from November 2012 through September 2032. We cannot be certain that we will be able to continue to replace existing financing or find additional sources of financing in the future.

If we are not able to obtain suitable financing at reasonable terms or replace existing debt and credit facilities when they become due or expire, our costs for borrowings will likely increase and our revenues may decrease, or we could be precluded from continuing our operations at current levels.

Increases in interest rates can make it more difficult and/or expensive for us to obtain the funds we need to operate our business. The amount of interest we incur on our revolving bank credit facility fluctuates based on changes in short-term interest rates, the amount of borrowings we incur and the ratings that national rating agencies assign to our outstanding debt securities. Increases in interest rates generally and/or any downgrading in the ratings that national rating agencies assign to our outstanding debt securities could increase the interest rates we must pay on any subsequent issuances of debt securities, and any such ratings downgrade could also make it more difficult for us to sell such debt securities.

**If we cannot obtain letters of credit and surety bonds, our ability to operate may be restricted.**

We use letters of credit and surety bonds to secure our performance under various construction and land development agreements, escrow agreements, financial guarantees and other arrangements. Should banks decline to issue letters of credit or surety companies decline to issue surety bonds, our ability to operate could be significantly restricted and could have an adverse effect on our business and results of operations.

**If our home buyers or our home buyers' buyers are not able to obtain suitable financing, our results of operations may decline.**

Our results of operations also depend on the ability of our potential home buyers to obtain mortgages for the purchase of our homes. The uncertainties in the mortgage markets and their impact on the overall mortgage market, including the tightening of credit standards, could adversely affect the ability of our customers to obtain financing for a home purchase, thus preventing our potential home buyers from purchasing our homes. Moreover, future increases in the cost of home mortgage financing could prevent our potential home buyers from purchasing our homes. In addition, where our potential home buyers must sell their existing homes in order to buy a home from us, increases in mortgage costs and/or lack of availability of mortgages could

prevent the buyers of our potential home buyers' existing homes from obtaining the mortgages they need to complete their purchases, which would result in our potential home buyers' inability to buy a home from us. Similar risks apply to those buyers whose contracts are in our backlog of homes to be delivered. If our home buyers, potential buyers or buyers of our home buyers' current homes cannot obtain suitable financing, our sales and results of operations would be adversely affected.

**If our ability to resell mortgages to investors is impaired, our home buyers will be required to find alternative financing.**

Generally, when our mortgage subsidiary closes a mortgage for a home buyer at a previously locked-in rate, it already has an agreement in place with an investor to acquire the mortgage following the closing. Due to the deterioration of the credit and financial markets, the number of investors that are willing to purchase our mortgages has decreased and the underwriting standards of the remaining investors have become more stringent. Should the resale market for our mortgages decline or the underwriting standards of our investors become more stringent, our ability to sell future mortgages could be adversely affected and we would either have to commit our own funds to long term investments in mortgage loans, which could, among other things, delay the time when we recognize revenues from home sales on our statements of operations or our home buyers would be required to find an alternative source of financing. If our home buyers cannot obtain another source of financing in order to purchase our homes, our sales and results of operations could be adversely affected.

**If land is not available at reasonable prices, our sales and results of operations could decrease.**

In the long term, our operations depend on our ability to obtain land at reasonable prices for the development of our residential communities . Due to the recent downturn in our business, our supply of available home sites, both owned and optioned, decreased from a peak of approximately 91,200 home sites controlled at April 30, 2006 to approximately 40,350 at October 31, 2012. In the future, changes in the general availability of land, competition for available land, availability of financing to acquire land, zoning regulations that limit housing density and other market conditions may hurt our ability to obtain land for new residential communities at prices that will allow us to make a reasonable profit. If the supply of land appropriate for development of our residential communities becomes more limited because of these factors, or for any other reason, the cost of land could increase and/or the number of homes that we are able to sell and build could be reduced.

**If the market value of our land and homes drops, our results of operations will likely decrease.**

The market value of our land and housing inventories depends on market conditions. We acquire land for expansion into new markets and for replacement of land inventory and expansion within our current markets. If housing demand decreases below what we anticipated when we acquired our inventory, we may not be able to make profits similar to what we have made in the past, may experience less than anticipated profits and/or may not be able to recover our costs when we sell and build homes. Due to the significant decline in our business since September 2005, we have recognized significant write-downs of our inventory. If market conditions worsen, we may have to write down our inventories further and/or may have to sell land or homes at a loss.

**We participate in certain joint ventures where we may be adversely impacted by the failure of the joint venture or its participants to fulfill their obligations.**

We have investments in and commitments to certain joint ventures with unrelated parties. These joint ventures may borrow money to help finance their activities. In certain circumstances, the joint venture participants, including ourselves, are required to provide guarantees of certain obligations relating to the joint ventures. As a result of the recent downturn in the home building industry, some of these joint ventures or their participants have or may become unable or unwilling to fulfill their respective obligations. In addition, in many of these joint ventures, we do not have a controlling interest and as a result, we are not able to require these joint ventures or their participants to honor their obligations or renegotiate them on acceptable terms. If the joint ventures or their participants do not honor their obligations, we may be required to expend additional resources or suffer losses, which could be significant.

**Government regulations and legal challenges may delay the start or completion of our communities, increase our expenses or limit our home building activities, which could have a negative impact on our operations.**

The approval of numerous governmental authorities must be obtained in connection with our development activities, and these governmental authorities often have broad discretion in exercising their approval authority. We incur substantial costs related to compliance with legal and regulatory requirements. Any increase in legal and regulatory requirements may cause us to incur substantial additional costs, or in some cases cause us to determine that the property is not feasible for development.

Various local, state and federal statutes, ordinances, rules and regulations concerning building, zoning, sales and similar matters apply to and/or affect the housing industry. Governmental regulation affects construction activities as well as sales activities,

14

mortgage lending activities and other dealings with home buyers. The industry also has experienced an increase in state and local legislation and regulations that limit the availability or use of land. Municipalities may also restrict or place moratoriums on the availability of utilities, such as water and sewer taps. In some areas, municipalities may enact growth control initiatives, which will restrict the number of building permits available in a given year. In addition, we may be required to apply for additional approvals or modify our existing approvals because of changes in local circumstances or applicable law. If municipalities in which we operate take actions like these, it could have an adverse effect on our business by causing delays, increasing our costs or limiting our ability to operate in those municipalities. Further, we may experience delays and increased expenses as a result of legal challenges to our proposed communities, whether brought by governmental authorities or private parties.

Our mortgage subsidiary is subject to various state and federal statutes, rules and regulations, including those that relate to licensing, lending operations and other areas of mortgage origination and financing. The impact of those statutes, rules and regulations can increase our home buyers' cost of financing, increase our cost of doing business, as well as restrict our home buyers' access to some types of loans.

**Increases in taxes or government fees could increase our costs, and adverse changes in tax laws could reduce demand for our homes.**

Increases in real estate taxes and other local government fees, such as fees imposed on developers to fund schools, open space, road improvements, and/or provide low and moderate income housing, could increase our costs and have an adverse effect on our operations. In addition, increases in local real estate taxes could adversely affect our potential home buyers who may consider those costs in determining whether to make a new home purchase and decide, as a result, not to purchase one of our homes. In addition, any changes in the income tax laws that would reduce or eliminate tax deductions or incentives to homeowners, such as a change limiting the deductibility of real estate taxes or interest on home mortgages, could make housing less affordable or otherwise reduce the demand for housing, which in turn could reduce our sales and hurt our results of operations.

**Adverse weather conditions, natural disasters and other conditions could disrupt the development of our communities, which could harm our sales and results of operations.**

Adverse weather conditions and natural disasters, such as hurricanes, tornadoes, earthquakes, floods and fires, can have serious effects on our ability to develop our residential communities. We also may be affected by unforeseen engineering, environmental or geological conditions or problems. Any of these adverse events or circumstances could cause delays in the completion of, or increase the cost of, developing one or more of our residential communities and, as a result, could harm our sales and results of operations.

**If we experience shortages or increased costs of labor and supplies or other circumstances beyond our control, there could be delays or increased costs in developing our communities, which could adversely affect our operating results.**

Our ability to develop residential communities may be adversely affected by circumstances beyond our control, including: work stoppages, labor disputes and shortages of qualified trades people, such as carpenters, roofers, electricians and plumbers; changes in laws relating to union organizing activity; lack of availability of adequate utility infrastructure and services; our need to rely on local subcontractors who may not be adequately capitalized or insured; and shortages, delays in availability, or fluctuations in prices of building materials. Any of these circumstances could give rise to delays in the start or completion of, or could increase the cost of, developing one or more of our residential communities. We may not be able to recover these increased costs by raising our home prices because the price for each home is typically set months prior to its delivery pursuant to the agreement of sale with the home buyer. If that happens, our operating results could be harmed.

We are subject to one collective bargaining agreement that covers approximately 2% of our employees. We have not experienced any work stoppages due to strikes by unionized workers, but we cannot assure you that there will not be any work stoppages due to strikes or other job actions in the future. We use independent contractors to construct our homes. At any given point in time, those subcontractors, who are not yet represented by a union, may be unionized.

**Product liability claims and litigation and warranty claims that arise in the ordinary course of business may be costly, which could adversely affect our business.**

As a home builder, we are subject to construction defect and home warranty claims arising in the ordinary course of business. These claims are common in the home building industry and can be costly. In addition, the costs of insuring against construction defect and product liability claims are high, and the amount of coverage offered by insurance companies is currently limited. There can be no assurance that this coverage will not be further restricted and become more costly. If the

15

limits or coverages of our current and former insurance programs prove inadequate, or we are not able to obtain adequate, or reasonably priced, insurance against these types of claims in the future, or the amounts currently provided for future warranty or insurance claims are inadequate, we may experience losses that could negatively impact our financial results.

**Our cash flows and results of operations could be adversely affected if legal claims are brought against us and are not resolved in our favor.**

Claims have been brought against us in various legal proceedings that have not had, and are not expected to have, a material adverse effect on our business or financial condition. Should such claims be resolved in an unfavorable manner or should additional claims be filed in the future, it is possible that our cash flows and results of operations could be adversely affected.

**We could be adversely impacted by the loss of key management personnel.**

Our future success depends, to a significant degree, on the efforts of our senior management. Our operations could be adversely affected if key members of senior management leave our employ. As a result of a decline in our stock price, previous retention mechanisms, such as equity awards, have diminished in value and, therefore, may become less effective as incentives for our senior management to continue to remain employed with us.

**Changes in tax laws or the interpretation of tax laws may negatively affect our operating results.**

We believe that our recorded tax balances are adequate. However, it is not possible to predict the effects of possible changes in the tax laws or changes in their interpretation and whether they could have a material adverse impact on our operating results. We have filed claims for refunds of taxes paid in prior years based upon certain filing positions we believe are appropriate. If the Internal Revenue Service disagrees with these filing positions, we may have to return some of the refunds we have received.

**We may not be able to realize all of our deferred tax assets.**

At October 31, 2012, we had $415.1 million of deferred tax assets against which we have recognized valuation allowances of $57.0 million. Losses for federal income tax purposes can generally be carried forward for a period of 20 years. We also file tax returns in the various states in which we do business. Each state has its own statutes regarding the use of tax loss carryforwards. Some of the states in which we do business do not allow for the carry forward of losses while others allow for carry forwards for 5 years to 20 years. In order to realize our net deferred tax assets, we must generate sufficient taxable income within the periods allowed by statute to carryfoward losses.

In addition, our ability to utilize net operating losses ("NOLs"), built-in losses, and tax credit carryforwards to offset our future taxable income and/or to recover previously paid taxes would be limited if we were to undergo an "ownership change," as determined under Internal Revenue Code Section 382 ("Section 382"). A Section 382 ownership change occurs if a stockholder or a group of stockholders who are deemed to own at least 5% of our common stock increase their ownership by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. If an ownership change occurs, Section 382 would impose an annual limit on the amount of NOLs we can use to reduce our taxable income equal to the product of the total value of our outstanding equity immediately prior to the ownership change (reduced by certain items specified in Section 382) and the federal long-term tax-exempt interest rate in effect for the month of the ownership change. A number of special rules apply to calculating this annual limit.

While the complexity of Section 382's provisions and the limited knowledge any public company has about the ownership of its publicly traded stock make it difficult to determine whether an ownership change has occurred, we currently believe that an ownership change has not occurred. However, if an ownership change were to occur, the annual limitation under Section 382 could result in a material amount of our NOLs expiring unused. This would significantly impair the value of our NOL asset and, as a result, have a negative impact on our financial position and results of operations.

During 2010, our stockholders approved an amendment to our second restated certificate of incorporation that is designed to deter transfers of our common stock that could result in an ownership change. However, these measures cannot guarantee complete protection against an ownership change and it remains possible that one may occur.

**Our business is seasonal in nature, so our quarterly operating results may fluctuate.**

Our quarterly operating results fluctuate with the seasons; normally, a significant portion of our agreements of sale are entered into with customers in the winter and spring months. Construction of a customer's home typically proceeds after signing the agreement of sale and can require 12 months or more to complete. Weather-related problems may occur in the late winter and early spring, delaying starts or closings or increasing costs and reducing profitability. In addition, delays in opening new

16

communities or new sections of existing communities could have an adverse impact on home sales and revenues. Expenses are not incurred and recognized evenly throughout the year. Because of these factors, our quarterly operating results may be uneven and may be marked by lower revenues and earnings in some quarters than in others.

**We invest in distressed loans and real estate related assets at significant discounts; however, if the real estate markets deteriorate significantly, we could suffer losses.**

We formed Gibraltar Capital and Asset Management to invest in distressed real estate opportunities. Our investments have involved acquisitions of portfolios or interests in portfolios of distressed loans, some of which have been converted to real estate owned. However, these investments present many risks in addition to those inherent in normal lending activities, including the risk that the recovery of the United States real estate markets will not take place for many years and that the value of our investments are not recoverable. There is also the possibility that, if we cannot liquidate our investments as expected, we would be required to reduce the value at which they are carried on our financial statements.

**Decreases in the market value of our investments in marketable securities could have an adverse impact on our results of operations.**

We have a significant amount of funds invested in marketable securities during the year, the market value of which is subject to changes from period to period. Decreases in the market value of our marketable securities could have an adverse impact on our results of operations.

**Future terrorist attacks against the United States or increased domestic or international instability could have an adverse effect on our operations.**

Adverse developments in the war on terrorism, future terrorist attacks against the United States or any foreign country, or increased domestic or international instability could significantly reduce the number of new contracts signed, increase the number of cancellations of existing contracts and/or increase our operating expenses which could adversely affect our business.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

### Headquarters

Our corporate office, which we lease from an unrelated third party, contains approximately 200,000 square feet and is located in Horsham, Pennsylvania.

### Manufacturing/Distribution Facilities

We own a manufacturing facility of approximately 300,000 square feet located in Morrisville, Pennsylvania, a manufacturing facility of approximately 186,000 square feet located in Emporia, Virginia, and a manufacturing facility of approximately 134,000 square feet in Knox, Indiana. We lease, from an unrelated third party, a facility of approximately 56,000 square feet located in Fairless Hills, Pennsylvania. At these facilities, we manufacture open wall panels, roof and floor trusses, and certain interior and exterior millwork to supply a portion of our construction needs. These facilities supply components used in our North, Mid-Atlantic and South geographic segments. These operations also permit us to purchase wholesale lumber, plywood, windows, doors, certain other interior and exterior millwork and other building materials to supply to our communities. We believe that increased efficiencies, cost savings and productivity result from the operation of these plants and from the wholesale purchase of materials.

### Office and Other Facilities

We own or lease from unrelated third parties office and warehouse space and golf course facilities in various locations, none of which are material to our business.

## ITEM 3. LEGAL PROCEEDINGS

We are involved in various claims and litigation arising principally in the ordinary course of business.

In January 2006, we received a request for information pursuant to Section 308 of the Clean Water Act from Region 3 of the U.S.

Environmental Protection Agency ("EPA") concerning storm water discharge practices in connection with our home

17

building projects in the states that comprise EPA Region 3. Thereafter, the U.S. Department of Justice assumed responsibility for the oversight of this matter and alleged that we violated regulatory requirements applicable to storm water discharges. The parties have entered into a consent decree, which has been submitted for approval to the presiding judge in the U.S. District Court for the Eastern District of Pennsylvania. We believe the disposition of this matter will not have a material adverse effect on our results of operations and liquidity or on our financial condition.

On November 4, 2008, a shareholder derivative action was filed in the Chancery Court of Delaware by Milton Pfeiffer against Robert I. Toll, Zvi Barzilay, Joel H. Rassman, Bruce E. Toll, Paul E. Shapiro, Robert S. Blank, Carl B. Marbach, and Richard J. Braemer. The plaintiff purports to bring his claims on behalf of Toll Brothers, Inc. and alleges that the director and officer defendants breached their fiduciary duties to us and our stockholders with respect to their sales of shares of our common stock during the period from December 9, 2004 to November 8, 2005. The plaintiff alleges that such stock sales were made while in possession of non-public, material information about us. The plaintiff seeks contribution and indemnification from the individual director and officer defendants for costs and expenses incurred by us in connection with defending a now-settled related class action. In addition, again purportedly on our behalf, the plaintiff seeks disgorgement of the defendants' profits from their stock sales.

On March 4, 2009, a second shareholder derivative action was brought by Oliverio Martinez in the U.S. District Court for the Eastern District of Pennsylvania. The case was brought against the eleven then-current members of our board of directors and the Company's Chief Accounting Officer. This plaintiff alleges breaches of fiduciary duty, waste of corporate assets, and unjust enrichment during the period from February 2005 to November 2006. The plaintiff further alleges that certain of the defendants sold our stock during this period while in possession of allegedly non-public, material information and plaintiff seeks disgorgement of profits from these sales. The plaintiff also asserts a claim for equitable indemnity for costs and expenses incurred by us in connection with defending a now-settled related class action lawsuit.

On April 1, 2009, a third shareholder derivative action was filed by William Hall, also in the U.S. District Court for the Eastern District of Pennsylvania, against the eleven then-current members of our board of directors and the Company's Chief Accounting Officer. This complaint is identical to the previous shareholder complaint filed in Philadelphia and, on July 14, 2009, the two cases were consolidated. On April 30, 2010, the plaintiffs filed an amended consolidated complaint.

An agreement has been reached by the parties to settle all three shareholder derivative actions, and this agreement has been filed in the Chancery Court of Delaware. The agreement is conditioned on, among other things, final approval by the Chancery Court of Delaware following notice to our shareholders. The agreement provides that, following approval of the settlement and entry of judgment by the Chancery Court of Delaware, the plaintiffs in the two actions pending in the U.S. District Court for the Eastern District of Pennsylvania will seek dismissal of those actions.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not Applicable

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock is traded on the New York Stock Exchange (Symbol: TOL).

The following table sets forth the price range of our common stock on the New York Stock Exchange for each fiscal quarter during the two years ended October 31, 2012.

| | | Three months ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | October 31 | | July 31 | | April 30 | | January 31 |
| **2012** | | | | | | | | |
| High | $ | 37.07 | $ | 31.33 | $ | 25.79 | $ | 23.67 |
| Low | $ | 28.39 | $ | 23.83 | $ | 21.78 | $ | 16.78 |
| **2011** | | | | | | | | |
| High | $ | 20.31 | $ | 21.93 | $ | 22.42 | $ | 21.33 |
| Low | $ | 13.16 | $ | 19.53 | $ | 19.08 | $ | 17.36 |

The closing price of our common stock on the New York Stock Exchange on the last trading day of our fiscal years ended October 31, 2012, 2011 and 2010 was $33.01, $17.44 and $17.94, respectively. At December 16, 2012, there were

18

approximately 776 record holders of our common stock.

For information regarding securities authorized for issuance under equity compensation plans, see "Equity Compensation Plan Information" in Item 12 of this Form 10-K.

We have not paid any cash dividends on our common stock to date and expect that, for the foreseeable future, we will not do so. Rather, we expect to follow a policy of retaining earnings in order to finance our business and, from time to time, repurchase shares of our common stock. The payment of dividends is within the discretion of our Board of Directors and any decision to pay dividends in the future will depend upon an evaluation of a number of factors, including our results of operations, capital requirements, our operating and financial condition, and any contractual limitation then in effect. Our bank credit agreement requires us to maintain a minimum tangible net worth (as defined in the agreement), which restricts the amount of dividends we may pay. At October 31, 2012, under the most restrictive provisions of our bank credit agreement, we could have paid up to approximately $908.3 million of cash dividends.

**Indemnification of Directors and Officers**

Our Certificate of Incorporation and Bylaws provide for indemnification of our directors and officers. We have also entered into individual indemnification agreements with each of our directors.

**Issuer Purchases of Equity Securities**

During the three months ended October 31, 2012, we repurchased the following shares under our repurchase program:

| Period | Total number of shares purchased (a) | | Average price paid per share | Total number of shares purchased as part of a publicly announced plan or program (b) | Maximum number of shares that may yet be purchased under the plan or program (b) |
|---|---|---|---|---|---|
| | (in thousands) | | | (in thousands) | (in thousands) |
| August 1 to August 31, 2012 | 3 | $ | 32.07 | 1 | 8,769 |
| September 1 to September 30, 2012 | 2 | $ | 36.04 | 2 | 8,767 |
| October 1 to October 31, 2012 | 1 | $ | 33.82 | 1 | 8,766 |
| Total | 6 | $ | 33.66 | 4 | |

(a)  Our stock incentive plans permit participants to exercise non-qualified stock options using a "net exercise" method. In a net exercise, we generally withhold from the total number of shares that otherwise would be issued to the participant upon exercise of the stock option that number of shares having a fair market value at the time of exercise equal to the option exercise price and applicable income tax withholdings, and remit the remaining shares to the participant. In addition, our stock incentive plans also permit participants to use the fair market value of Company common stock they own to pay for the exercise of stock options ("stock swap method"). During the three months ended October 31, 2012, the net exercise method was employed to exercise options to acquire 34,000 shares of our common stock; we withheld 10,083 of the shares subject to the options to cover $0.4 million of aggregate option exercise price and income tax withholdings and issued the remaining 23,917 shares to the participants. The 10,083 shares withheld under the net exercise method are not included in the total number of shares purchased in the table above. In addition, our stock incentive plans also permit participants to use the fair market value of Company common stock they own to pay for the exercise of stock options ("stock swap method"). During the three months ended October 31, 2012, the Company received 1,775 shares with an average fair market value per share of $32.59 for the exercise of 5,498 options using the stock swap method. The shares used under the stock swap method are included in the total number of shares purchased in the table above.

(b)  On March 20, 2003, our Board of Directors authorized the repurchase of up to 20 million shares of our common stock in open market transactions or otherwise, for the purpose of providing shares for our various employee benefit plans. The Board of Directors did not fix an expiration date for the repurchase program.

Except as set forth above, we did not repurchase any of our equity securities during the three-month period ended October 31, 2012.

**Stockholder Return Performance Graph**

The following graph and chart compares the five-year cumulative total return (assuming an investment of $100 was made on October 31, 2007 and that dividends, if any, were reinvested) from October 31, 2007 to October 31, 2012, for (a) our common stock, (b) the Standard & Poor's homebuilding Index (the "S&P homebuilding Index") and (c) the Standard & Poor's 500 Composite Stock Index (the "S&P 500 Index"):



| October 31: | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| **Toll Brothers, Inc.** | 100.00 | 100.92 | 75.60 | 78.31 | 76.12 | 144.09 |
| **S&P 500** | 100.00 | 63.90 | 70.17 | 81.76 | 88.37 | 101.81 |
| **S&P homebuilding** | 100.00 | 56.37 | 61.40 | 59.76 | 57.35 | 136.06 |

**ITEM 6. SELECTED FINANCIAL DATA**

The following tables set forth selected consolidated financial and housing data at and for each of the five fiscal years in the period ended October 31, 2012. It should be read in conjunction with the Consolidated Financial Statements and Notes thereto, listed in Item 15(a)1 of this Form 10-K beginning at page F-1 and Management's Discussion and Analysis of Financial Condition and Results of Operations included in Item 7 of this Form 10-K.

**Summary Consolidated Statements of Operations and Balance Sheets (amounts in thousands, except per share data):**

| Year ended October 31: | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Revenues | $ 1,882,781 | $ 1,475,881 | $ 1,494,771 | $ 1,755,310 | $ 3,148,166 |
| Income (loss) before income taxes | $ 112,942 | $ (29,366) | $ (117,187) | $ (496,465) | $ (466,787) |
| Net income (loss) | $ 487,146 | $ 39,795 | $ (3,374) | $ (755,825) | $ (297,810) |
| Earnings (loss) per share: | | | | | |
|   Basic | $ 2.91 | $ 0.24 | $ (0.02) | $ (4.68) | $ (1.88) |
|   Diluted | $ 2.86 | $ 0.24 | $ (0.02) | $ (4.68) | $ (1.88) |
| Weighted average number of shares outstanding: | | | | | |
|   Basic | 167,346 | 167,140 | 165,666 | 161,549 | 158,730 |
|   Diluted | 170,154 | 168,381 | 165,666 | 161,549 | 158,730 |

| At October 31: | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Cash, cash equivalents and marketable securities | $ 1,217,892 | $ 1,139,912 | $ 1,236,927 | $ 1,908,894 | $ 1,633,495 |
| Inventory | $ 3,761,187 | $ 3,416,723 | $ 3,241,725 | $ 3,183,566 | $ 4,127,475 |
| Total assets | $ 6,181,044 | $ 5,055,246 | $ 5,171,555 | $ 5,634,444 | $ 6,586,836 |
| Debt: | | | | | |
|   Loans payable | $ 99,817 | $ 106,556 | $ 94,491 | $ 472,854 | $ 613,594 |
|   Senior debt | 2,080,463 | 1,490,972 | 1,544,110 | 1,587,648 | 1,143,445 |
|   Senior subordinated debt | | | | 47,872 | 343,000 |
|   Mortgage company loan facility | 72,664 | 57,409 | 72,367 | 27,015 | 37,867 |
|     Total debt | $ 2,252,944 | $ 1,654,937 | $ 1,710,968 | $ 2,135,389 | $ 2,137,906 |
| Equity | $ 3,127,871 | $ 2,592,551 | $ 2,559,013 | $ 2,516,482 | $ 3,237,653 |

**Housing Data**

| Year ended October 31: | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Closings (1): | | | | | |
|   Number of homes | 3,286 | 2,611 | 2,642 | 2,965 | 4,743 |
|   Value (in thousands) | $ 1,882,781 | $ 1,475,881 | $ 1,494,771 | $ 1,755,310 | $ 3,106,293 |
| Revenues — percentage of completion (in thousands) | | | | $ | 41,873 |
| Net contracts signed: | | | | | |
|   Number of homes | 4,159 | 2,784 | 2,605 | 2,450 | 2,927 |
|   Value (in thousands) | $ 2,557,917 | $ 1,604,827 | $ 1,472,030 | $ 1,304,656 | $ 1,608,191 |

| At October 31: | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|
| Backlog: | | | | | |
|   Number of homes | 2,569 | 1,667 | 1,494 | 1,531 | 2,046 |
|   Value (in thousands) | $ 1,669,857 | $ 981,052 | $ 852,106 | $ 874,837 | $ 1,325,491 |
| Number of selling communities | 224 | 215 | 195 | 200 | 273 |
| Home sites: | | | | | |
|   Owned | 31,327 | 30,199 | 28,891 | 26,872 | 32,081 |
|   Controlled | 9,023 | 7,298 | 5,961 | 5,045 | 7,703 |

| Total | 40,350 | 37,497 | 34,852 | 31,917 | 39,784 |

(1)  Excludes 88 units delivered in ~~fiscal 2008 which were accounted for using the percentage of completion accounting method with~~ an aggregate delivered value of $86.1 million.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

This discussion and analysis is based on, should be read with, and is qualified in its entirety by, the Consolidated Financial Statements and Notes thereto included in Item 8 of this Form 10-K, beginning at page F-1. It also should be read in conjunction with the disclosure under "Forward-Looking Statement" in Part 1 of this Form 10-K.

Unless otherwise stated in this report, net contracts signed represents a number or value equal to the gross number or value of contracts signed during the relevant period, less the number or value of contracts canceled during the relevant period, which includes contracts that were signed during the relevant period and in prior periods.

**OVERVIEW**

*Our Business*

We design, build, market and arrange financing for detached and attached homes in luxury residential communities. We are also involved, directly and through joint ventures, in projects where we are building or converting existing rental apartment buildings into, high-, mid- and low-rise luxury homes. We are also developing, through joint ventures, a high-rise luxury condominium/hotel project and a for-rent luxury apartment complex. We cater to move-up, empty-nester, active-adult, age-qualified and second-home buyers in the United States. At October 31, 2012, we were operating in 19 states. In the five years ended October 31, 2012, we delivered 16,247 homes from 530 communities, including 3,286 homes from 280 communities in fiscal 2012. In addition, we invest in distressed real estate opportunities through our subsidiary, Gibraltar Capital and Asset Management LLC ("Gibraltar").

*Fiscal 2012 Financial Highlights*

In the twelve-month period ended October 31, 2012, we recognized $1.88 billion of revenues and net income of $487.1 million, as compared to $1.48 billion of revenues and net income of $39.8 million in fiscal 2011. The fiscal 2012 net income included an income tax benefit of $394.7 million related to the reversal of deferred tax asset valuation allowances and $14.7 million of inventory impairment charges and write-offs. Fiscal 2011 income included $51.8 million of inventory impairments and write-offs, $40.9 million of impairment charges related to our investments in unconsolidated entities, $3.8 million of expenses related to repurchases of our debt, and an income tax benefit of $69.2 million.

At October 31, 2012, we had $1.22 billion of cash, cash equivalents and marketable securities on hand and approximately $814.9 million available under our $885.0 million revolving credit facility that matures in October 2014. During fiscal 2012, we issued $587.5 million of senior notes and exchanged $119.9 million of senior notes maturing in 2022 for $117.6 million of senior notes maturing in fiscal 2013.

*Our Challenging Business Environment and Current Outlook*

We believe that, in fiscal 2012, the housing market began to recover from the significant slowdown that started in the fourth quarter of our fiscal year ended October 31, 2005. During fiscal 2012, we, and many of the other public home builders, have seen a strong recovery in the number of new sales contracts signed. Our net contracts signed in fiscal 2012, as compared to fiscal 2011, increased nearly 50% in the number of net contracts signed and 59% in the value of net contracts signed. Although the number and value of our net contracts signed increased in fiscal 2012 over fiscal 2011, they were still significantly below what we recorded in fiscal 2005.

We believe that, as the unemployment rate has declined and confidence has improved, pent-up demand has begun to be released. Additionally, rising home prices, reduced inventory, and low mortgage rates have resulted in increased demand, although still below historical levels. We believe that the key to a full recovery in our business depends on these factors as well as a sustained stabilization of financial markets and the economy in general.

We are still impacted by the slowdown, which we believe started with a decline in consumer confidence, an overall softening of demand for new homes and an oversupply of homes available for sale. The slowdown was exacerbated by, among other things, a decline in the overall economy, increased unemployment, the large number of homes that were vacant, homes that had been foreclosed on due to the economic downturn, a fear of job loss, a decline in home prices and the resulting reduction in home equity, the inability of some of our home buyers, or some prospective buyers of their homes, to sell their current homes, the deterioration in the credit markets, and the direct and indirect impact of the turmoil in the mortgage loan market.

22

We believe that the demographics of the move-up, empty-nester, active-adult, age-qualified and second-home upscale markets will provide us with the potential for growth in the coming decade. According to the U.S. Census Bureau, the number of households earning $100,000 or more (in constant 2011 dollars) at September 2012 stood at 25.4 million, or approximately 17.3% of all U.S. households. This group has grown at three times the rate of increase of all U.S. households since 1980. According to Harvard University's June 2012 "The State of the Nations Housing", the growth and aging of the current population, assuming the economic recovery is sustained over the next few years, supports the addition of about one million new household formations per year during the next decade.

According to the U.S. Census Bureau, during the period 1970 through 2007, total housing starts in the United States averaged approximately 1.26 million per year, while in the period 2008 through 2011, total housing starts averaged approximately 0.66 million per year. In addition, based on the trend of household formations in relation to population growth during the period 2000 through 2007, the number of households formed in the four-year period of 2008 through 2011 was approximately 2.3 million fewer than would have been expected.

We believe many of our target customers generally have remained employed during this downturn; however, we believe many deferred their home buying decisions because of concerns over the direction of the economy, the direction of home prices, and their ability to sell their existing home. Additionally, rising home prices, reduced inventory, and low mortgage rates have resulted in increased demand, although still below historical levels. We believe that a full recovery in our business depends on these factors as well as a sustained stabilization of financial markets and the economy in general.

In many markets, the pipeline of approved and improved home sites has dwindled as builders and developers have lacked both the capital and the economic benefit for bringing sites through approvals. Therefore, we believe that as demand continues to strengthen, builders and developers with approved land in well-located markets will be poised to benefit. We believe that this will be particularly true for us because our land portfolio is heavily weighted in the metro-Washington, DC to metro-Boston corridor where land is scarce, approvals are more difficult to obtain and overbuilding has been relatively less prevalent than in the Southeast and Western regions.

We continue to believe that many of our communities are in desirable locations that are difficult to replace and in markets where approvals have been increasingly difficult to achieve. We believe that many of these communities have substantial embedded value that may be realized in the future as the housing recovery strengthens.

### Competitive Landscape

Based on our experience during prior downturns in the housing industry, we believe that attractive land acquisition opportunities arise in difficult times for those builders that have the financial strength to take advantage of them. In the current environment, we believe our strong balance sheet, liquidity, access to capital, broad geographic presence, diversified product line, experienced personnel and national brand name all position us well for such opportunities now and in the future.

We continue to see reduced competition from the small and mid-sized private builders that had been our primary competitors in the luxury market. We believe that many of these builders are no longer in business and that access to capital by the remaining private builders is already severely constrained. We envision that there are fewer and more selective lenders serving our industry as the market rebounds and that those lenders likely will gravitate to the home building companies that offer them the greatest security, the strongest balance sheets and the broadest array of potential business opportunities. While some builders may re-emerge with new capital, the scarcity of attractive land is a further impediment to their re-emergence. We believe that reduced competition, combined with attractive long-term demographics, will reward those well-capitalized builders that can persevere through the current challenging environment.

We believe that geographic and product diversification, access to lower-cost capital and strong demographics benefit those builders, like us, who can control land and persevere through the increasingly difficult regulatory approval process. We believe that these factors favor a large publicly traded home building company with the capital and expertise to control home sites and gain market share. We also believe that over the past five years, many builders and land developers reduced the number of home sites that were taken through the approval process. The process continues to be difficult and lengthy, and the political pressure from no-growth proponents continues to increase, but we believe our expertise in taking land through the approval process and our already-approved land positions will allow us to grow in the years to come as market conditions improve.

### Land Acquisition and Development

Because of the length of time that it takes to obtain the necessary approvals on a property, complete the land improvements on it and deliver a home after a home buyer signs an agreement of sale, we are subject to many risks. In certain cases, we attempt to reduce some of these risks by utilizing one or more of the following methods: controlling land for future development

through options (also referred to herein as "land purchase contracts" or "option and purchase agreements"), thus allowing the necessary governmental approvals to be obtained before acquiring title to the land; generally commencing construction of a detached home only after executing an agreement of sale and receiving a substantial down payment from the buyer; and using subcontractors to perform home construction and land development work on a fixed-price basis.

In response to the decline in market conditions over the past several years, we re-evaluated and renegotiated or canceled many of our land purchase contracts. In addition, we sold, and may continue to sell, certain parcels of land that we identified as non-strategic. As a result, we reduced our land position from a high of approximately 91,200 home sites at April 30, 2006 to a low of approximately 31,700 home sites at January 31, 2010. Based on our belief that the housing market has begun to recover, the increased attractiveness of land available for purchase and the revival of demand in certain areas, we have begun to increase our land positions. During fiscal 2012 and 2011, we acquired control of approximately 6,100 home sites (net of options terminated) and 5,300 home sites (net of options terminated), respectively. In addition, in November 2012, we entered into an agreement with one of our joint venture partners to acquire approximately 800 lots from the joint venture. Of the 6,100 home sites we acquired control of in fiscal 2012, approximately 1,500 home sites were from the CamWest asset purchase. At October 31, 2012, we controlled approximately 40,350 home sites of which we owned approximately 31,300. Significant improvements were completed on approximately 12,700 of the 31,300 home sites. At October 31, 2012, we were selling from 224 communities, compared to 215 at October 31, 2011 and 195 communities at October 31, 2010. Our November 2011 acquisition of CamWest assets increased our selling community count by 15.

We expect to be selling from 225 to 255 communities at October 31, 2013. At October 31, 2012, we had 50 communities that were temporarily closed due to market conditions.

### *Availability of Customer Mortgage Financing*

We maintain relationships with a widely diversified group of mortgage financial institutions, many of which are among the largest and, we believe, most reliable in the industry. We believe that regional and community banks continue to recognize the long-term value in creating relationships with high-quality, affluent customers such as our home buyers, and these banks continue to provide such customers with financing.

We believe that our home buyers generally are, and should continue to be, better able to secure mortgages due to their typically lower loan-to-value ratios and attractive credit profiles as compared to the average home buyer. Nevertheless, in recent years, tightened credit standards have shrunk the pool of potential home buyers and hindered accessibility of or eliminated certain loan products previously available to our home buyers. Our home buyers continue to face stricter mortgage underwriting guidelines, higher down payment requirements and narrower appraisal guidelines than in the past. In addition, some of our home buyers continue to find it more difficult to sell their existing homes as prospective buyers of their homes may face difficulties obtaining a mortgage. In addition, other potential buyers may have little or negative equity in their existing homes and may not be able or willing to purchase a larger or more expensive home.

While the range of mortgage products available to a potential home buyer is not what it was in the period 2005 through 2007, we have seen improvements over the past two years. Indications from industry participants, including commercial banks, mortgage banks, mortgage real estate investment trusts and mortgage insurance companies are that availability, parameters and pricing of jumbo loans are all improving. We believe that improvement should not only enhance financing alternatives for existing jumbo buyers, but also help to offset the reduction in Fannie Mae/Freddie Mac-eligible loan amounts in some markets. Based on the mortgages provided by our mortgage subsidiary, we do not expect the change in the Fannie Mae/Freddie Mac-eligible loan amounts to have a significant impact on our business.

There has been significant media attention given to mortgage put-backs, a practice by which a buyer of a mortgage loan tries to recoup losses from the loan originator. We do not believe this is a material issue for our mortgage subsidiary. Of the approximately 15,700 loans sold by our mortgage subsidiary since November 1, 2004, only 31 have been the subject of either actual indemnification payments or take-backs or contingent liability loss provisions related thereto. We believe that this is due to (i) our typical home buyer's financial position and sophistication, (ii) on average, our home buyers who use mortgage financing to purchase a home pay approximately 30% of the purchase price in cash, (iii) our general practice of not originating certain loan types such as option adjustable rate mortgages and down payment assistance products, and our origination of few sub-prime and high loan-to-value/no documentation loans, (iv) our elimination of "early payment default" provisions from each of our agreements with our mortgage investors several years ago, and (v) the quality of our controls, processes and personnel in our mortgage subsidiary.

The Dodd-Frank Wall Street Reform and Consumer Protection Act provides for a number of new requirements relating to residential mortgage lending practices, many of which are subject to further potential rulemaking. These include, among others, minimum standards for mortgages and related lender practices, the definitions and parameters of a Qualified Mortgage and a

24

Qualified Residential Mortgage, future risk retention requirements, limitations on certain fees, prohibition of certain tying arrangements and remedies for borrowers in foreclosure proceedings in the event that a lender violates fee limitations or minimum standards. The ultimate effect of such provisions on lending institutions, including our mortgage subsidiary, will depend on the rules that are ultimately promulgated.

### *Gibraltar*

We continue to look for distressed real estate opportunities through Gibraltar. Gibraltar continues to selectively review a steady flow of new opportunities, including bank portfolios and other distressed real estate investments. In fiscal 2012, Gibraltar acquired 12 non-performing loans with an unpaid principal balance of approximately $56.6 million. The loans acquired included non-performing loans primarily secured by commercial land and buildings in various stages of completion. The portfolios that Gibraltar previously acquired were primarily residential acquisition, development, and construction loans secured by properties in various stages of completion.

At October 31, 2012, Gibraltar had direct investments in loan portfolios, real estate owned and participations in a loan portfolio and real estate owned of approximately $95.5 million and an investment in a structured asset joint venture of $37.3 million. At October 31, 2012, Gibraltar, directly and through a loan participation, controlled 109 loans and properties with a net unpaid principal of the loans or estimated fair value of the properties of approximately $195.9 million.

During the fiscal years ended October 31, 2012 and 2011, we recognized income of $7.2 million and $6.9 million from the Gibraltar operations, respectively, including its equity in the earnings from its investment in a structured asset joint venture.

## CONTRACTS AND BACKLOG

The aggregate value of gross sales contracts signed increased 56.1% in fiscal 2012, as compared to fiscal 2011, and 8.7% in fiscal 2011, as compared to fiscal 2010. The value of gross sales contracts signed was $2.67 billion (4,341 homes) in fiscal 2012, $1.71 billion (2,965 homes) in fiscal 2011 and $1.57 billion (2,789 homes) in fiscal 2010. The increase in the aggregate value of gross contracts signed in fiscal 2012, as compared to fiscal 2011, was the result of a 46.4% increase in the number of gross contracts signed, and a 6.6% increase in the average value of each contract signed. The increase in the number of gross contracts signed in fiscal 2012, as compared to fiscal 2011, was primarily due to the beginning of the recovery in the U.S. housing market in fiscal 2012, reduced competition from the small and mid-sized private builders that had been our primary competitors in the luxury market, and a 10% increase in the average number of selling communities in fiscal 2012, as compared to fiscal 2011.

The increase in the aggregate value of gross contracts signed in fiscal 2011, as compared to fiscal 2010, was the result of a 6.3% increase in the number of gross contracts signed, and a 2.3% increase in the average value of each contract signed. The increase in the number of gross contracts signed in fiscal 2011, as compared to fiscal 2010, was primarily due to the increase in the number of selling communities in fiscal 2011.

In fiscal 2012, 2011, 2010 and 2009, home buyers canceled $107.3 million (182 homes), $102.8 million (181 homes), $98.3 million (184 homes) and $321.2 million (453 homes) of signed contracts, respectively. As a percentage of the number of gross contracts signed in fiscal 2012, 2011, 2010 and 2009, home buyers canceled 4.2%, 6.1%, 6.6% and 15.6%, in those respective years, and 4.0%, 6.0%, 6.3%, and 19.8% of the value of gross contracts signed in those respective years. Our contract cancellation rates in fiscal 2012, 2011 and 2010 were comparable to the cancellation rates prior to fiscal 2006.

The aggregate value of net contracts signed increased 59.4% in fiscal 2012, as compared to fiscal 2011. The value of net contracts signed was $2.56 billion (4,159 homes) in fiscal 2012 and $1.60 billion (2,784 homes) in fiscal 2011. The increase in fiscal 2012, as compared to fiscal 2011, was the result of a 49.4% increase in the number of net contracts signed, and a 6.7% increase in the average value of each contract signed. The increase in the number of net contracts signed in fiscal 2012, as compared to fiscal 2011, was the result of the higher number of gross contracts signed in fiscal 2012 and the reduced rate of contract cancellations in fiscal 2012, as compared to fiscal 2011.

The aggregate value of net contracts signed increased 9.0% in fiscal 2011, as compared to fiscal 2010. The value of net contracts signed was $1.60 billion (2,784 homes) in fiscal 2011, $1.47 billion (2,605 homes) in fiscal 2010 and $1.30 billion (2,450 homes) in fiscal 2009. The increase in fiscal 2011, as compared to fiscal 2010, was the result of a 6.9% increase in the number of net contracts signed, and a 2.0% increase in the average value of each contract signed. The increase in the number of contracts signed in fiscal 2011 was primarily due to the increased number of communities that we had open for sale in fiscal 2011, as compared to fiscal 2010.

Backlog consists of homes under contract but not yet delivered to our home buyers. The value of our backlog at October 31, 2012, 2011 and 2010 was $1.67 billion (2,569 homes), $981.1 million (1,667 homes) and $852.1 million (1,494 homes), respectively.

The 70.2% and 54.1% increase in the value and number of homes in backlog at October 31, 2012, as compared to October 31, 2011, was due to the increase in the number and the average value of net contracts signed in fiscal 2012, as compared to fiscal 2011 and the higher value and number of homes in backlog at October 31, 2011 as compared to October 31, 2010, offset, in part, by the increase in the aggregate value and number of our deliveries in fiscal 2012, as compared to the aggregate value and number of deliveries in fiscal 2011.

The 15.1% and 11.6% increase in the value and number of homes in backlog at October 31, 2011 as compared the October 31, 2010, was due to the increase in the number and average value of net contracts signed in fiscal 2011, as compared to fiscal 2010 and the decrease in the aggregate value and number of our deliveries in fiscal 2011, as compared to the aggregate value and number of deliveries in fiscal 2010, offset, in part, by the lower value of our backlog at October 31, 2010, as compared to our backlog at October 31, 2009.

The decrease in backlog at October 31, 2010, as compared to the backlog at October 31, 2009, was primarily attributable to the continued decline in the new home market and the decrease in the value and number of net contracts signed in fiscal 2010, as compared to fiscal 2009, offset, in part, by lower deliveries in fiscal 2010, as compared to fiscal 2009.

For more information regarding revenues, gross contracts signed, contract cancellations and net contracts signed by geographic segment, see "Geographic Segments" in this MD&A.

## CRITICAL ACCOUNTING POLICIES

We believe the following critical accounting policies reflect the more significant judgments and estimates used in the preparation of our consolidated financial statements.

### Inventory

Inventory is stated at cost unless an impairment exists, in which case it is written down to fair value in accordance with GAAP. In addition to direct land acquisition, land development and home construction costs, costs also include interest, real estate taxes and direct overhead related to development and construction, which are capitalized to inventory during periods beginning with the commencement of development and ending with the completion of construction. For those communities that have been temporarily closed, no additional capitalized interest is allocated to the community's inventory until it re-opens, and other carrying costs are expensed as incurred. Once a parcel of land has been approved for development and we open the community, it can typically take four or more years to fully develop, sell and deliver all the homes in that community. Longer or shorter time periods are possible depending on the number of home sites in a community and the sales and delivery pace of the homes in a community. Our master planned communities, consisting of several smaller communities, may take up to ten years or more to complete. Because our inventory is considered a long-lived asset under GAAP, we are required to regularly review the carrying value of each of our communities and write down the value of those communities when we believe the values are not recoverable.

*Current Communities*: When the profitability of a current community deteriorates, the sales pace declines significantly or some other factor indicates a possible impairment in the recoverability of the asset, the asset is reviewed for impairment by comparing the estimated future undiscounted cash flow for the community to its carrying value. If the estimated future undiscounted cash flow is less than the community's carrying value, the carrying value is written down to its estimated fair value. Estimated fair value is primarily determined by discounting the estimated future cash flow of each community. The impairment is charged to cost of revenues in the period in which the impairment is determined. In estimating the future undiscounted cash flow of a community, we use various estimates such as: (i) the expected sales pace in a community, based upon general economic conditions that will have a short-term or long-term impact on the market in which the community is located and on competition within the market, including the number of home sites available and pricing and incentives being offered in other communities owned by us or by other builders; (ii) the expected sales prices and sales incentives to be offered in a community; (iii) costs expended to date and expected to be incurred in the future, including, but not limited to, land and land development costs, home construction costs, interest costs and overhead costs; (iv) alternative product offerings that may be offered in a community that will have an impact on sales pace, sales price, building cost or the number of homes that can be built in a particular community; and (v) alternative uses for the property, such as the possibility of a sale of the entire community to another builder or the sale of individual home sites.

*Future Communities*: We evaluate all land held for future communities or future sections of current communities, whether owned or optioned, to determine whether or not we expect to proceed with the development of the land as originally contemplated. This evaluation encompasses the same types of estimates used for current communities described above, as well as an evaluation of the regulatory environment in which the land is located and the estimated probability of obtaining the necessary approvals, the estimated time and cost it will take to obtain those approvals and the possible concessions that will be required to be given in order to obtain them. Concessions may include cash payments to fund improvements to public places such as parks and streets, dedication of a portion of the property for use by the public or as open space or a reduction in the density or size of the homes to be built. Based upon this review, we decide (i) as to land under contract to be purchased, whether the contract will likely be terminated or renegotiated, and (ii) as to land we own, whether the land will likely be developed as contemplated or in an alternative manner, or should be sold. We then further determine whether costs that have been capitalized to the community are recoverable or should be written off. The write-off is charged to cost of revenues in the period in which the need for the write-off is determined.

The estimates used in the determination of the estimated cash flows and fair value of both current and future communities are based on factors known to us at the time such estimates are made and our expectations of future operations and economic conditions. Should the estimates or expectations used in determining estimated fair value deteriorate in the future, we may be required to recognize additional impairment charges and write-offs related to current and future communities.

We provided for inventory impairment charges and the expensing of costs that we believed not to be recoverable in each of the three fiscal years ended October 31, 2012, 2011 and 2010 as shown in the table below (amounts in thousands).

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Land controlled for future communities | $ 451 | $ 17,752 | $ 6,069 |
| Land owned for future communities | 1,218 | 17,000 | 55,700 |
| Operating communities | 13,070 | 17,085 | 53,489 |
|  | $ 14,739 | $ 51,837 | $ 115,258 |

The table below provides, for the periods indicated, the number of operating communities that we reviewed for potential impairment, the number of operating communities in which we recognized impairment charges, the amount of impairment charges recognized, and, as of the end of the period indicated, the fair value of those communities, net of impairment charges ($ amounts in thousands).

27

| Three months ended: | Number of communities tested | Impaired operating communities | | |
|---|---|---|---|---|
| | | Number of communities | Fair value of communities, net of impairment charges | Impairment charges |
| Fiscal 2012: | | | | |
| January 31 | 113 | 8 | $ 49,758 | $ 6,425 |
| April 30 | 115 | 2 | $ 22,962 | 2,560 |
| July 31 | 115 | 4 | $ 6,609 | 2,685 |
| October 31 | 108 | 3 | $ 9,319 | 1,400 |
| | | | | $ 13,070 |
| Fiscal 2011: | | | | |
| January 31 | 143 | 6 | $ 56,105 | $ 5,475 |
| April 30 | 142 | 9 | $ 40,765 | 10,725 |
| July 31 | 129 | 2 | $ 867 | 175 |
| October 31 | 114 | 3 | $ 3,367 | 710 |
| | | | | $ 17,085 |
| Fiscal 2010: | | | | |
| January 31 | 260 | 14 | $ 60,519 | $ 22,750 |
| April 30 | 161 | 7 | $ 53,594 | 15,020 |
| July 31 | 155 | 7 | $ 21,457 | 6,600 |
| October 31 | 144 | 12 | $ 39,209 | 9,119 |
| | | | | $ 53,489 |

**Income Taxes — Valuation Allowance**

Significant judgment is applied in assessing the realizability of deferred tax assets. In accordance with GAAP, a valuation allowance is established against a deferred tax asset if, based on the available evidence, it is more-likely-than-not that such asset will not be realized. The realization of a deferred tax asset ultimately depends on the existence of sufficient taxable income in either the carryback or carryforward periods under tax law. We assess the need for valuation allowances for deferred tax assets based on GAAP's "more-likely-than-not" realization threshold criteria. In our assessment, appropriate consideration is given to all positive and negative evidence related to the realization of the deferred tax assets. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. This assessment considers, among other matters, the nature, consistency and magnitude of current and cumulative income and losses, forecasts of future profitability, the duration of statutory carryback or carryforward periods, our experience with operating loss and tax credit carryforwards being used before expiration, and tax planning alternatives.

Our assessment of the need for a valuation allowance on our deferred tax assets includes assessing the likely future tax consequences of events that have been recognized in our consolidated financial statements or tax returns. Changes in existing tax laws or rates could affect our actual tax results and our future business results may affect the amount of our deferred tax liabilities or the valuation of our deferred tax assets over time. Our accounting for deferred tax assets represents our best estimate of future events.

Due to uncertainties in the estimation process, particularly with respect to changes in facts and circumstances in future reporting periods (carryforward period assumptions), actual results could differ from the estimates used in our analysis. Our assumptions require significant judgment because the residential home building industry is cyclical and is highly sensitive to changes in economic conditions. If our results of operations are less than projected and there is insufficient objectively verifiable positive evidence to support the "more-likely-than-not" realization of our deferred tax assets, a valuation allowance would be required to reduce or eliminate our deferred tax assets.

Our deferred tax assets consist principally of the recognition of losses primarily driven by inventory impairments and impairments of investments in and advances to unconsolidated entities. In accordance with GAAP, we assessed whether a valuation allowance should be established based on our determination of whether it was "more likely than not" that some portion or all of the deferred tax assets would

not be realized. In fiscal 2009, we recorded valuation allowances against

28

substantially all of our deferred tax assets. We believed that the continued downturn in the housing market, the uncertainty as to its length and magnitude, our continued recognition of impairment charges, and our recent operating losses were significant negative evidence of the need for a valuation allowance against our deferred tax assets.

For federal income tax purposes, we are allowed to carry forward tax losses for 20 years and apply such tax losses to future taxable income to realize our federal deferred tax assets. At October 31, 2012, we estimate that we will have federal tax loss carryfowards of approximately $106.3 million resulting from losses incurred for federal income tax purposes during fiscal years 2011 and 2012.

We file tax returns in the various states in which we do business. Each state has its own statutes regarding the use of tax loss carryforwards. Some of the states in which we do business do not allow for the carry forward of losses while others allow for carry forwards for 5 years to 20 years.

At October 31, 2012, we re-evaluated the evidence related to the need for our deferred tax asset valuation allowances and determined that the valuation allowance on our federal deferred tax assets and certain state valuation allowances were no longer needed because of sufficient positive objective evidence. That evidence principally consisted of (i) an indication that the events and conditions that gave rise to significant reported losses in recent years were unlikely to recur in the foreseeable future, (ii) a return to profitability in 2012, (iii) strong backlog evidencing that profitability will likely increase in 2013, and (iv) long net operating loss carryfoward periods that provide evidence that even without significant growth these deferred tax assets will more likely than not be realized. Some of the evidence considered was as follows:

- We incurred pre-tax losses from 2008 through 2011 totaling $1.1 billion. These losses were driven primarily by impairments of land, options, inventory and joint ventures which aggregated approximately $1.53 billion during that period. The impairment charges were triggered by the most severe and longest downturn in the U.S. housing industry.

- We generated pre-tax income of $132.1 million since May 2011. This included generating pre-tax income in five out of the past six consecutive quarters. Our operations have been profitable in each of the last ten quarters excluding impairment charges.

- Impairment charges in fiscal 2012 decreased to $14.7 million due to the strength of the recovery in the housing industry and the lower carrying value of our inventories and joint venture investments as a result of the significant writedowns recognized on them over the period from 2005 through 2011.

- The value of new contracts signed in fiscal 2012 increased 59% over fiscal 2011. Our cancellation rate of 4.2% in units and 4.0% in value is the lowest it has been since before 2006.

- We are expecting significant revenue and pre-tax income growth in fiscal 2013 which is supported by our backlog as well as the continued improvement in housing industry trends. Our backlog at October 31, 2012, which totaled $1.67 billion, is the highest it has been since 2008. Our backlog is a strong indicator of our next eight months of operations as we require a signed agreement of sale and a significant cash deposit for a sale to be included in backlog. We have objective and verifiable positive evidence, summarized more fully below, that we will continue to be profitable in fiscal 2013 due to our backlog. That positive evidence in tandem with other positive evidence provides the basis for overcoming the negative evidence. Even without growth in our profits over 2012 levels of profitability, we would realize our federal deferred tax assets in less than 10 years.

- Based on our belief that the recovery in the housing market will be sustained, we expect to continue to grow revenues and be profitable beyond fiscal 2013.

- Housing market indices have shown positive gains over the past year. Unemployment rates continue to decrease from October 2010, consumer confidence has shown continued improvement and housing affordability is at near record levels. The October 2012 seasonally adjusted annual rate of housing starts was 894,000, as compared to 630,000 in October 2011 which represents an increase of 42%. The improvement in the housing market has been experienced by all the major public home builders. The financial community and economists are optimistic regarding the housing trends going into 2013.

- There is significant pent-up demand for housing that we believe will support a prolonged recovery. According to the U.S. Census Bureau, during the period 1970 through 2007, total housing starts in the United States averaged approximately 1.26 million per year, while in the period 2008 through 2011, total housing starts averaged approximately 0.66 million per year. In addition, based on the trend of household formations in relation to population

29

growth during the period 2000 through 2007, the number of household formations in the four year period of 2008 through 2011 was approximately 2.3 million less than would have been expected.

- We believe that the demographics of the move-up, empty-nester, active-adult, age-qualified and second-home upscale markets will provide us with the potential for growth in the coming decade. According to the U.S. Census Bureau, the number of households earning $100,000 or more (in constant 2011 dollars) at September 2011 stood at 25.4 million, or approximately 17.3% of all U.S. households. This group has grown at three times the rate of increase of all U.S. households since 1980. According to Harvard University's June 2012 "The State of the Nation's Housing", the growth and aging of the current population and assuming the economic recovery is sustained over the next few years supports the addition of about one million new household formations per year during the next decade.

- We have emerged from the downturn with reduced competition and thus an increased market share. We believe that many home builders in the areas in which we operate are no longer in business and that access to capital by the remaining ones is already severely constrained. The seasonally adjusted annual rate of housing starts in October 2012 increased 42% over the October 2011 rate, whereas the increase in the number of our signed contracts in fiscal 2012 was 49%. The excess of our contracts signed versus the housing starts evidence the additional market share we have gained over the past year.

**Revenue and Cost Recognition**

The construction time of our homes is generally less than one year, although some homes may take more than one year to complete. Revenues and cost of revenues from these home sales are recorded at the time each home is delivered and title and possession are transferred to the buyer. For detached homes, closing normally occurs shortly after construction is substantially completed.

For our standard attached and detached homes, land, land development and related costs, both incurred and estimated to be incurred in the future, are amortized to the cost of homes closed based upon the total number of homes to be constructed in each community. Any changes resulting from a change in the estimated number of homes to be constructed or in the estimated costs subsequent to the commencement of delivery of homes are allocated to the remaining undelivered homes in the community. Home construction and related costs are charged to the cost of homes closed under the specific identification method. The estimated land, common area development and related costs of master planned communities, including the cost of golf courses, net of their estimated residual value, are allocated to individual communities within a master planned community on a relative sales value basis. Any changes resulting from a change in the estimated number of homes to be constructed or in the estimated costs are allocated to the remaining home sites in each of the communities of the master planned community.

For high-rise/mid-rise projects, land, land development, construction and related costs, both incurred and estimated to be incurred in the future, are generally amortized to the cost of units closed based upon an estimated relative sales value of the units closed to the total estimated sales value. Any changes resulting from a change in the estimated total costs or revenues of the project are allocated to the remaining units to be delivered.

Forfeited customer deposits are recognized in other income-net in our Consolidated Statements of Operations in the period in which we determine that the customer will not complete the purchase of the home and we have the right to retain the deposit.

*Sales Incentives:* In order to promote sales of our homes, we grant our home buyers sales incentives from time-to-time. These incentives will vary by type of incentive and by amount on a community-by-community and home-by-home basis. Incentives that impact the value of the home or the sales price paid, such as special or additional options, are generally reflected as a reduction in sales revenues. Incentives that we pay to an outside party, such as paying some or all of a home buyer's closing costs, are recorded as an additional cost of revenues. Incentives are recognized at the time the home is delivered to the home buyer and we receive the sales proceeds.

**OFF-BALANCE SHEET ARRANGEMENTS**

We have investments in and advances to various unconsolidated entities. At October 31, 2012, we had investments in and advances to these entities of $330.6 million, and were committed to invest or advance $97.0 million to these entities if they require additional funding. In addition, we have guaranteed approximately $9.8 million of payments under a ground lease for one of the unconsolidated entities. Our investments in these entities are accounted for using the equity method.

The trends, uncertainties or other factors that have negatively impacted our business and the industry in general have also impacted the unconsolidated entities in which we have investments. We review each of our investments on a quarterly basis for indicators of impairment. A series of operating losses of an investee, the inability to recover our invested capital, or other

30

factors may indicate that a loss in value of our investment in the unconsolidated entity has occurred. If a loss exists, we further review to determine if the loss is other than temporary, in which case, we write down the investment to its fair value. The evaluation of our investment in unconsolidated entities entails a detailed cash flow analysis using many estimates, including, but, not limited to expected sales pace, expected sales prices, expected incentives, costs incurred and anticipated, sufficiency of financing and capital, competition, market conditions and anticipated cash receipts, in order to determine projected future distributions. Each of the unconsolidated entities evaluates its inventory in a similar manner as we do. See "Critical Accounting Policies — Inventory" in this MD&A for more detailed disclosure on our evaluation of inventory. If a valuation adjustment is recorded by an unconsolidated entity related to its assets, our proportionate share is reflected in (loss) income from unconsolidated entities with a corresponding decrease to our investment in unconsolidated entities. During fiscal 2011, based upon our evaluation of the fair value of our investments in unconsolidated entities, we determined, due to the continued deterioration of the market in which some of our unconsolidated entities operate, that there was an other than temporary impairment of our investments in these unconsolidated entities. Based on this determination, we recognized $40.9 million of impairment charges against the carrying value of our investments in fiscal 2011.

On October 27, 2011, a bankruptcy court issued an order confirming a plan of reorganization for South Edge, LLC ("South Edge"), a Nevada land development joint venture, which was the subject of an involuntary bankruptcy petition filed in December 2010. Pursuant to the plan of reorganization, South Edge settled litigation regarding a loan made by a syndicate of lenders to South Edge having a principal balance of $327.9 million, for which we had executed certain completion guarantees and conditional repayment guarantees. The confirmed plan of reorganization provided for a cash settlement to the lenders, the acquisition of land by us and the other members of South Edge that are parties to the agreement, and the resolution of all claims among members of the lending syndicate representing 99% of the outstanding amounts due under the loan, the bankruptcy trustee and the members of South Edge that are parties to the agreement. In November 2011, we made a payment of $57.6 million as our share of the settlement. We believe we have made adequate provision at October 31, 2012 for any remaining exposure to lenders that are not parties to the agreement. Our carrying value of our investment in Inspirada Builders, LLC, a successor entity to South Edge, LLC, is carried at nominal value.

In December 2011, we entered into a joint venture to develop a high-rise luxury for-sale/rental project in the metro-New York market. At October 31, 2012, we had $87.3 million invested in this joint venture and were committed to make additional contributions of $37.5 million. Under the terms of the agreement, upon completion of the construction of the building, we will acquire ownership of the top 18 floors of the building to sell, for our own account, luxury condominium units and our partner will receive ownership of the lower floors containing residential for-lease units and retail space.

In the third quarter of fiscal 2012, we acquired a 50% interest in an existing land joint venture for approximately $110.0 million. The joint venture intends to develop over 2,000 home sites in Orange County, California, on land that it owns. The joint venture expects to borrow additional funds to complete the development of this project. In November 2012, we entered into an agreement with our partner in this joint venture to acquire approximately 800 lots. As part of this November 2012 agreement, each partner committed to contribute $10.0 million to the joint venture if needed.

In addition, in the third quarter of fiscal 2012, we invested in a joint venture in which we have a 50% interest that will develop a high-rise luxury condominium/hotel project in the metro-New York market. At October 31, 2012, we had $5.4 million invested in this joint venture and expect to make additional investments of approximately $47.7 million for the development of this property. The joint venture expects to borrow additional funds to complete the construction of this project. We have also guaranteed approximately $9.8 million of payments under a ground lease on this project.

In the fourth quarter of fiscal 2012, we invested in a joint venture in which we have a 50% interest that will develop a multi-family residential apartment project containing approximately 398 units. At October 31, 2012, the Company had an investment of $15.4 million in this joint venture. The joint venture expects to borrow funds to complete the construction of this project. The Company does not have any additional commitment to fund this joint venture.

Pursuant to the Securities and Exchange Commission Regulation S-X, TMF Kent Partners, LLC ("TMF") and KTL 303 LLC ("KTL") were deemed significant joint ventures for the fiscal year ended October 31, 2011. We have a 50% ownership interest in TMF and KTL. For fiscal 2012, TMF and KTL were not deemed to be significant joint ventures.

TMF was formed to construct and market two luxury condominium buildings comprising a total of 450 residential units and a parking garage located in Brooklyn, New York. Building 1, comprised of 180 units, was completed in fiscal 2008 and was substantially settled out as of October 31, 2010. TMF began construction of Building 2, comprised of 270 units, in fiscal 2008 and commenced settlement of units in October 2010. As of October 31, 2012, five units in Building 2 have not been settled. TMF expects Building 2 to be substantially settled out by the end of the second quarter of fiscal 2013.

31

KTL was formed to construct and market a luxury condominium building comprising 128 residential units and approximately 14,500 square feet of commercial space located in Manhattan, New York. KTL began construction of the building in fiscal 2008 and commenced settling units in fiscal 2010. As of October 31, 2012, KTL had no remaining units to settle.

## RESULTS OF OPERATIONS

The following table compares certain items in our Consolidated Statement of Operations for fiscal 2012, 2011 and 2010 ($ amounts in millions):

|  | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
|  | $ | % | $ | % | $ | % |
| Revenues | 1,882.8 | | 1,475.9 | | 1,494.8 | |
| Cost of revenues | 1,532.1 | 81.4 | 1,260.8 | 85.4 | 1,376.6 | 92.1 |
| Selling, general and administrative | 287.3 | 15.3 | 261.4 | 17.7 | 263.2 | 17.6 |
| Interest expense | — | — | 1.5 | 0.1 | 22.8 | 1.5 |
|  | 1,819.4 | 96.6 | 1,523.6 | 103.2 | 1,662.5 | 111.2 |
| Income (loss) from operations | 63.4 | | (47.7) | | (167.8) | |
| Other: | | | | | | |
| Income (loss) from unconsolidated entities | 23.6 | | (1.2) | | 23.5 | |
| Other income - net | 25.9 | | 23.4 | | 28.3 | |
| Expenses related to early retirement of debt | | | (3.8) | | (1.2) | |
| Income (loss) before income taxes | 112.9 | | (29.4) | | (117.2) | |
| Income tax benefit | (374.2) | | (69.2) | | (113.8) | |
| Net income (loss) | 487.1 | | 39.8 | | (3.4) | |

Note: Amounts may not add due to rounding.

## FISCAL 2012 COMPARED TO FISCAL 2011

### REVENUES AND COST OF REVENUES

Revenues in fiscal 2012 were higher than those for fiscal 2011 by approximately $406.9 million, or 27.6%. This increase was primarily attributable to an increase in the number of homes delivered. In fiscal 2012, we delivered 3,286 homes with a value of $1.88 billion, as compared to 2,611 homes in fiscal 2011 with a value of $1.48 billion. The increase in the number of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily due to the higher number of homes in backlog at the beginning of fiscal 2012, as compared to the beginning of fiscal 2011, the increased number of homes delivered from available inventory, the 37.1% increase in the number of net contracts signed in the first six months of fiscal 2012, as compared to the comparable period of fiscal 2011, and deliveries from our November 2011 acquisition of CamWest. In fiscal 2012, we delivered 201 homes with a sales value of $99.7 million from our CamWest operations.

Cost of revenues as a percentage of revenues was 81.4% in fiscal 2012, as compared to 85.4% in fiscal 2011. We recognized inventory impairment charges and write-offs of $14.7 million in fiscal 2012 and $51.8 million in fiscal 2011. Cost of revenues as a percentage of revenues, excluding impairments, was 80.6% of revenues in fiscal 2012, as compared to 81.9% in fiscal 2011. The decrease in cost of revenues, excluding inventory impairment charges, as a percentage of revenue in fiscal 2012, as compared to fiscal 2011, was due primarily to lower interest costs in fiscal 2012 and increased deliveries in fiscal 2012 from two of our high-rise buildings which had significantly higher margins than our normal product, offset, in part, by the impact on costs from the application of purchase accounting on the homes delivered from the acquisition of CamWest in November 2011. In fiscal 2012 and 2011, interest cost as a percentage of revenues was 4.6% and 5.3%, respectively.

### SELLING, GENERAL AND ADMINISTRATIVE EXPENSES ("SG&A")

SG&A increased by $25.9 million in fiscal 2012, as compared to fiscal 2011. As a percentage of revenues, SG&A was 15.3% in fiscal 2012, as compared to 17.7% in fiscal 2011. The increase in SG&A was due primarily to increased compensation costs and increased sales and marketing costs. The increased compensation costs and increased sales and marketing costs were due primarily to the increased number of communities we had open in fiscal 2012, the increase in net sales contracts taken and the number of homes delivered in fiscal

2012, as compared to fiscal 2011. The decline in SG&A, as a percentage of revenues, was due to SG&A increasing by 9.9% while revenues increased 27.6%. The decline in the SG&A percentage was due in part to only a portion of these expenses varying directly with the amount of revenues recognized while an additional portion of these expenses were semi-fixed.

**INTEREST EXPENSE**

Interest incurred on average home building indebtedness in excess of average qualified assets is charged directly to the Consolidated Statement of Operations in the period incurred. Interest expensed directly to the Consolidated Statement of Operations in fiscal 2011 was $1.5 million. Due to the increase in qualified assets, we did not have any directly expensed interest from home building indebtedness in fiscal 2012.

**INCOME (LOSS) FROM UNCONSOLIDATED ENTITIES**

We are a participant in several unconsolidated entities. We recognize our proportionate share of the earnings and losses from these entities. The trends, uncertainties or other factors that have negatively impacted our business and the industry in general, and which are discussed in the "Overview" section of this MD&A, have also impacted the unconsolidated entities in which we have investments. Most of our unconsolidated entities are land development projects or high-rise/mid-rise construction projects and do not generate revenues and earnings for a number of years during the development of the property. Once development is complete, these unconsolidated entities will generally, over a relatively short period of time, generate revenues and earnings until all of the assets of the entity are sold. Because there is not a steady flow of revenues and earnings from these entities, the earnings recognized from these entities will vary significantly from quarter-to-quarter and year-to-year.

In fiscal 2012, we recognized $23.6 million of income from unconsolidated entities, as compared to $1.2 million of loss in fiscal 2011. The loss in fiscal 2011 included $40.9 million of impairment charges that we recognized on our investments in unconsolidated entities. No impairment charges were recognized in fiscal 2012. In fiscal 2012, we recognized a $2.3 million recovery of costs we previously incurred. The $18.4 million decrease in income in fiscal 2012, as compared to fiscal 2011, excluding the impairment charges recognized in fiscal 2011 and the recovery recognized in fiscal 2012, was due principally to lower income generated from two of our condominium joint ventures, primarily due to the delivery of fewer units in fiscal 2012 than in fiscal 2011, a distribution received in fiscal 2011 from the Toll Brothers Realty Trust in excess of our cost basis in it, and lower income realized from our structured asset joint venture in fiscal 2012, as compared to fiscal 2011 due primarily to the favorable settlement in fiscal 2011 of a large distress loan. The decrease in the number of units delivered in fiscal 2012 was due to fewer units being available for delivery due to the sellout or near sellout of units in those condominium joint ventures in the early part of fiscal 2012.

**OTHER INCOME - NET**

Other income - net includes the gains and losses from our ancillary businesses, interest income, management fee income, retained customer deposits, income/losses on land sales and other miscellaneous items.

In fiscal 2012 and 2011, other income - net was $25.9 million and $23.4 million, respectively. The increase in other income - net in fiscal 2012, as compared to fiscal 2011, was due to increased income from our ancillary operations, primarily from our Gibraltar operations and improved performance from our golf operations in fiscal 2012, as compared to fiscal 2011, as well as increases in retained customer deposits and rental income in fiscal 2012, as compared to fiscal 2011. These increases were offset, in part, by lower management fee income, lower interest income and a profit participation payment received in fiscal 2011 from a fiscal 2009 sale of a non-core asset.

**EXPENSES RELATED TO EARLY RETIREMENT OF DEBT**

In fiscal 2011, we purchased $55.1 million of our senior notes in the open market at various prices and expensed $3.8 million related to the premium paid on, and other debt redemption costs of, our senior notes. In fiscal 2012, we did not have any expenses related to the early retirement of debt.

**INCOME BEFORE INCOME TAXES**

In fiscal 2012 and 2011, we reported income before income tax benefit of $112.9 million, as compared to a loss before income tax benefit of $29.4 million in fiscal 2011.

**INCOME TAX BENEFIT**

We recognized a $374.2 million tax benefit in fiscal 2012, including the reversal of $394.7 million of federal and state deferred tax asset valuation allowances. See "Critical Accounting Policies - Income Taxes - Valuation Allowance" above for information regarding the reversal of valuation allowances against our net deferred tax assets.

Excluding the reversal of the deferred tax valuation allowances, we recognized a tax provision of $20.5 million. Based upon the federal statutory rate of 35%, our federal tax provision would have been $39.5 million. The difference between the tax

provision excluding the reversal of deferred tax valuation allowances and the tax provision based on the federal statutory rate was due primarily to the reversal of $34.2 million of previously accrued taxes on uncertain tax positions (net of federal tax provision) due to the expiration of statute of limitations of the applicable filings or the completion of audits during fiscal 2012, offset, in part, by the recognition $4.7 million of state income tax provision (net of federal tax benefit), a $5.5 million provision on uncertain tax positions (net of federal tax provision) taken in fiscal 2012 and $5.0 million of accrued interest and penalties.

We recognized a $69.2 million tax benefit in fiscal 2011. Based upon the federal statutory rate of 35%, our tax benefit would have been $10.3 million. The difference between the tax benefit recognized and the tax benefit based on the federal statutory rate was due primarily to the reversal of $52.3 million of previously accrued taxes on uncertain tax positions that were resolved during fiscal 2011, a reversal of prior valuation allowances of $25.7 million that were no longer needed, an increase of deferred tax assets, net of $25.9 million and a tax benefit for state income taxes, net of federal benefit of $1.0 million. The impact of these items were offset, in part, by $43.9 million of net new deferred tax valuation allowances and $3.1 million of accrued interest and penalties.

## FISCAL 2011 COMPARED TO FISCAL 2010

### REVENUES AND COST OF REVENUES

Revenues for fiscal 2011 were lower than those for fiscal 2010 by approximately $18.9 million, or 1.3%. This decrease was primarily due to a decrease in the number of homes delivered. The decrease in the number of homes delivered in fiscal 2011, as compared to fiscal 2010, was primarily due to the lower number of homes in backlog at the beginning of fiscal 2011, as compared to the beginning of fiscal 2010.

Cost of revenues as a percentage of revenues was 85.4% in fiscal 2011, as compared to 92.1% in fiscal 2010. In fiscal 2011 and 2010, we recognized inventory impairment charges and write-offs of $51.8 million and $115.3 million, respectively. Cost of revenues as a percentage of revenues, excluding impairments, was 81.9% of revenues in fiscal 2011, as compared to 84.4% in fiscal 2010. The decrease in cost of revenues, excluding inventory impairment charges, as a percentage of revenue in fiscal 2011, as compared to fiscal 2010, was due primarily to lower costs, as a percentage of revenues, on the homes delivered in fiscal 2011 than those delivered in fiscal 2010. The lower percentage was primarily due to the delivery of fewer quick-delivery homes in fiscal 2011, as compared to fiscal 2010, as our supply of quick-delivery homes has dwindled, the reduction in costs realized from our new centralized purchasing initiatives, and reduced costs realized in fiscal 2011 because fewer homes were delivered from certain higher cost communities, as compared to fiscal 2010, as these communities delivered their final homes. Generally, the cost, as a percentage of revenues, of a quick-delivery home is higher than our standard contract and build homes ("to be built homes"). The reduction in costs was offset, in part, by higher interest costs in fiscal 2011, as compared to fiscal 2010. In fiscal 2011 and 2010, interest cost as a percentage of revenues was 5.3% and 5.1%, respectively. The higher interest cost as a percentage of revenue was due to inventory generally being held for a longer period of time and, over the past several years, fewer qualifying assets to which interest can be allocated which resulted in higher amounts of capitalized interest allocated to qualifying inventory.

### SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

SG&A decreased by $1.9 million in fiscal 2011, as compared to fiscal 2010. As a percentage of revenues, SG&A was 17.7% in fiscal 2011, as compared to 17.6% in fiscal 2010. The increase in SG&A, as a percentage of revenues, was due primarily to increased compensation costs and increased sales and marketing costs, offset, in part, by an insurance claim recovery and the reversal of previously accrued costs due to changes in estimates. The increased compensation and sales and marketing costs were due primarily to the increased number of communities we had open in fiscal 2011, as compared to fiscal 2010.

### INTEREST EXPENSE

Interest incurred on average home building indebtedness in excess of average qualified inventory is charged directly to the Consolidated Statement of Operations in the period incurred. Interest expensed directly to the Consolidated Statement of Operations in fiscal 2011 and fiscal 2010 was $1.5 million and $22.8 million, respectively. The decrease in the amount of interest expensed directly was due to a higher amount of qualified inventory and a lower amount of debt in fiscal 2011, as compared to fiscal 2010. Due to the increase in qualified inventory and the decrease of our indebtedness in the last six months of fiscal 2011, we did not have any directly expensed interest in that period.

**(LOSS) INCOME FROM UNCONSOLIDATED ENTITIES**

We are a participant in several joint ventures. We recognize our proportionate share of the earnings and losses from these entities. The trends, uncertainties or other factors that have negatively impacted our business and the industry in general, and which are discussed in the "Overview" section of this MD&A, have also impacted the unconsolidated entities in which we have investments. Most of our joint ventures are land development projects or high-rise/mid-rise construction projects and do not generate revenues and earnings for a number of years during the development of the property. Once development is complete, the joint ventures will generally, over a relatively short period of time, generate revenues and earnings until all of the assets of the entity are sold. Because there is not a steady flow of revenues and earnings from these entities, the earnings recognized from these entities will vary significantly from year to year.

In fiscal 2011, we recognized $1.2 million of losses from unconsolidated entities, as compared to $23.5 million of income in fiscal 2010. The loss in fiscal 2011 included $40.9 million of impairment charges that we recognized on our investments in unconsolidated entities. No impairment charges were recognized in fiscal 2010. See "Off-Balance Sheet Arrangements" in this MD&A for information related to these impairment charges. The income from unconsolidated entities in fiscal 2011, excluding the impairment charges recognized, was $39.7 million in fiscal 2011, as compared to $23.5 million in fiscal 2010. The increase was due principally to higher income generated in fiscal 2011 from two of our high-rise construction ventures which had significantly more deliveries in fiscal 2011, as compared to fiscal 2010, income generated from our structured asset joint venture and distributions in fiscal 2011 from ventures in excess of our cost basis in the ventures of $7.3 million, offset, in part, by the reversal in fiscal 2010 of $11.0 million of accrued costs related to litigation against us and an unconsolidated entity in which we had an investment, due to settlement of the litigation for an amount that was less than we had previously estimated.

**OTHER INCOME - NET**

For fiscal 2011 and 2010, other income - net was $23.4 million and $28.3 million, respectively. The decrease in interest and other income in fiscal 2011 was primarily due to a decline of $9.1 million of retained customer deposits in fiscal 2011, as compared to fiscal 2010, offset, in part, by increased management fee income, an increase in interest income and a profit participation payment received in fiscal 2011 from a fiscal 2009 sale of a non-core asset, as compared to fiscal 2010.

**EXPENSES RELATED TO EARLY RETIREMENT OF DEBT**

In fiscal 2011, we purchased $55.1 million of our senior notes in the open market at various prices and expensed $3.8 million related to the premium paid on, and other debt redemption costs of, our senior notes.

In fiscal 2010, we purchased $45.5 million of our senior notes in open market purchases at various prices and expensed $1.2 million related to the premium paid and other debt redemption costs of our senior notes and the write-off of the unamortized costs related to our revolving credit facility that was terminated in October 2010.

**LOSS BEFORE INCOME TAXES**

For fiscal 2011, we reported a loss before income tax benefit of $29.4 million, as compared to a loss before income tax benefit of $117.2 million in fiscal 2010.

**INCOME TAX BENEFIT**

We recognized a $69.2 million tax benefit in fiscal 2011. Based upon the federal statutory rate of 35%, our tax benefit would have been $10.3 million. The difference between the tax benefit recognized and the tax benefit based on the federal statutory rate was due primarily to the reversal of $52.3 million of previously accrued taxes on uncertain tax positions that were resolved during fiscal 2011, a reversal of prior valuation allowances of $25.7 million that were no longer needed, an increase of deferred tax assets, net, of $25.9 million and a tax benefit for state income taxes, net of federal benefit of $1.0 million, offset, in part, by $43.9 million of net new deferred tax valuation allowance and $3.1 million of accrued interest and penalties.

We recognized a $113.8 million tax benefit in fiscal 2010. Based upon the federal statutory rate of 35%, our tax benefit would have been $41.0 million. The difference between the tax benefit recognized and the tax benefit based on the federal statutory rate was due primarily to the reversal of prior tax provisions of $39.5 million due to the expiration of statutes and settlements, a reversal of prior valuation allowances of $128.6 million that were no longer needed, and a tax benefit for state income taxes, net of federal benefit of $3.8 million offset, in part, by an increase in unrecognized tax benefit of $35.6 million, and a net new deferred tax valuation allowance of $55.5 million and $9.3 million of accrued interest and penalties.

The large reversal of valuation allowances previously recognized in fiscal 2010 was due to our recovery of certain deferred tax assets

through our ability to carryback fiscal 2010 tax losses to prior years and receive a refund of the applicable federal taxes.

35

The recovery of deferred tax assets principally related to inventory impairments and impairments of investments in and advances to unconsolidated entities recognized for income tax purposes in fiscal 2010 that were recognized for book purposes in prior years.

## CAPITAL RESOURCES AND LIQUIDITY

Funding for our business has been, and continues to be, provided principally by cash flow from operating activities before inventory additions, unsecured bank borrowings and the public debt and equity markets. At October 31, 2012, we had $1.22 billion of cash, cash equivalents and marketable securities on hand and approximately $814.9 million available under our $885 million revolving credit facility which extends to October 2014. Cash used in operating activities during fiscal 2012 was $169.0 million primarily from the acquisition of inventory, the origination of mortgage loans, net of sales to outside investors, and the reduction of our accounts payable and accrued expenses, offset in part, from pre-tax income from operations. In fiscal 2012, cash used in our investing activities was $563.1 million, including $580.0 million of purchases of marketable securities, $144.7 million for the acquisition of the assets of CamWest, $217.2 million to fund new joint venture projects, $30.1 million for investments in a non-performing loan portfolio and $14.5 million for the purchase of property and equipment. The cash used in investing activities was offset, in part, by $368.3 million of sales and redemptions of marketable securities, $55.1 million of cash received as returns on our investments in unconsolidated entities and in non-performing loan portfolios and foreclosed real estate. We generated $604.6 million of cash from financing activities in fiscal 2012, primarily from the issuance of $300 million of 5.875% Senior Notes due 2022 in February 2012, the issuance of $287.5 million of 0.5% Senior Exchangeable Notes due 2017 in September 2012, $33.7 million from the proceeds of our stock-based benefit plans and $15.3 million of net new borrowings under our mortgage company warehouse facility. The cash provided by financing activities was offset, in part, by $28.4 million of cash used to repay loans payable, net of new borrowings.

At October 31, 2011, we had $1.14 billion of cash and cash equivalents and marketable securities on hand and approximately $784.7 million available under our $885 million revolving credit facility that extends to October 2014. In fiscal 2011, cash flow provided by operating activities was $52.9 million. Cash provided by operating activities during fiscal 2011 was primarily from our earnings before inventory and joint venture impairments, depreciation and amortization, the receipt of a $154.3 million federal income tax refund and a decrease in restricted cash, offset, in part, by an increase in inventory. We used $74.5 million of cash in our investing activities in fiscal 2011, primarily for investments made in non-performing loan portfolios and marketable securities and the purchase of property, construction and office equipment, offset, in part, by the return of investments from unconsolidated entities and from our non-performing loan portfolios. We also used $111.1 million of cash in financing activities in fiscal 2011, principally for the $58.8 million redemption of senior notes, the net repayment of $31.4 million of loans payable and the purchase of $49.1 million of treasury stock, offset, in part by proceeds received from our stock-based benefit plans.

At October 31, 2010, we had $1.24 billion of cash and cash equivalents and marketable securities on hand, a decrease of $672.0 million compared to October 31, 2009. In fiscal 2010, cash flow used in operating activities was $146.3 million. Cash used in operating activities during fiscal 2010 was primarily used to acquire inventory, collateralize approximately $54.4 million of letters of credit and fund an increase in mortgage loan originations in excess of mortgage loan sales, offset, in part, by cash flow generated from our earnings before inventory impairments, depreciation and amortization. We used $151.4 million of cash in our investing activities in fiscal 2010, primarily for investments in marketable securities and for investments made in our unconsolidated entities. We also used $471.0 million of cash in financing activities in fiscal 2010, principally for the repayment of our $331.7 million bank term loan, $94.0 million for the redemption of senior and senior subordinated notes and repayment of $103.2 million of other loans payable, offset, in part, by $45.4 million of net borrowings on our mortgage company warehouse loan, $7.6 million of proceeds from stock-based benefit plans and $5.0 million of tax benefits from stock-based compensation.

In general, our cash flow from operating activities assumes that, as each home is delivered, we will purchase a home site to replace it. Because we own several years' supply of home sites, we do not need to buy home sites immediately to replace those that we deliver. In addition, we generally do not begin construction of our detached homes until we have a signed contract with the home buyer, although in the past several years, due to the high cancellation rate of customer contracts and the increase in the number of attached-home communities from which we were operating (all of the units of which are generally not sold prior to the commencement of construction), the number of speculative homes in our inventory increased significantly. Should our business remain at its current level or decline, we believe that our inventory levels would decrease as we complete and deliver the homes under construction but do not commence construction of as many new homes, as we complete the improvements on the land we already own and as we sell and deliver the speculative homes that are currently in inventory, resulting in additional cash flow from operations. In addition, we might delay or curtail our acquisition of additional land, as we did during the period April 2006 through January 2010, which would further reduce our inventory levels and cash needs. At October 31, 2012, we owned or controlled through options 40,350 home sites, as compared to 37,497 at October 31, 2011, 34,852 at October 31, 2010 and 91,200 at April 30, 2006, the high point of our home sites owned and controlled. Of the 40,350 home sites owned or

controlled through options at October 31, 2012, we owned 31,327. Of our owned home sites, significant improvements were completed on approximately 12,700 of them.

At October 31, 2012, the aggregate purchase price of land parcels under option and purchase agreements was approximately $747.0 million (including $4.1 million of land to be acquired from joint ventures in which we have invested). Of the $747.0 million of land purchase commitments, we had paid or deposited $42.9 million and, if we acquire all of these land parcels, we will be required to pay an additional $704.1 million. The purchases of these land parcels are scheduled over the next several years. We have additional land parcels under option that have been excluded from the aforementioned aggregate purchase amounts since we do not believe that we will complete the purchase of these land parcels and no additional funds will be required from us to terminate these contracts.

During the past several years, we have had a significant amount of cash invested in either short-term cash equivalents or short-term interest-bearing marketable securities. In addition, we have made a number of investments in unconsolidated entities related to the acquisition and development of land for future home sites or in entities that are constructing or converting apartment buildings into luxury condominiums. Our investment activities related to marketable securities and to investments in and distributions of investments from unconsolidated entities are contained in the "Consolidated Statements of Cash Flows" under "Cash flow used in investing activities."

In October 2010, we entered into an $885 million revolving credit facility with 12 banks, which extends to October 2014. At October 31, 2012, we had no outstanding borrowings under the credit facility but had outstanding letters of credit of approximately $70.1 million. At October 31, 2012, interest would have been payable on borrowings under our credit facility at 2.75% (subject to adjustment based upon our debt rating and leverage ratios) above the Eurodollar rate or at other specified variable rates as selected by us from time to time. We are obligated to pay an undrawn commitment fee of 0.63% (subject to adjustment based upon our debt rating and leverage ratios) based on the average daily unused amount of the credit facility. Under the terms of the credit facility, we are not permitted to allow our maximum leverage ratio (as defined in the credit agreement) to exceed 1.75 to 1.00, and we are required to maintain a minimum tangible net worth (as defined in the credit agreement) of approximately $2.14 billion at October 31, 2012. At October 31, 2012, our leverage ratio was approximately 0.31 to 1.00, and our tangible net worth was approximately $3.07 billion. Based upon the minimum tangible net worth requirement, our ability to pay dividends and repurchase our common stock was limited to an aggregate amount of approximately $1.24 billion at October 31, 2012. In addition, at October 31, 2012, we had $13.0 million of letters of credit outstanding that were not part of our new credit facility; these letters of credit were collateralized by $13.3 million of cash deposits.

We believe that we will be able to continue to fund our current operations and meet our contractual obligations through a combination of our existing cash resources and existing sources of credit. Due to the deterioration of the credit markets and the uncertainties that exist in the economy and for home builders in general, we cannot be certain that we will be able to replace existing financing or find sources of additional financing in the future.

## INFLATION

The long-term impact of inflation on us is manifested in increased costs for land, land development, construction and overhead. We generally contract for land significantly before development and sales efforts begin. Accordingly, to the extent land acquisition costs are fixed, increases or decreases in the sales prices of homes will affect our profits. Prior to the recent sustained downturn in the economy and the decline in demand for homes, the sales prices of our homes generally increased over time. Because the sales price of each of our homes is fixed at the time a buyer enters into a contract to purchase a home and because we generally contract to sell our homes before we begin construction, any inflation of costs in excess of those anticipated may result in lower gross margins. We generally attempt to minimize that effect by entering into fixed-price contracts with our subcontractors and material suppliers for specified periods of time, which generally do not exceed one year. The slowdown in the home building industry over the past several years and the decline in the sales prices of our homes, without a corresponding reduction in the costs, have had an adverse impact on our profitability.

In general, housing demand is adversely affected by increases in interest rates and housing costs. Interest rates, the length of time that land remains in inventory and the proportion of inventory that is financed affect our interest costs. If we are unable to raise sales prices enough to compensate for higher costs, or if mortgage interest rates increase significantly, affecting prospective buyers' ability to adequately finance home purchases, our revenues, gross margins and net income would be adversely affected. Increases in sales prices, whether the result of inflation or demand, may affect the ability of prospective buyers to afford new homes.

## CONTRACTUAL OBLIGATIONS

The following table summarizes our estimated contractual payment obligations at October 31, 2012 (amounts in millions):

|  | 2013 | 2014 – 2015 | 2016 – 2017 | Thereafter | Total |
|---|---|---|---|---|---|
| Senior notes (a) | $ 276.8 | $ 756.4 | $ 555.8 | $ 1,118.6 | $ 2,707.6 |
| Loans payable (a) | 32.7 | 25.3 | 10.4 | 60.0 | 128.4 |
| Mortgage company warehouse loan (a) | 74.3 |  |  |  | 74.3 |
| Operating lease obligations | 9.2 | 14.1 | 8.2 | 5.9 | 37.4 |
| Purchase obligations (b) | 531.0 | 327.8 | 62.0 | 72.5 | 993.3 |
| Retirement plans (c) | 5.1 | 12.6 | 12.0 | 53.1 | 82.8 |
| Other | 0.6 | 0.9 | 0.3 |  | 1.8 |
|  | $ 929.7 | $ 1,137.1 | $ 648.7 | $ 1,310.1 | $ 4,025.6 |

   (a) Amounts include estimated annual interest payments until maturity of the debt. Of the amounts indicated, $2.1 billion of the senior notes, $99.8 million of loans payable and $72.7 million of the mortgage company warehouse loan were recorded on the October 31, 2012 Consolidated Balance Sheet.

   (b) Amounts represent our expected acquisition of land under options or purchase agreements and the estimated remaining amount of the contractual obligation for land development agreements secured by letters of credit and surety bonds.

   (c) Amounts represent our obligations under our deferred compensation and supplemental executive retirement plans and our 401(k) salary deferral savings plans. Of the total amount indicated, $57.5 million was recorded on the October 31, 2012 Consolidated Balance Sheet.

## GEOGRAPHIC SEGMENTS

We operate in four geographic segments around the United States: the North, consisting of Connecticut, Illinois, Massachusetts, Michigan, Minnesota, New Jersey and New York; the Mid-Atlantic, consisting of Delaware, Maryland, Pennsylvania and Virginia; the South, consisting of Florida, North Carolina and Texas; and the West, consisting of Arizona, California, Colorado, Nevada and Washington. In fiscal 2011, we discontinued the sale of homes in South Carolina. In fiscal 2010, we discontinued the sale of homes in West Virginia and Georgia. The operations of South Carolina, West Virginia and Georgia were immaterial to the South and Mid-Atlantic geographic segments.

The following tables summarize information related to revenues, gross contracts signed, contract cancellations, net contracts signed, total revenues and income (loss) before income taxes by geographic segment for fiscal years 2012, 2011 and 2010. Information related to backlog at October 31, 2012, 2011 and 2010 and assets by geographic segment at October 31, 2012 and 2011 has also been provided. (Note: Amounts in tables may not add due to rounding.)

**Units Delivered and Revenues ($ amounts in millions):**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 891 | 718 | 774 | $ 513.7 | $ 381.6 | $ 407.7 |
| Mid-Atlantic | 1,025 | 887 | 876 | 564.5 | 499.7 | 488.4 |
| South | 626 | 522 | 498 | 366.7 | 285.0 | 264.3 |
| West | 744 | 484 | 494 | 437.9 | 309.6 | 334.4 |
|  | 3,286 | 2,611 | 2,642 | $ 1,882.8 | $ 1,475.9 | $ 1,494.8 |

**Gross Contracts Signed ($ amounts in millions):**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 1,051 | 817 | 813 | $ 689.2 | $ 466.6 | $ 418.6 |
| Mid-Atlantic | 1,233 | 936 | 902 | 684.0 | 524.1 | 502.5 |
| South | 985 | 713 | 551 | 621.2 | 416.6 | 297.1 |
| West | 1,072 | 499 | 523 | 670.8 | 300.3 | 352.1 |
|  | 4,341 | 2,965 | 2,789 | $ 2,665.2 | $ 1,707.6 | $ 1,570.3 |

**Contracts Canceled ($ amounts in millions):**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 58 | 67 | 68 | $ 33.6 | $ 37.0 | $ 35.2 |
| Mid-Atlantic | 37 | 37 | 44 | 22.3 | 19.8 | 23.4 |
| South | 52 | 45 | 39 | 34.2 | 28.1 | 21.1 |
| West | 35 | 32 | 33 | 17.2 | 17.9 | 18.6 |
|  | 182 | 181 | 184 | $ 107.3 | $ 102.8 | $ 98.3 |

**Net Contracts Signed ($ amounts in millions):**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 993 | 750 | 745 | $ 655.6 | $ 429.6 | $ 383.4 |
| Mid-Atlantic | 1,196 | 899 | 858 | 661.7 | 504.3 | 479.1 |
| South | 933 | 668 | 512 | 587.0 | 388.5 | 276.0 |
| West | 1,037 | 467 | 490 | 653.6 | 282.4 | 333.5 |
|  | 4,159 | 2,784 | 2,605 | $ 2,557.9 | $ 1,604.8 | $ 1,472.0 |

**Contract Cancellation Rates:**
  **(as a percentage of gross contracts signed, based on units and dollars)**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 5.5% | 8.2% | 8.4% | 4.9% | 7.9% | 8.4% |
| Mid-Atlantic | 3.0% | 4.0% | 4.9% | 3.3% | 3.8% | 4.7% |
| South | 5.3% | 6.3% | 7.1% | 5.5% | 6.7% | 7.1% |
| West | 3.3% | 6.4% | 6.3% | 2.6% | 6.0% | 5.3% |
| Total | 4.2% | 6.1% | 6.6% | 4.0% | 6.0% | 6.3% |

**Backlog at October 31 ($ amounts in millions):**

|  | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
|  | Units | Units | Units | $ | $ | $ |
| North | 655 | 553 | 521 | $ 449.2 | $ 307.4 | $ 259.3 |
| Mid-Atlantic | 658 | 487 | 475 | 386.2 | 288.9 | 284.4 |
| South | 749 | 442 | 296 | 483.5 | 263.2 | 159.7 |
| West | 507 | 185 | 202 | 351.0 | 121.6 | 148.7 |
|  | 2,569 | 1,667 | 1,494 | $ 1,669.9 | $ 981.1 | $ 852.1 |

39

**Revenues and Income (Loss) Before Income Taxes ($ amounts in millions):**

| | Revenues | | | Income (loss) before income taxes | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | 2010 | 2012 | 2011 | 2010 |
| North | $ 513.7 | $ 381.6 | $ 407.7 | $ 71.8 | $ 42.5 | $ (2.3) |
| Mid-Atlantic | 564.5 | 499.7 | 488.4 | 67.8 | 57.6 | 33.9 |
| South | 366.7 | 285.0 | 264.3 | 18.0 | (25.9) | (35.2) |
| West | 437.9 | 309.6 | 334.4 | 39.4 | (27.1) | (11.9) |
| Corporate and other | | | | (84.1) | (76.5) | (101.7) |
| Total | $ 1,882.8 | $ 1,475.9 | $ 1,494.8 | $ 112.9 | $ (29.4) | $ (117.2) |

Corporate and other is comprised principally of general corporate expenses such as the offices of the Executive Chairman, Chief Executive Officer and President, and the corporate finance, accounting, audit, tax, human resources, risk management, marketing and legal groups, directly expensed interest, offset, in part, by interest income, income from our ancillary businesses and income from a number of our unconsolidated entities.

**Total Assets ($ amounts in millions):**

| | At October 31, | |
|---|---|---|
| | 2012 | 2011 |
| North | $ 1,205.9 | $ 1,060.2 |
| Mid-Atlantic | 1,304.8 | 1,160.9 |
| South | 821.0 | 760.1 |
| West | 913.7 | 650.8 |
| Corporate and other | 1,941.7 | 1,423.2 |
| Total | $ 6,187.1 | $ 5,055.2 |

Corporate and other is comprised principally of cash and cash equivalents, marketable securities, deferred tax assets and the assets of the Company's Gibraltar investments, manufacturing facilities and mortgage subsidiary.

**FISCAL 2012 COMPARED TO FISCAL 2011**

**North**

Revenues in fiscal 2012 were higher than those in fiscal 2011 by $132.1 million, or 34.6%. The increase in revenues was primarily attributable to a 24.1% increase in the number of homes delivered and an increase of 8.5% in the average selling price of the homes delivered. The increase in the number of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily due to the commencement of settlements in fiscal 2012 at two of our high-rise buildings located in the New York and New Jersey urban markets and to a higher backlog at October 31, 2011, as compared to October 31, 2010. The increase in the average price of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily attributable to a shift in the number of homes delivered to more expensive areas and/or products.

The value of net contracts signed in fiscal 2012 was $655.6 million, a 52.6% increase from the $429.6 million of net contracts signed during fiscal 2011. This increase was primarily due to a 32.4% increase in the number of net contracts signed and a 15.3% increase in the average value of each net contract. The increase in the number of net contracts signed was primarily due to three high-rise buildings located in the New York and New Jersey urban markets that opened in the second half of fiscal 2011, a 9% increase in the number of selling communities, and an improvement in home buyer demand in fiscal 2012 as compared to fiscal 2011. The increase in the average sales price of net contracts signed in fiscal 2012, as compared to fiscal 2011, was primarily attributable to sales at two of our high-rise buildings located in the New York urban market that opened in the fourth quarter of fiscal 2011. In fiscal 2012, we signed 74 contracts at these buildings with an average sales value of approximately $1.8 million each, as compared to 12 contacts with an average sales value of approximately $1.6 million in fiscal 2011. Excluding the sales from these two high-rise buildings, the average sales price of our contracts was $567,000 and $556,000 in fiscal 2012 and 2011, respectively.

In fiscal 2012, we reported income before income taxes of $71.8 million, as compared to $42.5 million in fiscal 2011. This increase in

income was primarily attributable to higher earnings from the increased revenues and lower cost of revenues as a

40

percentage of revenues, in fiscal 2012, as compared to fiscal 2011, offset, in part, by a decrease in income from unconsolidated entities from $32.2 million in fiscal 2011 to $15.1 million in fiscal 2012 and by higher SG&A. The lower cost of revenues as a percentage of revenues was primarily due to the initial closings at two of our high-rise buildings located in the New York and New Jersey urban markets which had significantly higher margins than our other products and lower inventory impairment charges in fiscal 2012, as compared to fiscal 2011. In fiscal 2012 and 2011, we recognized inventory impairment charges of $1.8 million and $3.8 million, respectively. The $17.1 million decrease in income from unconsolidated entities in fiscal 2012 was due principally to a decrease in income generated from two of our high-rise joint ventures where unit availability has diminished since fiscal 2011 as they have closed most or all of their condominium units.

**Mid-Atlantic**

Revenues in fiscal 2012 were higher than those in fiscal 2011 by $64.8 million, or 12.9%. The increase in revenues was primarily attributable to a 15.6% increase in the number of homes delivered, partially offset by a 2.3% decrease in the average selling price of the homes delivered. The increase in the number of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily due to a higher backlog at October 31, 2011, as compared to October 31, 2010, primarily in Pennsylvania and Virgina. The decrease in the average price of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily attributable to a shift in the number of homes delivered to less expensive areas and/or products.

The value of net contracts signed during fiscal 2012 increased by $157.4 million, or 31.2%, from fiscal 2011. The increase was due to a 33.0% increase in the number of net contracts signed partially offset by a 1.4% decrease in the average value of each net contract. The increase in the number of net contracts signed was primarily due to a 10% increase in the number of selling communities and an increase in home buyer demand in fiscal 2012, as compared to fiscal 2011. The decrease in the average sales price of net contracts signed was primarily due to a shift in the number of contracts signed to less expensive areas and/or products in fiscal 2012, as compared to fiscal 2011.

We reported income before income taxes in fiscal 2012 and 2011 of $67.8 million and $57.6 million, respectively. The increase in the income before income taxes in fiscal 2012 was primarily due higher earnings from the increased revenues in fiscal 2012, as compared to fiscal 2011, offset, in part, by higher inventory impairment charges and SG&A in fiscal 2012, as compared to fiscal 2011. We recognized inventory impairment charges of $6.1 million and $4.3 million fiscal 2012 and 2011, respectively.

**South**

Revenues in fiscal 2012 were higher than those in fiscal 2011 by $81.7 million, or 28.7%. This increase was attributable to a 19.9% increase in the number of homes delivered and a 7.3% increase in the average price of the homes delivered. The increase in the number of homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily due to a higher backlog at October 31, 2011, as compared to October 31, 2010, which was the result of an increase in the number of net contracts signed in fiscal 2011 as compared to fiscal 2010. The increase in the average price of the homes delivered in fiscal 2012, as compared to fiscal 2011, was primarily attributable to a shift in the number of homes delivered to more expensive areas and/or products in fiscal 2012, as compared to fiscal 2011.

In fiscal 2012, the value of net contracts signed increased by $198.5 million, or 51.1%, as compared to fiscal 2011. The increase was attributable to increases of 39.7% and 8.2% in the number and average value of net contracts signed, respectively. The increase in the number of net contracts signed in fiscal 2012, as compared to fiscal 2011, was primarily due to increased demand and an increase in the number of selling communities in fiscal 2012, as compared to fiscal 2011. The increase in the average sales price of net contracts signed was primarily due to a shift in the number of contracts signed to more expensive areas and/or products in fiscal 2012, as compared to fiscal 2011.

We reported income before income taxes of $18.0 million in fiscal 2012, as compared to a loss before income taxes of $25.9 million in fiscal 2011. The increase in the income before income taxes was primarily due to lower inventory impairment charges in fiscal 2012, as compared to fiscal 2011, $15.2 million of impairment charges that we recognized on one of our investments in unconsolidated entities in fiscal 2011 which did not recur in 2012, and higher earnings from the increased revenues in fiscal 2012, as compared to fiscal 2011. In fiscal 2012 and 2011, we recognized inventory impairment charges of $6.0 million and $20.8 million, respectively.

**West**

Revenues in fiscal 2012 were higher than those in fiscal 2011 by $128.3 million, or 41.4%. The increase in revenues was attributable to a 53.7% increase in the number of homes delivered, offset, in part, by an 8.0% decrease in the average sales price of the homes delivered. The increase in the number of homes delivered was primarily attributable to home deliveries in Washington from CamWest. The decrease in the average price of the homes delivered was primarily due to a shift in the

number of homes delivered to less expensive products and/or locations, primarily in Arizona and Washington, in fiscal 2012, as compared to fiscal 2011.

The value of net contracts signed during fiscal 2012 increased $371.2 million, or 131.4%, as compared to fiscal 2011. This increase was due to a 122.1% increase in the number of net contracts signed and a 4.2% increase in the average value of each net contract signed. The increase in the number of net contracts signed was due to the addition of communities in Washington from CamWest where we entered into 254 net contracts in fiscal 2012 and an increase in the number of selling communities and demand in other states in fiscal 2012, as compared to fiscal 2011.

In fiscal 2012, we reported income before income taxes of $39.4 million, as compared to a loss before income taxes of $27.1 million in fiscal 2011. The increase in income before income taxes was primarily due to a $25.7 million impairment charge that we recognized on our South Edge investment in fiscal 2011 which did not recur in fiscal 2012, a $22.1 million decrease in inventory impairment charges and write-offs and higher earnings from the increased amount of revenues in fiscal 2012, as compared to fiscal 2011, offset, in part, by higher cost of revenues, excluding inventory impairment charges and interest, as a percentage of revenues, in fiscal 2012, as compared to fiscal 2011. In fiscal 2011, we recognized inventory impairment charges and write-offs of $22.9 million, as compared to $0.8 million in fiscal 2012. Cost of revenues as a percentage of revenues, excluding impairments and interest, was 78.2% of revenues in fiscal 2012, as compared to 75.9% in fiscal 2011. The increase in cost of revenues, excluding inventory impairment charges and interest, as a percentage of revenue in fiscal 2012, as compared to fiscal 2011, was primarily due to the impact of purchase accounting on the homes delivered in fiscal 2012 from our acquisition of CamWest, offset, in part, by improved margins in California and Nevada.

**Other**

In fiscal 2012 and 2011, other loss before income taxes was $84.1 million and $76.5 million, respectively. The increase in the loss in fiscal 2012, as compared to fiscal 2011, was primarily due to higher unallocated SG&A in fiscal 2012, as compared to fiscal 2011, offset, in part, by an increase of income recognized from our Gibraltar operations in fiscal 2012, as compared to fiscal 2011. The increase in unallocated SG&A in fiscal 2012, as compared to fiscal 2011, was primarily due to increased compensation costs in fiscal 2012, as compared to fiscal 2011, and a reduction in SG&A in fiscal 2011 from an insurance claim recovery.

**FISCAL 2011 COMPARED TO FISCAL 2010**

**North**

Revenues in fiscal 2011 were lower than those for fiscal 2010 by $26.1 million, or 6.4%. The decrease in revenues was primarily attributable to a 7.2% decrease in the number of homes delivered. The decrease in the number of homes delivered in the fiscal 2011 period, as compared to the fiscal 2010 period, was primarily due to a lower backlog at October 31, 2010, as compared to October 31, 2009, and a reduction in the number of units closed at several of our high-rise communities where unit availability has dwindled.

The value of net contracts signed in fiscal 2011 was $429.6 million, a 12.1% increase from the $383.4 million of net contracts signed during fiscal 2010. This increase was primarily due to an 11.3% increase in the average value of each net contract. The increase in the average sales price of net contracts signed in fiscal 2011, as compared to fiscal 2010, was primarily attributable to a shift in the number of contracts signed to more expensive areas and/or products in fiscal 2011, as compared fiscal 2010.

For the year ended October 31, 2011, we reported income before income taxes of $42.5 million, as compared to a $2.3 million loss for fiscal 2010. The increase in income in fiscal 2011 was primarily attributable to a decrease in impairment charges in fiscal 2011 of $25.6 million, as compared to fiscal 2010, an increase in income from unconsolidated entities of $19.5 million in fiscal 2011, as compared to fiscal 2010, and lower costs on homes delivered in fiscal 2011 than those delivered in fiscal 2010, offset, in part, by higher SG&A expenses and a decline in retained customer deposits in fiscal 2011, as compared to fiscal 2010. In fiscal 2011 and 2010, we recognized inventory impairment charges of $3.8 million and $29.4 million, respectively. The increase in income from unconsolidated entities in fiscal 2011 was due principally to income generated from two of our high-rise construction joint ventures that commenced delivery of units in the second and third quarters of fiscal 2010 and the recovery of an investment in an unconsolidated entity that we had previously impaired.

**Mid-Atlantic**

Revenues in fiscal 2011 were higher than those of fiscal 2010 by $11.3 million, or 2.3%. This increase was attributable to a 1.3% increase in the number of homes delivered and a 1.1% increase in the average price of the homes delivered. The increase in the number of homes delivered in fiscal 2011, as compared to fiscal 2010, was primarily due a higher number of net

contracts signed in the first six months of fiscal 2011, as compared to the first six months of fiscal 2010, offset, in part, by a lower backlog at October 31, 2010, as compared to October 31, 2009. The increase in the average price of the homes delivered in the fiscal 2011 period, as compared to the fiscal 2010 period, was primarily related to a shift in the number of homes delivered to more expensive products and/or locations.

The value of net contracts signed in fiscal 2011 increased by $25.2 million, or 5.3%, from the value of net contracts signed in fiscal 2010. The increase was due to a 4.8% increase in the number of contracts signed and a 0.5% increase in the average value of each net contract signed. The increase in the number of net contracts signed in fiscal 2011, as compared to fiscal 2010, was primarily due to an increase of 22.3% in the number of net contracts signed, primarily in Virginia, in the three months ended October 31, 2011, as compared to the three months ended October 31, 2010.

We reported income before income taxes for fiscal 2011 and 2010 of $57.6 million and $33.9 million, respectively. The increase in the income before income taxes was primarily due to a decrease in the cost of revenues in fiscal 2011, as compared to fiscal 2010. The decrease in the cost of revenues was primarily due to lower costs of the homes delivered in fiscal 2011 than those delivered in fiscal 2010 and lower impairment charges in fiscal 2011, as compared to fiscal 2010. The lower costs were due to the delivery of fewer quick-delivery homes in the fiscal 2011 period, as compared to the fiscal 2010 period, as our supply of such homes has dwindled, and to reduced sales incentives in general on the homes delivered in fiscal 2011, as compared to fiscal 2010. Generally, we give higher sales incentives on quick-delivery homes than on our to-be-built homes. In addition, reduced costs were realized in the fiscal 2011 period because fewer homes were delivered from certain higher cost communities in fiscal 2011, as compared to the fiscal 2010 period, as these communities closed out. We recognized inventory impairment charges of $4.3 million and $11.0 million for fiscal 2011 and 2010, respectively.

**South**

Revenues in fiscal 2011 were higher than those in fiscal 2010 by $20.7 million, or 7.8%. This increase was attributable to a 4.8% increase in the number of homes delivered and a 2.9% increase in the average price of the homes delivered. The increase in the number of homes delivered in fiscal 2011, as compared to fiscal 2010, was primarily due to the increased number of communities that we were delivering from in fiscal 2011, as compared to fiscal 2010. The increase in the average price of the homes delivered in fiscal 2011, as compared to fiscal 2010, was primarily attributable to a shift in the number of homes delivered to more expensive areas and/or products in fiscal 2011, as compared to fiscal 2010.

In fiscal 2011, the value of net contracts signed increased by $112.5 million, or 40.8%, as compared to fiscal 2010. The increase was attributable to increases of 30.5% and 7.9% in the number and average value of net contracts signed, respectively. The increase in the number of net contracts signed in fiscal 2011, as compared to fiscal 2010, was primarily due to an increase in the number of selling communities in fiscal 2011, as compared to fiscal 2010. The increase in the average sales price of net contracts signed was primarily due to a shift in the number of contracts signed to more expensive areas and/or products in fiscal 2011, as compared to fiscal 2010.

For fiscal 2011 and 2010, we reported losses before income taxes of $25.9 million and $35.2 million, respectively. The decline in the loss before income taxes was primarily due to lower impairment charges in fiscal 2011 of $16.3 million, as compared to fiscal 2010, and lower costs on homes delivered in fiscal 2011 than those delivered in fiscal 2010, offset, in part, by an increase in the loss from unconsolidated entities of $15.6 million in fiscal 2011, as compared to fiscal 2010. Cost of revenues as a percentage of revenues, excluding impairments, was 78.2% of revenues in fiscal 2011, as compared to 80.4% in fiscal 2010. This decrease in fiscal 2011, as compared to fiscal 2010, was due primarily to lower sales incentives, primarily on quick-delivery homes, in fiscal 2011, as compared to fiscal 2010. The increase in the loss from unconsolidated entities was primarily due to $15.2 million of impairment charges that we recognized on one of our investments.

**West**

Revenues in fiscal 2011 were lower than those in fiscal 2010 by $24.8 million, or 7.4%. The decrease in revenues was attributable to a 5.5% decrease in the average sales price of the homes delivered and a 2.0% decrease in the number of homes delivered. The decrease in the average price of the homes delivered was primarily due to a shift in the number of homes delivered to less expensive products and/or locations, primarily in Arizona and Nevada, in fiscal 2011, as compared to fiscal 2010.

The value of net contracts signed during fiscal 2011 decreased $51.1 million, or 15.3%, as compared to fiscal 2010. This decrease was due to an 11.2% decrease in the average value of each net contract signed and a 4.7% decrease in the number of net contracts signed. The decrease in the average sales price of net contracts signed was primarily due to a shift in the number of contracts signed to less expensive areas and/or products in fiscal 2011, as compared to fiscal 2010. The decrease in the number of net contracts signed was due to an 11.5% decline in the number of selling communities in fiscal 2011, as compared

43

to fiscal 2010, offset, in part, by an increase in housing demand in Arizona in fiscal 2011, as compared to fiscal 2010.

We reported losses before income taxes for fiscal 2011 and 2010 of $27.1 million and $11.9 million, respectively. The increase in the loss before income taxes was primarily due to a decrease in income from unconsolidated entities of $35.9 million in fiscal 2011, as compared to fiscal 2010, offset, in part, by lower inventory impairment charges and lower cost of revenues, excluding impairments, in fiscal 2011, as compared to fiscal 2010. The increase in the loss from unconsolidated entities was primarily due to $25.7 million of impairment charges that we recognized on one of our investments in unconsolidated entities in fiscal 2011 and the reversal of $11.0 million in fiscal 2010 of accrued costs related to litigation against us and an unconsolidated entity in which we had an investment, due to settlement of the litigation for an amount that was less than we had previously estimated. In fiscal 2011 and fiscal 2010, we recognized inventory impairment charges and write-offs of $22.9 million and $37.7 million, respectively. Cost of revenues as a percentage of revenues, excluding impairments, was 75.9% in fiscal 2011, as compared to 78.4% in fiscal 2010. The decrease in cost of revenues, excluding inventory impairment charges, as a percentage of revenue in fiscal 2011, as compared to fiscal 2010, was due primarily to the delivery of fewer quick-delivery homes in fiscal 2011, as compared to fiscal 2010, as our supply of such homes dwindled, and to reduced sales incentives on quick-delivery homes delivered in fiscal 2011, as compared to fiscal 2010. Generally, we give higher sales incentives on quick-delivery homes than on our to-be-built homes.

**Other**

For fiscal 2011 and 2010, other loss before income taxes was $76.5 million and $101.7 million, respectively. The decrease in the loss in fiscal 2011, as compared to fiscal 2010, was primarily due to a decrease of $21.2 million of interest directly expensed in fiscal 2011, as compared to fiscal 2010, and an increase of $7.2 million of income recognized from our Gibraltar operations in fiscal 2011, as compared to fiscal 2010, offset, in part, by an increase of $2.6 million of costs related to the repurchase of our senior notes in open market transactions in fiscal 2011, as compared to fiscal 2010.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to market risk primarily due to fluctuations in interest rates. We utilize both fixed-rate and variable-rate debt. For fixed-rate debt, changes in interest rates generally affect the fair market value of the debt instrument, but not our earnings or cash flow. Conversely, for variable-rate debt, changes in interest rates generally do not affect the fair market value of the debt instrument but do affect our earnings and cash flow. We do not have the obligation to prepay fixed-rate debt prior to maturity and, as a result, interest rate risk and changes in fair market value should not have a significant impact on such debt until we are required to refinance such debt.

At October 31, 2012, our debt obligations, principal cash flows by scheduled maturity, weighted-average interest rates and estimated fair value were as follows ($ amounts in thousands):

| Fiscal year of maturity | Fixed-rate debt | | Variable-rate debt (a) | |
| | Amount | Weighted-average interest rate (%) | Amount | Weighted-average interest rate (%) |
| --- | --- | --- | --- | --- |
| 2013 | $ 193,023 | 5.87% | $ 72,814 | 2.99% |
| 2014 | 277,942 | 4.90% | 150 | 0.42% |
| 2015 | 309,953 | 5.12% | 150 | 0.42% |
| 2016 | 2,097 | 5.75% | 150 | 0.42% |
| 2017 | 401,918 | 8.90% | 150 | 0.42% |
| Thereafter | 991,378 | 4.53% | 11,945 | 0.29% |
| Discount | (8,726) | | | |
| Total | $ 2,167,585 | 5.59% | $ 85,359 | 2.60% |
| Fair value at October 31, 2012 | $ 2,426,587 | | $ 85,359 | |

(a) Based upon the amount of variable-rate debt outstanding at October 31, 2012, and holding the variable-rate debt balance constant, each 1% increase in interest rates would increase the interest incurred by us by approximately $0.9 million per year.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Reference is made to the financial statements, listed in Item 15(a)(1) which appear at pages F-1 through F-53 of this report and which are incorporated herein by reference.

44

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

Any controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected. However, our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives.

Our Chief Executive Officer and Chief Financial Officer, with the assistance of management, evaluated the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, ("Exchange Act") as of the end of the period covered by this report ("Evaluation Date"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the Evaluation Date, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control Over Financial Reporting and Attestation Report of the Independent Registered Public Accounting Firm**

Management's Annual Report on Internal Control Over Financial Reporting and the attestation report of our independent registered public accounting firm on internal control over financial reporting on pages F-1 and F-2, respectively, are incorporated herein.

**Changes in Internal Control Over Financial Reporting**

There has not been any change in our internal control over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our quarter ended October 31, 2012 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

Not applicable.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The following table includes information with respect to all persons serving as executive officers as of the date of this Form 10-K. All executive officers serve at the pleasure of our Board of Directors.

| Name | Age | Positions |
| --- | --- | --- |
| Robert I. Toll | 71 | Executive Chairman of the Board and Director |
| Douglas C. Yearley, Jr. | 52 | Chief Executive Officer and Director |
| Richard T. Hartman | 55 | Executive Vice President and Chief Operating Officer |
| Martin P. Connor | 48 | Senior Vice President, Chief Financial Officer and Treasurer |

Robert I. Toll, with his brother Bruce E. Toll, the Vice Chairman of the Board and a Director of Toll Brothers, Inc., co-founded our predecessors' operations in 1967. Robert I. Toll served as Chairman of the Board and Chief Executive Officer from our inception until June 2010, when he assumed the new position of Executive Chairman of the Board.

Douglas C. Yearley, Jr. joined us in 1990 as assistant to the Chief Executive Officer with responsibility for land acquisitions. He has been an officer since 1994, holding the position of Senior Vice President from January 2002 until November 2005, the position of Regional President from November 2005 until November 2009, and the position of Executive Vice President from November 2009 until June 2010 when he was promoted to his current position of Chief Executive Officer. Mr. Yearley was elected a Director of Toll Brothers, Inc. in June 2010.

Richard T. Hartman, joined us in 1980 and served in various positions with us, including Regional President from 2005 through 2011. He was appointed to the positions of Executive Vice President and Chief Operating Officer effective January 1, 2012. In December 2012, Mr. Hartman was appointed to the position of President effective January 1, 2013.

Martin P. Connor joined the Company as Vice President and Assistant Chief Financial Officer in December 2008 and was elected a Senior Vice President in December 2009. Mr. Connor was appointed to his current position of Senior Vice President, Chief Financial Officer and Treasurer in September 2010. From June 2008 to December 2008, Mr. Connor was President of Marcon Advisors LLC, a finance and accounting consulting firm which he founded. From October 2006 to June 2008, Mr. Connor was Chief Financial Officer and Director of Operations for O'Neill Properties, a diversified commercial real estate developer in the Mid-Atlantic area. Prior to October 2006, he spent over 20 years at Ernst & Young LLP as an Audit and Advisory Business Services Partner, responsible for the real estate practice for Ernst & Young LLP in the Philadelphia marketplace. During the period from 1998 to 2005, he served on the Toll Brothers, Inc. engagement.

The other information required by this item will be included in the "Election of Directors" and "Corporate Governance" sections of our Proxy Statement for the 2012 Annual Meeting of Stockholders (the "2012 Proxy Statement") and is incorporated herein by reference.

### Code of Ethics

The Company has adopted a Code of Ethics for Principal Executive Officer and Senior Financial Officers ("Code of Ethics") that applies to the Company's principal executive officer, principal financial officer, principal accounting officer, controller and persons performing similar functions designated by the Company's Board of Directors. The Code of Ethics is available on the Company's internet website at www.tollbrothers.com under "Investor Relations: Company Information: Corporate Governance." If the Company were to amend or waive any provision of its Code of Ethics, the Company intends to satisfy its disclosure obligations with respect to any such waiver or amendment by posting such information on its internet website set forth above rather than by filing a Form 8-K.

### Indemnification of Directors and Officers

The Company's Certificate of Incorporation and Bylaws provide for indemnification of our directors and officers. We have also entered into individual indemnification agreements with each of our directors.

### ITEM 11. EXECUTIVE COMPENSATION

The information required by this item will be included in the "Executive Compensation" section of our 2013 Proxy Statement and is incorporated herein by reference.

46

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

Except as set forth below, the information required in this item will be included in the "Voting Securities and Beneficial Ownership" section of our 2013 Proxy Statement and is incorporated herein by reference.

The following table provides information as of October 31, 2012, with respect to compensation plans (including individual compensation arrangements) under which our equity securities are authorized for issuance.

### Equity Compensation Plan Information

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (in thousands) | | Weighted-average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (in thousands) |
|---|---|---|---|---|---|
| | (a) | | (b) | | (c) |
| Equity compensation plans approved by security holders | 10,669 | $ | 23.23 | | 5,489 |
| Equity compensation plans not approved by security holders | | | | | |
| Total | 10,669 | $ | 23.23 | | 5,489 |

**ITEM 13. CERTAIN RELATIONSHIPS, RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The information required in this item will be included in the "Corporate Governance and "Certain Transactions" sections of our 2013 Proxy Statement and is incorporated herein by reference.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required in this item will be included in the "Ratification of the Re-Appointment of Independent Registered Public Accounting Firm" section of the 2013 Proxy Statement and is incorporated herein by reference.

47

PART IV

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

**(a) Financial Statements and Financial Statement Schedules**

|  | Page |
|---|---|

**1. Financial Statements**

| | |
|---|---|
| Management's Annual Report on Internal Control Over Financial Reporting | F-1 |
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Balance Sheets | F-5 |
| Consolidated Statements of Changes in Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

**2. Financial Statement Schedules**

None

Financial statement schedules have been omitted because they are either not applicable or the required information is included in the financial statements or notes hereto.

**(b) Exhibits**

The following exhibits are included with this report or incorporated herein by reference:

| Exhibit Number | Description |
|---|---|
| 3.1 | Second Restated Certificate of Incorporation of the Registrant, dated September 8, 2005, is hereby incorporated by reference to Exhibit 3.1 of the Registrant's Form 10-Q for the quarter ended July 31, 2005. |
| 3.2 | Certificate of Amendment of the Second Restated Certificate of Incorporation of the Registrant, filed with the Secretary of State of the State of Delaware, is hereby incorporated by reference to Exhibit 3.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 22, 2010. |
| 3.3 | Certificate of Amendment of the Second Restated Certificate of Incorporation of the Registrant dated as of March 16, 2011 is hereby incorporated by reference to Exhibit 3.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 18, 2011. |

| Exhibit Number | Description |
|---|---|
| 3.4 | By-laws of the Registrant, as Amended and Restated June 11, 2008, are hereby incorporated by reference to Exhibit 3.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 13, 2008. |
| 3.5 | Amendment to the By-laws of the Registrant, dated as of September 24, 2009, is hereby incorporated by reference to Exhibit 3.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 24, 2009. |
| 3.6 | Amendment to the By-laws of the Registrant, dated as of June 15, 2011 is hereby incorporated by reference to Exhibit 3.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 16, 2011. |
| 4.1 | Specimen Stock Certificate is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-K for the fiscal year ended October 31, 1991. |
| 4.2 | Indenture dated as of November 22, 2002 among Toll Brothers Finance Corp., as issuer, the Registrant, as guarantor, and Bank One Trust Company, NA, as Trustee, including form of guarantee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 27, 2002. |
| 4.3 | Authorizing Resolutions, dated as of November 15, 2002, relating to $300,000,000 principal amount of 6.875% Senior Notes of Toll Brothers Finance Corp. due 2012, guaranteed on a senior basis by the Registrant and certain subsidiaries of the Registrant is hereby incorporated by reference to Exhibit 4.2 of the Registrant's Form 8-K filed with the Securities and Exchange Commission on November 27, 2002. |
| 4.4 | Authorizing Resolutions, dated as of September 3, 2003, relating to $250,000,000 principal amount of 5.95% Senior Notes of Toll Brothers Finance Corp. due 2013, guaranteed on a senior basis by the Registrant and certain subsidiaries of the Registrant is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 8-K filed with the Securities and Exchange Commission on September 29, 2003. |
| 4.5 | Authorizing Resolutions, dated as of March 9, 2004, relating to $300,000,000 principal amount of 4.95% Senior Notes of Toll Brothers Finance Corp. due 2014, guaranteed on a senior basis by the Registrant and certain subsidiaries of the Registrant is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 1, 2004. |
| 4.6 | Authorizing Resolutions, dated as of May 26, 2005, relating to $300,000,000 principal amount of 5.15% Senior Notes of Toll Brothers Finance Corp. due 2015, guaranteed on a senior basis by the Registrant and certain subsidiaries of the Registrant is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 8, 2005. |
| 4.7 | First Supplemental Indenture dated as of May 1, 2003 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and Bank One Trust Company, National Association, as Trustee, is hereby incorporated by reference to Exhibit 4.4 of the Registrant's Registration Statement on Form S-4/A filed with the Securities and Exchange Commission on June 16, 2003, File Nos. 333-103931, 333-103931-01, 333-103931-02, 333-103931-03 and 333-103931-04. |
| 4.8 | Second Supplemental Indenture dated as of November 3, 2003 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and Bank One Trust Company, National Association, as Trustee, is hereby incorporated by reference to Exhibit 4.5 of the Registrant's Registration Statement on Form S-4/A filed with |

the Securities and Exchange Commission on November 5, 2003, File Nos. 333-109604, 333-109604-01, 333-109604-02, 333-109604-03 and 333-109604-04.

49

| Exhibit Number | Description |
|---|---|
| 4.9 | Third Supplemental Indenture dated as of January 26, 2004 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended January 31, 2004. |
| 4.10 | Fourth Supplemental Indenture dated as of March 1, 2004 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.2 of the Registrant's Form 10-Q for the quarter ended January 31, 2004. |
| 4.11 | Fifth Supplemental Indenture dated as of September 20, 2004 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.9 of the Registrant's Form 10-K for the fiscal year ended October 31, 2004. |
| 4.12 | Sixth Supplemental Indenture dated as of October 28, 2004 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.10 of the Registrant's Form 10-K for the fiscal year ended October 31, 2004. |
| 4.13 | Seventh Supplemental Indenture dated as of October 31, 2004 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.11 of the Registrant's Form 10-K for the fiscal year ended October 31, 2004. |
| 4.14 | Eighth Supplemental Indenture dated as of January 31, 2005 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended April 30, 2005. |
| 4.15 | Ninth Supplemental Indenture dated as of June 6, 2005 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended July 31, 2005. |
| 4.16 | Tenth Supplemental Indenture dated as of August 1, 2005 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.13 of the Registrant's Registration Statement on Form S-4 filed with the Securities and Exchange Commission on September 29, 2005, File Nos. 333-128683, 333-128683-01, 333-128683-02, 333-128683-03 and 333-128683-04. |
| 4.17 | Eleventh Supplemental Indenture dated as of January 31, 2006 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended April 30, 2006. |
| 4.18 | Twelfth Supplemental Indenture dated as of April 30, 2006 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended July 31, 2006. |

50

| Exhibit Number | Description |
|---|---|
| 4.19 | Thirteenth Supplemental Indenture dated as of July 31, 2006 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and J.P. Morgan Trust Company, National Association, as successor Trustee, is hereby incorporated by reference to Exhibit 4.16 of the Registrant's Form 10-K for the year ended October 31, 2006. |
| 4.20 | Fourteenth Supplemental Indenture dated as October 31, 2006 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and The Bank of New York Trust Company, N.A. as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended April 30, 2007. |
| 4.21 | Fifteenth Supplemental Indenture dated as of June 25, 2007 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and The Bank of New York Trust Company, N.A. as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended July 31, 2007. |
| 4.22 | Sixteenth Supplemental Indenture dated as of June 27, 2007 to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule I thereto, and The Bank of New York Trust Company, N.A. as successor Trustee, is hereby incorporated by reference to Exhibit 4.2 of the Registrant's Form 10-Q for the quarter ended July 31, 2007. |
| 4.23 | Seventeenth Supplemental Indenture dated as of January 31, 2008, to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and The Bank of New York Trust Company, N.A. as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended April 30, 2009. |
| 4.24 | Eighteenth Supplemental Indenture dated as of October 27, 2011, to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended January 31, 2012. |
| 4.25 | Nineteenth Supplemental Indenture dated as of November 1, 2011, to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.2 of the Registrant's Form 10-Q for the quarter ended January 31, 2012. |
| 4.26 | Twentieth Supplemental Indenture dated as of April 27, 2012, to Indenture dated as of November 22, 2002 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Form 10-Q for the quarter ended April 30, 2012. |
| 4.27 | Indenture, dated as of April 20, 2009, among Toll Brothers Finance Corp., the Registrant and the other guarantors named therein and The Bank of New York Mellon, as trustee, is hereby incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 24, 2009. |
| 4.28 | Authorizing Resolutions, dated as of April 20, 2009, relating to the $400,000,000 principal amount of 8.910% Senior Notes due 2017 of Toll Brothers Finance Corp. guaranteed on a Senior Basis by the Registrant and certain of its subsidiaries, is hereby incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 24, 2009. |
| 4.29 | Form of Global Note for Toll Brothers Finance Corp.'s 8.910% Senior Notes due 2017 is hereby incorporated by reference to Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 24, 2009. |

51

| Exhibit Number | Description |
|---|---|

4.3      Authorizing Resolutions, dated as of September 22, 2009, relating to the $250,000,000 principal amount of 6.750% Senior Notes due 2019 of Toll Brothers Finance Corp. guaranteed on a Senior Basis by the Registrant and certain of its subsidiaries, is hereby incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 22, 2009.

4.31      Form of Global Note for Toll Brothers Finance Corp.'s 6.750% Senior Notes due 2019 is hereby incorporated by reference to Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 22, 2009.

4.32      First Supplemental Indenture dated as of October 27, 2011, to Indenture dated as of April 20, 2009 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.3 of the Registrant's Form 10-Q for the quarter ended January 31, 2012.

4.33      Second Supplemental Indenture dated as of November 1, 2011, to Indenture dated as of April 20, 2009 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.4 of the Registrant's Form 10-Q for the quarter ended January 31, 2012.

4.34      Third Supplemental Indenture dated as of April 27, 2012, to Indenture dated as of April 20, 2009 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.2 of the Registrant's Form 10-Q for the quarter ended April 30, 2012.

4.35      Indenture, dated as of February 7, 2012, among Toll Brothers Finance Corp., the Registrant and the other guarantors named therein and The Bank of New York Mellon, as trustee, is hereby incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 7, 2012.

4.36      Authorizing Resolutions, dated as of January 31, 2012, relating to the $300,000,000 principal amount of 5.875% Senior Notes due 2022 of Toll Brothers Finance Corp. guaranteed on a Senior Basis by the Registrant and certain of its subsidiaries, is hereby incorporated by reference Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 7, 2012.

4.37      Form of Global Note for Toll Brothers Finance Corp.'s 5.875% Senior Notes due 2022 is hereby incorporated by reference to Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 7, 2012.

4.38      First Supplemental Indenture dated as of April 27, 2012, to Indenture dated as of February 7, 2012 by and among the parties listed on Schedule A thereto, and The Bank of New York Mellon, as successor Trustee, is hereby incorporated by reference to Exhibit 4.3 of the Registrant's Form 10-Q for the quarter ended April 30, 2012.

4.39      Indenture, dated as of September 11, 2012, among Toll Brothers Finance Corp., the Registrant and the other guarantors named therein and The Bank of New York Mellon, as trustee, is hereby incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 13, 2012.

4.40      Rights Agreement dated as of June 13, 2007, by and between the Registrant and American Stock Transfer & Trust Company, as Rights Agent, is hereby incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 18, 2007.

10.1      Credit Agreement by and among First Huntingdon Finance Corp., the Registrant and the lenders which are parties thereto dated

October 22, 2010, is hereby incorporated by reference to Exhibit 10.1 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on October 27, 2010.

52

| Exhibit Number | Description |
|---|---|

10.2*    Toll Brothers, Inc. Employee Stock Purchase Plan (amended and restated effective January 1, 2008) is hereby incorporated by reference to Exhibit 4.31 of the Registrant's Form 10-K for the year ended October 31, 2007.

10.3*    Toll Brothers, Inc. Stock Incentive Plan (1998) is hereby incorporated by reference to Exhibit 4 of the Registrant's Registration Statement on Form S-8 filed with the Securities and Exchange Commission on June 25, 1998, File No. 333-57645.

10.4*    Amendment to the Toll Brothers, Inc. Stock Incentive Plan (1998) effective March 22, 2001 is hereby incorporated by reference to Exhibit 10.4 of the Registrant's Form 10-Q for the quarter ended July 31, 2001.

10.5*    Amendment to the Toll Brothers, Inc. Stock Incentive Plan (1998) effective December 12, 2007 is hereby incorporated by reference to Exhibit 10.4 of the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 18, 2008.

10.6*    Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007) (amended and restated as of September 17, 2008, is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Amendment No. 1 to Toll Brothers, Inc.'s Registration Statement on Form S-8 (No. 333-143367) filed with the Securities and Exchange Commission on October 29, 2008.

10.7*    Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Non-Employee Directors (2007) (amended and restated as of September 17, 2008) is hereby incorporated by reference to Exhibit 4.1 of the Registrant's Amendment No. 1 to Toll Brothers, Inc.'s Registration Statement on Form S-8 (No. 333-144230) filed with the Securities and Exchange Commission on October 29, 2008.

10.8*    Form of Non-Qualified Stock Option Grant pursuant to the Toll Brothers, Inc. Stock Incentive Plan for Employees (2007) is hereby incorporated by reference to Exhibit 10.1 of the Registrant's Form 8-K filed with the Securities and Exchange Commission on December 19, 2007.

10.9*    Form of Addendum to Non-Qualified Stock Option Grant pursuant to the Toll Brothers, Inc. Stock Incentive Plan for Employees (2007) is hereby incorporated by reference to Exhibit 10.3 of the Registrant's Form 10-Q for the quarter ended July 31, 2007.

10.10*    Form of Stock Award Grant pursuant to the Toll Brothers, Inc. Stock Incentive Plan for Employees (2007) is hereby incorporated by reference to Exhibit 10.4 of the Registrant's Form 10-Q for the quarter ended July 31, 2007.

10.11*    Form of Restricted Stock Unit Award pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007) is hereby incorporated by reference to Exhibit 10.19 of the Registrant's Form 10-K for the period ended October 31, 2008.

10.12*    Restricted Stock Unit Award to Robert I. Toll, dated December 19, 2008, pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007) is incorporated by reference to Exhibit 10.20 of the Registrant's Form 10-K for the period ended October 31, 2008.

10.13*    Restricted Stock Unit Award to Robert I. Toll, dated December 21, 2009, pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007) is incorporated by reference to Exhibit 10.17 of the Registrant's Form 10-K for the period ended October 31, 2009.

10.14*   Form of Non-Qualified Stock Option Grant pursuant to the Toll Brothers, Inc. Stock Incentive Plan for Non-Employee
         Directors (2007) is hereby incorporated by reference to Exhibit 10.2 of the Registrant's Current Report on Form 8-K filed with
         the Securities and Exchange Commission on December 19, 2007.

53

| Exhibit Number | Description |
|---|---|

10.15*    Form of Addendum to Non-Qualified Stock Option Grant pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Non-Employee Directors (2007) is hereby incorporated by reference to Exhibit 10.6 of the Registrant's Form 10-Q for the quarter ended July 31, 2007.

10.16*    Form of Stock Award Grant pursuant to the Toll Brothers, Inc. Stock Incentive Plan for Non-Employee Directors (2007) is hereby incorporated by reference to Exhibit 10.7 of the Registrant's Form 10-Q for the quarter ended July 31, 2007.

10.17*    Form of Stock Award Amendment pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Non-Employee Directors (2007) is hereby incorporated by reference to Exhibit 10.4 of the Registrant's Form 10-Q for the quarter ended January 31, 2010.

10.18*    Toll Brothers, Inc. Cash Bonus Plan (amended and restated as of December 9, 2009) is incorporated by reference to Exhibit 10.21 of the Registrant's Form 10-K for the period ended October 31, 2009.

10.19*    Toll Brothers, Inc. Senior Officer Bonus Plan is hereby incorporated by reference to Addendum C to Toll Brothers, Inc.'s definitive proxy statement on Schedule 14A for the Toll Brothers, Inc. 2010 Annual Meeting of Stockholders held on March 17, 2010 filed with the Securities and Exchange Commission on February 1, 2010.

10.20*    Toll Brothers, Inc. Supplemental Executive Retirement Plan (amended and restated effective as of December 12, 2007) is hereby incorporated by reference to Exhibit 10.1 to the Registrant's Form 10-Q for the quarter ended July 31, 2010.

10.21*    Agreement dated March 5, 1998 between the Registrant and Bruce E. Toll regarding Mr. Toll's resignation and related matters is hereby incorporated by reference to Exhibit 10.2 to the Registrant's Form 10-Q for the quarter ended April 30, 1998.

10.22*    Advisory and Non-Competition Agreement between the Registrant and Bruce E. Toll, dated as of November 1, 2010, is incorporated by reference to Exhibit 10.34 of the Registrant's Form 10-K for the period ended October 31, 2010.

10.23*    Toll Bros., Inc. Non-Qualified Deferred Compensation Plan, amended and restated as of November 1, 2008, is incorporated by reference to Exhibit 10.45 of the Registrant's Form 10-K for the period ended October 31, 2008.

10.24*    Amendment Number 1 dated November 1, 2010 to the Toll Bros., Inc. Non-Qualified Deferred Compensation Plan, amended and restated as of November 1, 2008, is incorporated by reference to Exhibit 10.40 of the Registrant's Form 10-K for the period ended October 31, 2010.

10.25    Form of Indemnification Agreement between the Registrant and the members of its Board of Directors, is hereby incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 17, 2009.

10.26*    Restricted Stock Unit Award to Douglas C. Yearley, Jr., dated December 20, 2010, pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007), is incorporated by reference to Exhibit 10.42 of the Registrant's Form 10-K for the period ended October 31, 2010.

| Exhibit Number | Description |
|---|---|
| 10.27* | Restricted Stock Unit Award to Martin P. Connor, dated December 20, 2010, pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007), is incorporated by reference to Exhibit 10.43 of the Registrant's Form 10-K for the period ended October 31, 2010. |
| 10.28* | Restricted Stock Unit Award to Robert I. Toll, dated December 20, 2010, pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007), is incorporated by reference to Exhibit 10.44 of the Registrant's Form 10-K for the period ended October 31, 2010. |
| 10.29* | Form of Performance Based Restricted Stock Unit Award pursuant to the Toll Brothers, Inc. Amended and Restated Stock Incentive Plan for Employees (2007),is incorporated by reference to Exhibit 10.33 of the Registrant's Form 10-K for the period ended October 31, 2011. |
| 12** | Statement re: Computation of Ratios of Earnings to Fixed Charges. |
| 21** | Subsidiaries of the Registrant. |
| 23.1** | Consent of Ernst & Young LLP, Independent Registered Public Accountant. |
| 23.2** | Consent of WeiserMazars LLP, Independent Registered Public Accountant. |
| 31.1** | Certification of Douglas C. Yearley, Jr. pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2** | Certification of Martin P. Connor pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Douglas C. Yearley, Jr. pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Martin P. Connor pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1** | Financial Statements of TMF Kent Partners, LLC. |
| 99.2** | Financial Statements of KTL 303 LLC. |
| 101.INS** | XBRL Instance Document |
| 101.SCH** | XBRL Schema Document |
| 101.CAL** | XBRL Calculation Linkbase Document |
| 101.LAB** | XBRL Labels Linkbase Document |
| 101.PRE** | XBRL Presentation Linkbase Document |
| 101.DEF** | XBRL Definition Linkbase Document |

\*        This exhibit is a management contract or compensatory plan or arrangement required to be filed as an exhibit to this report.

\*\*       Filed electronically herewith.

55

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the Township of Horsham, Commonwealth of Pennsylvania on December 28, 2012.

TOLL BROTHERS, INC.

By:   /s/ Douglas C. Yearly, Jr.
Douglas C. Yearley, Jr.
Chief Executive Officer
(Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robert I. Toll<br>Robert I. Toll | Executive Chairman of the Board of Directors | December 28, 2012 |
| /s/ Bruce E. Toll<br>Bruce E. Toll | Vice Chairman of the Board and Director | December 28, 2012 |
| /s/ Douglas C. Yearley, Jr.<br>Douglas C. Yearley, Jr. | Chief Executive Officer and Director<br>(Principal Executive Officer) | December 28, 2012 |
| /s/ Richard T. Hartman<br>Richard T. Hartman | Chief Operating Officer and<br>Executive Vice President | December 28, 2012 |
| /s/ Martin P. Connor<br>Martin P. Connor | Senior Vice President, Chief Financial Officer and<br>Treasurer (Principal Financial Officer) | December 28, 2012 |
| /s/ Joseph R. Sicree<br>Joseph R. Sicree | Senior Vice President and Chief Accounting<br>Officer (Principal Accounting Officer) | December 28, 2012 |
| /s/ Robert S. Blank<br>Robert S. Blank | Director | December 28, 2012 |
| /s/ Edward G. Boehne<br>Edward G. Boehne | Director | December 28, 2012 |
| /s/ Richard J. Braemer<br>Richard J. Braemer | Director | December 28, 2012 |
| /s/ Christine N. Garvey<br>Christine N. Garvey | Director | December 28, 2012 |
| /s/ Carl B. Marbach | | |

| | | |
|---|---|---|
| _____ | Director | December 28, 2012 |
| Carl B. Marbach | | |
| | | |
| /s/ Stephen A. Novick | Director | December 28, 2012 |
| Stephen A. Novick | | |
| | | |
| /s/ Paul E. Shapiro | Director | December 28, 2012 |
| Paul E. Shapiro | | |

56

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in the Securities Exchange Act Rule 13a-15(f). Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation under the framework in *Internal Control — Integrated Framework,* our management concluded that our internal control over financial reporting was effective as of October 31, 2012.

Our independent registered public accounting firm, Ernst & Young LLP, has issued its report, which is included herein, on the effectiveness of our internal control over financial reporting.

F-1

**Report of Independent Registered Public Accounting Firm**

**The Board of Directors and Stockholders of Toll Brothers, Inc.**

We have audited Toll Brothers, Inc.'s internal control over financial reporting as of October 31, 2012, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Toll Brothers, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Toll Brothers, Inc. maintained, in all material respects, effective internal control over financial reporting as of October 31, 2012, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Toll Brothers, Inc. as of October 31, 2012 and 2011, and the related consolidated statements of operations, changes in equity, and cash flows for each of the three years in the period ended October 31, 2012 of Toll Brothers, Inc. and our report dated December 28, 2012 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Philadelphia, Pennsylvania
December 28, 2012

**Report of Independent Registered Public Accounting Firm**

**The Board of Directors and Stockholders of Toll Brothers, Inc.**

We have audited the accompanying consolidated balance sheets of Toll Brothers, Inc. as of October 31, 2012 and 2011, and the related consolidated statements of operations, changes in equity, and cash flows for each of the three years in the period ended October 31, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Toll Brothers, Inc. at October 31, 2012 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended October 31, 2012, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Toll Brothers Inc.'s internal control over financial reporting as of October 31, 2011, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated December 28, 2012 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Philadelphia, Pennsylvania
December 28, 2012

### CONSOLIDATED STATEMENTS OF OPERATIONS
#### (Amounts in thousands, except per share data)

| | | Year ended October 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2012 | | 2011 | | 2010 |
| Revenues | $ | 1,882,781 | $ | 1,475,881 | $ | 1,494,771 |
| Cost of revenues | | 1,532,095 | | 1,260,770 | | 1,376,558 |
| Selling, general and administrative | | 287,257 | | 261,355 | | 263,224 |
| Interest expense | | — | | 1,504 | | 22,751 |
| | | 1,819,352 | | 1,523,629 | | 1,662,533 |
| Income (loss) from operations | | 63,429 | | (47,748) | | (167,762) |
| Other: | | | | | | |
| Income (loss) from unconsolidated entities | | 23,592 | | (1,194) | | 23,470 |
| Other income - net | | 25,921 | | 23,403 | | 28,313 |
| Expenses related to early retirement of debt | | | | (3,827) | | (1,208) |
| Income (loss) before income taxes | | 112,942 | | (29,366) | | (117,187) |
| Income tax benefit | | (374,204) | | (69,161) | | (113,813) |
| Net income (loss) | $ | 487,146 | $ | 39,795 | $ | (3,374) |
| Income (loss) per share: | | | | | | |
| Basic | $ | 2.91 | $ | 0.24 | $ | (0.02) |
| Diluted | $ | 2.86 | $ | 0.24 | $ | (0.02) |
| Weighted-average number of shares: | | | | | | |
| Basic | | 167,346 | | 167,140 | | 165,666 |
| Diluted | | 170,154 | | 168,381 | | 165,666 |

See accompanying notes

F-4

**CONSOLIDATED BALANCE SHEETS**
**(Amounts in thousands)**

| | October 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| ASSETS | | |
| Cash and cash equivalents | $ 778,824 | $ 906,340 |
| Marketable securities | 439,068 | 233,572 |
| Restricted cash | 47,276 | 19,760 |
| Inventory | 3,761,187 | 3,416,723 |
| Property, construction and office equipment, net | 106,214 | 99,712 |
| Receivables, prepaid expenses and other assets | 148,315 | 105,576 |
| Mortgage loans receivable | 86,386 | 63,175 |
| Customer deposits held in escrow | 29,579 | 14,859 |
| Investments in and advances to unconsolidated entities | 330,617 | 126,355 |
| Investments in non-performing loan portfolios and foreclosed real estate | 95,522 | 69,174 |
| Deferred tax assets, net of valuation allowances | 358,056 | |
| | $ 6,181,044 | $ 5,055,246 |
| LIABILITIES AND EQUITY | | |
| Liabilities | | |
| Loans payable | $ 99,817 | $ 106,556 |
| Senior notes | 2,080,463 | 1,490,972 |
| Mortgage company warehouse loan | 72,664 | 57,409 |
| Customer deposits | 142,977 | 83,824 |
| Accounts payable | 99,911 | 96,817 |
| Accrued expenses | 476,350 | 521,051 |
| Income taxes payable | 80,991 | 106,066 |
| Total liabilities | 3,053,173 | 2,462,695 |
| Equity | | |
| Stockholders' equity | | |
| Preferred stock, none issued | — | — |
| Common stock, 168,690 and 168,675 shares issued at October 31, 2012 and 2011, respectively | 1,687 | 1,687 |
| Additional paid-in capital | 404,418 | 400,382 |
| Retained earnings | 2,721,397 | 2,234,251 |
| Treasury stock, at cost - 53 shares and 2,946 shares at October 31, 2012 and 2011, respectively | (983) | (47,065) |
| Accumulated other comprehensive loss | (4,819) | (2,902) |
| Total stockholders' equity | 3,121,700 | 2,586,353 |
| Noncontrolling interest | 6,171 | 6,198 |
| Total equity | 3,127,871 | 2,592,551 |
| | $ 6,181,044 | $ 5,055,246 |

See accompanying notes

F-5

## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY
### (Amounts in thousands)

| | Common Stock Shares | Common Stock $ | Additional Paid-In Capital $ | Retained Earnings $ | Treasury Stock $ | Accumulated Other Comprehensive Loss $ | Non-Controlling Interest $ | Total Equity $ |
|---|---|---|---|---|---|---|---|---|
| Balance, November 1, 2009 | 164,732 | 1,647 | 316,518 | 2,197,830 | (159) | (2,637) | 3,283 | 2,516,482 |
| Net loss | | | | (3,374) | | | | (3,374) |
| Purchase of treasury stock | (31) | | | | (588) | | | (588) |
| Exercise of stock options | 1,684 | 17 | 33,638 | | 620 | | | 34,275 |
| Employee benefit plan issuances | 24 | | 435 | | | | | 435 |
| Conversion of restricted stock units to stock | 3 | | 61 | | 31 | | | 92 |
| Stock-based compensation | | | 9,332 | | | | | 9,332 |
| Issuance of restricted stock | 1 | | 22 | | | | | 22 |
| Other comprehensive income | | | | | | 2,060 | | 2,060 |
| Capital contribution | | | | | | | 277 | 277 |
| Balance, October 31, 2010 | 166,413 | 1,664 | 360,006 | 2,194,456 | (96) | (577) | 3,560 | 2,559,013 |
| Net income | | | | 39,795 | | | | 39,795 |
| Purchase of treasury stock | | | (1) | | (49,102) | | | (49,103) |
| Exercise of stock options | 2,236 | 23 | 23,156 | | 1,940 | | | 25,119 |
| Employee benefit plan issuances | 15 | | 285 | | 126 | | | 411 |
| Conversion of restricted stock units to stock | 10 | | 208 | | 67 | | | 275 |
| Stock-based compensation | | | 8,626 | | | | | 8,626 |
| Issuance of restricted stock and stock units | 1 | | 8,102 | | | | | 8,102 |
| Other comprehensive loss | | | | | | (2,325) | | (2,325) |
| Capital contribution | | | | | | | 2,638 | 2,638 |
| Balance, October 31, 2011 | 168,675 | 1,687 | 400,382 | 2,234,251 | (47,065) | (2,902) | 6,198 | 2,592,551 |
| Net income | | | | 487,146 | | | | 487,146 |
| Purchase of treasury stock | | | | | (505) | | | (505) |
| Exercise of stock options | 13 | | (9,831) | | 44,472 | | | 34,641 |
| Employee benefit plan issuances | | | 174 | | 301 | | | 475 |
| Conversion of restricted stock units to stock | | | (1,814) | | 1,814 | | | — |
| Stock-based compensation | | | 7,411 | | | | | 7,411 |
| Issuance of restricted stock and stock units | 2 | | 8,096 | | | | | 8,096 |
| Other comprehensive loss | | | | | | (1,917) | | (1,917) |
| Loss attributable to non-controlling interest | | | | | | | (27) | (27) |
| Balance, October 31, 2012 | 168,690 | 1,687 | 404,418 | 2,721,397 | (983) | (4,819) | 6,171 | 3,127,871 |

See accompanying notes

F-6

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Amounts in thousands)**

| | Year ended October 31, | | |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Cash flow (used in) provided by operating activities: | | | |
| Net income (loss) | $ 487,146 | $ 39,795 | $ (3,374) |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | |
| Depreciation and amortization | 22,586 | 23,142 | 20,044 |
| Stock-based compensation | 15,575 | 12,494 | 11,677 |
| (Recovery) impairment of investments in unconsolidated entities | (2,311) | 40,870 | — |
| Excess tax benefits from stock-based compensation | (5,776) | | (4,954) |
| Income from unconsolidated entities | (21,281) | (39,676) | (23,470) |
| Distributions of earnings from unconsolidated entities | 5,258 | 12,081 | 10,297 |
| Income from non-performing loan portfolios and foreclosed real estate | (12,444) | (5,113) | |
| Deferred tax benefit | 41,810 | (18,188) | 60,697 |
| Deferred tax valuation allowances | (394,718) | 18,188 | (60,697) |
| Inventory impairments and write-offs | 14,739 | 51,837 | 115,258 |
| Change in fair value of mortgage loans receivable and derivative instruments | (670) | 475 | (970) |
| Gain on sale of marketable securities | (40) | | |
| Expenses related to early retirement of debt | | 3,827 | 1,208 |
| Changes in operating assets and liabilities | | | |
| Increase in inventory | (195,948) | (215,738) | (140,344) |
| Origination of mortgage loans | (651,618) | (630,294) | (628,154) |
| Sale of mortgage loans | 629,397 | 659,610 | 579,221 |
| (Increase) decrease in restricted cash | (27,516) | 41,146 | (60,906) |
| Increase in receivables, prepaid expenses and other assets | (33,922) | (11,522) | (3,115) |
| Increase (decrease) in customer deposits | 44,383 | 13,175 | (15,182) |
| Decrease in accounts payable and accrued expenses | (58,537) | (28,624) | (38,598) |
| Decrease in income tax refund recoverable | — | 141,590 | 20,250 |
| (Decrease) increase in income taxes payable | (25,075) | (56,225) | 14,828 |
| Net cash (used in) provided by operating activities | (168,962) | 52,850 | (146,284) |
| Cash flow used in investing activities: | | | |
| Purchase of property and equipment — net | (14,495) | (9,553) | (4,830) |
| Purchase of marketable securities | (579,958) | (452,864) | (157,962) |
| Sale and redemption of marketable securities | 368,253 | 408,831 | 60,000 |
| Investment in and advances to unconsolidated entities | (217,160) | (132) | (58,286) |
| Return of investments in unconsolidated entities | 38,368 | 43,309 | 9,696 |
| Investment in non-performing loan portfolios and foreclosed real estate | (30,090) | (66,867) | |
| Return of investments in non-performing loan portfolios and foreclosed real estate | 16,707 | 2,806 | |
| Acquisition of a business | (144,746) | | |
| Net cash used in investing activities | (563,121) | (74,470) | (151,382) |
| Cash flow provided by (used in) financing activities: | | | |
| Net proceeds from issuance of senior notes | 578,696 | | |
| Proceeds from loans payable | 1,002,934 | 921,251 | 927,233 |

| | | | |
|---|---|---|---|
| Principal payments of loans payable | (1,016,081) | (952,621) | (1,316,514) |
| Redemption of senior subordinated notes | | | (47,872) |
| Redemption of senior notes | | (58,837) | (46,114) |
| Proceeds from stock-based benefit plans | 33,747 | 25,531 | 7,589 |
| Excess tax benefits from stock-based compensation | 5,776 | | 4,954 |
| Purchase of treasury stock | (505) | (49,102) | (588) |
| Change in noncontrolling interest | | 2,678 | 320 |
| Net cash provided by (used in) financing activities | 604,567 | (111,100) | (470,992) |
| Net decrease in cash and cash equivalents | (127,516) | (132,720) | (768,658) |
| Cash and cash equivalents, beginning of year | 906,340 | 1,039,060 | 1,807,718 |
| Cash and cash equivalents, end of year | $   778,824 | $   906,340 | $   1,039,060 |

See accompanying notes

F-7

## Notes to Consolidated Financial Statements

### 1. Significant Accounting Policies

#### Basis of Presentation

The accompanying consolidated financial statements include the accounts of Toll Brothers, Inc. (the "Company"), a Delaware corporation, and its majority-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated. Investments in 50% or less owned partnerships and affiliates are accounted for using the equity method unless it is determined that the Company has effective control of the entity, in which case the entity would be consolidated.

#### Use of Estimates

The preparation of financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

#### Cash and Cash Equivalents

Liquid investments or investments with original maturities of three months or less are classified as cash equivalents. The carrying value of these investments approximates their fair value.

#### Marketable Securities

Marketable securities are classified as available-for-sale, and accordingly, are stated at fair value, which is based on quoted market prices. Changes in unrealized gains and losses are excluded from earnings and are reported as other comprehensive income, net of income tax effects, if any.

#### Restricted Cash

Restricted cash primarily represents cash deposits collateralizing certain deductibles under insurance policies, outstanding letters of credit outside of our bank revolving credit facility and cash deposited into a voluntary employee benefit association to fund certain future employee benefits.

#### Inventory

Inventory is stated at cost unless an impairment exists, in which case it is written down to fair value in accordance with the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 360, "Property, Plant and Equipment" ("ASC 360"). In addition to direct land acquisition costs, land development costs and home construction costs, costs also include interest, real estate taxes and direct overhead related to development and construction, which are capitalized to inventory during the period beginning with the commencement of development and ending with the completion of construction. For those communities that have been temporarily closed, no additional capitalized interest is allocated to a community's inventory until it reopens. While the community remains closed, carrying costs such as real estate taxes are expensed as incurred.

The Company capitalizes certain interest costs to qualified inventory during the development and construction period of its communities in accordance with ASC 835-20, "Capitalization of Interest" ("ASC 835-20"). Capitalized interest is charged to cost of revenues when the related inventory is delivered. Interest incurred on home building indebtedness in excess of qualified inventory, as defined in ASC 835-20, is charged to the Consolidated Statement of Operations in the period incurred.

Once a parcel of land has been approved for development and the Company opens one of its typical communities, it may take four or more years to fully develop, sell and deliver all the homes in such community. Longer or shorter time periods are possible depending on the number of home sites in a community and the sales and delivery pace of the homes in a community. The Company's master planned communities, consisting of several smaller communities, may take up to ten years or more to complete. Because the Company's inventory is considered a long-lived asset under GAAP, the Company is required, under ASC 360, to regularly review the carrying value of each community and write down the value of those communities for which it believes the values are not recoverable.

*Current Communities*: When the profitability of a current community deteriorates, the sales pace declines significantly, or some other factor indicates a possible impairment in the recoverability of the asset, the asset is reviewed for impairment by comparing the estimated future undiscounted cash flow for the community to its carrying value. If the estimated future undiscounted cash flow is less than the community's carrying value, the carrying value is written down to its estimated fair value. Estimated fair value is primarily determined by discounting the estimated future cash flow of each community. The impairment is charged to cost of revenues in the period in which the impairment is determined. In estimating the future undiscounted cash flow of a community, the Company uses various estimates such as: (i) the expected sales pace in a community, based upon general economic conditions that will have a short-term or long-term impact on the market in which the community is located and on competition within the market, including the number of home sites available and pricing and incentives being offered in other communities owned by the Company or by other builders; (ii) the expected sales prices and sales incentives to be offered in a community; (iii) costs expended to date and expected to be incurred in the future, including, but not limited to, land and land development, home construction, interest and overhead costs; (iv) alternative product offerings that may be offered in a community that will have an impact on sales pace, sales price, building cost or the number of homes that can be built on a particular site; and (v) alternative uses for the property such as the possibility of a sale of the entire community to another builder or the sale of individual home sites.

*Future Communities*: The Company evaluates all land held for future communities or future sections of current communities, whether owned or under contract, to determine whether or not it expects to proceed with the development of the land as originally contemplated. This evaluation encompasses the same types of estimates used for current communities described above, as well as an evaluation of the regulatory environment applicable to the land and the estimated probability of obtaining the necessary approvals, the estimated time and cost it will take to obtain the approvals and the possible concessions that will be required to be given in order to obtain them. Concessions may include cash payments to fund improvements to public places such as parks and streets, dedication of a portion of the property for use by the public or as open space or a reduction in the density or size of the homes to be built. Based upon this review, the Company decides (i) as to land under contract to be purchased, whether the contract will likely be terminated or renegotiated, and (ii) as to land owned, whether the land will likely be developed as contemplated or in an alternative manner, or should be sold. The Company then further determines whether costs that have been capitalized to the community are recoverable or should be written off. The write-off is charged to cost of revenues in the period in which the need for the write-off is determined.

The estimates used in the determination of the estimated cash flows and fair value of both current and future communities are based on factors known to the Company at the time such estimates are made and its expectations of future operations and economic conditions. Should the estimates or expectations used in determining estimated fair value deteriorate in the future, the Company may be required to recognize additional impairment charges and write-offs related to current and future communities.

### Variable Interest Entities

The Company is required to consolidate variable interest entities ("VIEs") in which it has a controlling financial interest in accordance with ASC 810, "Consolidation" ("ASC 810"). A controlling financial interest will have both of the following characteristics: (i) the power to direct the activities of a VIE that most significantly impact the VIE's economic performance and (ii) the obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.

The Company's variable interest in VIEs may be in the form of equity ownership, contracts to purchase assets, management services and development agreements between the Company and a VIE, loans provided by the Company to a VIE or other member and/or guarantees provided by members to banks and other third parties.

The Company has a significant number of land purchase contracts and several investments in unconsolidated entities which it evaluates in accordance with ASC 810. The Company analyzes its land purchase contracts and the unconsolidated entities in which it has an investment to determine whether the land sellers and unconsolidated entities are VIEs and, if so, whether the Company is the primary beneficiary. The Company examines specific criteria and uses its judgment when determining if it is the primary beneficiary of a VIE. Factors considered in determining whether the Company is the primary beneficiary include risk and reward sharing, experience and financial condition of other member(s), voting rights, involvement in day-to-day capital and operating decisions, representation on a VIE's executive committee, existence of unilateral kick-out rights or voting rights, level of economic disproportionality between the Company and the other member(s) and contracts to purchase assets from VIEs. The determination whether an entity is a VIE and, if so, whether the Company is primary beneficiary may require significant judgment.

F-9

*Property, Construction and Office Equipment*

Property, construction and office equipment are recorded at cost and are stated net of accumulated depreciation of $157.5 million and $153.3 million at October 31, 2012 and 2011, respectively. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets. In fiscal 2012, 2011 and 2010, the Company recognized $8.1 million, $9.8 million and $14.1 million of depreciation expense, respectively.

*Mortgage Loans Receivable*

Residential mortgage loans held for sale are measured at fair value in accordance with the provisions of ASC 825, "Financial Instruments" ("ASC 825"). The Company believes the use of ASC 825 improves consistency of mortgage loan valuations between the date the borrower locks in the interest rate on the pending mortgage loan and the date of the mortgage loan sale. At the end of the reporting period, the Company determines the fair value of its mortgage loans held for sale and the forward loan commitments it has entered into as a hedge against the interest rate risk of its mortgage loans using the market approach to determine fair value. The evaluation is based on the current market pricing of mortgage loans with similar terms and values as of the reporting date and by applying such pricing to the mortgage loan portfolio. The Company recognizes the difference between the fair value and the unpaid principal balance of mortgage loans held for sale as a gain or loss. In addition, the Company recognizes the fair value of its forward loan commitments as a gain or loss. Interest income on mortgage loans held for sale is calculated based upon the stated interest rate of each loan. In addition, the recognition of net origination costs and fees associated with residential mortgage loans originated are expensed as incurred. These gains and losses, interest income and origination costs and fees are recognized in other income - net in the accompanying Consolidated Statements of Operations.

*Investments in and Advances to Unconsolidated Entities*

The trends, uncertainties or other factors that have negatively impacted our business and the industry in general have also impacted the unconsolidated entities in which the Company has investments. In accordance with ASC 323, "Investments—Equity Method and Joint Ventures", the Company reviews each of its investments on a quarterly basis for indicators of impairment. A series of operating losses of an investee, the inability to recover the Company's invested capital, or other factors may indicate that a loss in value of the Company's investment in the unconsolidated entity has occurred. If a loss exists, the Company further reviews to determine if the loss is other than temporary, in which case, it writes down the investment to its fair value. The evaluation of the Company's investment in unconsolidated entities entails a detailed cash flow analysis using many estimates including but not limited to expected sales pace, expected sales prices, expected incentives, costs incurred and anticipated, sufficiency of financing and capital, competition, market conditions and anticipated cash receipts, in order to determine projected future distributions.

Each of the unconsolidated entities evaluates its inventory in a similar manner as the Company. See "Inventory" above for more detailed disclosure on the Company's evaluation of inventory. If a valuation adjustment is recorded by an unconsolidated entity related to its assets, the Company's proportionate share is reflected in the Company's income (loss) from unconsolidated entities with a corresponding decrease to its investment in unconsolidated entities.

The Company is a party to several joint ventures with independent third parties to develop and sell land that is owned by its joint venture partners. The Company recognizes its proportionate share of the earnings from the sale of home sites to other builders. The Company does not recognize earnings from the home sites it purchases from these ventures, but reduces its cost basis in the home sites by its share of the earnings from those home sites.

The Company is also a party to several other joint ventures. The Company recognizes its proportionate share of the earnings and losses of its unconsolidated entities.

*Investments in Non-performing Loan Portfolios and Foreclosed Real Estate*

The Company's investments in non-performing loan portfolios were initially recorded at cost which the Company believes was fair value. The fair value was determined by discounting the cash flows expected to be collected from the portfolios using a discount rate that management believes a market participant would use in determining fair value. Management estimated cash flows expected to be collected on a loan-by-loan basis considering the contractual terms of the loan, current and expected loan performance, the manner and timing of disposition, the nature and estimated fair value of real estate or other collateral, and other factors it deemed appropriate. The estimated fair value of the loans at acquisition was significantly less than the contractual amounts due under the terms of the loan agreements.

Since, at the acquisition date, the Company expected to collect less than the contractual amounts due under the terms of the loans based, at least in part, on the assessment of the credit quality of the borrowers, the loans are accounted for in accordance

F-10

with ASC Topic 310-30, "Loans and Debt Securities Acquired with Deteriorated Credit Quality" (ASC 310-30). Under ASC 310-30, the accretable yield, or the amount by which the cash flows expected to be collected at the acquisition date exceeds the estimated fair value of the loan, is recognized in other income - net over the estimated remaining life of the loan using a level yield methodology provided the Company does not presently have the intention to utilize real estate secured by the loans for use in its operations or significantly improving the collateral for resale. The difference between the contractually required payments of the loan as of the acquisition date and the total cash flows expected to be collected, or non-accretable difference, is not recognized.

Pursuant to ASC 310-30, the Company aggregated loans with common risk characteristics into pools for purposes of recognizing interest income and evaluating changes in estimated cash flows. Loan pools are evaluated as a single loan for purposes of placing the pool on non-accrual status or evaluating loan impairment. Generally, a loan pool is classified as non-accrual when management is unable to reasonably estimate the timing or amount of cash flows expected to be collected from the loan pool or has serious doubts about further collectability of principal or interest. Proceeds received on non-accrual loan pools generally are either applied against principal or reported as other income - net, depending on management's judgment as to the collectability of principal. For the year ended October 31, 2012, none of the Company's loan pools were on non-accrual status.

A loan is removed from a loan pool only when the Company sells, forecloses or otherwise receives assets in satisfaction of the loan, or the loan is written off. Loans removed from a pool are removed at their amortized cost (unpaid principal balance less unamortized discount and provision for loan loss) as of the date of resolution.

The Company periodically re-evaluates cash flows expected to be collected for each loan pool based upon all available information as of the measurement date. Subsequent increases in cash flows expected to be collected are recognized prospectively through an adjustment to the loan pool's yield over its remaining life, which may result in a reclassification from non-accretable difference to accretable yield. Subsequent decreases in cash flows expected to be collected are evaluated to determine whether a provision for loan loss should be established. If decreases in expected cash flows result in a decrease in the estimated fair value of the loan pool below its amortized cost, the loan pool is deemed to be impaired and the Company will record a provision for loan losses to write the loan pool down to its estimated fair value. For the year ended October 31, 2012, the Company recorded a provision for loan losses of $2.3 million. There were no loan losses recorded during the year ended October 31, 2011.

The Company's investments in non-performing loans are classified as held for investment because the Company has the intent and ability to hold them for the foreseeable future.

_Real Estate Owned ("REO")_

REO assets, either directly owned or owned through a participation arrangement, acquired through subsequent foreclosure or deed in lieu actions on non-performing loans are initially recorded at fair value based upon third-party appraisals, broker opinions of value, or internal valuation methodologies (which may include discounted cash flows, capitalization rate analysis or comparable transactional analysis). Unobservable inputs used in estimating the fair value of REO assets are based upon the best information available under the circumstances and take into consideration the financial condition and operating results of the asset, local market conditions, the availability of capital, interest and inflation rates and other factors deemed appropriate by management. REO assets acquired are reviewed to determine if they should be classified as "held and used" or "held for sale". REO classified as "held and used" is stated at carrying cost unless an impairment exists, in which case it is written down to fair value in accordance with ASC 360-10-35. REO classified as "held for sale" is carried at the lower of carrying amount or fair value less cost to sell. An impairment charge is recognized for any decreases in estimated fair value subsequent to the acquisition date. For both classifications, carrying costs incurred after the acquisition, including property taxes and insurance, are expensed.

_Loan Sales_

As part of its disposition strategy for the loan portfolios, the Company may sell certain loans to third-party purchasers. The Company recognizes gains or losses on the sale of mortgage loans when the loans have been legally isolated from the Company and it no longer maintains effective control over the transferred assets.

**Fair Value Disclosures**

The Company uses ASC 820, "Fair Value Measurements and Disclosures" ("ASC 820"), to measure the fair value of certain assets and liabilities. ASC 820 provides a framework for measuring fair value in accordance with GAAP, establishes a fair value hierarchy which requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs

when measuring fair value and requires certain disclosures about fair value measurements.

In January 2010, the FASB issued Accounting Standards Update ("ASU") No. 2010-06, "Improving Disclosure about Fair Value Measurements" ("ASU 2010-06"), which amended ASC 820 to increase disclosure requirements regarding recurring and non-recurring fair value measurements. The Company adopted ASU 2010-06 as of February 1, 2010, except for the disclosures about Level 3 fair value disclosures which were effective for the Company on November 1, 2011. The adoption of ASU 2010-06 did not have a material impact on the Company's consolidated financial position, results of operations or cash flows.

The fair value hierarchy is summarized below:

Level 1:     Fair value determined based on quoted prices in active markets for identical assets or liabilities.

Level 2:     Fair value determined using significant observable inputs, generally either quoted prices in active markets for similar assets or liabilities or quoted prices in markets that are not active.

Level 3:     Fair value determined using significant unobservable inputs, such as pricing models, discounted cash flows or similar techniques.

### Treasury Stock

Treasury stock is recorded at cost. Issuance of treasury stock is accounted for on a first-in, first-out basis. Differences between the cost of treasury stock and the re-issuance proceeds are charged to additional paid-in capital.

### Revenue and Cost Recognition

The construction time of the Company's homes is generally less than one year, although some homes may take more than one year to complete. Revenues and cost of revenues from these home sales are recorded at the time each home is delivered and title and possession are transferred to the buyer. For single family detached homes, closing normally occurs shortly after construction is substantially completed. In addition, the Company has several high-rise/mid-rise projects that do not qualify for percentage of completion accounting in accordance with ASC 360, which are included in this category of revenues and costs. Based upon the current accounting rules and interpretations, the Company does not believe that any of its current or future communities currently qualify or will qualify in the future for percentage of completion accounting.

For the Company's standard attached and detached homes, land, land development and related costs, both incurred and estimated to be incurred in the future, are amortized to the cost of homes closed based upon the total number of homes to be constructed in each community. Any changes resulting from a change in the estimated number of homes to be constructed or in the estimated costs subsequent to the commencement of delivery of homes are allocated to the remaining undelivered homes in the community. Home construction and related costs are charged to the cost of homes closed under the specific identification method. The estimated land, common area development and related costs of master planned communities, including the cost of golf courses, net of their estimated residual value, are allocated to individual communities within a master planned community on a relative sales value basis. Any changes resulting from a change in the estimated number of homes to be constructed or in the estimated costs are allocated to the remaining home sites in each of the communities of the master planned community.

For high-rise/mid-rise projects that do not qualify for percentage of completion accounting, land, land development, construction and related costs, both incurred and estimated to be incurred in the future, are generally amortized to the cost of units closed based upon an estimated relative sales value of the units closed to the total estimated sales value. Any changes resulting from a change in the estimated total costs or revenues of the project are allocated to the remaining units to be delivered.

*Forfeited customer deposits:* Forfeited customer deposits are recognized in other income - net in the period in which the Company determines that the customer will not complete the purchase of the home and it has the right to retain the deposit.

*Sales Incentives:* In order to promote sales of its homes, the Company grants its home buyers sales incentives from time to time. These incentives will vary by type of incentive and by amount on a community-by-community and home-by-home basis. Incentives that impact the value of the home or the sales price paid, such as special or additional options, are generally reflected as a reduction in sales revenues. Incentives that the Company pays to an outside party, such as paying some or all of a home buyer's closing costs, are recorded as an additional cost of revenues. Incentives are recognized at the time the home is delivered to the home buyer and the Company receives the sales proceeds.

F-12

*Advertising Costs*

The Company expenses advertising costs as incurred. Advertising costs were $11.4 million, $11.1 million and $9.2 million for the years ended October 31, 2012, 2011 and 2010, respectively.

*Warranty Costs*

The Company provides all of its home buyers with a limited warranty as to workmanship and mechanical equipment. The Company also provides many of its home buyers with a limited ten-year warranty as to structural integrity. The Company accrues for expected warranty costs at the time each home is closed and title and possession have been transferred to the buyer. Costs are accrued based upon historical experience.

*Insurance Costs*

The Company accrues for the expected costs associated with the deductibles and self-insured amounts under its various insurance policies.

*Stock-Based Compensation*

The Company accounts for its stock-based compensation in accordance with ASC 718, "Compensation — Stock Compensation" ("ASC 718"). The Company used a lattice model for the valuation for its stock option grants. The option pricing models used are designed to estimate the value of options that, unlike employee stock options and restricted stock units, can be traded at any time and are transferable. In addition to restrictions on trading, employee stock options and restricted stock units may include other restrictions such as vesting periods. Further, such models require the input of highly subjective assumptions, including the expected volatility of the stock price.

*Income Taxes*

The Company accounts for income taxes in accordance with ASC 740, "Income Taxes" ("ASC 740"). Deferred tax assets and liabilities are recorded based on temporary differences between the amounts reported for financial reporting purposes and the amounts reported for income tax purposes. In accordance with the provisions of ASC 740, the Company assesses the realizability of its deferred tax assets. A valuation allowance must be established when, based upon available evidence, it is more likely than not that all or a portion of the deferred tax assets will not be realized. See "Income Taxes — Valuation Allowance" below.

Federal and state income taxes are calculated on reported pre-tax earnings (losses) based on current tax law and also include, in the applicable period, the cumulative effect of any changes in tax rates from those used previously in determining deferred tax assets and liabilities. Such provisions (benefits) differ from the amounts currently receivable or payable because certain items of income and expense are recognized for financial reporting purposes in different periods than for income tax purposes. Significant judgment is required in determining income tax provisions (benefits) and evaluating tax positions. The Company establishes reserves for income taxes when, despite the belief that its tax positions are fully supportable, it believes that its positions may be challenged and disallowed by various tax authorities. The consolidated tax provisions (benefits) and related accruals include the impact of such reasonably estimable disallowances as deemed appropriate. To the extent that the probable tax outcome of these matters changes, such changes in estimates will impact the income tax provision (benefit) in the period in which such determination is made.

ASC 740 clarifies the accounting for uncertainty in income taxes recognized and prescribes a recognition threshold and measurement attributes for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. ASC 740 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. ASC 740 requires a company to recognize the financial statement effect of a tax position when it is "more-likely-than-not" (defined as a substantiated likelihood of more than 50%), based on the technical merits of the position, that the position will be sustained upon examination. A tax position that meets the "more-likely-than-not" recognition threshold is measured to determine the amount of benefit to be recognized in the financial statements based upon the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. The inability of the Company to determine that a tax position meets the "more-likely-than-not" recognition threshold does not mean that the Internal Revenue Service ("IRS") or any other taxing authority will disagree with the position that the Company has taken.

If a tax position does not meet the "more-likely-than-not" recognition threshold, despite the Company's belief that its filing position is supportable, the benefit of that tax position is not recognized in the Consolidated Statements of Operations and the Company is required to accrue potential interest and penalties until the uncertainty is resolved. Potential interest and penalties

F-13

are recognized as a component of the provision for income taxes which is consistent with the Company's historical accounting policy. Differences between amounts taken in a tax return and amounts recognized in the financial statements are considered unrecognized tax benefits. The Company believes that it has a reasonable basis for each of its filing positions and intends to defend those positions if challenged by the IRS or other taxing jurisdiction. If the IRS or other taxing authorities do not disagree with the Company's position, and after the statute of limitations expires, the Company will recognize the unrecognized tax benefit in the period that the uncertainty of the tax position is eliminated.

### *Income Taxes — Valuation Allowance*

Significant judgment is applied in assessing the realizability of deferred tax assets. In accordance with GAAP, a valuation allowance is established against a deferred tax asset if, based on the available evidence, it is more-likely-than-not that such asset will not be realized. The realization of a deferred tax asset ultimately depends on the existence of sufficient taxable income in either the carryback or carryforward periods under tax law. The Company assesses the need for valuation allowances for deferred tax assets based on GAAP's "more-likely-than-not" realization threshold criteria. In the Company's assessment, appropriate consideration is given to all positive and negative evidence related to the realization of the deferred tax assets. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. This assessment considers, among other matters, the nature, consistency and magnitude of current and cumulative income and losses, forecasts of future profitability, the duration of statutory carryback or carryforward periods, the Company's experience with operating loss and tax credit carryforwards being used before expiration, and tax planning alternatives.

The Company's assessment of the need for a valuation allowance on its deferred tax assets includes assessing the likely future tax consequences of events that have been recognized in its consolidated financial statements or tax returns. Changes in existing tax laws or rates could affect the Company's actual tax results and its future business results may affect the amount of its deferred tax liabilities or the valuation of its deferred tax assets over time. The Company's accounting for deferred tax assets represents its best estimate of future events.

Due to uncertainties in the estimation process, particularly with respect to changes in facts and circumstances in future reporting periods (carryforward period assumptions), actual results could differ from the estimates used in the Company's analysis. The Company's assumptions require significant judgment because the residential home building industry is cyclical and is highly sensitive to changes in economic conditions. If the Company's results of operations are less than projected and there is insufficient objectively verifiable positive evidence to support the "more-likely-than-not" realization of its deferred tax assets, a valuation allowance would be required to reduce or eliminate its deferred tax assets.

### *Noncontrolling Interest*

The Company has a 67% interest in an entity that is developing land. The financial statements of this entity are consolidated in the Company's consolidated financial statements. The amounts shown in the Company's Consolidated Balance Sheets under "Noncontrolling interest" represent the noncontrolling interest attributable to the 33% minority interest not owned by the Company.

### *Geographic Segment Reporting*

The Company has determined that its home building operations operate in four geographic segments: North, Mid-Atlantic, South and West. The states comprising each geographic segment are as follows:

North:        Connecticut, Illinois, Massachusetts, Michigan, Minnesota, New Jersey and New York

Mid-Atlantic:   Delaware, Maryland, Pennsylvania and Virginia

South:         Florida, North Carolina and Texas

West:          Arizona, California, Colorado, Nevada and Washington

In fiscal 2011, the Company discontinued the sale of homes in South Carolina. In fiscal 2010, the Company discontinued the sale of homes in West Virginia and Georgia. The operations in South Carolina, West Virginia and Georgia were immaterial to the South and Mid-Atlantic geographic segments.

*Related Party Transactions*

See Note 4 "Investments and Advances to Unconsolidated Entities" for information regarding Toll Brothers Realty Trust.

*Recent Accounting Pronouncements*

In June 2011, the FASB issued ASU No. 2011-05, "Statement of Comprehensive Income" ("ASU 2011-05"), which requires entities to present net income and other comprehensive income in either a single continuous statement or in two separate, but consecutive, statements of net income and other comprehensive income. The adoption of this guidance, which relates to presentation only, is not expected to have a material impact on the Company's consolidated financial position, results of operations or cash flows. ASU 2011-05 will be effective for the Company's fiscal year beginning November 1, 2012.

*Reclassification*

Certain prior period amounts have been reclassified to conform to the fiscal 2012 presentation.

## 2. Acquisition

In November 2011, the Company acquired substantially all of the assets of CamWest Development LLC ("CamWest") for approximately $144.7 million in cash. The assets acquired were primarily inventory. As part of the acquisition, the Company assumed contracts to deliver approximately 29 homes with an aggregate value of $13.7 million. The average price of the homes in backlog at the date of acquisition was approximately $471,000. The assets the Company acquired included approximately 1,245 home sites owned and 254 home sites controlled through land purchase agreements. The Company's selling community count increased by 15 communities at the acquisition date. The acquisition of the assets of CamWest was not material to the Company's results of operations or its financial condition. In fiscal 2012, the Company delivered 201 homes and generated revenues of $99.7 million through its CamWest operations.

## 3. Inventory

Inventory at October 31, 2012 and 2011 consisted of the following (amounts in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Land controlled for future communities | $    56,300 | $    46,581 |
| Land owned for future communities | 1,040,373 | 979,145 |
| Operating communities | 2,664,514 | 2,390,997 |
|  | $ 3,761,187 | $ 3,416,723 |

Operating communities include communities offering homes for sale, communities that have sold all available home sites but have not completed delivery of the homes, communities that were previously offering homes for sale but are temporarily closed due to business conditions or non-availability of improved home sites and that are expected to reopen within twelve months of the end of the fiscal year being reported on and communities preparing to open for sale. The carrying value attributable to operating communities includes the cost of homes under construction, land and land development costs, the carrying cost of home sites in current and future phases of these communities and the carrying cost of model homes.

Communities that were previously offering homes for sale but are temporarily closed due to business conditions that do not have any remaining backlog and are not expected to reopen within twelve months of the end of the fiscal period being reported on have been classified as land owned for future communities.

Information regarding the classification, number and carrying value of these temporarily closed communities at October 31, 2012, 2011 and 2010 is provided in the table below ($ amounts in thousands).

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Land owned for future communities: |  |  |  |
| Number of communities | 40 | 43 | 36 |
| Carrying value (in thousands) | $    240,307 | $    256,468 | $    212,882 |
| Operating communities: |  |  |  |
| Number of communities | 5 | 2 | 13 |
| Carrying value (in thousands) | $    34,685 | $    11,076 | $    78,100 |

F-15

The Company provided for inventory impairment charges and the expensing of costs that it believed not to be recoverable in each of the three fiscal years ended October 31, 2012, 2011 and 2010 as shown in the table below (amounts in thousands).

| Charge: | 2012 | 2011 | 2010 |
|---|---|---|---|
| Land controlled for future communities | $ 451 | $ 17,752 | $ 6,069 |
| Land owned for future communities | 1,218 | 17,000 | 55,700 |
| Operating communities | 13,070 | 17,085 | 53,489 |
| | $ 14,739 | $ 51,837 | $ 115,258 |

For information related to the number of operating communities that the Company reviewed for potential impairment, the number of operating communities in which the Company recognized impairment charges, the amount of impairment charges recognized and the fair value of the communities for which an impairment charge was recorded, net of the charge, see Note 12, "Fair Value Disclosures".

At October 31, 2012, the Company evaluated its land purchase contracts to determine if any of the selling entities were VIEs and, if they were, whether the Company was the primary beneficiary of any of them. Under these land purchase contracts, the Company does not possess legal title to the land and its risk is generally limited to deposits paid to the sellers and the creditors of the sellers generally have no recourse against the Company. At October 31, 2012, the Company determined that 64 land purchase contracts, with an aggregate purchase price of $540.8 million, on which it had made aggregate deposits totaling $25.5 million, were VIEs and that it was not the primary beneficiary of any VIE related to its land purchase contracts.

Interest incurred, capitalized and expensed in each of the three fiscal years ended October 31, 2012, 2011 and 2010 was as follows (amounts in thousands):

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Interest capitalized, beginning of year | $ 298,757 | $ 267,278 | $ 259,818 |
| Interest incurred | 125,783 | 114,761 | 114,975 |
| Interest expensed to cost of revenues | (87,117) | (77,623) | (75,876) |
| Interest directly expensed in the consolidated statements of operations | — | (1,504) | (22,751) |
| Write-off against other income | (3,404) | (1,155) | (8,369) |
| Interest reclassified to property, construction and office equipment | | (3,000) | (519) |
| Capitalized interest applicable to investments in unconsolidated entities | (3,438) | | |
| Interest capitalized, end of year | $ 330,581 | $ 298,757 | $ 267,278 |

Inventory impairment charges are recognized against all inventory costs of a community, such as land, land improvements, cost of home construction and capitalized interest. The amounts included in the table directly above reflect the gross amount of capitalized interest without allocation of any impairment charges recognized. The Company estimates that, had inventory impairment charges been allocated on a pro rata basis to the individual components of inventory, capitalized interest at October 31, 2012, 2011 and 2010 would have been reduced by approximately $47.9 million, $54.0 million and $53.3 million, respectively.

During fiscal 2011, the Company reclassified $20.0 million of inventory related to commercial retail space located in one of its high-rise projects to property, construction and office equipment. The $20.0 million was reclassified due to the completion of construction of the facilities and the substantial completion of the high-rise project of which the facilities are a part.

## 4. Investments in and Advances to Unconsolidated Entities

The Company has investments in and advances to various unconsolidated entities. At October 31, 2012, the Company's aggregate investments in and advances to these unconsolidated entities amounted to $330.6 million, it had $97.0 million of funding commitments to them and had guaranteed $9.8 million of payments related to these entities.

### Development Joint Ventures

The Company has investments in and advances to a number of joint ventures with unrelated parties to develop land ("Development Joint Ventures"). Some of these Development Joint Ventures develop land for the sole use of the venture participants, including the Company, and others develop land for sale to the joint venture participants and to unrelated builders. The Company recognizes its share of earnings from the sale of home sites by the Development Joint Ventures to other builders.

F-16

With regard to home sites the Company purchases from the Development Joint Ventures, the Company reduces its cost basis in those home sites by its share of the earnings on the home sites. At October 31, 2012, the Company had approximately $116.5 million invested in or advanced to the Development Joint Ventures. In addition, the Company has a funding commitment of $3.5 million to one Development Joint Venture should an additional investment in that venture be required.

As of October 31, 2012, the Company had recognized cumulative impairment charges in connection with its current Development Joint Ventures of $95.2 million. These impairment charges are attributable to investments in certain Development Joint Ventures where the Company determined there were losses in value in the investments that were other than temporary. In fiscal 2011, the Company recognized impairment charges in connection with its Development Joint Ventures of $25.7 million. The Company did not recognize any impairment charges in connection with the Development Joint Ventures in fiscal 2012 or 2010. In fiscal 2012, the Company recovered $2.3 million of costs it previously incurred.

The impairment and recoveries related to Development Joint Ventures were attributable to the Company's investment in South Edge LLC, and its successor entity, Inspirada Builders, LLC (collectively, "Inspirada"). The Company believes it has made adequate provision at October 31, 2012 for any remaining liabilities with respect to Inspirada. The Company's investment in Inspirada is carried at a nominal value.

In the third quarter of fiscal 2012, the Company acquired a 50% interest in an existing joint venture for approximately $110.0 million. The joint venture intends to develop over 2,000 home sites in Orange County, California on land that it owns. The joint venture expects to borrow additional funds to complete the development of this project. In November 2012, we entered into an Amended and Restated Operating Agreement with our partner in this joint venture which, among other things, provided for our purchase of approximately 800 lots in the project, and the commitment by each partner to contribute an additional $10.0 million to the joint venture, if needed.

### Planned Community Joint Venture

The Company is a participant in a joint venture with an unrelated party to develop a single master planned community (the "Planned Community Joint Venture"). At October 31, 2012, the Company had an investment of $31.3 million in this Planned Community Joint Venture. At October 31, 2012, each participant had agreed to contribute additional funds up to $8.3 million, if required. At October 31, 2012, this joint venture did not have any indebtedness. The Company recognized impairment charges in connection with the Planned Community Joint Venture of $15.2 million in fiscal 2011. The Company did not recognize any impairment charges in connection with the Planned Community Joint Venture in fiscal 2012 or fiscal 2010.

### Other Joint Ventures

At October 31, 2012, the Company had an aggregate of $142.2 million of investments in a number of joint ventures with unrelated parties to develop luxury for-sale and rental residential units, commercial space and a hotel ("Other Joint Ventures"). At October 31, 2011, the Company had commitments to make $85.2 million of additional contributions to these joint ventures and had also guaranteed approximately $9.8 million of payments related to these joint ventures.

As of October 31, 2012, the Company had recognized cumulative impairment charges against its investments in these joint ventures and its pro rata share of impairment charges recognized by these joint ventures in the amount of $63.9 million. The Company did not recognize any impairment charges in connection with these joint ventures in fiscal 2012, 2011 or 2010.

In December 2011, the Company entered into a joint venture in which it has a 50% interest to develop a high-rise luxury for-sale/rental project in the metro-New York market. At October 31, 2012, the Company had an investment of $87.3 million and was committed to make additional investments of $37.5 million in this joint venture. Under the terms of the agreement, upon completion of the construction of the building, the Company will acquire ownership of the top 18 floors of the building to sell, for its own account, luxury condominium units and its partner will receive ownership of the lower floors containing residential rental units and retail space.

In the third quarter of fiscal 2012, the Company invested in a joint venture in which it has a 50% interest that will develop a high-rise luxury condominium/hotel project in the metro-New York market. At October 31, 2012, the Company had invested $5.4 million in this joint venture. The Company expects to make additional investments of approximately $47.7 million for the development of this property. The joint venture expects to borrow additional funds to complete the construction of this project. The Company has also guaranteed approximately $9.8 million of payments related to the ground lease on this project.

In the fourth quarter of fiscal 2012, the Company invested in a joint venture in which it has a 50% interest that will develop a multi-family residential apartment project containing approximately 398 units. At October 31, 2012, the Company had an

F-17

investment of $15.4 million in this joint venture. The joint venture expects to borrow funds to complete the construction of this project. The Company does not have any additional commitment to fund this joint venture.

*Structured Asset Joint Venture*

In July 2010, the Company, through Gibraltar, invested in a joint venture in which it is a 20% participant with two unrelated parties to purchase a 40% interest in an entity that owns and controls a portfolio of loans and real estate ("Structured Asset Joint Venture"). At October 31, 2012, the Company had an investment of $37.3 million in this Structured Asset Joint Venture. At October 31, 2012, the Company did not have any commitments to make additional contributions to the joint venture and has not guaranteed any of the joint venture's liabilities. If the joint venture needs additional capital and a participant fails to make a requested capital contribution, the other participants may make a contribution in consideration for a preferred return or may make the additional capital contribution and diminish the non-contributing participant's ownership interest.

*Toll Brothers Realty Trust and Trust II*

In fiscal 2005, the Company, together with the Pennsylvania State Employees Retirement System ("PASERS"), formed Toll Brothers Realty Trust II ("Trust II") to be in a position to invest in commercial real estate opportunities. Trust II is owned 50% by the Company and 50% by an affiliate of PASERS. At October 31, 2012, the Company had an investment of $3.2 million in Trust II. Prior to the formation of Trust II, the Company formed Toll Brothers Realty Trust ("Trust") in 1998 to invest in commercial real estate opportunities. The Trust is effectively owned one-third by the Company; one-third by Robert I. Toll, Bruce E. Toll (and members of his family), Douglas C. Yearley, Jr. and former members of the Company's senior management; and one-third by an affiliate of PASERS (collectively, the "Shareholders"). As of October 31, 2012, the Company had a net investment in the Trust of $0.1 million. The Company provides development, finance and management services to the Trust and recognized fees under the terms of various agreements in the amounts of $2.7 million, $2.9 million and $3.1 million in fiscal 2012, 2011 and 2010, respectively.

*General*

At October 31, 2012, the Company had accrued $2.1 million of aggregate exposure with respect to its estimated obligations to unconsolidated entities in which it has an investment. The Company's investments in these entities are accounted for using the equity method. The Company recognized $40.9 million of impairment charges related to its investments in and advances to unconsolidated entities in fiscal 2011. The Company did not recognize any impairment charges related to its investments in and advances to unconsolidated entities in fiscal 2012 or 2010. In fiscal 2012, the Company recovered $2.3 million of costs it previously incurred. Impairment charges and recoveries related to these entities are included in "Income (loss) from unconsolidated entities" in the Company's Consolidated Statements of Operations.

At October 31, 2012, the Company determined that two of its joint ventures were VIEs under the guidance within ASC810. However, the Company concluded that it was not the primary beneficiary of the VIEs because the power to direct the activities of these VIEs that most significantly impact their performance was shared by the Company and VIEs' other members. Business plans, budgets and other major decisions are required to be unanimously approved by all members. Management and other fees earned by the Company are nominal and believed to be at market rates and there is no significant economic disproportionality between the Company and other members.

The condensed balance sheets, as of the dates indicated, and the condensed statements of operations, for the periods indicated, for the Company's unconsolidated entities in which it has an investment, aggregated by type of business, are included below (in thousands). The column titled "Home Building Joint Ventures" includes the Planned Community and Other Joint Ventures described above.

Condensed Balance Sheets:

| | October 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Develop-ment joint ventures | Home building joint ventures | Toll Brothers Realty Trust I and II | Structured asset joint venture | Total |
| Cash and cash equivalents | 17,189 | 40,126 | 11,005 | 44,176 | 112,496 |
| Inventory | 255,561 | 294,724 | 5,643 | | 555,928 |
| Non-performing loan portfolio | | | | 226,315 | 226,315 |
| Rental properties | | | 173,767 | | 173,767 |
| Real estate owned | | | | 254,250 | 254,250 |
| Other assets (1) | 12,427 | 72,301 | 9,182 | 237,476 | 331,386 |
| Total assets | 285,177 | 407,151 | 199,597 | 762,217 | 1,654,142 |
| Debt (1) | 96,862 | 34,184 | 195,359 | 311,801 | 638,206 |
| Other liabilities | 13,890 | 5,707 | 5,202 | 561 | 25,360 |
| Members' equity | 174,425 | 367,260 | (964) | 179,942 | 720,663 |
| Noncontrolling interest | | | | 269,913 | 269,913 |
| Total liabilities and equity | 285,177 | 407,151 | 199,597 | 762,217 | 1,654,142 |
| Company's net investment in unconsolidated entities (2) | 116,452 | 173,465 | 3,357 | 37,343 | 330,617 |

| | October 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Develop-ment joint ventures | Home building joint ventures | Toll Brothers Realty Trust I and II | Structured asset joint venture | Total |
| Cash and cash equivalents | 14,190 | 10,663 | 11,726 | 48,780 | 85,359 |
| Inventory | 37,340 | 170,239 | 5,501 | | 213,080 |
| Non-performing loan portfolio | | | | 295,044 | 295,044 |
| Rental properties | | | 178,339 | | 178,339 |
| Real estate owned | | | 1,087 | 230,872 | 231,959 |
| Other assets (1) | 331,315 | 20,080 | 9,675 | 159,143 | 520,213 |
| Total assets | 382,845 | 200,982 | 206,328 | 733,839 | 1,523,994 |
| Debt (1) | 327,856 | 50,515 | 198,927 | 310,847 | 888,145 |
| Other liabilities | 5,352 | 9,745 | 3,427 | 382 | 18,906 |
| Members' equity | 49,637 | 140,722 | 3,974 | 172,944 | 367,277 |
| Noncontrolling interest | | | | 249,666 | 249,666 |
| Total liabilities and equity | 382,845 | 200,982 | 206,328 | 733,839 | 1,523,994 |
| Company's net investment in unconsolidated entities (2) | 17,098 | 72,734 | 1,872 | 34,651 | 126,355 |

(1) Included in other assets at October 31, 2012 and 2011 of the Structured Asset Joint Venture is $237.5 million and $152.6 million, respectively, of restricted cash held in a defeasance account which will be used to repay debt of the Structured Asset Joint Venture.

(2) Differences between the Company's net investment in unconsolidated entities and its underlying equity in the net assets of the entities are primarily a result of the difference in the purchase price of a joint venture interest and its underlying equity, impairments related to the Company's investments in unconsolidated entities, a loan made to one of the entities by the Company, interest capitalized on the Company's investment and distributions from entities in excess of the carrying amount of the Company's net investment.

F-19

Condensed Statements of Operations:

| | For the year ended October 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Develop-ment joint ventures | Home building joint ventures | Toll Brothers Realty Trust I and II | Structured asset joint venture | Total |
| Revenues | 39,278 | 89,947 | 37,035 | 31,686 | 197,946 |
| Cost of revenues | 36,315 | 65,068 | 13,985 | 32,828 | 148,196 |
| Other expenses | 1,414 | 4,116 | 20,587 | 8,646 | 34,763 |
| Gain on disposition of loans and REO | | | | (42,244) | (42,244) |
| Total expenses | 37,729 | 69,184 | 34,572 | (770) | 140,715 |
| Income from operations | 1,549 | 20,763 | 2,463 | 32,456 | 57,231 |
| Other income | 2,658 | 157 | | 691 | 3,506 |
| Net income before noncontrolling interest | 4,207 | 20,920 | 2,463 | 33,147 | 60,737 |
| Less: Net income attributable to noncontrolling interest | | | | 19,888 | 19,888 |
| Net income | 4,207 | 20,920 | 2,463 | 13,259 | 40,849 |
| Company's equity in earnings of unconsolidated entities (3) | 3,996 | 14,985 | 1,919 | 2,692 | 23,592 |

| | For the year ended October 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Develop-ment joint ventures | Home building joint ventures | Toll Brothers Realty Trust I and II | Structured asset joint venture | Total |
| Revenues | 4,624 | 242,326 | 37,728 | 46,187 | 330,865 |
| Cost of revenues | 3,996 | 191,922 | 15,365 | 30,477 | 241,760 |
| Other expenses | 1,527 | 8,954 | 18,808 | 10,624 | 39,913 |
| Gain on disposition of loans and REO | | | | (61,406) | (61,406) |
| Total expenses | 5,523 | 200,876 | 34,173 | (20,305) | 220,267 |
| Income (loss) from operations | (899) | 41,450 | 3,555 | 66,492 | 110,598 |
| Other income | 9,498 | 1,605 | | 252 | 11,355 |
| Net income before noncontrolling interest | 8,599 | 43,055 | 3,555 | 66,744 | 121,953 |
| Less: Net income attributable to noncontrolling interest | | | | 40,048 | 40,048 |
| Net income | 8,599 | 43,055 | 3,555 | 26,696 | 81,905 |
| Company's equity in (loss) earnings of unconsolidated entities (3) | (25,272) | 15,159 | 3,580 | 5,339 | (1,194) |

F-20

| | Development joint ventures | Home building joint ventures | Toll Brothers Realty Trust I and II | Structured asset joint venture | Total |
|---|---|---|---|---|---|
| | | | **For the year ended October 31, 2010** | | |
| Revenues | 7,370 | 132,878 | 34,755 | 16,582 | 191,585 |
| Cost of revenues | 6,402 | 106,638 | 13,375 | 6,693 | 133,108 |
| Other expenses | 1,522 | 8,121 | 18,693 | 2,977 | 31,313 |
| Loss on disposition of loans and REO | | | | 5,272 | 5,272 |
| Total expenses | 7,924 | 114,759 | 32,068 | 14,942 | 169,693 |
| Income (loss) from operations | (554) | 18,119 | 2,687 | 1,640 | 21,892 |
| Other income | 13,616 | 572 | | 5 | 14,193 |
| Net income before noncontrolling interest | 13,062 | 18,691 | 2,687 | 1,645 | 36,085 |
| Less: Net income attributable to noncontrolling interest | | | | 987 | 987 |
| Net income | 13,062 | 18,691 | 2,687 | 658 | 35,098 |
| Company's equity in earnings of unconsolidated entities (3) | 10,664 | 11,272 | 1,402 | 132 | 23,470 |

(3) Differences between the Company's equity in earnings (losses) of unconsolidated entities and the underlying net income of the entities are primarily a result of impairments related to the Company's investments in unconsolidated entities, distributions from entities in excess of the carrying amount of the Company's net investment and the Company's share of the entities profits related to home sites purchased by the Company that reduces the Company's cost basis of the home sites.

## 5. Investments in Non-performing Loan Portfolios and Foreclosed Real Estate

The Company's investment in non-performing loan portfolios consisted of the following at October 31, 2012 and 2011 (amounts in thousands):

| | 2012 | 2011 |
|---|---|---|
| Unpaid principal balance | $ 99,693 | $ 171,559 |
| Discount on acquired loans | (62,524) | (108,325) |
| Carrying value | $ 37,169 | $ 63,234 |

In fiscal 2012, Gibraltar acquired 12 non-performing loans with an unpaid principal balance of approximately $56.6 million. The purchase included non-performing loans primarily secured by commercial land and buildings in various stages of completion.

In September 2011, Gibraltar acquired 38 non-performing loans with an unpaid principal balance of approximately $71.4 million. The purchase included residential acquisition, development and construction loans secured by properties at various stages of completion.

In March 2011, the Company, through Gibraltar, acquired a 60% participation in a portfolio of non-performing loans. The portfolio of 83 loans, with an unpaid principal balance of approximately $200.3 million consisted primarily of residential acquisition, development and construction loans secured by properties at various stages of completion. The Company oversees the day-to-day management of the portfolio in accordance with the business plans that are jointly approved by the Company and the co-participant. The Company receives a management fee for such services. The Company recognizes income from the loan portfolio based upon its participation interest until such time as the portfolio meets certain internal rates of return as stipulated in the participation agreement. Upon reaching the stipulated internal rates of return, the Company will be entitled to receive additional income above its participation percentage from the portfolio.

The following table summarizes, for the portfolios acquired in fiscal 2012 and 2011, the accretable yield and the non-accretable difference on the Company's investment in the non-performing loan portfolios as of their acquisition date (amounts in thousands).

|  | 2012 | 2011 |
|---|---|---|
| Contractually required payments, including interest | $ 58,234 | $ 200,047 |
| Non-accretable difference | (8,235) | (81,723) |
| Cash flows expected to be collected | 49,999 | 118,324 |
| Accretable difference | (20,514) | (51,462) |
| Non-performing loans carrying amount | $ 29,485 | $ 66,862 |

The activity in the accretable yield for the Company's investments in the non-performing loan portfolios for the years ended October 31, 2012 and 2011 was as follows (amounts in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Balance, beginning of period | $ 42,326 | $ — |
| Loans acquired | 20,514 | 51,462 |
| Additions | 5,539 |  |
| Deletions | (40,227) | (4,656) |
| Accretion | (10,956) | (4,480) |
| Balance, end of period | $ 17,196 | $ 42,326 |

Additions primarily represent reclassifications from nonaccretable yield to accretable yield and the impact of impairments. The additions to accretable yield and the accretion of interest income are based on various estimates regarding loan performance and the value of the underlying real estate securing the loans. As the Company continues to gather additional information regarding the loans and the underlying collateral, the accretable yield may change. Therefore, the amount of accretable income recorded in the years ended October 31, 2012 and 2011 is not necessarily indicative of expected future results. Deletions primarily represent disposal of loans, which includes foreclosure of the underlying collateral and result in the removal of the loans from the accretable yield portfolios.

***Real Estate Owned***

The following table presents the activity in REO at October 31, 2012 and 2011 (amounts in thousands):

|  | **2012** | **2011** |
|---|---|---|
| Balance, beginning of period | $ 5,939 | $ — |
| Additions | 54,174 | 5,939 |
| Sales | (1,353) |  |
| Impairments | (126) |  |
| Depreciation | (281) |  |
| Balance, end of period | $ 58,353 | $ 5,939 |

As of October 31, 2012, approximately $5.9 million and $52.4 million of REO was classified as held-for-sale and held-and-used, respectively. At October 31, 2011, all REO was classified as held-and-used.

***General***

The Company's earnings from its Gibraltar's operations, excluding its equity earnings from its investment in the Structured Asset Joint Venture, are included in other income - net in its Consolidated Statements of Operations. In the years ended October 31, 2012 and 2011, the Company recognized $4.5 million and $1.5 million of earnings, respectively, from Gibraltar's operations.

**6. Credit Facility, Loans Payable, Senior Notes, Senior Subordinated Notes and Mortgage Company Warehouse Loan**

*Credit Facility*

On October 22, 2010, the Company entered into an $885 million revolving credit facility ("Credit Facility") with 12 banks, which extends to October 2014. At October 31, 2012, the Company had no outstanding borrowings under the Credit Facility but had outstanding letters of credit of approximately $70.1 million. At October 31, 2012, interest would have been payable on borrowings under the Credit Facility at 2.75% (subject to adjustment based upon the Company's debt rating and leverage ratios) above the Eurodollar rate or at other specified variable rates as selected by the Company from time to time. Under the terms of the Credit Facility, the Company is not permitted to allow its maximum leverage ratio (as defined in the Credit Facility agreement) to exceed 1.75 to 1.00 and is required to maintain a minimum tangible net worth (as defined in the Credit Facility agreement) of approximately $2.16 billion at October 31, 2012. At October 31, 2012, the Company's leverage ratio was approximately 0.31 to 1.00 and its tangible net worth was approximately $3.07 billion. Based upon the minimum tangible net worth requirement, the Company's ability to pay dividends and repurchase its common stock was limited to an aggregate amount of approximately $1.21 billion at October 31, 2012. At October 31, 2012, the Company is obligated to pay an undrawn commitment fee of 0.63% (subject to adjustment based upon the Company's debt rating and leverage ratios) based on the average daily unused amount of the facility.

*Loans Payable*

The Company's loans payable represent purchase money mortgages on properties the Company has acquired that the seller has financed and various revenue bonds that were issued by government entities on behalf of the Company to finance community infrastructure and the Company's manufacturing facilities. Information regarding the Company's loans payable at October 31, 2012 and 2011 is included in the table below ($ amounts in thousands).

|  | 2012 | | 2011 |
|---|---|---|---|
| Aggregate loans payable at October 31 | $ 99,817 | $ | 106,556 |
| Weighted-average interest rate | 3.64% | | 3.99% |
| Interest rate range | 0.26% - 7.87% | | 0.16% - 7.87% |
| Loans secured by assets | | | |
| Carrying value of loans secured by assets | $ 98,952 | $ | 105,092 |
| Carrying value of assets securing loans | $ 311,104 | $ | 283,169 |

*Senior Notes*

At October 31, 2012 and 2011, the Company's senior notes consisted of the following (amounts in thousands):

|  | 2012 | | 2011 |
|---|---|---|---|
| 6.875% Senior Notes due November 15, 2012 | $ 59,068 | $ | 139,776 |
| 5.95% Senior Notes due September 15, 2013 | 104,785 | | 141,635 |
| 4.95% Senior Notes due March 15, 2014 | 267,960 | | 267,960 |
| 5.15% Senior Notes due May 15, 2015 | 300,000 | | 300,000 |
| 8.91% Senior Notes due October 15, 2017 | 400,000 | | 400,000 |
| 6.75% Senior Notes due November 1, 2019 | 250,000 | | 250,000 |
| 5.875% Senior Notes due February 15, 2022 | 419,876 | | |
| 0.5% Exchangeable Senior Notes due September 15, 2032 | 287,500 | | |
| Bond discount | (8,726) | | (8,399) |
|  | $ 2,080,463 | $ | 1,490,972 |

The senior notes are the unsecured obligations of Toll Brothers Finance Corp., a 100%-owned subsidiary of the Company. The payment of principal and interest is fully and unconditionally guaranteed, jointly and severally, by the Company and a majority of its home building subsidiaries (together with Toll Brothers Finance Corp., the "Senior Note Parties"). The senior notes rank equally in right of payment with all the Senior Note Parties' existing and future unsecured senior indebtedness, including the Credit Facility. The senior notes are structurally subordinated to the prior claims of creditors, including trade creditors, of the subsidiaries of the Company that are not guarantors of the senior notes. The senior notes, other than the 0.5% Exchangeable Senior Notes due 2032 ("0.5% Senior Notes"), are

redeemable in whole or in part at any time at the option of the Company, at

F-23

prices that vary based upon the then-current rates of interest and the remaining original term of the notes. The 0.5% Senior Notes are not redeemable by the Company prior to September 15, 2017.

In February 2012, the Company, through Toll Brothers Finance Corp., issued $300 million principal amount of 5.875% Senior Notes due 2022 (the "5.875% Senior Notes"). The Company received $296.2 million of net proceeds from the issuance of the 5.875% Senior Notes. In March 2012, the Company, through Toll Brothers Finance Corp., issued an additional $119.9 million principal amount of its 5.875% Senior Notes in exchange for $80.7 million principal amount of its 6.875% Senior Notes due 2012 and $36.9 million principal amount of its 5.95% Senior Notes due 2013. The Company recognized a charge of $1.2 million in fiscal 2012 representing the aggregate costs associated with the exchange of both series of notes; these expenses are included in selling, general and administrative expenses in the Consolidated Statement of Operations.

In September 2012, the Company, through Toll Brothers Finance Corp., issued $287.5 million principal amount of 0.5% Senior Notes. The Company received $282.5 million of net proceeds from the issuance of the 0.5% Senior Notes. The 0.5% Senior Notes are exchangeable into shares of the Company's common stock at an exchange rate of 20.3749 shares per $1,000 principal amount of notes, corresponding to an initial exchange price of approximately $49.08 per share of the Company's common stock. If all of the 0.5% Senior Notes are exchanged, the Company would issue approximately 5.9 million shares of its common stock. Shares issuable upon conversion of the 0.5% Senior Notes are included in the calculation of diluted earnings per share (See Note 11, "Income (Loss) Per Share Information" for more information regarding the number of shares included). Holders of the 0.5% Senior Notes will have the right to require Toll Brothers Finance Corp. to repurchase their notes for cash equal to 100% of their principal amount, plus accrued but unpaid interest, on each of December 15, 2017, September 15, 2022 and September 15, 2027. Toll Brothers Finance Corp. will have the right to redeem the 0.5% Senior Notes on or after September 15, 2017 for cash equal to 100% of their principal amount, plus accrued but unpaid interest.

The Company repurchased $55.1 million of its 6.875% Senior Notes due 2012 in fiscal 2011 and $45.5 million ($13.5 million of its 5.95% Senior notes due 2013 and $32.0 million of its 4.95% Senior Notes due 2014) of its senior notes in fiscal 2010. In fiscal 2011 and 2010, the Company recognized $3.8 million and $1.2 million, respectively, of expenses related to the retirement of these notes. Expenses related to the retirement of notes include, if any, premium paid, write-off of unamortized debt issuance costs and other debt redemption costs.

In November 2012, the Company repaid the $59.1 million of outstanding 6.875% Senior Notes due November 15, 2012.

### Senior Subordinated Notes

The senior subordinated notes were the unsecured obligations of Toll Corp., a 100%-owned subsidiary of the Company were guaranteed on a senior subordinated basis by the Company, were subordinated to all existing and future senior indebtedness of the Company and were structurally subordinated to the prior claims of creditors, including trade creditors, of the Company's subsidiaries other than Toll Corp. The indentures governing these notes restricted certain payments by the Company, including cash dividends and repurchases of Company stock.

The Company redeemed $47.9 million of its 8.25% Senior Subordinated Notes due December 2011 in fiscal 2010 and recognized $34,000 of expenses related to the retirement of the notes.

### Mortgage Company Loan Facilities

TBI Mortgage Company ("TBI Mortgage"), the Company's wholly-owned mortgage subsidiary, has a Master Repurchase Agreement (the "Repurchase Agreement") with Comerica Bank. The purpose of the Repurchase Agreement is to finance the origination of mortgage loans by TBI Mortgage and it is accounted for as a secured borrowing under ASC 860. The Repurchase Agreement, as amended, provides for loan purchases up to $50 million, subject to certain sublimits. In addition, the Repurchase Agreement provides for an accordion feature under which TBI Mortgage may request that the aggregate commitments under the Repurchase Agreement be increased to an amount up to $75 million for a short period of time. The Repurchase Agreement, as amended, expires on July 23, 2013 and bears interest at LIBOR plus 2.00%, with a minimum rate of 3.00%. Borrowings under this facility are included in the fiscal 2013 maturities.

At October 31, 2012 and 2011, there were $72.7 million and $57.4 million, respectively, outstanding under the Repurchase Agreement, which are included in liabilities in the accompanying Consolidated Balance Sheets. At October 31, 2012 and 2011, amounts outstanding under the Repurchase Agreement were collateralized by $86.4 million and $63.2 million, respectively, of mortgage loans held for sale, which are included in assets in the Company's Consolidated Balance Sheets. As of October 31, 2012, there were no aggregate outstanding purchase price limitations reducing the amount available to TBI Mortgage. There are several restrictions on purchased loans under the Repurchase Agreement, including that they cannot be sold to others, they cannot be pledged to anyone other than the agent and they cannot support any other borrowing or repurchase agreement.

F-24

*General*

As of October 31, 2012, the annual aggregate maturities of the Company's loans and notes during each of the next five fiscal years are as follows (amounts in thousands):

|  | Amount |
|---|---|
| 2013 | $ 265,837 |
| 2014 | 278,092 |
| 2015 | 310,103 |
| 2016 | 402,068 |
| 2017 | 1,003,323 |

## 7. Accrued Expenses

Accrued expenses at October 31, 2012 and 2011 consisted of the following (amounts in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Land, land development and construction | $ 124,731 | $ 109,574 |
| Compensation and employee benefit | 111,093 | 96,037 |
| Insurance and litigation | 101,908 | 130,714 |
| Warranty | 41,706 | 42,474 |
| Interest | 28,204 | 25,968 |
| Commitments to unconsolidated entities | 2,135 | 60,205 |
| Other | 66,573 | 56,079 |
|  | $ 476,350 | $ 521,051 |

The Company accrues expected warranty costs at the time each home is closed and title and possession have been transferred to the home buyer. Changes in the warranty accrual during fiscal 2012, 2011 and 2010 were as follows (amounts in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance, beginning of year | $ 42,474 | $ 45,835 | $ 53,937 |
| Additions for homes closed during the year | 10,560 | 8,809 | 9,147 |
| Additions for liabilities acquired | 731 |  |  |
| Additions (reductions) to accruals for homes closed in prior years | 479 | (828) | (4,684) |
| Charges incurred | (12,538) | (11,342) | (12,565) |
| Balance, end of year | $ 41,706 | $ 42,474 | $ 45,835 |

F-25

## 8. Income Taxes

The following table provides a reconciliation of the Company's effective tax rate from the federal statutory tax rate for the fiscal years ended October 31, 2012, 2011 and 2010 ($ amounts in thousands).

|  | 2012 | | 2011 | | 2010 | |
|---|---:|---:|---:|---:|---:|---:|
|  | $ | %* | $ | %* | $ | %* |
| Federal tax benefit at statutory rate | 39,530 | 35.0 | (10,278) | 35.0 | (41,015) | 35.0 |
| State taxes, net of federal benefit | 4,711 | 4.2 | (954) | 3.2 | (3,809) | 3.3 |
| Reversal of accrual for uncertain tax positions | (34,167) | (30.3) | (52,306) | 178.1 | (39,485) | 33.7 |
| Accrued interest on anticipated tax assessments | 5,000 | 4.4 | 3,055 | (10.4) | 9,263 | (7.9) |
| Increase in unrecognized tax benefits | 5,489 | 4.9 |  |  | 35,575 | (30.4) |
| Increase in deferred tax assets, net |  |  | (25,948) | 88.4 |  |  |
| Valuation allowance — recognized |  |  | 43,876 | (149.4) | 55,492 | (47.4) |
| Valuation allowance — reversed | (394,718) | (349.5) | (25,689) | 87.5 | (128,640) | 109.8 |
| Other | (49) | — | (917) | 3.1 | (1,194) | 1.0 |
| Tax benefit | (374,204) | (331.3) | (69,161) | 235.5 | (113,813) | 97.1 |

\*    Due to rounding, amounts may not add.

The Company currently operates in 19 states and is subject to various state tax jurisdictions. The Company estimates its state tax liability based upon the individual taxing authorities' regulations, estimates of income by taxing jurisdiction and the Company's ability to utilize certain tax-saving strategies. Due primarily to a change in the Company's estimate of the allocation of income or loss, as the case may be, among the various taxing jurisdictions and changes in tax regulations and their impact on the Company's tax strategies, the Company's estimated rate for state income taxes was 6.4% in fiscal 2012 and 5.0% for each of fiscal 2011 and 2010.

The following table provides information regarding the (benefit) provision for income taxes for each of the fiscal years ended October 31, 2012, 2011 and 2010 (amounts in thousands).

|  | 2012 | 2011 | 2010 |
|---|---:|---:|---:|
| Federal | $    (329,277) | $    (21,517) | $    (67,318) |
| State | (44,927) | (47,644) | (46,495) |
|  | $    (374,204) | $    (69,161) | $    (113,813) |
| Current | $    (21,296) | $    (43,212) | $    (156,985) |
| Deferred | (352,908) | (25,949) | 43,172 |
|  | $    (374,204) | $    (69,161) | $    (113,813) |

In November 2009, the Worker, Homeownership, and Business Assistance Act of 2009 was enacted into law which allowed the Company to carry back its fiscal 2010 taxable loss against taxable income reported in fiscal 2006 and receive a federal tax refund in its second quarter of fiscal 2011 of $154.3 million. The tax losses generated in fiscal 2010 were primarily from the recognition for tax purposes of previously recognized book impairments and the recognition of stock option expenses recognized for book purposes in prior years.

F-26

The following table provides a reconciliation of the change in the unrecognized tax benefits for the years ended October 31, 2012, 2011 and 2010 (amounts in thousands).

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Balance, beginning of year | $ 104,669 | $ 160,446 | $ 171,366 |
| Increase in benefit as a result of tax positions taken in prior years | 5,000 | 8,168 | 14,251 |
| Increase in benefit as a result of tax positions taken in current year | 5,489 | | 15,675 |
| Decrease in benefit as a result of settlements | — | (17,954) | |
| Decrease in benefit as a result of completion of audits | (1,782) | (33,370) | |
| Decrease in benefit as a result of lapse of statute of limitation | (32,385) | (12,621) | (40,846) |
| Balance, end of year | $ 80,991 | $ 104,669 | $ 160,446 |

The Company has reached final settlement of its federal tax returns for fiscal years through 2009. The federal settlements resulted in a reduction in the Company's unrecognized tax benefits. The state impact of any amended federal return remains subject to examination by various states for a period of up to one year after formal notification of such amendments is made to the states.

The Company's unrecognized tax benefits are included in "Income taxes payable" on the Company's consolidated balance sheets. If these unrecognized tax benefits reverse in the future, they would have a beneficial impact on the Company's effective tax rate at that time. During the next twelve months, it is reasonably possible that the amount of unrecognized tax benefits will change but we are not able to provide a range of such change. The anticipated changes will be principally due to the expiration of tax statutes, settlements with taxing jurisdictions, increases due to new tax positions taken and the accrual of estimated interest and penalties.

The Company recognizes in its tax benefit, potential interest and penalties. The following table provides information as to the amounts recognized in its tax provision, before reduction for applicable taxes and reversal of previously accrued interest and penalties, of potential interest and penalties in the twelve-month periods ended October 31, 2012, 2011 and 2010, and the amounts accrued for potential interest and penalties at October 31, 2012 and 2011 (amounts in thousands).

| Expense recognized in statements of operations | |
|---|---|
| Fiscal year | |
| 2012 | $ 5,000 |
| 2011 | $ 4,700 |
| 2010 | $ 14,300 |
| Accrued at: | |
| October 31, 2012 | $ 24,906 |
| October 31, 2011 | $ 29,200 |

The amounts accrued for interest and penalties are included in "Income taxes payable" on the Company's consolidated balance sheets.

Since the beginning of fiscal 2007, the Company recorded significant deferred tax assets as a result of the recognition of inventory impairments and impairments of investments in and advances to unconsolidated entities. In accordance with GAAP, the Company assessed whether a valuation allowance should be established based on its determination of whether it is "more likely than not" that some portion or all of the deferred tax assets would not be realized. In fiscal 2009, the Company recorded valuation allowances against its deferred tax assets. The Company believed that the continued downturn in the housing market, the uncertainty as to its length and magnitude, the Company's continued recognition of impairment charges, and its operating losses were significant negative evidence of the need for a valuation allowance against its net deferred tax assets.

At October 31, 2012, the Company considered the need for a valuation allowance against its deferred tax assets considering all available and objectively verifiable positive and negative evidence. That evidence principally consisted of (i) an indication that the events and conditions that gave rise to significant losses in recent years were unlikely to recur in the foreseeable future, (ii) a return to profitability in fiscal 2012 together with expectations of continuing profitability in fiscal 2013, supported by existing backlog, and beyond, and (iii) the term of the statutory operating loss carry-forward periods provide evidence that it is more likely than not that these deferred tax assets will be realized.

F-27

At October 31, 2012, the Company re-evaluated the evidence related to the need for its deferred tax asset valuation allowances and determined that the valuation allowance on its federal deferred tax assets and certain state valuation allowances were no longer needed. Accordingly, in fiscal 2012, the Company reversed a valuation allowance in the amount of $394.7 million. This has been reported as a component of income tax benefit in the accompanying Consolidated Statement of Operations. The remaining valuation allowance of $57.0 million relates to deferred tax assets in states that have not met the "more-likely-than-not" realization threshold criteria. The Company will continue to review its deferred tax assets in accordance with ASC 740.

The components of net deferred tax assets and liabilities at October 31, 2012 and 2011 are set forth below (amounts in thousands).

| | 2012 | 2011* |
|---|---|---|
| Deferred tax assets: | | |
| Accrued expenses | $ 57,734 | $ 59,411 |
| Impairment charges | 319,818 | 368,459 |
| Inventory valuation differences | 29,288 | 30,802 |
| Stock-based compensation expense | 44,336 | 38,454 |
| Amounts related to unrecognized tax benefits | 36,934 | 47,387 |
| State tax, net operating loss carryforward | 50,006 | 52,323 |
| Federal tax net operating loss carryforward | 25,170 | 11,232 |
| Other | 20,169 | 11,783 |
| Total assets | 583,455 | 619,851 |
| Deferred tax liabilities: | | |
| Capitalized interest | 102,713 | 84,915 |
| Deferred income | 6,608 | 7,771 |
| Expenses taken for tax purposes not for book | 36,811 | 58,502 |
| Depreciation | 3,994 | 2,344 |
| Deferred marketing | 18,229 | 14,557 |
| Total liabilities | 168,355 | 168,089 |
| Net deferred tax assets before valuation allowances | 415,100 | 451,762 |
| Cumulative valuation allowance - state | (57,044) | (89,142) |
| Cumulative valuation allowance - federal | | (362,620) |
| Net deferred tax assets | $ 358,056 | $ — |

* To conform to the current period presentation, the October 31, 2011 amounts reflect adjustments to certain deferred amounts by $24.4 million with a corresponding adjustment to the related valuation allowances.

For federal income tax purposes, the Company is allowed to carry forward tax losses for 20 years and apply such tax losses to future taxable income to realize its federal deferred tax assets. At October 31, 2012, the Company estimates that it will have federal tax loss carryfowards of approximately $106.3 million resulting from losses incurred for federal income tax purposes during fiscal years 2011 and 2012.

We file tax returns in the various states in which we do business. Each state has its own statutes regarding the use of tax loss carryforwards. Some of the states in which we do business do not allow for the carryfoward of losses while others allow for carryforwards for 5 years to 20 years.

## 9. Stockholders' Equity

The Company's authorized capital stock consists of 400 million shares of common stock, $.01 par value per share and 15 million shares of preferred stock, $.01 par value per share. At October 31, 2012, the Company had 168.6 million shares of common stock issued and outstanding (excluding 0.1 million shares of treasury stock), 11.7 million shares of common stock reserved for outstanding stock options and restricted stock units, 5.5 million shares of common stock reserved for future stock option and award issuances, 5.9 million reserved for the conversion of its 0.5% senior notes and 0.6 million shares of common stock reserved for issuance under the Company's employee stock purchase plan. As of October 31, 2012, the Company had issued no shares of preferred stock.

F-28

*Issuance of Common Stock*

In fiscal 2012, 2011 and 2010, the Company issued 1,350, 1,250 and 1,250 shares of restricted common stock, respectively, pursuant to its stock incentive plans to certain outside directors. The Company is amortizing the fair market value of the awards on the date of grant over the period of time that each award vests. At October 31, 2012, 1,975 shares of the restricted stock awards were unvested.

*Stock Repurchase Program*

In March 2003, the Company's Board of Directors authorized the repurchase of up to 20 million shares of its common stock from time to time, in open market transactions or otherwise, for the purpose of providing shares for its various benefit plans.

The following table provides information about the Company's share repurchase program for the fiscal years ended October 31, 2012, 2011 and 2010.

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Number of shares purchased (in thousands) | 20 | 3,068 | 31 |
| Average price per share | $ 25.62 | $ 16.00 | $ 19.24 |
| Remaining authorization at October 31(in thousands) | 8,766 | 8,786 | 11,855 |

*Stockholder Rights Plan and Transfer Restriction*

In June 2007, the Company adopted a shareholder rights plan ("2007 Rights Plan"). The rights issued pursuant to the 2007 Rights Plan will become exercisable upon the earlier of (i) ten days following a public announcement that a person or group of affiliated or associated persons has acquired, or obtained the right to acquire, beneficial ownership of 15% or more of the outstanding shares of the Company's common stock or (ii) ten business days following the commencement of a tender offer or exchange offer that would result in a person or group beneficially owning 15% or more of the outstanding shares of common stock. No rights were exercisable at October 31, 2012.

On March 17, 2010, the Board of Directors of the Company adopted a Certificate of Amendment to the Second Restated Certificate of Incorporation of the Company (the "Certificate of Amendment"). The Certificate of Amendment includes an amendment approved by the Company's stockholders at the 2010 Annual Meeting of Stockholders' that restricts certain transfers of the Company's common stock in order to preserve the tax treatment of the Company's net operating and unrealized tax losses. The Certificate of Amendment's transfer restrictions generally restrict any direct or indirect transfer of the Company's common stock if the effect would be to increase the direct or indirect ownership of any Person (as defined in the Certificate of Amendment) from less than 4.95% to 4.95% or more of the Company's common stock or increase the ownership percentage of a person owning or deemed to own 4.95% or more of the Company's common stock. Any direct or indirect transfer attempted in violation of this restriction would be void as of the date of the prohibited transfer as to the purported transferee.

## 10. Stock-Based Benefit Plans

The Company has two active stock incentive plans, one for employees (including officers) and one for non-employee directors. The Company's active stock incentive plans provide for the granting of incentive stock options (solely to employees) and non-qualified stock options with a term of up to ten years at a price not less than the market price of the stock at the date of grant. The Company's active stock incentive plans also provide for the issuance of stock appreciation rights and restricted and unrestricted stock awards and stock units, which may be performance-based.

The Company grants stock options, restricted stock and various types of restricted stock units to its employees and its non-employee directors under its stock incentive plans. Beginning in fiscal 2012, the Company changed the mix of stock-based compensation to its employees by reducing the number of stock options it grants and, in their place, issued non-performance- based restricted stock units as a form of compensation. At October 31, 2012, 2011 and 2010, the Company had 5,489,000, 6,712,000 and 8,038,000 shares, respectively, available for grant under its stock incentive plans.

The Company has one additional stock incentive plan for employees, officers and directors that is inactive except for outstanding stock option awards at October 31, 2012. No additional options may be granted under this plan. Stock options granted under this plan were made with a term of up to ten years at a price not less than the market price of the stock at the date of grant and generally vested over a four-year period for employees and a two-year period for non-employee directors.

The following table provides information regarding the amount of total stock-based compensation expense recognized by the Company for fiscal 2012, 2011 and 2010 (amounts in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Total stock-based compensation expense recognized | $ 15,575 | $ 12,548 | $ 9,689 |
| Income tax benefit recognized | $ 5,711 | $ 4,793 | $ 3,711 |

At October 31, 2012, 2011 and 2010, the aggregate unamortized value of outstanding stock-based compensation awards was approximately $14.2 million, $12.7 million and $11.1 million, respectively.

Information about the Company's more significant stock-based compensation programs is outlined below.

***Stock Options:***

Stock options granted to employees generally vest over a four-year period, although certain grants may vest over a longer or shorter period, and stock options granted to non-employee directors generally vest over a two-year period. Shares issued upon the exercise of a stock option are either from shares held in treasury or newly issued shares.

The fair value of each option award is estimated on the date of grant using a lattice-based option valuation model that uses assumptions noted in the following table. Expected volatilities were based on implied volatilities from traded options on the Company's stock, historical volatility of the Company's stock and other factors. The expected lives of options granted were derived from the historical exercise patterns and anticipated future patterns and represent the period of time that options granted are expected to be outstanding; the range given below results from certain groups of employees exhibiting different behaviors. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table summarizes the weighted-average assumptions and fair value used for stock option grants in each of the fiscal years ended October 31, 2012, 2011 and 2010.

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Expected volatility | 44.20% - 50.24% | 45.38% - 49.46% | 46.74% - 51.41% |
| Weighted-average volatility | 46.99% | 47.73% | 49.51% |
| Risk-free interest rate | 0.78% - 1.77% | 1.64% - 3.09% | 2.15% - 3.47% |
| Expected life (years) | 4.59 - 9.06 | 4.29 - 8.75 | 4.44 - 8.69 |
| Dividends | none | none | none |
| Weighted-average fair value per share of options granted | $8.70 | $7.94 | $7.63 |

The fair value of stock option grants is recognized evenly over the vesting period of the options or over the period between the grant date and the time the option becomes non-forfeitable by the employee, whichever is shorter. Stock option expense is generally included in the Company's selling, general and administrative expenses in the accompanying Consolidated Statements of Operations. Information regarding the stock compensation expense, related to stock options, for fiscal 2012, 2011 and 2010 was as follows (amounts in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Stock compensation expense recognized - options | $ 7,411 | $ 8,626 | $ 9,332 |

In fiscal 2010, as part of severance plans for certain employees, the Company extended the period in which an option could be exercised on 175,813 options. The Company expensed $552,000 related to these extensions in fiscal 2010. This amount is included in the stock-based compensation expense recognized in the table above.

At October 31, 2012, total compensation cost related to non-vested stock option awards not yet recognized was approximately $7.2 million and the weighted-average period over which the Company expects to recognize such compensation costs and tax benefit is 2.4 years.

F-30

The following table summarizes stock option activity for the Company's plans during each of the fiscal years ended October 31, 2012, 2011 and 2010 (amounts in thousands, except per share amounts):

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | Number of options | Weighted-average exercise price | Number of options | Weighted-average exercise price | Number of options | Weighted-average exercise price |
| Balance, beginning | 12,868 | $ 20.94 | 14,339 | $ 19.36 | 16,123 | $ 17.73 |
| Granted | 777 | 20.50 | 1,103 | 19.32 | 1,015 | 18.39 |
| Exercised | (2,941) | 12.52 | (2,467) | 11.07 | (2,498) | 8.72 |
| Canceled | (35) | 20.67 | (107) | 20.12 | (301) | 17.03 |
| Balance, ending | 10,669 | $ 23.23 | 12,868 | $ 20.94 | 14,339 | $ 19.36 |
| Options exercisable, at October 31, | 8,540 | $ 24.09 | 10,365 | $ 21.24 | 11,670 | $ 19.00 |

The weighted average remaining contractual life (in years) for options outstanding and exercisable at October 31, 2012 was 4.5 and 3.6 years, respectively.

The intrinsic value of options outstanding and exercisable is the difference between the fair market value of the Company's common stock on the applicable date ("Measurement Value") and the exercise price of those options that had an exercise price that was less than the Measurement Value. The intrinsic value of options exercised is the difference between the fair market value of the Company's common stock on the date of exercise and the exercise price.

The following table provides information pertaining to the intrinsic value of options outstanding and exercisable at October 31, 2012, 2011 and 2010 (amounts in thousands):

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Intrinsic value of options outstanding | 106,084 | 16,839 | 35,214 |
| Intrinsic value of options exercisable | 77,936 | 16,839 | 35,214 |

Information pertaining to the intrinsic value of options exercised and the fair value of options that became vested or modified in each of the fiscal years ended October 31, 2012, 2011 and 2010 is provided below (amounts in thousands):

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Intrinsic value of options exercised | 39,730 | 23,573 | 25,327 |
| Fair value of options vested | 10,079 | 11,027 | 12,336 |

The Company's stock incentive plans permit optionees to exercise stock options using a "net exercise" method at the discretion of the Executive Compensation Committee of the Board of Directors ("Executive Compensation Committee"). In a net exercise, the Company withholds from the total number of shares that otherwise would be issued to an optionee upon exercise of the stock option that number of shares having a fair market value at the time of exercise equal to the option exercise price and applicable income tax withholdings and remits the remaining shares to the optionee. The following table provides information regarding the use of the net exercise method for fiscal 2012, 2011 and 2010.

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Options exercised | 303,412 | 194,000 | 1,201,372 |
| Shares withheld | 151,889 | 98,918 | 798,420 |
| Shares issued | 151,523 | 95,082 | 402,952 |
| Average market value per share withheld | $ 22.68 | $ 18.94 | $ 17.96 |
| Aggregate market value of shares withheld (in thousands) | $ 3,445 | $ 1,873 | $ 14,341 |

In addition, pursuant to the provisions of the Company's stock incentive plans, optionees are permitted to use the value of the Company's common stock that they own to pay for the exercise of options ("stock swap method"). The following table provides information regarding the use of the stock swap method for fiscal 2012, 2011 and 2010.

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Options exercised | 19,686 | 28,900 | 29,512 |
| Shares tendered | 8,224 | 14,807 | 14,459 |
| Shares issued | 11,462 | 14,093 | 15,053 |
| Average market value per share withheld | $ 25.52 | $ 20.53 | $ 19.71 |
| Aggregate market value of shares tendered (in thousands) | $ 210 | $ 304 | $ 285 |

### Performance Based Restricted Stock Units:

In December 2011, the Executive Compensation Committee approved awards of performance-based restricted stock units ("Performance-Based RSUs") relating to shares of the Company's common stock to certain of its senior management. The use of Performance-Based RSUs replaced the use of stock price-based restricted stock units awarded in prior years. The Performance-Based RSUs are based on the attainment of certain performance metrics of the Company in fiscal 2012. The number of shares underlying the Performance-Based RSUs that will be issued to the recipients may range from 90% to 110% of the base award depending on actual performance metrics as compared to the target performance metrics. The Performance-Based RSUs vest over a four-year period provided the recipients continue to be employed by the Company or serve on the Board of Directors of the Company (as applicable) as specified in the award document.

The value of the Performance-Based RSUs was determined to be equal to the estimated number of shares of the Company's common stock to be issued multiplied by the closing price of the Company's common stock on the New York Stock Exchange ("NYSE") on the date the Performance-Based RSUs were awarded. The Company evaluates the performance-based metrics quarterly and estimates the number of shares underlying the RSUs that are probable of being issued. The following table provides information regarding the issuance, valuation assumptions and amortization of the Company's Performance-Based RSUs issued in fiscal 2012.

|  | 2012 |
|---|---|
| Number of shares underlying Performance-Based RSUs to be issued | 370,176 |
| Closing price of the Company's common stock on date of issuance | $ 20.50 |
| Estimated aggregate fair value of Performance-Based RSUs issued (in thousands) | $ 7,589 |
| Performance-Based RSU expense recognized (in thousands) | $ 3,953 |
| Unamortized value of Performance-Based RSUs at October 31, 2012 (in thousands) | $ 3,636 |

### Stock Price-Based Restricted Stock Units:

In each of December 2010, 2009 and 2008, the Executive Compensation Committee approved awards to certain of its executives of market performance-based restricted stock units ("Stock Price-Based RSUs") relating to shares of the Company's common stock. In fiscal 2012, the Company adopted a Performance-Based Restricted Stock Award program to replace the Stock Price-Based RSU program. The Stock Price-Based RSUs will vest and the recipients will be entitled to receive the underlying shares if the average closing price of the Company's common stock on the NYSE, measured over any 20 consecutive trading days ending on or prior to five years from date of issuance of the Stock Price-Based RSUs increases 30% or more over the closing price of the Company's common stock on the NYSE on the date of issuance ("Target Price"), provided the recipients continue to be employed by the Company or serve on the Board of Directors of the Company (as applicable) as specified in the award document. In fiscal 2012, the Target Price of the Stock Price-Based RSUs issued in December 2010, 2009 and 2008 were met. The Stock Price-Based RSUs issued in December 2008 were paid in fiscal 2012. The recipient of this RSU elected to use a portion of the shares underlying the RSU to pay the required income withholding taxes on the payout. The gross value of the RSU payout was $5,934,000 (200,000 shares), the income tax withholding was $2,409,000 (81,200 shares) and the net value of the shares delivered was $3,525,000 (118,800 shares).

The Company determined the aggregate value of the Stock Price-Based RSUs using a lattice-based option pricing model. Expenses related to the Stock Price-Based RSUs are included in the Company's selling, general and administrative expenses. The following table provides information regarding the issuance, valuation assumptions, amortization and unamortized balances of the Company's Stock Price-Based RSUs in and at the relevant periods and dates in fiscal 2012, 2011 and 2010.

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Stock Price-Based RSUs issued: | | | | | | |
| Number issued | | — | | 306,000 | | 200,000 |
| Closing price of the Company's common stock on date of issuance | $ | | $ | 19.32 | $ | 18.38 |
| Target price | | | $ | 25.12 | $ | 23.89 |
| Volatility | | | | 48.22% | | 49.92% |
| Risk-free interest rate | | | | 1.99% | | 2.43% |
| Expected life | | | | 3.0 years | | 3.0 years |
| Aggregate fair value of Performance-Based RSUs issued (in thousands) | | | $ | 4,994 | $ | 3,160 |
| Stock Price-Based RSU expense recognized (in thousands) | $ | 2,887 | $ | 3,701 | $ | 2,121 |

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| At October 31: | | | | | | |
| Aggregate outstanding Stock Price-Based RSUs | | 506,000 | | 706,000 | | 400,000 |
| Cumulative unamortized value of Stock Price-Based RSUs (in thousands) | $ | 2,042 | $ | 4,929 | $ | 3,636 |

### Non-performance Based Restricted Stock Units:

In December 2012, 2011 and 2010, the Company issued restricted stock units ("RSUs") to various officers and employees. These RSUs generally vest in annual installments over a four-year period. The value of the RSUs was determined to be equal to the number of shares of the Company's common stock to be issued pursuant to the RSUs, multiplied by the closing price of the Company's common stock on the NYSE on the date the RSUs were awarded. The following table provides information regarding these RSUs.

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Non-performance-Based RSUs issued: | | | | | | |
| Number issued | | 107,820 | | 15,497 | | 19,663 |
| Closing price of the Company's common stock on date of issuance | $ | 20.50 | $ | 19.32 | $ | 18.38 |
| Aggregate fair value of RSUs issued (in thousands) | $ | 2,210 | $ | 299 | $ | 361 |
| Non-performance-Based RSU expense recognized (in thousands): | | | | | | |
| Twelve months ended October 31, | $ | 156 | $ | 144 | $ | 138 |

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| At October 31: | | | | | | |
| Aggregate Non-performance-Based RSUs outstanding | | 137,764 | | 30,994 | | 19,663 |
| Cumulative unamortized value of Non-performance-Based RSUs (in thousands) | $ | 1,326 | $ | 379 | $ | 224 |

### Restricted Stock Units in Lieu of Compensation

In December 2008, the Company issued restricted stock units ("RSUs") relating to 62,051 shares of the Company's common stock to a number of employees in lieu of a portion of the employees' bonuses and in lieu of a portion of one employee's 2009 salary. These RSUs, although not subject to forfeiture, will vest in annual installments over a four-year period, unless accelerated due to death, disability or termination of employment, as more fully described in the RSU award document. Because the RSUs are non-forfeitable, the value of the RSUs was determined to be equal to the number of shares of the Company's common stock to be issued pursuant to the RSUs multiplied by $21.70, the closing price of the Company's common stock on the NYSE on December 19, 2008, the date the RSUs were awarded. The amount applicable to employee bonuses was charged to the Company's accrual for bonuses that it made in fiscal 2008 and the amount applicable to salary deferral ($130,000) was charged to selling, general and administrative expense in the three-month period ended January 31, 2009. The Company's stock incentive plan permits the Company to withhold from the total number of shares that otherwise would be issued to a RSU recipient upon distribution that number of shares having a fair value at the time of distribution equal to the applicable income tax withholdings due and remit the remaining shares to the RSU participant. The following table

F-33

provides information relating to the distribution of shares and the withholding of taxes on the RSUs for fiscal 2012, 2011 and 2010.

|  | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Shares withheld | | 356 | | 741 | | 924 |
| Shares issued | | 7,982 | | 8,975 | | 2,749 |
| Value of shares withheld (in thousands) | $ | 10 | $ | 15 | $ | 17 |

At October 31, 2012, 2011 and 2010, approximately 38,000, 46,000 and 56,000 RSUs, respectively, were outstanding.

***Employee Stock Purchase Plan***

The Company's employee stock purchase plan enables substantially all employees to purchase the Company's common stock at 95% of the market price of the stock on specified offering dates without restriction or at 85% of the market price of the stock on specified offering dates subject to restrictions. The plan, which terminates in December 2017, provides that 1.2 million shares be reserved for purchase. At October 31, 2012, 594,000 shares were available for issuance.

The following table provides information regarding the Company's employee stock purchase plan for fiscal 2012, 2011 and 2010.

|  | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| Shares issued | | 18,456 | | 23,079 | | 23,587 |
| Average price per share | $ | 22.58 | $ | 15.59 | $ | 16.20 |
| Compensation expense recognized (in thousands) | $ | 63 | $ | 54 | $ | 57 |

## 11. Income (Loss) Per Share Information

Information pertaining to the calculation of income (loss) per share for each of the fiscal years ended October 31, 2012, 2011 and 2010 is as follows (amounts in thousands):

|  | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| **Numerator:** | | | | | | |
| Net income (loss) as reported | $ | 487,146 | $ | 39,795 | $ | (3,374) |
| Plus: Interest attributable to 0.5% Senor Notes, net of income tax benefit | | 78 | | | | |
| Numerator for diluted earnings (loss) per share | $ | 487,224 | $ | 39,795 | $ | (3,374) |
| | | | | | | |
| **Denominator:** | | | | | | |
| Basic weighted-average shares | $ | 167,346 | $ | 167,140 | $ | 165,666 |
| Common stock equivalents (a) | | 1,996 | | 1,241 | | |
| Shares attributable to 0.5% Senior Notes (b) | | 812 | | | | |
| Diluted weighted-average shares | $ | 170,154 | $ | 168,381 | $ | 165,666 |
| Other information: | | | | | | |
| Common stock equivalents excluded from diluted weighted-average shares due to anti-dilutive effect (a) | | | | | | 1,968 |
| Weighted average number of anti-dilutive options (c) | | 3,646 | | 7,936 | | 8,401 |
| Shares issued under stock incentive and employee stock purchase plans | | 2,927 | | 2,390 | | 1,712 |

(a) Common stock equivalents represent the dilutive effect of outstanding in-the-money stock options using the treasury method, Stock Price-Based RSUs whose Target Price criteria have been met but are unpaid and shares expected to be issued under Performance-Based Restricted Stock Units. For fiscal 2010, there were no common stock equivalents used in the calculation of diluted earnings per share because the Company had a net loss and any incremental shares would be anti-dilutive.

(b) On a full year basis, shares attributable to the 0.5% Senior Notes will be 5.9 million shares.

(c) Based upon the average of the average quarterly closing prices of the Company's common stock on the NYSE for the year.

F-34

## 12. Fair Value Disclosures

A summary of assets and (liabilities) at October 31, 2012 and 2011 related to the Company's financial instruments, measured at fair value on a recurring basis, is set forth below (amounts in thousands).

| Financial Instrument | Fair value hierarchy | Fair value | |
|---|---|---|---|
| | | October 31, 2012 | October 31, 2011 |
| Corporate Securities | Level 2 | $ 260,772 | $ 233,572 |
| Certificates of Deposit | Level 2 | $ 148,112 | |
| Short-Term Tax-Exempt Bond Fund | Level 1 | $ 30,184 | |
| Residential Mortgage Loans Held for Sale | Level 2 | $ 86,386 | $ 63,175 |
| Forward Loan Commitments - Residential Mortgage Loans Held for Sale | Level 2 | $ (102) | $ 218 |
| Interest Rate Lock Commitments ("IRLCs") | Level 2 | $ (202) | $ (147) |
| Forward Loan Commitments—IRLCs | Level 2 | $ 202 | $ 147 |

At October 31, 2012 and 2011, the carrying value of cash and cash equivalents and restricted cash approximated fair value.

During fiscal 2012, the Company reevaluated the methodologies used by third party brokers in determining the estimated fair value of its investments in corporate securities. Based on this reevaluation, the Company concluded the estimated fair value of these investments was determined using Level 2 inputs. In prior years, corporate securities were classified as Level 1.

At the end of the reporting period, the Company determines the fair value of its mortgage loans held for sale and the forward loan commitments it has entered into as a hedge against the interest rate risk of its mortgage loans using the market approach to determine fair value. The evaluation is based on the current market pricing of mortgage loans with similar terms and values as of the reporting date and by applying such pricing to the mortgage loan portfolio. The Company recognizes the difference between the fair value and the unpaid principal balance of mortgage loans held for sale as a gain or loss. In addition, the Company recognizes the fair value of its forward loan commitments as a gain or loss. These gains and losses are included in other income - net. Interest income on mortgage loans held for sale is calculated based upon the stated interest rate of each loan and is included in other income - net.

The table below provides, for the periods indicated, the aggregate unpaid principal and fair value of mortgage loans held for sale as of the date indicated (amounts in thousands).

| | Aggregate unpaid principal balance | Fair value | Excess |
|---|---|---|---|
| At October 31, 2012 | $ 84,986 | $ 86,386 | $ 1,400 |
| At October 31, 2011 | $ 62,765 | $ 63,175 | $ 410 |

IRLCs represent individual borrower agreements that commit the Company to lend at a specified price for a specified period as long as there is no violation of any condition established in the commitment contract. These commitments have varying degrees of interest rate risk. The Company utilizes best-efforts forward loan commitments ("Forward Commitments") to hedge the interest rate risk of the IRLCs and residential mortgage loans held for sale. Forward Commitments represent contracts with third-party investors for the future delivery of loans whereby the Company agrees to make delivery at a specified future date at a specified price. The IRLCs and Forward Commitments are considered derivative financial instruments under ASC 815, "Derivatives and Hedging", which requires derivative financial instruments to be recorded at fair value. The Company estimates the fair value of such commitments based on the estimated fair value of the underlying mortgage loan and, in the case of IRLCs, the probability that the mortgage loan will fund within the terms of the IRLC. To manage the risk of non-performance of investors regarding the Forward Commitments, the Company assesses the credit worthiness of the investors on a periodic basis.

As of October 31, 2012 and 2011, the amortized cost, gross unrealized holding gains, gross unrealized holding losses, and fair value of marketable securities were as follows (amounts in thousands):

F-35

|  | October 31, 2012 | October 31, 2011 |
|---|---|---|
| Amortized cost | $ 438,755 | $ 233,852 |
| Gross unrealized holding gains | 451 | 28 |
| Gross unrealized holding losses | (138) | (308) |
| Fair value | $ 439,068 | $ 233,572 |

The remaining contractual maturities of marketable securities as of October 31, 2012 ranged from less than 1 month to 26 months.

The Company recognizes inventory impairment charges based on the difference in the carrying value of the inventory and its fair value at the time of the evaluation. The fair value of the aforementioned inventory was determined using Level 3 criteria. See Note 1, "Significant Accounting Policies, Inventory" for additional information regarding the Company's methodology on determining fair value. As further discussed in Note 1, determining the fair value of a community's inventory involves a number of variables, many of which are interrelated. If the Company used a different input for any of the various unobservable inputs used in its impairment analysis, the results of the analysis may have been different, absent any other changes. The table below summarizes, for the periods indicated, the ranges of certain quantitative unobservable inputs utilized in determining the fair value of impaired communities.

|  | Selling price per unit (in thousands) | Sales pace per year (in units) | Discount rate |
|---|---|---|---|
| Three months ended October 31, 2012 | $501 - $536 | 11 | 18.3% |
| Three months ended July 31, 2012 | $175 - $571 | 4 - 12 | 14.0% - 17.5% |
| Three months ended April 30, 2012 | $413 - $472 | 6 - 17 | 17.5% |
| Three months ended January 31, 2012 | $344 - $2,287 | 1 - 25 | 13.0% - 18.8% |

The table below provides, for the periods indicated, the fair value of operating communities whose carrying value was adjusted and the amount of impairment charges recognized on operating communities (amounts in thousands).

|  | Impaired operating communities | | | |
|---|---|---|---|---|
| Three months ended: | Number of communities tested | Number of communities | Fair value of communities, net of impairment charges | Impairment charges recognized |
| Fiscal 2012: |  |  |  |  |
| January 31 | 113 | 8 | $ 49,758 | $ 6,425 |
| April 30 | 115 | 2 | $ 22,962 | 2,560 |
| July 31 | 115 | 4 | $ 6,609 | 2,685 |
| October 31 | 108 | 3 | $ 9,319 | 1,400 |
|  |  |  |  | $ 13,070 |
| Fiscal 2011: |  |  |  |  |
| January 31 | 143 | 6 | $ 56,105 | $ 5,475 |
| April 30 | 142 | 9 | $ 40,765 | 10,725 |
| July 31 | 129 | 2 | $ 867 | 175 |
| October 31 | 114 | 3 | $ 3,367 | 710 |
|  |  |  |  | $ 17,085 |
| Fiscal 2010: |  |  |  |  |
| January 31 | 260 | 14 | $ 60,519 | $ 22,750 |
| April 30 | 161 | 7 | $ 53,594 | $ 15,020 |
| July 31 | 155 | 7 | $ 21,457 | $ 6,600 |
| October 31 | 144 | 12 | $ 39,209 | $ 9,119 |

$       53,489

Gibraltar's portfolio of non-performing loans was recorded at estimated fair value at inception based on the acquisition price as determined by Level 3 inputs and was based on the estimated discounted future cash flows to be generated by the loans discounted at the rates used to value the portfolios at the acquisition dates. The table below provides, as of the dates indicated, the carrying amount and estimated fair value of the non-performing loan portfolios (amounts in thousands).

|  | October 31, 2012 | October 31, 2011 |
|---|---|---|
| Carrying amount | $ 37,169 | $ 63,234 |
| Estimated fair value | $ 38,109 | $ 64,539 |

Gibraltar's REO was recorded at estimated fair value at the time it was acquired through foreclosure or deed in lieu actions using Level 3 inputs. The valuation techniques used are discussed in Note 1, "Significant Accounting Policies, Investments in Non-Performing Loan Portfolios and Foreclosed Real Estate".

The purchase price allocation performed in connection with our acquisition of CamWest was primarily based on Level 3 inputs. The assets acquired were primarily inventory. The valuation techniques used to value this inventory were similar to the criteria used in valuing inventory as described in Note 1, "Significant Accounting Policies, Inventory".

The table below provides, as of the dates indicated, the book value and estimated fair value of the Company's debt at October 31, 2012 and 2011 (amounts in thousands).

|  | Fair value hierarchy | October 31, 2012 | | October 31, 2011 | |
|---|---|---|---|---|---|
|  |  | Book value | Estimated fair value | Book value | Estimated fair value |
| Loans payable (a) | Level 2 | $ 99,817 | $ 99,093 | $ 106,556 | $ 98,950 |
| Senior notes (b) | Level 1 | 2,089,189 | 2,340,189 | 1,499,371 | 1,614,010 |
| Mortgage company warehouse loan (c) | Level 2 | 72,664 | 72,664 | 57,409 | 57,409 |
|  |  | $ 2,261,670 | $ 2,511,946 | $ 1,663,336 | $ 1,770,369 |

(a) The estimated fair value of loans payable was based upon their indicated market prices or the interest rates that the Company believed were available to it for loans with similar terms and remaining maturities as of the applicable valuation date.

(b) The estimated fair value of the Company's senior notes is based upon their indicated market prices.

(c) The Company believes that the carrying value of its mortgage company loan borrowings approximates their fair value.

## 13. Employee Retirement and Deferred Compensation Plans

### Salary Deferral Savings Plans

The Company maintains salary deferral savings plans covering substantially all employees. During the first quarter of fiscal 2009, due to the continued downturn in the Company's business, the Company suspended its matching contributions and discretionary contributions to one of the plans. In fiscal 2011, the Company elected to make a discretionary contribution of 1% of eligible compensation for the plan year ended December 31, 2010. The Company made a 1% discretionary contribution for the plan year ended December 31, 2011 and for the plan year ended December 31, 2012 it intends to make a contribution of 2% of eligible compensation. Beginning in the third quarter of fiscal 2011, the Company resumed a matching contribution of up to 1% of eligible compensation for employees electing to contribute via salary deferrals and increased the matching contribution to 2% in January 2012. The Company recognized an expense, net of plan forfeitures, with respect to the plans of $5.0 million and $2.7 million for the fiscal years ended October 31, 2012 and 2011, respectively. The Company recognized $38,000 of expense for one plan in fiscal 2010.

### Deferred Compensation Plan

The Company has an unfunded, non-qualified deferred compensation plan that permits eligible employees to defer a portion of their compensation. The deferred compensation, together with certain Company contributions, earns various rates of return depending upon when the compensation was deferred and the length of time that it has been deferred. A portion of the deferred compensation and interest earned may be forfeited by a participant if he or she elects to withdraw the compensation prior to the end of the deferral period. At October 31, 2012 and 2011, the Company had accrued $20.7 million and $19.1 million, respectively, for its obligations under the plan.

*Defined Benefit Retirement Plans*

The Company has two unfunded defined benefit retirement plans. Retirement benefits generally vest when the participant has completed 15 or 20 years of service with the Company and reaches normal retirement age (age 62). Unrecognized prior service costs are being amortized over the period from the date participants enter the plans until their interests are fully vested. The Company used a 3.07%, 4.06% and 4.99% discount rate in its calculation of the present value of its projected benefit obligations at October 31, 2012, 2011 and 2010, respectively. The rates represent the approximate long-term investment rate at October 31 of the fiscal year for which the present value was calculated. Information related to the plans is based on actuarial information calculated as of October 31, 2012, 2011 and 2010.

Information related to the Company's retirement plans for each of the fiscal years ended October 31, 2012, 2011 and 2010 is as follows (amounts in thousands):

|  | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| Plan costs: | | | | | | |
| Service cost | $ | 389 | $ | 305 | $ | 270 |
| Interest cost | | 1,212 | | 1,290 | | 1,396 |
| Amortization of prior service cost | | 737 | | 694 | | 1,248 |
| Acceleration of benefits | | | | | | 72 |
| Amortization of unrecognized losses | | 66 | | | | |
| | $ | 2,404 | $ | 2,289 | $ | 2,986 |
| Projected benefit obligation: | | | | | | |
| Beginning of year | $ | 29,766 | $ | 26,037 | $ | 25,161 |
| Plan amendments adopted during year | | 575 | | | | 202 |
| Service cost | | 389 | | 305 | | 270 |
| Interest cost | | 1,212 | | 1,290 | | 1,396 |
| Benefit payments | | (731) | | (504) | | (125) |
| Change in unrecognized loss (gain) | | 3,108 | | 2,638 | | (867) |
| Projected benefit obligation, end of year | $ | 34,319 | $ | 29,766 | $ | 26,037 |
| Unamortized prior service cost: | | | | | | |
| Beginning of year | $ | 3,333 | $ | 4,027 | $ | 5,145 |
| Plan amendments adopted during year | | 575 | | | | 130 |
| Amortization of prior service cost | | (737) | | (694) | | (1,248) |
| Unamortized prior service cost, end of year | $ | 3,171 | $ | 3,333 | $ | 4,027 |
| Accumulated unrecognized (loss) gain, October 31 | $ | (4,307) | $ | (1,265) | $ | 1,372 |
| Accumulated benefit obligation, October 31 | $ | 34,319 | $ | 29,766 | $ | 26,037 |
| Accrued benefit obligation, October 31 | $ | 34,319 | $ | 29,766 | $ | 26,037 |

The table below provides, based upon the estimated retirement dates of the participants in the retirement plans, the amounts of benefits the Company would be required to pay in each of the next five fiscal years and for the five fiscal years ended October 31, 2022 in the aggregate (in thousands).

| Year ending October 31, | | Amount |
|---|---|---|
| 2013 | $ | 955 |
| 2014 | $ | 1,042 |
| 2015 | $ | 1,645 |
| 2016 | $ | 1,770 |
| 2017 | $ | 2,028 |
| November 1, 2017 - October 31, 2022 | $ | 12,247 |

F-38

## 14. Accumulated Other Comprehensive Loss and Total Comprehensive Income (Loss)

Accumulated other comprehensive loss at October 31, 2012 and 2011 was $4.8 million and $2.9 million, respectively, and was primarily related to employee retirement plans.

The table below provides, for each of the fiscal years ended October 31, 2012, 2011 and 2010, the components of total comprehensive income (loss) (amounts in thousands):

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| Net income (loss) as reported | $ 487,146 | $ 39,795 | $ (3,374) |
| Changes in pension liability, net of tax benefit | (1,839) | (1,934) | 1,986 |
| Change in fair value of available-for-sale securities, net of tax benefit | 476 | (192) | 74 |
| Unrealized loss on derivative held by equity investee, net of tax benefit | (554) | | |
| Total comprehensive income (loss) | $ 485,229 | $ 37,669 | $ (1,314) |
| Tax benefit recognized in total comprehensive income | $ 1,263 | | |

Due to the pre-tax losses recognized by the Company in fiscal 2011 and 2010 and its inability to forecast future profitability, the Company did not recognize tax benefit (provision) on the changes in other comprehensive income (loss) in those years. The benefit was recognized in fiscal 2012.

## 15. Commitments and Contingencies

### *Land Purchase Commitments*

Generally, the Company's option and purchase agreements to acquire land parcels do not require the Company to purchase those land parcels, although the Company may, in some cases, forfeit any deposit balance outstanding if and when it terminates an option and purchase agreement. If market conditions are weak, approvals needed to develop the land are uncertain or other factors exist that make the purchase undesirable, the Company may not expect to acquire the land. Whether an option and purchase agreement is legally terminated or not, the Company reviews the amount recorded for the land parcel subject to the option and purchase agreement to determine if the amount is recoverable. While the Company may not have formally terminated the option and purchase agreements for those land parcels that it does not expect to acquire, it has written off any non-refundable deposits and costs previously capitalized to such land parcels in the periods that it determined such costs were not recoverable.

Information regarding the Company's land purchase commitments at October 31, 2012 and 2011 is provided in the table below (amounts in thousands).

|  | 2012 | 2011 |
|---|---|---|
| Aggregate purchase commitments: | | |
| Unrelated parties | $ 742,918 | $ 551,905 |
| Unconsolidated entities that the Company has investments in | 4,067 | 12,471 |
| Total | $ 746,985 | $ 564,376 |
| Deposits against aggregate purchase commitments | $ 42,921 | $ 37,987 |
| Additional cash required to acquire land | 704,064 | 526,389 |
| Total | $ 746,985 | $ 564,376 |
| Amount of additional cash required to acquire land included in accrued expenses | $ 4,328 | $ 44 |

The Company has additional land parcels under option that have been excluded from the aforementioned aggregate purchase amounts since it does not believe that it will complete the purchase of these land parcels and no additional funds will be required from the Company to terminate these contracts.

*Legal Proceedings*

The Company is involved in various claims and litigation arising principally in the ordinary course of business. The Company believes that adequate provision for resolution of all current claims and pending litigation has been made for probable losses and the disposition of these matters will not have a material adverse effect on the Company's results of operations and liquidity or on its financial condition.

*Investments in and Advances to Unconsolidated Entities*

At October 31, 2012, the Company had investments in and advances to a number of unconsolidated entities, was committed to invest or advance additional funds and had guaranteed a portion of the indebtedness and/or loan commitments of these entities. See Note 4, "Investments in and Advances to Unconsolidated Entities," for more information regarding the Company's commitments to these entities.

*Surety Bonds and Letters of Credit*

At October 31, 2012, the Company had outstanding surety bonds amounting to $382.2 million, primarily related to its obligations to various governmental entities to construct improvements in the Company's various communities. The Company estimates that $241.6 million of work remains on these improvements. The Company has an additional $57.0 million of surety bonds outstanding that guarantee other obligations of the Company. The Company does not believe it is probable that any outstanding bonds will be drawn upon.

At October 31, 2012, the Company had outstanding letters of credit of $83.1 million, including $70.1 million under its Credit Facility and $13.0 million collateralized by restricted cash. These letters of credit were issued to secure various financial obligations of the Company including insurance policy deductibles and other claims, land deposits and security to complete improvements in communities in which it is operating. The Company believes it is not probable that any outstanding letters of credit will be drawn upon.

*Backlog*

At October 31, 2012, the Company had agreements of sale outstanding to deliver 2,569 homes with an aggregate sales value of $1.67 billion.

*Mortgage Commitments*

The Company's mortgage subsidiary provides mortgage financing for a portion of the Company's home closings. For those home buyers to whom the Company's mortgage subsidiary provides mortgages, it determines whether the home buyer qualifies for the mortgage he or she is seeking based upon information provided by the home buyer and other sources. For those home buyers who qualify, the Company's mortgage subsidiary provides the home buyer with a mortgage commitment that specifies the terms and conditions of a proposed mortgage loan based upon then-current market conditions. Prior to the actual closing of the home and funding of the mortgage, the home buyer will lock in an interest rate based upon the terms of the commitment. At the time of rate lock, the Company's mortgage subsidiary agrees to sell the proposed mortgage loan to one of several outside recognized mortgage financing institutions ("investors") that are willing to honor the terms and conditions, including interest rate, committed to the home buyer. The Company believes that these investors have adequate financial resources to honor their commitments to its mortgage subsidiary.

Information regarding the Company's mortgage commitments at October 31, 2012 and 2011 is provided in the table below (amounts in thousands).

|  | 2012 | | 2011 | |
| --- | --- | --- | --- | --- |
| Aggregate mortgage loan commitments: | | | | |
| IRLCs | $ | 111,173 | $ | 129,553 |
| Non-IRLCs | | 456,825 | | 306,722 |
| Total | $ | 567,998 | $ | 436,275 |
| Investor commitments to purchase: | | | | |
| IRLCs | $ | 111,173 | $ | 129,553 |
| Mortgage loans receivable | | 80,697 | | 60,680 |
| Total | $ | 191,870 | $ | 190,233 |

*Rent Expense and Future Rent Payments*

The Company leases certain facilities and equipment under non-cancelable operating leases. Rental expense incurred by the Company under these operating leases were (amounts in thousands):

| Year ending October 31, | | Amount |
|---|---|---|
| 2012 | $ | 11,183 |
| 2011 | $ | 12,405 |
| 2010 | $ | 16,583 |

At October 31, 2012, future minimum rent payments under the Company's operating leases were (amounts in thousands):

| Year ending October 31, | | Amount |
|---|---|---|
| 2013 | $ | 9,207 |
| 2014 | | 7,704 |
| 2015 | | 6,422 |
| 2016 | | 4,686 |
| 2017 | | 3,503 |
| Thereafter | | 5,919 |
| | $ | 37,441 |

**16. Other Income - Net**

The table below provides the components of other income - net for the years ended October 31, 2012, 2011 and 2010 (amounts in thousands):

| | 2012 | 2011 | 2010 |
|---|---|---|---|
| Interest income | 4,677 | 5,210 | 4,370 |
| Income from ancillary businesses | 6,607 | 3,734 | 5,871 |
| Gibraltar | 4,476 | 1,522 | (472) |
| Management fee income | 2,212 | 5,137 | 4,347 |
| Retained customer deposits | 3,247 | 2,076 | 11,190 |
| Land sales, net | 1,425 | 1,350 | 918 |
| Other | 3,277 | 4,374 | 2,089 |
| Total other income - net | 25,921 | 23,403 | 28,313 |

Income from ancillary businesses includes the activity of the Company's non-core businesses which include its mortgage, title, landscaping, security monitoring, and golf course and country club operations. The table below provides revenues and expenses for the Company's non-core ancillary businesses for the years ended October 31, 2012, 2011 and 2010 (amounts in thousands):

| | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|
| Revenue | $ | 67,137 | $ | 60,021 | $ | 51,458 |
| Expense | $ | 60,529 | $ | 56,287 | $ | 45,587 |

**17. Information on Geographic Segments**

The table below summarizes revenue and income (loss) before income taxes for each of the Company's geographic segments for each of the fiscal years ended October 31, 2012, 2011 and 2010 (amounts in thousands):

| | Revenues | | | | | | Income (loss) before income taxes | | | | | |
| | 2012 | | 2011 | | 2010 | | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North | $ | 513,724 | $ | 381,569 | $ | 407,723 | $ | 71,836 | $ | 42,525 | $ | (2,296) |
| Mid-Atlantic | | 564,434 | | 499,747 | | 488,359 | | 67,768 | | 57,606 | | 33,946 |
| South | | 366,701 | | 285,012 | | 264,321 | | 18,000 | | (25,936) | | (35,193) |
| West | | 437,922 | | 309,553 | | 334,368 | | 39,383 | | (27,113) | | (11,895) |
| Corporate and other | | | | | | | | (84,045) | | (76,448) | | (101,749) |
| Total | $ | 1,882,781 | $ | 1,475,881 | $ | 1,494,771 | $ | 112,942 | $ | (29,366) | $ | (117,187) |

"Corporate and other" is comprised principally of general corporate expenses such as the Offices of the Executive Chairman, the Chief Executive Officer, and the corporate finance, accounting, audit, tax, human resources, risk management, marketing and legal groups, directly expensed interest, offset, in part, by interest income and income from the Company's ancillary businesses and income from a number of its unconsolidated entities.

Total assets for each of the Company's geographic segments at October 31, 2012 and 2011 are shown in the table below (amounts in thousands):

| | 2012 | | 2011 | |
|---|---|---|---|---|
| North | $ | 1,205,900 | $ | 1,060,215 |
| Mid-Atlantic | | 1,304,798 | | 1,160,926 |
| South | | 821,001 | | 760,097 |
| West | | 913,699 | | 650,844 |
| Corporate and other | | 1,935,646 | | 1,423,164 |
| Total | $ | 6,181,044 | $ | 5,055,246 |

"Corporate and other" is comprised principally of cash and cash equivalents, marketable securities, deferred tax assets and the assets of the Company's Gibraltar investments, manufacturing facilities and mortgage subsidiary.

F-42

The Company provided for inventory impairment charges and the expensing of costs that it believed not to be recoverable and write-downs of investments in unconsolidated entities (including the Company's pro-rata share of impairment charges recognized by the unconsolidated entities in which it has an investment) for the years ended October 31, 2012, 2011 and 2010, as shown in the table below; the net carrying value of inventory and investments in and advances to unconsolidated entities for each of the Company's geographic segments at October 31, 2012 and 2011 is also shown (amounts in thousands).

| | Net Carrying Value | | Impairments | | |
| | At October 31, | | Year ended October 31, | | |
| | 2012 | 2011 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|
| **Inventory:** | | | | | |
| Land controlled for future communities: | | | | | |
| North | $ 13,196 | $ 19,390 | $ (881) | $ 948 | $ 3,947 |
| Mid-Atlantic | 27,249 | 21,592 | 327 | 307 | (81) |
| South | 7,724 | 3,812 | 800 | 313 | (233) |
| West | 8,131 | 1,787 | 205 | 16,184 | 2,436 |
| | 56,300 | 46,581 | 451 | 17,752 | 6,069 |
| Land owned for future communities: | | | | | |
| North | 226,082 | 231,085 | | | 15,900 |
| Mid-Atlantic | 431,620 | 455,818 | 300 | 300 | 9,000 |
| South | 141,644 | 125,461 | 918 | 16,700 | 13,950 |
| West | 241,027 | 166,781 | | | 16,850 |
| | 1,040,373 | 979,145 | 1,218 | 17,000 | 55,700 |
| Operating communities: | | | | | |
| North | 803,085 | 738,473 | 2,725 | 2,885 | 9,557 |
| Mid-Atlantic | 729,739 | 659,081 | 5,500 | 3,700 | 2,100 |
| South | 603,239 | 539,582 | 4,245 | 3,800 | 23,444 |
| West | 528,451 | 453,861 | 600 | 6,700 | 18,388 |
| | 2,664,514 | 2,390,997 | 13,070 | 17,085 | 53,489 |
| Total | $ 3,761,187 | $ 3,416,723 | $ 14,739 | $ 51,837 | $ 115,258 |
| Investments in and advances to unconsolidated entities: | | | | | |
| North | $ 142,213 | $ 40,734 | | | |
| South | 31,252 | 32,000 | | 15,170 | |
| West | 116,452 | 17,098 | (2,311) | 25,700 | |
| Corporate | 40,700 | 36,523 | | | |
| Total | $ 330,617 | $ 126,355 | $ (2,311) | $ 40,870 | $ — |

**18. Supplemental Disclosure to Consolidated Statements of Cash Flows**

The following are supplemental disclosures to the Consolidated Statements of Cash Flows for each of the fiscal years ended October 31, 2012, 2011 and 2010 (amounts in thousands):

| | | 2012 | | 2011 | | 2010 |
|---|---|---|---|---|---|---|
| **Cash flow information:** | | | | | | |
| Interest paid, net of amount capitalized | $ | 1,223 | $ | 18,666 | $ | 34,333 |
| Income tax payment | $ | 4,264 | | | $ | 3,994 |
| Income tax refunds | | | $ | 154,524 | $ | 152,770 |
| **Non-cash activity:** | | | | | | |
| Cost of inventory acquired through seller financing municipal bonds or recorded due to VIE criteria, net | $ | 26,059 | $ | 29,320 | $ | 41,276 |
| Cost of inventory acquired under specific performance contracts | | | | | $ | (4,889) |
| Miscellaneous (decreases) increases to inventory | $ | (478) | $ | 1,781 | $ | 1,725 |
| Reclassification of inventory to property, construction and office equipment | | | $ | 20,005 | $ | 18,711 |
| Increase (decrease) in unrecognized losses in defined benefit plans | $ | 3,108 | $ | 2,638 | $ | (867) |
| Defined benefit plan amendment | $ | 575 | | | $ | 202 |
| Income tax benefit related to exercise of employee stock options | $ | 3,885 | | | $ | 27,150 |
| Income tax benefit recognized in total comprehensive income | $ | 1,263 | | | | |
| (Increase) reduction of investments in unconsolidated entities due to increase/reduction in letters of credit or accrued liabilities | $ | 448 | $ | 13,423 | $ | 7,679 |
| Transfer of inventory to investment in non-performing loan portfolios and foreclosed real estate | $ | (802) | | | | |
| Transfer of inventory to investment in unconsolidated entities | $ | 5,793 | | | | |
| Reclassification of deferred income from investment in unconsolidated entities to accrued liabilities | $ | 2,943 | | | | |
| Reversal of litigation costs previously accrued | | | | | $ | 10,981 |
| Reclassification of stock-based compensation from accrued liabilities to additional paid-in capital | | | $ | 4,233 | | |
| Unrealized loss on derivative held by equity investee | $ | (875) | | | | |
| Miscellaneous (decreases) increases to investments in unconsolidated entities | $ | (276) | $ | (2,212) | $ | 2,495 |
| **Acquisition of Business:** | | | | | | |
| Fair value of assets purchased | $ | 149,959 | | | | |
| Liabilities assumed | $ | 5,213 | | | | |
| Cash paid | $ | 144,746 | | | | |

**19. Supplemental Guarantor Information**

A 100% - owned subsidiary of the Company, Toll Brothers Finance Corp. (the "Subsidiary Issuer"), has issued the following Senior Notes (amounts in thousands):

|  | Original Amount Issued | | Amount outstanding at October 31, 2012 | |
|---|---|---|---|---|
| 6.875% Senior Notes due 2012 | $ | 300,000 | $ | 59,068 |
| 5.95% Senior Notes due 2013 | $ | 250,000 | $ | 104,785 |
| 4.95% Senior Notes due 2014 | $ | 300,000 | $ | 267,960 |
| 5.15% Senior Notes due 2015 | $ | 300,000 | $ | 300,000 |
| 8.91% Senior Notes due 2017 | $ | 400,000 | $ | 400,000 |
| 6.75% Senior Notes due 2019 | $ | 250,000 | $ | 250,000 |
| 5.875% Senior Notes due 2022 | $ | 419,876 | $ | 419,876 |
| 0.50% Exchangeable Senior Notes due 2032 | $ | 287,500 | $ | 287,500 |

The obligations of the Subsidiary Issuer to pay principal, premiums, if any, and interest is guaranteed jointly and severally on a senior basis by the Company and a majority of the Company's 100% owned home building subsidiaries (the "Guarantor Subsidiaries"). The guarantees are full and unconditional. The Company's non-home building subsidiaries and several of its home building subsidiaries (the "Non-Guarantor Subsidiaries") do not guarantee the debt. Separate financial statements and other disclosures concerning the Guarantor Subsidiaries are not presented because management has determined that such disclosures would not be material to investors. Prior to the above described senior debt issuances, the Subsidiary Issuer did not have any operations.

Supplemental consolidating financial information of Toll Brothers, Inc., the Subsidiary Issuer, the Guarantor Subsidiaries, the Non-Guarantor Subsidiaries and the eliminations to arrive at Toll Brothers, Inc. on a consolidated basis is presented below ($ amounts in thousands).

F-45

**Consolidating Balance Sheet at October 31, 2012**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Cash and cash equivalents | — | — | 711,375 | 67,449 | — | 778,824 |
| Marketable securities | | | 378,858 | 60,210 | | 439,068 |
| Restricted cash | 28,268 | | 17,561 | 1,447 | | 47,276 |
| Inventory | | | 3,527,677 | 233,510 | | 3,761,187 |
| Property, construction and office equipment, net | | | 103,206 | 3,008 | | 106,214 |
| Receivables, prepaid expenses and other assets | 134 | 15,130 | 80,932 | 68,300 | (16,181) | 148,315 |
| Mortgage loans receivable | | | | 86,386 | | 86,386 |
| Customer deposits held in escrow | | | 27,312 | 2,267 | | 29,579 |
| Investments in and advances to unconsolidated entities | | | 70,145 | 260,472 | | 330,617 |
| Investments in non-performing loan portfolios and foreclosed real estate | | | | 95,522 | | 95,522 |
| Investments in and advances to consolidated entities | 2,823,052 | 2,092,810 | (1,173,254) | (632,496) | (3,110,112) | — |
| Deferred tax assets, net of valuation allowance | 358,056 | — | — | — | — | 358,056 |
| | 3,209,510 | 2,107,940 | 3,743,812 | 246,075 | (3,126,293) | 6,181,044 |
| LIABILITIES AND EQUITY | | | | | | |
| Liabilities | | | | | | |
| Loans payable | | | 69,393 | 30,424 | | 99,817 |
| Senior notes | | 2,032,335 | | | 48,128 | 2,080,463 |
| Mortgage company warehouse loan | | | | 72,664 | | 72,664 |
| Customer deposits | | | 136,225 | 6,752 | | 142,977 |
| Accounts payable | | | 99,889 | 22 | | 99,911 |
| Accrued expenses | | 27,476 | 341,233 | 119,244 | (11,603) | 476,350 |
| Income taxes payable | 82,991 | | | (2,000) | | 80,991 |
| Total liabilities | 82,991 | 2,059,811 | 646,740 | 227,106 | 36,525 | 3,053,173 |
| Equity | | | | | | |
| Stockholders' equity | | | | | | |
| Common stock | 1,687 | | 48 | 3,006 | (3,054) | 1,687 |
| Additional paid-in capital | 404,418 | 49,400 | | 1,734 | (51,134) | 404,418 |
| Retained earnings | 2,721,397 | (1,271) | 3,101,833 | 8,068 | (3,108,630) | 2,721,397 |
| Treasury stock, at cost | (983) | | | | | (983) |
| Accumulated other comprehensive loss | | | (4,809) | (10) | | (4,819) |
| Total stockholders' equity | 3,126,519 | 48,129 | 3,097,072 | 12,798 | (3,162,818) | 3,121,700 |
| Noncontrolling interest | | | | 6,171 | | 6,171 |
| Total equity | 3,126,519 | 48,129 | 3,097,072 | 18,969 | (3,162,818) | 3,127,871 |
| | 3,209,510 | 2,107,940 | 3,743,812 | 246,075 | (3,126,293) | 6,181,044 |

**Consolidating Balance Sheet at October 31, 2011**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Cash and cash equivalents | — | — | 775,300 | 131,040 | — | 906,340 |
| Marketable securities | | | 233,572 | | | 233,572 |
| Restricted cash | | | 19,084 | 676 | | 19,760 |
| Inventory | | | 2,911,211 | 505,512 | | 3,416,723 |
| Property, construction and office equipment, net | | | 77,001 | 22,711 | | 99,712 |
| Receivables, prepaid expenses and other assets | | 6,768 | 74,980 | 26,067 | (2,239) | 105,576 |
| Mortgage loans receivable | | | | 63,175 | | 63,175 |
| Customer deposits held in escrow | | | 10,682 | 4,177 | | 14,859 |
| Investments in and advances to unconsolidated entities | | | 86,481 | 39,874 | | 126,355 |
| Investments in non-performing loan portfolios and foreclosed real estate | | | | 69,174 | | 69,174 |
| Investments in and advances to consolidated entities | 2,694,419 | 1,508,550 | (727,258) | (477,322) | (2,998,389) | — |
| | 2,694,419 | 1,515,318 | 3,461,053 | 385,084 | (3,000,628) | 5,055,246 |
| LIABILITIES AND EQUITY | | | | | | |
| Liabilities | | | | | | |
| Loans payable | | | 61,994 | 44,562 | | 106,556 |
| Senior notes | | 1,490,972 | | | | 1,490,972 |
| Mortgage company warehouse loan | | | | 57,409 | | 57,409 |
| Customer deposits | | | 71,388 | 12,436 | | 83,824 |
| Accounts payable | | | 96,645 | 172 | | 96,817 |
| Accrued expenses | | 24,346 | 320,021 | 178,965 | (2,281) | 521,051 |
| Income taxes payable | 108,066 | | | (2,000) | | 106,066 |
| Total liabilities | 108,066 | 1,515,318 | 550,048 | 291,544 | (2,281) | 2,462,695 |
| Equity | | | | | | |
| Stockholders' equity | | | | | | |
| Common stock | 1,687 | | 3,054 | 2,003 | (5,057) | 1,687 |
| Additional paid-in capital | 400,382 | | 1,366 | 2,734 | (4,100) | 400,382 |
| Retained earnings | 2,234,251 | | 2,909,487 | 82,605 | (2,992,092) | 2,234,251 |
| Treasury stock, at cost | (47,065) | | | | | (47,065) |
| Accumulated other comprehensive loss | (2,902) | | (2,902) | | 2,902 | (2,902) |
| Total stockholders' equity | 2,586,353 | — | 2,911,005 | 87,342 | (2,998,347) | 2,586,353 |
| Noncontrolling interest | | | | 6,198 | | 6,198 |
| Total equity | 2,586,353 | — | 2,911,005 | 93,540 | (2,998,347) | 2,592,551 |
| | 2,694,419 | 1,515,318 | 3,461,053 | 385,084 | (3,000,628) | 5,055,246 |

F-47

**Consolidating Statement of Operations for the fiscal year ended October 31, 2012**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Revenues | | | 1,880,908 | 79,850 | (77,977) | 1,882,781 |
| Cost of revenues | | | 1,523,074 | 22,736 | (13,715) | 1,532,095 |
| Selling, general and administrative | 95 | 2,965 | 307,292 | 41,055 | (64,150) | 287,257 |
| Interest expense | | 115,141 | | 576 | (115,717) | — |
| | 95 | 118,106 | 1,830,366 | 64,367 | (193,582) | 1,819,352 |
| Income (loss) from operations | (95) | (118,106) | 50,542 | 15,483 | 115,605 | 63,429 |
| Other: | | | | | | |
|   Income from unconsolidated entities | | | 16,035 | 7,557 | | 23,592 |
|   Other income - net | 56 | 116,835 | 19,569 | 3,795 | (114,334) | 25,921 |
|   Income (loss) from consolidated subsidiaries | 112,981 | | 26,835 | | (139,816) | — |
| Income before income tax benefit (provision) | 112,942 | (1,271) | 112,981 | 26,835 | (138,545) | 112,942 |
| Income tax (benefit) provision | (374,204) | | 25,805 | 6,129 | (31,934) | (374,204) |
| Net income | 487,146 | (1,271) | 87,176 | 20,706 | (106,611) | 487,146 |

**Consolidating Statement of Operations for the fiscal year ended October 31, 2011**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Revenues | | | 1,445,148 | 105,364 | (74,631) | 1,475,881 |
| Cost of revenues | | | 1,217,512 | 57,617 | (14,359) | 1,260,770 |
| Selling, general and administrative | 137 | 1,345 | 270,605 | 42,131 | (52,863) | 261,355 |
| Interest expense | | 103,604 | 1,504 | | (103,604) | 1,504 |
| | 137 | 104,949 | 1,489,621 | 99,748 | (170,826) | 1,523,629 |
| (Loss) income from operations | (137) | (104,949) | (44,473) | 5,616 | 96,195 | (47,748) |
| Other: | | | | | | |
|   (Loss) income from unconsolidated entities | | | 6,129 | (7,323) | | (1,194) |
|   Other income (loss) - net | | 108,776 | 14,489 | (3,667) | (96,195) | 23,403 |
|   Expenses related to early retirement of debt | | (3,827) | | | | (3,827) |
|   Loss from consolidated subsidiaries | (29,229) | | (5,374) | | 34,603 | — |
| Loss before income tax benefit | (29,366) | — | (29,229) | (5,374) | 34,603 | (29,366) |
| Income tax benefit | (69,161) | | (68,837) | (12,656) | 81,493 | (69,161) |
| Net income | 39,795 | — | 39,608 | 7,282 | (46,890) | 39,795 |

**Consolidating Statement of Operations for the fiscal year ended October 31, 2010**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Revenues | | | 1,468,678 | 77,570 | (51,477) | 1,494,771 |
| Cost of revenues | | | 1,325,092 | 63,279 | (11,813) | 1,376,558 |
| Selling, general and administrative | 77 | 1,365 | 261,314 | 22,583 | (22,115) | 263,224 |
| Interest expense | | 106,411 | 22,751 | | (106,411) | 22,751 |
| | 77 | 107,776 | 1,609,157 | 85,862 | (140,339) | 1,662,533 |
| Loss from operations | (77) | (107,776) | (140,479) | (8,292) | 88,862 | (167,762) |
| Other: | | | | | | |
|   Income from unconsolidated entities | | | 5,905 | 17,565 | | 23,470 |
|   Other income - net | | 108,520 | 1,766 | 6,889 | (88,862) | 28,313 |
|   Expenses related to early retirement of debt | | (744) | (464) | | | (1,208) |
|   (Loss) income from consolidated subsidiaries | (117,110) | | 16,162 | | 100,948 | — |
| (Loss) income before income tax benefit | (117,187) | — | (117,110) | 16,162 | 100,948 | (117,187) |
| Income tax (benefit) provision | (113,813) | | (124,695) | 15,735 | 108,960 | (113,813) |
| Net (loss) income | (3,374) | — | 7,585 | 427 | (8,012) | (3,374) |

**Consolidating Statement of Cash Flows for the fiscal year ended October 31, 2012**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flow (used in) provided by operating activities: | | | | | | |
| Net income (loss) | 487,146 | (1,271) | 87,176 | 20,706 | (106,611) | 487,146 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | | | | |
| Depreciation and amortization | 22 | 5,036 | 18,459 | 340 | (1,271) | 22,586 |
| Stock-based compensation | 15,575 | | | | | 15,575 |
| Recovery of investment in unconsolidated entities | | | (2,311) | | | (2,311) |
| Excess tax benefits from stock-based compensation | (5,776) | | | | | (5,776) |
| Income from unconsolidated entities | | | (13,724) | (7,557) | | (21,281) |
| Distributions of earnings from unconsolidated entities | | | 5,258 | | | 5,258 |
| Income from non-performing loan portfolios and foreclosed real estate | | | | (12,444) | | (12,444) |
| Deferred tax benefit | 41,810 | | | | | 41,810 |
| Deferred tax valuation allowances | (394,718) | | | | | (394,718) |
| Inventory impairments and write-offs | | | 14,739 | | | 14,739 |
| Change in fair value of mortgage loans receivable and derivative instruments | | | | (670) | | (670) |
| Gain on sale of marketable securities | | | (40) | | | (40) |
| Changes in operating assets and liabilities | | | | | | |
| Increase in inventory | | | (111,788) | (84,160) | | (195,948) |
| Origination of mortgage loans | | | | (651,618) | | (651,618) |
| Sale of mortgage loans | | | | 629,397 | | 629,397 |
| Decrease (increase) in restricted cash | (28,268) | | 1,523 | (771) | | (27,516) |
| (Increase) decrease in receivables, prepaid expenses and other assets | (127,150) | (585,591) | 190,977 | 375,007 | 112,835 | (33,922) |
| Increase (decrease) in customer deposits | | | 48,157 | (3,774) | | 44,383 |
| (Decrease) increase in accounts payable and accrued expenses | (2,584) | 3,130 | 5,363 | (59,493) | (4,953) | (58,537) |
| Decrease in current income taxes payable | (25,075) | | | | | (25,075) |
| Net cash (used in) provided by operating activities | (39,018) | (578,696) | 243,789 | 204,963 | — | (168,962) |
| Cash flow used in investing activities: | | | | | | |
| Purchase of property and equipment — net | | | (13,706) | (789) | | (14,495) |
| Purchase of marketable securities | | | (519,737) | (60,221) | | (579,958) |
| Sale and redemption of marketable securities | | | 368,253 | | | 368,253 |
| Investment in and advances to unconsolidated entities | | | (3,637) | (213,523) | | (217,160) |
| Return of investments in unconsolidated entities | | | 32,659 | 5,709 | | 38,368 |
| Investment in non-performing loan portfolios and foreclosed real estate | | | | (30,090) | | (30,090) |
| Return of investments in non-performing loan portfolios and foreclosed real estate | | | | 16,707 | | 16,707 |
| Acquisition of a business | | | (144,746) | | | (144,746) |
| Net cash used in investing activities | — | — | (280,914) | (282,207) | — | (563,121) |
| Cash flow provide by (used in) financing activities: | | | | | | |
| Net proceeds from issuance of senior notes | | 578,696 | | | | 578,696 |
| Proceeds from loans payable | | | | 1,002,934 | | 1,002,934 |
| Principal payments of loans payable | | | (26,800) | (989,281) | | (1,016,081) |

| | | | | | |
|---|---|---|---|---|---|
| Proceeds from stock-based benefit plans | 33,747 | | | | | 33,747 |
| Excess tax benefits from stock-based compensation | 5,776 | | | | | 5,776 |
| Purchase of treasury stock | (505) | | | | | (505) |
| Net cash provided by (used in) financing activities | 39,018 | 578,696 | (26,800) | 13,653 | — | 604,567 |
| Net decrease in cash and cash equivalents | — | — | (63,925) | (63,591) | — | (127,516) |
| Cash and cash equivalents, beginning of year | — | — | 775,300 | 131,040 | — | 906,340 |
| Cash and cash equivalents, end of year | — | — | 711,375 | 67,449 | — | 778,824 |

F-50

**Consolidating Statement of Cash Flows for the fiscal year ended October 31, 2011**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flow provided by (used in) operating activities: | | | | | | |
| Net income | 39,795 | — | 39,608 | 7,282 | (46,890) | 39,795 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | | |
| Depreciation and amortization | | 3,210 | 19,343 | 589 | | 23,142 |
| Stock-based compensation | 12,494 | | | | | 12,494 |
| Impairment of investments in unconsolidated entities | | | 15,170 | 25,700 | | 40,870 |
| Income from unconsolidated entities | | | (21,299) | (18,377) | | (39,676) |
| Distributions of earnings from unconsolidated entities | | | 12,747 | (666) | | 12,081 |
| Income from non-performing loan portfolios and foreclosed real estate | | | | (5,113) | | (5,113) |
| Deferred tax benefit | (18,188) | | | | | (18,188) |
| Deferred tax valuation allowances | 18,188 | | | | | 18,188 |
| Inventory impairments and write-offs | | | 51,837 | | | 51,837 |
| Change in fair value of mortgage loans receivable and derivative instruments | | | | 475 | | 475 |
| Expenses related to early retirement of debt | | 3,827 | | | | 3,827 |
| Changes in operating assets and liabilities | | | | | | |
| Increase in inventory | | | (89,869) | (125,869) | | (215,738) |
| Origination of mortgage loans | | | | (630,294) | | (630,294) |
| Sale of mortgage loans | | | | 659,610 | | 659,610 |
| Decrease (increase) in restricted cash | | | 41,822 | (676) | | 41,146 |
| (Increase) decrease in receivables, prepaid expenses and other assets | (116,370) | 53,557 | (267,889) | 274,151 | 45,029 | (11,522) |
| Increase in customer deposits | | | 1,677 | 11,498 | | 13,175 |
| (Decrease) increase in accounts payable and accrued expenses | 2,287 | (1,757) | 80,257 | (111,272) | 1,861 | (28,624) |
| Decrease in income tax refund recoverable | 141,590 | | | | | 141,590 |
| Decrease in current income taxes payable | (56,225) | | | | | (56,225) |
| Net cash provided by (used in) operating activities | 23,571 | 58,837 | (116,596) | 87,038 | — | 52,850 |
| Cash flow used in investing activities: | | | | | | |
| Purchase of property and equipment — net | | | (6,658) | (2,895) | | (9,553) |
| Purchase of marketable securities | | | (452,864) | | | (452,864) |
| Sale and redemption of marketable securities | | | 408,831 | | | 408,831 |
| Investment in and advances to unconsolidated entities | | | (70) | (62) | | (132) |
| Return of investments in unconsolidated entities | | | 23,859 | 19,450 | | 43,309 |
| Investment in non-performing loan portfolios and foreclosed real estate | | | | (66,867) | | (66,867) |
| Return of investments in non-performing loan portfolios and foreclosed real estate | | | | 2,806 | | 2,806 |
| Net cash used in investing activities | — | — | (26,902) | (47,568) | — | (74,470) |
| Cash flow used in financing activities: | | | | | | |
| Proceeds from loans payable | | | | 921,251 | | 921,251 |
| Principal payments of loans payable | | | (11,589) | (941,032) | | (952,621) |

| | | | | | |
|---|---|---|---|---|---|
| Redemption of senior notes | | (58,837) | | | (58,837) |
| Proceeds from stock-based benefit plans | 25,531 | | | | 25,531 |
| Purchase of treasury stock | (49,102) | | | | (49,102) |
| Change in noncontrolling interest | | | | 2,678 | 2,678 |
| Net cash used in financing activities | (23,571) | (58,837) | (11,589) | (17,103) | — | (111,100) |
| Net (decrease) increase in cash and cash equivalents | — | — | (155,087) | 22,367 | — | (132,720) |
| Cash and cash equivalents, beginning of year | — | — | 930,387 | 108,673 | — | 1,039,060 |
| Cash and cash equivalents, end of year | — | — | 775,300 | 131,040 | — | 906,340 |

F-51

**Consolidating Statement of Cash Flows for the fiscal year ended October 31, 2010**

| | Toll Brothers, Inc. | Subsidiary Issuer | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flow (used in) provided by operating activities: | | | | | | |
| Net (loss) income | (3,374) | — | 7,585 | 427 | (8,012) | (3,374) |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities: | | | | | | |
| Depreciation and amortization | 28 | 3,262 | 15,961 | 793 | | 20,044 |
| Stock-based compensation | 11,677 | | | | | 11,677 |
| Excess tax benefits from stock-based compensation | (4,954) | | | | | (4,954) |
| Income from unconsolidated entities | | | (5,773) | (17,697) | | (23,470) |
| Distributions of earnings from unconsolidated entities | | | 10,297 | | | 10,297 |
| Deferred tax benefit | 60,697 | | | | | 60,697 |
| Deferred tax valuation allowances | (60,697) | | | | | (60,697) |
| Inventory impairments and write-offs | | | 107,508 | 7,750 | | 115,258 |
| Change in fair value of mortgage loans receivable and derivative instruments | | | | (970) | | (970) |
| Expenses related to early retirement of debt | | 744 | 464 | | | 1,208 |
| Changes in operating assets and liabilities | | | | | | |
| Increase in inventory | | | (16,730) | (123,614) | | (140,344) |
| Origination of mortgage loans | | | | (628,154) | | (628,154) |
| Sale of mortgage loans | | | | 579,221 | | 579,221 |
| Increase in restricted cash | | | (60,906) | | | (60,906) |
| (Increase) decrease in receivables, prepaid expenses and other assets | (50,136) | 36,330 | (143,435) | 144,320 | 9,806 | (3,115) |
| Decrease in customer deposits | | | (9,713) | (5,469) | | (15,182) |
| (Decrease) increase in accounts payable and accrued expenses | (274) | 5,778 | (133,422) | 91,114 | (1,794) | (38,598) |
| Decrease in income tax refund recoverable | 20,250 | | | | | 20,250 |
| Increase in current income taxes payable | 14,828 | | | | | 14,828 |
| Net cash (used in) provided by operating activities | (11,955) | 46,114 | (228,164) | 47,721 | — | (146,284) |
| Cash flow used in investing activities: | | | | | | |
| Purchase of property and equipment — net | | | (4,750) | (80) | | (4,830) |
| Purchase of marketable securities | | | (157,962) | | | (157,962) |
| Sale and redemption of marketable securities | | | 60,000 | | | 60,000 |
| Investment in and advances to unconsolidated entities | | | (28,493) | (29,793) | | (58,286) |
| Return of investments in unconsolidated entities | | | 9,696 | | | 9,696 |
| Net cash used in investing activities | — | — | (121,509) | (29,873) | — | (151,382) |
| Cash flow (used in) provided by financing activities: | | | | | | |
| Proceeds from loans payable | | | | 927,233 | | 927,233 |
| Principal payments of loans payable | | | (372,419) | (944,095) | | (1,316,514) |
| Redemption of senior subordinated notes | | | (47,872) | | | (47,872) |
| Redemption of senior notes | | (46,114) | | | | (46,114) |
| Proceeds from stock-based benefit plans | 7,589 | | | | | 7,589 |
| Excess tax benefits from stock-based compensation | 4,954 | | | | | 4,954 |

| | | | | | |
|---|---|---|---|---|---|
| Purchase of treasury stock | (588) | | | | (588) |
| Change in noncontrolling interest | | | | 320 | 320 |
| Net cash (used in) provided by financing activities | 11,955 | (46,114) | (420,291) | (16,542) | — | (470,992) |
| Net (decrease) increase in cash and cash equivalents | — | — | (769,964) | 1,306 | — | (768,658) |
| Cash and cash equivalents, beginning of year | — | — | 1,700,351 | 107,367 | — | 1,807,718 |
| Cash and cash equivalents, end of year | — | — | 930,387 | 108,673 | — | 1,039,060 |

F-52

**20. Summary Consolidated Quarterly Financial Data (Unaudited)**

The table below provides summary income statement data for each quarter of fiscal 2012 and 2011 (amounts in thousands, except per share data).

| | Three Months Ended, | | | |
| --- | --- | --- | --- | --- |
| | October 31 | July 31 | April 30 | January 31 |
| **Fiscal 2012:** | | | | |
| Revenue | $ 632,826 | $ 554,319 | $ 373,681 | $ 321,955 |
| Gross profit | $ 127,088 | $ 106,391 | $ 66,860 | $ 50,347 |
| Income (loss) before income taxes | $ 60,749 | $ 42,952 | $ 15,649 | $ (6,408) |
| Net income (loss) | $ 411,417 | $ 61,643 | $ 16,872 | $ (2,786) |
| Income (loss) per share (1) | | | | |
|   Basic | $ 2.44 | $ 0.37 | $ 0.10 | $ (0.02) |
|   Diluted | $ 2.35 | $ 0.36 | $ 0.10 | $ (0.02) |
| Weighted-average number of shares | | | | |
|   Basic | 168,416 | 167,664 | 166,994 | 166,311 |
|   Diluted (2) | 174,775 | 170,229 | 168,503 | 166,311 |
| | | | | |
| **Fiscal 2011:** | | | | |
| Revenue | $ 427,785 | $ 394,305 | $ 319,675 | $ 334,116 |
| Gross profit | $ 65,281 | $ 54,358 | $ 43,321 | $ 52,151 |
| Income (loss) before income taxes | $ 15,277 | $ 3,888 | $ (31,484) | $ (17,047) |
| Net income (loss) | $ 15,043 | $ 42,108 | $ (20,773) | $ 3,417 |
| Income (loss) per share (1) | | | | |
|   Basic | $ 0.09 | $ 0.25 | $ (0.12) | $ 0.02 |
|   Diluted | $ 0.09 | $ 0.25 | $ (0.12) | $ 0.02 |
| Weighted-average number of shares | | | | |
|   Basic | 166,896 | 168,075 | 166,910 | 166,677 |
|   Diluted (2) | 167,525 | 169,338 | 166,910 | 168,121 |

(1) Due to rounding, the sum of the quarterly earnings per share amounts may not equal the reported earnings per share for the year.

(2) For the three months ended January 31, 2012 and April 30, 2011, there were no common stock equivalents used in the calculation of diluted loss per share because the Company reported a net loss for each period, and any common stock equivalents would be anti-dilutive.

# EXHIBIT 141

Unofficial
²⁰Document

fm
cr

**RECORDING REQUESTED BY:**
Westminster Title Agency
**AND WHEN RECORDED MAIL TO:**
Toll Brothers Arizona LP
8767 E. Via de Ventura, Suite 390
Scottsdale, AZ 85258

## SPECIAL WARRANTY DEED
### CORPORATE

For the consideration of Ten Dollars, and other valuable consideration,

**Toll Prasada LLC, an Arizona Limited Liability Company**

conveys to

**Toll Brothers AZ Limited Partnership, an AZ Limited Partnership**

the following real property situated in **Maricopa** County, **Arizona**:

### See Exhibit A attached hereto and made a part hereof.

Subject to the following matters only:  The grantor warrants the title against the acts of the grantor only

Dated: _4-22-24_                                       EXEMPT ARS 11-1134 B7

**Toll Prasada LLC, an Arizona Limited Liability Company**

BY: TOLL SOUTHWEST LLC,
a Delaware limited liability company
General Partner

**By:** _____
   **Daniel E. Rhea**
   **Its: Vice President**

**State of Arizona**
**County of Maricopa**

On _April 22, 2024_ , before me, the undersigned Notary Public, personally appeared Daniel E. Rhea
Vice President as authorized signer of TOLL SOUTHWEST LLC a Delaware Corporation, as General
Partner of Toll Brothers AZ Limited Partnership, an Arizona LP

_____
Notary Public
My Commission Expires: _3-18-2028_



CORRINE SUZANNE GARCIA
Notary Public - Arizona
Maricopa County
Commission # 664568
My Comm. Expires Mar 18, 2028

# LEGAL DESCRIPTION

**Order No.:**    FM65231063

**For APN/Parcel ID(s):  502-14-129**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF MARICOPA, STATE
OF ARIZONA AND IS DESCRIBED AS FOLLOWS

**Lot 327 of TOLL AT PRASADA, PHASE 1 UNIT A, REPLAT of record in the office of the County
Recorder of
Maricopa County, Arizona, recorded in Book 1779 of Maps, Page 10 and according to the plat of
record in
the office of the County Recorder of Maricopa County, Arizona, recorded in Book 1444 of Maps,
Page 3
and thereafter Amended by Affidavit of Correction recorded May 13, 2019 in Recording No.
2019-0346628,
records of Maricopa County, Arizona.
EXCEPT all minerals, oil, and gas and other hydrocarbon substances below a depth of 100 feet
below the
surface, as conveyed in instrument recorded in Docket 10020, page 286, records of Maricopa
County,
Arizona; and
EXCEPT all minerals, coal, carbons, hydrocarbons, oil, gas, chemical elements and compounds
whether
in solid, liquid or gaseous fatal, and all steam and other forms of thermal energy on, in or under
the above
described land; and**   Unofficial Document
**EXCEPT any and all non-riparian water and water rights associated with the above described
land and
those reservations set forth in the Deed recorded in Recording No. 2006-676033 and Correction
Deed
*recorded in Recording No. 2009-1097493, records of Maricopa County Arizona; and*
EXCEPT all minerals, coal, carbons, hydrocarbons, oil, gas, chemical elements and compounds,
whether
in solid, liquid or gaseous form, and all steam and other forms of thermal energy, on, in, or
under the
above described land and all subsurface rights of any and all kinds, reserved in the Deed
recorded in
Recording No. 2018-0556434, records of Maricopa County, Arizona.**

# EXHIBIT 142

## <u>OFFICER'S CERTIFICATE</u>

**TOLL SOUTHWEST LLC**
**TOLL WEST INC.**

**Dated: June 4, 2024**

I, Kenneth J. Greenspan, Vice President and Assistant Secretary of Toll Southwest LLC, a Delaware limited liability company, and Toll West Inc., a Delaware corporation (collectively, the "<u>Companies</u>"), do hereby certify and confirm that:

1. The following officers are duly appointed to the offices next to their names and each of them is individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, (i) any performance agreement, bond, escrow agreement, easement, permit application, license application, deed, record plat and any and all documents which may be required by various governmental municipalities and agencies; (ii) any agreement, easement and any and all related documents which may be required by utility companies and (iii) any agreement, deed or document with respect to the sale and conveyance of individual homes, lots or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies:

| | |
|---|---|
| Mark G. Bailey | Regional President |
| | |
| Reginald (aka Reggie) E. Carveth | Division President |
| Eric J. Hunter | Division President |
| | |
| Matt Foran | Vice President |
| Jeff Nickless | Vice President |

2. Vice Presidents of Sales, including Jamie Charbonneau, are individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, any agreement, deed or document with respect to the sale of individual homes or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies.

3. Directors of Sales, including Sharon Curdy, and Area Sales Managers, including Patricia Brusca, Kari Lewis and Robert Wasinger, are appointed as authorized representatives of each of the Companies, and they are individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, agreements of sale and any and all related documents with respect to the sale of individual homes or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies.

4. Design Studio Managers, including Amy Custer and Candace Trujillo Ohlsen, are appointed as authorized representatives of each of the Companies, and they are individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, Exhibit Bs, Exhibit Cs, and change orders to agreements of sale with respect to the sale of individual homes or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies.

5. Stacey Rothaus is a duly appointed Vice President, and Colleen Connolly is a duly appointed Assistant Vice President, of each of the Companies, and they are individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, deeds (including Special Warranty Deeds) and all closing disclosures, including, but not limited to, (i) Buyer's Closing Disclosures; (ii) Seller's Closing Disclosures; (iii) Combined Closing Disclosures; (iv) ALTA Settlement Statements and all other documents necessary to effectuate settlement, including, but not limited to, Builder's Warranties, Owner's Affidavits and Seller Acknowledgments.

6. Linda Cantando, Tracy Joy and Suzan Naessens are hereby designated as authorized representatives of each of the Companies, and they are individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, all closing disclosures ("Closing Disclosures"), including, but not limited to, (i) Buyer's Closing Disclosures; (ii) Seller's Closing Disclosures and (iii) Combined Closing Disclosures, ALTA Settlement Statements and all other documents necessary to effectuate settlement, including, but not limited to, Builder's Warranties, Owner's Affidavits and Seller Acknowledgements.

[SIGNATURE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned has duly executed this Officer's Certificate as of the date first written above.

Kenneth J. Greenspan
Vice President and Assistant Secretary

# EXHIBIT 143

## <u>OFFICER'S CERTIFICATE</u>

### Dated:  January 12, 2022

I, Kenneth J. Greenspan, Vice President and Assistant Secretary of Toll CO I LLC, a Colorado limited liability company, and Toll Southwest LLC, a Delaware limited liability company (collectively, the "Companies"), do hereby certify and confirm that:

1.  The following officers are duly appointed to the offices next to their names and each of them is individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, (i) any performance agreement, bond, escrow agreement, easement, permit application, license application, deed, record plat and any and all documents which may be required by various governmental municipalities and agencies; (ii) any agreement, easement and any and all related documents which may be required by utility companies and (iii) any agreement, deed or document with respect to the sale and conveyance of individual homes, lots or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies:

|                     |                          |
|---------------------|--------------------------|
| Mark G. Bailey      | Group President          |
| David A. Keller     | Division President       |
| Reginald E. Carveth | Division President       |
| Matt Foran          | Division Vice President  |
| Eric J. Hunter      | Division Vice President  |

2.  The following officers are duly appointed to the offices next to their names and each of them is individually authorized, empowered and directed to execute and deliver, for and on behalf of each of the Companies, any agreement, deed or document with respect to the sale and conveyance of individual homes or units owned by each of the Companies, upon such terms and conditions as they deem appropriate and in the best interest of each of the Companies.

|                     |                 |
|---------------------|-----------------|
| Jamie Charbonneau   | Vice President  |
| Pamela J. Keller    | Vice President  |

IN WITNESS WHEREOF, the undersigned has duly executed this Officer's Certificate as of the date first written above.

DocuSigned by:

2D3645A0FBBD4B3...

Kenneth J. Greenspan
Vice President and Assistant Secretary

# EXHIBIT 144

## Executives [ edit ]

Robert Toll stepped down as chairman in 2018 and served exclusively as special advisor to the company.[11]

Douglas C. Yearley Jr. joined Toll Brothers in 1990 and was promoted as chief executive officer in June 2010 and currently holds the position of chairman and chief executive officer.[12] Doug also serves as co-chair of the Pennsylvania Chapter of American Cancer Society's Against Cancer.[13] Martin Connor was hired as chief financial officer in 2010.[12]

Robert Parahus was promoted to chief operating officer and executive president in 2020.[12]

# EXHIBIT 145



Search

# Mark Bailey

Regional President - Arizona, Colorado, Nevada and Utah
Toll Brothers

Englewood, Colorado, United States · 500+ connections

Connect

## Activity

770 followers



I'm honored—and deeply humbled—to be named one of 75 women recognized nationally in Builder and …

Mark Bailey commented on this

See all

Developer Magazine's May 2025 issue spotlighting Women in Homebuilding Leadership. To be included among such accomplished, driven leaders is both a privilege and a powerful reminder of the role mentorship plays in our industry. I'm especially

## Experience

 **Toll Brothers**
24 yrs 5 mos

- Regional President
  Nov 2022 - Present · 2 yrs 9 mos

- Group President, Colorado & Idaho
  Mar 2001 - Present · 24 yrs 5 mos

 ## Management Associate Program
Del Webb
1997 - 2001 · 4 yrs

✕  Use the LinkedIn app                              C

 Home     My Network     Post     Notifications

 ## Arizona State University
Construction · Construction
1992 - 1996

## Volunteer Experience

 ## HBA of Metro Denver
President
Nov 2019 - Present · 5 yrs 9 mos

 Home Builders Foundation
## Board Of Directors
Nov 2018 - Nov 2019  ·  1 yr 1 mo

## Skills

Land Development  · Contract Negotiation  ·  Homebuilding  ·

Real Estate  ·Value Engineering  ·Construction  ·

Land Acquisition  ·  Entitlements  ·  Residential Homes  ·

Construction Management

See more˅

## Accomplishments

**1** Organizations

Denver Home Builder Association

## Contact

🔲 LinkedIn

https://www.linkedin.com/in/mark-g-bailey

Other similar profiles



**Seth Ring** · 3rd+
Executive Vice President

**Thomas Murray** · 3rd+
Regional President at Toll Brothers

**Brian Murray** · 3rd+
Division President -Toll Brothers

**Rob Parahus** · 3rd+
President & Chief Operating Officer at Toll Brothers

**Dave Lemnah** · 3rd+
President - Lokal Homes

**Rob Paul** · 3rd+
Group President at Toll Brothers

**Nick Norvilas** · 3rd+
Division President at Toll Brothers

**Jeff Nickless** · 3rd+
Vice President of Land Acquisition at Toll Brothers

**Jay Saunders** · 3rd+
Division President Toll Brothers



**Karl Mistry** · 3rd+

Executive Vice President at Toll Brothers | PropTech Enthus…
st



# EXHIBIT 146

       



## Dan Rhea
Division Vice President @ Toll Brothers

Toll Brothers

Phoenix, Arizona, United States · Contact info

500+ connections

Message

---

## About

Visionary business executive who possesses extensive experience, with an emphasis on reducing costs, business/project analysis, extensive knowledge in project management, developing efficient business processes, and overseeing large projects. In addition, I have acquired a solid background in purcha ...see more

 **Top skills**
Leadership • Strategic Planning • Project Management • Strategic Thinking

---

## Activity
1,591 followers

Dan Rhea commented on a post • 7mo

Congrats Kyra!

Show all comments →

---

## Experience

 **Toll Brothers**
11 yrs 9 mos

**Division Vice President**
Full-time
Dec 2020 - Present · 4 yrs 8 mos
Scottsdale, Arizona, United States

**Senior Project Manager**
Nov 2013 - Nov 2020 · 7 yrs 1 mo
Senior Project Manager at Toll Brothers

 Senior Program Management, Manage Complex Projects and +1 skill

skill

**Partner/Owner**
TMD Properties
Feb 2006 - Nov 2013 · 7 yrs 10 mos
Phoenix, Arizona, United States

Entitlements, Municipal Relations, Product Design

**Account Manager**
Daltile - Mohawk Industries
Jan 2009 - Jun 2013 · 4 yrs 6 mos
Phoenix, Arizona, United States

Customer Relations, Product Specification, Sales

**Director of Purchasing/Business Development**
The Home Depot/CTI
Oct 2001 - Mar 2006 · 4 yrs 6 mos
Phoenix, Arizona, United States

Purchasing, Growth Management, Business Development, Process
Development …

**Purchasing Manager/Construction Operations Manager**
PulteGroup
May 1996 - Sep 2001 · 5 yrs 5 mos
Phoenix, Arizona, United States

Purchasing, Product Development, Value Engineering

Show all 7 experiences  ➔

## Education

**University of Wyoming**
BS, Social Science
1987 - 1991

## Volunteering

**Habitat For Humanity**
Phoenix Habitat For Humanity
Jun 2012 - Jul 2012 · 2 mos

Great Opportunity to give back and use my construction skills

## Skills

**Senior Program Management**

 Senior Project Manager at Toll Brothers

**Manage Complex Projects**

Senior Project Manager at Toll Brothers

Show all 31 skills  ➔

## Recommendations

## Recommendations

Received | Given

Michel Ducamp
Global Hospitality Executive
March 5, 2012, Michel managed Dan directly

I had the pleasure of hiring and supervising Dan at Solstice when I was
the COO. Dan's role was to develop crtifcal maintenance documents
and methodologies and implement them in the field. In that role Dan
was thorough and thoughtful, and was particularly conscious of the
nuances of very different work environments and getting things done in
foreign countries through contracted caretakers who were not always
well versed in maintenance procedures and home construction. Dan
was very detailed yet patient and was good at training from a remote  …


Wendi Cave
Design Manager at Verde River Ranch
March 1, 2012, Wendi worked with Dan on the same team

Dan Rhea is a smart, confident individual. He always brought clear
directives to the table with each account we worked on together. His
finance knowledge and focus was an asset I relied on daily. Additionally,
he has a great personality which is always beneficial to all who work
with him.

Show all 4 received  →

## Organizations

Luke Air Force Base
Honorary Commander (Voluntary Civilian Role) · Feb 2020 - Feb 2022

 Associated with Toll Brothers

Honored to be asked to spend 2 years learning more about Luke Air Force Base
and its important role and mission in the greater Phoenix metro area.   …

## Interests

Companies | Groups | Schools


University of Wyoming
78,280 followers



Zillow
467,101 followers


Show all companies  →

## Causes

Children • Education • Veteran Support





Henry, explore relevant opportunities
with Landstar

Get the latest jobs and industry news

**More profiles for you**

Justin Stedman · 3rd+
Director of Quality ★ Sr. Construction Management ★ Project
Coordination -Production $40 M+★ Process Improvement ★Vendor & …

Kevin E. Rosinski · 3rd+
Chief Operating Officer at Camelot Homes

Colin Phipps · 3rd+
Vice President of Land Acquisition at Toll Brothers

Mark Bailey · 3rd+
Regional President - Arizona, Colorado, Nevada and Utah

Devin Hobbs · 3rd+
Division Vice President at Toll Brothers

Show all

**Explore Premium profiles**

Joseph Hafner · 3rd+
Chief Engineer /Maints Manager /Life & Health Entrepreneur

Lena Zaatri · 3rd+
CO- Manufacturing Supply Planner/Purchaser at Torani (R. Torre & Co.)

Chase Franzen · 3rd+
Line Cook at Grand Canyon University



Danny Youngblood Jr · 3rd+
Electrician

People you may know
From Dan's job title

Shawn Smith
Vice President Operations at INFINITY DRYWALL CONTRACTING, INC

Zach Calef
Chief Revenue Officer

Ryan McDonald
Vice President - Corporate Services

Chad Tons
CEO, Infinity Marketing Team, LLC.

Show all

Promoted ···

Unlock Adventure.
Find Out Your Offer with The Platinum
Card®. Terms apply.

Get A Demo of REDO Today
Free returns and exchanges software
plus more to streamline your
operations

Proud to Be UAGC
Online bachelor's degrees. 5-week
classes. Credit for work/life
experience.

# EXHIBIT 147

      

Home · My Network · Jobs · Messaging · Notifications · Me ▾ · For Business ▾ · Try Premium for $0



## Reggie Carveth 🛡️

Division President at Toll Brothers



Michigan State University

Parker, Colorado, United States · Contact info

500+ connections

Connect

## About

Dynamic, results-focused leader dedicated to making a difference in people's lives and celebrating mutual successes.

Specialties: …                                                      …see more

## Activity

658 followers

Reggie hasn't posted yet
Recent posts Reggie shares will be displayed here.

Show all activity →

## Experience

 **Toll Brothers**
8 yrs 8 mos
Denver, Colorado, United States

**Division President**
Full-time
Jan 2022 - May 2023 · 1 yr 5 mos

**Vice President**
Dec 2017 - Jan 2022 · 4 yrs 2 mos

**Assistant Vice President**
Oct 2014 - Dec 2017 · 3 yrs 3 mos

 **VP of Operations**
Stonebridge Builders
May 2012 - Oct 2014 · 2 yrs 6 mos
Arvada, Colorado, United States

Arvada, Colorado, United States

Director of Operations
Tecra Tools
Oct 2009 - Dec 2011 · 2 yrs 3 mos
Englewood, CO



Toll Brothers
Full-time · 9 yrs 3 mos

Senior Project Manager
Dec 2007 - Aug 2008 · 9 mos
Michigan and Colorado

Project Manager
Dec 2002 - Dec 2007 · 5 yrs 1 mo
Michigan, United States

Assistant Project Manager
Jun 1999 - Dec 2002 · 3 yrs 7 mos
Michigan, United States

Assistant Superintendent
Multi Building
1997 - 1998 · 1 yr
Plymouth, Michigan, United States

Show all 10 experiences  →

## Education



Michigan State University
B.S. Political Science, B.S. Building and Construction Management
1994 - 1999
Activities and societies: Michigan State Singers, Mountain Bike Racing,
Skiing, Rock Climbing …

Internship with Senate Majority Leader Dick Posthumus

## Skills

Negotiation

 Endorsed by 5 colleagues at Toll Brothers

 13 endorsements

Planning

Show all 19 skills  →

## Recommendations

**Received**      Given



**Nick Belitz**
Principal at Morrissey Goodale LLC
July 8, 2009, Nick reported directly to Reggie

Reggie is a highly experienced project manager who never lets his focus
on the bottom line distract him developing and nurturing the personal
connections and relationships that are pivotal to building a successful
company. He is good to work with and goes out of his way to make sure
each member of the team knows their responsibilities, is held
accountable for their work, and is rewarded for a job well done. I would
be happy to work with Reggie again and wholeheartedly recommend
him....

**Mike Noles**
Vice President of The Umlor Group
June 1, 2009, Mike was senior to Reggie but didn't
manage Reggie directly

Reggie is a diligent man with loads of integrity. His years of experience
with Toll Brothers will serve him well as he manages complex projects in
new business endeavors. Reggie is very easy to get along with and I
enjoyed working with him very much.

Show all 5 received  →

## Interests

**Top Voices**      Companies      Groups      Schools



**David L. Katz, MD, MPH** 🔗
Founder: Diet ID; True Health Initiative. Founding Director, Yale-Griffin
PRC (1998-2019). Health Journalist. COVID Curmudgeon
874,104 followers

███████████



**John Burns** 🔗
Working with a great team to solve today to help you navigate to a
better tomorrow.
745,893 followers

███████████



Promoted  •••

Henry, explore relevant opportunities
with Cardone Capital

Get the latest jobs and industry news

███████████████

## More profiles for you

Jeff Nickless  · 3rd+



Vice President of Land Acquisition at Toll Brothers

Elizabeth Riddick · 3rd+
National Vice President of Sales at Toll Brothers

Randy Carpenter · 3rd+
Adventurer

Aric Jones · 3rd+
Division President - Colorado

Amanda Nilemo · 3rd+
Director, Community Planning, Toll Brothers

Show all

Explore Premium profiles

Chana Grossman · 3rd+
Executive Operations Manager @ Rowan Advance
Recruiting | Logistics | Event Coordinator …

Chase Franzen · 3rd+
Line Cook at Grand Canyon University

Frederick Pesqueda · 3rd+
Production Supervisor @ RJE International, Inc. | Mechanical
Engineering …

Janiyah Boulding · 3rd+
Casino Host @ Sky River Casino | Customer Engagement, Hospitality

People you may know
From Reggie's job title

Shawn Smith
Vice President Operations at INFINITY DRYWALL CONTRACTING, INC

Connect



Jorg Gaubmann ☑
Founder & Innovator | Business Solutions, Tech Enthusiast, and
Technology & Prototype Innovator …

Ryan McDonald ☑
Vice President - Corporate Services

Chad Tons [in]
CEO, Infinity Marketing Team, LLC.

Zach Calef ☑
Chief Revenue Officer

Show all

You might like
Pages for you

National Association of Home Builders
Construction
255,485 followers

D.R. Horton
Construction
192,356 followers

Show all

# EXHIBIT 148





E-FILED

# STATE OF ARIZONA
# CORPORATION COMMISSION
## CORPORATION ANNUAL REPORT
## & CERTIFICATE OF DISCLOSURE

05984273

**DUE ON OR BEFORE** 6/28/2017

**FILING FEE** 45.00

**PLEASE READ ALL INSTRUCTIONS.  The following information is required by A.R.S. §§10-1622 & 10-11622 for all corporations organized pursuant to Arizona Revised Statutes, Title 10.  The Commission's authority to prescribe this form is A.R.S.  §§ 10-121(A) & 10-3121(A).  YOUR REPORT MUST BE SUBMITTED ON THIS ORIGINAL FORM.  Make changes or corrections where necessary. Information for the report should reflect the current status of the corporation.**

F07543591

1. TOLL BROS., INC.

   8767 East Via de Ventura

   #390

   Scottsdale, ARIZONA  85258

**Business Phone:**

(Business phone is optional.)

**State of Domicile:** PA

**Type of Corporation:** PROFIT

2.

Statutory Agent: C T CORPORATION SYSTEM

Mailing Address: 3800 N CENTRAL AVE SUITE 460

City, State, Zip: PHOENIX, ARIZONA  85012

Statutory Agent's Street or Physical Address:

Physical Address: 3800 N CENTRAL AVE SUITE 460

City, State, Zip: PHOENIX ARIZONA, 85012

| ACC USE ONLY | |
|---|---|
| Fee: | 45.00 |
| Penalty: | |
| Reinstate: | |
| Expedite: | |
| Resubmit: | |

*If appointing a new statutory agent, the new agent MUST consent to that appointment by signing below.  Note that the agent address must be in Arizona.*

I, (individual) or We, (corporation or limited liability company) having been designated the new Statutory Agent, do hereby consent to this appointment until my removal or resignation pursuant to law.

_____
Signature of *new* Statutory Agent

_____
Printed Name of *new* Statutory Agent

3. **Secondary Address:**

250 GIBRALTAR RD

HORSHAM, PENNSYLVANIA  19044

(Foreign Corporations are **REQUIRED** to complete this section).

4. **Character of Business:**

CONTRACTOR

Received: 6/28/2017 8:50:50 AM

AR:0046
Rev. 8/2016

Arizona Corporation Commission
Corporations Division

**5.**   **CAPITALIZATION:**   | (For-profit Corporations and Business Trusts are **REQUIRED** to complete this section.)

Business trusts must indicate the number of transferable certificates held by trustees evidencing their beneficial interest in the trust estate.

**5a.** Please examine the corporation's original Articles of Incorporation for the amount of **shares authorized**.

| Number of Shares/Certificates **Authorized** | Class | Series Within Class (if any) |
|---|---|---|
| 1000.00 | Common | N/A |
| 0.00 | | |

**5b.** Review all corporation amendments to determine if the original number of shares has changed. Examine the corporation's minutes for the number of shares issued.

| Number of Shares/Certificates **Issued** | Class | Series Within Class (if any) |
|---|---|---|
| 1000.00 | Common | N/A |
| 0.00 | | |

**6.**   **SHAREHOLDERS:**   | (For-profit Corporations and Business Trusts are **REQUIRED** to complete this section.)

List shareholders holding more than 20% of any class of shares issued by the corporation, or having more than a 20% beneficial interest in the corporation.

**Name:** TOLL HOLDINGS, INC.     **Name:**

**Name:**     **Name:**

**7.**   **OFFICERS:**

| Name | Title | Date Taking Office |
|---|---|---|
| DOUGLAS C YEARLEY JR | CHIEF EXECUTIVE OFFICER | 6/16/2010 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | | |
| Robert Flaherty | OTHER OFFICER | 1/1/0001 |
| 8767 East Via de Ventura #390, Scottsdale, ARIZONA 85258 | | |
| Kevin Rosinski | OTHER OFFICER | 1/1/0001 |
| 8767 East Via de Ventura #390, Scottsdale, ARIZONA 85258 | | |
| Scott Ilizaliturri | OTHER OFFICER | 1/1/0001 |
| 17845 E. Colt Drive, Queen Creek, ARIZONA 85142 | | |
| MARTIN P CONNOR | OTHER OFFICER | 9/22/2010 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | | |
| KEVIN DUERMIT | OTHER OFFICER | 11/1/2005 |
| 8767 E. VIA DE VENTURA #390, SCOTTSDALE, ARIZONA 85258 | | |
| RICHARD T HARTMAN | PRESIDENT | 1/1/2012 |
| 250 GIBRALTAR RD, HORSHAM, PENNSYLVANIA 19044 | | |
| MICHAEL I SNYDER | SECRETARY | 11/1/1998 |
| 250 GIBRALTAR RD, HORSHAM, PENNSYLVANIA 19044 | | |
| GREGG L ZIEGLER | TREASURER | 3/13/2013 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | | |
| KENNETH J GREENSPAN | VICE-PRESIDENT | 1/1/2014 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | | |

| MARK J WARSHAUER | VICE-PRESIDENT | 4/8/2002 |
|---|---|---|
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | | |
| Richard Schoonmaker | OTHER OFFICER | 1/1/0001 |
| 18570 N. Thompson Peak Parkway, Scottsdale, ARIZONA 85255 | | |

8. **DIRECTORS**:

| Name | Date Taking Office |
|---|---|
| RICHARD T HARTMAN | 1/1/2012 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | |
| MARTIN P CONNOR | 9/22/2010 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | |
| DOUGLAS C YEARLEY JR | 6/16/2010 |
| 250 GIBRALTAR ROAD, HORSHAM, PENNSYLVANIA 19044 | |

Page 3

**9.    FINANCIAL DISCLOSURE (A.R.S. §10-11622(A)(9))**

**Nonprofits –** financial disclosure is no longer required.  **Cooperative marketing associations –** must submit a financial statement.  All other types of corporations are not required to file a financial statement.

**ONLY NONPROFIT CORPORATIONS MUST ANSWER THIS QUESTION:**

**9A.  MEMBERS (A.R.S. §10-11622(A)(6))**    This corporation **DOES** ☐ **DOES NOT** ☐ have members.

**10.  CERTIFICATE OF DISCLOSURE (A.R.S. §§10-202(D), 10-3202(D),10-1622(A)(8) & 10-11622(A)(7))**

A. Has any person who is currently an officer, director, trustee, incorporator, or who, in a For-profit corporation, controls or holds more than 10% of the issued and outstanding common shares or 10% of any other proprietary, beneficial or membership interest in the corporation been:
1.    Convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the five year        period immediately preceding the execution of this certificate?
2.    Convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses or restraint of trade or        monopoly in any state or federal jurisdiction within the five year period immediately preceding execution of this        certificate?
3.    Subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the five year period immediately preceding        execution of this certificate where such injunction, judgment, decree or permanent order involved the        violation of:
            (a) fraud or registration provisions of the securities laws of that jurisdiction, or
            (b) the consumer fraud laws of that jurisdiction, or
            (c) the antitrust or restraint of trade laws of that jurisdiction?

## One box must be marked: YES ☐ NO ☒

**If "YES" to A, the following information must be submitted** as an attachment to this report for each person subject to one or more of the actions stated in Items 1 through 3 above.

   1.    Full birth name.                                          5.        Date and location of birth.
   2.    Full present name and prior names used.       6.        The nature and description of each conviction
   3.    Present home address.                                           or judicial action; the date and location; the court
   4.    All prior addresses for immediately preceding 5 year          and public agency involved; and the file or
         period.                                                        cause number of the case.

B.    Has any person who is currently an officer, director, trustee, incorporator, or who, in a For-profit corporation, controls or holds over 20% of the issued and outstanding common shares, or 20% of any other proprietary, beneficial or membership interest in the corporation, served in any such capacity or held a 20% interest in any other corporation on the bankruptcy or receivership of that other corporation?

## One box must be marked: YES ☐ NO ☒

**If "YES" to B, the following information must be submitted** as an attachment to this report for each corporation subject to the statement above.
            (a) Name and address of each corporation and the persons involved.
            (b) State(s) in which it:  (i) was incorporated and      (ii) transacted business.
            (c) Dates of corporate operation.

**11. STATEMENT OF BANKRUPTCY OR RECEIVERSHIP (A.R.S. §§ 10-1623 & 10-11623)**

A. Has the **corporation** filed a petition for bankruptcy or appointed a receiver?    **One box must be marked:**    YES ☐    NO ☒

      **If "Yes" to A, the following information must be submitted** as an attachment to this report:
            1.    All officers, directors, trustees and major stockholders of the corporation within one year of filing the petition for bankruptcy or
                  the appointment of a receiver. If a major stockholder is a corporation, the statement shall list the current president, chairman of
                  the board of directors and major stockholders of such corporate stockholder. "Major stockholder" means a shareholder
                  possessing or controlling twenty per cent of the issued and outstanding shares or twenty per cent of any proprietary, beneficial
                  or membership interest in the corporation.
            2.    Whether any such person has been an officer, director, trustee or major stockholder of any other corporation within one year of
                  the bankruptcy or receivership of the other corporation. If so, for each such corporation give:
                  (a) Name and address of each corporation;
                  (b) States in which it:  (i) was incorporated and          (ii) transacted business.
                  (c) Dates of operation.

**12.  SIGNATURES:**    Annual Reports must be signed and dated by at least one duly authorized officer or they will be rejected.

**I declare, under penalty of perjury, that all corporate income tax returns required by Title 43 of the Arizona Revised Statutes have been filed with the Arizona Department of Revenue.  I further declare under penalty of perjury that I (we) have examined this report and the certificate, including any attachments, and to the best of my (our) knowledge and belief they are true, correct and complete.**

**Name:**    Kenneth J Greenspan              Date:6/28/2017

**Signature:**      Kenneth J Greenspan

**Title:**        VICE-PRESIDENT

            **(Signator(s) must be duly authorized corporate officer(s) listed in section 7 of this report.)**

# EXHIBIT 149



# EXHIBIT 150

