# EXHIBIT 151



# EXHIBIT 152

Ref #2021005031,  Date: 1/13/2021 1:40 PM,  Pages: 1 of 1 ,RECORDING $13.00
**Electronically Recorded Douglas County, CO.  Merlin Klotz, Clerk and Recorder**

## STATEMENT OF AUTHORITY

1. This Statement of Authority relates to an entity named
   **Toll Southwest LLC, a Delaware limited liability company**
   And is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2. The type of entity is a:
   | | |
   |---|---|
   | ☐ Corporation | ☐ Registered Limited Liability Partnership |
   | ☐ Nonprofit Corporation | ☐ Registered Limited Liability Limited Partnership |
   | ✓ Limited Liability Company | ☐ Limited Partnership Association |
   | ☐ General Partnership | ☐ Government or Governmental Subdivision or Agency |
   | ☐ Limited Partnership | ☐ Trust |
   | ☐ | |

3. The entity is formed under the law of the  **State of Delaware**

4. The mailing address for the entity is  1140 Virginia Drive, Fort Washington, PA 19034

5. The name and position of each person authorized to execute instruments conveying, encumbering or otherwise affecting title to real property on behalf of the entity is:
   Mark Bailey – Group President

6. The authority of the foregoing person(s) to bind the entity is  XX  not limited  ☐  limited
   as follows: _____

7. Other matters concerning the manner in which the entity deals with interests in real property:
   _____

8. The Statement of Authority is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

9. This Statement of Authority amends and supersedes in all respects any prior Statement of Authority executed on behalf of the entity.

Executed on  this  8  day of January, 2021.

**TOLL SOUTHWEST LLC,**
**a Delaware limited liability company**

By: _____

**Mark Bailey, Group President**

State of  Colorado
County of  Arapahoe  } ss

The foregoing instrument was acknowledged before me this  8  day of January, 2021 by Mark Bailey as Group President on behalf of Toll Southwest LLC, a Delaware limited liability company.

Witness my hand and official seal

_____
Notary Public

My commission expires: _8 / 16 / 22_

ANGELA SMITH
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

Statement of Authority – Commercial
ComStOfA (DSI Rev. 08/09/17)

Printed:  1/8/2021 12:06 PM by JY
Escrow No.:  N0023727-020-JY

Page 1  Recording Requested by:
FNTG-NCS Colorado

RECEPTION #20220012398, 2/24/2022 12:39:33 PM, 1 of 1, $13.00 Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

## STATEMENT OF AUTHORITY

1. This Statement of Authority relates to an entity named TOLL SOUTHWEST LLC, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2. The type of entity is a:

   ☐ corporation                     ☐ registered limited liability partnership
   ☐ nonprofit corporation           ☐ registered limited liability limited partnership
   ☒ limited liability company       ☐ limited partnership association
   ☐ general partnership             ☐ government or governmental subdivision or agency
   ☐ limited partnership             ☐ trust (Section 38-30-108.5, C.R.S.)
   ☐ other: _____

3. The entity is formed under the laws of: Delaware.

4. The mailing address for the entity is: 1140 Virginia Drive, Fort Washington, PA 19034

5. The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

   Mark G. Bailey, Group President
   Reginald (Reggie) E. Carveth, Division President
   Matt Foran, Vice President
   Kenneth (Ken) J. Greenspan, Vice President
   Stacey A. Rothaus, Vice President

6. The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property: N/A.

Executed this 17ᵗʰ day of February, 2022.

TOLL SOUTHWEST LLC,
a Delaware limited liability company

By: _____
Name: Ken Greenspan
Title: Vice President

STATE OF Pennsylvania       )
                            )  ss.
COUNTY OF Montgomery        )

The foregoing instrument was acknowledged before me this 17ᵗʰ day of February, 2022, by Kenneth Greenspan as Vice President of TOLL SOUTHWEST LLC, a Delaware limited liability company.

Witness my hand and official seal.

My commission expires: 9/8/2023          _____
                                         Notary Public

Commonwealth of Pennsylvania - Notary Seal
ELIZABETH P. STEIN, Notary Public
Montgomery County
My Commission Expires September 8, 2023
Commission Number 1159840

RECEPTION #20190056595,  9/19/2019 10:15:43 AM, 1 of 2, $18.00  Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

WHEN RECORDED   **TOLL SOUTHWEST LLC**
RETURN TO:      **250 GIBRALTAR RD**
                **HORSHAM, PA 19044**



## STATEMENT OF AUTHORITY
(§38-30-172, C.R.S.)

1. This Statement of Authority relates to an entity[1] named
**TOLL SOUTHWEST LLC, A DELAWARE LIMITED LIABILITY COMPANY**

2. The type of entity is a:
   - ☐ Corporation
   - ☐ Nonprofit Corporation
   - ☒ Limited Liability Company
   - ☐ General Partnership
   - ☐ Limited Partnership
   - ☐
   - ☐ Registered Limited Liability Partnership
   - ☐ Registered Limited Liability Limited Partnership
   - ☐ Limited Partnership Association
   - ☐ Government or Governmental Subdivision or Agency
   - ☐ Trust

3. The entity is formed under the laws of **Delaware**

4. The mailing address for the entity is **250 GIBRALTAR ROAD, HORSHAM, PA 19044**

5. The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering or otherwise affecting title to real property on behalf of the entity is **MARK G. BAILEY, DIVISION PRESIDENT OR CHRISTOPHER STULL, DIVISION VICE PRESIDENT**

6. The authority of the foregoing person(s) to bind the entity:  ☒ is[2] not limited  ☐ is limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property:

8. This Statement of Authority is executed on behalf of the entity pursuant to the provisions of §38-30-172, C.R.S. [3]

9. This Statement of Authority amends and supersedes in all respects any and all prior dated Statements of Authority executed on behalf of the entity.

Executed **this day of September 18th, 2019**

**TOLL SOUTHWEST LLC, A DELAWARE LIMITED
LIABILITY COMPANY**

By: _____

**Print Name:**  MARK BAILEY

**Title:**  DIVISION PRESIDENT

State of  Colorado           )
                             )ss.
County of  Arapahoe          )

The foregoing instrument was acknowledged before me on
this day of **September 18th, 2019**  by  Mark Bailey

Witness my hand and official seal

My Commission expires: _8-16-22_       _____
                                        Notary Public

> ANGELA SMITH
> Notary Public
> State of Colorado
> Notary ID # 2018403749
> My Commission Expires 08-16-2022

[1]This form should not be used unless the entity is capable of holding title to real property.

Form 884    closing/recordings/soa.html              25167883
                                                     (24080356)

RECEPTION #20190056595, 9/19/2019 10:15:43 AM, 2 of 2, $18.00 Electronically Recorded
Angela Myers, Clerk & Recorder, Larimer County, CO

[2] The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3] The statement of authority must be recorded to obtain the benefits of the statute.

Form 884    closing/recordings/soa.html                                              25167883  (24080356)

Ref #2019033591,  Date: 6/12/2019 2:34 PM,  Pages: 1 of 1 ,RECORDING $13.00  0
Electronically Recorded Douglas County, CO.  Merlin Klotz, Clerk and Recorder

## STATEMENT OF AUTHORITY

1. This Statement of Authority relates to an entity named TOLL SOUTHWEST LLC, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2. The type of entity is a:

   ☐ corporation                        ☐ registered limited liability partnership
   ☐ nonprofit corporation              ☐ registered limited liability limited partnership
   ☒ limited liability company          ☐ limited partnership association
   ☐ general partnership                ☐ government or governmental subdivision or agency
   ☐ limited partnership                ☐ trust (Section 38-30-108.5, C.R.S.)
   ☐ other: _____

3. The entity is formed under the laws of: Delaware.

4. The mailing address for the entity is: 10 Inverness Drive East, #125, Englewood, CO 80112.

5. The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is: Mark Bailey, as Division President, acting alone and without the need for multiple signatures.

6. The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ ~~limited as follows:~~

7. Other matters concerning the manner in which the entity deals with interests in real property: N/A.

Executed this _____ day of _____ 2019.

> TOLL SOUTHWEST LLC,
> a Delaware limited liability company
>
> By: _____
> Name:  Mark Bailey
> Title:  Division President

STATE OF COLORADO           )
                            )   ss.
COUNTY OF Arapahoe          )

The foregoing instrument was acknowledged before me this 10 day of June 2019, by Mark Bailey as Division President of TOLL SOUTHWEST LLC, a Delaware limited liability company.

Witness my hand and official seal.

My commission expires:

ANGELA SMITH
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

_____
Notary Public

No. 1112.  Rev. 8-01.  STATEMENT OF AUTHORITY – SIGNATURE PAGE
116682\00025\96339244.v1

First American Title Insurance
National Commercial Services
NCS- 85215-PH1 -CO

03766886    02/19/2020 01:20 PM
RF: $18.00    DF: $0.00    Page: 1 of 2
Electronically recorded in Boulder County Colorado. Recorded as received.

WHEN RECORDED
RETURN TO:



## STATEMENT OF AUTHORITY
(§38-30-172, C.R.S.)

1. This Statement of Authority relates to an entity[1] named
   **TOLL SOUTHWEST LLC, A DELAWARE LIMITED LIABILITY COMPANY**

2. The type of entity is a:
   ☐ Corporation                    ☐ Registered Limited Liability Partnership
   ☐ Nonprofit Corporation          ☐ Registered Limited Liability Limited Partnership
   ☒ Limited Liability Company      ☐ Limited Partnership Association
   ☐ General Partnership            ☐ Government or Governmental Subdivision or Agency
   ☐ Limited Partnership            ☐ Trust
   ☐

3. The entity is formed under the laws of **Delaware**

4. The mailing address for the entity is **10 INVERNESS DRIVE EAST, SUITE 125, ENGLEWOOD, CO 80112**

5. The ☐ name ☒ position of each person authorized to execute instruments conveying, encumbering or otherwise affecting title to real property on behalf of the entity is *GROUP PRESIDENT*

6. The authority of the foregoing person(s) to bind the entity: ☐ is[2] not limited ☐ is limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property:

8. This Statement of Authority is executed on behalf of the entity pursuant to the provisions of §38-30-172, C.R.S. [3]

9. This Statement of Authority amends and supersedes in all respects any and all prior dated Statements of Authority executed on behalf of the entity.

Executed **this day of** *2/18/2020*

(SEE ATTACHED "SIGNATURE PAGE")

---

[1]This form should not be used unless the entity is capable of holding title to real property.
[2]The absence of any limitation shall be prima facie evidence that no such limitation exists.
[3]The statement of authority must be recorded to obtain the benefits of the statute.

Form 884    closing/recordings/soa.html            70568072
                                                   (26987038)

Statement of Authority - Buyer/Borrower

## SIGNATURE PAGE

TOLL SOUTHWEST LLC, A DELAWARE LIMITED
LIABILITY COMPANY

By: _____

Print Name: MARK BAILEY

Title: GROUP PRESIDENT

State of Colorado )
                            )ss.
County of Arapahoe )

The foregoing instrument was acknowledged before me on this day of February 17, 2021 by
Mark Bailey AS Group President OF TOLL SOUTHWEST LLC, A DELAWARE LIMITED
LIABILITY COMPANY

Witness my hand and official seal

My Commission expires: 8-16-2022

Notary Public

ANGELA SMITH
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

Form 884    closing/recordings/soa.html                    70568072  (26987038)

03664972      07/10/2018 08:22 AM
RF: $13.00    DF: $0.00      Page: 1 of 1
Electronically recorded in Boulder County Colorado. Recorded as received.

## STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity named
    **Toll Southwest LLC (the General Partner of Toll CO, L.P.)**
    And is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.  The type of entity is a:
    - ☐ Corporation
    - ☐ Nonprofit Corporation
    - ☒ Limited Liability Company
    - ☐ General Partnership
    - ☐ Limited Partnership
    - ☐
    - ☐ Registered Limited Liability Partnership
    - ☐ Registered Limited Liability Limited Partnership
    - ☐ Limited Partnership Association
    - ☐ Government or Governmental Subdivision or Agency
    - ☐ Trust

3.  The entity is formed under the law of the   **State of Delaware and qualified to do business in Colorado**

4.  The mailing address for the entity is   **250 Gibraltar Road, Horsham, PA 19044**

5.  The name and position of each person authorized to execute instruments conveying, encumbering or otherwise affecting title to real property on behalf of the entity is:
    Mark Bailey, Division President

6.  The authority of the foregoing person(s) to bind the entity is  ☐  not limited  ☐  limited
    as follows:   NOT limited

7.  Other matters concerning the manner in which the entity deals with interests in real property:
    N/A

8   The Statement of Authority is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

9.  This Statement of Authority amends and supersedes in all respects any prior Statement of Authority executed on behalf of the entity.

Executed on  6/29/18

**Toll Southwest LLC**

By: Mark Bailey
**Title: Division President**

State of  *Colorado*
County of  *Arapahoe*,              } ss

The foregoing instrument was acknowledged before me this 29 day of June, 2018 by Mark Bailey as Division President of Toll Southwest LLC.

Witness my hand and official seal

Notary Public

My commission expires: *Nov 30, 2021*

JOYCE M. BISH
Notary Public – State of Colorado
Notary ID 20174049148
My Commission Expires Nov 30, 2021

Ref #2017086968, Date: 12/27/2017 4:00 PM, Pages: 1 of 2 ,RECORDING $18.00  0
Electronically Recorded Douglas County, CO. Merlin Klotz, Clerk and Recorder



## STATEMENT OF AUTHORITY
### (§38-30-172, C.R.S.)

1. This Statement of Authority relates to an entity[1] named

   **TOLL SOUTHWEST LLC, A COLORADO LIMITED LIABILITY COMPANY**

2. The type of entity is a:

   | | | | |
   |---|---|---|---|
   | ☐ | Corporation | ☐ | Registered Limited Liability Partnership |
   | ☐ | Nonprofit Corporation | ☐ | Registered Limited Liability Limited Partnership |
   | ☒ | Limited Liability Company | ☐ | Limited Partnership Association |
   | ☐ | General Partnership | ☐ | Government or Governmental Subdivision or Agency |
   | ☐ | Limited Partnership | ☐ | Trust |
   | ☐ | _____ | | |

3. The entity is formed under the laws of **COLORADO**

4. The mailing address for the entity is **250 GIBRALTAR ROAD, HORSHAM, PA 19044**

5. The **X** name **X** position of each person authorized to execute instruments conveying, encumbering or otherwise affecting title to real property on behalf of the entity is **TOLL BROS., INC., ITS SOLE MEMBER**

6. The authority of the foregoing person(s) to bind the entity: **X** is[2] not limited _____ is limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property:

8. This Statement of Authority is executed on behalf of the entity pursuant to the provisions of §38-30-172, C.R.S.[3]

9. This Statement of Authority amends and supersedes in all respects any and all prior dated Statements of Authority executed on behalf of the entity.

*(Signature and Notary Acknowledgment on Second Page)*

---

[1] This form should not be used unless the entity is capable of holding title to real property.
[2] The absence of any limitation shall be prima facie evidence that no such limitation exists.
[3] The statement of authority must be recorded to obtain the benefits of the statute.

Form 13759     03/2005     soa.odt          **ABC70565260**          **{29101997}**          pg 1 of 2

 Land Title

Executed this _____ day of _____, 2017

**TOLL SOUTHWEST LLC, A COLORADO LIMITED
LIABILITY COMPANY**

**BY: TOLL BROS., INC., ITS SOLE MEMBER**

_____

~~MARK BAILEY, DIVISION PRESIDENT~~

REGGIE CARNETH, V.P.

_____

_____

State of **COLORADO**                    )
                                         )ss
County of Douglas                        )

The foregoing instrument was acknowledged before me this 26 day of December _____, 2017
by ~~MARK BAILEY AS DIVISION PRESIDENT~~ OF TOLL BROS., INC. AS SOLE MEMBER OF TOLL SOUTHWEST LLC,
A COLORADO LIMITED LIABILITY COMPANY    REGGIE CARNETH, V.P.

Witness my hand and official seal.
My commission expires: _____July 12, 2020_____

                                         Notary Public

WHEN RECORDED RETURN TO:   **BETSY STEIN
                            TOLL SOUTHWEST LLC
                            250 GIBRALTAR ROAD
                            HORSHAM, PA 19044**

VENUS J HEAPS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164026402
MY COMMISSION EXPIRES JULY 12, 2020

Form 13759    03/2005    soa.odt        ABC70565260        {29101997}                    pg 2 of 2

2020099887          8/13/2020 2:29 PM
PGS   2          $18.00          DF $0.00
Electronically Recorded Jefferson County, CO
George P Stern, Clerk and Recorder          TD1000  N

## STATEMENT OF AUTHORITY

1.   This Statement of Authority relates to an entity[1] Toll Southwest LLC, a Delaware limited liability company, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.   This entity is a:

| | |
|---|---|
| ☐  corporation | ☐  registered limited liability partnership |
| ☐  nonprofit corporation | ☐  registered limited liability limited partnership |
| ☒  limited liability company | ☐  limited partnership association |
| ☐  general partnership | ☐  government or governmental subdivision or agency |
| ☐  limited partnership | ☐  trust (Section 38-30-108.5, C.R.S.) |
| ☐  other: | |

3.  The entity is formed under the laws of:  Pennsylvania

4.  The mailing address for the entity is:  250 Gibraltar Road, Horsham, PA 19044

5.  The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Mark G. Bailey, Division President

Reginald E. Carveth, Division Vice President

Matt Foran, Division Vice President

Christopher Stull, Division Vice President

Stacey A. Rothaus, Vice President

6.     The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7.  Other matters concerning the manner in which the entity deals with interests in real property:

[1]This form should not be used unless the entity is capable of holding title to real property.

[2]The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3]The statement of authority must be recorded to obtain the benefits of the statute.

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY      (Page 1 of 1)

Executed this 10th day of August, 2020.

Toll Southwest LLC, a Delaware limited liability company

BY: _Matt Foran_____

Matt Foran, Division Vice President

STATE OF COLORADO

COUNTY OF ADAMS

The foregoing instrument was acknowledged before me this August 10, 2020, by Matt Foran, Division Vice President of Toll Southwest LLC, a Delaware limited liability company.

_____
Notary Public
My Commission Expires: 01-27-2024

> CYNTHIA ROXANA DA SILVA
> Notary Public
> State of Colorado
> Notary ID # 20164003505
> My Commission Expires 01-27-2024

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY    (Page 2 of 2)

2019051691       6/21/2019 12:21 PM
PGS   1          $13.00       DF $0.00
Electronically Recorded Jefferson County, CO
George P Stern, Clerk and Recorder       TD1000   N

## STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity[1] named the Toll Southwest LLC, a Delaware limited liability company and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.  This entity is a:

| | |
|---|---|
| ☐ corporation | ☐ registered limited liability partnership |
| ☐ nonprofit corporation | ☐ registered limited liability limited partnership |
| ☒ limited liability company | ☐ limited partnership association |
| ☐ general partnership | ☐ government or governmental subdivision or agency |
| ☐ limited partnership | ☐ trust (Section 38-30-108.5, C.R.S.) |
| ☐ other: | |

3.  The entity is formed under the laws of:  Pennsylvania

4.  The mailing address for the entity is:  250 Gibraltar Road, Horsham, PA 19044

5.  The ☒ name ☐ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Barry A. Depew, Regional President or
Mark G. Bailey, Division President or
Michael I. Snyder, Senior Vice President & Secretary or
Kathryn L. Gaffney, Vice President or
Christopher Stull, Division Vice President or
Reginald E. Carveth, Division Vice President

6.[2] The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7.  Other matters concerning the manner in which the entity deals with interests in real property: Construction and Development

Executed this 20th day of June, 2019.

Toll Southwest LLC, a Delaware limited liability company

BY: _____

Christopher Stull, Division Vice President

STATE OF COLORADO

COUNTY OF LARIMER

The foregoing instrument was acknowledged before me this June 20th, 2019, by Christopher Stull, Division Vice President, Division President, of Toll Southwest LLC, a Delaware limited liability company

_____
Notary Public
My Commission Expires: 11/23/20

DIANE L BLAKEY
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19964001088
MY COMMISSION EXPIRES NOVEMBER 23, 2020

03863993        03/03/2021 07:54 AM
RF: $18.00    DF: $0.00        Page: 1 of 2
Electronically recorded in Boulder County Colorado. Recorded as received.

## STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity[1] Toll Southwest LLC, a
Delaware limited liability company, and is executed on behalf of the entity
pursuant to the provisions of Section 38-30-172, C.R.S.

2.  This entity is a:

☐ corporation                    ☐ registered limited liability partnership
☐ nonprofit corporation          ☐ registered limited liability limited
                                   partnership
☒ limited liability company      ☐ limited partnership association
☐ general partnership            ☐ government or governmental subdivision
                                   or agency
☐ limited partnership            ☐ trust (Section 38-30-108.5, C.R.S.)
☐ other:

3. The entity is formed under the laws of:  Pennsylvania

4.    The mailing address for the entity is:  1140 Virginia Drive, Fort Washington,
PA 19034

5. The ☒ name ☒ position of each person authorized to execute instruments
conveying, encumbering, or otherwise affecting title to real property on behalf
of the entity is:

Mark G. Bailey, Group President

Reginald E. Carveth, Division Vice President

Matt Foran, Division Vice President

Christopher Stull, Division Vice President

Stacey A. Rothaus, Vice President

6.    The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐
limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in
real property:

[1]This form should not be used unless the entity is capable of holding title to real property.

[2]The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3]The statement of authority must be recorded to obtain the benefits of the statute.

No. 1112.  Rev. 8-01.  STATEMENT OF AUTHORITY    (Page 1 of 1)

Executed this 24th day of February, 2021.

Toll Southwest LLC, a Delaware limited liability company

BY: _____

Mark Bailey, Group President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this February 24, 2021, by Mark Bailey, Group President of Toll Southwest LLC, a Delaware limited liability company

_____
Notary Public
My Commission Expires:

ANGELA BLEVINS
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

No. 1112. Rev. 8-01. STATEMENT OF AUTHORITY     (Page 2 of 2)

03640558    02/13/2018 02:02 PM
RF: $13.00    DF: $0.00    Page: 1 of 1
Electronically recorded in Boulder County Colorado. Recorded as received.

# STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity[1] named Toll Southwest LLC, a Delaware limited liability company and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.  This entity is a:

    ☐ corporation                              ☐ registered limited liability partnership
    ☐ nonprofit corporation                    ☐ registered limited liability limited partnership
    ☒ limited liability company                ☐ limited partnership association
    ☐ general partnership                      ☐ government or governmental subdivision or
                                                  agency

    ☐ limited partnership                      ☐ trust (Section 38-30-108.5, C.R.S.)
    ☐ other:

3.  The entity is formed under the laws of:  Pennsylvania

4.  The mailing address for the entity is:  250 Gibraltar Road, Horsham, PA 19044

5.  The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Barry A. Depew, Regional President or
Mark G. Bailey, Division President or
Michael I. Snyder, Senior Vice President & Secretary or
Kathryn L. Gaffney, Vice President or
Christopher Stull, Division Vice President or
Reginald E. Carveth, Division Vice President

6.[2] The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7.  Other matters concerning the manner in which the entity deals with interests in real property: Construction and Development

Executed this 5th day of February, 2018.


Toll Southwest LLC, a Delaware limited liability company


BY: _____
Mark G. Bailey, Division President

STATE OF COLORADO

COUNTY OF ARAPAHOE

    The foregoing instrument was acknowledged before me this February 5, 2018, by Mark G. Bailey, Division President of Toll Southwest LLC, a Delaware limited liability company.


_____
Notary Public
My Commission Expires: 11.30.2021

JOYCE M. BISH
Notary Public – State of Colorado
Notary ID 2017404148
My Commission Expires Nov 30, 2021

03781941        05/04/2020 02:15 PM
RF: $18.00    DF: $0.00        Page: 1 of 2
Electronically recorded in Boulder County Colorado. Recorded as received.

## STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity[1] Toll Southwest LLC, a Delaware limited liability company, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.  This entity is a:

☐ corporation                          ☐ registered limited liability partnership
☐ nonprofit corporation                ☐ registered limited liability limited
                                          partnership
☒ limited liability company            ☐ limited partnership association
☐ general partnership                  ☐ government or governmental subdivision
                                          or agency
☐ limited partnership                  ☐ trust (Section 38-30-108.5, C.R.S.)
☐ other:

3.  The entity is formed under the laws of:  Pennsylvania

4.  The mailing address for the entity is:  250 Gibraltar Road, Horsham, PA 19044

5.  The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Mark G. Bailey, Division President

Reginald E. Carveth, Division Vice President

Matt Foran, Division Vice President

Christopher Stull, Division Vice President

Kathryn L. Gaffney, Vice President

6.      The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7.  Other matters concerning the manner in which the entity deals with interests in real property:

[1] This form should not be used unless the entity is capable of holding title to real property.

[2] The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3] The statement of authority must be recorded to obtain the benefits of the statute.

No. 1112.  Rev. 8-01.  STATEMENT OF AUTHORITY    (Page 1 of 1)

Executed this 10th day of April, 2020.

Toll Southwest LLC, a Delaware limited liability company

BY: TOLL SOUTHWEST LLC, a Delaware limited liability company
General Partner

By: _____

Name: Mark Bailey

Title: Division President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this April 10, 2020, by
Mark Bailey as Division President of TOLL SOUTHWEST LLC, a Delaware
limited liability company General Partner.

_____
Notary Public

My Commission Expires:

ANGELA SMITH
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY     (Page 2 of 2)

03932812        12/07/2021 10:17 AM
RF: $18.00    DF: $0.00        Page: 1 of 2
Electronically recorded in Boulder County Colorado. Recorded as received.

## STATEMENT OF AUTHORITY

1.  This Statement of Authority relates to an entity[1] Toll Southwest LLC, a Delaware limited liability company, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.  This entity is a:

☐ corporation
☐ nonprofit corporation

☒ limited liability company
☐ general partnership

☐ limited partnership
☐ other:

☐ registered limited liability partnership
☐ registered limited liability limited partnership
☐ limited partnership association
☐ government or governmental subdivision or agency
☐ trust (Section 38-30-108.5, C.R.S.)

3.  The entity is formed under the laws of:  Pennsylvania

4.  The mailing address for the entity is:  1140 Virginia Drive, Fort Washington, PA 19034

5.  The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Mark G. Bailey, Group President

Reginald E. Carveth, Division Vice President

Matt Foran, Division Vice President

Stacey A. Rothaus, Vice President

6.  The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7.  Other matters concerning the manner in which the entity deals with interests in real property:

[1] This form should not be used unless the entity is capable of holding title to real property.

[2] The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3] The statement of authority must be recorded to obtain the benefits of the statute.

No. 1112.  Rev. 8-01.  STATEMENT OF AUTHORITY    (Page 1 of 1)

Executed this 7th day of October, 2021.

Toll Southwest LLC, a Delaware limited liability company

BY: _____

Mark Bailey, Group President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this October 7, 2021, by Mark Bailey, Group President of Toll Southwest LLC, a Delaware limited liability company

_____
Notary Public
My Commission Expires:

> ANGELA BLEVINS
> Notary Public
> State of Colorado
> Notary ID # 20184032749
> My Commission Expires 08-16-2022

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY      (Page 2 of 2)

03688058        11/30/2018 01:40 PM
RF: $13.00    DF: $0.00        Page: 1 of 1
Electronically recorded in Boulder County Colorado. Recorded as received.

# STATEMENT OF AUTHORITY

1. This Statement of Authority relates to an entity[1] named the Toll Southwest LLC, a Delaware limited liability company and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2. This entity is a:

☐ corporation                              ☐ registered limited liability partnership
☐ nonprofit corporation                    ☐ registered limited liability limited partnership
☒ limited liability company                ☐ limited partnership association
☐ general partnership                      ☐ government or governmental subdivision or agency
☐ limited partnership                      ☐ trust (Section 38-30-108.5, C.R.S.)
☐ other:

3. The entity is formed under the laws of:  Pennsylvania

4. The mailing address for the entity is:  250 Gibraltar Road, Horsham, PA 19044

5. The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Barry A. Depew, Regional President or
Mark G. Bailey, Division President or
Michael I. Snyder, Senior Vice President & Secretary or
Kathryn L. Gaffney, Vice President or
Christopher Stull, Division Vice President or
Reginald E. Carveth, Division Vice President

6.[2] The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property: Construction and Development

Executed this 28th[th]  day of November, 2018.

Toll Southwest LLC, a Delaware limited liability company

BY: _____

Mark G. Bailey, Division President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this November 28th, 2018, by Mark G. Bailey, Division President, of Toll Southwest LLC, a Delaware limited liability company

_____
Notary Public
My Commission Expires:

ANGELA SMITH
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

03817361       09/23/2020 08:11 AM
RF: $18.00     DF: $0.00       Page: 1 of 2
Electronically recorded in Boulder County Colorado. Recorded as received.

## STATEMENT OF AUTHORITY

1.   This Statement of Authority relates to an entity[1] Toll Southwest LLC, a Delaware limited liability company, and is executed on behalf of the entity pursuant to the provisions of Section 38-30-172, C.R.S.

2.   This entity is a:

| | |
|---|---|
| ☐ corporation | ☐ registered limited liability partnership |
| ☐ nonprofit corporation | ☐ registered limited liability limited partnership |
| ☒ limited liability company | ☐ limited partnership association |
| ☐ general partnership | ☐ government or governmental subdivision or agency |
| ☐ limited partnership | ☐ trust (Section 38-30-108.5, C.R.S.) |
| ☐ other: | |

3. The entity is formed under the laws of:  Pennsylvania

4.    The mailing address for the entity is:  1140 Virginia Drive, Fort Washington, PA 19034

5. The ☒ name ☒ position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the entity is:

Mark G. Bailey, Division President

Reginald E. Carveth, Division Vice President

Matt Foran, Division Vice President

Christopher Stull, Division Vice President

Stacey A. Rothaus, Vice President

6.    The authority of the foregoing person(s) to bind the entity is ☒ not limited ☐ limited as follows:

7. Other matters concerning the manner in which the entity deals with interests in real property:

[1]This form should not be used unless the entity is capable of holding title to real property.

[2]The absence of any limitation shall be prima facie evidence that no such limitation exists.

[3]The statement of authority must be recorded to obtain the benefits of the statute.

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY     (Page 1 of 1)

Executed this 17th day of September, 2020.

Toll Southwest LLC, a Delaware limited liability company

BY: _Matt Foran_____

Matt Foran, Division Vice President

STATE OF COLORADO

COUNTY OF JEFFERSON

The foregoing instrument was acknowledged before me this September 17, 2020, by  Matt Foran, Division Vice President  of Toll Southwest LLC, a Delaware limited liability company

_____
Notary Public
My Commission Expires: 01-27-2024

> CYNTHIA ROXANA DA SILVA
> Notary Public
> State of Colorado
> Notary ID # 20164003605
> My Commission Expires 01-27-2024

No. 1112.   Rev. 8-01.   STATEMENT OF AUTHORITY      (Page 2 of 2)

# EXHIBIT 153

       

| | |
|---|---|
| Home | |

My Network  Jobs  Messaging  Notifications  Me ▾  For Business ▾  Try Premium for $0

## Ken Greenspan ☑
Attorney at Toll Brothers

-  Toll Brothers
- William & Mary Law School

Chalfont, Pennsylvania, United States · Contact info

197 connections

Message  

### Activity
198 followers

Ken hasn't posted yet
Recent posts Ken shares will be displayed here.

Show all activity →

### Experience

 Attorney
Toll Brothers

### Education

 William & Mary Law School
1997, Law
1994 - 1997

Cornell University
1990 - 1994

### Interests

**Companies**  Groups  Schools

 Cornell University
725,875 followers





**Shauna P.** 🔗 · 3rd+
Bartender at Fraternal Order of Eagles with psychology background.

███████████

**Brit Prescott** 🔗 · 3rd+
Independent Distributor

███████████

---

People you may know

**David Medrano**
Plumber at Ocean Park Mechanical Inc

███████████

---

 **Raul Repreza** 🛡
Industrial, Commercial, Residential Service Plumber.

███████████

---

 **Joshua Kuskie**
--Journeyman Plumber
Project manager  …

███████████

---

 **Francisco Acevedo**
Experienced and versatile plumber

███████████

---

 **William Cortes** 🛡
Technical Support Specialist
Plumber…

███████████

---

Show all

---

You might like
Newsletters for you

 **Business Insider Today**
Get the inside scoop on today's biggest stories in business, from Wall
Street to Silicon Valley. …
Published daily

 Business Insider

███████████

---

 **The Atlas**
Trusted by 3M+ readers for AI updates. Subscribe now.
Published biweekly

🟢 Generative AI



Promoted  •••

Secure your spot today!
Global ARC Boston 2025: Register now
and save with early bird rates!

Save Thousands On Returns
Free returns and exchanges software
plus more to streamline your
operations

# EXHIBIT 154

Arizona Corporation Commission - **RECEIVED: 4/7/2023**
Arizona Corporation Commission - **FILED: 4/7/2023**
'AGE: 002 OF 007                    23040709320495

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

# ARTICLES OF AMENDMENT
# TO FOREIGN REGISTRATION STATEMENT

*Read the Instructions L017i*

1. **ENTITY NAME –** give the exact name of the LLC as currently shown in A.C.C. records:

   Toll Southwest LLC

## *CHECK THE BOX NEXT TO EACH CHANGE BEING MADE AND COMPLETE THE REQUESTED INFORMATION FOR THAT CHANGE.*

2. ☐ **LLC NAME CHANGE – NAME IN STATE OR COUNTRY OF FORMATION** (Foreign Name) – type or print the exact NEW name:

3. ☐ **LLC NAME CHANGE – NAME USED IN ARIZONA** (Entity Name) – type or print the exact NEW name. NOTE: If you are a Foreign Series LLC, the new name must have "series" in it:

4. ☐ **ENTITY TYPE CHANGE –** check one and follow instructions:
   NOTE: you may not change to or from a Foreign Series LLC.

   ☐ Changing to a PROFESSIONAL LLC – number 6 must also be completed.

   ☐ Changing to a NON-PROFESSIONAL LLC (professional LLC becoming a regular LLC).

5. ☐ **PROFESSIONAL SERVICES CHANGE –** list the NEW type of professional services the professional LLC will render:

6. ☐ **FOREIGN DOMICILE CHANGE –** list the NEW domicile state or country:

4/7/2023 9:05 AM  FROM: Fax  TO: 4-602-542-0900  PAGE: 003 OF 007

23040709320495

DocuSign Envelope ID: D8287284-CB2E-46A3-9DBB-915B5E5B726C

**7.** ☐ **PURPOSE / CHARACTER OF BUSINESS CHANGE** – state the NEW purpose or character of business:

_____

**8.** ☑ **MEMBERS CHANGE (CHANGE IN MEMBERS)** – _see Instructions L017i_ – if a change is being made with respect to one or more members, complete and attach the Amendment Attachment for Members form L044.  *The filing will be rejected if it is submitted without the attachment.*

**9.** ☑ **MANAGERS CHANGE (CHANGE IN MANAGERS)** – _see Instructions L017i_ – if a change is being made with respect to one or more managers, complete and attach the Amendment Attachment for Managers form L043.  *The filing will be rejected if it is submitted without the attachment.*

**10.** ☐ **MANAGEMENT STRUCTURE CHANGE** – _see Instructions L017i_ – check only one box below and follow instructions (all persons will be listed on the appropriate attachment form):

    ☐ CHANGING TO *MANAGER*-MANAGED LLC – complete and attach the Manager Structure Attachment form L040. *The filing will be rejected if it is submitted without the attachment.*

    ☐ CHANGING TO *MEMBER*-MANAGED LLC – complete and attach the Member Structure Attachment form L041. *The filing will be rejected if it is submitted without the attachment.*

| **11.** ☐ **STATUTORY AGENT CHANGE – NEW AGENT** APPOINTED – _see Instructions L017i_: | |
|---|---|
| **11.1** REQUIRED – give the **name** (can be an individual or an entity) **and** *physical or street address* (not a P.O. Box) in Arizona of the NEW statutory agent: | **11.2** REQUIRED - Mailing address in Arizona of NEW Statutory Agent, if different from street address (can be a P.O. Box): <br> ☐ Check box if same as street address. |
| Statutory Agent Name | |
| Attention (optional) | Attention (optional) |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional) |
| City    State    Zip | City    State    Zip |
| **11.3** **REQUIRED** – the Statutory Agent Acceptance form M002 must be submitted along with these Articles of Amendment | |

| **12.** ☐ **STATUTORY AGENT CHANGE – ADDRESS OF EXISTING STATUTORY AGENT** – complete 12.1 and 12.2: | |
|---|---|
| **12.1 NEW** *physical or street address* (not a P.O. Box) in Arizona of the existing statutory agent: | **12.2 NEW mailing address** in Arizona of the existing statutory agent (can be a P.O. Box): |
| Attention (optional) | Attention (optional) |
| Address 1 | Address 1 |
| Address 2(optional) | Address 2 (optional) |
| City    State    Zip | City    State    Zip |

4/7/2023 9:05 AM  FROM: Fax   TO: 4-602-542-0900   PAGE: 004 OF 007          23040709320495

DocuSign Envelope ID: D8287284-CB2E-46A3-9DBB-915B5E5B726C

**13.** ☑  **PRINCIPAL ADDRESS CHANGE –** list the NEW address:

| 8767 E. Via de Ventura, #390 | | |
|---|---|---|
| Attention (optional) | | |
| Address 1 | | |
| Address 2 (optional) | | |
| Scottsdale | AZ | 85258 |
| City | State or Province | Zip |
| Country   UNITED STATES ▾ | | |

**14.** ☒  **JURISDICTION OF FORMATION INFORMATION:**

**14.1**  List the NEW Foreign LLC street address in jurisdiction of formation:

| Attention (optional) | | |
|---|---|---|
| 3411 SILVERSIDE ROAD TATNALL BUILDING #104 | | |
| Address 1 | | |
| Address 2 (optional) | | |
| WILMINGTON | DE | 19810 |
| City | State or Province | Zip |
| Country ▾ | | |

United States

**14.2**  List the NEW statutory agent in the jurisdiction of formation and the statutory agent's NEW street and mailing addresses.

Statutory agent name:    UNITED AGENT GROUP INC.

Street address in jurisdiction of formation:

| Attention (optional) | | |
|---|---|---|
| 3411 SILVERSIDE ROAD TATNALL BUILDING #104 | | |
| Address 1 | | |
| Address 2 (optional) | | |
| WILMINGTON | DE | 19810 |
| City | State or Province | Zip |
| Country   United States ▾ | | |

4/7/2023 9:05 AM  FROM: Fax   TO: 4-602-542-0900   PAGE: 005 OF 007

23040709320495

DocuSign Envelope ID: D8287284-CB2E-46A3-9DBB-915B5E5B726C

Mailing address in jurisdiction of formation:

| Attention (optional) | | |
| --- | --- | --- |
| 3411 SILVERSIDE ROAD TATNALL BUILDING #104 | | |
| Address 1 | | |

| Address 2 (optional) | | |
| --- | --- | --- |
| WILMINGTON | DE | 19810 |
| City | State or Province | Zip |
| Country | United States ▼ | |

**15.** ☐  **AMENDMENT IN FOREIGN JURISDICTION** - if this amendment to the Foreign Registration Statement was due to an amendment or restatement of the LLC's Articles in the foreign domicile, you must attach a certified copy of that foreign amendment, and it must be dated not more than 60 days prior to its delivery to the Arizona Corporation Commission.

**SIGNATURE:**  By checking the box marked "I accept" below, I acknowledge *under penalty of law* that this document together with any attachments is submitted in compliance with Arizona law.

☑ I ACCEPT

| Signature | Kenneth J. Greenspan | 4/06/2023 |
| --- | --- | --- |
| | Printed Name | Date |

**REQUIRED** – check only one and fill in the corresponding blank if signing for an entity:

| ■ I am an **individual** authorized to sign this document. | ☐ I am signing on behalf of an **entity** that is authorized to sign this document. |
| --- | --- |
| | |

**Expedited or Same Day/Next Day services are available for an additional fee – see Instructions or Cover sheet for prices.**

| Filing Fee:  $25.00 (regular processing) All fees are nonrefundable - see Instructions. | Mail:  Arizona Corporation Commission - Examination Section 1300 W. Washington St., Phoenix, Arizona  85007 Fax (for Regular or Expedite Service ONLY): 602-542-4100 Fax (for Same Day/Next Day Service ONLY): 602-542-0900 |
| --- | --- |

Please be advised that A.C.C. forms reflect only the **minimum** provisions required by statute.  You should seek private legal counsel for those matters that may pertain to the individual needs of your business.  All documents filed with the Arizona Corporation Commission are **public record** and are open for public inspection. If you have questions after reading the Instructions, please call 602-542-3026 or (within Arizona only) 800-345-5819.

4/7/2023 9:05 AM  FROM: Fax   TO: 4-602-542-0900   PAGE: 006 OF 007

23040709320495

DocuSign Envelope ID: D8287284-CB2E-46A3-9DBB-915B5E5B726C

Clear Form                                                              Print Form

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

## AMENDMENT ATTACHMENT FOR MEMBERS

1.  **ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

    Toll Southwest LLC

2.  **Check one box only to indicate what document the Attachment goes with:**

    ☐ Articles of Amendment        ■ Articles of Amendment to Foreign Registration Statement

3.  **MEMBERS CHANGE (CHANGE IN MEMBERS)** – Use one block per person:
    To REMOVE a member - list the name only of the member being removed and check "Remove member."
    To ADD  a member - list the name and address of the member being added and check "Add member."
    To CHANGE ADDRESS only - list the name and NEW address and check "Address change."
    To CHANGE NAME of existing member - list the current name, then the NEW name, and check "Name change."
    If more space is needed, complete and attach the Amendment Attachment for Members.

| | | |
|---|---|---|
| Toll Bros., Inc. | | Name currently shown in ACC records |
| Name currently shown in ACC records | | |
| NEW Name | | NEW Name |
| 1140 Virginia Drive | | |
| Address 1 | | Address 1 |
| Address 2 (optional) | | Address 2 (optional) |
| Fort Washington    PA    19034 | | |
| City            State or     Zip | | City            State or     Zip |
|                 Province | |                 Province |
| UNITED STATES ▼ | | ▼ |
| Country | | Country |
| ■ Address change   ☐ Add member | | ☐ Address change   ☐ Add member |
| ☐ Name change     ☐ Remove member | | ☐ Name change     ☐ Remove member |
| | | |
| Name currently shown in ACC records | | Name currently shown in ACC records |
| NEW Name | | NEW Name |
| Address 1 | | Address 1 |
| Address 2 (optional) | | Address 2 (optional) |
| City            State or     Zip | | City            State or     Zip |
|                 Province | |                 Province |
| ▼ | | ▼ |
| Country | | Country |
| ☐ Address change   ☐ Add member | | ☐ Address change   ☐ Add member |
| ☐ Name change     ☐ Remove member | | ☐ Name change     ☐ Remove member |

4/7/2023 9:05 AM  FROM: Fax   TO: 4-602-542-0900   PAGE: 007 OF 007                23040709320495

DocuSign Envelope ID: D8287284-CB2E-46A3-9DBB-915B5E5B726C

[ Clear Form ]                                                         [ Print Form ]

DO NOT WRITE ABOVE THIS LINE; RESERVED FOR ACC USE ONLY.

## AMENDMENT ATTACHMENT FOR MANAGERS

**1. ENTITY NAME** – give the exact name of the LLC as currently shown in A.C.C. records:

Toll Southwest LLC

**2. Check one box only to indicate what document the Attachment goes with:**

☐ Articles of Amendment        ☑ Articles of Amendment to Foreign Registration Statement

**3. MANAGERS CHANGE (CHANGE IN MANAGERS) – Use one block per person -**
To REMOVE a manager - list the name only of the manager being removed and check "Remove manager."
To ADD  a manager - list the name and address of the manager being added and check "Add as manager."
To CHANGE ADDRESS only - list the name and NEW address and check "Address change."
To CHANGE NAME of existing manager - list the current name, then the NEW name, and check "Name change."
If more space is needed, complete and attach the Amendment Attachment for Managers.

| | |
|---|---|
| Richard T. Hartman<br>Name currently shown in ACC records | Name currently shown in ACC records<br>Robert Parahus |
| NEW Name | NEW Name<br>1140 Virginia Drive |
| Address 1 | Address 1 |
| Address 2 (optional) | Address 2 (optional)<br>Fort Washington    PA    19034 |
| City ▢ ▼   State or Province   Zip | City  UNITED STATES ▼   State or Province   Zip |
| Country | Country |
| ☐ Address change   ☐ Add as manager<br>☐ Name change   ☒ Remove manager | ☐ Address change   ☑ Add as manager<br>☐ Name change   ☐ Remove manager |
| Douglas C. Yearley, Jr.<br>Name currently shown in ACC records | Martin P. Connor<br>Name currently shown in ACC records |
| NEW Name<br>1140 Virginia Drive | NEW Name<br>1140 Virginia Drive |
| Address 1 | Address 1 |
| Address 2 (optional)<br>Fort Washington    PA    19034 | Address 2 (optional)<br>Fort Washington    PA    19034 |
| City  UNITED STATES ▼   State or Province   Zip | City  UNITED STATES ▼   State or Province   Zip |
| Country | Country |
| ☑ Address change   ☐ Add as manager<br>☐ Name change   ☐ Remove manager | ☑ Address change   ☐ Add as manager<br>☐ Name change   ☐ Remove manager |

L043.004
Rev. 4/2020

Arizona Corporation Commission – Corporations Division
Page 1 of 1




BA20221182947



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION
LIMITED LIABILITY COMPANY**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: BA20221182947 |
| Date Filed: 11/30/2022 |

| Entity Details | |
| --- | --- |
| Limited Liability Company Name | TOLL SOUTHWEST LLC |
| Entity No. | 201931910127 |
| Formed In | DELAWARE |

**Street Address of Principal Office of LLC**

| | |
| --- | --- |
| Principal Address | 1140 VIRGINIA DRIVE
FORT WASHINGTON, PA 19034 |

**Mailing Address of LLC**

| | |
| --- | --- |
| Mailing Address | 1140 VIRGINIA DRIVE
FORT WASHINGTON, PA 19034 |
| Attention | |

**Street Address of California Office of LLC**

| | |
| --- | --- |
| Street Address of California Office | None |

**Manager(s) or Member(s)**

| Manager or Member Name | Manager or Member Address |
| --- | --- |
| Douglas C. Yearley, Jr. | 1140 Virginia Drive
Fort Washington, PA 19034 |
| Robert Parahus | 1140 Virginia Drive
Fort Washington, PA 19034 |
| Martin P. Connor | 1140 Virginia Drive
Fort Washington, PA 19034 |

**Agent for Service of Process**

| | |
| --- | --- |
| California Registered Corporate Agent (1505) | UNITED AGENT GROUP INC.
Registered Corporate 1505 Agent |

**Type of Business**

| | |
| --- | --- |
| Type of Business | SERVE AS GENERAL PARTNER OF LP |

**Email Notifications**

| | |
| --- | --- |
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

**Chief Executive Officer (CEO)**

| CEO Name | CEO Address |
| --- | --- |
| Douglas C. Yearley, Jr. | 1140 Virginia Drive
Fort Washington, PA 19034 |

**Labor Judgment**

No Manager or Member of this Limited Liability Company has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

B1282-7770 11/30/2022 7:47 AM Received by California Secretary of State

Electronic Signature

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*KENNETH J GREENSPAN*                    *11/30/2022*
Signature                                Date

Arizona Corporation Commission - RECEIVED: 1/2/2025                    25010212149641
Arizona Corporation Commission - FILED: 1/2/2025

# 2025 ANNUAL REPORT

## ENTITY INFORMATION

**ENTITY NAME:**              TOLL BROTHERS REAL ESTATE, INC.
**ENTITY ID:**               F08284728
**ENTITY TYPE:**             Foreign For-Profit (Business) Corporation
**CHARACTER OF BUSINESS:**   Other - Other - Other - REAL ESTATE
**AUTHORIZED SHARES:**       Share Class: COMMON Share Series: N/A Share Total: 1000

**ISSUED SHARES:**           Share Class: Common Share Series: N/A Share Total: 1000

## STATUTORY AGENT INFORMATION

**STATUTORY AGENT NAME:**    UNITED AGENT GROUP INC.
**PHYSICAL ADDRESS:**        3260 N HAYDEN RD #210 , SCOTTSDALE, AZ 85251
**MAILING ADDRESS:**

## KNOWN PLACE OF BUSINESS

8767 E. Via de Ventura, #390, SCOTTSDALE, AZ 85258

## PRINCIPAL OFFICE ADDRESS

1140 Virginia Drive, FORT WASHINGTON, PA 19034

## PRINCIPAL INFORMATION

CEO (Chief Executive Officer): Douglas C. Yearley, Jr. - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office: 06/16/2010

CFO (Chief Financial Officer): MARTIN P CONNOR - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

COO (Chief Operating Officer): ROBERT PARAHUS - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Director: DOUGLAS C YEARLEY JR - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office: 06/16/2010

Director: MARTIN P CONNOR - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office: 09/22/2010

Director: ROBERT PARAHUS - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Other Officer: JOSEPH R DESANTO - 2966 COMMERCE PARK DRIVE, SUITE 100, ORLANDO, FL, 32819, USA - - Date of Taking Office:

Other Officer: KEVIN M ELLSWORTH - 8767 E VIA DE VENTURA #390, SCOTTSDALE, AZ, 85258, USA - - Date of Taking Office:

Other Officer: MICHAEL J GRUBB - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Other Officer: TIMOTHY J HOBAN - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of

25010212149641

Taking Office:

President: ROBERT PARAHUS - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Secretary: KEVIN J COEN - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Shareholder: TOLL HOLDINGS INC - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Treasurer: GREGG L ZIEGLER - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

Vice-President: KENNETH J GREENSPAN - 1140 VIRGINIA DRIVE, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office: 07/15/2015

Vice-President: KEVIN J COEN - 1140 Virginia Drive, FORT WASHINGTON, PA, 19034, USA - - Date of Taking Office:

## SIGNATURE

Vice-President: KENNETH J GREENSPAN - 01/02/2025

## 2025  FOREIGN PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# F09000004088

**Entity Name:** TOLL HOLDINGS, INC.

**FILED**
**Apr 27, 2025**
**Secretary of State**
**7265609134CC**

**Current Principal  Place of Business:**

1140 VIRGINIA DRIVE
FORT WASHINGTON,  PA  19034

**Current Mailing Address:**

1140 VIRGINIA DRIVE
ATTN: LEGAL DEPT.
FORT WASHINGTON,  PA  19034  US

**FEI Number: 23-2569047**                    **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

UNITED AGENT GROUP INC.
801 US HIGHWAY 1
NORTH PALM BEACH, FL  33408  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
Electronic Signature of Registered Agent                                    Date

**Officer/Director Detail :**

| | | | |
|---|---|---|---|
| Title | DIRECTOR & PRESIDENT | Title | SENIOR VICE PRESIDENT & SECRETARY |
| Name | PARAHUS, ROBERT | Name | COEN, KEVIN J. |
| Address | 1140 VIRGINIA DRIVE | Address | 1140 VIRGINIA DRIVE |
| City-State-Zip: | FORT WASHINGTON  PA  19034 | City-State-Zip: | FORT WASHINGTON  PA  19034 |
| Title | DIRECTOR, SR. VP, CFO AND ASSISTANT SECRETARY | Title | DIRECTOR & CEO |
| Name | CONNOR, MARTIN P | Name | YEARLEY, JR., DOUGLAS C |
| Address | 1140 VIRGINIA DRIVE | Address | 1140 VIRGINIA DRIVE |
| City-State-Zip: | FORT WASHINGTON  PA  19034 | City-State-Zip: | FORT WASHINGTON  PA  19034 |
| Title | VP & ASSISTANT SECRETARY | Title | SENIOR VICE PRESIDENT AND TREASURER |
| Name | GREENSPAN, KENNETH J | Name | ZIEGLER, GREGG |
| Address | 1140 VIRGINIA DRIVE | Address | 1140 VIRGINIA DRIVE |
| City-State-Zip: | FORT WASHINGTON  PA  19034 | City-State-Zip: | FORT WASHINGTON  PA  19034 |
| Title | SENIOR VP, CAO & ASSISTANT SECRETARY | | |
| Name | GRUBB, MICHAEL J. | | |
| Address | 1140 VIRGINIA DRIVE | | |
| City-State-Zip: | FORT WASHINGTON  PA  19034 | | |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: KENNETH J. GREENSPAN                    VICE PRESIDENT & SECRETARY                    04/27/2025
_____
Electronic Signature of Signing Officer/Director Detail                                    Date

SOSID: 3036271
Date Filed: 11/3/2017 8:21:00 AM
Elaine F. Marshall
North Carolina Secretary of State
C2017 307 00026

*State of North Carolina*
*Department of the Secretary of State*

## ARTICLES OF MERGER

Pursuant to North Carolina General Statute Sections 55-11-05(a), 55A-11-09(d), 55A-11-04, 57D-9-42, 59-73.32(a) and 59-1072(a), as applicable, the undersigned entity does hereby submit the following Articles of Merger as the surviving business entity in a merger between two or more business entities.

1. The name of the surviving entity is <u>Toll Holdings, Inc.</u>, a *(check one)*
☒ corporation, ☐ nonprofit corporation, ☐ professional corporation, ☐ limited liability company, ☐ limited partnership, ☐ partnership, ☐ limited liability partnership organized under the laws of

   <u>Delaware</u> *(state or country)*.

2. The address of the surviving entity is:

   Street Address <u>250 Gibraltar Road</u>          City <u>Horsham</u>

   State <u>PA</u>          Zip Code <u>19044</u>          County <u>Montgomery</u>

   (a) *(Complete only if the surviving business entity is a foreign business entity that is not authorized to transact business or conduct affairs in North Carolina.)* The mailing address of the surviving foreign business entity is:

   Street Address <u>250 Gibraltar Road</u>          City <u>Horsham</u>

   State <u>PA</u>          Zip Code <u>19044</u>          County <u>Mongtomery</u>

   The Surviving foreign business entity will file a statement of any subsequent change in its mailing address with the North Carolina Secretary of State.

3. For <u>each</u> merging entity: *(if more than one, complete on separate sheet and attach.)*

   The name of the merged entity is <u>Toll Bros. of North Carolina III, Inc.</u>, a *(check one)*
   ☒ corporation, ☐ nonprofit corporation, ☐ professional corporation, ☐ limited liability company, ☐ limited partnership, ☐ partnership, ☐ limited liability partnership organized under the laws of

   <u>North Carolina</u> *(state or country)*.

   The mailing address of each merging entity is: *(if more than one, complete on separate sheet and attach)*
   Street Address <u>250 Gibraltar Road</u>          City <u>Horsham</u>

   State <u>PA</u>          Zip Code <u>19044</u>          County <u>Montgomery</u>

4. If the surviving business entity is a <u>domestic</u> business entity, the text of each amendment, if any, to the Articles of Incorporation, Articles of Organization, or Certificate of Limited Partnership within the Plan of Merger is attached.

5. A Plan of Merger has been duly approved in the manner required by law by each of the business entities participating in the merger.

6. These articles will be effective upon filing unless a delayed date and/or time is specified _____.

This the 31ˢᵗ day of October_____, 20 17____.

Toll Holdings, Inc.
_____
*Name of Entity*

_____
*Signature*
Kenneth J. Greenspan, Vice President
*Type or Print Name and Title*

**NOTES:**
1. Filing fee is $50 for For-profit entities.
2. Filing fee is $25 for Non-profit entities.
3. This document must be filed with the Secretary of State. Certificate(s) of Merger must be registered pursuant to the requirements of N.C.G.S. Section 47-18.1

CORPORATIONS DIVISION          P. O. BOX 29622          RALEIGH, NC 27626-0622
*(Revised January 2014)*                                         *(Form BE-15)*

NC085 - 12/31/2013 Wolters Kluwer Online

# EXHIBIT 155

# Corporate Information

## Board of Directors and Executive Officers

**Robert I. Toll*** — *CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER*
**Bruce E. Toll** — *VICE CHAIRMAN OF THE BOARD*
**Zvi Barzilay*** — *PRESIDENT AND CHIEF OPERATING OFFICER*
**Robert S. Blank** — *PARTNER – WHITCOM PARTNERS*
**Richard J. Braemer** — *PARTNER – BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, ATTORNEYS AT LAW*

**Roger S. Hillas** — *RETIRED CHAIRMAN – MERITOR SAVINGS BANK*
**Carl B. Marbach** — *PRESIDENT – INTERNETWORK PUBLISHING CORP.*
**Joel H. Rassman*** — *SENIOR VICE PRESIDENT, TREASURER AND CHIEF FINANCIAL OFFICER*

**Paul E. Shapiro** — *CHIEF ADMINISTRATIVE OFFICER – SUNBEAM CORP.*

*\*EXECUTIVE OFFICER OF THE COMPANY*

## Officers

**Wayne S. Patterson** — *SENIOR VICE PRESIDENT*

**Kenneth J. Gary** — *VICE PRESIDENT AND GENERAL COUNSEL*

### VICE PRESIDENTS – OPERATIONS

Thomas Anhut
Thomas A. Argyris, Jr.
James W. Boyd
Barry A. Depew
Cory DeSpain
Michael J. Donnelly
Kevin D. Duermit
John P. Elcano
William J. Gilligan
Richard T. Hartman

Douglas C. Hoppe
Webb A. Koschene
John G. Mangano
Richard C. McCormick
Walter A. Music
Robert Parahus
Douglas C. Shipe
James A. Smith
Edward D. Weber
Douglas C. Yearley, Jr.

### VICE PRESIDENTS – ADMINISTRATION

**Bernard P. Anderson** — *WESTMINSTER MORTGAGE*
**Frederick N. Cooper** — *FINANCE*
**Jonathan C. Downs** — *HUMAN RESOURCES*
**Evan G. Ernest** — *TAXATION*
**Kevin F. McAndrews** — *COMMERCIAL DEVELOPMENT*
**Kim McCarron** — *MARKETING*
**Robert N. McCarron** — *LAND DEVELOPMENT*
**Kevin J. McMaster** — *CONTROLLER*
**Joseph J. Palka** — *EASTERN STATES ENGINEERING*
**Joseph R. Sicree** — *CHIEF ACCOUNTING OFFICER*
**Michael I. Snyder** — *CORPORATE PLANNING AND CORPORATE SECRETARY*
**Werner Thiessen** — *ACQUISITIONS*
**Steven A. Turbyfill** — *PRODUCT DEVELOPMENT*

### SUBSIDIARY OPERATIONS

**Wayne S. Patterson** — *PRESIDENT, WESTMINSTER SECURITY COMPANY*
**Thomas M. Coleman** — *PRESIDENT, COLEMAN–TOLL LIMITED PARTNERSHIP*
**Charles E. Moscony** — *PRESIDENT, WESTMINSTER ABSTRACT COMPANY*
**Donald L. Salmon** — *PRESIDENT, WESTMINSTER MORTGAGE CORPORATION*
**Gilbert Silverman** — *PRESIDENT, SILVERMAN–TOLL LIMITED PARTNERSHIP*

*Listings as of 11/1/99.*

## Employees

As of October 31, 1999, the Company employed 2,208 full-time persons.

## Shareholders

As of October 31, 1999, the Company had 741 shareholders of record.

## Stock Listing

The common stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Information Requests

The Form 10-K Annual Report, filed with the SEC, the Company's quarterly reports to stockholders, Forms 10-Q and other Company information are available upon request from Frederick N. Cooper or Joseph R. Sicree, Co-Directors of Investor Relations, at the Corporate Office.

## Corporate Office

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, Pennsylvania 19006
(215) 938-8000
Internet address: www.tollbrothers.com

## Transfer Agent & Registrar

Chase Mellon Shareholder Services, L.L.C.
Ridgefield Park, New Jersey

## Independent Auditors

Ernst & Young LLP
Philadelphia, Pennsylvania

## Securities Counsel

Wolf, Block, Schorr and Solis-Cohen LLP
Philadelphia, Pennsylvania

## Common Stock Price Range – New York Stock Exchange

| QUARTER ENDED | High | Low |
|---|---|---|
| **1999** | | |
| October 31 | $21¼ | $15⅝ |
| July 31 | $23⅜ | $19¹⅓₆ |
| April 30 | $23⅜ | $17⅛ |
| January 31 | $25⅞ | $21⅛ |
| **1998** | | |
| October 31 | $30¼ | $17⅝ |
| July 31 | $30¼ | $23¾ |
| April 30 | $31⅜ | $26⅞ |
| January 31 | $29 | $22⅜ |

## Statement on Forward-Looking Information

Certain information included herein and in other Company reports and SEC filings is forward-looking within the meaning of the Private Litigation Reform Act of 1995, including, but not limited to, statements concerning the Company's anticipated operating results, financial resources, increase in revenues, increased profitability, interest expense, growth and expansion, ability to acquire land, ability to sell homes and properties, ability to deliver homes from backlog, ability to secure materials and subcontractors and Year 2000 readiness, and the effect on the Company of any changes in interest rates and the effect on the Company or significant third parties are not Year 2000 compliant. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports and SEC filings. These risks and uncertainties include local, regional and national economic conditions, the effect of governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, the availability and cost of labor and materials, and weather conditions.

**Demographic data:** The sources for the demographic data included in this annual report are the U.S. Census Bureau, the Joint Center for Housing Studies of Harvard University and Claritas.

**Photography:** James B. Abbott, Mark Boisclair, Robert Brantley, Rob Ikeler, Robb Miller, Opulence Studios, Kim Sargent, Evan Schiller, Peter Tata, Bill Taylor, Greg Wilson

*COPYRIGHT 1999 BY TOLL BROTHERS, INC.*

# CORPORATE INFORMATION

## Board of Directors and Executive Officers

Robert I. Toll* — Chairman of the Board and Chief Executive Officer
Bruce E. Toll* — Vice Chairman of the Board
Zvi Barzilay* — President and Chief Operating Officer
Robert S. Blank — Partner - Whitcom Partners
Edward G. Boehne — Retired President - Federal Reserve Bank of Philadelphia
Richard J. Braemer — Partner - Ballard, Spahr, Andrews & Ingersoll, LLP, Attorneys at Law
Roger S. Hillas — Retired Chairman - Meritor Savings Bank
Carl B. Marbach — President - Internetwork Publishing Corp.
Joel H. Rassman* — Senior Vice President, Treasurer and Chief Financial Officer
Paul E. Shapiro — Chief Administrative Officer - Sunbeam Corp

*Executive Officer of the Company

## Officers

**Senior Vice President**
Wayne S. Patterson

**Vice President and General Counsel**
Kenneth J. Gary

**Vice Presidents - Operations**

| | | |
|---|---|---|
| Thomas Arnhut | Michael J. Donnelly | Benjamin D. Jogodnick |
| Thomas A. Argyris, Jr. | Kevin D. Duermit | Gregory Kamedulski |
| William P. Berry | Webb A. Kroschene | Walter A. Music |
| Charles W. Bowie | B. Mitchell Kotler | Robert Parashus |
| James W. Boyd | John G. Mangano | Douglas C. Shipe |
| Roger A. Brush | William J. Gilligan | James A. Smith |
| Thomas Carnaghi | Daniel Grosswald | James E. Tackett |
| Barry A. Depew | Richard T. Hartman | Steven W. Walker |
| Cory DeSpain | Douglas C. Heppe | Mark F. McAlpine |
| | | Richard C. McCormick |
| | | Thomas J. Murray |
| | | Edward D. Weber |
| | | Douglas C. Yearley, Jr. |

**Vice Presidents - Administration**

| | |
|---|---|
| Frederick N. Cooper | Finance |
| Jonathan C. Downs | Human Resources |
| Evan G. Ernest | Taxation |
| Manfred P. Marotta | Toll Integrated Systems |
| Kevin F. McAndrews | Commercial Development |
| Kira McCarron | Marketing |
| Robert N. McCarron | Land Development |
| Kevin J. McMaster | Controller |
| Charles E. Moscony | Westminster Title |
| Joseph J. Palka | Eastern State Engineering |
| Steven Robinson | Land Development |
| Joseph R. Sicree | Chief Accounting Officer |
| Michael I. Snyder | Corporate Planning and Corporate Secretary |
| Ronald E. Snyder | Land Development |
| Werner Thiessen | Acquisitions |
| Steven A. Yurtkill | Product Development |
| Philip M. Turner | Land Development |

**Subsidiary Operations**

| | |
|---|---|
| Wayne S. Patterson | President, Westminster Security Company |
| Charles E. Moscony | President, Westminster Title Company |
| Donald L. Salmon | President, Westminster Mortgage Corporation |
| Michael J. Zammit | Managing Director, Advanced Broadband |

Listings are as of 11/1/00.

## Employees

As of October 31, 2000, the Company had 2,479 full-time employees.

## Shareholders

As of October 31, 2000, the Company had 694 shareholders of record.

## Stock Listing

The common stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Investor Relations - Information Requests

The Company's Form 10-K Annual Report, Form 10-Q Quarterly Reports and other Company information are available upon request from Frederick N. Cooper (fcooper@tollbrothersinc.com) Joseph R. Sicree (jsicree@tollbrothersinc.com) Co-Directors of Investor Relations, at the Corporate Office.

## Corporate Office

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, Pennsylvania 19006
(215) 938-8000
www.tollbrothers.com

## Transfer Agent & Registrar

Mellon Investor Services, L.L.C.
Ridgefield Park, New Jersey

## Independent Auditors

Ernst & Young LLP
Philadelphia, Pennsylvania

## Securities Counsel

Wolf, Block, Schorr and Solis-Cohen LLP
Philadelphia, Pennsylvania

## Common Stock Price Range - New York Stock Exchange

| Quarter Ended | High | Low |
|---|---|---|
| **2000** | | |
| October 31 | $35 | $23 1/2 |
| July 31 | $24 3/8 | $18 7/8 |
| April 30 | $23 3/8 | $16 |
| January 31 | $19 3/4 | $16 |
| **1999** | | |
| October 31 | $21 1/2 | $15 1/8 |
| July 31 | $23 7/8 | $19 9/16 |
| April 30 | $23 1/4 | $17 1/8 |
| January 31 | $25 1/4 | $21 1/8 |

## Statement on Forward-Looking Information

Certain information included herein and in other Company reports, SEC filings, statements and presentations is forward-looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning the Company's anticipated operating results, resources, increases in revenues, increased profitability, interest expense, growth and expansion, the ability to acquire land, the ability to sell homes and properties, ability to deliver homes from backlog, ability to secure materials and subcontractors. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic conditions, the effect of governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, the availability and cost of labor and materials, and weather conditions.

Demographic data: The sources for the demographic data included in this annual report are the Census Bureau, the Joint Center for Housing Studies of Harvard University and Claritas.

Photography: James B. Abbott, Mark Boisclair, Tim Buchman, Alan Goldstein, Barry Grossman, Rob Ikeler, Eric Kieley, Robb Miller, Kirk Argent, Bob Singer, Bill Taylor

Copyright 2000 by TOLL BROTHERS, INC.

# Corporate Information

## Board of Directors and Executive Officers

Robert I. Toll* *CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER*
Bruce E. Toll *VICE CHAIRMAN OF THE BOARD*
Zvi Barzilay* *PRESIDENT AND CHIEF OPERATING OFFICER*
Robert S. Blank *PARTNER – WHITCOM PARTNERS*
Edward G. Boehne *RETIRED PRESIDENT – FEDERAL RESERVE BANK OF PHILADELPHIA*
Richard J. Braemer *PARTNER – BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, ATTORNEYS AT LAW*
Roger S. Hillas *RETIRED CHAIRMAN – MERITOR SAVINGS BANK*
Carl B. Marbach *PRESIDENT – INTERNETWORK PUBLISHING CORP.*
Joel H. Rassman* *SENIOR VICE PRESIDENT, TREASURER AND CHIEF FINANCIAL OFFICER*
Paul E. Shapiro *EXECUTIVE VICE PRESIDENT AND CHIEF ADMINISTRATIVE OFFICER – THE COMPANY*

*\*EXECUTIVE OFFICER OF THE COMPANY*

## Officers

**SENIOR VICE PRESIDENT**
Wayne S. Patterson

**VICE PRESIDENTS – OPERATIONS**

Peter Alles
Thomas J. Anhut
Thomas A. Argyris, Jr.
William P. Berry
Ronald Blum
Charles W. Bowie
James W. Boyd
Daniel Brouillette
Roger A. Brush
Thomas Carnaghi
Scott L. Coleman

Barry A. Depew
G. Cory DeSpain
Michael J. Donnelly
Kevin D. Duermit
John P. Elcano
Raymond P. Gamble
William J. Gilligan
Daniel Grosswald
Richard T. Hartman
Douglas C. Heppe
Benjamin D. Jogodnik

Gregory Kamedulski
Gregory S. Kelleher
Webb A. Koschnee
B. Mitchell Kotler
James Majewski, Jr.
John G. Mangano
Gary M. Mayo
Marc F. McAlpine
Richard C. McCormick
Robert D. McLaughlin
Thomas J. Murray

Walter A. Music
Robert Parahus
Ralph E. Reinert
Douglas C. Shipe
James A. Smith
W. Stephen Walker
Edward D. Weber
Douglas C. Yearley, Jr.

**VICE PRESIDENT AND GENERAL COUNSEL**
Kenneth J. Gary

**VICE PRESIDENTS – ADMINISTRATION**

Paul Brukardt *ACCOUNTING*
Frederick N. Cooper *FINANCE*
Jonathan A. Downs *HUMAN RESOURCES*
Evan G. Ernest *TAXATION*
Allen R. Irwin *COUNTRY CLUB/GOLF COURSE OPERATIONS*
Manfred P. Marotta *TOLL INTEGRATED SYSTEMS*
Kevin F. McAndrews *COMMERCIAL DEVELOPMENT*
Kira McCarron *MARKETING*
Robert N. McCarron *LAND DEVELOPMENT*
Kevin J. McMaster *CONTROLLER*

Charles E. Moscony *WESTMINSTER TITLE*
Joseph J. Palka *EASTERN STATES ENGINEERING*
Joseph R. Sicree *CHIEF ACCOUNTING OFFICER*
Michael I. Snyder *CORPORATE PLANNING AND CORPORATE SECRETARY*
Ronnie E. Snyder *LAND DEVELOPMENT*
Michael J. Soskinski *EASTERN STATES ENGINEERING*
Werner Thiessen *ACQUISITIONS*
Steven A. Turbyfill *PRODUCT DEVELOPMENT*
Phillip M. Turner *LAND DEVELOPMENT*

**SUBSIDIARY OPERATIONS**

Wayne S. Patterson *PRESIDENT, WESTMINSTER SECURITY COMPANY*
Charles E. Moscony *PRESIDENT, WESTMINSTER TITLE COMPANY*
Donald L. Salmon *PRESIDENT, WESTMINSTER MORTGAGE CORPORATION*
Michael J. Zammit *MANAGING DIRECTOR, ADVANCED BROADBAND*

Listings as of 11/1/01.

## Employees

As of October 31, 2001, the Company had 2,725 full-time employees.

## Shareholders

As of October 31, 2001, the Company had 681 shareholders of record.

## Stock Listing

The Common Stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Investor Relations - Information Requests

The Company's Form 10-K Annual Report, Form 10-Q Quarterly Reports and other Company information are available upon request from Frederick N. Cooper (fcooper@tollbrothersinc.com) or Joseph R. Sicree (jsicree@tollbrothersinc.com), Co-Directors of Investor Relations, at the Corporate Office.

## Corporate Office

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, Pennsylvania 19006
(215) 938-8000
www.tollbrothers.com

## Independent Auditors

Ernst & Young LLP
Philadelphia, Pennsylvania

## Transfer Agent & Registrar

Mellon Investor Services, L.L.C.
Ridgefield Park, New Jersey

## Securities Counsel

Wolf, Block, Schorr and Solis-Cohen LLP
Philadelphia, Pennsylvania

## Common Stock Price Range - New York Stock Exchange

| QUARTER ENDED | 2001 High | 2001 Low | 2000 High | 2000 Low |
| --- | --- | --- | --- | --- |
| October 31 | $40.24 | $29.86 | $35.00 | $23.50 |
| July 31 | $44.14 | $30.40 | $24.63 | $18.44 |
| April 30 | $39.70 | $32.40 | $23.06 | $16.00 |
| January 31 | $45.25 | $31.19 | $19.75 | $16.73 |

## Statement on Forward-Looking Information

Certain information included herein and in other Company reports, SEC filings, statements and presentations is forward looking within the meaning of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements concerning the Company's anticipated operating results, financial resources, increases in revenues, increased profitability, interest expense, growth and expansion, ability to acquire land, ability to sell homes and properties, ability to deliver homes from backlog, and ability to secure materials and subcontractors. Such forward-looking information involves important risks and uncertainties that could significantly affect actual results and cause them to differ materially from expectations expressed herein and in other Company reports, SEC filings, statements and presentations. These risks and uncertainties include local, regional and national economic and political conditions, consequences of any future terrorist attacks such as those that occurred on September 11, 2001, the effect of governmental regulation, the competitive environment in which the Company operates, fluctuations in interest rates, changes in home prices, the availability and cost of land for future growth, the availability of capital, the availability and cost of labor and materials, and weather conditions.

**Demographic data:** data sources for the demographic data included in this annual report are the U.S. Census Bureau, the Joint Center for Housing Studies of Harvard University and Claritas.

**Photographs:** James B. Abbott, Mark Boisclair, Author Coleman, Jeff Fadellin, John Henebry, Rob Ikeler, Chris John, Steve Lakatos, Robb Miller, Rob Muir, Tim Proctor, Kim Sargent, Beth Singer, Peter Tata, Bill Taylor

**Cover photo:** Edgebrook, New York
**Back cover photo:** Backyard view from Cimarron Ridge, Arizona

Copyright 2001 by TOLL BROTHERS, INC.



TOL LISTED NYSE

# Corporate Information

## Board of Directors and Executive Officers

Robert I. Toll*       Chairman of the Board and Chief Executive Officer
Bruce E. Toll*        Vice Chairman of the Board
Zvi Barzilay*         President and Chief Operating Officer
Robert S. Blank       Partner - Whitcom Partners, a media company
Edward G. Boehne      Retired President - Federal Reserve Bank of Philadelphia
Richard J. Braemer    Partner - Ballard, Spahr, Andrews & Ingersoll, LL.P. Attorneys at Law
Roger S. Hillas       Retired Chairman - Meritor Savings Bank
Carl B. Marbach       President - Internetwork Publishing Corp., an electronic publisher
Stephen A. Novick     Vice Chairman and Chief Creative Officer - Grey Global Group,
                      an advertising agency
Joel H. Rassman       Executive Vice President, Treasurer and Chief Financial Officer
Paul E. Shapiro       Executive Vice President and Chief Administrative Officer -
                      Revlon, Inc.

*Executive Officer of the Company

## Officers

### First Senior Vice President        Senior Vice President and General Counsel
Wayne S. Patterson            Kenneth J. Gary

### Senior Vice Presidents

| | | |
|---|---|---|
| Thomas Argyris, Jr. | G. Cory DeSpain | Edward D. Weber |
| James W. Boyd | Richard J. Hartman | Douglas C. Yearley, Jr. |
| Barry A. Depew | Werner Thiessen | |

### Vice Presidents - Operations

| | | |
|---|---|---|
| Peter Ikes | Augustine P. Flores | Gary M. Mayo |
| Keith A. Anderson | Raymond G. Carrillo | Mac F. McAlpine |
| Thomas A. Anhut | William J. Gilligan | Richard O. McCormick |
| William J. Besitrm | John D. Harris | Thomas Murray |
| Ronald Blum | Douglas C. Heppe | Daniel J. O'Brien |
| Charles W. Bowie | Benjamin D. Jogodnik | Robert Parahus |
| Roger Albrach | Gregory Kamedulski | Jon Paynter |
| Scott L. Coleman | Gregory S. Kelleher | William D. Perry |
| Perry J. Devlin | Webb A. Koshene | William O'Reilly |
| Michael J. Donnlley | B. Mitchel Kolter | Ralph E. Reinert |
| Kevin D. Duernth | Gary Lemon | Douglas C. Stipe |
| John Fredano | James N. Mawski, Jr. | James A. Smith |
| Alan E. Euvrard | John G. Mangano | |

### Vice Presidents - Administration

| | | | |
|---|---|---|---|
| Paul Brukardt | Acquisitions | Charles E. Mosony | Westminster Title |
| Frederick N. Cooper | Finance | Joseph I. Palka | Land Development |
| Jonathan G. Downs | Human Resources | Joseph P. Skree | Chief Accounting Officer |
| Evan G. Ernest | Taxation | | |
| Eric Finkelberg | Land Acquisitions | Michael I. Snyder | Corporate Planning and Corporate Secretary |
| Robert B. Fuller | Land Approvals | | |
| Bette Jo Helmer | Information Systems | Ronie E. Snyder | Land Development |
| Allan R. Irwin | Country Club/Golf Course Operations | Michael J. Sosinski | Eastern States Engineering |
| Manfred R. Marotta | Toll Integrated Systems | Steven J. Turbyfill | Product Development |
| Kira McCarron | Marketing | Phillip M. Turner | Land Development |
| Robert M. McCarron | Land Development | Mark J. Warshauer | Counsel |
| Kevin J. McMaster | Controller | | |

### Subsidiary Operations

Wayne S. Patterson    President, Westminster Security Company
Charles E. Mosony     President, Westminster Title Company
Donald L. Salmon      President, Westminster Mortgage Corporation
Michael J. Zamith     Managing Director, Advanced Broadband

Employee listings are as of 11/1/02.

## Employees
As of October 31, 2002, the Company had 2,960 full-time employees.

## Shareholders
As of October 31, 2002, the Company had 744 shareholders of record.

## Stock Listing
The Common Stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Investor Relations - Information Requests
The Company's Form 10K Annual Report, Form 10-Q Quarterly Reports and other Company information are available on our Web site, www.tollbrothers.com, or upon request from Frederick N. Cooper (fcooper@tollbrothersinc.com) or Joseph R. Sicree (jsicree@tollbrothersinc.com), Co-Directors of Investor Relations, at the Corporate Office.

## Common Stock Price Range - New York Stock Exchange
(adjusted for 2-for-1 stock split in March 2002)

Quarter Ended

| 2002 | High | Low | 2001 | High | Low |
|---|---|---|---|---|---|
| October 31 | $27.20 | $17.76 | October 31 | $20.12 | $12.93 |
| July 31 | $31.80 | $20.81 | July 31 | $22.07 | $15.20 |
| April 30 | $30.20 | $20.93 | April 30 | $19.85 | $16.20 |
| January 31 | $23.20 | $15.42 | January 31 | $22.63 | $15.60 |

## Corporate Office
Toll Brothers, Inc.
3103 Philmont Avenue
Huntington Valley, Pennsylvania 19006
(215) 938-8000
www.tollbrothers.com

## Transfer Agent and Registrar
American Stock Transfer and Trust Company
New York, New York
1-800-937-5449
www.amstock.com

## Independent Auditors
Ernst & Young LLP
Philadelphia, Pennsylvania

## Securities Counsel
Wolf, Block, Schorr and Solis-Cohen LLP
Philadelphia, Pennsylvania

Demographic Data:
The sources for the demographic data included in this annual report are Claritas; International Strategy & Investment Group; The Joint Center for Housing Studies of Harvard University; Merrill Lynch; National Association of Home Builders; National Association of Realtors; Raymond James & Associates, Inc.; U.S. Census Bureau; U.S. Department of Labor; and U.S. Immigration and Naturalization Service

Photography:
James B. Abbott, Jeffrey Aron, Mark Boisclair, Rob Brown, Chris Burkhalter, Mert Carpenter, Greg Cava, Craig Cozart, Barry Grossman, Rob Ikeler, Barry Kinsella, Robb Miller, Vic Moss, Rob Muir, Kim Sargent, Bob Shimer, Bill Taylor, George Wilkins, Jim Wilson

Photos:
Cover photo: The Mirador, Gilbert, AZ
Inside front cover: The Grande Clubhouse at Mizner Country Club, Boca Raton area, FL
Pg. 3: The Columbia, Lexington, Novi, MI
Pg. 4: The Sienna, Palm Springs, CA
Pg. 8: The Vasari backyard, Las Vegas, NV
Pg. 14: The Monterey, Las Colinas, TX
Center Spread: (clockwise from top left) The Menlo Manor, San Ramon, CA; The Carlsbad foyer, Yorba Linda, CA; The Capistrano backyard, Yorba Linda, CA; The Malvern Heritage, Novi, MI; The Turnberry living room, Monroe Township, NJ; The Langley Federal, Ashburn, VA; The Hampton Georgian, Raleigh, NC; The Segovia master bath, Boca Raton area, FL; The Strathmore Mediterranean, San Antonio, TX; The Chatsworth backyard, Las Vegas, NV; View of the Austin from the 3rd hole, Castle Rock, CO
Pg. 26: The Columbia, Buckingham, PA
Pg. 27: The Hampton, Raleigh, NC
Pg. 28: The Stratford Heritage, Ann Arbor, MI
Pg. 29: The Casa del Sol, Palm Beach Gardens, FL
Pg. 31: The Terraza, Gilbert, AZ
Pg. 34: The Grande Clubhouse at Naples Lakes Country Club, Naples, FL
Back cover photo: The Viana, Palm City, FL

Quote Sources:
Inside front cover: U.S. Census Bureau - Money Income in the United States: 2001- Report P60-218, issued Sept. 2002
Pg. 2 Newsweek, Aug. 26, 2002, "Real Estate" - Betting Against a Housing Bust by Daniel McGinn
Pg. 8 Time, Aug. 5, 2002, "Economy & Business", What Housing Bubble? by Daniel Kadlec
Pg. 10 Dr. Susan Wachter, Nov. 19, 2002, "Nationwide Trends and the American Luxury Home Market"
Pg. 12 Fortune, Oct. 28, 2002, "Is Real Estate Next?" by Shawn Tully
Pg. 14 Joint Center for Housing Studies of Harvard University, The State of the Nation's Housing 2002

Designed by Sean Bornemann. Copyright 2002 by TOLL BROTHERS, INC.



# Corporate Information

## Board of Directors and Executive Officers

**Robert I. Toll** — CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER
**Bruce E. Toll** — VICE CHAIRMAN OF THE BOARD
**Zvi Barzilay\*** — PRESIDENT AND CHIEF OPERATING OFFICER
**Robert S. Blank** — PARTNER, WHITMAN BREED ABBOTT & MORGAN, A MEDIA COMPANY
**Edward G. Boehne** — RETIRED PRESIDENT – FEDERAL RESERVE BANK OF PHILADELPHIA
**Richard J. Braemer** — PARTNER – BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, ATTORNEYS AT LAW
**Roger S. Hillas** — RETIRED CHAIRMAN – MERIDIAN SAVINGS BANK
**Carl B. Marbach** — PRESIDENT – INTERNETWORK PUBLISHING CORP., AN ELECTRONIC PUBLISHER
**Stephen A. Novick** — EXECUTIVE VICE CHAIRMAN AND CHIEF CREATIVE OFFICER – GREY GLOBAL GROUP, A MARKETING COMPANY
**Joel H. Rassman\*** — EXECUTIVE VICE PRESIDENT, TREASURER AND CHIEF FINANCIAL OFFICER
**Paul E. Shapiro** — SENIOR VICE PRESIDENT – MCANDREWS & FORBES HOLDINGS, INC.

*\*EXECUTIVE OFFICER AND DIRECTOR OF THE COMPANY*

## Officers

**FIRST SENIOR VICE PRESIDENT**
Wayne S. Patterson

**SENIOR VICE PRESIDENT AND GENERAL COUNSEL**
Kenneth J. Gary

**FIRST VICE PRESIDENT AND SECRETARY**
Michael I. Snyder

**SENIOR VICE PRESIDENTS**
Thomas A. Argyris, Jr.
James W. Boyd
Barry A. Depew
G. Cory DeSpain

**FIRST VICE PRESIDENT**
Richard T. Hartman
Werner Thiessen

**FIRST VICE PRESIDENT**
Edward D. Weber
Douglas C. Yearley, Jr.

**SENIOR VICE PRESIDENTS – OPERATIONS**

Peter Allen
Keith L. Anderson
Thomas J. Arnutt
William J. Bestfnt
Ronald Blum
Charles W. Bowie
Roger A. Brush
Scott L. Coleman
Perry J. Devlin
Michael J. Donnelly
Kevin D. Duermit
John P. Elcano
Alan E. Euvrard
Augustine P. Flores
Christopher G. Gaffney
William J. Gilligan
Gary M. Mayo
John D. Harris
John Jakiminich
Benjamin D. Jogodnik
Robert A. Johnson
Gregory E. Kamedulski
Gregory S. Kelleher
Webb A. Koschene
B. Mitchell Kotler
Gary Lemon
James Majewski, Jr.
John G. Mangano
Marc F. McAlpine
Richard C. McCormick
Thomas J. Murray
Matt I. Nowak
Michael J. Palmer
Jon Paynter
William D. Perry
Robert Paratus
William C. Reilly
Ralph E. Reinert
David K. Sadler
Douglas C. Shipe
James A. Smith
Charles E. Moscony
George W. Nelson
Joseph J. Palka
Joseph R. Sicree
Ronnie E. Snyder
Michael J. Sosinski
Steven A. Turbyfill
Phillip M. Turner
Christopher S. Utschig
Mark J. Warshauer

**SENIOR VICE PRESIDENTS – ADMINISTRATION**
Paul Brukardt
Frederick N. Cooper
Jonathan C. Downs
Evan G. Ernest
Robert B. Fuller
Patrick Galligan
Jed Gibson
Tracy Graves
Bette-Jo Hellner
Daniel J. Kennedy
Manfred P. Marotta
Kira McCarron
Robert N. McCarron
Kevin H. McMaster

**VICE PRESIDENTS – CITY LIVING BY TOLL BROTHERS**
Sanford Weiss
Joseph Cauffield
Dennis Devine

## Subsidiary Operations

**Kenneth J. Gary** — PRESIDENT, WESTMINSTER SECURITY COMPANY
**Charles E. Moscony** — PRESIDENT, WESTMINSTER TITLE COMPANY
**Donald L. Salmon** — PRESIDENT, WESTMINSTER MORTGAGE CORPORATION
**Richard R. Dostie** — PRESIDENT, TOLL-JACKSONVILLE LP
**Michael J. Zammit** — MANAGING DIRECTOR, ADVANCED BROADBAND

## Affiliate Operations

**James M. Steuterman** — SENIOR VICE PRESIDENT, TOLL BROTHERS REALTY TRUST

Employee listings are as of 1/11/03.

## Employees

As of October 31, 2003, the Company had 3,416 full-time employees.

## Shareholders

As of October 31, 2003, the Company had 649 shareholders of record.

## Stock Listing

The Common Stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Corporate Office

Toll Brothers, Inc.
3103 Philmont Avenue
Huntingdon Valley, Pennsylvania 19006
(215) 938-8000
www.tollbrothers.com

## Transfer Agent and Registrar

American Stock Transfer and Trust Company
59 Maiden Lane
New York, New York 10038
1-800-937-5449
www.amstock.com

## Independent Auditors

Ernst & Young LLP
Philadelphia, Pennsylvania

## Securities Counsel

Wolf, Block, Schorr and Solis-Cohen LLP
Philadelphia, Pennsylvania

## Investor Relations - Information Requests

The Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other Company information are available on or through our Web site, www.tollbrothers.com, or upon request from Frederick N. Cooper, Vice President-Finance (fcooper@tollbrothersinc.com) or Joseph R. Sicree, Vice President-Chief Accounting Officer (jsicree@tollbrothersinc.com), Co-Directors of Investor Relations, at the Corporate Office.

## Common Stock Price Range - New York Stock Exchange

[ADJUSTED FOR 2-FOR-1 STOCK SPLIT IN MARCH 2002]

| QUARTER ENDED | 2003 High | Low | 2002 | High | Low |
|---|---|---|---|---|---|
| October 31 | $37.02 | $25.67 | October 31 | $27.20 | $17.76 |
| July 31 | $32.13 | $27.64 | July 31 | $30.80 | $20.81 |
| April 30 | $23.86 | $17.63 | April 30 | $30.20 | $22.93 |
| January 31 | $21.92 | $18.85 | January 31 | $23.20 | $15.42 |

## Quote Sources:

Pg. 2: Barron's, Feb. 10, 2003 - "Gimme Shelter" by Andrew Bary. Pg. 33: The Conference Board, Oct. 23, 2003 - "Portfolios of America's Affluent Families are Healthy." Pg. 48: Joint Center for Housing Studies of Harvard University, the State of the Nation's Housing 2003

## Photography:

James B. Abbott, Mark Boisclair, Rob Brown, Chris Burkhalter, Mert Carpenter, Greg Cava, Barry Grossman, Levi Ellyson, Jeff Ryous, Omar Salinas, Evan Schiller, Frank Short, Walt Stoneham, Bill Taylor

## Photos:

**Cover:** Magdalena at Frenchman's Reserve, Palm Beach Gardens, FL; [Inset] Chamberlain at Trotters Gate, Powell, Ohio. **Back cover:** Milano at Toscana, Las Vegas, NV

## Demographic data:

The sources for the demographic data included in this annual report are AMERICAN DEMOGRAPHICS; Bloomberg L.P.; Citigroup Salomon Smith Barney; Classes; The Conference Board; Credit Suisse First Boston; International Strategy & Investment Group; The Joint Center for Housing Studies of Harvard University; Merrill Lynch; UBS; U.S. Census Bureau; U.S. Department of Labor; National Association of Realtors; Raymond James & Associates, Inc.; National Association of Home Builders; U.S. Immigration and Naturalization Service; Wachovia Securities

Designed by Sean Bornemann. Copyright 2003 by TOLL BROTHERS INC.

TOL NYSE

# Corporate Information

## Board Of Directors And Executive Officers

Robert I. Toll* — *CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER*
Bruce E. Toll — *VICE CHAIRMAN OF THE BOARD — PRESIDENT, BET INVESTMENTS, AN OFFICE AND COMMERCIAL REAL ESTATE COMPANY*

Zvi Barzilay* — *PRESIDENT AND CHIEF OPERATING OFFICER*
Robert S. Blank — *PARTNER — WHITCOM PARTNERS, A MEDIA COMPANY*
Edward G. Boehne — *RETIRED PRESIDENT — FEDERAL RESERVE BANK OF PHILADELPHIA*
Richard J. Braemer — *PARTNER — BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, ATTORNEYS AT LAW*
Roger S. Hillas — *RETIRED CHAIRMAN — MERITOR SAVINGS BANK*
Carl B. Marbach — *PRESIDENT — GREATER MARBACH AIRLINES, INC., AND FLORIDA PROFESSIONAL AVIATION, INC., AVIATION SERVICES AND CONSULTING COMPANIES*

Stephen A. Novick — *VICE CHAIRMAN AND CHIEF CREATIVE OFFICER — GREY GLOBAL GROUP, A MARKETING COMPANY*
Joel H. Rassman* — *EXECUTIVE VICE PRESIDENT, TREASURER AND CHIEF FINANCIAL OFFICER*
Paul E. Shapiro — *CHAIRMAN — D CAPITAL STRATEGIES, LLC, A LIFE SETTLEMENT COMPANY*

*\*EXECUTIVE OFFICER AND DIRECTOR OF THE COMPANY*

## Officers

### SENIOR VICE PRESIDENTS | OPERATIONS

Wayne S. Patterson — *FIRST SENIOR VICE PRESIDENT*

Thomas A. Argyris, Jr. — Barry A. Depew
James W. Boyd — G. Cory DeSpain

### SENIOR VICE PRESIDENTS | ADMINISTRATION

Frederick N. Cooper — *FINANCE/INVESTOR RELATIONS*
Kenneth J. Gary — *GENERAL COUNSEL*

### VICE PRESIDENTS | OPERATIONS

| | | |
|---|---|---|
| Peter Alles | John P. Elcano | B. Mitchell Kotler | Joseph J. Pease |
| Keith L. Anderson | Alan E. Edward | Gary Lemon | William D. Perry |
| Thomas J. Arrut | Christopher G. Gaffney | Bruce A. Lingerfelt | Charles R. Radatz |
| William J. Bestimt | William J. Gilligan | James Majewski, Jr. | William C. Reilly |
| Ronald Blum | Michael D. Glenn | John G. Mangano | Ralph E. Reinert |
| Charles W. Bowie | P. Scott Hare | Gary M. Mayo | Anthony J. Rocco |
| Roger A. Brush | John D. Harris | Marc F. McAlpine | C. J. Rogers |
| Anthony E. Casapulla | Gordon Ivasou | Richard C. McCormick | David K. Sadler |
| Joseph Caulfield | Robert D. Jaegar | Jeff Meyer | Douglas C. Shipe |
| Scott L. Coleman | John Jakiominch | Thomas J. Murray | Beverly A. Smith |
| Michael Davenport | Benjamin D. Jagdolnik | Richard M. Nelson | James A. Smith |
| Ronald Davis | Robert A. Johnson | Walt I. Nowak | Andrew M. Stern |
| Dennis M. Devino | Gregory S. Kamedulski | Michael I. Palmer | Edward L. Zabrowski |
| J. Michael Donnelly | Gregory S. Keileher | Robert Parahus | |
| Kevin D. Duermit | Webb A. Koschene | H. Jon Paynter | |

### VICE PRESIDENTS | ADMINISTRATION

| | | |
|---|---|---|
| Suzanne Barletto | Tracy Graves | George W. Nelson | Michael J. Sosinski |
| Paul Brukardt | Linda M. Hart | Michael T. Noles | Steven A. Turbyfill |
| Joseph DeSanto | Daniel J. Kennedy | Joseph J. Palka | Phillip M. Turner |
| Jonathan C. Downs | Manfred P. Marotta | David H. Richey | Christopher S. Utschig |
| Evan G. Ernest | Kira McCarron | Byron W. Rimmer | Mark I. Warshauer |
| Robert B. Fuller | Robert N. McCarron | Joseph R. Sicree | |
| Patrick Galligan | Kevin I. McMaster | Michael Smith | |
| Jed Gibson | James L. Meeks | Ronnie E. Snyder | |

*SENIOR VICE PRESIDENTS | OPERATIONS*

Richard T. Hartman
Edward D. Weber

*SENIOR VICE PRESIDENTS | ADMINISTRATION*

Michael I. Snyder — *SECRETARY*

Douglas C. Yearley, Jr.

Werner Thiessen — *ACQUISITIONS*

*EMPLOYEE LISTING ARE AS OF 1/1/1/04.*

## Corporate Office

Toll Brothers, Inc., 250 Gibraltar Road, Horsham, Pennsylvania 19044, 215-938-8000 • tollbrothers.com

## Transfer Agent & Registrar

American Stock Transfer and Trust Company, 59 Maiden Lane, New York, New York 10038
1-800-937-5449 • www.amstock.com

## Independent Auditors

Ernst & Young LLP — Philadelphia, Pennsylvania

## Securities Counsel

Wolf, Block, Schorr and Solis-Cohen LLP — Philadelphia, Pennsylvania

## Employees

As of October 31, 2004, the Company had 4,655 full-time employees.

## Shareholders

As of October 31, 2004, the Company had 1,013 shareholders of record.

## Stock Listing

The Common Stock of Toll Brothers, Inc. is traded on the New York Stock Exchange and Pacific Exchange (symbol "TOL").

## Certifications

The Company's Chief Executive Officer and Chief Financial Officer have filed their certifications as required by the SEC regarding the quality of the Company's public disclosure for each of the periods ended during the Company's fiscal year ended October 31, 2004. Further, the Company's Chief Executive Officer has certified to the New York Stock Exchange ("NYSE") that he is not aware of any violation by the Company of NYSE corporate governance listing standards, as required by Section 303A.12(a) of the NYSE Corporate Governance Rules.

## Investor Relations | Information Requests

The Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other Company information are available on or through our Web site, tollbrothers.com, or upon request from Frederick N. Cooper, Senior Vice President-Finance (fcooper@tollbrothersinc.com), Co-Directors of Investor Relations, at the President-Chief Accounting Officer (jsicree@tollbrothersinc.com), at the Corporate Office.

## Subsidiary Operations

Richard R. Dostie — *PRESIDENT, TOLL—JACKSONVILLE, LP*
Kenneth J. Gary — *PRESIDENT, WESTMINSTER SECURITY COMPANY*
Donald L. Salmon — *PRESIDENT, WESTMINSTER MORTGAGE CORPORATION*
William T. Unkel — *PRESIDENT, WESTMINSTER TITLE COMPANY*
Michael J. Zammit — *MANAGING DIRECTOR, ADVANCED BROADBAND*

## Affiliate Operations

James M. Steuterman — *SENIOR VICE PRESIDENT, TOLL BROTHERS REALTY TRUST*

Designed by R. Craig Schmiak. Copyright 2004 by TOLL BROTHERS.

**TOL**
NYSE

# Corporate Information

## Board of Directors and Executive Officers

**Robert I. Toll***
*CHAIRMAN OF THE BOARD AND CHIEF EXECUTIVE OFFICER*

**Bruce E. Toll**
*VICE CHAIRMAN OF THE BOARD*
*PRESIDENT – BET INVESTMENTS, AN OFFICE AND COMMERCIAL REAL ESTATE COMPANY*

**Zvi Barzilay***
*PRESIDENT AND CHIEF OPERATING OFFICER*

**Robert S. Blank**
*CO-CHAIRMAN & CO-CEO – WHITNEY COMMUNICATIONS COMPANY* and
*SENIOR PARTNER – WHITCOM PARTNERS, MEDIA COMPANIES*

**Edward G. Boehne**
*RETIRED PRESIDENT – FEDERAL RESERVE BANK OF PHILADELPHIA*

**Richard J. Braemer**
*PARTNER – BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, ATTORNEYS AT LAW*

**Roger S. Hillas**
*RETIRED CHAIRMAN – MERITOR SAVINGS BANK*

**Carl B. Marbach**
*PRESIDENT – GREATER MARBACH AIRLINES, INC.,* and *FLORIDA PROFESSIONAL AVIATION, INC.,*
*AVIATION SERVICES AND CONSULTING COMPANIES*

**Stephen A. Novick**
*SENIOR ADVISOR – THE ANDREA AND CHARLES BRONFMAN PHILANTHROPIES*

**Joel H. Rassman***
*EXECUTIVE VICE PRESIDENT, TREASURER AND CHIEF FINANCIAL OFFICER*

**Paul E. Shapiro**
*CHAIRMAN – Q CAPITAL STRATEGIES, LLC, A LIFE SETTLEMENT COMPANY*

*\*EXECUTIVE OFFICER AND DIRECTOR OF THE COMPANY*

## Corporate Administration

### Senior Vice Presidents

Frederick N. Cooper
*FINANCE & INVESTOR RELATIONS*

Michael I. Snyder
*CORPORATE PLANNING & SECRETARY*

Don H. Liu
*GENERAL COUNSEL*
*CHIEF COMPLIANCE OFFICER*

Werner Thiessen
*ACQUISITIONS*

### Vice Presidents

| | |
|---|---|
| Suzanne Barletto | James L. Meeks |
| Donald Barnes | William Morrison Jr. |
| Paul Brukardt | George W. Nelson |
| Joseph DeSanto | Michael T. Noles |
| Jonathan C. Downs | Edward Oliu |
| Evan G. Ernest | John Pagenkopf |
| Robert B. Fuller | Joseph J. Palka |
| Patrick Galligan | Russel Powell |
| Jed Gibson | David H. Richey |
| Charles M. Hare | Byron W. Rimmer |
| James Harrington, Jr. | Joseph R. Sicree |
| Linda M. Hart | Mark Simms |
| Terry Hodge | Michael Smith |
| Daniel J. Kennedy | Ronnie E. Snyder |
| Michael LaPat | Michael J. Sosinski |
| Manfred P. Marotta | Stephen A. Turbyfill |
| Kira McCarron | Christopher S. Utschig |
| Robert N. McCarron | Mark J. Warshauer |
| Kevin J. McMaster | |

## Home Building Operations

### Regional Presidents

| | |
|---|---|
| Thomas A. Argyris, Jr. | Richard T. Hartman |
| James W. Boyd | Wayne S. Patterson |
| Barry A. Depew | Edward D. Weber |
| G. Cory DeSpain | Douglas C. Yearley, Jr. |

### Group Presidents

| | |
|---|---|
| Roger A. Brush | Gary M. Mayo |
| Kevin D. Duermit | Robert Parahus |
| John P. Elcano | H. Jon Paynter |
| William J. Gilligan | Douglas C. Shipe |
| John G. Mangano | James A. Smith |

### Division Presidents

| | |
|---|---|
| Keith L. Anderson | Richard C. McCormick |
| Thomas J. Anhut | William Morrisey |
| Charles W. Bowie | Thomas Mulvey |
| J. Michael Donnelly | Thomas J. Murray |
| Richard R. Dostie | Chris Myers |
| Christopher G. Gaffney | John Noonan |
| John Jakominich | Walt I. Nowak |
| Gregory E. Kamedulski | Ralph E. Reinert |
| Gregory S. Kelleher | C. J. Rogers |
| Gary Lemon | John Vitella |
| Dan L. Martin | |

### Division Senior Vice Presidents

| | |
|---|---|
| Peter Alles | Michael J. Palmer |
| Benjamin D. Jogodnik | William C. Reilly |
| James A. Majewski, Jr. | |

### Division Vice Presidents

| | |
|---|---|
| Jeffrey Bartos | Robert A. Johnson |
| William J. Bestimt | Bruce A. Lingerfelt |
| Ronald Blum | Marc F. McAlpine |
| Anthony E. Casapulla | Sheila McGuire |
| Joseph Caulfield | Brad H. Nelson |
| Scott L. Coleman | Richard M. Nelson |
| Robert L. Craig | William D. Perry |
| Michael Davenport | Charles B. Raddatz |
| Mark O. Davis | Anthony J. Rocco |
| Dennis M. Devino | David K. Sadler |
| Alan E. Euvrard | Jeffrey Schnurr |
| Michael D. Glenn | Beverly A. Smith |
| P. Scott Hare | Andrew M. Stern |
| John D. Harris | John P. Szakats |
| Thomas Hausle | Kenneth S. Thirtyacre |
| William Holmes | Alan R. Truitt |
| Gordon Ivascu | Daniel C. Zalinsky |

## Subsidiary Operations

| | |
|---|---|
| Felicia Ratka | *PRESIDENT – WESTMINSTER SECURITY COMPANY* |
| Donald L. Salmon | *PRESIDENT – TBI MORTGAGE COMPANY* |
| William T. Unkel | *PRESIDENT – WESTMINSTER TITLE COMPANY* |
| Michael J. Zammit | *MANAGING DIRECTOR – ADVANCED BROADBAND* |

## Affiliate Operations

James M. Steuterman    *SENIOR VICE PRESIDENT – TOLL BROTHERS REALTY TRUST*

*EMPLOYEE LISTINGS ARE AS OF 11/1/05.*

# Corporate Officers

## Board of Directors and Executive Officers

Robert I. Toll*
 Chairman of the Board and Chief Executive Officer

Bruce E. Toll
 Vice Chairman of the Board
 President - BET Investments, an office and commercial real estate company

Zvi Barzilay*
 President and Chief Operating Officer

Robert S. Blank
 Co-Chairman & CO-CEO - Whitney Communications Company and
 Senior Partner - Whitcom Partners, media companies

Edward G. Boehne
 Retired President - Federal Reserve Bank of Philadelphia

 *Executive Officer and Director of the Company

Richard J. Braemer
 Partner - Ballard, Spahr, Andrews & Ingersoll, LLP, Attorneys at Law

Roger S. Hillas
 Retired Chairman - Meritor Savings Bank

Carl B. Marbach
 President - Greater Marbach Airlines, Inc., and Florida Professional Aviation, Inc.,
 aviation services and consulting companies

Stephen A. Novick
 Senior Advisor - The Andrea and Charles Bronfman Philanthropies

Joel H. Rassman*
 Executive Vice President, Treasurer and Chief Financial Officer

Paul E. Shapiro
 Chairman - Q Capital Strategies, LLC, a life settlement company

## Corporate Administration

### Senior Vice Presidents

| | |
|---|---|
| Frederick N. Cooper | Finance & Investor Relations |
| Jonathan C. Downs | Human Resources |
| Don H. Liu | General Counsel & Chief Compliance Officer |
| Kira McCarron | Chief Marketing Officer |
| Kevin J. McMaster | Controller |
| George W. Nelson | Chief Information Officer |
| Joseph R. Sicree | Chief Accounting Officer |
| Michael I. Snyder | Secretary & Corporate Planning |
| Werner Thiessen | Acquisitions |

### Vice Presidents

| | | |
|---|---|---|
| Suzanne Barletto | Linda M. Hart | Michael Smith |
| Sandy Colden | Daniel J. Kennedy | Stephen A. Turbyfill |
| Joseph DeSanto | Michael LaPat | Mark J. Warshauer |
| Evan G. Ernest | Mitchell Laskowitz | Michele Wolfe |
| Patrick Galligan | Manfred P. Marotta | Kathryn L. Yates |
| Robert Girvin | John K. McDonald | |
| Michael J. Grubb | David H. Richey | |

## Home Building Operations

### Regional Presidents

Thomas A. Argyris, Jr.
James W. Boyd
Barry A. Depew
William J. Gilligan
Richard T. Hartman
Robert Parahus
Edward D. Weber
Douglas C. Yearley, Jr.

### Group Presidents

Roger A. Brush
Kevin D. Duermit
John P. Elcano
John G. Mangano
Gary M. Mayo
H. Jon Paynter
Douglas C. Shipe
James A. Smith

### Division Presidents

| | | |
|---|---|---|
| Salem Al-Shatti | John Jakominich | Chris Myers |
| Keith L. Anderson | Gregory E. Kamedulski | Richard M. Nelson |
| Thomas J. Anhut | Bruce A. Lingerfelt | John Noonan |
| Ronald J. Boshaw | David Lopez | Walt I. Nowak |
| Charles W. Bowie | Dan L. Martin | Michael J. Palmer |
| Anthony E. Casapulla | Richard C. McCormick | Charles B. Raddatz |
| J. Michael Donnelly | Thomas Mulvey | Ralph E. Reinert |
| Christopher G. Gaffney | Thomas J. Murray | John Vitella |

### Division Senior Vice Presidents

Peter Alles
Robert D. Frakes
Benjamin D. Jogodnik
James A. Majewski, Jr.
William C. Reilly
Jeffrey Schnurr
Andrew M. Stern
Kenneth S. Thirtyacre
Daniel C. Zalinsky

### Division Vice Presidents

| | | | |
|---|---|---|---|
| David B. Anderson | | | |
| Eric Anderson | | | |
| Jeffrey Bartos | Mark O. Davis | Robert J. Kardos | David K. Sadler |
| William J. Bestimt | Dennis M. Devino | Gregory J. LaGreca | William Schmidt |
| Ronald Blum | Alan E. Euvrard | Brian F. Loftus | Richard N. Schoonmaker |
| Charles T. Breder | Robert L. Flaherty | Sheila McGuire | Kevin Stine |
| Joseph Caulfield | Michael D. Glenn | Lloyd Miller | John P. Szakats |
| John Christensen | Robert M. Hodak | Cynthia Morse | David Torres |
| Gregory Cole | P. Scott Hare | Brad H. Nelson | Alan R. Truitt |
| Scott L. Coleman | John D. Harris | Scott Nodland | David Von Spreckelsen |
| Charles M. Connors | Thomas Hausle | Mark Noeal | Ryan D. Walter |
| Robert L. Craig | William Holmes | Robert Paul | Adam Wilson |
| | Gordon Ivascu | William D. Perry | |
| | Robert A. Johnson | Anthony J. Rocco | |

## Land Acquisition and Land Development

### Senior Vice Presidents

James L. Meek
Joseph J. Palka

### Vice Presidents

| | | |
|---|---|---|
| Donald Barnes | James Harrington, Jr. | William Morrison, Jr. | Mark Simms |
| Paul Brukardt | Terry Hodge | Michael T. Noles | Ronnie E. Snyder |
| Robert B. Fuller | James Manners | Edward Oliu | Christopher S. Utschig |
| Charles M. Hare | Robert N. McCarron | Russel Powell | |

## Subsidiary and Affiliate Operations

Eastern States Engineering, Inc.
TBI Mortgage Company
Toll Architecture, Inc.
Toll Brothers Realty Trust

Christopher Stocke - Vice President
Donald L. Salmon - President
Jed Gibson - President
James M. Steuterman - Senior Vice President

Toll Landscape, L.L.C.
Westminster Security Company
Westminster Title Company, Inc.

Mark Culichia - Vice President
Felicia Ratka - President
William T. Unkel - President

Employee listings are as of 11/1/06.

# Corporate Officers

52  Toll Brothers 2007 Annual Report

## BOARD OF DIRECTORS AND EXECUTIVE OFFICERS

**Robert I. Toll***
Chairman of the Board & Chief Executive Officer

**Bruce E. Toll**
Vice Chairman of the Board
President - BET Investments, an office and commercial real estate company, and
Chairman - Philadelphia Media Holdings, LLC, parent company of the Philadelphia Inquirer and Philadelphia Daily News

**Zvi Barzilay***
President and Chief Operating Officer

**Robert S. Blank**
Co-Chairman & Co-CEO - Whitney Communications Company, and
Senior Partner - Whitcom Partners, media companies

**Edward G. Boehne**
Retired President - Federal Reserve Bank of Philadelphia

**Richard J. Braemer**
Senior Advisor - Ballard, Spahr, Andrews & Ingersoll, LLP, Attorneys at Law

**Roger S. Hillas**
Retired Chairman - Meritor Savings Bank

**Carl B. Marbach**
President - Greater Marbach Airlines, Inc., and Florida Professional Aviation, Inc., aviation services and consulting companies

**Stephen A. Novick**
Senior Advisor - The Andrea and Charles Bronfman Philanthropies

**Paul E. Shapiro**
Chairman - Q Capital Strategies, LLC, a life settlement company

*Executive Officer and Director of the Company

---

## CORPORATE ADMINISTRATION

### Senior Vice Presidents
- Frederick N. Cooper — Finance & Investor Relations
- Jonathan C. Downs — Human Resources
- Mark K. Kessler — General Counsel & Chief Compliance Officer
- Kira McCarron — Chief Marketing Officer
- Kevin J. McMaster — Controller
- George W. Nelson — Chief Information Officer
- Joseph R. Sicree — Chief Accounting Officer
- Michael J. Snyder — Chief Planning Officer
- Werner Thiessen — Acquisitions

### Vice Presidents
- Suzanne Barletto
- Gerald L. Belfiglio
- Linda B. Cohen
- Bonny Colden
- Joseph R. DeSanto
- Evan G. Ernest
- Patrick Galligan
- Robert J. Girvin
- Michael J. Grubb
- Daniel J. Kennedy

**Joel H. Rassman***
Executive Vice President, Treasurer and Chief Financial Officer

---

## HOME BUILDING OPERATIONS

**Regional Presidents**
- Thomas A. Argyris, Jr.
- James W. Boyd
- Barry A. Depew
- William J. Gilligan
- Richard T. Hartman
- Robert Parulius
- Edward D. Weber
- Douglas C. Yearley, Jr.

**Group Presidents**
- Keith L. Anderson
- Roger A. Brush
- Kevin D. Duermit
- H. Jon Paynter
- Ralph E. Reinert
- Christopher G. Gaffney
- John G. Marigano
- Douglas C. Shipe

**Division Presidents**
- Glen H. Martin
- Jeffrey A. Bartos
- Charles W. Bowie
- John D. Bunting
- Anthony E. Casapulla
- J. Michael Donnelly
- James H. Harrison
- Gregory E. Kamedulski
- Dan L. Martin
- Thomas J. Anhut
- Thomas R. Mulvey
- Chris Myers
- Richard M. Nelson
- Walt I. Nowak
- Michael J. Palmer
- Charles B. Raddatz
- William C. Reilly
- John Vitella

**Division Senior Vice Presidents**
- Richard C. McCormick
- Michael L. LaPat
- Manfred P. Marotta
- John K. McDonald
- Michael Smith
- Stephen A. Turbyfill
- Mark J. Warshauer
- Michele Wolfe
- Kathryn L. Yates

**Division Vice Presidents**
- Peter Alles
- Robert D. Frakes
- Benjamin D. Jogodnik
- James A. Majewski, Jr.
- Robert G. Paul
- Anthony J. Rocco
- Jeffrey Schnur
- Andrew M. Stein
- Kenneth S. Thirtyacre
- Daniel C. Zalinsky
- David B. Anderson
- Eric C. Anderson
- Ronald Blum
- Charles I. Breder
- Brian F. Loftus
- Sheila M. McGuire
- Lloyd S. Miller
- Cynthia L. Morse
- Brad H. Nelson
- Scott S. Nodland
- Mark J. Nosal
- William D. Perry
- David K. Sadler
- William H. Schmidt
- Robert L. Flaherty
- Robert L. Craig
- Mark O. Davis
- Alan E. Euvrard
- Robert A. Johnson
- Robert J. Kardos
- Gregory J. LaGreca
- James C. Carraway
- William H. Bye
- John Christensen
- Joseph Caulfield
- Scott C. Coleman
- Charles M. Connors
- Michael D. Glenn
- Thomas G. Gestile
- John D. Harris
- Thomas E. Hausle
- Robert M. Hodak
- William M. Holmes
- Gordon Ivascu
- Richard N. Schoonmaker
- John P. Szakats
- Charles W. Templeton
- David E. Torres
- Alan R. Truitt
- David Von Spreckelsen
- Ryan D. Walter

---

## LAND ACQUISITION, LAND DEVELOPMENT, AND COUNTRY CLUB OPERATIONS

**Executive Vice President**
- Joseph J. Palka

**Senior Vice Presidents**
- Robert N. McCarron
- David H. Richey

**Vice Presidents**
- Donald R. Barnes
- Paul Brukardt
- Robert B. Fuller
- Charles M. Hare

**Division Presidents**
- James H. Harrington, Jr.
- Terry R. Hodge
- John Jakominich
- Mitchell P. Laskowitz

**Division Vice Presidents**
- James Manners
- William Morrison, Jr.
- Michael T. Noles
- Edward Oliu
- Russel V. Powell
- Mark D. Simms
- Ronnie E. Snyder
- Christopher S. Utschig

---

## SUBSIDIARY AND AFFILIATE OPERATIONS

**Eastern States Engineering, Inc.** — Christopher E. Stoke - Vice President
**TBI Mortgage Company** — Donald L. Salmon - President
**Toll Architecture, Inc.** — Jed Gibson - President
**Toll Brothers Realty Trust** — James M. Steuterman - Sr. Vice President
**Toll Landscape, L.L.C.** — Mark Culchia - Vice President
**Westminster Security Company** — Virginia Ratika - Vice President
**Westminster Title Company, Inc.** — Alan T. Unell - President

# corporate officers

## boaR o IRectoR    IceR

**Robert I. toll**
Chairman of the  oard    Chief  xecutive Officer

**bruce e. toll**
ice Chairman of the  oard
resident -  hiladelphia
an office and commercial real estate company, and
Chairman -  hiladelphia   edia Holdings, LLC,
parent company of the  hiladelphia Inquirer
and  hiladelphia  aily  ews

**Zvi barzilay**
resident and Chief Operating Officer

**Robert . bian**
Co-Chairman  Co-C O -  hitney
Communications Company, and
enior  artner -  hilcomn  artners,
investments

**edard . boene**
Retired  resident -  ederal Reserve  ank
of  hiladelphia

**Ricard . braer**
artner -  allard,  pahr,  ndrews  Ingersoll, LL,
ttorneys at Law

**Roger . illas**
Retired Chairman -   editor  avings  ank

**carl b.  arbac**
resident -  reater   arbach  irlines, Inc., and
lorida  rofessional  viation, Inc.,
aviation services and consulting companies

**teen a.  ovic**
enior  divison -   he  ndrea and Charles  ronfman
hilanthropies

**oel . Rassan**
xecutive  ice  resident,   reasurer and
Chief  inancial Officer

**aul e.  airo**
Chairman -   Capital  trategies, LLC,
a life settlement company

*Executive Officer and Director of the Company

## coRoRate a    IIRRatio

frederick h. cooper  15
Jonathan c. downs  16
mark k. kessler  1
kira mccarron  23

**senior vice presidents**
kevin J. mcmaster  25
George w. nelson  5
Joseph r. Sence  16
michael l. Snyder  28
werner thiessen  18

*Inance  Investor Relations*
*Human Resources*
*eneral Counsel*
*Chief Compliance Officer*
*Chief  arketing Officer*

Controller
Chief Information Officer
Chief  ccounting Officer
ecretary  Chief  lanning Officer
cquisitions

**regional
presidents**
thomas A. Argyris, Jr.  22
James w. Boyd  15
Barry A. depew  25
william J. Gilligan  16
richard t. hartman  29
robert parslius  22
Edward d. weber  29
douglas c. Yearley, Jr.  18

**oe bull    I o eRatio**

la eveloet a cou tRy club o eRatio

## group
presidents
keith I. Anderson  11
roger A. Bartes  8
kevin d. diacmit  21
John p. Elcano  16
christopher G. Gaffney  12
John G. mangano  21
Glen h. martin  2
Gary m. mayo  11
thomas J. murray  14
ralph E. reinert  16
douglas c. Slupe  14

## division
presidents
thomas J. Anhut  14
Jeffrey A. Bartos  8
charles w. Bowie  12
John d. bunting  1
Anthony E casapulla  14
J. michael donnelly  17
James h. harrison  2
Gregory E. kamedalski  16
dan I. martin  11
richard c. mccormick  30
thomas c. mulvey  4

chris myers  14
richard m. nelson  10
walt i. nowak  14
robert G. paul  7
charles R. nadratz  11
william c. reilly  15
kenneth S. thirtyacre  11
John p. vitella  10

*dIRectS YEaRS of SERvIcE*

## ubliaRy a a    IIIate o eRatio

eastern   tates engineering inc.
tbi   ortgage co   any
toll architecture inc.
toll broters Realty trust
toll landscae LLC.
estinster   ecurity coany
estinster title coany inc.

**executive
vice president**
Joseph J. palia  10

**senior
vice president**
robert n. mccarron  16
david h. richey  6

christopher E. Stocke  2
donald I. Salmon  9
Jed Gibson  15
James m. Steuterman  6
mark culchtria  11
felicia ratka  8
william i. unkel  4

*dIRectS YEaRS of SERvIcE*

*ice  resident*
*resident*
*resident*
*r,  ice  resident*
*ice  resident*
*resident*
*resident*

Employee listings are as of 11/1/08

# CORPORATE OFFICERS

## BOARD OF DIRECTORS

**Robert I. Toll***
*Chairman of the Board & Chief Executive Officer*

**Bruce E. Toll**
*Vice Chairman of the Board*
*President - BET Investments,*
*an office and commercial real estate company*

**Zvi Barzilay***
*President and Chief Operating Officer*

**Robert S. Blank**
*Co-Chairman & Co-CEO - Whitney*
*Communications Company, and*
*Senior Partner - Whitcom Partners,*
*Investments*

**Edward G. Boehne**
*Retired President - Federal Reserve Bank*
*of Philadelphia*

**Richard J. Braemer**
*Senior Counsel - Ballard, Spahr, Andrews & Ingersoll,*
*LLP, Attorneys at Law*

**Christine N. Garvey**
*Retired Global Head of Corporate Real Estate*
*Services - Deutsche Bank AG*

**Roger S. Hillas**
*Retired Chairman - Mentor Savings Bank*

**Carl B. Marbach**
*President - Greater Marbach Airlines, Inc. and*
*Florida Professional Aviation, Inc.,*
*aviation services and consulting companies*

**Stephen A. Novick**
*Senior Advisor - The Andrea and Charles Bronfman*
*Philanthropies*

**Joel H. Rassman***
*Executive Vice President, Treasurer and*
*Chief Financial Officer*

**Paul E. Shapiro**
*Chairman - Q Capital Strategies, LLC,*
*a life settlement company*

## EXECUTIVE VICE PRESIDENT [NOTES YEARS OF SERVICE]

Douglas C. Yearley, Jr. [1]

## SENIOR VICE PRESIDENTS [NOTES YEARS OF SERVICE]

| | |
|---|---|
| Martin P. Connor | Assistant Chief Financial Officer |
| Frederick N. Cooper [18] | Finance & Investor Relations |
| Joseph R. DeSanti [25] | Tax |
| Jonathan C. Downs [1] | Human Resources |
| Mark K. Kessler | General Counsel & Chief Compliance Officer |
| Kira McCarron [23] | Chief Marketing Officer |

| | |
|---|---|
| John K. McDonald [8] | Deputy General Counsel |
| Kevin J. McMaster [8] | Controller |
| George W. Nelson | Chief Information Officer |
| Joseph R. Sicree [19] | Chief Accounting Officer |
| Michael I. Snyder [19] | Secretary & Chief Planning Officer |
| Werner Thiessen | Acquisitions |

## HOME BUILDING OPERATIONS [NOTES YEARS OF SERVICE]

**Regional Presidents**
Thomas A. Argyris, Jr [23]
James W. Boyd [25]
Barry A. Depew [15]
William J. Gilligan [18]
Richard T. Hartman [19]
Robert Parahus [17]
Edward D. Weber [18]

**Group Presidents**
Keith L. Anderson [12]
Roger A. Brush [5]
Kevin D. Duermit [22]
John P. Eccarn [19]
Christopher G. Gaffney [5]
John G. Mangano [7]
Gary M. Mayo [17]
Thomas J. Murray [15]
Ralph E. Reiner [7]
Douglas C. Shipe [5]

**Division Presidents**
Thomas J. Anhut [8]
Jeffrey A. Barras [25]
Charles W. Bowie [8]
John D. Buntin [9]
Thomas G. Gestler [8]
Robert M. Hoda [8]
Gregory E. Kamedulski [5]
Richard C. McCormick [9]
Thomas R. Mulvey [5]

Chris Myers [8]
Richard M. Nelson [8]
Walt I. Nowak [8]
Robert G. Paul [5]
Charles B. Ruddata [8]
Walter R. Schwartz [8]
Kenneth S. Thirtyacre [5]
John F. Vitelli [5]

## LAND DEVELOPMENT AND COUNTRY CLUB OPERATIONS [NOTES YEARS OF SERVICE]

**Executive Vice President**
Joseph J. Palka [5]

**Senior Vice Presidents**
Robert N. McCarron [5]
David H. Richey [5]

## SUBSIDIARY AND AFFILIATE OPERATIONS [NOTES YEARS OF SERVICE]

| | | |
|---|---|---|
| Eastern States Engineering, Inc. | Christopher E. Stocke | Vice President |
| TBI Mortgage® Company | Donald L. Salmon | President |
| Toll Architecture, Inc. | Jed Gibson | President |
| Toll Brothers Realty Trust | James M. Steuterman | Sr. Vice President |
| Toll Landscape, L.L.C. | Mark Culichia | Vice President |
| Westminster Security Company | Felicia Ratka | President |
| Westminster Title Company, Inc. | William T. Unkel | President |

*Executive Officer of the Company.
Director and employee listings are as of 11/30/09.

64    Toll Brothers 2010

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll***
*Executive Chairman of the Board*

**Bruce E. Toll**
*Vice Chairman of the Board*
*President - BET Investments,*
*an office and commercial real estate company*

**Douglas C. Yearley, Jr.***
*Chief Executive Officer*

**Zvi Barzilai***
*President and Chief Operating Officer*

**Robert S. Blank**
*Co-Chairman & Co-CEO - Whitney*
*Communications Company, and*
*Senior Partner - Whitcom Partners,*
*Investments*

**Edward G. Boehne**
*Retired President - Federal Reserve Bank*
*of Philadelphia*

**Richard J. Braemer**
*Senior Counsel - Ballard, Spahr, Andrews & Ingersoll,*
*LLP, Attorneys at Law*

**Christine N. Garvey**
*Retired Global Head of Corporate Real Estate*
*Services - Deutsche Bank AG*

**Carl B. Marbach**
*President - Greater Marbach Airlines, Inc., and*
*Florida Professional Aviation, Inc.,*
*aviation services and consulting companies*

**Stephen A. Novick**
*Senior Advisor - The Andrea and Charles Bronfman*
*Philanthropies*

**Paul E. Shapiro**
*Chairman - Q Capital Strategies, LLC,*
*a life settlement company*

## Chief Financial Officer and Treasurer

Martin P. Connor[2] **(Denotes years of service)**

## Senior Vice Presidents

Frederick N. Cooper[17]    *Finance, International Development*
                           *and Investor Relations*

Joseph R. DeSantis[7]    *Tax*

Jonathan C. Downs[18]    *Human Resources*

John K. McDonald[8]    *General Counsel*
                       *and Chief Compliance Officer*

Kevin J. McMaster[3]    *Controller*
George W. Nelson[7]    *Chief Information Officer*
Joseph R. Sicree[18]    *Chief Accounting Officer*
Michael I. Snyde[30]    *Secretary and Chief Planning Officer*
Kira Sterling[25]    *Chief Marketing Officer*
Werner Thiessen[20]    *Acquisitions*

## Home Building Operations

**Regional Presidents**
James W. Boyd[17]
Keith L. Anderson[13]
Barry A. Depew[27]
William J. Gilligan[6]
Richard T. Hartman[31]
Robert Parahus[24]
Edward D. Weber[31]

**Group Presidents**
Keith L. Anderson[13]
Thomas J. Antrut[16]
Kevin D. Thuemn[23]
John P. Elcano[18]
Christopher G. Gaffney[14]
John G. Mangano[23]
Gary M. Mayo[13]
Thomas J. Murray[16]
Ralph E. Reinert[18]
Douglas C. Shipe[16]

**Division Presidents**
Charles W. Bowie[14]
Thomas G. Gestie[21]
Gregory E. Kamedulski[8]
Thomas R. Muivey[6]
Chris Myers[16]
Richard M. Nelson[12]
Robert G. Paul[9]
Charles R. Rinfdatz[13]
Anthony J. Rocco[13]

Robert A. Schooley[12]
Walter R. Schwartz[8]
Kenneth S. Thirtyacre[13]
Daniel C. Zalinski[17]

## Gibraltar Capital and Asset Management, LLC

Roger A. Brush[17]    *President*
Michael L. LaPat[11]    *Chief Financial Officer and Senior Vice President*

## Country Club Operations

David H. Richey[8]    *President*
Mitchell F. Laskowitz[6]    *Senior Vice President*

## Subsidiary and Affiliate Operations

**Eastern States Engineering, Inc.**    Christopher E. Stocke[4]    *Vice President*
**TBI Mortgage Company**    Donald L. Salmon[11]    *President*
**Toll Architecture, Inc.**    Jed Gibson[17]    *President*
**Toll Brothers Realty Trust**    George P. Kruse[1]    *Managing Director*
**Toll Landscape, L.L.C.**    Mark Guidicha[13]    *Vice President*
**Westminster Security Company**    Felicia Ratka[10]    *President*
**Westminster Title Company, Inc.**    William T. Unkel[6]    *President*

## Land Development

Joseph H. Fida[17]    *Executive Vice President*
Robert N. McCarron[18]    *Senior Vice President*

*Executive Officer of the Company.*
*Director and employee listings are as of 11/15/10.*

# Corporate Directors and Officers

## Board of Directors

**Robert I. Toll**[1]
*Executive Chairman of the Board*

**Bruce E. Toll**
*Vice Chairman of the Board
President – BET Investments,
an office and commercial real estate company*

**Douglas C. Yearley, Jr.**[21]
*Chief Executive Officer*

**Robert S. Blank**
*Co-Chairman & Co-CEO – Whitney Communications
Company, and Senior Partner – Whitcom Partners,
investments*

**Edward G. Boehne**
*Retired President – Federal Reserve Bank
of Philadelphia*

**Richard J. Braemer**
*Senior Counsel – Ballard, Spahr, Andrews & Ingersoll, LLP,
Attorneys at Law*

**Christine N. Garvey**
*Retired Global Head of Corporate Real Estate
Services – Deutsche Bank AG*

**Carl B. Marbach**
*President – Greater Marbach Airlines, Inc., and
Florida Professional Aviation, Inc.,
aviation services and consulting companies*

**Stephen A. Novick**
*Senior Advisor – The Andrea and Charles
Bronfman Philanthropies*

**Paul E. Shapiro**
*Chairman – Q Capital Strategies, LLC,
a life settlement company*

---

## Chief Operating Officer and Executive Vice President

**Richard T. Hartman**[32]

## Senior Vice Presidents

**Frederick N. Cooper**[18]
*Finance, International
Development and
Investor Relations*

**Joseph R. DeSanto**[8]
*Tax*

**Jonathan C. Downs**[19]
*Human Resources*

### Home Building Operations

#### Regional Presidents

James W. Boyd  (18)
Barry A. Depew  (28)
William J. Gilligan  (17)
John G. Mangano  (24)
Robert Parahus  (25)
Edward D. Weber  (32)

#### Golf and Country Club Operations

**David H. Richey**[9]
*President*

---

## Chief Financial Officer and Treasurer

**Martin P. Connor**[3]

**Daniel J. Kennedy**[17]
*Internal Audit*

**John K. McDonald**[9]
*Development and*

**Michael I. Snyder**[31]
*General Counsel and
Chief Compliance Officer*

**Kevin J. McMaster**[28]
*Chief Accounting Officer*

*Controller*

#### Group Presidents

Keith S. Anderson  (14)
Thomas J. Anhut  (17)
Kevin D. Duermit  (24)
John P. Elcano  (19)
Christopher G. Gaffney  (15)
Gary M. Mayo  (14)
Thomas R. Mulvey  (7)
Thomas J. Murray  (17)
Douglas C. Shipe  (17)

#### Golf and Country Club Operations

**Mitchell P. Laskowitz**[7]
*Senior Vice President*

**George W. Nelson**[8]
*Chief Information Officer*

**Joseph R. Sicree**[19]
*Chief Accounting Officer*

**Kira Sterling**[26]
*Chief Marketing Officer*

**Werner Thiessen**[21]
*Acquisitions*

**Gregg L. Ziegler**[8]
*Treasury*

**Kevin J. McMaster**[28]
*Secretary and
Chief Planning Officer*

#### Division Presidents

Charles W. Bowie  (15)
Charles T. Breder  (11)
Eric H. Campbell  (14)
Thomas G. Gestite  (22)
Gregory E. Kamedulski  (19)
Robert I. Kardos  (13)
James A. McDade  (7)
Richard M. Nelson  (13)

Robert G. Paul  (10)
Charles B. Raddatz  (14)
Anthony I. Rocco  (14)
Walter R. Schwarz  (9)
Andrew I. Semon  (9)
Kenneth S. Thirlyacre  (14)
David H. Van Spreckelsen  (8)
Daniel C. Zalinsky  (18)

---

## Land Development Operations

**Joseph J. Palka**[8]
*Executive Vice President*

**Robert N. McCarron**[19]
*Senior Vice President*

---

## Subsidiary and Affiliate Operations

### Gibraltar Capital and Asset Management, LLC

**Roger A. Brush**[8]
*President*

**ESE Consultants, Inc.**

**Christopher E. Stocke**[6]
*President*

**TBI Mortgage® Company**

**Donald L. Salmon**[12]
*President*

**Michael L. LaPat**[12]
*Chief Financial Officer and
Senior Vice President*

**Toll Architecture, Inc.**

**Jed Gibson**[18]
*President*

**Toll Brothers Realty Trust**

**Charles L. Elliott**[8]
*Managing Director*

**Toll Integrated Systems**

**Keith Feil**[3]
*Director of Manufacturing*

**Toll Landscape, LLC**

**Mark Culichia**[4]
*President*

**Westminster Security Company**

**Felicia Ratka**[11]
*President*

**Westminster Title Company, Inc.**

**William T. Unkel**[7]
*President*

---

68  Toll Brothers

*Executive Officer of the Company.*
*Director and employee listing as of 11/1/12.*
*( ) Years of service with Toll Brothers.*

## Board of Directors

**Robert I. Toll\***
*Executive Chairman of the Board*

**Bruce E. Toll**
*Vice Chairman of the Board
President — BET Investments,
an office and commercial real estate company*

**Douglas C. Yearley, Jr.\*** (22)
*Chief Executive Officer*

**Robert S. Blank**
*Co-Chairman & Co-CEO — Whitney Communications
Company, and
Senior Partner — Whitcom Partners,
investments*

**Edward G. Boehne**
*Retired President — Federal Reserve Bank
of Philadelphia*

**Richard J. Braemer**
*Senior Counsel — Ballard, Spahr,
Andrews & Ingersoll, LLP, Attorneys at Law*

**Christine N. Garvey**
*Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG*

**Carl B. Marbach**
*President — Greater Marbach Airlines, Inc., and
Florida Professional Aviation, Inc.,
aviation services and consulting companies*

**Stephen A. Novick**
*Senior Advisor — The Andrea and Charles
Bronfman Philanthropies*

**Paul E. Shapiro**
*Chairman — Q Capital Strategies, LLC,
a life settlement company*

*\*Executive Officer of the Company
( ) Years of service with Toll Brothers,*

## President and Chief Operating Officer

**Richard T. Hartman\*** (33)

## Senior Vice Presidents

**Frederick N. Cooper** (19)
*Finance, International Development
and Investor Relations*

**Joseph R. DeSanto** (9)
*Tax*

**Jonathan C. Downs** (20)
*Human Resources*

**Daniel J. Kennedy** (18)
*Internal Audit*

**John K. McDonald** (10)
*General Counsel and
Chief Compliance Officer*

**Michael I. Snyder** (32)
*Secretary and
Chief Planning Officer*

### Home Building Operations

**Regional Presidents**

James W. Boyd (19)
Barry A. Depew (29)
William J. Gilligan (18)
John G. Mangano (25)
Robert Parahus (26)
Edward D. Weber (33)

**Group Presidents**

Keith L. Anderson (15)
Kevin D. Duermit (25)
John P. Elcano (20)
Christopher G. Gaffney (16)
Gregory E. Kamedulski (20)
Gary M. Mayo (19)
Thomas R. Mulvey (8)
Thomas J. Murray (18)
Douglas C. Shipe (18)

### Golf and Country Club Operations

**David H. Richey** (10)
*President*

**Mitchell P. Laskowitz** (8)
*Senior Vice President*

### Subsidiary and Affiliate Operations

## Gibraltar Capital and Asset Management, LLC

**Roger A. Brush** (19)
*President*

**Michael L. LaPat** (13)
*Chief Financial Officer and
Senior Vice President*

**ESE Consultants, Inc.**

**Christopher E. Stocke** (6)
*President*

**Toll Architecture, Inc.**

**Jed Gibson** (19)
*President*

**TBI Mortgage® Company**

**Donald I. Salmon** (13)
*President*

**Toll Brothers Realty Trust**

**Charles L. Elliott** (1)
*Managing Director*

## Chief Financial Officer and Treasurer

**Martin P. Connor\*** (4)

**George W. Nelson** (9)
*Chief Information Officer*

**Kira Sterling** (27)
*Chief Marketing Officer*

**Werner Thiessen** (22)
*Acquisitions*

**Gregg L. Ziegler** (10)
*Treasury*

**Division Presidents**

Eric C. Anderson (16)
Charles W. Bowie (16)
Charles T. Bexler (12)
Eric H. Campbell (1)
Robert L. Flaherty (15)
Thomas G. Gastle (23)
Robert J. Kartos (14)
David F. Kelly (8)
James A. McDade (8)

**Division Presidents**

Karl Mistry (8)
Robert M. Nelson (14)
Robert G. Paul (11)
Anthony J. Rocco (15)
Andrew J. Semon (10)
Kenneth S. Thirjane (15)
David H. Von Spreckelsen (9)
Daniel C. Zalnsky    (19)

### Land Development Operations

**Joseph J. Palka** (19)
*Executive Vice President*

**Robert N. McCarron** (20)
*Senior Vice President*

**Toll Integrated Systems**

**Keith Fell** (4)
*Director of Manufacturing*

**Westminster Security Company**

**Felicia Ratka** (12)
*President*

**Westminster Title Company, Inc.**

**William T. Unkel** (8)
*President*

**Toll Landscape, LLC**

**Mark Cuichta** (15)
*President*

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**[*]
Executive Chairman of the Board

**Bruce E. Toll**
Vice Chairman of the Board
Principal — BET Investments,
an office and commercial real estate company

**Douglas C. Yearley, Jr.**[*] (23)
Chief Executive Officer

**Robert S. Blank**
Co-Chairman & Co-CEO — Whitney
Communications Company, and
Senior Partner — Whitcom Partners, investments

**Edward G. Boehne**
Retired President — Federal Reserve Bank
of Philadelphia

**Richard J. Braemer**
Senior Counsel — Ballard, Spahr,
Andrews & Ingersoll, LLP, Attorneys at Law

**Christine N. Garvey**
Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG

**Carl B. Marbach**
President — Greater Marbach Airlines, Inc., and
Florida Professional Aviation, Inc.,
aviation services and consulting companies

**Stephen A. Novick**
Senior Advisor — The Andrea and Charles
Bronfman Philanthropies

**Paul E. Shapiro**
Chairman — Q Capital Strategies, LLC,
a life settlement company

[*]Executive Officer of the Company.
Director and employee taking as of 11/1/14.
( ) Years of service with Toll Brothers.

## President and Chief Operating Officer

**Richard T. Hartman**[*]    (34)

## Senior Vice Presidents

**Frederick N. Cooper** (20)
Finance, International Development
and Investor Relations

**John K. McDonald** (11)
General Counsel and
Chief Compliance Officer

**Joseph R. DeSanto** (10)
Tax

**Jonathan C. Downs** (21)
Human Resources

### Home Building Operations

**Regional Presidents**
James W. Boyd (20)
Barry A. Depew (20)
John P. Elcano    (21)
William J. Gilligan (19)
John G. Mangano (26)
Christopher G. Gaffney (17)
Robert Parahus (27)
Gary M. Mayo (16)
Edward D. Weber (34)

**Toll Brothers City Living®**
Thomas J. Murray (19)
Douglas C. Shipe (19)
President

## Subsidiary and Affiliate Operations

### Toll Brothers Apartment Living®
**Charles L. Elliott** (2)
Managing Director

### Golf and Country Club Operations
**David H. Richey** (11)
President

### Land Development Operations
**Robert N. McCarron** (27)
Executive Vice President
**Joseph J. Palka** (20)
Executive Vice President

## Chief Financial Officer

**Martin P. Connor**[*]    (6)

**George W. Nelson** (10)
Chief Information Officer

**Joseph R. Sircee** (21)
Chief Accounting Officer

**Michael J. Snyder** (33)
Secretary and
Chief Planning Officer

**Daniel J. Kennedy** (19)
Internal Audit

**Group Presidents**
Keith L. Anderson (16)
Keith D. Doerr (36)
John P. Elcano    (21)
Christopher G. Galvey (17)
Gregory B. Kamedulski (21)
Thomas J. Murray (19)

**Division Presidents**
Eric C. Anderson (17)
David Bauer (9)
Charles W. Ron (9)
Charles T. Broder (13)
Eric H. Campbell (2)
Robert L. Flaherty (16)
Thomas G. Gastle (24)
David E. Kelly (9)
Kenneth S. Thirgwow (16)
John S. Lannamann (12)
Jake P. Lucero (13)
James A. McDade (8)

**ESE Consultants, Inc.**
**Mark S. Mayhew**
Managing Director

**TBI Mortgage® Company**
**Donald L. Salmon** (14)
President

**Toll Architecture, Inc.**
**Jed Gibson** (20)
President

### Gibraltar Capital and Asset Management, LLC
**Michael L. LaPat** (14)
Chief Financial Officer
**Roger A. Brush** (20)
President

### Toll Integrated Systems
**Keith Fell** (5)
Director of Manufacturing

### Toll Landscape, LLC
**Mark Culichia** (16)
President

**Kira Sterling** (28)
Chief Marketing Officer

**Werner Thiessen** (23)
Acquisitions

**Gregg L. Ziegler** (11)
Treasurer

**Division Presidents**
Karl Mistry (9)
Richard M. Nelson (15)
Gregory S. Nebo (13)
Gregory G. Paul (12)
Sahi J. Ping (10)
Anthony J. Rocco (16)
Andrew J. Semon (11)
David H. Von Spreckelsen (10)
David R. Straub (10)
Daniel C. Zalinsky    (20)

### Westminster Security Company
**Felicia Ratka** (13)
President

### Westminster Title Company, Inc.
**William T. Unkel** (9)
President

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**
Executive Chairman of the Board

**Bruce E. Toll**
Vice Chairman of the Board
Principal — BET Investments,
an office and commercial real estate company

**Douglas C. Yearley, Jr.** *(24)*
Chief Executive Officer

**Robert S. Blank**
Co-Chairman & Co-CEO — Whitney
Communications Company, and
Senior Partner — Whitcom Partners, Investments

**Edward G. Boehne**
Retired President — Federal Reserve Bank
of Philadelphia

**Richard J. Braemer**
Senior Counsel — Ballard Spahr
LLP, Attorneys at Law

**Christine N. Garvey**
Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG

**Carl B. Marbach**
President — Greater Marbach Airlines, Inc. and
Florida Professional Aviation, Inc.,
aviation services and consulting companies

**Stephen A. Novick**
Senior Advisor — The Andrea and Charles
Bronfman Philanthropies

**Paul E. Shapiro**
Chairman — Q Capital Strategies, LLC,
a life settlement company

*"Executive Officer of the Company.*
*Director and employee listings as of 1/1/15.*
*( ) Years of service with Toll Brothers.*

## President and Chief Operating Officer

**Richard T. Hartman\*** *(35)*

## Senior Vice Presidents

**Frederick N. Cooper** *(21)*
Finance, International Development
and Investor Relations

**Jonathan C. Downs** *(22)*
Human Resources

**John Critikos** *(1)*
Internal Audit

**John K. McDonald** *(12)*
Chief Information Officer

**Daniel J. Kennedy** *(20)*
General Counsel and
Chief Compliance Officer

**Joseph R. DeSanto** *(11)*
Tax

**Michael I. Snyder** *(34)*
Secretary and
Chief Planning Officer

## Subsidiary and Affiliate Operations

### Toll Brothers Apartment Living

**Charles L. Elliott** *(3)*
Managing Director

### Home Building Operations

**Regional Presidents**

James W. Boyd *(21)*
Barry A. Depew *(31)*
William J. Gilligan *(20)*
John G. Marugano *(27)*
Robert Parahus *(28)*

**Group Presidents**

Keith L. Anderson *(17)*
Kevin D. Duermit *(27)*
John P. Elcano *(22)*
Christopher G. Gaffney *(19)*
Gregory C. Kamedulski *(22)*
Gary M. Mayo *(17)*
Thomas J. Murray *(20)*

**Toll Brothers City Living®**

**Thomas R. Mulvey** *(10)*
President

### Golf and Country Club Operations

**David H. Richey** *(12)*
President

### Land Development Operations

**Robert N. McCarron** *(22)*
Executive Vice President

**Joseph J. Palka** *(21)*
Executive Vice President

### ESE Consultants, Inc.

**Mark S. Mayhew** *(1)*
Managing Director

### TBI Mortgage® Company

**Donald L. Salmon** *(15)*
President

### Toll Architecture, Inc.

**Jed Gibson** *(21)*
President

### Gibraltar Capital and Asset Management, LLC

**Roger A. Brush** *(21)*
President

### Toll Integrated Systems

**Keith Fell** *(5)*
Director of Manufacturing

### Toll Landscape, LLC

**Mark Culichia** *(17)*
President

## Chief Financial Officer

**Martin P. Connor\*** *(6)*

**Kevin J. McMaster** *(31)*
Controller

**Joseph R. Sicree** *(22)*
Chief Accounting Officer

**Gregg L. Ziegler** *(12)*
Treasurer

**Kira Sterling** *(29)*
Chief Marketing Officer

**Werner Thiessen** *(24)*
Acquisitions

**Division Presidents**

Eric C. Anderson *(18)*
Mark G. Bailey *(14)*
David Bauer *(10)*
Charles T. Brede *(14)*
James Fitzpatrick *(13)*
Robert L. Flaherty *(17)*
David E. Kelly *(10)*
John S. Lammamann *(13)*
Joel F. Lucero *(14)*
Karl Mistry *(10)*
Kelley Moldstad *(3)*

**Division Presidents**

Robert D. Moore *(1)*
Richard M. Nelson *(16)*
Gregory S. Nietro *(14)*
Mark J. Nosal *(13)*
Robert G. Paul *(13)*
Seth L. Ring *(11)*
Anthony J. Rocco *(17)*
Andrew J. Semon *(12)*
David R. Straub *(14)*
Kenneth S. Thiryayre *(17)*
David H. Von Spreckelsen *(11)*

### Westminster Security Company

**Michael L. LaPat** *(15)*
Chief Financial Officer

### Westminster Title Company, Inc.

**Felicia Ratka** *(14)*
President

**William T. Unkel** *(10)*
President

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**
Executive Chairman of the Board

**Bruce E. Toll**
Vice Chairman of the Board
Principal — BET Investments,
an office and commercial real estate company

**Douglas C. Yearley, Jr.** (25)
Chief Executive Officer

**Robert S. Blank**
Co-Chairman & Co-CEO — Whitney
Communications Company, and
Senior Partner — Whitcom Partners

**Edward G. Boehne**
Retired President — Federal Reserve Bank
of Philadelphia

**Richard J. Braemer**
Senior Counsel — Ballard Spahr
LLP, Attorneys at Law

**Christine N. Garvey**
Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG

**Carl B. Marbach**
President — Greater Marbach Airlines, Inc.,
an aviation services and consulting company

**Stephen A. Novick**
Senior Advisor — The Andrea and Charles
Bronfman Philanthropies

**Paul E. Shapiro**
Chairman — Q Capital Holdings, LLC,
a life settlement company

*Executive Officer of the Company.
Director and employee listing as of 1/1/16.
( ) Years of service with Toll Brothers.*

## Senior Vice Presidents

**Richard T. Hartman*** (36)

**Frederick N. Cooper** (22)
Finance, International Development
and Investor Relations

**John Critikos** (2)
Chief Information Officer

**Joseph R. DeSanto** (12)
Tax

## President and Chief Operating Officer

**Richard T. Hartman*** (36)

### Home Building Operations

**Regional Presidents**
James W. Boyd (22)
Barry A. Depew (32)
Kevin D. Duermit (28)
William J. Gilligan (21)
John G. Marigano (28)
Robert Parahus (29)

**Toll Brothers City Living®**
Thomas R. Mulvey (11)
President

**Group Presidents**
Keith L. Anderson (18)
John P. Elcano   (23 )
Christopher G. Gaffney (19)
Gregory E. Kamedulski (23)
Gary M. Mayo (18)
Thomas J. Murray (21)

**Jonathan C. Downs** (23)
Human Resources

**Daniel J. Kennedy** (21)
Chief Audit Officer

**John K. McDonald** (13)
General Counsel and
Chief Compliance Officer

## Chief Financial Officer

**Martin P. Connor*** (7)

**Kevin J. McMaster** (32)
Controller

**Joseph R. Sicree** (23)
Chief Accounting Officer

**Michael I. Snyder** (35)
Secretary and
Chief Planning Officer

**Kira Sterling** (30)
Chief Marketing Officer

**Werner Thiessen** (25)
Acquisitions

**Gregg L. Ziegler** (13)
Treasurer

**Division Presidents**
Eric C. Anderson (19)
Mark G. Bailey (15)
David Bauer (11)
Charles T. Breder (15)
James Fitzpatrick (14)
Robert L. Flaherty (18)
David E. Kelly (11)
John S. Lammanann (14)
Karl Mistry (11)
Kelley Moldstad (4)
Robert D. Moore (2)

**Division Presidents**
Richard M. Nelson (17)
Gregory S. Nelro (15)
Mark L. Nosal (14)
Robert G. Paul (14)
Seth L. Ring (12)
Anthony J. Rocco (18)
Andrew J. Semon (13)
David R. Straub (15)
Kenneth S. Thanyarore (18)
John R. Tolbert (16)
David H. Von Spreckelsen (12)

## Subsidiary and Affiliate Operations

### Toll Brothers Apartment Living
### Toll Brothers Campus Living

**Charles L. Elliott** (4)
Managing Director

### Golf and Country Club Operations

**David H. Richey** (13)
President

### Land Development Operations

**Robert N. McCarron** (23)
Executive Vice President

**Joseph J. Palka** (22)
Executive Vice President

**ESE Consultants, Inc.**
**Mark S. Mayhew** (2)
Managing Director

**TBI Mortgage® Company**
**Donald L. Salmon** (16)
President

**Toll Architecture, Inc.**
**Jed Gibson** (22)
President

### Gibraltar Capital and Asset Management, LLC

**Roger A. Brush** (22)
President

**Keith Fell** (7)
Director of Manufacturing

**Toll Landscape, LLC**
**Mark Culchia** (18)
President

### Toll Integrated Systems

### Westminster Security Company
**Felicia Ratka** (15)
President

**Westminster Title Company, Inc.**
**William T. Unkel** (11)
President

### Michael L. LaPat (16)
Chief Financial Officer

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll\***
*Executive Chairman of the Board*

**Douglas C. Yearley, Jr.\*** (26)
*Chief Executive Officer*

**Edward G. Boehne**
*Retired President — Federal Reserve Bank
of Philadelphia*

**Richard J. Braemer**
*Senior Counsel — Ballard Spahr
LLP, Attorneys at Law*

**Christine N. Garvey**
*Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG*

**Carl B. Marbach**
*President — Greater Marbach Airlines, Inc.,
an aviation services and consulting company*

**John A. McLean**
*Chief Executive Officer and Distribution
Principal — Hartford Funds Distributors*

**Stephen A. Novick**
*Senior Advisor — Chiastro Investments*

**Paul E. Shapiro**
*Chairman — Q Capital Holdings, LLC,
a life settlement company*

\**Executive Officer of the Company.*
*Director and employee listing as of 1/1/17.*
*( ) Years of service with Toll Brothers.*

## Senior Vice Presidents

**Richard T. Hartman\*** (37)

**Frederick N. Cooper** (23)
*Finance, International Development
and Investor Relations*

**John Critikos** (3)
*Chief Information Officer*

**Joseph R. DeSanto** (13)
*Tax*

## President and Chief Operating Officer

**Richard T. Hartman\*** (37)

## Chief Financial Officer

**Martin P. Connor\*** (8)

**Benjamin D. Jogodnik** (21)
*Mergers & Acquisitions*

**Daniel J. Kennedy** (22)
*Chief Audit Officer*

**John K. McDonald** (14)
*General Counsel and
Chief Compliance Officer*

**Michael L. Snyder** (36)
*Secretary and
Chief Planning Officer*

**Kevin J. McMaster** (33)
*Controller*

**Joseph R. Sicree** (24)
*Chief Accounting Officer*

**Gregg L. Ziegler\*** (14)
*Treasurer*

**Kira Sterling** (31)
*Chief Marketing Officer*

## Home Building Operations

### Regional Presidents

James W. Boyd (23)
Barry A. Depew (33)
Kevin D. Duermit (29)
John G. Marrgano (29)
Robert Parahas (30)

**Toll Brothers City Living®**
Thomas J. Murray (22)
Seth J. Ring (13)
*President*

### Group Presidents

Keith L. Anderson (19)
Christopher G. Gaffney (20)
Gregory E. Kamedulski (24)
Gary M. Mayo (19)
Karl Mistry (12)
Robert D. Moore (3)

### Division Presidents

Eric C. Anderson (20)
David S. Assaf (16)
Mark G. Baxley (16)
David Bauer (12)
Robert G. Paul (15)
Anthony J. Rocco (19)
Andrew J. Semon (14)
David R. Straub (16)
Kenneth S. Thirlyarre (19)
John R. Robert (17)
David H. Von Spreckelsen (13)

Thomas M. Coleman, Jr.
James Fitzpatrick (15)
Robert L. Flaherty (19)
David E. Kelly (12)
John S. Lamnamann (15)
Kelley Matdstad (5)

Richard M. Nelson (18)
Gregory S. Netro (16)
Mark L. Nosal (15)

## Subsidiary and Affiliate Operations

**Toll Brothers Apartment Living**
**Toll Brothers Campus Living**
Charles L. Elliott (5)
*SR. VP/Managing Director*

**Golf and Country Club Operations**
Maurice Darbyshire (11)
*President*

**Land Development Operations**
Robert N. McCarron (24)
*Executive Vice President*

**Joseph J. Palka** (23)
*Executive Vice President*

**ESE Consultants, Inc.**
Mark S. Mayhew (3)
*SR. VP/Managing Director*

**TBI Mortgage® Company**
Donald L. Salmon (17)
*President*

**TBI Smart Home Solutions**
Felicia Ratka (16)
*President*

**Gibraltar Capital and Asset Management, LLC**
Roger A. Brush (23)
*President*

**Toll Architecture, Inc.**
Jed Gibson (23)
*President*

**Toll Integrated Systems**
Keith Fell (6)
*Director of Manufacturing*

**Michael L. LaPat** (17)
*Chief Financial Officer*

**Toll Landscape, LLC**
Mark Culichia (19)
*President*

**Westminster Title Company, Inc.**
William T. Unkel (12)
*President*

## STOCK PRICES

## RECONCILIATION OF NON-GAAP MEASURES

*(Amounts in thousands)*

## STOCKHOLDER RETURN PERFORMANCE GRAPH



## DIVIDENDS

## CORPORATE DIRECTORS AND OFFICERS

### Board of Directors

### President and Chief Operating Officer

### Chief Financial Officer

### Senior Vice Presidents

### Home Building Operations

### Subsidiary and Affiliate Operations

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**
Chairman Emeritus of the Board

**Douglas C. Yearley, Jr.** (28)
Chairman of the Board
and Chief Executive Officer

**Edward G. Boehne**
Retired President — Federal Reserve Bank
of Philadelphia

**Richard J. Braemer**
Senior Counsel — Ballard Spahr
LLP, Attorneys at Law

**Christine N. Garvey**
Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG

**Carl B. Marbach**
President — Greater Marbach Airlines, Inc.,
an aviation services and consulting company

**John A. McLean**
Senior Managing Director — New York Life
Investment Management

**Stephen A. Novick**
Senior Advisor — Chiastro Investments

**Wendell E. Pritchett**
Provost, Presidential Professor of Law and
Education — University of Pennsylvania

**Paul E. Shapiro**
Chairman — Q Capital Holdings LLC,
a life settlement company

*Executive Officer of the Company.
Director and employee listing as of 11/1/18.
() Years of service with Toll Brothers.

## Senior Leadership

**President and Chief Operating Officer**

**Richard T. Hartman*** (39)

**Frederick N. Cooper** (25)
Finance, International Development
and Investor Relations

**Benjamin D. Jogodnik** (23)
Mergers & Acquisitions

**John Critikos** (5)
Chief Information Officer

**Daniel J. Kennedy** (24)
Chief Audit Officer

**Joseph R. DeSanto** (15)
Tax

**John K. McDonald** (16)
General Counsel and
Chief Compliance Officer

**Michael J. Grubb** (15)
Chief Accounting Officer

**John Jakominich** (21)

**Joy N. Roman** (2)
Chief Human Resources Officer

**Michael J. Snyder** (38)
Secretary and
Chief Planning Officer

### Home Building Operations

**Regional Presidents**

**James W. Boyd** (25)

**Barry A. Depew** (35)

**Kevin D. Duermit** (31)

**John G. Mangano** (31)

**Robert Parahus** (32)

**Toll Brothers City Living®**

**Thomas R. Mulvey** (14)
President

**Group Presidents**

**Christopher G. Gaffney** (22)

**Gary M. Mayo** (21)

**Karl Mistry** (14)

**Robert D. Moore** (5)

**Thomas J. Murray** (24)

**Gregory S. Netro** (16)

**Seth J. Ring** (15)

**Division Presidents**

**Eric C. Anderson** (24)

**David S. Assaf** (18)

**Mark G. Bailey** (18)

**David Blair** (14)

**Craig Cherry** (20)

**Thomas M. Coleman, Jr.** (2)

**John Dean** (7)

**James Fitzpatrick** (17)

**Robert L. Flaherty** (21)

**Scott James** (1)

**David E. Kelly** (14)

**Division Presidents**

**John S. Lannamann** (17)

**Steven R. Merten** (14)

**Kelley Mickstad** (7)

**Richard H. Nelson** (20)

**Mark I. Nosal** (17)

**Robert G. Paul** (17)

**Jaime Pou** (1)

**Andrew J. Salmon** (16)

**John R. Tolbert** (19)

**David H. Von Spreckelsen** (15)

## Subsidiary and Affiliate Operations

**Toll Brothers Apartment Living**
**Toll Brothers Campus Living®**

**Robert N. McCarron** (26)
Executive Vice President

**Charles L. Elliott** (7)
President

**Toll Brothers Hospitality Group**

**John J. DePaul** (1)
President

**Golf and Country Club Operations**

**Maurice Darbyshire** (13)
President

**Land Development Operations**

**Mark S. Mayhew** (5)
SR. VP/Managing Director

**ESE Consultants, Inc.**

**TBI Mortgage® Company**

**Donald L. Salmon** (19)
CEO

**Steve Audet** (2)
President

**TBI Smart Home Solutions**

**Felicia Ratka** (18)
President

**Toll Architecture, Inc.**

**Jed Gibson** (25)
President

**Toll Integrated Systems**

**Keith Fell** (10)
Director of Manufacturing

**Toll Landscape, LLC**

**Mark Culicchia** (21)
President

**Westminster Title Company, Inc.**

**William T. Unkel** (14)
President

**Gibraltar Real Estate Capital**

**Roger A. Brush** (25)
President

**Michael L. LaPat** (19)
Chief Financial Officer

## Chief Financial Officer

**Martin P. Connor*** (10)

**Kevin J. McMaster** (35)
Controller

**Jennifer Olsen** (17)
National Sales

**Kira Sterling** (33)
Chief Marketing Officer

**Gregg L. Ziegler** (16)
Treasurer

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**
Chairman Emeritus of the Board

**Douglas C. Yearley, Jr.\*** (29)
Chairman of the Board
and Chief Executive Officer

**Edward G. Boehne**
Retired President — Federal Reserve Bank
of Philadelphia

**Richard J. Braemer**
Senior Counsel — Ballard Spahr
LLP, Attorneys at Law

**Christine N. Garvey**
Retired Global Head of Corporate Real Estate
Services — Deutsche Bank AG

**Karen H. Grimes**
Retired Partner, Senior Managing Director,
and Equity Portfolio Manager — Wellington
Management Company

**Carl B. Marbach**
Retired President — Greater Marbach Airlines,
Inc. an aviation services and consulting company

**John A. McLean**
Senior Managing Director — New York Life
Investment Management

**Stephen A. Novick**
Senior Advisor — Chasbro Investments

**Wendell E. Pritchett**
Provost, Presidential Professor of Law and
Education — University of Pennsylvania

**Paul E. Shapiro**
Chairman — Q Capital Holdings LLC,
a life settlement company

*Executive Officer of the Company.
(_) Years of service with Toll Brothers.
Director and employee listing as of 1/1/20.*

## Executive Vice Presidents and Co-Chief Operating Officers

**James W. Boyd\*** (26)

**Robert Parahus\*** (33)

### Senior Vice Presidents

**Todd Callahan** (7)
Land Acquisitions

**Frederick N. Cooper** (28)
Finance, International Development
and Investor Relations

**John Critikos** (6)
Chief Information Officer

**Joseph R. DeSanto** (16)
Tax

**David Ernst** (7)
Land Acquisitions

**Michael J. Grubb** (16)
Chief Accounting Officer

**John Jakominich** (22)
Land Acquisitions

**Benjamin D. Jogodnik** (24)
Mergers & Acquisitions

**Daniel J. Kennedy** (25)
Chief Audit Officer

## Chief Financial Officer

**Martin P. Connor\*** (11)

**Wendy Marlett** (1)
Chief Marketing Officer

**Joy N. Ronan** (3)
Chief Human Resources Officer

**Gregg L. Ziegler** (17)
Treasurer

## Subsidiary and Affiliate Operations

### Home Building Operations

**Regional Presidents**
Kevin D. Daemit (12)
John G. Mangano (32)
Karl Mistry (15)
Thomas J. Murray (25)
Seth J. Ring (16)

**Toll Brothers City Living®**
Thomas R. Mulvey (15)
President
David H. Von Spreckelsen (16)
Group President

**Group Presidents**
Eric C. Anderson (23)
Mark G. Bailey (19)
Robert L. Flaherty (22)
Christopher G. Gaffney (23)
Gary M. Mayo (22)
Kelley Moldstad (8)
Robert D. Moore (6)
Gregory S. Netro (19)
Robert G. Paul (18)

**Division Presidents**
David S. Assid (19)
David Bauer (15)
Kevin Brown (11)
Craig Cherry (21)
Brandon Cooper (16)
John Dean (8)
Brock Fanning (11)
James Fitzpatrick (18)
Brad Hare (16)
Scott James (2)
RM Jones (4)
David E. Kelly (15)

John S. Lannemann (18)
Alexander Martin (9)
Steven R. Merten (15)
Richard M. Nelson (21)
Nicholas Norvilas (8)
Fredrick Pfister (14)
Jeremiah Portlock (8)
Jaime Pou (2)
Christopher Ryan (1)
Andrew J. Semon (17)
Thomas Sharp (1)
Susan Stanley (3)

### Toll Brothers Apartment Living
### Toll Brothers Campus Living®
**Charles L. Elliott** (6)
President

### Toll Brothers Hospitality Group
**John J. DePaul** (2)
President

### Land Development Operations
**Robert N. McCarron** (27)
Executive Vice President

### ESE Consultants, Inc.
**Mark S. Mayhew** (6)
SR. VP/Managing Director

### TBI Mortgage® Company
**Steve Audet** (3)
President

### TBI Smart Home Solutions
**Felicia Ratka** (19)
President

### Toll Architecture, Inc.
**Jed Gibson** (26)
President

### Toll Integrated Systems
**Keith Fell** (11)
Director of Manufacturing

### Toll Landscape, LLC
**Mark Culichia** (22)
President

### Westminster Title Company, Inc.
**William T. Unkel** (15)
President

### Gibraltar Real Estate Capital
**Roger A. Brush** (26)
President
**Michael L. LaPat** (20)
Chief Financial Officer

# CORPORATE DIRECTORS AND OFFICERS

## Board of Directors

**Robert I. Toll**
*Chairman Emeritus of the Board*

**Douglas C. Yearley, Jr.[*]** (30)
*Chairman of the Board, President,
& Chief Executive Officer*

**Edward G. Boehne**
*Lead Independent Director
Retired President — Federal Reserve
Bank of Philadelphia*

**Richard J. Braemer**
*Senior Counsel — Ballard Spahr LLP,
Attorneys at Law*

**Stephen F. East**
*Retired Managing Director —
Wells Fargo & Company*

**Christine N. Garvey**
*Retired Global Head of Corporate Real
Estate Services — Deutsche Bank AG*

**Karen H. Grimes**
*Retired Partner, Senior Managing Director,
and Equity Portfolio Manager — Wellington
Management Company*

**Carl B. Marbach**
*President and Chief Executive Officer of Shared
Charter, Inc., a peer-to-peer private airplane
chartering service provider*

**John A. McLean**
*Senior Managing Director — New York Life
Investment Management*

**Stephen A. Novick**
*Senior Advisor — Chiadno Investments*

**Wendell E. Pritchett**
*Provost, Presidential Professor of Law
& Education — University of Pennsylvania*

**Paul E. Shapiro**
*Chairman — Q Capital Holdings LLC,
a life settlement company*

**Kevin J. Coen** (2)
*Corporate Secretary*

*Executive Ofcer of the Company.
Director and employee listing as of 1/1/21.
( ) Years of service with Toll Brothers.*

## Senior Vice Presidents

**Frederick N. Cooper** (27)
*Finance, International Development
& Investor Relations*

**John Critikos** (7)
*Chief Information Officer*

**Timothy J. Hoban** (15)
*General Counsel*

**Joseph R. DeSanto** (17)
*Tax*

**David Ernst** (8)
*Land Acquisitions*

## Home Building Operations

### REGIONAL PRESIDENTS

**Kevin D. Duerr** (33)

**Christopher G. Gaffney** (24)

**Karl Mistry** (16)

**Thomas J. Murray** (26)

**Seth J. Ring** (17)

### TOLL BROTHERS CITY LIVING®

**Thomas R. Mulvey** (16)
*President*

**David H. Von Spreckelsen** (17)
*Group President*

## Subsidiary and Affiliate Operations

### TOLL BROTHERS APARTMENT LIVING
### TOLL BROTHERS CAMPUS LIVING®

**Charles L. Elliott** (9)
*President*

### TOLL BROTHERS
### HOSPITALITY GROUP

**John J. DePaul** (3)
*President*

### LAND DEVELOPMENT OPERATIONS

**Robert N. McCarron** (28)
*Executive Vice President*

## Executive Vice Presidents and Co-Chief Operating Officers

**James W. Boyd[*]** (27)

**Robert Parahus[*]** (34)

**Patrick Galligan** (27)
*Homebuilding Controller*

**Michael J. Grubb** (17)
*Chief Accounting Officer*

**Andrew C. Lawhorn** (13)
*Acquisition Finance*

**John Jakonimich** (23)
*Land Acquisitions*

### GROUP PRESIDENTS

**Eric C. Anderson** (24)

**Mark G. Bailey** (20)

**Robert L. Flaherty** (23)

**Gary M. Mayo** (23)

**Kelley Mickstian** (9)

**Gregory S. Nerio** (20)

**Robert G. Paul** (19)

### ESE CONSULTANTS, INC.

**Mark S. Mayhew** (7)
*President*

**SR. VP/Managing Director**

### TBI MORTGAGE® COMPANY

**Steve Audet** (4)
*President*

### TBI SMART HOME SOLUTIONS

**Felcia Rabla** (20)
*President*

## Chief Financial Officer

**Martin P. Connor[*]** (12)

**Benjamin D. Jogodnik** (25)
*Mergers & Acquisitions*

**Daniel J. Kennedy** (26)
*Chief Audit Officer*

**Joy N. Roman** (4)
*Chief Human Resources Officer*

**Corey K. Tendler** (3)
*Chief Diversity &
Engagement Officer*

**John G. Mangano** (23)
*Building Technologies*

### DIVISION PRESIDENTS

**David S. Assal** (20)

**David Bauer** (16)

**Todd Callahan** (8)

**Craig Cherry** (22)

**Brandon Cooper** (17)

**John Dean** (9)

**Brock Fanning** (12)

**James Fitzpatrick** (19)

**Brad Hare** (17)

**R. Matthew Jones** (2)

**David A. Keller** (1)

**David A. Kelly** (16)

### TOLL ARCHITECTURE, INC.

**Jed Gibson** (27)
*President*

### TOLL INTEGRATED SYSTEMS

**Keith Fell** (12)
*Director of Manufacturing*

### TOLL LANDSCAPE, LLC

**Mark Culichia** (23)
*President*

**Wendy Marlett** (2)
*Chief Marketing Officer*

**Gregg L. Ziegler** (18)
*Treasurer*

**Alexander Martin** (10)

**Steven R. Merten** (16)

**Richard M. Nelson** (9)

**Nicholas Norvilas** (9)

**Donna M. O'Connell** (5)

**Fredrick Pfister** (15)

**Jeremiah Portlock** (9)

**Jaime Pou** (3)

**Christopher A. Rudd** (1)

**Christopher Ryan** (2)

**Andrew J. Semon** (18)

**Susan Stanley** (4)

**Eric E. White** (1)

### WESTMINSTER TITLE COMPANY, INC.

**William T. Unkel** (16)
*President*

### GIBRALTAR REAL ESTATE CAPITAL

**Roger A. Brush** (27)
*President*

**Michael L. LaPat** (21)
*Chief Financial Officer*

A3CE ;;;

;E7   (6;C75E CD7I75FE;G7        88;57CD365CA C3E7 9 G7C357

JYV W]]h  XeRS]VT]fUVd WcRe    heYcVdaVTe R]] aVcdddVcg XRdViVTfe gVWWTVcdRdWeYV URexdc ,(
A$c'    eYV TRdW'Cc)8 jU'RdWETe  SVc.,'--,%)7]] ViVTfe gV    WWTVcddVcgV Re eYV aWR8fRcUW:cVTe  cd)

| DR  V | 7XV | Fde   d |
|---|---|---|
| :fX]Rd9)OVRc]Vj'c) | 1, | 9YR cR   WeYV 8 RcUR U9YVW;iVTfe gV EWWTVc |
| R  VdM)8 jU | 10 | cVc;iVTfe gV LTV FcVdUV e R U9 (9YVWEaVcRxEWWTVc |
| H SVce FRcRYfd | 03 | FcVdUV e R U9YVWEaVcRxEWWTVc |
| CRce F)9    c | 02 | IV   cLTV FcVdUV e R U9YVWR T R] EWWTVc |

:fX]Rd9)OVRc]Vj'c)[   VUfd  ,44RdRdddeR e eeYV 9YVW;iVTfe gV EWWTVcheYcVdadS] ejWc]R URTbfded)
   V YRdSVR  WWTVcdTV ,44/"Y]U  XeYV ade   WIV  cLTV FcVdUV e Wc R fRcj--fe ] DgV    SVc-0'eYV
ade    WHVX R] FcVdUV e Wc DgV SVc-0fe ] DgV   SVc-4'R UeV ade      W;iVTfe gV LTV FcVdUV e Wc
DgV   SVc-4fe ]   fV -,'hYV      YV hRdac eVUe  9YVW;iVTfe gV EWWTVc)EDgVSVc,'-,3'YV hRdRaa    eVU
e eYV ade    W9YR cR   WeYV 8 RcUR U9YVW;iVTfe gV EWWTVc)Cc)OVRc]VjhRdV]VTeVUR :CVT,e

  R  VdM)8 jU    e R]]j[   VUfd  ,43.R UcV  R VUfe ] ,430'hYV   YV ]RfTYVUYdh    UVaV UV e UVgW]e
T   aVTfe j'SVWcV cV[  XeYV 9 aR j ,44.e  dVcgV gRc fdade    d'  T]fU  XHVX  R] FcVdUV e Wc -0eYcfXY
ETeSVc.,'-,4)V hRdRaa     eVUeeYV ade   W;iVTfe gV LTV FcVdUV e R U9 (9YVWEaVcRxEWWTVcVcVWWVTe gV
DgV   SVc,'-,4'heYcVdadS] ejWeYV 9    aR jtdhVdeVccVX )Fc ce YdRaa   e V e e;iVTfe gV LTV FcVdUV e
R U9 (9YVWEaVcRxEWWTVc'Cc)8 jUgVcdRheYV 9 aR jtdYV Sf]U    XaVcRe  d  9R] WcR'DVgRUR R UURY)
;WWVTe gV DgSVc,'--,'Cc)8 jUcVdXVUWc Ydc]V Rd;iVTfe gV LTV FcVdUV e R U9 (9YVWEaVcRe     XEWWTVcR U
h]] cVe cV Wc R]] ade  dheYeYV 9    aR j:VTV     SVc.,'--,)

H SVce FRcRYfd[VUfd   ,431R UdVcgVU gRc fdade    dheYfd'   T]fU  XHVX  R] FcVdUV we -1eYcfXY
ETeSVc.,'-,4):fc    XeYde  V'YV gVcdRheVV 9 dR jdtYV Sf]U    XaVcRe  d  DVhVcdVj'DVhOc'
9    VTe Tfe'CRddRTYfTfdeeVVd'R U]]R'R UYRgVUdYe cVdadS] ejWcJ ]]  eVVXcReVUlijdeXVeYV 9 aR jtdSf]U    X
T   aVTfe j'VWWWTe gVWSR,'4'heYcVdadS] ejWeYV 9    aR jtdVRdeVccVX );WWVTe Tfe gV DgSVc,'--,'Cc)
FRcRYfdhRdac eVUe  FcVdUV e R U9YVWEaVcRxEWWTVc)

CRce F)9     c[   VUfdRdLTV FcVdUV e R U7dddeR e 9YVWR T R] EWWTVc'VTV SVc-3R UhRdRaa    eVUR
IV   cLTV FcVdUV e :VTV SVc-4)Cc)9        chRdRaa    eVUeYdTfccV ade    WIV  cLTV FcVdUV e R U9YVW
R T R] EWWTVcVaeV SVc-,)cc fV -3e      :VTV SVc-3'Cc)9        chRdFcVdUV e eWCRrcT 7Ugdcd BB9'
R WR TV R URTT fe XT   dfJe  XWc eYRe YV Wf UVU)c ETe  SVc-1e    fV -3'Cc)9        chRd9YVW  R T R]
EWWTVVcR U:cVTx WEaVcaVcRde  dWc dEtDV ]] FcaVce Vd'R U'R Ug VcdWVUU'VcT R] ]]VdV ReVUVaW'gejVYV CU(7e]R e T
RcVR)Fce  ETeSVc-1'YV daVe  gVc-jVRcdRe ;cde " OfXBBFRdR     7fUe R U7Ugdcj8fd    VddlVcgTVdFRd'c
cVdadS]V WceeeYV cVR] VdeReV acRTe TV Wc;cde " OfXBBSV FY]RUV]aYBe RcVea]RTV):fc XeYV aVd UJWc ,443e
-0'YV dVcgVVaeYV VJ ]] 8ceYYVcd'T)RfUe V XRRXV    V e)

JYV eYVc WcRe    cVbfcVUSje deYV ade    j]]] SV   T]fUVU  eWYe W;]fVVU  eWYe  eYe jeYV  W:cVTecdr R Uq9 cacReV  gVcR TVr
dVTe  dWfcFcijIeReV  V e WceYV --- 7fR] CVVe   XWIe  T Y]UVcd$eYV q--- FcijIeReV  V er%)

5[PQ [R7 TUO

MV YRgV RUaeVUR 9 UV;eYTdWceYV FT  aR] ;iVTfe gV EWWTVcR UIW    R T R] EWWTVcd$q9WV;eYTdr%eYR e
Raa] Vde cac    T aR] ViVTfe gV'WWWTVc'aT aR] WR T R] WWTVc'aT aR] RTT fe WXWWTVc'T ec]'Vc R UaVdd
aVcWc Xd    ]RcWTfe   dUVVddXReVUSjfc8 RcUW:cVTe    cd)JYV 9 UV WV;eYTddRgR R RS]VV vHSdeV Re Re
hhh)e  ]]SceVVcd)T  V]fVcq   dceHV]Re do9 cacReV    gVcR TV r)WhV hVcV  R V UchR gV R jacgd     Wfc
9 UV  W;eYTd'hV  eV Ue dRe dWjfcUdT]dfcV VS] XRe dheYchV cVdadS]V cac Yv saV WR XR R  c 3(A)

;PQYURUOMU[[R6UQO [  MPRRUOQ

Efc9Vce WTReWeWT cacRe     R U8j]RhdacgUV  Wc  UV  WTRe   WfcUcVVTTe  cd R UWWTVVcd)MV RgV R]dV vc
   e   UgUfR]  UV  WTRe   RXcVW edheYeVVYRTYWfcUVVTe  cd)

# EXHIBIT 156

☐ 100% ☐        ☐  ☐  ☐  ☐        *Search the website*  ☐

☐ *I need to...*  ☐

**FOR  ATTOR NE Y S**  **FOR THE PUBLIC**  **CASES**  **N EWS & MEDIA**  **ABOUT**

*Quick Links*

**BROWSE  RUL E S**
*Browse the Rules that govern attorneys.*

**F ILE A COMPLAINT**
*File a complaint against an attorney.*

**LOOK UP AN ATTORNEY**
*View an attorney's contact information and disciplinary history.*

**SEARCH OPINIONS**
*Search Supreme Court and Disciplinary Board Opinions.*

**RECENT CASES**
*Search Supreme Court and*

☐ Back to Search

# Gary, Kenneth J.

*Public Information*

*Pending Proceedings*        *History*

*DISCIPLINARY BOARD*
*ACTIONS.*

**Attorney ID:**          45967

**Current Status:**       Retired

**Date of Admission:**    5/27/1986

**Employer**              N/A

**Address:**              1245 STUART RDG
                          ALPHARETTA, GEORGIA
                          30022-6364

**Country:**              UNITED STATES

**Telephone:**            (404) 693-1066

**Fax:**                  N/A

**County:**               OUT OF STATE

**District:**             Out of State

**Professional Liability Insurance:**

I do not maintain professional liability insurance because I do not have private clients and have no possible exposure to malpractice actions (e.g. retired, full-time in-house counsel, prosecutor, full-time government counsel, etc.)

Pennsylvania Judicial
Center
601 Commonwealth
Ave, Suite 5500
P.O. Box 62625
Harrisburg, PA 17106-
2625

Phone: 717.231.3380
Fax: 717.231.3381

## FOR ATTORNEYS

Rules

Forms

Attorney Registration

Reinstatement

Pro Bono

Attorney Gateway

Update My Information

Successorship

Lawyer Well-Being

FAQs & Resources

## FOR THE PUBLIC

File a Complaint

Look Up Attorney

FAQs & Resources

## CASES

Pending Cases

Recent Cases

Conservatorships

Search Opinions

Case Research Collection

Upcoming Public Proceedings

## NEWS & MEDIA

Newsletter Archives

## ABOUT

Our Structure

The Discipline Process

The Reinstatement Process

Annual Report

Leadership

Contact Us

Newsletter Sign-up

Please enter your email address to sign up for the newsletter

**Email**

**SIGN UP!**

**Follow us on Facebook**

**Follow us on LinkedIn**

**Follow us on YouTube**

**Follow us on Bluesky**

©2007-2025 The Disciplinary Board of the Supreme Court of Pennsylvania.

Disclaimer  |  ADA Policy

# EXHIBIT 157



# FinanceCharts

Screeners    Discuss

## Toll Brothers (TOL) IPO Date

Stocks / TOL Stock / Summary / IPO Date ▾

Compare    Follow

☐ Overview    ☐ Discuss    ☐ Charts    ☐ Performance    ☐ News    ☐ Dividends    ☐ Financials    ☐ Metrics    ☐ DCF

Toll Brothers (TOL)'s inital public offering was on Wednesday, July 16 1986.

### TOL Competitors' IPO Date

| NAME | MARKET CAP | CLOSE PRICE | PRICE CHANGE | IPO DATE |
|---|---|---|---|---|
| Toll Brothers (TOL) | $13.252B | $137.20 | +0.45% | Jul 16, 1986 |
| DR Horton (DHI) | $49.974B | $167.45 | +0.71% | Jun 05, 1992 |
| Lennar (LEN) | $32.452B | $125.69 | +1.98% | Jul 27, 1972 |
| Pultegroup (PHM) | $25.843B | $130.90 | +0.65% | Jun 29, 1983 |
| NVR (NVR) | $22.993B | $8,036.63 | +0.71% | Jun 25, 1987 |
| TopBuild (BLD) | $11.073B | $393.46 | -1.17% | Jun 17, 2015 |
| Installed Building.. (IBP) | $6.986B | $254.80 | -0.94% | Feb 13, 2014 |
| Taylor Morrison Home (TMHC) | $6.571B | $66.40 | +0.64% | Apr 10, 2013 |
| Meritage Homes (MTH) | $5.213B | $73.02 | +0.03% | Jul 21, 1988 |
| Cavco Industries (CVCO) | $4.442B | $562.89 | -1.65% | Jun 20, 2003 |

Last Updated: Wednesday, September 24 2025

## FinanceCharts.com

Your trusted source for comprehensive financial data, stock research, and market analysis. We're 100% FREE.

**QUICK LINKS**

Login

Discuss

Stock Screeners

Definitions

**COMPANY**

About Us

Contact

Help Center

**JOIN OUR COMMUNITY**

Connect with thousands of investors. Share insights, discuss strategies, and learn from the community.

☐ Join the Discussion

© 2025 FinanceCharts.com. All rights reserved.

Terms of Service     Privacy Policy     Do Not Sell My Personal Information

**IMPORTANT DISCLAIMERS**

FinanceCharts.com is not operated by a broker, a dealer, or a registered investment adviser. Under no circumstances does any information posted on FinanceCharts.com represent a recommendation to buy or sell a security. The information on this site is not intended to be, nor does it constitute, investment advice or recommendations. In no event shall FinanceCharts.com be liable to anyone using this site for any damages of any kind arising out of the use of any content or other material published or available on FinanceCharts.com, or relating to the use of, or inability to use, FinanceCharts.com or any content, including, without limitation, any investment losses, lost profits, lost opportunity, special, incidental, indirect, consequential or punitive damages. Past performance is a poor indicator of future performance. The information on this site is in no way guaranteed for completeness, accuracy, timeliness or in any other way. Company logos are owned by their respective copyright holders and are displayed for editorial purposes only. Prices are not displayed in real time.

# EXHIBIT 158

       



**Ken Gary**
General Counsel

University of Pennsylvania Carey Law School
Alpharetta, Georgia, United States · Contact info
201 connections

Message

## Activity
202 followers

Ken hasn't posted yet
Recent posts Ken shares will be displayed here.

Show all activity →

## Experience

General Counsel
Pure Med Spa
2008 - 2009 · 1 yr

 Executive VP and General Counsel
Beazer Homes
2005 - 2007 · 2 yrs

 Senior VP and General Counsel
Toll Brothers,Inc.
Mar 1990 - Mar 2005 · 15 yrs 1 mo

## Education

 University of Pennsylvania Carey Law School
J.D., Law
1980 - 1983

 Brown University
B.A., Political Science
1976 - 1980

## Interests

Companies    Schools



Brown University
211,932 followers

University of Pennsylvania Carey Law School
37,180 followers



Promoted    ...

cTrader by Spotware

Henry, keep up with the latest insights
from cTrader by Spotware

Learn more about cTrader Premium Trading
Platform

More profiles for you



South Cobb Arts Alliance, Inc.   · 3rd+
--

Marla Hoppenfeld   · 3rd+
Business Owner @ Hoppenfeld Consulting | Consultant, Non-Profit

Angie Kim   · 3rd+
President & CEO at Center for Cultural Innovation | Leader in Disruptive
& Equity Focused Funding   …

Kira Sterling   · 3rd+
Retired CMO/ Senior Vice President at Toll Brothers

Michael LaPat   · 3rd+
Managing Director

Show all

Explore Premium profiles



Crystal Hansen · 3rd+
Event Specialist at WeDo Designs

Manjot Dabb · 3rd+
--

Shauna P. · 3rd+
Bartender at Fraternal Order of Eagles with psychology background.

Brit Prescott · 3rd+
Independent Distributor

People you may know

David Medrano
Plumber at Ocean Park Mechanical Inc

Raul Repreza
Industrial, Commercial, Residential Service Plumber.

Joshua Kuskie
--Journeyman Plumber
Project manager …

Francisco Acevedo
Experienced and versatile plumber

William Cortes
Technical Support Specialist
Plumber…

Show all

# EXHIBIT 159

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C.  20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **March 14, 2005**

# BEAZER HOMES USA, INC.
(Exact name of registrant as specified in its charter)

| **DELAWARE** | **001-12822** | **54-2086934** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1000 Abernathy Road, Suite 1200**
**Atlanta Georgia 30328**
(Address of Principal
Executive Offices)

**(770) 829-3700**
(Registrant's telephone number, including area code)

**None**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions:

o  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 1.01  Entry into a Material Definitive Agreement.

On March 14, 2005, Beazer Homes USA, Inc. (the "Company") entered into an employment agreement with Kenneth J. Gary (the "Executive") in connection with the Executive's appointment as Executive Vice President, General Counsel and Corporate Secretary.

The employment agreement provides for the Executive to initially receive an annual salary of $375,000 (subject to review each year for increase).  The Executive is eligible to participate in the Company's bonus and stock incentive plans and all welfare benefit, incentive, savings and retirement plans.  The initial term of the agreement is two (2) years, with a provision for extension for successive one year periods unless written notice is provided by Mr. Gary or the Company stating a desire not to extend the agreement sixty (60) days prior to the scheduled expiration.

This summary of the material terms of the employment agreement described above is qualified by reference to the provisions of the agreement, which is attached as Exhibit 10.01.

Additionally, on March 14, 2005, Beazer Homes USA, Inc. (the "Company") entered into a supplemental employment agreement (the "Supplemental Employment Agreement") with Mr. Gary.

The Supplemental Employment Agreement supersedes the terms and provisions of the Employment Agreement in the event of a Change of Control (as defined in the Supplemental Employment Agreement) of the Company.  The Supplemental Employment Agreement automatically renews every year for a

successive two-year period unless earlier terminated by the Company and the Executive or otherwise terminated in accordance with the respective terms of the Supplemental Employment Agreement.

Pursuant to the Supplemental Employment Agreement, the Company will continue to employ the Executive for a period of two years from the date the Change of Control occurs (the "Effective Date"). During this two-year period, the Executive will be entitled to receive an amount approximating his most recent annual base salary ("Annual Base Salary"). In addition, the Executive shall be awarded an annual bonus at least equal to the arithmetic average of the Executive's bonuses for the last three years ("Annual Bonus").

Subsequent to a Change of Control, if the Executive's employment is terminated by the Company for cause, the Executive will be entitled to receive an amount equal to the portion of his Annual Base Salary accrued through the effective date of termination and any compensation previously deferred and all other payments to which the Executive may be entitled under his Supplemental Employment Agreement.

Subsequent to a Change of Control, if the Executive's employment is terminated by Beazer Homes as a result of the Executive's death or disability, or by the Executive for a reason other than a Good Reason (as defined in the Supplemental Employment Agreement), the Executive will be entitled to receive an amount equal to the portion of his Annual Base Salary and Annual Bonus accrued through the effective date of termination and any compensation previously

2

deferred (the "Accrued Obligations") and all other amounts to which the Executive may be entitled under his Supplemental Employment Agreement.

Subsequent to a Change of Control, if the Executive's employment is terminated by the Company for any reason other than for cause or as a result of the Executive's death or disability, or by the Executive for Good Reason, the Executive shall be entitled to receive an amount equal to the sum of (i) the Accrued Obligations; (ii) the product of (A) a multiple of 2.0 and (B) the sum of his Annual Base Salary and Average Annual Bonus; and (iii) all other amounts to which the Executive may be entitled under his Supplemental Employment Agreement. In addition, the Company must provide the Executive and his family certain benefits for a period of two years following the effective date of termination.

This summary of the material terms of the Supplemental Employment Agreement is qualified by reference to the provisions of the agreement, which is attached as Exhibit 10.02.

Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers

On March 14, 2005, Kenneth J. Gary, age 46, was appointed Executive Vice President, General Counsel and Corporate Secretary.

Mr. Gary joined Beazer Homes USA, Inc. from Toll Brothers, Inc. where he most recently served as Senior Vice President and General Counsel as well as heading that company's mortgage and title insurance subsidiaries. Prior to joining Toll Brothers as its General Counsel in 1990, Mr. Gary served as corporate counsel to Bell Atlantic Properties, the real estate subsidiary of Bell Atlantic Corporation and practiced real estate and corporate law with two major law firms for several years. He is a graduate of University of Pennsylvania Law School and Brown University.

Item 9.01 Financial Statements and Exhibits.

(c) Exhibits

10.01      Agreement by and between Beazer Homes USA, Inc. and Kenneth J. Gary dated as of March 14, 2005
10.02      Supplemental Employment Agreement by and between Beazer Homes USA, Inc. and Kenneth J. Gary dated as of March 14, 2005

3

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BEAZER HOMES USA, INC.

Date: March 18, 2005                              By:   /s/ Ian McCarthy
                                                       Ian McCarthy
                                                       President and Chief Executive Officer

4

Exhibit 10.1

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made effective as of the 14th day of March, 2005 (the "Effective Date") by and between BEAZER HOMES USA, INC., a Delaware corporation (the "Company"), and Kenneth J. Gary, an individual resident of the State of Georgia ("Executive").

WITNESSETH:

WHEREAS, the Company wishes to employ the Executive, and the Executive wishes to accept employment with the Company, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the Company and Executive hereby agree as follows:

1. **Employment and Duties**.

    (a)    The Company hereby agrees to employ Executive for the Term (as hereinafter defined) as its Executive Vice President, General Counsel and Corporate Secretary. If requested by the Board of Directors of the Company (the "Board"), Executive shall also serve on the Board without additional compensation. Executive shall also serve, if requested by the Board, as an executive officer and/or director of any subsidiaries and/or affiliated companies and shall comply with the policy of the Compensation Committee of the Board (the "Compensation Committee") with regard to retention or forfeiture of any director's fees. As used in this Agreement, the term "affiliated companies" shall include any company controlled by, controlling or under common control with the Company.

    (b)    The Executive shall have such management and oversight responsibilities and authority as are necessary to efficiently administer the affairs of the Company and as are customary of an Executive Vice President, General Counsel and Corporate Secretary.  All powers herein granted to the Executive are subject to supervisory approval of the Board and of the President and Chief Executive Officer of the Company (the "CEO"), and the Executive may be given such further reasonably related supervisory duties, powers and prerogatives as may be delegated to him from time to time by said Board and/or the CEO. The Executive shall report exclusively to the CEO and the Board and further shall render such advice to the CEO and Board as said CEO and/or Board may from time to time request.

    (c)    During the Term, and excluding any periods of vacation and sick leave to which the Executive is entitled, Executive shall devote substantially all of his business time and efforts to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to the Executive hereunder, use the Executive's reasonable best efforts to perform faithfully such responsibilities. In performing such duties hereunder, Executive shall comply with the policies and procedures as adopted from time to time by the Board, shall give the Company the benefit of his special knowledge, skills, contacts and business experience, shall perform his duties and carry out his responsibilities hereunder in a diligent manner.

    (d)    During the Employment Term, it shall not be a violation of this Agreement for the Executive to (i) with the prior approval of the Board in each case, serve on corporate, civic or charitable boards or committees, (ii) with the prior approval of the Board in each case, deliver lectures, fulfill speaking engagements or teach at educational institutions, and (iii) manage personal investments, so long as such activities do not significantly interfere or constitute a conflict of interest with the performance of the Executive's responsibilities as an employee of the Company in accordance with this Agreement.

    (e)    The principal location for performance of Executive's services hereunder shall be at the offices of Beazer Homes USA, Inc. in Atlanta, Georgia, subject to reasonable travel

requirements during the course of such performance. Executive shall not be required, without his consent, to regularly report to any office of the Company which is located more than thirty-five (35) miles from the Company's current office location, provided Executive will be expected to travel to the extent reasonably necessary to fulfill his responsibilities.

2. **Employment Term.**   The term of Executive's employment hereunder (the "Term") shall commence effective as of the date hereof and shall end on March 13, 2007, unless sooner terminated as provided herein; provided, however; that the Term shall automatically be extended for successive one year periods unless: (i) this Agreement is terminated as otherwise provided herein; or (ii) the Executive or the Company provides written notice to the other of such party's desire not to extend the Term at least sixty (60) days prior to the scheduled expiration of the Term as then in effect.

3. **Compensation and Benefits**

    (a)    **Base Salary**.  During the Term, the Executive shall receive an annual base salary ("Annual Base Salary") in the amount of $375,000, payable in accordance with the Company's normal payroll practices (but not less frequently than monthly). During the Term, the Annual Base Salary shall be reviewed by the Compensation Committee (for purposes of increase only) at least annually. Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to the Executive under this Agreement. Annual Base Salary shall not be reduced after any such increase and the term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased. Notwithstanding anything contained herein to the contrary, in the event that the Company shall implement a Company-wide reduction in executive base compensation, then, solely for such purpose and only during the continuation of such Company-wide reduction, the Company shall have the right to reduce the Annual Base Salary then payable hereunder in a manner that is consistent with said Company-wide reduction.

    (b)    **Bonuses; Stock Incentive Plans**. Executive will be eligible to and shall participate in the Company's bonus and stock incentive plans at the discretion of the Compensation Committee of the Board. The amount and terms of, and the targets, conditions and restrictions applicable to each bonus or other incentive award shall be subject to the provisions of any such plan and of the applicable award letter duly executed and delivered by the Company.

    (c)    **Incentive, Savings and Retirement Plans**. During the Term, the Executive shall be entitled to participate in all incentive, savings and retirement plans, practices, policies and programs applicable generally to other most senior executives of the Company and its affiliated companies.

(d)    **Welfare Benefit Plans**. During the Term, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company and its affiliated companies (including, without limitation, medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs) to the extent applicable generally to other most senior executives of the Company and its affiliated companies.

(e)    **Expenses**. The Company will pay or reimburse Executive for all reasonable and necessary out-of-pocket expenses incurred by him in the performance of his duties under this Agreement. Executive shall keep detailed and accurate records of expenses incurred in connection with the performance of his duties hereunder and reimbursement therefore shall be in accordance with policies and procedures to be established from time to time by the Board.

(f)    **Office and Support Staff**.  During the Term, the Executive shall be entitled to an office or offices of a size and with furnishings and other appointments, and to secretarial and other assistance, consistent with the Executive's position and title.

<div align="center">2</div>

(g)    **Vacation**.  During the Term, Executive shall be entitled to twenty (20) working days of compensated vacation in each fiscal year, to be taken at times which do not unreasonably interfere with the performance of Executive's duties hereunder. Any unused vacation time from any fiscal year shall be subject to accumulation or forfeiture in accordance with Company policy as in effect from time to time.

4.    **Termination of Employment**.

(a)    **Death or Disability**. The Executive's employment shall terminate automatically upon the Executive's death during the Term. If the Disability of the Executive occurs during the Term (pursuant to the definition of Disability set forth below), the Company may give to the Executive written notice in accordance with Section 10(c) of this Agreement of its intention to terminate the Executive's employment. In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"), provided that, within the 30 days after such receipt, the Executive shall not have returned to full-time performance of the Executive's duties. For purposes of this Agreement, "Disability" shall mean the absence of the Executive from the Executive's duties with the Company on a full-time basis for 120 consecutive business days as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Executive or the Executive's legal representative.

(b)    **Cause**. The Company may terminate the Executive's employment for Cause. For purposes of this Agreement, "Cause" shall mean:

(i)    any act or failure to act by Executive done with the intent to harm in any material respect the financial interests or reputation of the Company or any affiliated companies;

(ii)    Executive being convicted of (or entering a plea of guilty or *nolo contendere* to) a felony (other than a felony involving a motor vehicle);

(iii)    Executive's dishonesty, misappropriation or fraud with regard to the Company or any affiliated companies (other than good faith expense account disputes);

(iv)    a grossly negligent act or failure to act by Executive which has a material adverse affect on the Company or any affiliated companies;

(v)    the material breach by Executive of his agreements or obligations under this Agreement which has a material adverse effect on the Company, which breach, if curable, is not cured by Executive within fifteen (15) days after written notice from the Company which specifically identifies the material breach which the Company believes that Executive has committed; or

(vi)    the continued refusal to follow the directives of the CEO or the Board or their designees which are consistent with Executive's duties and responsibilities identified in Section 1 hereof; provided that the foregoing refusal shall not be "cause" if Executive in good faith believes that such direction is illegal, unethical or immoral and promptly so notifies the CEO or Board, as the case may be, in writing.

(c)    **Notice of Termination**.  Any termination by the Company for Cause shall be communicated by Notice of Termination to the Executive given in accordance with Section 10(c)

<div align="center">3</div>

of this Agreement. For purposes of this Agreement, a "Notice of Termination" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the termination date (which date shall be not more than thirty days after the giving of such notice). The failure by the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Cause shall not waive any right of the Company hereunder or preclude the Company from asserting such fact or circumstance in enforcing the Company's rights hereunder.

(d)    **Date of Termination**. "Date of Termination" means (i) if the Executive's employment is terminated by the Company for Cause, the date of receipt of the Notice of Termination or, subject to applicable cure periods, any later date specified therein, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the Date of Termination shall be the date on which the Company notifies the Executive of such termination and (iii) if the Executive's employment is terminated by reason of death or Disability, the Date of Termination shall be the date of death of the Executive or the Disability Effective Date, as the case may be.

6.    **Obligations of the Company upon Termination**.

(a)    **Other Than for Cause**. If, during the Term, the Company shall terminate the Executive's employment other than for Cause:

(i)    the Company shall pay to the Executive in a lump sum in cash within 30 days after the Date of Termination the aggregate of the following amounts: (1) the Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid, (2) any accrued but unpaid annual bonus ("Annual Bonus") respecting any completed fiscal year ending prior to the Date of Termination, (3) the product of (x) the Average Annual Bonus (hereinafter defined) and (y) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 and (4) any compensation previously deferred by the Executive (together with any accrued interest or earnings thereon) and any accrued vacation pay, in each case to the extent not theretofore paid (the sum of the amounts described in clauses (1), (2), (3) and (4) shall be hereinafter referred to as the "Accrued Obligations"). The timing of payment by the Company of any deferred compensation shall remain subject to any payment election previously made by the Executive.  The term "Average Annual Bonus" shall mean the arithmetic average of the Executive's bonuses (whether paid or deferred) under the Company's annual incentive plans during the last three full fiscal years prior to the Date of Termination or for such lesser period as the Executive has been employed by the Company (annualized in the event that the Executive was not employed by the Company for the whole of any such fiscal year).  Without limiting the generality of the foregoing definition, the "Average Annual Bonus" shall include the following components, if any, pursuant to the Company's EVCIP Rules (or any successor incentive plan, for so long as any of same shall exist):

(a)    Cash payouts from VC and IVC awards and the "Bank" payout, subject to the Payout Cap, all at full face value;

(b)    Any excess in the Bank discounted at 75% of face value (which shall, for purposes hereof, be deemed to be fully vested);

(c)    10% of the Bank contributed to the Deferred Compensation Plan, at full face value (which shall, for purposes hereof, be deemed to be fully vested); and

(d)    Any deferred bonus under the EVCIP which is invested in stock under the Company's Corporate Management Stock Purchase Program, at full face value of said bonus (which shall, for purposes hereof, be deemed to be fully vested);

(i)    so long as the Executive is and remains in compliance in all material respects with his obligations under Section 7 below, the Company shall pay to the Executive an amount equal to the sum of (1) Executive's Annual Base Salary (at the rate in effect on the Date of Termination), and (2) the Average Annual Bonus for a period of two years from the Date of Termination, (the "Severance Period"), at the same time that payments of Annual Base Salary would otherwise have become due and payable during said period in the absence of such termination;

(iii)    so long as the Executive is and remains in compliance in all material respects with his obligations under Section 7 below, during the Severance Period, or such longer period as may be provided by the terms of the appropriate plan, program, practice or policy, the Company shall continue benefits to the Executive and/or the Executive's family at least equal to those which would have been provided to them in accordance with the plans, programs, practices and policies described in Section 3(d) of this Agreement if the Executive's employment had not been terminated, provided, however, that if the Executive becomes reemployed with another employer and receives medical or other welfare benefits under another employer provided plan, the medical and other welfare benefits described herein shall cease; and

(iv)    to the extent not theretofore paid or provided, the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided or which the Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its affiliated companies (such other amounts and benefits shall be hereinafter referred to as the "Other Benefits").

(b)    **Death**. If the Executive's employment is terminated by reason of the Executive's death, this Agreement shall terminate without obligations to the Executive's legal representatives under this Agreement, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive's estate or beneficiary, as applicable, in a lump sum in cash within 30 days of the Date of Termination.

(c)    **Disability**. If the Executive's employment is terminated by reason of the Executive's Disability, this Agreement shall terminate without further obligations to the Executive, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive or the Executive's legal representative in a lump sum in cash within 30 days of the Date of Termination.

(d)    **Cause**. If the Executive's employment shall be terminated for Cause, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay to the Executive (x) his Annual Base Salary through the Date of Termination, (y) the amount of any compensation previously deferred by the Executive, and (z) Other Benefits, in each case to the extent theretofore unpaid. If the Executive voluntarily terminates employment during the

Term, this Agreement shall terminate without further obligations to the Executive, other than for Accrued Obligations and the timely payment or provision of Other Benefits. In such case, all Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination.

(e)    **Election Not to Extend**.  In the event that the Company elects, pursuant to Section 2 above, not to extend the Term, then, such election shall be treated for all purposes hereof the same as the termination by the Company of Executive's employment for other than Cause, and, in such case, commencing upon the date of the expiration of the Term, Executive shall be entitled to receive from the Company the same payments and benefits as Executive would be entitled to receive pursuant to Section 6(a) above; provided, however, and notwithstanding anything contained in Section 6(a) above to

the contrary, in connection with an election by the Company not to renew the Term, the applicable "Severance Period" shall not extend beyond the date that the Executive reaches the age of sixty-five (65).

7.     **Employment Covenants**.

(a)     **Covenant Not to Compete**. Executive recognizes and acknowledges that the Company is placing its confidence and trust in Executive. Executive, therefore, covenants and agrees that during the Applicable Non-Compete Period (as defined below) Executive shall not, either directly or indirectly, without the prior written consent of the Board (which may be withheld in the sole and absolute discretion of the Board):

(i)     Engage in or carry on any business or in any way become associated with any business in the Restricted Area (as hereinafter defined) which is similar to or is in competition with the Business of the Company (as hereinafter defined). As used in this Section 7(a), the term (1) "Business of the Company" shall mean and include all business activities in which the Company and/or any affiliated companies have engaged (or have prepared written plans to engage) at any time during the Term, including but not limited to, the purchase of land (or options therefor) for development and the construction of residential homes for resale to consumers, and (2) "Restricted Area" shall mean and include anywhere in the United States of America or in any foreign country in which the Company or any affiliated companies then engage (or have within the preceding three years engaged) in business;

(ii)     in connection with any business which is similar to or is in competition with the Business of the Company in the Restricted Area, solicit the business of any person or entity, on behalf of himself or any other person or entity, which is or has been at any time during the Term a customer or supplier of the Company including, but not limited to, former or present customers or suppliers with whom Executive has had personal contact during, or by reason of, his relationship with the Company;

(iii)     Be or become an employee, agent, consultant, representative, director or officer of, or be otherwise in any manner associated with, any person, firm, corporation, association or other entity which is engaged in or is carrying on any business which is similar to or in competition with the Business of the Company in the Restricted Area;

(iv)     Solicit for employment or employ any person employed by the Company at any time during the twelve (12) month period immediately preceding such solicitation or employment; or

(v)     Be or become a shareholder, joint venturer, owner (in whole or in part), or partner, or be or become associated with or have any proprietary or financial

6

interest in or of any firm, corporation, association or other entity which is engaged in or is carrying on any business which is similar to or in competition with the Business of the Company in the Restricted Area. Notwithstanding the preceding sentence, passive equity investments by Executive of $25,000 or less in any entity or affiliated group of any entity which is engaged in or is carrying on any business which is similar to or in competition with the Business of the Company shall not be deemed to violate this Section 7(a).

For purposes of identifying the Restricted Area, Executive hereby recognizes and acknowledges that the existing Business of the Company currently extends throughout the States of Georgia, Tennessee, South Carolina, North Carolina, California, Arizona, Nevada, Florida, New Jersey, Delaware, Maryland, Virginia, West Virginia, Texas, New York, Colorado, Mississippi, Indiana, Kentucky, Ohio, Pennsylvania, Washington, D.C., West Virginia and New Mexico. Executive further warrants and represents that, because of his varied skill and abilities, he does not need to compete with the Business of the Company and that this Agreement will not prevent him from earning a livelihood and acknowledges that the restrictions contained in this Section 7 constitute reasonable protections for the Company.

As used in this Section 7, "Applicable Non-Compete Period" shall mean the following:

(A)     at all times that the Executive is employed by the Company; and

(B)     for a period of time after the Executive's employment under this Agreement is terminated for any reason equal to the greater of

(i)     180 days; or

(ii)     such longer period of time that the Executive is entitled to receive payments under Sections 6(a)(ii) or (iii) above.

(b)     **Confidential Information**. Executive agrees that all Confidential Information shall be the sole property of the Company, and Executive agrees that he shall not during the Term nor thereafter, use for his benefit or the benefit of others or disclose at any time Confidential Information or take with him upon termination of this Agreement any records, papers, reports, lists, computer tapes or disks or any other materials of any nature that contain any Confidential Information. "Confidential Information" shall mean all information other than General Knowledge (defined below) relating to the Company's: (i) business or existing projects including all those in various stages of research and development including all unpublished plans for new products or services; (ii) financial information, internal business procedures and other information which relate to the way the Company conducts its business and which are not publicly available; (iii) data written by the Company's employees or others, including source codes, object codes, marketing and development plans, budgets, forecasts, forecast assumptions and future plans and potential strategies of the Company which have been or are being discussed; (iv) unpublished pricing data; (v) identity, buying habits and practices of the Company, its suppliers and customers to the extent not publicly available; (vi) information regarding the skills or compensation of employees of the Company; (vii) the Intellectual Property of the Company and any information pertaining thereto; (viii) materials and information supplied by customers or clients to the Company that contain data regarding any research, products, procedures or the like; and (ix) any other information deemed confidential by the Company by marking such information with the word "Confidential" or similar word; by orally advising the Executive that the information is confidential or by treating the information in such a manner that the Executive should reasonably believe it to be deemed confidential by the Company. "General Knowledge" shall mean (i) general skills or experience gained during Executive's employment with, consultation for or work for the Company; and (ii) information and data publicly available.

7

(c)    **Records**. All files, records, memoranda and other documents regarding former, existing or prospective customers of the Company or relating in any manner whatsoever to Confidential Information or the Business of the Company (collectively, "Records"), whether prepared by Executive or otherwise coming into his possession, shall be the exclusive property of the Company. All Records shall be immediately placed in the physical possession of the Company upon the termination of Executive's employment with the Company, or at any other time specified by the Board. The retention and use by Executive of duplicates in any form of Records is prohibited after the termination of Executive's employment with the Company.

(d)    **Breach**. Executive hereby recognizes and acknowledges that irreparable injury or damage shall result to the Company in the event of a breach or threatened breach by Executive of any of the terms or provisions of this Section 7, and Executive therefore agrees that the Company shall be entitled to an injunction restraining Executive from engaging in any activity constituting such breach or threatened breach. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company at law or in equity for such breach or threatened breach, including but not limited to, the recovery of damages from Executive and, if Executive is an employee of the Company, the termination of his employment with the Company in accordance with the terms and provisions of this Agreement.

(e)    **Survival**.  Notwithstanding the termination of the employment of Executive or the termination of this Agreement, the provisions of this Section 7 shall survive and be binding upon Executive unless a written agreement which specifically refers to the termination of the obligations and covenants of this Section 7 is executed by the Company.  Notwithstanding the foregoing, this Section 7 shall not survive the termination of this Agreement as the result of the Change Of Control Agreement (hereinafter defined) becoming effective.

(f)    **Blue-Penciling**. Should any court or other legally constituted authority determine that for any such agreement or covenant to be effective it must be modified to limit its duration or scope, the parties hereto shall consider such agreement or covenant to be amended or modified with respect to duration and/or scope so as to comply with the orders of any such court or other legally constituted authority, and as to all other portions of such agreement or covenants they shall remain in full force and effect as originally written.

8.    **No Mitigation**. In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not the Executive obtains other employment. The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest by (i) the Company, provided that the Executive prevails in at least one material issue, (ii) the Executive or (iii) others, of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof (including, without limitation, as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable Federal rate provided for in Section 7872(f) (2) (A) of the Internal Revenue Code of 1986, as amended (the "Code").

9.    **Successors**.

(a)    This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive otherwise than by will or the laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives.

(b)    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.

10.    **Miscellaneous**.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principles of conflict of laws. Any legal action, suit or proceeding arising out of or relating to this Agreement shall be instituted in the state or federal courts in the State of Delaware and the parties agree not to assert, in any action, suit or proceeding by way of motion, as a defense or otherwise, any claim that either party is not personally subject to the jurisdiction of such court, or that such action, suit or proceeding is brought in an inconvenient forum, or that the venue is improper or that the subject matter hereof cannot be enforced in such court.  The parties hereby irrevocably submit to the jurisdiction of any such court in any such action, suit or proceeding and agree that service of all process in any such action, suit or proceeding in any such court may be made by registered or certified mail, return receipt requested, to its address set forth in this Agreement, such service being hereby acknowledged by such party to be sufficient for personal jurisdiction in any action against such party in any such court and to be otherwise effective and binding service in every respect.

(b)    The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

(c)    All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party, by UPS or other commercial overnight courier or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

1000 Abernathy Road
Suite 1200
Atlanta, Georgia 30328

If to the Company:

1000 Abernathy Road
Suite 1200
Atlanta, Georgia 30328
Attention: President and Chief Executive Officer

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

(d)    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(e)    The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(f)    The Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Company may have hereunder shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(g)    This Agreement supersedes any and all other prior or contemporaneous agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof, and this Agreement contains all of the covenants and agreements between the parties with respect to employment of Executive by the Company.

9

---

Reference is hereby made to that certain Employment Agreement dated as of March 14, 2005 (the "Change of Control Agreement") by and between the Company and the Executive.  Notwithstanding anything contained herein to the contrary, (i) this Agreement shall not supersede the Change of Control Agreement, and (ii) upon the "Effective Date" occurring under the Change of Control Agreement, this Agreement shall be superseded by the Change of Control Agreement.

(h)    This Agreement may be executed via facsimile transmission signature and in counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have executed this **EMPLOYMENT AGREEMENT** effective as of the date first written above.

**BEAZER HOMES USA, INC.**

By:   /s/ Ian J. McCarthy
Name: Ian J. McCarthy
Title: President and Chief Executive Officer

**EXECUTIVE**

/s/ Kenneth J. Gary
Kenneth J. Gary

10

## EMPLOYMENT AGREEMENT

AGREEMENT by and between Beazer Homes USA, Inc., a Delaware corporation (the "Company") and Kenneth J. Gary (the "Executive"), dated as of the 14th day of March, 2005.

The Board of Directors of the Company (the "Board"), has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of the Executive, notwithstanding the possibility, threat or occurrence of a Change of Control (as defined below) of the Company. The Board believes it is imperative to diminish the inevitable distraction of the Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change of Control and to encourage the Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change of Control, and to provide the Executive with compensation and benefits arrangements upon a Change of Control which ensure that the compensation and benefits expectations of the Executive will be satisfied and which are competitive with those of other corporations. Therefore, in order to accomplish these objectives, the Board has caused the Company to enter into this Agreement.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    <u>Certain Definitions</u>.

(a)    The "Effective Date" shall mean the first date during the Change of Control Period (as defined in Section 1(b)) on which a Change of Control (as defined in Section 2) occurs. Anything in this Agreement to the contrary notwithstanding, if a Change of Control occurs and if the Executive's employment with the Company is terminated prior to the date on which the Change of Control occurs, and if it is reasonably demonstrated by the Executive that such termination of employment (i) was at the request of a third party who has taken steps reasonably calculated to effect a Change of Control or (ii) otherwise arose in connection with or in anticipation of a Change of Control, then for all purposes of this Agreement the "Effective Date" shall mean the date immediately prior to the date of such termination of employment.

(b)    The "Change of Control Period" shall mean the period commencing on the date hereof and ending on the second anniversary of the date hereof; provided, however, that commencing on the date one year after the date hereof, and on each annual anniversary of such date (such date and each annual anniversary thereof shall be hereinafter referred to as the "Renewal Date"), unless previously terminated, the Change of Control Period shall be automatically extended so as to terminate two years from such Renewal Date, unless at least 60 days prior to the Renewal Date the Company shall give notice to the Executive that the Change of Control Period shall not be so extended.

2.    <u>Change of Control</u>. For the purpose of this Agreement, a "Change of Control" shall mean:

(a)    The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 25% or more of either (i) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control: (i) any acquisition directly from the Company, (ii) any acquisition by the Company, (iii) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company or (iv) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii) and (iii) of subsection (c) of this Section 2; or

(b)    Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; or

(c)    Consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (ii) no Person (excluding any corporation resulting from such Business Combination or any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and (iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination; or

(d)    Approval by the shareholders of the Company of a complete liquidation or dissolution of the Company.

3.    <u>Employment Period</u>. The Company hereby agrees to continue the Executive in its employ, and the Executive hereby agrees to remain in the employ of the Company, subject to the terms and conditions of this Agreement, for the period commencing on the Effective Date and ending on the second anniversary of such date (the "Employment Period").

4.    <u>Terms of Employment</u>.

(a)  <u>Position and Duties</u>.

(i)  During the Employment Period, (A) the Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all material respects with the most significant of those held, exercised and assigned at any time during the 120 day period immediately preceding the Effective Date and (B) the Executive's services shall be performed at the location where the Executive was employed immediately preceding the Effective Date or any office or location less than 35 miles from such location.

<div align="center">2</div>

(ii) During the Employment Period, and excluding any periods of vacation and sick leave to which the Executive is entitled, the Executive agrees to devote reasonable attention and time during normal business hours to the business and affairs of the Company and, to the extent necessary to discharge the responsibilities assigned to the Executive hereunder, to use the Executive's reasonable best efforts to perform faithfully such responsibilities. During the Employment Period it shall not be a violation of this Agreement for the Executive to (A) serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of the Executive's responsibilities as an employee of the Company in accordance with this Agreement. It is expressly understood and agreed that to the extent that any such activities have been conducted by the Executive prior to the Effective Date, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the Effective Date shall not thereafter be deemed to interfere with the performance of the Executive's responsibilities to the Company.

(b)  <u>Compensation</u>.

(i)  <u>Base Salary</u>. During the Employment Period, the Executive shall receive an annual base salary ("Annual Base Salary"), which shall be paid at a monthly rate, at least equal to twelve times the highest monthly base salary paid or payable, including any base salary which has been earned but deferred, to the Executive by the Company and its affiliated companies in respect of the twelve month period immediately preceding the month in which the Effective Date occurs. Annual Base Salary shall be payable in accordance with the Company's normal payroll practices (but not less frequently than monthly). During the Employment Period, the Annual Base Salary shall be reviewed (for purposes of increase only) no more than 12 months after the last salary increase awarded to the Executive prior to the Effective Date and thereafter at least annually. Any increase in Annual Base Salary shall not serve to limit or reduce any other obligation to the Executive under this Agreement. Annual Base Salary shall not be reduced after any such increase and the term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased. As used in this Agreement, the term "affiliated companies" shall include any company controlled by, controlling or under common control with the Company.

(ii)  <u>Annual Bonus</u>. In addition to Annual Base Salary, the Executive shall be awarded, for each fiscal year ending during the Employment Period, an annual bonus (the "Annual Bonus") in cash at least equal to the arithmetic average of the Executive's bonuses (whether paid or deferred) under the Company's or its predecessor's annual incentive plans during the last three full fiscal years prior to the Effective Date or for such lesser period as the Executive has been employed by the Company or its predecessor (annualized in the event that the Executive was not employed by the Company for the whole of any such fiscal year), (the "Average Annual Bonus"). Each such Annual Bonus shall be paid no later than the end of the third month of the fiscal year next following the fiscal year for which the Annual Bonus is awarded, unless the Executive shall elect to defer the receipt of such Annual Bonus. Without limiting the generality of the foregoing definition, the "Average Annual Bonus" shall include the following components, if any, pursuant to the Company's EVCIP Rules (or any successor incentive plan, for so long as any shall exist):

(a)  Cash payouts from VC and IVC awards and the "Bank" payout, subject to the Payout Cap, all at full face value;

<div align="center">3</div>

(b)  Any excess in the Bank discounted at 75% of face value (which shall, for purposes hereof, be deemed to be fully vested);

(c)  10% of the Bank contributed to the Deferred Compensation Plan, at full face value (which shall, for purposes hereof, be deemed to be fully vested); and

(d)  Any deferred bonus under the EVCIP which is invested in stock under the Company's Corporate Management Stock Purchase Program, at full face value of said bonus (which shall, for purposes hereof, be deemed to be fully vested);

(iii)  <u>Incentive, Savings and Retirement Plans</u>. During the Employment Period, the Executive shall be entitled to participate in all incentive, savings and retirement plans, practices, policies and programs applicable generally to other most senior executives of the Company and its affiliated companies, but in no event shall such plans, practices, policies and programs provide the Executive with incentive opportunities (measured with respect to both regular and special incentive opportunities, to the extent, if any, that such distinction is applicable), savings opportunities and retirement benefit opportunities, in each case, less favorable, in the aggregate, than the most favorable of those provided by the Company and its affiliated companies for the Executive under such plans, practices, policies and programs as in effect at any time during the 120-day period immediately preceding the Effective Date or if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

(iv)  <u>Welfare Benefit Plans</u>. During the Employment Period, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under welfare benefit plans, practices, policies and programs provided by the Company and its affiliated companies (including, without limitation, medical, prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs) to the extent applicable generally to other most senior executives of the Company and its affiliated companies, but in no event shall such plans, practices, policies and programs provide the Executive with benefits

which are less favorable, in the aggregate, than the most favorable of such plans, practices, policies and programs in effect for the Executive at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive, those provided generally at any time after the Effective Date to other peer executives of the Company and its affiliated companies.

    (v)    <u>Expenses</u>. During the Employment Period, the Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by the Executive in accordance with the most favorable policies, practices and procedures of the Company and its affiliated companies in effect for the Executive at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

    (vi)    <u>Fringe Benefits</u>. During the Employment Period, the Executive shall be entitled to fringe benefits, including, without limitation, tax and financial planning services, payment of club dues, and, if applicable, use of an automobile and payment of related expenses, in accordance with the most favorable plans,

<div align="center">4</div>

practices, programs and policies of the Company and its affiliated companies in effect for the Executive at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

    (vii)    <u>Office and Support Staff</u>. During the Employment Period, the Executive shall be entitled to an office or offices of a size and with furnishings and other appointments, and to exclusive personal secretarial and other assistance, at least equal to the most favorable of the foregoing provided to the Executive by the Company and its affiliated companies at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive, as provided generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

    (viii)    <u>Vacation</u>. During the Employment Period, the Executive shall be entitled to paid vacation in accordance with the most favorable plans, policies, programs and practices of the Company and its affiliated companies as in effect for the Executive at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies.

    5.    <u>Termination of Employment</u>.

    (a)    <u>Death or Disability</u>. The Executive's employment shall terminate automatically upon the Executive's death during the Employment Period. If the Disability of the Executive occurs during the Employment Period (pursuant to the definition of Disability set forth below), the Company may give to the Executive written notice in accordance with Section 12(c) of this Agreement of its intention to terminate the Executive's employment. In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"), provided that, within the 30 days after such receipt, the Executive shall not have returned to full-time performance of the Executive's duties. For purposes of this Agreement, "Disability" shall mean the absence of the Executive from the Executive's duties with the Company on a full-time basis for 180 consecutive business days as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Executive or the Executive's legal representative.

    (b)    <u>Cause</u>. The Company may terminate the Executive's employment for Cause. For purposes of this Agreement, "Cause" shall mean:

    (i)    the willful and continued failure of the Executive to perform substantially the Executive's duties with the Company or one of its affiliates (other than any such failure resulting from incapacity due to physical or mental illness), for more than 15 days after a written demand for substantial performance is delivered to the Executive by the Board or the Chief Executive Officer of the Company which specifically identifies the manner in which the Board or Chief Executive Officer believes that the Executive has not substantially performed the Executive's duties, or

    (ii)    the willful engaging by the Executive in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company.

For purposes of this provision, no act or failure to act, on the part of the Executive, shall be considered "willful" unless it is done, or omitted to be done, by the Executive in bad faith or

<div align="center">5</div>

without reasonable belief that the Executive's action or omission was in the best interests of the Company. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or upon the instructions of the President and Chief Executive Officer of the Company or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by the Executive in good faith and in the best interests of the Company. The cessation of employment of the Executive shall not be deemed to be for Cause unless and until there shall have been delivered to the Executive a copy of a resolution duly adopted by the affirmative vote of not less than three-quarters of the entire membership of the Board at a meeting of the Board called and held for such purpose (after reasonable notice is provided to the Executive and the Executive is given an opportunity, together with counsel, to be heard before the Board), finding that, in the good faith opinion of the Board, the Executive is guilty of the conduct described in subparagraph (i) or (ii) above, and specifying the particulars thereof in detail.

    (c)    <u>Good Reason</u>. The Executive's employment may be terminated by the Executive for Good Reason. For purposes of this Agreement, "Good Reason" shall mean:

(i)        the assignment to the Executive of any duties inconsistent in any respect with the Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 4(a) of this Agreement, or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith and which is remedied by the Company within 15 days after receipt of notice thereof given by the Executive;

(ii)        any failure by the Company to comply with any of the provisions of Section 4(b) of this Agreement, other than an isolated, insubstantial and inadvertent failure not occurring in bad faith and which is remedied by the Company within 15 days after receipt of notice thereof given by the Executive;

(iii)        the Company's requiring the Executive to be based at any office or location other than as provided in Section 4(a)(i)(B) hereof or the Company's requiring the Executive to travel on Company business to a substantially greater extent than required immediately prior to the Effective Date, which is not remedied by the Company within 15 days after receipt of notice thereof given by the Executive;

(iv)        any purported termination by the Company of the Executive's employment otherwise than as expressly permitted by this Agreement; or

(v)        any failure by the Company to comply with and satisfy Section 11(c) of this Agreement, which is not remedied by the Company within 15 days after receipt of notice thereof given by the Executive.

Anything in this Agreement to the contrary notwithstanding, a termination by the Executive for any reason during the 30 day period immediately following the first anniversary of the Effective Date shall be deemed to be a termination for Good Reason for all purposes of this Agreement.

(d)        Notice of Termination. Any termination of the Executive's employment by the Company or by the Executive shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 12(c) of this Agreement. For purposes of this Agreement, a "Notice of Termination" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined

6

below) is other than the date of receipt of such notice, specifies the termination date (which date shall be not more than thirty days after the giving of such notice). The failure by the Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of the Executive or the Company, respectively, hereunder or preclude the Executive or the Company, respectively, from asserting such fact or circumstance in enforcing the Executive's or the Company's rights hereunder.

(e)        Date of Termination. "Date of Termination" means (i) if the Executive's employment is terminated by the Company for Cause, or by the Executive for Good Reason, the date of receipt of the Notice of Termination or, subject to applicable cure periods, any later date specified therein, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the Date of Termination shall be the date on which the Company notifies the Executive of such termination and (iii) if the Executive's employment is terminated by reason of death or Disability, the Date of Termination shall be the date of death of the Executive or the Disability Effective Date, as the case may be.

6.        Obligations of the Company upon Termination.

(a)        Good Reason; Other Than for Cause. If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause or the Executive shall terminate employment for Good Reason:

(i)        the Company shall pay to the Executive in a lump sum in cash within 30 days after the Date of Termination the aggregate of the following amounts:

A. the sum of (1) the Executive's Annual Base Salary through the Date of Termination to the extent not theretofore paid, (2) any accrued but unpaid Annual Bonus respecting any completed fiscal year ending prior to the Date of Termination, (3) the product of (x) the Average Annual Bonus and (y) a fraction, the numerator of which is the number of days in the current fiscal year through the Date of Termination, and the denominator of which is 365 and (4) any compensation previously deferred by the Executive (together with any accrued interest or earnings thereon) and any accrued vacation pay, in each case to the extent not theretofore paid (the sum of the amounts described in clauses (1), (2), (3) and (4) shall be hereinafter referred to as the "Accrued Obligations"). The timing of payment by the Company of any deferred compensation shall remain subject to any payment election previously made by the Executive; and

B. the amount equal to the product of (1) two (2), and (2) the sum of (x) the Executive's Annual Base Salary and (y) the Average Annual Bonus; and

(ii)        for two (2) years after the Executive's Date of Termination, or such longer period as may be provided by the terms of the appropriate plan, program, practice or policy, the Company shall continue benefits to the Executive and/or the Executive's family at least equal to those which would have been provided to them in accordance with the plans, programs, practices and policies described in Section 4(b)(iv) of this Agreement if the Executive's employment had not been terminated or, if more favorable to the Executive, as in effect generally at any time thereafter with respect to other peer executives of the Company and its affiliated companies and their families, provided, however, that if the Executive becomes reemployed with another employer and is eligible to receive medical or other welfare benefits under another employer provided plan, the medical and other welfare benefits described herein shall be secondary to those provided under such other plan during such applicable period of eligibility. For purposes of determining eligibility (but not the time of commencement of benefits) of the

7

Executive for retiree benefits pursuant to such plans, practices, programs and policies, the Executive shall be considered to have remained employed until two (2) years after the Date of Termination and to have retired on the last day of such period;

(iii)    the Company shall, at its sole expense as incurred, provide the Executive with outplacement services in accordance with the Company's policies with regard to outplacement then in effect; and

(iv)    to the extent not theretofore paid or provided, the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided or which the Executive is eligible to receive under any plan, program, policy or practice or contract or agreement of the Company and its affiliated companies (such other amounts and benefits shall be hereinafter referred to as the "Other Benefits").

(b)    Death. If the Executive's employment is terminated by reason of the Executive's death during the Employment Period, this Agreement shall terminate without further obligations to the Executive's legal representatives under this Agreement, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive's estate or beneficiary, as applicable, in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(b) shall include, without limitation, and the Executive's estate and/or beneficiaries shall be entitled to receive, benefits at least equal to the most favorable benefits provided by the Company and affiliated companies to the estates and beneficiaries of the most senior executives of the Company and such affiliated companies under such plans, programs, practices and policies relating to death benefits, if any, as in effect with respect to other most senior executives and their beneficiaries at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive's estate and/or the Executive's beneficiaries, as in effect on the date of the Executive's death with respect to other [most senior] executives of the Company and its affiliated companies and their beneficiaries.

(c)    Disability. If the Executive's employment is terminated by reason of the Executive's Disability during the Employment Period, this Agreement shall terminate without further obligations to the Executive, other than for payment of Accrued Obligations and the timely payment or provision of Other Benefits. Accrued Obligations shall be paid to the Executive or the Executive's legal representative in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 6(c) shall include, and the Executive shall be entitled after the Disability Effective Date to receive, disability and other benefits at least equal to the most favorable of those generally provided by the Company and its affiliated companies to disabled executives and/or their families in accordance with such plans, programs, practices and policies relating to disability, if any, as in effect generally with respect to other peer executives and their families at any time during the 120 day period immediately preceding the Effective Date or, if more favorable to the Executive and/or the Executive's family, as in effect at any time thereafter generally with respect to other peer executives of the Company and its affiliated companies and their families.

(d)    Cause; Other than for Good Reason. If the Executive's employment shall be terminated for Cause during the Employment Period, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay to the Executive (x) his Annual Base Salary through the Date of Termination, (y) the amount of any compensation previously deferred by the Executive, and (z) Other Benefits, in each case to the extent theretofore unpaid. If the Executive voluntarily terminates employment during the Employment Period, excluding a termination for Good Reason, this Agreement shall terminate without further obligations to the Executive, other than for Accrued Obligations and the timely payment or provision of Other

<div align="center">8</div>

Benefits. In such case, all Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination.

7.    Non-exclusivity of Rights. Nothing in this Agreement shall prevent or limit the Executive's continuing or future participation in any plan, program, policy or practice provided by the Company or any of its affiliated companies and for which the Executive may qualify, nor, subject to Section 12(f), shall anything herein limit or otherwise affect such rights as the Executive may have under any contract or agreement with the Company or any of its affiliated companies. Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan, policy, practice or program of or any contract or agreement with the Company or any of its affiliated companies at or subsequent to the Date of Termination shall be payable in accordance with such plan, policy, practice or program or contract or agreement except as explicitly modified by this Agreement.

8.    Full Settlement. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against the Executive or others. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever. In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and such amounts shall not be reduced whether or not the Executive obtains other employment. The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest by (i) the Company provided that the Executive prevails in at least one material issue, (ii) the Executive or (iii) others, of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof (including, without limitation, as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement), plus in each case interest on any delayed payment at the applicable Federal rate provided for in Section 7872(f) (2) (A) of the Internal Revenue Code of 1986, as amended (the "Code").

9.    Certain Additional Payments by the Company.

(a)    Anything in this Agreement to the contrary notwithstanding and except as set forth below, in the event it shall be determined that any payment or distribution by the Company to or for the benefit of the Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, but determined without regard to any additional payments required under this Section 9) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Code or any interest or penalties are incurred by the Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

Notwithstanding the foregoing provisions of this Section 9(a), if it shall be determined that the Executive is entitled to a Gross-Up Payment, but that the Payments do not exceed 110% of the greatest amount (the "Reduced Amount") that could be paid to the Executive such that the receipt of Payments would not give rise to any Excise Tax, then no Gross-Up Payment shall be made to the Executive and the Payments, in the aggregate, shall be reduced to the Reduced Amount.

(b)        Subject to the provisions of Section 9(c), all determinations required to be made under this Section 9, including whether and when a Gross-Up Payment is required and the

amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by such certified public accounting firm as may be designated by the Company (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Executive within 15 business days of the receipt of notice from the Executive that there has been a Payment, or such earlier time as is requested by the Company. In the event that the Accounting Firm is serving as accountant or auditor for the individual, entity or group effecting the Change of Control, the Company shall appoint another nationally recognized accounting firm to make the determinations required hereunder (which accounting firm shall then be referred to as the Accounting Firm hereunder). All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 9, shall be paid by the Company to the Executive within five days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 9(c) and the Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive.

(c)        The Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten business days after the Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Executive shall not pay such claim prior to the expiration of the 30-day period following the date on which it gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Executive in writing prior to the expiration of such period that it desires to contest such claim, the Executive shall:

(i)        give the Company any information reasonably requested by the Company relating to such claim,

(ii)        take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company,

(iii)        cooperate with the Company in good faith in order effectively to contest such claim, and

(iv)        permit the Company to participate in any proceedings relating to such claim;

provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 9(c), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or

more appellate courts, as the Company shall determine; provided, however, that if the Company directs the Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Executive, on an interest-free basis and shall indemnify and hold the Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)        If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 9(c), the Executive becomes entitled to receive any refund with respect to such claim, the Executive shall (subject to the Company's complying with the requirements of Section 9(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by the Executive of an amount advanced by the Company pursuant to Section 9(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and the Company does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

10.        Confidential Information. The Executive shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall have been obtained by the Executive during the Executive's employment by the Company or any of its affiliated companies and which shall not be or become public knowledge (other than by acts by the Executive or representatives of the Executive in violation of this Agreement). After termination of the Executive's employment with

the Company, the Executive shall not, without the prior written consent of the Company or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it. In no event shall an asserted violation of the provisions of this Section 10 constitute a basis for deferring or withholding any amounts otherwise payable to the Executive under this Agreement.

11.    Successors.

(a)    This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive otherwise than by will or the laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives.

(b)    This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.

(c)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

11

12.    Miscellaneous.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principles of conflict of laws. Any legal action, suit or proceeding arising out of or relating to this Agreement shall be instituted in the state or federal courts in the State of Delaware and the parties agree not to assert, in any action, suit or proceeding by way of motion, as a defense or otherwise, any claim that either party is not personally subject to the jurisdiction of such court, or that such action, suit or proceeding is brought in an inconvenient forum, or that the venue is improper or that the subject matter hereof cannot be enforced in such court.  The parties hereby irrevocably submit to the jurisdiction of any such court in any such action, suit or proceeding.

(b)    The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

(c)    All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party, by FedEx or other commercial overnight courier or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to the Executive:

1000 Abernathy Road
Suite 1200
Atlanta, Georgia 30328

If to the Company:

1000 Abernathy Road
Suite 1200
Atlanta, Georgia 30328
  Attention:  President and Chief Executive Officer

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

(d)    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(e)    The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(f)    The Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Executive or the Company may have hereunder, including, without limitation, the right of the Executive to terminate employment for Good Reason pursuant to Section 5(c)(i) through (v) of this Agreement, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(g)    Except as may otherwise be provided under any other written agreement between the Executive and the Company, the Executive and the Company acknowledge that the employment of the Executive by the Company is "at will" and, subject to Section 1 hereof, prior to the Effective Date, the Executive's employment and/or this Agreement may be terminated by either the Executive or the Company at any time prior to the Effective Date, in which case the Executive shall have no further rights under this Agreement. From and after the Effective Date,

12

this Agreement shall supersede any other agreement between the parties with respect to the subject matter hereof and, upon the Effective Date, any such other agreement shall be null, void and of no further force or effect.

IN WITNESS WHEREOF, the Executive has hereunto set the Executive's hand and, pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf, all as of the day and year first above written.

/s/ Kenneth J. Gary
_____
Kenneth J. Gary

BEAZER HOMES USA, INC.

By        /s/ Ian J. McCarthy
_____
Ian J. McCarthy
President and Chief Executive Officer

13

# EXHIBIT 160

Exclusive news, data and analytics for financial market professionals 

 World ⌄    Business ⌄

My News    🔍    **Sign In**    Register

Markets ⌄    Sustainability ⌄

# Beazer Homes says fires general counsel

    Legal ⌄    More ⌄

By Reuters

August 9, 2007 5:10 PM GMT-4 ·
Updated February 14, 2007

 

NEW YORK, Feb 14 (Reuters) - Beazer Homes USA
Inc. , one of the largest U.S. homebuilders, on
Wednesday said it fired Kenneth Gary, its executive
vice president and general counsel, for what it
called "a pattern of personal conduct which
includes violations of company policies."

The Atlanta-based company said that effective
Feb. 12, Gary was "terminated for cause," under
the terms of his employment agreement. As a
result, Beazer said, Gary's employment agreement
dated March 14, 2005 has also been terminated.

Get a look at the day ahead in U.S. and global markets with the Morning Bid U.S. newsletter. Sign up here.

Advertisement · Scroll to continue

Beazer disclosed the firing in a U.S. Securities and Exchange Commission filing. The company did not immediately return calls and an e-mail seeking further comment. Attempts to reach Gary were not immediately successful.

The company builds homes largely for first-time buyers.

According to a 2005 SEC filing, Gary joined Beazer in March 2005, when he was 46, as executive vice president, general counsel and corporate secretary.

He joined Beazer from luxury homebuilder Toll
Brothers Inc. , where he was a senior vice president
and general counsel, and led the mortgage and
title insurance units, the 2005 filing said. He had
joined Toll as general counsel in 1990, the filing
said.

---

Advertisement · Scroll to continue

---

Beazer shares closed on Wednesday up 82 cents at
$41.54 on the New York Stock Exchange. The
shares have fallen 36 percent in the last year.
Beazer disclosed Gary's termination after U.S.
markets closed.



Our Standards: The Thomson Reuters Trust
Principles. 

Suggested Topics: U.S. Markets

    Purchase Licensing Rights

## Read Next

 

Mexican state oil firm
Pemex's financial debt
poised to drop to $80
billion at end-Q3, minister
says

Argentine economic
activity rises 2.9% in July

# Sponsored Content

**Advertise Here**

## Markets >

World

Bank of Japan keeps

World

Fed's September

Bank of Japan keeps
interest rates steady,
decides to start
selling ETFs - as it
happened
September 19, 2025

Fed's September
rate cut, as it
happened
September 17, 2025

# What the Fed's rate cut means for your money

U.S. Markets · September 19, 2025

This was originally published in the On
The Money newsletter, where we share
U.S. personal finance tips and insights
every other week. Sign up here to receive
it for free.

U.S. Markets

Trump's stealth
corporate 'tax' hike
could be what the
US needs
September 16, 2025

U.S. Markets

US economy braces
for twin housing,
labor market
headwinds
September 15, 2025

# EXHIBIT 161

**9.A. CERTIFICATE OF DISCLOSURE (A.R.S. §10-128)**

Has any person serving either by election or appointment as officers, directors, trustees, incorporators and persons controlling or holding more than 10% of the issued and outstanding common shares or 10% of any other proprietary, beneficial or membership interest in the corporation:

1. Been convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the seven year period immediately preceding the execution of this certificate;

2. Been convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses or restraint of trade or monopoly in any state or federal jurisdiction within the seven year period immediately preceding execution of this certificate;

3. Been or are subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the seven year period immediately preceding execution of this certificate where such injunction, judgment, decree or permanent order:

      (a) involved the violation of fraud or registration provisions of the securities laws of that jurisdiction, or
      (b) involved the violation of the consumer fraud laws of that jurisdiction, or
      (c) involved the violation of the antitrust or restraint of trade laws of that jurisdiction?

        YES_____                NO__X__

If "YES", the following information must be submitted as an attachment to this report for each person subject to one or more of the actions stated in Items 1. through 3. above.

| | | | |
|---|---|---|---|
| 1. | Full name and prior names used. | 5. | Date and location of birth. |
| 2. | Full birth name. | 6. | Social Security Number |
| 3. | Present home address. | 7. | The nature and description of each conviction or judicial action; the date and location; the court and public agency involved, and the file or cause number of the case. |
| 4. | Prior addresses (for immediate preceding 7 year period). | | |

**9.B. STATEMENT OF BANKRUPTCY (A.R.S. §10-128.01)**

Are you currently in federal bankruptcy proceedings, and if so, under which chapter of federal bankruptcy law is the action filed and on what date?

Yes ____   Chapter _____   Date Filed _____   Case Number _____   No __X__

10.   This report must be executed by the corporation and attested by it's president, a vice-president, secretary, assistant secretary or treasurer. (If the corporation is in the hands of a receiver or trustee, it shall be executed on behalf of the corporation.)

I DECLARE, UNDER PENALTY OF LAW, THAT ALL CORPORATE INCOME TAX RETURNS REQUIRED BY TITLE 43 OF THE ARIZONA REVISED STATUTES HAVE BEEN FILED WITH THE ARIZONA DEPARTMENT OF REVENUE.

I further declare under penalty of law that I (we) have examined this report and the certificate, including any attachments, and to the best of my (our) knowledge and belief they are true, correct and complete.

By _____ Date 1/13/97   By _____ Date 1/13/97

Title  Kenneth J. Gary, Vice President      Title  Robert N. Dale, Assistant Secretary

-4-

O - 0346044

**FILED**

9:00 AM

State of North Carolina

**FEB 2 3 1994**

Department of the Secretary of State

EFFECTIVE

RUFUS L EDMISTEN

ARTICLES OF INCORPORATION SECRETARY OF STATE

NORTH CAROLINA

94  055  9004

Pursuant to §55-2-02 of the General Statutes of North Carolina, the undersigned does hereby submit these Articles of Incorporation for the purpose of forming a business corporation.

1.  The name of the corporation is:  Toll NC GP Corp.

2.  The corporation is authorized to issue  1,000  shares.  These shares shall be: *(check a or b)*
    a.  X  all of one class, designated as common stock; or
    b.  ___  divided into classes or series within a class as provided in the attached schedule, in accordance with NCGS §55-6-01.

3.  The street address and county of the initial registered office of the corporation is:

    Number and Street  225 Hillsborough Street

    City, State, Zip Code  Raleigh, North Carolina  27603  County  Wake

4.  The mailing address if different from the street address of the initial registered office is:

5.  The name of the initial registered agent is:  C T CORPORATION SYSTEM

6.  Any other provisions which the corporation elects to include are attached.

7.  The name and address of each incorporator is as follows:

    Kenneth J. Gary
    3103 Philmont Avenue
    Huntingdon Valley, PA  19006

8.  These articles will be effective upon filing, unless a date and/or time is specified:  upon filing date

This the 22nd day of  February , 19 94 .

TOLL NC GP CORP.

Signature

Kenneth J. Gary, Vice President
Type or Print Name and Title

**NOTES:**
1.  Filing fee is $100.  One executed original and one exact or conformed copy of these articles must be filed with the Secretary of State.

CORPORATIONS DIVISION          300 N. SALISBURY ST.          RALEIGH, NC 27603-5909

(N. C. - 1262 - 7/1/90)



# STATE OF ARIZONA
## CORPORATION COMMISSION
### CORPORATION ANNUAL REPORT
### & CERTIFICATE OF DISCLOSURE



**DUE ON OR BEFORE** 06/02/1998

**FILING FEE** $45.00

The following information is required by A.R.S. §10-1622 & §10-2501 for all corporations organized pursuant to Arizona Revised Statutes, Title 10. The Commission's authority to prescribe this form is A.R.S. §10-121.A. & §10-2545.A. YOUR REPORT MUST BE SUBMITTED ON THIS ORIGINAL FORM. Make changes or corrections where necessary. See instructions for proper format. REFER TO THE INSTRUCTIONS ON PAGE 4.

**RECEIVED**

1.  TOLL BROS. OF ARIZONA, INC.
    % C T CORPORATION SYSTEM
    3225 N CENTRAL AVE
    PHOENIX, AZ 85012

MAY 04 1998

ARIZONA CORP. COMMISSION
CORPORATIONS DIVISION

(215) 938-8000

Business Phone: _____
(Business phone is optional.)

State of Domicile: ARIZONA

Corporation File Number: -0804037-0

Type of Corporation: BUSINESS

2.  Arizona Statutory Agent: C T CORPORATION SYSTEM
    Street Address: 3225 N CENTRAL AVE
    (NOT P.O. BOX)
    City, State, Zip: PHOENIX    AZ 85012-



| ACC USE ONLY | |
|---|---|
| Fee ✓ $ | 45 |
| Penalty $ | |
| Reinstate $ | PAID |
| Expedite $ | |
| Total $ | 45 |
| FY97-98 | |

If appointing a new statutory agent, the new agent MUST consent to that appointment by signing below.

I, (individual) or We, (corporation or limited liability company) having been designated the new Statutory Agent, do hereby consent to this appointment until my removal or resignation pursuant to law.

Signature

3.  Secondary Address:
    (Foreign Corporations are REQUIRED to complete this section.)

4.  Check the one category below which best describes the CHARACTER OF BUSINESS of your corporation.

**BUSINESS CORPORATIONS**

- 1. Accounting
- 2. Advertising
- 3. Aerospace
- 4. Agriculture
- 5. Architecture
- 6. Banking/Finance
- 7. Barbers/Cosmetology
- ☒ 8. Construction
- 9. Contractor
- 10. Credit/Collection
- 11. Education
- 12. Engineering
- 13. Entertainment
- 14. General Consulting
- 15. Health Care
- 16. Hotel/Motel
- 17. Import/Export
- 18. Insurance
- 19. Legal Services
- 20. Manufacturing
- 21. Mining
- 22. News Media
- 23. Pharmaceutical
- 24. Publishing/Printing
- 25. Ranching/Livestock
- 26. Real Estate
- 27. Restaurant/Bar
- 28. Retail Sales
- 29. Science/Research
- 30. Sports/Sporting Events
- 31. Technology(Computers)
- 32. Technology(General)
- 33. Television/Radio
- 34. Tourism/Convention Services
- 35. Transportation
- 36. Utilities
- 37. Veterinary Medicine/Animal Care
- 38. Other _____

**NON-PROFIT CORPORATIONS**

- 1. Charitable
- 2. Benevolent
- 3. Educational
- 4. Civic
- 5. Political
- 6. Religious
- 7. Social
- 8. Literary
- 9. Cultural
- 10. Athletic
- 11. Science/Research
- 12. Hospital/Health Care
- 13. Agricultural
- 14. Animal Husbandry
- 15. Homeowner's Association
- 16. Professional, commercial industrial or trade association
- 17. Other _____

Page 2

**5. CAPITALIZATION:** (Business Corporations and Business Trusts are **REQUIRED** to complete this section.)
Business trusts must indicate the number of transferable certificates held by trustees evidencing their beneficial interest in the trust estate.

| Number of Shares/Certificates Authorized | Class | Series Within Class (if any) |
|---|---|---|
| 1,000 | Common | |

| Number of Shares/Certificates Issued | Class | Series Within Class (if any) |
|---|---|---|
| 1,000 | Common | |

**6. SHAREHOLDERS:** (Business Corporations and Business Trusts are **REQUIRED** to complete this section.)
List shareholders holding more than 20% of any class of shares issued by the corporation, or having more than a 20% beneficial interest in the corporation.

Name: Sole Shareholder: Toll Holdings, Inc., a Delaware corporation.

NONE ☐

Name: _____    Name: _____

**7. OFFICERS** (Attach additional sheets if necessary.)

Name: Bruce Toll
Title: President & Secretary
Address: 3103 Philmont Ave
Huntingdon Valley, PA 19006
Date taking office: 4/97

Name: Kenneth Gary
Title: Vice President
Address: 3103 Philmont Ave.
Huntingdon Vlly PA 19006
Date taking office: 4/97

Name: Joel Rassman
Title: Vice President & Treasurer
Address: 3103 Philmont Ave.
Huntingdon Valley PA 19006
Date taking office: 4/97

Name: Robert Dale
Title: Assistant Secretary
Address: 3103 Philmont Ave.
Huntingdon Valley PA 19006
Date taking office: 4/97

**8. DIRECTORS** (If no changes since last report, check here ✗ and go on to Section 9.)

Name: ROBERT I TOLL
Address: 3103 PHILMONT AVE
HUNTINGDON VALLEY, PA 19006-
Date taking office: 04-02-97

Name: BRUCE E TOLL
Address: 3103 PHILMONT AVE
HUNTINGDON VALLEY, PA 19006-
Date taking office: 04-02-97

Name: JOEL H RASSMAN
Address: 3103 PHILMONT AVE
HUNTINGDON VALLEY, PA 19006-
Date taking office: 04-02-97

Name: _____
Address: _____
Date taking office: _____

Please Enter Corporation Name: _OB04037-0_                                    Page 3

**9. FINANCIAL DISCLOSURE (A.R.S. §§10-1622.B & 10-2501.A.6)**
Only corporations that meet one or more of the following criteria must **attach** a financial statement (balance sheet including assets, liabilities and equity). The corporation is: 1) a **public service corporation** (e.g., public utility) as defined in Article XV, Section 2, Constitution of Arizona. 2) offers its **stock for sale** in transactions that are not exempt from A.R.S. §§ 44-1841 and 44-1842 as prescribed in §44-1844.A.1 (e.g., publicly traded). 3) a **nonprofit corporation**. All other forms of corporations are exempt from filing a financial disclosure.

_not required_

**10. CERTIFICATE OF DISCLOSURE (A.R.S. §§10-1622.A.8 & 10-2505.A)**
Has ANY person serving either by election or appointment as an officer, director, trustee, incorporator and person controlling or holding more than 10% of the issued and outstanding common shares or 10% of any other proprietary, beneficial or membership interest in the corporation been:

1. Convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the seven year period immediately preceding the execution of this certificate?
2. Convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses or restraint of trade or monopoly in any state or federal jurisdiction within the seven year period immediately preceding execution of this certificate?
3. Or are subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the seven year period immediately preceding execution of this certificate where such injunction, judgment, decree or permanent order involved the violation of:

   (a) fraud or registration provisions of the securities laws of that jurisdiction, or
   (b) the consumer fraud laws of that jurisdiction, or
   (c) the antitrust or restraint of trade laws of that jurisdiction?

One box **must** be marked:    **YES** ☐        **NO** ☒

If "YES", the following information must be submitted as an attachment to this report for each person subject to one or more of the actions stated in Items 1. through 3. above.

1. Full name and prior names used.
2. Full birth name.
3. Present home address.
4. Prior addresses (for immediate preceding 7 year period).
5. Date and location of birth.
6. Social Security Number
7. The nature and description of each conviction or judicial action; the date and location; the court and public agency involved, and the file or cause number of the case.

**11. STATEMENT OF BANKRUPTCY (A.R.S. §10-202.D.2)**
Has ANY person serving either by election or appointment as an officer, director, trustee, incorporator and person controlling or holding more than 20% of the issued and outstanding common shares or 20% of any other proprietary, beneficial or membership interest in the corporation served in such capacity or held a 20% interest in any other corporation during the bankruptcy, receivership, or charter revocation of the other corporation?

One box **must** be marked:    **YES** ☐        **NO** ☒

If YES, enter the following:    Chapter _____    Date Filed _____    Case Number _____

If "YES", the following information must be submitted as an attachment to this report for each person subject to the statement above. 1) The names and addresses of each corporation and the person or persons involved. 2) The state in which each corporation was a) incorporated b) transacted business. 3) The dates of corporate operation.

12.    **CAUTION:** Signature requirements vary according to the type of corporation. **See the instruction sheet** for specific rules. Annual Reports submitted with incorrect signatures will be rejected.

I DECLARE, UNDER PENALTY OF LAW, THAT ALL CORPORATE INCOME TAX RETURNS REQUIRED BY TITLE 43 OF THE ARIZONA REVISED STATUTES HAVE BEEN FILED WITH THE ARIZONA DEPARTMENT OF REVENUE.

I further declare under penalty of law that I (we) have examined this report and the certificate, including any attachments, and to the best of my (our) knowledge and belief they are true, correct and complete.

Name _Kenneth Gary_  Date _4/20/98_   Name _Robert Dale_  Date _4/20/97_

Signature _[signature]_              Signature _R. Mole_

Title _Vice President_              Title _Assistant Secretary_

**(Signator(s) must be duly authorized corporate officer(s) listed in section 7 of this report.)**



**STATE OF ARIZONA
CORPORATION COMMISSION
CORPORATION ANNUAL REPORT
& CERTIFICATE OF DISCLOSURE**



RECEIVED

OCT 26 1998

**DUE ON OR BEFORE** 01/02/1999    **FILING FEE** $45.00

The following information is required by A.R.S. §10-1622 & §10-2501 for all corporations organized pursuant to Arizona Revised Statutes, Title 10. The Commission's authority to prescribe this form is A.R.S. §10-121.A. & §10-2545.A. YOUR REPORT MUST BE SUBMITTED ON THIS ORIGINAL FORM. Make changes or corrections where necessary. Information for the report should reflect the current status of the corporation. See instructions for proper format. **REFER TO THE INSTRUCTIONS ON PAGE 4.**

1.  MV REAL ESTATE, INC. (FN)
    8700 E DEVENTURA
    SCOTTSDALE, AZ 85258

    Corporation File Number:       F-0828472-8
    Business Phone: (215) 938-8000   F-0828472-8
    (Business phone is optional.)
    State of Domicile: PENNSYLVANIA   Type of Corporation:  BUSINESS

2.  Arizona Statutory Agent:  C T CORPORATION SYSTEM
    Street Address:  3225 N CENTRAL AVE
    (NOT P.O. BOX)
    City, State, Zip:  PHOENIX        AZ 85012-

    *Use this box only if appointing a new Statutory Agent*

| ACC USE ONLY | |
|---|---|
| Fee $ | 45 |
| Penalty $ | |
| Reinstate $ | |
| Expedite $ | |
| Total $ | |
| FY98-99 | |

If appointing a new statutory agent, the new agent MUST consent to that appointment by signing below.

I, (individual) or We, (corporation or limited liability company) having been designated the new Statutory Agent, do hereby consent to this appointment until my removal or resignation pursuant to law.

_____
Signature of *new* Statutory Agent

3103 PHILMONT AVE
HUNTINGDON VALLEY, PA 19006

3.  Secondary Address:
    (Foreign Corporations are
    REQUIRED to complete
    this section.)

4.  Check the one category below which best describes the CHARACTER OF BUSINESS of your corporation.

**BUSINESS CORPORATIONS**

| | |
|---|---|
| ___ 1. Accounting | ___ 20. Manufacturing |
| ___ 2. Advertising | ___ 21. Mining |
| ___ 3. Aerospace | ___ 22. News Media |
| ___ 4. Agriculture | ___ 23. Pharmaceutical |
| ___ 5. Architecture | ___ 24. Publishing/Printing |
| ___ 6. Banking/Finance | ___ 25. Ranching/Livestock |
| ___ 7. Barbers/Cosmetology | ___ 26. Real Estate |
| X 8. Construction | ___ 27. Restaurant/Bar |
| ___ 9. Contractor | ___ 28. Retail Sales |
| ___ 10. Credit/Collection | ___ 29. Science/Research |
| ___ 11. Education | ___ 30. Sports/Sporting Events |
| ___ 12. Engineering | ___ 31. Technology(Computers) |
| ___ 13. Entertainment | ___ 32. Technology(General) |
| ___ 14. General Consulting | ___ 33. Television/Radio |
| ___ 15. Health Care | ___ 34. Tourism/Convention Services |
| ___ 16. Hotel/Motel | ___ 35. Transportation |
| ___ 17. Import/Export | ___ 36. Utilities |
| ___ 18. Insurance | ___ 37. Veterinary Medicine/Animal Care |
| ___ 19. Legal Services | ___ 38. Other _____ |

**NON-PROFIT CORPORATIONS**

| | |
|---|---|
| 1. ___ Charitable | |
| 2. ___ Benevolent | |
| 3. ___ Educational | |
| 4. ___ Civic | RECEIVED |
| 5. ___ Political | |
| 6. ___ Religious | DEC 10 1998 |
| 7. ___ Social | |
| 8. ___ Literary | |
| 9. ___ Cultural | ARIZONA CORP. COMMISSION |
| 10. ___ Athletic | CORPORATIONS DIVISION |
| 11. ___ Science/Research | |
| 12. ___ Hospital/Health Care | |
| 13. ___ Agricultural | |
| 14. ___ Animal Husbandry | |
| 15. ___ Homeowner's Association | |
| 16. ___ Professional, commercial industrial or trade association | |
| 17. ___ Other _____ | |

Page 2

5. **CAPITALIZATION:** (Business Corporations and Business Trusts are **REQUIRED** to complete this section.)
Business trusts must indicate the number of transferable certificates held by trustees evidencing their beneficial interest in the trust estate.

| Number of Shares/Certificates Authorized | Class | Series Within Class (if any) |
|---|---|---|
| 1,000 | Common | ---- |

| Number of Shares/Certificates Issued | Class | Series Within Class (if any) |
|---|---|---|
| 1,000 | Common | ---- |

6. **SHAREHOLDERS:** (Business Corporations and Business Trusts are **REQUIRED** to complete this section.)
List shareholders holding more than 20% of any class of shares issued by the corporation, or having more than a 20% beneficial interest in the corporation.

NONE ☐

Name: Toll Holdings, Inc.    Name: _____
(sole shareholder)

Name: _____    Name: _____

7. **OFFICERS** (If no changes since last report, check here __ and go on to Section 8.)

Name: ~~BRUCE E TOLL~~ Zvi Barzilay          Name: JOEL H RASSMAN

Title: PRESIDENT/~~CEO~~                      Title: VICE-PRESIDENT and Treasurer

Address: 3103 PHILMONT AVE                    Address: 3103 PHILMONT AVE
         HUNTINGDON VALLEY, PA  19006-                 HUNTINGDON VALLEY, PA  19006-

Date taking office: ~~01-02-98~~ 10/31/98     Date taking office: 01-02-98

Name: ~~BRUCE E TOLL~~ Zvi Barzilay          Name: ~~JOEL H RASSMAN~~ Robert I. Toll

Title: SECRETARY                              Title: ~~TREASURER~~  CEO

Address: 3103 PHILMONT AVE                    Address: 3103 PHILMONT AVE
         HUNTINGDON VALLEY, PA  19006-                 HUNTINGDON VALLEY, PA  19006-

Date taking office: ~~01-02-98~~ 10/31/98     Date taking office: 01-02-98
(ADDITIONAL OFFICER)
Kenneth J. Gary
Vice President, same address as above.  Took office 01-02-98

8. **DIRECTORS** (If no changes since last report, check here __ and go on to Section 9.)

Name: JOEL H RASSMAN                          Name: ~~BRUCE E TOLL~~ Zvi Barzilay

Address: 3103 PHILMONT AVE                    Address: 3103 PHILMONT AVE
         HUNTINGDON VALLEY, PA  19006-                 HUNTINGDON VALLEY, PA  19006-

Date taking office: 01-02-98                  Date taking office: ~~01-02-98~~ 6/01/98

Name: Robert I. Toll                          Name: _____

Address: 3103 Philmont Avenue                 Address: _____
         Huntigndon Valley, PA  19006

Date taking office: 1-02-98                   Date taking office: _____

Please Enter Corporation Name:  MV Real Estate, Inc. (FN)                              Page 3

*F-08284728*

**9. FINANCIAL DISCLOSURE (A.R.S. §§10-1622.B & 10-2501.A.6)**
Only nonprofit corporations must **attach** a financial statement (balance sheet including assets, liabilities and equity).   All other forms of corporations are exempt from filing a financial disclosure.

**10. CERTIFICATE OF DISCLOSURE (A.R.S. §§10-1622.A.8 & 10-2505.A)**
Has ANY person serving either by election or appointment as an officer, director, trustee, incorporator and person controlling or holding more than 10% of the issued and outstanding common shares or 10% of any other proprietary, beneficial or membership interest in the corporation been:

1. Convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the seven year period immediately preceding the execution of this certificate?
2. Convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses or restraint of trade or monopoly in any state or federal jurisdiction within the seven year period immediately preceding execution of this certificate?
3. Or are subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the seven year period immediately preceding execution of this certificate where such injunction, judgment, decree or permanent order involved the violation of:

      (a) fraud or registration provisions of the securities laws of that jurisdiction, or
      (b) the consumer fraud laws of that jurisdiction, or
      (c) the antitrust or restraint of trade laws of that jurisdiction?

One box **must** be marked:    **YES ☐**        **NO ☒**

If "YES", the following information must be submitted as an attachment to this report for each person subject to one or more of the actions stated in Items 1. through 3. above.

| | | | |
|---|---|---|---|
| 1. | Full name and prior names used. | 5. | Date and location of birth. |
| 2. | Full birth name. | 6. | Social Security Number |
| 3. | Present home address. | 7. | The nature and description of each conviction or judicial action; the |
| 4. | Prior addresses (for immediate preceding 7 year period). | | date and location; the court and public agency involved, and the file or cause number of the case. |

**11. STATEMENT OF BANKRUPTCY (A.R.S. §10-202.D.2)**
Has ANY person serving either by election or appointment as an officer, director, trustee, incorporator and person controlling or holding more than 20% of the issued and outstanding common shares or 20% of any other proprietary, beneficial or membership interest in the corporation served in such capacity or held a 20% interest in any other corporation during the bankruptcy, receivership, or charter revocation of the other corporation?

One box **must** be marked:    **YES ☐**        **NO ☒**

If YES, enter the following:    Chapter _____  Date Filed _____  Case Number _____

If "YES", the following information must be submitted as an attachment to this report for each person subject to the statement above. 1) The names and addresses of each corporation and the person or persons involved.  2) The state in which each corporation was a) incorporated b) transacted business.  3) The dates of corporate operation.

**12. SIGNATURES**

**CAUTION:** Signature requirements vary according to the type of corporation.  **See the instruction sheet** for specific rules.  Annual Reports submitted with incorrect signatures will be rejected.

I DECLARE, UNDER PENALTY OF LAW, THAT ALL CORPORATE INCOME TAX RETURNS REQUIRED BY TITLE 43 OF THE ARIZONA REVISED STATUTES HAVE BEEN FILED WITH THE ARIZONA DEPARTMENT OF REVENUE.

I further declare under penalty of law that I (we) have examined this report and the certificate, including any attachments, and to the best of my (our) knowledge and belief they are true, correct and complete.

Name_____  Date_12/9/99_  Name_____  Date_____

Signature_____  Signature_____

Title  Kenneth J. Gary, Vice President  _____  Title_____
    **(Signator(s) must be duly authorized corporate officer(s) listed in section 7 of this report.)**

# EXHIBIT 162

LANGUAGES

English

DESIGNATIONS

• Certified Real Estate Brokerage Manager

ASSOCIATION

Atlanta Fine Homes
Sotheby's International Realty

LEARN ABOUT OFFICE →

# Local Expertise. Global Connections.

Ken Gary is a licensed broker and real estate attorney who brings over 30 years of diverse real estate experience and business savvy to the Gary Group. Ken has served as both Real Estate Counsel and General Counsel for three different Fortune 500 companies, including Verizon, Beazer Homes and TollBrothers, Inc., where he also served as the company's lead real estate broker of record. Ken also founded and served as CEO of both a national mortgage company and a title insurance company. He has significant experience in 'non-traditional' real estate transactions such as mortgage foreclosures, short sales and bankruptcies. With this comprehensive and diverse experience in the real estate industry, Ken brings a unique and unmatched perspective to your real estate transaction. Ken's wife, Christine, is an accomplished professional since 1990 with over 15 years as an award winning, top producing real estate professional. They are married for more than 30 years, have lived in 5 major cities a child. They have enjoyed the life-style that Country Club of th the most prestigious gated, golf course communities in metro Atlanta, has to

TOP

MY STORY

PROPERTIES

CONNECT WITH ME



Ken Gary
SEND MESSAGE

sothebysrealty.com/atlantafinehomessir/eng/associate/753-a-913-4025698/ken-gary

Verify it's you

# EXHIBIT 163

       



# Maryann Heatherby, PHR, SHRM-CP

Senior Manager, Employee Relations at Toll Brothers



Toll Brothers



Commonwealth University-Bloomsburg

North Wales, Pennsylvania, United States · Contact info

500+ connections

Message 

## About

A unique Human Resources business partner with a depth of talent – from strategic workforce planning, employee relations, performance management, change management, HR administration, compensation, benefits, organizational communication to staff motivation. This experience is complemented by workin …

## Activity

1,035 followers

Maryann Heatherby, PHR, SHRM-CP reposted this · 5mo

Are you ready to stand out and make your mark at one of the most renowned luxury home builders in the country?
…                                                             …show more

54

Show all posts →

## Experience

Toll Brothers
8 yrs 1 mo
Horsham, PA

Senior Manager, Employee Relations
Full-time
Dec 2018 - Present · 6 yrs 10 mos

Human Resources Manager
Sep 2017 - Dec 2018 · 1 yr 4 mos

Senior Manager, Human Resources

Catherines Stores Corporation, division of Ascena Retail Group
Sep 2014 - Sep 2017 · 3 yrs 1 mo
Bensalem, PA

 Catherines Stores Corporation a division of ascena retail group
8 yrs 7 mos
Bensalem, PA

Human Resources Manager
Apr 2011 - Sep 2017 · 6 yrs 6 mos

Human Resources Generalist
Mar 2009 - Apr 2011 · 2 yrs 2 mos

 Human Resources Generalist
Accu-Sort Systems
Aug 2006 - Oct 2008 · 2 yrs 3 mos
Telford, PA

## Education

 Commonwealth University-Bloomsburg
BA, Organizational Communication Studies
2001 - 2005

Activities and societies: President – National Communication Association Student Chapter, Lambda Pi Eta, Communication Studies …

Outstanding Student in Communication Studies Award Recipient

## Licenses & certifications

 Professional in Human Resources (PHR) Certification
HRCI
Issued Jan 2011 · Expired Jun 2020

 SHRM-Certified Professional
SHRM
Issued Dec 2015 · Expired Jun 2019

████████████

## Skills

### Onboarding

 Endorsed by Christine Welsh, PHR, SHRM-CP and 1 other who is highly skilled at this …

Endorsed by 3 colleagues at Catherines

 28 endorsements

### Human Resources

Endorsed by Melissa Lord Illsley and 3 others who are highly skilled at this

Endorsed by 3 colleagues at Catherines

21 endorsements

# EXHIBIT 164

 





## Crystal Vecchione
Employee Relations Manager at Toll Brothers

Toll Brothers

Kutztown University of Pennsylvania

Ambler, Pennsylvania, United States  · Contact info

500+ connections



### About
Self-motivated and focused Human Resources Professional with over nine years of experience and a strong desire, drive and skills to succeed in a demanding and supportive Human Resources environment. Possess' excellent communication skills with the ability to multitask, problem solve and prioritize.   …

### Activity
590 followers



Crystal Vecchione posted this • 11mo

 This week at Toll Brothers, we had the incredible opportunity to celebrate Diwali, the Festival of Lights. It was a wonderful experience to learn about this meaningful tradition and a reminder of   …show more

 76                            3 comments · 2 reposts

Show all posts →

### Experience

Toll Brothers
13 yrs 3 mos

**Employee Relations Manager**
Full-time
Dec 2022 - Present · 2 yrs 10 mos
Fort Washington, Pennsylvania, United States

**Employee Relations Specialist**
Full-time
Dec 2019 - Dec 2022 · 3 yrs 1 mo

Dec 2019 - Dec 2022 · 3 yrs 1 mo
Horsham, PA

Sr. Human Resources Coordinator
Full-time
Apr 2017 - Dec 2019 · 2 yrs 9 mos

Show all 5 experiences  →

 Human Resources Coordinator
Kimmel Center, Inc.
Oct 2007 - Jan 2010 · 2 yrs 4 mos
Philadelphia, Pennsylvania

Human Resources Assistant
Nazareth Hospital
Oct 2004 - Oct 2007 · 3 yrs 1 mo
Philadelphia, Pennsylvania

 Princeton University
6 yrs 2 mos

Human Resources Assistant
Feb 2001 - Oct 2004 · 3 yrs 9 mos

Senior Bibliographic Specialist / Bibliographic Specialist /
Library Secretary Specialist
Sep 1998 - Feb 2001 · 2 yrs 6 mos
Princeton, New Jersey

## Education

 Kutztown University of Pennsylvania
BA, Speech Communication
1994 - 1998
Activities and societies: Member of Alpha Sigma Tau, Gamma Lambda
Chapter …

## Recommendations

Received     Given

Nothing to see for now
Recommendations that Crystal receives will appear here.

## Interests

Companies     Newsletters     Schools

 SHRM
1,059,842 followers


 Kutztown University of Pennsylvania
59,026 followers

# EXHIBIT 165

Jeffrey Gu <jeffreygu@proffer.info>

# Employees' Employer

**Crystal Vecchione** <CVECCHIONE@tollbrothers.com>                    Sun, Jun 29, 2025 at 11:29 AM
To: "Jeffrey Gu" <jeffreygu@proffer.info>

Thank you for your email. I am currently out of the office until Tuesday, July 1st with no access to my emails.

If you have a HR need/question, please reach out to HR Services via email at hrservices@tollbrothers.com or via phone at 1-866-9HR-Dept.

• Payroll: payroll_dept@tollbrothers.com or (215) 938-8050

• Benefits: Benefits@tollbrothers.com

If you have an urgent matter that requires immediate assistance, please contact Maryann Heatherby at mheatherby@tollbrothers.com.

Best regards,

# EXHIBIT 166

# Employees' Employer

**Jeffrey Gu** <jeffreygu@proffer.info>                                    Sun, Jun 29, 2025 at 11:30 AM
To: "mheatherby@tollbrothers.com" <mheatherby@tollbrothers.com>

Hello Ms. Heatherby,

I hope this message finds you well

I've contacted several employees, and I've received somewhat confusing information about who they work for, and I was hoping you could help clarify since you are the Director of Human Resources at Toll Brothers, Inc.

Would you be able to clarify what company directly employs these employees? Are they directly employed by Toll Brothers, Inc.?

- Nadia Bakho

- Nathaniel Emery

- Christopher Ferguson

- Peter Hemphill

- Nicole Jorgensen

- Karen Lake

- Joyce Lee

- Eric Lehman

- Jonathan Margolis

- Kristine Smith

- Michael Villani

Any assistance you can provide in clarifying this matter would be sincerely appreciated.


Jeffrey Gu

Partner, Proffer LLC
720-593-1548

# EXHIBIT 167

Jeffrey Gu <jeffreygu@proffer.info>

# Employees' Employer

**Jeffrey Gu** <jeffreygu@proffer.info>                                      Sun, Jun 29, 2025 at 11:29 AM
To: "cvecchione@tollbrothers.com" <cvecchione@tollbrothers.com>

Hello Ms. Vecchione,

I hope this message finds you well

I've contacted several employees, and I've received somewhat confusing information about who they work for, and I was hoping you could help clarify since you are the Director of Human Resources at Toll Brothers, Inc.

Would you be able to clarify what company directly employs these employees? Are they directly employed by Toll Brothers, Inc.?

- Nadia Bakho

- Nathaniel Emery

- Christopher Ferguson

- Peter Hemphill

- Nicole Jorgensen

- Karen Lake

- Joyce Lee

- Eric Lehman

- Jonathan Margolis

- Kristine Smith

- Michael Villani

Any assistance you can provide in clarifying this matter would be sincerely appreciated.


Jeffrey Gu

Partner, Proffer LLC
720-593-1548

# EXHIBIT 168



Jeffrey Gu <jeffwgu@gmail.com>

---

## 5131 Vivian St structural diagrams

---

**Jeffrey Gu** <jeffwgu@gmail.com>                                    Mon, Jun 30, 2025 at 6:05 PM
To: Nicole Jorgensen <njorgensen@tollbrothers.com>

Hi Nicole,

Is there someone who could better answer this question?

-Jeffrey

On Sat, Jun 28, 2025 at 5:38 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
I understand, maybe you could clarify something else for me. Do you specifically work for "Toll Brothers, Inc."?

On Sat, Jun 28, 2025 at 4:56 PM Nicole Jorgensen <njorgensen@tollbrothers.com> wrote:

Hi Jeffrey,


Summer has been great! I hope you've been having a nice summer as well.  I'm so sorry but I don't have a contact for the HR department :/



**Nicole Jorgensen**
**Sales Consultant, Colorado**
Toll Brothers
10851 E.  Hinsdale Cir, Centennial, CO 80112
Office: (720) 828-8821  |  Cell: (989) 277-7321



*The information provided herein is for informational purposes only. Nothing contained herein is intended to obligate or bind Seller, its affiliates, parents, subsidiaries, or related entities unless signed by all parties in an Agreement of Sale.*

---

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Saturday, June 28, 2025 10:03 AM
**To:** Nicole Jorgensen <njorgensen@tollbrothers.com>
**Subject:** Re: 5131 Vivian St structural diagrams


Hi Nicole, I hope your summer has been good so far. I'm trying to clarify something, would you be able to give me the contact of someone in HR at Toll Brothers? -Jeffrey On Mon, Jan 22, 2024 at 3:28 PM Dez Kolar <DKOLAR@tollbrothers.com>

Hi Nicole,


I hope your summer has been good so far. I'm trying to clarify something, would you be able to give me the contact of someone in HR at Toll Brothers?


-Jeffrey


On Mon, Jan 22, 2024 at 3:28 PM Dez Kolar <DKOLAR@tollbrothers.com> wrote:

I'm sorry, Jeffrey-

Unfortunately, Toll Brother blueprints are proprietary, so we are not able to provide these. The only item were are able to give out are the general floor plan renderings. I hope this is helpful. Thank you,

**Dez Kolar**
**Sr. Sales**
**Consultant, The**
**Ridge at Ward**
**Station**
Toll Brothers
5129 Vivian St,
Wheat Ridge, CO
80033
Office: (720) 640-9393 | Cell: (970) 708-9017

Days OFF: Thursday
& Friday



*The information provided herein is for informational purposes only. Nothing contained herein is intended to obligate or bind Seller, its affiliates, parents, subsidiaries, or related entities unless signed by all parties in an Agreement of Sale.*

---

**From:** Jeffrey Gu <jeffwgu@gmail.com>
**Sent:** Monday, January 22, 2024 12:05 PM
**To:** Dez Kolar <DKOLAR@tollbrothers.com>; Nicole Jorgensen <njorgensen@tollbrothers.com>
**Subject:** 5131 Vivian St structural diagrams

Hi Dez and Nicole, Would it be possible to send me structural diagrams for 5131 Vivian? Nate and the team encountered some problems with the 2nd floor floor, and I would like a copy of this if possible. -Jeffrey

Hi Dez and Nicole,

Would it be possible to send me structural diagrams for 5131 Vivian? Nate and the team encountered some problems with the 2nd floor floor, and I would like a copy of this if possible.

-Jeffrey

# EXHIBIT 169



Jeffrey Gu <jeffwgu@gmail.com>

---

## Request for notary contact information approved

---

**Colorado Department of State** <notary@coloradosos.gov>　　　　Mon, Jul 14, 2025 at 9:36 AM
To: jeffwgu@gmail.com



**Colorado Secretary of State**
**Jena Griswold**

www.coloradosos.gov

Your request for notary contact information has been approved.

{external_note}

You requested contact information for:

Name: PATRICIA RICE
Notary ID: 20074011318
Commission expiration date:
Additional information:

Reason for request: Confirm employer name

**Contact information found in our records**
If you are receiving information for more than one notary, it's because the information you provided matches multiple notaries in our database.

**Full legal name:** PATRICIA RENEE RICE

**Commission**

Notary ID: 20074011318

Status: Active

Commission start date: 03/19/2023

Commission expiration date: 03/19/2027

**Contact**

Email: price@tollbrothers.com

Home phone: 719-380-8748

Work phone: 719-388-2333

Home address: 7930 Topeka Ave, Cascade, CO, 80809, United States

Work address: 536 Chapel Hills Drive, Suite 150, Colorado Springs, CO, 80920, United States

# EXHIBIT 170

July 8: Called Patricia for 4 minutes. I asked her to name who she works for, Toll Brothers Inc, Toll Bros Inc, or Toll Southwest LLC. She refused to answer. I also asked her about Chris Ferguson, and she could not or would not answer.



July 8: Called Liz Stein, my first call missed the first time and then she called back. I asked her about Kenneth Greenspan, Statement of Authority, and his relationship to Toll Southwest LLC. I asked her "What company does he work for?" and "Does he have the authority to sign on behalf of Toll Southwest?"

She ended up escalating to the CEO instantly and accused me of intruding. She was seemingly panicking to a degree when talking to me, as I noticed my adrenaline increased also while talking to her.

She did say at one point that all employees of Toll Brothers are automatically employees of the other company or something along those lines. But she did not explicitly outline how this mechanism worked or really describe if it actually exists.



July 10: received a call from Chris Ferguson. He was cordial and offered to understand what my problem is. I instead asked who does he works for again, continuing the email chain I had with him from a few weeks ago. He again declined to tell me which specific entity he works for despite my telling him that looking on his W-2 form would be a very easy way of confirming this. He accused me of going in circles, but I told him he was the one going in circles because he refused to answer a direct question. We amicably ended the phone call.



# EXHIBIT 171



Josh Shapiro, Governor (http://governor.pa.gov/)

<< Back to Search Results                                    New Search

Searching By Name: Stein, Elizabeth

| Name & Commission Details | Business Name & Address | Phone |
|---|---|---|
| Stein, Elizabeth, P | Toll Brothers | (215) 938-8123 |
| Commission ID: 1159840 | | |
| Current Status: Commissioned | 1140 Virginia Drive | |
| ENotary Status: No | Fort Washington, PA 19034 | |
| | MONTGOMERY COUNTY | |

**Commission History**

| Status | Received Date | Effective Date | Expiration Date |
|---|---|---|---|
| Commissioned | 7/13/2023 | 9/8/2023 | 9/8/2027 |
| Expired | 7/11/2019 | 9/8/2019 | 9/8/2023 |
| Expired | 6/23/2015 | 9/8/2015 | 9/8/2019 |
| Expired | 5/23/2011 | 9/8/2011 | 9/8/2015 |
| Expired | 7/2/2007 | 9/8/2007 | 9/8/2011 |
| Expired | 8/25/2003 | 9/8/2003 | 9/8/2007 |
| Expired | 8/31/1999 | 9/8/1999 | 9/8/2003 |
| Expired | 1/25/1988 | 2/3/1988 | 2/3/1992 |

# EXHIBIT 172



Jeffrey Gu <jeffwgu@gmail.com>

---

## Employer Information

---

**Jeffrey Gu** <jeffwgu@gmail.com>                                    Thu, Jul 31, 2025 at 12:09 PM
To: dchristensen@newhomeco.com

Hi Dave,

Just noting for my records and yours that you have not responded within 2 business days.

-Jeffrey


-Jeffrey

On Wed, Jul 30, 2025 at 12:00 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
> Hi Dave,
>
> As a licensed realtor, I believe you should be able to give this information to me in a straightforward manner. Could
> you please provide me with the company that you have an employment relationship with?
>
> -Jeffrey

On Tue, Jul 29, 2025 at 12:26 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
> Hi Dave,
>
> Could you please send me information about who your employer is? One way of figuring this out is looking at
> your W2, if this is what the employer provides to you.
>
> -Jeffrey

# EXHIBIT 173



Jeffrey Gu <jeffwgu@gmail.com>

---

## Employment Information

---

**Jeffrey Gu** <jeffwgu@gmail.com>                                     Thu, Jul 31, 2025 at 12:09 PM
To: Olivewood <Olivewood@newhomeco.com>

Hi Gilma,

Just noting for my records and yours that you have not responded within 2 business days.

-Jeffrey

> On Wed, Jul 30, 2025 at 12:00 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
>> Hi Gilma,
>>
>> As a licensed realtor, I believe you should be able to give this information to me in a straightforward manner. Could you please provide me with the company that you have an employment relationship with?
>>
>> -Jeffrey
>>
>> On Tue, Jul 29, 2025 at 12:27 PM Jeffrey Gu <jeffwgu@gmail.com> wrote:
>>> Hi Gilma,
>>>
>>> Could you please send me information about who your employer is? One way of figuring this out is looking at your W2, if this is what the employer provides to you.
>>>
>>> -Jeffrey

# EXHIBIT 174

# STATE OF CALIFORNIA
# DEPARTMENT OF REAL ESTATE

In reviewing a licensee's information, please be aware that license discipline information may have been removed from a licensee's record pursuant to Business & Professions Code Section 10083.2 (c). However, discipline information may be available from the California Department of Real Estate upon submittal of a request, or by calling the Department's public information line at 1-877-373-4542.

The license information shown below represents public information. It will not reflect pending licensing changes which are being reviewed for subsequent updating. Although the business and mailing addresses of real estate licensees are included, this information is not intended for mass mailing purposes.

Some historical disciplinary action documents may not be in compliance with certain accessibility functions. For assistance with these documents, please contact the Department's Licensing Flag Section.

License information taken from records of the Department of Real Estate on 9/25/2025 7:43:20 AM

---

| | |
|---|---|
| **License Type:** | CORPORATION |
| **Name:** | TNHC Realty and Construction Inc |
| **Mailing Address:** | 18300 VON KARMAN AVE<br>SUITE 1000<br>IRVINE, CA 92612 |
| **License ID:** | 01870227 |
| **Expiration Date:** | 05/29/27 |
| **License Status:** | LICENSED |
| **Corporation License Issued:** | 08/27/09 |
| **Former Name(s):** | NO FORMER NAMES |
| **Main Office:** | 18300 VON KARMAN AVE<br>SUITE 1000<br>IRVINE, CA 92612 |

**Licensed Officer(s):**
DESIGNATED OFFICER
02196303 - Expiration Date: 05/29/27
Harbur, Miek

01203925 - Expiration Date: 08/26/25
Battaglia, Michael Charles

01029053 - Expiration Date: 08/26/25
Alkon, Jose Alejandro
OFFICER CANCELED AS OF 03/04/22

00874521 - Expiration Date: 08/26/13
Stelmar, Wayne James
OFFICER CANCELED AS OF 06/11/12

01913435 - Expiration Date: 08/26/21
Webb, Joan Marcus
OFFICER LICENSE EXPIRED AS OF 08/27/21

**DBA**    Bedford South Corona

ACTIVE AS OF 09/12/2016

The Cannery
ACTIVE AS OF 09/12/2016

McKinley Village
ACTIVE AS OF 09/12/2016

New Home
ACTIVE AS OF 09/12/2016

New Home Co.
ACTIVE AS OF 09/12/2016

The New Home Company
ACTIVE AS OF 07/29/2016

NWHM
ACTIVE AS OF 09/12/2016

Russell Ranch
ACTIVE AS OF 09/12/2016

TNHC
ACTIVE AS OF 09/12/2016

**Branches:**                11515 GROVEDALE
WHITTIER, CA 90604

1314 W CEDAR HAVEN
ONTARIO, CA 91762

14873 RUSTIC RIDGE CIR
FOLSOM, CA 95630

14973 PRAIRIE GOLD CIR
FOLSOM, CA 95630

1508 EUREKA ROAD
SUITE 290
ROSEVILLE, CA 95661

15218 JANINE DRIVE UNIT 1
WHITTIER, CA 90605

1610 LAKESIDE DR
LATHROP, CA 95330

16556 FOREST LANE
FONTANA, CA 92336

207 MISTWATER
IRVINE, CA 92618

215 PINNACLE
IRVINE, CA 92602

2461 E. HYDE PASEO
ONTARIO, CA 91764

2731 MULHOLLAND DR
LATHROP, CA 95330

2767 MULHOLLAND DR
LATHROP, CA 95330

2896 KNIGHTSBRIDGE LANE
ROSEVILLE, CA 95747

309 FORTIFY COURT
ROSEVILLE, CA 95747

3194 BEATTY DRIVE
EL DORADO HILLS, CA 95762

4002 SPRING LANE
CORONA, CA 92883

4002 SPRING LN
CORONA, CA 92883

4065 E. LILIANA PASEO
ONTARIO, CA 91764

4113 MONTEREY GROVE DR
GRANITE BAY, CA 95746

4119 MONTEREY GROVE DR
GRANITE BAY, CA 95746

4160 CAVITT STALLMAN
GRANITE BAY, CA 95746

4575 GREENBRAE RD
ROCKLIN, CA 95677

5500 CANNES WAY
FAIR OAKS, CA 95628

6065 WATERTON DRIVE
EASTVALE, CA 92880

8444 COTTONSEED WAY
ELK GROVE, CA 95624

8827 EUREKA CIRCLE
GRANITE BAY, CA 95746

8835 EUREKA GROVE CIRCLE
GRANITE BAY, CA 95746

9690 AIRE PL
RANCHO CUCAMONGA, CA 91730

W 11TH STREET AND N CENTRAL AVE
UPLAND, CA 91786

**Broker Associates:**    01489204 - Gailey, Jennifer Maureen
License Expiration Date: 12/20/2027

01456355 - Nguyen, Katrina Thi Thanh Thuy
License Expiration Date: 08/28/2028

01264261 - Stickelman, Laura Kay
License Expiration Date: 03/27/2027

**Salespersons:**    01309415 - Andrews, Cynthia Renee
License Expiration Date: 04/29/2029

01078922 - Aquino, Demetrio F Jr
License Expiration Date: 07/14/2026

01396712 - Beeks, Twanda Renea
License Expiration Date: 08/21/2027

02001832 - Burgman, Ryan Benjamin
License Expiration Date: 03/14/2028

00978873 - Cheshire, Malia K
License Expiration Date: 07/05/2028

01389799 - Christensen, David John
License Expiration Date: 06/20/2027

01403623 - Coffey, Joanne Susan
License Expiration Date: 01/29/2028

01951180 - Coleman, Kristin Aldene
License Expiration Date: 05/28/2026

02032402 - Demartino, Kyle K
License Expiration Date: 04/20/2029

01380132 - Drummy, Gilma A
License Expiration Date: 05/08/2027

01433597 - Dwyer, Steven George
License Expiration Date: 02/28/2026

02047063 - Earl, Unique Melanie
License Expiration Date: 09/13/2026

02039009 - Greyshock, Jennifer Lauren
License Expiration Date: 11/28/2025

01402197 - Hobiera, Gregory Lee
License Expiration Date: 01/15/2028

01452389 - Korczynski, Justyna
License Expiration Date: 09/03/2028

01719501 - Krehbiel, Ashley Elizabeth
License Expiration Date: 11/18/2029

00861436 - Mac Millan, Terri De Anne
License Expiration Date: 04/14/2028

01722723 - Marez, Angelita
License Expiration Date: 02/08/2026

01219192 - Michel, Lori Denise
License Expiration Date: 01/29/2029

02140781 - Rakela, Nicolas Reve
License Expiration Date: 05/27/2029

01263776 - Rivers, Rene Michele
License Expiration Date: 07/23/2027

01985079 - Tsai, William Wei-Lun
License Expiration Date: 08/30/2027

01296475 - Villery, Roderick Lorne
License Expiration Date: 09/17/2028

02011480 - Yarberry, Jennifer Sue
License Expiration Date: 12/14/2028

**Comment**:                          NO DISCIPLINARY ACTION

                                    NO OTHER PUBLIC COMMENTS

                                    >>>> Public information request complete <<<<

# EXHIBIT 175

 **Gmail**

Jeffrey Gu <jeffwgu@gmail.com>

---

## Current for sale homes

---

**Jeffrey Gu** <jeffwgu@gmail.com>                                          Fri, May 16, 2025 at 12:30 PM
To: Olivewood <Olivewood@newhomeco.com>

Thank you, Gilma. Yes, ready to start the summer.

On Fri, May 16, 2025 at 9:19 AM Olivewood <Olivewood@newhomeco.com> wrote:

> Jeffrey,
>
> Attached is our current availability and pricing.
>
> Hope you and your family are doing well!
>
> Gilma
>
> 
>
> **Olivewood**
> New Home Co.
> 207 Mistwater
> Irvine, CA 92618
> Office: (949) 508-2064
> NewHomeCo.com
>
> This message contains confidential information and is intended only for the intended recipients. If you are not an intended recipient you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version.
>
>    
>
> ---
>
> **From:** Jeffrey Gu <jeffwgu@gmail.com>
> **Sent:** Wednesday, May 14, 2025 8:21 AM
> **To:** Olivewood <Olivewood@newhomeco.com>
> **Subject:** Current for sale homes

[EXTERNAL]

Hi Gilma,


Would it be possible to send me a price list of the current new homes for sale?


-Jeffrey

# EXHIBIT 176

8/24/25, 1:40 PM                                    Division of Corporations - Filing

Delaware.gov                              Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **4684280** | Incorporation Date / Formation Date: | **6/25/2009** (mm/dd/yyyy) |
| Entity Name: | **THE NEW HOME COMPANY INC.** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **REGISTERED AGENT SOLUTIONS, INC.** | | |
| Address: | **838 WALKER ROAD SUITE 21-2** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19904** |
| Phone: | **888-716-7274** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[Submit]

[New Entity Search]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# EXHIBIT 177

8/24/25, 1:40 PM                                    Division of Corporations - Filing

Delaware.gov                              Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 4703252 | Incorporation Date / Formation Date: | 6/25/2009 (mm/dd/yyyy) |
| Entity Name: | THE NEW HOME COMPANY SOUTHERN CALIFORNIA LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | REGISTERED AGENT SOLUTIONS, INC. | | |
| Address: | 838 WALKER ROAD SUITE 21-2 | | |
| City: | DOVER | County: | Kent |
| State: | DE | Postal Code: | 19904 |
| Phone: | 888-716-7274 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT 178



Delaware.gov                                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

HOME

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 4703250 | Incorporation Date / Formation Date: | 6/25/2009 (mm/dd/yyyy) |
| Entity Name: | TNHC REALTY AND CONSTRUCTION INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | REGISTERED AGENT SOLUTIONS, INC. | | |
| Address: | 838 WALKER ROAD SUITE 21-2 | | |
| City: | DOVER | County: | Kent |
| State: | DE | Postal Code: | 19904 |
| Phone: | 888-716-7274 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status    Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT 179

       

Home    My Network    Jobs    Messaging    Notifications    Me ▾    For Business ▾    Try Premium for $0



### Larry Webb
Very Happy

- 

The Webb Group
Newport Beach, California, United States   ·   Contact info
215 connections

Message   ████████   ████████

## Activity
258 followers

Posts   ████████



Larry Webb posted this • 4mo

https://gofund.me/8be56c8c

 ...nate to Support Dick and Karen in Their Time of Need, organi ...
...undme.com

😊👍 3                                          1 comment

Show all posts  →

## Experience

**Advisor to Real Estate Executives**
The Webb Group · Full-time
Oct 2021 - Present · 4 yrs
Corona del Mar, California, United States

**Executive Chairman**
The New Home Company · Full-time
Aug 2019 - Sep 2022 · 3 yrs 2 mos
Orange County, California, United States

**CEO**
The New Home Company Inc. · Full-time



The New Home Company Inc. · Full-time
Aug 2009 - Aug 2019 · 10 yrs 1 mo

Chief Restructuring Officer
Landsource · Full-time
Jun 2008 - Jul 2009 · 1 yr 2 mos
Orange County, California, United States

Chief Executive Officer
John Laing Homes · Full-time
May 1995 - May 2008 · 13 yrs 1 mo
Orange County, California, United States

## Interests

Top Voices    Companies    Groups    Schools

Kevin O'Leary
Chairman, O'Leary Ventures and Beanstox
4,466,127 followers



Promoted

Henry, explore relevant opportunities
with Consensus Cloud Solutions

Get the latest jobs and industry news

## More profiles for you



A.J. Jarvis · 3rd+
Real Estate Development and Homebuilding

Megan Eltringham · 3rd+
Senior Vice President of Marketing & Design at The New Home
Company Inc. ...

John Stephens · 3rd+
Chief Financial Officer (Public & Private) | Real Estate, Homebuilding &
Financial Services | Capital Raising, Business & Financial Planning, M& ...





Matthew Zaist · 3rd+
Chief Executive Officer at The New Home Company Inc.

Message



**Carissa R. Paez** · 3rd+
Landscape Architect/Construction Professional with a Focus on Creating an Exceptional Customer Experience …

Show all

Explore Premium profiles

**Nick Cuneo** · 3rd+
Service Manager

**Chris Farina** · 3rd+
Electrical Inspector at State Wide Inspection Services

**Danny cook** · 3rd+
Millwright Superintendent @ Advanced Constructors Corp | Ensuring Safety and Efficiency …

**Kory Lombard Jr.** · 3rd+
Barista @ CHAGEE | Customer Service, Beverage Preparation



People you may know
From Larry's industry

**Rafael Rodriguez**
Maintenance Technician / Plumber

**Billy Rosenberg**
President at Infinity Residential Inc.

**Ben Howard**
Master Plumber at Infinity Property Assist

**Erik Avila**
Infinity Global Capital Partners

Show all

# EXHIBIT 180

Newsletter    Login |    Register

# BUILDER

Search

News & Analysis        Builder 100        Events

BUILDER 1(    LEADERSHIP                    SHARE

## New Home CIO Wayne Stelmar to Retire

COO Tom Redwitz to assume post; Leonard Miller, formerly of
Richmond American, to join company as COO.

*1 MIN READ*

February 16, 2017

The New Home Company (NYSE:NWHM), Aliso Viejo, Cal., Thursday afternoon
announced the retirement of Wayne Stelmar, a co-founder of the company and
its chief investment officer, on Feb. 17. He will continue in a consulting role with
the company and continue as a member of the company's board and its
Executive Committee

Succeeding Stelmar is Tom Redwitz, also a co-founder and the company's
current COO. Redwitz will lead the company's growth initiatives and land
strategies while continuing his management in overseeing architecture and
product design.

Leonard Miller will join the company as its chief operating officer effective March
13, 2017. Miller was most recently California Regional President for Richmond
American Homes, a subsidiary of M.D.C. Holdings, Inc., where he has served since
2004.

Larry Webb, the company's Chairman and CEO, stated, "I am extremely thankful
for Wayne's contributions, as he has been an integral part of The New Home
Company and its culture since its formation. Wayne has been a partner, chief
strategist and, most importantly, a friend for over twenty years. All of us will
continue to benefit from his insight and expertise in his new role as a consultant
and his ongoing service as a board member."

Stelmar commented, "As a co-founder, I am extremely proud of the
accomplishments of The New Home Company since its formation in 2009. I look
forward to contributing to the strategic growth of the company through my new
role and my continued participation on the board."

RELATED TOPICS                    SHARE

**SUBJECT**

Management

## Upcoming Events

**Sep 16, 2025**
Vancouver
Dealmakers
Fairmont Waterfront
Register Now

**Sep 16, 2025**
Building Future-
ready Communities
for Less
Live Webinar
Register for Free

**Sep 29 - Oct 1, 2025**
Builder Connections
Arlington, TX
Register Now

All Events

## More from Builder Magazine







Hancock Builders Names
Kelly Whiteley CEO

*2 MIN READ*

Incentive Wars: Which
Builder is Offering the
Biggest Deal in America this
Autumn?

*7 MIN READ*

Land Tejas Co-Founder and
Owner Al Brende Passes
Away at 80

*2 MIN READ*

[Digital Edition](#)

Builder Magazine Q3 2025

[Subscribe](#)

[Magazine Archives](#)

Explore Our Sites

**MFE** | Multifamily Executive

**AHF** | Affordable Housing Finance

**JLC** | The Journal of Light Construction

**ARCHITECT**

**PSN** | Pool and Spa News

**AQUATICS** INTERNATIONAL

Builder Magazine is part of Zonda Media, a Delaware corporation | © 2025 All rights reserved

About    Advertise    Contact Us    Privacy Policy    Accessibility Statement

Powered by **Zonda**

# EXHIBIT 181

**For assistance with TSDR**, email **teas@uspto.gov** and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.

STATUS    DOCUMENTS    MAINTENANCE    Back to Search    Print

|  |  |
|---|---|
| **Generated on:** | This page was generated by TSDR on 2025-08-26 10:27:50 EDT |
| **Mark:** | JOHN LAING HOMES |

John Laing Homes

|  |  |  |  |
|---|---|---|---|
| **US Serial Number:** | 76187021 | **Application Filing Date:** | Dec. 27, 2000 |
| **US Registration Number:** | 2653451 | **Registration Date:** | Nov. 26, 2002 |
| **Register:** | Principal |  |  |
| **Mark Type:** | Service Mark |  |  |

| **TM5 Common Status Descriptor:** |  | DEAD/REGISTRATION/Cancelled/Invalidated |
|---|---|---|
|  |  | The trademark application was registered, but subsequently it was cancelled or invalidated and removed from the registry. |

| **Status:** | Registration cancelled because registrant did not file an acceptable declaration under Section 8. To view all documents in this file, click on the Trademark Document Retrieval link at the top of this page. |
|---|---|
| **Status Date:** | Jul. 04, 2009 |
| **Publication Date:** | Sep. 03, 2002 |
| **Date Cancelled:** | Jul. 04, 2009 |

## Mark Information

## Goods and Services

## Basis Information (Case Level)

## Current Owner(s) Information

| **Owner Name:** | W L HOMES LLC |
|---|---|
| **Owner Address:** | 895 Dove Street, Suite 200 |
|  | Newport Beach, CALIFORNIA UNITED STATES 92660 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY | **State or Country Where Organized:** | DELAWARE |

## Attorney/Correspondence Information

## Prosecution History

## TM Staff and Location Information

## Assignment Abstract Of Title Information - Click to Load

## Proceedings - Click to Load

Feedback

# EXHIBIT 182



# State of California
## Bill Jones
### Secretary of State

LLC-5

**LIMITED LIABILITY COMPANY**
**APPLICATION FOR REGISTRATION**

**IMPORTANT** - Read the instructions before completing the form.
**This document is presented for filing pursuant to Section 17451 of the California Corporations Code.**

1. Name under which the foreign limited liability company proposes to transact business in California:
(End the name with LLC, L.L.C, Limited Liability Company or Ltd. Liability Co.)

WL Homes LLC

2. Name of the foreign limited liability company, if different from that entered above:

3. State (or other jurisdiction) and date of formation of the foreign limited liability company:

Jurisdiction: Delaware          Date of formation: 2-26-98

4. Enter the name and address of the agent for service of process and check the appropriate provision below:

H. Lawrence Webb
_____, which is

[ x ]  an individual residing in California.

[   ]  a corporation which has filed a certificate pursuant to Section 1505 of the California Corporations Code.
       Skip Item 5 and proceed to Item 6.

5. If the agent for service of process is an individual, enter a complete business or residential street address:

Street address: 19600 Fairchild Rd., Suite 150

City: Irvine          State: CA          Zip Code: 92612

6. The Secretary of State of California is hereby appointed as the agent for service of process on the foreign limited liability company if the designated agent has resigned and has not been replaced or cannot be found and served with the exercise of reasonable diligence.

7. Address of the principal executive office:

Address: 19600 Fairchild Rd., Suite 150

City: Irvine     State: CA     Zip Code: 92612

8. Address of the principal office in California, if any:

Address: 19600 Fairchild Rd., Suite 150

City: Irvine     State: CA     Zip Code: 92612

9. Describe type of business of the Limited Liability Company.

10. It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

_____
Signature of authorized person

H. Lawrence Webb, CEO
_____
Type or print name and title

Date: _____March 26,_____, 19 _98_

**For Secretary of State Use**

File No. 101998090064

**FILED**
In the office of the Secretary of State
of the State of California

**MAR 3 1 1998**

**BILL JONES, Secretary of State**

SEC/STATE (REV. 7/97)          FORM LLC-5 – FILING FEE: $70.00
Approved By Secretary Of State

PAGE   1

*State of Delaware*

## *Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "WL HOMES LLC" IS DULY FORMED UNDER
THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND
HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW,
AS OF THE FOURTH DAY OF MARCH, A.D. 1998.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE
NOT BEEN ASSESSED TO DATE.



*Edward J. Freel, Secretary of State*          10199809000b4

2864707   8300

981082832

AUTHENTICATION:          8951799

DATE:

03-04-98

# EXHIBIT 183

07-669816



# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Domestic Stock Corporation)

**S**



| FEES (Filing and Disclosure): $25.00. If amendment, see instructions. |
|---|

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. **CORPORATE NAME** (Please do not alter if name is preprinted.)

John Laing Homes (California), Inc.
C1877784

**FILED**
In the office of the Secretary of State
of the State of California

**MAR 2 6** 2007

A. ee
This Space For Filing Use Only

**DUE DATE:**

**CALIFORNIA CORPORATE DISCLOSURE ACT** (Corporations Code section 1502.1)

A publicly traded corporation must file with the Secretary of State a Corporate Disclosure Statement (**Form SI-PT**) annually, within 150 days after the end of its fiscal year. Please see reverse for additional information regarding publicly traded corporations.

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| 2 STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | | ZIP CODE |
|---|---|---|---|
| 895 Dove Street, Suite 200 | Newport Beach, CA | | 92660 |

| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 895 Dove Street, Suite 200 | Newport Beach | CA | 92660 |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| 4 CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| H. Lawrence Webb | 895 Dove Street, Suite 200 | Newport Beach, CA | 92660 |
| 5 SECRETARY/ | ADDRESS | CITY AND STATE | ZIP CODE |
| Ronald V. Rosequist | 1999 Harrison St., Suite 2400 | Oakland, CA | 94612 |
| 6. CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY AND STATE | ZIP CODE |
| Wayne J. Stelmar | 895 Dove Street, Suite 200 | Newport Beach, CA | 92660 |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director. Attach additional pages, if necessary.)

| 7 NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| H. Lawrence Webb | 895 Dove Street, Suite 200 | Newport Beach, CA | 92660 |
| 8 NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |
| 9. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

10. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 12 must be completed with a California address. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 12 must be left blank.)

11. NAME OF AGENT FOR SERVICE OF PROCESS
David Martucci

| 12. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 895 Dove Street, Suite 200 | Newport Beach | CA | 92660 |

**TYPE OF BUSINESS**

13 DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
Real estate development

14. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| Wayne J. Stelmar | | CFO | 3/19/07 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

| SI-200 C (REV 07/2006) | APPROVED BY SECRETARY OF STATE |
|---|---|

# EXHIBIT 184



**State of California
Secretary of State**



09-229052

**FILED**
In the office of the Secretary of State
of the State of California

MAY 1 9 2009

*EC* This Space For Filing Use Only

### STATEMENT OF INFORMATION
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00. If amendment, see instructions. 38

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| | S |
|---|---|

1  CORPORATE NAME  (Please do not alter if name is preprinted.)

JLH Realty & Construction, Inc.
C1843033

**DUE DATE:**

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 2.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 19520 Jamboree Road, Suite 500 | | Irvine | CA | 92612 |
| 3.  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | CITY | STATE | ZIP CODE |
| 19520 Jamboree Road, Suite 500 | | Irvine | CA | 92612 |
| 4.  MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | CITY | STATE | ZIP CODE |
| Same | | | | |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5.  CHIEF EXECUTIVE OFFICER/ | | | | |
| Steve Kabel | 19520 Jamboree Road, Suite 500 | Irvine | CA | 92612 |
| 6.  SECRETARY/ | ADDRESS | CITY | STATE | ZIP CODE |
| Kim Forbes | 19520 Jamboree Road, Suite 500 | Irvine | CA | 92612 |
| 7.  CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| Kim Forbes | 19520 Jamboree Road, Suite 500 | Irvine | CA | 92612 |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8.  NAME | | | | |
| Robert Booth | 19520 Jamboree Road, Suite 500 | Irvine | CA | 92612 |
| 9   NAME | ADDRESS | CITY | STATE | ZIP CODE |
| | | | | |
| 10  NAME | ADDRESS | CITY | STATE | ZIP CODE |
| | | | | |

11.  NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**AGENT FOR SERVICE OF PROCESS**  (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

12.  NAME OF AGENT FOR SERVICE OF PROCESS

Thomas L. Vincent

| 13  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4 Park Plaza, Suite 1100 | Irvine | CA | 92614 |

**TYPE OF BUSINESS**

14.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

Real estate service company

15.  BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 4-27-09 | Steve Kabel | President | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 C (REV 01/2008)                                    APPROVED BY SECRETARY OF STATE

# EXHIBIT 185



Home | Online Services | License Details

# ☐ Contractor's License Detail for License # 687596

⚠️ **DISCLAIMER: A license status check provides information taken from the CSLB license database. Before relying on this information, you should be aware of the following limitations.**

☐ CSLB complaint disclosure is restricted by law ( B&P 7124.6 ) If this entity is subject to public complaint disclosure click on link that will appear below for more information. Click here for a definition of disclosable actions.

☐ Only construction related civil judgments reported to CSLB are disclosed ( B&P 7071.17 ).

☐ Arbitrations are not listed unless the contractor fails to comply with the terms.

☐ Due to workload, there may be relevant information that has not yet been entered into the board's license database.

Data current as of 8/24/2025 9:25:43 AM

## Business Information

J L H REALTY & CONSTRUCTION INC
dba JOHN LAING HOMES

19520 JAMBOREE RD SUITE 500
IRVINE, CA 92612
Business Phone Number:(949) 732-0800

| | |
|---|---|
| **Entity** | Corporation |
| **Issue Date** | 04/14/1994 |
| **Expire Date** | 04/30/2010 |

## License Status

**This license is expired and not able to contract at this time.**

## Classifications

A - GENERAL ENGINEERING

## Bonding Information

### Contractor's Bond

This license filed a Contractor's Bond with SWISS RE CORPORATE SOLUTIONS PREMIER INSURANCE CORPORATION .

**Bond Number:** S9042721
**Bond Amount:** $12,500
**E!ective Date:** 01/01/2007
**Cancellation Date:** 01/01/2010
Contractor's Bond History

## Workers' Compensation

This license has workers compensation insurance with the STATE COMPENSATION INSURANCE FUND
**Policy Number:**1917626
**E!ective Date:** 05/15/2009
**Cancellation Date:** 06/05/2009
Workers' Compensation History

*Other*

☐  Personnel listed on this license (current or disassociated) are listed on other licenses.

# EXHIBIT 186



Jess Sanders
E-mail: jsanders@rutan.com

September 3, 2025

**VIA E-MAIL**

Jeffrey Gu
jeffwgu@gmail.com
jeffreygu@proffer.info

    Re:    <u>Public Records Act Request Received August 24, 2025</u>

Dear Mr. Gu,

    As you know, this office serves in the capacity of City Attorney for the City of Irvine ("City"). This letter is being sent in response to the above-referenced request under the California Public Records Act, Gov. Code, § 7920.000 et seq. (CPRA), which seeks the following:

        Permits and declarations for this following addresses:
        31 ICEBERG ROSE
        23 Highfield
        45 Nightshade.

    All non-exempt disclosable records that the City deems to fall within the scope of your request are attached to this correspondence. This completes the City's review and processing of the above-indicated request.

            Very truly yours,

            RUTAN & TUCKER, LLP



            Jess Sanders

JS:js
cc:    City Clerk (via e-mail only)

Rutan & Tucker, LLP | 18575 Jamboree Road, 9th Floor
Irvine, CA 92612 | 714-641-5100 | Fax 714-546-9035
Orange County | Palo Alto | San Francisco | www.rutan.com

2905/048170-0301
22647394.1 a09/03/25

# RESIDENTIAL BUILDING PERMIT 188762 RBP

FORM #41-12 4/00

**City of Irvine**
Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: 724-6300  For Inspections: 724-6500

## CONTRACTOR

License Class ____
Contractor ____ Lic. No. ____
Date ____

### LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

## OWNER-BUILDER

☐ I hereby affirm under penalty of perjury that I am exempt from the Contractors License Law for the following reason:
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale.
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project.
☐ I am exempt under Sec. ____
Reason ____

### OWNER-BUILDER DECLARATION

Date X ____ 2/13/01 ____ Owner ____

## WORKER'S COMPENSATION

☐ I hereby affirm under penalty of perjury one of the following declarations:
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided for by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.
☐ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy number are:
Carrier ____
Policy # ____
☐ I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions.

### WORKERS' COMPENSATION DECLARATION
WARNING: FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES.
Applicant ____

## LENDER

### CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec. 3097, Civ. C.).
Lender's Name ____
Lender's Address ____

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes.

X ____ Permit Applicant/Agent
____ Permit Applicant/Agent's Print Name

---

ADDRESS:
LOCATION:          23 HIGHFIELD GLEN
TRACT   LOT       APN       PLANNING AREA
15044  1   31                ORANGETREE

DESCRIPTION OF WORK

**SFD-PRODUCTION**

PROPOSED USE:

OWNER:        JOHN LAING HOMES
ADDRESS:      895 DOVE STREET #110
CITY, ST ZIP: NEWPORT BEACH, CA 92660
PHONE:        949-265-6856

TOT SQFT:  2,482    STORIES:  2    NO. UNITS:  1
CODE YR:   94       CONST. TYPE:  V-N
VALUATION: 143,608.00   SQ FT:
                    R3      2041
OCC TYPE:   U1      441

APPLICANT:    HUNSAKER & ASSOC.
ADDRESS:      3 HUGHES
CITY, ST ZIP: IRVINE, CA 92618
CONTACT:      BILL PATTERSON
PHONE:        949-583-1010

PLANNING APPROVAL:        01/09/01
PLN CK APPROVAL: DORNMESH, TONY   11/05/96

CONTRACTOR:
ADDRESS:
CITY, ST ZIP:
CONTR/LIC EXP:
IRV BUS LIC:  PROFESSIONAL

EXP DATE:

PERMIT ISSUED BY:         KAYE ARGUES
PROJECT 37257
PLAN CHECK 40113-CC       02/13/01
BUILDING PERMIT 188759-RBP

REMARKS:
OWNER-BUILDER

## SUMMARY OF FEES          RECEIPT #:206677

| | | | |
|---|---|---|---|
| NEW RES SFD > 1K | 2482 | 616.76 | |
| AUTOMATION FEE | 616.76 | 30.85 | |
| ENERGY/DISABLED ENFORCE INSP | 2482 | 90.00 | |
| STATE SEISMIC FEE 1-3 STORIE 143608 | | 14.40 | |
| PERMIT ISSUANCE FEE | 1 | 35.00 | |
| SYSTEMS DEVELOPMENT CHARGE | 143608 | 1,436.08 | |
| SLURRY SEAL- SFD | 2482 | 50.00 | |

TOTAL FEES:  2,273.09

## OFFICE

---

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in 180 days or if work is suspended for 180 days or more. Residential permit expiration: addition - 18 months, all others 6 months from date of permit.

**CONSTRUCTION WORKING HOURS**
Weekdays:        7 AM – 7 PM
Saturdays:       9 AM – 6 PM
Sundays/Holidays: PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed:
1. UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I.D. Number ____
2. The applicant agrees to contact and obtain an inquiry I.D. Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation.



CERTIFICATE OF OCCUPANCY

this certifies that on the **8-21** of 20 **01** that I made a final inspection ... the ...
... building permit types and from this inspection it appears that the Building or ... is now ready for occupancy. By **Al Keller** Date **8-22-01**
Inspector

## INDIVIDUAL APPROVAL

| | | |
|---|---|---|
| Plumbing, By | Date | |
| Mechanical By _Al Keller_ | Date **8-21-01** | |
| Electrical By | Date | |
| Fire Sprinkler By | Date | |
| Swimming Pool | Date | |
| Building By _Al Keller_ | Date **8-1-01** | |
| Grading By _T.J. Anderson_ | Date **8/30/01** | |
| Encroachment By | Date | |
| Landscaping By | Date | |
| Construction Permit By | Date | |
| OTHER By | Date | |

## UTILITY RELEASES

| | | |
|---|---|---|
| Electrical By | Date | |
| Gas By _Sonetta Koene_ | Date **9/21/01** | |

## BOND RELEASE

| | | |
|---|---|---|
| Bond Release By | Date | |



# Misc Commercial Permit

**00441352-MISC**

ADDRESS: 31 ICEBERG ROSE
TRACT: 16676                    LOT: 15
APN:
PLANNING AREA: 09

**DESCRIPTION OF WORK:**
BRICK PILASTERS (2) FOR COMMON AREA IN CONDO
COMPLEX

---

## City of Irvine
### Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501

---

**OWNER:** JOHN LAING HOMES
ADDRESS: 3121 MICHELSON 200
CITY, ST ZIP: IRVINE CA 92612
PHONE: (949) 265-6857

**APPLICANT:** JOHN LAING HOMES
ADDRESS: 3121 MICHELSON 200
CITY, ST ZIP: IRVINE CA 92612
CONTACT KEVIN EADS 949265-5959
PHONE: (949) 265-5857

**CONTRACTOR:**
ADDRESS:
CITY, ST ZIP:
CONTR LIC EXP                    EXP DATE:
IRV BUS LIC:

VALUATION:        $ 0
STORIES: 0
CODE YR: 2001

NO UNITS: 1
TOT SQFT: 16

USE
OVERHEAD STRUCTURE    OCC    CONST TYPE        SQ FT
                      U-2    Masonry 8-inch    16

**PERMIT FEES**
Automation Fee Inspection          10.00
Issuance Fee Comm                  35.00
Misc Comm Insp                    200.00
Slate Seismic Com                   0.50

**Total Permit Fees: $245.50**

Receipt#          00034581

**TCA Receipt:**                 TCA:

PLAN CHECK #   00440730-CTIS
PLANNING APPROVAL: LYNNAE GUZMAN 3/8/2007
BUILDING APPROVAL: LI CHEN 3/8/2007
PERMIT ISSUED BY: KAYE ARROUES 3/28/2007

---

### LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions
of Chapter 9 (commencing with Section 7000) of Division 3 of the Business
and Professions Code, and my license is in full force and effect

License Class _____  Lic No. _____

Date 3/28/07 _____
                    Contractor

### OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the
Contractor's License Law for the following reason

☐ I, as owner of the property, or my employees with wages as their sole
compensation, will do the work, and the structure is not intended or
offered for sale

☐ I, as owner of the property, am exclusively contracting with licensed
contractors to construct the project

Reason: _____  B&PC, for this

Date X 3/28/07  Owner _____

### WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of perjury, one of the following declarations

☐ I have and will maintain a certificate of consent to self-insure for
workers' compensation, as provided for by Section 3700 of the Labor
Code, for the performance of the work for which this permit is issued

☐ I have and will maintain workers' compensation insurance, as required
by Section 3700 of the Labor Code, for the performance of the work for
which this permit is issued. My workers' compensation insurance is
carrier and policy number are

Carrier _____  Policy # _____

☐ I certify that in the performance of the work for which this permit is
issued, I shall not employ any person in any manner so as to become
subject to the workers' compensation laws of California, and agree that
if I should become subject to the workers' compensation provisions of
Section 3700 of the Labor Code, I shall forthwith comply with those
provisions

**WARNING:** FAILURE TO SECURE WORKERS' COMPENSATION
COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER
TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED
THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF
COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706
OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES

### CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending
agency for the performance of the work for which this permit is issued (Sec
3097, Civ C)

Lender's Name _____
Lender's Address _____

I certify that I have read this application and state that the above information
is correct. I agree to comply with all city and county ordinances and state
laws relating to building construction, and hereby authorize representatives
of this city to enter upon the above-mentioned property for inspection
purposes

Signature of Applicant or Agent  Date X 3/28/07

Print Applicant's/Agent's Name  K. EADS

### CONTRACTOR
### OWNER-BUILDER
### WORKERS' COMPENSATION
### LENDER

---

### INSPECTION

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in 180 days of or work is suspended for 180 days or
more. Residential permit expiration addition - 18 months, all others 6 months from date of permit

**CONSTRUCTION WORKING HOURS**
Weekdays    7 AM – 7 PM
Saturday    9 AM – 6 PM
Sunday/Holiday  PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed
1  UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I D Number
2  The applicant agrees to contact and obtain an inquiry I D Number from UNDERGROUND SERVICE ALERT
(1-800-422-4133) at least 2 working days prior to commencing excavation

c testerreport/epermits rp

**CERTIFICATION OF COMPLETION**

I certify that under date _____ of _____ that I made a final inspection of all work
under the following permit types and from this inspection it appears that the Building or
Facility is now ready for occupancy.  By _____ Date _____

**INDIVIDUAL APPROVAL**

Plumbing By _____          Date _____

Mechanical By _____        Date _____

Electrical By _____         Date _____

Fire Sprinkler By _____     Date _____

Swimming Pool By _____      Date _____

Building By _____           Date _7-1-10_____

Grading By _____            Date _____

Encroachment By _____       Date _____

Landscaping By _____        Date _____

Construction Permit By _____ Date _____

OTHER_____ By _____     Date _____

UTILITY RELEASES

Electrical By _____          Date _____

Gas By _____                 Date _____

BOND RELEASE

Bond Released By                                Date

# Misc Commercial Permit



## 00441353-MISC

**DESCRIPTION OF WORK:**
METAL OVERHEAD STRUCTURES (20) IN COMMON AREA

**City of Irvine**
Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501

| | CONTRACTOR |
|---|---|
| License Class _____ | |
| Date 3/28/07 | |

☐ **LICENSED CONTRACTORS DECLARATION**
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

_____ Lic No _____
_____ Contractor _____

### OWNER-BUILDER

☐ I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason:
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project
☐ I am exempt under Sec _____ B&PC, for this Reason _____

Date X _____ Owner X _____

### WORKERS' COMPENSATION DECLARATION

☐ I hereby affirm under penalty of perjury one of the following declarations:
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided for by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued
☐ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy number are
Carrier _____
Policy # _____

☐ / I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions

Date X _____ Applicant X _____

**WARNING: FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES**

### CONSTRUCTION LENDING AGENCY

I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec 3097, Civ C )

Lender's Name _____
Lender's Address _____

I certify that I have read this application and state that the above information is correct   I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes

Print Applicant's/Agent's Name _____
Signature of Applicant or Agent   X _____   Date _____

| LENDER | WORKERS' COMPENSATION | OWNER-BUILDER | CONTRACTOR |
|---|---|---|---|

**OWNER:** JOHN LAING HOMES
**ADDRESS:** 31 ICEBERG ROSE
**TRACT:** 16676      **LOT:** 15
**APN:**
**PLANNING AREA:** 09

**APPLICANT:** JOHN LAING HOMES
**ADDRESS:** 3121 MICHELSON 200
**CITY, ST ZIP:** IRVINE  CA 92612
**PHONE:** (949) 265-6857

**CONTRACTOR:**
**ADDRESS:**
**CITY, ST ZIP:**
**CONTR LIC EXP:**
**IRV BUS LIC:**                **EXP DATE:**

**CONTACT** KEVIN EADS 9492656959
**PHONE** (949) 265-6857

**VALUATION:**     $ 6,000
**STORIES:** 0             **NO. UNITS:** 1
**CODE YR:** 2001          **TOT SQFT:** 80

**USE**                **CONST  TYPE**
OVERHEAD STRUCTURE      Miscellaneous

OCC                SQ FT
                   80

### PERMIT FEES

| | |
|---|---|
| Automation Fee Inspection | 10 00 |
| Issuance Fee Comm | 35 00 |
| Misc Comm Insp | 200 00 |
| State Seismic Com | 0.50 |

**Total Permit Fees: $245.50**

**Receipt#** 00034581

**TCA Receipt:**                **TCA:**

PLAN CHECK #   00440730-CTIS
PLANNING APPROVAL: LYNNAE GUZMAN 3/8/2007
BUILDING APPROVAL: LI CHEN  3/8/2007
PERMIT ISSUED BY: KAYE ARROUES  3/28/2007

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in  180 days or if work is suspended for 180 days or more   Residential permit expiration  addition - 18 months, all others 6 months from date of permit

### INSPECTION

**CONSTRUCTION WORKING HOURS**
Weekdays  7 AM – 7 PM
Saturday   9 AM – 6 PM
Sunday/Holiday  PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed
 1  UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I D  Number
 2  The applicant agrees to contact and obtain an inquiry I D  Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation

c leidenreport/oldpermits rp

## CERTIFICATION OF COMPLETION

I certify that under date _____ of _____ that I made a final inspection of all work under the following permit types and from this inspection it appears that the Building or Facility is now ready for occupancy. By _____ Date _____

## INDIVIDUAL APPROVAL

Plumbing By _____        Date _____

Mechanical By _____        Date _____

Electrical By _____        Date _____

Fire Sprinkler By _____        Date _____

Swimming Pool By _____        Date _____

Building By _____        Date 7-1-10 _____

Grading By _____        Date _____

Encroachment By _____        Date _____

Landscaping By _____        Date _____

Construction Permit By _____        Date _____

OTHER_____ By _____        Date _____

### UTILITY RELEASES

Electrical By _____        Date _____

Gas By _____        Date _____

### BOND RELEASE

Bond Released By                                        Date

# City of Irvine
## Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501



# New Residential Construction Permit

**00410794-RBP**

OWNER: < JOHN LANG HOMES
ADDRESS: 31 ICEBERG ROSE
TRACT: 16676    LOT: 15
APN:
PLANNING AREA: 09

APPLICANT: < JOHN LANG HOMES
ADDRESS: 3121 MICHELSON 200
CITY, ST ZIP: IRVINE CA 92612
PHONE: (949) 476-9090

CONTACT: KEVIN EADS 949-265-6846
PHONE: (949) 476-9090

CONTRACTOR: J L H REALTY & CONSTRUCTION
ADDRESS: 895 DOVE ST 200
CITY, ST ZIP: NEWPORT BEACH CA 92660
CONTR.LIC EXP 4/30/2006    EXP DATE: 10/31/2006
IRV BUS LIC: NEW

VALUATION:    $ 594,050
STORIES: 2
CODE YR: 2001

USE    OCC    CONST TYPE
RES. CONDO    R-3    Type V-1-H
GARAGE    U-1    Type V-1-Hr
Fire Sprinkler System        NFPA 13R
Air Condition        RESIDENTIAL
DECK    R-3    Wood Patio Covers

NO. UNITS. 4
TOT SQFT: 7,696

SQ FT
5,754
1,776

166

## DESCRIPTION OF WORK:
ONE 4 PLEX MFD CONDO BLDG, UNITS 161-164
Bldg 2, 31,33,35,37 Iceberg Rose
Four Quarters Models Woodbury

### PERMIT FEES
| | |
|---|---|
| Automation Fee Inspection | 76.96 |
| Microfilm | 192.75 |
| Energy Surcharge Insp | 176.00 |
| Issuance Fee Comm | 35.00 |
| Apt/Attached Condo Insp | 1,539.20 |
| State Seismic Res | 59.50 |
| System Dev Charge Circ | 2,970.25 |
| System Dev Charge Non-Circ | 2,970.25 |
| SlurrySeal New MFD Res Max | 200.00 |

**Total Permit Fees: $8,219.91**

Receipt#    00020616
TCA Receipt: 2300    TCA:

PLAN CHECK #    0038763B-RNC
PLANNING APPROVAL: DEREK WVSS  1/9/2006
PLANNING APPROVAL: LI CHEN  1/9/2006
BUILDING APPROVAL:
PERMIT ISSUED BY: SHERRY JANAKARAJAN 2/9/2006

c.lederreport/pesmits rp

---

## CONTRACTOR
License Class    B    Lic No. 687596

☐ I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect

Date 2/9/06    Contractor J L H REALTY & CONSTRUCTION

## OWNER-BUILDER

## OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason

☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale

☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project.

☐ I am exempt under Sec _____ B&PC, for this

Reason _____

Date _____    Owner _____

## WORKERS' COMPENSATION

## WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of perjury one of the following declarations

☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued

☐ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy number are

Carrier _____    Policy # _____

☐ I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions

Date 2/9/06    Applicant _____

Policy # _____

WARNING: FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES

## LENDER

## CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec 3097, Civ C)

Lender's Name _____

Lender's Address _____

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes

Print Applicant/Agent's Name _____    Date 2/9/06

## INSPECTION

PERMIT EXPIRATION: Permit becomes null & void if work is not started in 180 days or if work is suspended for 180 days or more. Residential permit expiration addition - 18 months, all others 6 months from date of permit

---

**CONTRACTOR WORKING HOURS**
Weekdays  7 AM – 7 PM
Saturday  9 AM – 6 PM
Sunday/Holiday  PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed
1  UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I.D. Number
2  The applicant agrees to contact and obtain an inquiry I.D. Number from UNDERGROUND SERVICE ALERT
(1-800-422-4133) at least 2 working days prior to commencing excavation

**CERTIFICATION OF COMPLETION**

I certify that under date __8-4__ of __2006__ that I made a final inspection of all work under the following permit types and from this inspection it appears that the Building or Facility is now ready for occupancy   By __M.UESE__     Date __8-4-06__

**INDIVIDUAL APPROVAL**

Plumbing By _____          Date _____

Mechanical By _____          Date _____

Electrical By _____          Date _____

Fire Sprinkler By _____          Date _____

Swimming Pool By _____          Date _____

Building By __M.UESE_____              Date __8-4-06_____

Grading By _____          Date _____

Encroachment By _____          Date _____

Landscaping By _____          Date _____

Construction Permit By _____          Date _____

OTHER_____ By _____          Date _____

UTILITY RELEASES

Electrical By _____          Date _____

Gas By _____          Date _____

BOND RELEASE

Bond Released By                                    Date

# Misc Commercial Permit

**0044351-MISC**



**City of Irvine**
Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, Ca 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501

**DESCRIPTION OF WORK:**
BUILT IN BENCH IN COMMON AREA

| | |
|---|---|
| **OWNER:** JOHN LAING HOMES | |
| ADDRESS: 31 ICEBERG ROSE | |
| TRACT: 16676 | LOT: 15 |
| APN: | |
| PLANNING AREA: 09 | |

**APPLICANT:** JOHN LAING HOMES
ADDRESS: 3121 MICHELSON 200
CITY, ST ZIP: IRVINE CA 92612
PHONE: (949) 265-6857

CONTACT: KEVIN EADS 949265-6959
PHONE: (949) 265-6857

CONTRACTOR:
ADDRESS:
CITY, ST ZIP:
CONTR LIC EXP
IRV BUS LIC:                    EXP DATE:

## CONTRACTOR
License Class: _____ Lic No _____
Date: 3/28/07
_____ Contractor

### LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect

## OWNER-BUILDER
Date X_____ , Owner
Reason _____ , for this
Reason. _____ B&PC, for this

### OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project
☐ I am exempt under Sec. _____ B&PC, for this

## WORKERS' COMPENSATION

### WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of perjury one of the following declarations
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation as provided for by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued
☐ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance is with the carrier and policy number are
Carrier _____
Policy # _____
☑ I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions
Date 3/28/07 X _____ Applicant

**WARNING:** FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES

## LENDER

### CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec 3097, Civ C)
Lender's Name _____
Lender's Address _____

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes

X _____ Signature of Applicant or Agent   Date 3/28/07
_____ Print Applicant's/Agent's Name

X K EADS 3/28/07

---

### VALUATION:
STORIES: 0                NO. UNITS: 1
CODE YR: 2001             TOT SQFT:80

VALUATION:      $ 922

USE
BENCH ACT AS RETAINING WU2

OCC          CONST TYPE
             Retaining Walls

SQ FT
80

### PERMIT FEES
| | |
|---|---|
| Automation Fee Inspection | 10 00 |
| Microfilm | 6 75 |
| Issuance Fee Comm | 35 00 |
| Fence Insp Min Com | 200 00 |
| State Seismic Com | 0 50 |

square footage fence          80

**Total Permit Fees: $252.25**

Receipt#          00034581

**TCA Receipt:**          TCA:

PLAN CHECK #   00440730-CTIS
PLANNING APPROVAL: LYNNAE GUZMAN 3/8/2007
BUILDING APPROVAL: LI CHEN 3/8/2007
PERMIT ISSUED BY: KAYE ARROUES 3/29/2007

---

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started on 180 days or if work is suspended for 180 days or more. Residential permit expiration addition - 18 months, all others 6 months from date of permit

## INSPECTION

**CONSTRUCTION WORKING HOURS**
Weekdays  7 AM – 7 PM
Saturday   9 AM – 6 PM
Sunday/Holiday  PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed
1  UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I D  Number
2  The applicant agrees to contact and obtain an inquiry I D  Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation

c lederreports/permits rp

**CERTIFICATION OF COMPLETION**

I certify that under date _____ of _____ that I made a final inspection of all work
under the following permit types and from this inspection it appears that the Building or
Facility is now ready for occupancy. By _____ Date _____

**INDIVIDUAL APPROVAL**

Plumbing By _____     Date _____

Mechanical By _____     Date _____

Electrical By _____     Date _____

Fire Sprinkler By _____     Date _____

Swimming Pool By _____     Date _____

Building By _____     Date 7 - 1 - 10

Grading By _____     Date _____

Encroachment By _____     Date _____

Landscaping By _____     Date _____

Construction Permit By _____     Date _____

OTHER_____ By _____     Date _____

**UTILITY RELEASES**

Electrical By _____     Date _____

Gas By _____     Date _____

**BOND RELEASE**

Bond Released By     Date

**City of Irvine**
**Building & Safety Division**
**Community Development Dept.**
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501



# New Residential Construction Permit

## 00313313-RBP

**ADDRESS: 33 NIGHTSHADE**
**TRACT: 16258**      **LOT: 1**
**APN:**
**PLANNING AREA:**

**DESCRIPTION OF WORK:**
1 8 plex model condo building
Plan 2 Bldg 28.  33,35,37,39,41,43,45,47 NIGHTSHADE.
PA 17 West Village

**OWNER:** IRVINE COMMUNITY DEVELOPMENT
**ADDRESS:** 550 NEWPORT CTR DR
**CITY, ST ZIP:** NEWPORT BEACH CA 92660
**PHONE:** (949) 720-2547

**APPLICANT:** JOHN LAING HOMES
**ADDRESS:** 19600 FAIRCHILD 150
**CITY, ST ZIP:** IRVINE  CA 92612
**CONTACT:** Debra Pember 714-993-4500
**PHONE:** 949-476-9090

**CONTRACTOR:**
**ADDRESS:**
**CITY, ST ZIP:**
**IRV BUS LIC:**
**CONTR LIC EXP:**      **EXP DATE:**

**VALUATION:**  $ 1,004,919
**STORIES: 0**      **NO. UNITS: 8**
**CODE YR:** 1998      **TOT SQFT:** 18,690

| USE | OCC | CONST. TYPE | SQ FT |
|---|---|---|---|
| patios | U-1 | Roof-Wood Patio Covers | 1,885 |
| as | R-1 | Air Conditioning Res | 12,827 |
| residences | R-1 | Type V - Hour, Wood | 12,827 |
| garages | U-1 | e V-1-Hr. Wood | 3,978 |
| sprinkler | R-1 | F.S. SYS-NFPA13R | 18,656 |

**Condo Insp Model > 15K SF** ... 3,851.10
**System Dev Charge Non-Circ** ... 5,024.60
**State Seismic Res** ... 100.50
**Energy Surcharge Insp** ... 255.00
**Issuance Fee Comm** ... 35.00
**Automation Fee Inspection** ... 192.56
**System Dev Charge** ... 5,024.60
**SlurrySeal New NFD Res Max** ... 400.00

**PLAN CHECK #:** 0030/627-RNC
**PLANNING APPROVAL: STACY TRAN** 4/4/2002
**PLANNING APPROVAL: TONY DORMANESH** 4/3/2002
**BUILDING APPROVAL BY: VASQUEZ** 4/10/2002
**PERMIT ISSUED BY:**

**Total Permit Fees: $14,883.36**
**Receipt#:** 222339
**TCA Receipt: 04939**      **TCA:**

---

### LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

License Class: _____  Date: _____
Lic. No.: _____  Contractor: _____

### OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason:
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale.
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project.
☐ I am exempt under Sec. _____, B&PC, for this reason: _____

Date: _____  Owner: _____

### WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of perjury one of the following declarations:
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided for by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.
☐ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy number are:
Carrier: _____  Policy #: _____
☐ I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions.

Applicant: _____  Date: _____

WARNING: FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES.

### CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec. 3097, Civ. C.).
Lender's Name: _____
Lender's Address: _____

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes.

Signature of Applicant or Agent: _____  Date: _____
Print Applicant's/Agent's Name: DEBRA PEMBER

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in 180 days or if work is suspended for 180 days or more. Residential permit expiration: addition - 18 months, all others 6 months from date of permit.

**INSPECTION**

---

**CONTRACTOR WORKING HOURS**
Weekdays: 7 AM - 7 PM
Saturday: 9 AM - 6 PM
Sunday/Holiday: PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed:
1. UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I.D. Number
2. The applicant agrees to contact and obtain an inquiry I.D. Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation.

## CERTIFICATION OF COMPLETION

I certify that under date _18th_ of _Nov._ that I made a final inspection of all work under the following permit types and from this inspection it appears that the Building or Facility is now ready for occupancy.  By _[signature]_ Date _11/18/02_

## INDIVIDUAL APPROVAL

Plumbing By _____    Date _____

Mechanical By _____    Date _____

Electrical By _____    Date _____

Fire Sprinkler By _____    Date _____

Swimming Pool By _____    Date _____

Building By _____    Date _____

Grading By _____    Date _____

Encroachment By _T. J. Anderson_    Date _11/21/02_

Landscaping By _____    Date _____

Construction Permit By _____    Date _____

OTHER_____ By _____    Date _____

## UTILITY RELEASES

Electrical By _____    Date _____

Gas By _Soretta Keener_    Date _11/21/02_

## BOND RELEASE

Bond Released By    Date

# Fire Sprinkler New Construction Permit



**City of Irvine**
**Building & Safety Division**
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501

**00320697-FSIN**

**DESCRIPTION OF WORK:**
NEW FIRE SPRINKLERS: BUILDING #28: UNITS 142 - 149
35,37,39,41,43,45,47 NIGHTSHADE

**CONTRACTOR**
License Class ___ C16 ___ Lic.No. _513761_

**OWNER-BUILDER**

**WORKERS' COMPENSATION**

**LENDER**

## LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

Date: _7-30-02_  Contractor _AUTOMATIC FIRE SPRINKLERS INC_

## OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason:
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale...
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project.
☐ I am exempt under Sec. ___ B&P.C, for this Reason: ___

Date ___ Owner ___

## WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of one of the following declarations:
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided for by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.
☑ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insuring is carrier and policy number are:
Carrier: _State Comp Ins Fund_
Policy # _162743601_

☐ I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions.

Date _7-30-02_ Applicant _Laila Assad_

**WARNING:** FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION DAMAGES AS PROVIDED IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES.

## CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec. 3097, Civ. C.).

Lender's Name ___
Lender's Address ___

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorizes representatives of this city to enter upon the above-mentioned property for inspection purposes.

_Laila Assad_  _7-30-02_
Signature of Applicant or Agent    Date

_Laila Assad_
Print Applicant's/Agent's Name

**OWNER:** JOHN LAING HOMES
**ADDRESS:** 895 DOVE ST 110
**CITY, ST ZIP:** NEWPORT BEACH CA 92660
**APN:**
**PLANNING AREA:**
**TRACT:** 16258
**ADDRESS:** 33 NIGHTSHADE
**LOT:** 1

**PHONE:** (949) 265-6857

**APPLICANT:** AUTOMATIC FIRE SPRINKLERS
**ADDRESS:** 7272 MARS DR
**CITY, ST ZIP:** HUNTINGTON BEACH CA 92647
**CONTACT:** Laura Asadi 714-841-2066
**PHONE:** 714-841-2066

**CONTRACTOR:** AUTOMATIC FIRE SPRINKLERS INC
**ADDRESS:** 7272 MARS DR
**CITY, ST ZIP:** HUNTINGTON BEACH CA 92647
**CONTR LIC EXP:** 7/31/2003
**IRV BUS LIC:** 24173    **EXP DATE:** 8/31/2002

**CIP #**

FS Piping Install Head Count         145.36
Issuance Fee Comm                     35.00
Automation Fee Inspection              7.27

**VALUATION:**
**STORIES:** 0
**CODE YR:**     OCC         CONST. TYPE

**NO. UNITS:**
**TOT SQFT:** 0        SQ FT

**USE**

**Total Permit Fees: $187.63**
**Receipt# 227217**

**PLAN CHECK #:** 00317132-RNFS
**PLANNING APPROVAL:**
**BUILDING APPROVAL:**
**PERMIT ISSUED BY:** VASQUEZ 7/30/2002

**TCA Receipt:**

**TCA:**

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in 180 days or if work is suspended for 180 days or more. Residential permit expiration: addition - 18 months, all others 6 months from date of permit.

## INSPECTION

**CONTRACTOR WORKING HOURS**
Weekdays: 7 AM – 7 PM
Saturday: 9 AM – 6 PM
Sunday/Holiday: PROHIBITED

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed:
1. UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I.D. Number ___
2. The applicant agrees to contact and obtain an inquiry I.D. Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation.

## CERTIFICATION OF COMPLETION

I certify that under date _____ of _____ that I made a final inspection of all work
under the following permit types and from this inspection it appears that the Building or
Facility is now ready for occupancy.  By _____  Date _____

## INDIVIDUAL APPROVAL

Plumbing By _____          Date _____

Mechanical By _____          Date _____

Electrical By _____          Date _____

Fire Sprinkler By *[signature]* _____          Date *1/6/05* _____

Swimming Pool By _____          Date _____

Building By _____          Date _____

Grading By _____          Date _____

Encroachment By _____          Date _____

Landscaping By _____          Date _____

Construction Permit By _____          Date _____

OTHER_____ By _____          Date _____

## UTILITY RELEASES

Electrical By _____          Date _____

Gas By _____          Date _____

## BOND RELEASE

Bond Released By _____          Date _____

City of Irvine
Building & Safety Division
Community Development Dept.
One Civic Center Plaza
PO Box 19575 Irvine, CA 92623-9575
For Permit Info: (949) 724-6300 For Inspections: (949) 724-6501



# Fire Sprinkler Alteration/Addition Permit

**ADDRESS: 33 NIGHTSHADE**

TRACT: 16258     LOT: 1

APN:

PLANNING AREA:

**DESCRIPTION OF WORK:**
LOCATION: CASALON AT QUAIL HILL
REVISION #1 FOR MODELS: BUILDING
ADD 2 HEADS

CIP #

00322550-FSI

---

**OWNER:** JOHN LANG HOMES
ADDRESS: 895 DOVE ST 110
CITY, ST ZIP: NEWPORT BEACH CA 92660
PHONE: (949) 265-6857

**APPLICANT:** AUTOMATIC FIRE SPRINKLERS
ADDRESS: 7272 MARS DR
CITY, ST ZIP: HUNTINGTON BEACH CA 92647
CONTACT: Laura Asadi 714-841-2066
PHONE: 714-841-2066

**CONTRACTOR:** AUTOMATIC FIRE SPRINKLERS INC
ADDRESS: 7272 MARS DR
CITY, ST ZIP: HUNTINGTON BEACH CA 92647
CONTR LIC EXP: 7/31/2003
IRV BUS LIC: 24173     EXP DATE: 8/31/2002

| | | | 2.40 |
| Automation Fee Inspection | | | 48.00 |
| FS Minimum Insp Fee | | | 35.00 |
| Issuance Fee Comm | | | 10.50 |
| Microfilm | | | |

**VALUATION:**
**STORIES:** 0    NO. UNITS:    CIP #
**CODE YR:**    TOT SQFT: 0
   OCC    CONST TYPE
**USE**    SQ FT

**Total Permit Fees: $95.90**
**Receipt# 231094**
**TCA Receipt:**
**TCA:**

PLAN CHECK #:    00317132-RNFS
PLANNING APPROVAL:
BUILDING APPROVAL:
PERMIT ISSUED BY: BILL MOORE  8/27/2002

---

**INSPECTION**

**PERMIT EXPIRATION:** Permit becomes null & void if work is not started in 180 days or if work is suspended for 180 days or more. Residential permit expiration: addition - 18 months, all others 6 months from date of permit.

---

**CONTRACTOR**

LICENSED CONTRACTORS DECLARATION
I hereby affirm under penalty of perjury that I am licensed under provisions of Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, and my license is in full force and effect.

License Class: C16    Lic No. 513781

Date ___ Contractor AUTOMATIC FIRE SPRINKLERS INC

**OWNER-BUILDER**

OWNER-BUILDER DECLARATION
I hereby affirm under penalty of perjury that I am exempt from the Contractor's License Law for the following reason:
☐ I, as owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale.
☐ I, as owner of the property, am exclusively contracting with licensed contractors to construct the project.
☐ I am exempt under Sec. _____, B&PC, for this
Reason: _____

Date ___ Owner _____

**WORKERS' COMPENSATION**

WORKERS' COMPENSATION DECLARATION
I hereby affirm under penalty of perjury one of the following declarations:
☐ I have and will maintain a certificate of consent to self-insure for workers' compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.
☑ I have and will maintain workers' compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My workers' compensation insurance carrier and policy number are:
Carrier State Comp
Policy # X 1629361

I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the workers' compensation laws of California, and agree that if I should become subject to the workers' compensation provisions of Section 3700 of the Labor Code, I shall forthwith comply with those provisions.

Date 8-21-02 Applicant X Laura Asadi

WARNING: FAILURE TO SECURE WORKERS' COMPENSATION COVERAGE IS UNLAWFUL, AND SHALL SUBJECT AN EMPLOYER TO CRIMINAL PENALTIES AND CIVIL FINES UP TO ONE HUNDRED THOUSAND DOLLARS ($100,000), IN ADDITION TO THE COST OF COMPENSATION, DAMAGES AS PROVIDED FOR IN SECTION 3706 OF THE LABOR CODE, INTEREST, AND ATTORNEY'S FEES.

**CONSTRUCTION LENDING AGENCY**

CONSTRUCTION LENDING AGENCY
I hereby affirm under penalty of perjury that there is a construction lending agency for the performance of the work for which this permit is issued (Sec. 3097, Civ. C).

Lender's Name _____
Lender's Address _____

I certify that I have read this application and state that the above information is correct. I agree to comply with all city and county ordinances and state laws relating to building construction, and hereby authorize representatives of this city to enter upon the above-mentioned property for inspection purposes.

X Laura Asadi
Signature of Applicant or Agent
Print Applicant's/Agent's Name
X 8-26-02
Date

**LENDER**

---

**NOTICE:**
Pursuant to Assembly Bill 3020, no excavation permit is valid unless the following is performed:
1. UNDERGROUND SERVICE ALERT has been contacted and has provided inquiry I.D. Number
2. The applicant agrees to contact and obtain an inquiry I.D. Number from UNDERGROUND SERVICE ALERT (1-800-422-4133) at least 2 working days prior to commencing excavation.

**CONTRACTOR WORKING HOURS**
Weekdays: 7 AM – 7 PM
Saturday: 9 AM – 6 PM
Sunday/Holiday: PROHIBITED

## CERTIFICATION OF COMPLETION

I certify that under date _____ of _____ that I made a final inspection of all work under the following permit types and from this inspection it appears that the Building or Facility is now ready for occupancy.  By _____ Date _____

## INDIVIDUAL APPROVAL

Plumbing By _____          Date _____

Mechanical By _____          Date _____

Electrical By _____          Date _____

Fire Sprinkler By _[signature]_          Date _11-18-02_

Swimming Pool By _____          Date _____

Building By _____          Date _____

Grading By _T.J. Anderson_          Date _11/21/02_

Encroachment By _____          Date _____

Landscaping By _____          Date _____

Construction Permit By _____          Date _____

OTHER_____ By _____          Date _____

## UTILITY RELEASES

Electrical By _____          Date _____

Gas By _____          Date _____

## BOND RELEASE

Bond Released By          Date

# EXHIBIT 187

# STATE OF CALIFORNIA
# DEPARTMENT OF REAL ESTATE

In reviewing a licensee's information, please be aware that license discipline information may have been removed from a licensee's record pursuant to Business & Professions Code Section 10083.2 (c). However, discipline information may be available from the California Department of Real Estate upon submittal of a request, or by calling the Department's public information line at 1-877-373-4542.

The license information shown below represents public information. It will not reflect pending licensing changes which are being reviewed for subsequent updating. Although the business and mailing addresses of real estate licensees are included, this information is not intended for mass mailing purposes.

Some historical disciplinary action documents may not be in compliance with certain accessibility functions. For assistance with these documents, please contact the Department's Licensing Flag Section.

License information taken from records of the Department of Real Estate on 8/24/2025 9:26:53 AM

| | |
|---|---|
| **License Type:** | CORPORATION |
| **Name:** | JLH Realty & Construction Inc |
| **Mailing Address:** | 19520 JAMBOREE RD STE 500<br>IRVINE, CA 92612 |
| **License ID:** | 01176549 |
| **Expiration Date:** | 03/15/10 |
| **License Status:** | EXPIRED |
| **Corporation License Issued:** | 03/16/94 (Unofficial -- taken from secondary records) |
| **Former Name(s):** | Watt Residential Construction Inc |
| **Main Office:** | NO CURRENT MAIN OFFICE ADDRESS ON FILE |
| **Licensed Officer(s):** | DESIGNATED OFFICER<br>01783617 - Expiration Date: 03/15/10<br>Mamet, Linda Helen<br>OFFICER LICENSE EXPIRED AS OF 03/16/10<br><br>00874521 - Expiration Date: 03/15/10<br>Stelmar, Wayne James<br>OFFICER LICENSE EXPIRED AS OF 03/16/10 |
| **DBA** | NO CURRENT DBAS |
| **Branches:** | NO CURRENT BRANCHES |
| **Comment:** | NO DISCIPLINARY ACTION<br><br>NO OTHER PUBLIC COMMENTS |

>>>> Public information request complete <<<<

# EXHIBIT 188



Newsletter    Login |    Register

Search

News & Analysis       Builder 100       Events

# Webb Steps Down as CEO of John Laing Homes

*1 MIN READ*

By Sarah Yaussi, Big Builder Magazine

April 30, 2008

The official release has yet to come out, but last week John Laing Homes CEO Larry Webb notified employees and trade partners that he was leaving the company. The move was a surprise to many stakeholders; Webb had contracted to stay on as CEO for five years when United Arab Emirates-based Emaar Properties purchased John Laing Homes for $1.05 billion in 2006. Robert Booth, managing director for Emaar Canada, will succeed Webb as chief executive.

Webb, a 20-plus-year industry veteran, got his start at John Laing as a division president in 1995. His fiery and magnetic personality quickly moved him into greater leadership roles in both the company and industry. Webb plans to use his newly found free time to relax and enjoy more time with his family.

The passing of the torch from Webb to Booth will take place over the next four weeks.

With a background in large-scale, master planned development, Booth has been a key player in Emaar's international expansion since joining the company in 2001. Booth spent five years in Dubai before moving to Canada, where he supervised Emaar's projects in North America. Based in Vancouver, he was heavily involved in the integration of John Laing Homes into the Emaar corporate fabric. Post acquisition, Booth helped oversee the company's land strategy as a participant in the executive land committee, playing a role in identifying expansion opportunities beyond the company's footprint in California and Colorado.

## Upcoming Events

**Aug 26, 2025**
Dispelling Myths and Maximizing Value: Unlock the Potential of Open Web Floor Trusses
Live Webinar
Register for Free

**Sep 9, 2025**
Zonda's Mortgage Playbook Webinar
Webinar
Register Now

**Sep 16, 2025**
Zonda's Market Expansion Opportunities Webinar
Webinar
Register Now

All Events

## About the Author

Sarah Yaussi, Big Builder Magazine

RELATED TOPICS                                                    SHARE

**SUBJECT**                                          **PEOPLE**

Business       Development       Leadership          Larry Webb       Robert Booth

Big Builder

**ORGANIZATION**

John Laing Homes

John Laing Homes

## More from Builder Magazine



**Resilience of Customer Base Contributes to Strong Q3 for Toll Brothers**

*3 MIN READ*



**Lowe's Acquires Distributor Foundation Building Materials for $8.8 Billion**

*3 MIN READ*



**Single-Family Starts Inch Higher as Builder Outlook Remains Pessimistic**

*3 MIN READ*

## Digital Edition

Builder Magazine Q3 2025

Subscribe

Magazine Archives

### Explore Our Sites

MFE | Multifamily Executive

AHF | Affordable Housing Finance

JLC | The Journal of Light Construction

ARCHITECT

PSN | Pool & Spa News

AQUATICS INTERNATIONAL

Builder Magazine is part of Zonda Media, a Delaware corporation | © 2025 All rights reserved

About    Advertise    Contact Us    Privacy Policy    Accessibility Statement

Powered by Zonda

# EXHIBIT 189

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WL HOMES, LLC, <u>et al.</u>, | ) | Case No. 09-10571 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| WACHOVIA BANK, NATIONAL | ) | Adv. No. 09-50514 |
| ASSOCIATION, a national banking | ) | |
| association, | ) | |
| | ) | Related to Docket Nos. 61, 62, 70, 71, |
| Plaintiff, | ) | and 72 |
| | ) | |
| v. | ) | |
| | ) | |
| WL HOMES, LLC (Debtor), a Delaware | ) | |
| Limited Liability Company; | ) | |
| JLH INSURANCE CORPORATION, an | ) | |
| Arizona Corporation; and | ) | |
| DOES 1 through 100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Thomas M. Horan
Francis A. Monaco, Jr.
Womble Carlyle Sandridge & Rice
PLLC
222 Delaware Avenue, 15th Floor
Wilmington, DE 19801

Gregory A. Bray
Linda Dakin-Grimm
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

James D. Whooley
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017

Carl D. Neff
Daniel K. Astin
John D. McLaughlin, Jr.
Joseph J. McMahon, Jr.
Ciardi Ciardi & Astin
919 Market Street, Suite 700
Wilmington, DE 19801

Albert A. Ciardi, III
Carl E. Singley
William Baldini
Ciardi Ciardi & Astin
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA 19103

Mark H. Ralston
Ciardi Ciardi & Astin
2603 Oak Lawn Avenue, Suite 200
Dallas, TX 75219

Rick Steinberg
Ciardi Ciardi & Astin
100 Church Street, 8th Floor
New York, NY 10007

*Counsel for Plaintiff Wachovia Bank*                    *Counsel for Defendants George L. Miller,*
*Trustee for the Debtors' Estates and JLH*
*Corporation*

## OPINION[1]

Before the Court are cross-motions for summary judgment filed by Wachovia Bank,

National Association ("Wachovia"), and George L. Miller, Chapter 7 Trustee for the Estate of

WL Homes, LLC (the "Trustee"), respectfully.  For the following reasons, the Court will grant

the motion for summary judgment filed by Wachovia, and deny the motion for summary

judgment filed by the Trustee.

## I. INTRODUCTION

This adversary proceeding is about the ability of a parent company to grant a security

interest in an asset of its subsidiary and the extent to which a third party may enforce such a

security interest.  The resolution of this issue turns on the legal significance that should be

accorded to the actions of an agent of both the parent and the subsidiary, wearing multiple hats

and presumptively acting on behalf of both entities.  The Court concludes that the fact that an

agent may represent more than one principal does not alter the well-established doctrine that an

---

[1]     Pursuant to Federal Rule of Bankruptcy Procedure 7052, this Opinion constitutes the
Court's findings of fact and conclusions of law.

agent with authority is capable of binding its principal. Accordingly, the Court finds that a security interest in the subsidiary's asset granted by the parent's agent to a third party is enforceable if it otherwise satisfies the requirements set forth in Article 9 of the Uniform Commercial Code ("U.C.C.").

## II.  BACKGROUND

On February 19, 2009 (the "Petition Date"), WL Homes, LLC ("WL Homes") and various of its affiliates (collectively with WL Homes, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Shortly thereafter, the Debtors' chapter 11 bankruptcy cases were converted to cases under chapter 7 and George L. Miller was appointed the chapter 7 trustee for the purpose of administering the Debtors' estates.

Prior to the Petition Date, WL Homes had formed JLH Insurance Corporation ("JLH") under the Arizona Department of Insurance as a captive and wholly owned insurance company for the express purpose of paying claims against WL Homes arising out of its business activities. WL Homes capitalized JLH by depositing $10 million into a bank account (the "JLH Account"). JLH remains a non-debtor affiliate, but as a wholly owned subsidiary of WL Homes, it is under the control of the Trustee.

In 2007, WL Homes entered into a line of credit loan agreement (the "Loan Agreement") with Wachovia Bank. To induce the Loan Agreement and to secure WL Homes' repayment obligation, the Loan Agreement includes a provision (the "Security Interest Provision") pursuant to which WL Homes granted a security interest to Wachovia in the JLH Account and two other

3

deposit accounts held at Wachovia (the "Laing Luxury Accounts"). The Security Interest Provision states, in relevant part:

> [WL Homes] shall maintain its . . . JLH Account . . . with [Wachovia]. The funds on deposit in the JLH Account shall at no time be less than $10,000,000.00. [WL Homes] shall also maintain its Laing Luxury Accounts . . . with [Wachovia]. The JLH Account and the Laing Luxury Accounts are collectively referred to as the Deposit Accounts. [WL Homes] grants to [Wachovia] a security interest in the Deposit Accounts.

Loan Agreement ¶ 6.5.

In 2008, WL Homes reaffirmed all of its obligations under the Loan Agreement to Wachovia pursuant to two loan agreement letters (collectively, the "Loan Letters"), dated June 23, 2008 and July 31, 2008, respectively. The Loan Letters were executed by Wayne Stelmar, who at all relevant times was the CFO of WL Homes and the president of JLH.

On March 20, 2009, Wachovia commenced this adversary proceeding, seeking, inter alia, a declaration that it holds a perfected security interest in the JLH Account and may enforce its security interest to satisfy WL Homes' debt obligation to Wachovia under the Loan Agreement. As of September 21, 2010, Wachovia contends that it is owed the principal amount of $10 million plus accrued interest in the amount of $1,105,486.

The parties have engaged in discovery. Wachovia now moves for summary judgment, seeking an order of the Court that it has an enforceable security interest in the JLH Account. [2] In

---

[2]    The Court notes that Wachovia also seeks summary judgment as to the enforceability of its security interest in the Laing Luxury Accounts. However, this Opinion is limited to a discussion of the enforceability of Wachovia's alleged security interest in the JLH Account. The Trustee does not dispute Wachovia's security interest in the Laing Luxury Accounts. Although the Trustee stated during oral argument his intention to file a fraudulent transfer action against Wachovia with respect to the Laing Luxury Accounts, an examination of the Court's docket reveals that no such action has been commenced, and under 11 U.S.C. § 546(a)(1), the deadline to commence any avoidance actions passed on February 19, 2011. The Court further notes that

4

response, the Trustee opposes summary judgment in favor of Wachovia, and cross-moves for

summary judgment, seeking a declaration that the JLH Account could not have been legally

pledged, and that JLH has neither authorized nor ratified the pledge by WL Homes of the JLH

Account.

This matter has been fully briefed and argued, and it is now ripe for decision.

## III.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and

(b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of

this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (K).

## IV.  DISCUSSION

**A.     Legal Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by

Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." F ED. R. CIV. P. 56(a).[3]  The Supreme Court

---

the Trustee's Answer [Adv. Docket No. 24] to Wachovia's Complaint [Adv. Docket No. 1]
includes three counterclaims, among them a fraudulent transfer cause of action by JLH against
Wachovia.  That counterclaim, however, concerns only the JLH Account and does not implicate
the Laing Luxury Accounts.  Whereas the existence of an action by the Trustee with respect to
the Laing Luxury Accounts would permit the Court to reserve judgment on the enforceability of
Wachovia's security interest in these accounts, the absence of such action and the absence of any
dispute as to the Laing Luxury Accounts requires the Court to conclude that Wachovia has an
enforceable security interest in the Laing Luxury Accounts and thereby dispose of this issue.
The remainder of the Opinion focuses entirely on the enforceability of Wachovia's asserted
security interest in the JLH Account.

[3]      Federal Rule of Civil Procedure 56 was amended as of December 1, 2010.  Subdivision
(a) now contains the summary judgment standard previously stated in subdivision (c).  F ED. R.
CIV. P. 56 Advisory Committee's Note to 2010 Amendments ("Subdivision (a) carries forward

has explained that an issue of material fact is genuine only "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  The Supreme Court further explained that materiality is

determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment."  Id.

The purpose of summary judgment is "to isolate and dispose of factually unsupported

claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Summary judgment

may be properly granted "as a means of avoiding full-dress trials in unwinnable cases, thereby

freeing courts to utilize scarce judicial resources in more beneficial ways." Mesnick v. Gen.

Elec. Co., 950 F.2d 816, 822 (5th Cir. 1991), cert. denied , 504 U.S. 985 (1992).

The movant bears the burden of establishing the absence of a genuine dispute as to a

material fact.  Celotex, 477 U.S. at 322-23 ("[A] party seeking summary judgment always bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact.") (citing FED. R. CIV. P. 56).

After the movant has made the requisite showing, the burden shifts to the non-movant to

establish that summary judgment is not warranted.  Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(c) requires that a

party "asserting that a fact cannot be or is genuinely disputed" has to support such an allegation

---

the summary-judgment standard expressed in former subdivision (c), changing only one word—
genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-
judgment determination.").

by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F ED. R. CIV. P. 56(c).  Thus, a party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita , 475 U.S. at 586, and instead must produce specific facts that establish the existence of a genuine dispute.  Id. at 587. Without factual corroboration, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

In deciding a motion for summary judgment, the court must view all facts in the light most favorable to the non-movant to determine whether the movant is nonetheless entitled to judgment as a matter of law.  Anderson, 477 U.S. at 261 n.2; Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (2003) (citation omitted).  Moreover, the court must draw all inferences in favor of the non-movant and "where the non-moving party's evidence contradicts the movant's . . . the non-movant's must be taken as true."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994) (internal quotation marks omitted) (citation omitted).  See also Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976) ("Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion.  The non-movant's

allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.").

In accordance with these standards, a motion for summary judgment may only be denied "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587 (citation omitted). Therefore, the Third Circuit has held that "in all cases summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." Petruzzi's IGA Supermarkets v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

Finally, the standard for summary judgment remains unaffected where the parties have filed cross-motions for summary judgment. In deciding cross-motions for summary judgment, the court must consider each party's motion separately and independently. Panhandle E. Pipe Line Co. v. Utilicorp United Inc., 928 F. Supp. 466, 470 (D. Del. 1996) (citing Williams v. Phila. Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994)).

**B.**    **Wachovia's Motion for Summary Judgment**

Wachovia seeks summary judgment in its favor on the issue of whether it has an enforceable security interest in the JLH Account. Wachovia asserts that it has established all elements necessary to show that it has an enforceable security interest in this account. Article 9 of the U.C.C., adopted in all relevant respects in California, provides that a security interest attaches to collateral when it becomes enforceable against the debtor. CAL. COM. CODE § 9203(a). Specifically with respect to deposit accounts, U.C.C. § 9-203 provides that a security

8

interest becomes enforceable when the following three conditions are satisfied: (1) value has been given; (2) there is a valid security agreement and the collateral is a deposit account over which the secured party has control; and (3) the debtor has rights in the collateral or the power to transfer rights in the collateral.  CAL. COM. CODE §§ 9203(b), 9104(a)(1).

The Trustee does not dispute that value has been given or that Wachovia has control over the JLH Account.  The Trustee does dispute, however, that WL Homes has rights in the JLH Account sufficient to effectuate a pledge of this account as security to Wachovia.  To prevail on its motion, Wachovia has the burden to provide sufficient factual support in defense of each of the elements of an enforceable security interest.  The Court addresses each element in turn.

### 1.    <u>Value Given</u>

Wachovia asserts that value has been given as required by U.C.C. § 9-203.  It is well established that the extension of credit constitutes value.  CAL. COM. CODE § 1204 ("[A] person gives value for rights if the person acquires them . . . in return for a binding commitment to extend credit or for the extension of immediately available credit, whether or not drawn upon and whether or not a chargeback is provided for in the event of difficulties in collection . . . .").

Here, the Loan Agreement between Wachovia and WL Homes establishes that Wachovia has given value to WL Homes in exchange for its security interest in the JLH Account.  The Trustee does not dispute Wachovia's assertion that value has been given or the validity of the Loan Agreement.  Accordingly, the Court finds that value has been given, such that the first prong of an enforceable security interest in the JLH Account has been established.

2.      **Valid Security Agreement and Wachovia's Control over the JLH Account**

Wachovia also asserts that there is a valid security agreement and that Wachovia has the

requite control over the JLH Account.  The Loan Agreement containing the Security Interest

Provision is a security agreement whose validity is uncontested.  Thus the Court concludes a

valid security agreement exists.

The U.C.C. provides that a secured party has control over a deposit account if the secured

party is the bank in which the account is maintained.  CAL. COM. CODE § 9014.  Here, Wachovia

asserts that it has control over the JLH Account by virtue of being the banking institution at

which this account is maintained.  To support its contention, Wachovia has submitted an account

statement along with the depository authorization and agreement certificate (the "Depository

Certificate") pursuant to which the JLH Account was opened.  Again, the Trustee disputes

neither that the JLH Account is a deposit account maintained at Wachovia, nor that Wachovia

has control over this account by virtue of its banking relationship.  Accordingly, the Court finds

that Wachovia has the requisite control over the JLH Account, such that the second prong of an

enforceable security interest in the JLH Account has been established.

3.      **WL Homes' Rights in the JLH Account**

Finally, Wachovia asserts that WL Homes has sufficient rights in the JLH Account to

satisfy the U.C.C. requirements for attachment of its security interest in this account.  Wachovia

relies upon four independent legal theories to show that WL Homes has rights in the JLH

Account.  First, Wachovia asserts that WL Homes exerts sufficient control over the JLH Account

to give rise to the requisite rights in this account to grant the security interest.  Second, Wachovia

asserts that JLH consented and impliedly gave WL Homes permission to use the JLH Account as

collateral.  Third, Wachovia alleges that JLH should be estopped from denying the validity of

Wachovia's security interest in the JLH Account.  Finally, Wachovia invokes the alter ego

doctrine to allege the propriety of enforcing its security interest against JLH.  The Trustee

disputes Wachovia's assertion that WL Homes has sufficient rights in the JLH Account to

effectuate attachment.

The Court finds that WL Homes has sufficient rights in the JLH Account for two

independent reasons: (1) WL Homes' use and control of the JLH Account, and (2) JLH's consent

and permission to use the JLH Account as collateral.  Because each of these theories

independently establishes that WL Homes has sufficient rights in the JLH Account for the

purpose of granting a security interest in the account, the Court does not reach WL Homes'

estoppel and alter ego arguments.

### a.     Use and Control

Under the U.C.C., a debtor need not have title to collateral in order to grant a security

interest in such collateral.  The Third Circuit has held that "[Article 9 of the U.C.C.] does not

specify the quantum of 'rights' which a debtor must have in collateral to support a security

interest: evidently less than full 'legal title' will do . . . ."  In re Ferandos, 402 F.3d 147, 156 (3d

Cir. 2005).  Case law teaches that "control over the collateral, rather than record ownership, is

the key factor in determining a debtor's rights in collateral" for the purpose of granting a security

interest.  First Nat'l Bank of Omaha v. Pleasant Hollow Farm, Inc., 532 N.W.2d 60, 63 (S.D.

1995).  The Courts of Appeal in the Eleventh Circuit and the Ninth Circuit have both held that

while mere possession of collateral is not sufficient to establish that a debtor has rights in such

collateral, any right beyond mere possession, including the right to use and control the collateral,

11

suffices to establish the debtor's rights for the purpose of attachment of a security interest in such collateral. Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Serv., Inc.), 113 F.3d 1091, 1103 (9th Cir. 1997) ("While section 9203(1)(c) does not require that a debtor own or hold title to the collateral, mere possession of collateral by a debtor is not sufficient to constitute 'rights in the collateral' under section 9203. Where a debtor has rights to collateral beyond naked possession, a security interest may attach to such rights.") (citations omitted); Merchants Bank v. Atchison (In re Atchison), 832 F.2d 1236, 1239 (11th Cir. 1987) ("[A] debtor's rights in the collateral may be found from any rights going beyond mere possession, such as the right to use and control the collateral.") (citations omitted). The court in Atchison, for example, determined that the debtor retained use and control of certain equipment that was pledged as collateral "because the equipment was in everyday use at the [debtor's] lumberyard." Atchinson, 832 F.2d at 1240.

Here, Wachovia asserts that WL Homes has sufficient rights in the JLH Account to grant a security interest in this account because WL Homes has the right to use and control this account. In support of its assertion, Wachovia directs the Court's attention to the Depository Certificate, pursuant to which five of the seven signers who are authorized to manage the JLH Account are exclusively WL Homes officers. The other two signers—Wayne J. Stelmar and Kimberly Forbes—are officers of both WL Homes and JLH.

As additional support for Wachovia's allegation that WL Homes controls the JLH Account, Wachovia cites to the deposition testimonies of James Chang, the Controller at WL Homes, and Kimberly Wack of Aon, the manager of JLH that WL Homes employed. Mr. Chang stated that "if anybody [from JLH] needed to transfer [money out of the JLH Account at

Wachovia], they would have to contact [him]."  Whooley Declaration, Ex. 6 at 50:13-19.  In response to a question about whether "the wrong people were identified as authorized representatives" with respect to the JLH Account, Ms. Wack testified that "[a]s long as they're all WL Homes employees, [she] would not see anything wrong with that."  Whooley Declaration, Ex. 5 at 112:2-6.  Based on these factual allegations, it appears that the JLH Account has been exclusively controlled by WL Homes.

The Trustee has not come forward with any evidence that contradicts Wachovia's allegations concerning WL Homes' use and control of the JLH Account.  Without factual support, the Trustee's mere contention that "WL Homes had no legal rights in the [JLH Account]" is insufficient to withstand a properly supported motion for summary judgment on this issue.  Accordingly, the Court accepts Wachovia's uncontroverted evidence that WL Homes has the right to use and control the JLH Account and therefore has had sufficient rights in the JLH Account to give rise to Wachovia's security interest in it.

   **b.**  <u>**Consent and Permission**</u>

The established case law is clear that a debtor may grant a security interest in collateral that the debtor does not actually own if the owner of such collateral consents to such an arrangement, because "all of the courts that have considered the question have ruled that an owner's permission to use goods as collateral creates rights in the debtor sufficient to give rise to an enforceable security interest."  <u>Atchison</u>, 832 F.2d at 1239 (citations omitted); <u>see also K.N.C. Wholesale, Inc. v. Awmco, Inc.</u>, 128 Cal. Rptr. 345, 349 (Cal. Ct. App. 1976) ("[A] debtor who does not own collateral may nonetheless use the collateral for security, thereby obtaining 'rights

13

in the collateral,' when authorized to do so by the actual owner of the collateral.") (citations omitted).

A court may infer from the circumstances that an owner has granted permission to a debtor to use its property as collateral or has otherwise consented to the debtor's use of the owner's property as collateral.  In <u>Atchinson</u>, for instance, the owner of certain equipment signed a mortgage on behalf of a corporation of which he was an officer and shareholder, pursuant to which he pledged his equipment as security for the repayment of the mortgage.  The <u>Atchinson</u> court held that the owner of the collateral at issue had "himself signed the mortgage on behalf of the corporation; even if he did own the [collateral], his signature for [the corporation] was sufficient to infer his consent to its use as collateral."  <u>Atchison,</u> 832 F.2d at 1239.  Similarly, the court in <u>K.N.C. Wholesale</u> inferred that a subsidiary had impliedly consented to the pledge of its equipment by its parent for the purpose of securing a loan by a lender to the parent, on the condition that the parent obtain a liability release for the same loan from the lender in favor of the subsidiary.  <u>K.N.C. Wholesale,</u> 128 Cal. Rptr. at 348.

Here, based upon Wachovia's proffered evidence, the Court concludes that JLH has consented to WL Homes' pledge of the JLH Account as collateral for the Loan Agreement.  Pursuant to the Loan Agreement and the Security Interest Provision therein, WL Homes pledged to maintain the JLH Account with Wachovia and granted a security interest in this account to Wachovia to secure WL Homes' obligation under the Loan Agreement.  Mr. Stelmar subsequently signed the Loan Letters, pursuant to which WL Homes reaffirmed all of its obligations to Wachovia under the Loan Agreement.

14

Even though Mr. Stelmar signed the Loan Letters on behalf of WL Homes, his concurrent

position as president of JLH cannot be overlooked.  Courts have held that "[i]f the president,

vice-president or director of a corporation has knowledge or notice of a fact, knowledge or notice

of that fact is generally imputed to the corporation."  In re Pubs, Inc. of Champaign , 618 F.2d

432, 438 (7th Cir. 1980) (citations omitted).  See also Buchanan v. Reliance Ins. Co. (In re Color

Tile Inc.), 475 F.3d 508, 513 (3d Cir. 2007) ("Where an agent receives notice, that notice is

imputed to the principal.") (citing Am. Sur. Co. v. Pauly, 170 U.S. 133, 153 (1898)).  Therefore,

Mr. Stelmar's knowledge of WL Homes' pledge of the JLH Account as security to Wachovia

may be properly imputed to JLH, such that JLH is chargeable with Mr. Stelmar's knowledge as

of such pledge.[4]

Moreover, as in Atchison, Mr. Stelmar's signature on behalf of WL Homes is further

evidence of his consent to such an arrangement on behalf of JLH.  Under the doctrine of apparent

authority, Wachovia was entitled to believe that Mr. Stelmar had the requisite authority to

consent to and reaffirm WL Homes' pledge of the JLH Account on behalf of JLH.  The Third

Circuit has cautioned that "[a]pparent authority can exist only to the extent that it is reasonable

---

[4]      The Trustee asserts, and refers to deposition testimony in support his assertion, that WL
Homes and JLH were unaware of the Security Interest Provision in the Loan Agreement,
pursuant to which WL Homes granted Wachovia a security interest in the JLH Account and the
Laing Luxury Accounts.  However, "[i]t has long been the common law rule that signing a
document authenticates and adopts the words it contains, even if there was a lack of subjective
understanding of the words or their legal effect.  In essence, people are presumed to be bound by
what they sign."  In re Schwalb, 347 B.R. 726, 743 (Bankr. D. Nev. 2006) (citations omitted).
Therefore, whether Mr. Stelmar was subjectively aware of the pledge of the JLH Account is of
no moment because he is charged with notice of the contents of the Loan Letters, and to the
extent that they referred to and reaffirmed WL Homes' obligations in the Loan Agreement, Mr.
Stelmar is thereby also charged with notice of the contents of the Loan Agreement.  Accordingly,
through Mr. Stelmar, JLH is chargeable with the knowledge of Wachovia's security interest in
the JLH Account.

for the third party dealing with the agent to believe the agent is authorized."  Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 345 (3d Cir. 2004) (internal quotation marks omitted) (citation omitted).  See also Universal Computer Sys., Inc. v. Med. Servs. Ass'n of Pa., 628 F.2d 820, 823 (3d Cir. 1980) ("The test for determining whether an agent possesses apparent authority is whether 'a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.'") (citation omitted).

Here, in light of Mr. Stelmar's position as the president of JLH, Wachovia was entitled to rely on the presumption that Mr. Stelmar had sufficient authority to consent to the Security Interest Provision in the Loan Agreement, which was subsequently affirmed pursuant to the Loan Letters.  The fact that Mr. Stelmar did not contest the explicit acknowledgement of the obligations, including those in the Security Interest Provision, provides a sufficient basis for the Court to infer that he consented to them.  The Court concludes that Mr. Stelmar's signature on the Loan Letters is sufficient evidence of both JLH's awareness of Wachovia's security interest and JLH's consent and implicit permission to use the JLH Account for such purpose.

Wachovia has carried its burden of establishing that WL Homes has the requisite rights in the JLH Account, both by virtue of its use and control of the JLH Account and by virtue of JLH's implied consent.  Accordingly, Wachovia is entitled to summary judgment on the issue that it has an enforceable security interest in the JLH Account.

16

**C.    The Trustee's Motion for Summary Judgment**

The Trustee has cross-moved for summary judgment, seeking a declaratory judgment of the Court that (1) JLH was legally prohibited from pledging the JLH as security, and (2) JLH neither authorized nor ratified WL Homes' pledge of the JLH Account as security to Wachovia.

**1.    Arizona Insurance Law**

The Trustee argues that the pledge of the JHL Account violates Arizona law and is therefore invalid on the ground of illegality. Specifically, the Trustee cites to five Arizona statutory provisions in support of his argument.

First, the Trustee argues that pledging the JLH Account would have violated the requirement that a captive insurer "possess[] and thereafter maintain[] minimum unimpaired paid-in capital and surplus." ARIZ. REV. STAT. ANN. § 20-1098.03(A) (West). In the case of a pure captive insurer, a categorization that indisputably applies to JLH, the minimum statutory amount is $250,000. Id. § 20-1098.03(A)(1). The Trustee argues that the security interest in the JLH Account would have caused JLH's capital and surplus to drop below the required minimum. However, Wachovia has proffered evidence in the form of a bank statement that could lead the Court to conclude that a security interest in the JLH Account would not cause JLH to drop below the minimum statutory amount. Viewing the facts in the light most favorable to Wachovia, the Court cannot summarily find that this provision has been violated.

Second, the Trustee alleges that JLH could have pledged its assets only with the approval of the Arizona Department of Insurance (the "DOI"). Under Arizona insurance law, a "captive insurer may pledge, with the approval of [DOI], any additional prescribed capital and surplus, whether in the form of cash, another allowable asset or any irrevocable and unconditional letter

of credit that contains an evergreen clause." Id. § 20-1098.03(C).  The Trustee avers the absence

of such approval, and Wachovia has not alleged otherwise.  However, as discussed earlier, it is

WL Homes, and not JLH, that has pledged the JLH Account as collateral for the Loan

Agreement.  Thus, it appears that JLH has not violated this provision.  However, to the extent

that JLH may be found to have violated this provision, the only consequence of such a violation

would be the revocation of JLH's license or the refusal of the DOI to renew such license. See id.

§ 20-1098.03(A).

Third, the Trustee argues that pledging the JLH Account would have threatened JLH's

solvency and would therefore not be permitted by the DOI.  Based upon the relevant statute, "a

pure captive insurer is not subject to restrictions on allowable investments, except that [the DOI]

may prohibit or limit any investment that threatens the solvency or liquidity of the pure captive

insurer." Id. § 20-1098.10(B).  This provision does not appear to apply to the facts at bar

because there is no contention that JLH has made any "investments."  Moreover, as noted above,

the financial impact of the pledge of the JLH Account is disputed, and the Court must view the

facts in the light most favorable to Wachovia.  Finally, this provision empowers the DOI to

restrict JLH's investments but does not actually prohibit, restrict, or penalize such investments.

Thus, the Court cannot find that JLH has violated this provision.

Fourth, the Trustee asserts that the pledge of the JLH Account would have violated the

restrictions placed on a captive insurer with respect to loans.  Under Arizona law, "[o]nly a pure

captive insurer may make loans to its affiliates." Id. § 20-1098.10(C).  Such a loan must be

evidenced by a note, and "[b]efore making any such loan, the pure captive insurer shall obtain

the [DOI's] written approval to make the loan and approval for the form of the note." Id.  The

evidence is undisputed that JLH and WL Homes did not execute a note or loan agreement, with or without DOI approval.  However, there is no allegation that JLH actually made a "loan" to WL Homes and thereby violated this provision.  Moreover, there is no corollary provision that would invalidate a pledge of JLH's assets, even in the event that such a pledge is deemed to be a "loan" under such provision.

Lastly, the Trustee argues that the pledge of the JLH Account would have violated the requirement that a captive insurer obtain DOI approval "before implementing any material change in its plan of operations."  Id. § 20-1098.22.  The Trustee asserts, without any factual allegations in support thereof, that a pledge of the JLH Account "would no doubt have a material change in [JLH's] plan of operations."  In rebuttal, Wachovia contends that, following the grant of the security interest, JLH "continued its operations normally during 2008 and even realized a net profit during that year."  Neither party has proffered any evidence to corroborate their respective positions.  Accordingly, the Court finds that the Trustee has not carried its burden of establishing that the pledge of the JLH Account constitutes a "material change in its operation."

Accordingly, the Court finds that the Trustee is not entitled to summary judgment in its favor on the issue of whether the pledge of the JLH Account has violated applicable Arizona insurance law.[5]

---

[5]    Furthermore, the Court finds that to the extent that any provisions of Arizona insurance law may have been violated on account of the pledge of the JLH Account, such violations, if any, would not invalidate an otherwise valid security interest held by Wachovia.  Under California law, "a borrower cannot avoid payment on his loan on the ground that the loan was made in violation of statutory provisions regulating the maximum amount of loans which a lending institution may make," Coronet Credit Corp. v. West Thrift Co., 53 Cal. Rptr. 433, 443 (Cal. Ct. App. 1966), because such a result could inequitably reward the party who committed such a violation.  At most, JLH's violation would be redressed through statutory penalties and fines.

## 2.     JLH's Authorization and/or Ratification

The Trustee also requests summary judgment that JLH is not a party to the Loan Agreement pursuant to which Wachovia asserts its security interest in the JLH Account.  The Court notes that there is no factual dispute on the issue of whether JLH is a party to the Loan Agreement, and the Loan Agreement itself makes it abundantly clear that WL Homes and Wachovia are the only parties to this agreement.  Accordingly, the Court must grant summary judgment in the Trustee's favor on this issue.  However, the Court notes that whether JLH is a party to the Loan Agreement is immaterial to the issue of whether Wachovia has an enforceable security interest in the JLH Account.  Similarly, whether JLH has authorized and/or ratified the Loan Agreement and/or the pledge of the JLH Account as collateral is equally immaterial, so long as WL Homes has sufficient rights in the JLH Account to grant the security interest, and for the reasons articulated above, the Court has already found that WL Homes has the requisite rights to effectuate an enforceable security interest in favor of Wachovia in the JLH Account.

## V.  CONCLUSION

For the foregoing reasons, the Court will grant the motion for summary judgment filed by

Wachovia.[6]  The Court will deny the motion for summary judgment filed by the Trustee to the

extent that it seeks a declaration that Wachovia's security interest is invalid.  An appropriate

Order follows.

BY THE COURT:

Dated:        Wilmington, Delaware
              May 25, 2011                    _____
                                              Brendan Linehan Shannon
                                              United States Bankruptcy Judge

---

[6]       The Court notes that, with respect to the JLH Account, WL Homes and JLH have
asserted counterclaims against Wachovia for conversion, turnover pursuant to 11 U.S.C. § 542,
and fraudulent transfer.  Adv. Docket No. 24, ¶¶ 136-59.  These counterclaims and causes of
action are not presently before the Court in the context of the cross-motions for summary
judgment at bar.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WL HOMES, LLC, <u>et al.</u>, | ) | Case No. 09-10571 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| WACHOVIA BANK, NATIONAL | ) | Adv. No. 09-50514 |
| ASSOCIATION, a national banking | ) | |
| association, | ) | |
| | ) | Related to Docket Nos. 61, 62, 70, 71, |
| Plaintiff, | ) | and 72 |
| | ) | |
| v. | ) | |
| | ) | |
| WL HOMES, LLC (Debtor), a Delaware | ) | |
| Limited Liability Company; | ) | |
| JLH INSURANCE CORPORATION, an | ) | |
| Arizona Corporation; and | ) | |
| DOES 1 through 100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

<u>**ORDER**</u>

Upon consideration of the motion for summary judgment (the "Motion for Summary

Judgment") [Adv. Docket No. 61] filed by Wachovia Bank, National Association ("Wachovia");

the response to the Motion for Summary Judgment and the cross-motion for summary judgment

(the "Cross-Motion for Summary Judgment") [Adv. Docket No. 70] filed by George L. Miller,

Chapter 7 Trustee for the Estate of WL Homes, LLC (the "Trustee"); and the reply thereto [Adv.

Docket No. 72]; and the Court having conducted a hearing on this matter; and for the reasons set

forth in the accompanying Opinion, it is hereby

**ORDERED**, that the Motion for Summary Judgment filed by Wachovia is **GRANTED**;

and it is further

**ORDERED**, that the Cross-Motion for Summary Judgment filed by the Trustee is

**DENIED**.

BY THE COURT:

Dated:      Wilmington, Delaware
          May 25, 2011

Brendan Linehan Shannon
United States Bankruptcy Judge

# EXHIBIT 190

# Home builder John Laing files for bankruptcy

By Reuters

February 20, 2009 4:35 PM GMT-4 ·
Updated February 20, 2009

 

### Summary

Files for Chapter 11 protection

Lists assets of $1.4 bln and liabilities of $937 mln

Exiting Colorado, Arizona and Texas operations

(Changes throughout, adds background)

By Santosh Nadgir and Emily Chasan

> Get a look at the day ahead in U.S. and global markets with the Morning Bid U.S. newsletter. Sign up here.

BANGALORE/NEW YORK, Feb 20 (Reuters) - The U.S. home builder known as John Laing Homes, a unit of Dubai builder Emaar Properties , sought Chapter 11 bankruptcy protection on Thursday, citing a sharp decline in new home sales.

The company, which was acquired by Emaar for $1.05 billion in June 2006, filed its bankruptcy petition in the U.S. Bankruptcy Court in Delaware under the name WL Homes LLC, but said it does business as John Laing Homes.

---

Advertisement · Scroll to continue

about $937 million. Five U.S. affiliates of the

Exclusive news, data and analytics for financial market professionals 

Reuters    World ⌄                    My News  🔍        **Sign In**        Subscribe - $1/wk

estates.

Business ⌄

The company is exiting operations in Colorado,
Texas and Arizona and plans to focus on its
flagship homebuilding and luxury units in
Markets ⌄
Southern California, according to court papers.

The luxury unit builds homes for high-end buyers
Sustainability ⌄
with sale prices approaching $10 million per home,
it said.

Legal ⌄    More ⌄

Advertisement · Scroll to continue

After the 2006 acquisition, Emaar planned to
expand the John Laing Homes brand to a national

homebuilding platform, the company said in court papers.

In connection with these plans, John Laing Homes had built an Emaar Design Studio division and expanded to other projects, but now the company said it was "in the process of analyzing which, if any, of the Emaar-related projects will continue."

Emaar took a 750 million dirham goodwill writedown related to John Laing Homes in October last year.

In documents filed with the court, John Laing Homes said it sold about 560 homes and posted revenue of $287 million between January and November last year. It was a sharp decline from 2007 when it sold 1,371 homes and posted revenue of $948 million.

John Laing Homes said its origins dated back to 1848 in Great Britain when James Laing built his first home in the English countryside. It entered the U.S. market in 1984.

AD    00:00    Coming up: Dow notches re

The case is In re: WL Homes LLC, U.S. Bankruptcy Court, District of Delaware, No. 09-10571.

## Sponsored Content



Editing by Himani Sarkar

Our Standards: The Thomson Reuters Trust Principles. 

Suggested Topics Markets

     Purchase Licensing Rights

## Read Next

< >

ECB rate cut talk may resume after September pause, sources say

Business

Wall St Week Ahead Investors zero in on Nvidia results as US tech stocks waver

## Sponsored Content

Advertise Here

Markets ›

Markets

Cool it with the credit ratings critiques. We need them more than ever

August 22, 2025

Business

Asia's imports of US LNG to surge, but likely not enough for Trump

August 21, 2025

# Latest updates: Wall Street rallies after Powell hints at possible Fed rate cut

World · August 22, 2025 · 19 hours ago

As Fed Chairman Jerome Powell spoke at the annual conference in Wyoming, U.S. President Donald Trump threatened to fire Fed Governor Lisa Cook.

Markets

Washington's chip stakes look like industrial policy on overdrive

August 21, 2025

U.S. Markets

Fed's dilemma between AI and housing

August 20, 2025

| Latest | Browse | Media | About Reuters |
|---|---|---|---|
| Home | World |  Videos | About Reuters ↗ |
| Authors | Business |  Pictures | Advertise with Us ↗ |
| Topic Sitemap | Markets |  Graphics | Careers ↗ |
| Archive | Sustainability |  Podcasts | Reuters News Agency ↗ |
| Article Sitemap | Legal | | Brand Attribution Guidelines ↗ |
| | Breakingviews | | Reuters and AI ↗ |
| | Technology | | Reuters Leadership ↗ |
| | Investigations | | Reuters Fact Check |
| | Sports | | Reuters Diversity Report ↗ |
| | Science | | Commercial Disclosure (Japan) ↗ |
| | Lifestyle | | |

Stay Informed

Download the App (iOS) ↗

Download the App (Android) ↗

Newsletters

Subscribe

---

## Information you can trust

Reuters, the news and media division of
Thomson Reuters, is the world's largest
multimedia news provider, reaching billions
of people worldwide every day. Reuters
provides business, financial, national and
international news to professionals via
desktop terminals, the world's media
organizations, industry events and directly
to consumers.

## Follow Us



## LSEG Products

### Workspace⟐

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

### Data Catalogue⟐

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

### World-Check⟐

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us**  **Cookies**  **Terms & Conditions**  **Privacy**  **Digital Accessibility**  **Corrections**
**Advertising Guidelines**                                                                    **Site Feedback**
**Purchase Licensing Rights**  **Do Not Sell or Share My Personal Information and Limit the Use of My Sensitive Personal I**

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2025 Reuters. All rights reserved

# EXHIBIT 191

 The State Bar *of California*

Miek Debeuckelaer Harbur #279510
License Status: Active

Address: The New Home Company Inc., 18300 Von Karman Ave, Ste 1000, Irvine, CA 92612-0182
Phone: 949-382-6525  |  Fax: Not Available
Email: **mharbur@nwhm.com**  |  Website: Not Available

## More about This Attorney ☐

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney proVle page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status ☐ | Discipline ☐ | Administrative Action ☐ |
|---|---|---|---|
| Present | Active | | |
| 12/2/2011 | Admitted to the State Bar of California | | |

Additional Information:
- About the disciplinary system

Copyright © 2025 The State Bar of California

  

# EXHIBIT 192



**The New Home Company**    Priced, NYSE: NWHM

Single-family homebuilder focused on major metropolitan areas in CA.

First Day Return: **+10.9%**

Industry: Real Estate

Single-family homebuilder focused on major metropolitan areas in CA.

### IPO Data

| | |
|---|---|
| IPO Date | 01/30/2014 |
| Offer Price | IPO Intelligence Only |
| Price Range | IPO Intelligence Only |
| Offer Shares (mm) | IPO Intelligence Only |
| Deal Size ($mm) | $86 |
| Lock-Up Date | IPO Intelligence Only |
| Street Research | IPO Intelligence Only |

### Underwriters

IPO Intelligence Only

### Company Data

| | |
|---|---|
| Headquarters | Aliso Viejo, CA, United States |
| Founded | 2009 |
| Employees at IPO | 128 |
| Website | www.thenewhomecompany.com |

**IPO News** for The New Home Company

- Homebuilder Century Communities files for a $102 million IPO    05/05/14
- Health IPOs down 1% and housing IPOs trade up after heavy discount    02/13/14
- Residential insulation company Installed Building Products prices IPO at $11,  …    02/13/14
more

### The New Home Company (NWHM) Performance

NWHM vs. IPO Index (IPOUSA)



**——** Renaissance IPO Index

Our ETF tracks the IPO Index

# EXHIBIT 193

           Home  My Network  Jobs  Messaging  Notifications  Me ▾  |  For Business ▾  Try Premium for $0



## Miek Harbur
General Counsel at The New Home Company

- The New Home Company Inc.
-  University of California, Los Angeles - School of Law

Irvine, California, United States · Contact info

416 connections

Message      

---

### Activity
426 followers

Miek Harbur reposted this • 2mo

 We're excited to share that the acquisition of Landsea Homes is officially complete. With this closing, we welcome an incredible team into the New Home Co. family. Together, we move forwar …show more

 1,801                                        94 comments

Show all posts →

---

### Experience

General Counsel
The New Home Company Inc.
Jan 2016 - Present · 9 yrs 8 mos
Aliso Viejo, California

---

Corporate Associate
Gibson, Dunn & Crutcher LLP
Aug 2011 - Jan 2016 · 4 yrs 6 mos
Irvine, CA

---

Judicial Intern
U.S. Court of Appeals for the Ninth Circuit
May 2009 – Aug 2009 · 4 mos

---

### Education

University of California, Los Angeles - School of Law
JD
2008 – 2011

2008 - 2011

Activities and societies: Women's Law Journal, Writing Advisor, Graduate Assistant Tutor …

**Emory University**
B.A., Psychology
2004 - 2008

Activities and societies: Social Science research assistant, Delta Delta Delta, Psi Chi, Student Alumni Association …

## Skills

Corporate Law

Endorsed by 3 colleagues at Gibson Dunn

3 endorsements

Mergers & Acquisitions

Endorsed by 2 colleagues at Gibson Dunn

2 endorsements

Show all 10 skills →

## Languages

Dutch

## Interests

Companies    Groups    Schools

**Emory University**
220,329 followers

**Gibson Dunn**
83,292 followers

Show all companies →

US AUTO    Promoted  …

AUTO

Henry, explore relevant opportunities
with US Auto Trust

Get the latest jobs and industry news





People you may know
From Miek's school

Vincent Chang
Founder & Senior Executive | Radiopharmaceuticals & Life Science |
Global Strategy, Innovation & Cross-border Partnerships  …

Muhammad Ahmed Raza
Assistant Accountant

Agustian candra
Working as a salesman in Bravo Tecnology Company

Audrey Lopez
Paralegal

GURMU DARAJE
Healthcare Innovation | Driving Digital Transformation & Patient-
Centered Care …

Show all

About                          Accessibility              Talent Solutions

Professional Community         Careers                    Marketing Solutions
Policies

Privacy & Terms  ▼            Ad Choices                 Advertising

Sales Solutions                Mobile                     Small Business

Safety Center

LinkedIn Corporation © 2025

 Questions?
Visit our Help Center.

 Manage your account and privacy
Go to your Settings.

Recommendation transparency
Learn more about Recommended Content.

Select Language

# EXHIBIT 194

IF 5 - 990288



## State of California
### Secretary of State
#### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

[D]

31 Lu

**FILED**
Secretary of State
State of California

**MAY 2 1 2015**

1.50 / pu

This Space For Filing Use Only

**There is no fee for filing the Corporate Disclosure Statement.**

**IMPORTANT — PLEASE READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**1. CORPORATE NAME**

THE NEW HOME COMPANY INC.
C3642213

**Independent Auditor**

**2.** NAME OF THE INDEPENDENT AUDITOR THAT PREPARED THE MOST RECENT AUDITOR'S REPORT
Ernst & Young LLP

**3.** DESCRIPTION OF OTHER SERVICES, IF ANY, PERFORMED BY THE INDEPENDENT AUDITOR NAMED IN ITEM 2
Services in connection with statutory and regulatory filings; tax compliance; tax advice and planning services.

**4.** NAME OF THE INDEPENDENT AUDITOR EMPLOYED BY THE CORPORATION ON THE DATE OF THIS STATEMENT, IF DIFFERENT FROM ITEM 2

**Directors and Executive Officers**

**5.** NAMES OF DIRECTORS

| | | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | H. Lawrence Webb (also CEO under 6b) | $1,414,199 | 0 | 227,273 | ☐YES ☑NO | ☐YES ☑NO |
| 2) | Wayne Stelmar | $1,183,973 | 0 | 181,818 | ☐YES ☑NO | ☐YES ☑NO |
| 3) | David Berman | $99,995 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, COMPLETE ITEM B OF THE ATTACHMENT (FORM SI-PTA).

**6a.** NAMES OF EXECUTIVE OFFICERS

| | | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | Joseph D. Davis | $1,194,916 | 0 | 181,818 | ☐YES ☑NO | ☐YES ☑NO |
| 2) | Tom Redwitz | $1,183,973 | 0 | 181,818 | ☐YES ☑NO | ☐YES ☑NO |
| 3) | Kevin Carson | $460,351 | 5,000 | 12,000 | ☐YES ☑NO | ☐YES ☑NO |
| 4) | Andrew J. Jarvis | $397,411 | 7,280 | 4,550 | ☐YES ☑NO | ☐YES ☐NO |
| 5) | | | | | ☐YES ☐NO | ☐YES ☐NO |

**6b.** CHIEF EXECUTIVE OFFICER (if not named in 6a)

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| H. Lawrence Webb | $1,414,199 | 0 | 227,273 | ☐YES ☑NO | ☐YES ☑NO |

**6c.** ADDITIONAL EXECUTIVE OFFICERS (if not named in 6a or 6b)

| | | BANKRUPTCY | FRAUD |
|---|---|---|---|
| 1) | | ☐BANKRUPTCY | ☐FRAUD |
| 2) | | ☐BANKRUPTCY | ☐FRAUD |
| 3) | | ☐BANKRUPTCY | ☐FRAUD |

IF MORE SPACE IS NEEDED, ENTER ADDITIONAL INFORMATION IN ITEM D OF THE ATTACHMENT (FORM SI-PTA).

**Loans to Members of the Board of Directors**

**7.** NAMES OF DIRECTORS    DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS)

1)
2)
3)

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, COMPLETE ITEM C OF THE ATTACHMENT (FORM SI-PTA).

**Additional Statutory Disclosures**

**8.** Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years?   ☐YES ☑NO

**9.** Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description.   ☐YES ☑NO

**10.** Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description.   ☐YES ☑NO

**11.** By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| Wayne Stelmar | | CFO | 5/21/15 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM. | SIGNATURE | TITLE | DATE |

SI-PT (REV 01/2013)    APPROVED BY SECRETARY OF STATE

15-990288



# State of California
## Secretary of State

### Attachment to
### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

This Space For Filing Use Only

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**A. CORPORATE NAME**   THE NEW HOME COMPANY INC.
C3642213

**B. Additional Directors** (Continued from Item 5 on Form SI-PT)

| | NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 4) | Douglas C. Neff | $99,995 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 5) | Nadine Watt | $99,995 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 6) | Sam Bakhshandehpour | $114,495 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 7) | Michael Berchtold | $612,495 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 8) | Gregory P. Lindstrom | $114,495 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 9) | Paul Heeschen | $105,995 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 10) | Cathey S. Lowe | $119,495 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 11) | William A. Witte | $117,495 | 5,041 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 12) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 13) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 14) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 15) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 16) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 17) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 18) | | | | | ☐YES ☐NO | ☐YES ☐NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**C. Additional Loans to Members of the Board of Directors** (Continued from Item 7 on Form SI-PT)

| | NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|---|
| 4) | | |
| 5) | | |
| 6) | | |
| 7) | | |
| 8) | | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**D. Additional Information** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

Item 5 of Form SI-PT and SI-PTA: Non-employee director compensation includes (i) payment of annual cash retainer for attendance at board and committee meetings during 2014, (ii) reimbursement for reasonable expenses incurred by non-employee directors in connection with duties as a director, and (iii) the grant date fair value of the listed shares or options which were awarded under the Company's 2014 Long-Term Incentive Plan. Compensation paid to Mr. Berchtold includes items (i) through (iii) plus advisory fees paid to Berchtold Capital Partners, an entity owned by Mr. Berchtold, for services in connection with the the Company's 2014 initial public offering.

Item 6a and 6b of Form SI-PT: Executive officer compensation includes (i) base salary, (ii) bonus, if applicable, (iii) Company 401(k) matching contribution, if applicable, and (iv) the grant date fair value of the listed shares or options which were awarded under the Company's 2014 Long-Term Incentive Plan.

SI-PTA (REV 01/2013)                                              APPROVED BY SECRETARY OF STATE

 **State of California** **D**

**Secretary of State**

**Corporate Disclosure Statement**
(Domestic Stock and Foreign Corporations)

 43

16-990283

**FILED**
Secretary of State
State of California

**MAY 19 2016**

This Space For Filing Use Only

There is no fee for filing the Corporate Disclosure Statement.

**IMPORTANT — PLEASE READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. **CORPORATE NAME**

   The New Home Company Inc.
   C3642213

**Independent Auditor**

2. NAME OF THE INDEPENDENT AUDITOR THAT PREPARED THE MOST RECENT AUDITOR'S REPORT
   Ernst & Young LLP

3. DESCRIPTION OF OTHER SERVICES, IF ANY, PERFORMED BY THE INDEPENDENT AUDITOR NAMED IN ITEM 2
   Services in connection with statutory and regulatory filings; capital markets transactions; tax compliance; tax advice and planning

4. NAME OF THE INDEPENDENT AUDITOR EMPLOYED BY THE CORPORATION ON THE DATE OF THIS STATEMENT, IF DIFFERENT FROM ITEM 2

**Directors and Executive Officers**

5. NAMES OF DIRECTORS

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | | FRAUD | |
|---|---|---|---|---|---|---|---|
| 1) H. Lawrence Webb (also CEO see 6b) | $1,625,382 | 43,952 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 2) Wayne Stelmar (also CIO) | $1,241,717 | 35,126 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 3) David Berman | $99,994 | 4,219 | 0 | ☐YES ☑NO | ☐YES ☑NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, COMPLETE ITEM B OF THE ATTACHMENT (FORM SI-PTA).

6a. NAMES OF EXECUTIVE OFFICERS

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | | FRAUD | |
|---|---|---|---|---|---|---|---|
| 1) Tom Redwitz | $1,241,717 | 35,126 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 2) John Stephens | $615,948 | 14,318 | 0 | ☐YES ☑NO | ☐YES ☑NO |
| 3) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 4) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 5) | | | | ☐YES ☐NO | ☐YES ☐NO |

6b. CHIEF EXECUTIVE OFFICER (if not named in 6a)

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | | FRAUD | |
|---|---|---|---|---|---|---|---|
| H. Lawrence Webb | $1,625,382 | 43,952 | | ☐YES ☑NO | ☐YES ☑NO |

6c. ADDITIONAL EXECUTIVE OFFICERS (if not named in 6a or 6b)

| | | | |
|---|---|---|---|
| 1) | | ☐BANKRUPTCY | ☐FRAUD |
| 2) | | ☐BANKRUPTCY | ☐FRAUD |
| 3) | | ☐BANKRUPTCY | ☐FRAUD |

IF MORE SPACE IS NEEDED, ENTER ADDITIONAL INFORMATION IN ITEM D OF THE ATTACHMENT (FORM SI-PTA).

**Loans to Members of the Board of Directors**

7. NAMES OF DIRECTORS                DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS)

   1)
   2)
   3)

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, COMPLETE ITEM C OF THE ATTACHMENT (FORM SI-PTA).

**Additional Statutory Disclosures**

8. Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? ☐YES ☑NO

9. Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. ☐YES ☑NO

10. Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. ☐YES ☑NO

11. By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| John M. Stephens | | CFO | 5/13/16 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

SI-PT (REV 01/2013)                                                          APPROVED BY SECRETARY OF STATE

16-990283



# State of California
## Secretary of State

**Attachment to
Corporate Disclosure Statement**
(Domestic Stock and Foreign Corporations)

This Space For Filing Use Only

| IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM |
|---|

**A. CORPORATE NAME**   The New Home Company Inc.
C3642213

**B. Additional Directors** (Continued from Item 5 on Form SI-PT)

| | NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | | FRAUD | |
|---|---|---|---|---|---|---|---|---|
| 4) | Douglas C. Neff | $99,994 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 5) | Nadine Watt | $99,994 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 6) | Sam Bakhshandehpour | $114,494 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 7) | Michael Berchtold | $99,994 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 8) | Gregory P. Lindstrom | $114,494 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 9) | Paul Heeschen | $105,994 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 10) | Cathey S. Lowe | $119,494 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 11) | William A. Witte | $117,494 | 4,219 | 0 | ☐YES ☑NO | | ☐YES ☑NO | |
| 12) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 13) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 14) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 15) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 16) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 17) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |
| 18) | | | | | ☐YES ☐NO | | ☐YES ☐NO | |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**C. Additional Loans to Members of the Board of Directors** (Continued from Item 7 on Form SI-PT)

| | NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|---|
| 4) | | |
| 5) | | |
| 6) | | |
| 7) | | |
| 8) | | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**D. Additional Information** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

SI-PTA (REV 01/2013)                                                                 APPROVED BY SECRETARY OF STATE

2/2



# State of California

## Secretary of State

### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

**D**

17-990465

**FILED**
Secretary of State
State of California

JUN 0 1 2017

There is no fee for filing the Corporate Disclosure Statement.

**IMPORTANT — PLEASE READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. CORPORATE NAME

The New Home Company Inc.
C3642213

This Space For Filing Use Only

**Independent Auditor**

2. NAME OF THE INDEPENDENT AUDITOR THAT PREPARED THE MOST RECENT AUDITOR'S REPORT
Ernst & Young LLP

3. DESCRIPTION OF OTHER SERVICES, IF ANY, PERFORMED BY THE INDEPENDENT AUDITOR NAMED IN ITEM 2
Services in connection with statutory and regulatory filings; capital markets transactions; tax compliance; tax advice and planning

4. NAME OF THE INDEPENDENT AUDITOR EMPLOYED BY THE CORPORATION ON THE DATE OF THIS STATEMENT, IF DIFFERENT FROM ITEM 2

**Directors and Executive Officers**

5. NAMES OF DIRECTORS

| | | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | H. Lawrence Webb (also CEO see 6b) | $2,004,030 | 62,189 | | ☐YES ☑NO | ☐YES ☑NO |
| 2) | Wayne Stelmar (former exec. officer) | $1,149,179 | 42,985 | | ☐YES ☑NO | ☐YES ☑NO |
| 3) | David Berman | $104,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, COMPLETE ITEM B OF THE ATTACHMENT (FORM SI-PTA).

6a. NAMES OF EXECUTIVE OFFICERS

| | | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | Tom Redwitz | $1,151,999 | 42,985 | | ☐YES ☑NO | ☐YES ☑NO |
| 2) | John Stephens | $1,170,966 | 42,985 | | ☐YES ☑NO | ☐YES ☑NO |
| 3) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 4) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 5) | | | | | ☐YES ☐NO | ☐YES ☐NO |

6b. CHIEF EXECUTIVE OFFICER (If not named in 6a)

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| H. Lawrence Webb | 2,004,030 | 62,189 | | ☐YES ☑NO | ☐YES ☑NO |

6c. ADDITIONAL EXECUTIVE OFFICERS (if not named in 6a or 6b)

| | | BANKRUPTCY | FRAUD |
|---|---|---|---|
| 1) | | ☐BANKRUPTCY | ☐FRAUD |
| 2) | | ☐BANKRUPTCY | ☐FRAUD |
| 3) | | ☐BANKRUPTCY | ☐FRAUD |

IF MORE SPACE IS NEEDED, ENTER ADDITIONAL INFORMATION IN ITEM D OF THE ATTACHMENT (FORM SI-PTA).

**Loans to Members of the Board of Directors**

7. NAMES OF DIRECTORS          DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS)

1)
2)
3)

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, COMPLETE ITEM C OF THE ATTACHMENT (FORM SI-PTA).

**Additional Statutory Disclosures**

| 8. | Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? | ☐YES ☑NO |
|---|---|---|
| 9. | Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. | ☐YES ☑NO |
| 10. | Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. | ☐YES ☑NO |

11. By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| LAIEK HARBAUR | | Secretary | 5/24/17 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

| SI-PT (REV 01/2013) | 1/2 | APPROVED BY SECRETARY OF STATE |
|---|---|---|



# State of California
## Secretary of State

**17-990465**

### Attachment to
### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

This Space For Filing Use Only

## IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

**A. CORPORATE NAME** The New Home Company Inc.
C3642213

**B. Additional Directors** (Continued from Item 5 on Form SI-PT)

| NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| 4) Douglas C. Neff | $119,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 5) Nadine Watt | $104,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 6) Sam Bakhshandehpour | $119,499 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 7) Michael Berchtold | $120,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 8) Gregory P. Lindstrom | $125,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 9) Paul Heeschen | $110,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 10) Cathey S. Lowe | $130,999 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 11) William A. Witte | $128,499 | 5,970 | | ☐YES ☑NO | ☐YES ☑NO |
| 12) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 13) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 14) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 15) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 16) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 17) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 18) | | | | ☐YES ☐NO | ☐YES ☐NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**C. Additional Loans to Members of the Board of Directors** (Continued from Item 7 on Form SI-PT)

| NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|
| 4) | |
| 5) | |
| 6) | |
| 7) | |
| 8) | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**D. Additional Information** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

SI-PTA (REV 01/2013)                    2/2                    APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State
### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

D

T8-990440

**FILED**
Secretary of State
State of California

MAY 2 9 2018

There is no fee for filing the Corporate Disclosure Statement.

**IMPORTANT — PLEASE READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. CORPORATE NAME

   The New Home Company Inc.
   C3642213

   This Space For Filing Use Only

**Independent Auditor**

2. NAME OF THE INDEPENDENT AUDITOR THAT PREPARED THE MOST RECENT AUDITOR'S REPORT
   Ernst & Young LLP

3. DESCRIPTION OF OTHER SERVICES, IF ANY, PERFORMED BY THE INDEPENDENT AUDITOR NAMED IN ITEM 2
   Audit services in connection with statutory and regulatory filings; capital markets transactions; tax compliance; tax advice & planning

4. NAME OF THE INDEPENDENT AUDITOR EMPLOYED BY THE CORPORATION ON THE DATE OF THIS STATEMENT, IF DIFFERENT FROM ITEM 2

**Directors and Executive Officers**

5. NAMES OF DIRECTORS

| | NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | H. Lawrence Webb (also CEO see 6b) | $2,669,371 | 75,839 | | ☐YES ☑NO | ☐YES ☑NO |
| 2) | Wayne Stelmar | $406,861 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 3) | David Berman | $104,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, COMPLETE ITEM B OF THE ATTACHMENT (FORM SI-PTA).

6a. NAMES OF EXECUTIVE OFFICERS

| | NAMES OF EXECUTIVE OFFICERS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| 1) | Tom Redwitz | $1,532,915 | 46,641 | | ☐YES ☑NO | ☐YES ☑NO |
| 2) | John Stephens | $1,399,660 | 40,298 | | ☐YES ☑NO | ☐YES ☑NO |
| 3) | Leonard Miller | $1,085,510 | 37,173 | | ☐YES ☑NO | ☐YES ☑NO |
| 4) | | | | | ☐YES ☐NO | ☐YES ☐NO |
| 5) | | | | | ☐YES ☐NO | ☐YES ☐NO |

6b. CHIEF EXECUTIVE OFFICER (if not named in 6a)

| | | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|---|
| | H. Lawrence Webb | $2,669,371 | 75,839 | | ☐YES ☑NO | ☐YES ☑NO |

6c. ADDITIONAL EXECUTIVE OFFICERS (if not named in 6a or 6b)

| | | BANKRUPTCY | FRAUD |
|---|---|---|---|
| 1) | | ☐BANKRUPTCY | ☐FRAUD |
| 2) | | ☐BANKRUPTCY | ☐FRAUD |
| 3) | | ☐BANKRUPTCY | ☐FRAUD |

IF MORE SPACE IS NEEDED, ENTER ADDITIONAL INFORMATION IN ITEM D OF THE ATTACHMENT (FORM SI-PTA).

**Loans to Members of the Board of Directors**

7. NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS)

| | NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|---|
| 1) | | |
| 2) | | |
| 3) | | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, COMPLETE ITEM C OF THE ATTACHMENT (FORM SI-PTA).

**Additional Statutory Disclosures**

| 8. | Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? | ☐YES ☑NO |
|---|---|---|
| 9. | Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. | ☐YES ☑NO |
| 10. | Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. | ☐YES ☑NO |

11. By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| Miek Harbur | | Secretary | 5/24/18 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

SI-PT (REV 01/2013) | APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State

**T8-990440**

### Attachment to
### Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)

This Space For Filing Use Only

| IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM |
|---|

**A. CORPORATE NAME**   The New Home Company Inc.
C3642213

**B. Additional Directors** (Continued from Item 5 on Form SI-PT)

| NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| 4) Douglas C. Neff | $119,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 5) Nadine Watt | $104,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 6) Sam Bakhshandehpour | $119,490 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 7) Michael Berchtold | $119,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 8) Gregory P. Lindstrom | $125,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 9) Paul C. Heeschen | $110,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 10) Cathey Lowe | $130,990 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 11) William A. Witte | $128,490 | 5,071 | | ☐YES ☑NO | ☐YES ☑NO |
| 12) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 13) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 14) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 15) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 16) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 17) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 18) | | | | ☐YES ☐NO | ☐YES ☐NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**C. Additional Loans to Members of the Board of Directors** (Continued from Item 7 on Form SI-PT)

| NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|
| 4) | |
| 5) | |
| 6) | |
| 7) | |
| 8) | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**D. Additional Information** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

1/2

SI-PTA (REV 01/2013)

APPROVED BY SECRETARY OF STATE



**State of California**
**Secretary of State**

**Corporate Disclosure Statement**
(Domestic Stock and Foreign Corporations)

17 D

I9-990559

**FILED**
Secretary of State
State of California

**JUN 1 0 2019**

There is no fee for filing the Corporate Disclosure Statement.

**IMPORTANT — Please read Instructions before completing this form**

| 1. Corporate Name |
|---|
| The New Home Company Inc.<br>C3642213 |

This Space For Office Use Only

**Independent Auditor**

2. Name of the Independent Auditor that prepared the most recent auditor's report  Ernst & Young LLP

3. Description of other services, if any, performed by the Independent Auditor named in Item 2

*Audit services in connection with statutory and regulatory filings (See SI-PTA Item D)*

4. Name of the Independent Auditor employed by the Corporation on the date of this statement, if different from Item 2

5a. Does the Corporation's most current SEC Form 10-K filing list a California Principal Executive Address?
☑ Yes. Proceed to Item #5b
☐ No. Proceed to Item #6

5b. Does the Corporation have 1 or more female Director on its current Board of Directors? ☑ Yes ☐ No

**Directors and Executive Officers**

| 6. Names of Directors | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|
| 1) H. Lawrence Webb (also CEO see 7b) | $1,612,787 | 77,910 | | ☐Yes | ☑No | ☐Yes | ☑No |
| Complete Item B of the attachment (Form SI-PTA), for additional Directors | | | | | | | |

| 7a. Names of Executive Officers | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|
| 1) Tom Redwitz | $989,986 | 37,690 | | ☐Yes | ☑No | ☐Yes | ☑No |
| 2) John Stephens | $1,095,927 | 34,245 | | ☐Yes | ☑No | ☐Yes | ☑No |
| 3) Leonard Miller | $1,080,660 | 34,245 | | ☐Yes | ☑No | ☐Yes | ☑No |
| 4) | | | | ☐Yes | ☐No | ☐Yes | ☐No |
| 5) | | | | ☐Yes | ☐No | ☐Yes | ☐No |

| 7b. Chief Executive Officer (if not named in 7a) | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|
| H. Lawrence Webb | $1,612,787 | | | ☐Yes | ☑No | ☐Yes | ☑No |

7c. Additional Executive Officers (if not named in 7a or 7b)

| 1) _____ | ☐ Bankruptcy | ☐ Fraud |
|---|---|---|
| 2) _____ | ☐ Bankruptcy | ☐ Fraud |
| 3) _____ | ☐ Bankruptcy | ☐ Fraud |

If more space is needed, enter additional information in Item D of the attachment (Form SI-PTA).

**Loans to Members of the Board of Directors**

8. Names of Directors          Description of Loan (including amount and terms)

1) _____

If the Corporation has made additional loans to Directors, Complete Item C of the attachment (Form SI-PTA).

**Additional Statutory Disclosures**

| 9. Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? | ☐Yes | ☑No |
|---|---|---|
| 10. Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. | ☐Yes | ☑No |
| 11. Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. | ☐Yes | ☑No |

12. By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

Miek Harbur                              Secretary              6/7/2019

Type or Print Name of Person Completing the Form     Signature          Title          Date

SI-PT (REV 03/2019)                                    APPROVED BY SECRETARY OF STATE

1/2

19-990559



## State of California
### Secretary of State

**Attachment to
Corporate Disclosure Statement
(Domestic Stock and Foreign Corporations)**

This Space For Office Use Only

**IMPORTANT — Please read instructions before completing this form**

**A. Corporate Name**

The New Home Company Inc.
C3642213

**B. Additional Directors** (Continued from Item 6 on Form SI-PT)

| Names of Directors | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|
| 2) Wayne Stelmar | $214,562 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 3) Gregory P. Lindstrom | $125,999 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 4) Cathey Lowe | $130,999 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 5) Douglas C. Neff | $119,999 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 6) Sam Bakhshandehpour | $119,499 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 7) Michael Berchtold | $139,541 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 8) Paul C. Heeschen | $119,749 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 9) William A. Witte | $116,749 | 5,982 | | ☐ Yes ☑ No | | ☐ Yes ☑ No | |
| 10) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 11) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 12) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 13) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 14) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 15) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 16) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 17) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |
| 18) | | | | ☐ Yes ☐ No | | ☐ Yes ☐ No | |

If the Corporation has additional Directors, attach additional pages as needed.

**C. Additional Loans to Members of the Board of Directors** (Continued from Item 8 on Form SI-PT)

| Names of Directors | Description of Loan (including amount and terms) |
|---|---|
| 2) | |
| 3) | |
| 4) | |
| 5) | |
| 6) | |
| 7) | |
| 8) | |

If the Corporation has made additional loans to Directors, attach additional pages as needed.

**D. Additional Information** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

Item 3 (continued) Capital markets transactions;tax compliance; tax advice & planning

2/2

SI-PTA (REV 12/2018)                    APPROVED BY SECRETARY OF STATE

20-990384

| | Secretary of State | SI-PT |
|---|---|---|
| | **Corporate Disclosure Statement**<br>**(Domestic Stock and Foreign**<br>**Corporations)** | **94** |

**FILED**
Secretary of State
State of California

**MAY 28 2020**

This Space For Office Use Only

**IMPORTANT -** Read Instructions before completing this form.

**Filing Fee** – There is no fee for filing the Corporate Disclosure Statement.

**Copy Fees** – First page $1.00; each additional page $0.50;
Certification Fee - $5.00

---

**1. Corporate Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State.)

The New Home Company Inc.

**2. 7-Digit Secretary of State Entity (File) Number**

| C | 3 | 6 | 4 | 2 | 2 | 1 | 3 |
|---|---|---|---|---|---|---|---|

**3. Jurisdiction** (Enter the state, foreign country or other place where the corporation is formed)

Delaware

**4. Independent Auditor**

**4a.** Name of the Independent Auditor that prepared the most recent auditor's report.

Ernst & Young LLP

**4b.** Description of other services, if any, performed by the Independent Auditor named in Item 4a.

Audit services in connection with statutory and regulatory filings (see attachment)

**4c.** Name of the Independent Auditor employed by the corporation on the date of this statement, if different from Item 4a.

KPMG LLP

**5. Reporting Compliance with California Corporations Code Sections 301.3 and 2115.5.**

**5a.** Check the applicable statement for the **current calendar year** (select only one box):

☑ The corporation has **not** moved its principal executive office either into California from another state or out of California into another state.

☐ The corporation has moved its principal executive office **into** California from another state.

☐ The corporation has moved its principal executive office **out** of California into another state.

**5b. Total number of directors** on the corporation's **current** Board of Directors (select only one box):

☑ 6 or more
☐ 5
☐ 4 or fewer

**5c.** Number of female directors on the corporation's **current** Board of Directors (select only one box):

☐ 3 or more
☐ 2
☑ 1
☐ 0

**6. Required Statutory Disclosures**

**6a.** Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? ☐ Yes ☑ No

**6b.** Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. ☐ Yes ☑ No

**6c.** Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. ☐ Yes ☑ No

**- CONTINUE ON NEXT PAGE -**
(Page 1 of 2)

20-990384

**Corporate Disclosure Statement**
(Domestic Stock and Foreign Corporations)
(Page 2 of 2)

**7. Directors**

| | Names of Directors | Compensation | Shares | Options | Bankruptcy | Fraud |
|---|---|---|---|---|---|---|
| 1) | Paul C. Heeschen | $137,692 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 2) | Gregory P. Lindstrom | $131,720 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 3) | Cathey Lowe | $139,220 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 4) | Douglas C. Neff | $112,081 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 5) | Sam Bakshandehpour | $125,970 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 6) | Michael Berchtold | $142,345 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 7) | Wayne Stelmar | $169,325 | 13,043 | | ☐Yes ☑No | ☐Yes ☑No |
| 8) | H. Lawrence Webb | $1,027,531 | 38,242 | 81,801 | ☐Yes ☑No | ☐Yes ☑No |
| 9) | William Witte | $28,805 | | | ☐Yes ☑No | ☐Yes ☑No |
| 10) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 11) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 12) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 13) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 14) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 15) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 16) | | | | | ☐Yes ☐No | ☐Yes ☐No |

**8. Executive Officers**

| 8a. | Names of Executive Officers | Compensation | Shares | Options | Bankruptcy | Fraud |
|---|---|---|---|---|---|---|
| 1) | Leonard S. Miller | $1,519,819 | 118,836 | 74,984 | ☐Yes ☑No | ☐Yes ☑No |
| 2) | John M. Stephens | $1,400,325 | 115,068 | 59,987 | ☐Yes ☑No | ☐Yes ☑No |
| 3) | Thomas Redwitz | $1,385,985 | | | ☐Yes ☑No | ☐Yes ☑No |
| 4) | | | | | ☐Yes ☐No | ☐Yes ☐No |
| 5) | | | | | ☐Yes ☐No | ☐Yes ☐No |

| 8b. | Chief Executive Officer (if not named in 8a) | Compensation | Shares | Options | Bankruptcy | Fraud |
|---|---|---|---|---|---|---|
| | | | | | ☐Yes ☑No | ☐Yes ☑No |

| 8c. | Additional Executive Officers (if not named in 8a or 8b) | | |
|---|---|---|---|
| 1) | | ☐Bankruptcy | ☐Fraud |
| 2) | | ☐Bankruptcy | ☐Fraud |
| 3) | | ☐Bankruptcy | ☐Fraud |

**9. Loans to Members of the Board of Directors**

| | Names of Directors | Description of Loan including Amount and Terms |
|---|---|---|
| 1) | | |
| 2) | | |

If additional space is needed, place the additional information on only one side of a standard letter-sized piece of paper (8 ½ x 11) clearly marked as an attachment to the Corporate Disclosure Statement and attach the extra page(s) to the completed Corporate Disclosure Statement.

By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| Miek Harbur | | Secretary | 5/27/2020 |
|---|---|---|---|
| Type or Print Name of Person Completing the Form | Signature | Title | Date |

SI-PT (REV 12/2019)

2019 California Secretary of State
bizfile.sos.ca.gov

2/3

20-990384

**Attachment to the Corporate Disclosure Statement**

Item 4b. (continued) *Capital markets transactions; tax compliance; tax advice & planning*

Item 7. The term of William Witte expired on May 21, 2019 as he was not renominated for reelection at our 2019 Annual Meeting of Stockholders.

3/3

21-995221

**Secretary of State**

**Corporate Disclosure Statement**

**(Domestic Stock and Foreign Corporations)**

SI-PT

**FILED**
Secretary of State
State of California
05/21/2021
Filing Date

This Space For Office Use Only

**IMPORTANT -** <u>Read Instructions</u> before completing this form.

**Filing Fee** – There is no fee for filing the Corporate Disclosure Statement.

**Copy Fees** – First page $1.00; each additional page $0.50;
Certification Fee - $5.00

1. **Corporate Name** (Enter the **exact** name of the corporation as it is recorded with the California Secretary of State.)

## The New Home Company Inc.

| 2. **7-Digit Secretary of State Entity Number** | 3. **Jurisdiction** (Enter the state, foreign country or other place where the corporation is formed.) |
|---|---|
| C3642213 | Delaware |

4. **Independent Auditor**

4a. Name of the Independent Auditor that prepared the most recent auditor's report.

## KPMG LLP

4b. Description of other services, if any, performed by the Independent Auditor named in Item 4a.

Audit services in connection with statutory and regulatory filings; capital markets transactions; tax compliance; tax advice & planning

4c. Name of the Independent Auditor employed by the corporation on the date of this statement, if different from Item 4a.

5. **Board Diversity**

5a. Check the applicable statement for the **current** calendar year (select only one box):

[ ] The corporation has **not** moved its principal executive office either into California from another state or out of California into another state.

[ ] The corporation has moved its principal executive office **into** California from another state.

[✓] The corporation has moved its principal executive office **out** of California into another state.

| 5b. **Total** number of directors on the corporation's **current** Board of Directors (select only one box): | 5c. Number of **female** directors on the corporation's **current** Board of Directors (select only one box): | 5d. Number of directors from **underrepresented communities** on the corporation's **current** Board of Directors (select only one box): |
|---|---|---|
| [ ] 9 or more | [ ] 3 or more | [ ] 3 or more |
| [✓] 8 | [ ] 2 | [ ] 2 |
| [ ] 7 | [✓] 1 | [✓] 1 |
| [ ] 6 | [ ] 0 | [ ] 0 |
| [ ] 5 | | |
| [ ] 4 or fewer | | |

6. **Required Statutory Disclosures**

| 6a. Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years? | [ ] Yes [✓] No |
|---|---|
| 6b. Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K? If yes, attach a description. | [ ] Yes [✓] No |
| 6c. Has the corporation been found legally liable in any material legal proceeding during the preceding five years? If yes, attach a description. | [ ] Yes [✓] No |

**- CONTINUE ON NEXT PAGE -**
**(Page 1 of 2)**

21-995221

## Corporate Disclosure Statement
### (Domestic Stock and Foreign Corporations)
### (Page 2 of 2)

**7. Directors**

| | Names of Directors | Compensation | Shares | Option | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Yes | No | Yes | No |
| 1) | Sam Bakhshandehpour | $131,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 2) | Michael Berchtold | $135,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 3) | Paul C. Heeschen | $145,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 4) | Gregory P. Lindstrom | $136,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 5) | Cathey Lowe | $146,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 6) | Douglas C. Neff | $104,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 7) | Wayne Stelmar | $104,997 | 16,759 | | ☐ | ☑ | ☐ | ☑ |
| 8) | H. Lawrence Webb | $1,117,615 | 44,571 | 57,534 | ☐ | ☑ | ☐ | ☑ |
| 9) | | | | | ☐ | ☐ | ☐ | ☐ |
| 10) | | | | | ☐ | ☐ | ☐ | ☐ |
| 11) | | | | | ☐ | ☐ | ☐ | ☐ |
| 12) | | | | | ☐ | ☐ | ☐ | ☐ |
| 13) | | | | | ☐ | ☐ | ☐ | ☐ |
| 14) | | | | | ☐ | ☐ | ☐ | ☐ |
| 15) | | | | | ☐ | ☐ | ☐ | ☐ |
| 16) | | | | | ☐ | ☐ | ☐ | ☐ |

**8. Executive Officers**

| 8. | Names of Executive Officers | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Yes | No | Yes | No |
| 1) | Leonard S. Miller | $1,469,296 | 44,571 | 57,534 | ☐ | ☑ | ☐ | ☑ |
| 2) | John M. Stephens | $1,252,944 | 33,954 | 46,411 | ☐ | ☑ | ☐ | ☑ |
| 3) | | | | | ☐ | ☐ | ☐ | ☐ |
| 4) | | | | | ☐ | ☐ | ☐ | ☐ |
| 5) | | | | | ☐ | ☐ | ☐ | ☐ |

| 8b. | Chief Executive Officer (if not named in 8a) | Compensation | Shares | Options | Bankruptcy | | Fraud | |
|---|---|---|---|---|---|---|---|---|
| | | | | | ☐Yes | ☐No | ☐Yes | ☐No |

| 8c. | Additional Executive Officers (if not named in 8a or 8b) | | |
|---|---|---|---|
| 1) | | ☐ Bankruptcy | ☐ Fraud |
| 2) | | ☐ Bankruptcy | ☐ Fraud |
| 3) | | ☐ Bankruptcy | ☐ Fraud |

**9. Loans to Members of the Board of Directors**

| | Names of Directors | Description of Loan including Amount and Terms |
|---|---|---|
| 1) | | |
| 2) | | |

If additional space is needed, place the additional information on only one side of a standard letter-sized piece of paper (8 ½ x 11) clearly marked as an attachment to the Corporate Disclosure Statement and attach the extra page(s) to the completed Corporate Disclosure Statement.

By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

| Miek Harbur | | Secretary | 5/21/2021 |
|---|---|---|---|
| Type or Print Name of Person Completing the Form | Signature | Title | Date |

2020 California Secretary of State
bizfile.sos.ca.gov

# EXHIBIT 195

# ReedSmith

January 2005
Bulletin 05-02

## Summary of
## Amended California Corporate Disclosure Act

If you have questions or would like additional information on the material covered in this Bulletin, please contact one of the authors:

John M. Iino
(Century City)
310.734.5251
jiino@reedsmith.com

Robert M. Smith
(San Francisco)
415.659.5955
rsmith@reedsmith.com

… or the Reed Smith attorney with whom you regularly work.

On September 27, 2004, California Governor Arnold Schwarzenegger signed into law Assembly Bill 1000, amending the disclosure and timing requirements of the California Corporate Disclosure Act (the "Act"), which was originally enacted in late 2002. The Act continues to require all California corporations and foreign corporations (i.e., non-California corporations) qualified to do business in California ("foreign corporations") to make basic disclosures on an annual basis on forms prescribed by the California Secretary of State ("Secretary of State"). The Act requires those corporations that are also publicly traded to make additional disclosures, known as public company disclosures. The amendments principally affect the latter type of disclosures, and, for this reason, publicly traded corporations falling within the Act should pay special attention to the new amendments. The amendments clarify some, but not all, of the ambiguities present in the original Act relating to public company disclosures, expand on some of the disclosure requirements, and impose a new filing period for these types of disclosures that is different and separate from the filing period applicable for basic disclosures. The amendments took effect immediately. The following is a summary of the current law with a brief analysis of the differences between the old Act and the amended Act.

### The Original California Disclosure Act

The original California Disclosure Act, effective on January 1, 2003, was enacted as a response to the collapse of Enron and other business scandals that prompted the enactment of the Sarbanes-Oxley Act of 2002. In its original form, the Act imposed disclosure requirements that duplicated and, in some instances, exceeded the reporting requirements of the Securities and Exchange Commission (the "SEC"). A detailed discussion of the original Act and a comparison of its requirements against federal law are available on our website at www.reedsmith.com/library/publicationView.cfm?itemid=9589.

### Who Must Comply

**California Corporations**—All California corporations must comply with the basic disclosure requirements discussed below, which are set forth in Section 1502 of the California Corporations Code (the "Code"). California corporations that are also "publicly traded" must also comply with the public company disclosure requirements set forth in newly enacted Section 1502.1 of the Code.

**Foreign Corporations**—All foreign corporations (i.e., non-California corporations) qualified to do business in California must also comply with the basic disclosure requirements discussed below, which are set forth in Section 2117 of the Code. Such foreign corporations that are also "publicly traded" must comply with the public company disclosure requirements set forth in newly enacted Section 2117.1 of the Code.

LONDON
NEW YORK
LOS ANGELES
SAN FRANCISCO
WASHINGTON, D.C.
PHILADELPHIA
PITTSBURGH
OAKLAND
PRINCETON
NORTHERN VA
WILMINGTON
NEWARK
MIDLANDS, U.K.
CENTURY CITY
RICHMOND

This bulletin is presented for informational purposes and is not intended to constitute legal advice.
© Reed Smith LLP 2005. All Rights Reserved.
"Reed Smith" refers to Reed Smith, a limited liability partnership formed in the state of Delaware.

**Client Bulletin 05-02**

**"Publicly Traded Corporations"**—All "publicly traded corporations" that are also California corporations or foreign corporations must comply with Sections 1502.1 (for California corporations) and 2117.1 (for foreign corporations) of the Code, which set forth the public company disclosures required by the amended Act. The amendment defines a "publicly traded corporation" as:

③ A "corporation," as defined in Section 162 of the Code;

③ …that is also an "issuer," as defined in Section 3 of the Securities Exchange Act of 1934;

③ …that has "at least one class of securities listed or admitted for trading on a national securities exchange, on the National or Small-Cap Markets of the NASDAQ Stock Market, on the OTC-Bulletin Board, or on the electronic service operated by Pink Sheets, LLC."

Pre-amendment, the Act used the term "publicly traded company" as opposed to "publicly traded corporation." The amendment clarified that the public company disclosure requirements apply only to corporations, and not to non-corporate entities such as business trusts, limited liability companies, partnerships or associations. Also pre-amendment, the Act defined such a company as one "with securities that are either listed or admitted to trading on a national or foreign exchange, or is subject of two-way quotations, such as both bid and asked prices, that is regularly published by one or more broker-dealers in the National Daily Quotation Service or a similar service." The amendment clarified that corporations with securities listed on the OTC Bulletin Board and "Pink Sheets" fall within the Act's purview.

**When to File – New Timing Requirement**

The amendments revised the filing period for the pubic company disclosures specified in the original Act. All corporations falling under the Act must file what are known as basic disclosures, as set forth in Sections 1502 and 2117 of the Code, which include company details such as the names and addresses of the principal executive officers and the address of the company's principal office. Those corporations that are also "publicly traded," as discussed earlier, must also file what are known as public company disclosures, as set forth in Sections 1502.1 and 2117.1 of the Code, which include compensation paid to the company's highest paid officers and fraud convictions entered against the company. As stated earlier, the filing periods for these two types of disclosures may differ. All disclosures must be filed annually during the following periods:

**Basic Disclosure Filing Period**—A statement of basic disclosures must be filed within the six-month period ending with the month in which the original articles of incorporation (for a California corporation) or Statement and Designation of Foreign Corporation (for a foreign corporation) was filed with the Secretary of State. For example, a California corporation that filed its original articles of incorporation in June must file its annual statement of information sometime during the months of January through June of each succeeding year.

Public Company Disclosure Filing Period—A statement of public company disclosures must be filed within 150 days after the end of the corporation's fiscal year.

Under the original Act, all disclosures—both basic and public company disclosures—were required to be filed annually at the same time, within the six-month period described above. This filing period remained unchanged for the basic disclosures required to be made by all corporations. However, the filing period for public company disclosures was changed to make the period different and separate from the filing period applicable to basic disclosures. This means that many publicly traded corporations will have two different filing deadlines in California, one for the basic disclosures, and one for the additional public company disclosures.

**Basic Disclosure Requirements**

Sections 1502 and 2117 of the Code set forth the basic disclosures that all corporations incorporated or qualified to do business in California must file with the Secretary of State on an annual basis. Corporations comply with these basic disclosure requirements by completing forms prescribed by the Secretary of State, known as the Statement of Information (Domestic Stock Corporation) (Forms SI-200 C and SI-200 N/C) and Statement of

**Client Bulletin 05-02**

Information (Foreign Corporation) (Form SI-350.)[5]Unlike the public company disclosure requirements, the basic disclosure requirements were unchanged by the amendments.

**Revised Public Company Disclosure Requirements**

The Secretary of State also prescribes a form for disclosure of public company information, called the Corporate Disclosure Statement (Form SI-PT), attached hereto as Exhibit A.  The amendments revised the requirements related to these disclosures, which are set forth in Sections 1502.1 and 2117.1 of the Code.[6]Section 1502.1 applies to California corporations and Section 2117.1 applies to foreign corporations, the two sections are nearly identical.  For the most part, the amendments were enacted in an attempt to conform the old Act's disclosure requirements with the SEC's disclosure requirements for public companies.  The public company requirements have been revised to require the disclosure of the following information:

**Auditor Information**—The name of the independent auditor that prepared the most recent auditor's report on the corporation's annual financial statements, and, if different, the name of the corporation's current independent auditor.  Pre-amendment, the Act required the corporation to disclose "the name of the independent auditor used by the corporation," without the specification contained in the amendments.[7]

**Non-audit Services**—A description of "other services, if any, performed for the corporation during its two most recent fiscal years and the period between the end of its most recent fiscal year and the date of the statement" by the independent auditor, its parent corporation, or by a subsidiary or corporate affiliate of the independent auditor or its parent corporation.  Pre-amendment, the required disclosure period for non-audit services was during the 24 months prior to filing the statement of information.  By contrast, the SEC rules require disclosure of an issuer's audit committee's approval of non-audit services and disclosure of fees expended for non-audit services in the most recent fiscal year.

**Director and Officer Compensation**—The compensation for the most recent fiscal year paid to each member of the board of directors and each of the five most highly compensated executive officers who are not members of the board of directors, including the number of any shares issued, options for shares granted, and similar equity-based compensation.  The compensation paid to the CEO must also be disclosed, if the CEO is not among the five most highly compensated executive officers.  Pre-amendment, there was some question as to whether the compensation of additional executive officers beyond the five most highly compensated executive officers was required to be disclosed when one or more of the five are also directors, because the original Act only specified "the five most highly compensated officers excluding any officer who is also a member of the board of directors." This has been clarified by the amendments.

The definition of "executive officer" has been amended to mean "the chief executive officer, president, vice president, any vice president in charge of a principal business unit, division, or function, any other officer of the corporation who performs a policymaking function, or any other person who performs similar policymaking functions for the corporation."[8] Pre-amendment, the term "executive officer" was not defined.

Also, the amendments broadened the types of compensation requiring disclosure.  Pre-amendment, the Act required disclosure of compensation including "any shares or options for shares that were not available to other employees of the corporation."  The definition of "compensation" now refers specifically to the compensation disclosure requirements set forth in Item 402 of Regulation S-K of the SEC.

Note the California disclosure requirement is broader than Item 402 of Regulation S-K and Regulation S-B, as Item 402 permits excluding any executive officer, other than the Chief Executive Officer, whose annual salary and bonus in the previous fiscal year does not exceed $100,000.

**Loans to Directors**—A description of any loan made to any member of the board of directors by the corporation during the two most recent fiscal years at an interest rate lower than the rate available from unaffiliated commercial lenders to a similarly situated borrower.  Pre-amendment, the Act required disclosure of loans made

**Client Bulletin 05-02**

at a "preferential rate," without defining its meaning, which the amendment now defines.  Also, the amendment now specifically excludes:

- Advances for expenses reasonably anticipated in a director's performance of his duties, as permitted under Section 315(d) of the Code;[9]

- Payments by the corporation of life insurance premiums permitted under Section 315(e) of the Code;[10] and

- Advances for expenses incurred by a director in defending any proceeding, as permitted under Section 317(f) of the Code.[11]

While the amendments have closed the gap somewhat between the California and federal rules with respect to this disclosure requirement, there are still differences between the requirements that make the Act's requirements at times more comprehensive and less comprehensive than the federal rules.  For example, the Act requires disclosure of loans made to a director in the past two years at a preferential loan rate, regardless of the amount of the transaction, subject to certain exceptions.  Section 402 of the Sarbanes-Oxley Act on the other hand, prohibits companies from extending or arranging for the extension of credit in the form of personal loans to any director or executive officer, with certain limited exceptions.  In addition, Item 404 of Regulation S-K and Regulation S-B requires disclosure if any director (or other enumerated persons) has any outstanding indebtedness to the company in excess of $60,000, irrespective of when created and irrespective of the loan rate.

**Bankruptcy Proceedings**—A statement indicating whether an order for relief has been entered in a bankruptcy case with respect to the corporation, its executive officers or members of the board of directors during the ten years prior to the date of the statement of information.  Pre-amendment, the obligation only required disclosure of voluntary bankruptcy filings.  Now every case, voluntary or involuntary, must be disclosed, except successfully contested involuntary cases in which no order for relief is entered.  Item 401 of Regulation S-K and Regulation S-B, on the other hand, require bankruptcy information from the past five years, but also require disclosure of bankruptcy of a company of which the person was an executive officer within two years of the filing.

**Fraud Convictions**—A statement indicating whether any member of the board of directors or executive officer was convicted of fraud during the ten years preceding the date of the statement of information, if the conviction has not been overturned or expunged.  Pre-amendment, the original Act contained no exception for "overturned or expunged" fraud convictions.  Again, the Act's requirement is broader than the federal requirement, which requires disclosure for only the past five years.

**Material Legal Proceedings**—A description of:  (1) any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the corporation or any of its subsidiaries is a party or of which any of their property is the subject, as specified by Item 103 of Regulation S-K, and (2) any material legal proceeding during which the corporation was found legally liable by entry of a final judgment or final order that was not overturned on appeal during the five years preceding the filing of the Corporate Disclosure Statement.  The original Act required disclosure of the corporation's violations of "federal security laws or any security or banking provision of California law" for which a judgment exceeding $10,000 was entered during the previous ten years. Although the first California requirement is tied to the SEC disclosure requirements, the second California requirement generally differs from the SEC requirements by requiring disclosure in each Corporate Disclosure Statement of any prior judgment or order within the five-year time period, as opposed to disclosure of pending matters or material developments in such matters, as set forth in the SEC disclosure requirements.

**Client Bulletin 05-02**

**Certification**

The Act requires that a corporation certify that the information filed with the Secretary of State is true and correct.  The Act does not permit any claims against the state for inaccurate information contained in statements filed with the Secretary of State.

**Penalties for Non-compliance**

Legal counsel should be consulted to ensure compliance under the new amendments.  Among other things, companies should consider revising their director and officer questionnaires to ensure they have the necessary information to make the relevant disclosures.  While the Act does not prescribe specific penalties for non-compliance with the new disclosure requirements, penalties under other law exist.  Section 2204 of the Code provides that the failure of a corporation to file its annual report may result in the imposition of a fine of $250 and the possibility of suspension of the company's powers, rights and privileges.  Additionally, failure to comply with the Act or providing false or misleading information may subject a corporation to additional liabilities, both civil and criminal under California, federal and other applicable securities laws.  Directors or officers who knowingly concur in the making of any materially false statement to shareholders or other persons also may be subject to civil and criminal liabilities.  For example, a knowing filing of a false material statement by a director, officer or agent of a corporation is punishable under the California Code as a felony.

**Regulation FD and Selective Disclosure**

A public company filing a Corporate Disclosure Statement under the Act should also be careful to consider whether the filing triggers any reporting obligations under Regulation FD or general "selective disclosure" principles.  Regulation FD generally requires that whenever a public company, or person acting on its behalf, discloses material nonpublic information to certain enumerated persons, the company must make public disclosure of that same information simultaneously (for intentional disclosures), or promptly (for non-intentional disclosures).

Depending on the materiality of the information contained in the Corporate Disclosure Statement, Regulation FD and general principles regarding "selective disclosure" may require a public company to consider separate public disclosure of such information to comply with its SEC reporting obligations.  Under the amended Act, there are two scenarios in which filing the Corporate Disclosure Statement might trigger a company's duties to make a public disclosure: (1) where the Corporate Disclosure Statement contains a disclosure that is broader than the corresponding disclosure requirement under SEC rules (for example, the Act requires disclosure of bankruptcy filings by directors and officers for the past ten years, while Item 401 of Regulation S-K and Regulation S-B requires disclosure for only the past five years); and (2) where the timing of the Corporate Disclosure Statement filing is significantly earlier than the timing of the corresponding filing under SEC rules.

In such cases, company counsel should be consulted to assure the Corporate Disclosure Statement does not disclose material information that has not been previously publicly disclosed.  If such disclosure is made, company counsel should take steps to assure compliance under the federal rules.

*    *    *    *    *    *    *

Reed Smith, a leading global law firm with nearly 1,000 lawyers located in 14 U.S. and two U.K. cities, represents Fortune 100 as well as mid-market and emerging companies.  Clients include technology companies and entrepreneurs, financial services firms, life sciences companies and health care providers and insurers, communications companies, manufacturers, universities, non-profit organizations, real estate developers, and municipalities throughout the United States, the United Kingdom, and in 40 other countries.  For more information, please visit reedsmith.com.

**Client Bulletin 05-02**

_____

[1]   The full text of the amendments and the updated forms to be used for filings are included as exhibits to this memorandum, but can also be found at www.ss.ca.gov/business/corp/corp_soinfo.htm.

[2]   Section 162 of the Code states that: "'Corporation,' unless otherwise expressly provided, refers only to a corporation organized under this division or a corporation subject to this division under the provisions of subdivision (a) of Section 102."

[3]   Section 3 of the Securities Exchange Act of 1934 provides: "The term 'issuer' means any person who issues or proposes to issue any security; except that with respect to certificates of deposit for securities, voting-trust certificates, or collateral-trust certificates, or with respect to certificates of interest or shares in an unincorporated investment trust not having a board of directors or of the fixed, restricted management, or unit type, the term 'issuer' means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued; and except that with respect to equipment-trust certificates or like securities, the term 'issuer' means the person by whom the equipment or property is, or is to be, used."

[4]   National securities exchanges include the New York Stock Exchange, the American Stock Exchange and NASDAQ.

[5]   Forms are usually mailed to the company or its designated agent in advance of the filing deadline.  A company's failure to receive a form is no defense for missing the deadline, but the Secretary of State generally provides for a grace period of two months.

[6]   See Exhibit B for the full text of Sections 1502.1 and 2117.1 of the Code.

[7]   Also pre-amendment, the Act required disclosure of the date of the last report for the corporation prepared by the independent auditor, with a copy of the auditor's report attached to the Corporate Disclosure Statement.  This requirement has been eliminated.

[8]   This definition has been amended to parallel the definition of "officer" in Rule 16a-1 under the Securities Exchange Act of 1934.

[9]   Section 315(d) of the Code provides: "Notwithstanding subdivision (a), a corporation may advance money to a director or officer of the corporation or of its parent for any expenses reasonably anticipated to be incurred in the performance of the duties of the director or officer, provided that in the absence of the advance the director or officer would be entitled to be reimbursed for the expenses by the corporation, its parent, or any subsidiary."

[10]  Section 315(e) of the Code provides: "The provisions of subdivision (a) do not apply to the payment of premiums in whole or in part by a corporation on a life insurance policy on the life of a director or officer so long as repayment to the corporation of the amount paid by it is secured by the proceeds of the policy and its cash surrender value."

[11]  Section 317(f) of the Code provides: "Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision."

[12]  Item 103 of Regulation S-K sets forth the standard used for determining disclosure of legal proceedings in a company's SEC reports on Forms 10-K and 10-Q.

**Client Bulletin 05-02 — Exhibits**

# Exhibit A

Corporate Disclosure Statement (Form SI-PT)



SECRETARY OF STATE

# KEVIN SHELLEY

### STATE OF CALIFORNIA

## NOTICE OF LEGISLATIVE CHANGE

### Corporate Disclosure – Publicly Traded Corporations
### (Assembly Bill 1000)

Assembly Bill 1000, chaptered and effective September 27, 2004 as an urgency statute, amends California Corporations Code sections 1502 and 2117 and adds California Corporations Code sections 1502.1 and 2117.1, changing the filing requirements for publicly traded corporations.

Prior to September 27, 2004, all publicly traded corporations were required to disclose additional information when filing their initial or annual Statement of Information.  Assembly Bill 1000 requires all publicly traded corporations to disclose this additional information by filing a separate Corporate Disclosure Statement rather than including the information as part of the Statement of Information.

The Corporate Disclosure Statement must be filed annually, within 150 days after the end of the corporation's fiscal year.   There is no fee for filing the Corporate Disclosure Statement.

Assembly Bill 1000 also makes several changes to information required to be included in the Corporate Disclosure Statement.   Please see the reverse side of this notice for additional information.  You may also refer to the bill, a copy of which can be accessed from the California Legislative Counsel's website at http://www.leginfo.ca.gov/bilinfo.html.

For easier completion, the Corporate Disclosure Statement is available on the Secretary of State's website at http://www.ss.ca.gov/business and can be viewed, filled in and printed from your computer.   The completed form can be mailed to Secretary of State, Statement of Information Unit, P.O. Box 944230, Sacramento, CA 94244-2300 or delivered in person to the Sacramento office, 1500 11th Street, 3rd Floor, Sacramento, CA 95814. If you are not completing this form online, please type or legibly print in black or blue ink.

In addition to the Corporate Disclosure Statement, all publicly traded corporations must also file, during their applicable filing period, a Statement of Information as required by Corporations Code section 1502 or 2117.  For faster processing, the required Statement of Information can be filed online at https://businessfilings.ss.ca.gov.

(Please see reverse)

STATEMENT OF INFORMATION 1500 11TH STREET, 3RD FL • SACRAMENTO, CA 95814 • PO BOX 944230 • SACRAMENTO, CA 94244-2300 • 916 657 5448 • WWW.SS.CA.GOV

PROGRAMS ARCHIVES, BUSINESS PROGRAMS, ELECTIONS, INFORMATION TECHNOLOGY, CALIFORNIA STATE HISTORY MUSEUM,
MANAGEMENT SERVICES, SAFE AT HOME, DOMESTIC PARTNERS REGISTRY, NOTARY PUBLIC, POLITICAL REFORM

AB1000 Notice (09/2004)

Assembly Bill 1000 amends California Corporations Code sections 1502 and 2117 and adds California Corporations Code sections 1502.1 and 2117.1.  The primary changes are as follows:

• Requires the Corporate Disclosure Statement for publicly traded corporations to be filed separately from the Statement of Information and within 150 days after the end of the corporation's fiscal year.

• Removes the requirement to include the date of the last report prepared for the corporation by the independent auditor and the requirement to attach a copy of the most recent independent auditor's report.

• Clarifies the terms publicly traded corporation, executive officer, compensation and loan.

• Requires the name of the independent auditor that prepared the most recent auditor's report **and**, if different, the name of the independent auditor employed by the corporation on the date of the statement.

• Changes the time period for reporting the description of other services performed by the independent auditor to the two most recent fiscal years and the period between the end of its most recent fiscal year and the date of the statement.

• Requires the compensation paid to the chief executive officer if the chief executive officer is not among the five most highly compensated executive officers of the corporation.

• Requires a description of any loan to directors made at an interest rate lower than the interest rate available from unaffiliated commercial lenders generally to a similarly-situated borrower rather than loans at a preferential rate.  Loans must be reported for the two most recent fiscal years rather than the previous 24 months.

• Requires a statement indicating whether an order for relief has been entered in a bankruptcy case rather than a statement indicating whether any bankruptcy was filed.  Clarifies that the time period for reporting this information is 10 years preceding the date of the statement.

• Requires a statement indicating whether any member of the board of directors or executive officer of the corporation has been convicted of fraud within the previous 10 years only  if the conviction has not been overturned or expunged.  Clarifies that the time period for reporting this information is 10 years preceding the date of the statement.

• Requires a description of any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the corporation or any of its subsidiaries is a party or of which any of their property is the subject, as specified by Item 103, Part 229 of Regulation S-K of the Securities Exchange Commission (17 C.F.R. Sec. 229.103).

• Requires a description of any material legal proceeding during which the corporation was found legally liable by entry of a final judgment or final order that was not overturned on appeal during five years preceding the date of the statement.

A publicly traded corporation is a California or foreign corporation, as defined in Corporations Code section 162 or 171, respectively, that is an issuer as defined in Section 3 of the Securities Exchange Act of 1934, as amended (15 U.S.C. Sec. 78c), and has at least one class of securities listed or admitted for trading on a national securities exchange, on the National or Small-Cap Markets of the NASDAQ Stock Market, on the OTC-Bulletin Board, or on the electronic service operated by Pink Sheets, LLC.



**KEVIN SHELLEY**
**Secretary of State**

1500 11th Street, 3rd Floor
P.O. Box 944230
Sacramento, CA 94244-2300

Statement of Information
(916) 657-5448

# CORPORATE DISCLOSURE STATEMENT
## General Information

**Due Date:** Every domestic stock and foreign publicly traded corporation must file with the Secretary of State a Corporate Disclosure Statement (Form SI-PT) annually, within 150 days after the end of its fiscal year.

**Publicly Traded Corporation:** A publicly traded corporation is a California or foreign corporation, as defined in Corporations Code section 162 or 171, respectively, that is an issuer as defined in Section 3 of the Securities Exchange Act of 1934, as amended (15 U.S.C. Sec. 78c), and has at least one class of securities listed or admitted for trading on a national securities exchange, on the National or Small-Cap Markets of the NASDAQ Stock Market, on the OTC-Bulletin Board, or on the electronic service operated by Pink Sheets, LLC.

**Authority:** Statutory filing provisions are found in California Corporations Code sections 1502.1 and 2117.1, unless otherwise indicated.

**Definitions:** The following definitions apply to the Corporate Disclosure Statement:

"Independent auditor" means an auditor that meets the requirements for auditor independence stated in 17 C.F.R. Sec. 210.2-01.

"Compensation" includes all plan and nonplan compensation awarded to, earned by, or paid to the person for all services rendered in all capacities to the corporation and to its subsidiaries, as the compensation is specified by Item 402 of Regulation S-K of the Securities and Exchange Commission (Section 229.402 of Title 17 of the Code of Federal Regulations).

"Executive officer" means the chief executive officer, president, any vice president in charge of a principal business unit, division, or function, any other officer of the corporation who performs a policymaking function, or any other person who performs similar policymaking functions for the corporation.

"Loan" excludes an advance for expenses, the corporation's payment of life insurance premiums and an advance of litigation expenses as permitted according to the applicable laws of the state or place of incorporation. For California corporations, see Corporations Code sections 315(d), 315(e) and 317, respectively.

**Fee:** There is no fee for filing the Corporate Disclosure Statement.

**Where to file:** For easier completion, the Corporate Disclosure Statement is available on the Secretary of State's website at http://www.ss.ca.gov/business and can be viewed, filled in and printed from your computer. The completed form can be mailed to Secretary of State, Statement of Information Unit, P.O. Box 944230, Sacramento, CA 94244-2300 or delivered in person to the Sacramento office, 1500 11th Street, 3rd Floor, Sacramento, CA 95814. If you are not completing this form online, please type or legibly print in black or blue ink.

**Additional Filing Requirements:** In addition to the Corporate Disclosure Statement, all publicly traded corporations must also file, during their applicable filing period, a Statement of Information as required by Corporations Code section 1502 or 2117. For faster processing, the Statement of Information can be filed online at https://businessfilings.ss.ca.gov.

SI-PT INFO (09/2004)

**INSTRUCTIONS FOR COMPLETING FORM SI-PT**

Every domestic stock and foreign publicly traded corporation must file a Corporate Disclosure Statement (Form SI-PT) annually, within 150 days after the end of its fiscal year.

There is no fee for filing the Corporate Disclosure Statement.

Statutory filing provisions are found in California Corporations Code sections 1502.1 and 2117.1, unless otherwise indicated.

**Complete Corporate Disclosure Statement (Form SI-PT) as follows:**

**Item 1.**   Enter the name of the corporation **exactly** as it is of record with the California Secretary of State.

**Item 2.**   Enter the name of the independent auditor that prepared the most recent auditor's report on the corporation's annual financial statements.

**Item 3.**   Enter a description of other services, if any, performed for the corporation during its two most recent fiscal years and the period between the end of its most recent fiscal year and the date of the statement by the independent auditor named in Item 2, by its parent corporation, or by a subsidiary or corporate affiliate of the independent auditor or its parent corporation.  If more space is needed, enter the additional information in Item D of the Attachment (Form SI-PTA).

**Item 4.**   Enter the name of the independent auditor employed by the corporation on the date of this statement, if different from the individual named in Item 2.

**Item 5.**   • Enter the name of each director and the compensation (in U.S. dollars) paid to each director for the most recent fiscal year, including the number of any shares issued, options for shares granted, and similar equity-based compensation granted to each director.
   • Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to each director.
   • Check YES or NO to indicate whether or not each director has been convicted of fraud during the 10 years preceding the date of this statement, if the conviction has not been overturned or expunged.
   If the corporation has additional directors, complete Item B of the Attachment (Form SI-PTA).

**Item 6.**   • Enter the names of the five most highly compensated executive officers of the corporation, **excluding** any executive officer who is also a member of the board of directors.  Enter the compensation (in U.S. dollars) paid to each executive officer for the most recent fiscal year, including the number of any shares issued, options for shares granted, and similar equity-based compensation granted to each executive officer.

   If the chief executive officer is not among the five most highly compensated executive officers of the corporation, the name and compensation paid to the chief executive officer must also be included in item 6b.

   If more space is needed, enter the additional information in Item D of the Attachment (Form SI-PTA).
   • Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to each executive officer.
   • Check YES or NO to indicate whether or not each executive officer has been convicted of fraud during the 10 years preceding the date of this statement, if the conviction has not been overturned or expunged.

**Item 7.**   Enter a description of each loan made to a director by the corporation during the corporation's two most recent fiscal years at an interest rate lower than the interest rate available from unaffiliated commercial lenders generally to a similarly situated borrower.  Include the name of the director receiving the loan, the amount of the loan (in U.S. dollars) and the terms of the loan.  If more space is needed for the description of the loan, enter the additional information in Item D of the Attachment (Form SI-PTA).  If no such loans were made, the field should be left blank.

   If the corporation has made additional loans to directors, complete Item C of the Attachment (Form SI-PTA).

**Item 8.**   Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to the corporation.

**Item 9.**   Check YES or NO to indicate whether or not the corporation or any of its subsidiaries has been a party to, or any of their property has been subject to, any material pending legal proceeding, other than ordinary routine litigation incidental to the business, as specified by Item 103, Part 229 of Regulation S-K of the Securities Exchange Commission (17 C.F.R. Sec. 229.103).  If yes, attach a description.

**Item 10.** Check YES or NO to indicate whether or not the corporation has been found, in any material legal proceeding, legally liable by entry of a final judgment or final order (that was not overturned on appeal) during the five years preceding the date of this statement.  If yes, attach a description.

**Item 11.** Type or print the name and title of the person completing this form and enter the date this form was completed.  By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.



# State of California

**D**

## Kevin Shelley
## Secretary of State

### CORPORATE DISCLOSURE STATEMENT
(Domestic Stock and Foreign Corporations)

**There is no fee for filing the Corporate Disclosure Statement.**

**IMPORTANT — PLEASE READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1.  CORPORATE NAME

This Space For Filing Use Only

**INDEPENDENT AUDITOR**

2.  NAME OF THE INDEPENDENT AUDITOR THAT PREPARED THE MOST RECENT AUDITOR'S REPORT

3.  DESCRIPTION OF OTHER SERVICES, IF ANY, PERFORMED BY THE INDEPENDENT AUDITOR NAMED IN ITEM 2

4.  NAME OF THE INDEPENDENT AUDITOR EMPLOYED BY THE CORPORATION ON THE DATE OF THIS STATEMENT, IF DIFFERENT FROM ITEM 2

**DIRECTORS AND EXECUTIVE OFFICERS**

5.  NAMES OF DIRECTORS

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| 1) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 2) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 3) | | | | ☐YES ☐NO | ☐YES ☐NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, COMPLETE ITEM B OF THE ATTACHMENT (FORM SI-PTA).

6a.  NAMES OF EXECUTIVE OFFICERS

| | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| 1) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 2) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 3) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 4) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 5) | | | | ☐YES ☐NO | ☐YES ☐NO |

6b.  CHIEF EXECUTIVE OFFICER (Complete if not named in 6a.)

| | | | | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| | | | | ☐YES ☐NO | ☐YES ☐NO |

**LOANS TO MEMBERS OF THE BOARD OF DIRECTORS**

7.  NAMES OF DIRECTORS          DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS)

1)

2)

3)

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, COMPLETE ITEM C OF THE ATTACHMENT (FORM SI-PTA).

**ADDITIONAL STATUTORY DISCLOSURES**

8.  Has an order for relief been entered in a bankruptcy case with respect to the corporation during the preceding 10 years?   ☐YES ☐NO

9.  Has the corporation or any of its subsidiaries been a party to, or any of their property been subject to, any material pending legal proceedings, as specified by Item 103, Part 229 of SEC Regulation S-K?  If yes, attach a description .   ☐YES ☐NO

10.  Has the corporation been found legally liable in any material legal proceeding during the preceding five years?  If yes, attach a description.   ☐YES ☐NO

11.  By submitting this Corporate Disclosure Statement to the Secretary of State, the corporation certifies the information contained herein, including any attachments, is true and correct.

TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM          SIGNATURE          TITLE          DATE

SI-PT (REV 09/2004)                                                              APPROVED BY SECRETARY OF STATE

Clear Form          Save Form          Print Form

## INSTRUCTIONS FOR COMPLETING FORM SI-PTA

For easier completion, this form is available on the Secretary of State's website at
http://www.ss.ca.gov/business and can be viewed, filled in and printed from your computer.
Completed forms along with the applicable fees can be mailed to Secretary of State, Statement
of Information Unit, P.O. Box 944230, Sacramento, CA 94244-2300 or delivered in person to the
Sacramento office, 1500 11th Street, 3rd Floor, Sacramento, CA 95814. If you are not completing this
form online, please type or legibly print in black or blue ink. This form should not be altered.

Statutory filing provisions are found in California Corporations Code sections 1502.1 and 2117.1,
unless otherwise indicated.

Use this form to add additional directors' names and information; additional loans made to directors;
and any additional information that does not fit on the Corporate Disclosure Statement (Form SI-PT).

**Complete Attachment to Corporate Disclosure Statement (Form SI-PTA) as follows:**

**Item A.** Enter the name of the corporation exactly as it is of record with the California Secretary of
State.

**Item B.** If this attachment adds additional directors:

- Enter the name of each director and the compensation (in U.S. dollars) paid to each
director for the most recent fiscal year, including the number of any shares issued, options
for shares granted, and similar equity-based compensation granted to each director.

- Check YES or NO to indicate whether or not an order for relief has been entered in a
bankruptcy case during the 10 years preceding the date of this statement with respect to
each director.

- Check YES or NO to indicate whether or not each director has been convicted of fraud
during the 10 years preceding the date of this statement, if the conviction has not been
overturned or expunged.

Attach additional pages as needed.

**Item C.** Enter a description of each loan made to a director by the corporation during the
corporation's two most recent fiscal years at an interest rate lower than the interest rate
available from unaffiliated commercial lenders generally to a similarly situated borrower.
Include the name of the director receiving the loan, the amount of the loan (in U.S. dollars)
and the terms of the loan.

Attach additional pages as needed.

**Item D.** If extra space is needed to complete the information requested on the Corporate Disclosure
Statement (Form SI-PT) or this Attachment to Corporate Disclosure Statement (Form SI-
PTA), please enter the additional information in Item D. Please reference the item number
from Form SI-PT or Form SI-PTA, as applicable, that corresponds with each item of
additional information.



# State of California
## Kevin Shelley
## Secretary of State

**ATTACHMENT TO**
**CORPORATE DISCLOSURE STATEMENT**
(Domestic Stock and Foreign Corporations)

This Space For Filing Use Only

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**A. CORPORATE NAME**

**B. ADDITIONAL DIRECTORS** (Continued from Item 5 on Form SI-PT)

| NAMES OF DIRECTORS | COMPENSATION | SHARES | OPTIONS | BANKRUPTCY | FRAUD |
|---|---|---|---|---|---|
| 4) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 5) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 6) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 7) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 8) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 9) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 10) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 11) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 12) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 13) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 14) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 15) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 16) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 17) | | | | ☐YES ☐NO | ☐YES ☐NO |
| 18) | | | | ☐YES ☐NO | ☐YES ☐NO |

IF THE CORPORATION HAS ADDITIONAL DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**C. ADDITIONAL LOANS TO MEMBERS OF THE BOARD OF DIRECTORS** (Continued from Item 7 on Form SI-PT)

| NAMES OF DIRECTORS | DESCRIPTION OF LOAN (INCLUDING AMOUNT AND TERMS) |
|---|---|
| 4) | |
| 5) | |
| 6) | |
| 7) | |
| 8) | |

IF THE CORPORATION HAS MADE ADDITIONAL LOANS TO DIRECTORS, ATTACH ADDITIONAL PAGES AS NEEDED.

**D. ADDITIONAL INFORMATION** (Please reference item number from Form SI-PT or Form SI-PTA, as applicable)

SI-PTA  (REV 09/2004)                                                      APPROVED BY SECRETARY OF STATE

**Client Bulletin 05-02 — Exhibits**

# Exhibit B

## Sections 1502.1 and 2117.1 of the California Corporations Code

1502.1.(a)   In addition to the statement required pursuant to Section 1502, every publicly traded corporation shall file annually, within 150 days after the end of its fiscal year, a statement, on a form prescribed by the Secretary of State, that includes all of the following information:

(1)   The name of the independent auditor that prepared the most recent auditor's report on the corporation's annual financial statements.

(2)   A description of other services, if any, performed for the corporation during its two most recent fiscal years and the period between the end of its most recent fiscal year and the date of the statement by the foregoing independent auditor, by its parent corporation, or by a subsidiary or corporate affiliate of the independent auditor or its parent corporation.

(3)   The name of the independent auditor employed by the corporation on the date of the statement, if different from the independent auditor listed pursuant to paragraph (1).

(4)   The compensation for the most recent fiscal year of the corporation paid to each member of the board of directors and paid to each of the five most highly compensated executive officers of the corporation who are not members of the board of directors, including the number of any shares issued, options for shares granted, and similar equity-based compensation granted to each of those persons.  If the chief executive officer is not among the five most highly compensated executive officers of the corporation, the compensation paid to the chief executive officer shall also be included.

(5)   A description of any loan, including the amount and terms of the loan, made to any member of the board of directors by the corporation during the corporation's two most recent fiscal years at an interest rate lower than the interest rate available from unaffiliated commercial lenders generally to a similarly-situated borrower.

(6)   A statement indicating whether an order for relief has been entered in a bankruptcy case with respect to the corporation, its executive officers, or members of the board of directors of the corporation during the 10 years preceding the date of the statement.

(7)   A statement indicating whether any member of the board of directors or executive officer of the corporation was convicted of fraud during the 10 years preceding the date of the statement, if the conviction has not been overturned or expunged.

(8)   A description of any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the corporation or any of its subsidiaries is a party or of which any of their property is the subject, as specified by Item 103 of Regulation S-K of the Securities Exchange Commission (Section 229.103 of Title 12 of the Code of Federal Regulations).  A description of any material legal proceeding during which the corporation was found legally liable by entry of a final judgment or final order that was not overturned on appeal during the five years preceding the date of the statement.

(b)   For purposes of this section, the following definitions apply:

## Client Bulletin 05-02 — Exhibits

(1)    "Publicly traded corporation" means a corporation, as defined in Section 162, that is an issuer as defined in Section 3 of the Securities Exchange Act of 1934, as amended (15 U.S.C. Sec. 78c), and has at least one class of securities listed or admitted for trading on a national securities exchange, on the National or Small-Cap Markets of the NASDAQ Stock Market, on the OTC-Bulletin Board, or on the electronic service operated by Pink Sheets, LLC.

(2)    "Executive officer" means the chief executive officer, president, any vice president in charge of a principal business unit, division, or function, any other officer of the corporation who performs a policymaking function, or any other person who performs similar policymaking functions for the corporation.

(3)    "Compensation" as used in paragraph (4) of subdivision (a) means all plan and nonplan compensation awarded to, earned by, or paid to the person for all services rendered in all capacities to the corporation and to its subsidiaries, as the compensation is specified by Item 402 of Regulation S-K of the Securities and Exchange Commission (Section 229.402 of Title 17 of the Code of Federal Regulations).

(4)    "Loan" as used in paragraph (5) of subdivision (a) excludes an advance for expenses permitted under subdivision (d) of Section 315, the corporation's payment of life insurance premiums permitted under subdivision (e) of Section 315, and an advance of expenses permitted under Section 317.

(c)    This statement shall be available and open to the public for inspection.  The Secretary of State, not later than December 31, 2004, shall provide access to all information contained in this statement by means of an online database.

(d)    A corporation shall certify that the information it provides pursuant to this section is true and correct. No claim may be made against the state for inaccurate information contained in statements filed under this section with the Secretary of State.


2117.1.(a)    In addition to the statement required pursuant to Section 2117, every publicly traded foreign corporation shall file annually, within 150 days after the end of its fiscal year, on a form prescribed by the Secretary of State, a statement that includes all of the following information:

(1)    The name of the independent auditor that prepared the most recent auditor's report on the publicly traded foreign corporation's annual financial statements.

(2)    A description of other services, if any, performed for the publicly traded foreign corporation during its two most recent fiscal years and the period between the end of its most recent fiscal year and the date of the statement by the foregoing independent auditor, by its parent corporation, or by a subsidiary or corporate affiliate of the independent auditor or its parent corporation.

(3)    The name of the independent auditor employed by the foreign corporation on the date of the statement, if different from the independent auditor listed pursuant to paragraph (1).

(4)    The compensation for the most recent fiscal year of the publicly traded foreign corporation paid to each member of the board of directors and paid to each of the five most highly compensated executive officers of the foreign corporation who are not members of the board of directors, including the number of any shares issued, options for shares granted, and similar equity-based compensation granted to each of those persons.  If the chief executive officer is not among the five most highly compensated executive officers of the corporation, the compensation paid to the chief executive officer shall also be included.

(5)    A description of any loan, including the amount and terms of the loans, made to any member of the board of directors by the publicly traded foreign corporation during the foreign corporation's two most recent fiscal years at an interest rate lower than the interest rate available from unaffiliated commercial lenders generally to a similarly situated borrower.

**Client Bulletin 05-02 — Exhibits**

(6)    A statement indicating whether an order for relief has been entered in a bankruptcy case with respect to the foreign corporation, its executive officers, or members of the board of directors of the foreign corporation during the 10 years preceding the date of the statement.

(7)    A statement indicating whether any member of the board of directors or executive officer of the publicly traded foreign corporation was convicted of fraud during the 10 years preceding the date of the statement, which conviction has not been overturned or expunged.

(8)    A description of any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the corporation or any of its subsidiaries is a party or of which any of their property is the subject, as specified by Item 103 of Regulation S-K of the Securities Exchange Commission (Section 229.103 of Title 12 of the Code of Federal Regulations).  A description of any material legal proceeding during which the corporation was found legally liable by entry of a final judgment or final order that was not overturned on appeal during the five years preceding the date of the statement.

(b)    For purposes of this section, the following definitions apply:

(1)    "Publicly traded foreign corporation" means a foreign corporation, as defined in Section 171, that is an issuer as defined in Section 3 of the Securities Exchange Act of 1934, as amended (15 U.S.C. Sec. 78c), and has at least one class of securities listed or admitted for trading on a national securities exchange, on the National or Small-Cap Markets of the NASDAQ Stock Market, on the OTC-Bulletin Board, or on the electronic service operated by Pink Sheets, LLC.

(2)    "Executive officer" means the chief executive officer, president, any vice president in charge of a principal business unit, division, or function, any other officer of the corporation who performs a policymaking function, or any other person who performs similar policymaking functions for the corporation.

(3)    "Compensation" as used in paragraph (4) of subdivision (a) means all plan and nonplan compensation awarded to, earned by, or paid to the person for all services rendered in all capacities to the corporation and to its subsidiaries, as the compensation is specified by Item 402 of Regulation S-K of the Securities and Exchange Commission (Section 229.402 of Title 17 of the Code of Federal Regulations).

(4)    "Loan" as used in paragraph (5) of subdivision (a) excludes an advance for expenses, the foreign corporation's payment of life insurance premiums, and an advance of litigation expenses, in each instance as permitted according to the applicable law of the state or place of incorporation or organization of the foreign corporation.

(c)    This statement shall be available and open to the public for inspection.  The Secretary of State, not later than December 31, 2004, shall provide access to all information contained in this statement by means of an online database.

(d)    A foreign corporation shall certify that the information it provides pursuant to this section is true and correct.  No claim may be made against the state for inaccurate information contained in statements filed under this section with the Secretary of State.

# EXHIBIT 196

Table of Contents

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-189366**

**PROSPECTUS**



### 7,812,500 Shares

# The New Home Company Inc.

### Common Stock
### $11.00 per share

This is the initial public offering of our common stock. We are selling 7,812,500 shares of our common stock. The initial public offering price of our common stock is $11.00 per share.

We have granted the underwriters an option to purchase up to 1,171,875 additional shares of our common stock at the same price per share as the other shares sold in this offering, and we will use the net proceeds from any exercise of this option to purchase an equivalent number of shares of our common stock from one of our non-management institutional investors.

Our common stock has been approved for listing on the New York Stock Exchange, subject to official notice of issuance, under the symbol "NWHM."

---

**Investing in our common stock involves risks. See " Risk Factors " beginning on page 26.**

We are an "emerging growth company" under the federal securities laws and are eligible for certain reduced reporting requirements. See "Summary —Implications of Being an Emerging Growth Company."

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determine if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

---

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ 11.00 | $85,937,500 |
| Underwriting discount[1] | $ 0.77 | $ 6,015,625 |
| Proceeds to us (before expenses) | $ 10.23 | $79,921,875 |

(1)   We refer you to "Underwriting" beginning on page 200 of this prospectus for additional information regarding underwriting compensation.

The underwriters expect to deliver the shares to purchasers on or about February 5, 2014 through the book-entry facilities of The Depository Trust Company.

# Citigroup              J.P. Morgan              Credit Suisse

# Zelman Partners LLC

**January 30, 2014**

Table of Contents



Table of Contents




**Lambert Ranch**
Irvine, CA

**August 2009:** The New Home Company is founded with an initial capital commitment of $10M by its four senior executives and founders.

**September 2009:** TNHC commences building in Irvine CA, its first fee-based project with The Irvine Company.

**August 2010:** $20M combined capital commitment to TNHC by IHP Capital Partners and Watt Residential LLC.

**December 2010:** TNHC acquires 50-acre Lambert Ranch in Irvine, CA. Development commences May 2011.

**January 2011:** $10M capital commitment to TNHC from Tricon Capital.

**May 2011:** TNHC Land Company formed and immediately enters into agreement for 547-lot site in Davis, CA.



**Villa Metro**
Valencia, CA

Table of Contents



**Rose Lane**
Larkspur, CA

**Meadows**
Folsom, CA

**September 2011:** Company expands to Bay Area with acquisition of property in Larkspur, Marin County, CA.

– Models complete September 2013.

**May 2012:** Sales commence at Lambert Ranch's three neighborhoods in Irvine, CA.

– September 2013: Lambert Ranch community sold-out (169 homes) at an average price of $1,400,000.

– Awarded 2012 Community of the Year by SoCal Awards and Builder and Developer Magazine.

**April 2013:** Newport Beach site containing 79 luxury condominiums acquired. Development begins in May.

**August 2013:** Sales commence at Villa Metro's three neighborhoods in Valencia, CA.

– 39 sales in 8 weeks at an average price of $363,000.

– Awarded Community of the Year by SoCal Awards.



**Meridian**
Newport Beach, CA

Meridian offers sophisticated coastal residences in the heart of Newport Beach, California.
*Artists rendering

**Table of Contents**

We are responsible for the information contained in this prospectus and any free writing prospectus that we authorize with this offering. You should rely only on the information contained in this prospectus or in any free writing prospectus that we in connection with this offering. Neither we nor the underwriters have authorized anyone to provide you with different or ad Neither we nor the underwriters take any responsibility for, or can provide any assurance as to the reliability of, any other give you. We and the underwriters are not offering to sell, or seeking offers to buy, these securities in any jurisdiction wher permitted. You should not assume that the information contained in this prospectus or any free writing prospectus that we connection with this offering is accurate as of any date other than its date. Our business, financial condition, results of ope may have changed since that date.

---

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 26 |
| Cautionary Note Concerning Forward-Looking Statements | 51 |
| Use of Proceeds | 52 |
| Capitalization | 53 |
| Dilution | 54 |
| Dividend Policy | 56 |
| Selected Financial Data | 57 |
| Management's Discussion and Analysis of Financial Conditions and Results of Operation | 61 |
| Market Opportunity | 99 |
| Our Business | 138 |
| Management | 166 |
| Executive and Director Compensation | 175 |
| Certain Relationships and Related Party Transactions | 182 |
| Principal Stockholders | 185 |
| Description of Capital Stock | 188 |
| Shares Eligible For Future Sale | 192 |
| Certain Material Federal Income Tax Considerations | 195 |
| Underwriting | 200 |
| Legal Matters | 206 |
| Experts | 206 |
| Where You Can Find More Information | 207 |
| Index to Consolidated Financial Statements | F-1 |

We use market data and industry forecasts and projections throughout this prospectus, and in particular in the sections entitled "Summary," "Marke Opportunity" and "Our Business." We have obtained substantially all of this information from a market study prepared for us in connection with this offering by John Burns Real Estate Consulting, LLC or JBREC, an independent research provider and consulting firm. We have paid JBREC a fee of $54,533 for that market study, plus an amount charged at an hourly rate for additional information we may require from JBREC from time to time in connection with that market study. Such information is included in this prospectus in reliance on JBREC's authority as an expert on such matters. Any forecasts prepared by JBREC are based on data (including third-party data), models and experience of various professionals, and are based on various assumptions (including the completeness and accuracy of third-party data), all of which are subject to change without notice. See "Experts." In addition, certain market and industry data has been taken from publicly available industry publications. These sources generally state that the information they provide has

**Table of Contents**

been obtained from sources believed to be reliable, but that the accuracy and completeness of the information are not guaranteed. Forecasts and other forward-looking information obtained from these sources are subject to the same qualifications and additional uncertainties regarding the other forward-looking statements in this prospectus.

ii

Table of Contents

## SUMMARY

*This summary highlights information contained elsewhere in this prospectus, but it does not contain all of the information that you may consider important in making your investment decision. Therefore, you should read this entire prospectus carefully, including, in particular, the " Risk Factors" section beginning on page 25 of this prospectus. As used in this prospectus, unless the context otherwise requires or indicates, references to " the Company," "our company," "we," "our" and "us" [1] for periods prior to the completion of our formation transactions, refer to The New Home Company LLC and its subsidiaries and affiliates, which we sometimes refer to as "TNHC LLC," and [2] following the completion of our formation transactions, refer to The New Home Company Inc. and its subsidiaries.*

*Unless otherwise indicated, market data is derived from a market study prepared for us in connection with this offering by John Burns Real Estate Consulting, LLC or JBREC.*

*Unless the context otherwise requires, the information in this prospectus assumes that: [1] our formation transactions have been completed, [2] the shares of our common stock to be sold in this offering are sold at $11.00 per share, and [3] the underwriters' option to purchase additional shares is not exercised.*

### Our Company

We are a new generation homebuilder focused on the design, construction and sale of innovative and consumer-driven homes in major metropolitan areas within select growth markets in California, including coastal Southern California, the San Francisco Bay area and metro Sacramento. We also seek to create unique communities via our significant land development expertise, either stand-alone or within master-planned communities developed by third parties. As a new generation homebuilder, we are driven by:

- understanding our target homebuyer customers through extensive research and analytical methods;

- personalizing new home designs to fit our target homebuyers' unique lifestyle needs;

- a tailored, contemporary and technology-enhanced approach to marketing our new homes;

- enhancing the homebuyer experience through high-touch customer service and care;

- selecting attractive investment opportunities, without burdensome legacy issues, that we believe are well-positioned to be developed in a manner that enhances the value of such opportunities; and

- hand-selecting talented employees that share our culture of continuous personal and professional innovation and development.

We were founded in August 2009, towards the end of an unprecedented downturn in the U.S. homebuilding industry, with a combined initial capital commitment of $10 million by our founders, who are also our four most senior executives. Our founders, Larry Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Tom Redwitz, our Chief Operating Officer, have extensive and complementary construction, design, marketing, development and entitlement expertise as well as strong relationships with key land sellers within each of our local markets and have worked together for up to 25 years. Additionally, Messrs. Webb and Stelmar served in similar capacities together at John Laing Homes and oversaw the growth of that business, beginning with the merger of Watt Residential Partners with John Laing Homes in 1998, the leveraged buyout of John Laing Homes in 2001 for $190 million and, finally, orchestrating its timely sale in 2006 for $1.05 billion.

1

Commencing with the $20 million capital commitment by IHP Capital Partners, or IHP, and Watt Residential LLC, or Watt, in August 2010, and the subsequent $10 million capital commitment by Tricon Capital Group, Inc., or Tricon, in January 2011, we began to rapidly deploy capital to acquire land and build homes on larger infill sites within established communities, where we could leverage the experience of our management team in land planning and development. Fee building represented a capital efficient method for us to establish our operations and strengthen relationships with strategic landowners. In an effort to sustain a steep growth trajectory while retaining ownership control and generating attractive risk-adjusted returns for all stakeholders, we have employed a joint venture strategy, in which we contribute a minority share of the capital and receive distributions in excess of our percentage capital interest plus management fees. Our joint venture strategy has been instrumental in allowing us to leverage our entity level capital and establish a homebuilding platform focused on high-growth, land-constrained markets, such as Orange and Los Angeles counties in Southern California and Santa Clara, San Mateo, Marin and Yolo counties in Northern California. We intend to continue to use joint venture partnerships to access unique market opportunities, including land development opportunities. In addition, during 2013 we significantly expanded our fee building relationships with one master-planned community developer located in Orange County. We intend to invest the proceeds of this offering primarily to accelerate the contribution from wholly owned projects for our own account.

We employ a local market, consumer-driven approach to designing differentiated homes that meet the unique lifestyle needs of homebuyers across a variety of demographics. Our deeply analytical approach to market research and construction expertise across an extensive product offering allow us the flexibility to pursue a wide array of land acquisition opportunities and appeal to a broad range of potential homebuyers, including entry-level, move-up, move-down and luxury-focused customers. The homes that we and our unconsolidated joint ventures are building range in price from approximately $300,000 to $3.2 million, with home sizes ranging from approximately 800 to 5,300 square feet. Customer-focused community creation and product development, as well as exemplary customer service, are key components of the lifestyle connection we seek to establish with each homebuyer.

Additionally, we strive to enhance the home-buying experience and buyers' personal investment in their homes through actively engaging them in the selection of design options and upgrades. Our on-site design studios offer state-of-the-art amenities and a wide variety of structural and design options, allowing buyers to personalize any of our home types to meet their unique needs. We believe our design studios are a key source of competitive differentiation and contribute to greater profitability through the sale of higher margin options. In 2012, our cancellation rate, excluding our unconsolidated joint ventures, was 16%, which was below the average of approximately 18.5% for homebuilders who were public in 2012. In 2012, our cancellation rate for our unconsolidated joint ventures was 5%. In February 2013, we were awarded the Eliant Homebuyers' Choice Award for Best Overall Customer Experience, Best Design Selection Experience and Best Construction Experience among mid-size builders. Our commitment to customer satisfaction is a key element of our company culture, which we believe fosters an environment where our team members can innovate. We believe our reputation for high quality, differentiated architecture and design as well as high customer satisfaction and company culture enhances our overall financial performance and generates increased customer loyalty. However, we face significant competition in our markets.

In addition to our award-winning home designs and customer service, an important element of our business strategy is leveraging our substantial land entitlement and development expertise to add value to the land we acquire. Collectively, our senior executive team as well as our deep bench of managerial talent have decades of experience acquiring land, creating masterplans, obtaining entitlements and completing projects on budget and on schedule. However, despite our management team's experience, we were formed in 2009 and have a limited operating history. To increase returns and manage risks associated with larger projects, from time to time, we may seek to sell land at various stages of development to other homebuilders. We believe we have established a reputation as both successful land developers and high-quality homebuilders, and will continue to focus on optimal capital allocation and balance between these activities throughout the lives of our projects.

Table of Contents

As of September 30, 2013, our homebuilding operations consisted of eight communities, three of which are actively selling, containing 329 lots under various stages of development. In addition, our unconsolidated joint venture homebuilding projects consisted of 28 communities, four of which are actively selling, containing 1,761 lots, as described below, in Southern California, the San Francisco Bay area and metro Sacramento. Additionally as of September 30, 2013, we operated seven communities, five of which are actively selling, containing 887 lots under fee building projects in Southern and Northern California.

### Lots and Communities as of September 30, 2013

|  | Total | | Actively Selling | |
| --- | --- | --- | --- | --- |
|  | Lots | Communities | Lots | Communities |
| Company | 329 | 8 | 78 | 3 |
| Unconsolidated Joint Ventures | 1,761 | 28 | 328 | 4 |
| Fee Building | 887 | 7 | 528 | 5 |

Since August 2009, we have delivered 169 homes at Company projects, 116 homes through our unconsolidated joint ventures and 294 homes through our fee building projects. Our management team has long-standing relationships with leading masterplan community developers in each of our core markets and, through these relationships, we are generally invited to participate in new lot offerings. Home sales revenues from our Company projects and our unconsolidated joint venture activities were $25.6 million and $0, respectively, in 2011, $24.2 million and $56.0 million, respectively, in 2012, and $24.7 million and $105.0 million, respectively, for the nine months ended September 30, 2013, and our business mix has shifted to projects in which we have a significant financial interest (either directly or in unconsolidated joint ventures), although we continue to pursue fee building on a selective basis. As of September 30, 2013, we owned or controlled 826 lots and our unconsolidated joint ventures owned or controlled 3,040 lots. We owned 329 lots and controlled 497 lots, and our unconsolidated joint ventures owned 1,761 lots and controlled 1,279 lots. In addition, as such date we had 887 additional lots under fee building contracts. Cumulatively, we believe these lots represent supply to support our current growth plan over the next several years. We believe that our current inventory of owned and controlled lots and lots under option or purchase contracts will be adequate to supply our and our unconsolidated joint ventures' homebuilding operations' projected closings through 2016.

For the nine months ended September 30, 2013, we had net income of $2.9 million, and for the years ended December 31, 2012 and 2011, we experienced net losses of $1.4 million and $2.3 million, respectively.

In Southern California, we owned or controlled 473 lots as of September 30, 2013, and our unconsolidated joint ventures owned or controlled 567 lots. In addition, we controlled six fee building projects that contain a total of 544 homes remaining to be built in Irvine and Dana Point (Orange County) and Carlsbad (San Diego County).

In the San Francisco Bay area, we owned and controlled 162 lots as of September 30, 2013, and our unconsolidated joint ventures owned or controlled 728 lots. The lots owned by unconsolidated joint ventures consist of 85 lots in Larkspur (Marin County) and 239 lots in San Jose (Santa Clara County) intended for homebuilding activity. The lots controlled by unconsolidated joint ventures consist of 404 lots in Foster City (San Mateo County). Of these, approximately 200 lots are intended for homebuilding activity.

In metro Sacramento, we owned or controlled 191 lots located in established market areas in El Dorado, Placer and Sacramento counties and our unconsolidated joint ventures owned or controlled 1,745 lots as of September 30, 2013. One joint venture owned 870 lots in Sacramento County (Russell Ranch). We expect to acquire and develop 547 lots in Davis (Yolo county) and 328 lots in McKinley Village (Sacramento County) through unconsolidated joint ventures. We expect to create a masterplan containing 12 communities in the Russell Ranch community, under which we may acquire lots and build homes for our own account in addition to selling lots to other homebuilders. We are in the process of creating a masterplan containing eight communities

3

Table of Contents

in Davis, under which we may acquire lots from the unconsolidated joint venture and build homes for our own account in addition to selling lots to other homebuilders. We anticipate that the McKinley Village community will contain 328 homes in four product types. In addition, we controlled one fee building project that contains a total of 343 homes remaining to be built in Davis (Yolo County).

### Owned and Controlled Lots as of September 30, 2013

|  | Company | | | Unconsolidated Joint Ventures | | |
|---|---|---|---|---|---|---|
|  | Owned | Controlled | Total | Owned | Controlled | Total |
| Southern California | 170 | 303 | 473 | 567 | — | 567 |
| San Francisco Bay Area | — | 162 | 162 | 324 | 404 | 728 |
| Metro Sacramento | 159 | 32 | 191 | 870 | 875 | 1,745 |
| Total | 329 | 497 | 826 | 1,761 | 1,279 | 3,040 |

Net new home orders for our projects for the nine months ended September 30, 2013 and the years ended December 31, 2012 and 2011 were 6 homes, 72 homes and 45 homes, respectively. Net new home orders for our unconsolidated joint venture projects for the nine months ended September 30, 2013 and the year ended December 31, 2012 were 111 homes and 96 homes, respectively. For the nine months ended September 30, 2013 and the year ended December 31, 2012, we delivered 59 homes and 53 homes, respectively, from our projects and 74 homes and 42 homes, respectively, from our unconsolidated joint venture projects. The dollar amount of our backlog of homes sold but not closed for our projects as of September 30, 2013 was approximately $20.0 million. The dollar amount of the backlog of homes sold but not closed for our unconsolidated joint venture projects as of September 30, 2013 was approximately $93.5 million.

### Industry Overview

The following information is contained in the market study provided by JBREC:

*National Housing Market*

The U.S. housing market continues to improve from the cyclical low points reached during the 2007 to 2009 national recession and the extended housing correction. Between the 2005 market peak and 2011, new single-family home sales declined 76%, according to data compiled by the U.S. Census Bureau, and median home prices declined 34%, as measured by the CoreLogic Case-Shiller Index. In 2011, some U.S. markets showed early indications of recovery as a result of an improving macroeconomic backdrop and strong housing affordability compared to historical data. The recovery gained momentum in 2012, and more regions of the country benefitted from declining inventory, stable to increasing prices and rising demand.

In the first half of 2013, home sales and prices rose dramatically in many metropolitan areas, as very low inventory drove consumers to new home communities that could supply new construction. In the second half of 2013, the housing market has cooled as potential buyers considered the impacts of higher home prices and mortgage rates, and continued anxiety following the October government shutdown. Despite this slowing, JBREC's outlook remains positive, with expectations of more moderate and sustainable growth ahead.

In the 12 months ended October 31, 2013:

- New home sales have increased to a seasonally adjusted annual rate of 444,000 according to the Census Bureau, which is 55% of the normalized level of 800,000 nationally.

- Homebuilding permits have increased to 1,034,000 annually on a seasonally adjusted basis, according to the Census Bureau, and single-family permits have risen by 9% year-over-year.

Table of Contents

- The median resale single-family home price increased 12% year-over-year, according to data compiled by the National Association of Realtors, with sales volume up by 11%.

*Selected Housing Markets*

The following table provides a summary of actual economic data and estimates, forecasts and projections for the eight primary markets for the most recent data available as of October 2013.

| Market | Forecasted 2013 Home Value Appreciation (1) | Forecasted 2014 Home Value Appreciation (1) | Data: Twelve months ended October 31, 2013 | | | |
| | | | Job Growth | Permits | Job Growth / Permit Ratio | Months of Resale Supply (2) |
|---|---|---|---|---|---|---|
| Orange County | 18.0% | 8.2% | 28,100 | 9,256 | 3.0 | 2.7 |
| San Diego | 18.1% | 9.1% | 23,000 | 6,799 | 3.4 | 2.7 |
| Ventura | 18.2% | 9.3% | 5,500 | 669 | 8.2 | 3.4 |
| Los Angeles | 19.0% | 8.2% | 56,600 | 12,823 | 4.4 | 3.1 |
| San Francisco | 18.1% | 6.8% | 23,700 | 5,423 | 4.4 | 3.2 |
| San Jose | 19.5% | 5.4% | 22,900 | 6,748 | 3.4 | 2.2 |
| Sacramento | 26.6% | 11.0% | 7,800 | 4,437 | 1.8 | 1.8 |
| Phoenix | 20.6% | 9.4% | 36,000 | 17,362 | 2.1 | 2.9 |

(1)  This information is contained in the market study provided to us by JBREC and is based upon various assumptions and forward-looking estimates. Actual results may differ materially from this forecast.

(2)  Estimated months of supply as of May 31, 2013.

## Our Competitive Strengths

We believe the following strengths will provide us with a significant competitive advantage in implementing our business strategy:

### Experienced and Proven Leadership Supported by a Talented Senior Management Team

Our founders have worked together for various periods of up to 25 years and have successful track records of managing and growing homebuilding companies. Their combined real estate industry experience includes land acquisition, entitlement, master-planned community creation, land development, home construction, financing, marketing and sales of single-family detached and attached homes in communities in a variety of markets. Prior to forming our company in 2009, Messrs. Webb and Stelmar worked together for 11 years at John Laing Homes and oversaw the growth of that business, beginning with the merger of Watt Residential Partners with John Laing Homes in 1998, the leveraged buyout of John Laing Homes in 2001 for $190 million (representing a purchase price of approximately 1.0x book value) and, finally, orchestrating the timely sale of John Laing Homes in 2006 for $1.05 billion (representing a sale price of approximately 3.4x book value). Mr. Redwitz joined John Laing Homes in 2002 as President of its Laing Luxury Division, having served previously as President of Taylor Woodrow's Southern California division from 1999 to 2002. In addition, Mr. Davis brings over 40 years of land development and entitlement experience and served for eleven years as President of Irvine Community Development Corporation, a subsidiary of The Irvine Company and developer of the Irvine Ranch, a 125,000 lot master-planned community containing approximately 40 villages located in Orange County, California. However, despite our management team's experience, we were formed in 2009 and have a limited operating history.

We believe that our founders' extensive experience, relationships, local market knowledge and reputation provide us with a competitive advantage in being able to acquire land, create masterplans, obtain entitlements, build quality homes and complete projects on budget and on schedule. Our executives are supported by a talented senior management team that was assembled at a time of dislocation in the homebuilding industry and was hand-picked to build deep organizational strength designed to ensure execution of management's business plan.

Table of Contents

Our founders have made and continue to hold a significant investment in the Company. Collectively, Messrs. Webb, Stelmar, Redwitz and Davis have invested $15 million cumulatively since the Company's formation in 2009.

*Significant Land Positions in Our Markets to Support Growth Plan*

We believe that we have strong land positions strategically located within our core markets, many of which were acquired during the downturn and are controlled at favorable prices. The prior experience of our founders in the creation of thoughtful land plans and consumer-driven architecture provides us the ability to create unique communities, enhancing the value of our homes. Our Southern California assets are well located along key transportation corridors in major job centers in our submarkets. In the San Francisco Bay area, our assets are located within and around the Silicon Valley, a major employment center. In Sacramento, our assets are located in infill or existing master-planned communities, located near major employment centers, with a concentration of larger technology and medical companies and strong school districts.

As of September 30, 2013, in California, we owned or controlled 826 lots, our unconsolidated joint ventures owned or controlled 3,040 lots, and we controlled 887 lots under fee building arrangements. We owned 78 lots, and our unconsolidated joint ventures owned 771 lots, on which we had commenced development. An additional 528 lots were under development and subject to fee building contracts. The remaining lots were owned or controlled and in various stages of pre-development activities with development expected to begin during 2014. However, there can be no assurance that we or our unconsolidated joint ventures will acquire any of the land parcels under contract on the timing anticipated or at all or that we or our unconsolidated joint ventures will proceed to build and sell homes on any of this land.

*Focus on Attractive Growth Markets in California*

We are currently focused on identifying unique sites and creating communities that allow us to design, construct and sell consumer-driven single family detached and attached homes in major metropolitan areas in coastal Southern California, the San Francisco Bay area and metro Sacramento. Given our existing land positions, strong local relationships and reputation for quality building, we believe our business is well-positioned to capitalize on the housing market recovery underway in these markets. However, we face significant competition in our markets, and during the most recent downturn, the California housing market experienced a deeper and longer decline than many other markets. According to JBREC, these regions represent some of the largest single family housing markets in the country, as defined by sales, starts and building permits. Our markets are generally characterized as infill markets with barriers to entry, job growth and increasing populations, which can create growing demand for new housing. Moreover, our management team has deep local market knowledge of the California homebuilding and the land planning and development businesses. We believe this experience and strong relationships with local market participants uniquely enable our company to source site acquisitions and achieve land entitlements to fuel our growth.

*History of Operational Discipline*

Our management team possesses extensive and valuable expertise, including in the growth and operation of a much larger homebuilder controlled by a large public company. The perspective gained from leadership roles with companies such as John Laing Homes, Taylor Woodrow, The Irvine Company and others has helped shape the strict discipline and hands-on management approach that we believe has been a key component of initial success. From weekly project activity performance management to semi-monthly operations reviews covering each project combined with financial accountability at the project level, our strict operating discipline is a key part of our strategy to increase returns while effectively managing risk. However, like other growing companies, we face challenges in expanding our operations while trying to manage risk and maintaining our disciplined and

hands-on approach. Our management team has drawn upon the deep real estate knowledge base of IHP, Watt and Tricon personnel and their substan experience in investing in real estate. Additionally, IHP and Tricon have made off-market opportunities available to us through affiliates and may make additional opportunities available to us in the future.

*Absence of Legacy Issues Allows Us to Focus on the Growth of Our Business*

Our absence of legacy issues enables us to focus on the growth of our business, as opposed to diverting attention and resources to manage troubled assets or other legacy issues. Our land inventory was accumulated following the investment in us by IHP and Watt in August 2010 and by Tricon in January 2011, and we do not have any existing distressed assets or liabilities to manage, unlike many competitors that were affected by the unprecedented downturn in the real estate markets that resulted from the recession during 2008 and 2009. All of our real estate assets were acquired and are located in markets that we targeted after the downturn commenced. However, there can be no assurance that our land inventory will not decline in value from the prices that we paid.

## Our Business Strategy

Our business strategy is focused on the design, construction and sale of consumer-driven new homes in planned communities in major metropolitan areas located in coastal Southern California, the San Francisco Bay area and metro Sacramento. Our business strategy is driven by the following:

*Disciplined Acquisition of Attractive Land Positions*

We believe that we have strong land positions strategically located within our core markets, many of which were acquired or that we acquired control over during the downturn in the market. We believe that our professional reputation and long-standing relationships with key land sellers including master plan community developers, brokers and other builders, as well as our institutional investors and joint venture partners, enable us to acquire well-positioned land parcels in our existing markets as well as new target markets. The strength of these relationships often provides us with a first look at acquisition opportunities and allows us to negotiate terms based on our reputation for delivering on our promises.

In addition, we plan to continue to leverage the strength of our land planning and land development expertise in each local market to position us to add value to our land, capture incremental profit opportunities and provide a steady supply of lots to support the significant planned growth of our homebuilding business. Land development and planning operations are overseen by Joseph Davis, one of our founders and our Chief Investment Officer, who has over 40 years of industry experience. Collectively, the five senior professionals in charge of our land acquisition and planning activities have over 90 years of experience and extensive relationships that help us to achieve entitlements in a timely manner in order to reduce market risk. We only seek to acquire land where we believe our development and entitlement skills can help us earn a risk-adjusted return that is accretive to our overall return on land or that is in excess of existing market opportunities.

We believe that our strategy of holding an inventory of land that will provide us with a two- to three-year supply of developed lots for our homebuilding operations and focusing on the entitlement and development of parcels, primarily in our land development joint ventures, that we can complete within approximately 24 to 48 months from the date the property is acquired allows us to control our exposure to land development and market cycle risk while pursuing attractive returns on our capital. Furthermore, we have stringent underwriting return criteria that measure entitlement, development, market and financing risks for each proposed acquisition. These risks are quantified and a numeric risk value is determined, which is used to set our minimum required unleveraged internal rate of return for the proposed acquisition.

7

Table of Contents

We further seek to reduce our exposure to land risk through the use of land options, joint ventures and other flexible land acquisition arrangements. Our joint venture strategy has been instrumental in allowing us to leverage our entity-level capital and establish a homebuilding platform focused on high-growth, land-constrained markets.

### Deliver a Diverse, Consumer-Driven Product Offering and a Superior Home Experience

We consider ourselves a local market, consumer-driven homebuilder with expertise across a wide variety of product types and customer segments, including the entry-level, move-up, move-down and luxury-focused customer segments. In addition to understanding the key economic drivers of demand in our markets, we focus on understanding the pool of potential buyers, the product types sought by those buyers and the proper price point for the product types in each market. We perform extensive consumer research that helps us create land plans and design homes that meet the needs and desires of our specific targeted buyers. Our homes are competitively priced, but are not designed to be the lowest cost option in the market. Our core operating philosophy is to provide a positive, memorable experience to our homeowners through active engagement in the building process, tailoring our product to the buyer's lifestyle needs and enhancing communication, knowledge and satisfaction.

A key element of our strategy is to allow all buyers to personalize their homes regardless of the price point. Unlike many homebuilders with centralized locations to which buyers can travel to select options and upgrades, each of our communities has an on-site design center with a dedicated designer knowledgeable about the attributes of the homes offered in the community. The specific options and upgrades, both structural and finishes, available for the community are selected by our buyers as they navigate the buying process. These options and upgrades in many cases can form a substantial part of the total purchase price of a home and are typically priced with profit margins well in excess of the profit margins on the base home purchase before the options and upgrades. We also believe that the active participation of buyers in selecting options and upgrades results in buyers becoming more personally invested in their homes. In 2012, our cancellation rate, excluding our unconsolidated joint ventures, was 16%, which was below the average of approximately 18.5% for homebuilders who were public in 2012. In 2012, the cancellation rate for our unconsolidated joint ventures was 5%.

We spend extensive amount of time studying and designing our products through the selection of architects, consultants and homeowner focus groups for all levels and price points in our target markets. We believe our diversified product strategy enables us to better serve a wide range of buyers, adapt quickly to changing market conditions and improve performance and returns while strategically reducing portfolio risk. We believe these steps improve the selling process, lead to a more satisfied homeowner, increase the number of buyers referred to our communities and enhance our operating results.

### Increase Active Community Count in Our Markets

Our belief that homebuilding is a local market business supports our strategy to pursue significant opportunities to expand our business in our existing markets. We continually review the allocation of capital among our markets, based on both aggregate demographic information and our own operating results. We use the results of these reviews to focus our investments on those markets where we believe we can increase our profitability and return on capital. Additionally, we engage in limited speculative building and proceed with community development in phases where we believe it is economically feasible to do so with the goal of optimizing community design and increasing profits. While our primary growth strategy will focus on increasing our market position in our existing markets, we are exploring expansion opportunities in Phoenix and the Pacific Northwest and may consider other markets, through organic growth or acquisitions.

Table of Contents

### Vigilant Focus on Cost Structure

Cost control throughout our business permeates our corporate culture. Our management team maintains its focus on controlling costs and in implementing measures designed to ensure that our organization is efficient. We competitively bid each phase of development while maintaining strong relationships with our trade partners. We manage production schedules closely and, while respecting our valued relationships, require accountability from our vendors and trade partners.

We have made significant investments in systems in order to be responsive to the reporting and other needs of our institutional investors. These systems are designed to enable us to operate our business efficiently. We believe that our systems and infrastructure are designed to be scalable and support the planned growth of our Company.

### Prudent Use of Leverage to Enhance Shareholder Returns

Our seasoned management team has experienced many cycles in the housing market and our four most senior executives have made substantial personal investments in us. We seek to increase stockholder value over the long-term, and operate our business to mitigate risks from downturns in the market and position ourselves to capitalize on upturns. We intend to employ both debt and equity as part of our ongoing financing strategy, coupled with redeployment of cash flow from continuing operations, to provide us with the financial flexibility to access capital on favorable terms. In that regard, we expect to employ prudent levels of leverage to finance the acquisition and development of our lots and construction of our homes. Upon completion of the offering, we expect to have leverage on a debt to book capitalization basis of less than 20%. Our existing indebtedness is both recourse and non-recourse to us and we anticipate that future indebtedness will be likewise. As of September 30, 2013, we had approximately $46.8 million of loan commitments, of which $17.0 million was outstanding. At that date, our aggregate loan commitments consisted primarily of a revolving loan and a loan from a land seller secured by the land.

9

Table of Contents

### Project Sales by Market

The following table sets forth home sales revenue and units delivered by market for our projects in which we built and sold the homes for our account during the nine months ended September 30, 2013 and 2012, and the years ended December 31, 2012, 2011 and 2010. In addition, the following table sets forth units delivered by market during those periods for our unconsolidated joint ventures and our fee building projects, in which we built the homes for independent third-party property owners. In our fee building business, we receive management fees for homes we build for independent third-party property owners and do not record the home sales revenue from the homes sold.

| | Nine Months Ended September 30, 2013 | | Nine Months Ended September 30, 2012 | | Year Ended December 31, 2012 | | Year Ended December 31, 2011 | | Year Ended December 31, 2010 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered |
| | | | | | | (dollars in thousands) | | | | |
| **Southern California** | | | | | | | | | | |
| *Company Projects* | | | | | | | | | | |
| **Orange County:** | | | | | | | | | | |
| Stonetree Manor, Irvine | $ — | — | $ — | — | $ — | — | $ 9,916 | 14 | $ 674 | 1 |
| Four Quartets, Irvine | — | — | 980 | 2 | 980 | 2 | 5,146 | 11 | — | — |
| **Total—Southern California** | — | — | 980 | 2 | 980 | 2 | 15,062 | 25 | 674 | 1 |
| **Northern California** | | | | | | | | | | |
| *Company Projects* | | | | | | | | | | |
| **Sacramento County:** | | | | | | | | | | |
| Madeira, Elk Grove | — | — | 3,364 | 10 | 3,364 | 10 | 5,842 | 17 | 2,338 | 7 |
| Marbella, Folsom | — | — | 1,527 | 5 | 1,527 | 5 | — | — | — | — |
| Folsom Trails, Folsom | 17,376 | 44 | — | — | 3,303 | 9 | — | — | — | — |
| **Placer County:** | | | | | | | | | | |
| Strada, Roseville | — | — | — | — | — | — | 933 | 5 | — | — |
| Lincoln, Roseville | 3,780 | 11 | 2,422 | 8 | 4,326 | 14 | 627 | 2 | — | — |
| Granite Bay, Granite Bay | 3,579 | 4 | 4,010 | 5 | 10,698 | 13 | — | — | — | — |
| **Total—Northern California** | 24,735 | 59 | 11,323 | 28 | 23,218 | 51 | 7,402 | 24 | 2,338 | 7 |
| **Total—Company** | $ 24,735 | 59 | $ 12,303 | 30 | $ 24,198 | 53 | $ 22,464 | 49 | $ 3,012 | 8 |
| *Unconsolidated Joint Ventures* [1] | | | | | | | | | | |
| **Orange County:** | | | | | | | | | | |
| Lambert Ranch-Field, Irvine | $ 28,012 | 26 | $ — | — | $ 14,466 | 14 | $ — | — | $ — | — |
| Lambert Ranch-Hill, Irvine | 37,764 | 24 | | | 21,131 | 15 | | | | |
| Lambert Ranch-Grove, Irvine | 39,226 | 24 | | | 20,421 | 13 | | | | |
| **Total—Unconsolidated Joint Ventures** | $ 105,002 | 74 | $ — | — | $ 56,018 | 42 | $ — | — | $ — | — |
| *Fee Building Projects* | | | | | | | | | | |
| **Orange County:** | | | | | | | | | | |
| Carmel, Irvine [2] | | — | | — | | — | | 47 | | 49 |
| Toscana, Irvine [3] | | 45 | | 14 | | 41 | | — | | — |
| San Marino, Irvine [3] | | 38 | | — | | 9 | | — | | — |
| Mendocino, Irvine [3] | | 65 | | — | | — | | — | | — |
| **Total—Fee Building Projects** | | 148 | | 14 | | 50 | | 47 | | 49 |

[1] Home sales revenue from unconsolidated joint ventures reflects the entire amount of home sales revenue of such joint ventures and not our share thereof. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest

Table of Contents

for each of our joint ventures is described under "Our Business—Joint Ventures." Revenue from unconsolidated joint ventures is not included in our revenue for generally accepted accounting principles, or GAAP, purposes, but is recognized as a component of equity in net (income) loss of unconsolidated joint ventures. These figures are included here for informational purposes only.

(2)  We entered into a fee building agreement to build homes in this community for an independent third-party owner. This project was marketed under The New Home Company brand name.

(3)  We entered into a fee building agreement to build homes in this community for an independent third-party property owner. This project is marketed under the independent third-party property owner's name.

### Description of Completed Projects and Communities under Development

Our homebuilding projects usually take approximately 24 to 36 months to complete from the initiation of homebuilding activity. The following table presents project information relating to each of our markets as of September 30, 2013 and includes information for all completed projects from our inception and current projects under development where we are building and selling homes for our own account or for our unconsolidated joint ventures, and all completed projects from our inception and current projects under development where we are acting as a fee builder.

| County, Project, City | Year of First Delivery (1) | Total Number of Homes to Be Built at Completion (2) | Cumulative Units Delivered as of September 30, 2013 | Backlog at September 30, 2013(3) | Lots as of September 30, 2013(4) | Sales Price Range (in thousands) (5) | Home Size Range (sq. ft.)(6) |
|---|---|---|---|---|---|---|---|
| *Company Projects* | | | | | | | |
| **Southern California** | | | | | | | |
| Los Angeles County: | | | | | | | |
| Canyon Oaks, Calabasas | 2016 | 150 | — | — | 150 | $625 - $785 | 1,800 - 2,317 |
| Orange County: | | | | | | | |
| Four Quartets, Irvine | 2011 | 13 | 13 | — | — | $372 - $554 | 1,132 - 1,745 |
| Stonetree Manor, Irvine | 2011 | 15 | 15 | — | — | $635 - $732 | 1,964 - 2,268 |
| Ventura County: | | | | | | | |
| Twenty Oaks, Thousand Oaks | 2014 | 20 | — | — | 20 | $974 - $1,070 | 2,900 - 4,016 |
| **Southern California Total** | | **198** | **28** | **—** | **170** | | |
| | | | | | | | |
| **Northern California** | | | | | | | |
| El Dorado County: | | | | | | | |
| Blackstone, El Dorado Hills | 2015 | 71 | — | — | 71 | $434 - $454 | 2,000 - 2,333 |
| Placer County: | | | | | | | |
| Lincoln Crossing, Lincoln | 2011 | 27 | 27 | — | — | $324 - $415 | 1,948 - 2,350 |
| Strada, Roseville | 2011 | 5 | 5 | — | — | $180 - $197 | 1,271 - 1,462 |
| Granite Bay, Granite Bay | 2012 | 17 | 17 | — | — | $733 - $985 | 2,809 - 3,680 |
| Olive Ranch, Granite Bay | 2013 | 12 | — | 11 | 12 | $850 - $1,252 | 3,252 - 3,834 |
| Sacramento County: | | | | | | | |
| Madeira, Elk Grove | 2010 | 34 | 34 | — | — | $273 - $369 | 1,948 - 2,204 |
| Marbella, Folsom | 2012 | 5 | 5 | — | — | $343 - $405 | 1,874 - 2,203 |
| The Trails, Folsom | 2012 | 79 | 53 | 21 | 26 | $353 - $506 | 1,874 - 2,203 |
| The Meadows, Folsom | 2013 | 40 | — | — | 40 | $427 - $472 | 2,061 - 2,350 |
| Candela, Sacramento | 2014 | 10 | — | — | 10 | $296 - $319 | 1,541 - 1,801 |
| **Northern California Total** | | **300** | **141** | **32** | **159** | | |
| | | | | | | | |
| **Total Company Projects** | | **498** | **169** | **32** | **329** | | |

Table of Contents

| County, Project, City | Year of First Delivery[1] | Total Number of Homes to Be Built at Completion[2] | Cumulative Units Delivered as of September 30, 2013 | Backlog at September 30 2013[3] | Lots as of September 30, 2013[4] | Sales Range (in thousands) | Home Size Range (sq. ft.)[5] |
|---|---|---|---|---|---|---|---|
| *Unconsolidated Joint Venture Projects [7]* | | | | | | | |
| **Southern California** | | | | | | | |
| Los Angeles County: | | | | | | | |
| Aqua, Villa Metro, Valencia | 2013 | 95 | — | 17 | 95 | $306 - $354 | 1,105 - 1,441 |
| Terra, Villa Metro, Valencia | 2013 | 99 | — | 10 | 99 | $348 - $400 | 1,420 - 1,745 |
| Sol, Villa Metro, Valencia | 2013 | 99 | — | 12 | 99 | $375 - $434 | 1,610 - 1,998 |
| Cielo, Villa Metro, Valencia | 2014 | 22 | — | — | 22 | $350 - $439 | 1,764 - 2,391 |
| Village at Calabasas, Calabasas | 2015 | 87 | — | — | 87 | $1,114 - $1,393 | 2,038 - 2,549 |
| Orange County: | | | | | | | |
| The Field, Lambert Ranch, Irvine | 2012 | 66 | 40 | 25 | 26 | $940 - $1,489 | 2,784 - 3,053 |
| The Hill, Lambert Ranch, Irvine | 2012 | 45 | 39 | 6 | 6 | $1,264 - $2,217 | 3,423 - 3,808 |
| The Grove, Lambert Ranch, Irvine | 2012 | 58 | 37 | 21 | 21 | $1,500 - $2,100 | 4,281 - 4,596 |
| Meridian, Newport Beach | 2014 | 79 | | | 79 | $2,000 - $3,200 | 2,726 - 3,170 |
| Oliva, San Juan Capistrano | 2014 | 33 | — | — | 33 | $1,600 - $2,025 | 3,812 - 5,291 |
| **Southern California Total** | | **683** | **116** | **91** | **567** | | |
| | | | | | | | |
| **Northern California** | | | | | | | |
| Marin County: | | | | | | | |
| The Collection, Rose Lane, Larkspur | 2014 | 29 | — | — | 29 | $1,885 - $2,864 | 1,649 - 3,539 |
| Garden House, Rose Lane, Larkspur[8] | 2014 | 14 | — | — | 14 | $850 - $1,000 | 898 - 1,280 |
| Terraces, Rose Lane, Larkspur [8] | 2014 | 42 | — | — | 42 | $1,005 - $1,348 | 772 - 1,601 |
| Santa Clara County: | | | | | | | |
| Row Towns, Orchard Park, San Jose | 2014 | 107 | — | — | 107 | $690 - $815 | 1,645 - 2,181 |
| Court Towns, Orchard Park, San Jose | 2014 | 60 | — | — | 60 | $680 - $770 | 1,690 - 2,243 |
| Condo Flats, Orchard Park, San Jose | 2014 | 72 | — | — | 72 | $690 - $775 | 1,653 - 2,164 |
| Sacramento County | | | | | | | |
| Russell Ranch, Folsom | 2015 | 870 | — | — | 870 | $475 - $690 | 2,450 - 3,450 |
| **Northern California Total** | | **1,194** | **—** | **—** | **1,194** | | |
| **Total—Unconsolidated Joint Venture Projects** | | **1,877** | **116** | **91** | **1,761** | | |
| | | | | | | | |
| *Fee Building Projects* | | | | | | | |
| **Southern California** | | | | | | | |
| Orange County: | | | | | | | |
| Carmel, Irvine | 2011 | 96 | 96 | — | — | $899 - $1,206 | 2,616 - 2,846 |
| San Marino, Irvine[9] | 2012 | 47 | 47 | — | — | $900 - $1,100 | 2,808 - 3,761 |
| Toscana, Irvine[9] | 2011 | 86 | 86 | — | — | $1,000 - $1,300 | 2,806 - 3,137 |
| Mendocino, Irvine[9] | 2013 | 133 | 65 | 68 | 68 | $800 - $950 | 2,221 - 2,452 |
| The Strand, Dana Point[9] | 2014 | 2 | — | 2 | 2 | $5,000 -$5,700 | 6,436 - 7,855 |
| Mendocino Ext., Irvine[9] | 2014 | 114 | — | — | 114 | $800 - $950 | 2,221 - 2,452 |
| Strada, Irvine[9] | 2014 | 224 | — | — | 224 | $850 - $950 | 2,178 - 2,680 |
| Laurel, Irvine[9] | 2014 | 120 | — | — | 120 | $800 - $900 | 2,170 - 2,493 |
| San Diego County: | | | | | | | |
| Carlsbad 16, Carlsbad | 2014 | 16 | — | — | 16 | $750 - $990 | 2,900 - 3,750 |
| **Southern California Total** | | **838** | **294** | **70** | **544** | | |
| | | | | | | | |
| **Northern California** | | | | | | | |
| Yolo County: | | | | | | | |
| West Village[9] | 2014 | 343 | — | — | 343 | $357 - $458 | 1,416 - 2,045 |
| **Northern California Total** | | **343** | **—** | **—** | **343** | | |
| **Total—Fee Building Projects** | | **1,181** | **294** | **70** | **887** | | |

Table of Contents

(1)   Year of first delivery for future periods is based upon management's estimates and is subject to change.

(2)   The number of homes to be built at completion is subject to change, and there can be no assurance that we will build these homes.

(3)   Backlog consists of homes under sales contracts that had not yet closed as of September 30, 2013, and there can be no assurance that closing of sold homes will occur. Backlog has not been reduced to reflect our historical cancellation rate.

(4)   Consists of owned lots, fee building lots and unconsolidated joint venture lots as of September 30, 2013, including owned lots, fee building lots and unconsolidated joint venture lots in backlog as of September 30, 2013. Of the foregoing lots, there were no completed and unsold lots other than those being used as model homes.

(5)   Sales price range reflects actual total price for homes already sold in the respective projects and, where sales have not yet commenced for a project, anticipated sales prices for homes to be sold. The actual prices at which our homes are sold in the future may differ.

(6)   Reflects actual home size range for homes already sold in the respective projects and, where sales have not yet commenced for a project, anticipated home size ranges for homes to be sold. The actual home size ranges may differ.

(7)   We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Joint Ventures."

(8)   Garden House and Terraces have nine and five below-market homes, respectively, as required by the Housing Authority of the County of Marin. The price range for these homes is $181,000 to $425,000 and is excluded from the sales price range reflected in the table.

(9)   We entered into a fee building agreement to build homes in this community for an independent third-party property owner. The project is marketed under the third-party owner's name.

## Pending Acquisitions

As of September 30, 2013, we and our unconsolidated joint ventures had options or were under contract to acquire land for aggregate purchase prices of approximately $194.2 million and $60.1 million, respectively, in each case net of deposits. As of September 30, 2013, we and our unconsolidated joint ventures had paid $3.0 million and $4.5 million, respectively, in non-refundable deposits relating to these pending acquisitions. The following table presents certain information with respect to each of these pending acquisitions as of September 30, 2013.

| | Company | | | Unconsolidated Joint Ventures | | |
|---|---|---|---|---|---|---|
| Market | Total Lots Controlled(1) | Communities | Aggregate Purchase Price, Net(2) | Total Lots Controlled(3) | Communities | Aggregate Purchase Price, Net(4) |
| Southern California | 303 | 5 | $ 153,422,000 | 0 | 0 | $ — |
| San Francisco Bay Area | 162 | 3 | 33,250,000 | 404 | 3 | 29,000,000 |
| Metro Sacramento | 32 | 1 | 7,500,000 | 875 | 12 | 31,129,000 |
| **Company Total** | **497** | **9** | **$ 194,172,000** | **1,279** | **15** | **$ 60,129,000** |

(1)   All of the 497 lots controlled under Company projects are under purchase contracts. There can be no assurance that we will acquire any of these land parcels on the terms or timing anticipated or at all or that we will proceed to build and sell homes on any of this land.

(2)   Consists of the estimated aggregate purchase price for pending acquisitions of all the lots per region, less aggregate deposits paid of $3.2 million, of which $3.0 million was non-refundable, as of September 30, 2013.

(3)   All of the 1,279 lots are under purchase contracts. There can be no assurance that we will acquire any of these land parcels on the terms or timing anticipated or at all or that we will proceed to build and sell homes on any of this land.

(4)   Consists of the estimated aggregate purchase price for pending acquisitions of all the lots per region, less aggregate deposits paid of $4.5 million, as of September 30, 2013.

13

Table of Contents

### Owned and Controlled Lots

As of September 30, 2013, we and our unconsolidated joint ventures owned or controlled, pursuant to purchase and sale agreements, non-binding letters of intent, an aggregate of 826 lots and 3,040 lots, respectively. In addition, we also controlled 887 lots under fee building arrangements. The following table presents certain information with respect to our owned and controlled lots as of September 30, 2013 and for the period from October 1 to December 7, 2013.

| Market | As of September 30, 2013 | | | Activity from October 1 to December 7, 2013 | | | | | As of December 7, 2013 |
|---|---|---|---|---|---|---|---|---|---|
| | Lots Owned | Lots Controlled[1] | Lots Owned and Controlled[1] | Project Location | Status | Lots Controlled | Commun-ities | Purchase Price, Net ($mm) | Total Lots Owned or Controlled |
| Company | | | | | | | | | |
| Southern California | 170 | 303 | 473 | | | | | | 473 |
| Northern California | 159 | 194 | 353 | | | 207 | 3 | 32.25 | 560 |
| | | | | Alameda | LOI[2] | 167 | 2 | 30.25 | |
| | | | | Winters | Contract | 40 | 1 | 2.0 | |
| **Total — Company** | **329** | **497**[3] | **826** | | | | | **32.25** | **1,033** |
| **Unconsolidated Joint Ventures** | **1,761** | **1,279** | **3,040** | | | **—** | **—** | | **3,040** |
| **Fee Building Projects** | **—** | **887** | **887** | | | **814** | **5** | **—** | **1,701** |
| | | | | Irvine-Jasmine | Contract | 228 | 1 | — | |
| | | | | Irvine-Corte Bella | Contract | 119 | 1 | — | |
| | | | | Irvine-Terrazza | Contract | 149 | 1 | — | |
| | | | | Irvine-Vista Scena | Contract | 195 | 1 | — | |
| | | | | Irvine-Entrada | Contract | 123 | 1 | — | |

(1) All 497 lots and 1,279 lots that we and our unconsolidated joint ventures, respectively, control are under purchase and sale agreements, and we control 887 lots pursuant to fee building contracts. With respect to the lots under non-binding letters of intent, there can be no assurance that we will enter into binding agreements or as to the terms thereof.

(2) Letter of Intent, or LOI, reflects executed non-binding letters of intent that are subject to customary conditions and have not yet closed, and there can be no assurance that such closings will occur.

(3) We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different unconsolidated joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Joint Ventures."

14

Table of Contents

## Recent Developments

### Quarter Ended December 31, 2013

The following table sets forth our selected preliminary operating data for the three months ended December 31, 2013.

| | Three Months Ended December 31, | | Increase (Decrease) |
| --- | --- | --- | --- |
| | 2013 | 2012 | Amount % |
| **Company** | | | |
| Net new home orders | 6 | 21 | (71)% |
| New homes delivered | 23 | 23 | — |
| Average selling communities | 3 | 2 | 50% |
| Selling communities at end of period | 3 | 2 | 50% |
| Backlog[1] at end of period, number of homes | 15 | 26 | (42)% |
| **Joint Ventures** | | | |
| Net new home orders | 45 | 21 | 114% |
| New homes delivered | 74 | 42 | 76% |
| Average selling communities | 6 | 3 | 100% |
| Selling communities at end of period | 6 | 3 | 100% |
| Backlog[1] at end of period, number of homes | 62 | 54 | 15% |

_____

[1]   Backlog consists of homes under sales contracts that had not yet closed as of December 31, 2013, and there can be no assurance that closings
sold homes will occur. Backlog has not been reduced to reflect our historical cancellation rate.

The preliminary operating data presented above for the three months ended December 31, 2013 is subject to change pending finalization, and actual data may differ.

### Other Developments

In October 2013, we formed our TNHC-HW Cannery unconsolidated joint venture, and it is under contract to acquire a 98 acre site for the development of 547 lots in Davis, California. For more information, see "Our Business—Joint Ventures."

In December 2013, the Company entered into additional fee building contracts with the Irvine Company to build five projects containing a total of 814 homes. Pursuant to these contracts, construction activity began in late December 2013.

On January 16, 2014, we entered into an option agreement with respect to our potential acquisition of entitled parcels of land in Southern California for an aggregate purchase price of approximately $74 million on which we currently plan to develop approximately 1,200 lots. In connection with the option agreement, we paid a refundable deposit of $500,000. The option agreement provides for a due diligence period that continues through January 27, 2014, at which time our initial deposit becomes non-refundable, and we are required to deposit an additional $1 million. The option agreement provides for a total of $4 million in non-refundable option payments by us over time that are not credited against the purchase price and contemplates a closing of the lot purchase in December 2014. If we proceed with this acquisition, we will likely acquire the lots through a joint venture, although we have not entered into any joint venture for such purpose as of the date hereof. There can be no assurance that we will proceed with this acquisition on the terms described or at all or that we will be successful in developing the lots.

15

Table of Contents

### Summary Risk Factors

An investment in shares of our common stock involves risks. You should consider carefully the risks discussed below and described more fully along with other risks under "Risk Factors" in this prospectus before investing in our common stock.

- The homebuilding and land development industry in the United States has recently undergone a significant downturn, and the likelihood of a continued recovery is uncertain in the current state of the economy.

- Our industry is cyclical and adverse changes in general and local economic conditions could reduce the demand for homes and, as a result, could have a material adverse effect on us.

- Our geographic concentration could materially and adversely affect us if the homebuilding industry in our markets should decline.

- Because most of our homebuyers finance the purchase of their homes, the terms and availability of mortgage financing can affect the demand for and the ability to complete the purchase of a home, which could materially and adversely affect us.

- Interest rate increases or changes in federal lending programs or other regulations could lower demand for our homes, which could materially and adversely affect us.

- Our long-term growth depends, in part, upon our ability to successfully identify and acquire desirable land parcels for residential buildout.

- The estimates, forecasts and projections relating to our markets prepared by JBREC are based upon numerous assumptions and may not prove to be accurate.

- Our business and results of operations are dependent on the availability and skill of subcontractors.

- Fluctuations in real estate values may require us to write-down the book value of our real estate assets.

- We expect to use leverage in executing our business strategy, which may adversely affect the return on our assets.

- Our current and future joint venture investments could be adversely affected by a lack of sole decision-making authority, disputes with our joint venture partners, and reliance on the financial condition and liquidity of our joint venture partners.

- We have a limited operating history and we may not be able to successfully operate our business.

- There is currently no public market for shares of our common stock, a trading market for our common stock may never develop following this offering and our common stock prices may be volatile and could decline substantially following this offering.

- The offering price per share of our common stock offered under this prospectus may not accurately reflect the value of your investment.

Table of Contents

### Formation Transaction

Immediately prior to the completion of this offering, TNHC LLC converted into a Delaware corporation, The New Home Company Inc. As part of this conversion, all of the outstanding membership interests in TNHC LLC will be converted into an aggregate of 8,636,250 shares of common stock in The New Home Company Inc. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

We carry out our business generally through a number of project-specific, wholly owned subsidiaries and joint ventures. Our fee building business is conducted primarily through our wholly owned subsidiary, TNHC Realty and Construction Inc., through which we also conduct real estate brokerage and contracting activities relating to our business.

The following chart illustrates our expected ownership and structure immediately following the completion of this offering (assuming no exercise by the underwriters of their option to purchase additional shares):



(1)    As part of our formation transactions, the members of The New Home Company LLC (the entity that was converted into a Delaware corporation and renamed The New Home Company Inc. as part of our formation transactions), or TNHC LLC, will receive an aggregate of 8,636,250 shares of our common stock in connection with the exchange of their membership interests in TNHC LLC. The members of TNHC LLC include an entity owned by our executive management team and three other non-management institutional investors (Tricon, Watt and IHP). For a more detailed discussion regarding the shares of our common stock that will be received by the members of TNHC LLC, see "Principal Stockholders."

17

Table of Contents

(2) Excludes: (i) 107,500 shares of our common stock issuable upon the vesting of restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our director nominees upon the pricing of this offering pursuant to our 2014 Long Term Incentive Plan; and (ii) 885,454 shares of our common stock issuable upon exercise of options (with a strike price equal to $11.00 per share) to be granted to the members of our management team, other officers and employees upon the pricing of this offering pursuant to our 201 Long Term Incentive Plan.

(3) If the underwriters exercise their option to purchase additional shares of our common stock, we will use the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors.

### Non-Management Institutional Investors

IHP, Watt, and Tricon are our current non-management institutional investors.

IHP Capital Partners was founded in 1992 and is one of the largest investment firms in the United States providing equity financing for residential development. The firm invests institutional capital in for-sale residential real estate projects, including land entitlement, land development and housing construction. IHP and its investment partners have created neighborhoods and communities valued at more than $19 billion, investing in over 235 projects with more than 50 builder and developer partners throughout the United States.

The Watt Companies offer comprehensive and diversified real estate services across the United States to investors and partners, homebuyers a commercial customers. Watt builds homes, offices and shopping centers.

Tricon Capital Group Inc., a publicly traded company listed on the Toronto Stock Exchange (TCN.TO), is one of North America's leading residential real estate investment companies with over $1.7 billion of assets under management and a portfolio of approximately 3,000 U.S. single-family rental homes. Tricon provides financing to local operators or developers in select markets in the United States and Canada, with a primary focus on for-sale housing in growing markets. Since inception, Tricon has invested in over 150 transactions for development projects valued at more than $11 billion. Tricon's interest in us is held through Tricon XI LP, a commingled fund sponsored and managed by Tricon.

### Our Offices

Our principal executive offices are located at 95 Enterprise, Suite 325, Aliso Viejo, California 92656. Our main telephone number is (949) 382-7800. Our internet website is thenewhomecompany.com. The information contained in, or that can be accessed through, our website is not incorporate by reference in and is not a part of this prospectus.

### Implications of Being an Emerging Growth Company

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to companies that are not "emerging growth companies." These provisions include, among other matters:

- an exemption to provide fewer years of financial statements and other financial data in an initial public offering registration statement;

- an exemption from the auditor attestation requirement in the assessment of the emerging growth company's internal control over financial reporting;

Table of Contents

- an exemption from new or revised financial accounting standards until they would apply to private companies with no pending registration statement and from compliance with any requirements adopted by the Public Company Accounting Oversight Board requiring mandatory audit firm rotation;

- reduced disclosure about the emerging growth company's executive compensation arrangements; and

- an exemption from the requirement to seek non-binding advisory votes on executive compensation and golden parachute arrangements.

We have determined to opt out of the exemption from compliance with new or revised financial accounting standards. Our decision to opt out of this exemption is irrevocable.

We have elected to adopt the reduced disclosure requirements available to emerging growth companies. As a result of these elections, the information that we provide in this prospectus may be different than the information you may receive from other companies in which you hold equity interests. In addition, it is possible that some investors will find our common stock less attractive as a result of our elections, which may cause a less active trading market for our common stock and more volatility in our stock price.

We will remain an "emerging growth company" until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion or (c) in which we are deemed to be a large accelerated filer, which means, among other things, that the market value of our common stock that is held by non-affiliates is at least $700 million as of the last business day of our most recently completed second fiscal quarter, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

19

Table of Contents

## The Offering

| | |
|---|---|
| Common stock offered by us | 7,812,500 shares |
| Common stock to be outstanding immediately following this offering | 16,448,750 shares[(1)] |
| Underwriters' option to purchase additional shares | Up to 1,171,875 shares. If the underwriters exercise their option to purchase additional shares of our common stock, we will use the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors. See "Use of Proceeds." |
| Use of proceeds | We expect to receive net proceeds from this offering of approximately $76.7 million (or approximately $88.7 million if the underwriters fully exercise their option to purchase additional shares of our common stock from us), after deducting the underwriting discount and estimated offering expenses payable by us. |
| | We intend to use the net proceeds from this offering, excluding the net proceeds received from any exercise of the underwriters' option to purchase additional shares from us, primarily for the acquisition of land, including the land described above under "—Pending Acquisitions," and for development of lots, home construction and other related purposes. |
| | Although we will receive the net proceeds from any sale of shares of our common stock pursuant to any exercise of the underwriters' option to purchase additional shares from us, we will use such proceeds to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors. See "Use of Proceeds." |
| Dividend policy | We currently intend to retain our future earnings, if any, to finance the development and expansion of our business and, therefore, do not intend to pay cash dividends on our common stock for the foreseeable future. Any future determination to pay dividends will be at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in any financing instruments and such other factors as our board of directors deems relevant. See "Dividend Policy." |
| New York Stock Exchange symbol | Our common stock has been approved for listing on the New York Stock Exchange, subject to official notice of issuance, under the symbol "NWHM." |
| Directed share program | The underwriters have reserved for sale, at the initial public offering price, up to 390,625 shares of our common stock being offered to persons who are directors, officers or employees, or who are otherwise associated with us. See "Underwriting." |

Table of Contents

| Risk factors | Investing in our common stock involves a high degree of risk. For a discussion of factors you should consider in making an investment, see "Risk Factors" beginning on page 26 of this prospectus. |

---

[1] Based on 8,636,250 shares to be outstanding immediately after the consummation of our formation transactions and excludes: (i) 107,500 shares of our common stock issuable upon the vesting of restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our director nominees upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan; (ii) 885,454 shares of our common stock issuable upon the exercise of options (with a strike price equal to $11.00 per share) to be granted to the members of our management team, other officers and employees upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan; and (iii) 651,921 shares of our common stock reserved for future issuance under our 2014 Long-Term Incentive Plan.

21

Table of Contents

## Summary of Selected Financial Data

The following tables set forth our summary selected financial data and other operating information, including pro forma information. The selected financial data as of and for the years ended December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010 are derived from our consolidated financial statements, which have been audited by Ernst & Young LLP, independent registered public accounting firm. The selected financial data as of and for the nine months ended September 30, 2013 and for the nine months ended September 30, 2012 are derived from unaudited financial statements. The unaudited financial statements include all adjustments, consisting of normal recurring accruals, which we consider necessary for a fair presentation of the financial position and the results of operations for these periods. Operating results for the nine months ended September 30, 2013 are not necessarily indicative of the results that may be expected for the entire year ending December 31, 2013. The data should be read in conjunction with the consolidated financial statements, related notes and other financial information included herein.

The unaudited pro forma consolidated statements of operations data for the year ended December 31, 2012 and the nine months ended September 30, 2013 are based on the historical statements of operations. Our historical information is derived from our unaudited statement of operations for the nine months ended September 30, 2013 and our audited statement of operations for the year ended December 31, 2012 included elsewhere in this prospectus.

The unaudited pro forma consolidated balance sheet data as of September 30, 2013 gives effect to the issuance of 7,812,500 shares of common stock at $11.00 per share and the conversion of our membership interests into 8,636,250 shares of common stock all in connection with our initial public offering, as if those transactions had occurred as of September 30, 2013. The unaudited pro forma consolidated statements of operations data for the nine months ended September 30, 2013 and the year ended December 31, 2012 give effect to the issuance of stock awards and the adjustments in executive salaries and board of directors' compensation plans assuming we were public as of January 1, 2012. In addition, we have adjusted our provision for income taxes in the pro forma statement of operations assuming we operated as a corporation for Federal and state tax purposes as of January 1, 2012.

The unaudited pro forma consolidated financial statements data are provided for informational purposes only and are based on estimates and assumptions as set forth in the notes to such statements. The unaudited pro forma consolidated financial statements data are not necessarily indicative of the results of operations to be expected in any future period. This information should be read in conjunction with our historical consolidated financial statements and related notes as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus, and in conjunction with the accompanying notes to these unaudited pro forma consolidated financial statements.

| | TNHC Inc. Pro Forma (3) | TNHC LLC | | TNHC Inc. ProForma (3) | TNHC LLC | | | Period From August 18, 2010 (Inception) Through December 31, | Predecessor Period From January 1, 2010 Through August 17, |
|---|---|---|---|---|---|---|---|---|---|
| | Nine Months Ended September 30, | | | Year Ended December 31, | | | | | |
| Statement of Operations Data:[(1)] | 2013 | 2013 | 2012 | 2012 | 2012 | 2011 (As Restated) (6) | 2010 | 2010 | 2010 |
| Home sales[(2)] | $24,735,081 | $24,735,081 | $12,303,354 | $24,197,956 | $24,197,956 | $ 25,624,111 | $ 5,319,408 | | $ 538,598 |
| Cost of home sales[(2)] | 20,386,325 | 20,386,325 | 10,720,384 | 20,779,338 | 20,779,338 | 21,774,199 | 4,423,236 | | 399,995 |
| Homebuilding gross profit | 4,348,756 | 4,348,756 | 1,582,970 | 3,418,618 | 3,418,618 | 3,849,912 | 896,172 | | 138,603 |
| Fee building | 33,689,862 | 33,689,862 | 13,485,624 | 28,268,675 | 28,268,675 | 16,522,946 | 11,494,347 | | 12,941,110 |
| Cost of fee building | 30,663,898 | 30,663,898 | 12,843,103 | 26,505,042 | 26,505,042 | 16,762,666 | 11,331,286 | | 12,764,497 |
| Fee building gross profit (loss) | 3,025,964 | 3,025,964 | 642,521 | 1,763,633 | 1,763,633 | (239,720) | 163,061 | | 176,613 |
| Land sales gross margin | — | — | (321,791) | (321,791) | (321,791) | | | | — |
| Abandoned project costs | 489,395 | 489,395 | 239,340 | 408,642 | 408,642 | 128,798 | — | | — |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | (1,689,659) | 183,191 | (349,445) | (349,445) | 38,916 | — | | — |
| Selling and marketing | 1,272,575 | 1,272,575 | 1,096,071 | 1,677,058 | 1,677,058 | 1,748,430 | 453,799 | | 134,002 |
| General and administrative | 5,986,901 | 4,122,348 | 3,194,285 | 7,924,144 | 4,474,949 | 3,997,617 | 848,114 | | 328,295 |
| Income (loss) from operations | 1,315,508 | 3,180,061 | (2,809,187) | (4,799,939) | (1,350,744) | (2,303,569) | (242,680) | | (147,081) |
| Guaranty fee income | 85,173 | 85,173 | 56,782 | 85,172 | 85,172 | | | | |
| Other expense, net | (33,790) | (33,790) | (16,001) | (15,048) | (15,048) | (14,750) | (10,596) | | (6,048) |
| Income (loss) before taxes | 1,366,891 | 3,231,444 | (2,768,406) | (4,729,815) | (1,280,620) | (2,318,319) | (253,276) | | (153,129) |
| Provision for taxes | — | (315,313) | (49,543) | — | (71,255) | (10,149) | — | | — |
| Net income (loss) | $ 1,366,891 | $ 2,916,131 | $ (2,817,949) | $ (4,729,815) | $ (1,351,875) | $ (2,328,468) | $ (253,276) | | $ (153,129) |

Table of Contents

| | TNHC Inc. Pro Forma (3) | TNHC LLC | | TNHC Inc. Pro Forma (3) | TNHC LLC | | | Predecessor |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Period From August 18, 2010 (Inception) Through December 31, | Period From January 1, 2010 Through August 17, |
| | Nine Months Ended September 30, | | | Year Ended December 31, | | | | |
| | 2013 | 2013 | 2012 | 2012 | 2012 | 2011 | 2010 | 2010 |
| Unaudited pro forma income (loss) per share | | | | | | | | |
| Basic | $ 0.16 | | | $ (0.55) | | | | |
| Diluted | $ 0.16 | | | $ (0.55) | | | | |
| **Operating Data — Company Projects** | | | | | | | | |
| Net new home orders | | 66 | 51 | | 72 | 45 | 15 | 4 |
| New homes delivered | | 59 | 30 | | 53 | 49 | 8 | — |
| Average sales price of homes delivered | | $ 419,000 | $ 410,000 | | $ 457,000 | $ 523,000 | $ 665,000 | $ — |
| Cancellation rate | | 16.5% | 16.4% | | 16.0% | 25.0% | 10.0% | 0.0% |
| Average selling communities | | 4 | 5 | | 4 | 4 | 3 | 1 |
| Selling communities at end of period | | 3 | 3 | | 3 | 4 | 3 | 1 |
| Backlog at end of period, number of homes | | 32 | 30 | | 26 | 7 | 11 | 4 |
| Backlog at end of period, aggregate sales value | | $20,030,000 | $15,498,000 | | $10,593,000 | $5,074,000 | $ 3,982,000 | $ 1,177,000 |

| | As of September 30, 2013 | | As of December 31, | |
|---|---|---|---|---|
| | TNHC Inc. Pro Forma (3) | TNHC LLC | 2012 | 2011 |
| **Balance Sheet Data** | | | | |
| Cash, cash equivalents and restricted cash | $ 81,274,231 | $ 4,602,356 | $ 6,152,048 | $ 5,523,851 |
| Receivables | 4,475,666 | 4,475,666 | 6,049,676 | 59,317 |
| Real estate inventories | 48,023,354 | 48,023,354 | 39,268,764 | 28,890,573 |
| Investment in unconsolidated joint ventures | 28,238,214 | 28,238,214 | 12,424,229 | 4,854,584 |
| Other assets | 3,949,283 | 3,949,283 | 615,999 | 433,465 |
| Total assets | $ 165,960,748 | $ 89,288,873 | $64,510,716 | $39,761,790 |
| Notes payable to member | $ — | $ — | $ 1,000,000 | $ — |
| Notes payable | 16,975,153 | 16,975,153 | 16,721,878 | 9,383,462 |
| Accounts payable and accrued expenses | 11,866,625 | 11,866,625 | 11,214,124 | 2,526,739 |
| Total liabilities | 28,841,778 | 28,841,778 | 28,936,002 | 11,910,201 |
| Members' equity | — | 60,447,095 | 35,574,714 | 27,851,589 |
| Stockholders' equity | 137,118,970 | — | — | — |
| Total liabilities and equity | $ 165,960,748 | $ 89,288,873 | $64,510,716 | $39,761,790 |

23

Table of Contents

|  | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
|  | **2013** | **2012** | **2012** | **2011** | | |
| **Operating and Financial Data – Unconsolidated Joint Ventures**[(4)] | | | | | | |
| Home sales | $ 105,001,748 | $      — | $ 56,018,517 | $      — | $      — | $      — |
| Cost of home sales | 76,741,526 | — | 41,548,236 | — | — | — |
| Homebuilding gross profit | 28,260,222 | — | 14,470,281 | | | |
| Net income (loss) | $  19,768,602 | $ (2,678,930) | $  8,652,751 | $ (776,819) | $      — | $      — |
| Management fees earned by the Company[(5)] | 4,373,734 | 1,928,883 | 2,949,365 | 844,411 | — | — |
| Net new home orders | 111 | 75 | 96 | — | — | — |
| New homes delivered | 74 | — | 42 | — | — | — |
| Cancellation rate | 5.9% | 2.6% | 5.0% | — | — | — |
| Average selling communities | 6 | 3 | 3 | — | — | — |
| Selling communities at end of period | 4 | 3 | 3 | — | — | — |
| Backlog at end of period, number of homes | 91 | 75 | 54 | — | — | — |
| Backlog at end of period, aggregate sales value | $ 93,529,000 | $101,403,000 | $ 72,921,000 | $      — | $      — | $      — |

|  | As of September 30, | As of December 31, | |
|---|---|---|---|
|  | **2013** | **2012** | **2011** |
| **Balance Sheet Data – Unconsolidated Joint Ventures** | | | |
| Total assets, primarily real estate inventories | $ 287,698,964 | $173,255,773 | $92,622,144 |
| Total liabilities, primarily accounts payable and notes payable | $  85,728,922 | $ 44,673,841 | $21,610,963 |
| The Company's equity | 28,238,214 | 12,424,229 | 4,854,584 |
| Other partners' equity | 173,731,828 | 116,157,703 | 66,156,597 |
| Total equity | 201,970,042 | 128,581,932 | 71,011,181 |
| Total liabilities and equity | $ 287,698,964 | $173,255,773 | $92,622,144 |

|  | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
|  | **2013** | **2012** | **2012** | **2011** | | |
| **Operating Data – Fee Building Projects** | | | | | | |
| New homes delivered | 148 | 14 | 50 | 47 | 37 | 12 |

(1)  In connection with this offering, we converted into a Delaware corporation. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

(2)  During the years ended December 31, 2011 and 2010, the Company entered into a fee building services agreement that allowed us to independently operate a design center and directly market upgrade options to the landowners' homebuyers. We recognized revenue for these option upgrades in accordance with ASC 360-20, *PROPERTY, PLANT AND EQUIPMENT, REAL ESTATE SALES* , as more fully described in the notes to the consolidated financial statements. During the years ended December 31, 2011 and 2010, we recognized revenue for these option upgrades of $3,159,988 and $2,846,472, respectively, which is included above in home sales. The cost of these option upgrades, included above in cost of home sales, was $2,476,668 and $2,231,778 during the years ended December 31, 2011 and 2010, respectively. These revenues and costs were for the delivery of option upgrades on 47 and 49 homes, respectively, which are included in the operating data for fee building services.

Table of Contents

(3) For information regarding the pro forma adjustments, see the unaudited pro forma financial statements contained on pages F-2 through F-7 of this prospectus, which unaudited pro forma financial statements were prepared in accordance with Article 11 of Regulation S-X.

(4) "Operating and Financial Data – Unconsolidated Joint Ventures" reflects the data for the ventures and not our share thereof. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Joint Ventures." Such financial data is not included in our financial data for GAAP purposes, but is recognized in our results of operations as a component of equity in net (income) loss of unconsolidated joint ventures. We have investments in several unconsolidated joint ventures and this information has been included to provide additional information about the operations and financial condition of our unconsolidated joint ventures. This data is included for informational purposes only.

(5) We have entered into agreements with our unconsolidated joint ventures to provide management services related to the underlying projects. Pursuant to the agreements, we receive a management fee based on each project's revenues. During the nine months ended September 30, 2013 and 2012 and the years ended December 31, 2012 and 2011, we earned $4,373,734, $1,928,883, $2,949,365 and $844,411, respectively, in management fees, which have been recorded as fee building revenue.

(6) As more fully discussed on page F-15 of this prospectus, our consolidated financial statements for the years ended December 31, 2012, and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010 have been restated to reflect adjustments related to share-based awards included in general and administrative expenses.

25

Table of Contents

## RISK FACTORS

*An investment in our common stock involves a high degree of risk and should be considered highly speculative. Before making an investment decision, you should carefully consider the following risk factors, which address the material risks concerning our business and an investment in our common stock, together with the other information contained in this prospectus. If any of the risks discussed in this prospectus occur, our business, prospects, liquidity, financial condition and results of operations could be materially and adversely affected, in which case the trading price of our common stock could decline significantly and you could lose part or all of your investment. Some statements in this prospectus, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section entitled " Cautionary Note Concerning Forward-Looking Statements."*

### Risks Related to Our Business

*The homebuilding and land development industry in the United States has recently undergone a significant downturn, and the likelihood of a continued recovery is uncertain in the current state of the economy.*

The homebuilding and land development industry experienced substantial losses in connection with the recent downturn in the U.S. housing market and, in particular, in California. Although the housing markets in the U.S. and the California markets have begun to recover, we cannot predict whether and to what extent this recovery will continue or its timing. While some of the many negative factors that contributed to the housing downturn may have moderated in 2012, several remain, and they could return or intensify to inhibit any future improvement in housing market conditions. These negative factors include but are not limited to the following:

- weak general economic and employment growth that, among other things, restrains consumer incomes, consumer confidence and demand for homes;

- elevated levels of mortgage loan delinquencies, defaults and foreclosures that could add to a "shadow inventory" of lender-owned homes that may be sold in competition with new and other resale homes at low "distressed" prices or that generate short sales activity at such price levels;

- a significant number of homeowners whose outstanding principal balance on their mortgage loan exceeds the market value of their home, which undermines their ability to purchase another home that they otherwise might desire and be able to afford;

- volatility and uncertainty in domestic and international financial, credit and consumer lending markets amid slow growth or recessionary conditions in various regions around the world; and

- tight lending standards and practices for mortgage loans that limit consumers' ability to qualify for mortgage financing to purchase a home, including increased minimum credit score requirements, credit risk/mortgage loan insurance premiums or other fees, required down payment amounts, more conservative appraisals, higher loan-to-value ratios and extensive buyer income and asset documentation requirements.

Additional headwinds may come from the efforts and proposals of lawmakers to reduce the debt of the federal government through tax increases or spending cuts, and financial markets' and businesses' reactions to those efforts and proposals, which could impair economic growth. Given these factors, we may not be successful in implementing our business strategy and may not operate profitably.

*Our industry is cyclical, and adverse changes in general and local economic conditions could reduce the demand for homes and, as a result, could have a material adverse effect on us.*

The residential homebuilding industry is cyclical and is highly sensitive to changes in general economic conditions such as levels of employment, consumer confidence and income, availability of financing for acquisitions, construction and permanent mortgages, interest rate levels, inflation and demand for housing. The

Table of Contents

health of the residential homebuilding industry may also be significantly affected by "shadow inventory" levels during recessionary and recovery periods. "Shadow inventory" refers to the number of homes with mortgages that are in some form of distress but that have not yet been listed for sale. Shadow inventory can occur when lenders put properties that have been foreclosed or forfeited to lenders on the market gradually, rather than all at once, or delay the foreclosure process. A significant shadow inventory in our markets could, were it to be released into our markets, adversely impact home and land prices and demand for our homes and land, which would have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations. In addition, an important segment of our end-purchaser and customer base consists of first time and second time "move-up" buyers, who often purchase homes subject to contingencies related to the sale of their existing homes. The difficulties facing these buyers in selling their homes during recessionary periods may adversely affect our sales. Moreover, during such periods, we may need to reduce our sales prices and offer greater incentives to buyers to compete for sales, which may reduce our margins.

Furthermore, we are subject to additional market exposure risk because it can take years from the time we acquire control of a property to the time we make our first home sale on the site. A project that we initially expect to be profitable may become less profitable or unprofitable due to changes in the global and local economic conditions that occur after we acquire control of the property and before we sell the homes we build on them.

*Our geographic concentration could materially and adversely affect us if the homebuilding industry in our current markets declines.*

Our business strategy is focused on the design, construction and sale of innovative single-family detached and attached homes in planned communities in major metropolitan areas in coastal Southern California, the San Francisco Bay area and metro Sacramento and the potential entry into other Southwestern and Pacific Northwest markets. In Southern California, we principally operate in the counties of Orange, Los Angeles, Ventura and San Diego, and in Northern California, we principally operate in the counties of El Dorado, Placer, Sacramento, Yolo Marin, San Mateo and Santa Clara. Because our operations are concentrated in these areas, a prolonged economic downturn in one or more of these areas could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations, and a disproportionately greater impact on us than other homebuilders with more diversified operations. During the downturn from 2008 to 2010, land values, the demand for new homes and home prices declined substantially in California. In addition, the state of California recently experienced severe budget shortfalls and has raised taxes and increased fees to offset the deficit. If these conditions in California persist or worsen, our business, prospects, liquidity, financial condition and results of operations could materially suffer. If the current, relatively weak buyer demand for new homes in California continues or worsens, home prices could stagnate or continue to decline, which would have a material adverse effect on us.

*Because most of our homebuyers finance the purchase of their homes, the terms and availability of mortgage financing can affect the demand for and the ability to complete the purchase of a home, which could materially and adversely affect us.*

Our business depends on the ability of our homebuyers to obtain financing for the purchase of their homes. Many of our homebuyers must sell their existing homes in order to buy a home from us. Since 2009, the U.S. residential mortgage market as a whole has experienced significant instability due to, among other things, defaults on subprime and other loans, resulting in the declining market value of such loans. In light of these developments, lenders, investors, regulators and other third parties questioned the adequacy of lending standards and other credit requirements for several loan programs made available to borrowers in recent years. This has led to tightened credit requirements and an increase in indemnity claims for mortgages. Deterioration in credit quality among subprime and other nonconforming loans has caused most lenders to eliminate subprime mortgages and most other loan products that do not conform to Federal National Mortgage Association, or Fannie Mae, Federal Home Loan Mortgage Corporation, or Freddie Mac, Federal Housing Administration, or FHA, or Veterans Administration, or the VA, standards. Fewer loan products and tighter loan qualifications, in turn, make it more difficult for a borrower to finance the purchase of a new home or the purchase of an existing

27

Table of Contents

home from a potential "move-up" buyer who wishes to purchase one of our homes. In general, these developments have delayed any general improvement in the housing market. If our potential homebuyers or the buyers of our homebuyers' existing homes cannot obtain suitable financing, our business, prospects, liquidity, financial condition and results of operations could be materially and adversely affected.

*Interest rate increases or changes in federal lending programs or other regulations could lower demand for our homes, which could materially and adversely affect us.*

Substantially all purchasers of our homes finance their acquisitions with mortgage financing. Rising interest rates, decreased availability of mortgage financing or of certain mortgage programs, higher down payment requirements or increased monthly mortgage costs may lead to reduced demand for our homes and mortgage loans. Increased interest rates can also hinder our ability to realize our backlog because our home purchase contracts provide customers with a financing contingency. Financing contingencies allow customers to cancel their home purchase contracts in the event that they cannot arrange for adequate financing. As a result, rising interest rates can decrease our home sales and mortgage originations. Any of these factors could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

In addition, as a result of the turbulence in the credit markets and mortgage finance industry, the federal government has taken on a significant role in supporting mortgage lending through its conservatorship of Fannie Mae and Freddie Mac, both of which purchase home mortgages and mortgage-backed securities originated by mortgage lenders, and its insurance of mortgages originated by lenders through the FHA and the VA. The availability and affordability of mortgage loans, including interest rates for such loans, could be adversely affected by a curtailment or cessation of the federal government's mortgage-related programs or policies. The FHA may continue to impose stricter loan qualification standards, raise minimum down payment requirements, impose higher mortgage insurance premiums and other costs, or limit the number of mortgages it insures. Due to federal budget deficits, the U.S. Treasury may not be able to continue supporting the mortgage-related activities of Fannie Mae, Freddie Mac, the FHA and the VA at present levels, or it may revise significantly the federal government's participation in and support of the residential mortgage market. Because the availability of Fannie Mae, Freddie Mac, FHA and VA-backed mortgage financing is an important factor in marketing and selling many of our homes, any limitations, restrictions or changes in the availability of such government-backed financing could reduce our home sales, which could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

Furthermore, in July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was signed into law. This legislation provides for a number of new requirements relating to residential mortgages and mortgage lending practices, many of which are to be developed further by implementing rules. These include, among others, minimum standards for mortgages and lender practices in making mortgages, limitations on certain fees and incentive arrangements, retention of credit risk and remedies for borrowers in foreclosure proceedings. The effect of such provisions on lending institutions will depend on the rules that are ultimately enacted. However, these requirements, as and when implemented, are expected to reduce the availability of loans to borrowers or increase the costs to borrowers to obtain such loans. Any such reduction could result in a decline of our home sales, which could materially and adversely affect us.

*Because of the seasonal nature of our business, our quarterly operating results fluctuate.*

As discussed under "Management's Discussion and Analysis of Financial Condition—Liquidity and Capital Resources—Seasonality" we have experienced seasonal fluctuations in our quarterly operating results and capital requirements that can have a material impact on our results and our consolidated financial statements. We typically experience the highest new home order activity in spring and summer, although this activity also highly depends on the number of active selling communities, timing of new community openings and other market factors. Since it typically takes four to six months to construct a new home, we deliver more homes in the second half of the year as spring and summer home orders convert to home deliveries. Because of this seasonality, home

28

Table of Contents

starts, construction costs and related cash outflows have historically been highest in the second and third quarters, and the majority of cash receipts from home deliveries occur during the second half of the year. We expect this seasonal pattern to continue over the long-term, although it may be affected by volatility in the homebuilding industry. We expect the traditional seasonality cycle and its impact on our results to become more prominent if and as the present housing recovery progresses and the homebuilding industry returns to a more normal operating environment, but we can make no assurances a the degree to which our historical seasonal patterns will occur in 2013 and beyond, if at all.

### Our business and long-term growth would suffer if we are unable to successfully identify and acquire desirable land parcels for residential buildout.

Our future growth depends, in part, upon our ability to successfully identify and acquire attractive land parcels for development of our single-family homes at reasonable prices and with terms that meet our underwriting criteria. Our ability to acquire land parcels for new single-family homes may be adversely affected by changes in the general availability of land parcels, the willingness of land sellers to sell land parcels at reasonable prices, competiti for available land parcels, availability of financing to acquire land parcels, zoning and other market conditions. If the supply of land parcels appropriate fo development of single-family homes is limited because of these factors, or for any other reason, our ability to grow could be significantly limited, and our revenue, gross margins and the number of homes that we build and sell could decline. Additionally, our ability to begin new projects could be impacted if we elect not to purchase land parcels under option contracts. To the extent that we are unable to purchase land parcels timely or enter into new contract the purchase of land parcels at reasonable prices, our home sales revenue and results of operations could be negatively impacted.

### The estimates, forecasts and projections relating to our markets prepared by JBREC are based upon numerous assumptions and may not prove to be accurate.

This prospectus contains estimates, forecasts and projections relating to our markets that were prepared for us for use in connection with this offer by JBREC, an independent research provider and consulting firm focused on the housing industry. See "Market Opportunity." We have paid JBREC a fe $54,533 for its services, plus an amount charged at an hourly rate for additional information we may require from JBREC from time to time in connection with its services. The estimates, forecasts and projections relate to, among other things, employment, demographics, household income, home sales pri and affordability. These estimates may not be, and the forecasts and projections may not prove to be, accurate. These estimates, forecasts and projections based on data (including third-party data), significant assumptions, proprietary methodologies and the experience and judgment of JBREC. In many case particular estimate, forecast or projection may be extremely sensitive to small changes in the underlying assumptions, judgments and methodologies, wh may prove to be inaccurate or inappropriate. Accordingly, the application of alternative assumptions, judgments or methodologies could result in materia less favorable estimates, forecasts and projections than those contained in this prospectus. Other real estate experts have different views regarding thes forecasts and projections that may be more positive or negative, including in terms of the timing, magnitude and direction of future changes.

The forecasts and projections in this prospectus are forward-looking statements and involve risks and uncertainties that may cause actual results to materially different from the projections. JBREC has made these forecasts and projections based on studying the historical and current performance of t residential housing market and applying JBREC's qualitative knowledge and subjective estimates, assumptions and judgments about the residential hou market. The future is difficult to predict, particularly given that the economy and housing markets are cyclical, subject to changing consumer and market psychology and governmental policies related to mortgage regulations and interest rates. There will usually be differences between projected and actual outcomes, because events and circumstances frequently do not occur as expected, and the differences may be material. Accordingly, the forecasts and projections included in this prospectus might not occur or might occur to a different extent or at a different time. For the foregoing reasons, neither we no JBREC can provide any assurance that the estimates, forecasts and projections contained in this prospectus are accurate, actual outcomes may vary significantly from those contained or

Table of Contents

implied by the forecasts and projections, and you should not place undue reliance on these estimates, forecasts and projections. Except as required by l we are not obligated to, and do not intend to, update the statements in this prospectus to conform to actual outcomes or changes in our or JBREC's expectations.

*We may not achieve projected goals and objectives in the time periods that we anticipate or announce publicly, which could have an adverse effect on our business and could cause the price of our common stock to decline.*

We set goals and objectives for the timing of certain accomplishments and milestones regarding our business. We have included some of these go and objectives in this prospectus and may make similar future public statements. For example, this prospectus includes forecasts regarding the timelines opening sales locations, or beginning development, in various communities or markets and the number of homes in planned future communities. These projections are based on our current expectations and may not accurately reflect specific uncertainties or uncertainties inherent in all forecasts. More specifically, the actual timing of these events can vary dramatically due to a number of factors, including currently unforeseen matters and matters beyon our control. You should not unduly rely on these forecasts in deciding whether to invest in our common stock.

*If the market value of our land inventory decreases, our results of operations could be adversely affected by impairments and write-downs.*

The market value of our land and housing inventories depends on market conditions. We acquire land for expansion into new markets and for replacement of land inventory and expansion within our current markets. There is an inherent risk that the value of the land owned or controlled by us ma decline after purchase. The valuation of property is inherently subjective and based on the individual characteristics of each property. We may have acqu options on or bought and developed land at a cost we will not be able to recover fully or on which we cannot build and sell homes profitably. In addition, our deposits for lots controlled under option or similar contracts may be put at risk. Factors such as changes in regulatory requirements and applicable la (including in relation to building regulations, taxation and planning), political conditions, the condition of financial markets, both local and national economic conditions, the financial condition of customers, potentially adverse tax consequences, and interest and inflation rate fluctuations subject valuations to uncertainty. Moreover, all valuations are made on the basis of assumptions that may not prove to reflect economic or demographic reality. I housing demand decreases below what we anticipated when we acquired our inventory, our results of operations and financial conditions may be advers affected and we may not be able to recover our costs when we sell and build houses. We regularly review the value of our land holdings and continue to review our holdings on a periodic basis. Material write-downs and impairments in the value of our inventory may be required, and we may in the future s land or homes at a loss, which could adversely affect our results of operations and financial condition.

*Any limitation on, or reduction or elimination of, tax benefits associated with owning a home would decrease the demand for our home products and land, which could be material to our business.*

Changes in federal income tax laws may affect the demand for new homes and land suitable for residential development. Current tax laws general permit significant expenses associated with owning a home, primarily mortgage interest expense and real estate taxes, to be deducted for the purpose o calculating an individual's federal, and in many cases, state, taxable income. Various proposals have been publicly discussed to limit mortgage interest deductions and to limit the exclusion of gains from the sale of a principal residence. For instance, under the American Taxpayer Relief Act of 2012, whic was signed into law in January 2013, the federal government enacted higher income tax rates and limits on the value of tax deductions for certain high-income individuals and households. If the federal government or a state government changes or further changes its income tax laws, as some lawmaker have proposed, by eliminating, limiting or substantially reducing these income tax benefits without offsetting provisions, the after-tax cost of owning a new home would increase for many of our potential customers. Enactment of any such proposal may have an adverse effect on the homebuilding industry in general, as the loss or reduction of homeowner tax deductions could decrease the demand for new homes.

30

Table of Contents

*Difficulty in obtaining sufficient capital could prevent us from acquiring land for our developments or increase costs and delays in the completion of our development projects.*

The homebuilding and land development industry is capital-intensive and requires significant up-front expenditures to acquire land parcels and beg development. If internally generated funds are not sufficient, we may seek additional capital in the form of equity or debt financing from a variety of potential sources, including additional bank financings or securities offerings. The availability of borrowed funds, especially for land acquisition and construction financing, may be greatly reduced nationally, and the lending community may require increased amounts of equity to be invested in a proje by borrowers in connection with both new loans and the extension of existing loans. The credit and capital markets have recently experienced significa volatility. If we are required to seek additional financing to fund our operations, continued volatility in these markets may restrict our flexibility to access such financing. If we are not successful in obtaining sufficient capital to fund our planned capital and other expenditures, we may be unable to acquire la for our housing developments or to develop housing. Additionally, if we cannot obtain additional financing to fund the purchase of land under our option contracts or purchase contracts, we may incur contractual penalties and fees. Any difficulty in obtaining sufficient capital for planned development expenditures could also cause project delays, which could increase our costs. Any one or more of the foregoing events could have a material adverse ef on our business, prospects, liquidity, financial condition and results of operations.

*We face potentially substantial risk with respect to our land and lot inventory.*

We intend to acquire land parcels for replacement and expansion of land inventory within our current and any new markets. The risks inherent in purchasing and developing land parcels increase as consumer demand for housing decreases. As a result, we may buy and develop land parcels on wh homes cannot be profitably built and sold. The market value of land parcels, building lots and housing inventories can fluctuate significantly as a result o changing market conditions, and the measures we employ to manage inventory risk may not be adequate to insulate our operations from a severe drop inventory values. When market conditions drive land values down, option agreements we have previously entered into may become less desirable, at wh time we may elect to forego deposits and pre-acquisition costs and terminate the agreements. Land parcels, building lots and housing inventories are illi assets, and we may not be able to dispose of them efficiently or at all if we are in financial distress. In addition, inventory carrying costs can be significa and can result in losses in a poorly performing project or market. In the event of significant changes in economic or market conditions, we may have to s homes at significantly lower margins or at a loss, if we are able to sell them at all.

*Adverse weather and geological conditions may increase costs, cause project delays and reduce consumer demand for housing, all of which could materially and adversely affect us.*

As a homebuilder and land developer, we are subject to the risks associated with numerous weather-related and geologic events, many of which a beyond our control. These weather-related and geologic events include but are not limited to droughts, floods, wildfires, landslides, soil subsidence and earthquakes. The occurrence of any of these events could damage our land parcels and projects, cause delays in the completion of our projects, reduce consumer demand for housing and cause shortages and price increases in labor or raw materials, any of which could harm our sales and profitability. Ou California markets are in areas which have historically experienced significant earthquake activity and seasonal wildfires. In addition to directly damagin our land or projects, earthquakes, wildfires or other geologic events could damage roads and highways providing access to those projects, thereby adve affecting our ability to market homes in those areas and possibly increasing the costs of completion.

There are some risks of loss for which we may be unable to purchase insurance coverage. For example, losses associated with landslides, earthqu and other geologic events may not be insurable, and other losses, such as those arising from terrorism, may not be economically insurable. A sizeable uninsured loss could materially and adversely affect our business, prospects, liquidity, financial condition and results of operations.

31

Table of Contents

***Our business and results of operations depend on the availability and skill of trade partners.***

Substantially all of our construction work is done by third-party trade partners with us acting as the general contractor. Accordingly, the timing and quality of our construction depend on the availability and skill of our trade partners. We do not have long-term contractual commitments with any trade partners, and there can be no assurance that skilled subcontractors will continue to be available at reasonable rates and in the areas in which we conduct operations. Certain of the trade partners engaged by us are represented by labor unions or are subject to collective bargaining arrangements that require payment of prevailing wages that are higher than normally expected on a residential construction site. A strike or other work stoppage involving any of our subcontractors could also make it difficult for us to retain subcontractors for our construction work. In addition, union activity could result in higher costs to retain our subcontractors. The inability to contract with skilled trade partners at reasonable costs on a timely basis could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

In addition, despite our quality control efforts, we may discover that our trade partners were engaging in improper construction practices or installing defective materials in our homes. When we discover these issues, we, generally through our trade partners, repair the homes in accordance with our new home warranty and as required by law. We reserve 1% of the sales price of each home we sell to satisfy warranty and other legal obligations to our homebuyers. These reserves are established based on market practices, our historical experiences and our judgment of the qualitative risks associated with the types of homes built. However, the cost of satisfying our warranty and other legal obligations in these instances may be significantly higher than our reserves, and we may be unable to recover the cost of repair from such trade partners. Regardless of the steps we take, we can in some instances be subject to fines or other penalties, and our reputation may be adversely affected.

***Labor and raw material shortages and price fluctuations could delay or increase the cost of home construction, which could materially and adversely affect us.***

The residential construction industry experiences serious labor and raw material shortages from time to time, including shortages in qualified tradespeople, and supplies of insulation, drywall, cement, steel and lumber. These labor and raw material shortages can be more severe during periods of strong demand for housing or during periods where the regions in which we operate experience natural disasters that have a significant impact on existing residential and commercial structures. The cost of labor and raw materials may also increase during periods of shortage or high inflation. During the recent economic downturn, a large number of qualified trade partners went out of business or otherwise exited the market. A reduction in available trade partners will likely exacerbate labor shortages when demand for new housing increases. Shortages and price increases could cause delays in and increase our cost of home construction, which in turn could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

***New and existing laws and regulations or other governmental actions may increase our expenses, limit the number of homes that we can build or delay the completion of our projects.***

We are subject to numerous local, state, federal and other statutes, ordinances, rules and regulations concerning zoning, development, building design, construction and similar matters which impose restrictive zoning and density requirements, which can limit the number of homes that can be built within the boundaries of a particular area. Projects that are not entitled may be subjected to periodic delays, changes in use, less intensive development or elimination of development in certain specific areas due to government regulations. We may also be subject to periodic delays or may be precluded entirely from developing in certain communities due to building moratoriums or "slow-growth" or "no-growth" initiatives that could be implemented in the future. Local governments also have broad discretion regarding the imposition of development fees and exactions for projects in their jurisdiction. Projects for which we have received land use and development entitlements or approvals may still require a variety of other governmental approvals and permits during the development process and can also be impacted adversely by unforeseen health, safety and welfare issues, which can further delay these projects or prevent their development.

32

Table of Contents

As a result, home sales could decline and costs could increase, which could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

### *Our current and future joint venture investments could be adversely affected by a lack of sole decision-making authority and reliance on the financial condition and liquidity of our joint venture partners.*

Upon completion of this offering and our formation transactions, we will own interests in projects through 12 joint ventures, 11 of which are unconsolidated. As of September 30, 2013, we had investments in our unconsolidated joint ventures of $28.2 million. We may enter into additional joint ventures in the future, thereby reducing the amount of capital required by us to make investments and diversifying our capital sources for growth. Such joint venture investments involve risks not otherwise present in wholly owned projects, including the following:

- we do not have exclusive control over the development, financing, management and other aspects of the project or joint venture, which may prevent us from taking actions that are in our best interest but opposed by our partners;

- joint venture agreements often restrict the transfer of a partner's interest or may otherwise restrict our ability to sell the interest when we desire or on advantageous terms;

- our existing joint venture agreements contain, and any future joint venture agreements may contain, buy-sell provisions pursuant to which one partner may initiate procedures requiring the other partner to choose between buying the other partner's interest or selling its interest to that partner; we may not have the capital to purchase our joint venture parties' interest under these circumstances even if we believe it would be beneficial to do so;

- we cannot exercise sole decision-making authority regarding the project or joint venture, which could create the potential risk of creating impasses on decisions, such as acquisitions or sales;

- a partner may, at any time, have economic or business interests or goals that are, or that may become, inconsistent with our business interests or goals;

- a partner may fail to fund its share of required capital contributions or may become bankrupt, which generally would cause us and any other remaining partners to remain liable for the joint venture's liabilities;

- our relationships with our partners are contractual in nature and may be terminated or dissolved under the terms of the applicable joint venture agreements, and, in such event, we may not continue to own or operate the interests or assets underlying such relationship or may need to purchase such interests or assets at a premium to the market price to continue ownership;

- disputes between us and our partners may result in litigation or arbitration that would increase our expenses and prevent our officers and directors from focusing their time and efforts on our business and could result in subjecting the projects owned by the joint venture to additional risk; or

- we may be liable for joint venture obligations where the joint venture is a partnership and we serve as a general partner.

Any of the above might subject a project to liabilities in excess of those contemplated and adversely affect the value of our current and future joint venture investments.

### *We may be unable to obtain suitable bonding for the development of our housing projects.*

We are often required to provide bonds to governmental authorities and others to ensure the completion of our projects. As a result of market conditions, surety providers have been reluctant to issue new bonds and some providers are requesting credit enhancements (such as cash deposits or letters of credit) in order to maintain

Table of Contents

existing bonds or to issue new bonds. If we are unable to obtain required bonds in the future for our projects, or if we are required to provide credit enhancements with respect to our current or future bonds, our business, prospects, liquidity, financial condition and results of operations could be materi and adversely affected.

### We are subject to environmental laws and regulations, which may increase our costs, limit the areas in which we can build homes and delay completion of our projects.

We are subject to a variety of local, state, federal and other statutes, ordinances, rules and regulations concerning the environment. The particular environmental laws which apply to any given property vary according to multiple factors, including the property's location, its environmental conditions, the present and former uses of the property, the presence or absence of endangered plants or animals or sensitive habitats, as well as conditions at nea properties. Environmental laws and conditions may result in delays, may cause us to incur substantial compliance and other costs and can prohibit or severely restrict development and homebuilding activity in environmentally sensitive regions or areas. In addition, in those cases where an endangered o threatened species is involved and agency rulemaking and litigation are ongoing, the outcome of such rulemaking and litigation can be unpredictable, an any time can result in unplanned or unforeseeable restrictions on or even the prohibition of development in identified environmentally sensitive areas. Fre time to time, the United States Environmental Protection Agency, or the EPA, and similar federal, state or local agencies review land developers' and homebuilders' compliance with environmental laws and may levy fines and penalties for failure to strictly comply with applicable environmental laws, including those applicable to control or storm water discharges during construction, or impose additional requirements for future compliance as a result o past failures. Any such actions taken with respect to us may increase our costs and result in project delays. We expect that increasingly stringent requirements will be imposed on land developers and homebuilders in the future. Environmental regulations can also have an adverse impact on the availability and price of certain raw materials such as lumber, and on other building materials.

California is especially susceptible to restrictive government regulations and environmental laws. For example, California imposes notification obligations respecting environmental conditions, sometimes recorded on deeds, and also those required to be delivered to persons accessing property o home buyers or renters, which may cause some persons, or their financing sources, to view the subject parcels as less valuable or as impaired. Californ has also enacted so-called "climate change" legislation, which could result in additional costs to achieve energy use or energy efficiency mandates, alter community layouts, meet "green building" standards and impose carbon or other greenhouse gas reductions or offset obligations, and could result in oth costs or obligations as well.

Under various environmental laws, current or former owners of real estate, as well as certain other categories of parties, may be required to investigate and clean up hazardous or toxic substances or petroleum product releases, and may be held liable to a governmental entity or to third parties related damages, including for bodily injury, and for investigation and clean-up costs incurred by such parties in connection with the contamination. A mitigation system may be installed during the construction of a home if a cleanup does not remove all contaminants of concern or to address a naturally occurring condition such as methane. Some buyers may not want to purchase a home with a mitigation system.

### Ownership, leasing or occupation of land and the use of hazardous materials carries potential environmental risks and liabilities.

We are subject to a variety of local, state and federal statutes, rules and regulations concerning land use and the protection of health and the environment, including those governing discharge of pollutants to soil, water and air, including asbestos, the handling of hazardous materials and the cleanup of contaminated sites. We may be liable for the costs of removal, investigation or remediation of man-made or natural hazardous or toxic substances located on, under or in a property currently or formerly owned, leased or occupied by us, whether or not we caused or knew of the pollution. costs of any required removal, investigation or remediation of such

34

Table of Contents

substances or the costs of defending against environmental claims may be substantial. The presence of such substances, or the failure to remediate such substances adequately, may also adversely affect our ability to sell the land or to borrow using the land as security. Environmental impacts from historical activities have been identified at some of the projects we have developed in the past and additional projects are located on land that was contaminated by previous use.

The particular impact and requirements of environmental laws that apply to any given community vary greatly according to the community site, the site's environmental conditions and the present and former uses of the site. We expect that increasingly stringent requirements may be imposed on land developers and homebuilders in the future. Environmental laws may result in delays, cause us to implement time consuming and expensive compliance programs and prohibit or severely restrict development in certain environmentally sensitive regions or areas, such as wetlands. We also may not identify of these concerns during any pre-acquisition or pre-development review of project sites, and concerns could arise due to post-acquisition changes in law agency policies, or the interpretation thereof. Furthermore, we could incur substantial costs, including cleanup costs, fines, penalties and other sanctions damages from third-party claims for property damage or personal injury, as a result of our failure to comply with, or liabilities under, applicable environmental laws and regulations. In addition, under environmental laws and regulations, third parties, such as environmental groups or neighborhood associations, may challenge the permits and other approvals required for our projects and operations. These matters could adversely affect our business prospects, liquidity, financial condition and results of operations.

*We may be liable for claims for damages as a result of use of hazardous materials.*

As a land development and homebuilding business with a wide variety of historic ownership, development, homebuilding and construction activities we could be liable for future claims for damages as a result of the past or present use of hazardous materials, including building materials or fixtures known or suspected to be hazardous or to contain hazardous materials or due to use of building materials or fixtures which are associated with elevated mold. Many of the agreements pursuant to which we purchase land for development provide that we purchase the land "as is" and that the seller of the land ma no representation as to the existence of any environmental contaminants. Accordingly, we have to rely on our own investigation as to the existence of environmental contaminants, and we may not be able to identify all pre-existing environmental contaminants at the time we purchase the land. Any such claims may adversely affect our business, prospects, liquidity, financial condition and results of operations. Insurance coverage for such claims may be limited or non-existent.

*We may become subject to litigation, which could materially and adversely affect us.*

In the future we may become subject to litigation, including claims relating to our operations, joint ventures, securities offerings and otherwise in the ordinary course of business or otherwise. Some of these claims may result in significant defense costs and potentially significant judgments against us, some of which are not, or cannot be, insured against. We generally intend to vigorously defend ourselves. However, we cannot be certain of the ultimate outcomes of any claims that may arise in the future. Resolution of these types of matters against us may result in our having to pay significant fines, judgments or settlements, which, if uninsured, or if the fines, judgments and settlements exceed insured levels, could adversely impact our earnings and cash flows, thereby materially and adversely affecting us. Certain litigation or the resolution of certain litigation may affect the availability or cost of some of our insurance coverage, which could materially and adversely impact us, expose us to increased risks that would be uninsured, and materially and adversely impact our ability to attract directors and officers. Furthermore, any litigation, regardless of its outcome, can divert the attention of our management from operating our core business and can harm our reputation, each of which could harm our business.

35

Table of Contents

*We may suffer uninsured losses or material losses in excess of insurance limits, and increased insurance costs and reduced insurance coverage may affect our results of operations and increase our potential exposure to liability.*

Material losses or liabilities in excess of insurance proceeds may occur in the future. We could suffer physical damage to property and liabilities resulting in losses that may not be fully recoverable by insurance. In addition, certain types of risks, such as personal injury claims, may be, or may become in the future, either uninsurable or not economically insurable, or may not be currently or in the future covered by our insurance policies. In addition, the costs of insuring against construction defect, product liability and director and officer claims are substantial, and the cost of insurance for our operations may rise, deductibles and retentions may increase and the availability of insurance may diminish. Should an uninsured loss or a loss in excess of insured limits occur, we could sustain financial loss or lose capital invested in the affected property as well as anticipated future income from that property. Significant increases in the cost of insurance coverage could also have a material adverse effect on our results of operations and financial condition. In addition, we could be liable to repair damage or meet liabilities caused by uninsured risks.

*We may not be able to compete effectively against competitors in the homebuilding industry.*

We operate in a very competitive environment which is characterized by competition from a number of other homebuilders in each market in which we operate. Additionally, there are relatively low barriers to entry into our business. We compete with numerous large national and regional homebuilding companies and with smaller local homebuilders and land developers for, among other things, home buyers, desirable land parcels, financing, raw materials and skilled management and labor resources. Our competitors may independently develop land and construct housing units that are superior or substantially similar to our products. Increased competition could hurt our business, as it could prevent us from acquiring attractive land parcels on which to build homes or make such acquisitions more expensive, hinder our market share expansion and cause us to increase our selling incentives and reduce our prices. An oversupply of homes available for sale and the heavy discounting of home prices by some of our competitors have adversely affected demand for homes in the market as a whole and could do so again in the future. We also compete with the resale, or "previously owned," home market which has increased significantly due to the large number of homes that have been foreclosed on or could be foreclosed on due to the recent economic downturn. If we are unable to compete effectively in our markets, our business could decline disproportionately to our competitors, and our results of operations and financial condition could be adversely affected.

We may be at a competitive disadvantage with regard to certain of our large national and regional homebuilding competitors whose operations are more geographically diversified than ours, as these competitors may be better able to withstand any future regional downturn in the housing market. We compete directly with a number of large national and regional homebuilders that may have longer operating histories and greater financial and operational resources than we do. Many of these competitors also have longstanding relationships with subcontractors and suppliers in the markets in which we operate. This may give our competitors an advantage in securing materials and labor at lower prices, marketing their products and allowing their homes to be delivered to customers more quickly and at more favorable prices. This competition could reduce our market share and limit our ability to expand our business as we have planned.

*If we are unable to develop our communities successfully or within expected timeframes, our results of operations could be adversely affected.*

Before a community generates any revenue, time and material expenditures are required to acquire land, obtain development approvals and construct significant portions of project infrastructure, amenities, model homes and sales facilities. It can take several years from the time we acquire control of a property to the time we make our first home sale on the site. Delays in the development of communities expose us to the risk of changes in market conditions for homes. A decline in our ability to develop and market our communities successfully and to generate positive cash flow from these operations in a timely manner could have a material adverse effect on our business and results of operations and on our ability to service our debt and to meet our working capital requirements.

36

Table of Contents

*Increases in our cancellation rate could have a negative impact on our home sales revenue and homebuilding margins.*

The cancellation rate of buyers for our owned projects who contracted to buy a home but did not close escrow (as a percentage of overall orders), excluding our unconsolidated joint ventures, was approximately 16.5% and 16%, respectively, for the nine months ended September 30, 2013 and the year ended December 31, 2012, respectively. Our cancellation rate for our unconsolidated joint venture projects was 5.9% and 5% for the nine months ended September 30, 2013 and the year ended December 31, 2012, respectively. Home order cancellations negatively impact the number of closed homes, net home orders, home sales revenue and results of operations, as well as the number of homes in backlog. Home order cancellations can result from a number of factors, including declines or slow appreciation in the market value of homes, increases in the supply of homes available to be purchased, increased competition, higher mortgage interest rates, homebuyers' inability to sell their existing homes, homebuyers' inability to obtain suitable financing, including providing sufficient down payments, and adverse changes in economic conditions. Upon a home order cancellation, the homebuyer's escrow deposit is returned to the homebuyer (other than with respect to certain design-related deposits, which we retain). An increase in the level of our home order cancellations could have a negative impact on our business, prospects, liquidity, financial condition and results of operations.

*We are subject to product liability and warranty claims arising in the ordinary course of business.*

As a homebuilder, we are subject to construction defect, product liability and home warranty claims, including moisture intrusion and related claims, arising in the ordinary course of business or otherwise. While we maintain general liability insurance and generally seek to require our subcontractors and design professionals to indemnify us for some portion of the liabilities arising from their work, there can be no assurance that these insurance rights and indemnities will be collectable or adequate to cover any or all construction defect and warranty claims for which we may be liable. For example, contractual indemnities can be difficult to enforce, we are often responsible for applicable self-insured retentions (particularly in markets where we include our subcontractors on our general liability insurance and our ability to seek indemnity for insured claims is significantly limited), certain claims may not be covered by insurance or may exceed applicable coverage limits, and one or more of our insurance carriers could become insolvent. Further, in the United States, and California in particular, the coverage offered and the availability of general liability insurance for construction defects is currently limited and is costly. As a result, an increasing number of our subcontractors may be unable to obtain insurance, particularly in California where we have instituted an "owner controlled insurance program," under which subcontractors are effectively insured by us. If we cannot effectively recover construction defect liabilities and defense costs from our subcontractors or their insurers, or if we are self-insured, we may suffer losses. Coverage may be further restricted and become even more costly. Such circumstances could adversely affect our business, prospects, liquidity, financial condition and results of operations.

In addition, we conduct all of our business in California, one of the most highly regulated and litigious jurisdictions in the United States, which imposes a ten year, strict liability tail on many construction liability claims. As a result, our potential losses and expenses due to litigation, new laws and regulations may be greater than those of our competitors who have smaller California operations.

*We have incurred annual losses since our inception and may have difficulty achieving or maintaining profitability in the future.*

We generated net losses of $1.4 million in 2012 and $2.3 million in 2011 and may never achieve profitability on an annual basis. Even if we achieve profitability, we may not be able to sustain or increase profitability on a annual basis going forward. If our revenue grows more slowly than we anticipate, or if our operating expenses exceed our expectations and cannot be adjusted accordingly, our business will be harmed. As a result, the price of our shares common stock may decline, and you may lose a portion or all of your investment.

37

Table of Contents

***Our operating performance is subject to risks associated with the real estate industry.***

Real estate investments are subject to various risks, fluctuations and cycles in value and demand, many of which are beyond our control. Certain events may decrease cash available for operations, as well as the value of our real estate assets. These events include, but are not limited to:

- adverse changes in international, national or local economic and demographic conditions;

- adverse changes in financial conditions of buyers and sellers of properties, particularly residential homes and land suitable for development of residential homes;

- competition from other real estate investors with significant capital, including other real estate operating companies and developers and institutional investment funds;

- reductions in the level of demand for and increases in the supply of land suitable for development;

- fluctuations in interest rates, which could adversely affect our ability, or the ability of homebuyers, to obtain financing on favorable terms or at all;

- unanticipated increases in expenses, including, without limitation, insurance costs, development costs, real estate assessments and other taxes and costs of compliance with laws, regulations and governmental policies; and

- changes in enforcement of laws, regulations and governmental policies, including, without limitation, health, safety, environmental, zoning and tax laws, governmental fiscal policies and the Americans with Disabilities Act of 1990.

In addition, periods of economic slowdown or recession, rising interest rates or declining demand for real estate, or the public perception that any of these events may occur, could result in a general decline in the purchase of homes or an increased incidence of home order cancellations. If we cannot successfully implement our business strategy, our business, prospects, liquidity, financial condition and results of operations will be adversely affected.

***Because real estate investments are relatively illiquid, our ability to promptly sell one or more properties for reasonable prices in response to changing economic, financial and investment conditions may be limited and we may be forced to hold non-income producing properties for extended periods of time.***

Real estate investments are relatively difficult to sell quickly. As a result, our ability to promptly sell one or more properties in response to changing economic, financial and investment conditions is limited and we may be forced to hold non-income producing assets for an extended period of time. We cannot predict whether we will be able to sell any property for the price or on the terms that we set or whether any price or other terms offered by a prospective purchaser would be acceptable to us. We also cannot predict the length of time needed to find a willing purchaser and to close the sale of a property.

***Fluctuations in real estate values may require us to write-down the book value of our real estate assets.***

The homebuilding and land development industries are subject to significant variability and fluctuations in real estate values. As a result, we may be required to write-down the book value of our real estate assets in accordance with U.S. generally accepted accounting principles, or GAAP, and some of those write-downs could be material. Any material write-downs of assets could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

***Inflation could adversely affect our business and financial results.***

Inflation could adversely affect us by increasing the costs of land, raw materials and labor needed to operate our business. If our markets have an oversupply of homes relative to demand, we may be unable to offset any such increases in costs with corresponding higher sales prices for our homes. Inflation typically also accompanies higher interests rates, which could adversely impact potential customers' ability to obtain financing on favorable terms.

38

Table of Contents

thereby further decreasing demand. If we are unable to raise the prices of our homes to offset the increasing costs of our operations, our margins could decrease. Furthermore, if we need to lower the price of our homes to meet demand, the value of our land inventory may decrease. Inflation may also raise our costs of capital and decrease our purchasing power, making it more difficult to maintain sufficient funds to operate our business.

*A major health and safety incident relating to our business could be costly in terms of potential liabilities and reputational damage.*

Building sites are inherently dangerous, and operating in the homebuilding industry poses certain inherent health and safety risks. Due to health and safety regulatory requirements and the number of projects we work on, health and safety performance is critical to the success of all areas of our business. Any failure in health and safety performance may result in penalties for non-compliance with relevant regulatory requirements or litigation, and a failure that results in a major or significant health and safety incident is likely to be costly in terms of potential liabilities incurred as a result. Such a failure could generate significant negative publicity and have a corresponding impact on our reputation, our relationships with relevant regulatory agencies, governmental authorities and local communities, and our ability to win new business, which in turn could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

*Acts of war or terrorism may seriously harm our business.*

Acts of war, any outbreak or escalation of hostilities between the United States and any foreign power or acts of terrorism may cause disruption to the U.S. economy, or the local economies of the markets in which we operate, cause shortages of building materials, increase costs associated with obtaining building materials, result in building code changes that could increase costs of construction, affect job growth and consumer confidence, or cause economic changes that we cannot anticipate. Each of these events could reduce demand for our homes and adversely impact our business, prospects, liquidity, financial condition and results of operations.

*An information systems interruption or breach in security could adversely affect us.*

We rely on accounting, financial and operational management information systems to conduct our operations. Any disruption in these systems could adversely affect our ability to conduct our business. Furthermore, any security breach of information systems or data could result in a violation of applicable privacy and other laws, significant legal and financial exposure, damage to our reputation and a loss of confidence in our security measures, which could harm our business.

*Poor relations with the residents of our communities could negatively impact sales, which could cause our revenues or results of operations to decline.*

Residents of communities we develop rely on us to resolve issues or disputes that may arise in connection with the operation or development of the communities. Efforts made by us to resolve these issues or disputes could be deemed unsatisfactory by the affected residents, and subsequent actions by these residents could adversely affect sales or our reputation. In addition, we could be required to make material expenditures related to the settlement of such issues or disputes or to modify our community development plans, which could adversely affect our results of operations.

*We may incur a variety of costs to engage in future growth or expansion of our operations or acquisitions or disposals of businesses, and the anticipated benefits may never be realized.*

As a part of our business strategy, we may make acquisitions, or significant investments in or disposals of businesses. We may also expand our operations to new markets. Any future acquisitions, investments, disposals or entry into a new market would be accompanied by risks such as:

- difficulties in assimilating the operations and personnel of acquired companies or businesses;

- potential loss of key employees of the acquired companies or business;

Table of Contents

- diversion of our management's attention from ongoing business concerns;

- our potential inability to maximize our financial and strategic position through the successful incorporation or disposition of operations;

- difficulty in maintaining of uniform standards, controls, procedures and policies;

- impairment of existing relationships with employees, contractors, suppliers and customers as a result of the integration of new management personnel and cost-saving initiatives; and

- risks associated with entering markets in which we have limited or no direct experience.

The magnitude, timing and nature of any future acquisition or expansion will depend on a number of factors, including our ability to identify suitable additional markets or acquisition candidates. We cannot guarantee that we will be able to successfully integrate any company or business that we might acquire in the future, or that any expansion into a new market will be successfully executed, and our failure to do so could harm our current business.

In addition, we may not realize the anticipated benefits of these transactions or expansions, and there may be other unanticipated or unidentified effects. While we would seek protection, for example, through warranties and indemnities in the case of acquisitions, significant liabilities may not be identified in due diligence or may come to light after the expiry of warranty or indemnity periods. Additionally, while we would seek to limit our ongoing exposure, for example, through liability caps and period limits on warranties and indemnities in the case of disposals, some warranties and indemnities may give rise to unexpected and significant liabilities. Any claims arising in the future may adversely affect our business, prospects, liquidity, financial condition and results of operations and could lead to a decline in the price of our common stock.

*We have broad discretion to use the offering proceeds and our investment of those proceeds may not yield a favorable return.*

Our management has broad discretion to spend the proceeds from this offering in ways with which you may not agree. The failure of our management to apply these funds effectively could result in unfavorable returns. This could harm our business and could cause the price of our common stock to decline.

*Utility shortages or price increases could adversely impact our operations.*

Certain of the areas in which we operate, particularly in Southern and Northern California, have experienced power shortages, including mandatory periods without electrical power, as well as significant increases in utility costs. We may incur additional costs and may not be able to complete construction on a timely basis if such power shortages and utility rate increases continue. In addition, power shortages and rate increases may adversely affect the local economies in which we operate, which may reduce demand for housing in our markets.

*We are an early-stage company and will rely on significant growth to achieve and sustain profitability. Our business strategy will fail if we are unable to manage our expected growth.*

Our predecessor began operations in the third quarter of 2009, and we sold our first home in 2010. Through September 30, 2013, we delivered 169 homes and our unconsolidated joint ventures delivered 116 homes (and there were 294 homes delivered in fee building projects marketed under a third-party owner's name), and we have only recently begun to significantly expand our operations. Our business plan requires us to continue to expand our operations over a relatively short period of time. This expansion has placed, and is expected to continue to place, a significant strain on our management, operational and financial resources. In order to manage our continued growth, we may be required to raise significant amounts of capital, improve existing and implement new operational and financial systems, procedures and controls and expand, train and manage a growing employee base. Our current and planned personnel, systems, procedures and controls may not be adequate, and we may be unable to obtain the necessary capital, to support our anticipated growth. If we are unable to manage our growth effectively, our business will suffer and we may never reach profitability.

40

Table of Contents

## Risks Related to Our Indebtedness

*We expect to use leverage in executing our business strategy, which may adversely affect the return on our assets.*

We expect to employ prudent levels of leverage to finance the acquisition and development of our lots and construction of our homes. Our existing indebtedness is both recourse and non-recourse to us, and we anticipate that future indebtedness will be likewise. As of September 30, 2013, we had approximately $46.8 million loan commitments, of which $17.0 million was outstanding. We will consider a number of factors when evaluating our level of indebtedness and when making decisions regarding the incurrence of new indebtedness, including the purchase price of assets to be acquired with debt financing, the estimated market value of our assets and the ability of particular assets, and our company as a whole, to generate cash flow to cover the expected debt service costs. As a means of sustaining our long-term financial health and limiting our exposure to unforeseen dislocations in the debt and financing markets, we currently expect to remain conservatively capitalized. However, subsequent to the completion of this offering, our board of directors may change our target debt levels at any time without the approval of our stockholders.

Incurring substantial debt could subject us to many risks that, if realized, would adversely affect us, including the risk that:

- our cash flow from operations may be insufficient to make required payments of principal of and interest on the debt, which is likely to result in acceleration of the maturity of such debt;

- our debt may increase our vulnerability to adverse economic and industry conditions with no assurance that investment yields will increase with higher financing costs;

- we may be required to dedicate a portion of our cash flow from operations to payments on our debt, thereby reducing funds available for operations and capital expenditures, future investment opportunities or other purposes; and

- the terms of any refinancing may not be as favorable as the terms of the debt being refinanced.

If we do not have sufficient funds to repay our debt at maturity, it may be necessary to refinance the debt through additional debt or additional equity financings. If, at the time of any refinancing, prevailing interest rates or other factors result in higher interest rates on refinancings, increases in interest expense could adversely affect our cash flows and results of operations. If we are unable to refinance our debt on acceptable terms, we may be forced to dispose of our assets on disadvantageous terms, potentially resulting in losses. To the extent we cannot meet any future debt service obligations, we may lose some or all of our assets that may be pledged to secure our obligations to foreclosure. Also, debt agreements may contain specific cross-default provisions with respect to specified other indebtedness, giving the lenders the right to declare a default if we are in default under other loans in some circumstances. Defaults under our debt agreements could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

*Access to financing sources may not be available on favorable terms, or at all, especially in light of current market conditions, which could adversely affect our ability to increase our returns.*

Our growth strategy requires significant additional capital. Our access to additional third-party sources of financing will depend, in part, on:

- general market conditions;

- the market's perception of our growth potential;

- with respect to acquisition or development financing, the market's perception of the value of the land parcels to be acquired or developed;

- our debt levels;

41

Table of Contents

- any credit rating assigned to us or our existing debt by a rating agency or any indication that those ratings may be lowered;

- our expected results of operations;

- our cash flow; and

- the market price of our common stock.

Recently, domestic financial markets have experienced unusual volatility, uncertainty and a tightening of liquidity in both the investment grade debt and equity capital markets. Credit spreads for major sources of capital widened significantly during the U.S. credit crisis as investors demanded a higher risk premium. Given the current volatility and weakness in the capital and credit markets, potential lenders may be unwilling or unable to provide us with financing that is attractive to us or may charge us prohibitively high fees in order to obtain financing. Consequently, there is greater uncertainty regarding our ability to access the credit market in order to attract financing on reasonable terms. Investment returns on our assets and our ability to make acquisitions could be adversely affected by our inability to secure additional financing on reasonable terms, if at all.

Depending on market conditions at the relevant time, we may have to rely more heavily on additional equity financings or on less efficient forms of debt financing that require a larger portion of our cash flow from operations, thereby reducing funds available for our operations, future business opportunities and other purposes. We may not have access to such equity or debt capital on favorable terms at the desired times, or at all.

### *Our current financing arrangements contain, and our future financing arrangements likely will contain, restrictive covenants relating to our operations.*

Our current financing arrangements contain, and the financing arrangements we enter into in the future likely will contain, covenants (financial and otherwise) affecting our ability to incur additional debt, make certain investments, reduce liquidity below certain levels, make distributions to our stockholders and otherwise affect our operating policies. If we fail to meet or satisfy any of these covenants in our debt agreements, we would be in default under these agreements, which could result in a cross-default under other debt agreements, and our lenders could elect to declare outstanding amounts due and payable, terminate their commitments, require the posting of additional collateral and enforce their respective interests against existing collateral. A default also could limit significantly our financing alternatives, which could cause us to curtail our investment activities or dispose of assets when we otherwise would not choose to do so. A default on any of our debt agreements could materially and adversely affect our business, prospects, liquidity, financial condition and results of operations.

### *Secured indebtedness exposes us to the possibility of foreclosure on our ownership interests in our land parcels.*

Incurring mortgage and other secured indebtedness increases our risk of loss of our ownership interests in our land parcels or other assets because defaults thereunder, and the inability to refinance such indebtedness, may result in foreclosure action initiated by lenders.

### *Interest expense on debt we incur may limit our cash available to fund our growth strategies.*

As of September 30, 2013, we had approximately $46.8 million loan commitments, of which $17.0 million was outstanding. As part of our financing strategy, we may incur a significant amount of additional debt. Our current debt has, and any additional debt we subsequently incur may have, a floating rate of interest. Higher interest rates could increase debt service requirements on our current floating rate debt and on any floating rate debt we subsequently incur, and could reduce funds available for operations, future business opportunities or other purposes. If we need to repay existing debt during periods of rising interest rates, we could be required to refinance our then-existing debt on unfavorable terms or liquidate one or more of our assets to repay such debt at times which may not permit realization

42

Table of Contents

of a favorable return on such assets and could result in a loss. The occurrence of either such event or both could materially and adversely affect our business, prospects, liquidity, financial condition and results of operations.

*Failure to hedge effectively against interest rate changes may adversely affect us.*

We may obtain in the future one or more forms of interest rate protection—in the form of swap agreements, interest rate cap contracts or similar agreements—to hedge against the possible negative effects of interest rate fluctuations on our indebtedness that bears interest at floating rates. However, cannot assure you that any hedging will adequately relieve the adverse effects of interest rate increases or that counterparties under these hedging agreements will honor their obligations thereunder. In addition, we may be subject to risks of default by hedging counterparties. Increased interest expen on our floating rate indebtedness that we have not hedged will harm our financial position and results of operations.

## Risks Related to Our Organization and Structure

*We have a limited operating history and we may not be able to successfully operate our business.*

Our company was founded in August 2009, and prior to the nine month period ended September 30, 2013, we have incurred losses since our inception. Prior to the completion of this offering, TNHC LLC will be converted from a Delaware limited liability company into a Delaware corporation and renamed The New Home Company Inc. Given our limited operating history, you have limited historical information upon which to evaluate our prospects, including our ability to acquire desirable land parcels, develop such land and market our homes. In addition, we cannot assure you that our pa experience will be sufficient to enable us to operate our business successfully or implement our operating policies and business strategies as described this prospectus. Furthermore, we may not be able to generate sufficient operating cash flows to pay our operating expenses or service our indebtedness should not rely upon the past performance of our management team, as past performance may not be indicative of our future results.

*We depend on key personnel.*

Our success depends to a significant degree upon the contributions of certain key personnel including, but not limited to, H. Lawrence Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Thomas Redwitz, our Chief Operating Officer, each of whom would be difficult to replace. Although we will enter into employment agreements with Messrs. Webb, Stelmar, Davis an Redwitz upon the completion of this offering, there is no guarantee that these executives will remain employed with us. If any of our key personnel were cease employment with us, our operating results could suffer. Our ability to retain our key personnel or to attract suitable replacements should any mem of our management team leave depends on the competitive nature of the employment market. The loss of services from key personnel or a limitation in t availability could materially and adversely impact our business, prospects, liquidity, financial condition and results of operations. Further, such a loss cou be negatively perceived in the capital markets. Although we are currently considering our coverages, we have not obtained key person life insurance tha would provide us with proceeds in the event of death or disability of any of our key personnel.

*Termination of the employment agreements with the members of our management team could be costly and prevent a change in control of our company.*

The employment agreements we will enter into with H. Lawrence Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Thomas Redwitz, our Chief Operating Officer, upon the completion of this offering each provide that if their employment with us terminates under certain circumstances, we may be required to pay them significant amounts of severance compensation, ther making it costly to terminate their employment. Furthermore, these provisions could delay or prevent a transaction or a change in control of our company that might involve a premium paid for shares of

43

Table of Contents

our common stock or otherwise be in the best interests of our stockholders, which could adversely affect the market price of our common stock.

*Certain anti-takeover defenses and applicable law may limit the ability of a third-party to acquire control of us.*

Our charter and bylaws and Delaware law contain provisions that may delay or prevent a transaction or a change in control of our company that might involve a premium paid for shares of our common stock or otherwise be in the best interests of our stockholders, which could adversely affect the market price of our common stock. Certain of these provisions are described below.

*Selected provisions of our charter and bylaws.*

Our charter and/or bylaws contain anti-takeover provisions that:

- divide our directors into three classes, with the term of one class expiring each year, which could delay a change in our control;

- authorize our board of directors, without further action by the stockholders, to issue up to 50,000,000 shares of preferred stock in one or more series, and with respect to each series, to fix the number of shares constituting that series and establish the rights and other terms of that series;

- require that actions to be taken by our stockholders may be taken only at an annual or special meeting of our stockholders and not by written consent;

- specify that special meetings of our stockholders can be called only by our board of directors pursuant to a resolution adopted by a majority of the total number of directors then in office, the chairman of our board of directors or our chief executive officer;

- establish advance notice procedures for stockholders to submit nominations of candidates for election to our board of directors and other proposals to be brought before a stockholders meeting;

- provide that our bylaws may be amended by our board of directors without stockholder approval;

- allow our directors to establish the size of our board of directors by action of our board of directors, subject to a minimum of three members;

- provide that vacancies on our board of directors or newly created directorships resulting from an increase in the number of our directors may be filled only by a majority of directors then in office, even though less than a quorum;

- do not give the holders of our common stock cumulative voting rights with respect to the election of directors; and

- prohibit us from engaging in certain business combinations with any "interested stockholder" unless specified conditions are satisfied as described below under "—Selected provisions of Delaware law."

*Selected provisions of Delaware law.*

We have opted out of Section 203 of the Delaware General Corporation Law, or the DGCL, which regulates corporate takeovers. However, our charter contains provisions that are similar to Section 203 of the DGCL. Specifically, our charter provides that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the person became an interested stockholder, unless:

- prior to the time that person became an interested stockholder, our board of directors approved either the business combination or the transaction which resulted in the person becoming an interested stockholder;

- upon consummation of the transaction which resulted in the person becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding certain shares; or

44

Table of Contents

- at or subsequent to the time the person became an interested stockholder, the business combination is approved by our board of directors an the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, consolidation, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an interested stockholder is a person who, together with that person's affiliates and associates, ow within the previous three years owned, 15% or more of our voting stock. This provision could prohibit or delay mergers or other takeover or change in control attempts with respect to us and, accordingly, may discourage attempts to acquire us.

*We may change our operational policies, investment guidelines and our business and growth strategies without stockholder consent, which may subject us to different and more significant risks in the future.*

Our board of directors will determine our operational policies, investment guidelines and our business and growth strategies. Our board of directors may make changes to, or approve transactions that deviate from, those policies, guidelines and strategies without a vote of, or notice to, our stockholder This could result in us conducting operational matters, making investments or pursuing different business or growth strategies than those contemplated i this prospectus. Under any of these circumstances, we may expose ourselves to different and more significant risks in the future, which could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

*We are subject to taxation as a corporation.*

Immediately prior to the completion of this offering, we converted into a Delaware corporation. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

*The obligations associated with being a public company will require significant resources and management attention; we have identified a material weakness in our internal controls over financial reporting.*

As a privately held company, we have not been required to maintain internal control over financial reporting in a manner that meets the standards o publicly traded companies required by Section 404(a) of the Sarbanes-Oxley Act. We anticipate that we will be required to meet these standards in the course of preparing our financial statements in the future. Additionally, once we are no longer an "emerging growth company," our independent registere public accounting firm will be required to attest to the effectiveness of our internal control over financial reporting on an annual basis. The rules governing the standards that must be met for our management to assess our internal control over financial reporting are complex and require significant documentation, testing and possible remediation.

Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with accounting principles generally accepted in the United States, or GAAP. We are currently in the process of reviewing, documenting and testing our internal control over financial reporting, but we are not currently in compliance with, and we cannot be certain when we will be able to implement the requirements of Section 404(a). For instance, in December 2013, we determined that an error in our financ statements occurred as we did not properly record compensation expense for equity based units. We restated our consolidated statement of operations, members' equity, and cash flows for the years ended December 31, 2012 and 2011, and for the period from August 18, 2010 (inception) to December 3 2010, to correct this error. This error was the result of our failure to design proper controls to identify, evaluate and account for equity-based awards, and lack of such proper controls resulted in a material weakness in internal control over financial reporting as defined in Public Company Accounting Oversig Board Auditing Standard No. 5.

45

Table of Contents

We may encounter problems or delays in implementing any changes necessary to make a favorable assessment of our internal control over financial reporting. In addition, we may encounter problems or delays in completing the implementation of any necessary improvements and receiving an unqualified opinion on the effectiveness of the internal controls over financial reporting in connection with the attestation provided by our independent registered public accounting firm. If we cannot favorably assess the effectiveness of our internal control over financial reporting, or if our independent registered public accounting firm is unable to provide an unqualified attestation report on our internal controls, investors could lose confidence in our financial information and the price of our common stock could decline.

These reporting and other obligations will place significant demands on our management, administrative, operational and accounting resources and will cause us to incur significant expenses. We may need to upgrade our systems or create new systems, implement additional financial and management controls, reporting systems and procedures, create or outsource an internal audit function, and hire additional accounting and finance staff. If we are unable to accomplish these objectives in a timely and effective fashion, our ability to comply with the financial reporting requirements and other rules that apply to reporting companies could be impaired. Any failure to maintain effective internal control over financial reporting could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

*If we fail to implement and maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could materially and adversely affect us.*

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. We may in the future discover areas of our internal controls that need improvement. We cannot be certain that we will be successful in implementing or maintaining adequate internal control over our financial reporting and financial processes. Furthermore, as we grow our business, our internal controls will become more complex, and we will require significantly more resources to ensure our internal controls remain effective. Additionally, the existence of any material weakness or significant deficiency would require management to devote significant time and incur significant expense to remediate any such material weakness or significant deficiency, and management may not be able to remediate any such material weakness or significant deficiency in a timely manner. The existence of any material weakness or significant deficiency in our internal control over financial reporting could also result in errors in our financial statements that could require us to restate our financial statements, cause us to fail to meet our reporting obligations and cause stockholders to lose confidence in our reported financial information, all of which could materially and adversely affect us.

*We are an "emerging growth company," and, as a result of the reduced disclosure and governance requirements applicable to emerging growth companies, our common stock may be less attractive to investors.*

We are an "emerging growth company," as defined in the JOBS Act, and we are eligible to take advantage of certain exemptions from various reporting requirements applicable to other public companies but not to emerging growth companies, including, but not limited to, an exemption from the auditor attestation requirement of Section 404 of the Sarbanes-Oxley Act, reduced disclosure about executive compensation arrangements pursuant to the rules applicable to smaller reporting companies and no requirement to seek non-binding advisory votes on executive compensation or golden parachute arrangements. We have elected to adopt these reduced disclosure requirements. We could be an emerging growth company until the last day of the fiscal year following the fifth anniversary of the completion of this offering, although a variety of circumstances could cause us to lose that status earlier. We cannot predict whether investors will find our common stock less attractive as a result of our taking advantage of these exemptions. If some investors find our common stock less attractive as a result of our choices, there may be a less active trading market for our common stock and our stock price may be more volatile.

In addition, Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or

46

Table of Contents

revised financial accounting standards. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. However, we have determined to opt out of such extended transition period, and, as a result, we will comply with new or revised financial accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Section 107 of the JOBS Act provides that our decision to opt out of the extended transition period for complying with new or revised financial accounting standards is irrevocable.

*Changes in accounting rules, assumptions or judgments could materially and adversely affect us.*

Accounting rules and interpretations for certain aspects of our operations are highly complex and involve significant assumptions and judgment. These complexities could lead to a delay in the preparation and dissemination of our financial statements. Furthermore, changes in accounting rules and interpretations or in our accounting assumptions or judgments, such as asset impairments, could significantly impact our financial statements. In some cases, we could be required to apply a new or revised standard retroactively, resulting in restating prior period financial statements. Any of these circumstances could have a material adverse effect on our business, prospects, liquidity, financial condition and results of operations.

## Risks Related to this Offering and Ownership of Our Common Stock

*There is currently no public market for shares of our common stock, a trading market for our common stock may never develop following this offering and our common stock prices may be volatile and could decline substantially following this offering.*

Prior to this offering there has been no market for shares of our common stock. An active trading market for the shares of our common stock may never develop, or if one develops, it may not be sustained following this offering. Accordingly, no assurance can be given as to the following:

- the likelihood that an active trading market for shares of our common stock will develop or be sustained;

- the liquidity of any such market;

- the ability of our stockholders to sell their shares of common stock; or

- the price that our stockholders may obtain for their common stock.

If an active market does not develop or is not maintained, the market price of our common stock may decline and you may not be able to sell your shares. Even if an active trading market develops for our common stock subsequent to this offering, the market price of our common stock may be highly volatile and subject to wide fluctuations.

Some of the factors that could negatively affect or result in fluctuations in the market price of our common stock include:

- actual or anticipated variations in our quarterly operating results;

- changes in market valuations of similar companies;

- changes in interest rates, mortgage regulations or land and home prices in the areas in which we operate;

- adverse market reaction to the level of our indebtedness;

- additions or departures of key personnel;

- actions by stockholders;

- speculation in the press or investment community;

- general market, economic and political conditions, including an economic slowdown or dislocation in the global credit markets and in California in particular;

47

Table of Contents

- our operating performance and the performance of other similar companies;

- changes in accounting principles and tax laws; and

- passage of legislation or other regulatory developments that adversely affect us or the homebuilding and land development industry.

*If securities or industry analysts do not publish, or cease publishing, research or reports about us, our business or our market, or if they change their recommendations regarding our common stock adversely, our stock price and trading volume could decline.*

If a trading market for our common stock develops, the trading market will be influenced by whether industry or securities analysts publish research and reports about us, our business, our market or our competitors and, if any analysts do publish such reports, what they publish in those reports. We may not obtain analyst coverage in the future. Any analysts who do cover us may make adverse recommendations regarding our common stock, adversely change their recommendations from time to time or provide more favorable relative recommendations about our competitors. If any analyst who may cover us in the future were to cease coverage of our company or fail to regularly publish reports on us, or if analysts fail to cover us or publish reports about us at all, we could lose, or never gain, visibility in the financial markets, which in turn could cause our stock price or trading volume to decline.

*The offering price per share of our common stock offered by this prospectus may not accurately reflect the value of your investment.*

Prior to this offering there has been no market for our common stock. The offering price per share of our common stock offered by this prospectus was negotiated among us, our non-management institutional investors and the underwriters. Factors considered in determining the price of our common stock include:

- the history and prospects of companies whose principal business is the acquisition and development of land, and the design, construction and sale of single-family homes;

- prior offerings of those companies;

- our prospects for acquiring land parcels for development at attractive values;

- our capital structure;

- an assessment of our management and its experience in acquiring land parcels and designing, constructing and selling homes;

- general conditions of the securities markets at the time of this offering; and

- other factors we deemed relevant.

*If you purchase common stock in this offering, you will experience immediate dilution.*

The offering price of our common stock is higher than the pro forma as adjusted net tangible book value per share of our common stock outstanding upon the completion of this offering. Accordingly, if you purchase common stock in this offering, you will experience immediate dilution of approximately $2.66 per share of our common stock. This means that investors that purchase shares of our common stock in this offering will pay a price per share that exceeds the pro forma as adjusted per share net tangible book value of our assets. See "Dilution."

*We do not intend to pay dividends on our common stock for the foreseeable future.*

We currently intend to retain our future earnings, if any, to finance the development and expansion of our business and, therefore, do not intend to cash dividends on our common stock for the foreseeable future. Any

48

Table of Contents

future determination to pay dividends will be at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in any financing instruments and such other factors as our board of directors deems relevant. Accordingly, you may need to sell your shares of our common stock to realize a return on your investment, and you may not be able to sell your shares at or above the price you paid for them.

> *Future sales of our common stock or other securities convertible into our common stock could cause the market value of our common stock to decline and could result in dilution of your shares.*

Our board of directors is authorized, without your approval, to cause us to issue additional shares of our common stock or to raise capital through the issuance of preferred stock, securities (including debt securities) convertible into common stock, options, warrants and other rights, on terms and for consideration as our board of directors in its sole discretion may determine. Sales of substantial amounts of our common stock could cause the market price of our common stock to decrease significantly. We cannot predict the effect, if any, of future sales of our common stock, or other securities on the value of our common stock. Sales of substantial amounts of our common stock by a large stockholder or otherwise, or the perception that such sales could occur, may adversely affect the market price of our common stock.

We are offering 7,812,500 shares of our common stock as described in this prospectus (or up to 8,984,375 shares if the underwriters fully exercise their option to purchase additional shares from us). Upon the completion of this offering, the members of our management team will collectively beneficially own 2,886,687 shares of our common stock (excluding grants of options to purchase shares of our common stock), which will represent 17.5% of our common stock outstanding immediately after this offering. See "Principal Stockholders." In addition, our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees will be granted an aggregate of 73,750 restricted stock units, and the members of our management team, other officers and employees will be granted options to purchase an aggregate of 885,454 shares of our common stock (with a strike price equal to $11.00 per share), in each case upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan, and our director nominees will be granted an aggregate of 33,750 restricted stock units upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan. In connection with this offering, we, our officers and directors, TNHC Partners LLC and our non-management institutional investors and others have agreed that for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of Citigroup Global Markets Inc., dispose of or hedge any shares or any securities convertible into or exchangeable for our common stock, subject to certain exceptions. Citigroup Global Markets Inc. in its sole discretion may release any of the securities subject to these lock-up agreements at any time, which, in the case of officers and directors, shall be with notice. If the restrictions under the lock-up agreements are waived, shares of our common stock may become available for resale into the market, subject to applicable law, which could reduce the market price for our common stock.

We will enter into a registration rights agreement with the members of TNHC LLC, including the members of our management team and the institutional investors in TNHC LLC, with respect to the shares of our common stock that they will receive as part of our formation transactions. We refer to these shares collectively as the "registrable shares." Pursuant to the registration rights agreement, we will grant the members of TNHC LLC and their direct and indirect transferees TNHC Partners LLC and others shelf registration rights requiring us to file a shelf registration statement and to maintain the effectiveness of such registration statement so as to allow sales thereunder from time to time, demand registration rights to have the registrable shares registered for resale, and, in certain circumstances, the right to "piggy-back" the registrable shares in registration statements we might file in connection with any future public offering.

In connection with this offering, we intend to file a registration statement on Form S-8 to register the offer and sale of the total number of shares of our common stock that may be issued under our 2014 Long-Term Incentive Plan, including the restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our director nominees, as well as the options to purchase shares of our common stock granted to the members of our management team, other officers and employees, in each case upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

Table of Contents

*Future offerings of debt securities, which would rank senior to our common stock upon our bankruptcy or liquidation, and future offerings of equity securities that may be senior to our common stock for the purposes of dividend and liquidating distributions, may adversely affect the market price of our common stock.*

In the future, we may attempt to increase our capital resources by conducting offerings of debt securities or additional offerings of equity securities. Upon bankruptcy or liquidation, holders of our debt securities and shares of preferred stock and lenders with respect to other borrowings will receive a distribution of our available assets prior to the holders of our common stock. Additional equity offerings may dilute the holdings of our existing stockholders or reduce the market price of our common stock, or both. Our preferred stock, if issued, could have a preference on liquidating distributions or a preference on dividend payments or both that could limit our ability to make a dividend distribution to the holders of our common stock. Our decision to issue securities in any future offering will depend on market conditions and other factors beyond our control. As a result, we cannot predict or estimate the amount, timing or nature of our future offerings, and purchasers of our common stock in this offering bear the risk of our future offerings reducing the market price of our common stock and diluting their ownership interest in our company.

*Non-U.S. holders may be subject to U.S. federal income tax on gain realized on the sale or disposition of shares of our common stock.*

Because of our anticipated holdings in United States real property interests following the completion of our formation transactions, we believe we will be and will remain a "United States real property holding corporation", or USRPHC, for U.S. federal income tax purposes. As a result, a non-U.S. holder (as defined in "Certain Material Federal Income Tax Considerations") may be subject to U.S. federal income tax on any gain realized on a sale or disposition of shares of our common stock if (i) our common stock is not regularly traded on an established securities market, or (ii) our common stock is regularly traded on an established securities market (such as the New York Stock Exchange) and such non-U.S. holder holds more than 5% of our common stock at any time during the shorter of the five-year period preceding the date of the sale or disposition and the non-U.S. holder's holding period in such stock. A non-U.S. holder also will be required to file a U.S. federal income tax return for any taxable year in which it realizes a gain from the disposition of our common stock that is subject to U.S. federal income tax under these rules. In addition, if our stock is not treated as publicly traded for purposes of the rules, a purchaser of the stock may be required to withhold and remit to the Internal Revenue Service, or the IRS, 10% of the purchase price, unless an exception applies.

We anticipate that our common stock will be regularly traded on an established securities market following this offering. However, no assurance can be given in this regard and no assurance can be given that our common stock will remain regularly traded in the future. Non-U.S. holders should consult their tax advisors concerning the consequences of disposing of shares of our common stock.

50

Table of Contents

## CAUTIONARY NOTE CONCERNING FORWARD-LOOKING STATEMENTS

Various statements contained in this prospectus, including those that express a belief, expectation or intention, as well as those that are not statements of historical fact, are forward-looking statements. These forward-looking statements may include projections and estimates concerning the timing and success of specific projects and our future production, revenues, income and capital spending. Our forward-looking statements are generally accompanied by words such as "estimate," "project," "forecast," "would," "should," "could," "may," "predict," "believe," "expect," "intend," "anticipate," "potential," "plan," "goal" or other words that convey the uncertainty of future events or outcomes. The forward-looking statements in this prospectus speak only as of the date of this prospectus, and we disclaim any obligation to update these statements unless required by law, and we caution you not to rely on them unduly. We have based these forward-looking statements on our current expectations and assumptions about future events. While our management considers these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond our control. The following factors, among others, may cause our actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements:

- economic changes either nationally or in the markets in which we operate, including declines in employment, volatility of mortgage interest rates and inflation;

- continued or increased downturn in the homebuilding industry;

- continued volatility and uncertainty in the credit markets and broader financial markets;

- our future operating results and financial condition;

- our business operations;

- changes in our business and investment strategy;

- availability of land to acquire and our ability to acquire such land on favorable terms or at all;

- availability, terms and deployment of capital;

- continued or increased disruption in the availability of mortgage financing or the number of foreclosures in the market;

- shortages of or increased prices for labor, land or raw materials used in housing construction;

- delays in land development or home construction resulting from adverse weather conditions or other events outside our control;

- issues concerning our joint venture partnerships;

- the cost and availability of insurance and surety bonds;

- changes in, or the failure or inability to comply with, governmental laws and regulations;

- the timing of receipt of regulatory approvals and the opening of projects;

- the degree and nature of our competition;

- our leverage and debt service obligations;

- availability of qualified personnel and our ability to retain our key personnel; and

- additional factors discussed under the sections captioned "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Our Business."

Table of Contents

## USE OF PROCEEDS

We expect to receive net proceeds from this offering of approximately $76.7 million (or approximately $88.7 million if the underwriters fully exercise their option to purchase additional shares of our common stock from us), after deducting the underwriting discount and estimated offering expenses payable by us.

We intend to use the net proceeds from this offering, excluding any net proceeds received from any exercise of the underwriters' option to purchase additional shares from us, primarily for the acquisition of land, including the land described under "Our Business—Pending Acquisitions," and for development of lots, home construction and other related purposes. We do not intend to use any of the net proceeds from this offering to purchase of any real estate inventories from any of our executive officers, directors, director nominees or more than 5% stockholders.

Pending these uses, we intend to invest the net proceeds from this offering in a variety of capital preservation investments, including short-term, interest-bearing investment grade securities, money market accounts, certificates of deposit and direct or guaranteed obligations of the U.S. government.

Although we will receive the net proceeds from any sale of shares of our common stock pursuant to the underwriters' option to purchase additional shares from us, we will use such proceeds to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors.

52

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of September 30, 2013:

- on an actual basis;

- on a pro forma basis to give effect to:

  - our conversion from a limited liability company to a corporation and the adoption of our certificate of incorporation as part of our formation transactions;

  - the issuance of 8,636,250 shares of our common stock to TNHC LLC's members in exchange for, and the cancellation of, their respective membership interests in TNHC LLC as part of our formation transactions; and

  - the issuance and sale of 7,812,500 shares of our common stock that we are offering at an initial public offering price of $11.00 per share, after deducting the underwriting discount and estimated offering expenses payable by us.

This table should be read in conjunction with the sections captioned "Use of Proceeds," "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical financial statements and related notes thereto included elsewhere in this prospectus.

| | As of September 30, 2013 (unaudited) | |
| --- | --- | --- |
| | Actual | Pro Forma |
| Debt: | | |
| Notes payable | $ 16,975,153 | $ 16,975,153 |
| | | |
| Total Debt | 16,975,153 | 16,975,153 |
| | | |
| Members' equity and stockholders' equity: | | |
| Members' equity | 60,447,095 | — |
| Common stock, $0.01 par value per share; no shares authorized and no shares issued and outstanding, actual and pro forma; 500,000,000 shares authorized and 16,448,750 shares issued and outstanding[1] pro forma | — | 164,488 |
| Preferred Stock, $0.01 par value per share, no shares authorized and no shares issued and outstanding, actual; 50,000,000 shares authorized and no shares issued and outstanding, pro forma | — | — |
| Additional paid-in capital | — | 136,954,482 |
| | | |
| Total members' equity | 60,447,095 | — |
| | | |
| Total stockholders' equity | — | 137,118,970 |
| | | |
| Total capitalization | $ 77,422,248 | $ 154,094,123 |

[1] The number of outstanding shares does not include: (i) 107,500 shares of our common stock issuable upon the vesting of restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our director nominees upon the pricing of this offering pursuant to our
2014 Long-Term Incentive Plan; (ii) 885,454 shares of our common stock issuable upon exercise of options to be granted to the members of our management team, other officers and employees upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (with a strike price equal to $11.00 per share); and (iii) 651,921 shares of our common stock reserved for future issuance under our 2014 Long-Term Incentive Plan.

53

Table of Contents

## DILUTION

Purchasers of shares of our common stock in this offering will incur an immediate and substantial dilution to the extent of the difference between the public offering price per share that you pay in this offering and the net tangible book value per share of our common stock immediately after this offering.

Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities, by the number of outstanding shares of our common stock.

As of September 30, 2013, our historical net tangible book value was approximately $60.4 million. As of September 30, 2013, our pro forma net tangible book value was approximately $60.4 million, or $7.00 per share of our common stock, after giving effect to:

- our conversion from a limited liability company to a corporation and the adoption of our certificate of incorporation as part of our formation transactions; and

- the issuance of 8,636,250 shares of our common stock to TNHC LLC's members in exchange for, and the cancellation of, their respective membership interests in TNHC LLC as part of our formation transactions.

After giving further effect to the sale of 7,812,500 shares of our common stock that we are offering at an initial public offering price of $11.00 per share, after deducting the underwriting discount and estimated offering expenses payable by us, our pro forma as adjusted net tangible book value as of September 30, 2013 was approximately $137.1 million, or $8.34 per share. This amount represents an immediate increase in net tangible book value of approximately $1.34 per share of our common stock to our existing stockholders and an immediate dilution of approximately $2.66 per share to purchasers in this offering.

The following table illustrates the dilution to purchasers in this offering on a per share basis:

| | | |
|---|---:|---:|
| Initial public offering price per share | | $11.00 |
| Pro forma net tangible book value per share as of September 30, 2013 | $7.00 | |
| Increase in net tangible book value per share, after giving effect to the pro forma as adjusted adjustments described above | 1.34 | |
| Pro forma as adjusted net tangible book value per share after this offering | | 8.34 |
| Dilution per share to purchasers in this offering | | $ 2.66 |

The following table sets forth, as of September 30, 2013, on the pro forma as adjusted basis as described above, the differences between the number of shares of our common stock purchased from us, the total consideration paid to us and the average price per share paid to us by existing stockholders and by purchasers in this offering, before deducting the underwriting discount and estimated offering expenses payable by us, at an initial public offering price of $11.00 per share.

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---:|---:|---:|---:|---:|
| | Number | Percent | Amount | Percent | |
| Existing stockholders | 8,636,250 | 52.5% | $ 60,447,095 | 41.3% | $ 7.00 |
| Purchasers in this offering | 7,812,500 | 47.5 | 85,937,500 | 58.7% | 11.00 |
| Total | 16,448,750 | 100.0% | $146,384,595 | 100.0% | $ 8.90 |

54

Table of Contents

If the underwriters' option to purchase additional shares from us is exercised in full, then, after giving effect to our use of the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors, the following will occur:

- the number of shares of our common stock held by our existing stockholders will decrease to 7,464,375 shares, or approximately 45.4% of the total number of shares of our common stock outstanding;

- the number of shares of our common stock held by purchasers in this offering will increase to 8,984,375 shares, or approximately 54.6% of the total number of shares of our common stock outstanding; and

- the pro forma as adjusted net tangible book value per share will be the same amount as described above, and the immediate dilution experienced by purchasers in this offering will be the same amount as described above.

55

Table of Contents

## DIVIDEND POLICY

We currently intend to retain our future earnings, if any, to finance the development and expansion of our business and, therefore, do not intend to pay cash dividends on our common stock for the foreseeable future. Any future determination to pay dividends will be at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in any financing instruments and such other factors as our board of directors deems relevant. Accordingly, you may need to sell your shares of our common stock to realize a return on your investment, and you may not be able to sell your shares at or above the price you paid for them. See "Risk Factors—Risks Related to this Offering and Ownership of Our Common Stock—We do not intend to pay dividends on our common stock for the foreseeable future."

56

Table of Contents

## SELECTED FINANCIAL DATA

The following tables set forth our selected financial data and other operating information, including pro forma information. The selected financial data as of and for the years ended December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010 are derived from our consolidated financial statements, which have been audited by Ernst & Young LLP, independent registered public accounting firm. The selected financial data as of and for the nine months ended September 30, 2013 and for the nine months ended September 30, 2012 are derived from unaudited financial statements. The unaudited financial statements include all adjustments, consisting of normal recurring accruals, which we consider necessary for a fair presentation of the financial position and the results of operations for these periods. Operating results for the nine months ended September 30, 2013 are not necessarily indicative of the results that may be expected for the entire year ended December 31, 2013. The data should be read in conjunction with the consolidated financial statements, related notes and other financial information included herein.

The unaudited pro forma consolidated statements of operations data for the year ended December 31, 2012 and the nine months ended September 30, 2013 are based on the historical statements of operations. Our historical information is derived from our unaudited statement of operations for the nine months ended September 30, 2013 and our audited statement of operations for the year ended December 31, 2012 included elsewhere in this prospectus.

The unaudited pro forma consolidated balance sheet data as of September 30, 2013 gives effect to the issuance of 7,812,500 shares of common stock at $11.00 per share and the conversion of our membership interests into 8,636,250 shares of common stock all in connection with our initial public offering as if those transactions had occurred as of September 30, 2013. The unaudited pro forma consolidated statements of operations data for the nine months ended September 30, 2013 and the year ended December 31, 2012 give effect to the issuance of stock awards and the adjustments to executive salaries and board of directors' compensation plans assuming we were public as of January 1, 2012. In addition, we have adjusted our provision for income taxes in the pro forma statement of operations assuming we operated as a corporation for Federal and state tax purposes as of January 1, 2012.

The unaudited pro forma consolidated financial statements data are provided for informational purposes only and are based on estimates and assumptions as set forth in the notes to such statements. The unaudited pro forma consolidated financial statements data are not necessarily indicative of results of operations to be expected in any future period. This information should be read in conjunction with our historical consolidated financial statements and related notes as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus, and in conjunction with the accompanying notes to these unaudited pro forma consolidated financial statements.

57

Table of Contents

| | TNHC Inc. Pro Forma(3) | TNHC LLC | | TNHC Inc. Pro Forma(3) | TNHC LLC | | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|---|---|---|
| | | Nine Months Ended September 30, | | | Year Ended December 31, | | | | |
| | 2013 | 2013 | 2012 | 2012 | 2012 | 2011 (As Restated)(6) | 2010 | 2010 |
| **Statement of Operations Data:**(1) | | | | | | | | |
| Home sales(2) | $ 24,735,081 | $24,735,081 | $12,303,354 | $ 24,197,956 | $24,197,956 | $ 25,624,111 | $ 5,319,408 | $ 538,598 |
| Cost of home sales(2) | 20,386,325 | 20,386,325 | 10,720,384 | 20,779,338 | 20,779,338 | 21,774,199 | 4,423,236 | 399,995 |
| Homebuilding gross profit | 4,348,756 | 4,348,756 | 1,582,970 | 3,418,618 | 3,418,618 | 3,849,912 | 896,172 | 138,603 |
| Fee building | 33,689,862 | 33,689,862 | 13,485,624 | 28,268,675 | 28,268,675 | 16,522,946 | 11,494,347 | 12,941,110 |
| Cost of fee building | 30,663,898 | 30,663,898 | 12,843,103 | 26,505,042 | 26,505,042 | 16,762,666 | 11,331,286 | 12,764,497 |
| Fee building gross profit (loss) | 3,025,964 | 3,025,964 | 642,521 | 1,763,633 | 1,763,633 | (239,720) | 163,061 | 176,613 |
| Land sales gross margin | — | — | (321,791) | (321,791) | (321,791) | — | — | — |
| Abandoned project costs | 489,395 | 489,395 | 239,340 | 408,642 | 408,642 | 128,798 | — | — |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | (1,689,659) | 183,191 | (349,445) | (349,445) | 38,916 | — | — |
| Selling and marketing | 1,272,575 | 1,272,575 | 1,096,071 | 1,677,058 | 1,677,058 | 1,748,430 | 453,799 | 134,002 |
| General and administrative | 5,986,901 | 4,122,348 | 3,194,285 | 7,924,144 | 4,474,949 | 3,997,617 | 848,114 | 328,295 |
| Income (loss) from operations | 1,315,508 | 3,180,061 | (2,809,187) | (4,799,939) | (1,350,744) | (2,303,569) | (242,680) | (147,081) |
| Guaranty fee income | 85,173 | 85,173 | 56,782 | 85,172 | 85,172 | — | — | — |
| Other expense, net | (33,790) | (33,790) | (16,001) | (15,048) | (15,048) | (14,750) | (10,596) | (6,048) |
| Income (loss) before taxes | 1,366,891 | 3,231,444 | (2,768,406) | (4,729,815) | (1,280,620) | (2,318,319) | (253,276) | (153,129) |
| Provision for taxes | — | (315,313) | (49,543) | — | (71,255) | (10,149) | — | — |
| Net income (loss) | $ 1,366,891 | $ 2,916,131 | $ (2,817,949) | $ (4,729,815) | $ (1,351,875) | $ (2,328,468) | $ (253,276) | $ (153,129) |
| Unaudited pro forma income (loss) per share | | | | | | | | |
| Basic | $ 0.16 | | | $ (0.55) | | | | |
| Diluted | $ 0.16 | | | $ (0.55) | | | | |
| **Operating Data — Company Projects** | | | | | | | | |
| Net new home orders | | 66 | 51 | | 72 | 45 | 15 | 4 |
| New homes delivered | | 59 | 30 | | 53 | 49 | 8 | — |
| Average sales price of homes delivered | | $ 419,000 | $ 410,000 | | $ 457,000 | $ 523,000 | $ 665,000 | $ — |
| Cancellation rate | | 16.5% | 16.4% | | 16.0% | 25.0% | 10.0% | 0.0% |
| Average selling communities | | 4 | 5 | | 4 | 4 | 3 | 1 |
| Selling communities at end of period | | 3 | 3 | | 3 | 4 | 3 | 1 |
| Backlog at end of period, number of homes | | 32 | 30 | | 26 | 7 | 11 | 4 |
| Backlog at end of period, aggregate sales value | | $20,030,000 | $15,498,000 | | $10,593,000 | $ 5,074,000 | $ 3,982,000 | $ 1,177,000 |

| | As of September 30, 2013 | | As of December 31, | |
|---|---|---|---|---|
| | TNHC Inc. Pro Forma(3) | TNHC LLC | 2012 | 2011 |
| **Balance Sheet Data** | | | | |
| Cash, cash equivalents and restricted cash | $ 81,274,231 | $ 4,602,356 | $ 6,152,048 | $ 5,523,851 |
| Receivables | 4,475,666 | 4,475,666 | 6,049,676 | 59,317 |
| Real estate inventories | 48,023,354 | 48,023,354 | 39,268,764 | 28,890,573 |
| Investment in unconsolidated joint ventures | 28,238,214 | 28,238,214 | 12,424,229 | 4,854,584 |
| Other assets | 3,949,283 | 3,949,283 | 615,999 | 433,465 |
| Total assets | $ 165,960,748 | $ 89,288,873 | $64,510,716 | $39,761,790 |
| Notes payable to member | $ — | $ — | $ 1,000,000 | $ — |
| Notes payable | 16,975,153 | 16,975,153 | 16,721,878 | 9,383,462 |
| Accounts payable and accrued expenses | 11,866,625 | 11,866,625 | 11,214,124 | 2,526,739 |
| Total liabilities | 28,841,778 | 28,841,778 | 28,936,002 | 11,910,201 |
| Members' equity | — | 60,447,095 | 35,574,714 | 27,851,589 |
| Stockholders' equity | 137,118,970 | | | |
| Total liabilities and members' equity | $ 165,960,748 | $ 89,288,873 | $64,510,716 | $39,761,790 |

58

Table of Contents

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | | |
| **Operating and Financial Data – Unconsolidated Joint Ventures**[(4)] | | | | | | |
| Home sales | $ 105,001,748 | $ — | $ 56,018,517 | $ — | $ — | $ — |
| Cost of home sales | 76,741,526 | — | 41,548,236 | — | — | — |
| Homebuilding gross profit | 28,260,222 | — | 14,470,281 | | | |
| Net income (loss) | $ 19,768,602 | $ (2,678,930) | $ 8,652,751 | $ (776,819) | $ — | $ — |
| Management fees earned by the Company[(5)] | 4,373,734 | 1,928,883 | 2,949,365 | 844,411 | — | — |
| Net new home orders | 111 | 75 | 96 | — | — | — |
| New homes delivered | 74 | — | 42 | — | — | — |
| Cancellation rate | 5.9% | 2.6% | 5.0% | — | — | — |
| Average selling communities | 6 | 3 | 3 | — | — | — |
| Selling communities at end of period | 4 | 3 | 3 | — | — | — |
| Backlog at end of period, number of homes | 91 | 75 | 54 | — | — | — |
| Backlog at end of period, aggregate sales value | $ 93,529,000 | $101,403,000 | $ 72,921,000 | $ — | $ — | $ — |

| | As of September 30, 2013 | As of December 31, | |
|---|---|---|---|
| | | 2012 | 2011 |
| **Balance Sheet Data – Unconsolidated Joint Ventures** | | | |
| Total assets, primarily real estate inventories | $ 287,698,964 | $173,255,773 | $92,622,144 |
| Total liabilities, primarily accounts payable and notes payable | $ 85,728,922 | $ 44,673,841 | $21,610,963 |
| The Company's equity | 28,238,214 | 12,424,229 | 4,854,584 |
| Other partners' equity | 173,731,828 | 116,157,703 | 66,156,597 |
| Total equity | 201,970,042 | 128,581,932 | 71,011,181 |
| Total liabilities and equity | $ 287,698,964 | $173,255,773 | $92,622,144 |

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | | |
| **Operating Data – Fee Building Projects** | | | | | | |
| New homes delivered | 148 | 14 | 50 | 47 | 37 | 12 |

(1) In connection with this offering, we converted into a Delaware corporation. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

(2) During the years ended December 31, 2011 and 2010, the Company entered into a fee building services agreement that allowed us to independently operate a design center and directly market upgrade options to the landowners' homebuyers. We recognized revenue for these option upgrades in accordance with ASC 360-20, *Property, Plant and Equipment, Real Estate Sales*, as more fully described in the notes to the consolidated financial statements. During the years ended December 31, 2011 and 2010, we recognized revenue for these option upgrades of $3.2 million and $2.8 million, respectively, which is included above in home sales. The cost of these option upgrades, included above in cost of home sales, was $2.5 million and $2.2 million during the years ended December 31, 2011 and 2010, respectively. These revenues and costs were for the delivery of option upgrades on 47 and 49 homes, respectively, which are included in the operating data for fee building services.

(3) For information regarding the pro forma adjustments, see the unaudited pro forma financial statements contained on pages F-2 through F-7 of this prospectus, which unaudited pro forma financial statements were prepared in accordance with Article 11 of Regulation S-X.

59

**Table of Contents**

(4)    "Operating and Financial Data – Unconsolidated Joint Ventures" reflects the data for the ventures and not our share thereof. We own economic interests in our unconsolidated
        ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest.
        These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is
        described under "Our Business—Joint Ventures." Such financial data is not included in our financial data for GAAP purposes, but is recognized in our results of operations as a
        component of equity in net (income) loss of unconsolidated joint ventures. We have interests in several unconsolidated joint ventures and this information has been included to
        provide additional information about the operations and financial condition of our unconsolidated joint ventures. This data is included for informational purposes only.

(5)    We have entered into agreements with our unconsolidated joint ventures to provide management services related to the underlying projects. Pursuant to the agreements, we receive
        a management fee based on each project's revenues. During the nine months ended September 30, 2013 and 2012 and the years ended December 31, 2012 and 2011, we earned
        $4,373,734, $1,928,883, $2,949,365 and $844,411, respectively, in management fees, which have been recorded as fee building revenue.

(6 )   As more fully discussed on page F-15 of this prospectus, our consolidated financial statements for the years ended December 31, 2012, and 2011 and for the period from
        August 18, 2010 (inception) through December 31, 2010 have been restated to reflect adjustments related to share-based awards included in general and administrative expense.

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITIONS AND RESULTS OF OPERATION

*You should read the following in conjunction with the sections of this prospectus entitled "Risk Factors," "Cautionary Note Concerning Forward–Looking Statements," "Selected Financial Data" and "Our Business" and our historical financial statements and related notes thereto included elsewhere in this prospectus. This discussion contains forward–looking statements reflecting current expectations that involve risks and uncertainties. Actual results and the timing of events may differ materially from those contained in these forward–looking statements due to a number of factors, including those discussed in the section entitled "Risk Factors" and elsewhere in this prospectus.*

We are a new generation homebuilder focused on the design, construction and sale of innovative and consumer-driven homes in major metropolitan areas within select growth markets in California, including coastal Southern California, the San Francisco Bay area and metro Sacramento. We also seek create unique communities via our significant land development expertise, either stand-alone or within master-planned communities developed by third parties.

We were founded in August 2009, towards the end of an unprecedented downturn in the U.S. homebuilding industry, with a combined initial capital commitment of $10 million by our founders, who are also our four most senior executives. Our business initially focused on fee building projects in Southern California, in which we built, marketed and sold homes for independent third-party land owners in prestigious master planned communities. Fee building represented a capital-efficient method of establishing operations and strengthening relationships with key land owners and developers. Commencing with the $20 million capital commitment by Institutional Housing Partners, or IHP, and Watt Residential LLC, or Watt, in August 2010, and the subsequent $10 million capital commitment by Tricon Capital, or Tricon, in January 2011, we began to rapidly deploy capital to acquire land and build homes for our own account on larger infill sites within established communities, where we could leverage the experience of our management team in land planning and development. In an effort to sustain a steep growth trajectory while retaining ownership control and generating attractive risk-adjusted returns for all stakeholders, we have employed a joint venture strategy, in which we contribute a minority share of the capital and receive distributions in excess our percentage capital interest plus management fees from the joint ventures. Our joint venture strategy has been instrumental in allowing us to leverage entity-level capital and establish a homebuilding platform focused on high-growth, land-constrained markets, such as Orange and Los Angeles counties in Southern California and San Mateo, Santa Clara, Marin and Yolo counties in Northern California.

### Overview and Outlook

During the year ended December 31, 2012 and continuing through the nine months ended September 30, 2013, the overall housing market continue to show signs of improvement largely driven by increasing consumer confidence levels related to the homebuilding industry, continued favorable housing affordability based on historical metrics, decreasing home inventory levels in many markets, and more positive consumer sentiment for the overall economy. Individual markets continue to experience varying results as local economic and employment situations strongly influence the local market demand and home buying abilities. However, our markets have shown positive indicators of a sustainable recovery. We improved on several key operati metrics during the year and nine months ended December 31, 2012 and September 30, 2013, respectively, as compared to the year and nine months en December 31, 2011 and September 30, 2012, respectively, including increased net new home orders, home deliveries, fee building revenue, homebuildi gross margin, backlog units, backlog value and equity in net income from unconsolidated joint ventures.

We expect to adopt an equity incentive plan in connection with this offering. The number of shares of our common stock that may be issued under 2014 Long-Term Incentive Plan is 1,644,875 shares. We expect to grant 107,500 restricted stock units to our officers (other than Messrs. Webb, Stelman Davis and Redwitz) and employees and our non-employee director nominees, as well as options to purchase 885,454 shares of our

Table of Contents

common stock to the members of our management team, other officers and employees, in each case pursuant to our 2014 Long-Term Incentive Plan (at a strike price equal to $11.00 per share). We expect to have 651,921 shares of our common stock reserved for future issuance under our 2014 Long-Term Incentive Plan. Based upon this initial public offering price, we expect to recognize compensation expense in respect of the foregoing restricted stock unit grants of $1,182,500, of which $902,916 will be recognized ratably over the first twelve months, $139,792 in the second twelve months and $139,792 in the third twelve months, from the grant date. In addition, based upon this initial public offering price, we expect to recognize compensation expense in respect of the foregoing option grants of $4,059,833, of which $1,353,278 will be recognized in the first twelve months, $1,353,278 in the second twelve months and $1,353,277 in the third twelve months, from the grant date. For a description of our 2014 Long-Term Incentive Plan and the initial awards to be made pursuant to such plan, see "Executive and Director Compensation—2014 Long-Term Incentive Plan."

## Basis of Presentation

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany accounts have been eliminated upon consolidation. The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles, or GAAP, as contained within the Financial Accounting Standards Board, or FASB, Accounting Standards Codification, or ASC. Operating results for the periods presented are not necessarily indicative of the results to be expected for any subsequent period.

## Results of Operations

Our primary goal in 2012 was to acquire land or lots in targeted market areas to generate deliveries beginning in 2013 and beyond. We are currently in the process of acquiring and developing lots in California to increase our lot supply and community count. Our communities are strategically located in major metropolitan areas within select California growth markets, including coastal Southern California, the San Francisco Bay area and metro Sacramento. While our primary growth strategy will focus on increasing our market position in these markets, we are exploring expansion opportunities in Phoenix and the Pacific Northwest and may consider other markets, through organic growth or acquisitions. During the nine months ended September 30, 2013 and the year ended December 31, 2012, we acquired 20 and 150 lots, respectively, in California. As of September 30, 2013, we owned 329 lots and had begun development on 78 of those lots. We were under contract to acquire 497 lots in our existing markets as of September 30, 2013.

We are also focused on increasing our number of active selling locations, which we expect will contribute to our new home order growth, homes in backlog and ultimately new home deliveries. Our backlog units increased 7% from 30 to 32 as of September 30, 2013 as compared to September 30, 2012. Backlog value also increased $4.5 million, or 29%, to $20.0 million as of September 30, 2013 as compared to September 30, 2012. We opened one new community and increased our net new home orders by 60% during the year ended December 31, 2012 as compared to the year ended December 31, 2011. Our backlog units increased from seven to 26, a 271% increase, and the backlog value increased 109% from $5.1 million to $10.6 million as of December 31, 2012, as compared to December 31, 2011.

Our equity in net income (loss) from unconsolidated joint ventures increased $1,872,850 from a loss of $183,191 to income of $1,689,659 for the nine months ended September 30, 2013 as compared to the nine months ended September 30, 2012. We experienced our first net new home orders and home deliveries from an unconsolidated joint venture during the year ended December 31, 2012, which were 96 and 42, respectively. During the nine months ended September 30, 2013, net new home orders and new home deliveries from unconsolidated joint ventures were 111 and 74, respectively.

62

Table of Contents

In addition, during the nine months ended September 30, 2013, we added four new fee building contracts for the construction of 801 homes in Southern California.

We refer to our financial statement line items in the explanation of our period-over-period changes in results of operations. Below are general definitions of what those line items include and represent.

## Revenues

Revenues are derived primarily from home deliveries and fee building services provided to independent third-party property owners. Fee building services also include management fees received from our unconsolidated joint ventures. Homes sales revenue is recorded at close of escrow of the hom Revenue for fee building services is recognized either over a cost-to-cost approach in applying the percentage-of-completion method or in proportion to total efforts expected to be provided net of estimated warranty costs.

## Expenses

Expenses primarily relate to cost of home sales and fee building cost of sales provided to independent third-party property owners. Cost of home s includes the cost of land, land development, home construction, capitalized interest, indirect costs of construction, estimated warranty costs, real estate and direct overhead costs incurred during development and home construction that benefit the entire project. Cost of fee building includes direct labor, subcontractor costs and other indirect costs. Selling and marketing expense is comprised of direct selling expenses, including internal and external commissions, related selling and marketing expenses, such as advertising and model operations, and sales office costs, and is recorded in the period incurred. General and administrative expenses represent parent and subsidiary overhead expenses, such as salaries, benefits, office expenses, outside professional services and insurance and travel expenses, and are recorded in the period incurred.

## Investments in Unconsolidated Joint Ventures

Investments in our unconsolidated joint ventures are accounted for under the equity method of accounting. Under the equity method, we recognize our proportionate share of earnings and losses generated by the joint venture upon the delivery of lots or homes to third parties. Our ownership interests our unconsolidated joint ventures vary, but are generally less than or equal to 50%.

## Other Income (Expense), Net

Other income (expense), net, consists of miscellaneous fees paid to state regulatory agencies offset partially by interest income and national contra rebates.

The historical financial data presented below is not necessarily indicative of the results to be expected for any future period. Immediately prior to th completion of this offering, we intend to convert into a Delaware corporation. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

Table of Contents

*Consolidated Financial Data:*

| | Nine Months Ended September 30, 2013 | Nine Months Ended September 30, 2012 | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
| | | | 2012 | 2011 (As Restated) (1) | | |
| Revenue: | | | | | | |
| Home sales | $ 24,735,081 | $ 12,303,354 | $24,197,956 | $ 25,624,111 | $ 5,319,408 | $ 538,598 |
| Fee building | 33,689,862 | 13,485,624 | 28,268,675 | 16,522,946 | 11,494,347 | 12,941,110 |
| Land sales | — | 2,940,100 | 2,940,100 | — | — | — |
| | 58,424,943 | 28,729,078 | 55,406,731 | 42,147,057 | 16,813,755 | 13,479,708 |
| Expenses: | | | | | | |
| Cost of home sales | 20,386,325 | 10,720,384 | 20,779,338 | 21,774,199 | 4,423,236 | 399,995 |
| Fee building | 30,663,898 | 12,843,103 | 26,505,042 | 16,762,666 | 11,331,286 | 12,764,497 |
| Cost of land sales | — | 3,261,891 | 3,261,891 | — | — | — |
| Abandoned project costs | 489,395 | 239,340 | 408,642 | 128,798 | — | — |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | 183,191 | (349,445) | 38,916 | — | — |
| Selling and marketing | 1,272,575 | 1,096,071 | 1,677,058 | 1,748,430 | 453,799 | 134,002 |
| General and administrative | 4,122,348 | 3,194,285 | 4,474,949 | 3,997,617 | 848,114 | 328,295 |
| | 55,244,882 | 31,538,265 | 56,757,475 | 44,450,626 | 17,056,435 | 13,626,789 |
| Income (loss) from operations | 3,180,061 | (2,809,187) | (1,350,744) | (2,303,569) | (242,680) | (147,081) |
| Guaranty fee income | 85,173 | 56,782 | 85,172 | — | — | — |
| Other expense, net | (33,790) | (16,001) | (15,048) | (14,750) | (10,596) | (6,048) |
| Income (loss) before taxes | 3,231,444 | (2,768,406) | (1,280,620) | (2,318,319) | (253,276) | (153,129) |
| Provision for taxes | $ (315,313) | (49,543) | (71,255) | (10,149) | — | — |
| Net income (loss) | $ 2,916,131 | $ (2,817,949) | $ (1,351,875) | $ (2,328,468) | $ (253,276) | $ (153,129) |

(1)   As more fully discussed on page F-15 of this prospectus, our consolidated financial statements for the years ended December 31, 2012, and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010 have been restated to reflect adjustments related to share-based awards included in general and administrative expen...

## Matters Affecting the Comparability of Our Financial Results

The New Home Company LLC was formed in August 2009, and on August 18, 2010, Watt and IHP were admitted as members, increasing our tota... capital commitment to $30 million. Prior to the admission of Watt and IHP, most of our operations consisted of "fee building projects" in which we built, marketed and sold homes for independent third-party property owners with whom we had revenue-sharing agreements on projects typically marketed un... The New Home Company brand name.

For the periods prior to August 18, 2010, we were wholly owned by our founders. References to our "Predecessor" in this prospectus are reference... to us prior to August 18, 2010. As a result of the foregoing, the financial and operational data for 2010 that is presented and discussed in this prospectus... generally bifurcated between the period during 2010 that our business was conducted through our Predecessor (January 1, 2010 through August 17, 20... and subsequent thereto (August 18, 2010 through December 31, 2010). The historical operational results of our Predecessor may not be comparable to... results of operations of us because each of our Predecessor and us used a different basis of accounting and our homebuilding operations have been ou... strategic focus since August 18, 2010 compared to our Predecessor's focus on fee building services prior to such date.

Table of Contents

## Nine Months Ended September 30, 2013 Compared to Nine Months Ended September 30, 2012

*Net New Home Orders and Backlog*

|  | Nine Months Ended September 30, | | Increase (Decrease) | |
|---|---|---|---|---|
|  | **2013** | **2012** | **Amount** | **%** |
| Net new home orders | 66 | 51 | 15 | 29% |
| Cancellation rate | 16.5% | 16.4% | 0.1% | 1% |
| Average selling communities | 4 | 5 | (1) | -20% |
| Selling communities at end of period | 3 | 3 | (1) | -33% |
| Backlog (dollar value) | $20,030,000 | $15,498,000 | $4,532,000 | 29% |
| Backlog (units) | 32 | 30 | 2 | 7% |
| Average sales price of backlog | $ 625,900 | $ 516,600 | $ 109,300 | 21% |

Net new home orders for the nine months ended September 30, 2013 increased 29% to 66, compared to 51 during the same period in 2012. Our overall "absorption rate" (the rate at which home orders are contracted, net of cancellations) for the nine months ended September 30, 2013 was 16.5 pe[r] average selling community (1.4 monthly), compared to 10.2 per average selling community (0.9 monthly) during the same period in 2012.

Our cancellation rate, excluding our unconsolidated joint ventures, of buyers who contracted to buy a home, but did not close escrow (as a percent[age] of overall orders), was approximately 16.5% for the nine months ended September 30, 2013 as compared to 16.4% for the same period in 2012. Our average number of selling communities decreased by one for the nine months ended September 30, 2013, but reflected the opening of one new commu[nity] offset by the final closeout of two selling communities, compared to the same period in 2012.

Backlog reflects the number of homes, net of actual cancellations experienced during the period, for which we have entered into a sales contract w[ith] a customer, but for which we have not yet delivered the home. Backlog has not been reduced to reflect our historical cancellation rate. Homes in backlog are generally closed within three to six months, although we may experience cancellations of sales contracts prior to closing. An increase in net new hom[e] orders during the year ended December 31, 2012 positively impacted our number of homes in backlog as of September 30, 2013, which are homes we expect to close in future periods. We expect that our net new home orders and backlog increases will have a positive impact on revenues and cash flow [in] future periods. The dollar value of backlog increased $4.5 million, or 29%, as of September 30, 2013, compared to September 30, 2012. The increase in [the] dollar amount of backlog reflects an increase in the number of homes in backlog of 2 and an increase in average sales price of the homes in backlog. Th[e] average sales price of backlog increased by $109,300, or 21%, during the nine months ended September 30, 2013 primarily due to a different product m[ix] driven by the introduction of sales in a higher priced community during the same period.

*Home Sales Revenue and New Homes Delivered*

|  | Nine Months Ended September 30, | | Increase (Decrease) | |
|---|---|---|---|---|
|  | **2013** | **2012** | **Amount** | **%** |
| New homes delivered | 59 | 30 | 29 | 97% |
| Home sales revenue | $24,735,081 | $12,303,354 | $12,431,727 | 101% |
| Average sales price of homes delivered | $ 419,000 | $ 410,000 | $ 9,000 | 2% |

New home deliveries increased by 29, or 97%, during the nine months ended September 30, 2013 compared to the same period in 2012. The incr[ease] in new home deliveries was primarily attributable to the increase in net new home orders and units in backlog.

During the nine months ended September 30, 2013, average sales price of homes delivered increased $9,000, or 2%, from the same period in 201[2]. This increase is primarily due to a different product mix and geographical location of homes delivered.

Table of Contents

*Homebuilding*

| | Nine Months Ended September 30, | | | |
| | **2013** | **%** | **2012** | **%** |
|---|---|---|---|---|
| Home sales | $24,735,081 | 100.0% | $12,303,354 | 100.0% |
| Cost of home sales | 20,386,325 | 82.4% | 10,720,384 | 87.1% |
| Homebuilding gross margin | 4,348,756 | 17.6% | 1,582,970 | 12.9% |
| Add: interest in cost of home sales | 347,571 | 1.4% | 164,732 | 1.3% |
| Adjusted homebuilding gross margin[(1)] | $ 4,696,327 | 19.0% | $ 1,747,702 | 14.2% |
| Homebuilding gross margin percentage | | 17.6% | | 12.9% |
| Adjusted homebuilding gross margin percentage[(1)] | | 19.0% | | 14.2% |

_____

[(1)]    Non-GAAP financial measure (as discussed below).

Cost of home sales includes the cost of land, land development, home construction, capitalized interest, indirect costs of construction, estimated warranty costs, real estate taxes and direct costs incurred during development and home construction that benefit the project and is dependent upon the number of new home deliveries and the price at which we can acquire land and raw materials. Cost of home sales increased to $20.4 million from $10.7 million during the nine months ended September 30, 2013 when compared to the same period in 2012. The increase in cost of home sales primarily relates to the 97% increase in new home deliveries.

Cost of home sales as a percentage of home sales revenue decreased to 82.4% from 87.1% for the nine months ended September 30, 2013 when compared to the same period in 2012, respectively, due to a larger number of new home deliveries from communities with a lower cost of land.

Homebuilding gross margin represents home sales revenue less cost of home sales. Our homebuilding gross margin increased to 17.6% for the nine months ended September 30, 2013 as compared to 12.9% for the same period in 2012 primarily due to a shift in product mix to more deliveries from higher margin communities and improved overall market conditions.

Excluding interest in cost of home sales, adjusted homebuilding gross margin percentage was 19.0% for the nine months ended September 30, 2013 compared to 14.2% for the same period in 2012. Adjusted homebuilding gross margin is a non-GAAP financial measure. We believe that by adding interest in cost of home sales back to homebuilding gross margin, investors are able to assess the performance of our homebuilding business excluding our interest cost, allowing a focus on the performance of the underlying homebuilding operations. We believe this information is meaningful as it isolates the impact that leverage has on homebuilding gross margin and permits investors to make better comparisons with our competitors who adjust gross margins in a similar fashion. See the table above reconciling this non-GAAP financial measure to homebuilding gross margin, the nearest GAAP equivalent.

*Fee Building*

| | Nine Months Ended September 30, | | | |
| | **2013** | **%** | **2012** | **%** |
|---|---|---|---|---|
| Fee building revenues | $33,689,862 | 100.0% | $13,485,624 | 100.0% |
| Cost of fee building | 30,663,898 | 91.0% | 12,843,103 | 95.2% |
| Fee building gross margin | $ 3,025,964 | 9.0% | $  642,521 | 4.8% |

As of September 30, 2013 and 2012, we had seven and five, respectively, fee building agreements with independent third-party land owners and te and three, respectively, construction management agreements with

Table of Contents

our unconsolidated joint ventures to provide construction management services. Fee building revenue increased to $33.7 million for the nine months end
September 30, 2013 compared to $13.5 million for the same period during 2012. Cost of fee building increased to $30.7 million for the nine months ende
September 30, 2013 compared to $12.8 million for the same period during 2012. Cost of fee building includes direct labor, subcontractor costs and other
indirect costs, for which we are reimbursed by the independent third-party land owner and is primarily driven by the pace at which the land owner has us
execute on its development plan. The increase in fee building revenue and cost is due to two new fee building agreements as of September 30, 2013 an
increase in management fees from three communities contained within one unconsolidated joint venture during the nine months ended September 30, 2
compared to the nine months ended September 30, 2012.

We collect management fees from our unconsolidated joint ventures during the life of the project, and these fees increase as new homes are delive
These management fees were $4,373,734 and $1,928,883 for the nine months ended September 30, 2013 and 2012, respectively, and are included in f
building revenues. The 127% increase in management fees from unconsolidated joint ventures caused fee building gross margin to increase 4.2%.

*Abandoned Project Costs*

Pre-acquisition costs, which consist primarily of due diligence costs for specific projects, are expensed to abandoned project costs when we detern
continuation of the respective project is not probable. During the nine months ended September 30, 2013, abandoned project costs increased to $489,39
from $239,340 during the nine months ended September 30, 2012, primarily due to the increase in project investigation activity.

*Equity in Net Income (Loss) of Unconsolidated Joint Ventures*

As of September 30, 2013 and 2012, we had ownership interests in ten and three, respectively, unconsolidated joint ventures. We own economic
interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributio
from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. The unconsolidated joint ventu
produced $19.8 million in net income during the nine months ended September 30, 2013 and a net loss of $2.7 million for the same period in 2012. Our
equity in net income from unconsolidated joint ventures was $1.7 million for the nine months ended September 30, 2013, compared to equity in net loss
$0.2 million for the same period in 2012. The change was primarily due to the 74 and 0 new home deliveries during the nine months ended September 3
2013 and 2012, respectively, partially offset by losses in unconsolidated joint ventures entered into that were not yet generating income.

The following sets forth supplemental information about our unconsolidated joint ventures. We have investments in several unconsolidated joint
ventures, and this information has been included to provide additional information about the operations and financial condition of our unconsolidated join
ventures. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each ca
a share of the distributions from the joint ventures in excess of our percentage capital interest, the amount of which varies among our different joint
ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Jo
Ventures." Dollar amounts and other data reflect the entire amounts attributable to our unconsolidated joint ventures and not our share thereof. Such
information is not included in our financial data for GAAP purposes, but is recognized in our results of operations as a component of equity in net income
(loss) of unconsolidated joint ventures. This data is included for informational purposes only.

67

Table of Contents

| | Nine Months Ended September 30, | | Increase (Decrease) | |
|---|---|---|---|---|
| **Unconsolidated Joint Ventures—Net New Home Orders, Backlog, Revenues and Deliveries** | **2013** | **2012** | **Amount** | **%** |
| Net new home orders | 111 | 75 | 36 | 48% |
| Cancellation rate | 5.9% | 2.6% | 3.3% | 127% |
| Average selling communities | 6 | 3 | 3 | 100% |
| Selling communities at end of period | 4 | 3 | 1 | 33% |
| Backlog (dollar value) | $ 93,529,000 | $101,403,000 | $ (7,874,000) | -8% |
| Backlog (units) | 91 | 75 | 16 | 21% |
| Average sales price of backlog | $ 1,027,800 | $ 1,352,000 | $ (324,200) | -24% |
| New homes delivered | 74 | — | 74 | n/a |
| Home sales revenue | $105,001,748 | $ — | $105,001,748 | n/a |
| Average sales price of homes delivered | $ 1,419,000 | $ — | $ 1,419,000 | n/a |

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| **Unconsolidated Joint Ventures—Homebuilding** | **2013** | **%** | **2012** | **%** |
| Unconsolidated joint ventures home sales | $105,001,748 | 100.0% | $— | n/a |
| Cost of unconsolidated joint ventures home sales | 76,741,526 | 73.1% | — | n/a |
| Unconsolidated joint ventures gross margin | 28,260,222 | 26.9% | — | n/a |
| Add: interest in cost of unconsolidated joint venture home sales | 2,555,686 | 2.4% | — | n/a |
| Adjusted unconsolidated joint ventures gross margin | $ 30,815,908 | 29.3% | $— | n/a |
| Unconsolidated joint ventures home sales gross margin percentage | | 26.9% | | — |
| Adjusted unconsolidated joint ventures home sales gross margin percentage[1] | | 29.3% | | — |

_____

[1] Non-GAAP financial measure (as discussed below).

The table below summarizes lots owned and controlled by our unconsolidated joint ventures as of the dates presented:

| | September 30, | | Increase | |
|---|---|---|---|---|
| **Unconsolidated Joint Ventures—Lots Owned and Controlled** | **2013** | **2012** | **Amount** | **%** |
| Lots owned | 1,761 | 502 | 1,259 | 251% |
| Lots controlled[1] | 1,279 | 1,345 | (66) | (5)% |
| Total | 3,040 | 1,847 | 1,193 | 65% |

_____

[1] Consists of 1,279 lots and 1,345 lots that are under purchase and sale agreements, as of September 30, 2013 and 2012, respectively.

Table of Contents

*Selling, General and Administrative Expense*

| | Nine Months Ended September 30, | | As a Percentage of Home Sales Revenue | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Selling and marketing expenses | $1,272,575 | $1,096,071 | 5.1% | 8.9% |
| General and administrative expenses ("G&A") | 4,122,348 | 3,194,285 | 16.7% | 26.0% |
| Total selling, marketing and G&A | $5,394,923 | $4,290,356 | 21.8% | 34.9% |

Selling and marketing expense incurred during the nine months ended September 30, 2013 decreased to 5.1% of home sales revenue compared to 8.9% for the same period in 2012. The decrease in selling and marketing expense is primarily due to fewer home deliveries from Company projects with broker involvement during the nine months ended September 30, 2013 as compared to the same period in 2012.

G&A expenses decreased to 16.7% of home sales revenue for the nine months ended September 30, 2013 compared to 26.0% for the same period in 2012. The decrease in G&A as a percentage of home sales revenue is primarily due to a 101% increase in home sales revenue for the nine months ended September 30, 2013 as compared to the same period in 2012.

*Other Income (Expense), Net*

Other expense, net increased slightly during the nine months ended September 30, 2013 compared to the same period in 2012 due to an increase in fees paid to state regulatory agencies.

*Provision For Taxes*

We are a limited liability company which is treated as a partnership for income tax purposes and is subject to certain minimal taxes and fees; however, income taxes on taxable income or losses realized by us are the obligation of the members. We have a subsidiary that is treated as a C Corporation, and Federal and state income taxes are provided for this entity.

Provision for income taxes increased to $315,313 for the nine months ended September 30, 2013 compared to $49,543 for the nine months ended September 30, 2012. The increase in provision for income taxes is primarily due to the increase in fee building gross margin during the nine months ended September 30, 2013 compared to the nine months ended September 30, 2012.

*Net Income (Loss)*

As a result of the foregoing factors, net income during the nine months ended September 30, 2013 was $2.9 million compared to a net loss during the same period in 2012 of $2.8 million.

*Interest Incurred*

Interest, which was incurred principally to finance land acquisition, land development and home construction, totaled $813,694 and $364,482 for the nine months ended September 30, 2013 and 2012, respectively, all of which was capitalized to real estate inventory. The increase in interest incurred during the nine months ended September 30, 2013 compared to the nine months ended September 30, 2012 was primarily attributable to our increase in average outstanding debt balances, which was the result of the increase in the number of projects and the growth in our real estate inventory.

69

Table of Contents

*Lots Owned and Controlled*

| | September 30, | | Increase (Decrease) | |
| | 2013 | 2012 | Amount | % |
|---|---|---|---|---|
| *Lots Owned* | | | | |
| Southern California | 170 | 150 | 20 | 13% |
| Northern California | 159 | 270 | (111) | (41)% |
| Total | 329 | 420 | (91) | (22)% |
| *Lots Controlled* (1) | | | | |
| Southern California | 303 | 20 | 283 | 1,415% |
| Northern California | 194 | — | 194 | 0% |
| Fee Building Projects | 887 | 285 | 602 | 211% |
| Total | 1,384 | 305 | 1,079 | 354% |
| *Total Lots Owned and Controlled* | 1,713 | 725 | 988 | 136% |

_____

(1)   Includes 497 and 20 lots as of September 30, 2013 and 2012, respectively, that are under purchase contracts.

Our lots owned decreased by 22% to 329 as of September 30, 2013 primarily due to an increase in new home deliveries at three communities part offset by the acquisition of one community containing 20 lots.

## Year Ended December 31, 2012 Compared to Year Ended December 31, 2011

*Net New Home Orders and Backlog*

| | Year Ended December 31, | | Increase (Decrease) | |
| | 2012 | 2011 | Amount | % |
|---|---|---|---|---|
| Net new home orders | 72 | 45 | 27 | 60% |
| Cancellation rate | 16% | 25% | (9)% | (36)% |
| Average selling communities | 4 | 4 | — | 0% |
| Selling communities at end of period | 3 | 4 | (1) | (25)% |
| Backlog (dollar value) | $10,593,000 | $5,074,000 | $5,519,000 | 109% |
| Backlog (units) | 26 | 7 | 19 | 271% |
| Average sales price of backlog | $   407,000 | $  725,000 | $ (318,000) | (44)% |

Net new home orders for the year ended December 31, 2012 increased 60% to 72, compared to 45 during the the year ended December 31, 2011 overall "absorption rate" (the rate at which home orders are contracted, net of cancellations) for the year ended December 31, 2012 was 18 per average selling community (1.7 monthly), compared to 11.25 per average selling community (0.8 monthly) during the year ended December 31, 2011. Our cancellation rate, excluding our unconsolidated joint ventures, of buyers who contracted to buy a home, but did not close escrow (as a percentage of over orders), was approximately 16% for the year ended December 31, 2012 as compared to 25% for the year ended December 31, 2011. The growth during year ended December 31, 2012 was primarily due to the opening of one new community and increased absorption rates at our selling communities. Our average number of selling communities decreased by one during the year ended December 31, 2012 due to opening one new community, offset by the closeout of two selling communities. The increase in net new home orders positively impacted our number of homes in backlog, which are homes we expect to close in future periods. We expect that our net new home orders and backlog increases will have a positive impact on revenues and cash flow future periods.

Backlog reflects the number of homes, net of actual cancellations experienced during the period, for which we have entered into a sales contract w a customer, but for which we have not yet delivered the home. Backlog

Table of Contents

has not been reduced to reflect our historical cancellation rate. Homes in backlog are generally closed within three to six months, although we may experience cancellations of sales contracts prior to closing. The increase in backlog units of 19 homes was driven by the 60% increase in net new home orders during the year ended December 31, 2012 as compared to the previous year. The dollar value of backlog increased $5.5 million, or 109%, as of December 31, 2012. The increase in dollar amount of backlog reflects an increase in the number of homes in backlog of 19. We experienced a decrease average sales price of backlog of $318,000 during the year ended December 31, 2012 compared to the year ended December 31, 2011 due to the introduction of sales in a lower priced community during the same period. The increase in the dollar amount of backlog of homes sold, but not closed, as described above generally results in an increase in operating revenues in subsequent periods.

*Home Sales Revenue and New Homes Delivered*

|  | Year Ended December 31, | | Increase (Decrease) | |
|  | 2012 | 2011 | Amount | % |
|---|---|---|---|---|
| New homes delivered | 53 | 49 | 4 | 8% |
| Home sales revenue | $24,197,956 | $25,624,111[1] | $(1,426,155) | (6%) |
| Average sales price of homes delivered | $ 457,000 | $ 523,000[1] | $ (66,000) | (13%) |

[1] We entered into a fee building services agreement that allowed us to independently operate a design center and directly market upgrade options to landowners' homebuyers. We recognized revenue only for these option upgrades, and not the related homes delivered, in accordance with ASC 360-20, **PROPERTY, PLANT AND EQUIPMENT, REAL ESTATE SALES,** as more fully described in the notes to the consolidated financial statements. During the years ended December 31, 2012 and 2011, we recognized revenue for these option upgrades of $0 and $3.2 million, respectively, which is included above in home sales revenue. These option revenues were for the delivery of 0 and 47 homes in 2012 and 2011, respectively, which are not included above as new homes delivered. Excluding these option upgrade revenues, home sales revenue and the average sales price of homes delivered in the year ended December 31, 2011 would have been $22.5 million and $458,000, respectively.

New home deliveries increased by four, or 8%, during the year ended December 31, 2012 compared to the year ended December 31, 2011. The increase in new home deliveries was primarily attributable to the increase in net new home orders and units in backlog.

Home sales revenue decreased by $1.4 million, or 6%, during the year ended December 31, 2012 primarily due to the closeout of a fee building project during the year ended December 31, 2011, which generated $3.2 million in home sales revenue during the year ended December 31, 2011 and none during the year ended December 31, 2012 (see note 1 above).

*Homebuilding*

|  | Year Ended December 31, | | | |
|  | 2012 | % | 2011 | % |
|---|---|---|---|---|
| Home sales[1] | $24,197,956 | 100.0% | $25,624,111 | 100.00% |
| Cost of home sales[1] | 20,779,338 | 85.9% | 21,774,199 | 85.0% |
| Homebuilding gross margin | 3,418,618 | 14.1% | 3,849,912 | 15.0% |
| Add: interest in cost of home sales | 328,245 | 1.4% | 425,704 | 1.7% |
| Adjusted homebuilding gross margin[2] | $ 3,746,863 | 15.5% | $ 4,275,616 | 16.7% |
| Homebuilding gross margin percentage | | 14.1% | | 15.0% |
| Adjusted homebuilding gross margin percentage[2] | | 15.5% | | 16.7% |

71

Table of Contents

(1)    We entered into a fee building services agreement that allowed us to independently operate a design center and directly market upgrade options to landowners' homebuyers. We recognized revenue only for these option upgrades, and not for the related new homes delivered, in accordance with ASC 360-20, *Property, Plant and Equipment, Real Estate Sales,* as more fully described in the notes to the consolidated financial statements. During the years ended December 31, 2012 and 2011, we recognized revenue for these option upgrades of $0 and $3.2 million, respectively, which is included above in homebuilding home sales. The cost of these option upgrades, included above in homebuilding cost of home sales, was $0 and $ million during the years ended December 31, 2012 and 2011, respectively. Excluding these option upgrades revenues, homebuilding home sales during the years ended December 31, 2012 and 2011 would have been $24.2 million and $22.5 million, respectively, and the homebuilding cost of hom sales would have been $20.8 million and $19.3 million respectively. Homebuilding gross margins would have been 14.1% for both years ended December 31, 2012 and 2011 and did not materially change on a per unit basis.

(2)    Adjusted homebuilding gross margin is a non-GAAP financial measure. We believe that by adding interest in cost of home sales back to homebuilding gross margin, investors are able to assess the performance of our homebuilding business excluding our interest cost, allowing a focus on the performance of the underlying homebuilding operations. We believe this information is meaningful as it isolates the impact that leverage has on homebuilding gross margin and permits investors to make better comparisons with our competitors who adjust gross margins in a similar fashio See the table above reconciling this non-GAAP financial measure to homebuilding gross margin, the nearest GAAP equivalent.

Cost of home sales includes the cost of land, land development, home construction, capitalized interest, indirect costs of construction, estimated warranty costs, real estate taxes and direct costs incurred during development and home construction that benefit the project and is dependent upon the number of new home deliveries and the price at which we can acquire land and raw materials. Cost of home sales decreased to $20.8 million from $21.8 million during the year ended December 31, 2012 when compared to the same period in 2011. Although new home deliveries increased by 8%, cost of home sales were higher during the year ended December 31, 2011 as a result of the cost of option upgrades at one of our fee building projects that was completed during the year ended December 31, 2011 (see note 1 above). Cost of home sales during the year ended December 31, 2012 did not include costs related to option upgrades discussed in note 1 above, and, as a result, the cost of home sales decreased for the year ended December 31, 2012 d an increase in new home deliveries.

Homebuilding gross margin represents home sales revenue less cost of home sales. Our homebuilding gross margin decreased to 14.1% for the y ended December 31, 2012 as compared to 15.0% for the year ended December 31, 2011 primarily due to option revenue related to the delivery of optio and upgrades at one of our fee building projects that was completed during the year ended December 31, 2011 (see note 1 above). Excluding the additio options and upgrades deliveries during the year ended December 31, 2011, homebuilding gross margins would have remained the same (see note 1 ab and did not materially change on a per unit basis.

Excluding interest in cost of home sales, adjusted homebuilding gross margin percentage was 15.5% for the year ended December 31, 2012, compared to 16.7% for the year ended December 31, 2011. Excluding the additional options and upgrades deliveries during the year ended December 3 2011, adjusted homebuilding gross margins would have been 15.5% and 16.0% for the years ended December 31, 2012 and 2011, respectively. Adjuste homebuilding gross margin is a non-GAAP financial measure. We believe that by adding interest in cost of home sales back to homebuilding gross marg investors are able to assess the performance of our homebuilding business excluding our interest cost, allowing a focus on the performance of the underlying homebuilding operations. We believe this information is meaningful as it isolates the impact that leverage has on homebuilding gross margin a permits investors to make better comparisons with our competitors, who adjust gross margins in a similar fashion. See the table above reconciling this no GAAP financial measure to homebuilding gross margin, the nearest GAAP equivalent.

Table of Contents

*Fee Building*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2012 | % | 2011 | % |
| Fee building revenue | $28,268,675 | 100.0% | $16,522,946 | 100.0% |
| Cost of fee building | 26,505,042 | 93.8% | 16,762,666 | 101.5% |
| Fee building gross margin | $ 1,763,633 | 6.2% | $  (239,720) | (1.5)% |

As of December 31, 2012 and 2011, we had five and two fee building agreements, respectively, with independent third-party land owners and four and two construction management agreements, respectively, with our unconsolidated joint ventures to provide construction management services. Fee building revenue and our cost of fee building increased to $28.3 million and $26.5 million, respectively, for the year ended December 31, 2012 compared to $16.5 million and $16.8 million, respectively, for the year ended December 31, 2011. The increase in fee building revenue and cost of fee building is due to three new fee building agreements entered during the year ended December 31, 2012 and the increase in new home deliveries from three communities contained within one unconsolidated joint venture. Cost of fee building includes direct labor, subcontractor costs and other indirect costs, for which we are reimbursed by the independent third-party land owner and is primarily driven by the pace at which the land owner has us execute on its development plan. We collect management fees from unconsolidated joint ventures during the life of the project, which increase as new homes are delivered. These management fees were $2.9 million and $0.8 million for the years ended December 31, 2012 and 2011, respectively, and are included in fee building revenues. During the year ended December 31, 2012 and 2011, there were 42 and 0, respectively, new home deliveries from unconsolidated joint ventures which was the primary reason management fees from unconsolidated joint ventures increased. Fee building revenue during the years ended December 31, 2012 and 2011 also included $450,477 and $0 related to an adjustment of the warranty liability on one of our fee building projects. Cost of fee building was not affected by this adjustment during the years ended December 31, 2012 and 2011. The additional fee building revenue from the warranty adjustment had a positive impact on fee building gross margin during the year ended December 31, 2012. Cost of fee building for the year ended December 31, 2011 included the contract intangible amortization expense of $0 and $0.4 million, respectively. As a result of the additional contract intangible amortization expense of $0.4 million during the year ended December 31, 2011, cost of fee building exceeded fee building revenue by $239,720 and created a negative fee building gross margin. During the year ended December 31, 2012, the additional fee building revenue from the warranty adjustment, the increase in management fees from unconsolidated joint ventures and the lack of contract intangible amortization expense caused fee building gross margin to increase by 7.7% from (1.5%) to 6.2%.

*Land Sale*

For the year ended December 31, 2012, we recognized $2.9 million in land sales revenue and $3.3 million in cost of land sales related to the sale of 42 finished lots contained within one of our communities. During April 2012, we made a decision to redeploy capital from a project in Sacramento to a project in San Jose. In connection therewith, we entered into an agreement with a single purchaser to sell 42 finished lots for $2.9 million. As a result, we recognized an impairment charge of $350,000 on the sale during June 2012 included in the cost of land sales. The sale closed in July 2012, resulting in a gross margin of $28,209 in the third quarter of the year ended December 31, 2012. For the year ended December 31, 2012, the net result of this transaction was a negative gross margin on land sales of $321,791.

*Abandoned Project Costs*

Pre-acquisition costs, which consist primarily of due diligence costs for specific projects, are expensed to abandoned project costs when we determine continuation of the respective project is not probable. During the year ended December 31, 2012, abandoned project costs increased to $0.4 million from $0.1 million during the year ended December 31, 2011, primarily due to the increase in project investigation activity.

73

Table of Contents

*Equity in Net (Income) Loss of Unconsolidated Joint Ventures*

As of December 31, 2012 and 2011, we had ownership interests in five and two unconsolidated joint ventures, respectively. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distribution from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. The unconsolidated joint venture produced $8.7 million in net income during the year ended December 31, 2012 and a net loss of $0.8 million for the year ended December 31, 2011. Our equity in net income from unconsolidated joint ventures was $0.3 million for the year ended December 31, 2012, compared to equity in net loss of $39,000 for the year ended December 31, 2011. The change was primarily due to the 42 new home deliveries during the year ended December 31, 2012 compared to no new home deliveries during the year ended December 31, 2011.

The following sets forth supplemental information about our unconsolidated joint ventures. We have investments in several unconsolidated joint ventures, and this information has been included to provide additional information about the operations and financial condition of our unconsolidated joint ventures. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Joint Ventures." Dollar amounts and other data reflect the entire amounts attributable to our unconsolidated joint ventures and not our share thereof. This data is included for informational purposes only.

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| *Unconsolidated Joint Ventures—Homebuilding* | 2012 | % | 2011 | % |
| Unconsolidated joint ventures home sales | $56,018,517 | 100.0% | $— | n/a |
| Cost of unconsolidated joint ventures home sales | 41,548,236 | 74.2% | — | n/a |
| Unconsolidated joint ventures gross margin | 14,470,281 | 25.8% | — | n/a |
| Add: interest in cost of unconsolidated joint venture home sales | 1,358,380 | 2.4% | — | n/a |
| Adjusted unconsolidated joint ventures gross margin[(1)] | $15,828,661 | 28.3% | $— | n/a |
| Unconsolidated joint ventures home sales gross margin percentage | 25.8% | | — | |
| Adjusted unconsolidated joint ventures home sales gross margin percentage[(1)] | 28.3% | | — | |

––––––––––––
(1)   Non-GAAP financial measure (as discussed below).

74

Table of Contents

| | Year Ended December 31, | | Increase (Decrease) | |
|---|---|---|---|---|
| | 2012 | 2011 | Amount | % |
| *Unconsolidated Joint Ventures—Net New Home Orders, Backlog and Deliveries* | | | | |
| Net new home orders | 96 | — | 96 | n/a |
| Cancellation rate | 5% | n/a | n/a | n/a |
| Average selling communities | 3 | — | 3 | n/a |
| Selling communities at end of period | 3 | — | 3 | n/a |
| Backlog (dollar value) | $ 72,921,000 | $ — | $72,921,000 | n/a |
| Backlog (units) | 54 | — | 54 | n/a |
| Average sales price per unit of backlog | $ 1,350,000 | $ — | $ 1,350,000 | n/a |
| New homes delivered | 42 | — | 42 | n/a |
| Average sales price of homes delivered | $ 1,334,000 | $ — | $ 1,334,000 | n/a |

The table below summarizes lots owned and controlled by our unconsolidated joint ventures as of the dates presented:

| | December 31, | | Increase | |
|---|---|---|---|---|
| | 2012 | 2011 | Amount | % |
| *Unconsolidated Joint Ventures—Lots Owned and Controlled* | | | | |
| Lots owned | 766 | 254 | 512 | 202% |
| Lots controlled[1] | 1,042 | 394 | 648 | 164% |
| Total | 1,808 | 648 | 1,160 | 179% |

_____

[1] Consists of 1,042 lots and 394 lots that are under purchase and sale agreements, as of December 31, 2012 and 2011, respectively.

*Selling, General and Administrative Expense*

| | Year Ended December 31, | | As a Percentage of Home Sales Revenue | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Selling and marketing | $1,677,058 | $1,748,430 | 6.9% | 6.8% |
| General and administrative ("G&A") - as restated | 4,474,949 | 3,997,617 | 18.5% | 15.6% |
| Total selling, marketing and G&A - as restated | $6,152,007 | $5,746,047 | 25.4% | 22.4% |

Selling and marketing expense incurred during the year ended December 31, 2012 and 2011 was consistent as the average number of selling communities remained the same.

G&A expenses increased to 18.5% of home sales revenue for the year ended December 31, 2012 compared to 15.6% for the year ended December 2011. The increase in G&A is primarily due to a 36% increase in office staff during the year ended December 31, 2012 as a result of the increase in, and level of activity of, the projects in our pipeline. We expect that our G&A expense as a percentage of home sales revenue will decrease as our new home deliveries and related revenue increase from growth in our community count.

*Guaranty Fee Income*

During the year ended December 31, 2012, we received $113,563 from one of our unconsolidated joint venture for certain loan guaranties provided over a 12-month period by us on behalf of the unconsolidated joint venture, of which $28,391 was deferred. As a result, guarantee fee income was $85,1 for the year ended December 31, 2012. We did not receive any guarantee fees during the year ended December 31, 2011.

75

Table of Contents

### Other Expense, Net

Other expense, net increased slightly during the year ended December 31, 2012 due to an increase in miscellaneous fees paid to state regulatory agencies.

### Provision For Taxes

We are a limited liability company which is treated as a partnership for income tax purposes and subject to certain minimal taxes and fees; however, income taxes on taxable income or losses realized by us are the obligation of our members. We have a subsidiary that is treated as a C corporation, and Federal and state income taxes are provided for this entity. Provision for income taxes increased to $71,255 for the year ended December 31, 2012 compared to $10,149 for the year ended December 31, 2011. The increase in provision for income taxes is primarily due to the increase in fee building gross margin during the year ended December 31, 2012 compared to the year ended December 31, 2011. In addition, the federal statutory tax rate of our sole taxable subsidiary increased from 15% to 34% because its income on a separate company basis increased to over $100,000 for the year ended December 31, 2012 but was at or under $50,000 for the year ended December 31, 2011, causing it to be taxed in different tax brackets for those years.

### Net Loss

As a result of the foregoing factors, net loss during the year ended December 31, 2012 was $1.4 million compared to a net loss during the year ended December 31, 2011 of $2.3 million. The net loss for the year ended December 31, 2011 included $0.4 million of amortization expense related to the intangible asset resulting from the application of push-down accounting on August 18, 2010.

### Interest Incurred

Interest incurred, which was incurred principally to finance land acquisition, land development and home construction, totaled $0.6 million and $0.4 million for the years ended December 31, 2012 and 2011, respectively, all of which was capitalized to real estate inventory. The increase in interest incurred during the year ended December 31, 2012 compared to the year ended December 31, 2011 was primarily attributable to our increase in outstanding debt, which was the result of the increase in the number of projects and the growth in our real estate inventory.

### Lots Owned and Controlled

The table below summarizes our lots owned and controlled as of the dates presented:

|  | December 31, | | Increase (Decrease) | |
|  | 2012 | 2011 | Amount | % |
|---|---|---|---|---|
| **Lots Owned** | | | | |
| Southern California | 150 | 2 | 148 | NM* |
| Northern California | 219 | 340 | (121) | (36%) |
| Total | 369 | 342 | 27 | 8% |
| **Lots Controlled** (1) | | | | |
| Southern California | 107 | 20 | 87 | 435% |
| Northern California | 108 | — | 108 | — |
| Fee Building Projects | 234 | 102 | 132 | 129% |
| Total | 449 | 122 | 327 | 268% |
| **Total Lots Owned and Controlled** | 818 | 464 | 354 | 76% |

---

\* Not meaningful.

(1) Includes 183 lots and 20 lots that were under purchase and sale agreements as of December 31, 2012 and 2011, respectively, and 32 lots that are under a non-binding letter of intent as of December 31, 2012.

76

Table of Contents

In Southern California, our owned and controlled land totaled 257 lots as of December 31, 2012. The controlled lots are subject to purchase and sale agreements and include two infill sites (which are new homes constructed on vacant or under-utilized sites among existing properties in established communities) strategically located within our core markets, including 20 lots in Thousand Oaks (Ventura County) and 87 lots in Calabasas (Los Angeles County). In addition to Company projects, we are managing five fee building projects, all located in Southern California, for a total of 234 homes.

In Northern California, our owned and controlled land totaled 327 lots as of December 31, 2012. We plan to open sales locations at two new communities in 2013 in the following cities (counties): Granite Bay (Placer) and Folsom (Sacramento). Lots under purchase and sale agreements in Northern California include one infill site with 76 lots in San Mateo (San Mateo County).

## Year Ended December 31, 2011 Compared to the Period from August 18, 2010 through December 31, 2010

*Net New Home Orders and Backlog*

| | Year Ended December 31, 2011 | Period From August 18, 2010 (Inception) Through December 31, 2010 | Increase (Decrease) Amount | % |
|---|---|---|---|---|
| Net new home orders | 45 | 15 | 30 | 200% |
| Cancellation rate | 25% | 10% | 15% | 150% |
| Average selling communities | 4 | 3 | 1 | 33% |
| Selling communities at end of period | 4 | 3 | 1 | 33% |
| Backlog (dollar value) | $ 5,074,000 | $ 3,982,000 | $1,092,000 | 27% |
| Backlog (units) | 7 | 11 | (4) | (36%) |
| Average sales price of backlog | $ 725,000 | $ 362,000 | $ 363,000 | 100% |

Net new home orders for the year ended December 31, 2011 increased 200% to 45, compared to 15 for the period from August 18, 2010 to December 31, 2010. Our overall absorption rate for the year ended December 31, 2011 was 11.25 per average selling community (0.94 monthly), compared to 5.0 per average selling community (1.11 monthly) during the period from August 18, 2010 to December 31, 2010. Our cancellation rate, excluding our unconsolidated joint ventures, of buyers who contracted to buy a home, but did not close escrow (as a percentage of overall orders), was approximately 25% for the year ended December 31, 2011 as compared to 10% for the period from August 18, 2010 to December 31, 2010. The growth during the year ended December 31, 2011 was primarily due to the opening of three new communities, one of which closed out within the same period. Our average number of selling communities increased by one during the year ended December 31, 2011 due to opening three new communities, offset by the final closeout of two selling communities.

The decrease in backlog units of four homes was driven by the increase in new home deliveries and the final closeout of two selling communities during the year ended December 31, 2011 as compared to the period from August 18, 2010 to December 31, 2010. The dollar value and average sales price of backlog increased by $1.1 million and $363,000, respectively, when compared to the period from August 18, 2010 to December 31, 2010 primarily due to a different product mix with larger home and lot sizes. Backlog has not been reduced to reflect our historical cancellation rate.

77

Table of Contents

*Home Sales Revenue and New Homes Delivered*

| | Year Ended December 31, 2011 | Period From August 18, 2010 (Inception) Through December 31, 2010 | Increase (Decrease) Amount | % |
|---|---|---|---|---|
| New homes delivered | 49 | 8 | 41 | 513% |
| Home sales revenue (1) | $25,624,111 | $ 5,319,048 | $20,305,063 | 382% |
| Average sales price of homes delivered | $ 523,000 | $ 665,000 | $ (142,000) | (21%) |

(1)   We entered into a fee build agreement that allowed us to independently operate a design center and directly market upgrade options to the landowners' homebuyers. We recognized revenue only for these option upgrades, and not the related new homes delivered, in accordance with ASC 360-20, *PROPERTY, PLANT AND EQUIPMENT, REAL ESTATE SALES*, as more fully described in the notes to the consolidated financial statements. During the year ended December 31, 2011 and the period from August 18, 2010 (Inception) through December 31, 2010, we recognized revenue for these option upgrades of $3.2 million and $2.3 million, respectively, which is included above in home sales revenue. These revenues were for the delivery of option upgrades on 47 and 37 homes during the year ended December 31, 2011 and the period from August 18, 2010 (Inception) through December 31, 2010, respectively.

New home deliveries increased by 41, or 513%, during the year ended December 31, 2011 compared to the period from August 18, 2010 to December 31, 2010. The increase in new home deliveries was primarily attributable to the increase in net new home orders and net increase of one selling community.

Home sales revenue increased by $20.3 million, or 382%, during the year ended December 31, 2011 primarily due to the increase in new home deliveries. The decrease in average sales price is primarily due to a change in product mix.

*Homebuilding*

| | Year Ended December 31, 2011 | % | Period From August 18, 2010 (Inception) Through December 31, 2010 | % |
|---|---|---|---|---|
| Home sales (1) | $25,624,111 | 100.0% | $ 5,319,408 | 100.0% |
| Cost of home sales (1) | 21,774,199 | 85.0% | 4,423,236 | 83.2% |
| Homebuilding gross margin | 3,849,912 | 15.0% | 896,172 | 16.8% |
| Add: interest in cost of home sales | 425,704 | 1.7% | 43,398 | 0.8% |
| Adjusted homebuilding gross margin (2) | $ 4,275,616 | 16.7% | $ 939,570 | 17.7% |
| Homebuilding gross margin percentage | 15.0% | | 16.8% | |
| Adjusted homebuilding gross margin percentage (2) | 16.7% | | 17.7% | |

(1)   We entered into a construction management services agreement that allowed us to independently operate a design center and directly market upgrade options to the landowners' homebuyers. We recognized revenue only for these option upgrades, and not for the related new homes delivered, in accordance with ASC 360-20, *PROPERTY, PLANT AND EQUIPMENT, REAL ESTATE SALES* , as more fully described in the notes to the consolidated financial statements. During the year ended December 31, 2011 and the period from August 18, 2010 (Inception) through December 31, 2010, we recognized revenue for these option upgrades of $3.2 million and $2.3 million, respectively, which is included above in homebuilding home sales. The cost of these option upgrades, included above in homebuilding cost of home sales, was $2.5 million and

78

Table of Contents

(2)    $1.7 million during the year ended December 31, 2011 and the period from August 18, 2010 (Inception) through December 31, 2010, respectively. Non-GAAP financial measure (as discussed below).

Cost of home sales includes the cost of land, land development, home construction, capitalized interest, indirect costs of construction, estimated warranty costs, real estate taxes and direct costs incurred during development and home construction that benefit the project and is dependent upon the number of new home deliveries and the price at which we can acquire land and raw materials. Cost of home sales increased to $21.8 million from $4.4 million during the year ended December 31, 2011 when compared to the period from August 18, 2010 (Inception) to December 31, 2010, primarily due to 513% increase in new home deliveries.

Our homebuilding gross margin decreased to 15.0% for the year ended December 31, 2011 as compared to 16.8% for the period from August 18, 2010 to December 31, 2010 primarily due to the decline in delivery of options and upgrades at one of our fee building projects from 2011 compared to 2010. Excluding these option upgrades revenues, homebuilding home sales during the year ended December 31, 2011 and the period from August 18, 2010 (Inception) through December 31, 2010 would have been $22.5 million and $3.0 million, respectively, and homebuilding cost of home sales would have been $19.3 million and $2.7 million, respectively. Homebuilding gross margin percentage would have increased to 14.1% for the year ended December 31, 2011 from 9.2% for the period from August 18, 2010 (Inception) through December 31, 2010, respectively (see note 1 above).

Excluding interest in cost of home sales, adjusted homebuilding gross margin percentage was 16.7% for the year ended December 31, 2011, compared to 17.7% for the period from August 18, 2010 to December 31, 2010. The decrease in adjusted homebuilding gross margin is primarily due to decline in delivery of options and upgrades at one of our fee building projects from 2011 compared to 2010. Adjusted homebuilding gross margin is a non-GAAP financial measure. We believe that by adding interest in cost of home sales back to homebuilding gross margin, investors are able to assess the performance of our homebuilding business excluding our interest cost, allowing a focus on the performance of the underlying homebuilding operations. We believe this information is meaningful as it isolates the impact that leverage has on homebuilding gross margin and permits investors to make better comparisons with our competitors, who adjust gross margins in a similar fashion. See the table above reconciling this non-GAAP financial measure to homebuilding gross margin, the nearest GAAP equivalent.

*Fee Building*

| | Year Ended | | Period From August 18, 2010 (Inception) Through December 31, | |
|---|---|---|---|---|
| | 2011 | % | 2010 | % |
| Fee building revenues | $16,522,946 | 100.0% | $  11,494,347 | 100.0% |
| Cost of fee building | 16,762,666 | 101.5% | 11,331,286 | 98.6% |
| Fee building gross margin | $   (239,720) | (1.5%) | $   163,061 | 1.4% |

As of December 31, 2011 and 2010, we had two and one fee building agreements, respectively, with independent third-party land owners and two and one construction management agreements, respectively, with our unconsolidated joint ventures to provide construction management services. Fee building revenues increased $5.0 million, or 44%, to $16.5 million for the year ended December 31, 2011 from $11.5 million for the period from August 18, 2010 through December 31, 2010. Cost of fee building increased $5.4 million, or 48%, to $16.8 million for the year ended December 31, 2011 from $11.3 million for the period from August 18, 2010 through December 31, 2010. Cost of fee building includes direct labor, subcontractor costs and other indirect costs, which we are reimbursed by the independent third-party land owner and is primarily driven by the pace at which

79

Table of Contents

the land owner has us execute on its development plan. The increase in revenue and cost of fee building is due to the addition of two new fee building agreements during the year ended December 31, 2011.

Cost of fee building includes amortization expense on contracts intangible related to a fee building contract contributed by our Predecessor at our formation. Amortization expense was $0.4 million and $0.3 million for the year ended December 31, 2011 and the period from August 18, 2010 and December 31, 2010, respectively.

### Abandoned Project Costs

Pre-acquisition costs, which consist primarily of due diligence costs for specific projects, are expensed to abandoned project costs when we deter continuation of the respective project is not probable. During the year ended December 31, 2011, we recognized $0.1 million in abandoned project costs compared to $0 for the period from August 18, 2010 to December 31, 2010. The increase is primarily due to the increase in project investigation activity.

### Equity in Net (Income) Loss of Unconsolidated Joint Ventures

As of December 31, 2011 and 2010, we had ownership interests in two and one unconsolidated joint ventures, respectively. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributio from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. The unconsolidated joint ventu resulted in a net loss of $0.8 million during the year ended December 31, 2011, of which $39,000 was our proportionate share of equity in net loss. The unconsolidated joint ventures did not have any income or loss during the period from August 18, 2010 to December 31, 2010.

### Selling, General and Administrative Expense

| | Year Ended December 31, 2011 | Period From August 18, 2010 (Inception) Through December 31 2010 | As a Percentage of Home Sales Revenue | |
| | | | Year Ended December 31, 2011 | Period From August 18, 2010 (Inception) Through December 31 2010 |
|---|---|---|---|---|
| Selling and marketing expenses | $ 1,748,430 | $ 453,799 | 6.8% | 8.5% |
| General and administrative expenses ("G&A") - as restated | 3,997,617 | 848,114 | 15.6% | 15.9 |
| Total selling, marketing and G&A - as restated | $ 5,746,047 | $ 1,301,913 | 22.4% | 24.4% |

Selling and marketing expenses increased $1.3 million, or 285%, to $1.7 million for the year ended December 31, 2011 from $0.5 million for the period from August 18, 2010 through December 31, 2010. The increase in selling and marketing expense was primarily due to a 513% increase in numbe of homes delivered from Company projects for the year ended December 31, 2011. The increase in selling and marketing expenses was also due to an increase of two selling communities for Company projects to four at December 31, 2011 from two at December 31, 2010. Selling and marketing expense were 6.8% and 8.5% of overall home sales revenue for the year ended December 31, 2011 and the period from August 18, 2010 to December 31, 2010, respectively.

G&A increased $3.1 million, or 371%, to $4.0 million for the year ended December 31, 2011 from $0.8 million for the period from August 18, 2010 to December 31, 2010, primarily attributable to twelve months of G&A for the full year as compared to just over four months for the period from August 18, 2010 to December 31, 2010. Our G&A as a percentage of home sales revenue were 15.6% and 15.9% for the year ended December 31, 201 and the period from August 18, 2010 to December 31, 2010, respectively, as a result of increased general and administrative support attributable to our growth in employees and operations relative to our home sales revenue growth.

Table of Contents

*Provision For Taxes*

Provision for income taxes increased to $10,149 for the year ended December 31, 2011 compared to $0 for the period from August 18, 2010 to December 31, 2011. The increase in provision for income taxes is primarily due to state tax credits that were available during the period from August 18, 2010 to December 31, 2010 and not available during the year ended December 31, 2011.

*Other Expense, Net*

Other expense, net increased to $14,750 for the year ended December 31, 2011 from $10,596 for the period from August 18, 2010 to December 31, 2010. The increase was primarily due to an increase in miscellaneous fees paid to state regulatory agencies.

*Net Loss*

As a result of the foregoing factors, net loss for the year ended December 31, 2011 was $2.3 million compared to a net loss for the period from August 18, 2010 to December 31, 2010 of $0.3 million.

*Interest Incurred*

Interest incurred, which was incurred principally to finance land acquisition, land development and home construction, totaled $0.4 million and $0.1 million for the year ended December 31, 2011 and the period from August 18, 2010 to December 31, 2010, respectively, all of which was capitalized to real estate inventory. The increase in interest incurred during the year ended December 31, 2011 compared to the period from August 18, 2010 to December 31, 2010 was primarily attributable to a full year of interest in 2011 compared to only a partial year in 2010.

*Lots Owned and Controlled*

The table below summarizes our lots owned and controlled as of the dates presented:

| | December 31, 2011 | December 31, 2010 | Increase (Decrease) Amount | % |
|---|---|---|---|---|
| **Lots Owned** | | | | |
| Southern California | 2 | 27 | (25) | (93%) |
| Northern California | 340 | 128 | 212 | 166% |
| Total | 342 | 155 | 187 | 121% |
| **Lots Controlled** [1] | | | | |
| Southern California | 20 | — | 20 | — |
| Northern California | — | — | — | — |
| Fee Building Projects | 102 | 133 | (31) | (23%) |
| Total | 122 | 133 | (11) | (8%) |
| **Total Lots Owned and Controlled** | 464 | 288 | 176 | 61% |

[1] Includes 20 lots that were under purchase and sale agreements as of December 31, 2011.

81

Table of Contents

## Year Ended December 31, 2011 Compared to the Period from January 1, 2010 through August 17, 2010 (Our Predecessor)

*Net New Home Orders and Backlog*

|  | December 31, 2011 | August 17, 2010 | Increase (Decrease) Amount | % |
|---|---|---|---|---|
| Net new home orders | 45 | 4 | 41 | NM* |
| Cancellation rate | 25% | 0% | 25% | n/a |
| Average selling communities | 4 | 1 | 3 | 300% |
| Selling communities at end of period | 4 | 1 | 3 | 300% |
| Backlog (dollar value) | $5,074,000 | $1,177,000 | $3,897,000 | 331% |
| Backlog (units) | 7 | 4 | 3 | 75% |
| Average sales price of backlog | $ 725,000 | $ 294,000 | $ 431,000 | 147% |

_____
\*    Not meaningful.

Net new home orders for the year ended December 31, 2011 increased by 41 to 45 compared to four for the period from January 1, 2010 through August 17, 2010. Our overall absorption rate for the year ended December 31, 2011 was 11.25 per average selling community (0.94 monthly). The comparative analysis for the absorption rate for the period from January 1, 2010 through August 17, 2010 is not comparable since there was only one average selling community which opened in June 2010. Our absorption rate per average selling community increased and we experienced substantial order growth for the year ended December 31, 2011 as compared to the period from January 1, 2010 through August 17, 2010 due to twelve months of order activity from four selling communities versus three months of order activity from one selling location in the 2010 period. Our cancellation rate was approximately 25% for the year ended December 31, 2011 as compared to 0% for the period from January 1, 2010 through August 17, 2010. The cancellation rate was higher for the year ended December 31, 2011 due to increased sales activity and therefore increased opportunity for cancellation to occur.

Backlog units increased by three homes, or 75%, to seven as of December 31, 2010 as compared to four homes as of August 17, 2010, primarily driven by the increase in net new home orders offset by 49 home deliveries for the year ended December 31, 2011. The dollar value of backlog increased $3.9 million, or 331%, to $5.1 million as of December 31, 2011 from $1.2 million as of August 17, 2010. The increase in dollar amount of backlog reflects the increase in the number of homes in backlog and an increase in the average sales price of homes in backlog. Our average sales price of homes in backlog increased $0.4 million, or 147%, to $0.7 million at December 31, 2011 compared to $0.3 million at August 17, 2010 due to the introduction of new products at new communities with a shift to larger square footage and higher-end homes with corresponding higher average sales prices in the 2011 period. Backlog has not been reduced to reflect our historical cancellation rate.

*Home Sales Revenue and New Homes Delivered*

|  | Year Ended December 31, 2011 | January 1, 2010 Through August 17, 2010 | Increase (Decrease) Amount | % |
|---|---|---|---|---|
| New homes delivered | 49 | — | 49 | n/a |
| Home sales revenue (1) | $25,624,111 | $ 538,598 | $25,085,513 | NM* |
| Average sales price of homes delivered (1) | $ 523,000 | n/a (1) | $ — | n/a |

_____
\*    Not meaningful.
(1)    Our Predecessor and we entered into a fee building agreement that allowed us to independently operate a design center and directly market upgrade options to the landowners' homebuyers. We recognized revenue only for these option upgrades, and not for the related new home deliveries, in accordance with ASC 360-20, *PROPERTY, PLANT AND EQUIPMENT, REAL ESTATE SALES* , as more fully described in the notes to the consolidated financial statements. During the year ended December 31, 2011 and the period from January 1, 2010 through August 17, 2010, we recognized revenue for these option upgrades of $3.2 million and $0.6 million,

82

Table of Contents

respectively, which is included above in home sales revenue. These revenues were for the delivery of option upgrades on 47 and 12 homes during year ended December 31, 2011 and the period from January 1, 2010 through August 17, 2010, respectively, which are included above in new home deliveries from fee building.

Excluding these option upgrades revenues, home sales revenue during the year ended December 31, 2011 and the period from January 1, 2010 through August 17, 2010 would have been $22.5 million and $0, respectively, and the average sales price of homes delivered in 2011 would have been $459,000.

The increase in new homes delivered and average sales price of homes delivered is due to the lack of home sales during the Predecessor period from January 1, 2010 through August 17, 2010. As described in note (1) to the table above, the $538,958 home sales revenue recognized during the Predecessor period from January 1, 2010 through August 17, 2010 was for option upgrades on the delivery of fee building homes.

*Fee Building*

|  | Year Ended December 31, | | Period From January 1, 2010 Through August 17, | |
|  | 2011 | % | 2010 | % |
|---|---|---|---|---|
| Fee building revenues | $ 16,522,946 | 100.0% | $ 12,941,110 | 100.0% |
| Cost of fee building | 16,762,666 | 101.5% | 12,764,497 | 98.6% |
| Fee building gross margin | $ (239,720) | (1.5%) | $ 176,613 | 1.4% |

Fee building revenues increased $3.6 million to $16.5 million for the year ended December 31, 2011 from $12.9 million for the period from January 1, 2010 through August 17, 2010. Cost of fee building increased $4.0 million to $16.8 million for the year ended December 31, 2011 from $12.8 million for the period from January 1, 2010 through August 17, 2010. Cost of fee building includes direct labor, subcontractor costs and other indirect costs for which we are reimbursed by the independent third-party land owner and is primarily driven by the pace at which the land owner has us execute on its development plan. The number of homes delivered under our fee building agreements increased 35, or 292%, to 47 during the year ended December 31, 2011, from 12 during the period from January 1, 2010 through August 17, 2010, which was the primary reason that fee building revenues and cost of fee building increased.

Cost of fee building for the year ended December 31, 2011 included amortization expense on contracts intangible related to a fee building contract contributed by our Predecessor at our formation. Amortization expense was $0.4 million and $0 for the year ended December 31, 2011 and the period from January 1, 2010 through August 17, 2010, respectively, which was the primary reason fee building gross margin decreased.

*Selling, General and Administrative Expense*

|  | Year Ended December 31, 2011 | Predecessor Period From January 1, 2010 Through August 17, 2010 | As a Percentage of Home Sales Revenue | |
|  |  |  | Year Ended December 31, 2011 | Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|
| Selling and marketing expenses | $ 1,748,430 | $ 134,002 | 6.8% | 24.9% |
| General and administrative expenses ("G&A") - as restated for the year ended December 31, 2011 | 3,997,617 | 328,295 | 15.6% | 61.0% |
| Total selling, marketing and G&A - as restated for the year ended December 31, 2011 | $ 5,746,047 | $ 462,297 | 22.4% | 85.9% |

83

Table of Contents

Selling and marketing expenses increased $1.6 million to $1.7 million for the year ended December 31, 2011 from $0.1 million for the period from January 1, 2010 through August 17, 2010. The increase in selling and marketing expenses were primarily due to an increase of 49 homes delivered for the year ended December 31, 2011, from none in the period from January 1, 2010 through August 17, 2010. The increase in selling and marketing expenses also due to an increase of two selling communities during the year ended December 31, 2011. Selling and marketing expenses were 6.8% and 24.9% of overall home sales revenue for the year ended December 31, 2011 and the period from January 1, 2010 to August 17, 2010, respectively. This decrease due to less home sales revenue during the period from January 1, 2010 through August 17, 2010 (home sales revenue during this period was solely from option sales on a fee building project; there was no home sales revenue from Company projects).

G&A increased $3.7 million to $4.0 million for the year ended December 31, 2011 from $0.3 million for the period from January 1, 2010 through August 17, 2010, primarily attributable to our growth in employees and operations for the full year 2011 as compared to the period from January 1, 2010 through August 17, 2010. Our G&A as a percentage of home sales revenue were 15.6% compared to 61.0% for the year ended December 31, 2011 and period from January 1, 2010 through August 17, 2010, respectively. This decrease is due to less home sales revenue during the period from January 1, through August 17, 2010 (home sales revenue during this period was solely from option sales on a fee building project; there was no home sales revenue from Company projects).

### Other Expense, Net

Other expense, net increased to $14,750 for the year ended December 31, 2011 from $6,048 for the period from January 1, 2010 through August 17, 2010. The increase was primarily due to an increase in miscellaneous fees paid to state regulatory agencies.

### Net Loss

As a result of the foregoing factors, net loss for the year ended December 31, 2011 was $2.3 million compared to a net loss for the period from January 1, 2010 through August 17, 2010 of $0.2 million.

### Interest Incurred

Interest incurred, which was incurred principally to finance land acquisition, land development and home construction, totaled $0.4 million and $0.1 million for the year ended December 31, 2011 and the period from January 1, 2010 to August 17, 2010, respectively, all of which was capitalized to real estate inventory. The increase in interest incurred during the year ended December 31, 2011 compared to the period from January 1, 2010 to August 17, 2010 was primarily attributable to a full year of interest in 2011 compared to only a partial year in 2010.

## Liquidity and Capital Resources

### Overview

Our principal uses of capital for the year ended December 31, 2012 and the nine months ended September 30, 2013 were land purchases, land development, home construction, investments in unconsolidated joint ventures, operating expenses and the payment of routine liabilities. Our principal sources of capital for the year ended December 31, 2012 and the nine months ended September 30, 2013 were capital contributions from our members acquisition, development and construction loans.

As of September 30, 2013, we had $29.8 million in available borrowings under our existing loan facilities and $4.5 million in cash. We anticipate tha available borrowings under our existing loan facilities, cash flows from new home deliveries and distributions from our joint ventures will be sufficient to develop our current projects for the next 12 months. Historically, we have relied on capital contributions from our members and our loan facilities to increase our real estate inventory balance. During the next 12 months, we anticipate that we will use the proceeds from this offering and our loan faciliti to further increase our real estate inventory balance. Subsequent to the

84

completion of the offering, we anticipate that we will seek to obtain additional financing through a revolving credit facility, although we currently do not have a commitment from a lender for any such facility.

As of September 30, 2013, we and our unconsolidated joint ventures had contracts to acquire land for an aggregate purchase price of approximately $194.2 million and $60.1 million, respectively, in each case net of deposits. Based on the timing in these option contracts and purchase contracts, we do expect to fund more than $100.3 million over the next 12 months for pending acquisitions, subject to available proceeds from this offering, borrowings under loan facilities, existing cash and expected cash flow from operations. In the event we determine not to exercise our options or to close on such purchases, our liability is generally limited to the amount of our non-refundable deposits that we have paid, which at September 30, 2013 totaled $3.0 million for us and $4.5 million for our joint ventures. There can be no assurance that we will close on the land parcels that we expect to acquire during the next 12 months.

Our available borrowings are contingent upon us meeting certain criteria for funding. In the event we are unable to meet the funding requirements, we would have to seek other sources to meet our financial commitments or reduce our plan to invest in additional real estate projects or joint ventures. We remain focused on generating positive margins in our homebuilding operations and acquiring desirable land positions in order to maintain a strong balance sheet and keep us poised for growth.

To a large extent, our ability to generate cash flow from operations is subject to general economic, financial, competitive, legislative and regulatory factors and other factors that are beyond our control. We cannot assure you that our business will generate cash flow from operations in an amount sufficient to enable us to fund our liquidity needs. Further, our capital requirements may vary materially from those currently planned if, for example, our revenues do not reach expected levels or we have to incur unforeseen capital expenditures and make investments to maintain our competitive position. If this is the case, we may seek alternative financing, such as selling assets or operations or selling additional debt or equity securities. We cannot assure you that we will be able to do so on favorable terms, if at all. Any inability to generate sufficient cash flow or incur additional debt on favorable terms could adversely affect our financial condition and could cause us to be unable to service our debt and may delay or prevent the expansion of our business or otherwise require us to forego market opportunities. See "Risk Factors—Risks Related to Our Indebtedness— Access to financing sources may not be available on favorable terms, or at all, especially in light of current market conditions, which could adversely affect our ability to increase our returns."

Cash flows for each of our communities depend on their stage in the development cycle, and can differ substantially from reported earnings. Early stages of development or expansion require significant cash outlays for land acquisitions, entitlements and other approvals, and construction of model homes, roads, utilities, general landscaping and other amenities. Because these costs are a component of our real estate inventories and not recognized in our consolidated statement of operations until a home closes, we incur significant cash outlays prior to our recognition of earnings. In the later stages of community development, cash inflows may significantly exceed earnings reported for financial statement purposes, as the cash outflow associated with home and land construction was previously incurred. From a liquidity standpoint, we are actively acquiring and developing lots in our markets to increase our lot supply and community count. We focus on strategically located sites, which are located along key transportation corridors in major job centers in our submarkets. As demand for new homes improves and we continue to expand our business, we expect that cash outlays for land purchases and land development intended to increase our lot inventory will exceed our cash generated by operations. During the year ended December 31, 2012, we delivered 53 homes and purchased 150 lots. During the nine months ended September 30, 2013, we delivered 59 homes and purchased 20 lots. The opportunity to purchase substantially finished lots in desired locations is becoming increasingly more limited and competitive. As a result, we are investing more capital to acquire and develop lots for our homebuilding activity.

We exercise strict controls and believe we have a prudent strategy for company-wide cash management, including those related to cash outlays for land and inventory acquisition and development. We ended the 2012

85

year with $6.0 million of cash and cash equivalents. During the first quarter of 2013, our members increased the aggregate capital commitment from $40 million to $50 million. As of December 31, 2012, $38.4 million of committed entity capital was funded. The remaining $11.6 million of the $50.0 million commitment was contributed during the first quarter of 2013, increasing our cash balance accordingly. This contribution was used to acquire additional land. Subsequently, during the second quarter of 2013, our members increased the aggregate capital commitment from $50 million to $60 million. This additional $10 million commitment was contributed during April 2013, increasing our cash balance accordingly. This contribution was also used to acquire additional land and make additional investments in unconsolidated joint ventures. As of September 30, 2013, the $60 million capital commitment was fully funded, and we do not anticipate receiving additional capital commitments or contributions from our members prior to the completion of this offering. We intend to generate cash from the sale of our inventory, net of loan release payments on our notes payable when applicable, but we intend to redeploy the cash generated from the sale of inventory to acquire and develop strategic and well-positioned lots that represent opportunities to generate future income. At September 30, 2013, we had $4.6 million of cash and cash equivalents, including $134,520 of restricted cash.

At September 30, 2013, December 31, 2012 and December 31, 2011, we had $3.8, $5.5 million and $14,619, respectively, in accounts payable that related to costs incurred under our fee building agreements. Funding to pay these amounts is the obligation of the independent third-party land owner, which is funded on a monthly basis. Similarly, contracts and account receivable as of the same periods included $4.2, $5.8 million and $59,317, respectively, related to the payment of the above payables. The increase in activity and addition of new fee building agreements during the year ended December 31, 2012 caused the increase in accounts payable and contracts and accounts receivable. As of September 30, 2013, we have not experienced any losses for uncollectable contracts and accounts receivable related to our fee building projects.

While our primary growth strategy will focus on increasing our market position in existing markets in California, we continue to be open to opportunities to expand outside these markets through organic growth or acquisitions. We are exploring opportunities to expand into Phoenix and the Pacific Northwest.

We intend to employ both debt and equity as part of our ongoing financing strategy, coupled with redeployment of cash flows from continuing operations, to provide us with the financial flexibility to access capital on favorable terms. In that regard, we expect to employ prudent levels of leverage to finance the acquisition and development of our lots and construction of our homes. As of September 30, 2013, we had approximately $46.8 million of aggregate loan commitments, of which $17.0 million was outstanding. We will consider a number of factors when evaluating our level of indebtedness and when making decisions regarding the incurrence of new indebtedness, including the purchase price of assets to be acquired with debt financing, the estimated market value of our assets and the ability of particular assets, and our company as a whole, to generate cash flow to cover the expected debt service. As a means of sustaining our long-term financial health and limiting our exposure to unforeseen dislocations in the debt and financing markets, we currently expect to remain conservatively capitalized. However, subsequent to this offering, our board of directors may change our target debt levels at any time without the approval of our stockholders.

We intend to finance future acquisitions and developments with the most advantageous source of capital available to us at the time of the transaction, which may include a combination of common and preferred equity, secured and unsecured corporate level debt, property-level debt and mortgage financing and other public, private or bank debt.

### Land Acquisition Note

During the year ended December 31, 2012, we entered into a note with a land seller, secured by real estate, which bears interest at 7.0% per annum. The note provides for a commitment of $9.5 million all of which had been funded as of September 30, 2013. The note matures on February 15, 2015 and requires certain mandatory pay downs totaling $1.0 million based on the occurrence of certain project-related events. Interest is payable monthly and the remaining principal is due at maturity.

Table of Contents

### Unsecured Note

IHP issued an unsecured promissory note to us on December 13, 2012 that bore interest at 14% per annum and matured on August 30, 2013. The [...] provided for a commitment of $5,500,000, of which $1,000,000 had been funded as of December 31, 2012. As of September 30, 2013, this note had bee[n] paid in full and the remaining commitment was closed.

### Secured Acquisition and Development Loans and Construction Loans

As of September 30, 2013, we were party to several secured acquisition and development loan agreements to purchase and develop land parcels. [...] addition, we were party to several secured construction loan agreements for the construction of our model and production homes. On September 26, 20[...] we entered into a revolving credit agreement to borrow up to $30,000,000 on Eligible Properties, as defined within the agreement. Interest is payable monthly and any outstanding principal is due upon maturity, which is September 26, 2015, or upon the occurrence of the outstanding loan balance exceeding the allowable borrowing base. We may repay advances at any time without premium or penalty. Interest is charged at a rate of the one-mont[h] LIBOR plus a margin ranging from 3.25% to 4.25% depending on our leverage ratio as calculated at the end of each fiscal quarter. In connection with the[...] agreement, we are required to maintain certain financial covenants, including (i) a minimum unencumbered liquid assets covenant; (ii) a minimum EBITD[A] to interest ratio (determined as of the end of each fiscal quarter on a rolling four-quarter basis); (iii) a minimum tangible net worth covenant; (iv) a maximum liabilities to tangible net worth ratio; and (v) a maximum land assets to tangible net worth ratio. As of September 30, 2013, $1.8 million was outstanding under this credit facility.

The acquisition and development loans will be repaid as lots are released from the loans based upon a specific release price, as defined in each respective loan agreement. Our construction loans will be repaid with proceeds from home sales based upon a specific release price, as defined in each respective loan agreement. These loans range in maturity between September 2013 and September 2015, including six month extensions which are at o[ur] election (subject to certain conditions). Interest on the loans is paid monthly at a rate based on LIBOR or prime rate pricing, with interest rate floors rangi[ng] between 3.5% and 5.125%.

As of September 30, 2013, we had approximately $46.8 million of total aggregate loan commitments, of which $17.0 million was outstanding (including $9.5 million outstanding under the land acquisition note).

### Covenant Compliance

Under our secured development and construction loans and revolving credit facility, we are required to comply with certain financial covenants, including but not limited to those set forth in the table below:

| Financial Covenant | Actual at September 30, 2013 | Covenant Requirement at September 30, 2013 |
|---|---|---|
| Unencumbered Liquid Assets | $ 4,602,356 | $  3,000,000 |
| Tangible Net Worth | $59,892,906 | $ 51,177,694 |
| Total Liabilities to Tangible Net Worth | 0.48 : 1.0 | < 1.5 : 1.0 |
| Land Assets to Tangible Net Worth | 0.43 : 1.0 | < 1.5 : 1.0 |
| Debt to Tangible Net Worth | 0.28 : 1.0 | < 2.5 : 1.0 |
| EBITDA to Interest Paid | 5.15 : 1.0 | > 2.0 : 1.0 |

As of September 30, 2013 and December 31, 2012 and 2011, we were in compliance with all of these financial covenants.

87

Table of Contents

We believe that our leverage ratios provide useful information to the users of our financial statements regarding our financial position and cash and debt management. The ratio of debt-to-capital and the ratio of net debt-to-capital are calculated as follows:

| | September 30, 2013 | At December 31, | | |
| | | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Notes payable | $ 16,975,153 | $17,721,878 | $ 9,383,462 | $ 5,818,436 |
| Members' equity | 60,447,095 | 35,574,714 | 27,851,589 | 19,284,813 |
| Total capital | $ 77,422,248 | $53,296,592 | $37,235,051 | $25,103,249 |
| Ratio of debt-to-capital[(1)] | 22% | 33% | 25% | 23% |
| Notes payable | $ 16,975,153 | $17,721,878 | $ 9,383,462 | $ 5,818,436 |
| Less: cash | (4,602,356) | (6,152,048) | (5,523,851) | (2,425,377) |
| Net debt | 12,372,797 | 11,569,830 | 3,859,611 | 3,393,059 |
| Members' equity | 60,447,095 | 35,574,714 | 27,851,589 | 19,284,813 |
| Total capital | $ 72,819,892 | $47,144,544 | $31,711,200 | $22,677,872 |
| Ratio of net debt-to-capital[(2)] . | 17% | 25% | 12% | 15% |

_____

[(1)] The ratio of debt-to-capital is computed as the quotient obtained by dividing notes payable by the sum of total notes payable plus members' equity.

[(2)] The ratio of net debt-to-capital is computed as the quotient obtained by dividing net debt (which is notes payable less cash) by the sum of net debt plus members' equity. The most directly comparable GAAP financial measure is the ratio of net debt-to-capital. We believe the ratio of net debt-to-capital is a relevant financial measure for investors to understand the leverage employed in our operations and as an indicator of our ability to obtain financing. We believe that by deducting our cash from our notes payable, we provide a measure of our indebtedness that takes into account our cash liquidity. We believe this provides useful information as the ratio of debt-to-capital does not take into account our liquidity and we believe that the ratio net of cash provides supplemental information by which our financial position may be considered. Investors may also find this to be helpful when comparing our leverage to the leverage of our competitors that present similar information. See the table above reconciling this non-GAAP financial measure to the ratio of debt-to-capital.

*Short-Term Liquidity and Capital Resources*

In addition to our contractual obligations of $12.4 million over the next twelve months, we plan to expand the business by entering into new real estate projects and fund ongoing investments in joint ventures. Since our operating cash flows will not be sufficient to fund our operating activities, we plan to fund our financial commitments and operating cash requirements with cash we obtain from acquisition, development and construction loans for which we have $29.8 million in remaining commitments as of September 30, 2013, and with cash proceeds we obtain from this initial public offering. The funding available under these loans is contingent upon us meeting certain criteria for funding. In the event we are unable to meet the funding requirements under loans, we would have to seek other sources to meet our financial commitments or reduce our plan to invest in additional real estate projects or joint ventures.

*Cash Flows — Nine Months Ended September 30, 2013 Compared to Nine Months Ended September 30, 2012*

For the nine months ended September 30, 2013 as compared to the nine months ended September 30, 2012, the comparison of cash flows is as follows:

- Net cash used in operating activities was $13.9 million in the 2013 period versus $4.6 million in the 2012 period. The change was primarily a result of an increase in cash outflows for real estate

inventories of $17.5 million in the 2013 period compared to cash outflows of $3.7 million in the 2012 period, primarily driven by the acquisition of 20 lots in Thousand Oaks, CA and increased development activities at the Company's existing projects, offset partially by net income of $2.9 million during the 2013 period compared to the net loss of $2.8 million during the 2012 period. We also had cash flows from operating activities as a result of distributions of earnings from our unconsolidated joint venture, LR8 Investors LLC, during the 2013 period in which we received $2.4 million. We anticipate that we will continue to receive additional distributions of operating cash flow from LR8 Investors LLC during the next twelve months. However, we anticipate that this cash flow will be used to fund other real estate projects and investments in unconsolidated joint ventures.

- Net cash used in investing activities increased to $8.5 million in the 2013 period from $6.9 million in the 2012 period. The change was primarily a result of increased cash contributions to our unconsolidated joint ventures during the 2013 period partially offset by distributions of equity from our unconsolidated joint ventures.

- Net cash provided by financing activities was $20.9 million in the 2013 period versus $7.9 million in the 2012 period. The change was primarily a result of an increase in contributions from members to $21.6 million in the 2013 period from $8.6 million in the 2012 period. This was partially offset by an increase in net repayments of notes payable to $0.8 million in the 2013 period as compared to $0.7 million in the 2012 period.

As of September 30, 2013, our cash balance was $4.5 million. We believe we have sufficient cash and sources of financing for at least twelve mon

*Cash Flows—Year Ended December 31, 2012 Compared to Year Ended December 31, 2011*

For the year ended December 31, 2012 as compared to the year ended December 31, 2011, the comparison of cash flows is as follows:

- Net cash provided by operating activities increased to $1.0 million in the 2012 period from a use of $6.9 million in the 2011 period. The chang was primarily a result of a decrease in cash outflows for real estate inventories of $1.3 million in the 2012 period compared to $7.3 million in the 2011 period. During 2012, we acquired 150 lots with seller-provided financing compared to 208 lots during 2011 with minimal financing. We anticipate that cash outflows associated with our real estate inventories will continue to increase as we expand our investments in real es development projects and invest in unconsolidated joint ventures. Our cash outflows associated with our contracts and accounts receivable a increased from an inflow of $2.9 million to an outflow of $6.0 million as a result of increased activity related to our fee building business. The activity in the cash outflows associated with our fee building receivables was offset by an increase in payables that related to the fee building business. The amount of inflows and outflows of cash associated with our fee building business will vary based upon the timing of development of our fee building projects and the number of active fee building projects in process. In addition, net loss decreased to $1.4 million in the 2012 period compared to $2.3 million in the 2011 period.

- Net cash used in investing activities increased to $7.9 million in the 2012 period from $3.3 million in the 2011 period. The change was primarily a result of increased net cash contributions to our unconsolidated joint ventures during the 2012 period.

- Net cash provided by financing activities decreased to $7.4 million in the 2012 period from $13.6 million in the 2011 period. The change was primarily a result of (i) net repayments of notes payable of $2.2 million in the 2012 period as compared to net borrowings on notes payable of $3.6 million in the 2011 period and (ii) a decrease in contributions from members to $8.6 million in the 2012 period from $14.0 million in the 2011 period. This was partially offset by proceeds from the issuance of unsecured notes to a member of $1.0 million in the 2012 period as compared to $0 in the 2011 period and a decrease in distributions to members to $0 in the 2012 period from $4.0 million in the 2011 period.

Table of Contents

As of December 31, 2012, our cash balance was $6.0 million. As previously discussed, additional capital contributions of $11.6 million were made by members subsequent to December 31, 2012. We believe we have sufficient cash and sources of financing for at least twelve months.

*Cash Flows—Year Ended December 31, 2011 Compared to the Period from August 18, 2010 (Inception) Through December 31, 2010*

For the year ended December 31, 2011 as compared to the period from August 18, 2010 through December 31, 2010, the comparison of cash flows is as follows:

- Net cash used in operating activities decreased to $6.9 million in the 2011 period from a use of $11.0 million in the 2010 period. The change was primarily a result of (i) a decrease in cash outflows for real estate inventories to $7.2 million in the 2011 period compared to $11.0 million in the 2010 period, primarily driven by a focus on land development and home construction in the 2011 period as compared to a focus on land purchases in the 2010 period and (ii) cash inflows from an increase in accrued expenses and other liabilities of $1.3 million in the 2011 period as compared to cash outflows from a decrease in accrued expenses and other liabilities of $0.4 million in the 2010 period.

- Net cash used in investing activities increased to $3.3 million in the 2011 period from $1.8 million in the 2010 period. The change was primarily a result of increased cash contributions to our unconsolidated joint ventures during the 2011 period.

- Net cash provided by financing activities decreased to $13.6 million in the 2011 period from $14.2 million in the 2010 period. The change was primarily a result of an increase in cash distributions to members to $4.0 million in the 2011 period as compared to $0 in the 2010 period. This was partially offset by an increase in net borrowings on notes payable to $3.6 million in the 2011 period as compared to $0.3 million in the 2010 period and an increase in cash contributions from members to $14.0 million in the 2011 period as compared to $13.9 million in the 2010 period.

As of December 31, 2011, our cash balance was $5.4 million.

*Cash Flows—Year Ended December 31, 2011 Compared to the Period from January 1, 2010 Through August 17, 2010*

For the year ended December 31, 2011 as compared to the period from January 1, 2010 through August 17, 2010, the comparison of cash flows is as follows:

- Net cash used in operating activities increased to $6.9 million in the 2011 period from a use of $5.5 million in the 2010 period. The change was primarily a result of (i) an increase in cash outflows for real estate inventories to $7.2 million in the 2011 period compared to $6.1 million in the 2010 period, primarily driven by the increase in land, land development and homes under construction in the 2011 period as compared to the 2010 period and (ii) an increase in consolidated net loss to $2.3 million in the 2011 period compared to a consolidated net loss of $0.3 million in the 2010 period.

- Net cash used in investing activities increased to $3.3 million in the 2011 period from $0.2 million in the 2010 period. The change was primarily a result of increased cash contributions to our unconsolidated joint ventures during the 2011 period.

- Net cash provided by financing activities increased to $13.6 million in the 2011 period from $5.5 million in the 2010 period. The change was primarily a result of an increase in net cash contributions from members to $10.0 million in the 2011 period as compared to $0 in the 2010 period. This was partially offset by an increase in net borrowings on notes payable to $3.6 million in the 2011 period as compared to $5.5 million in the 2010 period.

As of December 31, 2011, our cash balance was $5.4 million.

Table of Contents

## Contractual Obligations

The following table summarizes our future estimated cash payments under existing contractual obligations as of December 31, 2012, including estimated cash payments due by period. Our purchase obligations primarily represent commitments for subcontractor labor and material to be utilized in normal course of business.

| Contractual Obligations | Total | Less Than 1 Year | 1-3 Years | 4-5 Years | More than 5 years |
|---|---|---|---|---|---|
| Long-term debt principal payments[(1)] | $17,721,878 | $ 5,251,426 | $12,470,452 | $ — | $ — |
| Long-term debt interest payments | 1,810,000 | 1,087,000 | 723,000 | — | — |
| Operating leases | 1,541,684 | 419,343 | 914,372 | 207,969 | — |
| Purchase obligations[(2)] | 3,758,136 | 3,758,136 | — | — | — |
| Total | $24,831,698 | $10,515,905 | $14,107,824 | $207,969 | — |

[(1)] Long-term debt includes our secured acquisition and development and construction loans which have contractual maturities depending on specified events such as home sales and release price. The related debt payments for these loans are shown in the schedule above based on our expectation of the specified event occurring, which is between September 2013 and October 2014. For a more detailed description of our long-term debt, please see note 9 of the notes to our consolidated financial statements included elsewhere in this prospectus.

[(2)] Includes subcontractor labor and material commitments as of December 31, 2012 for which we are responsible if the subcontractor completes the work as specified in their respective commitments, excluding purchase obligations made on behalf of the owner(s) of fee build projects for which we do not have risk of loss.

## Off-Balance Sheet Arrangements

As of September 30, 2013, we held membership interests in 10 unconsolidated joint ventures. We were a party to four loan-to-value maintenance agreements related to unconsolidated joint ventures as of September 30, 2013. The following table reflects certain financial and other information related to our unconsolidated joint ventures as of September 30, 2013.

| Joint Venture Name | Year Formed | Location | Assets | Debt [(1)] | Equity | Debt-to-Total Capitalization | Loan-to-Value Maintenance Agreement | Future Capital Commitment [(2)] |
|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in thousands) | | | |
| LR8 Investors, LLC | 2010 | Irvine, Orange County | $ 51,417 | $19,292 | $ 24,812 | 44% | Yes | $ — |
| Larkspur Land 8 Investors, LLC | 2011 | Larkspur, Marin County | 48,755 | 15,094 | 31,943 | 32% | Yes | 501 |
| TNHC-TCN Santa Clarita LP | 2012 | Valencia, Los Angeles County | 36,603 | 9,037 | 24,512 | 27% | Yes | 200 |
| TNHC-HW Santa Jose LLC | 2012 | San Jose, Santa Clara County | 39,380 | 5,853 | 33,320 | 15% | Yes | — |
| TNHC Newport LLC | 2013 | Newport Beach, Orange County | 44,188 | — | 41,985 | 0% | N/A | 784 |
| Encore McKinley Village LLC | 2013 | Sacramento, Sacramento County | 4,223 | — | 4,000 | 0% | N/A | 3,932 |
| TNHC San Juan LLC | 2013 | San Juan Capistrano, Orange County | 11,900 | — | 11,775 | 0% | N/A | 1,254 |
| TNHC Russell Ranch LLC | 2013 | Folsom, Sacramento County | 31,345 | 20,000 | 11,204 | 64% | No | 13,400 |
| TNHC-HW Foster City LLC | 2013 | Foster City, San Mateo County | 3,436 | — | 3,155 | 0% | N/A | 3,725 |
| Calabasas Village LP | 2013 | Calabasas, Los Angeles County | 16,452 | 1,058 | 15,264 | 6% | No | 3,123 |
| Total Unconsolidated Joint Ventures | | | $287,699 | $70,334 | $201,970 | 26% | | $ 26,919 |

91

Table of Contents

---

(1) Scheduled maturities of the unconsolidated joint venture debt as of September 30, 2013 are as follows: $29.8 million matures in 2014, $5.7 million matures in 2015, $14.9 million matures in 2016 and $20 million matures in 2017.

(2) Future capital commitment represents our proportionate share of estimated future contributions to the respective unconsolidated joint ventures as of September 30, 2013. Actual contributions may differ materially.

As of September 30, 2013, the unconsolidated joint ventures were in compliance with their respective loan covenants, where applicable, and we did not make any loan-to-value maintenance related payments during the year ended December 31, 2012 and the nine months ended September 30, 2013.

## Inflation

Our homebuilding and fee building segments can be adversely impacted by inflation, primarily from higher land, financing, labor, material and construction costs. In addition, inflation can lead to higher mortgage rates, which can significantly affect the affordability of mortgage financing to homebuyers. While we attempt to pass on cost increases to customers through increased prices, when weak housing market conditions exist, we are often unable to offset cost increases with higher selling prices.

## Seasonality

Historically, the homebuilding industry experiences seasonal fluctuations in quarterly operating results and capital requirements. We typically experience the highest new home order activity in spring and summer, although this activity is also highly dependent on the number of active selling communities, timing of new community openings and other market factors. Since it typically takes four to six months to construct a new home, we deliver more homes in the second half of the year as spring and summer home orders convert to home deliveries. Because of this seasonality, home starts, construction costs and related cash outflows have historically been highest in the second and third quarters, and the majority of cash receipts from home deliveries occur during the second half of the year. We expect this seasonal pattern to continue over the long-term, although it may be affected by volatility in the homebuilding industry.

## Critical Accounting Policies

Our financial statements have been prepared in accordance with GAAP. The preparation of these financial statements requires our management to make estimates and judgments that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of costs and expenses during the reporting period. On an ongoing basis, our management evaluates its estimates and judgments, including those which impact our most critical accounting policies. Our management bases its estimates and judgments on historical experience and on various other factors that we believe to be reasonable under the circumstances. Actual results may differ from our estimates under different assumptions or conditions. Our management believes that the following accounting policies are among the most important to the portrayal of our financial condition and results of operations and require among the most difficult, subjective or complex judgments:

### Implications of Being an Emerging Growth Company

We are an "emerging growth company," as defined in the JOBS Act, and we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies." These provisions include:

- a requirement to present only two years of audited financial statements and only two years of related Management's Discussion and Analysis of Financial Condition and Results of Operations included in an initial public offering registration statement;

- an exemption to provide less than five years of selected financial data in an initial public offering registration statement;

92

- an exemption from the auditor attestation requirement of Section 404 of the Sarbanes-Oxley Act in the assessment of the emerging growth company's internal control over financial reporting;

- an exemption from the adoption of new or revised financial accounting standards until they would apply to private companies with no pending registration statement; and

- an exemption from compliance with any new requirements adopted by the Public Company Accounting Oversight Board requiring mandatory audit firm rotation or a supplement to the auditor's report in which the auditor would be required to provide additional information about the audit and the financial statements of the issuer.

We have determined to opt out of the exemption from compliance with new or revised financial accounting standards. As a result, we will comply with new or revised financial accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Our decision to opt out of this exemption is irrevocable.

We have elected to adopt certain of the reduced disclosure requirements described above. As a result of these elections, the information that we provide in this prospectus may be different than the information you may receive from other public companies in which you hold equity interests. In addition, it is possible that some investors will find our common stock less attractive as a result of our elections, which may cause a less active trading market for our common stock and more volatility in our stock price.

We will remain an "emerging growth company" until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.0 billion or (c) in which we are deemed to be a large accelerated filer, which means among other things, that the market value of our common stock that is held by non-affiliates is at least $700 million as of the last business day of our most recently completed second fiscal quarter and (2) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

*Real Estate Inventories and Cost of Sales*

Real estate inventories consist of land, land under development, homes under construction, completed homes and model homes and are stated at net of impairment losses. We capitalize direct carrying costs, including interest, property taxes and related development costs to inventories. Field construction supervision and related direct overhead are also included in the capitalized cost of inventories. Direct construction costs are specifically identified and allocated to homes while other common costs, such as land, land improvements and carrying costs, are allocated to homes within a community based upon their anticipated relative sales or fair value. Homebuilding cost of sales is recognized at the same time revenue is recognized and recorded based upon total estimated costs to be allocated to each home within a community. Any changes to the estimated costs are allocated to the remaining undelivered lots and homes within their respective community. The estimation and allocation of these costs requires a substantial degree of judgment by management.

The estimation process involved in determining relative sales or fair values is inherently uncertain because it involves estimating future sales values of homes before delivery. Additionally, in determining the allocation of costs to a particular land parcel or individual home, we rely on project budgets that are based on a variety of assumptions, including assumptions about construction schedules and future costs to be incurred. It is common that actual results differ from budgeted amounts for various reasons, including construction delays, increases in costs that have not been committed or unforeseen issues encountered during construction that fall outside the scope of existing contracts, or costs that come in less than originally anticipated. While the actual results for a particular construction project are accurately reported over time, a variance between the budget and actual costs could result in the understatement or overstatement of costs and have a related impact on gross margins between reporting periods. To reduce the potential for such variance, we have procedures that have been applied on a consistent basis, including assessing and revising project budgets on a periodic basis, obtaining commitments from subcontractors and vendors for future costs to be incurred and utilizing the most recent information available to estimate costs.

93

If there are indicators of impairment, we perform a detailed budget and cash flow review of our real estate assets to determine whether the estimated remaining undiscounted future cash flows of the community are more or less than the asset's carrying value. If the undiscounted cash flows are more than the asset's carrying value, no impairment adjustment is required. However, if the undiscounted cash flows are less than the asset's carrying value, the asset is deemed impaired and is written down to fair value.

When estimating undiscounted cash flows of a community, we make various assumptions, including: (i) expected sales prices and sales incentives to be offered, including the number of homes available, pricing and incentives being offered by us or other builders in other communities, and future sales price adjustments based on market and economic trends; (ii) expected sales pace and cancellation rates based on local housing market conditions, competition and historical trends; (iii) costs expended to date and expected to be incurred including, but not limited to, land and land development costs, home construction costs, interest costs, indirect construction and overhead costs, and selling and marketing costs; (iv) alternative product offerings that may be offered that could have an impact on sales pace, sales price and/or building costs; and (v) alternative uses for the property.

Many assumptions are interdependent, and a change in one may require a corresponding change to other assumptions. For example, increasing or decreasing sales absorption rates has a direct impact on the estimated per unit sales price of a home, the level of time-sensitive costs (such as indirect construction, overhead and carrying costs), and selling and marketing costs (such as model maintenance costs and advertising costs). Depending on the underlying objective of the community, assumptions could have a significant impact on the projected cash flow analysis. For example, if our objective is to preserve operating margins, which could lead to higher margins but lower absorption, our cash flow analysis will be different than if the objective is to increase sales, which could lead to lower margins but higher absorption. These objectives may vary significantly from community to community and over time. If assets are considered impaired, impairment is determined by the amount the asset's carrying value exceeds its fair value. Fair value is determined based on estimated future cash flows discounted for inherent risks associated with real estate assets. These discounted cash flows are impacted by expected risk based on estimated land development, construction and delivery timelines; market risk of price erosion; uncertainty of development or construction cost increases; and other risks specific to the asset or market conditions where the asset is located when assessment is made. These factors are specific to each community and may vary among communities. For the nine months ended September 30, 2013 and 2012, the year ended December 31, 2011 and for the periods from August 18, 2010 (inception) to December 31, 2010, and from January 1, 2010 to August 17, 2010, we reviewed all of our homebuilding projects for impairment and did not identify any indicators of impairment. During the second quarter of the year ended December 31, 2012, we initiated a change in use to sell certain finished lots not under construction for one of our communities in Northern California. This change in use resulted in an impairment of $350,000 for the related land held for sale which is reflected in cost of land sales in the accompanying statement of operations. The sale closed in July 2012, resulting in a gross margin of $28,209. For the year ended December 31, 2012, the net result of this transaction was a negative gross margin on land sales of $321,791.

As of September 30, 2013 and December 31, 2012 and 2011, we had $1,697,670, $1,326,897 and $2,378,733, respectively, of completed model homes without a sales contract.

### Variable Interest Entities

We account for variable interest entities in accordance with ASC 810, *CONSOLIDATION*, or ASC 810. For further details on what is a variable interest entity, or VIE, refer to note 1 to the audited consolidated financial statements included elsewhere in this prospectus. For each VIE, we assess whether we are the primary beneficiary by first determining if we have the ability to control the activities of the VIE that most significantly impact its economic performance. Such activities include, but are not limited to, the ability to determine and approve the operating budget; determine the scope of land development work, if any; the ability to control financing decisions for the VIE; the ability to acquire additional land into the VIE or dispose of land in the VIE; the ability to approve, change or amend the respective VIE's operating agreement; if we are the managing

94

Table of Contents

member who controls key decisions; and hire or fire key employees of the VIE. If we are not able to control such activities, we are not considered the primary beneficiary of the VIE. If we do have the ability to control such activities, we will continue our analysis by determining if we are expected to absorb a potentially significant amount of the VIE's losses or, if no party absorbs the majority of such losses, if we will potentially benefit from a significant amount of the VIE's expected gains. If we are the primary beneficiary of the VIE, we will consolidate the VIE in our financial statements and reflect such assets and liabilities as consolidated real estate not owned within our inventory balance in our consolidated balance sheet. The evaluation of whether an entity is a VIE and we are the primary beneficiary of that VIE requires significant judgment by management.

As further disclosed in note 1 to the consolidated financial statements included elsewhere in this prospectus, we are involved in several ventures with independent third parties for our homebuilding activities. We use the equity method of accounting for investments that qualify as VIEs where we are not the primary beneficiary.

### Acquired Intangible Assets

Upon consummation of a business combination as defined in ASC 805, *Business Combinations*, we perform an assessment to determine the value of the acquired company's tangible and identifiable intangible assets and liabilities. In our assessment, we determine whether identifiable intangible assets exist, which typically include fee build contracts, backlog and customer relationships. A high degree of judgment is made by management on variables, such as revenue growth rates, profitability, discount rates and industry market multiples, when calculating the value of the intangible assets. The identified intangible assets are amortized over their respective calculated term, which is generally the economic benefit period.

### Revenue Recognition

#### Home Sales and Profit Recognition

In accordance with ASC 360, *Property, Plant, and Equipment*, revenues from home sales and other real estate sales are recorded and a profit is recognized when the respective units are closed. Home sales and other real estate sales are closed when all conditions of escrow are met, including delivery of the home or other real estate asset, title passage, appropriate consideration is received and collection of associated receivables, if any, is reasonably assured. Sales incentives are a reduction of revenues when the respective unit is closed. When it is determined that the earnings process is not complete, the sale and the related profit are deferred for recognition in future periods. The profit we record is based on the calculation of cost of sales, which is dependent on our allocation of costs, as described in more detail above in the section entitled "Real Estate Inventories and Cost of Sales."

#### Fee Building

We enter into fee building agreements to provide services whereby we will build homes on behalf of independent third-party property owners. The independent third-party property owner funds all project costs incurred by us to build the homes. We primarily enter into cost plus fee contracts where we charge independent third-party property owners for all direct and indirect costs plus a negotiated management fee. For these types of contracts, we recognize revenue based on the actual total costs we have expended and the applicable management fee. The management fee is typically a fixed fee based on a percentage of the cost or home sales revenue of the project depending on the terms of the agreement with the independent third-party property owner. In accordance with ASC 605, *Revenue Recognition*, revenues from fee building services are recognized over a cost-to-cost approach in applying the percentage-of-completion method. Under this approach, revenue is earned in proportion to total costs incurred, divided by total costs expected to be incurred. The total estimated cost plus the management fee represents the total contract value. We recognize revenue based on the actual labor and other direct costs incurred, plus the portion of the management fee we have earned to date. In the course of providing our services, we routinely subcontract for services and incur other direct costs on behalf of our clients. These costs are passed through to clients and, in accordance with industry practice and GAAP, are included in our revenue and cost of revenue. Under certain agreements, we are eligible to receive additional incentive compensation as certain financial thresholds

95

defined in the agreement are achieved. We recognize revenue for any incentive compensation when such financial thresholds are probable of being met such compensation is deemed to be collectible, generally at the date the amount is communicated to us by the independent third-party property owner.

We enter into fee building and management contracts, including with our unconsolidated joint ventures, where we do not bear risks for any services outside of our own. For these types of contracts, we recognize revenue as services are performed. We do not recognize any revenue or costs related to subcontractors' cost since we do not bear any risk related to them.

We generally utilize a cost-to-cost approach in applying the percentage-of-completion method of revenue recognition for our fee build projects, under which revenue is earned in proportion to total costs incurred, divided by total costs expected to be incurred. Recognition of revenue and profit under this method is dependent upon a number of factors, including the accuracy of a variety of estimates, including construction progress, material quantities, the achievement of milestones, penalty provisions, labor productivity and cost estimates. Due to uncertainties inherent in the estimation process, it is possible that actual completion costs may vary from estimates.

We also enter into fee build and management contracts, including with our unconsolidated joint ventures, where we provide construction supervision services and do not bear risks for any services outside of our own. Revenues from these services are recognized over a proportional performance method. Under this approach, revenue is earned in proportion to total estimated efforts, generally direct labor hours, expected to be provided to the client. The estimated total efforts require a substantial degree of judgment by management.

As of and for the nine months ended September 30, 2013 and as of and for the years ended December 31, 2012 and 2011, one customer comprised 81%, 95% and 93%, respectively, of our fee building revenue and 85%, 95% and 42%, respectively, of the related receivables.

### Warranty Reserves

In the normal course of business, we incur warranty-related costs associated with homes that have been delivered to homebuyers. Estimated future direct warranty costs are accrued and charged to cost of sales in the period when the related homebuilding revenues are recognized while indirect warranty overhead salaries and related costs are charged to cost of sales in the period incurred. Amounts are accrued based upon our historical rates. We also consider historical experience of our peers due to our limited history related to homebuilding sales. We receive warranty payments from our clients for certain of our fee building projects where we have the contractual risk of construction. These payments are recorded as warranty reserve accruals. We assess the adequacy of our warranty accrual on a quarterly basis and adjust the amounts as appropriate for current quantitative and qualitative factors. Factors that affect the warranty accruals include the number of homes delivered, historical and anticipated rates of warranty claims and cost per claim. Although we consider the warranty accruals reflected in our consolidated balance sheet to be adequate, actual future costs could differ significantly from our currently estimated amounts. Our warranty accrual is included in accrued expenses and other liabilities in the accompanying consolidated balance sheets.

### Contracts and Accounts Receivable

Contracts and accounts receivable primarily represents the fees earned but not collected, and reimbursable project costs incurred in connection with our fee building agreements. We periodically evaluate the collectability of our contracts receivable, and if it is determined that a receivable might not be fully collectible, an allowance is recorded for the amount deemed uncollectible. This allowance for doubtful accounts is estimated based on management's evaluation of the contracts involved and the financial condition of its clients. Factors considered in evaluations include, but are not limited to:

- client type;

- historical contract performance;

96

Table of Contents

- historical collection and delinquency trends;

- client credit worthiness; and

- general economic conditions.

As of September 30, 2013 and December 31, 2012 and 2011, no allowance was recorded related to contracts and accounts receivable.

*Income Taxes*

We account for income taxes in accordance with ASC Topic 740, *Income Taxes.* Deferred tax assets and liabilities are recorded based on future tax consequences of both temporary differences between the amounts reported for financial reporting purposes and the amounts deductible for income tax purposes, and are measured using enacted tax rates expected to apply in the years in which the temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in earnings in the period when the changes are enacted.

In accordance with the provisions of ASC 740, we periodically assess our deferred tax assets, including the benefit from net operating losses, to determine if a valuation allowance is required. A valuation allowance must be established when, based upon available evidence, it is more likely than not that all or a portion of the deferred tax assets will not be realized. Realization of the deferred tax assets is dependent upon, among other matters, taxable income in prior years available for carryback, estimates of future income, tax planning strategies and reversal of existing temporary differences. Due to uncertainties inherent in the estimation process, it is possible that actual results may vary from estimates.

We have considered the positive and negative evidence in evaluating the realizability of our deferred tax asset. Notwithstanding that we have incurred net losses on a consolidated basis from inception through December 31, 2012, however, our sole taxable subsidiary recognized net income (and net taxable income) for the same period, and is projected to continue to generate income in future periods sufficient to utilize its deferred tax assets.

## Stock-Based Compensation

We account for share-based awards in accordance with ASC 718, *Compensation—Stock Compensation* , or ASC 718. ASC 718 requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. ASC 718 requires all entities to apply a fair-value-based measurement method in accounting for share-based payment transactions with employees except for equity instruments held by employee share owner plans. We utilized an option-based model to estimate the fair value of the share-based award issued in fiscal 2010. The key assumptions utilized in such option based model are expected dividend yield, expected term, expected volatility, risk free interest rate and expected forfeiture rate. See Note 14, "Stock Based Compensation," to our financial statements for further information regarding the key assumptions.

## Related Party Transactions

See "Certain Relationships and Related Party Transactions" for a description of our transactions with related parties.

## Recently Issued Accounting Standards

In May 2011, the FASB issued ASU No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs* , or ASU 2011-04. ASU 2011-04 amends ASC 820, *Fair Value Measurements* , or ASC 820, providing a consistent definition and measurement of fair value, as well as similar disclosure requirements between GAAP and International Financial Reporting Standards. ASU 2011-04 changes certain fair value measurement principles, clarifies the application of existing

97

Table of Contents

fair value measurement and expands the ASC 820 disclosure requirements, particularly for Level 3 fair value measurements. Our adoption of these provisions of ASU 2011-04 on January 1, 2012 did not have an impact on the consolidated financial statements.

## Controls and Procedures

In December 2013, we determined that an error in our financial statements occurred as we did not properly record compensation expense for equity-based units. We restated our consolidated statement of operations, members' equity and cash flows for the years ended December 31, 2012 and 2011, and for the period from August 18, 2010 (inception) to December 31, 2010, to correct this error, which we determined revealed a material weakness in internal control over financial reporting as defined in Public Company Accounting Oversight Board Auditing Standard No. 5. This material weakness was the result of an error in our interpretation of the accounting guidance relating to equity-based units. Due to the non-cash nature of the transactions resulting in the restatement, there was no net impact to our cash flows. In addition, total members' equity remained unchanged. As a result, there was no impact on our consolidated balance sheets.

A "material weakness" is a deficiency in internal controls such that there is a reasonable possibility that a material misstatement of our financial statements will not be prevented or detected on a timely basis. We plan to remediate this material weakness primarily by implementing review procedures to monitor our agreements that relate to compensatory arrangements and evaluate the effects of those arrangements on the financial statements and related disclosures, and to implement a review process whereby compensation arrangements are reviewed for compliance with GAAP. However, there is no guarantee that additional material weaknesses will not be identified in the future.

## Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risks related to fluctuations in interest rates on our outstanding variable rate debt. We did not utilize swaps, forward or option contracts on interest rates or commodities, or other types of derivative financial instruments, as of or during the nine months ended September 30, 2013 or during the years ended December 31, 2012 and 2011. We have not entered into and currently do not hold derivatives for trading or speculative purposes. Many of the statements contained in this section are forward-looking and should be read in conjunction with our disclosures under the heading "Cautionary Note Concerning Forward-Looking Statements."

The table below details the principal amount and the average interest rates for the outstanding debt for each category based upon the expected maturity or disposition dates. The fair value of our variable rate debt, which consists of our notes payable, is based on quoted market prices for the same or similar instruments as of September 30, 2013.

| | Expected Maturity | | | | Estimated Fair |
| | 2013 | 2014 | 2015-2017 | Total | Value |
|---|---|---|---|---|---|
| Variable rate debt[(1)] | $1,970,487 | $3,705,749 | $1,798,917 | $7,475,153 | $ 7,475,153 |
| Average interest rate | 3.43% | 3.43% | 3.43% | 3.43% | 3.43% |

(1)  Contractual maturities of the variable rate debt are in 2013, 2014 and 2015; however, the assets securing the loans are expected to be sold in less than a year and consequently repayment will be required at that time. For a more detailed description of our long-term debt, please see note 9 of the notes to our consolidated financial statements included elsewhere in this prospectus.

Based on the current interest rate management policies we have in place with respect to our outstanding debt, we do not believe that the future market rate risks related to the above securities will have a material adverse impact on our financial position, results of operations or liquidity.

98

Table of Contents

## MARKET OPPORTUNITY

*Unless otherwise indicated, market data is derived from a market study prepared for us in connection with this offering by John Burns Real Estate Consulting, LLC ("JBREC") based on the most recent data available as of October 2013. Founded in 2001, JBREC is an independent research provider and consulting firm focused on the housing industry. The following information contains forward-looking statements which are subject to uncertainty and you should review "Cautionary Note Concerning Forward-Looking Statements."*

This Market Opportunity section provides a review of the following:

Overview

- National Housing Market

Selected Housing Markets

- Orange County

- San Diego County

- Ventura County

- Los Angeles County

- San Francisco Metropolitan Division

- San Jose Metropolitan Statistical Area

- Sacramento Metropolitan Statistical Area

- Phoenix Metropolitan Statistical Area

### National Housing Market

The U.S. housing market continues to improve from the cyclical low points reached during the 2007 - 2009 national recession and the extended housing correction. Between the 2005 market peak and 2011, new single-family home sales declined 76%, according to data compiled by the U.S. Census Bureau (the "Census Bureau"), and median home prices declined 34%, as measured by the CoreLogic Case-Shiller Index. In 2011, some U.S. markets showed early indications of recovery as a result of an improving macroeconomic backdrop and strong housing affordability compared to historical data. The recovery gained momentum in 2012 and more regions of the country benefitted from declining inventory, stable to increasing prices and rising demand.

In the first half of 2013, home sales and prices rose dramatically in many metropolitan areas, as very low inventory drove consumers to new home communities that could supply new construction. In the second half of 2013, the housing market has cooled as potential buyers consider the impacts of higher home prices and mortgage rates, and continued anxiety following the October government shutdown. Despite this slowing, JBREC's outlook remains positive, with expectations of more moderate and sustainable growth ahead.

In the 12 months ended October 31, 2013:

- New home sales have increased to a seasonally adjusted annual rate of 444,000 according to the Census Bureau, which is 55% of the normal level of 800,000 nationally.

- Homebuilding permits have increased to 1,034,000 annually on a seasonally adjusted basis, according to the Census Bureau, and single-family permits have risen by 9% year-over-year.

- The median resale single-family home price increased 12% year-over-year, according to data compiled by the National Association of Realtors, with sales volume up by 11%.

99

Table of Contents

Strong housing markets have historically been associated with favorable affordability, a healthy domestic economy, positive demographic trends such as population growth and household formation, low or falling mortgage rates, increases in renters that qualify as homebuyers, and locally based dynamics such as higher housing demand relative to housing supply. Many markets across the United States are experiencing a number of these positive trends. Relative to long-term historical averages, data compiled by the U.S. Bureau of Labor Statistics (the "BLS") and the Census Bureau show that the U.S. economy is creating more jobs than homebuilding permits issued and the inventory of resale and new unsold homes is low compared to recent periods. Affordability conditions remain good, but no longer at the best level in more than 30 years, as measured by the ratio of homeownership costs to household income.

Despite recent momentum, the U.S. housing market has not fully recovered from the 2007 - 2009 recession as consumer confidence remains below average levels, mortgage underwriting standards have tightened, and the number of delinquent mortgages remains elevated relative to historical averages. Additionally, real estate is a local industry and not all markets exhibit the same trends.

The U.S. housing market is in phase three of a three-phase supply-constrained housing recovery, as described below:

- *Phase 1*—job growth begins.

- *Phase 2*—price appreciation occurs among low-priced homes in foreclosure, increasing resale prices to the point where purchasing a new home provides a good value compared to purchasing an existing home. Reduced resale inventory and great affordability fuel a surge in demand for new homes during this recovery.

- *Phase 3*—strong demand and limited supply lead to considerable price appreciation in land-constrained markets, and a resurgence in construction activity in markets with sufficient land supplies. Price appreciation allows discretionary buyers to sell their existing homes and potentially purchase a new home.

While conditions are improving, significant future growth is required to return to pre-recession housing market conditions.

- Construction starts, as measured by the Census Bureau through October 2013, were at 891,000 units per year. This represents 60% of the stable level of 1.5 million annual starts, which is comparable to housing starts in 2000, a year that is reflective of a more stable market. Permits issued through October 2013 are nearly double the level of the low of 478,000 annual starts in April 2009.

- Existing home sales, as measured by the National Association of Realtors, were at 5.29 million annualized transactions through October 2013. This volume is in line with what JBREC estimates to be a stable level based on the ratio of existing home sales activity per household during the late 1980s and 1990s, when the housing market was in a more balanced environment and many economic variables were near historical averages. Existing home sales had fallen to an annualized rate of 3.3 million transactions in July 2010.

- New home sales were at 421,000 annualized transactions through October 2013, as measured by the Census Bureau, representing 53% of a normal level of activity at 800,000 annual transactions. JBREC estimates 800,000 transactions to be a stable level based on new home sales activity during the late 1990s, when the new home market was in a more balanced environment and many economic variables were near historical averages. New home sales had fallen to 273,000 annualized transactions in February 2011.

- Home affordability for the nation as measured by the Burns Affordability Index reached its most favorable levels during the housing downturn as prices and mortgage rates declined. A combination of rising prices and mortgage rates in 2013 is increasing the cost of housing relative to the incomes of U.S. homebuyers, bringing affordability measures closer to the historical median level measured from 1981 to 2012.

Table of Contents

   *Demand.*    Job growth is the most important factor for a healthy housing market. While year-over-year job growth is once again positive after significant losses from 2008 through 2010, the pace of growth remains moderate amidst fiscal uncertainty. Additionally, the rate of job growth in economic recoveries has slowed over the last 30 years, primarily as a result of the aging U.S. labor force, productivity improvements and globalization. Job growth for the 12 months ended October 2013 is at 1.7% and JBREC forecasts that job growth will grow at a 1.7% average annual rate from 2013 through 2017.



   By the end of 2014, the national economy is expected to have recovered all of the 7.7 million jobs lost between 2008 and 2010.

   According to data compiled by the Census Bureau and the BLS, the current average employment growth to homebuilding permit ratio for the count is 2.3. A balanced ratio in a stable market is 1.2 to 1.3. The ratio has remained above the stable market ratio for several quarters, due to a rise in employ growth coupled with historically low homebuilding permit levels. Eventually, the relative excess job growth to homebuilding permit growth should spur improving consumer confidence and new home sales, which will in turn drive increased construction activity.

   Household formations are expected to average 1.24 million per year through 2017. The reduction in headship rates for nearly all age groups from 2000 to 2010 was caused primarily by the economic distress in the late 2000s. Immigration is expected to add to the household and population growth a well, occurring at approximately 0.3% per year, and mostly concentrated in the 20 to 40 year old demographic.

   A lack of inventory is currently limiting sales activity in the existing home market, but sales are expected to grow through 2017 as rising prices encourage homeowners to list their homes, and also due to continued investor activity. After decreasing to 3.3 million transactions in July 2010 from a pe of nearly 7.1 million transactions three years prior, existing home sales transactions are currently nearly 5.3 million according to the National Association Realtors, hampered by a tight supply of homes on the market. JBREC forecasts that sales will rise to 5.5 million transactions in 2016, which would be slightly higher than the sales activity in 2001, and will decline in 2017 when JBREC expects rates will exceed 5.5% and the economy will be slowing.

   Based on a review of over 160 markets, JBREC estimates the share of sales that were for investment purposes was approximately 26% in the thir quarter of 2013, which is dropping from a February 2012 level of 23%, based on the National Association of Realtors. The elevated but declining share c distressed sales is expected to keep investor activity above normal levels in the near term. Many investors are converting distressed inventory to rentals a long-term hold, which is aiding the recovery process by removing marginal inventory that otherwise depresses prices.

Table of Contents

The projected slow but steady job growth should support absorption of the rising new home supply, which is coming off historical lows. New single family home sales transactions reached a trough in 2011 at 306,000 homes sold, according to the Census Bureau, and are forecasted to rise steadily to 766,000 sales in 2016 before declining in 2017 as higher mortgage rates and a slowing economy reduce sales to 600,000. The 766,000 new single-family sales in 2016 is roughly equivalent to pre-boom 1996 and slightly lower than in 2007. The new home market currently has only 183,000 units of completed supply as of October 2013, which is still historically low but rising, and JBREC expects construction levels to increase as the price of housing rebounds.



*Supply.*    JBREC forecasts permits and starts activity should steadily increase through 2016 at a rate that slightly exceeds the recoveries in past regional downturns, such as those in Houston in the late-1980s and Southern California in the late-1990s. With prices rising, and certain submarkets stabilized, homebuilder demand for lots is increasing substantially.

Minimal entitlement processing occurred during the housing downturn, so the supply of finished, or even approved, lots is currently limited. As such, a lag in the delivery of new lot supply is expected, especially in markets with prolonged approvals processes, such as California.



The number of existing homes available for sale (not including "shadow inventory," which is the number of homes subject to a mortgage that are in some form of distress but that are not currently for sale) remains very low but is starting to trend up. As of the second quarter of 2013, there were 3.0 months of inventory supply on the market, which is significantly below the 11 months of inventory in the fourth quarter of 2009.

While the number of homes entering the foreclosure process is declining, the overall volume is still high relative to historical levels. According to the Mortgage Bankers Association, approximately 9.8% of all mortgages were delinquent as of the third quarter of 2013—nearly twice the pre-2008 level. The shadow inventory is still substantial, based on estimates by JBREC. This supply is likely to be sold or liquidated over the next several years. JBREC believes that banks will dispose of many of these distressed loans through either short sales or foreclosures and will do so at a moderate rate so as to limit the downward pressure on home prices resulting from the liquidation. However, there is a risk that banks will change their philosophy and will instead decide to dispose of these distressed loans at a more rapid pace.

The media has made much of the distress in the market, focusing on the homes that are in some form of delinquency or foreclosure. However, only 4% of the total housing units in the United States are in some sort of distress; the remaining 96% are not, according to estimates by JBREC.

Table of Contents

*Affordability.*    Affordability in the existing home market is at historically favorable levels nationally, looking back over the last 30 years. The ratio of annual housing costs (which are mortgage payments plus a portion of the down payment) for the median-priced resale home to the median household income reached an historical low in 2012 that dated back to 1981, but is rising quickly and approaching the historical average.



Due to rising mortgage rates coupled with expected home price appreciation, affordability conditions nationally are weaker in the second half of 2013, and will continue to weaken gradually in the coming years, reaching the historical median in 2015. While affordability conditions vary by market, most markets have experienced their most favorable historical affordability during this cycle.

Home values are trending up, and the combination of continued low mortgage rates, a declining percentage of distressed sales, and low inventory levels are expected to drive rising home values. JBREC estimates national home values appreciated by approximately 10.7% during the 12 months ended October 31, 2013, and forecasts national appreciation of 6.2% in 2014 and 5.1% in 2015, slowing to 1.0% by 2017. Many factors can influence this outlook. Purchases by the Federal Reserve of mortgage-backed securities cause JBREC to believe that the Federal Reserve would like to see home prices rise.



Increasing home price appreciation will likely be supported by low mortgage rates, which remain historically favorable, and are expected to remain low in the near term due to low inflation and global economic uncertainty. JBREC projects that average 30-year fixed mortgage rates will rise gradually to 6.0% by 2017, as increasing inflation and an improving economy drive rates higher after this period of particularly low inflation. However, as interest rates can change quickly, this expectation may not materialize.

There is a strong case for solid price appreciation:

* *DEMAND* —demand has been growing much faster than the new home supply being added to the market, which has helped to reduce the excess existing supply in the market. With a low level of excess supply, prices will rise as there will be multiple buyers for every house on the market for sale.

* *AFFORDABILITY* —the most favorable affordability in decades has made it easier for buyers to pay higher prices for homes. Affordability is returning to the long-term historical averages and remains good.

* *INVESTMENT* —hard assets, such as real estate, are broadly considered an inflation hedge, and many investors will focus on inflation once the current deflation concerns subside. International investors sense an attractive opportunity to buy U.S. real estate, partially due to favorable exchange rates. Also, large institutional investors as well as local investment groups see a great opportunity to buy homes at below replacement cost or below the historical price/income ratio, and have been driving prices up.

*The Bear Case .*    While the fundamentals are in place for a recovery in the housing market, there are a number of factors that are slowing the recovery, including the following:

* The market is experiencing a low level of activity from entry-level buyers due to a lack of savings, challenges with back-end debt-to-income ratios and credit, and uncertainty about the housing market and the economy.

Table of Contents

- A low level of home purchases by current homeowners is occurring due to the high loan-to-value ratios of many existing homeowners.

- The economy could still experience slow and volatile growth in the years to come, and even a recession. Recessions caused by excess lever such as the recent recession, usually resolve over many years and the path is typically very volatile.

- A large number of mortgaged homes will continue to go through the foreclosure process and will be sold under duress.

- Mortgage rates could rise.

- The implementation of qualified mortgage and qualified residential mortgage rules proposed in the Dodd Frank Wall Street Reform and Consumer Protection Act could make mortgages more difficult to obtain. The recent qualified mortgage definition recommended a 43% back-end debt-to-income ratio, which is generally more accommodative than the early 1990s.

- Development and building costs are rising, which could negatively impact homebuilder margins and limit their interest in starting more communities and homes.

In addition, the government deficit is substantial, and the United States could be subject to further credit rating downgrades until political leadership develops and executes a plan to address the deficit. A lack of fiscal accountability could cause U.S. economic problems for years to come.

*Conclusion.* In summary, housing is a risky asset class, but JBREC believes the outlook for the housing market is very favorable as a result of several factors, including the following:

- *DEMAND IS STRONG.* The number of adults finding employment is exceeding new home supply by a ratio of 2.3 to 1.

- *SUPPLY IS LOW.* Resale inventory is well below the historical average months of supply, new home inventory is near an all-time low, and new construction is well below historical averages.

- *AFFORDABILITY IS HISTORICALLY FAVORABLE.* With mortgage rates close to 4.0% as of October 2013, and home prices in many markets still below pe levels, homeownership is an attractive financial option.

JBREC forecasts that the excesses of the recent downturn will clear and that home prices and construction will increase for the foreseeable future.

## Selected Housing Markets

The following table provides a summary of actual economic data and estimates, forecasts and projections for the eight primary markets for the most recent data available as of October 2013.

| Market | Forecasted 2013 Home Value Appreciation (1) | Forecasted 2014 Home Value Appreciation (1) | Data: Twelve months ended October 31, 2013 | | | |
|---|---|---|---|---|---|---|
| | | | Job Growth | Permits | Job Growth / Permit Ratio | Months of Resale Supply (2) |
| Orange County | 18.0% | 8.2% | 28,100 | 9,256 | 3.0 | 2.7 |
| San Diego | 18.1% | 9.1% | 23,000 | 6,799 | 3.4 | 2.7 |
| Ventura | 18.2% | 9.3% | 5,500 | 669 | 8.2 | 3.4 |
| Los Angeles | 19.0% | 8.2% | 56,600 | 12,823 | 4.4 | 3.1 |
| San Francisco | 18.1% | 6.8% | 23,700 | 5,423 | 4.4 | 3.2 |
| San Jose | 19.5% | 5.4% | 22,900 | 6,748 | 3.4 | 2.2 |
| Sacramento | 26.6% | 11.0% | 7,800 | 4,437 | 1.8 | 1.8 |
| Phoenix | 20.6% | 9.4% | 36,000 | 17,362 | 2.1 | 2.9 |

(1) This information is contained in the market study provided to us by JBREC and is based upon various assumptions and forward-looking estimates. Actual results may differ materially from this forecast.

(2) Estimated months of supply as of October 31, 2013.

104

Table of Contents

## Orange County, CA Housing Market Overview

Orange County, California, also referred to as the Santa Ana-Anaheim-Irvine metropolitan division, is a part of a single MSA which consists of Los Angeles and Orange Counties together. Orange County has over 3.1 million people and 1.0 million households, making it the third-most populous county in California. Considered to be a set of suburban commuter cities several decades ago, Orange County now has its own vibrant economy and employment centers, and stands on its own identity as a mature community and culture independent of the larger Los Angeles County to its north. Because of its coastal location and its status as a thriving employment center, Orange County is a "first choice" region for housing within the greater Southern California real estate market.

The housing fundamentals of Orange County have shown considerable improvement in recent years, which is a positive sign for home price appreciation in this market, indicating a recovery from the recession of the last few years. The Burns Housing Cycle Risk Index™ measures the health of the housing market based on the performance of 24 market fundamentals in relation to their own history, and has historically been a one- to three-year leading indicator for home price appreciation. The improvement in the overall fundamentals is the result of improving job growth, low supply and the turning of the business cycle. The affordability fundamentals are worse than the historical average, as the combination of rapid home value appreciation and rising mortgage rates has shifted Orange County to a slightly overpriced market.



There are 1.4 million non-farm payroll jobs in Orange County, and employment growth has been positive since 2011 after job losses in 2007 through 2010. The metro area lost 165,200 jobs (10.7%) from the 2006 peak, and since the trough in 2010 has added 94,200 jobs (7.0% growth). JBREC expects employment growth of 25,000 jobs (1.7%) in 2014.



Although the area is famous for its vacation destinations such as Disneyland and Knott's Berry Farm, employment in Orange County is distributed over many industries and sectors. The largest employment sector is the high-paying Professional Business Services (18.4% of jobs) sector, followed by the Trade, Transportation & Utilities (17.2%) sector. Leisure and Hospitality (13.0%), Educational and Health Services (11.7%), Manufacturing (11.1%) and Government (10.0%) follow in size. While Disney is indeed the county's largest employer, the next three places are held by the University of California, Irvine; St. Joseph's



Health; and Boeing. The headquarters of several Fortune 500 companies are in Orange County, including Ingram Micro and First American in Santa Ana, Western Digital in Lake Forest and Pacific Life in Newport Beach. The city of Irvine is the home of Allergan, Broadcom, Standard Pacific and Gateway. The Asian-based automobile and electronics companies Mazda, Toshiba, Toyota, Samsung, Kia, Mitsubishi and Hyundai all have regional or national headquarters in Orange County.

Table of Contents

While Orange County lost 0.4% of its population in 2005 and 2006, it has gained population every year since then, adding a total of 193,700 people (6.6%) from 2007 through October 2013. JBREC expects population growth of 27,000 people (0.9% growth) and household growth of 12,000 (1.2% growth) in 2014.





As of October 2013, the median household income in Orange County was $71,600, having peaked in 2008 at $76,200. Notably, Orange County median household income is well above the corresponding figure of $53,700 for Los Angeles County, showing the prevalence of higher-income jobs, many of them professional, in Orange County. JBREC expects income growth will be relatively flat for Orange County in 2013.



Existing home sales in Orange County are rising after dipping in 2011. In the 12 months ended October 31, 2013, existing home sales for the area increased to 34,999, up 49% from the trough of 2007. Existing home sales levels are still well below the peak level of 52,000 in 2003. Home prices have increased sharply in Orange County. The median existing single-family detached home price declined 31% between 2007 and 2009, due in part to a shift in sales activity away from the higher price points and a loss in value. The strength of the Orange County economy is seen in the fact that this decline was less than the corresponding drop of 41% in Los Angeles County. As of October 2013, the median price for existing single-family detached homes was $610,000, up from $513,500 in October 2012 and above the 2004 median price level of $570,000, but still below the median price for 2005.



New home sales activity for the 12 months ended October 31, 2013 has risen from the trough levels of 2009, but remains low for this market. New home sales transactions totaled 3,130 for the 12 months ended October 31, 2013, well below the peak of 6,436 in 2003. JBREC expects the new home sales volume to increase to 3,600 transactions in 2014. The median new home



106

<code/>

<input/>

<caption/>

<label/>

<section/>

<span/>

<header/>

<footer/>

<body/>

<title/>

<table/>

<figure/>

<math/>

<aside/>

<strong/>

<summary/>

Table of Contents

Resale listings in Orange County are low, which could lead to more competitiveness and increasing prices in the resale market. Through October 2013, the county had 8,020 homes listed on the market, which represented a 15% increase from one year prior and a 30% drop from 2010. By comparison, listings exceeded 17,000 homes on the market in some months of 2007. The level of listings as of October 2013 translates to a very low 2.7 months of supply, based on existing home sales activity over the most recent 12 months. A 6.0 month supply is considered equilibrium for most markets. The October 2013 inventory level is well below the peak level of 8.9 months of supply in 2008.



Pre-foreclosure notices are declining in Orange County, which is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months ended third quarter 2013, approximately 5,800 notices were issued, representing a 63% decline from one year prior and an 82% decline from the peak in 2009.

While the number of homes falling into pre-foreclosure is declining, there is a moderate level of



potential distressed homes that are not yet on the market and may limit upward movement for home prices. JBREC estimated the shadow inventory at the end of the second quarter 2013 at 13,500, or about 4.3 months of supply. The shadow inventory is approximately two times the very low level of listings that are on the market. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, and the pace distressed sales will be slow enough that home prices will not be significantly negatively affected.

When comparing the monthly costs of owning the median-priced home with the median household income, affordability conditions are slightly worse than the historical median affordability conditions in the Orange County metro division. JBREC's Affordability Index takes into consideration the change in mortgage rates over time in its estimate of the ownership costs, which can significantly impact the monthly payment. JBREC forecasts affordability conditions in Orange County will weaken further in 2014 as home prices and mortgage rates are expected to rise.

In summary, the housing fundamentals in Orange County are solid. Job growth is positive for housing demand in this market, particularly as job growth outpaces the supply of new homes being added to the market. Low levels of existing home listings are creating a more competitive resale market, which should influence future home price appreciation. Prices are at low levels not seen since 2004, in a time when mortgage rates are also low. The combination of relatively low prices and low mortgage rates in a county of high-income jobs suggests a continued rebound in the form of rising construction activity and home prices.

Table of Contents

## San Diego, CA Housing Market Overview

The San Diego-Carlsbad-San Marcos, California MSA consists of San Diego County. San Diego is the second-most populous county in the State of California, with over 3.2 million people and more than 1.1 million households, which is slightly larger than neighboring Orange County. The coastal county is known for its defense/military bases, high-tech industry and tourism, as well as manufacturing and research. The majority of demand for housing is generated by growth in the region's diverse economy, but San Diego has also attracted certain affluent second-home buyers and retirees for quality of life reasons.

The housing fundamentals in San Diego are improving, which is a positive sign for price appreciation in this market. The Housing Cycle Risk Index™ measures the health of the housing market based on the performance of 24 market fundamentals in relation to their own history, and has historically been a one- to three-year leading indicator for home price appreciation. The overall housing market fundamentals grade has improved since 2008, as the demand, supply and affordability fundamentals have all improved in this market. Weakening affordability as of October 2013 is driving a small decline in the Index. The risk of a substantial oversupply of residential lots and homes in this MSA are reduced due to very limited land supply and a very difficult entitlement process which typically requires several years to convert a raw property into entitled and finished residential lots.



San Diego has a payroll employment level of nearly 1.3 million workers, and job growth has resumed after the market witnessed a decrease in employment of 6.6% between 2008 and 2010. On a percentage basis, the San Diego metro area experienced the smallest decrease in employment of the Southern California metro areas. The metro area has added 72,900 jobs (6.0% growth) since 2011, and JBREC forecasts job growth of 27,000 (2.1%) in 2014.



Defense/military has a large presence in San Diego's economy, including the largest naval fleet in the world. The county is also home to a large number of research and manufacturing businesses, particularly in the wireless and biotechnology sectors, and is home to two Fortune 500 companies (Qualcomm and Sempra Energy).



The Government sector is the county's largest, accounting for 17.8% of employment. The Professional and Business Services sector is nearly equal in size, accounting for 17.2% of jobs, and is generally considered to be a high-income employment sector. The Trade, Transportation and Utilities sector comprises 16.5% of employment. Compared to the nation, San Diego has a higher concentration of jobs in the Professional and Business Services, Leisure and Hospitality, and Government sectors.

Table of Contents

Population and household growth in San Diego have rebounded after slowing in the early- to mid-2000s. From 2008 to 2012, population growth averaged 39,800 people (1.3%) per year and household growth averaged 11,900 (1.1%) per year. JBREC expects population growth of 37,400 people (growth) and household growth of 14,200 households (1.3% growth) in 2014.





As of October 2013, the median household income in San Diego was $60,600, which is higher than the national average. After peaking above $63,500 in 2008, the median household income in San Diego declined in 2009 and 2010 and more modestly in 2012. JBREC expects the emdian household income will increase to $61,700 in 2014.



San Diego's existing home sales are steadily rising. In the 12 months ended October 31, 2013, sales increased to 40,770 transactions, representing an increase of more than 53% from the 2007 market trough of 26,715, and 10% just in the last 12 months. The federal and state tax credits, as well as increased levels of distressed sales, helped to boost sales in 2008 and 2009. Sales slowed in 2010 and 2011 as the tax credits began to expire and the number of homes on the market began to decline, but sales are rising once again. Resale prices had witnessed strong appreciation from the late 1990s through 2005, but remained essentially flat in 2006 and decreased from 2007 through 2009. The median price in San Diego declined 38% from the peak in 2005 to the trough in 2009, due in part to a shift in sales activity away from the higher price points and a loss in value. Home prices are now rising rapidly with a 17% increase to $450,750 in the 12 months ended October 2013.



San Diego's new home sales activity is steadily increasing from trough levels in 2011, and the increase accelerated in 2013 as both demand and supply returned to the market. New home sales totaled 3,716 in the 12 months ended October 31, 2013, a 24% increase. JBREC forecasts 3,800 transactions in 2014, which is still quite low in comparison to historical levels for this



110

Table of Contents

market. The median new home price reached a new peak in October 2013 at $526,000. However, new home prices should not be relied upon as the only indicator of market trends, as they can be heavily influenced by the mix of home types being sold at any given time. Resale home prices are a better indication of market trends.

Home values in the San Diego MSA are rebounding, and are poised for continued positive growth in 2014, according to the Burns Home Value Index TM . San Diego home values appreciated 17.3% during the 12 months ended October 31, 2103, on top of a 3.7% increase in 2012, after six years of declining values from 2006 through 2011. JBREC forecasts home values to rise 9.1% in 2014.



Homebuilding permit activity in San Diego is rising from its lowest levels in decades, but for the 12 months ended October 31, 2013, permits remained approximately one-third of the peak level during the early 2000s. The trough of the market for construction activity occurred in 2009 at just under 3,000 total homebuilding permits, which was less than 7% of the peak permit level in the county in 1986. During the 12 months ended October 31, 2013, San Diego issued 6,799 homebuilding permits, which is much lower than the demand generated by the recent improvement in employment growth. Over the 30-year period from 1983 through October 2013, 57% of the homebuilding permits issued were for single-family homes. During the 12 months ended October 31, 2013, 37% of the homebuilding permits issued were for single-family homes. This shift is due to a lack of land zoned for traditional single-family detached homes and a resulting increase in the share of infill, attached housing.



The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 31, 2013 higher than the number of homebuilding permits issued in that same time. The employment growth to homebuilding permit ratio was 3.4 in October 2013, as compared to the 1.3 average employment growth to homebuilding permit ratio for the market from 1981 through 2012, and is expected to remain elevated in 2014.



Although resale listings have been rising in San Diego since February 2013, listings remain quite low, causing the resale market to become more competitive and leading to increases in prices. As of October 2013, San Diego had 9,100 homes listed on the market, which represented a decline of 4% from the prior year. In late 2006 and again in late 2007, listings surpassed 22,000 homes on the market. The level of listings as of October 2013 equated to 2.7 months of supply, based on existing home sales activity over the prior 12 months. This



111

Table of Contents

represents a significant decrease from the more than nine months of supply 2008, and is well below the equilibrium level of 6.0 months.



In addition to the decline in listings, pre-foreclosure notices have been trending downward, which is a positive sign for home prices in the San Diego market. Pre-foreclosure notices are an indicator of future home sales that will be distressed sales. In the 12 months ended September 30, of 2013, just under 7,300 pre-foreclosure notices had been issued, representing a 59% decline from the prior year and a 681% decline from the peak in 2009.

While the level of future distressed home sales is generally declining, there remains a moderate level of distressed homes that are not yet on the market that will act to limit rapid appreciation of home prices. As of the end of the second quarter of 2013, the shadow inventory amounted to an estimated 16,600 homes, or 5.0 months of supply. This is approximately two times the level of listings that were on the market at that time. JBREC believes that most shadow inventory homes in San Diego will gradually become distressed sales over the



next few years, and the pace of distressed sales will be slow enough that home prices will not be significantly negatively affected.

When comparing the monthly costs of owning the median-priced home with the median household income, through October 31, 2013, affordability in San Diego is slightly worse than the area's historical median dating back to 1981. Affordability conditions are expected to worsen in 2014 as home prices and mortgage rates are expected to rise.

In summary, San Diego's housing fundamentals are solid. Job growth exceeds the area's new construction levels, and listings are low. As the fundamentals that drive the San Diego housing market reflect a more stable environment, the market is on track to return to solid price appreciation and rising construction.

Table of Contents

## Ventura, CA Housing Market Overview

The Ventura MSA, also referred to as the Oxnard-Thousand Oaks-Ventura MSA, consists of Ventura County. The county is home to nearly 845,600 people and more than 278,600 households. The coastal county has a rich history, while simultaneously providing amenities found in much more urban settings. Although Ventura lives in the large shadow of Los Angeles County to the south, it has a vibrant economy in its own right, and household income levels are significantly higher than surrounding metros. Limited land supply and a tough land planning and approval environment will continue to restrict the supply of new homes.

The housing fundamentals in Ventura are improving, which is a positive sign for home price appreciation in this market, indicating a recovery from the recession and housing correction of the last few years. The improvement in overall fundamentals is the result of improving job growth, low supply and average affordability. In particular, the supply fundamentals stand out, given the very low levels of homebuilding permit activity and resale listings. The combination of rapid price appreciation and rising mortgage rates create affordability conditions that are on par with Ventura's historical average.



There are nearly 286,700 non-farm payroll jobs in Ventura County, and employment growth has been positive since 2011 after job losses that lasted from 2007 through 2010. The metro area lost 25,000 jobs (8.4%) from the 2006 peak before adding 11,900 jobs (4.3% growth) in 2011 through October 2013. JBREC expects employment growth rising to 5,500 jobs added in 2014.

Ventura's largest employment sector is Trade, Transportation and Utilities (19.7% of jobs), followed by the Government (15.5%) sector. The high-paying Professional Business Services sector comprises an additional 12.8% of jobs in the MSA, which is lower than the national average for this sector. The Fortune 500 pharmaceutical company Amgen is headquartered in Thousand Oaks.





113

Table of Contents

Population and household growth slowed in the Ventura MSA in the mid-2000s, but has rebounded, adding an estimated 6,700 people and 2,800 households during the 12 months ended October 31, 2013. JBREC expects population growth of approximately 7,100 people (0.8% growth) and household growth of approximately 3,500 (1.3% growth) in 2014.





As of October 2013, the median household income in Ventura County was $72,600, having peaked in 2008 at $76,900. Notably, Ventura's median household income is well above the median income for Los Angeles County, showing the prevalence of higher-income jobs, many of them professional, in Ventura County. JBREC expects Ventura median incomes will increase to $74,200 in 2014.



Existing home sales in Ventura are rising rapidly after remaining relatively flat in 2011 and declining in 2012. In the 12 months ended October 31, 2013, existing home sales for the area increased to 9,729, up 31% from the trough of 2007. Existing home sales levels during the 12 months ended October 31, 2013 were still well below the recent peak level of 16,153 in 2003. Home prices are starting to turn around in Ventura. The median existing single-family detached home price declined 38% between 2007 and 2009, due in part to a shift in sales activity away from the higher price points and a loss in value. Although substantial, this decline was slightly less than the corresponding drop of 41% in Los Angeles County. As of October 2013, the median price for existing single-family detached homes was $495,000, up from $415,000 in October 2012 and still below peak.



New home sales activity for the 12 months ended October 31, 2013 has risen from the trough levels of 2011, but remains very low for this market. New home sales transactions totaled 428 for the 12 months ended October 31, 2013, well below the peak of 2,965 in 2000. JBREC expects the new home sales volume to increase to 600 transactions in 2014. The median new home price is once again starting to increase after declining from the



114

Table of Contents

peak level in 2005. As of October 2013, the median new home price was $511,750, which is up 60% from October 2012, but still down 27% from its peak of $699,000 in 2005. The median new home price can be heavily influenced by the mix of home types being sold at any given time, and should not be re upon as the only indicator of market trends.

Home values in Ventura are poised for continued positive growth in 2014, according to the Burns Home Value Index. JBREC forecasts home values to rise by 9.3% in 2014, after rising 19.7% during the 12 months ended October 31, 2013.



Homebuilding permit activity in Ventura is starting to pick up, but remains at very low levels. Single-family homebuilding permits had fallen to 204 units in 2009, but rose to 329 over the 12 months ended October 31, 2013. Single-family homebuilding permits are expected to account for roughly 52% of the total residential construction activity in 2014, rising to 420 permits. In contrast, multifamily permits totaled 340 during the 12 months ended October 31, 2013 and are projected to rise to 380 in 2014. Limited available land will keep construction activity well below what was seen over the last few decades.



The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 31, 2013 approximately eight times the number of homebuilding permits issued in that same time; the employment growth to homebuilding permit ratio for the 12 months ended October 31, 2013 was 8.2. That ratio is expected to remain high in 2014 at 6.9, due to improving job growth and low permit levels.



Resale listings in Ventura are low, which could lead to more competitiveness and increasing prices in the resale market. As of October 2013, the county had 2,729 homes listed on the market, which represented a 6% increase from one year prior and a 42% drop from 2010. By comparison, listings exceeded 7,000 homes on the market in some months of 2007. The level of listings as of October 2013 translates to a very low 3.4 months of supply, based on existing home sales activity. A 6.0 month supply is considered equilibrium for most markets. The October 2013 inventory level is well below the peak level of 11.8 months of supply in 2008.



Pre-foreclosure notices are declining in Ventura, which is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months ended in the third quarter of 2013,

115

Table of Contents

approximately 2,000 notices were issued, representing a 64% decline from a year prior and a 78% decline from the peak in 2009.



While the number of homes falling into pre-foreclosure is declining, there is a moderate level of potential distressed homes that are not yet on the market and may limit upward movement for home prices. As of the end of the second quarter of 2013, JBREC estimated the shadow inventory at 4,900, or about 5.1 months of supply. The shadow inventory is nearly two times the very low level of listings that were on the market at that time. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, and the pace of distressed sales will be slow enough that home prices will not be significantly negatively affected.



When comparing the monthly costs of owning the median-priced home with the median household income, affordability conditions are on par with the historical median in Ventura. JBREC forecasts affordability conditions in Ventura will weaken in 2014 as home prices and mortgage rates are expected to rise.

In summary, the housing fundamentals in Ventura are improving steadily. Job growth is positive for housing demand in this market, particularly as job growth materially outpaces the supply of new homes being added to the market. Low levels of existing home listings are creating a more competitive resale market, which should influence future home price appreciation. Prices are still at relatively low levels in a time when mortgage rates are also low. The combination of low prices and low mortgage rates in a county of high-income jobs suggests a rebound in the form of rising construction activity and home prices.

116

Table of Contents

## Los Angeles, CA Housing Market Overview

The Los Angeles metropolitan division is a part of a single MSA which consists of Los Angeles and Orange Counties together; the Los Angeles division represents Los Angeles County only. This county has over 10.0 million people and 3.3 million households, making it the most populous county in the entire nation as well as in California, representing slightly less than 30% of the state population and about 3% of the population of the entire nation. Owing to its size, this market has a wide diversity of submarkets and demographics, which make it critical for builders and developers to understand the local consumer. A large percentage of new homebuilding activity will likely occur in either infill locations close to job growth or in more distant areas where land is available for traditional single-family detached home development.



The housing fundamentals of Los Angeles County have shown considerable improvement in recent years, which is a positive sign for home price appreciation in this market, indicating a recovery from the recession of the last few years. The improvement in the overall fundamentals is the result of improving job growth and declining distressed sales, crossed with low construction levels in the recession. The affordability fundamentals are at historical averages with prices on average having fallen to levels consistent with prices in 2003 at the same time that mortgage rates are at a low level, around 4.5% as of the end of the third quarter of 2013. The current affordability conditions are slightly above the historical average.



There are more than 3.9 million non-farm payroll jobs in Los Angeles County, and employment has been positive since 2011 after job losses in 2008 through 2010. The metro area lost 349,700 jobs (8.5%) from the 2007 peak. By year 2013, the Los Angeles metro will have added 161,800 jobs starting in 2011. The recent recession resulted in fewer losses than the 433,900 jobs lost in the downturn of 1991 through 1994, which had fallen upon a smaller population. JBREC expects employment growth of 80,000 jobs in 2014.

Although the area is famous for its entertainment industry, employment in Los Angeles County is distributed over many industries and sectors. The largest employment sector is Trade, Transportation and Utilities (19.4% of jobs), followed by the high-paying Professional and Business Services (15.0%), Government (13.9%) and Educational and Health Services (14.4%). Los Angeles County is home to such Fortune 500 companies as Walt Disney, DirecTV, Occidental Petroleum and Edison International, as well



as the U.S headquarters for automobile companies Toyota, Honda and Isuzu. The city and county governments are also major employers, as is the educational system. The ports of Los Angeles and Long Beach handle one-fourth of all container traffic coming into the United States, making the compl the largest port in the country and the third-largest in the world.

117

Table of Contents

Los Angeles County lost a little less than one percent of its population in the three years from 2005 through 2007, but since has rebounded, adding 64,500 people and 23,600 households during the 12 months ended October 31, 2013. JBREC expects population growth of approximately 66,800 people (0.7% growth) and household growth of approximately 31,700 households (1.0% growth) in 2014.





As of October 2013, the median household income in Los Angeles County was $53,700, having declined modestly since 2008 when it peaked at $55,500. JBREC anticipates that the median income will increase to $54,800 in 2014.



Existing home sales in Los Angeles County are rising vigorously after declining in 2010 and 2011. In the 12 months ended October 31, 2013, existing home sales for the area increased to 82,656, up 41% from the trough of the market in 2008. Existing home sales levels for the 12 months ended October 31, 2013 were still well below the peak levels that topped 127,000 transactions in both 2003 and 2004. Home prices have turned around in Los Angeles County. In a classic business cycle, the median existing single-family detached home price declined by 44% between 2007 and 2009, representing the withdrawal of generous lending that had made high prices possible and led to many distressed sales. As of October 2013, the median price for existing single-family detached home prices was $449,000, up from $351,000 in October 2012 and above the 2004 median price level of $410,000, but still below the 2007 peak of $564,400.



New home sales activity for the 12 months ended October 31, 2013 rose from trough levels in 2011, but remains very low in comparison to history in this market. New home sales transactions totaled 4,343 for the 12 months ended October 31, 2013, up from 3,822 in 2011, but still well short of the peak at 12,370 in 2006. The median new home price is once again rising after declining from the peak level in 2007. As of October 2013 the median new home price was $480,000, down 4.5% from its peak of $502,867 in 2007. The median



118

Table of Contents

new home price can be heavily influenced by the mix of home types being sold at any given time in this broad region. As a result, resale home prices are a better indication of market trends.

Home values in Los Angeles County are poised for continued positive growth in 2014, according to the Burns Home Value Index. JBREC forecasts home values to rise by 8.2% in 2014, after growing 19.7% during 12 months ended October 2013.



While the mix of new housing construction in this county has historically been a fairly balanced split between attached homes and single-family detached homes, the market is becoming a more attached-dominated market as the availability of land for detached housing is diminished. JBREC forecasts that much of the growth in the housing in 2014 will be for multifamily units, but single-family construction is also expected to rebound from trough levels. Single-family homebuilding permits had fallen to 2,268 units in 2009 as construction slowed, but rose to 3,691 over the 12 months ended October 2013. Single-family homebuilding permits are expected to account for approximately 29.4% of the total residential construction activity in 2014, rising to 6,000 permits. In contrast, multi-family permits totaled 9,132 during the 12 months ended October 31, 2013 and are projected to rise to 14,400 in 2014.



The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 2013 over four times the number of homebuilding permits issued in that same time; the employment growth to homebuilding permit ratio through October 2013 was 4.4. This ratio is expected to slightly decrease to 3.9 in 2014.



Resale listings in Los Angeles County are very low, which could lead to more competitiveness and increasing prices in the resale market. As of October 2013, the county had 21,390 homes listed on the market, which represents a 1% decline from one year prior and an almost 42% drop from 2010. By comparison, listings exceeded 50,000 homes on the market in much of 2007 and 2008. The level of listings as of October 2013 translates to a very low 3.5 months of supply, based on existing home sales activity over the most recent twelve months. A 6.0 month supply is considered equilibrium for most markets. The October 2013 supply is well below the level of more than 11 the 12 months of supply in 2008, when listings had peaked.



119

**Table of Contents**

Pre-foreclosure notices are declining in Los Angeles County. This is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months ended in the third quarter of 2013, approximately 23,100 notices were issued, representing a 55% decline from one year prior and a 79% decline from the peak in 2009.



While the number of homes falling into pre-foreclosure is declining, there is a moderate level of potential distressed homes that are not yet on market and may limit upward movement for home prices. As of the end of second quarter of 2013, JBREC estimated the shadow inventory at 50,600 homes, or about 6.4 months of supply. This is approximately three times the very low level of listings on the market at that same time. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, and the pace of distressed sales will be slow enough that prices will not be significantly negatively affected.

When comparing the monthly costs of owning the median-priced home with the median household income,



affordability conditions are good in relation to history in the Los Angeles metro area. JBREC forecasts affordability conditions in Los Angeles County will continue to weaken in 2014 as home prices and mortgage rates are expected to rise.

In summary, the housing fundamentals in Los Angeles are excellent. Solid job growth is positive for housing demand in this market, particularly as job growth significantly outpaces the supply of new homes being added to the market. Low levels of existing home listings are creating a more competitive resale market, which should influence future home price appreciation. Additionally, the combination of prices that are down from peak levels and low mortgage rates means that affordability is close to the long-term median, suggesting a coming cyclic rebound in the form of increased construction activity and rising home prices.

Table of Contents

## San Francisco, CA Housing Market Overview

The San Francisco Metropolitan Division consists of three counties: San Francisco, San Mateo and Marin. It is part of the larger San Francisco-Oakland-Hayward MSA, which also includes the East Bay counties of Alameda and Contra Costa. All three counties in the San Francisco Metropolitan Division are affluent, and housing there tends to be expensive. Combined, the three counties have a population of more than 1.8 million. The San Francisco metro is mature and largely developed in core locations. Limited land supply and a tough land planning and approval environment restrict the supply of new homes. Homebuyers typically evaluate opportunities to buy higher density product closer-in, or commute to outlying locations for relative affordability and detached homes. Like many other markets, the San Francisco Metro experienced a housing correction; however, San Francisco's economy was still struggling from the technology correction during the early parts of the national housing boom so home prices didn't rise or fall as much as other metros.

The housing fundamentals of the San Francisco metro have shown considerable improvement in recent years. The improvement in the overall fundamentals is the result of improving job growth, low supply and the turning of the business cycle. The affordability fundamentals are average (by San Francisco standards), with the median resale price approaching peak pricing as of October 2013, but mortgage rates remain low at 4.5%. The combination of slightly below-peak prices and lower mortgage payments continues to provide a good buying opportunity. As a result, properties are now quickly snapped up by eager buyers, mostly at higher prices than one year ago and sometimes above their asking prices.



There are over 1.0 million non-farm payroll jobs in the San Francisco metro, and employment growth has resumed since 2011 after job losses in 2009 and 2010. The metro area lost 60,600 jobs (6.1%) in 2009. Over the 12 months ended October 2013, San Francisco has added 23,700 jobs (2.3%). JBREC forecasts employment growth of 25,000 jobs (2.4%) in 2014.



The strongest sector for employment is the high-paid Professional and Business Services (23.5% of jobs), followed by Trade, Transportation and Utilities (15.1%), Leisure and Hospitality (13.7%), Government (13.0%), and Educational and Health Services (11.3%). In the city of San Francisco, tourism is a major industry. Many companies make their headquarters in San Francisco, including Wells Fargo (the largest private employer in the city), Union Bank, the construction firm Bechtel, and Visa. In San Mateo County the largest private employers are Genentech, Oracle, and Kaiser Permanente. These counties are also home to many smaller companies, often startups, in the biotech and



computer/Internet fields, in the spirit of Silicon Valley to the south.

Table of Contents

While the San Francisco metro lost 1.6% of its population in the dot-com recession from 2001 through 2004, it has gained population every year since then, adding 148,800 people (8.8% cumulative) from 2007 through October 2013. JBREC expects population growth of approximately 18,000 people (1.0% growth) and household growth of approximately 9,300 (1.3% growth) in 2014.





As of October 2013, the median household income in the three-county metro was $77,000, just short of its peak of $78,514 in 2008. This high level of median household income suggests the prevalence of well-paying professional jobs. JBREC expects the median income will increase by 1.4% to roughly $77,700 in 2014.



Existing home sales in the San Francisco metro rose during the 12 months ended October 2013 and had been increasing for three years before that, since 2009. In the 12 months ended October 31, 2013, existing home sales for the area rose to 17,889, up 4% from October 2012 and up 43% from the trough of 2008. Current existing home sales levels are still well below the peak level of 24,979 in 2004. The median existing single-family detached home price declined by 22% between 2007 and 2011, but this was a far smaller decline than in many metros, due to limited supply, less of a price increase early in the decade because of the crash in the technology sector, and an abundance of high-paying jobs. As of October 2013, the median price for existing single-family detached home prices was $855,000, up 13% from $757,000 in October 2012. Since the economy remains strong, supply remains low, and mortgage rates are low, prices are likely to rise in the near and medium term.



New home sales activity during the 12 months ended October 31, 2013 is below the recent low of 826 sales in 2011. However, there have always been relatively few new sales compared to the population of this mature and land-constrained metro. New home sales transactions totaled 701 for the 12 months



122

Table of Contents

ended October 31, 2013, down 22% from a year ago, and well below the peak of 2,516 in 2004. JBREC expects sales to increase by 80% to 1,800 units in 2014. The median new home price continues to strongly rise. As of October 2013, the median new home price was $778,500, which is up 6% from a year ago. However, the median new home price can be heavily influenced by the mix of home types being sold at any given time in this broad region. As a result, resale prices are a better indication of market trends, especially given that the new home sales volume in this market is very much lower than the existing home sales volume.

Home values in the San Francisco metro are poised for continued positive growth in 2014, according to the Burns Home Value Index. JBREC forecasts home values to rise by 7% in 2014, after growing 16% during the 12 months ended October 31, 2013.



Because of cultural preference and the lack of buildable land, the mix of new permits has favored multifamily in-fill housing over single-family detached homes for the last two decades. JBREC forecasts that this trend will continue in 2014. Single-family construction is also expected to rebound from trough levels during the downturn in housing. Single-family homebuilding permits had fallen to only 349 units in 2010 and 374 units in 2011, but rose to 547 over the 12 months ended October 31, 2013. Single-family homebuilding permits are expected to rise to approximately 1,000 in 2014, but remain low given the constraints in this market. Historically, more than one-half of the single-family homebuilding permits issues in the metro division have been in San Mateo County, and this has risen to two-thirds of single-family permits in 2011 and 2012. Multifamily permits totaled 4,876 during the 12 months ended October 31, 2013 and are forecast to rise to 7,500 units in 2014.



The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 31, 2013 outpacing the number of homebuilding permits issued in that same time by more than four to one. The ratio is expected to decrease slightly to about three to one in 2014 as permit activity is not expected to dramatically increase.



Resale listings in the San Francisco metro are low, despite rising steadily in much of 2013, which is leading to more competitiveness and increasing prices in the resale market. As of October 2013, the county had just 4,830 homes listed on the market, which represented a 13% increase from one year prior and a 33% drop from 2010. This level of listings translates to a very low 3.2 months of supply, based on existing home sales activity over the 12 months through



123

**Table of Contents**

October 31, 2013. A 6.0 month supply is considered equilibrium for most markets. The October 2013 inventory level is well below the peak level of 6.3 months of supply in 2009 and 2010. Note that even the peak level of inventory was rather low, indicating the existing home market conditions have always been tight. It is not surprising, therefore, that both new and existing homes are often quickly purchased when they come to market, whether by investors or by households planning to occupy the residences; sometimes the homes are sold as soon as they are listed, and sometimes they sell at higher prices than had been expected.



Pre-foreclosure notices are declining in this metro. This is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months ended September 30, 2013, approximately 1,900 notices were issued, representing a 63% decline from one year prior and a 79% decline from the peak in 2009.



While the number of homes falling into pre-foreclosure is declining, there is a moderate level of potential distressed homes that are not yet on the market and may limit upward movement for home prices.

JBREC estimated the shadow inventory as of June 30, 2013 at 4,836 homes, or about 3.2 months of supply. This level of shadow inventory is slightly more than the level of listings that were on the market at that time. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, but the pace of distressed sales will be slow enough that home prices will not be significantly negatively affected.

When comparing the monthly costs of owning the median-priced home with the median household income, affordability conditions are slightly worse than the historical median in the San Francisco metro area. JBREC estimates that affordability will weaken further in 2014 as home prices and mortgage rates are both expected to rise.

In summary, the housing fundamentals in the San Francisco metro are solid, with a recovery well underway and the potential for further price appreciation. There is solid growth of high-income jobs to support demand in an environment of low and constrained supply. Affordability is slightly worse than average for the metro's history. Limited lot and land supplies and the political environment affecting project approvals are long-term conditions in the Bay Area, which underscores the importance of a management team with strong local knowledge and planning and development expertise.

Table of Contents

## San Jose, CA Housing Market Overview

The San Jose MSA consists of Santa Clara and San Benito counties. With over 1.9 million people and 641,000 households, San Jose is one of the larger markets in the state of California. Widely regarded as a leading technology center, the metro area is home to many of the world's foremost technology companies. The job growth from this South Bay market has a ripple effect on regional housing demand. The mix of housing in San Jose is shifting from a fairly balanced split between attached homes and single-family detached homes to a more attached-dominated market, due to limited land for detached housing as well as political and environmental challenges.

San Jose's housing fundamentals have shown considerable improvement in recent years, which is a positive sign for home price appreciation in this market. The improvement in the overall fundamentals is the result of improving job growth and rising sales activity paired with low homebuilding permit and listings levels. The affordability fundamentals in San Jose are improved from 2005, and are slightly worse than the MSA's historical median.



There are nearly 943,000 non-farm payroll jobs in the San Jose metro area, and employment growth is once again positive after job losses in 2009 and 2010. The metro area lost 59,800 jobs (6.5%) from the 2008 peak before adding 66,700 jobs (7.6% growth) from 2011 through October 2013. The recent recession resulted in fewer losses than the downturn caused by the "dot com" bust in the early 2000s, when San Jose lost 182,300 jobs between 2001 and 2004, or 17.5% of the market total. JBREC expects employment growth of 25,000 jobs (2.5%) in 2014.



Because of its dominance in the technology industry, San Jose has a very high concentration of employment in related job sectors when compared to the nation as a whole. Technology and innovation-related employment contribute significantly to the sizeable economy in the MSA. The largest employment sector is the higher-paying Professional and Business Services sector, which accounts for over 20% of the payroll jobs in the metro area. The next largest sector is Manufacturing, which accounts for 17% of the jobs in San Jose—nearly twice the national average. The Information sector, at approximately 6% of all jobs, is three times the concentration of the nation, and is also considered to be a higher-paying sector. Technology companies dominate the Fortune 500 companies in San Jose, which include Hewlett-Packard, Apple, Google,



SanDisk and Intel, among many others. Approximately 41% of the U.S. venture capital investment activity in 2012 took place in Silicon Valley (which also includes the San Francisco market to the north), amounting to nearly $10.9 billion, according to the PricewaterhouseCoopers MoneyTree Report.

Table of Contents

Unlike the years that followed the dot com bust in the early 2000s, San Jose has not witnessed a drop in population or households in the recent downturn. Growth has remained strong, with an average of 24,600 people (1.4% growth) added each year from 2007 through 2012, and an average of 7,000 households (1.3% growth) added annually. JBREC assumes population growth of approximately 10,600 people (0.6% growth) and household growth of approximately 6,000 households (0.9% growth) in 2014.





As of October 2013, the median household income in the San Jose metro area was $86,500, which is the highest among the major Bay Area markets, driven by tech jobs. The San Jose median household income peaked above $87,300 in 2008, declining in 2009 and 2010. JBREC expects incomes will grow by 2.8% in 2014.



Existing home sales in San Jose are rising after remaining relatively flat in 2010 and 2011. In the 12 months ended October 31, 2013, existing home sales for the area increased 34% to 20,308 transactions from the trough of the market at 15,130 transactions in 2008. Existing home sales during the 12 months ended October 31, 2013 constituted a return to the levels prevalent in the mid-1990s. Home prices also continue to rise in San Jose. The total decline in the median existing single-family detached home price of nearly 37% between 2008 and 2009 was a result of sales activity shifting to lower price points, as well as a loss of value. The median existing single-family detached home price of $714,000 in October 2013 was on par with the median price in 2006 for this market.



San Jose's new home sales activity is rising from trough levels in 2011, but remains historically low for this market. New home sales transactions totaled 1,816 for the 12 months ended October 31, 2013. The San Jose market has historically accounted for 28% of the new home sales activity among the three major Bay Area markets (San Jose, San Francisco and Oakland) over the last 20 years and, during the 12 months ended October 31, 2013, San Jose made up roughly 30% of the total. The median new home price is once again rising after declining from the peak at $644,300 in 2007. As of October 2013, the median new home price was



126

Table of Contents

$762,500 which exceeds the 2007 peak. The median new home price can be heavily influenced by the mix of home types being sold at any given time in this broad region. As a result, resale home prices are a better indication of market trends, especially given that the new home sales volume in this market is considerably lower than the existing home sales volume.



Home values in the San Jose MSA are rebounding sharply, and are poised for continued positive growth in 2014, according to the Burns Home Value Index<sup>TM</sup> . San Jose home values appreciated 17% during the 12 months ended October 31, 2013, following five years of declining prices from 2007 through 2011 and a 9% rise in 2012. JBREC forecasts home values to rise 5% in 2014.

While the mix of new housing construction in San Jose has historically been a fairly balanced split between attached homes and single-family detached homes, the market is becoming a more attached-dominated market as the availability of land for detached housing is diminished. JBREC forecasts that much of the growth in the housing inventory in 2014 will be for multifamily units, but single-family construction is also expected to rebound from trough levels during the downturn in housing. Single-family homebuilding permits had fallen to 642 units in 2009 as construction slowed, but nearly tripled to 1,819 single-family homebuilding permits over the 12 months ended October 31, 2013. Single-family homebuilding permits are expected to account for approximately 30% of the total residential construction activity in 2014, rising to 2,300 permits.



The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 2013 significantly higher than the number of homebuilding permits issued in that same time. The employment growth to homebuilding permit ratio in for 12 months ended October 31, 2013 was 3.4. Historically, the ratio has been closer to 1.2 jobs added for every homebuilding permit issued. The ratio is expected to remain high, about 3.2 in 2014, due to solid job growth amidst relatively low permit levels.



Resale listings in San Jose are still low, despite rising from January through August 2013. Low supply leads to more competitiveness and increasing prices in the resale market. Through October 31, 2013, San Jose 3,650



homes listed on the market, which represented an 10% increase from one year prior. By comparison, listings exceeded 10,000 homes on the market in August 2008. The October 2013 level of listings translates to a very low 2.2 months of supply, based on existing home sales activity over the most recent months. A 6.0 month supply is considered equilibrium for most markets. The October 2013 inventory level is well below the level of more than 8.5 months of supply when listings had peaked.

Table of Contents

Pre-foreclosure notices are once again declining in the San Jose mar after flattening in 2011. This is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months end September 30, 2013, approximately 2,400 notices were issued, representin 67% decline from one year prior and an 86% decline from the peak in 2009



While the number of homes falling into pre-foreclosure is declining, there is a moderate level of potential distressed homes that are not yet on t market and may limit upward movement for home prices. As of June 2013, JBREC estimated the shadow inventory at 5,890 homes, or 2.9 months of supply. This is approximately one and a half times the very low level of listin on the market at that time. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, and the pac distressed sales will be slow enough that home prices will not be significant negatively affected.

When comparing the monthly costs of owning the median-priced hom with the median household income, affordability conditions are weaker in relation to history



in the San Jose MSA. JBREC's Affordability Index takes into consideration the change in mortgage rates over time in its estimate of the ownership costs which can significantly impact the monthly payment. Affordability conditions at the end of 2011 were at the market's best since 1997. Affordability conditions weakened in 2013 due to rising home prices to a level that is slightly worse than historical levels. JBREC forecasts affordability conditions in San Jose will continue to weaken in 2014 as home prices and mortgage rates are expected to rise.

In summary, the housing fundamentals in San Jose are improving. The combination of solid job growth and a high-income employment base are positive for housing demand in this market, particularly as job growth outpaces the supply of new homes being added to the market. Low levels of existin home listings are creating a more competitive resale market, which should influence future home price appreciation.

128

Table of Contents

## Sacramento, CA Housing Market Overview

The Sacramento-Arden-Arcade-Roseville metro consists of four counties: El Dorado, Placer, Sacramento and Yolo counties. Sacramento's status as the capital of California provides a large employment basis for solid middle-class households. This is a major metro area with more than 2.2 million residents and more than 836,000 jobs, comparable to, for instance, greater Portland or Charlotte. Because of the relative availability of land and the low prices for housing in the area, this region experienced a great deal of construction and rapidly rising prices during the boom of the last decade. Sacramento has long been impacted by Bay Area commuters and relocations. High prices and a lack of developable land in the Bay Area traditionally push buyers into the greater Sacramento area, although that impact was muted during the housing downturn.

The housing fundamentals of the Sacramento metro have shown considerable improvement in the last year, based largely on gains in demand relative to supply, which is a positive sign for home price appreciation in this market, indicating a recovery from the recession and housing correction of the last few years. The improvement in the overall fundamentals is the result of improving job growth, better than normal affordability, and the turning of the business cycle. The affordability fundamentals are good, with prices comparable to 2003-2004 levels, at the same time that mortgage rates are at 4.5% as of October 2013.



There are 836,900 non-farm payroll jobs in the Sacramento metro, and employment growth turned positive in 2012 after job losses from 2008 through 2011. The metro area lost 94,400 jobs (10.1%) from 2008 through 2011. However, since then Sacramento MSA has been growing, 7,800 jobs (0.9% growth) from October 2012 through October 2013. JBREC expects improving employment growth averaging 15,000 jobs (1.8%) in 2014.



Because Sacramento is the state capital, the largest sector of employment by far is Government (26.6%), followed by Trade, Transportation and Utilities (17.3%), Professional and Business Services (13.8%), and Educational and Health Services (13.1%). Beside governmental and educational organizations at various levels, the largest private employers in Sacramento include Sutter Health, Kaiser Permanente, Intel, and Dignity Health. Not captured in the non-farm payroll data is a significant agricultural and food processing presence surrounding Sacramento. California produces more than 2 million tons of rice annually and 95% of this is grown in the Sacramento Valley. The Port of West Sacramento handles large shipments of bagged rice and bulk rice for transporation to Asia, Europe and South America (California Rice Commission).



129

Table of Contents

The population and number of households continue to grow at a relatively steady pace in the Sacramento MSA, with improved growth expected in the near term. Over the 12 months ended October 2013, the population rose to 2,227,700, adding 22,100 (1.0%) residents from a year prior. JBREC anticipates population growth of approximately 22,200 (1.0% growth) and household growth of approximately 8,700 (1.1% growth) in 2014.





As of October 2013, the median household income in the Sacramento metro area was $59,100, increasing from 2010 and 2011, but still below the peak of $61,139 in 2008. JBREC expects continued increases in incomes, with growth of 3.1% in 2014 from current levels.



Existing home sales in the Sacramento metro area have steadily increased since 2011 after dipping in 2010. In the 12 months ended October 2013, existing home sales for the area slipped to 35,366, down 1% from October 2012, but up 63% from the trough in 2007. At this rate, existing home sales were still well below the peak level of 50,459 in 2004. JBREC expects resale sales to top 38,300 transactions in 2014. The median existing single-family detached home price declined by 51% between 2006 and 2011, representing the withdrawal of loose lending standards and a correction from unsustainable prices. As of October 2013, the median single-family detached existing home price was $270,000, which was up 29% from October 2012.



The new home sales volume during the 12 months ended October 2013 increased sharply following

six years of decline in the Sacramento MSA, but remains well below the boom years. New home sales transactions totaled 3,243 for the 12 months ended October 31, 2013, which was up 35% from a year prior. By comparison, new home sales in the MSA reached 16,635 in 2003, and surpassed 15,000 transactions per year for four consecutive years from 2002 through 2005, indicating the strength of the boom in this area. JBREC projects new home sales will reach 4,500 transactions in 2014. The median new home price as of October 2013 was $355,500, which was up 20% from October 2012, but still far below the peak of $466,000 attained in 2005. The median new home price can be heavily influenced by the mix of home types being sold at any given time. As a result, resale home prices are a better indication of market trends, especially given the very low level of new homes that are transacting.

130

Table of Contents

Home values in the Sacramento MSA are poised for positive growth in 2013, according to the Burns Home Value Index. JBREC forecasts home values to rise by 11% in 2014, after growing 27% during the 12 months ended October 2013. The predicted home value appreciation is based on the current over-correction of the housing cycle on the downside, and the current affordability conditions resulting from the combination of relatively low prices and low mortgage rates.

Single-family construction has begun to rebound from trough levels during the housing downturn, with continued growth projected in the near future. Because of the availability of land, new single-family construction has tended to be higher than multifamily construction in the Sacramento area. Single-family homebuilding permits had fallen to 1,873 units in 2011, but rose to 3,593 over the 12 months ended October 2013. By comparison, single-family homebuilding permits topped 18,000 units in 2003 and 2004. Single-family homebuilding permits are expected to rise to 5,300 in 2014, which is still well below peak levels. Multifamily permits totaled only 844 during the 12 months ended October 2013 and are projected to rise to 900 units in 2014.

The demand being generated for housing is greater than the new supply being added to the market, with job growth in the 12 months ended October 2013 outpacing the number of homebuilding permits issued in that same time by almost two to one. Job growth is expected to outpace homebuilding activity level in 2014 with an employment-to-permit ratio of 2.4 compared to 1.8 as of October 2013.

Resale listings in the Sacramento metro area are low, despite rising steadily in 2013. Low supply could lead to more competitiveness and increasing prices in the resale market. As of October 2013, the MSA had just 5,292 homes listed on the market, which represented a 54% increase from one year prior. The October 2013 level of listings translates to only 1.8 months of supply, based on existing home sales activity over the 12 months ended October 2013. A 6.0 month supply is considered equilibrium for most markets. In contrast, inventory in October 2007 constituted 8.3 months of supply. Given the low levels of inventory, existing homes are being quickly purchased when they come to market, whether by investors or by households planning to occupy the residences.









Table of Contents

Pre-foreclosure notices are declining in the Sacramento metro area, which is a positive sign for home prices, as pre-foreclosure notices are an indicator of future distress. In the 12 months ended September 2013, just over 7,900 notices were issued, representing a 62% decline from one year prior and a 79% decline from the peak in 2009.

While the number of homes falling into pre-foreclosure is declining, there is a significant number of potential distressed homes that are not yet on the market. The high number of defaults and distressed properties (both short sales and REOs) continues to be a slight drag on the Sacramento real estate market. JBREC estimated the shadow inventory as of September 2013 at 18,514, or about 6.2 months of supply. This level of shadow inventory is about four and a half times the very low level of listings on the market at that time. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years, and will act as a slight drag on the Sacramento market, but the pace of distressed sales will be slow enough that home prices will not be massively impacted. While declining, the sheer size of the shadow inventory makes it something not to be dismissed.

When comparing the monthly costs of owning the median-priced home with the median household income, affordability conditions are good in relation to history in the Sacramento metro area. JBREC estimates that affordability conditions reached their historical best level in early 2012 and have gradually weakened in 2013 due to price increases. Affordability will continue weakening in 2014 as home prices and mortgage rates rise.







In summary, the housing fundamentals in the Sacramento metro remain good. Prices are relatively low and, at the same time, mortgage rates remain near historic lows. The combination of overcorrected prices, low mortgage rates and low levels of homes for sale supports a cyclic recovery and optimism regarding prices and construction in this market.

132

Table of Contents

## Phoenix, AZ Housing Market Overview

The Phoenix-Mesa-Glendale Metropolitan Area consists of Maricopa and Pinal counties. With 4.4 million people and 1.6 million households, Phoenix is the largest market in the state of Arizona. Phoenix is well known as a retirement mecca and enjoys plenty of tourism, but is also ranked secon the country for solar power installations and is a manufacturing and distribution hub that operates at a 40% savings from California locations. Key cities i the MSA include Phoenix, Mesa, Scottsdale and Tempe.

The housing fundamentals in the Phoenix MSA have shown considerable improvement in recent years, which is typically a precursor for home price appreciation. The Housing Cycle Risk Index™ measures the health of the housing market based on the performance of 24 market fundamentals in relation to their own history, and has historically been a one- to three-year leading indicator for home price appreciation. The improvement in the overall fundamentals is due to the combination of significantly improved demand fundamentals as a result of improving job growth and rising sales activity, and improved supply fundamentals as a result of low homebuilding permit and listings levels. The affordability fundamentals in Phoenix are good, but are slowly weakening as prices rise in this market.



There are more than 1.8 million non-farm payroll jobs in the Phoenix metro area, and employment growth resumed in 2011 after three years of losses from 2008 through 2010. The metro area lost 228,500 jobs, or 11.9% from the 2007 peak of 1.9 million. Over the 12 months ended October 2013, Phoenix has added 36,000 (2%) jobs. JBREC expects that Phoenix will add 50,000 new jobs (2.8%) in 2014.



Phoenix has a diverse employment distribution that resembles that of the nation as a whole, with some differences. The largest employment sector is the Trade, Transportation and Utilities sector, which accounts for 20% of the jobs in the metro. Phoenix has a larger combined concentration of jobs in the sectors that generally represent higher incomes: Professional and Business Services, Financial Activities and Information. The combination of these three sectors represents 26% of the jobs in the metro, versus 22% for the nation.



Metro leaders are focused on development or expansion of several industry clusters, including renewable energy, biomedical/personalized medicin advanced business services, manufacturing and distribution, data centers, emerging technology and aerospace and aviation. Several of these sectors capitalize on the many sunny, clear days each year and lower cost of doing business, which is reportedly 40% lower than California. Top employers inclu city, county and state government, Bank of America, Wells Fargo, Raytheon, Arizona State University and Apollo Group, which is the parent company fo Phoenix University and many other accessible education programs.

Table of Contents

Population and household growth slowed in Phoenix during the recession, with an average of 61,840 people (1.5% growth) and 22,160 households (1.5% growth) added annually from 2008 through 2012. From October 2012 to October 2103, Phoenix population and households increased 128,600 (2.9%) and 44,400 (2.8%), respectively. JBREC expects strong population growth of approximately 114,000 people (2.6% growth) and strong household growth of 45,200 households (2.8% growth) in 2014.





The median household income is rising in the Phoenix metro, increasing 3.1% during the 12 months ended October 2013 to nearly $54,100. While the median household income is still below the peak of $55,700 in 2008, JBREC expects continued income growth of 3.3% in 2014 which will bring the meidan income to $55,800.



Phoenix's existing home sales volume has recovered significantly from the low in 2007, but remains below the peak in 2003. Approximately 98,000 existing home sales for the 12 months ended October 31, 2013 were 63% higher than the trough at 60,600 transactions in volume in 2008. JBREC forecasts that existing home sales will reach 99,800 transactions in 2014.

The median existing single-family home price rose 22% during the 12 months ended October 31, 2013 to $192,000, following five years of declining or weak prices. From the 2006 peak to the 2010 trough, the median existing single-family detached home price declined by 54% as a result of sales activity shifting to lower price points, as well as a loss of value. The median home price as of October 2013 is on par with the median price in late 2004 for this market.



New home sales activity increased in Phoenix during the 12 months ended October 31, 2013, and JBREC forecasts strong sales growth for the next several years. New home sales transactions totaled 12,066 for the 12 months ended October 31, 2013, which was up 7.5% from October 2012. JBREC projects that new home sales activity will increase to 18,000 transactions in 2014, which would be the highest level since 2008.



134

Table of Contents

While solid growth is forecasted for the next several years, new home sales activity is likely to remain well below the peak levels achieved in 2005. Very low resale and new home inventory levels paired with recovering demand are driving new home prices higher, as consumers want to take advantage of low mortgage rates and good affordability. New homes typically have a pricing premium over resale homes, and that gap is growing again as housing recovers. DataQuick indicates the October 2013 median price for new homes was $273,737. The median new home price rose 21% during the 12 months ended October 2013 to after declining from the peak of $269,300 in 2006. The median new home price can be heavily influenced by the mix of home types being sold and, as a result, resale home prices are a better indication of market trends.

Phoenix home values rose 20% during the 12 months ended October 31, 2013, following a 16% increase in 2012. These gains offset five years of declining values from 2007 through 2011, during which time home values declined 55% from the 2006 peak, according to JBREC's Burns Home Value Index$^{TM}$. The index provides an estimate of home value trends in an MSA, and is calculated based on an "electronic appraisal" of every home in the market, rather than just the small sample of homes that are actually transacting. JBREC forecasts Phoenix home values to rise by 10% in 2014.



Single-family homebuilding permit activity in the Phoenix metro continues to rise from very low levels, and JBREC forecasts volume to grow in 2013 as the demand for housing increases. Single-family homebuilding permits totaled 12,685 in the 12 months ended October 31, 2013, rising from 7,212 units at the low point of the cycle in 2010. JBREC forecasts that single-family homebuilding permits will reach 20,000 issuances in 2014, which would be the highest level since 2007 in this market.



The pace of job growth is ahead of permit activity in Phoenix, resulting in current demand outpacing the new supply being added to the market. During the 12 months ended October 31, 2013, approximately 2.1 jobs were added to the market for every one homebuilding permit issued. Historically, this ratio has been closer to 1.2 for the Phoenix metro. The ratio is expected to remain elevated at 2.0 in 2014 as employment growth excees new home supply.



The resale inventory has steadily declined in the Phoenix metro through early 2013, but as of October has increased 16% year-over-year. As of October 2013, there were 23,844 listings in the metro, translating to 2.9 months of supply, based on sales activity during the 12 months ended October 2013. A 6.0 month supply is considered equilibrium for most markets. Low levels of inventory could lead to more competitiveness and increasing prices in the resale market. The level of listings as of October 2013 was well below the peak of more than 58,200 listings in October 2007, and the months of supply had been as high as 12.6 months in March 2008.



135

Table of Contents

Pre-foreclosure notices have been declining in the Phoenix metro division since a peak in the fourth quarter of 2009. At the peak, approximately 117,300 notices were issued in Phoenix. In the 12 months ended September 2013, approximately 19,900 notices had been issued, which represents a 59% decline from the 12 months ended September 30, 2012.



There is a relatively high level of potential distressed homes that are not yet on the market and may limit home price appreciation. As of September 2013, the shadow inventory amounted to an estimated 28,969 homes, or 3.7 months of supply at the resale sales rate during the 12 months ended September 2013. JBREC believes that most shadow inventory homes will gradually become distressed sales over the next few years; however, demand for the distressed inventory will exceed the slow pace of inventory coming to market so that material home price declines are unlikely.

When comparing the monthly costs of owning the median-priced home with the median household income, current affordability conditions are still very good in



relation to history in the Phoenix metro. JBREC's Affordability Index takes into consideration the change in mortgage rates over time in its estimate of the ownership costs, which can significantly impact the monthly payment. Affordability conditions at 2012 year-end were near the market's best, and have weakened in 2013 but remain better than normal. JBREC forecasts that affordability conditions in Phoenix will worsen and return to the long-term median in 2014 as home prices and mortgage rates are expected to rise.

In summary, the Phoenix metropolitan area is recovering, with strong job growth that is fueling housing demand. Additional demand for homes by retirees and second-home buyers is not captured in the job growth metrics, which serve as a proxy for demand. Investors have also been active buyers in recent years, helping to clear much of the distress. Because resale and new home inventories are very limited, home prices have been appreciating.

Table of Contents

**Use of Estimates and Forward-Looking Statements**

This market study was prepared by JBREC for The New Home Company in connection with this offering. Founded in 2001, JBREC is an independent research provider and consulting firm focused on the housing industry. The market study contains forward-looking statements which are subject to uncertainty.

The estimates, forecasts and projections prepared by JBREC are based upon numerous assumptions and may not prove to be accurate. This market study contains estimates, forecasts and projections that were prepared by JBREC, a real estate consulting firm. The estimates, forecasts and projections relate to, among other things, home value indices, payroll employment growth, median household income, housing permits and household formation. No assurance can be given that these estimates are, or that the forecasts and projections will prove to be, accurate. These estimates, forecasts and projections are based on data (including third-party data), significant assumptions, proprietary methodologies and the experience and judgment of JBREC. No assurance can be given regarding the accuracy or appropriateness of the assumptions and judgments made, or the methodologies used, by JBREC. The application of alternative assumptions, judgments or methodologies could result in materially less favorable estimates, forecasts and projections than those contained in this market study. Other real estate experts have different views regarding these forecasts and projections that may be more positive or negative, including in terms of the timing, magnitude and direction of future changes.

The forecasts and projections are forward-looking statements and involve risks and uncertainties that may cause actual results to be materially different from the projections. JBREC has made these forecasts and projections based on studying the historical and current performance of the residential housing market and applying JBREC's qualitative knowledge about the residential housing market. The future is difficult to predict, particularly given that the economy and housing markets can be cyclical, subject to changing consumer and market psychology, and governmental policies related to mortgage regulations and interest rates. There will usually be differences between projected and actual outcomes, because events and circumstances frequently do not occur as expected, and the differences may be material. Accordingly, the forecasts and projections included in this market study might not occur or might occur to a different extent or at a different time. For the foregoing reasons, JBREC cannot provide any assurance that the estimates, forecasts and projections contained in this market study are accurate, actual outcomes may vary significantly from those contained or implied by the forecasts and projections, and you should not place undue reliance on these estimates, forecasts and projections. See "Risk Factors—Risks Related to Our Business— estimates, forecasts and projections relating to our markets prepared by JBREC are based upon numerous assumptions and may not prove to be accurate.

137

Table of Contents

# OUR BUSINESS

## Our Company

We are a new generation homebuilder focused on the design, construction and sale of innovative and consumer-driven homes in major metropolitan areas within select growth markets in California, including coastal Southern California, the San Francisco Bay area and metro Sacramento. We also seek to create unique communities via our significant land development expertise, either stand-alone or within master-planned communities developed by third parties. As a new generation homebuilder, we are driven by:

- understanding our target homebuyer customers through extensive research and analytical methods;

- personalizing new home designs to fit our target homebuyers' unique lifestyle needs;

- a tailored, contemporary and technology-enhanced approach to marketing our new homes;

- enhancing the homebuyer experience through high-touch customer service and care;

- selecting attractive investment opportunities, without burdensome legacy issues, that we believe are well-positioned to be developed in a manner that enhances the value of such opportunities; and

- hand-selecting talented employees that share our culture of continuous personal and professional innovation and development.

We were founded in August 2009, towards the end of an unprecedented downturn in the U.S. homebuilding industry, with a combined initial capital commitment of $10 million by our founders, who are also our four most senior executives. Our founders, Larry Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Tom Redwitz, our Chief Operating Officer, have extensive and complementary construction, design, marketing, development and entitlement expertise as well as strong relationships with key land sellers within each of our local markets and have worked together for up to 25 years. Additionally, Mr. Webb and Mr. Stelmar served in similar capacities together at John Laing Homes and oversaw the growth of that business, beginning with the merger of Watt Residential Partners with John Laing Homes in 1998, the leveraged buyout of John Laing Homes in 2001 for $190 million and, finally, orchestrating its timely sale in 2006 for $1.05 billion. Messrs. Webb and Stelmar were instrumental in driving the expansion of John Laing Homes following the merger from a small, multi-market builder to the second largest private builder in the United States at the time of its sale in 2006 (2,891 closings in 2005). We believe that the diverse and complementary skill sets our founders have acquired during their extensive careers in the industry provide an important competitive advantage for our company.

We were formed in 2009, and on August 18, 2010, Watt and IHP were admitted as members. References to our "Predecessor" in this prospectus are references to us prior to August 18, 2010. Our Predecessor's business focused on fee building projects in Southern California, in which we built, marketed and sold homes for independent third-party land owners in prestigious master planned communities typically under The New Home Company name. Fee building represented a capital-efficient method of establishing operations and strengthening relationships with key land owners and developers. Commencing with the $20 million capital commitment by IHP Capital Partners, or IHP, and Watt Residential LLC, or Watt, in August 2010, and the subsequent $10 million capital commitment by Tricon Capital Group, Inc., or Tricon, in January 2011, we began to rapidly deploy capital to acquire land and build homes on larger infill sites within established communities, where we could leverage the experience of our management team in land planning and development. In an effort to sustain a steep growth trajectory while retaining ownership control and generating attractive risk-adjusted returns for all stakeholders, we have employed a joint venture strategy, in which we contribute a minority share of the capital and receive distributions in excess of our percentage capital interest plus management fees. Our joint venture strategy has been instrumental in allowing us to leverage our entity-level capital and establish a homebuilding platform focused on high-growth, land-constrained markets, such as Orange and Los Angeles counties in Southern California and Santa Clara, San Mateo, Marin and Yolo counties in Northern California. In 2012, sales

138

Table of Contents

from unconsolidated joint ventures represented 57% of our total sales, versus 0% in 2011. We intend to continue to use joint venture partnerships to acc
unique market opportunities, including land development opportunities. We intend to invest the proceeds of this offering primarily to accelerate the
contribution from wholly owned projects for our own account.

Fee building represented a capital efficient method for the Company to establish its operations (2009) and strengthen relationships with strategic
landowners. During 2013, the Company significantly expanded its relationships with one master-planned community developer located in Orange County

We employ a local market, consumer-driven approach to designing differentiated homes that meet the unique lifestyle needs of homebuyers across
variety of demographics. Our deeply analytical approach to market research and construction expertise across an extensive product offering allow us the
flexibility to pursue a wide array of land acquisition opportunities and appeal to a broad range of potential homebuyers, including entry-level, move-up,
move-down and luxury-focused customers. Our current product offering (including homes that we are building for our unconsolidated joint ventures)
ranges in price from approximately $300,000 to $3.7 million (excluding 12 units of affordable housing), with home sizes ranging from approximately 800
to 5,300 square feet. Customer-focused community creation and product development, as well as exemplary customer service, are key components of th
lifestyle connection we seek to establish with each homebuyer.

Additionally, we strive to enhance the home-buying experience and buyers' personal investment in their homes through actively engaging them in t
selection of design options and upgrades. Our on-site design studios offer state-of-the-art amenities and a wide variety of structural and design options
across many price points, allowing buyers to personalize any of our home types to meet their unique needs. We believe our design studios are a key sou
of competitive differentiation and contribute to greater profitability through the sale of higher margin options. In 2012, our cancellation rate, excluding our
unconsolidated joint ventures, was 16%, which was below the average of approximately 18.5% for homebuilders who were public in 2012. In 2012, the
cancellation rate for our unconsolidated joint ventures was 5%. In February 2013, we were awarded the Eliant Homebuyers' Choice Award for Best Over
Customer Experience, Best Design Selection Experience and Best Construction Experience among mid-size builders. Our commitment to customer
satisfaction is a key element of our company culture, which we believe fosters an environment where our team members can innovate. We believe our
reputation for high quality, differentiated architecture and design as well high customer satisfaction and company culture enhances our overall financia
performance and generates increased customer loyalty. However, we face significant competition in our markets.

In addition to our award-winning home designs and customer service, an important element of our business strategy is leveraging our substantial la
entitlement and development expertise to add value to the land we acquire. Collectively, our senior executive team as well as our deep bench of manage
talent have decades of experience acquiring land, creating masterplans, obtaining entitlements and completing projects on budget and on schedule.
However, despite our management team's experience, we were formed in 2009 and have a limited operating history. To increase returns and manage ri
associated with larger projects, from time to time, we may seek to sell land at various stages of development to other homebuilders. We believe we have
established a reputation as both successful land developers and high-quality homebuilders, and will continue to focus on optimal capital allocation and
balance between these activities throughout the lives of our projects.

As of September 30, 2013, our homebuilding operations consisted of eight communities, three of which are actively selling, containing 329 lots und
various stages of development. In addition, our unconsolidated joint venture homebuilding projects consisted of 28 communities, four of which are active
selling, containing 1,761 lots, as described below, in Southern California, the San Francisco Bay area and metro Sacramento. The 28 unconsolidated joi
venture communities are located in Irvine (Orange County – three communities), Larkspur (Marin County – three communities), San Jose (Santa Clara
County – three communities), Calabasas (Los Angeles County – one community), Folsom (Sacramento County – 12 communities), Newport Beach (Oran
County – one community), San Juan Capistrano (Orange County – one community) and Santa Clarita

Table of Contents

(Los Angeles County – four communities). Additionally, as of September 30, 2013, we operated seven communities, five of which are actively selling, containing 887 lots under fee building projects in Southern California and Northern California.

### Lots and Communities as of September 30, 2013

| | Total | | Actively Selling | |
| | Lots | Communities | Lots | Communities |
|---|---|---|---|---|
| Company | 329 | 8 | 78 | 3 |
| Unconsolidated Joint Ventures | 1,761 | 28 | 328 | 4 |
| Fee Building | 887 | 7 | 528 | 5 |

Since August 2009, we have delivered 169 homes at Company projects, 116 homes through our unconsolidated joint ventures, and 294 homes through our fee building projects. These communities are located in prestigious master-planned communities in California. Our management team has longstanding relationships with leading masterplan community developers in each of our core markets and, through these relationships, we are generally invited to participate in new lot offerings. Home sales revenues for our Company projects and our unconsolidated joint venture activities were $25.6 million and $0, respectively, in 2011, $24.2 million and $56.0 million, respectively, in 2012, and $24.7 million and $105.0 million, respectively, for the nine months ended September 30, 2013, and our business mix has shifted to projects in which we have a significant financial interest (directly or in unconsolidated joint ventures). As of September 30, 2013, we owned or controlled 826 lots and our unconsolidated joint ventures owned or controlled 3,040 lots. As of September 30, 2013, we owned 329 lots and controlled 497 lots, and our unconsolidated joint ventures owned 1,761 lots and controlled 1,279 lots. In addition, at such date, we controlled 887 additional lots under fee building contracts. Cumulatively, we believe these lots represent supply to support our current growth plan over the next several years. We believe that our current inventory of owned and controlled lots and lots under land option or purchase contracts will be adequate to supply our and our unconsolidated joint ventures' homebuilding operations' projected closings through 2016. We seek to invest only in land inventory that we can efficiently develop for homebuilding over a 24- to 36-month horizon in order to increase our returns on capital and reduce our exposure to market risk. We continually evaluate new communities and believe we have an attractive pipeline of land acquisition opportunities.

For the nine months ended September 30, 2013, we had net income of $2.9 million, and for the years ended December 31, 2012 and 2011, we experienced net losses of $1.4 million and $2.3 million, respectively.

In Southern California, we owned or controlled 473 lots as of September 30, 2013, and our unconsolidated joint ventures owned or controlled 567 lots. Each of these unconsolidated joint ventures will develop lots and build and sell homes. We and our unconsolidated joint ventures plan to open sales locations at five communities by September 30, 2014. In addition, we controlled six fee building projects that contain a total of 544 homes remaining to be built in Irvine and Dana Point (Orange County) and Carlsbad (San Diego County).

In the San Francisco Bay area, we owned or controlled 162 lots as of September 30, 2013 and our unconsolidated joint ventures owned or controlled 728 lots. The lots owned by unconsolidated joint ventures consist of 85 lots in Larkspur (Marin County) and 239 lots in San Jose (Santa Clara County) intended for homebuilding activity. The lots controlled by unconsolidated joint ventures consist of 404 lots in Foster City (San Mateo County). Of these, approximately 200 lots are intended for homebuilding activity some of which we may purchase for Company projects. We anticipate that the remaining lots will be sold and developed by others, primarily for other residential uses. We plan to open sales locations at five new communities through our unconsolidated joint ventures located in Larkspur (two communities) and San Jose (three communities) by March 31, 2014.

In metro Sacramento, we owned or controlled 191 lots in established market areas in El Dorado, Placer and Sacramento counties and our unconsolidated joint ventures owned or controlled 1,745 lots as of September 30, 2013. One joint venture owned 870 lots in Sacramento County (Russell Ranch). We expect to acquire and

Table of Contents

develop 547 lots in Davis (Yolo county) and 328 lots in McKinley Village (Sacramento County) through unconsolidated joint ventures. We are in the process of creating masterplans containing eight communities in Davis and 12 communities in Russell Ranch, under which we may acquire lots from the unconsolidated joint venture and build homes for our own account in addition to selling lots to other homebuilders. We plan to open sales locations at three new communities located in Granite Bay (Placer County), Natomas (Sacramento County), and El Dorado Hills (El Dorado County) by September 30, 20 We anticipate that the McKinley Village community will contain 328 homes in four product types. In addition, we controlled one fee building project that contains a total of 343 homes remaining to be built in Davis (Yolo County).

### Owned and Controlled Lots

| Market | As of September 30, 2013 | | | Activity October 1 to December 7, 2013 | | | | | As of December 7, 2013 |
|---|---|---|---|---|---|---|---|---|---|
| | Lots Owned | Lots Controlled (1) | Lots Owned and Controlled (1) | Project Location | Status | Lots Controlled | Commun- ities | Purchase Price, Net ($mm) | Total Lots Owned or Controlled |
| Company | | | | | | | | | |
| Southern California | 170 | 303 | 473 | | | | | | 473 |
| Northern California | 159 | 194 | 353 | | | 207 | 3 | 32.25 | 560 |
| | | | | Alameda | LOI (2) | 167 | 2 | 30.25 | |
| | | | | Winters | Contract | 40 | 1 | 2.0 | |
| **Total — Company** | 329 | 497 | 826 | | | | | 32.25 | 1,033 |
| **Unconsolidated Joint Ventures** (3) | 1,761 | 1,279 | 3,040 | | | — | — | — | 3,040 |
| **Fee Building Projects** | — | 887 | 887 | | | 814 | 5 | — | 1,701 |
| | | | | Irvine-Jasmine | Contract | 228 | 1 | — | |
| | | | | Irvine-Corte Bella | Contract | 119 | 1 | — | |
| | | | | Irvine-Terrazza | Contract | 149 | 1 | — | |
| | | | | Irvine-Vista Scena | Contract | 195 | 1 | — | |
| | | | | Irvine-Entrada | Contract | 123 | 1 | — | |

_____

(1)  All 497 lots and 1,279 lots that we and our unconsolidated joint ventures, respectively, control are under purchase and sale agreements.

(2)  Letter of Intent, or LOI, reflects executed non-binding letters of intent that are subject to customary conditions and have not yet closed, and there ca be no assurance that such closings will occur.

(3)  We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different unconsolidate joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "Our Business—Joint Ventures."

Net new home orders for our projects for the nine months ended September 30, 2013 and the years ended December 31, 2012 and 2011 were 66 homes, 72 homes and 45 homes, respectively. Net new home orders for our unconsolidated joint venture projects for the nine months ended September 30, 2013 and the year ended December 31, 2012 were 111 homes and 96 homes, respectively. For the nine months ended September 30, 2 and the year ended December 31, 2012, we delivered 59 homes and 53 homes, respectively, from our projects and 74 and 42 homes, respectively, from unconsolidated joint venture projects. For the year ended December 31, 2011, we delivered 49 homes from our projects and no homes from our unconsolidated joint venture projects for total home sales revenue of $25.6 million. The dollar amount of our backlog of homes sold but not closed for ou projects as of September 30, 2013 was approximately $20.0 million. The dollar amount of the backlog of homes sold but not closed for our unconsolidate joint venture projects as of September 30, 2013 was approximately $93.5 million.

Table of Contents

We operate our business through The New Home Company LLC, which, prior to the completion of this offering, will be converted into a Delaware corporation and renamed The New Home Company Inc. The members of The New Home Company LLC, which include TNHC Partners LLC (the founders), IHP, Watt and Tricon, will receive an aggregate of 8,636,250 shares of our common stock in connection with our conversion into a corporation.

## Our Competitive Strengths

We believe the following strengths will provide us with a significant competitive advantage in implementing our business strategy:

### Experienced and Proven Leadership Supported by a Talented Senior Management Team

Our founders have worked together for various periods of up to 25 years and have successful track records of managing and growing homebuilding companies. Their combined real estate industry experience includes land acquisition, entitlement, master-planned community creation, land development, home construction, financing, marketing and sales of single-family detached and attached homes in communities in a variety of markets. Prior to forming our company in 2009, Messrs. Webb and Stelmar worked together for 11 years at John Laing Homes, from its formation in 1998, ultimately serving as its Chief Executive Officer and Chief Financial Officer, respectively. In 2001, Messrs. Webb and Stelmar led the leveraged buyout of John Laing Homes for $190 million (representing a purchase price of approximately 1.0x book value), resulting in GMAC/RFC becoming the majority owner, and successfully orchestrated the timely sale of John Laing Homes in 2006 for $1.05 billion (representing a sale price of approximately 3.4x book value). Mr. Redwitz joined John Laing Homes in 2002 as President of its Laing Luxury Division, having served previously as President of Taylor Woodrow's Southern California division from 1999 to 2002. In addition, Mr. Davis brings over 40 years of land development and entitlement experience and served for eleven years as President of Irvine Community Development Corporation, a subsidiary of The Irvine Company and developer of the Irvine Ranch, a 125,000 lot master-planned community containing approximately 40 villages located in Orange County, California. However, despite our management team's experience, we were formed in 2009 and have a limited operating history.

We believe that our founders' extensive experience, relationships, local market knowledge and reputation provide us with a competitive advantage in being able to acquire land, create masterplans, obtain entitlements, build quality homes and complete projects on budget and on schedule. Our executives are supported by a talented senior management team that was assembled at a time of dislocation in the homebuilding industry and was hand-picked to bring deep organizational strength designed to ensure execution of management's business plan.

Our founders have made and continue to hold a significant investment in the Company. Collectively, Messrs. Webb, Stelmar, Redwitz and Davis have invested $15 million cumulatively since the Company's formation in 2009. Upon the completion of this offering, they will collectively beneficially own 2,886,687 shares of our common stock (excluding options to purchase 772,727 shares of our common stock, with a strike price of $11.00 per share, to be granted in connection with this offering), which will represent 17.5% of our common stock outstanding immediately after this offering.

### Significant Land Positions in Our Markets to Support Growth Plan

We believe that we have strong land positions strategically located within our core markets, many of which were acquired during the downturn and are controlled at favorable prices. The prior experience of our founders in the creation of thoughtful land plans and consumer-driven architecture provides us the ability to create unique communities, enhancing the value of our homes. Our Southern California assets are well located along key transportation corridors in major job centers in our submarkets. In the San Francisco Bay area, our assets are located within and around the Silicon Valley, a major employment center. In Sacramento, our assets are located in infill or existing master-planned communities, located near major employment centers, with a concentration of larger technology and medical companies and strong school districts.

142

Table of Contents

As of September 30, 2013, in California, we owned or controlled 826 lots, our unconsolidated joint ventures owned or controlled 3,040 lots, and we controlled 887 lots under fee building arrangements. We owned 78 lots, and our unconsolidated joint ventures owned 771 lots, on which we had commenced development. An additional 528 lots were under development and subject to fee building contracts. The remaining lots were owned or controlled and in various stages of pre-development activities with development expected to begin during 2014.

### Focus on Attractive Growth Markets in California

We are currently focused on identifying unique sites and creating communities that allow us to design, construct and sell consumer-driven single-family detached and attached homes in major metropolitan areas in coastal Southern California, the San Francisco Bay area and metro Sacramento. Given our existing land positions, strong local relationships and reputation for quality building, we believe our business is well-positioned to capitalize on the housing market recovery underway in these markets. However, we face significant competition in our markets and during the most recent downturn the California housing market experienced a deeper and longer decline than many other markets. According to JBREC, these regions represent some of the largest single family housing markets in the country, as defined by sales, starts and building permits. In coastal Southern California, we principally operate in the counties of Orange, San Diego, Los Angeles and Ventura. In the San Francisco Bay area, we principally operate in the counties of Santa Clara, San Mateo and Marin, while in metro Sacramento, we operate primarily in the counties of El Dorado, Placer, Sacramento and Yolo. These markets are generally characterized as infill markets with barriers to entry, job growth and increasing populations, which can create growing demand for new housing. Moreover, our management team has deep local market knowledge of the California homebuilding and the land planning and development businesses. We believe this experience and strong relationships with local market participants uniquely enable our company to source site acquisitions and achieve land entitlements to fuel our growth.

### History of Operational Discipline

Our management team possesses extensive and valuable expertise, including in the growth and operation of a much larger homebuilder controlled by a large public company. The perspective gained from leadership roles with companies such as John Laing Homes, Taylor Woodrow, The Irvine Company and others has helped shape the strict discipline and hands-on management approach that we believe has been a key component of our initial success. Our weekly project activity performance management to semi-monthly operations reviews covering each project combined with financial accountability at the project level, our strict operating discipline is a key part of our strategy to increase returns while effectively managing risk. However, like other growing companies, we face challenges in expanding our operations while trying to manage risk and maintaining our disciplined and hands-on approach. Our management team has drawn upon the deep real estate knowledge base of IHP, Watt and Tricon personnel and their substantial experience in investing in real estate. Additionally, IHP and Tricon have made off-market opportunities available to us through affiliates and may make additional opportunities available to us in the future.

We also have strong relationships with institutional joint venture partners, including Westbrook, Encore Housing, Hillwood, Tricon, IHP and Resmark. As of September 30, 2013, we had ten unconsolidated joint ventures with these partners, with total assets of $287.7 million and total capital contributed by the partners of $173.7 million, as well as $28.2 million contributed by us. We believe that these relationships may provide us with access to future land opportunities controlled by them.

### Absence of Legacy Issues Allows Us to Focus on the Growth of Our Business

Our absence of legacy issues enables us to focus on the growth of our business, as opposed to diverting attention and resources to manage troubled assets or other legacy issues. Our land inventory was accumulated following the investment in us by IHP and Watt in August 2010 and by Tricon in January 2011, and we do not have any existing distressed assets or liabilities to manage, unlike many competitors that were affected by the

143

Table of Contents

unprecedented downturn in the real estate markets that resulted from the recession during 2008 and 2009. All of our real estate assets were acquired and located in markets that we targeted after the downturn commenced. However, there can be no assurance that our land inventory will not decline in value from the prices that we paid.

## Our Business Strategy

Our business strategy is focused on the design, construction and sale of consumer-driven new homes in planned communities in major metropolitan areas located in coastal Southern California, the San Francisco Bay area and metro Sacramento. Our business strategy is driven by the following:

### Disciplined Acquisition of Attractive Land Positions

We believe that we have strong land positions strategically located within our core markets, many of which were acquired or that we acquired control over during the downturn in the market. We believe that our professional reputation and long-standing relationships with key land sellers including master plan community developers, brokers and other builders, as well as our institutional investors and joint venture partners, enable us to acquire well-positioned land parcels in our existing markets as well as new target markets. The strength of these relationships often provides us with a first look at acquisition opportunities and allows us to negotiate terms based on our reputation for delivering on our promises.

In addition, we plan to continue to leverage the strength of our land planning and land development expertise in each local market to position us to add value to our land, capture incremental profit opportunities and provide a steady supply of lots to support the significant planned growth of our homebuilding business. Land development and planning operations are overseen by Joseph Davis, one of our founders and our Chief Investment Officer, who has over 40 years of industry experience. Collectively, the five senior professionals in charge of our land acquisition and planning activities have over 90 years of experience and extensive relationships that help us to achieve entitlements in a timely manner in order to reduce market risk. We only seek to acquire land where we believe our development and entitlement skills can help us earn a risk-adjusted return that is accretive to our overall return on land that is in excess of existing market opportunities.

As of September 30, 2013, in California, we owned or controlled 826 lots and our unconsolidated joint ventures owned or controlled 3,040 lots. In addition, we controlled 887 lots under fee building arrangements. We owned 329 lots and our unconsolidated joint ventures owned 1,761 lots. We controlled 497 lots and our unconsolidated joint ventures controlled 1,279 lots. We believe that our strategy of holding an inventory of land that will provide us with a two- to three-year supply of developed lots for our homebuilding operations and focusing on the entitlement and development of parcels, primarily in our land development joint ventures, that we can complete within approximately 24 to 48 months from the date the property is acquired allows us to control our exposure to land development and market cycle risk while pursuing attractive returns on our capital. Furthermore, we have stringent underwriting return criteria that measure entitlement, development, market and financing risks for each proposed acquisition. These risks are quantified and a numeric risk value is determined, which is used to set our minimum required unleveraged internal rate of return for the proposed acquisition.

We further seek to reduce our exposure to land risk through the use of land options, joint ventures and other flexible land acquisition arrangements. Our joint venture strategy has been instrumental in allowing us to leverage our entity-level capital and establish a homebuilding platform focused on high-growth, land-constrained markets.

### Deliver a Diverse, Consumer-Driven Product Offering and a Superior Home Experience

We consider ourselves a local market, consumer-driven homebuilder with expertise across a wide variety of product types and customer segments, including the entry-level, move-up, move-down and luxury-focused customer segments. In addition to understanding the key economic drivers of demand in our markets, we focus on

144

Table of Contents

understanding the pool of potential buyers, the product types sought by those buyers and the proper price point for the product types in each market. We perform extensive consumer research that helps us create land plans and design homes that meet the needs and desires of our specific targeted buyers homes are competitively priced, but are not designed to be the lowest cost option in the market. Our core operating philosophy is to provide a positive, memorable experience to our homeowners through active engagement in the building process, tailoring our product to the buyer's lifestyle needs and enhancing communication, knowledge and satisfaction. Our selling process focuses on the homes' features, benefits, quality and design. Our customers experience is measured by an independent survey company, beginning with the sales process. This customer feedback continues to be measured well a the buyer closes on the sale. Ultimately, we use direct customer feedback we receive to improve and differentiate the quality of our home products, sellir experience and service for our customers.

A key element of our strategy is to allow all buyers to personalize their homes regardless of the price point. Unlike many homebuilders with centralized locations to which buyers can travel to select options and upgrades, each of our communities has an on-site design center with a dedicated designer knowledgeable about the attributes of the homes offered in the community. The specific options and upgrades, both structural and finishes, available for the community are selected by our buyers as they navigate the buying process. These options and upgrades in many cases can form a substantial part of the total purchase price of a home and are typically priced with profit margins well in excess of the profit margins on the base home purchase before the options and upgrades. We also believe that the active participation of buyers in selecting options and upgrades results in buyers becoming more personally invested in their homes. In 2012, our cancellation rate, excluding our unconsolidated joint ventures, was 16%, which was belo the average of approximately 18.5% for homebuilders who were public in 2012. In 2012, the cancellation rate for our unconsolidated joint ventures was 5%.

We spend extensive amount of time studying and designing our products through the selection of architects, consultants and homeowner focus gro for all levels and price points in our target markets. We believe our diversified product strategy enables us to better serve a wide range of buyers, adapt quickly to changing market conditions and improve performance and returns while strategically reducing portfolio risk. We believe these steps improve th selling process, lead to a more satisfied homeowner, increase the number of buyers referred to our communities and enhance our operating results.

### Increase Active Community Count in Our Markets

Our belief that homebuilding is a local market business supports our strategy to pursue significant opportunities to expand our business in our exist markets. We continually review the allocation of capital among our markets, based on both aggregate demographic information and our own operating results. We use the results of these reviews to focus our investments on those markets where we believe we can increase our profitability and return on capital. Additionally, we engage in limited speculative building and proceed with community development in phases where we believe it is economically feasible to do so with the goal of optimizing community design and increasing profits. While our primary growth strategy will focus on increasing our market position in our existing markets, we are exploring expansion opportunities in Phoenix and the Pacific Northwest and may consider other markets, through organic growth or acquisitions.

### Vigilant Focus on Cost Structure

Cost control throughout our business permeates our corporate culture. Our management team maintains its focus on controlling costs and in implementing measures designed to ensure that our organization is efficient. We competitively bid each phase of development while maintaining strong relationships with our trade partners. We manage production schedules closely and, while respecting our valued relationships, require accountability from our vendors and trade partners.

We have made significant investments in systems in order to be responsive to the reporting and other needs of our institutional investors. These systems are designed to enable us to operate our business efficiently. We believe that our systems and infrastructure are designed to be scalable and w support the planned growth of our Company.

145

Table of Contents

*Prudent Use of Leverage to Enhance Shareholder Returns*

Our seasoned management team has experienced many cycles in the housing market and our four most senior executives have made substantial personal investments in us. We seek to increase stockholder value over the long-term, and operate our business to mitigate risks from downturns in the market and position ourselves to capitalize on upturns. We intend to employ both debt and equity as part of our ongoing financing strategy, coupled with redeployment of cash flow from continuing operations, to provide us with the financial flexibility to access capital on favorable terms. In that regard, we expect to employ prudent levels of leverage to finance the acquisition and development of our lots and construction of our homes. Upon completion of the offering, we expect to have leverage on a debt to book capitalization basis of less than 20%. Our existing indebtedness is both recourse and non-recourse to us and we anticipate that future indebtedness will be likewise. As of September 30, 2013, we had approximately $46.8 million of loan commitments, of which $17.0 million was outstanding. At that date, our aggregate loan commitments consisted primarily of project-specific revolving loans and a loan from a land seller secured by the land. Additionally, at September 30, 2013, our unconsolidated joint ventures had approximately $137.7 million of loan commitments, of which $70.3 million was outstanding. We provide limited recourse to the lenders under $100.9 million of the unconsolidated joint venture loan commitments, of which $39.8 million was outstanding.

We expect to incur indebtedness to supplement our investment capital. We are in discussions to obtain commitments for an unsecured revolving credit facility that we anticipate will be in place following completion of the offering. We expect that the proposed facility will consist of a borrowing base of our existing and future real estate assets, and will contain customary financial covenants. The proposed facility will be used to fund land acquisition and development expenditures and home construction and for general corporate purposes. There is no assurance that we will be able to enter into a definitive agreement relating to this proposed credit facility on terms we find acceptable.

Beyond our anticipated credit facility, we intend to use other financing methods as necessary, potentially including preferred equity, secured and unsecured corporate-level debt, property-level debt and other public, private or bank debt. When possible and desirable, we will seek to replace short-term sources of capital with long-term financing.

146

Table of Contents

## Project Sales by Market

The following table sets forth home sales revenue and units delivered by market for our projects in which we built and sold the homes for our accou during the nine months ended September 30, 2013 and the years ended December 31, 2012, 2011 and 2010. In addition, the following table sets forth u delivered by market during those periods for our unconsolidated joint ventures and our fee building projects, in which we built the homes for independent third-party property owners. In our fee building business, we receive management fees for homes we build for independent third-party property owners a do not record the home sales revenue from the homes sold.

| | Nine Months Ended September 30, 2013 | | Year Ended December 31, | | | | | |
| | | | 2012 | | 2011 | | 2010 | |
| | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered | Home Sales Revenue | Units Delivered |
| | | | | | (dollars in thousands) | | | |
| **Southern California** | | | | | | | | |
| *Company Projects* | | | | | | | | |
| **Orange County:** | | | | | | | | |
| Stonetree Manor, Irvine | $ — | — | $ — | — | $ 9,916 | 14 | $ 674 | 1 |
| Four Quartets, Irvine | — | — | 980 | 2 | 5,146 | 11 | — | — |
| **Total—Southern California** | — | — | 980 | 2 | 15,062 | 25 | 674 | 1 |
| **Northern California** | | | | | | | | |
| *Owned Projects* | | | | | | | | |
| **Sacramento County:** | | | | | | | | |
| Madeira, Elk Grove | — | — | 3,364 | 10 | 5,842 | 17 | 2,338 | 7 |
| Marbella, Folsom | — | — | 1,527 | 5 | — | — | — | — |
| Folsom Trails, Folsom | 17,376 | 44 | 3,303 | 9 | — | — | — | — |
| **Placer County:** | | | | | | | | |
| Strada, Roseville | — | — | — | — | 933 | 5 | — | — |
| Lincoln, Roseville | 3,780 | 11 | 4,326 | 14 | 627 | 2 | — | — |
| Granite Bay, Granite Bay | 3,579 | 4 | 10,698 | 13 | — | — | — | — |
| **Total—Northern California** | 24,735 | 59 | 23,218 | 51 | 7,402 | 24 | 2,338 | 7 |
| **Total—Company** | $ 24,735 | 59 | $ 24,198 | 53 | $ 22,464 | 49 | $ 3,012 | 8 |
| *Unconsolidated Joint Ventures* [1] | | | | | | | | |
| **Orange County:** | | | | | | | | |
| Lambert Ranch-Field, Irvine | $ 28,012 | 26 | $ 14,466 | 14 | $ — | — | $ — | — |
| Lambert Ranch-Hill, Irvine | 37,764 | 24 | 21,131 | 15 | — | — | — | — |
| Lambert Ranch-Grove, Irvine | 39,226 | 24 | 20,421 | 13 | — | — | — | — |
| **Total—Unconsolidated Joint Ventures** | $ 105,002 | 74 | $ 56,018 | 42 | $ — | — | $ — | — |
| *Fee Building Projects* | | | | | | | | |
| **Orange County:** | | | | | | | | |
| Carmel, Irvine [2] | | — | | — | | 47 | | 49 |
| Toscana, Irvine [3] | | 45 | | 41 | | — | | — |
| San Marino, Irvine [3] | | 38 | | 9 | | — | | — |
| Mendocino, Irvine [3] | | 65 | | | | | | |
| **Total—Fee Building Projects** | | 148 | | 50 | | 47 | | 49 |

[1] Home sales revenue from unconsolidated joint ventures reflects the entire amount of home sales revenue of such joint ventures and not our share thereof. We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under "—Joint Ventures." Revenue from unconsolidated joint ventures is not included in our revenue for generally accepted accounting principles, or GAAP, purposes, but is recognized as a component of equity in net (income) loss of unconsolidated joint ventures. These figures are included here for informational purposes only.

Table of Contents

(2) We entered into a fee building agreement to build homes in this community for an independent third-party owner. This project was marketed under T
New Home Company brand name.

(3) We entered into a fee building agreement to build homes in this community for an independent third-party property owner. This project is marketed under the independent third-party property owner's name.

## Description of Completed Projects and Communities under Development

Our homebuilding projects usually take approximately 24 to 36 months to complete from the initiation of homebuilding activity. The following table presents project information relating to each of our markets as of September 30, 2013 and includes information for all completed projects from our inception and current projects under development where we are building and selling homes for our own account or for our unconsolidated joint ventures, completed projects from our inception and current projects under development where we are acting as a fee builder.

| County, Project, City | Year of First Delivery (1) | Total Number of Homes to Be Built at Completion (2) | Cumulative Units Delivered as of September 30, 2013 | Backlog at September 30, 2013(3) | Lots as of September 30, 2013(4) | Sales Range (in thousands) (5) | Home Size Range (sq. ft.)(6) |
|---|---|---|---|---|---|---|---|
| *Company Projects* | | | | | | | |
| **Southern California** | | | | | | | |
| Los Angeles County: | | | | | | | |
| Canyon Oaks, Calabasas | 2016 | 150 | — | — | 150 | $625 - $785 | 1,800 - 2,317 |
| Orange County: | | | | | | | |
| Four Quartets, Irvine | 2011 | 13 | 13 | — | — | $372 - $554 | 1,132 - 1,745 |
| Stonetree Manor, Irvine | 2011 | 15 | 15 | — | — | $635 - $732 | 1,964 - 2,268 |
| Ventura County: | | | | | | | |
| Twenty Oaks, Thousand Oaks | 2014 | 20 | — | — | 20 | $974 - $1,070 | 2,900 - 4,016 |
| **Southern California Total** | | **198** | **28** | **—** | **170** | | |
| | | | | | | | |
| **Northern California** | | | | | | | |
| El Dorado County: | | | | | | | |
| Blackstone, El Dorado Hills | 2015 | 71 | — | — | 71 | $434 - $454 | 2,000 - 2,333 |
| Placer County: | | | | | | | |
| Lincoln Crossing, Lincoln | 2011 | 27 | 27 | — | — | $324 - $415 | 1,948 - 2,350 |
| Strada, Roseville | 2011 | 5 | 5 | — | — | $180 - $197 | 1,271 - 1,462 |
| Granite Bay, Granite Bay | 2012 | 17 | 17 | — | — | $733 - $985 | 2,809 - 3,680 |
| Olive Ranch, Granite Bay | 2013 | 12 | — | 11 | 12 | $850 - $1,252 | 3,252 - 3,834 |
| Sacramento County: | | | | | | | |
| Madeira, Elk Grove | 2010 | 34 | 34 | — | — | $273 - $369 | 1,948 - 2,204 |
| Marbella, Folsom | 2012 | 5 | 5 | — | — | $343 - $405 | 1,874 - 2,203 |
| The Trails, Folsom | 2012 | 79 | 53 | 21 | 26 | $353 - $506 | 1,874 - 2,203 |
| The Meadows, Folsom | 2013 | 40 | — | — | 40 | $427 - $472 | 2,061 - 2,350 |
| Candela, Sacramento | 2014 | 10 | — | — | 10 | $296 - $319 | 1,541 - 1,801 |
| **Northern California Total** | | **300** | **141** | **32** | **159** | | |
| **Total Company Projects** | | **498** | **169** | **32** | **329** | | |
| *Unconsolidated Joint Venture Projects (7)* | | | | | | | |
| **Southern California** | | | | | | | |
| Los Angeles County: | | | | | | | |
| Aqua, Villa Metro, Valencia | 2013 | 95 | — | 17 | 95 | $306 - $354 | 1,105 - 1,441 |
| Terra, Villa Metro, Valencia | 2013 | 99 | — | 10 | 99 | $348 - $400 | 1,420 - 1,745 |
| Sol, Villa Metro, Valencia | 2013 | 99 | — | 12 | 99 | $375 - $434 | 1,610 - 1,998 |
| Cielo, Villa Metro, Valencia | 2014 | 22 | — | — | 22 | $350 - $439 | 1,764 - 2,391 |
| Village at Calabasas, Calabasas | 2015 | 87 | — | — | 87 | $1,114 - $1,393 | 2,038 - 2,549 |
| Orange County: | | | | | | | |
| The Field, Lambert Ranch, Irvine | 2012 | 66 | 40 | 25 | 26 | $940 - $1,489 | 2,784 - 3,053 |
| The Hill, Lambert Ranch, Irvine | 2012 | 45 | 39 | 6 | 6 | $1,264 - $2,217 | 3,423 - 3,808 |
| The Grove, Lambert Ranch, Irvine | 2012 | 58 | 37 | 21 | 21 | $1,500 - $2,100 | 4,281 - 4,596 |
| Meridian, Newport Beach | 2014 | 79 | — | — | 79 | $2,000 - $3,700 | 2,726 - 3,170 |
| Oliva, San Juan Capistrano | 2014 | 33 | — | — | 33 | $1,600 - $2,025 | 3,812 - 5,291 |
| **Southern California Total** | | **683** | **116** | **91** | **567** | | |

148

Table of Contents

| County, Project, City | Year of First Delivery (1) | Total Number of Homes to Be Built at Completion (2) | Cumulative Units Delivered as of September 30, 2013 | Backlog at September 30, 2013 (3) | Lots as of September 30, 2013 (4) | Sales Range (in thousands) (5) | Home Size Range (sq. ft.) (6) |
|---|---|---|---|---|---|---|---|
| **Northern California** | | | | | | | |
| Marin County: | | | | | | | |
| The Collection, Rose Lane, Larkspur | 2014 | 29 | — | — | 29 | $1,885 - $2,864 | 1,649 - 3,539 |
| Garden House, Rose Lane, Larkspur (8) | 2014 | 14 | — | — | 14 | $850 - $1,000 | 898 - 1,280 |
| Terraces, Rose Lane, Larkspur (8) | 2014 | 42 | — | — | 42 | $1,005 - $1,348 | 772 - 1,601 |
| Santa Clara County: | | | | | | | |
| Row Towns, Orchard Park, San Jose | 2014 | 107 | — | — | 107 | $690 - $815 | 1,645 - 2,181 |
| Court Towns, Orchard Park, San Jose | 2014 | 60 | — | — | 60 | $680 - $770 | 1,690 - 2,243 |
| Condo Flats, Orchard Park, San Jose | 2014 | 72 | — | — | 72 | $690 - $775 | 1,653 - 2,164 |
| Sacramento County | | | | | | | |
| Russell Ranch, Folsom | 2015 | 870 | — | — | 870 | $475 - $690 | 2,450 - 3,450 |
| **Northern California Total** | | **1,194** | **—** | **—** | **1,194** | | |
| **Total—Unconsolidated Joint Venture Projects** | | **1,877** | **116** | **91** | **1,761** | | |
| *Fee Building Projects* | | | | | | | |
| **Southern California** | | | | | | | |
| Orange County: | | | | | | | |
| Carmel, Irvine | 2011 | 96 | 96 | — | — | $899 - $1,206 | 2,616 - 2,846 |
| San Marino, Irvine (9) | 2012 | 47 | 47 | — | — | $900 - $1,100 | 2,808 - 3,761 |
| Toscana, Irvine (9) | 2011 | 86 | 86 | — | — | $1,000 - $1,300 | 2,806 - 3,137 |
| Mendocino, Irvine (9) | 2013 | 133 | 65 | 68 | 68 | $800 - $950 | 2,221 - 2,452 |
| The Strand, Dana Point (9) | 2014 | 2 | — | 2 | 2 | $5,000 - $5,700 | 6,436 - 7,855 |
| Mendocino Ext., Irvine (9) | 2014 | 114 | — | — | 114 | $800 - $950 | 2,221 - 2,452 |
| Strada, Irvine (9) | 2014 | 224 | — | — | 224 | $850 - $950 | 2,178 - 2,680 |
| Laurel, Irvine (9) | 2014 | 120 | — | — | 120 | $800 - $900 | 2,170 - 2,493 |
| San Diego County: | | | | | | | |
| Carlsbad 16, Carlsbad | 2014 | 16 | — | — | 16 | $750 - $990 | 2,900 - 3,750 |
| **Southern California Total** | | **838** | **294** | **70** | **544** | | |
| **Northern California** | | | | | | | |
| Yolo County: | | | | | | | |
| West Village (9) | 2014 | 343 | — | — | 343 | $357 - $458 | 1,416 - 2,045 |
| **Northern California Total** | | **343** | **—** | **—** | **343** | | |
| **Total—Fee Building Projects** | | **1,181** | **294** | **70** | **887** | | |

(1) Year of first delivery for future periods is based upon management's estimates and is subject to change.

(2) The number of homes to be built at completion is subject to change, and there can be no assurance that we will build these homes.

(3) Backlog consists of homes under sales contracts that had not yet closed as of September 30, 2013, and there can be no assurance that closing of sold homes will occur. Backlog has not been reduced to reflect our historical cancellation rate.

(4) Consists of owned lots, fee building lots and unconsolidated joint venture as of September 30, 2013, including owned lots, fee building lots and unconsolidated joint venture lots in backlog as of September 30, 2013. Of the foregoing lots, there were no completed and unsold homes other than those being used as model homes.

(5) Sales price range reflects actual total price for homes already sold in the respective project and, where sales have not yet commenced for a projects, anticipated sales prices for homes to be sold. The actual prices at which our homes are sold in the future may differ.

(6) Reflects actual home size range for homes already sold in the respective projects and, where sales have not yet commenced for a project, anticipated home size ranges for homes to be sold. The actual home size ranges may differ.

(7) We own economic interests in our unconsolidated joint ventures, which include our capital interests that range from 5% to 35% plus, in each case, a share of the distributions from the joint ventures in excess of our capital interest. These economic interests vary among our different joint ventures. A description of such share of distributions in excess of our capital interest for each of our joint ventures is described under " —Joint Ventures."

(8) Garden House and Terraces have nine and five below-market homes, respectively, as required by the Housing Authority of the County of Marin. The price range for these homes is $181,000 to $425,000 and is excluded from the sales price range reflected in the table.

(9) We entered into a fee building agreement to only build homes in this community for an independent third-party property owner. The project is marketed under the third-party owner's name.

149

Table of Contents

## Pending Acquisitions

As of September 30, 2013, we and our unconsolidated joint ventures had options or were under contract to acquire land for an aggregate purchase price of approximately $194.2 million and $60.1 million, respectively, in each case net of deposits. As of September 30, 2013, we and our unconsolidated joint ventures had paid $3.0 million and $4.5 million, respectively, in non-refundable deposits relating to these pending acquisitions. The following table presents certain information with respect to each of these pending acquisitions as of September 30, 2013.

| | Company | | | Unconsolidated Joint Ventures | | |
|---|---|---|---|---|---|---|
| Market | Total Lots Controlled (1) | Communities | Aggregate Purchase Price, Net (2) | Total Lots Controlled (3) | Communities | Aggregate Purchase Price, Net (4) |
| Southern California | 303 | 5 | $153,422,000 | 0 | 0 | $ — |
| San Francisco Bay Area | 162 | 3 | $ 33,250,000 | 404 | 3 | $29,000,000 |
| Metro Sacramento | 32 | 1 | $ 7,500,000 | 875 | 12 | $31,129,000 |
| **Company Total** | **497** | **9** | **$194,172,000** | **1,279** | **15** | **$60,129,000** |

(1)  All of the 497 lots controlled under Company projects are under purchase contracts. There can be no assurance that we will acquire any of these land parcels on the terms or timing anticipated or at all or that we will proceed to build and sell homes on any of this land.

(2)  Consists of the estimated aggregate purchase price for pending acquisitions of all the lots per region, less aggregate deposits paid of $3.2 million, of which $3.0 million was non-refundable, as of September 30, 2013.

(3)  All of the 1,279 lots are under purchase contracts. There can be no assurance that we will acquire any of these land parcels on the terms or timing anticipated or at all or that we will proceed to build and sell homes on any of this land.

(4)  Consists of the estimated aggregate purchase price for pending acquisitions of all the lots per region, less aggregate deposits paid of $4.5 million as of September 30, 2013.

## Acquisition Process

As of September 30, 2013, we and our unconsolidated joint ventures had 17 and 43 communities, respectively, containing 826 and 3,040 lots, respectively, including controlled lots. In addition, at that date, we had seven communities containing 887 lots under our fee building arrangements. We believe that our current inventory of owned and controlled lots and lots under land option or purchase contracts will be adequate to supply our and our unconsolidated joint ventures' homebuilding operations' projected closings through 2016.

Our land acquisition strategy is differentiated between housing programs and larger lot development programs. For lot development programs, the focus is on developing entitled parcels that we can complete within approximately 24 to 48 months from the date the property is acquired. For housing programs, we focus on controlling development and market cycle risk while maintaining an inventory of owned lots and lots under land option or purchase contracts sufficient for construction of homes over a two- to three-year period from the initiation of homebuilding activity. Our acquisition process generally includes the following steps aimed at reducing development and market cycle risk:

- review of the status of entitlements and other governmental processing, including title reviews;

- identification of target buyer and appropriate housing product;

- determination of land plan to accommodate desired housing product;

- completion of environmental reviews and third-party market studies;

- preparation of detailed budgets for all cost categories;

- completion of due diligence on the land parcel prior to committing to the acquisition;

- utilization of options, joint ventures and other land acquisition arrangements, if necessary;

Table of Contents

- limitation on the size of an acquisition to minimize investment levels in any one project, which is generally an amount not to exceed 15% of the Company's equity; and

- employment of centralized control of approval of all acquisitions through a Board approval process.

Before purchasing a land parcel, we engage and work closely with outside architects and consultants to design our homes and communities.

We acquire land parcels pursuant to purchase agreements that are often structured as option contracts. Such option contracts require us to pay non-refundable deposits, which can vary by transaction, and entitle (but do not obligate) us to acquire the land typically at fixed prices. The term within which we can exercise our option varies by transaction, and our acquisition is often contingent upon the completion of entitlement or other work with regard to the land (such as "backbone" improvements, such as the installation of main roads or utility services). Depending upon the transaction, we may be required to purchase all of the land involved at one time or we may have a right to acquire identified groups of lots over a specified timetable. In some transactions, a portion of the consideration that we pay for the land may be in the form of a share of the profits of a project after we receive an agreed to level of profits from the project. In limited instances such as where we acquire land from a master developer that is part of a larger project, the seller may have repurchase rights entitling it to repurchase the land from us under circumstances where we do not develop the land by an outside deadline (unless the delay is caused by certain circumstances outside our control), or where we seek to sell the land directly to a third party or indirectly through a change in control of our company. Repurchase rights typically allow the seller to repurchase the land at the price that we paid the seller to acquire the land plus the cost of improvements that we have made to the land and less some specified discount.

## Homebuilding, Marketing and Sales Process

The detached homes that we and our unconsolidated joint ventures are building range in size from approximately 1,100 to 5,300 square feet, and attached homes that we and our unconsolidated joint ventures are building range in size from approximately 800 to 3,200 square feet. The prices of homes also vary substantially. Sales prices for detached homes that we and our unconsolidated joint ventures are building range from approximately $300,000 to $2.9 million (excluding 12 units of affordable housing) and sales prices for attached homes range from approximately $350,000 to $3.2 million. For the nine months ended September 30, 2013 and the years ended December 31, 2012 and 2011, the average sales price of our homes delivered from our projects was approximately $419,000, $457,000 and $523,000 and for homes delivered from our unconsolidated joint venture projects was $1.4 million, $1.3 million and $0 (no homes delivered), for the nine months ended September 30, 2013 and the years ended December 31, 2012 and 2011.

We typically develop communities in phases based upon projected sales. We seek to control the timing of construction of subsequent phases in the same community based on demand as evidenced by sales of homes in prior phases and the number of qualified potential homebuyers that exist on our priority buyer list. Our construction process is driven by sales contracts that generally precede the start of the construction of homes. The determination that a potential home buyer is qualified to obtain the financing necessary to complete the purchase is an integral part of our process. Once qualified, our on-site design centers, with designers dedicated to a specific community, work with the buyer to tailor the home to the buyer's specifications. This practice is designed to enhance the buyers' design center experience and results in increased option sales.

The design of our homes must conform to zoning requirements, building codes and energy efficiency laws. As a result, we contract with a number of architects and other consultants in connection with the design process. Substantially all of our construction work is done by trade partners with us acting as the general contractor. We also enter into contracts as needed with design professionals and other service providers who are familiar with local market conditions and requirements. We do not have long-term contractual commitments with our trade partners, suppliers or laborers. We maintain strong and long-standing relationships with many of our trade

Table of Contents

partners. We believe that our relationships with trade partners have been enhanced through involving them prior to the start of a new community, maintaining our schedules and making timely payment. By dealing fairly, we believe we are able to keep our key trade partners loyal to us.

### Sales and Marketing

In connection with the sale and marketing of our homes, we make extensive use of advertising and other promotional activities, including through our website (thenewhomecompany.com), social-media, brochures, direct mail and other community-specific collateral materials. The information contained in, or that can be accessed through, our website is not incorporated by reference and is not a part of this prospectus.

We sell our homes through our own sales representatives. Our in-house sales force works from sales offices located in model homes close to or in each community. Sales representatives assist potential buyers by providing them with floor plan, price and community amenity information, construction timetables and tours of model homes. Sales personnel are licensed by the applicable real estate bodies in their respective markets, are trained by us and generally have had prior experience selling new homes in the local market.

As of September 30, 2013, we owned 18 model homes (13 of which were owned by our unconsolidated joint ventures). Generally, we build model homes at each project and have them professionally decorated to display design features and options available for purchase in the design center. We believe that model homes play a significant role in helping homebuyers understand the efficiencies and value provided by each floor plan type. Interior decorations vary among our models and are selected based upon the lifestyles of our targeted homebuyers. Structural changes in design from the model homes, other than those predetermined, are not generally permitted, but homebuyers may select various other optional construction and design amenities. Our on-site design centers are an integral part of our sales process. Specific options are selected for each community based upon the price of the home and anticipated buyer preferences. Options include structural (room configurations or pre-determined additional square footage), electrical, plumbing and finish options (flooring, cabinets, fixtures). In certain communities, we also offer turn-key landscape options. Each design center is managed by our own designers dedicated to the specific community. We believe this approach enables us to create a strong relationship with our buyers that results in fewer cancellations and increased revenue.

We typically sell homes using sales contracts that include cash deposits by the purchasers. Before entering into sales contracts, we pre-qualify our customers through a preferred mortgage provider. However, purchasers can generally cancel sales contracts if they are unable to sell their existing homes, if they fail to qualify for financing or under certain other circumstances. Although cancellations can delay the sale of our homes, they have historically not had a material impact on our operating results. For our projects, the cancellation rate, excluding our unconsolidated joint ventures, of buyers who contracted to buy a home but did not close escrow as a percentage of overall orders was approximately 16.5% during the nine months ended September 30, 2013, 16% during the year ended December 31, 2012 and 25% during the year ended December 31, 2011. For our unconsolidated joint venture projects, the cancellation rate was 6% during the nine months ended September 30, 2013, 5% during the year ended December 31, 2012 and 0% during the year ended December 31, 2011 (as we had no home sales through unconsolidated joint ventures in 2011). Cancellation rates are subject to a variety of factors beyond our control, such as adverse economic conditions and increases in mortgage interest rates. As of September 30, 2013, we did not have any completed and unsold homes.

### Customer Financing

At each of our communities, we seek to assist our homebuyers in obtaining financing by arranging with preferred mortgage lenders to offer qualified buyers a variety of financing options. Most homebuyers utilize long-term mortgage financing to purchase a home, and mortgage lenders will usually make loans only to qualified borrowers.

Table of Contents

### Quality Control and Customer Service

We pay particular attention to the product design process and carefully consider quality and choice of materials in order to attempt to eliminate building deficiencies. The quality and workmanship of the trade partners we employ are monitored using our personnel and third-party consultants. We make regular inspections and evaluations of our trade partners to seek to ensure that our standards are met.

We maintain a quality control and customer service staff whose role includes providing a positive experience for each customer throughout the pre-sale, sale, building, closing and post-closing periods. These employees are also responsible for providing after-sales customer service. Our quality and service initiatives include taking customers on a comprehensive tour of their home during construction and prior to closing and using a third party, Eliant, to survey our buyers in order to improve our standards of quality and customer satisfaction.

We have consistently ranked at the top end of the survey results when compared to the other builders who participate in the Eliant survey.

### Warranty Program

Our company currently provides a limited one-year warranty covering workmanship and materials. In addition, our limited warranty, which generally ranges from a minimum of two years up to the period covered by the applicable statute of repose, covers certain defined construction defects. The limited warranty covering construction defects is transferable to subsequent buyers not under direct contract with us and requires that homebuyers agree to the definitions and procedures set forth in the warranty, including the submission of unresolved construction-related disputes to binding arbitration. We generally reserve 1% of the sales price of each home we sell to provide warranty service to our homebuyers. Additionally, we have dedicated customer service staff that work with our buyers and coordinate with trade partners, as necessary, during the warranty period. We believe that our reserves are adequate to cover the ultimate resolution of our potential liabilities associated with known and anticipated warranty and construction defect related claims and litigation.

We subcontract our homebuilding work to trade partners who generally provide us with an indemnity prior to receiving payments for their work. Accordingly, claims relating to workmanship and materials are generally the primary responsibility of our trade partners.

We purchase general liability insurance that covers development and construction activity at each of our communities. Our trade partners are covered by these programs.

There can be no assurance, however, that the terms and limitations of the limited warranty will be effective against claims made by homebuyers, that we will be able to renew our insurance coverage or renew it at reasonable rates, that we will not be liable for damages, that we will not incur significant costs of repairs or the expenses of litigation surrounding possible construction defects, soil subsidence or building related claims or that claims will not arise out of uninsurable events or circumstances not covered by insurance and not subject to effective indemnification agreements with our trade partners.

## Seasonality

We have experienced seasonal variations in our quarterly operating results and capital requirements. We typically take orders for more homes in the first half of the fiscal year than in the second half, which creates additional working capital requirements in the second and third quarters to build our inventories to satisfy the deliveries in the second half of the year. We expect this seasonal pattern to continue over the long-term, although it may be affected by volatility in the homebuilding industry.

Table of Contents

## Raw Materials

Typically, all the raw materials and most of the components used in our business are readily available in the United States. Most are standard items carried by major suppliers. However, a rapid increase in the number of homes started could cause shortages in the availability of such materials or in the price of services, thereby leading to delays in the delivery of homes under construction. We continue to monitor the supply markets to achieve favorable prices.

## Joint Ventures

Our joint venture strategy has been instrumental in allowing us to leverage our entity-level capital and establish a homebuilding platform focused on high-growth, land-constrained markets, such as Orange and Los Angeles counties in Southern California and Santa Clara, San Mateo, Marin, Sacramento and Yolo counties in Northern California.

154

Table of Contents

We serve as the administrative member, manager or managing member of each of our nine homebuilding and three land development joint ventures. We do not, however, exercise control over the joint ventures, as the joint venture agreements generally provide our respective partners with the right to consent to certain actions. Under the joint venture agreements, certain major decisions must be approved by the applicable joint venture's executive committee, which is comprised of both our representatives and representatives of our joint venture partners. In addition, some of our joint venture agreements grant both partners a buy-sell right pursuant to which, subject to certain exceptions, either partner may initiate procedures requiring the other partner to choose between selling its interest to the other partner or buying the other partner's interest. Additional information on our joint ventures and the agreements governing them is set forth below.

| Name (Projects) | Location | Percentage of Capital Contributed by Us | Our equity balance as of September 30, 2013(1) (in thousands) | Total Joint Venture (in thousands) Assets | Debt (2) | Equity | Total Number of Homes | Planned Opening (3) | Cumulative Units Closed as of September 30, 2013 | Backlog as of September 30, 2013(4) | Lots Owned as of September 30, 2013 | Lots Controlled as of September 30, 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LR8 Investors, LLC (The Field, The Hill, The Grove) | Irvine, California | 5% | $ 2,453 | $51,417 | $19,292 | $24,812 | 169 | 2012 | 116 | 52 | 53 | — |
| Larkspur Land 8 Investors, LLC (Rose Lane) | Larkspur, California | 10% | $ 3,194 | $48,755 | $15,094 | $31,943 | 85 | 2013 | — | — | 85 | — |
| TNHC-HW San Jose, LLC (Orchard Park) | San Jose, California | 15% | $ 4,998 | $39,380 | $ 5,853 | $33,320 | 239 | 2014 | — | — | 239 | — |
| TNHC-TCN Santa Clarita LP (Villa Metro) | Santa Clarita, California | 10% | $ 2,451 | $36,603 | $ 9,038 | $24,512 | 315 | 2013 | — | 39 | 315 | — |
| TNHC Newport LLC (Meridian) | Newport Beach, California | 13% | $ 5,314 | $44,188 | $ — | $41,985 | 79 | 2014 | — | — | 79 | — |
| The Grove at Granite Bay LLC (The Grove)(5) | Granite Bay, California | 50% | $ 537 | $ 537 | $ — | $ 537 | 32 | 2014 | — | — | — | 32 |
| Encore McKinley Village, LLC (McKinley Village) | Sacramento, California | 10% | $ 409 | $ 4,223 | $ — | $ 4,000 | 328 | 2015 | — | — | — | 328 |
| TNHC San Juan LLC (Oliva) | San Juan Capistrano, California | 20% | $ 2,393 | $11,900 | $ — | $11,775 | 33 | 2014 | — | — | 33 | — |
| TNHC Russell Ranch LLC (Russell Ranch) | Folsom, California | 35% | $ 3,921 | $31,345 | $20,000 | $11,204 | 870 | 2015 | — | — | 870 | — |
| TNHC-HW Foster City LLC (Civic Center) | Foster City, California | 35% | $ 1,578 | $ 3,436 | $ — | $ 3,155 | 404 | 2015 | — | — | — | 404 |
| Calabasas Village LP (Village at Calabasas) | Calabasas, California | 10% | $ 1,527 | $16,452 | $ 1,058 | $15,264 | 87 | 2015 | — | — | 87 | — |
| TNHC-HW Cannery LLC (Cannery Park)(6) | Davis, California | 35% | $ — | $ — | $ — | $ — | 547 | 2015 | — | — | — | 547 |

(1) Amounts reflect capital contributions, distributions and cumulative net income or loss.
(2) Scheduled maturities of the unconsolidated joint venture debt as of September 30, 2013 are as follows: $29.8 million matures in 2014, $5.7 million matures in 2015, $14.9 million matures in 2016 and $20.0 matures in 2017.
(3) Represents planned year in which model homes will be open for sales at the communities, except for Russell Ranch, Civic Center and Cannery Park where it represents expected commencement date of lot sales.
(4) Backlog consists of homes under sales contracts that had not yet closed as of September 30, 2013, and there can be no assurance that closing of sold homes will occur. Backlog has not been reduced to reflect our historical cancellation rate.
(5) This joint venture was consolidated in the Company's results as of September 30, 2013.
(6) Joint venture operating agreement executed in October 2013.

155

Table of Contents

### TNHC Newport LLC

We have an indirect capital interest in the TNHC Newport joint venture through our unconsolidated subsidiary, TNHC Meridian Investors. We have a 37% capital interest in TNHC Meridian Investors, and IHP Meridian, an affiliate of IHP, is our partner in TNHC Meridian Investors. Under the terms of the TNHC Meridian Investors joint venture agreement, after the return of certain preference amounts, capital contributions and cost overruns/profit shortfalls to the joint venture partners, we are entitled to receive distributions from the joint venture equal to our percentage capital interest. TNHC Meridian Investors in turn has a 35% capital interest in the TNHC Newport joint venture. NB Residences, LLC is our partner in the TNHC Newport joint venture and TNHC Newport owns the Meridian project located in Newport Beach, California. Under the terms of the TNHC Newport joint venture agreement, after the return to the joint venture partners of a 20% per annum first priority preference amount and their first priority contributed capital and a 12% per annum second priority preference amount and their second priority contributed capital, TNHC Meridian Investors is entitled to receive 50% of the distributions from the joint venture in accordance with our percentage economic interest. In addition, TNHC Meridian Investors receives management fees from the joint venture of approximately 3% of gross sales revenue. From this management fee, IHP Meridian is entitled to receive a $500,000 project commitment fee, payable in installments equal to 1/12th of any portion of the management fee paid by TNHC Newport, and we are entitled to the remainder.

TNHC Meridian serves as the managing member of the joint venture with discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee, which is composed of one representative appointed by us and two by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction, approval of any budget that varies materially from the initial annual budget, and the incurrence of any joint venture indebtedness or modification of the terms of existing debt. We may be removed as the managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a buy-sell right pursuant to which, after the initial phase of construction has been substantially completed, either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest. If a member is involved in a bankruptcy proceeding, has engaged in bad conduct or has committed a material breach or default (which we refer to as a "call event" for purposes of this section), the member that is not the subject of such call event has the right to purchase all of the membership interest of the member who was the subject of such call event. If we were the subject of such call event, our partner has a put right to sell its interests to us.

### TNHC-HW San Jose, LLC

We have a 15% capital interest in the TNHC-HW San Jose joint venture. HW San Jose, LLC is our partner in this joint venture. The joint venture owns the Row Towns, Court Towns and Condo Flats of the Orchard Park project located in San Jose, California. Under the terms of the joint venture, after the return to the joint venture partners of a 20% per annum first priority preference amount and their first priority contributed capital and a 12% per annum second priority preference amount and their second priority contributed capital, we are entitled to receive 30% of the distributions from the joint venture. In addition, we receive management fees from the joint venture of approximately 3% of gross sales revenue.

We serve as the managing member of the TNHC-HW San Jose joint venture with discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee, which is composed of one representative appointed by us and two by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction of each phase, approval of any budget that varies materially from the initial annual budget, the incurrence of any joint venture indebtedness or modifying the terms of existing debt. We may be removed as the managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a buy-sell right pursuant to which, after the date on which completion of construction of the improvements has been substantially completed, either member may initiate procedures requiring the other member to choose between selling its

Table of Contents

interest to the initiating member or buying the initiating member's interest. If a member is involved in a bankruptcy proceeding, has engaged in bad cond or has committed a material breach or default (which we refer to as a "call event" for purposes of this section), the member that is not the subject of such call event has the right to purchase all of the membership interest of the member who was the subject of such call event. If we were the subject of such event, our partner has a put right to sell its interest to us.

### LR8 Investors, LLC

We have a 5% capital interest in the LR8 Investors joint venture, which owns The Field, The Hill and The Grove projects in the Lambert Ranch in Irvine, California. MFC18 LR LLC is our partner in this joint venture. If at any time, our partner intends to sell to one or more third-party purchasers more than 50% of its interest or any portion of its interest so that it will no longer control the joint venture, it may require us to sell our entire interest in the joint venture pursuant to the terms and conditions of such sale. Under the terms of the joint venture, we and our joint venture partner are entitled to distributio in accordance with our respective capital interests until each joint venture partner has achieved a 15% internal rate of return on its capital contributions. Thereafter, we are entitled to receive 15% of distributions until each joint venture partner achieves a 20% internal rate of return or an aggregate of 1.5 tim its peak capital contributions to the joint venture, whichever is greater. Thereafter, we are entitled to receive 20% of distributions until each joint venture partner has achieved the greater of a 25% internal rate of return or received an amount equal to 1.65 times its peak capital contributions to the joint ventu Thereafter we are entitled to receive 30% of distributions. In addition, we receive management fees from the joint venture of approximately 3% of gross sales revenue.

We serve as the administrative member of the LR8 Investors joint venture in charge of its day-to-day operations with the duty to carry out all decisions and resolutions of the executive committee. Our partner serves as the managing member having the authority to do any act which is necessar desirable to carry out the purposes of the joint venture, subject to the consent of the executive committee for certain major decisions. The executive committee consists of one member appointed by us and two members appointed by our partner. We may be removed as the administrative member for or if we are terminated as the general contractor but may not resign in our capacity as such. No member may transfer its interest in the joint venture with the written consent of the other member, except when such transfer is permitted under the joint venture agreement.

We have agreed to offer the parent entity of MFC18 LR LLC the opportunity to enter into one or more future homebuilding joint ventures that total $30 million or more of equity. The decision to seek such capital is ours in our sole discretion. We have not entered into any documentation with regard to any future joint venture, and our joint venture partner has not committed to make any such investments. There can be no assurance as to the timing or completion of any future joint venture with such partner.

### Larkspur Land 8 Investors, LLC

We have a 10% capital interest in the Larkspur Land 8 Investors joint venture, which owns The Collection, Garden House and Terraces and Rose Lane projects in Larkspur, California. MFC18 Larkspur Land, LLC is our partner in this joint venture. If at any time, our partner intends to sell to one or more third-party purchasers more than 50% of its interest or any portion of its interest so that it will no longer control the joint venture, it may require us to sell our entire interest in the joint venture pursuant to the terms and conditions of such sale. Under the terms of the joint venture, we and our joint venture partner are entitled to distributions from the joint venture in accordance with our respective capital interests until each joint venture partner has achieved 15% internal rate of return on its capital contributions. Thereafter, we are entitled to receive 20% of distributions until each joint venture partner receives amounts equal to the greater of a 20% internal rate of return or an aggregate of 1.5 times its capital contributions. Thereafter, we are entitled to receive 2 of distributions until each member has achieved a 25% internal rate of return or received an amount equal to 1.65 times its capital contributions, whichev is greater. Thereafter we are entitled to receive 35% of distributions. In addition, we receive management fees from the joint venture of approximately 3% of gross sales revenue.

Table of Contents

We serve as the administrative member of the Larkspur Land 8 Investors joint venture in charge of its day-to-day operations with the duty to carry out all decisions and resolutions of the executive committee. Our partner serves as the managing member having the authority to do any act which is necessary or desirable to carry out the purposes of the joint venture, subject to the consent of the executive committee for certain major decisions. The executive committee consists of one member appointed by us and two members appointed by our partner. We may be removed as the administrative member of the joint venture for cause or if we are terminated as the general contractor but may not resign in our capacity as such. No member may transfer its interest in the joint venture without the written consent of the other member, except when such transfer is permitted under the joint venture agreement.

### TNHC-TCN Santa Clarita LP

We have a 10% capital interest in the TNHC-TCN Santa Clarita joint venture. The joint venture owns the Acqua, Terra, Sol and Viento, Villa Metro and Valencia projects located in Santa Clarita, California. TCN Villa Metro LP, an affiliate of Tricon, is our partner in this joint venture. Under the terms of the joint venture, after the return of certain preference amounts and undistributed capital to the joint venture partners, we are entitled to receive 25% of distributions from the joint venture until our partner achieves a 20% internal rate of return and receives an aggregate of 1.5 times its peak capital contributions to the joint venture. Thereafter we are entitled to receive 35% of distributions. In addition, we receive management fees from the joint venture of approximately 3% of gross sales revenue.

We serve as the general partner of the joint venture with discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee, which is composed of one representative appointed by us and two by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction of each phase, approval of each annual budget, and the incurrence of any joint venture indebtedness or modification of the terms of existing debt. We may be removed as the general partner for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a buy-sell right pursuant to which, after the third-year anniversary of the joint venture, either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest.

### TNHC San Juan LLC

We have a 20% capital interest in the TNHC San Juan joint venture. Ora Residential Investments I, L.P. is our partner in this joint venture. The joint venture will develop a project located in San Juan, California. Under the terms of the joint venture, after the return of certain preference amounts and priority capital to the joint venture partners, we are entitled to 30% of the distributions from the joint venture until our partner has achieved a 21% internal rate of return. Thereafter, we are entitled to receive 70% of distributions until we have received an amount equal to the amount of distributions received by our joint venture partner. Thereafter, we are entitled to receive 50% of distributions. In addition, we receive management fees from the joint venture of up to approximately 3% of gross sales revenue.

We serve as the managing member of the TNHC San Juan joint venture with discretion to manage its business and affairs on a daily basis, except for major decisions that require the prior written consent of our joint venture partner. Major decisions include, among others, the settlement of any claim against or by the joint venture in which the amount in controversy exceeds $100,000, the merger of the joint venture into any other entity, the incurrence of secured joint venture indebtedness that exceeds certain thresholds and the deviation in any material respect from the annual plan. We may be removed as managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a put-call right pursuant to which, upon the occurrence of an event of default or certain management impasse, either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest. Our joint venture partner also has the option to initiate the put-call procedures if the joint venture fails to acquire a project development loan by January 31, 2014 or if certain events triggering a change of control occurs.

158

Table of Contents

### Encore McKinley Village, LLC

We entered into the Encore McKinley Village joint venture through McKinley Village, LLC (which we refer to as our McKinley entity for the purpose of this section), an entity owned 50% by us and 50% by RCI McKinley Village, LLC. Our McKinley entity has a 20% capital interest in the Encore McKinley Village joint venture, which owns the McKinley Village project in Sacramento, California. Encore McKinley Associates, LLC is the partner with our McKinley entity in this joint venture. Under the terms of the joint venture, our McKinley entity is entitled to distributions from the joint venture in accordance with its capital interest until our joint venture partner has received a return of all of its contributions and achieved an internal rate of return of 12%. Thereafter, our McKinley entity is entitled to receive 12.5% of distributions plus 20% of the rest of the distributions until our joint venture partner has achieved an internal rate of return of 16%. Our McKinley entity will then receive 25% of distributions plus 20% of the rest of the distributions until our joint venture partner has achieved an internal rate of return of 20%. Thereafter, our McKinley entity will receive 37.5% of distributions plus 20% of the rest of the distributions from the joint venture. In addition, our McKinley entity receives management fees from the joint venture of approximately 3% of project revenue. The amounts noted above are shared between us and RCI.

Our McKinley entity serves as the administrative member of the Encore McKinley Village joint venture with discretion to manage its business and affairs on a daily basis, except for major decisions that require the prior written consent of our joint venture partner. Major decisions include, among others, the adoption of or any supplement to the business plan, any litigation, arbitration or settlement involving the joint venture, any loan by the joint venture to a member, distribution of any property in kind and any other transaction not in the joint venture's ordinary course of business. Our McKinley entity may be removed as the managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement.

### THNC Russell Ranch LLC

We have a 35% capital interest in the THNC Russell Ranch joint venture. IHP Capital Partners VI, LLC is our partner in this joint venture. We and our partner are each represented on the executive committee of the joint venture by two representatives. The joint venture was formed to develop lots in a master-planned community located in Folsom, California. Under the terms of the joint venture, after the return of certain preferred amounts and priority capital to the joint venture partners, we are entitled to receive 50% of the distributions from the joint venture in accordance with our percentage economic interest. In addition, we receive management fees from the joint venture of approximately 3% of net revenues.

We serve as the managing member of the THNC Russell Ranch joint venture responsible for implementing the decisions of the members and overseeing the day-to-day operations of the joint venture. Major decisions require the approval of our joint venture partner. Major decisions include, among others, the commencement of any development, the acquisition of any interest in real property, the incurrence of any joint venture indebtedness or modifying the terms of existing debt or the formation of an assessment district or any other financing mechanism for the infrastructure for the projects. We may be removed as the managing member for cause. We may not transfer or pledge our interest in the joint venture without the prior written consent of our joint venture partner, except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, after December 2015 or when there is a failure to fund additional capital, both members have a buy-sell right pursuant to which either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest. In addition, IHP has the sole right to initiate such buy-sell procedures upon the occurrence of certain replacement events or loss of control events.

### The Grove at Granite Bay, LLC

We have a 50% capital interest in The Grove at Granite Bay, LLC joint venture. 2540 Partners LLC is our partner in this joint venture. Our joint venture partner is required to contribute 32 lots with an agreed-upon value of $250,000 per lot. The joint venture was formed to develop a project located in Granite Bay, California. Under

159

Table of Contents

the terms of the joint venture, each member is entitled to receive distributions from the joint venture in respect of its preferred return balance based upon its capital contribution, and to the extent its capital account balance exceeds that of the other member. We are thereafter entitled to receive 50% of distributions from the joint venture in accordance with our economic interest. In addition, we will receive management fees and warranty fees from the joint venture of approximately 3% and 1%, respectively, of total gross revenues. This joint venture was consolidated in the Company's results as of September 30, 2013.

We serve as the manager of the joint venture with discretion to manage its business and affairs on a daily basis, except for certain matters that require the consent of our joint venture partner. These matters include, among others, the continuation of the business of the joint venture after its dissolution, the approval of the transfer of a member's interest in the joint venture and the amendment to the articles of organization or the joint venture agreement. We may be removed as the manager for cause. Both members have a put-call right pursuant to which, upon the occurrence of an involuntary withdrawal of a member, the remaining member has the option to choose between selling its interest to the withdrawing member or buying out the withdrawing member's interest. Involuntary withdrawal means, among others events, the bankruptcy, dissolution or a change of control of any member.

### TNHC-HW Foster City LLC

We have a 35% capital interest in the TNHC-HW Foster City joint venture. HWFC Project, LLC is our partner in this joint venture. The joint venture owns the Civic Center project located in Foster City, California. Under the terms of the joint venture, after the return to the joint venture partners of a 20% per annum first priority preference amount and their first priority contributed capital, and a 12% per annum second priority preference amount and their second priority contributed capital, we are entitled to receive 46.47% of the distributions from the joint venture. In addition, we receive management fees from the joint venture of approximately 3% of gross sales proceeds.

We serve as the managing member of the TNHC-HW Foster City joint venture with discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee, which is composed of one representative appointed by us and two by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction, approval of any budget that varies materially from the initial annual budget and the filing of any application to zone or subdivide the project site. We may be removed as the managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a buy-sell right pursuant to which, after the first-year anniversary of the joint venture, either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest. If a member is involved in a bankruptcy proceeding, has engaged in bad conduct or has committed a material breach or default (which we refer to as a "call event" for purposes of this section), the member that is not the subject of such call event has the right to purchase all of the membership interest of the member who was the subject of such call event. If we were the subject of such call event, our partner has a put right to sell its interest to us.

### Calabasas Village LP

We have a 10% capital interest in the Calabasas Village joint venture. We serve as a limited partner and, through one of our wholly-owned subsidiaries, as the general partner of the joint venture. Calabasas Equity, LP, an affiliate of Tricon, is also a limited partner in this joint venture. The joint venture owns the Calabasas Village project located in Calabasas, California. Under the terms of the joint venture, after the return of a certain preference amount and undistributed capital to the joint venture partners, we are entitled to receive 25% of the distributions from the joint venture until our partner achieves a 20% internal rate of return and then 50% of the distributions from the joint venture until our partner achieves a 25% internal rate of return. Thereafter, we are entitled to receive 60% of the distributions from the joint venture.

Table of Contents

As the general partner of the joint venture, we have the discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee composed of one representative appointed by us and by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction of each phase, approval of each annual budget, and the incurrence of any joint venture indebtedness or modification of the terms of existing debt. We may be removed as the general partner for cause. No partner may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both partners have a buy-sell right pursuant to which, after the third-year anniversary of the joint venture, either partner may initiate procedures requiring the other partner to choose between selling its interest to the initiating partner or buying the initiating partner's interest.

*TNHC-HW Cannery LLC*

We have a 35% capital interest in the TNHC-HW Cannery joint venture. Davis City Development, LLC is our partner in this joint venture. The joint venture will acquire the Davis property. Under the terms of the joint venture, after the return of a certain preference amount and priority capital to the joint venture partner, we are entitled to receive 50% of the distributions from the joint venture. In addition, we receive management fees from the joint venture of approximately 3% of gross sales revenue.

We serve as the managing member of the TNHC-HW Cannery joint venture with discretion to manage its business and affairs on a daily basis. Certain major decisions require the approval of the executive committee composed of one representative appointed by us and two by our partner. Major decisions include, among others, approval of any tax elections, approval of the commencement of construction of each phase, approval of any budget that varies materially from the initial annual budget, and the incurrence of any joint venture indebtedness or modification of the terms of existing debt. We may be removed as the managing member for cause. No member may transfer or pledge its interest in the joint venture except when such transfer or pledge is permitted under the joint venture agreement. Subject to certain exceptions, both members have a buy-sell right pursuant to which, after the date on which completion of construction of the improvements has been substantially completed, either member may initiate procedures requiring the other member to choose between selling its interest to the initiating member or buying the initiating member's interest. If a member is involved in a bankruptcy proceeding, has engaged in bad conduct or has committed a material breach or default (which we refer to as a "call event" for purposes of this section), the member that is not the subject of such call event has the right to purchase all of the membership interest of the member who was the subject of such call event. If we were the subject of such call event, our partner has a put right to sell its interest to us.

### Fee Building Services

Although our primary business focus is building and selling homes for our own account, we also selectively provide construction services to build homes for independent third-party property owners, some of which have been or will be marketed under The New Home Company brand name. We refer to these projects as "fee building projects." Our services with respect to fee building projects may include design, development, construction and sale of the homes, and we may take a project at any stage of development through its completion and sale. We earn revenue on our fee building projects either as a fee for the project or as a percentage of the cost or revenue of the project depending upon the terms of the agreement with our customer.

### Our Financing Strategy

We intend to employ both debt and equity as part of our ongoing financing strategy, coupled with redeployment of cash flows from continuing operations, to provide us with the financial flexibility to access capital on favorable terms. In this regard, we expect to employ prudent levels of leverage to finance the acquisition and development of our lots and construction of our homes. Our existing indebtedness is both recourse and non-recourse

161

Table of Contents

to us, and we anticipate that future indebtedness will be likewise. As of September 30, 2013, we had approximately $46.8 million of aggregate loan commitments, of which $17.0 million was outstanding. At that date, our aggregate loan commitments consisted of project specific revolving loans and a loan from a land seller secured by the land. Existing indebtedness of our joint ventures is both non-recourse and limited recourse to us. As of September 2013, the unconsolidated joint ventures had approximately $137.7 million of aggregate loan commitments, of which $70.3 million was outstanding. Of these commitment amounts, $36.8 million was non-recourse and $100.9 million was limited recourse to us. Of the amounts outstanding, $39.8 million was limited recourse to us. Limited recourse guarantees include environmental, completion and loan-to-value maintenance. We consider a number of factors when evaluating our level of indebtedness and, when making decisions regarding the incurrence of new indebtedness, including the purchase price of assets to be acquired with debt financing, the estimated market value of our assets and the ability of particular assets, and our company as a whole, to generate cash flow to cover the expected debt service. As a means of sustaining our long-term financial health and limiting our exposure to unforeseen dislocations in the debt and financing markets, we currently expect to remain conservatively capitalized. However, our charter does not contain a limitation on the amount of debt we may incur, and we may change our target debt levels at any time without the approval of our stockholders.

We intend to finance future acquisitions and developments with the most advantageous source of capital available to us at the time of the transaction, which may include a combination of common equity, secured and unsecured corporate level debt, property-level debt and mortgage financing and other public, private or bank debt.

## Our Formation Transactions and Structure

Prior to this offering, we have operated our business through TNHC LLC. Prior to the completion of this offering, we will engage in the following formation transactions:

- TNHC LLC has been converted from a Delaware limited liability company into a Delaware corporation and renamed The New Home Company Inc. As a corporation, we are subject to taxation as a corporation under U.S. Federal and state income tax laws.

- In connection with the conversion, the membership interests of TNHC LLC will be automatically converted into shares of our common stock, and, as a result, the members of TNHC LLC, which members include an entity owned by the members of our management team, will receive an aggregate of 2,886,687 shares of our common stock. We will allocate those shares among the members of TNHC LLC in the manner described in footnote (1) below.

See "Description of Capital Stock" for additional information regarding the terms of our common stock and the terms of our charter and bylaws that will be in effect following our formation transactions. Concurrently with the completion of our formation transactions, the operating agreement of TNHC LLC will be terminated. Following the completion of our formation transactions, The New Home Company Inc., which is the issuer of the shares of our common stock offered by this prospectus, will own the assets and conduct the business described in this prospectus.

We carry out our business generally through a number of project-specific, wholly owned subsidiaries and joint ventures. Our fee building business is conducted primarily through our wholly owned subsidiary, TNHC Realty and Construction Inc., through which we also conduct real estate brokerage and contracting activities relating to our business.

162

Table of Contents

The following chart illustrates our ownership and structure immediately prior to the completion of this offering:



The following chart illustrates our expected ownership and structure immediately following the completion of this offering (assuming no exercise by the underwriters of their option to purchase additional shares):



Table of Contents

_____

(1)   As part of our formation transactions, the members of The New Home Company LLC (the entity that was converted into a Delaware corporation and renamed The New Home Company Inc. as part of our formation transactions), or TNHC LLC, will receive an aggregate 8,636,250 of shares of our common stock in connection with the exchange of their membership interests in TNHC LLC. The members of TNHC LLC include an entity owned by our executive management team and three other non-management institutional investors (Tricon, Watt and IHP). For a more detailed discussion regarding the shares of our common stock that will be received by the members of TNHC LLC, see "Principal Stockholders."

(2)   Excludes: (i) 107,500 shares of our common stock issuable upon the vesting of restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our director nominees upon the pricing of this offering pursuant to our 2014 Long Term Incentive Plan; and (ii) 885,454 shares of our common stock issuable upon exercise of options (with a strike price equal to $11.00 per share) to be granted to the members of our management team, other officers and employees upon the pricing of this offering pursuant to our 2014 Long Term Incentive Plan. The actual number of restricted stock units and the strike price and the number of shares of common stock subject to options will be based upon the price at which the shares are sold to the public in this offering.

(3)   If the underwriters exercise their option to purchase additional shares of our common stock, we will use the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors.

## Government Regulation and Environmental Matters

We are subject to numerous local, state, federal and other statutes, ordinances, rules and regulations concerning zoning, development, building design, construction and similar matters, which impose restrictive zoning and density requirements, the result of which is to limit the number of homes that can be built within the boundaries of a particular area. Projects that are not entitled may be subjected to periodic delays, changes in use, less intensive development or elimination of development in certain specific areas due to government regulations. We may also be subject to periodic delays or may be precluded entirely from developing in certain communities due to building moratoriums or "slow-growth" or "no-growth" initiatives that could be implemented in the future. Local governments also have broad discretion regarding the imposition of development fees and exactions for projects in their jurisdiction. Projects for which we have received land use and development entitlements or approvals may still require a variety of other governmental approvals and permits during the development process and can also be impacted adversely by unforeseen health, safety and welfare issues, which can further delay these projects or prevent their development.

We are also subject to a variety of local, state, federal and other statutes, ordinances, rules and regulations concerning the environment. The particular environmental laws which apply to any given homebuilding site vary according to multiple factors, including the site's location, its environmental conditions and the present and former uses of the site, as well as adjoining properties. Environmental laws and conditions may result in delays, may cause us to incur substantial compliance and other costs, and can prohibit or severely restrict homebuilding activity in environmentally sensitive regions or areas. In addition, in those cases where an endangered or threatened species is involved, environmental rules and regulations can result in the restriction or elimination of development in identified environmentally sensitive areas. From time to time, the EPA and similar federal or state agencies review homebuilders' compliance with environmental laws and may levy fines and penalties for failure to strictly comply with applicable environmental laws or impose additional requirements for future compliance as a result of past failures. Any such actions taken with respect to us may increase our costs. Further, we expect that increasingly stringent requirements will be imposed on homebuilders in the future. Environmental regulations can also have an adverse impact on the availability and price of certain raw materials such as lumber. California is especially susceptible to restrictive government regulations and environmental laws.

Under various environmental laws, current or former owners of real estate, as well as certain other categories of parties, may be required to investigate and clean up hazardous or toxic substances or petroleum product releases, and may be held liable to a governmental entity or to third parties for related damages, including for bodily injury, and for investigation and clean-up costs incurred by such parties in connection with

164

Table of Contents

the contamination. A mitigation system may be installed during the construction of a home if a cleanup does not remove all contaminants of concern or to address a naturally occurring condition such as methane. Some buyers may not want to purchase a home with a mitigation system.

## Competition

Competition in the homebuilding industry is intense, and there are relatively low barriers to entry into our business. Homebuilders compete for, among other things, home-buying customers, desirable land parcels, financing, raw materials and skilled labor. Increased competition could hurt our business, as it could prevent us from acquiring attractive land parcels on which to build homes or make such acquisitions more expensive, hinder our market share expansion, and lead to pricing pressures on our homes that may adversely impact our margins and revenues. If we are unable to successfully compete, our business, prospects, liquidity, financial condition and results of operations could be materially and adversely affected. Our competitors may independently develop land and construct housing units that are superior or substantially similar to our products. Furthermore, a number of our primary competitors are significantly larger, have a longer operating history and may have greater resources or lower cost of capital than us. Accordingly, they may be able to compete more effectively in one or more of the markets in which we operate. Many of these competitors also have longstanding relationships with trade partners and suppliers in the markets in which we operate. We also compete for sales with individual resales of existing homes and with available rental housing.

## Employees

As of September 30, 2013, we had 128 employees, 53 of whom were executive, management and administrative personnel located in our offices and 75 were located at our projects. Of the latter, 26 were sales and design personnel and 49 were involved in field construction. Although none of our employees are covered by collective bargaining agreements, certain of the trade partners engaged by us are represented by labor unions or are subject to collective bargaining arrangements. We believe that our relations with our employees and trade partners are very good.

## Legal Proceedings

We are not involved in any material litigation nor, to our knowledge, is any material litigation threatened against us. However, we may in the future become involved in various legal proceedings arising in the ordinary course of business or otherwise.

## Our Offices

Our principal executive offices are located at 95 Enterprise, Suite 325, Aliso Viejo, California 92656. Our main telephone number is (949) 382-7800. Our internet website is thenewhomecompany.com. The information contained in, or that can be accessed through, our website is not incorporated by reference and is not a part of this prospectus.

165

Table of Contents

## MANAGEMENT

### Officers, Directors and Director Nominees

Upon the completion of this offering, our board of directors will consist of 11 directors. Of these 11 directors, we believe that six, constituting a majority, will be considered "independent," with independence being determined in accordance with the listing standards established by the New York Stock Exchange. Our board of directors will be divided into three classes upon completion of this offering, Class 1, Class 2 and Class 3. At each annual meeting of our stockholders, one class of directors will be elected for a three-year term to succeed the directors of the same class whose terms are then expiring. The initial terms of the Class 1, Class 2 and Class 3 directors will expire upon the election and qualification of successor directors at the annual meetings of our stockholders held during the calendar years 2015, 2016 and 2017, respectively. There will be no cumulative voting in the election of directors. Consequently, at each annual meeting, the successors to the directors whose terms are then expiring will be elected by a plurality of the votes cast at that meeting. Pursuant to an investor rights agreement that we will enter into with our non-management institutional investors prior to the completion of this offering, each non-management institutional investor will have the right to nominate one member of our board for as long as it owns 4% or more of our outstanding common stock (excluding shares of common stock that are subject to issuance upon the exercise or exchange of rights of conversion or any options, warrants or other rights to acquire shares). Each non-management institutional investor will agree to vote all shares of our common stock that it owns in favor of Messrs. Webb or Berchtold (or, if at that time nominated as a director, Messrs. Stelmar, Davis or Redwitz) in any election in which Messrs. Webb or Berchtold (or, as the case may be, Messrs. Stelmar, Davis or Redwitz) is a director nominee, and each of Messrs. Webb, Stelmar, Davis and Redwitz will agree to vote all shares of our common stock that he owns in favor of the nominees of the non-management institutional investors in any election of directors in which a non-management institutional investor nominee is a director nominee for as long as such non-management institutional investor owns at least 4%.

166

Table of Contents

Set forth below are the names, ages and positions of our directors and officers as of the date of this prospectus, after giving effect to our formation transactions, and the persons who have agreed to become directors upon the completion of this offering, whom we refer to as our director nominees.

| Name | Age | Position with the Company |
|------|-----|---------------------------|
| Mr. H. Lawrence Webb | 65 | Chief Executive Officer and Chairman of our Board of Directors (Class 3 term will expire in 2017) |
| Mr. Wayne Stelmar | 59 | Chief Financial Officer, Secretary and Director Nominee (Class 2 term will expire in 2016) |
| Mr. Joseph D. Davis | 63 | Chief Investment Officer |
| Mr. Tom Redwitz | 58 | Chief Operating Officer |
| Mr. Kevin Carson | 53 | President, Northern California |
| Mr. Andrew J. Jarvis | 48 | President, TNHC Land Company LLC |
| Ms. Joan Marcus-Colvin | 53 | Senior Vice President, Sales, Marketing and Design |
| Mr. Robin Koenemann | 56 | Senior Vice President, Operations |
| Mr. Mark Kawanami | 50 | Senior Vice President, Finance |
| Mr. Brian Olin | 39 | Senior Vice President, Land and Planning |
| Mr. Ray Ferrarini | 48 | Senior Vice President, Operations |
| Mr. David Berman | 66 | Non-employee Director Nominee (Class 1 term will expire in 2015) |
| Mr. Douglas C. Neff | 65 | Non-employee Director Nominee (Class 1 term will expire in 2015) |
| Mr. Michael Berchtold | 50 | Non-employee Director Nominee (Class 2 term will expire in 2016) |
| Ms. Nadine Watt* | 45 | Independent Director Nominee (Class 1 term will expire in 2015) |
| Mr. Sam Bakhshandehpour* | 38 | Independent Director Nominee (Class 2 term will expire in 2016) |
| Mr. Gregory P. Lindstrom* | 60 | Independent Director Nominee (Class 2 term will expire in 2016) |
| Mr. William A. Witte* | 62 | Independent Director Nominee (Class 3 term will expire in 2017) |
| Ms. Cathey S. Lowe* | 60 | Independent Director Nominee (Class 3 term will expire in 2017) |
| Mr. Paul Heeschen* | 56 | Independent Director Nominee (Class 3 term will expire in 2017) |

———————
\*    This individual has agreed to become a member of our board of directors upon the completion of this offering and is expected to be an independent director.

## Biographical Information

The following is a summary of certain biographical information concerning our directors, our officers and our director nominees.

*H. Lawrence Webb* . Mr. Webb has served as our Chief Executive Officer and a member of our board of managers since 2010 and, following our formation transactions, will serve as Chief Executive Officer and Chairman of our board of directors. Between 1995 and 2008, he was Chief Executive Officer of John Laing Homes. Prior to joining John Laing Homes, he was Division President for Orange, Riverside and San Bernardino Counties for Kaufman & Broad, as well as Orange County President of Greystone Homes. From 2008 to 2009, Mr. Webb served as Co-Chief Restructuring Officer for LandSource. Mr. Webb currently serves on the Policy Advisory Board of Partners In Building, a Houston and Austin, Texas-based homebuilding company. Mr. Webb received his Bachelor of Arts in History from the State University of New York at Cortland and his Master of City and Regional Planning from Harvard University. Mr. Webb's leadership, vision, skills, deep knowledge of our business and experience in many facets of the homebuilding business led to our conclusion that Mr. Webb should serve as the Chairman of our board of directors.

*Wayne Stelmar* . Mr. Stelmar has served as our Chief Financial Officer and a member of our board of managers since 2010 and, following our formation transactions, will serve as Chief Financial Officer, Secretary and a member of our board of directors. In 1998, when Watt Residential Partners and John Laing Homes merged, he became CFO of John Laing Homes. Prior to joining John Laing Homes, Mr. Stelmar served as CFO of Watt

Table of Contents

Residential Partners. He joined the Watt Group Inc. in 1988. He has also worked with accounting firms Kenneth Leventhal & Company (later, E&Y Kenneth Leventhal Real Estate Group) and Grant Thornton where he began his career in 1977. Mr. Stelmar is a CPA (inactive) and holds a California real estate broker's license. Mr. Stelmar received his Bachelor of Science in Accounting from California State University, Northridge.

*Joseph D. Davis* . Mr. Davis has served as our Chief Investment Officer and a member of our board of managers since 2010 and, following our formation transactions, will serve as Chief Investment Officer. From 1996 to 2007, he served as President of Irvine Community Development Company, where he oversaw the planning, development and marketing of master planned communities owned by The Irvine Company on The Irvine Ranch, Orange County, California. He has held senior management positions at Amfac, Inc., Watt Group Inc., and Chevron Land and Development. Mr. Davis holds California real estate broker's and contractor's licenses. Mr. Davis received his Bachelor of Science in Business Administration and his Master of Business Administration from the University of Southern California.

*Tom Redwitz* . Mr. Redwitz has served as President of our Southern California subsidiary, Chief Operating Officer and a member of our board of managers since 2010 and, following our formation transactions, will serve as Chief Operating Officer. From 2002 to 2009, Mr. Redwitz served as the President of Laing Luxury Homes, a division of John Laing Homes. Mr. Redwitz is a licensed architect and general contractor. He also served as Division President while at Taylor Woodrow from 1996 to 2002 and worked nearly 10 years as an executive for The Irvine Company. Mr. Redwitz received his Associated Bachelor in Architecture from the University of California, Berkeley.

The following is a summary of certain biographical information concerning key employees.

*Kevin Carson* . Mr. Carson serves as President of our Northern California subsidiary. Prior to joining us in 2010, Mr. Carson served as President of the Sacramento division of John Laing Homes from 1999 to 2009, where he oversaw the overall operations of that division. Prior to joining John Laing Homes, Mr. Carson held several roles, including Division President of Crosswind Communities, President of the Sacramento division of Ryland Homes, and Vice President of Land Acquisition and Development for Dunmore Homes. Mr. Carson received his Bachelor of Arts in Community and Regional Planning from California State University, Chico and his Master of Arts in Urban Planning from Miami University in Oxford, Ohio.

*Andrew J. Jarvis* . Mr. Jarvis serves as President of TNHC Land Company LLC, our land holding company. Prior to joining us in 2010, Mr. Jarvis served as Vice President of Development and Hospitality for Emaar Properties from 2007 to 2009, Vice President of Land Acquisition and Development John Laing Homes, Luxury from 2002 to 2007, and Vice President of Land and Planning for Taylor Woodrow Homes from 1995 to 2002. Mr. Jarvis received his Bachelor of Arts in Architectural Engineering from the University of Colorado, Boulder and his Master of Business Administration in Finance from the University of California, Irvine.

*Joan Marcus-Colvin* . Ms. Marcus-Colvin serves as our Senior Vice President of Sales, Marketing and Design. Prior to joining us in 2010, Ms. Marcus-Colvin served as Senior Director of Interior Design for Emaar Design Studio LLC from 2007 to 2009 and as Vice President of Sales, Marketing and Design for John Laing Homes, Luxury from 2002 to 2007. Ms. Marcus-Colvin holds our California real estate broker's license. Ms. Marcus-Colvin received her Bachelor of Arts in Political Science from the University of California, Los Angeles.

*Robin Koenemann* . Mr. Koenemann serves as our Senior Vice President of Operations. Prior to joining us in 2010, Mr. Koenemann served as Vice President of Operations for John Laing Homes, Luxury from 2002 to 2009 and as Vice President of Construction at Capital Pacific Homes/J.M. Peters from 1992 to 2002. Mr. Koenemann currently maintains a California State Contractor's License "B." Mr. Koenemann served in the United States Navy from 1975 to 1979.

168

Table of Contents

*Mark Kawanami* . Mr. Kawanami serves as our Senior Vice President of Finance. Prior to joining us in 2010, Mr. Kawanami served as Vice President of Finance of John Laing Homes from 1998 to 2009. Prior to joining John Laing Homes, Mr. Kawanami held multiple roles, including Vice President of Finance for American Family Communities, Corporate Controller for California Pacific Homes and Director of Finance for Creative Design Consultants. Prior to entering the real estate business, Mr. Kawanami spent 3 years at KPMG where he earned his CPA; he is currently a member (inactive) of the American Institute of Certified Public Accountants. Mr. Kawamani received his Bachelor of Arts in Economics from the University of California, Los Angeles.

*Brian Olin* . Mr. Olin serves as our Senior Vice President of Land and Planning. Prior to joining us in 2011, Mr. Olin served in various positions, including President of the Bay Area Land Division beginning in 2005, at Lennar Corporation from 1999 to 2011. Mr. Olin received his Bachelor of Science in Economics and Business Administration from Saint Mary's College of California.

*Ray Ferrarini* . Mr. Ferrarini serves as our Senior Vice President of Operations in Northern California. Prior to joining us in August 2013, Mr. Ferrarini held the position of Regional Vice President of Operations for Shea Homes from 2005 to 2013 where he oversaw operations for Shea's Northern California Division. Prior to joining Shea Homes, Mr. Ferrarini was the Vice President of Operations for John Laing Homes from 2002 to 2005 in Northern California. Mr. Ferrarini attended California State University at Chico with focused studies in Construction Management and Business Administration.

As indicated above, Messrs. Webb, Stelmar and Redwitz served as executives, and Messrs. Koenemann, Ferrarini and Kawanami and Ms. Marcus-Colvin served as officers, of John Laing Homes. WL Homes LLC (doing business as John Laing Homes) and certain affiliated entities filed with the U.S. Bankruptcy Court for the District of Delaware for bankruptcy protection from creditors in 2009.

The following is a summary of certain biographical information concerning our non-employee director nominees.

*David Berman* . Mr. Berman will serve as a member of our board of directors effective upon the completion of this offering. Mr. Berman is Chairman and Chief Executive Officer of Tricon Capital Group Inc., the company he co-founded in 1988. From 1985 to 1988, Mr. Berman served as Executive Vice President of Lakeview Estates Limited, where he was responsible for land development and single-family homebuilding. Prior to 1985, Mr. Berman served as Vice President for real estate acquisitions and equity lending at First City Development Corporation and as Vice President for real estate lending at what is now Citibank Canada. Mr. Berman received his Bachelor of Science and his Master of Business Administration from the University of the Witwatersrand in Johannesburg, South Africa. Mr. Berman's hands-on experience in the homebuilding business, his extensive background in lending and finance of real estate, his experience in growing a business, his knowledge of our business and his leadership position with one of our institutional investors lead to our conclusion that Mr. Berman should serve as a member of our board of directors.

*Douglas C. Neff* . Mr. Neff will serve as a member of our board of directors effective upon the completion of this offering. Mr. Neff is a Managing Partner and President of IHP Capital Partners, which positions he has served in since 1992. Mr. Neff also serves as Chairman of IHP Capital Partners's Investment Committee and has primary responsibility for the company's operations. From 1985 until the founding of IHP Capital Partners in 1992, Mr. Neff was a Partner of The O'Donnell Group, a regional developer, owner and manager of commercial and industrial real estate. Prior to 1985, Mr. Neff was Treasurer of The Irvine Company and a Vice President in the Real Estate Industries Group at Wells Fargo Bank in San Francisco. Mr. Neff received his Bachelor of Arts in American Studies from Amherst College and his Master of Business Administration from the University of Chicago. Mr. Neff's background in real estate and finance, his extensive experience in real estate transactions, his deep knowledge of our markets, his knowledge of our business and his leadership position with one of our institutional investors lead to our conclusion that Mr. Neff should serve as a member of our board of directors.

Table of Contents

*Michael J. Berchtold* . Mr. Berchtold will serve as a member of our board of directors effective upon the completion of this offering. Mr. Berchtold is the principal and owner of Berchtold Capital Partners, an entity that serves as an advisor to us, providing general advice and guidance in connection with our becoming a public company, as well as assisting us with the selection of the members of our board of directors and the selection of our compensation consultant and advising our executives and our board of managers regarding governance and compensation matters. Mr. Berchtold worked for Morgan Stanley from 1987 to 2007 in a variety of investment banking roles in New York, Los Angeles, Tokyo, Singapore and Hong Kong. For more than 15 years, Mr. Berchtold was based in Asia where he served as Morgan Stanley's Head of Investment Banking for Asia Pacific for seven years and as President of Asia Pacific for four years. Mr. Berchtold has served on the Board of Visitors and Executive Committee of the UCLA Anderson School of Management since 2007 and also serves on the Advisory Board of the UCLA Anderson Center for Global Management. Mr. Berchtold received his Bachelor of Arts in History from the University of California, Los Angeles and his Master of Business Administration from the Anderson School of Management at the University of California, Los Angeles. Mr. Berchtold's leadership skills, his finance and capital markets experience, his strategic perspective and his understanding of our business lead to our conclusion that Mr. Berchtold should serve as a member of our board of directors.

*Nadine Watt* . Ms. Watt will serve as a member of our board of directors effective upon the completion of this offering. Ms. Watt is President of Watt Companies, where she oversees all commercial investment activities, including acquisitions, development and asset management, for the company's 6 million square-foot portfolio of properties. She also oversees Watt Companies' oil and gas operations. Since 2000, Ms. Watt has served in various capacities in the Watt group of companies, including leading a strategic reorganization of Watt Companies in 2011. Ms. Watt is a member of the University of Southern California Marshall School of Business' Board of Leaders, a board member of the California Science Center, the Brentwood School and 1st Century Bank and the vice chair of the Los Angeles Business Council. Ms. Watt received her Bachelor of Science in Foreign Service from the Georgetown University School of Foreign Service and her Master of Arts from the School of Cinematic Arts at the University of Southern California. Ms. Watt's experience in the real estate industry, her experience in managing businesses, her knowledge of our business and her leadership position with one of our institutional investors lead to our conclusion that Ms. Watt should serve as a member of our board of directors.

*Sam Bakhshandehpour* . Mr. Bakhshandehpour will serve as a member of our board of directors effective upon the completion of this offering. Since 2012, Mr. Bakhshandehpour has served as the President of sbe Entertainment (SLS Hotels), in which capacity he is responsible for top-level management of the Hotel, Restaurant and Nightlife Groups, as well as the company's International, Residential, Gaming and Corporate initiatives. From 2000 to 2012, Mr. Bakhshandehpour served in various positions at J.P. Morgan Securities, most recently running its Real Estate, Lodging & Gaming Investment Banking practice on the West Coast. While at J.P. Morgan Securities, Mr. Bakhshandehpour focused on mergers & acquisitions and capital raising for gaming companies globally, as well as select real estate investment trusts, lodging, homebuilders and real estate private equity funds on the West Coast. Mr. Bakhshandehpour holds a Bachelor of Science in Business Administration from Georgetown University with a double major in Finance and International Business. Mr. Bakhshandehpour's background in finance and capital markets, his experience in the real estate and homebuilding industry and his leadership experience lead to our conclusion that Mr. Bakhshandehpour should serve as a member of our board of directors.

*Gregory P. Lindstrom* . Mr. Lindstrom will serve as a member of our board of directors effective upon the completion of this offering. From 2007 to 2011, Mr. Lindstrom served as Executive Vice President, General Counsel and Board Secretary of The Irvine Company, a California real estate development, investment and operating company. In these positions, Mr. Lindstrom was a member of the four-person Office of the Chairman responsible for all administrative functions of the company, including the legal department. From 1978 to 2008, Mr. Lindstrom was a partner at Latham & Watkins LLP, where, at various times, he served as managing partner of the San Francisco and Orange County offices and as a member of the firm's Executive Committee. Currently, Mr. Lindstrom is a full-time Alternative Dispute Resolution professional specializing in the resolution of complex business disputes. Mr. Lindstrom received his Bachelor of Arts from the University of California Los Angeles and his J.D. from the University of Chicago. Mr. Lindstrom's extensive legal background, his

170

Table of Contents

demonstrated leadership ability and his prior service as an executive officer of a California real estate company lead to our conclusion that Mr. Lindstrom should serve as a member of our board of directors.

*William A. Witte* . Mr. Witte will serve as a member of our board of directors effective upon the completion of this offering. Mr. Witte is the President and Managing Partner of Related California, an urban and multifamily housing development company in California. Prior to joining The Related Companies in 1989, Mr. Witte served as Deputy Mayor for Housing and Neighborhoods for San Francisco under Mayor Art Agnos, where he oversaw all housing, development and redevelopment activities for the City. From 1981 to 1988, Mr. Witte served as Director of Housing and Economic Development for San Francisco under Mayor Dianne Feinstein. He also served as an appointed Commissioner of the San Francisco Housing Authority from 1989 to 1990. Mr. Witte is a member of the Board of Overseers of the Graduate School of Design at the University of Pennsylvania and a member of the National Real Estate Advisory Council of the Enterprise Foundation. Mr. Witte received his Bachelor of Arts in Urban Studies and his Master in City Planning, both from the University of Pennsylvania. Mr. Witte's experience in and knowledge of our industry, his prior public service in California and his experience managing businesses lead to our conclusion that Mr. Witte should serve as a member of our board of directors.

*Cathey S. Lowe* . Ms. Lowe will serve as a member of our board of directors effective upon the completion of this offering. Ms. Lowe is a finance professional and, since 2009, is the owner of Cathey Lowe Consulting, LLC, a consulting company that provides financial support to chief executive officers who do not require a full-time chief financial officer or to chief financial officers who lack staffing depth or expertise. Prior to founding Cathey Lowe Consulting, LLC, from 2002 to 2007, Ms. Lowe was the Senior Vice-President of Finance and Corporate Treasurer for the Ryland Group Inc., a national homebuilder and mortgage company headquartered in Calabasas, California, where she was responsible for identifying and developing the appropriate capital structure for the company. Additionally, she was the Investor Relations Officer and represented the Ryland Group on Wall Street with shareholders, analysts, rating agencies, the stock exchange and the financial media. She also managed the Land Committee and its evaluation and approval process of new land opportunities for Ryland's homebuilding operations. Prior to joining Ryland, Ms. Lowe worked for Atlantic Richfield Company in Dallas and Los Angeles in various finance and accounting functions for more than 20 years. Ms. Lowe is a CPA. She received her Bachelor of Business Administration in Accounting from the University of Houston, her Master of Science in Organizational Behavior from the University of Texas at Dallas and her Master of Business Administration in Finance from the Anderson School of Management at the University of California, Los Angeles. Ms. Lowe's background in finance, diverse experience with a national homebuilder company and her management experience lead to our conclusion that Ms. Lowe should serve as a member of our board of directors.

*Paul Heeschen* . Mr. Heeschen will serve as a member of our board of directors effective upon the completion of this offering. Mr. Heeschen serves as a General Partner of Sequoia Enterprises, LP, D.C.H. LP and Redwood Enterprises VII LP. For the past 22 years, he has been a Principal of Heeschen Associates, a private investment firm. Mr. Heeschen served as an Executive Chairman of Diedrich Coffee Inc. from February 2010 to May 2010 and Director from January 1996 to May 2010. He served as Non-Executive Chairman of Diedrich Coffee, Inc. from February 2001 to January 2010. Mr. Heeschen has been a Director at PCM, Inc. since February 2006. He is a trustee of the Palm Trust. Mr. Heeschen received his Bachelor of Science in Accounting from University of Southern California. Mr. Heeschen's experience serving on the boards of complex public companies, his demonstrated leadership ability and his extensive finance and business background lead to our conclusion that Mr. Heeschen should serve as a member of our board of directors.

## Family Relationships

There are no family relationships among any of our directors or executive officers.

Table of Contents

## Board of Directors

The number of members of our board of directors will be determined from time-to-time by action of our board of directors. Immediately following the completion of this offering, our board of directors will consist of 11 persons. After the completion of this offering, we expect our board of directors to determine that six of our directors, constituting a majority, satisfy the listing standards for independence of the New York Stock Exchange and Rule 10A- under the Exchange Act.

Our board of directors believes its members collectively have or will have the experience, qualifications, attributes and skills to effectively oversee the management of our company, including a high degree of personal and professional integrity, an ability to exercise sound business judgment on a broad range of issues, sufficient experience and background to have an appreciation of the issues facing our company, a willingness to devote the necessary t to board duties, a commitment to representing the best interests of our company and our stockholders and a dedication to enhancing stockholder value.

## Role of our Board of Directors in Risk Oversight

One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors administers this oversight function directly, with support from its standing committees to be established upon the completion of this offering, our audit committee, our compensation committee and our nominating and corporate governance committee, each of which will address risks specific to its area of oversight. In particular, our audit committee will have the responsibility to consider and discuss our major financial risk exposures and the steps our management take monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. audit committee will also monitor compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee will assess and monitor whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our nominating and corporate governance committee will provide oversight with respect to corporate governance and ethical conduct and will monitor the effectiveness of our corporate governance guidelines, including whether such guidelines are successful in preventing illegal or improper liability-creating conduct.

## Committees of our Board of Directors

Following the completion of this offering, our board will establish three committees: our audit committee, our compensation committee and our nominating and corporate governance committee. Each of these committees will consist of three members who will satisfy the New York Stock Exchange independence standards.

### *Audit Committee*

Upon the completion of this offering, our board of directors will establish an audit committee, which will be comprised of three independent directors, Cathey S. Lowe, Sam Bakhshandehpour and William A. Witte. We expect that our board of directors will determine that each of these member will be "financially literate" under the rules of the New York Stock Exchange. Ms. Lowe will serve as the chairperson of the audit committee. Our audit committee, pursuant to its written charter, will, among other matters, oversee (1) our financial reporting, auditing and internal control activities; (2) the integrity and audits of our financial statements; (3) our compliance with legal and regulatory requirements; (4) the qualifications and independence of our independent auditors; (5) the performance of our internal audit function and independent auditors; and (6) our overall risk exposure and management. Duties of the audit committee will also include the following:

- annually review and assess the adequacy of the audit committee charter and the performance of the audit committee;

- be responsible for the appointment, retention and termination of our independent auditors and determine the compensation of our independe auditors;

- review with the independent auditors the plans and results of the audit engagement;

172

Table of Contents

- evaluate the qualifications, performance and independence of our independent auditors;

- have sole authority to approve in advance all audit and non-audit services by our independent auditors, the scope and terms thereof, and the fees therefor;

- review the adequacy of our internal accounting controls;

- meet at least quarterly with our executive officers, internal audit staff and our independent auditors in separate executive sessions; and

- prepare the audit committee report required by SEC regulations to be included in our annual proxy statement.

We expect that Ms. Lowe will be designated by our board of directors as our audit committee financial expert, as that term is defined in the rules of the SEC.

### *Compensation Committee*

Upon the completion of this offering, our board of directors will establish a compensation committee, which will be comprised of three independent directors, Gregory P. Lindstrom, Sam Bakhshandehpour and Cathey S. Lowe, each of whom will be a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act. Mr. Lindstrom will serve as the chairperson of our compensation committee. The compensation committee, pursuant to its written charter, will, among other matters:

- assist our board of directors in developing and evaluating potential candidates for executive officer positions and overseeing the development of executive succession plans;

- administer, review and make recommendations to our board of directors regarding our compensation plans, including our 2014 Long-Term Incentive Plan;

- annually review and approve our corporate goals and objectives with respect to compensation for executive officers and, at least annually, evaluate each executive officer's performance in light of such goals and objectives to set his or her annual compensation, including salary, bonus and equity and non-equity incentive compensation, subject to approval by our board of directors;

- provide oversight of management's decisions regarding the performance, evaluation and compensation of other officers;

- review our incentive compensation arrangements to confirm that incentive pay does not encourage unnecessary risk-taking and to review and discuss, at least annually, the relationship between risk management policies and practices, business strategy and our executive officers' compensation;

- assist management in complying with our proxy statement and annual report disclosure requirements;

- discuss with management the compensation discussion and analysis required by SEC regulations; and

- prepare a report on executive compensation to be included in our annual proxy statement.

Our compensation committee will have the authority to retain and terminate any compensation consultant to be used to assist in the evaluation of executive officer compensation.

### *Nominating and Corporate Governance Committee*

Upon the completion of this offering, our board of directors will establish a nominating and corporate governance committee, which will be comprised of three independent directors, William A. Witte, Gregory P. Lindstrom and Paul C. Heeschen. Mr. Witte will serve as the chairperson of our nominating and corporate governance committee. The nominating and corporate governance committee, pursuant to its written charter, will, among other matters:

- identify individuals qualified to become members of our board of directors and ensure that our board of directors has the requisite expertise and its membership consists of persons with sufficiently diverse and independent backgrounds;

173

Table of Contents

- develop, and recommend to our board of directors for its approval, qualifications for director candidates and periodically review these qualifications with our board of directors;

- review the committee structure of our board of directors and recommend directors to serve as members or chairs of each committee of our board of directors;

- review and recommend committee slates annually and recommend additional committee members to fill vacancies as needed;

- develop and recommend to our board of directors a set of corporate governance guidelines applicable to us and, at least annually, review such guidelines and recommend changes to our board of directors for approval as necessary; and

- oversee the annual self-evaluations of our board of directors and management.

## Compensation Committee Interlocks and Insider Participation

None of our executive officers serves, or in the past has served, as a member of the board of directors or compensation committee, or other committee serving an equivalent function, of any entity that has one or more executive officers who serve as members of our board of directors or our compensation committee. None of the members of our compensation committee is, or has ever been, an officer or employee of our company.

## Code of Business Conduct and Ethics

Our board of directors will adopt a code of business conduct and ethics that will apply to our officers, directors and any employees. Among other matters, our code of business conduct and ethics will be designed to deter wrongdoing and to promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

- full, fair, accurate, timely and understandable disclosure in our communications with and reports to our stockholders, including reports filed with the SEC, and other public communications;

- compliance with applicable governmental laws, rules and regulations;

- prompt internal reporting of violations of the code to appropriate persons identified in the code; and

- accountability for adherence to the code of business conduct and ethics.

Any waiver of the code of business conduct and ethics for our executive officers, directors or any employees may be made only by our nominating and corporate governance committee and will be promptly disclosed as required by law and New York Stock Exchange regulations.

## Limitations on Liabilities and Indemnification of Directors and Officers

For information concerning limitations of liability and indemnification applicable to our directors and officers, see "Description of Capital Stock—Limitations on Liability, Indemnification of Officers and Directors and Insurance."

## Director Compensation

For a discussion of our director compensation arrangements, see "Executive and Director Compensation—Director Compensation."

174

Table of Contents

## EXECUTIVE AND DIRECTOR COMPENSATION

### Fiscal 2013 Summary Compensation Table

The following table summarizes information regarding the compensation awarded to, earned by or paid to H. Lawrence Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Thomas Redwitz, our Chief Operating Officer. We refer to these individuals in this section as our named executive officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| H. Lawrence Webb<br>Chief Executive Officer | 2013 | $350,000 | — | — | — | $350,000 |
| Wayne Stelmar<br>Chief Financial Officer | 2013 | $350,000 | — | — | — | $350,000 |
| Joseph Davis<br>Chief Investment Officer | 2013 | $350,000 | — | — | — | $350,000 |
| Thomas Redwitz<br>Chief Operating Officer | 2013 | $350,000 | — | — | — | $350,000 |

### Narrative to Summary Compensation Table

Our named executive officers are currently party to employment agreements with us that will be terminated upon completion of this offering. The existing employment agreements were entered into with each of our named executive officers in 2010, and each provides for, among other things, a base salary of $350,000, incentive compensation, if any, based on determination by the board of managers of TNHC LLC, and participation in any benefit plans that may be in effect from time to time. As discussed below under "—Employment Agreements," upon the completion of this offering, we will enter into new employment agreements with each of our named executive officers.

### Employment Agreements

Effective upon the completion of this offering, we will enter into employment agreements with each of Messrs. Webb, Stelmar, Davis and Redwitz. The employment agreements will have an initial term expiring on the third anniversary of the effective date of the employment agreement. Each employment agreement will provide for automatic one-year extensions after the expiration of the initial term, unless either party provides the other with at least 180 days' prior written notice of non-renewal. The employment agreements will require each named executive officer to dedicate his full business time and attention to the affairs of our company.

The employment agreements will provide for, among other things:

- an annual base salary of $500,000, $450,000, $450,000 and $450,000, respectively, for Messrs. Webb, Stelmar, Davis and Redwitz;

- eligibility for annual cash performance bonuses based on the satisfaction of performance goals to be established by our compensation committee;

- subject to the approval of our compensation committee, eligibility for equity-based compensation awards on the same terms and conditions as other senior executive officers; and

- participation in any employee benefit plans and programs that are maintained from time to time for our other senior executive officers.

The employment agreements will contain customary employee non-solicitation provisions that apply during the term of the agreements and for two years after the termination of their employment. The employment agreements also will contain standard confidentiality provisions that apply during the term of the agreements and after the termination of their employment.

Table of Contents

We may terminate the employment of a named executive officer at any time with or without cause, and the executive may terminate his employment with or without good reason. If we terminate a named executive officer's employment for cause, or if the named executive officer resigns without good reason, the named executive officer will be entitled to receive any earned but unpaid annual base salary, any earned but unpaid prior-year bonus, reimbursement of expenses incurred prior to the date of termination, accrued vacation and any other paid-time-off and any benefits that have been earned and accrued prior to the date of termination.

If we terminate a named executive officer's employment without cause or if the named executive officer terminates his employment for good reason, or due to disability or death, the named executive officer will be entitled to receive any earned but unpaid annual base salary, any earned but unpaid prior-year bonus, reimbursement of expenses incurred prior to the date of termination, accrued vacation and any other paid-time-off and any benefits that have been earned and accrued prior to the date of termination. In addition we will reimburse the employer-subsidized portion of the premium under our health and dental plans for a period of 24 months, in the case of Mr. Webb, or 12 months, in the case of Messrs. Stelmar, Davis and Redwitz (or until such earlier date on which they obtain substantially similar coverage).

If we terminate a named executive officer's employment without cause or if the named executive officer terminates his employment for good reason, the named executive officer will also be entitled to receive a lump sum cash payment in an amount equal to one times or, in the case of Mr. Webb, two times the sum of (1) the named executive officer's annual base salary, plus (2) the highest annual bonus paid to the named executive officer during the previous three calendar years. These severance benefits will be payable only if the named executive officer signs and does not revoke a waiver and release of any claims against us.

## Director Compensation

For the fiscal year ended December 31, 2013, members of the board of managers of TNHC LLC received no compensation for services rendered as such members.

Our board of directors will establish a compensation program for our non-employee directors. Pursuant to this compensation program, we will pay the following fees to each of our non-employee directors:

- an annual retainer of $40,000;

- $1,000 for each meeting attended in excess of eight meetings per year for our board of directors or any committee;

- an annual grant of $41,250 of restricted stock units pursuant to our 2014 Long-Term Incentive Plan (or 3,750 restricted stock units), the initial grant of which will be made upon the pricing of this offering and which restricted stock units will vest one year after the date of grant, subject to continued service. Once vested, the restricted stock units will be settled for an equal number of shares of our common stock;

- an additional annual cash retainer of $13,500 to the chair of our audit committee and an additional cash retainer of $8,500 for the other members of the audit committee;

- an additional annual cash retainer of $9,000 to the chair of our compensation committee and an additional cash retainer of $6,000 for the other members of such committee; and

- an additional annual cash retainer of $9,000 to the chair of our nominating and corporate governance committee and an additional cash retainer of $6,000 for the other members of such committee.

We will also reimburse our non-employee directors for reasonable out-of-pocket expenses incurred in connection with the performance of their duties as directors, including without limitation travel expenses in connection with their attendance in-person at board and committee meetings. Any non-employee director elected or appointed to our board of directors for the first time following the completion of this offering, and, as of the

176

Table of Contents

date of each annual meeting after the completion of this offering, each continuing non-employee director, will receive a grant of $41,250 of restricted stock units, based on the trading price of our common stock on the date of grant, which restricted stock units will vest one year after the date of grant subject to continued service. Once vested, the restricted stock units will be settled for an equal number of shares of our common stock. Directors who are employees will not receive any compensation for their services as directors.

## Director Stock Ownership Requirement

Each of our non-management directors will be required, within three years of becoming a member of our board, to own shares of our common stock equal to three times the annual cash retainer payable to our non-employee directors.

## 2014 Long-Term Incentive Plan

Prior to the completion of this offering, our board will have adopted, and our stockholders will have approved, our 2014 Long-Term Incentive Plan to attract and retain directors, officers, employees and consultants. Our 2014 Long-Term Incentive Plan provides for the grant of equity-based awards, including options to purchase shares of common stock, stock appreciation rights, common stock, restricted stock, restricted stock units and performance awards.

### Administration of our 2014 Long-Term Incentive Plan and Eligibility

Our 2014 Long-Term Incentive Plan will be administered by our compensation committee, which may delegate certain of its authority under our 2014 Long-Term Incentive Plan to our board of directors or, subject to applicable law, to our Chief Executive Officer or such other executive officer as our compensation committee deems appropriate; provided, that our compensation committee may not delegate its authority under our 2014 Long-Term Incentive Plan to our Chief Executive Officer or any other executive officer with regard to the selection for participation in our 2014 Long-Term Incentive Plan of an officer, director or other person subject to Section 16 of the Exchange Act or decisions concerning the timing, price or amount of an award to such an officer, director or other person.

Our compensation committee has the authority to make awards to eligible participants, which includes our officers, directors, employees and consultants, and persons expected to become our officers, directors, employees or consultants. Our compensation committee also has the authority to determine what form the awards will take, the amount and timing of the awards and all other terms and conditions of the awards. Our compensation committee may not amend or replace any previously granted option or stock appreciation right in a manner that is considered a repricing under stock exchange listing rules without stockholder approval.

### Share Authorization

The number of shares of our common stock that may be issued under our 2014 Long-Term Incentive Plan is 1,644,875 shares, of which no more than 1,644,875 shares of our common stock in the aggregate may be issued in connection with incentive stock options (which generally are stock options that meet the requirements of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code")). The number of shares of our common stock available under our 2014 Long-Term Incentive Plan shall be reduced by the sum of the aggregate number of shares of common stock which become subject to outstanding options, outstanding stock appreciation rights, outstanding stock awards and outstanding performance-related awards. To the extent that shares of our common stock subject to an outstanding option, stock appreciation right, stock award or performance award granted under our 2014 Long-Term Incentive Plan are not issued or delivered by reason of the expiration, termination, cancellation or forfeiture of such award or the settlement of such award in cash, then such shares of our common stock generally shall again be available under our 2014 Long-Term Incentive Plan.

177

Table of Contents

In the event of any equity restructuring that causes the per share value of shares of our common stock to change, such as a stock dividend, stock split, spinoff, rights offering or recapitalization through an extraordinary dividend, then our compensation committee will appropriately adjust the number and class of securities available under our 2014 Long-Term Incentive Plan and the terms of each outstanding award under our 2014 Long-Term Incentive Plan. In the event of any other change in corporate capitalization, including a merger, consolidation, reorganization or partial or complete liquidation, our compensation committee may make such equitable adjustments as it determines to be appropriate and equitable to prevent dilution or enlargement of rights of participants. The decision of our compensation committee regarding any such adjustment shall be final, binding and conclusive.

### Stock Options

Our 2014 Long-Term Incentive Plan authorizes the grant of incentive stock options and options that do not qualify as incentive stock options, except that incentive stock options will be granted only to persons who are our employees or employees of one of our subsidiaries, in accordance with Section 422 of the Code. The exercise price of each option will be determined by our compensation committee, provided that the price cannot be less than 100% of the fair market value of the shares of our common stock on the date on which the option is granted (or 110% of the shares' fair market value on the grant date in the case of an incentive stock option granted to an individual who is a "ten percent stockholder" under Sections 422 and 424 of the Code). The term of an option cannot exceed ten years from the date of grant (or five years in the case of an incentive stock option granted to a "ten percent stockholder").

### Stock Appreciation Rights

Our 2014 Long-Term Incentive Plan authorizes the grant of stock appreciation rights. A stock appreciation right provides the recipient with the right to receive, upon exercise of the stock appreciation right, shares of our common stock or, if provided in the award agreement, cash, or a combination of the two. The amount that the recipient will receive upon exercise of the stock appreciation right generally will equal the excess of the fair market value of the shares of our common stock on the date of exercise over the shares' fair market value on the date of grant. Stock appreciation rights will become exercisable in accordance with terms determined by our compensation committee. Stock appreciation rights may be granted in tandem with an option grant or as independent grants. The term of a stock appreciation right cannot exceed, in the case of a tandem stock appreciation right, the expiration, cancellation or other termination of the related option and, in the case of a free-standing stock appreciation right, ten years from the date of grant.

### Stock Awards

Our 2014 Long-Term Incentive Plan also provides for the grant of common stock, restricted stock and restricted stock units. Our compensation committee will determine the number of shares of common stock subject to a restricted stock award or restricted stock unit and the restriction period, performance period (if any), the performance measures (if any) and the other terms applicable to a stock award under our 2014 Long-Term Incentive Plan. A restricted stock unit confers on the participant the right to receive one share of common stock or, in lieu thereof, and if provided in the award agreement, the fair market value of such share of common stock in cash. The holders of awards of restricted stock will be entitled to receive dividends, and the holders of awards of restricted stock units may be entitled to receive dividend equivalents.

### Performance Awards

Our 2014 Long-Term Incentive Plan also authorizes the grant of performance awards. Performance awards represent the participant's right to receive an amount of cash, shares of our common stock, or a combination of both, contingent upon the attainment of specified performance measures within a specified period. Our compensation committee will determine the applicable performance period, the performance goals and such other conditions that apply to the performance award.

178

Table of Contents

### Change in Control

Subject to the terms of the applicable award agreement, upon a "change in control" (as defined in our 2014 Long-Term Incentive Plan), our compensation committee may, in its discretion, determine whether some or all outstanding options and stock appreciation rights shall become exercisable in full or in part, whether the restriction period and performance period applicable to some or all outstanding restricted stock awards and restricted stock units awards shall lapse in full or in part and whether the performance measures applicable to some or all outstanding awards shall be deemed to be satisfied. Our compensation committee may further require that shares of stock of the corporation resulting from such a change in control, or a parent corporation thereof, be substituted for some or all of our shares of common stock subject to an outstanding award and that any outstanding awards, in whole or in part, be surrendered to us by the holder, to be immediately cancelled by us, in exchange for a cash payment, shares of capital stock of the corporation resulting from or succeeding us or a combination of both cash and such shares of stock.

### Termination; Amendment

Our 2014 Long-Term Incentive Plan will automatically expire on the tenth anniversary of its effective date. Our board of directors may terminate or amend our 2014 Long-Term Incentive Plan at any time, subject to any requirement of stockholder approval required by applicable law, rule or regulation. Our compensation committee may amend the terms of any outstanding award under our 2014 Long-Term Incentive Plan at any time. No amendment or termination of our 2014 Long-Term Incentive Plan or any outstanding award may adversely affect any of the rights of an award holder without the holder's consent.

### Initial Awards

Upon the pricing of this offering, we will grant the following awards under our 2014 Long-Term Incentive Plan to the members of our management team, other officers and employees and our non-employee director nominees. In determining the initial awards to be granted, consideration was given to the form and amount of awards typically granted in connection with initial public offerings and the recommendations of Semler, Brossy Consulting Group, LLC, a compensation consultant that has been retained to assist us in making such determinations. We asked Semler Brossy to review compensation information for public homebuilders, provide compensation data related to executives at public homebuilders and provide us with general advice on compensation matters, including the determination of salaries and bonus, if any, amounts for our executive officers and equity awards for officers and directors and other employees.

- Each of Messrs. H. Lawrence Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Thomas Redwitz, our Chief Operating Officer, will be granted options to purchase 227,273 shares in the case of Mr. Webb and 181,818 shares each (with a strike price equal to $11.00 per share) in the case of Messrs. Stelmar, Davis and Redwitz. These options will vest on the third anniversary of the date of grant subject to continued service, and will expire in 10 years.

- Our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees will be granted 73,750 restricted stock units and options to purchase 112,727 shares of our common stock (with a strike price equal to $11.00 per share) and cash awards in an aggregate amount of $200,000. Once vested, the restricted stock units will be settled for an equal number of shares of our common stock.

- As part of the annual retainer, each of our non-employee director nominees will be granted restricted stock units, including an initial grant to be made upon the pricing of this offering, as described above.

179

Table of Contents

*Registration Statement on Form S-8*

In connection with this offering, we intend to file a registration statement on Form S-8 to register the total number of shares of our common stock that may be issued under our 2014 Long-Term Incentive Plan, including the restricted stock units to be granted to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz), employees and our director nominees, as well as the options to purchase shares of our common stock to be granted to the members of our management team, officers and employees, in each case upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

## Executive Incentive Compensation Plan

Prior to the completion of this offering, we expect to adopt an Executive Incentive Compensation Plan ("Incentive Plan") to assist us in attracting, motivating and retaining officers and other key employees who have significant responsibility for our growth and long-term success by providing incentive awards that ensure a strong pay-for-performance linkage for such officers and key employees. The material terms of the Incentive Plan are expected to be as follows:

*PLAN TERM.* The Incentive Plan will continue in effect until terminated by our board of directors.

*ELIGIBLE PARTICIPANTS.* All of our officers and other key employees will be eligible to participate in the Incentive Plan. Our compensation committee, in its discretion, will select the officers and other key employees to whom awards may from time to time be granted under the Incentive Plan.

*AWARD TYPES.* Under the Incentive Plan, the compensation committee may grant cash incentive award opportunities with respect to each performance period designated by our compensation committee, which may correspond to, or be longer or shorter than, our fiscal year.

*ADMINISTRATION.* The Incentive Plan will be administered by a committee designated by our board. The compensation committee will have the authority to select the persons who are granted awards under the Incentive Plan, to determine the time when awards will be granted, to determine whether objectives and conditions for earning awards have been met, to determine whether awards will be paid at the end of the award period or deferred and to determine whether an award or payment of an award should be reduced or eliminated. The compensation committee will have full power and authority to administer and interpret the Incentive Plan and to adopt such rules, regulations, agreements, guidelines and instruments for the administration of the Incentive Plan and for the conduct of its business as the compensation committee deems necessary or advisable. The compensation committee's interpretations of the Incentive Plan, and all actions taken and determinations made by the compensation committee pursuant to the powers vested in it, will be conclusive and binding on all parties concerned, including us, our stockholders and any person receiving an award under the Incentive Plan.

*PERFORMANCE TARGETS.* Under the Incentive Plan, any performance goals applicable to a particular award will be determined by the compensation committee at the time of grant. The performance goals may be one or more of the following corporate-wide or subsidiary, division, operating unit or individual measures, stated in either absolute terms or relative terms, such as rates of growth or improvement: the attainment of a specified fair market value for a specified period of time; earnings per share; return on assets; return on equity; return on investments; return per share of common stock on invested capital; total stockholder return; earnings or net income of the company before or after taxes and/or interest; earnings before interest, taxes, depreciation and amortization; revenues; market share; cash flow or cost-reduction goals; interest expense after taxes; economic value created; gross margin; operating margin; net cash provided by operations; and strategic business criteria, consisting of one or more objectives based on meeting specified market penetration, geographic business expansion goals, cost targets, customer satisfaction, reductions in errors and omissions, reductions in lost business, management of employment practices and employee benefits, supervision of litigation and information technology, quality and quality audit scores, efficiency and goals relating to acquisitions or divestitures, or any combination of the foregoing.

Table of Contents

*ADJUSTMENTS.* The compensation committee may provide that the performance targets or the manner in which performance will be measured against the performance targets will be adjusted in such a manner as it deems appropriate, including, without limitation, any adjustments to reflect the impact of specified corporate transactions (such as a stock split or stock dividend), special charges, accounting or tax law changes and other extraordinary or nonrecurring events.

*PAYMENT OF AWARDS.* Performance-based awards will be payable upon a determination by the compensation committee that the specified performance targets for the preceding payment period were achieved. A participant may elect to defer all or a portion of any award otherwise payable if permitted pursuant to a deferred compensation plan adopted by, or an agreement entered into with us, provided that such deferral complies with Section 409A of the Code.

*DELEGATION OF ADMINISTRATIVE AUTHORITY.* The compensation committee, as it deems necessary, may delegate its responsibilities for administering the Incentive Plan to our executives.

## Rule 10b5-1 Sales Plan

Our directors and executive officers may adopt written plans, known as Rule 10b5-1 plans, in which they will contract with a broker to buy or sell shares of our common stock on a periodic basis. Under a Rule 10b5-1 plan, a broker executes trades pursuant to parameters established by the director or officer when entering into the plan, without further direction from them. The director or officer may amend or terminate a Rule 10b5-1 plan in some circumstances. Our directors and executive officers also may buy or sell additional shares outside a Rule 10b5-1 plan when they are not in possession of material nonpublic information, subject to compliance with the terms of our policy on insider trading and communications with the public. Our directors and executive officers may not establish any such plan prior to the expiration of the lock-up agreements described under "Underwriting."

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Upon the completion of this offering, our executive officers, directors, director nominees and other related parties will receive material financial and other benefits, including the following:

### Employment Agreements

H. Lawrence Webb, Wayne Stelmar, Joseph Davis and Thomas Redwitz will serve as our Chief Executive Officer, Chief Financial Officer, Chief Investment Officer and Chief Operating Officer, respectively. Upon the completion of this offering, we will enter into employment agreements with each of these officers, which employment agreements will provide for salary, bonus and other benefits and severance upon a termination of employment under certain circumstances. We may enter into similar employment arrangements with certain executive officers that we hire in the future. See "Executive and Director Compensation—Employment Agreements" for a description of the material terms of the employment agreements.

### Grants Under our 2014 Long-Term Incentive Plan

Each of Messrs. H. Lawrence Webb, our Chief Executive Officer, Wayne Stelmar, our Chief Financial Officer, Joseph Davis, our Chief Investment Officer, and Thomas Redwitz, our Chief Operating Officer, will be granted options to purchase 227,273 shares in the case of Mr. Webb and 181,818 shares each (with a strike price equal to $11.00 per share) in the case of Messrs. Stelmar, Davis and Redwitz, upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan. These options will vest on the third anniversary of the date of grant, subject to continued service, and will expire in 10 years.

Our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees will be granted 73,750 restricted stock units and options to purchase 112,727 shares of our common stock (with a strike price equal to $11.00 per share) upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan, and cash awards in an aggregate amount of $200,000. Once vested, the restricted stock units will be settled for an equal number of shares of our common stock.

As part of the annual retainer, each of our non-employee director nominees will be granted $41,250 of restricted stock units (or, for the initial grant, 3,750 restricted stock units), including an initial grant to be made upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan, which restricted stock units will vest one year from the date of grant, subject to continued service. Once vested, the restricted stock units will be settled for an equal number of shares of our common stock.

### Indemnification Agreements

Upon the completion of this offering, we will enter into an indemnification agreement with each of our officers and directors. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law against liabilities that may arise by reason of their service to us and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified. See "Description of Capital Stock—Limitations on Liability, Indemnification of Officers and Directors and Insurance."

### Registration Rights

We will enter into a registration rights agreement with the members of TNHC LLC, including the members of our management team, with respect to the shares of our common stock that they will receive as part of our formation transactions. We refer to these shares collectively as the "registrable shares." Pursuant to the registration rights agreement, we will grant the members of TNHC LLC and their direct and indirect transferees shelf registration rights requiring us to file a shelf registration statement and to maintain the effectiveness of such registration statement so as to allow sales thereunder from time to time, demand registration rights to have the

182

Table of Contents

resale of the registrable shares registered, and, in certain circumstances, the right to "piggy-back" the registrable shares in registration statements we m
file in connection with certain future public offerings.

Notwithstanding the foregoing, any registration will be subject to cutback provisions, and we will be permitted to suspend the use, from time to time
of the prospectus that is part of the registration statement (and therefore suspend sales under the registration statement) for certain periods, referred to a
"blackout periods."

## Joint Ventures

During the years ended December 31, 2012 and 2011, we incurred construction-related costs on behalf of our unconsolidated joint ventures totalin
$2,231,559 and $411,235, respectively. As of December 31, 2012 and 2011, $51,160 and $40,549 are reflected as due from affiliates in our consolidate
balance sheets, respectively.

We have entered into agreements with our unconsolidated joint ventures to provide management services related to the underlying projects. Pursu
to such management agreements, we receive overhead fees based on each project's revenues. During the years ended December 31, 2012 and 2011,
earned and received $2,949,365 and $844,411, respectively, in overhead fees, which have been recorded as fee building revenue in our consolidated
statements of operations.

During the year ended December 31, 2012, we received $113,563 from one of our unconsolidated joint ventures for certain loan guaranties provide
over a 12-month period by us on behalf of the unconsolidated joint venture. We deferred these fees as unearned income at the point the guarantee was
executed and the cash was received. For the year ended December 31, 2012, we have recognized $85,172 of these fees as guaranty fee income, in our
consolidated statements of operations. As of December 31, 2012, the remaining deferred portion of the fees was $28,391, which is reflected as deferred
income from affiliate in our consolidated balance sheets.

We have a 10% capital interest in the Calabasas Village joint venture. We serve as a limited partner and, through one of our wholly-owned
subsidiaries, as the general partner of the joint venture. Calabasas Equity, LP, an affiliate of Tricon, is also a limited partner in this joint venture. The join
venture owns the Calabasas Village project located in Calabasas, California. Under the terms of the joint venture, after the return of a certain preference
amount and undistributed capital to the joint venture partners, we are entitled to receive 25% of the distributions from the joint venture until our partner
achieves a 20% internal rate of return and then 50% of the distributions from the joint venture until our partner achieves a 25% internal rate of return.
Thereafter, we are entitled to receive 60% of the distributions from the joint venture. At the time of Calabasas Equity becoming our partner in the Calabas
Village joint venture, the joint venture executed an unsecured promissory note for the benefit of Watt Communities, LLC, our prior partner in such joint
venture and an affiliate of Watt. The principal amount of such note is $986,000 and bears interest at 12% per annum. Pursuant to the terms of such note
joint venture agreed to pay to Watt Communities its originally contributed capital in the principal amount of such note and Watt Communities agreed to
cooperate in assigning its property rights under the joint venture. In accordance with the terms of such note, the joint venture made a payment of $920,0
on November 30, 2013, and the balance of the principal and all accrued interest is due on January 31, 2014.

We have an indirect capital interest in the TNHC Newport joint venture through our unconsolidated subsidiary, TNHC Meridian Investors. We have
37% capital interest in TNHC Meridian Investors, and IHP Meridian, an affiliate of IHP, is our partner in TNHC Meridian Investors. Under the terms of the
TNHC Meridian Investors joint venture agreement, after the return of certain preference amounts, capital contributions and cost overruns/profit shortfalls
the joint venture partners, we are entitled to receive distributions from the joint venture equal to our percentage capital interest. TNHC Meridian Investors
in turn has a 35% capital interest in the TNHC Newport joint venture.

### IHP Note

IHP, one of TNHC LLC's members and, subsequent to the completion of our formation transactions, one of our shareholders, issued an unsecured
promissory note to us on December 13, 2012. The note provided for a

183

Table of Contents

commitment of $5,500,000, of which $1,000,000 had been funded as of December 31, 2012 and is included in notes payable to member in our consolida
balance sheets. The note bore interest at 14% per annum and was repaid in August 2013 and the remaining commitment was closed.

### Investor Rights Agreement

Pursuant to an investor rights agreement that we will enter into with our non-management institutional investors prior to the completion of this offering, each non-management institutional investor will have the right to nominate one member of our board for as long as it owns 4% or more of our outstanding common stock (excluding shares of common stock that are subject to issuance upon the exercise or exchange of rights of conversion or any options, warrants or other rights to acquire shares). Each non-management institutional investor will agree to vote all shares of our common stock that it owns in favor of Messrs. Webb or Berchtold (or, if at that time nominated as a director, Messrs. Stelmar, Davis or Redwitz) in any election in which Mess Webb or Berchtold (or, as the case may be, Messrs. Stelmar, Davis or Redwitz) is a director nominee, and each of Messrs. Webb, Stelmar, Davis and Redwitz will agree to vote all shares of our common stock that he owns in favor of the nominees of the non-management institutional investors in any election of directors in which a non-management institutional investor nominee is a director nominee for as long as such non-management institutional investor owns at least 4%.

### Advisory Services of Berchtold Capital Partners

Berchtold Capital Partners, an entity owned by Mr. Michael Berchtold, one of our non-employee director nominees, serves as an advisor to us, providing us with general advice and guidance in connection with our becoming a public company, as well as assisting us with the selection of the memb of our board of directors, the selection of and interacting with our compensation consultant and advising our executives and our board of managers regarding governance and compensation matters. We will pay Berchtold Capital Partners $500,000 for providing us with these services.

### Share Purchase from Non-Management Institutional Investors

We have entered into an agreement with our non-management institutional investors. Pursuant to such agreement, Watt, one of our non-managem institutional investors has agreed to sell to us, and we have agreed to buy from such non-management institutional investor up to 1,171,875 shares of ou common stock, if the underwriters exercise their option to purchase additional shares of our common stock from us. The aggregate number of shares tha will purchase from such non-management institutional investor pursuant to such agreement will be the same number of shares, if any, that we sell to the underwriters pursuant to the exercise of such option. The price per share of common stock that we will pay to purchase these shares will be equal to the price per share of common stock sold to the public pursuant to this offering, less the underwriting discount.

184

Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth the beneficial ownership of our common stock immediately prior to and immediately after the completion of this offering by (1) each of our directors and director nominees, (2) each of our executive officers, (3) all of our directors, director nominees and executive officers as a group and (4) each person known by us to be the beneficial owner of more than 5% of our outstanding common stock.

To our knowledge, each person named in the table has sole voting and investment power with respect to all of the securities shown as beneficially owned by such person, except as otherwise set forth in the notes to the table. The number of securities shown represents the number of securities the person "beneficially owns," as determined by the rules of the SEC. The SEC has defined "beneficial ownership" of a security to mean the possession, directly or indirectly, of voting or investment power over that security. A security holder is also deemed to be, as of any date, the beneficial owner of all securities over which such security holder has the right to acquire voting or investment power within 60 days after that date, including through (1) the exercise of any option, warrant or right, (2) the conversion of a security, (3) the power to revoke a trust, discretionary account or similar arrangement or (4) the automatic termination of a trust, discretionary account or similar arrangement.

The percentages reflect beneficial ownership immediately prior to and immediately after the completion of this offering as determined in accordance with Rule 13d-3 under the Exchange Act and are based on 8,636,250 shares of our common stock outstanding as of the date immediately prior to the completion of this offering and 16,448,750 shares of our common stock outstanding as of the date immediately following the completion of this offering, in each case after giving effect to our formation transactions. We have granted the underwriters an option to purchase up to 1,171,875 additional shares of common stock. If the underwriters exercise their option to purchase additional shares of our common stock from us, we will use the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors. Except as noted below, the address for all beneficial owners in the table below is 95 Enterprise, Suite 325, Aliso Viejo, California 92656.

| | Amount and Nature of Beneficial Ownership | | | | | |
|---|---|---|---|---|---|---|
| | Immediately Prior to this Offering | | Immediately After this Offering(1) | | Immediately After this Offering (Assuming Full Exercise of the Underwriters' Option to Purchase Additional Shares and the Related Repurchase of Shares from one of our Non-Management Institutional Investors) | |
| Name and Address of Beneficial Owner | Shares Beneficially Owned | Percentage | Shares Beneficially Owned | Percentage | Shares Beneficially Owned | Percentage |
| H. Lawrence Webb(1)(2) (3) (4) | 998,790 | 11.6% | 998,790 | 6.1% | 998,790 | 6.1% |
| Wayne Stelmar(1)(3)(5)(6) | 721,672 | 8.3% | 721,672 | 4.4% | 721,672 | 4.4% |
| Joseph Davis(1)(3)(7)(8) | 647,903 | 7.5% | 647,903 | 3.9% | 647,903 | 3.9% |
| Thomas Redwitz(1)(3)(9)(10) | 518,322 | 6.0% | 518,322 | 3.2% | 518,322 | 3.2% |
| David Berman(11)(12) | 1,916,327 | 22.2% | 1,916,327 | 11.6% | 1,916,327 | 11.6% |
| Douglas C. Neff(13)(14) | 1,916,618 | 22.2% | 1,916,618 | 11.7% | 1,916,618 | 11.7% |
| Michael Berchtold(15) | — | * | — | * | — | * |
| Nadine Watt(16)(17) | 1,916,618 | 22.2% | 1,916,618 | 11.7% | 744,743 | 4.5% |
| Sam Bakhshandehpour(15) | — | * | — | * | — | * |
| Gregory P. Lindstrom(15) | — | * | — | * | — | * |
| William A. Witte(15) | — | * | — | * | — | * |
| Cathey S. Lowe(15) | — | * | — | * | — | * |
| Paul Heeschen(15) | — | * | — | * | — | * |
| All directors, director nominees and executive officers as a group (13 persons)(2)(4)(5)(6) (7)(8)(9)(10)(11)(13)(15)(16) | 8,636,250 | 100.0% | 8,636,250 | 52.5% | 7,464,375 | 45.4% |

185

Table of Contents

| | Amount and Nature of Beneficial Ownership | | | | | |
|---|---|---|---|---|---|---|
| | Immediately Prior to this Offering | | Immediately After this Offering[1] | | Immediately After this Offering (Assuming Full Exercise of the Underwriters' Option to Purchase Additional Shares and the Related Repurchase of Shares from one of our Non-Management Institutional Investors) | |
| Name and Address of Beneficial Owner | Shares Beneficially Owned | Percentage | Shares Beneficially Owned | Percentage | Shares Beneficially Owned | Percentage |
| **More than 5% Stockholders:** | | | | | | |
| TNHC Partners LLC[1] [3] | 2,886,687 | 33.4% | 2,886,687 | 17.5% | 2,886,687 | 17.5% |
| IHP Capital Partners VI, LLC [14] | 1,916,618 | 22.2% | 1,916,618 | 11.7% | 1,916,618 | 11.7% |
| Watt/TNHC LLC[17] | 1,916,618 | 22.2% | 1,916,618 | 11.7% | 744,743 | 4.5% |
| TCN/TNHC LP[11][12] | 1,916,327 | 22.2% | 1,916,327 | 11.6% | 1,916,327 | 11.6% |

---

[*]   Represents less than 1% of the number of shares of our common stock outstanding.

[1]   As part of our formation transactions, the members of TNHC LLC will receive an aggregate of 8,636,250 shares of our common stock in connection with the exchange of their membership interest in TNHC LLC. The members of TNHC LLC include an entity owned by our executive management team and our three non-management institutional investors.

[2]   Includes 998,790 shares of our common stock owned by the Hadley-Webb Family Trust (of which Mr. Webb is a trustee).

[3]   The Hadley-Webb Family Trust (of which Mr. Webb is a trustee), the W. and L. Stelmar Trust (of which Mr. Stelmar is a trustee), the Joseph and Terri Davis Family Trust (of which Mr. Davis is a trustee) and the Redwitz Family Trust (of which Mr. Redwitz is a trustee) are the only members of TNHC Partners LLC. Messrs. Webb, Stelmar, Davis and Redwitz may be deemed to share voting power and dispositive power over the shares of common stock owned by TNHC Partners LLC. Each of Messrs. Webb, Stelmar, Davis and Redwitz disclaims beneficial ownership of the shares of our common stock owned by TNHC Partners LLC except to the extent of any pecuniary interest therein.

[4]   Excludes 227,273 shares of our common stock issuable upon the exercise of options to be granted to Mr. Webb upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (with a strike price of $11.00 per share).

[5]   Includes 721,672 shares of our common stock owned by the W. and L. Stelmar Trust (of which Mr. Stelmar is a trustee).

[6]   Excludes 181,818 shares of our common stock issuable upon the exercise of options (with a strike price of $11.00 per share) to be granted to Mr. Stelmar upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

[7]   Includes 647,903 shares of our common stock owned by the Joseph and Terri Davis Family Trust (of which Mr. Davis is a trustee).

[8]   Excludes 181,818 shares of our common stock issuable upon the exercise of options (with a strike price of $11.00 per share) to be granted to Mr. Davis upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

[9]   Includes 518,322 shares of our common stock owned by the Redwitz Family Trust (of which Mr. Redwitz is a trustee).

[10]   Excludes 181,818 shares of our common stock issuable upon the exercise of options (with a strike price of $11.00 per share) to be granted to Mr. Redwitz upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

[11]   Excludes $41,250 of restricted stock units to be granted to Mr. Berman upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (or 3,750 restricted stock units). Mr. Berman is Chairman and Chief Executive Officer of Tricon Capital Group, Inc., one of our non-management institutional investors.

[12]   TCN/TNHC GP LLC has voting and dispositive power over the shares of our common stock held by TCN/TNHC LP. Mr. Berman disclaims beneficial ownership of the shares of our common stock owned by TCN/TNHC LP except to the extent of any pecuniary interest therein.

Table of Contents

(13)    Excludes $41,250 of restricted stock units to be granted to Mr. Neff upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (or 3,750 restricted stock units). Mr. Neff is a Managing Partner and President of IHP Capital Partners, one of our non-management institutional investors.

(14)    Institutional Housing Partners VI L.P. has voting and dispositive power over the shares of our common stock held by IHP Capital Partners VI LLC. Mr. Neff disclaims beneficial ownership of the shares of our common stock owned by IHP Capital Partners VI LLC except to the extent of any pecuniary interest therein.

(15)    Excludes $41,250 of restricted stock units to be granted to each of Messrs. Berchtold, Bakhshandehpour, Heeschen, Lindstrom and Witte and Ms. Lowe upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (or 3,750 restricted stock units).

(16)    Excludes $41,250 of restricted stock units to be granted to Ms. Watt upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan (or 3,750 restricted stock units). Ms. Watt is President of Watt Companies, an affiliate of one of our non-management institutional investors.

(17)    Watt Residential LLC has voting and dispositive power over the shares of our common stock held by Watt/TNHC LLC. Ms. Watt disclaims beneficial ownership of the shares of our common stock owned by Watt/TNHC LLC except to the extent of any pecuniary interest therein.

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

*The following description is intended as a summary of our certificate of incorporation [which we refer to as our " charter" ] and our bylaws, which will become effective prior to the completion of this offering and the forms of which are filed as exhibits to the registration statement of which this prospectus forms a part, and to the applicable provisions of the DGCL.*

### General

Prior to the completion of this offering, TNHC LLC was converted from a Delaware limited liability company into a Delaware corporation and renamed The New Home Company Inc. and the members of TNHC LLC will receive an aggregate of 8,636,250 shares of our common stock in connection with the conversion of their membership interests in TNHC LLC. Upon the completion of this offering and our formation transactions, our authorized capital stock will consist of 500,000,000 shares of common stock, par value of $0.01 per share, and 50,000,000 shares of preferred stock. Immediately prior to this offering, after giving effect to our formation transactions, there will be 8,636,250 shares of our common stock outstanding. Upon the completion of this offering, as a result of the issuance of 7,812,500 shares in this offering by us, there will be 16,448,750 shares of our common stock issued and outstanding and no shares of preferred stock issued and outstanding.

### Common Stock

Shares of our common stock have the following rights, preferences and privileges:

- *Voting Rights* . Each outstanding share of common stock entitles its holder to one vote on all matters submitted to a vote of our stockholders, including the election of directors. There are no cumulative voting rights. Generally, all matters to be voted on by stockholders must be approved by a majority of the votes cast by the shares of common stock present in person or represented by proxy and entitled to vote.

- *Dividends* . Subject to the rights of the holders of any preferred stock which may be outstanding from time to time, the holders of common stock are entitled to receive dividends as, when and if dividends are declared by our board of directors out of assets legally available for the payment of dividends. We currently intend to retain our future earnings, if any, to finance the development and expansion of our business and, therefore, do not intend to pay cash dividends on our common stock for the foreseeable future. Any future determination to pay dividends will be at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, restrictions contained in any financing instruments and such other factors as our board of directors deems relevant.

- *Liquidation* . In the event of a liquidation, dissolution or winding up of our affairs, whether voluntary or involuntary, after payment of our liabilities and obligations to creditors and any holders of preferred stock, our remaining assets, if any, will be distributed ratably among the holders of shares of common stock on a per share basis.

- *Rights and Preferences* . Our common stock has no preemptive, redemption, conversion or subscription rights. The rights, powers, preferences and privileges of holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of preferred stock that we may designate and issue in the future.

- *Merger* . In the event we merge or consolidate with or into another entity, holders of each share of common stock generally will be entitled to receive the same per share consideration.

Our common stock has been approved for listing on the New York Stock Exchange, subject to official notice of issuance, under the symbol "NWHM."

188

Table of Contents

## Preferred Stock

Our charter will provide that our board of directors has the authority, without action by the stockholders, to designate and issue up to 50,000,000 shares of preferred stock in one or more classes or series and to fix the powers, rights, preferences and privileges of each class or series, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences and the number of shares constituting any class or series. The rights fixed as to any class or series of preferred stock may be greater than the rights of the holders of the common stock. There will be no shares of preferred stock outstanding immediately after the completion of this offering. Any issuance of shares of preferred stock could adversely affect the voting power and liquidation rights of holders of common stock, and the likelihood that the holders will receive dividend payments and payments upon liquidation could have the effect of delaying, deferring or preventing a change in control that might otherwise be favorable to our common stockholders. We have no present plan to issue any shares of preferred stock.

## Anti-Takeover Effects of Our Charter, Our Bylaws and Delaware Law

Some provisions of Delaware law and our charter and bylaws will contain provisions that could have the effect of delaying, deterring or preventing another party from acquiring or seeking to acquire control of us. These provisions are intended to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage anyone seeking to acquire control of us to negotiate first with our board of directors. However, these provisions may also delay, deter or prevent a change in control or other takeover of our company that our stockholders might consider to be in their best interests, including transactions that might result in a premium being paid over the market price of our common stock, and also may limit the price that investors are willing to pay in the future for our common stock. These provisions may also have the effect of preventing changes in our management.

Our charter will divide our board of directors into three classes. The initial term of the directors who are members of Class 1 will expire in 2015, the initial term of the directors who are members of Class 2 will expire in 2016, and the initial term of the Class 3 directors will expire in 2017. Beginning in 2014, our stockholders will elect directors for three year terms upon the expiration of their current terms. Our stockholders will elect only one class of directors each year. We believe that classification of our board of directors will help to assure the continuity of our business strategies and policies. The classified board provision could have the effect of making the replacement of incumbent directors more time consuming and difficult. At least two annual meetings of our stockholders will generally be required to effect a change in a majority of our board of directors.

### Our Charter and Bylaws

Our charter and bylaws will include anti-takeover provisions that:

- divide our directors into three classes, with the term of one class expiring each year, which could delay a change in our control;

- authorize our board of directors, without further action by the stockholders, to issue up to 50,000,000 shares of preferred stock in one or more classes or series, and to fix the number of shares constituting each class or series and establish the rights and other terms of that class or series;

- require that actions to be taken by our stockholders may be taken only at an annual or special meeting of our stockholders and not by written consent;

- specify that special meetings of our stockholders can be called only by our board of directors pursuant to a resolution adopted by a majority of the total number of directors then in office, the chairman of our board of directors or our chief executive officer;

- establish advance notice procedures for stockholders to submit nominations of candidates for election to our board of directors and other proposals to be brought before a stockholders' meeting;

- provide that our bylaws may be amended by our board of directors without stockholder approval;

189

Table of Contents

- allow our directors to establish the size of our board of directors by action of our board, subject to a minimum of three members;

- provide that vacancies on our board of directors or newly created directorships resulting from an increase in the number of our directors may be filled only by a majority of directors then in office, even though less than a quorum;

- do not give the holders of our common stock cumulative voting rights with respect to the election of directors; and

- prohibit us from engaging in certain business combinations with any "interested stockholder" unless specified conditions are satisfied as described below under "—Business Combinations."

### *Business Combinations*

We have opted out of Section 203 of the DGCL, which regulates corporate takeovers. However, our charter contains provisions that are similar to Section 203 of the DGCL. Specifically, our charter provides that we may not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the person became an interested stockholder, unless:

- prior to the time that person became an interested stockholder, our board of directors approved either the business combination or the transaction which resulted in the person becoming an interested stockholder;

- upon consummation of the transaction which resulted in the person becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding certain shares; or

- at or subsequent to the time the person became an interested stockholder, the business combination is approved by our board of directors and the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, consolidation, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an interested stockholder is a person who, together with that person's affiliates and associates, own within the previous three years owned, 15% or more of our voting stock. This provision could prohibit or delay mergers or other takeover or change in control attempts with respect to us and, accordingly, may discourage attempts to acquire us in transactions that may otherwise be favorable to our stockholders.

## Limitations on Liability, Indemnification of Officers and Directors and Insurance

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties as directors. Our charter and bylaws will include provisions that indemnify, to the fullest extent allowable under the DGCL, the personal liability of directors or officers for monetary damages for actions taken as our director or officer, or for serving at our request as a director or officer or another position at another corporation or enterprise, as the case may be. Our charter and bylaws also provide that we must indemnify and advance reasonable expenses to our directors and officers, subject to our receipt of an undertaking from the indemnified party as may be required under the DGCL. We are also expressly authorized to carry directors' and officers' insurance to protect us, our directors, officers and certain employees for some liabilities. The limitation of liability and indemnification provisions in our charter may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. However, these provisions do not limit or eliminate our rights, or those of any stockholder, to seek non-monetary relief, such as injunction or rescission, in the event of a breach of a director's duty of care. The provisions will

190

Table of Contents

also not alter the liability of directors under the federal securities laws. In addition, your investment may be adversely affected to the extent that, in a class action or direct suit, we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions. There currently no pending material litigation or proceeding against any of our directors, officers or employees for which indemnification is sought.

We expect to maintain standard policies of insurance that provide coverage (1) to our directors and officers against loss rising from claims made by reason of breach of duty or other wrongful act and (2) to us with respect to indemnification payments that we may make to such directors and officers.

Upon the completion of this offering, we will enter into an indemnification agreement with each of our officers and directors. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law against liabilities that may arise by reason of their service to us and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified. We believe that the limitation of liability and indemnification provisions in our charter and bylaws and the indemnification agreements will facilitate our ability to continue to attract and retain qualified individuals to serve as directors and officers.

## Authorized but Unissued Shares

Our authorized but unissued shares of common stock will be available for future issuance without your approval. We may use additional shares for variety of purposes, including future offerings to raise additional capital, to fund acquisitions and as employee compensation. The existence of authorized but unissued shares of common stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender off merger or otherwise.

## Transfer Agent and Registrar

The transfer agent and registrar for the shares of our common stock will be American Stock Transfer & Trust Company, LLC.

Table of Contents

<div align="center">

**SHARES ELIGIBLE FOR FUTURE SALE**

</div>

**General**

Upon the completion of this offering, we will have outstanding 16,448,750 shares of our common stock.

Of these shares, the 7,812,500 shares sold in this offering (or 8,984,375 shares if the underwriters fully exercise their option to purchase additional shares) will be freely transferable without restriction or further registration under the Securities Act, except any shares acquired by our affiliates. The remaining 8,636,250 shares of our common stock (or 7,464,375 shares if the underwriters fully exercise their option to purchase additional shares, after giving effect to our use of the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors) will be "restricted shares" as defined in Rule 144 of the Securities Act.

Prior to this offering, there has been no market for shares of our common stock. Although our common stock has been approved for listing on the New York Stock Exchange, subject to official notice of issuance, under the symbol "NWHM," an active trading market for the shares of our common stock may never develop or if one develops, it may not be sustained following this offering. No assurance can be given as to (1) the likelihood that an active market for common stock will develop, (2) the liquidity of any such market, (3) the ability of the stockholders to sell their shares or (4) the prices that stockholders may obtain for any of their shares. No prediction can be made as to the effect, if any, that future sales of shares of our common stock, or the availability of shares of our common stock for future sale, will have on the market price prevailing from time to time. Sales of substantial amounts of our common stock, or the perception that such sales could occur, may adversely affect prevailing market prices of our common stock. See "Risk Factors—Risks Related to this Offering and Ownership of Our Common Stock."

**Rule 144**

After giving effect to our formation transactions and this offering, 8,636,250 shares of our outstanding common stock (or, if the underwriters fully exercise their option to purchase additional shares, after giving effect to our use of the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from Watt, one of our non-management institutional investors, 7,464,375 shares) will be "restricted securities" under the meaning of Rule 144 under the Securities Act, and may not be sold in the absence of registration under the Securities Act or an exemption from registration, including the exemption provided by Rule 144.

In general, under Rule 144, as currently in effect, beginning 90 days after the date of this prospectus, a person who is not deemed to have been an affiliate of ours at any time during the three months preceding a sale of restricted securities for which a six-month holding period has elapsed since the restricted securities were acquired from us or any of our affiliates may sell those securities, subject only to the availability of current public information about us. After a one-year holding period has elapsed, such a non-affiliated person may sell those restricted securities without further restriction under Rule 144.

Generally, an affiliate of ours who holds restricted securities for which a six-month holding period has elapsed may sell those restricted securities pursuant to Rule 144, except that:

- the number of securities sold, when taken together with the number of securities sold by that affiliate and certain related persons within the preceding three months, does not exceed the greater of:

    - 1% of the shares of our common stock then outstanding, which will equal approximately 164,488 shares immediately after this offering; or

    - the average weekly trading volume of our common stock on the New York Stock Exchange during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC;

<div align="center">192</div>

Table of Contents

- we must have been subject to the Exchange Act periodic reporting requirements for at least 90 days before the sale and have filed all required reports (other than current reports on Form 8-K) during that time period; and

- certain manner-of-sale and notice provisions are satisfied.

Assuming the underwriters do not exercise their option to purchase additional shares from us, all 8,636,250 shares of our common stock that will be outstanding immediately before this offering will become eligible under Rule 144 for sale in the public market from time to time after the effective date of the registration statement relating to this prospectus upon expiration of their applicable holding periods, subject to the volume limitation, public notice, manner-of-sale and current public information requirements of Rule 144.

The above does not override the contractual restrictions on sales pursuant to the lock-up agreements described below.

## 2014 Long-Term Incentive Plan

We expect to adopt an equity incentive plan in connection with this offering. The number of shares of our common stock that may be issued under our 2014 Long-Term Incentive Plan is 1,644,875 shares. Based upon the initial public offering price of $11.00 per share, upon the pricing of this offering, we expect to grant 107,500 restricted stock units to our officers (other than Messrs. Webb, Stelmar, Davis and Redwitz) and employees and our non-employee director nominees, as well as options to purchase 885,454 shares of our common stock (with a strike price of $11.00 per share) to the members of our management team, other officers and employees, in each case pursuant to our 2014 Long-Term Incentive Plan. We expect to have 651,921 shares of our common stock reserved for future issuance under our 2014 Long-Term Incentive Plan. For a description of our 2014 Long-Term Incentive Plan and the initial awards to be made pursuant to such plan, see "Executive and Director Compensation—2014 Long-Term Incentive Plan."

In connection with this offering, we intend to file a registration statement on Form S-8 to register the issuance of the total number of shares of our common stock that may be issued under our 2014 Long-Term Incentive Plan, including shares of common stock issuable upon the vesting of the restricted stock units to be granted to the members of our management team, other officers and employees and our director nominees, as well as the shares of our common stock issuable upon exercise of the options to be granted to the members of our management team, in each case upon the pricing of this offering pursuant to our 2014 Long-Term Incentive Plan.

## Registration Rights

We will enter into a registration rights agreement with the members of TNHC LLC, including the members of our management team, with respect to the shares of our common stock that they will receive as part of our formation transactions. We refer to these shares collectively as the "registrable shares." Pursuant to the registration rights agreement, we will grant the members of TNHC LLC and their direct and indirect transferees shelf registration rights requiring us to file a shelf registration statement and to maintain the effectiveness of such registration statement so as to allow sales thereunder from time to time, demand registration rights to have the resale of the registrable shares registered, and, in certain circumstances, the right to "piggy-back" the registrable shares in registration statements we might file in connection with certain future public offerings.

Notwithstanding the foregoing, any registration will be subject to cutback provisions, and we will be permitted to suspend the use, from time to time, of the prospectus that is part of the registration statement (and therefore suspend sales under the registration statement) for certain periods, referred to as "blackout periods."

## Lock-Up Agreements

In connection with this offering, we and our officers and directors, TNHC Partners LLC and our non-management institutional investors and others have agreed that for a period of 180 days from the date of this

193

Table of Contents

prospectus, we and they will not, without the prior written consent of Citigroup Global Markets Inc., dispose of or hedge any shares or any securities convertible into or exchangeable for our common stock, subject to certain exceptions. Citigroup Global Markets Inc., in its sole discretion, may release any of the securities subject to these lock-up agreements at any time, which, in the case of officers and directors, shall be with notice. If the restrictions under the lock-up agreements are waived, shares of our common stock may become available for resale into the market, subject to applicable law, which could reduce the market price for our common stock. See "Underwriting."

194

Table of Contents

## CERTAIN MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain material U.S. federal income tax consequences to you of the acquisition, ownership and disposition of shares of our common stock offered pursuant to this prospectus. This discussion is not a complete analysis of all of the potential U.S. federal income tax consequences relating thereto, nor does it address any estate and gift tax consequences or any tax consequences arising under any state, local or foreign tax laws, or any other U.S. federal tax laws. This discussion is based on the Code, Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS all as in effect as of the date of this prospectus. These authorities may change, possibly retroactively, or be interpreted differently, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS with respect to the matters discussed below, and there can be no assurance that the IRS will not take a contrary position regarding the tax consequences of the acquisition, ownership or disposition of the shares of our common stock, or that any such contrary position would be sustained by a court.

This discussion is limited to holders who purchase shares of our common stock pursuant to this prospectus and who hold the shares of our common stock as a "capital asset" within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion also does not consider any specific facts or circumstances that may be relevant to holders subject to special rules under the U.S. federal income tax laws, including, without limitation:

- financial institutions, banks and thrifts;

- insurance companies;

- tax-exempt organizations;

- "S" corporations, partnerships or other pass-through entities;

- traders in securities that elect to mark to market;

- regulated investment companies and real estate investment trusts;

- broker-dealers or dealers in securities or currencies;

- United States expatriates;

- persons subject to the alternative minimum tax;

- "controlled foreign corporations," "passive foreign investment companies" and corporations that accumulate earnings to avoid U.S. federal income tax;

- persons holding our stock as a hedge against currency risks or as a position in a straddle; or

- U.S. holders (as defined below) whose functional currency is not the United States dollar.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) holds shares of our common stock, the tax treatment of a partner in the partnership will depend on the status of the partner, the activities of the partnership, and certain determinations made at the partner level. Accordingly, partnerships holding our common stock and the partners in such partnerships should consult their tax advisors regarding the specific U.S. federal income tax consequences to them.

PROSPECTIVE INVESTORS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE PARTICULAR U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF ACQUIRING, OWNING AND DISPOSING OF SHARES OF OUR COMMON STOCK, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS AND ANY OTHER U.S. FEDERAL TAX LAWS.

Table of Contents

For purposes of this discussion, a "U.S. holder" is any beneficial owner of shares of our common stock who, for U.S. federal income tax purposes,

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the law of the United States, any state thereof or in the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust, if a United States court can exercise primary supervision over the administration of the trust and one or more United States persons h the authority to control all substantial decisions of the trust, or if the trust has a valid election in place to be treated as a United States person.

A "non-U.S. holder" is any beneficial owner of our common stock that is neither a "U.S. holder" nor a partnership.

## Taxation of U.S. Holders

### Distributions on Shares of Our Common Stock

If we make cash or other property distributions on shares of our common stock, such distributions generally will constitute dividends for U.S. federa income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Subject to certain limitations, these distributions may be eligible for the dividends-received deduction in the case of U.S. holders that are corporations. In general, a dividend distribution to a corporate U.S. holder may qualify for the 70% dividends received deduction if the U.S. holder owns less than 20% of the voting power and value of our stock. Dividends paid to non-corporate U.S. holders generally will qualify for taxation at reduced rates if such U.S. holders meet certain holding period and other applicable requirements. The reduced rate will not, however, apply to dividends received to the exten that the U.S. holder elects to treat dividends as "investment income," which may be offset by investment expense. Distributions in excess of our current a accumulated earnings and profits, as determined under U.S. federal income tax principles, will constitute a return of capital and will first be applied again and reduce a U.S. holder's tax basis in the shares of our common stock, but not below zero. Distributions in excess of our current and accumulated earn and profits and in excess of a U.S. holder's tax basis in its shares of our common stock will be taxable as capital gain realized on the sale or other disposition of the shares of our common stock and will be treated as described under "—Sale or Other Taxable Dispositions of Shares of Our Common Stock" below.

### Sale or Other Taxable Dispositions of Shares of Our Common Stock

If a U.S. holder sells or disposes of shares of our common stock, such U.S. holder generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount of cash and the fair market value of any property received on the sale or other dispo and the U.S. holder's adjusted basis in the shares of our common stock for U.S. federal income tax purposes. This gain or loss generally will be long-ter capital gain or loss if the U.S. holder has held the shares of our common stock for more than one year. The deductibility of capital losses is subject to limitations.

### Backup Withholding and Information Reporting

Information reporting will generally apply to a U.S. holder with respect to payments of dividends on shares of our common stock and to certain payments of proceeds on the sale or other disposition of shares of our

196

Table of Contents

common stock unless the U.S. holder is an exempt recipient. Certain U.S. holders may be subject to U.S. backup withholding on payments of dividends shares of our common stock and certain payments of proceeds on the sale or other disposition of shares of our common stock unless the beneficial own shares of our common stock furnishes the payor or its agent with a taxpayer identification number, certified under penalties of perjury, and certain other information, or otherwise establishes, in the manner prescribed by law, an exemption from backup withholding.

U.S. backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a credit against a U.S. holder's U.S. federal income tax liability, which may entitle the U.S. holder to a refund, provided the U.S. holder timely furnishes the required information to the IRS.

### Medicare Tax

A U.S. person that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, will be subject to 3.8% tax on the lesser of (1) the U.S. person's "net investment income" for the relevant taxable year and (2) the excess of the U.S. person's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000 depending the individual's circumstances). Net investment income generally includes dividends, and net gains from the disposition of common stock, unless such income or gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). A U.S. holder that is an individual, estate or trust should consult its tax advisor regarding the applicability of the Medicare tax to its income and gains in respect of its investment in our common stock.

## Taxation of Non-U.S. Holders

### Distributions on Shares of Our Common Stock

Distributions that are treated as dividends (see "—Taxation of U.S. Holders—Distributions on Shares of Our Common Stock") generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividends, or such lower rate specified by an applicable income tax treaty. To receive the benefit of a reduced treaty rate, a non-U.S. holder must furnish to us or our paying agent a valid IRS Form W-8BEN (or applicable successor form) certifying such non-U.S. holder's qualification for the reduced rate. This certification must be provided to us or our paying agent prior to the payment of dividends and must be updated periodically. Non-U.S. holders that do not timely provide us or our paying agent with the required certification, but that qualify for a reduced treaty rate, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

If a non-U.S. holder holds shares of our common stock in connection with the conduct of a trade or business in the United States, and dividends pa on the shares of our common stock are effectively connected with such non-U.S. holder's U.S. trade or business (and if required by an applicable incom tax treaty, attributable to a permanent establishment maintained by the non-U.S. holder in the United States), the non-U.S. holder will be exempt from U.S. federal withholding tax. To claim the exemption, the non-U.S. holder must generally furnish to us or our paying agent a properly executed IRS Form W-8ECI (or applicable successor form).

Although exempt from U.S. federal withholding tax, any dividends paid on shares of our common stock that are effectively connected with a non-U.S. holder's U.S. trade or business (and if required by an applicable income tax treaty, attributable to a permanent establishment maintained by the non-U.S. holder in the United States) generally will be subject to U.S. federal income tax on a net income basis at the regular graduated U.S. federal income rates in much the same manner as if such non-U.S. holder were a resident of the United States. A non-U.S. holder that is a foreign corporation also may subject to an additional branch profits tax equal to 30% (or such lower rate specified by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain items. Non-U.S. holders should consult their tax advisors regarding any applicable incom tax treaties that may provide for different rules.

197

Table of Contents

Distributions that are not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a non-U.S. holder's adjusted tax basis in its common stock, but not below zero. Distributions in excess of our current and accumulated earnings and profits and in excess of a non-U.S. holder's tax basis in its shares of our common stock may be subject to U.S. federal income tax as gain realized on the sale or other disposition of the shares of our common stock as described under "—Sale or Other Taxable Dispositions of Shares of Our Common Stock" below.

*Sale or Other Taxable Dispositions of Shares of Our Common Stock*

Subject to the discussion of backup withholding and withholding tax relating to foreign accounts below, a non-U.S. holder generally will not be subject to U.S. federal income tax on any gain realized upon the sale or other disposition of the common stock, unless:

- the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States, and if required by an applicable income tax treaty, attributable to a permanent establishment maintained by the non-U.S. holder in the United States;

- the non-U.S. holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met; or

- our common stock constitutes a "United States real property interest" ("USRPI") within the meaning of the Foreign Investment in Real Property Tax Act ("FIRPTA") by reason of our status as a "United States real property holding corporation" ("USRPHC") for U.S. federal income tax purposes.

Gain described in the first bullet point above will be subject to U.S. federal income tax on a net income basis at the regular graduated U.S. federal income tax rates in much the same manner as if such non-U.S. holder were a resident of the United States. A non-U.S. holder that is a foreign corporation also may be subject to an additional branch profits tax equal to 30% (or such lower rate specified by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain items. Non-U.S. holders should consult any applicable income tax treaties that may provide for different rules.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a flat 30% rate (or such lower rate specified by an applicable income tax treaty), but may be offset by United States source capital losses (even though the individual is not considered a resident of the United States) provided the non-U.S. holder has timely filed U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, because of our anticipated holdings of United States real property interests following the completion of our formation transactions, we believe we will be and will remain a USRPHC for U.S. federal income tax purposes. Because the determination of whether we are a USRPHC depends on the fair market value of our United States real property interests relative to the fair market value of our other trade or business assets and our foreign real property interests, it is possible we may not remain a USRPHC in the future. As a USRPHC, if a class of our stock is regularly traded on an established securities market (such as the New York Stock Exchange), such stock will be treated as a USRPI only with respect to a non-U.S. holder that actually or constructively holds more than five percent of such class of stock at any time during the shorter of the five-year period preceding the date of disposition or the holder's holding period for such stock. We anticipate that our common stock will be regularly traded on an established securities market following this offering. However, no assurance can be given in this regard and no assurance can be given that our common stock will remain regularly traded in the future. Non-U.S. holders should consult their tax advisors concerning the consequences of disposing of shares of our common stock.

If gain on the sale or other taxable disposition of shares of our common stock were subject to taxation under FIRPTA as a sale of a USRPI, the non-U.S. holder would be subject to regular U.S. federal income tax with respect to such gain in the same manner as a taxable U.S. holder (subject to any applicable alternative minimum

198

Table of Contents

tax and a special alternative minimum tax in the case of nonresident alien individuals). In addition, if the sale or other taxable disposition of shares of our common stock is subject to tax under FIRPTA, and if the shares of our common stock are not regularly traded on an established securities market, the purchaser of the stock would be required to withhold and remit to the IRS 10% of the purchase price. A non-U.S. holder also will be required to file a U.S. federal income tax return for any taxable year in which it realizes a gain from the disposition of our common stock that is subject to U.S. federal income tax.

### Backup Withholding Tax and Information Reporting

We must report annually to each non-U.S. holder of shares of our common stock and to the IRS the amount of payments on the shares of our common stock paid to such non-U.S. holder and the amount of any tax withheld with respect to those payments. These information reporting requirements apply even if no withholding was required because the payments were effectively connected with the non-U.S. holder's conduct of a United States trade or business, or withholding was reduced or eliminated by an applicable income tax treaty. This information also may be made available under a specific treaty or agreement with the tax authorities in the country in which the non-U.S. holder resides or is established. Backup withholding, however, generally will not apply to distribution payments to a non-U.S. holder of shares of our common stock provided the non-U.S. holder furnishes to us or our paying agent the required certification as to its non-U.S. status, such as by providing a valid IRS Form W-8BEN or IRS Form W-8ECI, or certain other requirements are met. Notwithstanding the foregoing, backup withholding may apply if either we or our paying agent has actual knowledge, or reason to know, that the holder is a U.S. person that is not an exempt recipient.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non-U.S. holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

### Additional Withholding Tax Relating to Foreign Accounts

Withholding taxes may apply to certain types of payments made to "foreign financial institutions" (as specially defined in the Code) and certain other non-United States entities. Specifically, a 30% withholding tax may be imposed on dividends on, and gross proceeds from the sale or other disposition of shares of our common stock paid to a foreign financial institution or to a non-financial foreign entity, unless (1) the foreign financial institution undertakes certain diligence and reporting, (2) the non-financial foreign entity either certifies it does not have any substantial United States owners or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (1) above, it must enter into an agreement with the U.S. Treasury requiring, among other things, that it undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, annually report certain information about such accounts, and withhold 30% on payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have entered into an intergovernmental agreement with the United States governing these withholding taxes and reporting requirements may be subject to different rules.

Final Treasury Regulations and a recently released IRS notice provide that the withholding provisions described above will generally apply to payments of dividends made on or after July 1, 2014 and to payments of gross proceeds from a sale or other disposition of stock on or after January 1, 2

The preceding discussion of certain U.S. federal income tax consequences is for general information only and is not tax advice. Accordingly, each investor should consult its own tax advisor as to particular tax consequences to it of purchasing, holding and disposing of shares of our common stock, including the applicability and effect of any state, local or foreign tax laws, and of any pending or subsequent changes in applicable laws.

Table of Contents

## UNDERWRITING

Citigroup Global Markets Inc., J.P. Morgan Securities LLC and Credit Suisse Securities (USA) LLC are acting as joint book-running managers of the offering and as representatives of the underwriters named below. Subject to the terms and conditions stated in the underwriting agreement dated the date of this prospectus, each underwriter named below has severally agreed to purchase, and we have agreed to sell to that underwriter, the number of shares set forth opposite the underwriter's name.

| Underwriter | Number of Shares |
|---|---|
| Citigroup Global Markets Inc. | 3,515,625 |
| J.P. Morgan Securities LLC | 1,953,125 |
| Credit Suisse Securities (USA) LLC | 1,562,500 |
| Zelman Partners LLC | 781,250 |
| Total | 7,812,500 |

The underwriting agreement provides that the obligations of the underwriters to purchase the shares included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all the shares (other than those covered by the over-allotment option described below) if they purchase any of the shares.

Shares sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any shares sold by the underwriters to securities dealers may be sold at a discount from the initial public offering price not to exceed $0.462 per share. If all the shares are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The representatives have advised us that the underwriters do not intend to make sales to discretionary accounts.

If the underwriters sell more shares than the total number set forth in the table above, we have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to 1,171,875 additional shares at the public offering price less the underwriting discount. The underwriters may exercise the option solely for the purpose of covering over-allotments, if any, in connection with this offering. To the extent the option is exercised, each underwriter must purchase a number of additional shares approximately proportionate to that underwriter's initial purchase commitment. Any shares sold under the option will be issued and sold on the same terms and conditions as the other shares that are the subject of this offering. If the underwriters exercise this option, we will use the net proceeds from the sale of those additional shares to purchase an equivalent number of shares of our common stock from our non-management institutional investors.

We and our officers and directors, TNHC Partners LLC and our non-management institutional investors, and others have agreed that, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of Citigroup Global Markets Inc., dispose of or hedge any shares or any securities convertible into or exchangeable for our common stock, subject to certain exceptions. Citigroup Global Markets Inc., in its sole discretion, may release any of the securities subject to these lock-up agreements at any time, which, in the case of officers and directors, shall be with notice.

At our request, the underwriters have reserved up to 5% of the shares for sale at the initial public offering price to persons who are directors, officers or employees, or who are otherwise associated with us, through a directed share program. The number of shares available for sale to the general public will be reduced by the number of directed shares purchased by participants in the program. Except for persons who have entered into lock-up agreements as described above, each person buying shares through the directed share program has agreed that, for a period of 180 days from the date of this prospectus, he or she will not, without the prior written consent of Citigroup Global Markets Inc., dispose of or hedge any shares or any securities convertible into or

Table of Contents

exchangeable for our common stock with respect to shares purchased in the program. However, for persons purchasing shares through the directed sha program who have entered into a lock-up agreement as described above, that lock-up agreement shall govern with respect to their purchases. Citigroup Global Markets Inc., in its sole discretion, may release any of the securities subject to these lock-up agreements at any time, which, in the case of officer and directors, shall be with notice. Any directed shares not purchased will be offered by the underwriters to the general public on the same basis as all o shares offered. We have agreed to indemnify the underwriters and their control persons against certain liabilities and expenses, including liabilities unde the Securities Act, in connection with the sales of the directed shares.

Prior to this offering, there has been no public market for our shares. Consequently, the initial public offering price for the shares was determined b negotiations among us, our non-management institutional investors and the underwriters. Among the factors considered in determining the initial public offering price were our results of operations, our current financial condition, our future prospects, our markets, the economic conditions in and future prospects for the industry in which we compete, our management and currently prevailing general conditions in the equity securities markets, including current market valuations of publicly traded companies considered comparable to our company. We cannot assure you, however, that the price at which shares will sell in the public market after this offering will not be lower than the initial public offering price or that an active trading market in our shares will develop and continue after this offering.

Our common stock has been approved for listing on the New York Stock Exchange, subject to official notice of issuance, under the symbol "NWHM."

The following table shows the underwriting discounts and commissions that we are to pay to the underwriters in connection with this offering. Thes amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

|  | Paid by Us | |
| --- | --- | --- |
|  | No Exercise | Full Exercise |
| Per share | $    0.77 | $    0.77 |
| Total | $6,015,625 | $ 6,917,969 |

We estimate that our total expenses of this offering will be $3.25 million. The underwriters have agreed to reimburse us up to $494,141 for certain o our out-of-pocket expenses associated with this offering. In addition, we have agreed to reimburse the underwriters up to $30,000 for portions of their expenses in connection with the review and qualification of the offering by the Financial Industry Regulatory Authority, Inc., as set forth in the underwriting agreement.

In connection with the offering, the underwriters may purchase and sell shares in the open market. Purchases and sales in the open market may include short sales, purchases to cover short positions, which may include purchases pursuant to the over-allotment option, and stabilizing purchases.

- Short sales involve secondary market sales by the underwriters of a greater number of shares than they are required to purchase in the offeri

  - "Covered" short sales are sales of shares in an amount up to the number of shares represented by the underwriters' over-allotment option.

  - "Naked" short sales are sales of shares in an amount in excess of the number of shares represented by the underwriters' over-allotme option.

- Covering transactions involve purchases of shares either pursuant to the underwriters' over-allotment option or in the open market in order to cover short positions.

  - To close a naked short position, the underwriters must purchase shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may

Table of Contents

be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- To close a covered short position, the underwriters must purchase shares in the open market or must exercise the over-allotment option. In determining the source of shares to close the covered short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option.

- Stabilizing transactions involve bids to purchase shares so long as the stabilizing bids do not exceed a specified maximum.

Purchases to cover short positions and stabilizing purchases, as well as other purchases by the underwriters for their own accounts, may have the effect of preventing or retarding a decline in the market price of the shares. They may also cause the price of the shares to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions on the New York Stock Exchange, in the over-the-counter market or otherwise. If the underwriters commence any of these transactions, they may discontinue them at any time.

The underwriters are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. The underwriters and their respective affiliates may, from time to time, engage in transactions with and perform services for us in the ordinary course of their business for which they may receive customary fees and reimbursement of expenses. In the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investments and securities activities may involve securities and/or instruments of us or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

We have agreed to indemnify the underwriters and their control persons against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters or their control persons may be required to make because of any of those liabilities.

### Notice to Prospective Investors in the European Economic Area

In relation to each member state of the European Economic Area that has implemented the Prospectus Directive (each, a "relevant member state") with effect from and including the date on which the Prospectus Directive is implemented in that relevant member state (the "relevant implementation date"), an offer of shares described in this prospectus may not be made to the public in that relevant member state other than:

- to any legal entity which is a qualified investor as defined in the Prospectus Directive;

- to fewer than 100 or, if the relevant member state has implemented the relevant provision of the 2010 PD Amending Directive, 150 natural or legal persons (other than qualified investors, as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by us for any such offer; or

- in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of shares shall require us or any underwriter to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

Table of Contents

For purposes of this provision, the expression an "offer of securities to the public" in any relevant member state means the communication in any form and by any means of sufficient information on the terms of the offer and the shares to be offered so as to enable an investor to decide to purchase or subscribe for the shares, as the expression may be varied in that member state by any measure implementing the Prospectus Directive in that member state and the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the relevant member state) and includes any relevant implementing measure in the relevant member state. The expression 2010 PD Amending Directive means Directive 2010/73/EU.

The sellers of the shares have not authorized and do not authorize the making of any offer of shares through any financial intermediary on their behalf, other than offers made by the underwriters with a view to the final placement of the shares as contemplated in this prospectus. Accordingly, no purchaser of the shares, other than the underwriters, is authorized to make any further offer of shares on behalf of the sellers or the underwriters.

## Notice to Prospective Investors in the United Kingdom

This prospectus is only being distributed to, and is only directed at, persons in the United Kingdom that are qualified investors within the meaning of Article 2(1)(e) of the Prospectus Directive that are also (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order") or (ii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (each such person being referred to as a "relevant person"). This prospectus and its contents are confidential and should not be distributed, published or reproduced (in whole or in part) or disclosed by recipients to any other persons in the United Kingdom. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents

## Notice to Prospective Investors in France

Neither this prospectus nor any other offering material relating to the shares described in this prospectus has been submitted to the clearance procedures of the *Autorité des Marchés Financiers* or of the competent authority of another member state of the European Economic Area and notified to the *Autorité des Marchés Financiers*. The shares have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the shares has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or

- used in connection with any offer for subscription or sale of the shares to the public in France.

Such offers, sales and distributions will be made in France only:

- to qualified investors ( *investisseurs qualifiés* ) and/or to a restricted circle of investors ( *cercle restreint d'investisseurs* ), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French *Code monétaire et financier* ;

- to investment services providers authorized to engage in portfolio management on behalf of third parties; or

- in a transaction that, in accordance with article L.411-2-II-1 or -2° or -3° of the French *Code monétaire et financier* and article 211-2 of the General Regulations ( *Règlement Général* ) of the *Autorité des Marchés Financiers* , does not constitute a public offer ( *appel public à l'épargne* ).

The shares may be resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French *Code monétaire et financier* .

Table of Contents

## Notice to Prospective Investors in Hong Kong

The shares may not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the shares may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

## Notice to Prospective Investors in Japan

The shares offered in this prospectus have not been and will not be registered under the Financial Instruments and Exchange Law of Japan. The shares have not been offered or sold and will not be offered or sold, directly or indirectly, in Japan or to or for the account of any resident of Japan (including any corporation or other entity organized under the laws of Japan), except (i) pursuant to an exemption from the registration requirements of the Financial Instruments and Exchange Law and (ii) in compliance with any other applicable requirements of Japanese law.

## Notice to Prospective Investors in Singapore

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the shares are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

- a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the shares pursuant to an offer made under Section 275 of the SFA except:

- to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

Table of Contents

- where no consideration is or will be given for the transfer; or

- where the transfer is by operation of law.

**Notice to Prospective Investors in Australia**

No prospectus or other disclosure document (as defined in the Corporations Act 2001 (Cth) of Australia ("Corporations Act")) in relation to the common stock has been or will be lodged with the Australian Securities & Investments Commission ("ASIC"). This document has not been lodged with ASIC and is only directed to certain categories of exempt persons. Accordingly, if you receive this document in Australia:

- you confirm and warrant that you are either:

  - a "sophisticated investor" under section 708(8)(a) or (b) of the Corporations Act;

  - a "sophisticated investor" under section 708(8)(c) or (d) of the Corporations Act and that you have provided an accountant's certificate to us which complies with the requirements of section 708(8)(c)(i) or (ii) of the Corporations Act and related regulations before the offer has been made;

  - a person associated with the company under section 708(12) of the Corporations Act; or

  - a "professional investor" within the meaning of section 708(11)(a) or (b) of the Corporations Act, and to the extent that you are unable to confirm or warrant that you are an exempt sophisticated investor, associated person or professional investor under the Corporations Act, any offer made to you under this document is void and incapable of acceptance; and

- you warrant and agree that you will not offer any of the common stock for resale in Australia within 12 months of that common stock being issued unless any such resale offer is exempt from the requirement to issue a disclosure document under section 708 of the Corporations Act.

Table of Contents

## LEGAL MATTERS

Certain legal matters in connection with this offering, including the validity of the shares of our common stock offered hereby, will be passed upon for us by Sidley Austin LLP , New York, New York. Certain legal matters in connection with this offering will be passed upon for the underwriters by Latham & Watkins LLP, Los Angeles, California.

## EXPERTS

Ernst & Young LLP, independent registered public accounting firm, has audited our consolidated financial statements as of and for the years ended December 31, 2012 and 2011, for the period from August 18, 2010 through December 31, 2010, and for our predecessor company as for the period from January 1, 2010 through August 17, 2010, as set forth in their report. We have included our and our Predecessor's financial statements in this prospectus and elsewhere in the registration statement in reliance on Ernst & Young LLP's report, given on their authority as an expert in accounting and auditing.

Additionally, Ernst & Young LLP, independent registered public accounting firm, has audited the consolidated financial statements of LR8 Investors, LLC, one of our unconsolidated joint ventures, as of and for the years ended December 31, 2012 and 2011, and for the period from September 22, 2010 through December 31, 2010, as set forth in their report. We have included financial statements of LR8 Investors, LLC in this prospectus and elsewhere in the registration statement in reliance on Ernst & Young LLP's report, given on their authority as an expert in accounting and auditing.

Unless otherwise indicated, all statistical and economic market data included in this prospectus, and in particular in the sections entitled "Summary," "Market Opportunity" and "Our Business," is derived from market information prepared for us by JBREC, a nationally recognized independent research provider and consulting firm, and is included in this prospectus in reliance on JBREC's authority as an expert in such matters. We have paid JBREC a fee of $54,533 for its services, plus an amount charged at an hourly rate for additional information we may require from JBREC from time to time in connection with its services.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our common stock being offered by this prospectus. This prospectus, which constitutes part of that registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules which are part of the registration statement. Some items included in the registration statement are omitted from the prospectus in accordance with the rules and regulations of the SEC. For further information with respect to us and the common stock offered by this prospectus, we refer you to the registration statement and the accompanying exhibits.

A copy of the registration statement and the accompanying exhibits and any other document we file may be inspected without charge at the public reference room maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549, and copies of all or any part of the registration statement may be obtained from the public reference room upon the payment of the fees prescribed by the SEC. The public may obtain information on the operation of the public reference facilities in Washington, D.C. by calling the SEC at 1-800-SEC-0330. Our filings with the SEC are available to the public from the SEC's website at www.sec.gov.

Upon the completion of this offering, we will be subject to the information and periodic reporting requirements of the Exchange Act applicable to a company with securities registered pursuant to Section 12 of the Exchange Act. In accordance therewith, we will file proxy statements, periodic information and other information with the SEC. All documents filed with the SEC are available for inspection and copying at the public reference room and website of the SEC referred to above. We maintain a website at thenewhomecompany.com. You may access our reports, proxy statements and other information free of charge at this website as soon as reasonably practicable after such material is electronically filed with, or furnished to, the SEC. The information contained in, or that can be accessed through, our website is not incorporated by reference in and is not a part of this prospectus.

207

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | PAGE |
|---|---|
| **The New Home Company Inc.** | |
| Pro Forma Consolidated Balance Sheet as of September 30, 2013 (Unaudited) | F-3 |
| Pro Forma Consolidated Statements of Operations for the Nine Months Ended September 30, 2013 and for the Year Ended December 31, 2012 (Unaudited) | F-4 |
| Notes to Pro Forma Financial Statements | F-6 |
| **The New Home Company LLC and The New Home Company Predecessor** | |
| Report of Independent Registered Public Accounting Firm | F-8 |
| Consolidated Balance Sheets as of September 30, 2013 (Unaudited) and December 31, 2012 and 2011 | F-9 |
| Consolidated Statements of Operations for the Nine Months Ended September 30, 2013 and 2012 (Unaudited), for the Years Ended December 31, 2012 and 2011, for the Period from August 18, 2010 (Inception) Through December 31, 2010 and for the Period from January 1, 2010 Through August 17, 2010 | F-10 |
| Consolidated Statements of Members' Equity for the Nine Months Ended September 30, 2013 (Unaudited), for the Years Ended December 31, 2012 and 2011, for the Period from August 18, 2010 (Inception) Through December 31, 2010 and for the Period from January 1, 2010 Through August 17, 2010 | F-11 |
| Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2013 and 2012 (Unaudited), for the Years Ended December 31, 2012 and 2011, for the Period from August 18, 2010 (Inception) Through December 31, 2010 and for the Period from January 1, 2010 Through August 17, 2010 | F-12 |
| Notes to Consolidated Financial Statements | F-13 |
| **LR8 Investors, LLC (our unconsolidated investee)** | |
| Report of Independent Registered Public Accounting Firm | F-39 |
| Consolidated Balance Sheets as of December 31, 2012 and 2011 | F-40 |
| Consolidated Statements of Operations for the Years Ended December  31, 2012 and 2011, and for the Period from September 22, 2010 (Inception) Through December 31, 2010 | F-41 |
| Consolidated Statements of Members' Capital for the Years Ended December  31, 2012 and 2011, and for the Period from September 22, 2010 (Inception) Through December 31, 2010 | F-42 |
| Consolidated Statements of Cash Flows for the Years Ended December  31, 2012 and 2011, and for the Period from September 22, 2010 (Inception) Through December 31, 2010 | F-43 |
| Notes to Consolidated Financial Statements | F-44 |

**Table of Contents**

### THE NEW HOME COMPANY INC.

### UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS

The following unaudited pro forma consolidated statements of operations for the year ended December 31, 2012 and the nine months ended September 30, 2013 are based on the historical statements of operations of The New Home Company LLC ("Company"). The Company's historical information is derived from the unaudited statement of operations of the Company for the nine months ended September 30, 2013 and the audited statement of operations of the Company for the year ended December 31, 2012 included elsewhere in this prospectus.

The unaudited pro forma consolidated balance sheet as of September 30, 2013 gives effect to the issuance of 7,812,500 shares of common stock at $11.00 per share and the conversion of the Company's membership interests into 8,636,250 shares of common stock, all in connection with the Company's initial public offering, as if those transactions had occurred as of September 30, 2013.

The unaudited pro forma consolidated statements of operations for the nine months ended September 30, 2013 and the year ended December 31, give effect to the issuance of stock awards and the adjustments to executive salaries and board of directors' compensation plans, assuming the Company public as of January 1, 2012. In addition, the Company has adjusted its provision for income taxes in the pro forma statement of operations assuming it operated as a corporation for Federal and state tax purposes as of January 1, 2012.

The unaudited pro forma consolidated financial statements are provided for informational purposes only and are based on estimates and assumptions as set forth in the notes to such statements. The unaudited pro forma consolidated financial statements are not necessarily indicative of the results of operations to be expected in any future period. This information should be read in conjunction with the historical consolidated financial statements and related notes of the Company as well as "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in this prospectus, and in conjunction with the accompanying notes to these unaudited pro forma consolidated financial statements. The pro forma income tax adjustment reflects that the Company would have filed a consolidated tax return as a corporation reflecting a consolidated net income (loss) for the period presented. On a pro forma basis, the Company would have been required to set up a valuation allowance against the net tax asset associated with its losses, thereby resulting in no tax provision or benefit for the periods presented. Any deferred tax assets associated with the losses would have a full valuation allowance applied against them.

F-2

Table of Contents

### THE NEW HOME COMPANY INC.

### PRO FORMA CONSOLIDATED BALANCE SHEET (Unaudited)
### AS OF SEPTEMBER 30, 2013

| | TNHC LLC Consolidated Historical | Proceeds From Offering (1) | TNHC Inc. Pro Forma |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $ 4,467,836 | $ 76,671,875 | $ 81,139,711 |
| Restricted cash | 134,520 | — | 134,520 |
| Contracts and accounts receivable | 4,475,666 | — | 4,475,666 |
| Due from affiliates | 617,189 | — | 617,189 |
| Real estate inventories | 48,023,354 | — | 48,023,354 |
| Investment in unconsolidated joint ventures | 28,238,214 | — | 28,238,214 |
| Property and equipment, net of accumulated depreciation | 475,857 | — | 475,857 |
| Other assets | 2,856,237 | — | 2,856,237 |
| Total assets | $ 89,288,873 | $ 76,671,875 | $ 165,960,748 |
| | | | |
| **Liabilities and members' equity** | | | |
| Accounts payable | $ 7,018,793 | — | $ 7,018,793 |
| Accrued expenses and other liabilities | 4,847,832 | — | 4,847,832 |
| Notes payable | 16,975,153 | — | 16,975,153 |
| | 28,841,778 | — | 28,841,778 |
| Common stock, par value $0.01 per share | — | 164,488 | 164,488 |
| Additional paid-in capital | — | 136,954,482 | 136,954,482 |
| Member's equity | 60,447,095 | (60,447,095) | — |
| Total equity | 60,447,095 | 76,671,875 | 137,118,970 |
| Total liabilities and equity | $ 89,288,873 | $ 76,671,875 | $ 165,960,748 |

*SEE ACCOMPANYING NOTES.*

F-3

Table of Contents

**THE NEW HOME COMPANY INC.**

**PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS (Unaudited)
FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2013**

| | Consolidated Historical | Stock Award Adjustments (2) | Salary Compensation (3) | Corporate Tax Elimination (4) | Pro Forma |
|---|---|---|---|---|---|
| Revenue | | | | | |
| Home sales | $24,735,081 | — | — | — | $24,735,081 |
| Fee building, including overhead fees from unconsolidated joint ventures | 33,689,862 | — | — | — | 33,689,862 |
| Total revenues | 58,424,943 | — | — | — | 58,424,943 |
| | | | | | |
| Expenses | | | | | |
| Cost of homes sales | 20,386,325 | — | — | — | 20,386,325 |
| Fee building | 30,663,898 | — | — | — | 30,663,898 |
| Abandoned project costs | 489,395 | — | — | — | 489,395 |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | — | — | — | (1,689,659) |
| Selling and marketing | 1,272,575 | — | — | — | 1,272,575 |
| General and administrative | 4,122,348 | 1,119,803 | 744,750 | — | 5,986,901 |
| | 55,244,882 | 1,119,803 | 744,750 | — | 57,109,435 |
| | | | | | |
| Income (loss) from operations | 3,180,061 | (1,119,803) | (744,750) | — | 1,315,508 |
| Guaranty fee income | 85,173 | — | — | — | 85,173 |
| Other expense, net | (33,790) | — | — | — | (33,790) |
| | | | | | |
| Income (loss) before taxes | 3,231,444 | (1,119,803) | (744,750) | — | 1,366,891 |
| Provision for taxes | (315,313) | — | — | 315,313 | — |
| | | | | | |
| **Net income (loss)** | $ 2,916,131 | $ (1,119,803) | $ (744,750) | $ 315,313 | $ 1,366,891 |
| | | | | | |
| **Pro forma shares outstanding   (5)** | | | | | 8,636,250 |
| | | | | | |
| **Pro forma income per share (basic and diluted)** | | | | | $ 0.16 |

*SEE ACCOMPANYING NOTES.*

F-4

Table of Contents

**THE NEW HOME COMPANY INC.**

**PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS (Unaudited)
FOR THE YEAR ENDED DECEMBER 31, 2012**

| | Consolidated Historical | Stock Award Adjustments (2) | Salary Compensation (3) | Corporate Tax Elimination (4) | Pro Forma |
|---|---|---|---|---|---|
| Revenue | | | | | |
| Home sales | $24,197,956 | — | — | — | $24,197,956 |
| Fee building, including overhead fees from unconsolidated joint ventures | 28,268,675 | — | — | — | 28,268,675 |
| Land sales | 2,940,100 | — | — | — | 2,940,100 |
| Total revenues | 55,406,731 | — | — | — | 55,406,731 |
| Expenses | | | | | |
| Cost of homes sales | 20,779,338 | — | — | — | 20,779,338 |
| Fee building | 26,505,042 | — | — | — | 26,505,042 |
| Cost of land sales | 3,261,891 | — | — | — | 3,261,891 |
| Abandoned project costs | 408,642 | — | — | — | 408,642 |
| Equity in net (income) loss of unconsolidated joint ventures | (349,445) | — | — | — | (349,445) |
| Selling and marketing | 1,677,058 | — | — | — | 1,677,058 |
| General and administrative | 4,474,949 | 2,456,195 | 993,000 | — | 7,924,144 |
| | 56,757,475 | 2,456,195 | 993,000 | — | 60,206,670 |
| Income (loss) from operations | (1,350,744) | (2,456,195) | (993,000) | — | (4,799,939) |
| Guaranty fee income | 85,172 | — | — | — | 85,172 |
| Other income (expense), net | (15,048) | — | — | — | (15,048) |
| Income (loss) before taxes | (1,280,620) | (2,456,195) | (993,000) | — | (4,729,815) |
| Provision for taxes | (71,255) | — | — | 71,255 | — |
| **Net income (loss)** | $ (1,351,875) | $ (2,456,195) | $ (993,000) | $ 71,255 | $ (4,729,815) |
| **Pro forma shares outstanding(5)** | | | | | 8,636,250 |
| **Pro forma loss per share (basic and diluted)** | | | | | $ (0.55) |

*SEE ACCOMPANYING NOTES.*

F-5

Table of Contents

## THE NEW HOME COMPANY INC.
## NOTES TO PRO FORMA FINANCIAL STATEMENTS

(1) Represents the issuance of 7,812,500 shares of our common stock at an initial public offering price of $11.00 per share after deducting the underwriting discount and estimated offering expenses payable by the Company and the conversion of the Company's members equity interests into 8,636,250 shares of common stock in connection with the Company's initial public offering.

(2) In connection with the Company's initial public offering, the Company intends to issue 992,954 share-based awards to directors, officers and other employees. Included in this issuance will be 107,500 restricted stock units, 69,375 of which will vest after one year and 38,125 of which will vest ratably over three years. Based upon an initial public offering price of $11.00 per share, total compensation expense of the restricted stock units is $1,182,500, of which $902,916 will be recognized ratably over the first twelve months (representing $763,124 for the restricted stock units vesting after one year and $139,792 for the restricted stock units vesting ratably over three years), $139,792 in the second twelve months and $139,792 in the third twelve months, from the grant date. Also included in the issuance of 992,954 share-based awards, the Company intends to grant options with respect to 885,454 shares of its common stock, 112,727 of which will vest ratably over three years and 772,727 of which will vest after three years. Based upon a strike price of $11.00, total compensation expense of the options is $4,059,833, of which $1,353,278 will be recognized in the first twelve months, $1,353,278 in the second twelve months and $1,353,777 in the third twelve months, from the grant date. The value of the stock options was based upon the Black-Scholes model utilizing a weighted-average expected life of four years for members of management and 6.5 years for other employees, expected volatility factor of 43.8% for members of management and 73.6% for other employees, risk free interest rate of 1.5% for members of management and 2.10% for other employees, dividend yield rate of 0% and a forfeiture rate of 0%. In the case of both the restricted stock units and the stock option awards the fair value on the date of grant will be amortized over the applicable vesting period. As the Company does not have a trading history to measure volatility, the volatility of the Company's peer group, consisting of public homebuilders, was utilized to measure the fair value of the stock option awards. In connection with the initial public offering, the Company also intends to pay $200,000 in cash awards to its officers and employees (other than Messrs. Webb, Stelmar, Davis and Redwitz), is expensed in the period paid.

As part of the Company's formation transactions, the members of the Company will receive an aggregate of 8,636,250 shares of common stock in connection with the conversion of their membership interests in the Company into shares of common stock. Based upon an initial public offering price of $11.00 per share, 727,624 of the 2,886,687 shares that TNHCP will receive relate to the portion of the Promote that is contingent under the terms of the operating agreement as described above.

In addition, based upon the initial public offering price, the number of shares allocated to TNHCP would be 2,886,687 shares and the number of shares allocated to the three institutional investors would be 5,749,563 shares.

As noted in Footnote 1 and Footnote 14 of The New Home Company LLC financial statements, in fiscal year 2010 the Company issued share based units that vest at the earlier of a performance condition, such as a liquidity event, or over a four-year employment period. The Company has recorded compensation expense for these share based units over a four-year requisite service period in its historical financial statements. Upon the conversion of the Company from an LLC to a Delaware corporation and the consummation of an initial public offering, all unvested share based units will vest as the performance condition becomes probable. These share based units do not have a continuing impact on the consolidated statement of operations. Accordingly, the pro forma statement of operations does not reflect the effects of the acceleration of the compensation expense related to the vesting of share based units upon an initial public offering. The remaining unrecognized compensation expense related to equity based units was $435,417, at September 30, 2013.

(3) To reflect the increases in certain officers' salaries and board compensation based upon approved increases, including estimated related burden, though these increases took place on January 1, 2012.

F-6

Table of Contents

(4) To eliminate the provision for income taxes on a consolidated basis assuming the Company operated as a corporation as of January 1, 2012.

(5) Excluded from the computation of the unaudited pro forma shares outstanding are all of the shares of common stock to be issued in the Company's initial public offering because the net proceeds from the initial public offering, excluding the net proceeds received from any exercise of the underwriters' option to purchase additional shares from the Company, are expected to be used for general corporate purposes, primarily for the acquisiti of land and for development of lots, home construction and other related purposes.

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Members
The New Home Company LLC

We have audited the accompanying consolidated balance sheets of The New Home Company LLC as of December 31, 2012 and 2011, and the re
consolidated statements of operations, members' equity, and cash flows for the years ended December 31, 2012 and 2011, for the period from August 1
2010 (inception) through December 31, 2010, and for the predecessor entity of The New Home Company LLC (The New Home Company Predecessor)
the period from January 1, 2010 through August 17, 2010. These financial statements are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards
require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We
not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over
financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion o
the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining,
a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estim
made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of The New Hom
Company LLC at December 31, 2012 and 2011, and the consolidated results of its operations, members' equity, and cash flows for the years ended
December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010, and of The New Home Company
Predecessor for the period from January 1, 2010 through August 17, 2010, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 1, the financial statements for the years ended December 31, 2012 and 2011 and for the period from August 18, 2010
(inception) through December 31, 2010 have been restated to correct an error in recognition of share based awards for each of the years ended
December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010.

/s/ Ernst & Young LLP

Irvine, California
April 19, 2013
except for the effects on the financial statements of the
restatement described in Note 1, as to which the date is
December 17, 2013.

F-8

Table of Contents

**THE NEW HOME COMPANY LLC**

**CONSOLIDATED BALANCE SHEETS**

| | September 30, 2013 (Unaudited) | December 31, 2012 | December 31, 2011 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $ 4,467,836 | $ 6,007,928 | $ 5,446,764 |
| Restricted cash | 134,520 | 144,120 | 77,087 |
| Contracts and accounts receivable | 4,475,666 | 6,049,676 | 59,317 |
| Due from affiliates | 617,189 | 51,160 | 40,549 |
| Real estate inventories | 48,023,354 | 39,268,764 | 28,890,573 |
| Investment in unconsolidated joint ventures | 28,238,214 | 12,424,229 | 4,854,584 |
| Property and equipment, net of accumulated depreciation | 475,857 | 323,139 | 243,208 |
| Other assets | 2,856,237 | 241,700 | 149,708 |
| Total assets | $ 89,288,873 | $64,510,716 | $39,761,790 |
| | | | |
| **Liabilities and members' equity** | | | |
| Accounts payable | $ 7,018,793 | $ 7,955,033 | $ 442,046 |
| Accrued expenses and other liabilities | 4,847,832 | 3,259,091 | 2,084,693 |
| Notes payable to member | — | 1,000,000 | — |
| Notes payable | 16,975,153 | 16,721,878 | 9,383,462 |
| | 28,841,778 | 28,936,002 | 11,910,201 |
| Commitments and contingencies (Note 12) | | | |
| Members' equity | 60,447,095 | 35,574,714 | 27,851,589 |
| Total liabilities and members' equity | $ 89,288,873 | $64,510,716 | $39,761,790 |

*SEE ACCOMPANYING NOTES.*

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, | Predecessor Period From January 1, 2010 Through August 17, |
| --- | --- | --- | --- | --- | --- | --- |
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| | (Unaudited) | | (As Restated, Note 1) | | | |
| Revenue: | | | | | | |
| Home sales | $24,735,081 | $12,303,354 | $24,197,956 | $25,624,111 | $ 5,319,408 | $    538,598 |
| Fee building, including overhead fees from unconsolidated joint ventures of $4,373,734, $1,928,883, $2,949,365, $844,411, $0 and $0, respectively | 33,689,862 | 13,485,624 | 28,268,675 | 16,522,946 | 11,494,347 | 12,941,110 |
| Land sales | — | 2,940,100 | 2,940,100 | — | — | — |
| | 58,424,943 | 28,729,078 | 55,406,731 | 42,147,057 | 16,813,755 | 13,479,708 |
| Expenses: | | | | | | |
| Cost of homes sales | 20,386,325 | 10,720,384 | 20,779,338 | 21,774,199 | 4,423,236 | 399,995 |
| Fee building | 30,663,898 | 12,843,103 | 26,505,042 | 16,762,666 | 11,331,286 | 12,764,497 |
| Cost of land sales | — | 3,261,891 | 3,261,891 | — | — | — |
| Abandoned project costs | 489,395 | 239,340 | 408,642 | 128,798 | — | — |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | 183,191 | (349,445) | 38,916 | — | — |
| Selling and marketing | 1,272,575 | 1,096,071 | 1,677,058 | 1,748,430 | 453,799 | 134,002 |
| General and administrative | 4,122,348 | 3,194,285 | 4,474,949 | 3,997,617 | 848,114 | 328,295 |
| | 55,244,882 | 31,538,265 | 56,757,475 | 44,450,626 | 17,056,435 | 13,626,789 |
| Income (loss) from operations | 3,180,061 | (2,809,187) | (1,350,744) | (2,303,569) | (242,680) | (147,081) |
| Guaranty fee income | 85,173 | 56,782 | 85,172 | | | |
| Other expense, net | (33,790) | (16,001) | (15,048) | (14,750) | (10,596) | (6,048) |
| Income (loss) before taxes | 3,231,444 | (2,768,406) | (1,280,620) | (2,318,319) | (253,276) | (153,129) |
| Provision for taxes | (315,313) | (49,543) | (71,255) | (10,149) | — | — |
| Net income (loss) | $ 2,916,131 | $ (2,817,949) | $ (1,351,875) | $ (2,328,468) | $   (253,276) | $   (153,129) |
| Unaudited proforma income (loss) and earnings per share (Note 15): | | | | | | |
| Net income (loss) | $ 3,231,444 | $ (2,768,406) | $ (1,280,620) | $ (2,318,319) | $   (253,276) | $   (153,129) |
| Basic | $      0.42 | $     (0.57) | $     (0.25) | $     (0.65) | $     (0.11) | $     (0.18) |
| Diluted | $      0.42 | $     (0.57) | $     (0.25) | $     (0.65) | $     (0.11) | $     (0.18) |
| Unaudited proforma weighted average common shares outstanding (Note 15): | | | | | | |
| Basic | 7,667,424 | 4,881,748 | 5,044,438 | 3,553,008 | 2,351,107 | 854,989 |
| Diluted | 7,667,424 | 4,881,748 | 5,044,438 | 3,553,008 | 2,351,107 | 854,989 |

*SEE ACCOMPANYING NOTES.*

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**CONSOLIDATED STATEMENTS OF MEMBERS' EQUITY**

**(As Restated for the Years Ended December 31,
2012 and 2011 and for the Period From August 18,
2010 (Inception) Through December 31, 2010, See Note 1)**

| | TNHC Partners LLC | Watt/TNHC LLC | IHP Capital Partners VI, LLC | TCN/TNHC LP | Total Members' Equity |
|---|---|---|---|---|---|
| Balance at December 31, 2009 | $ 5,338,385 | $ — | $ — | $ — | $ 5,338,385 |
| Net loss from January 1, 2010 through August 17, 2010 | (153,129) | | | | (153,129) |
| Balance at August 17, 2010 | 5,185,256 | — | — | | 5,185,256 |
| Contributions upon formation | 60,000 | 6,000,000 | 6,000,000 | | 12,060,000 |
| Fair value adjustment to predecessor | 754,744 | — | — | | 754,744 |
| Contributions post-formation | 600,000 | 600,000 | 600,000 | — | 1,800,000 |
| Amortization of equity based compensation | 158,333 | — | — | | 158,333 |
| Net loss from August 18, 2010 through December 31, 2010 | (84,426) | (84,425) | (84,425) | — | (253,276) |
| Balance at December 31, 2010 | 6,673,907 | 6,515,575 | 6,515,575 | — | 19,705,057 |
| Contributions | 1,850,000 | 1,850,000 | 1,850,000 | 8,450,000 | 14,000,000 |
| Reallocation of prior losses | 21,107 | 21,106 | 21,106 | (63,319) | — |
| Distributions | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (4,000,000) |
| Amortization of equity based compensation | 475,000 | — | — | — | 475,000 |
| Net loss | (582,117) | (582,117) | (582,117) | (582,117) | (2,328,468) |
| Balance at December 31, 2011 | 7,437,897 | 6,804,564 | 6,804,564 | 6,804,564 | 27,851,589 |
| Contributions | 2,150,000 | 2,150,000 | 2,150,000 | 2,150,000 | 8,600,000 |
| Amortization of equity based compensation | 475,000 | — | — | — | 475,000 |
| Net loss | (337,968) | (337,969) | (337,969) | (337,969) | (1,351,875) |
| Balance at December 31, 2012 | 9,724,929 | 8,616,595 | 8,616,595 | 8,616,595 | 35,574,714 |
| Contributions (Unaudited) | 5,400,000 | 5,400,000 | 5,400,000 | 5,400,000 | 21,600,000 |
| Amortization of equity based compensation (Unaudited) | 356,250 | — | — | — | 356,250 |
| Net income (Unaudited) | 729,032 | 729,033 | 729,033 | 729,033 | 2,916,131 |
| Balance at September 30, 2013 (Unaudited) | $16,210,211 | $14,745,628 | $14,745,628 | $14,745,628 | $60,447,095 |

*SEE ACCOMPANYING NOTES.*

F-11

Table of Contents

## THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, | Predecessor Period From January 1, 2010 Through August 17, |
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| | (Unaudited) | | (As Restated, Note 1) | | | |
| **Operating activities:** | | | | | | |
| Net income (loss) | $ 2,916,131 | $(2,817,949) | $ (1,351,875) | $ (2,328,468) | $ (253,276) | $ (153,129) |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | | | | |
| Amortization of contracts intangible | — | — | — | 420,244 | 334,500 | — |
| Depreciation | 144,006 | 99,073 | 138,833 | 144,090 | 39,433 | 23,583 |
| Abandoned project costs | 489,395 | 239,340 | 408,642 | 128,798 | — | — |
| Equity in net (income) loss of unconsolidated joint ventures | (1,689,659) | 183,191 | (349,445) | 38,916 | — | — |
| Distributions of earnings from unconsolidated joint ventures | 2,370,392 | — | 451,504 | — | — | — |
| Amortization of equity based compensation | 356,250 | 356,250 | 475,000 | 475,000 | 158,333 | — |
| Net changes in operating assets and liabilities: | | | | | | |
| Restricted cash | 9,600 | (20,945) | (67,033) | 226,072 | (303,159) | — |
| Contracts and accounts receivable | 1,574,010 | (3,438,633) | (5,990,359) | 2,895,795 | (2,156,760) | (778,949) |
| Due from affiliates | (566,029) | 18,611 | (10,611) | (30,365) | (10,184) | — |
| Real estate inventories | (17,533,987) | (3,695,283) | (1,286,833) | (7,303,526) | (11,045,143) | (6,119,775) |
| Other assets | (2,614,537) | (121,184) | (91,992) | (81,303) | (11,251) | 59,213 |
| Accounts payable | (936,240) | 4,231,542 | 7,512,987 | (2,766,092) | 2,674,175 | 353,464 |
| Accrued expenses and other liabilities | 1,588,741 | 319,438 | 1,174,398 | 1,285,566 | (428,085) | 1,121,051 |
| Net cash (used in) provided by operating activities | (13,891,927) | (4,646,549) | 1,013,216 | (6,895,273) | (11,001,417) | (5,494,542) |
| **Investing activities:** | | | | | | |
| Purchases of property and equipment | (296,724) | (118,581) | (218,764) | (120,207) | (105,857) | (210,441) |
| Contributions to unconsolidated joint ventures | (17,184,352) | (6,785,470) | (10,431,175) | (3,225,000) | (1,668,500) | — |
| Distributions of equity from unconsolidated joint ventures | 8,979,636 | — | 2,759,471 | — | — | — |
| Net cash used in investing activities | (8,501,440) | (6,904,051) | (7,890,468) | (3,345,207) | (1,774,357) | (210,441) |
| **Financing activities:** | | | | | | |
| Borrowings from notes payable | 13,883,569 | 5,443,250 | 10,828,173 | 15,917,765 | 6,308,275 | — |
| Repayments of notes payable | (13,630,294) | (6,142,956) | (12,989,757) | (12,352,739) | (5,989,839) | — |
| Proceeds from issuance of unsecured notes to member | 1,055,000 | — | 1,000,000 | — | — | 5,500,000 |
| Repayments of unsecured notes to member | (2,055,000) | — | — | — | — | — |
| Cash contributions from members | 21,600,000 | 8,600,000 | 8,600,000 | 14,000,000 | 13,860,000 | — |
| Cash distribution to members | — | — | — | (4,000,000) | — | — |
| Net cash provided by (used in) financing activities | 20,853,275 | 7,900,294 | 7,438,416 | 13,565,026 | 14,178,436 | 5,500,000 |
| Net (decrease) increase in cash and cash equivalents | (1,540,092) | (3,650,306) | 561,164 | 3,324,546 | 1,402,662 | (204,983) |
| Cash and cash equivalents – beginning of period | 6,007,928 | 5,446,764 | 5,446,764 | 2,122,218 | 719,556 | 924,539 |
| Cash and cash equivalents – end of period | $ 4,467,836 | $ 1,796,458 | $ 6,007,928 | $ 5,446,764 | $ 2,122,218 | $ 719,556 |
| **Supplemental disclosures of cash flow information** | | | | | | |
| Interest paid, net of amounts capitalized | $ — | $ — | $ — | $ — | $ — | $ — |
| Taxes paid | $ 216,522 | $ — | $ 3,380 | $ 18,990 | $ — | $ — |
| **Supplemental disclosures of non cash transaction** | | | | | | |
| Note payable with land seller | $ — | $ 9,500,000 | $ 9,500,000 | $ — | $ — | $ — |
| Contribution of real estate to equity investment | $ 8,290,002 | $ — | $ — | $ — | $ — | $ — |
| Assets contributed and liabilities assumed at formation of the Company (Note 1) | | | | | | |
| Real estate projects held for development and sale | $ — | $ — | $ — | $ — | $ 10,670,702 | $ — |
| Contracts intangible and other assets | $ — | $ — | $ — | $ — | $ 1,810,918 | |

| | | | | | |
|---|---|---|---|---|---|
| Accounts payable and accrued liabilities | $ — | $ — | $ — | $ — | $ (1,761,175) | $ — |
| Unsecured notes payable to member | $ — | $ — | $ — | $ — | $ (5,500,000) | $ — |

*SEE ACCOMPANYING NOTES.*

F-12

THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.  Organization and Summary of Significant Accounting Policies

### Organization

The New Home Company LLC (the "Company"), a Delaware limited liability company, and its subsidiaries are primarily engaged in all aspects of residential real estate development, including acquiring land and designing, constructing and selling homes located in California.

The Company intends to file a Registration Statement on Form S-1 with the Securities and Exchange Commission with respect to an initial public offering (the "Offering"). Prior to the consummation of the Offering, which is expected to be completed in 2014, the Company will engage in certain formation transactions pursuant to which the Company will be reorganized from a Delaware limited liability company into a Delaware corporation and renamed The New Home Company, Inc.

The New Home Company Predecessor (the "Predecessor"), a Delaware limited liability company, was formed with an effective date of August 26, 2009. The Predecessor was capitalized through cash contributions by its sole member, TNHC Partners LLC ("TNHCP"). The Predecessor began operating on August 31, 2009 specializing in homebuilding and fee building services.

Effective August 18, 2010, the Predecessor amended and restated its operating agreement (the "Operating Agreement") and concurrently admitted Watt/TNHC LLC ("Watt") and IHP Capital Partners VI, LLC ("IHP") as members. Watt and IHP each contributed cash of $6,000,000 in exchange for a 33.33%, or 66.67% in total, capital interest. The Company evaluated the admission of IHP and Watt in accordance with Staff Accounting Bulletin 5J – *Miscellaneous Accounting: New Basis of Accounting Required in Certain Circumstances*, Accounting Standards Codification ("ASC") 805 *, Business Combinations*, and ASC 810, *Variable Interest Entities* . Based on this analysis, the Company concluded that the admission of IHP and Watt did not result in a variable interest entity but resulted in a change in control of a voting interest entity in which TNHCP lost a greater than 50% voting control in the Company. As a result of the change in control, TNHCP, IHP and Watt were deemed to have gained control of the Company as a collective group by collaborating on all key decisions that could have a significant economic impact. Accordingly, the net assets of the Predecessor contributed by TNHCP, in exchange for a 33.33% capital interest, were recorded at a fair value of $6,000,000 and primarily consisted of three real estate projects, one fee building agreement, working capital and fixed assets, as noted below:

| | |
|---|---:|
| Cash | $  779,555 |
| Real estate inventories | 10,670,702 |
| Contracts intangible and other assets | 1,810,918 |
| Notes payable to member | (5,500,000) |
| Accounts payable and accrued liabilities | (1,761,175) |
| Net assets contributed by TNHCP | $ 6,000,000 |

In accordance with the Company's application of the provisions of ASC 805 to the business combination, the Company measured all the assets and liabilities at fair value as of August 18, 2010 (the "Measurement Date"). The measurement of fair value of the assets and liabilities of the Company resulted in the Company recognizing an intangible asset of $754,744 related to a fee building contract. The fair value of all other assets and liabilities of the Company was determined to equal the book value of the Predecessor immediately preceding the Measurement Date. The real estate inventory held by the Company as of August 18, 2010 had been recently purchased and had not been developed since the purchase date; accordingly, the Company concluded book value was equal to fair value on the Measurement Date. The Company further concluded that the outstanding note payable was issued at a rate that represented an amount the Company could obtain in the current lending

F-13

Table of Contents

THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

market environment and accordingly, its book value equaled its fair value on the Measurement Date. The fair value of the remaining assets and liabilities were deemed to be equal to their book value due to their relatively short term nature. The intangible asset associated with the fee building contract was amortized over approximately 16 months.

In accordance with the Operating Agreement, each member committed to make capital contributions of up to $10,000,000 to the Company. The capital percentages were 33.3% for each member and the economic ownership percentages were 50%, 25% and 25% for TNHCP, Watt, and IHP, respectively. As of December 31, 2010, TNHCP, Watt and IHP had each funded $6,600,000 of their $10,000,000 capital commitment.

Effective January 1, 2011, the Company admitted TCN/TNHC LP ("Tricon") as a member of the Company. On January 6, 2011, Tricon made an initial cash contribution of $6,600,000. Tricon also committed to make capital contributions of up to $10,000,000 to the Company. As a result of this transaction, capital percentages were adjusted to 25% for each member, and the economic ownership percentages were adjusted to 50%, 16.67%, 16.67% and 16.66% for TNHCP, Watt, IHP and Tricon, respectively. As of December 31, 2012, TNHCP, Watt, IHP, and Tricon had each funded $9,600,000 of their $10,000,000 capital commitment.

During 2013, the Company amended its Operating Agreement, increasing each member's capital commitment from $10,000,000 to $15,000,000. As a result of this transaction, the economic ownership percentages were adjusted to 45.83%, 18.06%, 18.06%, and 18.05% for TNHCP, Watt, IHP and Tricon, respectively. As of September 30, 2013 (unaudited), TNHCP, Watt, IHP, and Tricon had each fully funded its capital commitment.

Net income and net losses are allocated among the members pursuant to the provisions of the Operating Agreement.

Distributions to the members are made pursuant to the Operating Agreement. Through September 30, 2013 (unaudited) and December 31, 2012 and 2011, $4,000,000 in distributions had been made resulting from the admission of Tricon in January 2011.

Each member's liability is limited in accordance with the provisions of the Delaware Limited Liability Company Act for limited liability companies. The term of the Company shall continue until it is dissolved or its affairs are wound up in accordance with the Operating Agreement.

## Basis of Presentation

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany accounts have been eliminated upon consolidation.

The accompanying financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") as contained within the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC").

Unless the context otherwise requires, the terms "we", "us", "our" and "the Company" refer to the Company and its predecessor.

F-14

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Restatement**

The consolidated financial statements of the Company for the years ended December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010 have been restated to reflect adjustments related to share based units included in general and administrative expense. The previously issued consolidated financial statements did not record compensation expense for these share based units issued by the Company to certain members of management in 2010, as they were deemed to be contingent on a performance condition, as defined. The Company did not record any compensation expense in prior periods as the contingent performance condition was not probable. During the third quarter of fiscal 2013, the Company reevaluated the terms of the share based units issued in fiscal 2010 noting that they include certain service and contingent performance vesting conditions. Upon this reevaluation, the Company concluded that the respective employees vest in the share based units over the earlier of a four-year employment term or upon an occurrence of the contingent performance condition. The Company noted, in accordance with ASC 718, if a share based award vests because either the service or contingent performance conditions are satisfied, the requisite service period to record compensation expense should be the shorter of the explicit or implicit service period. Accordingly, the Company concluded that compensation expense should be recognized over a four-year service period beginning at the date of grant. See Note 14, "Stock Based Compensation," for a description of the share based units.

Upon the conversion of the Company from an LLC to a Delaware corporation and the consummation of an initial public offering, all unvested share based units will vest as the performance condition becomes probable. Further, all vested share based units will be converted to 1,143,437 shares of common stock of the Delaware corporation, which is determined as set forth in the TNHC LLC operating agreement. However, there is no guarantee that an initial public offering will be consummated.

F-15

Table of Contents

## THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

The following tables set forth the effects of the restatement on line items within our previously reported consolidated financial statements for the years ended December 31, 2012 and 2011 and for the period from August 18, 2010 (inception) through December 31, 2010:

| | As Previously Reported | Adjustment | As Restated | As Previously Reported | Adjustment | As Restated | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, 2012 | | | Year Ended December 31, 2011 | | | Period From August 18, 2010 (Inception) Through December 31, 2010 | | |
| **Consolidated Statements of Operations** | | | | | | | | | |
| General and administrative expense | $ 3,999,949 | $ 475,000 | $ 4,474,949 | $ 3,522,617 | $ 475,000 | $ 3,997,617 | $ 689,781 | $ 158,333 | $ 848,114 |
| Loss from operations | (875,744) | (475,000) | (1,350,744) | (1,828,569) | (475,000) | (2,303,569) | (84,347) | (158,333) | (242,680) |
| Loss before taxes | (805,620) | (475,000) | (1,280,620) | (1,843,319) | (475,000) | (2,318,319) | (94,943) | (158,333) | (253,276) |
| Net loss | (876,875) | (475,000) | (1,351,875) | (1,853,468) | (475,000) | (2,328,468) | (94,943) | (158,333) | (253,276) |
| **Consolidated Statements of Members' Equity** | | | | | | | | | |
| Amortization of equity based compensation | $ — | $ 475,000 | $ 475,000 | $ — | $ 475,000 | $ 475,000 | $ — | $ 158,333 | $ 158,333 |
| Net loss | (876,875) | (475,000) | (1,351,875) | (1,853,468) | (475,000) | (2,328,468) | (94,943) | (158,333) | (253,276) |
| Total members' equity | 35,574,714 | — | 35,574,714 | 27,851,589 | — | 27,851,589 | 19,705,057 | — | 19,705,057 |
| **Consolidated Statements of Cash Flows** | | | | | | | | | |
| Net loss | $ (876,875) | $ (475,000) | $ (1,351,875) | $ (1,853,468) | $ (475,000) | $ (2,328,468) | $ (94,943) | $ (158,333) | $ (253,276) |
| Amortization of equity based compensation | — | 475,000 | 475,000 | — | 475,000 | 475,000 | — | 158,333 | 158,333 |
| Net cash provided by (used in) operating activities | 1,013,216 | — | 1,013,216 | (6,895,273) | — | (6,895,273) | (11,001,417) | — | (11,001,417) |

Due to the non-cash nature of the transaction resulting in the restatement, there was no net impact to our cash flows. In addition, total members' equity remained unchanged; therefore, there was no impact to our consolidated balance sheets. The effects of the accounting that resulted in the restatement have been included in the nine months ended September 30, 2013 and 2012 (unaudited).

F-16

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following tables set forth the effects of the restatement on line items within our previously reported interim financial information for the three months ended March 31, 2013 and 2012 (unaudited):

| | As Previously Reported | Adjustment | As Restated | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|---|---|---|
| | Three Months Ended March 31, 2013 | | | Three Months Ended March 31, 2012 | | |
| | (Unaudited) | | | (Unaudited) | | |
| **Consolidated Statements of Operations** | | | | | | |
| General and administrative expense | $ 963,104 | $ 118,750 | $ 1,081,854 | $ 934,299 | $ 118,750 | $1,053,049 |
| Income (loss) from operations | 342,786 | (118,750) | 224,036 | (535,994) | (118,750) | (654,744) |
| Income (loss) before taxes | 371,177 | (118,750) | 252,427 | (529,633) | (118,750) | (648,383) |
| Net income (loss) | 306,432 | (118,750) | 187,682 | (529,633) | (118,750) | (648,383) |
| **Consolidated Statements of Members' Equity** | | | | | | |
| Amortization of equity based compensation | | | | $ — | | |
| | $ — | $ 118,750 | $ 118,750 | | $ 118,750 | $ (118,750) |
| Net income (loss) | 306,432 | (118,750) | 187,682 | (529,633) | (118,750) | (648,383) |
| **Consolidated Statements of Cash Flows** | | | | | | |
| Net income (loss) | $ 306,432 | $ (118,750) | $ 187,682 | $ (529,633) | $ (118,750) | $ (648,383) |
| Amortization of equity based compensation | — | 118,750 | 118,750 | — | 118,750 | 118,750 |
| Net cash (used in) provided by operating activities | (1,629,224) | — | (1,629,224) | 546,520 | — | 546,520 |

### Use of Estimates

The preparation of the Company's consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of commitments and contingencies. Accordingly, actual results could differ materially from these estimates.

### Segment Reporting

ASC 280, *Segment Reporting* ("ASC 280") established standards for the manner in which public enterprises report information about operating segments. In accordance with ASC 280, we have determined that our homebuilding division and our fee building division are our operating segments. Corporate is a non-operating segment.

### Cash and Cash Equivalents and Concentration of Credit Risk

We define cash and cash equivalents as cash on hand, demand deposits with financial institutions, and short term liquid investments with an initial maturity date of less than three months. The Company's cash balances exceed federally insurable limits. The Company monitors the cash balances in its operating accounts and adjusts the cash balances as appropriate; however, these cash balances could be impacted if the underlying financial institutions or are subject to other adverse conditions in the financial markets. To date, the Company has experienced no loss or lack of access to cash in its operating accounts.

### Restricted Cash

Restricted cash of $134,520, $144,120 and $77,087 as of September 30, 2013 (unaudited) and December 31, 2012 and 2011, respectively, is held accounts reserved for payments of subcontractor costs incurred in connection with various fee building projects.

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

### Real Estate Inventories and Cost of Sales

We capitalize pre-acquisition, land, development and other allocated costs, including interest, during development and home construction. Pre-acquisition costs, including non-refundable land deposits, are expensed to abandoned project costs when we determine continuation of the respective pr[...] is not probable. During the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period fro[m] August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company reduced its real es[tate] inventory balance by $489,395, $239,340, $408,642, $128,798, $0 and $0, respectively, for projects no longer being pursued. The associated expense i[s] reflected as abandoned project costs in the accompanying consolidated statements of operations.

Land, development and other common costs are typically allocated to real estate inventories using a methodology that approximates the relative-sales-value method. Home construction costs per production phase are recorded using the specific identification method. Cost of sales for homes close[d] includes the allocation of construction costs of each home and all applicable land acquisition, land development and related common costs (both incurre[d] and estimated to be incurred) based upon the relative-sales-value of the home within each community. Changes to estimated total development costs subsequent to initial home closings in a community are generally allocated on a relative-sales-value method to remaining homes in the community. Inventory is stated at cost, unless the carrying amount is determined not to be recoverable, in which case inventory is written down to fair value. We revi[ew] our real estate assets at each community on a periodic basis and whenever indicators of impairment exist. Real estate assets include projects actively s[elling] and projects under development or held for future development. Indicators of impairment include, but are not limited to, significant decreases in local housing market values and selling prices of comparable homes, significant decreases in gross margins and sales absorption rates, costs in excess of bu[dget] and actual or projected cash flow losses.

If there are indicators of impairment, we perform a detailed budget and cash flow review of our real estate assets to determine whether the estimat[ed] remaining undiscounted future cash flows of the community are more or less than the asset's carrying value. If the undiscounted cash flows are more tha[n] the asset's carrying value, no impairment adjustment is required. However, if the undiscounted cash flows are less than the asset's carrying value, the as[set] is deemed impaired and is written down to fair value.

When estimating undiscounted cash flows of a community, we make various assumptions, including: (i) expected sales prices and sales incentives [to] be offered, including the number of homes available, pricing and incentives being offered by us or other builders in other communities, and future sales price adjustments based on market and economic trends; (ii) expected sales pace and cancellation rates based on local housing market conditions, competition and historical trends; (iii) costs expended to date and expected to be incurred including, but not limited to, land and land development costs, home construction costs, interest costs, indirect construction and overhead costs, and selling and marketing costs; (iv) alternative product offerings that [may] be offered that could have an impact on sales pace, sales price and/or building costs; and (v) alternative uses for the property.

Many assumptions are interdependent and a change in one may require a corresponding change to other assumptions. For example, increasing o[r] decreasing sales absorption rates has a direct impact on the estimated per unit sales price of a home, the level of time sensitive costs (such as indirect construction, overhead and carrying costs), and selling and marketing costs (such as model maintenance costs and advertising costs). Depending on the underlying objective of the community, assumptions could have a significant impact on the projected cash flow analysis. For example, if our objective is t[o] preserve operating margins, our cash flow analysis will be different than if the objective is to increase sales. These objectives may vary significantly from community to community and over time. If assets are considered impaired, impairment is determined by the amount the asset's carrying value exceeds i[ts] fair value. Fair value is determined based on estimated future cash

F-18

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

flows discounted for inherent risks associated with real estate assets. These discounted cash flows are impacted by expected risk based on estimated land development, construction and delivery timelines; market risk of price erosion; uncertainty of development or construction cost increases; and other risks specific to the asset or market conditions where the asset is located when assessment is made. These factors are specific to each community and may vary among communities. For the nine months ended September 30, 2013 (unaudited), the year ended December 31, 2011, the period from August 18, 2010 (inception) to December 31, 2010 and the period from January 1, 2010 to August 17, 2010, no impairment adjustments relating to homebuilding real estate inventories were recorded. During the second quarter of the year ended December 31, 2012, the Company initiated a change in use to sell certain finished lots not under construction for one of its communities in Northern California. This change in use resulted in an impairment of $350,000 for the related land held for sale, which is reflected in cost of land sales in the accompanying statement of operations. These lots held for sale were sold, with no further adjustments required, to an independent third party in the third quarter of the year ended December 31, 2012. The remaining finished lots under construction for the same project were completed and sold to the respective homebuyers, including the model homes, during the year ended December 2012, which sales generated a positive margin.

## Capitalization of Interest

We follow the practice of capitalizing interest to inventories owned during the period of development and to investments in unconsolidated homebuilding and land development joint ventures in accordance with ASC 835, *Interest* ("ASC 835"). Homebuilding interest capitalized as a cost of inventories owned is included in cost of home sales as related units or lots are sold. Interest capitalized to investments in unconsolidated homebuilding joint ventures is included as a reduction of income from unconsolidated joint ventures when the related homes or lots are sold to third parties. To the extent our debt exceeds our qualified assets as defined in ASC 835, we expense a portion of the interest incurred by us. Qualified assets represent projects that are actively selling or under development as well as investments in unconsolidated joint ventures accounted for under the equity method.

## Revenue Recognition

### Home Sales and Profit Recognition

In accordance with ASC 360, *Property, Plant, and Equipment*, revenues from home sales and other real estate sales are recorded and a profit is recognized when the respective units are closed. Home sales and other real estate sales are closed when all conditions of escrow are met, including delivery of the home or other real estate asset, title passage, appropriate consideration is received and collection of associated receivables, if any, is reasonably assured. Sales incentives are a reduction of revenues when the respective unit is closed. When it is determined that the earnings process is not complete, the sale and the related profit are deferred for recognition in future periods. The profit we record is based on the calculation of cost of sales, which is dependent on our allocation of costs, as described in more detail above in the section entitled "Real Estate Inventories and Cost of Sales."

### Fee Building

The Company enters into fee building agreements to provide services whereby it will build homes on behalf of independent third-party property owners. The independent third-party property owner funds all project costs incurred by the Company to build and sell the homes. The Company primarily enters into cost plus fee contracts where it charges independent third-party property owners for all direct and indirect costs plus a negotiated management fee. For these types of contracts, the Company recognizes revenue based on the actual total costs it

F-19

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

has expended and the applicable management fee. The management fee is typically a fixed fee based on a percentage of the cost or home sales revenue of the project depending on the terms of the agreement with the independent third-party property owner. In accordance with ASC 605, *REVENUE RECOGNITION*, revenues from fee building services are recognized over a cost-to-cost approach in applying the percentage-of-completion method. Under this approach, revenue is earned in proportion to total costs incurred, divided by total costs expected to be incurred. The total estimated cost plus the management fee represents the total contract value. The Company recognizes revenue based on the actual labor and other direct costs incurred, plus the portion of the management fee it has earned to date. In the course of providing its services, the Company routinely subcontracts for services and incurs other direct costs on behalf of its clients. These costs are passed through to clients and, in accordance with industry practice and GAAP, are included in the Company's revenue and cost of revenue. Under certain agreements, the Company is eligible to receive additional incentive compensation as certain financial thresholds defined in the agreement are achieved. The Company recognizes revenue for any incentive compensation when such financial thresholds are probable of being met and such compensation is deemed to be collectible, generally at the date the amount is communicated to us by the independent third-party property owner.

The Company also enters into fee building and management contracts with third parties and its unconsolidated joint ventures where it provides construction supervision services and does not bear risks for any services outside of its own. In accordance with ASC 605, revenues from these services recognized over a proportional performance method. Under this approach, revenue is earned in proportion to total efforts, generally direct labor hours, expected to be provided to the client or on a straight line basis if pattern of performance cannot be determined while costs are recognized as incurred. Revenue recognition for any portion of the fees earned from these services that is contingent upon a financial threshold or specific event is deferred until threshold is achieved or the event occurs.

As of and for the nine months ended September 30, 2013 (unaudited) and as of and for the years ended December 31, 2012 and 2011, one customer comprised 81%, 85% and 92%, respectively, of the Company's fee building revenue and 85%, 95% and 42%, respectively, of the related receivables.

### Variable Interest Entities

The Company accounts for variable interest entities in accordance with ASC 810, *CONSOLIDATION* ("ASC 810"). Under ASC 810, a variable interest entity ("VIE") is created when: (a) the equity investment at risk in the entity is not sufficient to permit the entity to finance its activities without additional subordinated financial support provided by other parties, including the equity holders; (b) the entity's equity holders as a group either (i) lack the direct or indirect ability to make decisions about the entity, (ii) are not obligated to absorb expected losses of the entity or (iii) do not have the right to receive expected residual returns of the entity; or (c) the entity's equity holders have voting rights that are not proportionate to their economic interests, and the activities of the entity involve or are conducted on behalf of the equity holder with disproportionately few voting rights. If an entity is deemed to be a VIE pursuant to ASC 810, the enterprise that has both (i) the power to direct the activities of a VIE that most significantly impact the entity's economic performance and (ii) the obligation to absorb the expected losses of the entity or right to receive benefits from the entity that could be potentially significant to the VIE is considered the primary beneficiary and must consolidate the VIE.

Under ASC 810, a non-refundable deposit paid to an entity is deemed to be a variable interest that will absorb some or all of the entity's expected losses if they occur. Our land purchase and lot option deposits generally represent our maximum exposure to the land seller if we elect not to purchase the optioned property. In some instances, we may also expend funds for due diligence, development and construction activities with respect to optioned land prior to takedown. Such costs are classified as real estate inventories, which we would have to write off should we not exercise the option. Therefore, whenever we enter into a land option or purchase contract with an

F-20

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

entity and make a non-refundable deposit, a VIE may have been created. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, the Company was not required to consolidate any VIEs. In accordance with ASC 810, we perform ongoing reassessments of whether we are the primary beneficiary of a VIE.

**Investments in Unconsolidated Joint Ventures**

We first analyze our homebuilding and land development joint ventures to determine if they are variable interest entities under the provisions of ASC 810 (as discussed above) when determining whether the entity should be consolidated. If we conclude that our homebuilding and land development joint ventures are not variable interest entities, then, in accordance with the provisions of ASC 810, limited partnerships or similar entities must be further evaluated under the presumption that the general partner, or the managing member in the case of a limited liability company, is deemed to have a controlling interest and therefore must consolidate the entity unless the limited partners or non-managing members have: (1) the ability, either by a single limited partner or through a simple majority vote, to dissolve or liquidate the entity, or kick-out the managing member/general partner without cause, or (2) substantive participatory rights that are exercised in the ordinary course of business. Under the provisions of ASC 810, we may be required to consolidate certain investments in which we hold a general partner or managing member interest.

As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, the Company concluded that some of its homebuilding and land development joint ventures were variable interest entities. However, the Company concluded that it was not the primary beneficiary and accounted for the entities under the equity method of accounting.

Our current equity investment balance and future capital contributions required represent the maximum exposure for our unconsolidated home and land development joint ventures. Under the joint venture operating agreements, future capital contributions are determined based on the operating budget and needs of the joint venture, which will likely vary throughout the life of each joint venture based on the circumstances unique to the project. In addition to required contributions, the Company began providing guaranties during the year ended December 31, 2012 for debt held by certain of its unconsolidated joint ventures. As of September 30, 2013 (unaudited) and December 31, 2012, our unconsolidated joint ventures had outstanding debt secured by financing guaranties of $39,840,236 and $25,034,540, respectively, of which between 5% and 15% was guaranteed by us.

Investments in our unconsolidated joint ventures are accounted for under the equity method of accounting. Under the equity method, we recognize our proportionate share of earnings and losses generated by the joint venture upon the delivery of lots or homes to third parties. Our proportionate share of intra-entity profits and losses are eliminated until the related asset has been sold by the unconsolidated joint venture to third parties. Our ownership interest in our unconsolidated joint ventures vary, but are generally less than or equal to 50%.

We review inventory projects within our unconsolidated joint ventures for impairments consistent with our real estate inventories. We also review our investments in unconsolidated joint ventures for evidence of other-than-temporary declines in value. To the extent we deem any portion of our investment in unconsolidated joint ventures as not recoverable, we impair our investment accordingly. For the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, no impairments relating to investment in unconsolidated joint ventures were recorded.

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Selling and Marketing Expense**

Selling and marketing costs incurred to sell real estate projects are capitalized if they are reasonably expected to be recovered from the sale of the project or from incidental operations, and are incurred for tangible assets that are used directly through the selling period to aid in the sale of the project or services that have been performed to obtain regulatory approval of sales. All other selling expenses and other marketing costs are expensed in the period incurred.

**Warranty Reserves**

We offer warranties on our homes that generally provide for one-year warranties to cover various defects in workmanship or materials or to cover structural construction defects. Estimated future direct warranty costs are accrued and charged to cost of sales in the period when the related homebuilding revenues are recognized. Amounts are accrued based upon the Company's historical rates. Due to the Company's limited history related to homebuilding sales, the Company also considers the historical experience of its peers in determining the amount of its warranty reserve. In addition, the Company receives warranty payments from its clients for certain of its fee building projects where it has the contractual risk of construction. These payments are recorded as warranty reserve accruals. Indirect warranty overhead salaries and related costs are charged to the reserve in the period incurred. We assess the adequacy of our warranty accrual on a quarterly basis and adjust the amounts recorded if necessary. Our warranty accrual is included in accrued expenses and other liabilities in the accompanying consolidated balance sheets.

**Acquired Intangible Assets**

Upon consummation of a business combination as defined in ASC 805, *BUSINESS COMBINATIONS*, the Company performed an assessment to determine the value of the acquired company's tangible and identifiable intangible assets and liabilities. In its assessment, the Company determined whether identifiable intangible assets exist, which typically include backlog and customer relationships. The identified intangible assets are amortized over the shorter of their economic or useful life.

**Contracts and Accounts Receivable**

Contracts and accounts receivable primarily represents the fees earned but not collected and reimbursable project costs incurred in connection with fee building agreements. The Company periodically evaluates the collectability of its contracts receivable, and, if it is determined that a receivable might not be fully collectible, an allowance is recorded for the amount deemed uncollectible. This allowance for doubtful accounts is estimated based on management's evaluation of the contracts involved and the financial condition of its clients. Factors considered in evaluations include, but are not limited to:

- client type;

- historical contract performance;

- historical collection and delinquency trends;

- client credit worthiness; and

- general economic conditions.

As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, no allowance was recorded related to contracts and accounts receivable.

F-22

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

## Property and Equipment

Property and equipment are recorded at cost and depreciated using the straight-line method over their estimated useful lives ranging from three to seven years. Leasehold improvements are stated at cost and are amortized using the straight-line method over the shorter of either their estimated useful lives or the probable term of the lease.

## Income Taxes

The Company is a limited liability company which is treated as a partnership for income tax purposes and is subject to certain minimal taxes and fees; however, income taxes on taxable income or losses realized by the Company are the obligation of the members. The Company has concluded that there are no significant uncertain tax positions requiring recognition in its financial statements, nor has the Company been assessed interest or penalties by any major tax jurisdictions. The Company's evaluation was performed for the tax years ended December 31, 2012, 2011, and 2010.

The Company has a subsidiary that is treated as a C Corporation. Federal and state income taxes are provided for this entity in accordance with the provisions of ASC 740, *INCOME TAXES*. The provision for, or the benefit from, income taxes is calculated using the asset and liability method, under which deferred tax assets and liabilities are recorded based on the difference between the financial statement and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. Deferred tax assets are evaluated to determine whether a valuation allowance should be established based on whether it is more likely than not that some or all of the deferred tax asset will not be realized. The ultimate realization of deferred tax assets depends primarily on the generation of future taxable income during the periods in which those temporary differences become deductible. Judgment is required in determining future tax consequences of events that have been recognized in the consolidated financial statements and tax returns. Differences between anticipated and actual outcomes of these future tax consequences could have a material impact on the consolidated financial position or results of operations.

The Company follows certain accounting guidance with respect to how uncertain tax positions should be accounted for and disclosed in the consolidated financial statements. The guidance requires the assessment of tax positions taken or expected to be taken in the tax return and to determine whether the tax positions are "more-likely-than-not" of being sustained upon examination by the applicable taxing authority. Tax positions deemed to meet the more-likely-than-not criteria would be recoded as a tax benefit or expense in the current year. We are required to assess open tax years, as defined by the statute of limitations, for all major jurisdictions, including federal and certain states. Open tax years are those that are open for examination by taxing authorities. We have no examinations in progress and believe that there are no uncertain tax positions that do not meet the more-likely-than-not level of authority.

## Stock-Based Compensation

We account for share-based awards in accordance with ASC 718, *COMPENSATION – STOCK COMPENSATION* ("ASC 718"). ASC 718 requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. ASC 718 requires all entities to apply a fair-value-based measurement method in accounting for share-based payment transactions with employees except for equity instruments held by employee share ownership plans.

F-23

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Recently Issued Accounting Standards**

In May 2011, the FASB issued ASU No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs* ("ASU 2011-04"). ASU 2011-04 amends ASC 820, *Fair Value* Measurements ("ASC 820"), providing a consistent definition and measurement of fair value, as well as similar disclosure requirements between GAAP and International Financial Reporting Standards. ASU 2011-04 changes certain fair value measurement principles, clarifies the application of existing fair value measurement and expands the ASC 820 disclosure requirements, particularly for Level 3 fair value measurements. The Company's adoption of these provisions of ASU 2011-04 on January 1, 2012 did not have an impact on the consolidated financial statements.

**2.   Contracts and Accounts Receivable**

Contracts and accounts receivable consist of the following:

| | September 30, 2013 (unaudited) | December 31, | |
| --- | --- | --- | --- |
| | | 2012 | 2011 |
| Contracts receivable: | | | |
| Costs incurred on fee building projects | $ 30,663,898 | $ 26,505,042 | $ 16,762,666 |
| Estimated earnings | 3,025,964 | 1,313,156 | (239,720) |
| Revenue related to fee building warranty adjustment | — | 450,477 | — |
| | 33,689,862 | 28,268,675 | 16,522,946 |
| Less: billings during the period | (29,504,979) | (22,023,895) | (16,463,629) |
| Non cash impact of fee building warranty adjustment | — | (450,477) | — |
| | 4,184,883 | 5,794,303 | 59,317 |
| Other receivables: | | | |
| Escrow receivables | 290,783 | 255,373 | — |
| | $  4,475,666 | $  6,049,676 | $      59,317 |

Accounts payable at September 30, 2013 (unaudited) and December 31, 2012 and 2011 includes $3,818,264, $5,466,602 and $14,619, respectively, related to costs incurred under the Company's fee building contracts.

F-24

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**3.   Contracts Intangible**

The formation of the Company was accounted for under the acquisition method of accounting in accordance with ASC 805, *BUSINESS COMBINATIONS* . As such, the Company allocated amounts to acquired tangible and intangible assets and liabilities based upon their fair values.

Contracts intangible represents the fair value attributable to a fee building contract contributed by TNHCP at formation. Contracts intangible was amortized over the life of the related fee building project, which was completed as of December 31, 2011, and consisted of the following:

|  | September 30, 2013 (unaudited) | December 31, 2012 | December 31, 2011 |
|---|---|---|---|
| Contracts intangible | $ — | $ — | $ 754,744 |
| Beginning accumulated amortization | — | — | (334,500) |
| Amortization expense | — | — | (420,244) |
| Ending accumulated amortization | — | — | (754,744) |
| Contracts intangible, net | $ — | $ — | $ — |

**4.   Real Estate Inventories**

Real estate inventories are summarized as follows:

|  | September 30, 2013 (unaudited) | December 31, 2012 | December 31, 2011 |
|---|---|---|---|
| Deposits and pre-acquisition costs | $ 6,472,400 | $11,946,919 | $ 3,790,177 |
| Land held and land under development | 25,919,955 | 15,555,113 | 3,655,946 |
| Homes completed or under construction | 13,933,329 | 10,439,835 | 19,065,717 |
| Model homes | 1,697,670 | 1,326,897 | 2,378,733 |
|  | $48,023,354 | $39,268,764 | $28,890,573 |

All of our deposits and pre-acquisition costs are non-refundable, except for $600,000, $250,000 and $150,000 as of September 30, 2013 (unaudited) and December 31, 2012 and 2011, respectively. As of December 31, 2012, deposits and pre-acquisition costs included $6,885,376 incurred in connection with the anticipated formation of an unconsolidated joint venture. Such amount was contributed to the unconsolidated joint venture during the nine months ended September 30, 2013 (unaudited).

Model homes, homes completed, and homes under construction include all costs associated with home construction, including land, development, indirects, permits, and vertical construction. Land under development includes costs incurred during site development such as land, development, indirects and permits. Land is classified as held for future development if no significant development has occurred.

F-25

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Interest is capitalized on inventory during development and other qualifying activities. Interest capitalized as cost of inventory is included in cost of sales as related units are closed. For the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011 period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, interest incurred, capitalized and expensed was as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period from August 18, 2010 (Inception) Through December 31, | Predecessor Period from January 1, 2010 Through August 17, |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| | (unaudited) | | | | | |
| Interest incurred | $ 813,694 | $ 364,482 | $ 639,103 | $ 388,282 | $ 141,612 | $ 121,836 |
| Interest expense | — | — | — | — | — | — |
| Capitalized interest in beginning inventory | 493,486 | 182,628 | 182,628 | 220,050 | 121,836 | — |
| Interest capitalized as a cost of inventory | 813,694 | 364,482 | 639,103 | 388,282 | 141,612 | 121,836 |
| Inventory previously capitalized as cost of inventory, included in cost of sales | (347,572) | (164,732) | (328,245) | (425,704) | (43,398) | — |
| Capitalized interest in ending inventory | $ 959,608 | $ 382,378 | $ 493,486 | $ 182,628 | $ 220,050 | $ 121,836 |

**5.  Investment in Unconsolidated Joint Ventures**

As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, the Company had ownership interests in eleven, five and two unconsolidated homebuilding joint ventures, respectively, with ownership percentages ranging from 5% to 35%. The combined balance sheets for our unconsolidated homebuilding joint ventures accounted for under the equity method are as follows (unaudited):

| | September 30, 2013 | December 31, 2012 | December 31, 2011 |
|---|---|---|---|
| Cash and cash equivalents | $ 6,947,909 | $ 3,355,575 | $ 817,658 |
| Restricted cash | 6,647,361 | 5,249,000 | — |
| Real estate inventories | 272,734,091 | 163,595,376 | 91,668,286 |
| Other assets | 1,369,603 | 1,055,822 | 136,200 |
| Total Assets | $287,698,964 | $173,255,773 | $92,622,144 |
| Accounts payable and accrued liabilities | $ 15,394,525 | $ 7,952,065 | $ 5,610,963 |
| Notes payable | 70,334,397 | 36,721,776 | 16,000,000 |
| Total Liabilities | 85,728,922 | 44,673,841 | 21,610,963 |
| The Company's equity | 28,238,214 | 12,424,229 | 4,854,584 |
| Other partners' equity | 173,731,828 | 116,157,703 | 66,156,597 |
| Total equity | 201,970,042 | 128,581,932 | 71,011,181 |
| Total liabilities and equity | $287,698,964 | $173,255,773 | $92,622,144 |

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The combined statements of operations for our unconsolidated homebuilding joint ventures accounted for under the equity method are as follows (unaudited):

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period from August 18, 2010 (Inception) Through December 31, | Predecessor Period from January 1, 2010 Through August 17, |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| Revenues | $105,001,748 | $ — | $56,018,517 | $ — | $ — | $ — |
| Cost of sales and expenses | 85,233,146 | 2,678,930 | 47,365,766 | 766,819 | — | — |
| Income (loss) of unconsolidated joint ventures | $ 19,768,602 | $(2,678,930) | $ 8,652,751 | $(766,819) | $ — | $ — |
| Income (loss) from unconsolidated joint ventures reflected in the accompanying consolidated statements of operations | $ 1,689,659 | $ (183,191) | $ 349,445 | $ (38,916) | $ — | $ — |

The Company has entered into agreements with its unconsolidated joint ventures to provide management services related to the underlying projec (collectively referred to as the "Management Agreements"). Pursuant to the Management Agreements, the Company receives an overhead fee based on each project's revenues from its unconsolidated joint ventures. During the nine months ended September 30, 2013 and 2012 (unaudited), the years ende December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company earned $4,373,734, $1,928,883, $2,949,365, $844,411, $0 and $0, respectively, in management fees, which have been recorded as fee building revenues in the accompanying consolidated statements of operations.

**6.    Property and Equipment**

Property and equipment consists of the following:

| | September 30, 2013 | December 31, | |
|---|---|---|---|
| | (unaudited) | 2012 | 2011 |
| Computer equipment | $ 482,228 | $ 297,677 | $ 188,454 |
| Furniture and fixtures | 234,745 | 174,965 | 111,931 |
| Software | 137,164 | 108,119 | 87,211 |
| Leasehold improvements | 113,054 | 89,708 | 64,109 |
| | 967,191 | 670,469 | 451,705 |
| Less: accumulated depreciation | (491,334) | (347,330) | (208,497) |
| | $ 475,857 | $ 323,139 | $ 243,208 |

For the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company incurred depreciation expense $144,006, $99,073, $138,833, $144,090, $39,433 and $23,583, respectively.

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**7.    Other Assets**

Other assets consist of the following:

| | September 30, 2013 | December 31, | |
| | | 2012 | 2011 |
|---|---|---|---|
| | (unaudited) | | |
| Prepaid rent | $    79,654 | $ 92,142 | $ 46,541 |
| Deferred tax asset | — | 39,045 | — |
| Prepaid offering costs | 2,700,000 | — | — |
| Other | 76,583 | 110,513 | 103,167 |
| | $2,856,237 | $241,700 | $149,708 |

**8.    Accrued Expenses and Other Liabilities**

Accrued expenses and other liabilities consist of the following:

| | September 30, 2013 | December 31, | |
| | | 2012 | 2011 |
|---|---|---|---|
| | (unaudited) | | |
| Accrued payroll | $  350,786 | $  506,133 | $  288,719 |
| Incentive compensation | — | 540,000 | — |
| Employee benefits | 643,257 | 295,811 | 212,785 |
| Accrued professional fees | 1,977,490 | — | — |
| Income taxes payable | 145,242 | 113,400 | 3,100 |
| Warranty reserve | 972,133 | 759,840 | 1,090,923 |
| Completion reserve | 436,003 | 503,906 | 441,231 |
| Accrued building fees | 191,125 | 380,153 | — |
| Deferred fees from unconsolidated joint ventures | — | 28,391 | — |
| Other accrued expenses | 131,796 | 131,457 | 47,935 |
| | $4,847,832 | $3,259,091 | $2,084,693 |

During the year ended December 31, 2012, the Company elected to institute a fully discretionary employee incentive compensation plan. The accr for the year ended December 31, 2012 is $540,000, which has been included in general and administrative expenses in the accompanying consolidated statements of operations. The Company did not have an incentive compensation accrual for the nine months ended September 30, 2013 and 2012 (unaudited), the year ended December 31, 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 2010 through August 17, 2010.

Completion reserves relate to liabilities for completed subcontractor work on closed homes for which invoices have not been remitted as of the balance sheet date.

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Changes in our warranty accrual are detailed in the table set forth below:

| | Nine Months Ended September 30, 2013 (unaudited) | Year Ended December 31, 2012 | 2011 |
|---|---|---|---|
| Beginning warranty liability for homebuilding projects | $ 464,449 | $ 260,483 | $   27,100 |
| Warranty provision for homebuilding projects | 249,226 | 214,777 | 235,165 |
| Warranty payments for homebuilding projects | (9,543) | (10,811) | (1,782) |
| Ending warranty liability for homebuilding projects | 704,132 | 464,449 | 260,483 |
| Beginning warranty liability for fee building projects | 295,391 | 830,440 | — |
| Warranty provision for fee building projects | — | — | 923,303 |
| Warranty efforts for fee building projects | (27,390) | (84,572) | (92,863) |
| Adjustment to warranty accrual for fee building projects | — | (450,477) | — |
| Ending warranty liability for fee building projects | 268,001 | 295,391 | 830,440 |
| Total ending warranty liability | $ 972,133 | $ 759,840 | $1,090,923 |

As a result of an assessment of historical and anticipated rates of warranty costs related to fee building projects, management reduced the reserve $450,477 during the year ended December 31, 2012, which has been included in fee building revenue in the accompanying consolidated statements of operations.

**9.   Notes Payable**

Notes payable consisted of the following:

| | September 30, 2013 (unaudited) | December 31, 2012 | 2011 |
|---|---|---|---|
| Note payable with land seller | $ 9,500,000 | $ 9,500,000 | $   — |
| Acquisition and development loans | 1,970,487 | 4,251,426 | 4,314,469 |
| Construction loans | 3,705,749 | 2,970,452 | 5,068,993 |
| Revolving credit facility | 1,798,917 | — | — |
| Related party promissory note (Note 13) | — | 1,000,000 | — |
| | $16,975,153 | $17,721,878 | $9,383,462 |

During the year ended December 31, 2012, the Company entered into a note with a land seller, secured by real estate, which bears interest at 7.0% per annum. The note matures on February 15, 2015 and requires certain mandatory pay downs totaling $1,000,000 based on the occurrence of certain project-related events. Interest is payable monthly and the remaining principal is due at maturity.

The Company enters into secured acquisition and development loan agreements to purchase and develop land parcels. In addition, the Company enters into secured construction loan agreements for the construction of its model and production homes. The acquisition and development loans will be repaid as lots are released from the loans based upon a specific release price, as defined in each respective loan agreement. The construction loans will be repaid with proceeds from home closings based upon a specific release price, as defined in each

Table of Contents

### THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

respective loan agreement. As of September 30, 2013 (unaudited), the loans have maturity dates ranging from September 2013 to October 2014 and bear interest at variable rates of applicable LIBOR plus 3.25% per annum. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, the weighted average interest rate on these loans was 3.5%, 3.5% and 4.2%, respectively, per annum.

On September 26, 2013, the Company entered into a revolving credit agreement to borrow up to $30,000,000 on Eligible Properties, as defined within the agreement. Interest is payable monthly and any outstanding principal is due upon maturity, which is September 26, 2015, or upon the occurrence of the outstanding loan balance exceeding the allowable borrowing base. The Company may repay advances at any time without premium or penalty. Interest is charged at a rate of 1-month LIBOR plus a margin ranging from 3.25% to 4.25% depending on the Company's leverage ratio as calculated at end of each fiscal quarter. In connection with the agreement, the Company is required to maintain certain financial covenants, including (i) a minimum unencumbered liquid assets covenant; (ii) a minimum EBITDA to interest ratio (determined as of the end of each fiscal quarter on a rolling four-quarter basis).; (iii) a minimum tangible net worth covenant; (iv) a maximum liabilities to tangible net worth ratio; and (v) a maximum land assets to tangible net worth ratio. As of September 30, 2013 (unaudited), the Company was in compliance with all financial covenants and had received advances related to one Eligible Property.

IHP issued an unsecured promissory note to the Company on December 13, 2012. The note provided for a commitment of $5,500,000 and bore interest at 14% per annum. As of September 30, 2013 (unaudited), this note had been paid in full and the remaining commitment was closed.

Notes payable have stated maturities as follows for the years ending December 31:

| | |
|---|---:|
| 2013 | $ 1,970,487 |
| 2014 | 3,705,749 |
| 2015 | 11,298,917 |
| | $ 16,975,153 |

F-30

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**10.   Income Taxes**

For the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, major components of income tax expense were as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period from August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period from January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | | |
| | | (unaudited) | | | | |
| Current: | | | | | | |
| Federal | $192,351 | $ 69,000 | $110,300 | $ 6,349 | $      — | $      — |
| State | 122,962 | — | — | 3,800 | — | — |
| Total current | 315,313 | 69,000 | 110,300 | 10,149 | — | — |
| Deferred: | | | | | | |
| Federal | — | — | — | — | — | — |
| State | — | (19,457) | (39,045) | — | — | — |
| Total deferred | — | (19,457) | (39,045) | — | — | — |
| | $315,313 | $ 49,543 | $ 71,255 | $10,149 | $      — | $      — |

The Company has considered the positive and negative evidence in evaluating the realizability of its deferred tax asset. Notwithstanding that the Company has incurred net losses on a consolidated basis from inception through December 31, 2012, its sole taxable subsidiary recognized net income (net taxable income) for the same periods, and is projected to continue to generate income in future periods sufficient to utilize its deferred tax assets.

At September 30, 2013 (unaudited) and December 31, 2012 and 2011, the tax effects of temporary differences that give rise to significant portions deferred taxes were as follows:

| | September 30, 2013 | December 31, | |
|---|---|---|---|
| | (unaudited) | 2012 | 2011 |
| Deferred tax asset: | | | |
| State tax credit | $      — | $ 39,045 | $      — |
| Deferred tax liabilities: | | | |
| Miscellaneous tax items | — | — | — |
| | $      — | $ 39,045 | $      — |

F-31

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

For the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the effective tax rate differed from the federal statutory rate due to the following:

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period from August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Period from January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| | (unaudited) | | | | | |
| Income (loss) before taxes | $3,231,444 | $(2,768,406) | $(1,280,620) | $(2,318,319) | $ (253,276) | $ (153,129) |
| Less: Non-taxable entities income (loss)(a) | 2,572,883 | (2,970,572) | (1,571,334) | (2,368,703) | (256,744) | (183,270) |
| Income before taxes of taxable entities | $ 658,561 | $ 202,166 | $ 290,714 | $ 50,384 | $ 3,468 | $ 30,141 |
| Federal statutory rate | 34% | 34% | 34% | 15% | 15% | 15% |
| Income tax expense computed at statutory rate | $ (223,911) | $ (68,736) | $ (98,842) | $ (7,558) | $ (520) | $ (4,521) |
| Changes in taxes resulting from: | | | | | | |
| State tax expense, net of federal benefits | (38,423) | (11,795) | — | (3,800) | — | — |
| State tax credits and other reconciling items | (52,979) | 30,988 | 27,587 | 1,209 | 520 | 4,521 |
| Total provision for income taxes | $ (315,313) | $ (49,543) | $ (71,255) | $ (10,149) | $ — | $ — |
| Effective tax rate | 48% | 25% | 25% | 20% | N/A | N/A |

---

(a)    Non-taxable entities represent income or loss related to consolidated limited liability companies in which the taxable income or loss is reflected on the respective partners' tax return.

The federal statutory tax rate of the Company's sole taxable subsidiary increased from 15% to 34% because its income on a separate company ba increased to over $100,000 for the year ended December 31, 2012 but was at or under $50,000 for the year ended December 31, 2011, the period from August 18, 2010 (inception) to December 31, 2010 and the period from January 1, 2010 to August 17, 2010, causing it to be taxed in different tax bracke for those years.

F-32

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**11.  Fair Value Disclosures**

ASC 820, *FAIR VALUE MEASUREMENTS AND DISCLOSURES* , defines fair value as the price that would be received for selling an asset or paid to transfer a liability in an orderly transaction between market participants at measurement date and requires assets and liabilities carried at fair value to be classified and disclosed in the following three categories:

- Level 1 – Quoted prices for identical instruments in active markets

- Level 2 – Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are inactive; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets at measurement date

- Level 3 – Valuations derived from techniques where one or more significant inputs or significant value drivers are unobservable in active markets at measurement date

The accompanying consolidated balance sheets include the following financial instruments: cash and cash equivalents, restricted cash, contracts and accounts receivable, due from affiliates, accounts payable, accrued expenses and other liabilities, and notes payable, including notes payable to members.

The Company considers the carrying value of cash and cash equivalents, restricted cash, contracts and accounts receivable, accounts payable, and accrued expenses and other liabilities to approximate the fair value of these financial instruments based on the short duration between origination of the instruments and their expected realization. The fair value of amounts due from affiliates and notes payable to member is not determinable due to the related party nature of such amounts.

At September 30, 2013 (unaudited) and December 31, 2012 and 2011, as required by ASC 820, the following presents net book values and estimated fair values of notes:

| | Liabilities at Fair Value as of September 30, 2013 | | | | |
|---|---|---|---|---|---|
| | Total | Level 1 | Level 2 | Level 3 | Book Value |
| | | | (unaudited) | | |
| Note payable with land seller | $ 9,500,000 | $      — | $      — | $ 9,500,000 | $ 9,500,000 |
| Acquisition and development loans | 1,970,487 | — | — | 1,970,487 | 1,970,487 |
| Construction loans | 3,705,749 | — | — | 3,705,749 | 3,705,749 |
| Revolving credit facility | 1,798,917 | — | — | 1,798,917 | 1,798,917 |
| | $16,975,153 | $      — | $      — | $16,975,153 | $16,975,153 |

| | Liabilities at Fair Value as of December 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Total | Level 1 | Level 2 | Level 3 | Book Value |
| Note payable with land seller | $ 9,500,000 | $      — | $      — | $ 9,500,000 | $ 9,500,000 |
| Acquisition and development loans | 4,251,426 | — | — | 4,251,426 | 4,251,426 |
| Construction loans | 2,970,452 | — | — | 2,970,452 | 2,970,452 |
| | $16,721,878 | $      — | $      — | $16,721,878 | $16,721,878 |

| | Liabilities at Fair Value as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Total | Level 1 | Level 2 | Level 3 | Book Value |
| Acquisition and development loans | $ 4,314,469 | $      — | $      — | $ 4,314,469 | $ 4,314,469 |
| Construction loans | 5,068,993 | — | — | 5,068,993 | 5,068,993 |
| | $ 9,383,462 | $      — | $      — | $ 9,383,462 | $ 9,383,462 |

F-33

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Estimated fair values of the note payable with land seller, acquisitions and development loans and construction loans at September 30, 2013 (unaudited) and December 31, 2012 and 2011 were based on cash flow models discounted at market interest rates that considered underlying risks of the debt.

Nonfinancial assets and liabilities include items such as inventory and long lived assets that are measured at fair value when acquired and resulting from impairment, if deemed necessary. During the nine months ended September 30, 2013 (unaudited), the year ended December 31, 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company did not record any fair value adjustments to those nonfinancial assets and liabilities measured at fair value on a nonrecurring basis. During the nine months and the year ended December 31, 2012, the Company recorded a fair value adjustment of $350,000 resulting from an impairment charge on its real estate inventories, as more fully described in Note 1.

**12.  Commitments and Contingencies**

Lawsuits, claims and proceedings have been or may be instituted or asserted against us in the normal course of business, including actions brought on behalf of various classes of claimants. We are also subject to local, state and federal laws and regulations related to land development activities, house construction standards, sales practices, employment practices and environmental protection. As a result, we are subject to periodic examinations or inquiry by agencies administering these laws and regulations.

We record a reserve for potential legal claims and regulatory matters when they are probable of occurring and a potential loss is reasonably estimable. We accrue for these matters based on facts and circumstances specific to each matter and revise these estimates when necessary.

In view of the inherent difficulty of predicting outcomes of legal claims and related contingencies, we generally cannot predict their ultimate resolution, related timing or eventual loss. If our evaluations indicate loss contingencies that could be material are not probable, but are reasonably possible, we will disclose their nature with an estimate of possible range of losses or a statement that such loss is not reasonably estimable. At September 30, 2013 (unaudited) and December 31, 2012 and 2011, the Company did not have any accruals for asserted or unasserted matters.

We obtain surety bonds in the normal course of business to ensure completion of certain infrastructure improvements of our projects. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, the Company had outstanding surety bonds totaling $2,464,997, $179,998 and $87, respectively. The beneficiaries of the bonds are various municipalities and other organizations. In the unlikely event that any such surety bond issued by a third party is called because the required improvements are not completed, the Company could be obligated to reimburse the issuer of the bond.

Rent expense for the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010 was $328,688, $179,998, $244,2 $174,827, $64,136 and $60,329, respectively. As of September 30, 2013, future minimum lease payments under noncancelable operating lease agreements are as follows:

| | |
|---|---:|
| 2013 | $   104,110 |
| 2014 | 481,895 |
| 2015 | 484,566 |
| 2016 | 169,441 |
| 2017 | 38,528 |
| | $1,278,540 |

F-34

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**13.    Related Party Transactions**

During the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company incurred construction-related costs on behalf of its unconsolidated joint ventures totaling $3,435,510, $1,397,511, $2,231,559, $411,235, $10,184 and $0 respectively. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, $188,342, $51,160 and $40,549 are reflected as due from affiliates in the accompanying consolidated balance sheets, respectively.

The Company has entered into agreements with its unconsolidated joint ventures to provide management services related to the underlying projects. Pursuant to the Management Agreements, the Company receives an overhead fee based on each project's revenues. During the nine months ended September 30, 2013 and 2012 (unaudited), the years ended December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010, the Company earned $4,373,734, $1,928,883, $2,949,365, $844,411 and $0, respectively, in overhead fees, which have been recorded as fee building revenue in the accompanying consolidated statements of operations. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, $372,066, $0 and $0 are reflected as due from affiliates in the accompanying consolidated balance sheets, respectively.

Under one of its Management Agreements, a portion of the Company's management fee revenue is deferred until each member of the joint venture has received a specified return. As of September 30, 2013 (unaudited) and December 31, 2012 and 2011, this hurdle had not been achieved; therefore, no amount under the contingent portion of the management fee has been recognized by the Company.

The Company has entered into loan guaranties on behalf of certain of its unconsolidated joint ventures in order to secure performance under the loans and maintain certain loan-to-value ratios. Concurrent with the execution of the guaranties, the Company entered into agreements with its partners in each of the unconsolidated joint ventures whereby the Company and the partners are apportioned liability under the guaranties according to their respective percentage interest. In addition, the agreements provide the Company, to the extent the partner has an unpaid liability under the guaranties, the right to receive distributions from the unconsolidated joint venture that would otherwise be made to the partner. The loans underlying the guaranties comprise acquisition and development loans, construction revolvers and model loans, and the guaranties remain in force until the loans are satisfied, which is expected to occur over a period between October 2013 and March 2016. Due to the nature of the loans, the outstanding balance at any given time is subject to a number of factors including the status of site improvements, the mix of horizontal and vertical development underway, the timing of phase build outs and the period necessary to complete the escrow process for homebuyers. With respect to guaranties regarding specific performance, the Company is not generally subject to financial liability, but is only required to complete the project that is funded by the beneficiary of the guaranty. As of September 30, 2013 (unaudited) and December 31, 2012, $39,840,236 and $25,034,540, respectively, was outstanding under the loans, in which the Company is subject to financial liability equal to between 5% and 15%. In connection with providing the loan guaranties, the Company received fees from the unconsolidated joint ventures and deferred certain advanced payments received in 2012 as unearned income at the point the guaranties were executed and the cash was received. For the nine months ended September 30, 2013 and 2012 (unaudited) and the year ended December 31, 2012, the Company has recognized $85,173, $56,782 and $85,172, respectively, as guaranty fee income in the accompanying consolidated statements of operations. As of September 30, 2013 (unaudited), $56,781 is included in due from affiliates in the accompanying consolidated balance sheets. As of December 31, 2012, the deferred portion of $28,391, which is reflected as accrued expenses and other liabilities (Note 8) in the accompanying consolidated balance sheets.

IHP, one of the Company's members, issued an unsecured promissory note to the Company on December 13, 2012. The note provided for a commitment of $5,500,000, of which $1,000,000 had been funded

F-35

Table of Contents

**THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

as of December 31, 2012 and is included in notes payable to member in the accompanying consolidated balance sheets (Note 9). As of September 30, 2 (unaudited), this note had been paid in full and the remaining commitment was closed.

## 14.  Stock Based Compensation

On August 18, 2010, the Company granted equity based units to certain members of management. Recipients of the equity based units have the ri to receive certain distributions, if any, from the Company following return of capital to its equity members. The share based units vest if either a four-year service period or contingent performance conditions are satisfied. The four-year service period is utilized to record compensation expense, as it is the shorter of the two vesting conditions. The equity based units have a contractual term of four years.

The fair value for the equity based units was established in fiscal year 2013 based on the key assumptions as of the date of grant using an option based model. As the Company does not have a trading history to measure volatility, the volatility of the Company's peer group, consisting of public homebuilders, was utilized to measure the fair value of the share based units. The fair value of the equity based units was determined using the following assumptions:

|  | **August 18, 2010** |
|---|---|
| Dividend yield | 0.0% |
| Expected volatility | 65.0% |
| Risk-free interest rate | 0.9% |
| Term | 4 years |

The Company did not grant any equity based units during the nine months ended September 30, 2013 and the years ended December 31, 2012 an 2011. No equity based units were cancelled or forfeited or expired during the nine months ended September 30, 2013 and the years ended December 3 2012 and 2011.

The grant-date fair value of the equity based units granted during the period ended December 31, 2010 was $1.9 million. The Company recognized $356,250, $356,250, $475,000, $475,000 and $158,333 of compensation expense during the nine months ended September 30, 2013 and 2012 (unaudi the years ended December 31, 2012 and 2011, and for the period from August 18, 2010 (inception) to December 31, 2010, respectively, and all such compensation expense was included in general and administrative expense in the accompanying consolidated statements of operations. The remaining unrecognized compensation expense related to equity based units was $435,417, $791,667 and $1.3 million at September 30, 2013 (unaudited) and December 31, 2012 and 2011, respectively.

The fair value for the equity based units was established in fiscal year 2013 based on the key assumptions as of the date of grant using an option based model.

F-36

Table of Contents

## THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

**15.  Segment Information**

The Company's operations are organized into two reportable segments: homebuilding and fee building. In accordance with ASC 280, *SEGMENT REPORTING*, in determining the most appropriate reportable segments, we considered similar economic and other characteristics, including product types, average selling prices, gross profits, production processes, suppliers, subcontractors, regulatory environments, land acquisition results, and underlying demand and supply.

The reportable segments follow the same accounting policies as our consolidated financial statements described in Note 1. Operational results of each reportable segment are not necessarily indicative of the results that would have been achieved had the reportable segment been an independent, stand-entity during the periods presented. Financial information relating to reportable segments was as follows:

| | Nine Months Ended September 30, | | Year Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, | Predecessor Period From January 1, 2010 Through August 17, |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2012 | 2011 | 2010 | 2010 |
| | (unaudited) | | | | | |
| **Revenues** | | | | | | |
| Homebuilding | $24,735,081 | $15,243,454 | $27,138,056 | $25,624,111 | $ 5,319,408 | $ 538,598 |
| Fee building | 33,689,862 | 13,485,624 | 28,268,675 | 16,522,946 | 11,494,347 | 12,941,110 |
| Total | $58,424,943 | $28,729,078 | $55,406,731 | $42,147,057 | $16,813,755 | $13,479,708 |
| **Gross profit** | | | | | | |
| Homebuilding | $ 4,348,756 | $ 1,261,179 | $ 3,096,827 | $ 3,849,912 | $ 896,172 | $ 138,603 |
| Fee building | 3,025,964 | 642,521 | 1,763,633 | (239,720) | 163,061 | 176,613 |
| Total | $ 7,374,720 | $ 1,903,700 | $ 4,860,460 | $ 3,610,192 | $ 1,059,233 | $ 315,216 |

| | September 30, 2013 | December 31, | |
|---|---|---|---|
| | | 2012 | 2011 |
| | (unaudited) | | |
| **Assets** | | | |
| Homebuilding | $ 84,352,281 | $ 58,265,760 | $ 39,584,837 |
| Fee building | 4,936,592 | 6,244,956 | 176,953 |
| Total | $ 89,288,873 | $ 64,510,716 | $ 39,761,790 |

F-37

Table of Contents

## THE NEW HOME COMPANY LLC AND THE NEW HOME COMPANY PREDECESSOR

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

**16.    Unaudited Pro Forma Income (Loss) per Share**

Unaudited pro forma basic and diluted net income (loss) per share for the nine months ended September 30, 2013 and 2012, the years ended December 31, 2012 and 2011, the period from August 18, 2010 (inception) through December 31, 2010 and the period from January 1, 2010 through August 17, 2010 gives effect to the conversion of the Company's members' equity into common stock as though the conversion had occurred as of the beginning of the period or the original date of issuance, if later. Unaudited pro forma income (loss) per share does not consider shares issued in the Offe. The number of shares to be converted is based on an initial public offering price of $11.00 per share. In addition, the pro forma amounts give effect to reflect any income tax adjustments as if the Company was a taxable entity as of the beginning of the period. The pro forma income tax adjustment reflec that the Company would have filed a consolidated tax return as a corporation reflecting a consolidated net income (loss) for the periods presented. On a forma basis, the Company would have been required to set up a valuation allowance against the net tax asset associated with its losses, thereby resulti no tax provision or benefit for the periods presented. Any deferred tax assets associated with the losses would have a full valuation allowance applied against them. The following does not represent pro forma financial information prepared in accordance with Article 11 of Regulation S-X.

| | Nine Months Ended September 30, | | Years Ended December 31, | | Period From August 18, 2010 (Inception) Through December 31, 2010 | Predecessor Predecessor Period From January 1, 2010 Through August 17, 2010 |
|---|---|---|---|---|---|---|
| | **2013** | **2012** | **2012** | **2011** | | |
| Income (loss) before taxes | $3,231,444 | $(2,768,406) | $(1,280,620) | $(2,318,319) | $    (253,276) | $   (153,129) |
| Pro forma income tax provision to reflect the conversion to a C Corporation | — | — | — | — | — | — |
| Pro forma net income (loss) | $3,231,444 | $(2,768,406) | $(1,280,620) | $(2,318,319) | $    (253,276) | $   (153,129) |
| Pro forma weighted-average shares to reflect the conversion of members' equity | 7,667,424 | 4,881,748 | 5,044,438 | 3,553,008 | 2,351,107 | 854,989 |
| Pro forma weighted-average shares used to compute pro forma basic and diluted net income (loss) per share | 7,667,424 | 4,881,748 | 5,044,438 | 3,553,008 | 2,351,107 | 854,989 |

**17.    Subsequent Events**

In October 2013, the Company formed the TNHC-HW Cannery LLC unconsolidated joint venture, which is under contract to acquire a 276-acre site for the development of 547 lots in Davis, California.

In December 2013, the Company entered into additional fee building contracts with one land owner to build five projects containing a total of 814 homes. Pursuant to these contracts, construction activity is to begin in late December 2013.

The Company has evaluated subsequent events through February 3, 2014.

F-38

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Members
LR8 Investors, LLC

We have audited the accompanying consolidated balance sheets of LR8 Investors, LLC as of December 31, 2012 and 2011, and the related consolidated statements of operations, members' capital, and cash flows for the years ended December 31, 2012 and 2011, and the period from September 22, 2010 (inception) through December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion o the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estim made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of LR8 Investors LLC at December 31, 2012 and 2011, and the consolidated results of its operations, members' capital, and cash flows for the years ended December 31 2012 and 2011, and for the period from September 22, 2010 (inception) through December 31, 2010, in conformity with U.S. generally accepted account principles.

/s/ Ernst & Young LLP

Irvine, California
April 19, 2013

F-39

Table of Contents

**LR8 INVESTORS, LLC**

**CONSOLIDATED BALANCE SHEETS**

|  | December 31, | |
| --- | ---: | ---: |
|  | **2012** | **2011** |
| **Assets** | | |
| Cash | $ 1,170,076 | $      96,122 |
| Restricted cash | 5,249,000 | — |
| Real estate inventories | 79,190,159 | 65,755,834 |
| Other assets | 728,297 | 136,200 |
| Total assets | $ 86,337,532 | $ 65,988,156 |
| **Liabilities and members' capital** | | |
| Accounts payable | $ 4,516,863 | $ 2,056,958 |
| Due to affiliates | 431,748 | 34,068 |
| Accrued expenses and other liabilities | 1,049,500 | 3,002,449 |
| Notes payable | 31,137,340 | 16,000,000 |
|  | 37,135,451 | 21,093,475 |
| Commitments and contingencies (Note 7) | | |
| Members' capital | 49,202,081 | 44,894,681 |
| Total liabilities and members' capital | $ 86,337,532 | $ 65,988,156 |

*SEE ACCOMPANYING NOTES.*

F-40

Table of Contents

**LR8 INVESTORS, LLC**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | | Period From September 22, 2010 (Inception) to December 31, |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| Revenues: | | | |
| Home sales | $49,821,399 | $ — | $ — |
| Design studio option sales | 6,197,118 | — | — |
| | 56,018,517 | — | — |
| Cost of sales: | | | |
| Homes sales | 37,113,105 | — | — |
| Design studio option sales | 4,435,131 | — | — |
| | 41,548,236 | — | — |
| Gross profit | 14,470,281 | — | — |
| Selling and marketing expenses | 1,361,282 | 10,383 | — |
| Selling and marketing expenses incurred from affiliates | 750,090 | — | — |
| Guaranty fee to affiliates | 85,172 | — | — |
| Overhead fees to affiliates | 2,468,337 | 764,936 | — |
| Net income (loss) | $ 9,805,400 | $(775,319) | $ — |

*SEE ACCOMPANYING NOTES.*

F-41

Table of Contents

## LR8 INVESTORS, LLC

## CONSOLIDATED STATEMENTS OF MEMBERS' CAPITAL

| | The New Home Company Southern California LLC | MFCI8 LR, LLC | Total |
|---|---|---|---|
| Balance at September 22, 2010 (Inception) | $ — | $ — | $ — |
| Contributions | 1,668,500 | 31,701,500 | 33,370,000 |
| Balance at December 31, 2010 | 1,668,500 | 31,701,500 | 33,370,000 |
| Contributions | 615,000 | 11,685,000 | 12,300,000 |
| Net loss | (38,766) | (736,553) | (775,319) |
| Balance at December 31, 2011 | 2,244,734 | 42,649,947 | 44,894,681 |
| Contributions | 1,050,100 | 19,951,900 | 21,002,000 |
| Distributions | (1,325,000) | (25,175,000) | (26,500,000) |
| Net income | 490,270 | 9,315,130 | 9,805,400 |
| Balance at December 31, 2012 | $ 2,460,104 | $ 46,741,977 | $ 49,202,081 |

*SEE ACCOMPANYING NOTES.*

F-42

Table of Contents

**LR8 INVESTORS, LLC**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | Period From September 22, 2010 (Inception) to December 31, |
|---|---|---|---|
| | 2012 | 2011 | 2010 |
| **Operating activities:** | | | |
| Net income (loss) | $ 9,805,400 | $ (775,319) | $ — |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Amortization expense | 85,172 | — | — |
| Net changes in operating assets and liabilities: | | | |
| Real estate inventories | (13,434,325) | (17,185,699) | (48,570,135) |
| Other assets | (677,269) | (136,200) | — |
| Accounts payable | 2,459,905 | 1,983,935 | 73,023 |
| Due to affiliates | 397,680 | 23,884 | 10,184 |
| Accrued expenses and other liabilities | (1,952,949) | 3,002,449 | — |
| Net cash provided by (used in) operating activities | (3,316,386) | (13,086,950) | (48,486,928) |
| **Financing activities** | | | |
| Proceeds from issuance of secured notes | 72,620,866 | — | 16,000,000 |
| Cash collateral on secured notes | (5,249,000) | — | — |
| Repayments of secured notes | (57,483,526) | — | — |
| Members' capital contributions | 21,002,000 | 12,300,000 | 33,370,000 |
| Members' capital distributions | (26,500,000) | — | — |
| Net cash (used in) provided by financing activities | 4,390,340 | 12,300,000 | 49,370,000 |
| Net increase (decrease) in cash | 1,073,954 | (786,950) | 883,072 |
| Cash at beginning of period | 96,122 | 883,072 | — |
| Cash at end of period | $ 1,170,076 | $ 96,122 | $ 883,072 |

*SEE ACCOMPANYING NOTES.*

Table of Contents

<div align="center">

**LR8 INVESTORS, LLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

</div>

## 1. Organization and Summary of Significant Accounting Policies

LR8 Investors, LLC, a Delaware limited liability company (the "Company"), was formed with an effective date of September 22, 2010. The Company was capitalized through cash contributions by its members, The New Home Company Southern California LLC ("TNHC") and MFCI8 LR, LLC ("Westbrook") (collectively referred to herein as the "Members"). On December 22, 2010, the Company, through a wholly owned subsidiary, acquired approximately 51 acres of land located in Irvine, California, for the development and sale of approximately 169 homes in a community known as Lambert Ranch (the "Project").

Subject to the operating agreement, distributions of net cash flow to the Members shall be in the following order of priority:

1) To the Members in proportion to their respective percentage interests (Westbrook 95% and TNHC 5%), until each Member has received aggregate distributions necessary to provide each Member with a 15% IRR on its capital contributions;

2) To the Members in the following proportion: 85% to Westbrook and 15% to TNHC, until each Member has received aggregate distributions necessary to provide each Member with a 20% IRR and a 1.5x multiple on its capital contributions;

3) To the Members in the following proportion: 80% to Westbrook and 20% to TNHC, until each Member has received aggregate distributions necessary to provide each Member with a 25% IRR and a 1.65x multiple on its capital contributions; and

4) To the Members, in the following proportion: 70% to Westbrook and 30% to TNHC.

Subject to the operating agreement, income and loss is allocated to the Members based on the hypothetical distribution that the Members would receive if, on the last day of the year, all Company assets were sold and all liabilities were satisfied at book value.

### Basis of Presentation

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") as contained within the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"). This basis of accounting contemplates the recovery of the Company's assets and the satisfaction of its liabilities in the normal course of business. Management believes the Company has sufficient cash and access to capital to fund its operations.

### Reclassification

Certain prior year amounts in the consolidated financial statements have been reclassified to conform to the current year presentation.

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned and controlled subsidiary. The accounting policies of the subsidiary are substantially the same as those of the Company. All significant intercompany accounts and transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of the Company's consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and the disclosure of commitments and contingencies. Actual results could differ materially from those estimates.

<div align="center">

F-44

</div>

Table of Contents

## LR8 INVESTORS, LLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

**Cash**

The Company considers all highly-liquid investments that are readily convertible to cash, with original maturity dates of three months or less, to be cash and cash equivalents. Financial instruments that potentially subject the Company to significant concentrations of credit risk consist principally of cash deposited with financial institutions in excess of amounts insured by the Federal Deposit Insurance Corporation. The Company has not experienced any losses related to uninsured cash balances.

**Restricted Cash**

Restricted cash of $5,249,000 and $0 as of December 31, 2012 and 2011, respectively, is held in various accounts and serves as additional collateral for certain notes payable.

**Real Estate Inventories and Cost of Sales**

Real estate inventories are carried at cost. Development costs, including land, land development, direct costs of construction, indirect costs, interest and property taxes incurred during the development period, are capitalized. Capitalization of development costs ends when the assets are substantially complete and ready for sale.

Costs of home sales are allocated based on specific identification, relative fair value before construction or relative sales value, depending on the nature of the costs and/or project. Project specific costs are amortized to cost of sales as homes are closed based upon a method that approximates relative sales value. A provision for warranty costs is included in cost of homes sold at the time the sale of a home is recorded. Selling and marketing costs are expensed in the period incurred.

Real estate inventories are stated at cost, unless the carrying amount is determined not to be recoverable, in which case the inventories are written down to fair value in accordance with ASC 360, *PROPERTY, PLANT AND EQUIPMENT* ("ASC 360"). ASC 360 requires that real estate assets be tested for impairment whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable.

Impairment of assets is measured by comparing the carrying amount of an asset to the undiscounted future net cash flows expected to be generated by the asset. These evaluations for impairment are significantly impacted by estimates of the amounts and timing of revenues, costs and expenses, and other factors. If real estate assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying value of the assets exceeds the fair value of the assets. Fair value is determined based on estimated future cash flows discounted for inherent risks associated with the real estate assets, or other valuation techniques.

At December 31, 2012 and 2011, the Company determined that the carrying amounts of its real estate inventories were not impaired based upon undiscounted future cash flow of the underlying Project.

**Revenue Recognition**

In accordance with ASC 360, revenues from home sales and other real estate sales are recorded and a profit is recognized when the respective units are closed. Home sales and other real estate sales are closed when all conditions of escrow are met, including delivery of the home or other real estate, title passage, appropriate consideration is received and collection of associated receivables, if any, is reasonably assured. Sales incentives are a reduction of revenues when the respective unit is closed. When it is determined that the earnings process is

F-45

Table of Contents

**LR8 INVESTORS, LLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

not complete, the sale and the related profit are deferred for recognition in future periods. The profit we record is based on the calculation of cost of sales, which is dependent on our allocation of costs, as described in more detail above in Note 1 under the caption entitled "Real Estate Inventories and Cost of Sales."

**Income Taxes**

As a limited liability company, the Company is subject to certain minimal taxes and fees; however, income taxes on income or loss reported by the Company are the obligation of the Members.

The Company applies the provisions of ASC 740, *Accounting for Uncertainty in Income Taxes* ("ASC 740"). Based on its evaluation, under ASC 740, the Company has concluded that there are no significant uncertain tax positions requiring recognition in its financial statements, nor has the Company been assessed interest or penalties by any major tax jurisdictions. The Company's evaluation was performed for the tax years ended December 31, 2012, 2011 and 2010.

**2.  Real Estate Inventories**

Real estate inventories consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Land and land development | $24,456,777 | $57,903,207 |
| Construction in progress | 43,456,152 | 7,852,627 |
| Model homes | 11,277,230 | — |
| | $79,190,159 | $65,755,834 |

Construction in progress consists primarily of construction costs for homes and common area facilities, which are in various stages of development.

For the years ended December 31, 2012 and 2011 and for the period from September 22, 2010 (inception) to December 31, 2010, the Company incurred, capitalized and amortized interest costs as follows:

| | Year Ended December 31, | | Period From September 22, 2010 (Inception) to December 31, 2010 |
| --- | --- | --- | --- |
| | 2012 | 2011 | |
| Interest included in beginning real estate inventories | $ 1,340,495 | $   32,028 | $          — |
| Interest incurred and capitalized | 1,980,418 | 1,308,467 | 32,028 |
| Interest amortized to cost of sales | (1,358,380) | — | — |
| Interest included in ending real estate inventories | $ 1,962,533 | $1,340,495 | $     32,028 |

F-46

Table of Contents

**LR8 INVESTORS, LLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

3.   **Other Assets**

Other assets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Cash collateral - performance bonds | $674,906 | $ 111,200 |
| Unamortized loan fees (Note 5) | 28,391 | — |
| Refundable deposits | 25,000 | 25,000 |
| Prepaid commissions | — | — |
| | $728,297 | $136,200 |

4.   **Accrued Expenses and Other Liabilities**

Accrued Expenses and other liabilities consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Warranty reserve | $  560,206 | $    — |
| Completion reserve | 489,294 | — |
| Homebuyer option deposits | — | — |
| Interest | — | — |
| Taxes due to the City of Irvine | — | 2,821,117 |
| Insurance premiums | — | 181,332 |
| | $1,049,500 | $3,002,449 |

We offer warranties on our homes that generally provide for one-year warranties to cover various defects in workmanship or materials or to cover structural construction defects. Estimated future direct warranty costs are accrued and charged to cost of sales in the period when the related homebuild revenues are recognized. Due to the Company's limited history related to homebuilding sales, the Company considers the historical experience of its pe in determining the amount of its warranty reserve. We assess the adequacy of our warranty accrual on a quarterly basis and adjust the amounts recorde necessary. Our warranty accrual is included in accrued expenses and other liabilities in the accompanying consolidated balance sheets.

Changes in the Company's warranty liability are as follows:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Beginning warranty liability | $    — | $    — |
| Warranty provision | 560,206 | — |
| Warranty payments | — | — |
| Ending warranty liability | $560,206 | $    — |

F-47

Table of Contents

## LR8 INVESTORS, LLC

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

The completion reserve includes project costs for homes that have closed but for which invoices from vendors have not been received. The Compa[ny] periodically assesses the adequacy of its completion reserve and adjusts the amounts as necessary.

### 5.   Related Party Transactions

During the years ended December 31, 2012 and 2011 and the period from September 22, 2010 (inception) to December 31, 2010, TNHC incurred personnel-related costs on the Company's behalf totaling $1,718,734, $411,235 and $10,184, respectively. The Company capitalized $1,070,738, $411,[235] and $10,184 of these amounts to real estate inventories for the years ended December 31, 2012 and 2011 and the period from September 22, 2010 (inception) to December 31, 2010, respectively, and charged the remaining $750,090, $0 and $0, respectively, to selling and marketing expense incurred from affiliates in the accompanying consolidated statements of operations. As of December 31, 2012 and 2011, $11,609 and $34,068, respectively, is included in due to affiliates in the accompanying consolidated balance sheets.

Pursuant to the Development Management Agreement as referenced in the Operating Agreement, TNHC shall receive an overhead fee from the Company in an amount equal to 3.0% of the Project revenues. This amount will be paid as follows:

1)   0.75% of the projected gross sales revenue of the Project, paid in equal monthly installments beginning with the commencement of grading work, based upon a 23 month period;

2)   0.75% of the projected gross sales revenue of the Project, paid in equal monthly installments beginning with the commencement of the construction of the model homes, based upon a 28 month period;

3)   0.75% of the gross sales revenue from each home sold, payable upon the close of escrow;

4)   0.75% of the gross sales revenue from each home sold, payable upon each Member having reached a 15% IRR on its capital contributions.

During the years ended December 31, 2012 and 2011 and the period from September 22, 2010 (inception) to December 31, 2010, TNHC earned $2,468,337, $764,936 and $0, respectively, in overhead fees, which have been recorded by the Company as overhead fees to affiliates in the accompany[ing] consolidated statements of operations. At December 31, 2012 and 2011, $420,139 and $0, respectively, was due to TNHC for such fees and have been included in due to affiliates in the accompanying consolidated balance sheets.

The Company pays TNHC for certain loan guaranties provided on behalf of the Company. The Company recorded guaranty fee expense of $85,17[?] for the year ended December 31, 2012 in the accompanying consolidated statement of operations. As of December 31, 2012, $28,391 was included in o[ther] assets in the accompanying consolidated balance sheets. No guaranty fee expense was incurred prior to the year ended December 31, 2012.

Table of Contents

## LR8 INVESTORS, LLC

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)

**6.  Notes Payable**

The Company had notes payable secured by real estate outstanding as follows:

|  | December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| Construction note payable; matures April 2014 and bears interest at a rate of applicable LIBOR plus 5.5% (5.75% at December 31, 2012) | $ 18,260,812 | $      — |
| Model note payable; matures April 2014 and bears interest at a rate of applicable LIBOR plus 5.5% (5.75% at December 31, 2012) | 6,773,728 | — |
| Acquisition and development note payable; matured October 2013 and bore interest at a rate of applicable LIBOR plus 6.5% (6.75% at December 31, 2012) | 6,102,800 | — |
| Land seller notes; matured on March 31, 2012 and bore interest at the rate of 8.0% | — | 16,000,000 |
|  | $ 31,137,340 | $ 16,000,000 |

The principal amount of maturities of notes payable is as follows:

| | |
|---|---|
| 2013 | $ 6,102,800 |
| 2014 | 25,034,540 |
|  | $ 31,137,340 |

**7.  Commitments and Contingencies**

The Company's commitments and contingencies include the usual obligations and litigation incurred by real estate developers in the normal course business. In the opinion of management, there are no material loss contingencies that are probable or reasonably possible.

The Company obtains performance bonds in the normal course of business to ensure completion of the infrastructure of the Project. At December 2012, the Company had $7,760,972 in performance bonds outstanding with various cities, governmental entities, and others, for which the Company had disbursed $674,906 in cash collateral to third parties. The Company was in compliance with all performance standards under such bonds as of December 31, 2012.

**8.  Subsequent Events**

The Company has evaluated subsequent events through February 3, 2014.

F-49

Table of Contents







Our executives have spent decades developing and building homes. We have helped to provide better environments, contributed to better schools, supported communities with a deeper sense of social consciousness — all with a level of integrity, of respect, of compassion for the world we live in and the land we build on.



Table of Contents

# 7,812,500 Shares

# The New Home Company Inc.

**Common Stock**



**PROSPECTUS**
**January 30, 2014**

*Joint Book-Running Managers*

# Citigroup                J.P. Morgan                Credit Suisse

*Lead Manager*

# Zelman Partners LLC

   Through and including February 24, 2014 (25 days after the date of this prospectus), all dealers that effect transactions in shares of our common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# EXHIBIT 197







GENERAL STRUCTURAL NOTES

*Toll Brothers*
America's Luxury Home Builder®

FELTEN GROUP
ARCHITECTURE | ENGINEERING | FORENSICS
Phone: 720.638.6505    WWW.FELTENGROUP.COM

2017.11.01-CO

GSN

TOWNHOMES
PARADE AT
WHEATRIDGE
BUILDING 22

GENERAL; GENERAL - SUBSTITUTIONS; GENERAL - SPECIAL INSPECTIONS; GENERAL - METHOD OF CONSTRUCTION; SOIL AND SITE PREPARATION; FOUNDATION - CONCRETE; FOUNDATION - BASEMENTS; STEEL REINFORCEMENT; FRAMING - GENERAL; FRAMING - CONNECTORS; FRAMING - HARDWARE; FRAMING - POWDER ACTUATED PINS; FRAMING - BOTTOM/SILL PLATE ANCHORS; GUARDRAILS AND HANDRAILS; OSB/SOFFIT BOARD; STEEL - STRUCTURAL; STEEL - WELDING; STRUCTURAL COMPOSITE LUMBER (SCL); WOOD JOISTS; WOOD TRUSSES; WOOD STRUCTURAL SHEATHING

# EXHIBIT 198

2022040096     4/27/2022 3:52 PM
PGS   2          $18.00     DF $50.29
Electronically Recorded Jefferson County, CO
George P Stern, Clerk and Recorder          TD1000 Y

Doc Fee:  $50.29

### SPECIAL WARRANTY DEED

**This Deed**, made **April 26, 2022**

Between  **Toll Southwest LLC, a Delaware limited liability company,** of the County **Arapahoe**, State of **COLORADO**, grantor(s) and  **Alexander Stringham,  a Tenant in Severalty,** whose legal address is **5116 Ward Road** , Wheat Ridge, CO 80033 County of **Jefferson**, and State of **COLORADO,** grantee(s)

    **WITNESSETH**, That the grantor(s), for and in the consideration of the sum of **Five Hundred Two Thousand Nine Hundred Thirty-Eight Dollars and No/100's  ($502,938.00** ) the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm, unto the grantee(s), his heirs and assigns forever, all the real property together with improvements, if any, situate, lying and being in the County of **Jefferson**, State of **COLORADO** described as follows:

Lot 9, Block 3 in The Ridge at Ward Station Filing No. 2 Replat on the plat recorded August 12, 2020, at Reception 2020098997, County of Jefferson, State of Colorado.

APN: 39-174-12-111
Acct No.: 300516219

also known by street and number as **5116 Ward Road, Wheat Ridge, CO 80033**

    **TOGETHER** with all and singular hereditaments and appurtenances, thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the grantor, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances.

    **TO HAVE AND TO HOLD** said premises above bargained and described, with the appurtenances, unto the grantee, their heirs and assigns forever. The grantor(s), for themselves, their heirs and personal representatives or successors, does covenant and agree that they shall and will WARRANT AND FOREVER DEFEND the above-bargained premises in the quiet and peaceable possession of the grantee(s), their heirs and assigns, against all and every person or persons claiming the whole or any part thereof, by, through or under the grantor(s).

    **Subject to general taxes for the year 2022; and easements, reservations, restrictions, covenants and rights of way of record, if any; and distribution utility easements; and inclusion of the property within any special taxing district; and the benefits and burdens of any declaration and party wall agreements, if any.**

    The singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

    **IN WITNESS WHEREOF**, the grantor has executed this on the date set forth above.

WDSpecial-ESCROW NO. 200-H0671343-054-J1E

IN WITNESS WHEREOF, the Grantor has executed this deed on the date set forth above.

Toll Southwest LLC,
a Delaware limited liability company General Partner

By: _____

Name: Reginald E. Carveth
Title: Division President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this _____26_____ day of
_____April_____ 202_2_ by Reginald E. Carveth as Division President of  Toll Southwest LLC,
a Delaware limited liability company General Partner

_____
Notary Public
My Commission Expires:

JENNIFER N ELLIS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20024034115
My Commission Expires October 18, 2022

# EXHIBIT 199

2022018761          2/17/2022 2:22 PM
PGS   2              $18.00      DF $48.47
Electronically Recorded Jefferson County, CO
George P Stern, Clerk and Recorder        TD1000 Y

## SPECIAL WARRANTY DEED

**THIS DEED** is dated 02|17|2022, and is made between **Toll Southwest LLC, a Delaware limited liability company** (whether one, or more than one), the "Grantor," of the County of **Montgomery** and State of **Pennsylvania**, and **Evan J. Genders and Dana M. Genders, as Joint Tenants** (whether one, or more than one), the "Grantee," whose legal address is **12377 W 51st Ave., Wheat Ridge, Colorado 80033** of the County of **Jefferson**, State of **Colorado**.

**State Doc Fee** $48.47

**WITNESS,** that the Grantor, for and in consideration of the sum of **FOUR HUNDRED EIGHTY-FOUR THOUSAND SIX HUNDRED NINETY-SEVEN AND NO/100** Dollars (**$484,697.00**), the receipt and sufficiency of which is hereby acknowledged, hereby grants, bargains, sells, conveys and confirms unto the Grantee (not in tenancy in common, but in joint tenancy) and the Grantee's heirs and assigns forever, all the real property, together with any improvements thereon, located in the County of **Jefferson** and State of **Colorado**, described as follows:

Lot 1 Block 5 in The Ridge at Ward Station Filing No. 2 Replat on the plat recorded August 12, 2020, at Reception 2020098997, County of Jefferson, State of Colorado.

also known by street address as:  **12377 W 51st Ave., Wheat Ridge, CO 80033**
and assessor's schedule or parcel no.:  **39-174-12-127**

with all appurtenances.

**TOGETHER** with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, the reversions, remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the Grantor, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances;

**TO HAVE AND TO HOLD** the said premises above bargained and described, with the appurtenances, unto the Grantee and the Grantee's heirs and assigns forever.  The Grantor, for the Grantor and the Grantor's heirs and assigns, does covenant and agree that the Grantor shall and will WARRANT THE TITLE AND DEFEND the above described premises, *but not any adjoining vacated street or alley,* if any, in the quiet and peaceable possession of the Grantee and the heirs and assigns of the Grantee, against all and every person or persons claiming the whole or any part thereof, by, through or under the Grantor except and subject to: ☒ none; or ☐ the following matters:

**DEED ACCEPTANCE** Buyer acknowledges and agrees to accept a deed at closing that prevents Buyers or their successors and assigns from voting in favor of or otherwise consenting to any restrictive covenant or other measure directly or indirectly subjecting Seller, the declarant, or any of its affiliates, to any additional restrictive covenants, fees, assessment, taxes or other burdens that do not apply proportionally to other lots or owners in the community.

**IN WITNESS WHEREOF,** the Grantor has executed this deed on the date set forth above.

BY: TOLL SOUTHWEST LLC,
a Delaware limited liability company
General Partner
By: _____
Name: Reginald E. Carveth
Title: Division Vice President

STATE OF COLORADO

COUNTY OF ARAPAHOE

The foregoing instrument was acknowledged before me this February 10, 2022 by Reginald E. Carveth as Division Vice President of TOLL SOUTHWEST LLC, a Delaware limited liability company
General Partner

_____
Notary Public
My Commission Expires:

ANGELA BLEVINS
Notary Public
State of Colorado
Notary ID # 20184032749
My Commission Expires 08-16-2022

_____
Name and Address of Person Creating Newly Created Legal Description (§ 38-35-106.5, C.R.S.)

After Recording Return To:

No. 16.   Rev. 10-09.   SPECIAL WARRANTY DEED    (Page 2 of 2)                    132-21000712-TBI

# EXHIBIT 200

**To:**
*City of Wheat Ridge*, 7500 W. 29th Avenue, Wheat Ridge, CO 80033
*Gerald Dahl*, 710 Kipling Street, Suite 300 Lakewood, CO 80215

**Claimant:**
Jeffrey Gu
Property Address: 5131 Vivian St, Wheat Ridge, CO 80033
Mailing Address: 2332 N Clay St Apt 3, Denver, CO 80211
Email: jeffwgu@gmail.com
Phone: 720-593-1548

**Date:** July 17, 2025

**RE: Notice of Claim Against the City of Wheat Ridge Pursuant to the Colorado
Governmental Immunity Act**

Pursuant to § 24-10-109, Colorado Revised Statutes, I hereby submit this written Notice of
Claim against the City of Wheat Ridge. This claim arises from the City's negligent, reckless, and
willful misconduct in the administration and enforcement of its planning, licensing, permitting,
and inspection obligations, including acts and omissions by Chief Building Official Renee
Meriaux and City Attorney Gerald Dahl.

**Summary of Claim**

The City of Wheat Ridge failed to fulfill its responsibilities in connection with residential
permitting, inspections, and contractor verification protocols. This failure enabled construction
defects, misrepresentations of legal authority, and contractor misconduct. As a direct and
proximate result of the City's negligence in enforcing applicable laws and procedures, I have
suffered substantial financial losses related to the purchase of the affected property. To date,
there has been observable warping of the 2nd story floor, carpet tenting in the 3rd floor and a
stair landing, cracks in the ceiling of the 2nd floor, long and wide cracks in the cement of the
garage floor, and frequent malfunctioning of the tension garage door. Evidence of this and other
matters will be provided digitally via email to the City.

Despite my attempts to bring all these issues to the City's attention, senior officials—including
the Chief Building Official and City Attorney—have repeatedly provided misleading or dismissive
responses that have delayed accountability. Their continued misdirection has made it more
difficult for me to pursue justice and fully document the extent of the harm. Had the CBO, the
City Attorney, and other City staff properly exercised their duties, I would not have purchased
this property, and their ongoing misconduct has only deepened the damage.

**Amount of Damages Claimed**

**$293,225.44**

(This amount does not include the cost of remediation or future ongoing losses, which are
anticipated but not yet fully quantified.)

Breakdown:

| | |
|---|---|
| Mortgage Payments to Date | $135,192.06 |
| Down Payment | $80,867.45 |
| Permanent Fixtures (non-transferable improvements): | $58,275.73 |
| Other Incidentals (fees, inspections, alternative lodging, travel, etc.) | $18,890.20 |
| Remediation Costs | |
| | |
| Total (excluding remediation) | $293,225.44 |

**Factual Basis of Claim**

1. **Mismatch of Contractor Identity and Insurance Documents**
   The contractor's license and building permit issued by the City lists "Toll Brothers" as the contractor, whereas the Certificate of Liability Insurance (COI) names *Toll Southwest, LLC* as the insured. These entities are legally distinct, if they exist at all in Colorado Secretary of State registrations–*Toll Brothers* or *Toll Brothers, Inc.* notably do not. On June 30, 2025 via email, CBO Renee Meriaux acknowledged this mismatch and attempted to justify it by asserting, "Yes, we accepted this COI as Toll Brothers is a DBA of Toll Southwest, LLC." However, no SOS corporate filing supports this representation, and the CBO provided no further evidence. The City's acceptance and attempt to justify this disparity reflects a lack of due diligence and a willful disregard for state registration and insurance protocols.

2. **Negligent Building Inspections and compromised Certificate of Occupancy**
   The City conducted a "ROUGH FRAME" inspection on September 27, 2022, and a "DRYWALL FASTENING / MOISTURE BOARD" inspection on October 25, 2022.
   - In the Rough Frame inspection, the inspector failed to cite improperly cut vertical studs in a wall that did not even exist just 1 week prior.
   - In the Drywall Fastening inspection, the inspector failed to note a visibly protruding group of studs from the very same stretch of wall.

   These omissions demonstrate a failure to identify obvious and material code violations that would have been apparent to any reasonably competent inspector. The City of Wheat Ridge issued a Certificate of Occupancy despite visible and documentable building code violations during inspections, including these nonstandard framing and drywall fastening defects. The COO was granted even though earlier inspections failed to identify structural anomalies, such as improperly notched studs and protruding framing in the bedroom wall. By issuing a COO under these circumstances, the City signaled unjustified final approval of construction that did not comply with applicable codes or standards of professional workmanship.

3. **Refusal to Investigate Contractual Authority**
   Despite repeated requests, City Attorney Gerald Dahl has refused to verify whether Mark Bailey had the authority to act on behalf of *Toll Southwest, LLC* when he executed the

Subdivision Improvement Agreement (SIA) for the Ridge at Ward Station, dated August 5, 2019, of which the City was a signatory. Moreover, the SIA itself carries a glaring inaccuracy, stating that *Toll Southwest, LLC* is "a Colorado Limited Liability Company", whereas the Colorado SOS, Delaware SOS, Texas SOS, Utah SOS, Idaho SOS, and Arizona Corporation Commission (ACC) all reflect it being a Delaware Limited Liability Company.

Though Mark Bailey is seemingly an employee of *Toll Brothers Inc.,* given that *Toll Southwest, LLC* was the legal entity involved in the project and not *Toll Brothers Inc.*, this lack of clarity undermines the enforceability of the agreement and raises serious questions regarding the legitimacy of the project's municipal approvals. Records retrieved from the ACC name only 3 managers for *Toll Southwest, LLC*, a manager-managed LLC, and Mark Bailey is indeed not one of them. Furthermore, Utah, Idaho, Texas, and ACC records for *Toll Bros, Inc.*, the 100% owner of *Toll Southwest, LLC*, do not list Mr. Bailey (or Reginald Carveth, signer of my deed from 2023) as an officer or director of this parent corporation at the time of signing (or at any time, for that matter).

**Employees Involved**

- **Renee Meriaux**, Chief Building Official
- **Gerald Dahl**, City Attorney

**Nature of Injury and Damages**

The City's failures have caused the purchase of a defective property under materially misleading conditions. The cost of addressing the structural issues–in addition to the financial losses already incurred through the mortgage, down payment, purchase of fixtures, ongoing fixes, and inspections–will impose a significant financial burden on me as a homeowner.

**Conclusion**

These acts and omissions by the City of Wheat Ridge and its employees rise to the level of willful and wanton misconduct, stripping the City of immunity under § 24-10-118(2), C.R.S. If this matter is not resolved within the required statutory window, I reserve all rights to pursue full legal remedies in court, including attorneys' fees and all allowable damages.

Please consider this the official notice required under the Colorado Governmental Immunity Act. All further communication may be directed to me at the contact information listed above.

Sincerely,


Jeffrey Gu

**Exhibit 201**

| | | Interest | 0.1 |
|---|---|---|---|
| Mortgage Payments to Date | $149,946.54 | $172,991.78 | |
| Down Payment | $80,867.45 | $107,634.58 | |
| Permanent Fixtures (non-transferable improvements): | $58,275.73 | $77,565.00 | |
| Other incidentals (fees, inspections, alternative lodging, travel, etc.) | $19,590.20 | $22,601.01 | |
| | | | |
| | | | |
| Total | $308,679.92 | $380,792.37 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Renter Conditional Mitigation Costs | $45,056.29 | $51,980.98 | |

| | | |
|---|---|---|
| Cleaning Fees 2023 | | $4,300.00 |
| Cleaning Fees 2024 | | $4,450.00 |
| Cleaning Fees 2025 | | $2,225.00 |
| HOA Fee 2023 | | $1,045.00 |
| Insurance 2023 | | $1,946.00 |
| HOA Fee 2024 | | $1,045.00 |
| Insurance 2024 | | $1,417.10 |
| HOA Fee 2025 | | $1,045.00 |
| Insurance 2025 | | $1,417.10 |
| Engineer Inspection 1 | | $350.00 |
| Engineer Inspection 2 | | $350.00 |
| | | |
| Total | | $19,590.20 |

| | | |
|---|---|---|
| Earnest Money | | $48,388.00 |
| Closing payment | | $32,479.45 |
| Total | | $80,867.45 |

| | | |
|---|---|---|
| Solar | | $21,114.74 |
| Interior Design Fee 1 | | $1,400.00 |
| Hunter Douglas Blinds | | $20,340.28 |
| Norman Roller Shades | | $2,795.84 |
| Lights and Fixtures | | $2,985.05 |
| Interior Design Fee 2 | | $2,145.00 |
| ZLINE Fridge | | $5,357.04 |
| LG Washtower | | $2,137.78 |
| | | |
| | | |
| | | |
| Total | | $58,275.73 |

| UWM | | Mr. Cooper | | 2024 |
|---|---|---|---|---|
| 03/01/2023 | $4,511.14 | | | |
| 04/03/2023 | $4,511.12 | | | |
| 05/01/2023 | $4,511.12 | 10/01/2025 | $4,918.16 | |
| 06/01/2023 | $4,511.12 | 09/01/2025 | $4,918.16 | |
| 07/03/2023 | $4,511.12 | 08/01/2025 | $4,918.16 | |
| 08/01/2023 | $4,511.12 | 07/01/2025 | $4,918.16 | |
| 09/01/2023 | $4,511.12 | 06/01/2025 | $4,918.16 | |
| 10/02/2023 | $4,511.12 | 05/01/2025 | $4,819.82 | |
| 11/01/2023 | $4,511.12 | 04/01/2025 | $4,679.76 | |
| 12/01/2023 | $4,511.12 | 03/01/2025 | $4,679.76 | |
| 01/02/2024 | $4,511.12 | 02/01/2025 | $4,679.76 | |
| 02/01/2024 | $4,511.12 | 01/01/2025 | $4,679.76 | |
| 03/01/2024 | $4,679.76 | 12/01/2024 | $4,679.76 | |
| | | 11/01/2024 | $4,679.76 | |
| | | 10/01/2024 | $4,679.76 | |
| | | 09/01/2024 | $4,679.76 | |
| | | 08/01/2024 | $4,679.76 | |
| | | 07/01/2024 | $4,679.76 | |
| | | 06/01/2024 | $4,679.76 | |
| | | 05/01/2024 | $4,679.76 | |
| | | 04/08/2024 | $4,679.76 | |
| | | 04/01/2024 | $507.38 | |
| Total | $58,813.20 | | $91,133.34 | Grand Total $149,946.54 |

| Date | Type | Description | Unit | Status | Amount | Balance |
|---|---|---|---|---|---|---|
| 10/01/2025 | RENT | | 5131 Vivian St Room 1 - Coy | UNPAID | $1,050.00 | $1,050.00 |
| 10/01/2025 | RENT | | 5131 Vivian St Room 2 | UNPAID | $1,150.00 | $1,150.00 |
| 10/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | UNPAID | $1,250.00 | $1,250.00 |
| 09/01/2025 | RENT | | 5131 Vivian St Room 1 - Coy | PAID | $1,050.00 | $0.00 |
| 09/01/2025 | RENT | | 5131 Vivian St Room 2 | PAID | $1,150.00 | $0.00 |
| 09/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 08/01/2025 | RENT | | 5131 Vivian St Room 1 - Coy | PAID | $1,050.00 | $0.00 |
| 08/01/2025 | RENT | | 5131 Vivian St Room 2 | PAID | $1,150.00 | $0.00 |
| 08/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 07/28/2025 | RENT | | 5131 Vivian St Room 1 - Coy | PAID | $1,150.00 | $0.00 |
| 07/28/2025 | SECURITY DEPOSIT | | 5131 Vivian St Room 1 - Coy | PAID | $525.00 | $0.00 |
| 07/01/2025 | RENT | Initial Prorated Rent | 5131 Vivian St, Room 3, Room 3 - Coy | PAID | $203.22 | $0.00 |
| 07/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 06/24/2025 | SECURITY DEPOSIT | | 5131 Vivian St Room 2 | PAID | $575.00 | $0.00 |
| 06/01/2025 | RENT | | 5131 Vivian St Room 2 | PAID | $1,150.00 | $0.00 |
| 06/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,100.00 | $0.00 |
| 05/06/2025 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 05/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 04/06/2025 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 04/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 03/06/2025 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,100.00 | $0.00 |
| 03/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 02/06/2025 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 02/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - Jeong | PAID | $1,250.00 | $0.00 |
| 01/06/2025 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,100.00 | $0.00 |
| 01/01/2025 | RENT | | 5131 Vivian St, Room 3, Room 3 - Jeong | PAID | $1,250.00 | $0.00 |
| 01/01/2025 | RENT | Base Rent | 5131 Vivian St, Room 1 - Jeong | PAID | $1,100.00 | $0.00 |
| 12/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |

| Date | Type | Description | Property | Status | Amount | Amount |
|---|---|---|---|---|---|---|
| 12/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 12/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,100.00 | $0.00 |
| 11/06/2024 | RENT | | 5131 Vivian St Room 1 - Yang | PAID | $1,050.00 | $0.00 |
| 11/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 11/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,100.00 | $0.00 |
| 10/06/2024 | RENT | | 5131 Vivian St Room 1 - Yang | PAID | $1,050.00 | $0.00 |
| 10/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 10/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,100.00 | $0.00 |
| 09/06/2024 | RENT | | 5131 Vivian St Room 1 - Yang | PAID | $1,050.00 | $0.00 |
| 09/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 09/01/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,100.00 | $0.00 |
| 08/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,100.00 | $0.00 |
| 08/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 08/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 07/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,100.00 | $0.00 |
| 07/01/2024 | RENT | Base Rent | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,250.00 | $0.00 |
| 07/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $583.33 | $0.00 |
| 06/07/2024 | RENT | Prorated Rent for first month | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $475.00 | $0.00 |
| 06/07/2024 | SECURITY DEPOSIT | | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $150.00 | $0.00 |
| 06/07/2024 | SECURITY DEPOSIT | Cleaning Deposit | 5131 Vivian St, Room 3, Room 3 - May 2024 | PAID | $1,050.00 | $0.00 |
| 06/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 06/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 05/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 05/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 04/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 04/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,150.00 | $0.00 |
| 03/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 03/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 02/06/2024 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 02/01/2024 | RENT | | 5131 Vivian St Room 2 - Yang | | $1,050.00 | $0.00 |
| 01/06/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | | $1,050.00 | $0.00 |

| Date | Type | Note | Property | Status | Amount | Balance |
|------|------|------|----------|--------|--------|---------|
| 01/01/2024 | RENT | | 5131 Vivian St Room 1 - Jeong | | $1,050.00 | $0.00 |
| 12/01/2023 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 12/01/2023 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 11/01/2023 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 11/01/2023 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 10/01/2023 | RENT | | 5131 Vivian St Room 1 - Jeong | PAID | $1,050.00 | $0.00 |
| 10/01/2023 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 09/01/2023 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 09/01/2023 | RENT | First month rent | 5131 Vivian St Room 1 - Jeong | PAID | $700.00 | $0.00 |
| 08/25/2023 | SECURITY_DEPOSIT | | 5131 Vivian St Room 1 - Jeong | PAID | $525.00 | $0.00 |
| 08/01/2023 | RENT | | 5131 Vivian St Room 2 - Yang | PAID | $1,050.00 | $0.00 |
| 08/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 07/01/2023 | RENT | 1st month prorated rent | 5131 Vivian St Room 2 - Yang | PAID | $440.32 | $0.00 |
| 07/01/2023 | SECURITY_DEPOSIT | | 5131 Vivian St Room 2 - Yang | PAID | $525.00 | $0.00 |
| 07/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 06/01/2023 | RENT | | 5131 Vivian St Room 2 - Carrillo | PAID | $1,050.00 | $0.00 |
| 06/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 05/01/2023 | RENT | | 5131 Vivian St Room 2 - Carrillo | PAID | $1,050.00 | $0.00 |
| 05/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 04/01/2023 | RENT | | 5131 Vivian St Room 2 - Carrillo | PAID | $1,050.00 | $0.00 |
| 04/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 03/01/2023 | RENT | | 5131 Vivian St Room 2 - Carrillo | PAID | $1,050.00 | $0.00 |
| 03/01/2023 | RENT | | 5131 Vivian St Room 1 - Cheilus | PAID | $950.00 | $0.00 |
| 02/21/2023 | RENT | Prorated for Feb | 5131 Vivian St Room 2 - Carrillo | PAID | $300.00 | $0.00 |
| 02/11/2023 | RENT | Prorated for Feb | 5131 Vivian St Room 1 - Cheilus | PAID | $610.71 | $0.00 |
| 02/10/2023 | SECURITY_DEPOSIT | Sec + Cleaning fee | 5131 Vivian St Room 2 - Carrillo | PAID | $525.00 | $0.00 |
| 02/03/2023 | SECURITY_DEPOSIT | Security deposit + cleaning fee | 5131 Vivian St Room 1 - Cheilus | PAID | $475.00 | $0.00 |

| | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | | | | | | | | | |
| $90,112.58 | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |