~~IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO~~

~~Civil Action No: 1:25-cv-02884-CYC~~

~~Toll Brothers, Inc. et al v. Gu et al~~

Jeffrey Gu
jeffwgu@gmail.com
2332 N Clay St Apt 3
Denver, CO 80211
1-720-593-1548
Defendant/Counterclaim Plaintiff Pro Se

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| **Toll Brothers, Inc. et al,**<br>**Plaintiffs and**<br>**Counterclaim Defendants**<br>**v.**<br>**Gu et al,**<br>**Defendants and**<br>**Counterclaim Plaintiff** | **Case No.: 1:25-cv-02884-PAB-CYC** |

# FIRST AMENDED ANSWER AND COUNTERCLAIM

**Table of Contents**

ANSWERS
I. INTRODUCTION
II. RESPONSES
III. AFFIRMATIVE DEFENSES
1. Lack of Standing / Improper Joinder
2. Failure to State a Claim
3. Unclean Hands
4. Waiver
5. No Likelihood of Confusion
6. No Commercial Use
7. Fair Use / Nominative Use
8. First Amendment / Petitioning Activity

9. Abuse of Process
10. Failure to Mitigate Damages
11. Non-Infringing Names
12. Implausibility of Harm
13. Retaliatory Motive and Lack of Identifiable Victim
14. The Law Disregards Trifles
COUNTERCLAIM
I. INTRODUCTION
II. PARTIES
III. JURISDICTION AND VENUE
IV. FACTUAL ALLEGATIONS
A. Pre-purchase
B. Agreement of Sale
C. Construction
D. Closing
E. Post-closing
F. City of Wheat Ridge
G. Toll Brothers History
H. Licenses
I. Insurance
J. Marsh
K. Consumers
L. Other Toll Court Cases
M. Oakstone Matter
N. SEC Disclosures
O. Statements of Authority
P. Tenure at TB
Q. A Tale of Two Kens
R. Employee Evasiveness
S. TB Annual Reports
T. The New Home Company History
U. John Laing Homes Company History
V. The New Home Company Disclosures
W. A Tale of Two Builders
X. Statements of Authority Involving Reginald Carveth
Y. Other Deeds
Z. Westminster Abstract Company
AA. Demand Letter and Individual Contacts

BB. Chicago Title Commitment Letter
CC. Heritage Title Interactions
DD. UWM Closing Instructions
V. CAUSES OF ACTION
Count 1. Declaratory Judgment (Applicability of CP-1 Exemption/ C.R.S. § 12-10-201 et seq. )
Count 2. Fraudulent Inducement
A. Misrepresentation by Omission and False Authority: The Use of Shell Entities and Paper Officers
B. The Gary-Greenspan Pattern
C. Harm and Reliance
Count 3. Civil Conspiracy
A. Toll Brothers, Inc. and Related Entities
B. Westminster Abstract Company
C. Toll Southwest LLC and its Paper Officers
~~B. The City of Wheat Ridge, Gerald Dahl, Renee Meriaux, and Charles Abbott Associates~~
~~C. Felten Group, Inc.~~
~~D. Marsh & McLennan Companies, Inc. and Subsidiary Entities~~
~~E. The New Home Company, Inc. and Bert L. Howe & Associates, Inc.~~
D. Harm and Joint Liability
Count 4. Deceptive Trade Practices
Count 5: Declaratory Judgment – Invalidity of Recorded Documents (28 U.S.C. § 2201; C.R.S. §§ 38-30-172 & 38-35-201 et seq.)
Count 6: Declaratory Judgment – Breach of Non-Delegable Duty to Perform Reasonable Examination (28 U.S.C. § 2201; C.R.S. § 10-11-106; 3 CCR 702-8-1-2 § 5(A))
Count 7: Declaratory Judgment – Breach of Fiduciary Duty and Unlawful Escrow Disbursement (28 U.S.C. § 2201; C.R.S. § 10-11-127(1); 3 CCR 702-8-1-3 § 5(D)(1); 3 CCR 702-8-1-2 § 5(K))
Count 8: Statutory Liability for Recording Spurious Documents (C.R.S. § 38-35-109(3))
Count 9: Civil Theft (C.R.S. §§ 18-4-405 and 13-21-125)
Count 10: Common Law Conversion
Count 11: Underwriter Non-Delegable Supervision and Vicarious Liability (3 CCR 702-8-1-2 § 5(H), § 5(O)(3))
~~Count 5. Breach of Statutory Duty~~
~~Count 6. Abuse of Process~~
~~Count 7. Negligence~~
~~Count 8: Violation of First Amendment Rights (42 U.S.C. § 1983)~~
~~Count 9: Violation of Fourteenth Amendment Rights – Due Process and Equal Protection (42 U.S.C. § 1983)~~

VI. PRAYER FOR RELIEF
1. Declaratory Relief
2. Injunctive Relief
3. Rescission or, in the Alternative, Compensatory Damages
4. Mitigation Expenses
5. Statutory Damages
C.R.S. § 38-35-109(3)
C.R.S. § 18-4-405
C.R.S. § 6-1-113
C.R.S. § 12-10-202
6. Punitive Damages
7. Attorneys' Fees and Costs
8. Additional Legal or Equitable Relief
VII. DEMAND FOR JURY TRIAL
Notice of Electronic Filing

**ANSWERS**

**I. INTRODUCTION**

This lawsuit is not about trademark infringement. It is a retaliatory strike—an effort to silence a consumer who asked difficult questions about Plaintiffs' business practices, entity registrations, and regulatory compliance. The Complaint alleges no quantifiable harm, no commercial use, and no plausible theory of confusion under the Lanham Act. Plaintiffs attach no exhibits of lost sales, diverted customers, or actual confusion. Instead, they rely on conclusory assertions and speculative narratives to recast a homeowner and consumer advocate as a commercial actor.

The absence of evidence is telling. Plaintiffs devote pages to unrelated disputes—such as the so-called "Oakstone Matter" involving The New Home Company, Inc.—that have nothing to do with the claims before this Court. They even describe the backstory of Toll Southwest LLC, the subsidiary that purportedly sold Defendant his home, despite that entity's lack of standing to enforce trademark rights. These pleading choices reveal the true motive behind the action: to

intimidate, discredit, and suppress a whistleblower who has raised legitimate concerns about corporate misrepresentation, shell-entity structuring, and deceptive trade practices across jurisdictions. Many of the named "Copy" entities underscore the overreach. Several contain only the common word "Toll" or letters "TB," which Plaintiffs do not own exclusively and which are not inherently distinctive when used alone. Furthermore, USPTO 73636618 and USPTO 73636618 are both owned by TB Proprietary Corp., which brings into question the standing of the parent corporation. Thus, sweeping every touchpoint and entity into a Lanham Act case is improper and underscores the lack of a credible infringement theory.

However, this does not mean there is nothing of import here, quite the contrary. By alleging in Paragraph 28 that Defendant "purchased a townhome from Plaintiff Toll Southwest," Plaintiffs themselves placed the home sale and entity structure directly as a threshold issue. Colorado law strictly regulates who may act as a property seller without license, limiting what we might call the "Colorado Real Estate Commission CP-1 exemption" ("CP-1") to entities selling through their own "officers, partners, or regularly salaried employees." Once Plaintiffs elected to make the transaction part of their narrative, the Court necessarily must determine whether Toll Southwest LLC of Delaware—or any other Plaintiff—qualified for the exemption, which is more formally laid out in C.R.S. § 12-10-201(6)(b) (2023). Toll Southwest LLC of Delaware exists primarily as a title-holding shell: it employs no sales staff, conducts no marketing, does not receive earnest money, does not retain the officers that sign for it, and does not administer the warranty processes. If Toll Southwest LLC of Delaware was nothing more than a nominal signatory, then it lacks standing both to enforce trademark rights and to qualify for CP-1's

narrow statutory exemption. Until this threshold question is resolved, Plaintiffs' claims possibly rest on a misidentified and improperly joined party.

Somewhat amusingly, Plaintiffs allege in Paragraph 66 that the registration of similarly named entities across state lines may confuse consumers as to the proper entity for legal recourse. This is a startling admission. If, as Plaintiffs assert, consumers might misdirect service or claims due to ambiguous entity naming, it is only because Plaintiffs themselves have built a multi-layered corporate shell system intentionally designed to obscure which "Toll Brothers" entity is responsible for any given transaction. The conduct Plaintiffs attribute to Defendants is not only modeled after Plaintiffs' own structuring, but reveals how structurally confusing Plaintiffs' operations truly are.

At a minimum, Plaintiffs' case is an effort to weaponize trademark law as a shield against consumer accountability. It rests on speculation, omits evidence, and ignores statutory constraints. Defendant respectfully submits that the Court should view the Complaint for what it is: an overreaching attempt to chill lawful criticism and avoid scrutiny of Plaintiffs' opaque business structure. But there is a way to salvage this action. Likely, the proper first step in this litigation is to clarify Plaintiffs' standing under CP-1; absent such clarity, the Complaint cannot survive.

**II. RESPONSES**

Defendant denies the allegations in the "Introduction" section of the Complaint, as they consist of conclusions, characterizations, and unsupported rhetoric rather than factual allegations. To the extent any specific factual assertion is contained therein, Defendant denies it unless expressly admitted below.

24. Admitted.

25. Admitted.

26. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegation, and therefore denies it.

27. Admitted.

28. Defendant admits that "On or about January 19, 2023, Gu purchased a townhome" and "Gu submitted thirty-five warranty requests relating to the home" but denies the remainder. Some allegations are conclusory statements and contain no facts to admit. Defendant notably denies the fact that "Toll Southwest is a Colorado LLC." The entity, a named Plaintiff, is a Delaware LLC. This complaint would not have diversity jurisdiction if it is indeed a Colorado LLC.

29. a. Admitted. b. Admitted c. Admitted d. Defendant admits that "Filing a complaint with the Florida Board of Architecture and Interior Design (the "FL Board"), making allegations regarding Toll Brothers' licensing in Florida. Gu has no relationship or interactions with Toll Brothers in Florida" but denies the remainder. e. Denied. The allegations are conclusory statements and contain no facts to admit.

30. Defendant admits that he 'responded "Please let me know if Toll Brothers, Inc., a Delaware corporation, would like to discuss the Colorado registrations"' but denies the remainder as some allegations are conclusory statements and contain no facts to admit.

31. Defendant admits that he "formed seven entities…and registered them with the Colorado Secretary of State," that they were the 7 entities listed, and that he "is the registered agent for all CO Copy Entities" but denies the remainder as some allegations are conclusory statements and contain no facts to admit.

32. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegation, and therefore denies it.

33. Denied. The allegations are conclusory statements and contain no facts to admit.

34. Admitted.

35. Admitted.

36. Admitted.

37. Admitted.

38. Defendant admits that “Gu filed Articles of Incorporation with the Florida Secretary of State for: • TB PROPRIETARY CORP (FL SOS P25000042421; formed 22 Jul 2025) • TOLL ARCHITECTURE, INC (FL SOS P25000042414; formed 22 Jul 2025)” but denies the rest on the basis that the allegations are conclusory statements and contain no facts to admit.

39. Admitted.

40. Admitted.

41. Admitted.

42. Denied. The allegations are conclusory statements and contain no facts to admit.

43. Defendant admits that he “has previously filed claims relating to Toll Brothers with the PA AG, the CO AG and the FL Board” but denies the rest on the basis that the allegations are conclusory statements and contain no facts to admit.

44. Denied. The allegations are conclusory statements and contain no facts to admit.

45. Denied. The allegations are conclusory statements and contain no facts to admit.

46. Defendant admits that he ‘was involved in the purchase of a new home in California from a company called New Home Company (“New Home”),’ “he filed 16 prelitigation notices,” and

"made claims against bonds, licenses, and companies," but denies the rest on the basis that the allegations are conclusory statements and contain no facts to admit.

47. Defendant admits that he 'formed a Colorado corporation titled "The New Home Company Inc," with himself as the sole registered agent, and the same place of business as the Copy Entities, which again, is the Property that he purchased' but denies the rest on the basis that the allegations are conclusory statements and contain no facts to admit.

48. Admitted.

49. Admitted.

50. Denied. The allegations are conclusory statements and contain no facts to admit.

51. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegation, and therefore denies it.

52. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegation, and therefore denies it.

53. Admitted.

54. Denied. Defendant has not refused to dissolve the entities but merely has not been obligated to do so.

55-58. Denied. The allegations are conclusory statements and contain no facts to admit.

**III. AFFIRMATIVE DEFENSES**

*Defendant asserts the following affirmative defenses without assuming the burden of proof where such burden properly belongs to Plaintiffs.*

**1. Lack of Standing / Improper Joinder**

Plaintiffs' claims are barred in whole or in part because one or more of the named Plaintiffs lack standing to pursue the asserted causes of action. The alleged trademarks at issue are not owned

by all of the named Plaintiffs. The inclusion of non-owner entities, including Toll Brothers, Inc. and Toll Southwest LLC, constitutes improper joinder and expands this action beyond the rights-holding party. To the extent Plaintiffs seek to proceed under the Lanham Act or related theories, only the trademark owner may bring such claims, and the claims of non-owner Plaintiffs should therefore be dismissed. If this action is truly about safeguarding corporate goodwill and identity, then Plaintiffs should explain why Toll Holdings, Inc. of Delaware—the more proximate owner of the subsidiaries—is not before the Court. Its absence underscores the selective and improper joinder of entities that do not themselves own or enforce the marks.

**2. Failure to State a Claim**

Plaintiffs' Complaint fails to state a claim upon which relief can be granted. It lacks specific allegations of actual harm, commercial use, or damages tied to Defendant's actions.

**3. Unclean Hands**

Plaintiffs' own conduct—including their failure to disclose proper corporate identities to consumers and use of unregistered foreign entities to conduct business in Colorado—bars them from equitable relief.

**4. Waiver**

Plaintiffs waived their rights, if any, by failing to enforce or even acknowledge the marks in question, and by neglecting to clarify entity structure or naming conflicts for many years.

**5. No Likelihood of Confusion**

There is no likelihood of consumer confusion, as Defendant did not offer any goods or services under the names in question, nor did he represent himself as the Plaintiff.

**6. No Commercial Use**

Defendant made no commercial use of any name, mark, or domain that would give rise to a claim under the Lanham Act or Copyright Act.

**7. Fair Use / Nominative Use**

Any use of names or marks by Defendant falls under the doctrines of nominative or descriptive fair use, and was part of investigative or journalistic inquiry into public entities.

**8. First Amendment / Petitioning Activity**

Defendant's conduct constitutes protected speech and petitioning activity under the First Amendment and/or applicable state constitutional provisions. The lawsuit is an attempt to chill that conduct.

**9. Abuse of Process**

This lawsuit is being used as a tool of retaliation, reputation damage, and suppression of regulatory complaints—not for legitimate trademark or copyright enforcement.

**10. Failure to Mitigate Damages**

Plaintiffs failed to take reasonable steps to mitigate any alleged harm, including directly contacting Defendant to resolve the matter beyond one cease and desist letter.

**11. Non-Infringing Names**

Plaintiffs' claims are overbroad and defective to the extent they are premised on entities that do not infringe on any protected mark. Several of the named entities include only the common word "Toll" or other terms that are not exclusive to Plaintiffs, and are not confusingly similar to Plaintiffs' actual registered trademarks. Plaintiffs therefore lack standing to pursue claims against

these entities, and their attempt to do so improperly expands trademark rights beyond their lawful scope.

**12. Implausibility of Harm**

Plaintiffs' claims are implausible on their face. Defendant's entity registrations occurred mere weeks before this Complaint was filed. In that short time, no business was transacted, no advertising occurred, and no consumer could have plausibly been confused into believing Defendant's entities were affiliated with Plaintiffs. Homebuilding and related transactions are long-cycle processes measured in months, not days or weeks. Plaintiffs identify no single incident of actual confusion, no lost sale, and no reputational harm traceable to Defendant's registrations within the narrow window between formation and suit. Their allegations are speculative and rhetorical, not factual, and therefore fail to state a claim upon which relief can be granted.

**13. Retaliatory Motive and Lack of Identifiable Victim**

Plaintiffs' claims are barred, in whole or in part, by their retaliatory motive and lack of a legally cognizable victim. Plaintiffs characterize Defendant's protected regulatory complaints, correspondence, and inquiries into entity registrations as "harassment." These activities are lawful, statutorily protected, and directed at clarifying which entities were responsible for the construction, sale, and warranty of Defendant's home. Plaintiffs have not identified any specific entity or individual harmed by these actions, nor have they shown how such conduct caused damages or confusion under the Lanham Act. To the extent Plaintiffs' claims rest on the assertion of "harassment," they fail for lack of standing, improper joinder, and reliance on conclusory rhetoric rather than concrete injury.

**14. The Law Disregards Trifles**

Plaintiff's claims are barred, in whole or in part, by the doctrine of *de minimis non curat lex*, as the alleged breaches or damages complained of are immaterial, trifling, or legally insignificant.

# COUNTERCLAIM

**COUNTERCLAIM PLAINTIFF JEFFREY GU,** by and for himself, brings the following Counterclaims against **COUNTERCLAIM DEFENDANTS TOLL BROTHERS, INC., et al.**

**I. INTRODUCTION**

Defendant and Counterclaim Plaintiff Jeffrey Gu asserts counterclaims.

This amended counterclaim arises from a coordinated statutory mortgage lending theft and civil conversion scheme that unlawfully extracted $726,731 in purchase funds, earnest money deposits, and loan proceeds through unauthorized conveyancing instruments, a decertified and error-laden title commitment, and invalid corporate authority representations. Counterclaim Defendants executed a calculated, multi-tiered scheme designed to systematically bypass statutory gatekeepers, subvert mandatory Colorado regulatory safeguards, and insulate corporate parent entities from accountability at every stage of the residential real estate transaction for 5131 Vivian Street.

On the front end of the transaction, Toll Brothers, Inc., Toll Bros., Inc., and Toll Southwest LLC intentionally eliminated the independent fiduciary oversight required of a licensed real estate broker under Colorado Real Estate Commission Position Statement CP-1 by improperly asserting a developer-owner exemption while conducting marketing, sales, negotiations, and contracting through an unlicensed shell apparatus. On the back end, Counterclaim Defendants

neutralized the traditional title verification barrier by routing title examination and underwriting through a captive agency pipeline operated by Westminster Abstract Company, underwritten by Chicago Title Insurance Company, and subject to the corporate supervision and statutory reserve mandates of Fidelity National Financial, Inc. Westminster Abstract Company and Chicago Title Insurance Company facilitated the transaction by issuing an 84-day-old title commitment on an already decertified 2016 ALTA form containing a facially invalid Schedule B-1, Requirement 9 that omitted all verified signatories and pointed solely to an obsolete, superseded 2019 Statement of Authority (whose signatory, Christopher Stull, had already left the company for over a year) in direct violation of their non-delegable statutory examination duties under C.R.S. § 10-11-106(1) and 3 CCR 702-8-1-2 § 5(A).

Acting as the closing and settlement agent, American Heritage Title Agency, Inc. (d/b/a Heritage Title Company), also owned and controlled by Fidelity National Financial, Inc., breached its statutory fiduciary trust duties under C.R.S. § 10-11-127(1) by accepting and disbursing buyer trust funds against this facially incomplete title commitment—completely failing to perform minimal due diligence to identify or confirm an authorized signatory because Requirement 9 listed none—and effectuating the recording of a spurious Special Warranty Deed executed by an unauthorized and unverified signatory, Reginald Carveth, in direct violation of C.R.S. § 38-30-172, against the instructions of the lender, United Wholesale Mortgage, LLC. By capturing every touchpoint to systematically evade statutory oversight—from unlicensed brokering through captive underwriting and unauthorized settlement disbursement—Counterclaim Defendants established a closed-loop conveyor belt that leveraged a nationally recognized homebuilder brand to induce Counterclaim Plaintiff's reliance. In doing so, they substituted lawful statutory conveyancing and sound title underwriting with an unauthorized cadre of paper "officers" and

defective instruments, culminating in the unlawful conversion, civil theft, and mortgage lending theft of $726,731 of Counterclaim Plaintiff's funds pursuant to C.R.S. § 13-21-125 and C.R.S. § 18-4-405.

In Paragraph 28 of the Complaint, Plaintiffs allege that "Gu purchased a townhome from Plaintiff Toll Southwest." That allegation grossly oversimplifies the purchase process and disregards the involvement of multiple affiliated entities—including Plaintiffs' parent corporation—in marketing, contracting, and warranty administration. (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161.) Homebuying is not akin to purchasing a product at a convenience store: it is a multi-stage pipeline involving advertising, pre-qualification, bidding, execution of contracts, and post-closing service obligations. By reducing this process to a single entity name, Plaintiffs conceal the true complexity of their sales structure and the extent to which they attempted to form transactions around the Colorado Real Estate Commission's CP-1 exemption ("CP-1"). Because Plaintiffs themselves chose to place the purchase transaction into their Complaint, Counterclaim Plaintiff respectfully submits that the Court must first clarify which entity (if any) was the actual "seller," and whether that entity qualified for CP-1's narrow exemption. Without such clarity, it will be impossible to assess Plaintiffs' standing, to resolve their claims, or to evaluate Counterclaim Plaintiff's causes of action. This threshold determination is therefore vital to adjudicating both the Complaint and the Counterclaims.

Counterclaim Plaintiff has already sought clarification from the Colorado Department of Real Estate (See ¶¶ 141). That agency declined to resolve the ambiguities in Plaintiffs' entity structure, choosing instead to defer responsibility. In so doing, the regulatory authority effectively placed the interpretive burden on this Court. Thus, the judicial determination sought

here is not only proper but necessary to fill the gap left by regulators unwilling to adjudicate Plaintiffs' use of the CP-1 exemption.

By styling their Complaint as they did, Plaintiffs themselves placed their corporate structure, sales practices, and regulatory compliance directly at issue. They did not limit their pleading to the trademark owner, TB Proprietary Corp. of Delaware, but instead joined other entities—such as Toll Brothers, Inc. and Toll Southwest LLC—that neither own nor enforce the marks in question. Plaintiffs also chose to frame their allegations around Defendant's post-closing conduct in connection with his home purchase. That strategy makes it impossible to adjudicate their claims without simultaneously addressing the inducement, licensing, and statutory compliance issues that underpin the transaction. Under Rule 13(a), these counterclaims are not optional: they arise from the same transaction or occurrence that is the subject matter of Plaintiffs' Complaint, and resolution of one necessarily requires resolution of the other.

Even Plaintiffs inadvertently admit to there being aspects of this case requiring more clarity. In Paragraph 47 of their Complaint, they describe the situation as an "entire mess." That candid phrasing underscores Defendant's point: this confusion stems not from the "copy entities" but from Plaintiffs' own opaque structure and shifting narratives. Their counsel has likewise stumbled, erroneously alleging in Paragraph 28 of their Complaint that "Toll Southwest is a Colorado LLC." Were that to be true, diversity jurisdiction would vanish altogether.

Identity is not a sideshow in this litigation—it is the litigation. Plaintiffs chose to sue under conflicting corporate names, alleging confusion while obscuring which entity constructed the property, which entity marketed it, which entity sold it, which entity accepted earnest money, and which entity provided warranties. By making "identity" the centerpiece of their complaint,

~~Plaintiffs have made it unavoidable that this Court resolves the true identities of the entities responsible. Defendant welcomes that inquiry, because it reveals not confusion caused by Defendant, but confusion caused by Plaintiffs' own shell-game of registrations and subsidiaries.~~

**Preview of Exhibits**

To aid the Court's understanding of the counterclaim, several exhibits provide a clear overview of the corporate structure and consumer experience at issue. Exhibit 2, titled Colorado Ops, maps the array of subsidiary entities used by Toll Brothers in the state (See Exhibit 2 Colorado Ops.pdf). Exhibit 3, titled Consumer Journey, depicts the sequence of entities presented to a homebuyer during the marketing, contracting, and closing process (See Exhibit 3 Consumer Journey.pdf). Exhibit 87, titled Corporate Hierarchy, shows the relationship of Toll Brothers, Inc. to its numerous subsidiaries (See Exhibit 87 Corporate Hierarchy.pdf). These diagrams illustrate how the corporate defendants controlled and coordinated the consumer-facing process while obscuring which entities bore legal responsibility.

**II. PARTIES**

**A. Counterclaim Plaintiff:**

**Jeffrey Gu**

Residence: 2332 N Clay St Apt 3, Denver, CO 80211

State of Domicile: Colorado

**B. Counterclaim Defendants:**

**Toll Brothers, Inc.,** a Delaware Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Toll Southwest LLC,** a Delaware LLC

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**TB Proprietary Corp.,** a Delaware Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Toll Holdings, Inc.,** a Delaware Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Toll Bros., Inc.,** a Pennsylvania Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Westminster Abstract Company dba Westminster Title Agency, Inc.,** a Pennsylvania Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Toll Holdings, Inc.,** a Delaware Corporation

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**Fidelity National Financial, Inc.,** a Nevada Corporation

Principal Place of Business: 601 Riverside Avenue Jacksonville, Florida, 32204

**Chicago Title Insurance Company,** a Florida Corporation

Principal Place of Business: 601 RIVERSIDE AVE., JACKSONVILLE, FL 32204

**American Heritage Title Agency, Inc. d/b/a Heritage Title Company, Inc.,** a Colorado Corporation

Principal Place of Business: 8055 TUFTS AVE STE 300, DENVER, CO 80237

**Rocket Mortgage, LLC,** a Michigan LLC, as the current master servicer/administrative holder of the Deed of Trust

Principal Place of Business: 1050 Woodward Ave, Detroit, MI 48226, US

**Kenneth J. Greenspan,** an individual

Address: 408 Dornishwood Place, Chalfont, PA 18914

**Mark G. Bailey,** an individual

Address: 1560 S Logan St., Denver, CO 80210

**Reginald E. Carveth III,** an individual

Address: 19091 E. Cody Ave, Parker, CO 80134

**Matt Foran,** an individual

Principal Place of Business: 1140 Virginia Drive, Fort Washington, PA 19034

**David A. Keller,** an individual

Address: 3311 Bishop Pine Pt, Colorado Springs, CO 80904

**Eric J. Hunter,** an individual

Address: 860 Grey Eagle Cir N, Colorado Springs, CO 80919

**Christopher D. Stull,** an individual

Address: 5868 Kilbeggin Rd, Timnath, CO 80547

~~**City of Wheat Ridge**~~

~~Principal Place of Business: 7500 W 29th Ave., Wheat Ridge, CO 80033~~

~~**Gerald Dahl,** in his official capacity as City Attorney of City of Wheat Ridge~~

~~Principal Place of Business: 7500 W 29th Ave., Wheat Ridge, CO 80033~~

~~**Renee Meriaux,** in her capacity as Chief Building Official of City of Wheat Ridge Building Department~~

~~Principal Place of Business: 7500 W 29th Ave., Wheat Ridge, CO 80033~~

~~**Charles Abbot Associates, Inc.,** a California Corporation~~

~~Principal Place of Business: 27201 PUERTA REAL, SUITE 200, MISSION VIEJO, CA 92691~~

~~**Felten Group, Inc.**, an Arizona Corporation~~

Principal Place of Business: 18325 N Allied Way Ste 200, Phoenix, AZ 85054, US

**Marsh & McLennan Companies, Inc.,** a Delaware Corporation

Principal Place of Business: 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, UNITED STATES, 10036

**Marsh LLC,** a Delaware LLC

Principal Place of Business: 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, UNITED STATES, 10036

**Marsh USA LLC,** a Delaware LLC

Principal Place of Business: 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, UNITED STATES, 10036

**The New Home Company, Inc,** a Delaware Corporation

Principal Place of Business: 18300 VON KARMAN AVE., SUITE 1000, IRVINE, CA 92612

**Bert L Howe and Associates, Inc,** a California Corporation

Principal Place of Business: 5415 E. LA PALMA AVENUE, ANAHEIM HILLS, CA 92807

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1331 because Counterclaim Plaintiff asserts claims arising under the First and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. § 1983. These constitutional claims are directed against the City of Wheat Ridge, a municipal corporation within the State of Colorado, its officials and agents acting under color of state law.

The counterclaims asserted herein arise out of the exact same transaction that form the subject matter of Plaintiffs' Complaint. Accordingly, these counterclaims are compulsory pursuant to Fed. R. Civ. P. 13(a). This Court possesses supplemental subject-matter jurisdiction over all asserted state-law counterclaims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims in the primary action that they form part of the same case or controversy under Article III of the United States Constitution.

1. Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Counterclaim Plaintiff is a resident of Colorado. The corporate Counterclaim Defendants—including Toll Brothers, Inc. (a Delaware corporation with principal place of business in Pennsylvania), TB Proprietary Corp. (a Delaware corporation with principal place of business in Pennsylvania), Toll Southwest LLC (a Delaware limited liability company with members domiciled outside Colorado)Marsh & McLennan Companies, Inc. (a Delaware corporation with principal place of business in New York), Marsh LLC (a Delaware limited liability company with members domiciled outside Colorado), Marsh USA LLC (a Delaware limited liability company with members domiciled outside Colorado), The New Home Company, Inc. (a Delaware corporation), Felten Group, Inc. (an Arizona corporation), and Bert L. Howe & Associates, Inc. (a California corporation)—are citizens of states other than Colorado for purposes of diversity.

2. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims alleged herein, including fraudulent inducement, negligence and, and civil conspiracy, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within the District of Colorado, including the negotiation, execution, and closing of the home purchase transaction, the permitting and inspection activities of the City of Wheat Ridge, and the communications and acts that form the basis of the alleged conspiracy.

## IV. FACTUAL ALLEGATIONS

*All referenced corporate registrations, recorded county documents, employee information, licenses, and permits are matters of public record and can be judicially noticed. If Plaintiffs dispute the accuracy of the attached copies, they are in possession of the true and correct versions and should provide them to the Court.*

### A. Pre-purchase

1. On January 16, 2022, Jeffrey Gu ("**JG**") received an email titled "Thank you for your interest in The Ridge at Ward Station" from the email tbmailer@tollbrothers.com. (See Exhibit 1 Gmail - Toll Brothers Inc Thank you for your interest in The Ridge at Ward Station.pdf, Exhibit 2 Colorado Ops.pdf, and Exhibit 3 Consumer Journey.pdf)
2. The domain tollbrothers.com is registered by **Toll Brothers, Inc**. of Delaware (See Exhibit 4 tollbrothers.com whois.pdf)
3. The email contains the text "You are receiving our email because jeffwgu@gmail.com signed up to receive emails from Toll Brothers, Inc."
4. **Toll Brothers, Inc.** was incorporated in Delaware on May 28, 1986 and has a file number of 2092118. (See Exhibit 5 DE SOS Toll Brothers, Inc..pdf)
5. **Toll Brothers, Inc.** of Delaware has had a corporate headquarters of 1140 Virginia Drive, Fort Washington, PA 19034 since at least 2021.
6. **Toll Brothers, Inc.** of Delaware is not registered as a foreign corporation in Colorado, as of September 22, 2025.

7. According to the Plaintiffs' complaint in Paragraph 25, this entity has received a number of accolades, stating that "Toll Brothers has been listed among Fortune Magazine's Most Admired Companies in the World for eleven straight years" and that "Toll Brothers has spent decades cultivating its well-earned reputation and goodwill."
8. On February 1, 2022, **JG** received an email titled "Best & Finals offers now open for Building #15 [Sites #71-74]" from the email DKOLAR@tollbrothers.com. (See Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf)
9. The email was sent by **Dez Kolar**.
10. The email cc's **Nicole Jorgensen**.
11. The email contains the text "You are receiving our email because seedlist@tollbrothers.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc."
12. It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".
13. On information and belief, **Ms. Kolar** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.
14. On information and belief, **Ms. Kolar** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.
15. **Ms. Kolar** did not have an active real estate license with the Colorado Department of Real Estate in 2022.
16. **Ms. Kolar**, did not have an active real estate license with the Colorado Department of Real Estate in 2023.

17. On information and belief, **Ms. Jorgensen** was a salaried employee of **Toll Brothers, Inc.** of Delaware in 2022 or 2023.

18. On information and belief, **Ms. Jorgensen** was not a salaried employee of **Toll Southwest LLC** of Delaware in 2022 or 2023.

19. **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate for the entirety of 2022.

20. **Ms. Jorgensen** did not have an active real estate license with the Colorado Department of Real Estate in 2023.

21. On information and belief, **Toll Southwest LLC** of Delaware did not operate a payroll in Colorado from 2020-2024.

22. On information and belief, **Toll Southwest LLC** of Delaware did not file employment taxes in Colorado from 2020-2024.

23. **Toll Brothers, Inc** of Delaware and none of its subsidiaries had an active real estate license with the Colorado Department of Real Estate between 2020-2024. (See Exhibit 7 Colorado Toll Brothers License.pdf)

24. **Toll Brothers Real Estate, Inc** had an active real estate license in Colorado at one period of time. (See Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf)

25. This period was between February 11, 2002 and August 19, 2003.

26. **Toll Brothers Real Estate, Inc** currently has an active real estate license in California. (See Exhibit 9 Public License Lookup - DRE CA.pdf)

27. On February 5, 2022, **JG** received an email titled “Toll Brothers: We've Received Your Offers” from the email tbmailer@tollbrothers.com. (See Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf)

28. The email displays "Hale, Home Site #74 Minimum Price: $597,790 Your Offer: $646,123 Wellshire, Home Site #73 Minimum Price: $602,925 Your Offer: $611,123"
29. The email contains the text "Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, PA 19034 - 855.897.8655"
30. It also contains the text "10th YEAR ON FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST".
31. It also contains the text "TOL LISTED NYSE" as a stylized graphic.
32. The letters TOL refer to the stock ticker symbol TOL.
33. The ticker symbol TOL refers to **Toll Brothers, Inc** of Delaware.

**B. Agreement of Sale**

34. February 12, 2022, **JG** signed an **Agreement of Sale** for a property described as the following: Hale Aberdeen style home on TBI Lot 0074, Legal Lot 7, Block/Tract 5, in the community known as The Ridge at Ward Station having a street address of 5131 Vivian St, Wheat Ridge, CO 80033 (See Exhibit 11 Agreement of Sale.pdf)
35. The Seller in this **Agreement of Sale** was **Toll Southwest LLC** of Delaware.
36. **Toll Southwest LLC** was incorporated in Delaware on July 29, 2011 and has a file number of 5018070. (See Exhibit 12 DE SOS Toll Southwest.pdf)
37. **Toll Southwest LLC** of Delaware was registered in Colorado as a foreign company on May 4, 2017 and has ID number 20171351296 (See Exhibit 13 CO Toll Southwest LLC.pdf)
38. This registration lists "1140 Virginia Dr, Fort Washington, PA 19034, US" as the "Principal office street address" for **Toll Southwest LLC** of Delaware**.**

39. **Toll Southwest LLC** of Delaware is not registered as a foreign entity with the Pennsylvania Secretary of State.

40. **Toll Southwest LLC** of Delaware cannot operate in Pennsylvania legally.

41. This entity was different from the one, **Toll Brothers Inc** of Delaware, that accepted the offer for the same home via email, the offer of $646,123, in ¶¶ 27–33.

42. According to the Plaintiffs' complaint in Paragraph 28, **Toll Southwest LLC** of Delaware is a "Colorado LLC".

43. This fact in the Plaintiffs' complaint is verifiably false.

44. The property cited in the **Agreement of Sale**, according to its structural and architectural plans, had 3 bedrooms, including a 1st floor bedroom with interior walls ("**The Walls**"). (See Exhibit 14 5131 Walls In Question.pdf and Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf)

45. **DJT Design**, the architectural firm that created the designs for the homes at The Ridge at Ward Station, signed their contract for creating the designs for the homes in the neighborhood with **Toll Brothers, Inc.** of Delaware. (See Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf)

46. On February 12, 2022, the earnest money of $33,475 for the property was accepted via Stripe. (See Exhibit 17 Gmail - Toll Bros Receipt)

47. The payment recipient on the receipt is called "**Toll Bros., Inc**."

48. **Toll Bros., Inc** was incorporated in Pennsylvania, possibly under a different name, on June 30, 1986 and has an ID number of 928642. (See Exhibit 18 Toll Integrated Systems, Inc.pdf)

49. **Toll Bros., Inc** of Pennsylvania is not the same entity as **Toll Southwest LLC** of Delaware or **Toll Brothers, Inc** of Delaware.

50. **Toll Bros., Inc** of Pennsylvania is not a direct subsidiary of **Toll Brothers, Inc** of Delaware.

## C. Construction

51. On May 11, 2022**, JG** received an email titled “Building #15 update” from the email DKOLAR@tollbrothers.com. (See Exhibit 19 Gmail - Building #15 framing update 1.pdf)

52. The email contains a photo of the initial framing of the property. The first floor was not yet complete.

53. The email contains a graphic with the text “Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022”.

54. A February 3, 2022 press release titled "Toll Brothers Named #1 Homebuilder in FORTUNE Magazine Survey of the World’s Most Admired Companies” announced this ranking. (See Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf)

55. The press release refers to “Toll Brothers, Inc. (NYSE:TOL) (www.Tollbrothers.com), the nation’s leading builder of luxury homes.”

56. This update email came from **Toll Brothers, Inc.** of Delaware.

57. On May 22, 2022**, JG** took a photo of the 2nd floor framing in construction. (See Exhibit 21 5-22-22 2nd floor.pdf)

58. **The Walls** are not present in this photo.

59. **The Walls** are not present in the photo because they did not exist at the time.

60. On June 7, 2022, **JG** took a photo of the 3rd floor framing in construction. (See Exhibit 22 6-7-22 Roof.pdf)

61. **The Walls** are not present in this photo.

62. **The Walls** are not present in the photo because they did not exist at the time.

63. **City of Wheat Ridge** Building Department permit 202102734 pertains to the property at 5131 Vivian St, 80033. (See Exhibit 23 5131 Vivian Permit.pdf)

64. On July 15, 2022, inspector **Andrew Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See Exhibit 24 Rough Frame Inspection 7-15-22.pdf)

65. **Mr. Haessler** was an employee of Charles Abbot Associates, Inc. ("**CAA**"), according to his LinkedIn profile, at the time. (See Exhibit 25 LinkedIn Andrew Haessler.pdf)

66. **CAA** had/has a contract to provide permitting and inspection services to the **City of Wheat Ridge Building Department**. (See Exhibit 26 Wheat Ridge CAA Contracts.pdf)

67. **Toll Brothers Inc** of Delaware and their subcontractors at this time did not have any immediate plans to install studs for **The Walls**.

68. **Toll Brothers Inc** of Delaware and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add the framing for **The Walls**. (See Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf)

69. **Mr. Haessler** did not make a note in the permitting platform about **The Walls** at this inspection.

70. **Mr. Haessler** marked this inspection "PARTIAL".

71. On August 7, 2022, **JG** took a photo of the 1st floor framing. (See Exhibit 28 8-7-22.pdf)

72. **The Walls** are not present in this photo.

73. **The Walls** are not present in the photo because they did not exist at the time.

74. On or around September 12, 2022, **JG**, his designer **Megan Thompson**, and his hired inspector **Vince Busnardo** tour the property for a pre-drywall walkthrough organized by the builder's staff. (See Exhibit 29 Gmail - Pre-drywall walk.pdf)

75. On September 12, 2022, **Mr. Busnardo** created an inspection report for the walkthrough which contains photos. (See Exhibit 30 Busnardo Inspection.pdf).

76. On the page marked "Page 19 of 32" in the report, it shows the first floor without **The Walls**.

77. Ms. Thompson mentions how **The Walls** were forgotten in a September 26, 2022 follow up email. (SeeExhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf)

78. On September 21, 2022, inspector **Eric Bowman** performed a "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See Exhibit 32 Electrical Inspection 1 9-21-22.pdf)

79. In the note for the inspection, he states "Wiring not complete on first floor". (See Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf)

80. **Mr. Bowman** marked this inspection "INCOMPLETE".

81. **Mr. Bowman** could not mark the inspection "COMPLETE" because **The Walls** were not present in order to put wiring through them.

82. On September 24, 2022, **JG** took an interior photo of the 1st floor with some plumbing in the first floor bathroom present. (See Exhibit 34 9-24-22 No Wall Present.pdf)

83. **The Walls** are not present in this photo.

84. **The Walls** are not present in the photo because they did not exist at the time.

85. September 24, 2022 was a Saturday.

86. **Toll Brothers Inc** and their subcontractors or subsidiaries at this time or prior did not submit any revision applications to the **City of Wheat Ridge** Building Department to add **The Walls**. (See Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf)

87. On September 26, 2022, Mr. Bowman performed a second "ELE59 - ROUGH ELECTRICAL" inspection, for permit 202102734. (See Exhibit 35 Electrical Inspection 2 9-26-22.pdf)

88. **Mr. Bowman** marked this inspection "COMPLETE".

89. **Mr. Bowman** could mark the inspection "COMPLETE" because **The Walls** were present in order to put wiring through them.

90. The inspection was performed at 7:45am.

91. **The Walls** were present in this inspection.

92. Contractors did not perform work at this location on Sunday, September 25, 2022.

93. The framing for **The Walls** was installed on September 26, the same day as this electrical inspection.

94. On September 27, 2022, **Mr. Haessler** performed a "BLD59 - ROUGH FRAME" inspection, for permit 202102734. (See Exhibit 36 Rough Frame Inspection 9-27-22.pdf)

95. **Mr. Haessler** marked this inspection "COMPLETE".

96. On October 1, 2022, **JG** took a photo of the 1st floor of **The Walls** with some electrical present. (See Exhibit 37 10-1-22 Wall Present.pdf)

97. On October 8, 2022, **JG** took a photo of **The Walls** that shows a grouping of two studs in the upper left and cutouts in a vertical stud near the left of the photo. (See Exhibit 38 10-8-22 Wall Present 2.pdf)

98. The cutout of one stud has a visible nail driven horizontally through it.

99. On October 8, 2022, **JG** took another photo of **The Walls**. (See Exhibit 39 10-8-22 Wall Present 3.pdf)

100. This photo shows 2 vertical studs that constitute parts of **The Walls**.

101. This photo shows 3 cutouts total in the said 2 vertical studs.

102. The cutouts exceed 25% of the stud width.

103. The cutouts exceed 40% of the stud width.

104. The cutouts exceed 50% of the stud width.

105. The cutouts exceed 55% of the stud width.

106. The cutouts exceed 60% of the stud width.

107. The cutouts exceed 66% of the stud width.

108. IRC 2018 "R602.6 Drilling and notching of studs" states, "Drilling and notching of studs shall be in accordance with the following: 1. Notching. Any stud in an exterior wall or bearing partition shall be permitted to be cut or notched to a depth not exceeding 25 percent of its width. Studs in nonbearing partitions shall be permitted to be notched to a depth not to exceed 40 percent of a single stud width." (See Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.pdf and Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.pdf)

109. The City of Wheat Ridge Building Department had adopted the standards within ICC 2018 for all the inspections for this home. (See Exhibit 42 5131 Vivian COO.pdf)

110. ICC 2018 includes IRC 2018.

111. **Mr. Haessler** did not make a note in the permitting platform about these cutouts in this final framing inspection.

112. **Mr. Haessler** did not make a note in the permitting platform about a violation of IRC 2018 R602.6 in this final framing inspection.

113. On October 25, 2022, **Mr. Haessler** performed a "BLD65 - DRYWALL FASTENING / MOISTURE BOARD" inspection, for permit 202102734. (See Exhibit 43 Drywall Fastening Inspection 10-25-22.pdf)

114. On the date of the inspection, **Mr. Haessler** marked this inspection "COMPLETE".

115. **Mr. Haessler** did not make a note in the permitting platform about a group of studs protruding from the drywall around **The Walls**.

116. On November 25, 2022, **JG** took a photo of **The Walls** with drywall and paint. (See Exhibit 44 11-25-22 Stud Jutting Drywall.pdf)

117. The photo shows a group of studs protruding from **The Walls**. These are the same studs that appear in ¶¶ 99.

118. **Mr. Haessler** marked the inspection "COMPLETE" despite this workmanship error.

**D. Closing**

119. On January 19, 2023**, JG** closed on the property at 5131 Vivian St. (See Exhibit 45 Final Closing Disclosure.pdf)

120. The Seller displayed on this **Closing Disclosure** is **Toll Southwest LLC** of Delaware, with an address of "1140 Virginia Drive Fort Washington , PA 19034" shown.

121. There is no "Real Estate Broker (S)" listed in the "Contact Information" section of the **Closing Disclosure**.

122. The Seller displayed on this **Closing Disclosure** is not **Toll Brothers, Inc.** of Delaware.

123. The **Certificate of Occupancy** for 5131 Vivian St shows the date "01/18/23" and permit number "202102734". (See Exhibit 42 5131 Vivian COO.pdf)

124. The listed owner is "TOLL SOUTHWEST LLC" and address is "10 Inverness Dr 125, Englewood, CO 80112".

125. This address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

126. The listed contractor is "TOLL BROTHERS" and address is "10 Inverness Dr 125, Englewood, CO 80112".

127. "TOLL BROTHERS" does not pertain to any entity incorporated in Delaware registered with the Colorado Secretary of State.

128. "TOLL BROTHERS" is not the DBA name of any entity owned by **Toll Brothers, Inc** of Delaware registered with the Colorado Secretary of State.

129. The listed owner and contractor do not have the same name.

130. The listed owner and contractor do not pertain to the same entity.

131. Colorado Real Estate Commission statement CP-1 states that "Unlicensed individuals or entities selling real property ("Selling Principals") such as bank owned properties (REOs), homebuilders, iBuyers (Instant Buyers) and any other individual or entity identified in section 12-10-201(6)(b), Colorado Revised Statutes (C.R.S), are exempt from being licensed and, as sellers, are not required to use Commission-Approved Forms.". (See Exhibit 46 Colorado CP-1 2022.pdf)

132. **Toll Brothers, Inc** of Delaware is a homebuilder.

133. **Toll Southwest LLC** of Delaware is not a homebuilder.

134. The marketing for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

135. The marketing for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

136. The real estate brokering for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

137. The real estate brokering for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

138. The construction for the property at 5131 Vivian St was performed by **Toll Brothers, Inc.** of Delaware.

139. The construction for the property at 5131 Vivian St was not performed by **Toll Southwest LLC** of Delaware.

140. The marketing, brokering, and selling for the property at 5131 Vivian St was organized by a single corporate entity.

141. In an August 19, 2025 email from the Colorado Department of Real Estate, the department provided this opinion: The Colorado Real Estate Commission has not previously determined that the formation and use of subsidiary entities disqualifies the homebuilder exemption. The concerns referenced in your complaint are not addressed in the license law. You may choose to contact legal counsel to determine other legal options that may be available. (See Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf)

142. On the **Special Warranty Deed** for 5131 Vivian St, **Toll Southwest LLC** of Delaware is the Grantor and **Jeffrey Gu** is the Grantee. (See Exhibit 48 5131 Vivian St Special Warranty Deed.pdf)

143. **Reginald Carveth** was the signatory for the Grantor in this **Special Warranty Deed** and others. (See Exhibit 198 CO Deed.pdf and Exhibit 199 PA Deed.pdf)

144. On information and belief, **Mr. Carveth** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing.

145. On information and belief, **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

146. **Toll Southwest LLC** of Delaware's managers at the time of closing consisted of a combination or subset of this group of people: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.** (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

147. **Mr. Carveth** was not one of these 3-4 managers of **Toll Southwest LLC** of Delaware at the time of signing.

148. **Toll Southwest LLC** of Delaware had only one member, **Toll Bros., Inc** of Pennsylvania.

149. **Toll Southwest LLC** of Delaware still only has one member, as of September 22, 2025, **Toll Bros., Inc.** of Pennsylvania.

150. **Mr. Carveth** was also not a member of **Toll Southwest LLC** of Delaware at the time of signing.

151. **Mr. Carveth** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of signing.

152. On January 28, 2023, **JG** received an email titled “Helpful information about caring for your new home” from reply@emails.tollbrothers.com. (See Exhibit 51 Gmail - Helpful information about caring for your new home.pdf)

153. The email contains the text “You are receiving our email because jeffwgu@gmail.com signed up to receive emails or because your organization has a business relationship with Toll Brothers, Inc”

154. The email contains a graphic with the text “Toll Brothers #1 HOME BUILDER FORTUNE WORLD'S MOST ADMIRED COMPANIES 2022”.

155. On January 31, 2023, **JG** received an email titled “How was your Toll Brothers Home Building Experience?” from customersurvey@tollbrothersinc.com. (See Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf)

156. The email's signatory is **Toll Brothers, Inc**. of Delaware CEO **Douglas Yearley**.

157. In the email, **Mr. Yearley** represents himself as the CEO of **Toll Brothers, Inc**. of Delaware.

158. **Mr. Yearley** was also one of 3-4 managers for **Toll Southwest LLC** of Delaware at the time of sending the email, according to Arizona filed documents. (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

159. The aforementioned email does not portray **Mr. Yearley** as a manager of **Toll Southwest LLC** of Delaware.

160. The email contains the text “Toll Brothers, Inc., 1140 Virginia Drive, Fort Washington, Pennsylvania 19034”

161. The domain tollbrothersinc.com is registered by **Toll Brothers, Inc**. of Delaware (See Exhibit 53 tollbrothersinc.com whois.pdf)

**E. Post-closing**

162. On August 31, 2023, **JG** sent a warranty request about the garage door of the property not closing properly. (See Exhibit 54 Gmail - Garage door wont properly close.pdf)

163. On December 28, 2023, **JG** sent a warranty request about the luxury vinyl plank (LVP) on the 2nd floor being uneven and bubbling. (See Exhibit 55 Gmail - Large amount of LVP bubbling.pdf and Exhibit 134 LVP Warranty Text.pdf)

164. One area of the bubbling cited was on the second floor, in the kitchen near the stairs that go to the 3rd floor.

165. The area of the bubbling cited is right above **The Walls**.

166. On February 15, 2024, in response to the LVP warranty request, their representative stated that "After careful review of your service request ID #1228317 we have determined that the item mentioned is beyond the scope of the warranty." (See Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf)

167. On March 12, 2024, the warranty team sent a response to a warranty request **JG** made about overly large cracks in the garage slab. (See Exhibit 57 Gmail - Re Large cracks in slab.pdf)

168. On April 22, 2024, **JG** sent another request for the garage door not closing correctly. (See Exhibit 58 Gmail - Garage door closes inconsistently.pdf)

169. On June 16 and June 18, 2025, **JG** sent 2 Colorado Construction Defect Action Reform Act (CDARA) letters to **Toll Brothers Inc**. (See Exhibit 59 Toll Brothers CDARA Structure Letter.pdf and Exhibit 60 Toll Brothers CDARA Window Letter.pdf)

170. In the first letter, he notes a long crack in the 2nd floor ceiling. (See Exhibit 61 2nd floor ceiling crack.pdf)

171. In the same letter, he notes carpet tenting on the 3rd floor, above the long crack. (See Exhibit 62 3rd floor carpet tenting.pdf)

172. In the same letter, he notes large cracks in the garage. (See Exhibit 63 Renter noting larger crack.pdf)

173. In the second letter, he notes water intrusion in some windows.

174. **Toll Brothers, Inc.** of Delaware still has not resolved the issues in the two letters.

175. **Toll Brothers, Inc.** of Delaware was not the named seller on the **Closing Disclosure** or **Agreement of Sale**, but eventually responded to the letters despite this.

176. On June 18, 2025, **JG** sent a complaint to the Pennsylvania Office of Attorney General, Bureau of Consumer Protection. (See Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf)

177. On June 27, 2025, **JG** concluded a communication with **Felten Group** employees **David Sparks**, Vice President of Research & Development, and **Mark Matthews**, Vice President of Engineering. (See Exhibit 65 Gmail - Felten Group emails.pdf and Exhibit 197 Felten Plans First Page.pdf)

178. **Felten Group** created the structural plans for Building 15 of the Ridge at Ward Station.

179. **Felten Group** created the structural plans for all the buildings of the Ridge at Ward Station.

180. **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the structural plans for Building 15.

181. **Mr. Sparks** and **Mr. Matthews** refused to provide **JG** the signatory company to the contract to create these plans.

182. **Mr. Sparks** and **Mr. Matthews** refused to detail whether their company approved or analyzed plans for the installation of **The Walls** on or around the time they were installed.

183. On July 1, 2025, **JG** concluded an email chain wherein he communicated with **Chris Ferguson** and **Eric Lehman**, two high level officers or employees of **Toll Brothers, Inc** of Delaware in Colorado. (See Exhibit 66 Chris Ferguson not admitting employment.pdf)

184. Neither of the gentlemen would confirm who their employer was, with **Mr. Ferguson** writing "Toll Brothers."

185. On July 9, 2025, an in-house counsel, **Matt Care**, responded on behalf of **Toll Brothers, Inc** of Delaware to **Agent Brian Murray** regarding the PA AG complaint initiated on June 18, 2025. (See Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf)

186. In the letter, he states "Toll has requested an opportunity to inspect the home".

187. By July 9, 2025, **JG** had received no communication with **Toll Brothers, Inc.** of Delaware about the CDARA claims noted in the original complaint.

188. **Mr. Care's** statement to **Mr. Murray** that "Toll has requested an opportunity to inspect the home" was false.

189. Thus, **Mr. Care** lied to an agent of the Pennsylvania state government.

190. **JG** brought up this falsity to **Mr. Murray** and asked **Mr. Murra**y to ask **Mr. Care** to furnish evidence of this supposed prior communication with him. (See Exhibit 68 Email Chain with Brian Murray 1.pdf)

191. **Mr. Care** could not provide **Mr. Murray** the evidence of communication on or prior to July 9, 2025.

192. **Mr. Care** attempted to rectify the solution by initiating a phone call from **Mr. Ferguson** to **JG** on July 10, and, eventually, by writing a letter.

193. On July 17, 2025, **JG** received a CDARA response letter from **Toll Brothers, Inc** of Delaware via FedEx overnight, where **Mr. Care** notes that "I am in-house counsel for Toll Brothers, Inc." ( See Exhibit 69 TB Formal CDARA Letter)

194. The Disciplinary Board of the Supreme Court of Pennsylvania registration for **Mr. Care** shows **Toll Bros., Inc.** of Pennsylvania as his employer. (See Exhibit 70 Care, Matthew Charles.pdf)

195. This entity is not the same entity as the one he states he is in-house counsel for in his CDARA response letter.

196. **Mr. Care** sent a letter on behalf of an entity with which he had no employment relationship.

197. On July 24, 2025, after this formal CDARA response letter, **JG** initiated an email chain with **Mr. Care**. (See Exhibit 71 Toll CDARA Response.pdf and Exhibit 72 Gmail - Re: Toll CDARA Response.pdf)

198. In these emails, **JG** attempted to gain clarity on their entity structure before allowing them into the house for the CDARA inspections.

199. On August 6, 2025, **JG** asked the following: You say you're the attorney for the seller of my home, which on my closing disclosure and deed states Toll Southwest LLC. Does that mean you are an attorney for Toll Southwest LLC? If so, please provide confirmation of this employment relationship.

200. **Mr. Care** never answered this specific question.

201. **Mr. Care** never provided the requested confirmation.

202. In these email chains, **Mr. Care** wrote that **Mr. Ferguson** works for "Toll Brothers" after being asked for clarification on **Mr. Ferguson's** employment.

203. On August 8, 2025, **Toll Brothers, Inc.** sent **JG** a cease and desist regarding his entity registrations, the subject of *Toll Brothers Inc, et al. vs Gu, et al*. (See Exhibit 73 Cease and Desist)

**F. City of Wheat Ridge**

204. On July 1, 2025, City of Wheat Ridge Chief Building Official **Renee Meriaux** concluded an email chain with **JG**, where they discussed the Contractor's License #190246, which names an entity called "Toll Brothers". (See Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf and Exhibit 75 Wheat Ridge License.pdf)

205. **Ms. Meriaux** is an employee of **CAA.**

206. **Ms. Meriaux** is the Chief Building Official of the **City of Wheat Ridge Building Department**.

207. In the email, she states "I recognize you are in the process of researching what entities might be responsible for the conditions observed in on your property, and I respect that. However, be advised that the City is not required to assist in that research, other than to respond to public records requests, each of which must be on the form you have been given. By this message I am informing you that I will not continue to follow up on your questions as you pursue your efforts vid-s-vis the contractors/builders. I will, though, respond to CORA requests as they are received. As to this last, if you send the form, I will be able to respond."

208. The serifed text style of the email is different from the sans-serifed text style of all **Ms. Meriaux's** other emails.

209. The serifed text style of the email is the same text style used by **City of Wheat Ridge City Attorney Gerald Dahl** in an email he sent to **JG** on June 25, 2025. (See Exhibit 76 Gmail - Building plan CORA request.pdf)

210. This response sent by **Ms. Meriaux** was actually originally written by **Mr. Dahl**.

211. In a prior email on June 30, 2025, **Ms. Meriaux** states that "Yes, we accepted this COI as Toll Brothers is a DBA of Toll Southwest, LLC We do not regulate SOS requirements."

212. On July 1, 2025, Senior Deputy City Clerk **Margy Greer** responded to a CORA request for "All documentation the City of Wheat Ridge relied on to confirm that 'Toll Brothers' was a registered DBA of Toll Southwest LLC" (See Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf)

213. She responded that they verify with the SEC EDGAR search tool, pointing to this URL:
https://www.sec.gov/edgar/search/#/ciks=0000794170&entityName=Toll%2520Brothers%252C%2520Inc.%2520(TOL)%2520(CIK%25200000794170)

214. She did not respond by saying that they use the Colorado Secretary of State Business Database Search tool, which has this URL:
https://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do

215. **JG** followed up in this email chain with **Mr. Dahl.** (See Exhibit 78 Gmail - Dahl Followup.pdf)

216. On a July 13, 2025 email chain, **JG** brought to **Mr. Dahl's** attention that an Site Improvement Agreement ("**SIA**") signed between the **City** and **Toll Southwest LLC** of Delaware had a factual error.

217. The factual error that JG brought to his attention was the fact that "Toll Southwest LLC" was referred to in the **SIA** as a "Colorado Limited Liability Company."

218. In this same email, **JG** brought up the fact that "An SOS filing from Arizona shows only 3 managers for Toll Southwest LLC, and Mr. Mark Bailey is not one of them."

219. On information and belief, **Mark Bailey** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing this SIA.

220. On information and belief, **Mr. Bailey** was not a compensated officer or employee of **Toll Southwest** of Delaware at the time of signing this SIA.

221. **Mr. Bailey** is not one of the 3-4 managers of **Toll Southwest LLC** of Delaware. (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

222. In this same email, **JG** brought up the fact that 'A statement of authority from slightly before the signing of the SIA, notarized in Larimer County, has a factual inaccuracy, saying the LLC was formulated under the laws of "Pennsylvania", which contradicts many other SOAs and deeds signed before and after this time.'

223. On July 16, 2025, **Mr. Dahl** finished the email chain saying, 'You already have my message to you of July 10: "I understand your desire to research the Toll Bros entity. The work under this SIA is complete, the City has no need to enquire, and I must decline to research on your behalf." Respectfully, it is clear you are not satisfied with my

responses for the City; however, repeating the request will not change my position. Accordingly, I will not respond to additional repeated requests.'

224. **Mr. Dahl** was seemingly referring to the entity **Toll Bros., Inc.** of Pennsylvania.

225. **Mr. Dahl** was not referring to the entity **Toll Southwest LLC** of Delaware.

226. **Toll Bros., Inc.** of Pennsylvania was not the signatory of the aforementioned SIA or the **Special Warranty Deed** for the property at 5131 Vivian St.

227. **Mr. Dahl** was confused about what entity he was referring to.

228. On August 21, 2025, **JG** sent another email to **Mr. Dahl** and **Ms. Meriaux**. (See Exhibit 79 Gmail - Toll Brothers in Colorado.pdf)

229. In it, he asks the City to acknowledge 3 matters: '1. Acknowledge that the license issued under "Toll Brothers" was improper because the named entity was not registered in Colorado. Clarify whether the City intends to revoke, amend, or re-issue those permits under the correct legal entity. Provide a written explanation of how this irregularity will be addressed to protect homeowners from reliance on improperly issued permits'

230. On August 28, 2025, **Mr. Dahl** responded with "Your August 21 message and attachments were received and filed. Nothing further at this time."

231. In the first half of September 2025, **JG** called the **Wheat Ridge Building Department** and asked for clarification: "Could you and the City please tell me the reasons for ignoring my questions?"

232. He was told various times by Deputy CBO **Steve Peck** to make his questions "in writing."

233. **Mr. Peck** is an employee of **CAA.**

234. On September 10, 2025, **Ms. Meriaux** emailed CAA officer **Diana Snodgrass**. (See Exhibit 80 CAA Snodgrass Email.pdf)

235. On information and belief, **Ms. Snodgrass** is the CFO of CAA.

236. On information and belief, **Ms. Snodgrass** does not have a direct contractual relationship with the **City of Wheat Ridge**.

237. The email states, "FYI - Just keeping you in the loop. City Attorney told us to tell him all of his requests must be in writing and we will no longer respond over the phone."

238. Also on September 10, 2025, **JG's** neighbor and designer **Ms. Thompson** called the **City of Wheat Ridge Building Department**, encountering no request for her to put her communication in writing. (See Exhibit 81 Neighbor being treated normally Sept 10 2025.pdf)

239. By this point, it was **City of Wheat Ridge's** policy to require that, for **JG**, "his requests must be in writing and we will no longer respond over the phone."

240. On September 12, 2025, **Mr. Dahl** sent **JG** a letter titled "Re: Your property at Ridge at Ward Station" (See Exhibit 82 Wheat Ridge Cease Letter.pdf)

241. The letter states "As you have been informed, repeated requests for the same actions and questions will not produce different results or answers from those you have already been given. Additionally, your contacts have become increasingly frequent and repetitive, and City staff have the right to be free from harassment. Additional correspondence from you will be retained, and may or may not be responded to as appropriate in the sole discretion of the City."

242. On September 15, 2025, **City of Wheat Ridge** responded to a CORA request of **JG's** for communications related to directing that JG make all questions in writing. (See Exhibit 83 Gmail - CORA Request for Directive.pdf)

243. The City invoked CRS 24-72-204(3) (a)(IV) to withhold some respondent records.

244. On September 18, 2025, the **City** said that there were no privilege logs related to this withholding. (See Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf)

**G. Toll Brothers History**

245. The URL at https://www.tollbrothers.com/about claims that the company does business in 24 states. (See Exhibit 85 Toll Brothers About.pdf)

246. The Plaintiffs' complaint also claims that the company does business in 24 states in Paragraph 25.

247. TB PROPRIETARY CORP. incorporated in Delaware on July 14, 1987 (See Exhibit 86 DE SOS TB Proprietary Corp.pdf and Exhibit 87 Corporate Hierarchy.pdf)

248. TB PROPRIETARY CORP. of Delaware is also registered as a foreign corporation in New Jersey.

249. On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in these 2 states as of September 22, 2025. (See Exhibit 88 Toll Brothers Registrations.pdf)

250. On information and belief, TB PROPRIETARY CORP. of Delaware is only registered in less than 5 states as of September 22, 2025.

251. TB PROPRIETARY CORP. of Delaware is the service mark owner for "Toll Brothers". (See Exhibit 89 Toll Brothers Trademark.pdf)

252. TB PROPRIETARY CORP. of Delaware is the service mark owner for "America's Luxury Homebuilder". (See Exhibit 90 Americans Luxury Homebuilder Trademark.pdf)

253. These service marks are used in company advertising and branding in all 24 states in which it operates.

254. TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "Toll Brothers" service mark as of September 22, 2025.

255. TB PROPRIETARY CORP. of Delaware is not registered in all 24 states that use the "America's Luxury Homebuilder" service mark as of September 22, 2025.

256. On information and belief, TB PROPRIETARY CORP. of Delaware is 100% owned by TOLL HOLDINGS, INC of Delaware.

257. On information and belief, TB PROPRIETARY CORP. of Delaware is not 100% owned by TOLL BROTHERS, INC. of Delaware.

258. TOLL BROTHERS, INC. incorporated in Delaware on May 28, 1986. (See Exhibit 5 DE SOS Toll Brothers, Inc..pdf)

259. TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in New Jersey.

260. TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in Pennsylvania.

261. TOLL BROTHERS, INC. of Delaware is also registered as a foreign corporation in California.

262. On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in these 4 states as of September 22, 2025.

263. On information and belief, TOLL BROTHERS, INC. of Delaware is only registered in less than 6 states as of September 22, 2025.

264. TOLL BROTHERS, INC. of Delaware is not registered in all 24 states in which the website and complaint Paragraph 25 claim it does business as of September 22, 2025.

265. TOLL SOUTHWEST LLC incorporated in Delaware on July 29, 2011 (See Exhibit 12 DE SOS Toll Southwest.pdf)

266. TOLL SOUTHWEST LLC of Delaware is not registered in Pennsylvania as of September 22, 2025.

267. TOLL SOUTHWEST LLC of Delaware is 100% owned by TOLL BROS, INC of Pennsylvania. (See Exhibit 50 AZ Toll Southwest 2017.pdf)

268. TOLL BROS, INC of Pennsylvania is 100% owned by TOLL HOLDINGS, INC of Delaware. (See Exhibit 91 Toll Holdings 100 of Toll Bros.pdf)

269. TOLL HOLDINGS, INC. incorporated in Delaware on August 1, 1989. (See Exhibit 92 DE SOS Toll Holdings.pdf)

270. TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in Florida.

271. TOLL HOLDINGS, INC. of Delaware is also registered as a foreign corporation in North Carolina.

272. TOLL HOLDINGS, INC of Delaware is not registered in Pennsylvania as of September 22, 2025.

273. TOLL HOLDINGS, INC of Delaware is 100% owned by TOLL BROTHERS, INC of Delaware. (See Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf)

274. TOLL BROTHERS, INC of Delaware maintains more than 200 subsidiaries, many of which are themselves subsidiaries of subsidiaries. (See Exhibit 94 Subsidiaries List.pdf)

**H. Licenses**

275. **City of Wheat Ridge** Building Department permit 202102734 pertained to the property at 5131 Vivian St, 80033. (See Exhibit 23 5131 Vivian Permit.pdf)

276. The General Contractor for permit 202102734 has the name "Toll Brothers" and "Contractor No" of 190246. (See Exhibit 95 202102734 Contact Info.pdf).

277. This contractor number pertains to **City of Wheat Ridge** Contractor's License # 190246. (See Exhibit 96 Wheat Ridge License.pdf)

278. In response to a CORA request for "Any materials submitted and communications created in the process of the application for the contractor's license for Toll Brothers, License # 190246," the City of Wheat Ridge provided only emails with "Toll Brothers" employees and a Certificate of Liability Insurance. (See Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf and Exhibit 98 Information to prove toll brothers permit.pdf)

279. The name on the Certificate of Liability Insurance shows the Insured as being "Toll Southwest LLC".

280. This name is not the same name as on the Contractor's License # 190246, which lists "Toll Brothers".

281. The listed information in this Contractor's License shows "TOLL BROTHERS" with an address of "10 INVERNESS DR E ENGLEWOOD CO 80112".

282. "TOLL BROTHERS" was not registered as a DBA name with the Colorado Secretary of State between 2019-2024.

283. "TOLL BROTHERS" was not a DBA name of **Toll Southwest LLC** of Delaware according to the Colorado Secretary of State between 2019-2024.

284. The listed address is not the same as the **Toll Brothers, Inc** of Delaware headquarters of "1140 Virginia Drive, Fort Washington, PA 19034."

285. The listed address is not the same as the **Toll Southwest LLC** of Delaware "Principal office street address" of "1140 Virginia Dr, Fort Washington, PA 19034, US" listed with the Colorado Secretary of State.

286. A Douglas County Contractor Registration shows "Toll Bros., Inc" as the "Contractor Name." (See Exhibit 99 CO Douglas Registration 2025.pdf)

287. Littleton License #AEC000964 shows "Toll Southwest LLC - Class B" next to "Company" (See Exhibit 100 Littleton Contractor License 2025.pdf)

288. Erie License #GC-005217-2023 shows "TOLL BROTHERS" next to "Company" (See Exhibit 101 Erie Contractor License 2025.pdf)

289. An Aurora Residential Building Contractor license shows "TOLL BROTHERS" under "Business". (See Exhibit 102 Aurora Contractor License 2025.pdf)

290. Centennial License with "License Number" "CL-005667-2025" has a "Company Name Toll Brothers, Inc" (See Exhibit 103 Centennial Contractor License 2025.pdf)

291. Pikes Peak Regional Building Department has Contractor Details for "TOLL BROS., INC." (See Exhibit 104 Colorado Springs Contractor License 2025.pdf)

292. **Toll Brothers, Inc.** of Delaware did not use the same subsidiary to register as a contractor across various counties, cities, and towns, in Colorado.

293. At least 3 different entities were named across these 7 different licenses.

**I. Insurance**

294. In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "500,000", and the Certificate Holder is **City of Littleton**. (See Exhibit 105 Littleton COI 2024.pdf)

295. In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Southwest, LLC" is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **City of Wheat Ridge**. (See Exhibit 106 Wheat Ridge COI.pdf)

296. In a Certificate of Liability Insurance dated 10/22/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROS., INC." is the Named Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Douglas County**. (See Exhibit 107 CO Douglas COI 2024.pdf).

297. In a Certificate of Liability Insurance dated 10/29/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "TOLL BROTHERS, INC." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Erie**. (See Exhibit 108 Erie COI.pdf)

298. In a Certificate of Liability Insurance dated 11/4/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Bros. Inc." is the Insured, the "Each Occurrence Limit" is "7,000,000", and the Certificate Holder is **Pikes Peak Regional Building Department**. (See Exhibit 109 Colorado Spring COI 2024.pdf)

299. In a Certificate of Liability Insurance dated 11/18/2024, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll brothers, Inc." is

the Insured, the "Each Occurrence Limit" is "1,000,000", and the Certificate Holder is **City of Centennial**. (See Exhibit 110 Centennial COI 2024.pdf)

300. In a Certificate of Liability Insurance dated 7/1/2025, the producer is **Marsh USA LLC**, the first listed policy number is "MWZY 318815 10", "Toll Brothers, Inc." is the Insured, the "Each Occurrence Limit" is "5,000,000", and the Certificate Holder is **Town of Superior**. (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf)

301. All of these Certificates display the policy number "MWZY 318815 10"

302. All of these Certificates, besides the ones that share the name "Toll Southwest, LLC", have a different name for Insured when accounting for capitalization.

303. All of these Certificates have a unique combination of Insured and "Each Occurrence" limit.

304. None of these certificates list a producer "CONTACT NAME", "PHONE", or "EMAIL."

**J. Marsh**

305. **Marsh USA LLC** of Delaware is an insurance broker for **Toll Brothers, Inc.** of Delaware and subsidiaries. (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf and Exhibit 107 CO Douglas COI 2024.pdf)

306. **Marsh USA LLC** is 100% owned by **Marsh LLC**. (See Exhibit 112 AZ MARSH USA LLC.pdf)

307. **Marsh USA LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

308. On information and belief, **Marsh LLC** is 100% owned by **MARSH & MCLENNAN COMPANIES, INC**.

309. On information and belief, **Marsh LLC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

310. **Marsh LLC** is not registered in the State of New York.

311. **Marsh LLC** uses the same symbol in its logo as **MARSH & MCLENNAN COMPANIES, INC**. on its website (See Exhibit 113 Marsh Homepage.pdf and Exhibit 114 MarshMcLennan Homepage.pdf)

312. This mark is owned by **MARSH & MCLENNAN COMPANIES, INC**. (See Exhibit 115 MM Trademark.pdf)

313. **MARSH & MCLENNAN COMPANIES, INC's** headquarters is 1166 AVENUE OF THE AMERICAS, NEW YORK, NY, 10036.

314. The domain marsh.com has the same registrant as marshmclennan.com. (See Exhibit 116 marsh.com.pdf and Exhibit 117 marshmclennan.com.pdf)

315. That registrant is listed as "Marsh & McLennan Corporation".

316. The listed address in this Certificate of Liability Insurance dated 10/22/2024 is "30 South 17th Street Philadelphia, PA 19103". (See Exhibit 107 CO Douglas COI 2024.pdf)

317. This address is currently a Guy Carpenter office. (See Exhibit 118 30 South 17th Street.pdf)

318. Guy Carpenter is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

319. The listed address in this Certificate of Liability Insurance dated 7/1/2025 is "1717 Arch Street Philadelphia, PA 19103". (See Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf)

320. This address is currently a Marsh McLennan Agency office. (See Exhibit 119 1717 Arch Street.pdf)

321. Marsh McLennan Agency is a subsidiary of **MARSH & MCLENNAN COMPANIES, INC**. It uses the trademark from ¶¶ 312 in its branding.

**K. Consumers**

322. The profile for "Toll Brothers" has 1.5 out of 5 stars as a rating on the website ConsumerAffairs as of September 22, 2025. (See Exhibit 120 Toll Brothers Consumer Affairs.pdf)

323. This profile is available at https://www.consumeraffairs.com/housing/toll-brothers.html.

324. As of September 22, 2025, there are 332 reviews for this company profile.

325. The most frequent rating is 1 star, with 269 ratings. (See Exhibit 121 Toll Brothers Consumer Affairs Frequency.pdf)

326. This rating contrasts with the accolades stated in Paragraph 25 of the Plaintiffs' complaint.

327. On October 29, 2019, a Medium user named **Jeremy Smith** posted an article titled "Our Dream Home By Toll Brothers That Turned Into A Nightmare." (See Exhibit 122 Medium North Carolina.pdf)

328. In it, he discusses how he lost his down payment, design customization payment, and ultimately the chance to close on the home due to a credit score decrease.

329. The credit score decrease was due to an error on the part of one creditor.

330. In it, he cites a letter from a Toll Brothers employee named Deveraux Hamilton which references an entity named **Toll NC II, LP**.

331. **Toll NC II, LP** is one of the many subsidiaries or subsidiaries of a subsidiary of **Toll Brothers, Inc.** of Delaware.

332. **Toll Brothers, Inc** of Delaware signed the Agreement of Sale with **Mr. Smith** through **Toll NC II, LP** in order to make it difficult for **Mr. Smith** to pursue any recourse for any problems with the transaction.

333. A Reddit user named "DISGRUNTLED_TB_BUYER" in a post commented on how their buying process with "Toll Brothers" was positive. (See Exhibit 123 Toll Brothers Reddit 1.pdf)

334. In the same post, the user details how "after they get your money and commitment, it only goes downhill."

335. The user shows a contrast between the positive buying experience and the negative post-buying experience.

336. Another Reddit user named "Cold_Ad103" states that they had rust problems on the exterior of their million dollar home and were "Simply heartbroken and tired of the pushback. They aren't listening. I have a bad feeling they're just going to do the minimum and patch it up." Exhibit 124 Toll Brothers Reddit 2.pdf

337. An article about an apartment complex named "Northside Piers" built on or around 2008 cites complaints about 'leaky walls, poor insulation, mold, faulty plumping, faulty sewage system, faulty heating, faulty air-conditioning. And the biggest: "The windows are thin and the seams between the panes allow wind and rain to easily come through, residents say. Some residents have taped around the window panes, but they say rain and air still blows in."'(See Exhibit 125 Toll Brothers Northside Piers.pdf)

338. The article states that this was the Toll Brothers response: The company "is aware of these isolated situations and strongly disagrees with the allegations as they have been presented. It "will continue to honor its obligations and provide the quality and customer service for which it is known."

339. The response implies that Toll Brothers did not view these as systemic issues but were isolated problems unique to each unit.

**L. Other Toll Court Cases**

340. In prior litigation, **Toll Brothers, Inc.** of Delaware has appeared under varying subsidiary names.

341. In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, the named defendant was not the parent company, **Toll Brothers, Inc.** of Delaware, but a subsidiary company.

342. In *Goldan et al. v. Toll Brothers AZ Limited Partnership*, **Toll Brothers AZ Limited Partnership** retained the services of PHLK LLP.

343. One lawyer representing the case was Brian Plante.

344. Another lawyer representing the case was **Melanie Woodfin**.

345. **Toll Brothers AZ Limited Partnership** was named **EDMUNDS-TOLL CONSTRUCTION COMPANY** at one point in time.

346. **EDMUNDS-TOLL CONSTRUCTION COMPANY** was acquired by **Toll Brothers, Inc.** of Delaware in 1995.

347. In *Rawlins et al. v. Toll Southwest, LLC*, plaintiffs litigated against an LLC owned by **Toll Bros, Inc**. of Pennsylvania.

348. In *Bhaskar Koukuntla v. Toll Bros., Inc.*, plaintiff litigated against a corporation owned by **Toll Holdings, Inc** of Delaware, which is in turn owned by **Toll Brothers, Inc.** of Delaware.

349. In *Paul Tolstyga v. Toll Bros., Inc. and Toll Dallas TX, LLC*, plaintiffs were confronted with multiple subsidiaries of **Toll Brothers, Inc.** of Delaware.

350. In the examples cited above, plaintiffs pursuing claims in different states sued different subsidiaries of **Toll Brothers, Inc.** of Delaware—a limited partnership in Arizona, an LLC in Utah and Texas, and **Toll Bros., Inc.** of Pennsylvania in other jurisdictions.

**M. Oakstone Matter**

351. **JG's** parents are named Xian Feng Gu ("**XFG**") and Di Lan Ge ("**DLG**").

352. On June 24, 2024, **XFG** and **DLG** signed closing documents for a newly built home in Irvine, California in Portola Springs.

353. The Grantor on the Grant Deed for this transaction was a company called **The New Home Company Southern California LLC.** (See Exhibit 126 129 Oakstone Grant Deed.pdf)

354. On information and belief, **The New Home Company Southern California LLC** is 100% owned by **The New Home Company, Inc.**

355. **The New Home Company, Inc.** markets the homes sold to its buyers online at newhomeco.com.

356. The webpage for the neighborhood for the house sold to the **XFG** and **DLG** is available at https://www.newhomeco.com/region/orange-county/olivewood-portola-springs.

357. Like the **Toll Brothers, Inc.** of Delaware, **The New Home Company, Inc.** also of Delaware markets its homes through the parent company and sells them contractually through a subsidiary.

358. **XFG**, born in October 1957, was over 65 at the time of closing.

359. **DLG**, born in April 1959, was over 65 at the time of closing.

360. In February of 2025, **JG** agreed to help his elderly parents with administering warranty and other issues related to this home.

361. Throughout March to May 2025, JG sent **The New Home Company Inc.** numerous California SB800 notice of claim letters.

362. These are what the Plaintiff refers to as "16 prelitigation notices" in Paragraph 46 of the Complaint.

363. Also in Paragraph 46, Plaintiff references a situation in which **JG** allegedly "trespassed on site and took pictures."

364. Plaintiff refers to a situation cited in a cease and desist letter sent to Defendant by **The New Home Company, Inc.** on May 27, 2025. (See Exhibit 127 Cease and Desist 1.pdf)

365. The author of the letter was PHLK lawyer **Melanie Woodfin**.

366. Melanie Woodfin was also an attorney representing **Toll Brothers AZ Limited Partnership** in *Goldan et al. v. Toll Brothers AZ Limited Partnership*.

367. The cease and desist letter refers to a situation on May 20, 2025 in which Plaintiff took numerous pictures of unmarked commercial vehicles in the Irvine neighborhood known as Olivewood. (See,Exhibit 149 IMG_8225.pdf,Exhibit 150 IMG_8223.pdf, and Exhibit 151 IMG_8228.pdf)

368. The California CSLB has a bulletin titled "Contractors State License Board Reminds Contractors to Include License Number on Vehicles and Advertisements." (See Exhibit 128 20-21_Advertising_on_Vehicles.pdf)

369. The bulletin states the following: According to Business and Professions Code (BPC) § 7029.6, your business name and contractor license number should be clearly visible on your commercially registered vehicle in print type of at least 72-point font, or three-quarters of an inch in height and width.

370. **Toll Brothers, Inc.** of Delaware and/or subsidiaries build and sell homes in Irvine, California.

371. **Toll Brothers, Inc.** of Delaware and/or subsidiaries are aware of California Business and Professions Code (BPC) § 7029.6 and the CSLB guidance regarding displays on commercial vehicles.

372. On April 21, 2025, **JG** submitted a complaint to the California DRE against a subsidiary of **The New Home Company Inc.** (See Exhibit 129 DRE Complaint Number.pdf)

373. On May 23, 2025, **JG** sent complaint evidence to the CSLB, issued litigation hold notices to **The New Home Company Inc** and its retained law firm PHLK, and sent bond-related letters to surety companies.

374. As of September 22, 2025, **The New Home Company Inc** has sent **JG** four cease and desist letters. (See Exhibit 127 Cease and Desist 1.pdf, Exhibit 130 Cease and Desist 2.pdf, Exhibit 131 Cease and Desist 3.pdf, and Exhibit 132 Cease and Desist 4.pdf)

375. On August 7, 2025, **JG** submitted a Letter of Concern to the Orange County Grand Jury regarding misconduct by the **City of Irvine**.

376. Throughout May to June 2025, **JG** submitted various complaints about **Bert L. Howe and Associates** to the California CSLB, BPELSG, and CAB.

377. On August 11, 2025, **Bert L. Howe & Associates** issued a cease-and-desist letter to **JG**. (See Exhibit 133 BHA Cease and Desist.pdf)

378. The cease and desist letter references these regulatory complaints.

**N. SEC Disclosures**

379. On the investor FAQ page, **Toll Brothers, Inc.** of Delaware answers the question "What companies has Toll Brothers acquired?" with the following text: Toll Brothers has made thirteen acquisitions: Geoffrey H. Edmunds in Scottsdale, Arizona (1995), Coleman Homes' Las Vegas Division (1998), Silverman Homes in metro Detroit (1999), Richard R. Dostie (2003) and The Manhattan Building Company (2003) in northern New Jersey, the central Florida Division of Landstar Homes (2005), CamWest Development LLC in Seattle, Washington (2012), Shapell Industries, Inc. in California (2014), Coleman Homes in Boise, Idaho (2017), Sharp Residential in Atlanta, Georgia (2019), Sabal Homes in South Carolina (2019), Thrive Residential in Nashville and Atlanta (2020), Keller Homes in Colorado Springs (2020), StoryBook Homes in Las Vegas (2021), and Rialto Homes in San Antonio (2022). (See Exhibit 135 Toll Brothers What Acquisitions Investor FAQ.pdf and https://investors.tollbrothers.com/resources/financial-faqs)

380. Public records show that some of these companies still operate independently.

381. **Manhattan Building Company**, since at least 2005, has operated as an independent company with no affiliation to **Toll Brothers, Inc**. of Delaware or its subsidiaries. (See Exhibit 136 About — The Manhattan Building Company.pdf)

382. This is according to Sanford Weiss.

383. In its press release on the "acquisition" of **CamWest Development LLC**, CEO **Mr. Yearley** is quoted as having stated "We are excited to enter the Seattle market with the acquisition of CamWest." (See Exhibit 137 CamWest Press Release.pdf)

384. **CamWest Development LLC** held an active business registration in Washington until 2024. (See Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf)

385. In its 2012 Annual Report to the Washington SOS, "Yes" was marked for the question "Does your company own land, buildings or other real property in Washington?" (See Exhibit 139 Camwest Annual Reports.pdf)

386. In its 2013, 2014, and 2015 Annual Reports to the Washington SOS, "No" was marked to the question "Does your company own land, buildings or other real property in Washington?"

387. **Eric Campbell** remained listed as the sole Member and only person listed under "Governing People" in these 4 reports.

388. If truly acquired, another member would be listed.

389. If truly acquired, **Mr. Campbell** would no longer be listed.

390. A 10-K from 2012 represents that **Toll Brothers, Inc** of Delaware or its subsidiaries purchased only specific assets of **CamWest Development LLC**. (See Exhibit 140 10-K 2012.pdf)

391. This pattern repeated itself with the Sharp Residential purchase.

392. This pattern repeated itself with the Keller Homes purchase.

393. This pattern repeated itself with the Rialto Homes purchase.

394. This pattern repeats itself with all the mentioned "acquisitions" except for the "Geoffrey H. Edmunds" acquisition.

**O. Statements of Authority**

395. **Toll Southwest LLC** of Delaware has submitted at least 20 different Statements of Authority to various Colorado counties since 2012. (See Exhibit 152 Statements of Authority.pdf)

396. The instructions on these forms request a list of individuals from the signatory, typically with this statement: The name/position of each person authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf the entity is.

397. These Statements of Authority never list these individuals: **Douglas Yearley, Richard Hartman, Robert Parahus,** or **Martin Connor.**

398. The individuals listed in these Statements of Authority are not or never have been managers of **Toll Southwest LLC** of Delaware. (See Exhibit 49 AZ Toll Southwest LLC 2023.pdf and Exhibit 50 AZ Toll Southwest 2017.pdf)

399. These Statements of Authority never name **Daniel Rhea**.

400. **Mr. Rhea** has signed for **Toll Southwest LLC** of Delaware for deeds in Arizona. (See Exhibit 141 AZ Daniel Rhea.pdf)

401. According to these Statements of Authority, **Mr. Rhea** did not have the authority to sign on behalf of **Toll Southwest LLC** of Delaware.

402. More generally speaking, Statements of Authority in Colorado show authority but do not grant it.

403. **JG** obtained Officer's Certificates from Heritage Title Company that name **Toll Southwest LLC** of Delaware. (See Exhibit 142 Officers Cert 2024.pdf and Exhibit 143 Officers Cert 2022.pdf).

404. None of these certificates name any of the managers listed in ¶¶ 382 above.

405. Attorney **Kenneth Greenspan** is the signatory of both Officer's Certificates.

406. **Mr. Greenspan** is also the signatory of several of the Statements of Authority referenced above.

407. On information and belief, **Mr. Greenspan** was a compensated officer or employee of **Toll Brothers, Inc.** of Delaware at the time of signing these documents.

408. On information and belief, **Mr. Greenspan** was not a compensated officer or employee of **Toll Southwest LLC** of Delaware at the time of his signing these documents.

**P. Tenure at TB**

409. Douglas Yearley has worked at **Toll Brothers, Inc.** of Delaware for over 35 years. (See Exhibit 144 Doulgas Yearley.pdf)

410. Mark Bailey has worked at **Toll Brothers, Inc.** of Delaware for over 24 years. (See Exhibit 145 Mark Bailey LinkedIn.pdf)

411. Daniel Rhea has worked at **Toll Brothers, Inc.** of Delaware for over 11 years. (See Exhibit 146 Dan Rhea LinkedIn.pdf)

412. Reginald Carveth has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See Exhibit 147 Reggie Carveth LinkedIn.pdf)

413. Kenneth Greenspan has worked at **Toll Brothers, Inc.** of Delaware for over 8 years. (See Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf)

**Q. A Tale of Two Kens**

414. **Mr. Greenspan** is currently a Vice President and Secretary at **Toll Brothers, Inc.** of Delaware, as of September 22, 2025. (See Exhibit 153 Ken Greenspan LinkedIn.pdf)

415. **Mr. Greenspan** has been working at the company since at least 2017. (See Exhibit 50 AZ Toll Southwest 2017.pdf)

416. **Mr. Greenspan's** LinkedIn does not state his tenure at **Toll Brothers, Inc.** of Delaware.

417. **Mr. Greenspan** has signed many documents registered with Secretaries of State and county recorders. (Exhibit 154 Greenspan Docs.pdf, Exhibit 50 AZ Toll Southwest 2017.pdf, Exhibit 142 Officers Cert 2024.pdf and Exhibit 143 Officers Cert 2022.pdf).

418. **Mr. Greenspan** often signs for subsidiaries of **Toll Brothers, Inc.** of Delaware.

419. On information and belief, **Mr. Greenspan** was not a compensated officer or employee of any of these subsidiaries at the time of signing.

420. **Mr. Greenspan** does not appear on any Annual Reports. (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

421. **Mr. Greenspan** signs documents for subsidiaries in lieu of the General Counsel, who previously frequently signed them.

422. **Kenneth Gary** became a licensed attorney in Pennsylvania on or around May 27, 1986. (See Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

423. **Toll Brothers, Inc.** of Delaware's IPO date was on or around July, 16 1986. (See Exhibit 157 Toll Brothers (TOL) IPO Date.pdf)

424. According to **Mr. Gary's** LinkedIn, he ascended to General Counsel in March of 1990. (See Exhibit 158 Ken Gary LinkedIn.pdf)

425. **Mr. Gary** was a licensed attorney for less than 4 years before ascending to General Counsel of **Toll Brothers, Inc.** of Delaware.

426. **Mr. Gary** was General Counsel of **Toll Brothers, Inc.** of Delaware for more than 15 years.

427. **Mr. Gary** retained this position until 2005, when he joined Beazer Homes as General Counsel. (See Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf)

428. **Mr. Gary** was fired from Beazer Homes as General Counsel in 2007. (See Exhibit 160 Beazer Homes says fires general counsel.pdf)

429. **Mr. Gary** was General Counsel for Beazer Homes for less than 3 years.

430. On information and belief, **Mr. Gary** was never again General Counsel for a major homebuilder after Beazer Homes.

431. The Directors and Officers page from the 1999 **Toll Brothers, Inc.** of Delaware Annual Report states that **Mr. Gary** was "Vice President and General Counsel." (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

432. Documents signed by **Mr. Gary** throughout his tenure and submitted to Secretaries of State show him simply as "Vice President." (See Exhibit 161 Gary Docs.pdf)

433. These documents do not show him writing "General Counsel."

434. In **Mr. Gary's** current bio page for his realty company, he states that he is a "real estate attorney." (See Exhibit 162 Gary current work.pdf)

435. **Mr. Gary's** current Pennsylvania attorney license is "retired." (See Exhibit 156 Gary, Kenneth J. PA Bar.pdf)

436. **Mr. Gary** does not have an attorney license in Georgia, where he currently operates his realty business.

437. On information and belief, **Mr. Gary** does not have an active attorney license in any state.

438. **Mr. Gary's** stating that he is "a real estate attorney" is false.

**R. Employee Evasiveness**

439. On June 29, **JG** emailed 2 HR managers, **Crystal Vecchione** and **Maryann Heatherby**, for information about the employer for several employees (See Exhibit 166 Email - Employees' Employer.pdf and Exhibit 167 Email - Employees' Employer 2.pdf).

440. **Ms. Vecchione** is an "Employee Relations Manager" and **Ms. Heatherby** is a "Senior Manager" with "Toll Brothers." (See Exhibit 163 Maryann Heatherby | LinkedIn.pdf and Exhibit 164 Crystal Vecchione | LinkedIn.pdf)

441. **Ms. Vecchione's** email management system responded with an auto-reply email. (See Exhibit 165 Email - Receipt Employees' Employer.pdf)

442. Ultimately, neither manager responded to **JG's** emails.

443. On June 30, 2025, **JG** concluded an email chain with **Nicole Jorgensen**. (See Exhibit 168 Gmail - Nicole avoiding question.pdf)

444. In the chain, **JG** had asked **Ms. Jorgensen** for a contact in the HR department, to which she replied, "Summer has been great! I hope you've been having a nice summer as well. I'm so sorry but I don't have a contact for the HR department :/"

445. **JG** followed up by asking 'I understand, maybe you could clarify something else for me. Do you specifically work for "Toll Brothers, Inc."?' and "Is there someone who could better answer this question?"

446. These questions were both ignored by Ms. Jorgensen.

447. **Patricia Rice** is a Colorado notary. (See Exhibit 169 Gmail - Patricia Rice Notary CO.pdf)

448. On July 8, 2025, **JG** called **Ms. Rice**. (See Exhibit 170 Toll Brothers Employee phone calls.pdf)

449. **JG** asked her if she worked for "Toll Brothers Inc, Toll Bros Inc, or Toll Southwest LLC."

450. She did not answer who she worked for.

451. **JG** also asked her who **Mr. Ferguson** worked for.

452. She did not answer who **Mr. Ferguson** worked for.

453. Also on July 8, 2025, **Elizabeth Stein** returned an initial call from **JG**. (See Exhibit 170 Toll Brothers Employee phone calls.pdf)

454. **Ms. Stein** is a Pennsylvania notary. (SeeExhibit 171 Liz Stein Pennsylvania.pdf)

455. **Ms. Stein** works at the **Toll Brothers, Inc.** of Delaware headquarters.

456. **JG** asked **Ms. Stein** about **Mr. Greenspan**, asking her "What company does he work for?" and "Does he have the authority to sign on behalf of Toll Southwest?"

457. **Ms. Stein** did not answer these questions.

458. **Ms. Stein** accused JG of "intruding."

459. **Ms. Stein** brought this phone call to the attention of **Toll Brothers, Inc.** of Delaware CEO **Mr. Yearley**.

460. On information and belief, **Ms. Stein** worked down the hallway from **Mr. Yearley**.

461. The two spoke about **JG** for a few minutes after **Ms. Stein** stopped speaking with **JG**.

462. On July 31, 2025, **JG** concluded 2 email chains with 2 individuals, one named **David Christensen** and one named **Gilma Drummy**. (See Exhibit 172 Gmail - Employer Information Dave.pdf and Exhibit 173 Gmail - Employment Information Gilma.pdf)

463. Both are "Broker Associates" for the corporation "TNHC Realty and Construction Inc," which has a license ID of 01870227. (See Exhibit 174 TNHC Realty License.pdf)

464. Neither Broker Associate answered **JG's** question about their employment.

465. As recently as May 16, 2025, **JG** had no problem communicating with **Ms. Drummy**. (See Exhibit 175 Gmail - Gilma Current for sale homes.pdf)

**S. TB Annual Reports**

466. **Toll Brothers, Inc.** of Delaware Annual Reports going back to 1999 can be accessed at the following URL: https://investors.tollbrothers.com/financials-and-filings/annual-reports

467. Up to and including the 2020 edition, these reports contained a page showing "Officers and Directors." (See Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf)

468. This page shows how tenured many officers of the company were, displaying their number of years at the company.

469. Every edition after 2020 has a section that states the following: Our Certificate of Incorporation and Bylaws provide for indemnification of our directors and officers. We have also entered into individual indemnification agreements with each of our directors.

470. Every edition after 2020 does not have an "Officers and Directors" page showing these individuals and their tenure at the company.

**T. The New Home Company History**

471. **The New Home Company Inc** incorporated in Delaware on June 25, 2009. (See Exhibit 176 The New Home Company Inc.pdf)

472. **The New Home Company Southern California LLC** incorporated in Delaware on June 25, 2009. (See Exhibit 177 The New Home Company Southern California LLC.pdf)

473. **TNHC Realty and Construction Inc** incorporated in Delaware on June 25, 2009. (See Exhibit 178 TNHC Realty and Construction Inc.pdf)

474. These 3 companies were all incorporated in Delaware on the same day.

475. **H Lawrence Webb** was CEO of The New Home Company Inc from 2009 - 2019. (See Exhibit 179 Larry Webb | LinkedIn.pdf)

476. **H Lawrence Webb** was Executive Chairman of **The New Home Company Inc** from 2019 - 2022.

477. **Wayne Stelmar** was CIO of The New Home Company Inc until 2017. (See Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf)

**U. John Laing Homes Company History**

478. **WL Homes LLC** was more commonly known as "John Laing Homes."

479. **WL Homes LLC** owned the trademark for "John Laing Homes." (See Exhibit 181 WL Homes LLC Trademark.pdf)

480. **WL Homes LLC** was registered in California. (See Exhibit 182 WL Homes LLC.pdf)

481. **John Laing Homes (California), Inc** was a separate entity from **WL Homes LLC** in California. (SeeExhibit 183 John Laing Homes (California), Inc.pdf)

482. **JLH Realty & Construction, Inc.** was a separate entity from **WL Homes LLC** and **John Laing Homes (California), Inc** in California. (See Exhibit 184 JLH Realty and Construction Inc.pdf)

483. **JLH Realty & Construction, Inc** had a CSLB license number of 687596. (See Exhibit 185 JLH CSLB License.pdf)

484. **JLH Realty & Construction, Inc** had a DRE license number of 01176549. (See Exhibit 187 JLH DRE License.pdf)

485. Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a CSLB license number.

486. Neither **John Laing Homes (California), Inc** nor **WL Homes LLC** ever had a DRE license number.

487. "John Laing Homes" was listed as the owner-builder on a permit from 3/28/2007 for the Irvine address 31 Iceberg Rose. (See Exhibit 186 John Laing Homes Permits and Declarations.pdf)

488. "John Laing Homes" had no FBN registration in Orange County at that time.

489. **WL Homes LLC'**s CEO was H Lawrence Webb through March of 2008. (See Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf)

490. **WL Homes LLC's** executive **Wayne Stelmar** signed documents for WL Homes LLC in July of 2008. (See Exhibit 189 Wachovia v JLH.pdf)

491. **WL Homes LLC** filed for bankruptcy in Delaware in February of 2009. (See Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf)

**V. The New Home Company Disclosures**

492. **Miek Harbur** became a licensed attorney in California on or around December 2, 2011. (See Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf)

493. **The New Home Company Inc.'s** IPO date was on or around January 30, 2014. (See Exhibit 192 NWHM IPO Date.pdf)

494. According to **Ms. Harbur's** LinkedIn, she ascended to General Counsel of **The New Home Company Inc** in January of 2016. (See Exhibit 193 Miek Harbur | LinkedIn.pdf)

495. **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025.

496. **Ms. Harbur** was a licensed attorney for less than 5 years before ascending to General Counsel of **The New Home Company Inc.**.

497. **Ms. Harbur** and/or other employees submitted Form SI-PT for The New Home Company Inc between 2015-2021 to the California Secretary of State. (See Exhibit 194 Combined SI-PT.pdf)

498. In each form where this individual was present, "NO" was checked beside **Mr. Webb** under BANKRUPTCY.

499. In each form where this individual was present, "NO" was checked beside **Mr. Stelmar** under BANKRUPTCY.

500. State instructions for this question state "Check YES or NO to indicate whether or not an order for relief has been entered in a bankruptcy case during the 10 years preceding the date of this statement with respect to each director." (See Exhibit 195 Form SI-PT Info.pdf)

501. **Ms. Harbur** is currently the General Counsel for **The New Home Company Inc**, as of September 22, 2025. (See Exhibit 193 Miek Harbur | LinkedIn.pdf)

502. On January 30, 2014, **The New Home Company Inc** made an SEC filing disclosing information for an IPO. (See Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of bankruptcy.pdf)

503. This filing did not disclose **Mr. Webb's** relationship to the bankruptcy of **WL Homes LLC.**

504. This filing did not disclose **Mr. Stelmar's** relationship to the bankruptcy of **WL Homes LLC.**

**W. A Tale of Two Builders**

505. Both **The New Home Company, Inc** of Delaware and **Toll Brothers, Inc.** of Delaware, within 4 years of their respective IPOs, hired General Counsels who became licensed attorneys less than 5 years prior to assuming the role. (See ¶¶ 422-425, 492-496.)

506. Both companies operate centralized marketing, brokerage, and IT systems through the parent company. (See ¶¶ 1-2, 8, 355-356, 462-463.)

507. Both companies frequently use subsidiaries as the signatories for contracts with homebuyers. (See ¶¶ 142, 353.)

508. In both companies, the trademark-holding entity is not the same entity that signs contracts with consumers or interacts with municipal permitting authorities. (See ¶¶ 251, 356.)

509. Both companies regularly designate subsidiaries—rather than parent companies—as the licensed contractors, builders, or developers on record with municipalities. (See ¶¶ 277, 463.)

510. When recently contacted, employees from both companies ignored requests from **JG** to provide their employer information. (See ¶¶ 439-465.)

511. Both companies have a pattern of partnering with municipal governments in ways that limit the redress options available to homeowners. (See ¶¶ 204-244, 375.)

512. Both companies have issued cease-and-desist letters to homeowners and residents who submit prelitigation letters or regulatory complaints concerning construction defects. (See ¶¶ 203, 374.)

513. Both companies have misrepresented matters to shareholders while being publicly traded. (See ¶¶ 379-394, 502-504.)

514. **The New Home Company, Inc** of Delaware or its affiliated counsel appears to have provided **Toll Brothers, Inc.** of Delaware or its affiliated counsel with information about **JG's** recent dispute with **The New Home Company, Inc** of Delaware, information that subsequently appeared in the Federal complaint docketed as *1:25-cv-02884-CYC*. (See ¶¶ 344, 365 and original Complaint Paragraphs 3, 45-52.)

## X. Statements of Authority Involving Reginald Carveth

515. **Toll Southwest LLC** of Delaware has recorded at least 20 different Statements of Authority to various Colorado counties since 2012 signed by individuals without authority to sign for it. (See Exhibit 152 Statements of Authority.pdf)

516. On information and belief, Toll Southwest LLC never employed or had on its payroll Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and/or Christopher Stull between 2012-2023.

517. On information and belief, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and/or Christopher Stull never had authority to sign legal documents on behalf of Toll Southwest LLC between 2012-2023.

518. The following is an itemization of documents recorded in various Colorado counties by the aforementioned individuals.

519. December 27, 2017 – Douglas County, CO: Executed by **Reginald E. Carveth** claiming title as Vice President, certifying that Toll Southwest LLC is a Colorado Limited Liability Company. Ibid.

520. February 13, 2018 – Boulder County, CO: Executed by **Mark G. Bailey** claiming title as Division President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

521. November 30, 2018 – Boulder County, CO: Executed by **Mark G. Bailey** claiming title as Division President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

522. February June 21, 2019 – Jefferson County, CO: Executed by **Christopher Stull** claiming title as Division Vice President *and* Division President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

523. May 4, 2020 – Boulder County, CO: Executed by **Mark G. Bailey** claiming title as Division President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

524. August 13, 2020 – Jefferson County, CO: Executed by **Matt Foran** claiming title as Division Vice President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

525. September 23, 2020 – Boulder County, CO: Executed by **Matt Foran** claiming title as Division Vice President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

526. September 21, 2020 – El Paso County, CO: Executed by **David A. Keller** claiming title as Division President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

527. February 17, 2021 – El Paso County, CO: Executed by **Kenneth J. Greenspan** claiming title as Vice President, certifying that Reginald E. Carveth was Vice President of Toll Southwest LLC. Ibid.

528. March 3, 2021 – Boulder County, CO: Executed by **Mark G. Bailey** claiming title as Group President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

529. December 7, 2021 – Boulder County, CO: Executed by **Mark G. Bailey** claiming title as Group President, certifying that Reginald E. Carveth was Division Vice President of Toll Southwest LLC. Ibid.

530. February 24, 2022 – Larimer County, CO: Executed by **Kenneth J. Greenspan** claiming title as Vice President, certifying that Reginald E. Carveth was Division President of Toll Southwest LLC. Ibid.

531. March 8, 2022 – El Paso County, CO: Executed by **Kenneth J. Greenspan** claiming title as Vice President, certifying that Reginald E. Carveth was Division President of Toll Southwest LLC. Ibid.

532. March 15, 2022 – El Paso County, CO: Executed by **Kenneth J. Greenspan** claiming title as Vice President, certifying that Reginald E. Carveth was Division President of Toll Southwest LLC. Ibid.

533. March 22, 2022 – El Paso County, CO: Executed by **Kenneth J. Greenspan** claiming title as Vice President, certifying that Reginald E. Carveth was Division President of Toll Southwest LLC. Ibid.

534. June 15, 2022 – El Paso County, CO: Executed by **Eric J. Hunter** claiming title as Division President, certifying that Reginald E. Carveth was Division President of Toll Southwest LLC. Ibid.

## Y. Other Deeds

535. Many or all deeds from Counterclaim Plaintiff's development were signed by **Reginald Carveth** on behalf of Toll Southwest LLC. See Exhibit 202 Jefferson Ridge Deeds.pdf

536. Many or all deeds from the Candelas development in Jefferson County were signed by **Mark Bailey** on behalf of Toll Southwest LLC. See Exhibit 203 Jefferson Candelas Deeds.pdf

537. Many or all deeds retrieved by Counterclaim Plaintiff from Boulder County were signed by **Reginald Carveth** on behalf of Toll Southwest LLC. See Exhibit 204 Boulder Deeds.pdf

538. Many or all deeds retrieved by Counterclaim Plaintiff from Broomfield County were signed by **Mark Bailey** on behalf of Toll Southwest LLC. See Exhibit 205 Broomfield Deeds.pdf

539. Many or all deeds retrieved by Counterclaim Plaintiff from Broomfield County were signed by **Mark Bailey** on behalf of Toll Southwest LLC. See Exhibit 206 Douglas Deeds.pdf

540. A deed retrieved by Counterclaim Plaintiff from Adams County was signed by **Mark Bailey** on behalf of Toll Southwest LLC. See Exhibit 207 Adams Deed.pdf

541. A deed retrieved by Counterclaim Plaintiff from Arapahoe County was signed by **Mark Bailey** on behalf of Toll Southwest LLC. See Exhibit 208 Arapahoe Deed.pdf

542. Many or all deeds retrieved by Counterclaim Plaintiff from Maricopa County, Arizona were signed by **Robert L. Flaherty** on behalf of Toll Southwest LLC. See Exhibit 209 Maricopa Deeds.pdf

543. Many or all deeds retrieved by Counterclaim Plaintiff from Pinal County, Arizona were signed by **Robert L. Flaherty** on behalf of Toll Southwest LLC. See Exhibit 210 Pinal Deeds.pdf

**Z. Westminster Abstract Company**

544. Westminster Abstract Company acted as the title agency for closing on 5131 Vivian St. See Exhibit 211 5131 Vivian Title Insurance.pdf

545. Westminster Abstract Company is wholly owned by Toll Holdings, Inc. See Exhibit 212 Westerminster Abstract Company ACC.pdf

546. Kenneth Greenspan is a Director of Westminster Abstract Company. See *supra*.

547. Its website is accessible at https://www.westminstertitleagency.com.

548. The registrant for the website is Toll Brothers, Inc. See Exhibit 213 Westerminster Whois.pdf

549. The title insurance notice letter in Exhibit 211 was written by Steve Koester.

550. Steve Koester is the only listed employee on the website across Arizona, Nevada, and Colorado. See Exhibit 214 Steve Across States.pdf

551. Available jobs at Toll Brothers, Inc. or its subsidiaries are available for perusal at https://www.tollcareercenter.com/.

552. Westminster Abstract Company lists open jobs on this website. See Exhibit 215 Westminster Jobs.pdf

553. Accessing the site on August 5, 2026, Counterclaim Plaintiff found the following openings for each discipline: Accounting & Finance (1), Administration (30), Architecture (5), Customer Service (13), Design Studio (15), Engineering (7), Human Resources (1), Information Technology (7), Land (3), Landscape (4), Manufacturing (5), Marketing (6), Mortgage (3), Operations (34), Purchasing (15), Sales (43), and Title (3). See Exhibit 216 Toll Career Center numbers.pdf

554. There were more than 14 times more listings for Sales than Title.

555. The only departments with fewer listings than Title were Accounting & Finance and Human Resources.

556. Title only had 3 jobs open out of 195 total.

557. 12 C.F.R. § 1024.15(b)(1) states that a person is in violation of section 8 of RESPA (12 U.S.C. 2607) if the following does not hold true: "The person making each referral has provided to each person whose business is referred a written disclosure, in the format of the Affiliated Business Arrangement Disclosure Statement set forth in appendix D of this part, of the nature of the relationship (explaining the ownership and financial interest) between the provider of settlement services (or business incident thereto) and the person making the referral and of an estimated charge or range of charges generally made

by such provider (which describes the charge using the same terminology, as far as practical, as section L of the HUD-1 settlement statement)."

558. This is Appendix D of 12 CFR § 1024. See Exhibit 217 1024.15 Disclosure Notice.pdf, retrieved August 6, 2026.

559. Seller Toll Southwest LLC included a "AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT" (Sales Affiliated Business Disclosure Statement) included as part of the Sales Agreement. See Exhibit 218 ABA From Sales.pdf

560. The Sales Affiliated Business Disclosure Statement states, in part, the following:

> In connection with the purchase of the above-referenced property, you may need to obtain mortgage financing and homeowners insurance. We recommend Toll Brothers Mortgage Company ("Toll Brothers Mortgage") for mortgage financing, Westminster Title Agency, Inc. ("Westminster Title") for title insurance and Westminster Insurance Agency ("Westminster Insurance") and Toll Brothers Insurance Agency ("Toll Brothers Insurance") for homeowners insurance. These settlement service providers provide efficient and professional services at competitive rates. Please note that Toll Brothers, Inc. has a business relationship with these companies. Specifically, these three companies are subsidiaries of Toll Brothers. Because of this relationship, this referral may provide Toll Brothers or its affiliates a financial or other benefit.

561. The Sales Affiliated Business Disclosure Statement does not include any mention of Toll Southwest LLC.

562. The Sales Affiliated Business Disclosure Statement does not mention Toll Holdings, Inc.

563. The Sales Affiliated Business Disclosure Statement does not mention any ownership percentages.

564. The Sales Affiliated Business Disclosure Statement does not define what "we" encompasses.

565. The Sales Affiliated Business Disclosure Statement does not define what "Toll Brothers" encompasses.

566. Toll Brothers Mortgage Company also provided a "AFFILIATED BUSINESS DISCLOSURE STATEMENT" (Mortgage Affiliated Business Disclosure Statement) to Counterclaim Plaintiff. See Exhibit 219 ABA From Mortgage.pdf

567. Toll Brothers Mortgage Company is wholly owned by Toll Holdings, Inc. See Exhibit 220 Toll Brothers Mortgage Company ACC.pdf

568. Toll Brothers Mortgage Company was previously called TBI Mortgage Company. See Exhibit 221 TBMC Name Change.pdf

569. The Mortgage Affiliated Business Disclosure Statement stated "This is to give you notice that TBI Mortgage Company has a business relationship with Westminster Title Agency, Inc. The nature of the relationship (and percentage of ownership interest) is Mutual Affiliates of Toll Brothers, whose ownership interest is 100.00 %."

570. The Mortgage Affiliated Business Disclosure Statement leaves "Toll Brothers" undefined.

**AA. Demand Letter and Individual Contacts**

571. During the week of August 3, 2026, Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros., Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull received notice of Jeffrey Gu's demands to cure the Statements of Authority and Special Warranty Deed for 5131 Vivian St. See Exhibit 226 Toll Brothers Formal Legal Demand.pdf, Exhibit 222 Demand Letter Proofs.pdf, Exhibit 227 Baskerville Legal Demand Receipt.pdf, and Exhibit 230 Keller Receipt.pdf

572. As of August 17, 2026, Counterclaim Plaintiff received no responses from the demand letter.

573. Richard T. Hartman retired from Toll Brothers, Inc. on December 31, 2019, according to a press release. See Exhibit 228 Hartman Retirement.pdf.

574. Martin Connor retired from Toll Brothers, Inc. on October 31, 2025, according to a press release. See Exhibit 231 Connor Retirement.pdf.

575. The Arizona Corporation Commission webpage for Toll Southwest LLC (search accessible at https://arizonabusinesscenter.azcc.gov/businesssearch) still lists Martin Connor as a manager. See Exhibit 232 AZ ACC Toll Southwest.pdf.

576. The last update to the Toll Southwest LLC's manager list was on April 7, 2023. Ibid.

**BB. Chicago Title Commitment Letter**

577. American Heritage Title Agency, Inc. d/b/a Heritage Title Company, Inc. (Heritage) sent an email to Jeffrey Gu from the address toll@heritagetco.com containing a Commitment (Title Commitment) drafted by Westminster Abstract Company. See Exhibit 236 Heritage Toll email.pdf and Exhibit 233 Commitment Letter.pdf.

578. The Title Commitment states that it is "Issued By Chicago Title Insurance Company." Ibid.

579. Schedule A was signed by Steve Koester on behalf of Westminster Title Agency, Inc. Ibid.

580. The Title Commitment date is listed as October 27, 2022. Ibid.

581. Requirement 9 in "SCHEDULE B, PART I Requirements" (Requirement 9) lists, in its entirety, the following:

Deed sufficient to convey the fee simple estate or interest in the land described or referred to herein, to the Proposed Purchaser. Note: Statement of Authority for Toll Southwest LLC, a Delaware limited liability comapny recorded June 21, 2019 at Reception No. 2019051691 discloses the following person(s) authorized to sign on behalf of the entity, pursuant to Colorado Revised Statutes:

Ibid.

582. Requirement 9 does not list any individual or anything after the colon. Ibid.

583. Requirement 9 misspells "company" as "comapny." Ibid.

584. Reception No. 2019051691 (Outdated Statement of Authority) refers to a Statement of Authority signed by Christopher Stull. See Exhibit 234 Jefferson County SOAs.pdf

585. According to his LinkedIn profile, Christopher Stull left Toll Brothers, Inc. and/or Toll Southwest LLC in October of 2021. See Exhibit 242 Christopher Stull LinkedIn.pdf

586. In other words, Christopher Stull left Toll Brothers, Inc. and/or Toll Southwest LLC about one year before the cited Statement of Authority in Requirement 9.

587. By the time of this commitment date of October 27, 2022, at least 4 other Statements of Authority–Reception No. 2020099887 from 8/13/2020, Reception No. 2020121356 from 9/23/2020, Reception No. 2021034830 from 3/3/2021, and Reception No. 2021169598 from 12/7/2021, all recorded in Jefferson County– had superseded the Outdated Statement of Authority. Ibid.

## CC. Heritage Title Interactions

588. Heritage responded only with Officer's Certificate when asked for proof of Reginald Carveth's signing authority. See Exhibit 235 Heritage Toll Signing Authority.pdf, Exhibit 142 Officers Cert 2024.pdf, and Exhibit 143 Officers Cert 2022.pdf).

589. They did not respond with a reference to the Outdated Statement of Authority. Exhibit 234 Jefferson County SOAs.pdf

590. On August 26, 2026, Jeffrey Gu sent Heritage a demand letter, asking for internal documents related to their verification of Requirement 9. See Exhibit 240 Heritage Demand Letter.pdf

591. Heritage simply responded with documents from closing that Jeffrey Gu had seen or signed before. See Exhibit 241 Heritage Demand Letter Response.pdf

592. Heritage disbursed trust funds relate to the transaction in the amount of $726,731 on or around January 19, 2023.

593. Heritage disbursed these funds despite the lack of named authorized signatories and the Outdated Statement of Authority in Requirement 9.

594. Heritage is owned by Fidelity National Financial, Inc. See Exhibit 239 Heritage Title - About.pdf

## DD. UWM Closing Instructions

595. United Wholesale Mortgage, LLC (UWM) was the lender for the property at 5131 Vivian St during the closing process. See ¶ 119, Exhibit 45 Final Closing Disclosure.pdf

596. UWM provided Closing Instructions for closing on the transaction to Heritage. SeeExhibit 243 UWM Closing Instructions.pdf

597. One of the instructions states, "If your review of the deed, note, security instrument and/or rider, if applicable, discloses an error, contact lender before proceeding."

598. Another states, "You must review the deed of record or the new deed being prepared with this mortgage/deed of trust for compliance with all applicable laws."

599. Another states, "The date of the title commitment may not be more than thirty (30) days before the closing date. If the title commitment has expired, do not close the loan, and contact lender immediately."

600. Another states, "A title policy must be issued on the current American Land Title Association form (ALTA) or the state- approved equivalent."

601. By the time of closing on January 19, 2023, it was already 30 days past the instructions for a new commitment to be created.

602. The Commitment for 5131 Vivian St used the 2016 ALTA commitment form. See ¶ 577, Exhibit 233 Commitment Letter.pdf.

603. By the date of the Commitment, October 27, 2022, ALTA had already released a 2021 commitment form. See Exhibit 244 ALTA - Policy Forms and Related Documents.pdf

604. The 2016 ALTA commitment form was decertified by ALTA as of December 31, 2022.

605. By the time of closing on January 19, 2023, the Commitment used was based on the decertified 2016 version.

606. By the time of closing on January 19, 2023, the 2016 version of the ALTA commitment form was not the most current commitment form provided by ALTA.

607. A title commitment letter for Jeffrey Gu's neighbor at 5133 Vivian St has the exact same incomplete section in Schedule B-1, Requirement 9. See Exhibit 245 Neighbor Title Commitment.pdf

608. Rocket Mortgage LLC is the current servicer of the mortgage for 5131 Vivian. See Exhibit 246 Freddie Mac.pdf

609. The Deed of Trust for 5131 Vivian is Reception No. 2023004044 in Jefferson County Records. See Exhibit 247 5131 Vivian Deed of Trust.pdf

## V. CAUSES OF ACTION

**Count 1. Declaratory Judgment (Applicability of CP-1 Exemption/ C.R.S. § 12-10-201 et seq. )**

~~*All Counterclaim Defendants*~~

*Against Toll Brothers, Inc., Toll Bros, Inc., and Toll Southwest LLC,*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Counterclaim Plaintiff seeks a declaration that Plaintiffs can or cannot rely on the "owner-broker" exemption described in Commission Position Statement CP-1, or, more specifically, a declaration on whether C.R.S. § 12-10-201(6)(b) (2023) applied to the Plaintiffs' actions at the time of sale. The exemption applies only where property is sold by the entity's own "officers, partners or regularly salaried employees." Plaintiffs structured the transaction on paper through Toll Southwest LLC of Delaware, yet all material sales communications, offer acceptance, earnest money collection, and warranty obligations were carried out by Toll Brothers, Inc. of Delaware or Toll Bros., Inc. of Pennsylvania—separate entities that did not hold title to the property. (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161, 175.)

Plaintiffs themselves have produced Statements of Authority and Officer Certificates purporting to show that individuals such as Mark Bailey and Reginald Carveth were "officers" of Toll Southwest LLC of Delaware. (See ¶¶ 395-408.) Yet these documents lack any accompanying evidence of actual employment: no payroll records, no compensation, and no fiduciary duties tied specifically to the LLC. The effect is theatrical rather than substantive—titles on paper

without the underlying employment relationship. This creates an irreconcilable contradiction: if the officers and employees were not *actually* retained by the titled seller, then the CP-1 exemption cannot apply. If CP-1 does not apply, then the transaction required a licensed brokerage—yet none was involved. (See ¶¶ 23-25.)

Counterclaim Plaintiff therefore seeks a declaratory judgment that (a) CP-1 does not apply to this transaction because the sale was not conducted by officers or employees of the titled seller, and (b) Plaintiffs violated Colorado's real estate licensing statutes by marketing, contracting, and conveying the property without a licensed broker.

It's worth noting Plaintiffs once held a Colorado real estate license through Toll Brothers Real Estate Inc. of Delaware, acknowledging the statutory requirement that new home sales be brokered by licensed entities. (See ¶¶ 23-25.) At some point, Plaintiffs abandoned this path, permitting the license to lapse while continuing identical sales practices under the "Toll Brothers" name. Instead of maintaining licensure, Plaintiffs shifted to invoking the statutory CP-1 "owner-broker" exemption, a carve-out designed for genuine builders acting through their own officers and employees. Plaintiffs never disclosed this change of posture to consumers, nor did they identify which entity, if any, they considered to be the exempt "home builder." (See ¶¶ 121.) This pivot was not administrative; it was strategic, designed to minimize oversight while maintaining the outward appearance of compliance.

Counterclaim Defendants' invocation of the CP-1 owner-seller exemption served as the initial, critical mechanism to evade statutory scrutiny and facilitate the civil theft of Counterclaim Plaintiff's $726,731 in purchase funds. By bypassing the mandatory statutory disclosures, licensing oversight, and fiduciary safeguards required of a licensed real estate broker under

Colorado law, Counterclaim Defendants constructed an unregulated transactional environment. This regulatory avoidance allowed Counterclaim Defendants to execute conveyances under color of false authority, conceal structural entity defects, and unlawfully obtain Counterclaim Plaintiff's purchase funds $726,731 without delivering valid, unencumbered legal title.

**Count 2. Fraudulent Inducement**

*Against Toll Brothers, Inc., TB Proprietary Corp, Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Counterclaim Defendants knowingly misrepresented or concealed material facts regarding corporate registrations, officer legitimacy, licensing status, and the true identity of contracting parties, thereby inducing Counterclaim Plaintiff to enter into the Agreement of Sale and close on the property under false pretenses and to his material detriment.

By soliciting Counterclaim Plaintiff's bid and accepting it, Toll Brothers, Inc. affirmatively represented that it was the offeror and principal in the transaction for the property at 5131 Vivian St. See ¶¶ 8, 27. In the purchase of Counterclaim Plaintiff's home, at least ~~three~~ five different Toll-affiliated entities were involved, each playing a distinct and opaque role:

- **Toll Brothers, Inc.** handled nearly all consumer-facing communications including marketing, sales coordination, offer acceptance, construction updates, and post-closing warranty contact. (See ¶¶ 1-20, 27-33, 45, 51-56, 152-161, 169-175, 193.)
- **TB Proprietary Corp** provided brand assets. (See ¶ 251.)

- "Toll Brothers" for contractor licensing in Wheat Ridge. (See ¶¶ 126-130.)
- **Toll Bros., Inc.** accepted the earnest money deposit. (See ¶¶ 46-47.)
- **Toll Southwest LLC** acted as the official signatory on the Agreement of Sale and later served as the grantor on the Special Warranty Deed. (See ¶¶ 34-43, 119-125.)
- **Westminster Abstract Company** acted as a captive title agency, intentionally overlooking an invalid chain of authority in its title verification process, a corruption of a title company's typically fiduciary and neutral role. (See ¶¶ 544-570.)

At no point was this layered entity structure disclosed to Counterclaim Plaintiff in a manner that reflected the legal significance or liabilities associated with each entity. To the contrary, this ambiguity was the result of a calculated corporate design—refined over decades—to distance the publicly traded parent company from consumer liability.

Further evidence is found in Toll Southwest LLC's Affiliated Business Arrangement Disclosure included in the original Sales Agreement. See ¶ 559. In apparent violation of the consumer financial protection statute 12 C.F.R. § 1024.15(b)(1), the mandatory disclosure included in the Sales Agreement delineated none of the information required in the said disclosure. See ¶¶ 557-565. Notable ambiguities and omissions include the following:

1) Absence of the supposed referrer's name (ostensibly Toll Southwest LLC in this context)
2) Absence of an ownership interest explanation
3) Absence of a description of Toll Southwest LLC's relation to Westminster Abstract Company
4) Absence of what the term "Toll Brothers" or "we" meant in that context

The ambiguity surrounding these relationships—despite a clear corporate hierarchy that could have been explicitly mapped out in this Affiliated Business Arrangement Disclosure (and a similarly nonforthright disclosure provided in connection with Toll Brothers Mortgage Company, see ¶ 566)—suggests a cynical, affiliate-wide intention by Toll Brothers, Inc. and its officers, such as Reginald Carveth, to exploit corporate obscurity to unlawfully obtain Counterclaim Plaintiff's purchase funds of $726,731.

**A. Misrepresentation by Omission and False Authority: The Use of Shell Entities and Paper Officers**

The entity that signed the Agreement of Sale, **Toll Southwest LLC**, does not appear to have any real operational infrastructure and exists solely as a paper signatory. It has no functioning website, no public-facing contact information, and its purported "officers" are simply long-serving Toll Brothers, Inc. employees. Notably, LLCs are generally not structured to have officers: corporations are.

This practice of assigning "paper officers"—individuals who function more as signature proxies than legitimate operational executives—is widespread across Toll Brothers Inc's regional subsidiaries. For example:

- **Mark Bailey**, with over 24 years at Toll Brothers, Inc., signed numerous Statements of Authority and other documents as "Division President" or "Group President" for Toll Southwest LLC in Colorado, sometimes listing contradictory formation states. (See ¶¶ 216-222, 395, 403, 410.)
- **Reginald Carveth**, with over 8 years at the company, similarly signed notarized real estate documents and Statements of Authority across jurisdictions in Colorado,

sometimes listing Colorado or Pennsylvania as the formation state. (See ¶¶ 143-145, 395, 412.)

- **Kenneth Greenspan**, with over 8 years at the company, has signed numerous documents across states and across entities, including a more senior subsidiary, Toll Holdings, Inc. (See ¶¶ 395, 403-405, 414-421.)

This entity confusion serves no functional purpose other than to confuse consumers, frustrate regulatory oversight, and insulate Toll Brothers, Inc. from direct contractual liability—while still providing benefits from operational speed and branding. (See ¶¶ 395, 398, 413.)

**B. The Gary-Greenspan Pattern**

The deceptive structure of these entity relationships was developed and maintained at the highest levels of Toll Brothers, Inc.'s legal department.

- In 1990, Kenneth Gary—barely out of law school—was installed as General Counsel of a newly public Toll Brothers, Inc., a highly irregular appointment for someone with little legal experience. Despite holding the company's top legal position, Gary regularly appeared in notarized or recorded documents not as "General Counsel" but simply as "Vice President," seemingly not a person charged with fiduciary oversight. After 15 years at Toll Brothers, Inc. and a two year tenure as General Counsel at Beazer Homes—where he was reportedly terminated for cause—Mr. Gary has never again held a General Counsel position in any other homebuilder. Today, he falsely markets himself as a broker-attorney despite not holding an active attorney license, while his opaque and ethically questionable methods remain embedded in Toll Brothers' entity structure. The

company's present-day shell structuring and systemic consumer misdirection are built on the legal foundation Mr. Gary created. (See ¶¶ 422-438)

- Kenneth Greenspan, who succeeded Mr. Gary in this corporate plumbing role, continued the same practice: despite acting as the successor architect of Toll Brothers, Inc.'s multi-entity corporate architecture, his name rarely appears on formal documents beyond the role of "Vice President" or "Secretary." In this role, he continues to orchestrate this system of regional shell companies, each fronted by nominal officers with broad signature authority but no evidence of real employment—thereby continuing the superstructure of multiple layers of legal insulation between the parent company and its consumer obligations. (See ¶¶ 395, 403-405, 414-421, Exhibit 87 Corporate Hierarchy.pdf)

This legal structure has enabled Toll Brothers, Inc to:

- Shield Toll Brothers, Inc. from direct liability, even when it acts as the de facto contracting party (See ¶¶ 322-339, 340-350.),
- Avoid proper licensure and registration disclosures (See ¶¶ 275-293, 294-304),
- Disguise the real counterparty to real estate contracts, inducing consumers into contractual relationships based on materially false assumptions (See ¶¶ 35, 142), ~~and~~
- ~~Attempt to take advantage of~~ Facially comply with the owner-seller exemption under Colorado Real Estate Commission Position Statement CP-1/C.R.S. § 12-10-201(6)(b) (2023), (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161, 175.) and
- Utilize affiliated entities, such as Westminster Abstract Company, to execute real estate closings and conveyances under color of authority to unlawfully obtain Counterclaim

Plaintiff's purchase funds of $726,731 while obscuring defects in title and entity authorization.

**C. Harm and Reliance**

Toll Brothers, Inc. has long exploited the financing benefits and investor credibility of public markets, while operationally shielding themselves in the legal opacity of private LLCs. (See ¶¶ 379-394.) It seeks to raise capital like a public company—offering the illusion of transparency and accountability—yet it structures its day-to-day operations, liability exposure, and consumer-facing obligations behind layers of opaque, unregistered subsidiaries. This hybrid structure is not a sign of innovation; it is a calculated evasion of regulatory oversight and contractual responsibility. : it is a calculated mechanism designed to obscure legal authority, shield invalid property transfers from scrutiny, and steal purchaser funds.

Counterclaim Plaintiff was deceptively induced, *ultra vires*, to execute agreements and disburse purchase funds based on materially false representations of legal accountability, statutory compliance, and marketable conveyancing authority. In reliance upon these deceptive representations totally lacking in authority, Counterclaim Plaintiff transferred, and Counterclaim Defendants unlawfully obtained and retained, a total of $726,731 in purchase funds, earnest money deposits, and loan proceeds. See ¶ 119.

This deceptive scheme was not incidental—it was structural, deliberate, and central to Counterclaim Defendants' operational model. As a direct and proximate result of this fraudulent inducement, Counterclaim Plaintiff suffered concrete, quantifiable pecuniary losses and a clouded title to real property, establishing direct statutory injury and entitling Counterclaim

Plaintiff to full compensatory damages, spurious title remedies under C.R.S. § 38-35-109(3), civil theft remedies under C.R.S. § 18-4-405, and all additional relief set forth below.

~~Had Counterclaim Plaintiff known that he was not truly contracting with Toll Brothers, Inc.—despite every outward indication to the contrary—he would not have proceeded with the Agreement of Sale under the same terms, or possibly at all. At a minimum, Counterclaim Plaintiff would have sought to negotiate different terms, exercised greater due diligence, and verified the licensing of the true counterparty.~~

~~Instead, Counterclaim Plaintiff was induced to sign based on false impressions of legal accountability, regulatory compliance, and direct engagement with a publicly traded company with a supposedly excellent reputation, when in reality the contractual seller was a poorly disclosed, minimally staffed LLC with no assets, no online presence, and no clear liability path.~~

~~This fraud was not incidental—it was structural, deliberate, and baked into the Toll Brothers, Inc.'s operating model. As a result, Counterclaim Plaintiff has suffered damages and is entitled to relief as set forth below.~~

**Count 3. Civil Conspiracy**

~~*Against all Counterclaim Defendants*~~

*Against Toll Brothers, Inc., TB Proprietary Corp, Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull*

~~Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.~~

~~Defendants engaged in a coordinated scheme involving multiple public and private entities, contractors, consultants, and insurers, to conceal material facts, circumvent consumer protections, misrepresent legal liability, and suppress regulatory enforcement across state lines. This conspiracy induced consumers, including the Plaintiff, to enter into property transactions under false pretenses, while denying access to recourse mechanisms intentionally obscured by interlocking layers of legal and administrative deceit.~~

~~The conspiracy spans multiple domains—engineering, brokering, planning, permitting, inspecting, and insurance brokering—and involves both affirmative acts and knowing omissions. The pattern of behavior across parties demonstrates tacit or explicit agreement to further unlawful objectives under color of legality.~~

**A. Toll Brothers, Inc. and Related Entities**

Toll Brothers, Inc., a publicly traded company, used a multilayered network of shell entities (e.g., Toll Bros., Inc., Toll Southwest LLC) to market, sell, and transfer homes while avoiding direct liability. These entities frequently misrepresented their licensing, failed to register as foreign entities in key jurisdictions, and misled Counterclaim Plaintiff into believing he was contracting with the parent company. (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161, 249.)

Toll Brothers' internal officers signed ~~contradictory~~ unauthorized Statements of Authority across multiple counties and states, assigning signature power to long-tenured employees who were used as "paper officers" to obscure operational accountability. These officers regularly swapped formation states and jurisdictions to avoid regulatory exposure. (See ¶¶ 395-408.)

Toll Brothers' legal leadership—including Kenneth Gary and Kenneth Greenspan—designed or perpetuated this structure over decades. Despite one holding the position of General Counsel and the other one wielding nearly as much power, neither consistently appeared as such in public filings, suggesting deliberate detachment from direct liability. It suggests a legal department that has exploited state registration loopholes and professional licensure ambiguity to facilitate consumer fraud and statutory theft of more than $726,731 via spurious documents while maintaining plausible deniability. (See ¶¶ 119, 414-438.) As a direct, proximate, and foreseeable result of this civil conspiracy, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and stolen purchase funds in excess of $726,731. See ¶ 119.

**B. Westminster Abstract Company**

Counterclaim Defendant Westminster Abstract Company (Westminster), acting as title agency for 5131 Vivian St. (Exhibit 211), violated C.R.S § 10-11-106(1) by executing title functions without conducting a reasonable title examination or retaining proof of insurability under sound underwriting standards. See ¶ 544. Westminster is a captive, non-autonomous instrumentality wholly owned by Toll Holdings, Inc., directed by Kenneth Greenspan, and controlled by Toll Brothers, Inc., which registers Westminster's domain, and directly manages its hiring. See ¶¶ 545-548.

Across Arizona, Nevada, and Colorado, Steve Koester—author of the subject title notice letter—is the sole listed employee on Westminster's website across 3 states. See ¶¶ 549-550. As of August 5, 2026, Toll Brothers Inc.'s career portal revealed severe under-resourcing in title functions, listing only 3 title job openings out of 195 total (1.5%), with 14 times more openings in Sales (43) and amongst the fewest openings alongside Accounting & Finance (1) and HR (3).

See ¶¶ 551-556. This structural under-staffing directly caused Westminster to bypass mandatory C.R.S. Title 7 authority examinations, resulting in the issuance of commitments and recording of unauthorized conveyancing instruments without obtaining or retaining required manager delegation resolutions pursuant to C.R.S. § 10-11-106(1). As a direct, proximate, and foreseeable result of this civil conspiracy, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and stolen purchase funds in excess of $726,731. See ¶ 119.

**C. Toll Southwest LLC and its Paper Officers**

Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros., Inc., Toll Southwest LLC, and Westminster—acting by and through individual corporate officers including Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull—entered into a common, intentional, and unlawful combination and agreement to execute, deliver, and record facially defective and unauthorized conveyancing instruments throughout the State of Colorado. The unlawful object of this conspiracy was to systematically launder invalid land instruments through a captive title infrastructure, bypass statutory corporate authority verification requirements mandated by C.R.S. Title 7, and obscure the true corporate entity structure and financial arrangements from property purchasers. See ¶¶ 515-570. In furtherance of this unlawful combination, the conspirators committed a continuous pattern of overt acts across multiple counties by routinely executing unauthorized Statements of Authority and deeds on behalf of Toll Southwest LLC. As a direct, proximate, and foreseeable result of this civil conspiracy, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and stolen purchase funds in excess of $726,731. See ¶ 119.

**B. The City of Wheat Ridge, Gerald Dahl, Renee Meriaux, and Charles Abbott Associates**

The City of Wheat Ridge conspired with third-party municipal contractors, Charles Abbot Associates, Inc. ("CAA"), to retroactively validate or obscure unpermitted construction activity and building code violations. (See ¶¶ 64-70, 94-118, 204-214.) Chief Building Official Renee Meriaux and City Attorney Gerald Dahl each took affirmative steps to frustrate records requests and disclosure of code violations that could trigger consumer or legal remedies. (See ¶¶ 215-244 .)

CAA, the City's contracted permitting and inspection provider, issued permits and inspection approvals under false pretenses. (See ¶¶ 64-70, 94-118, 123-130, 278-285.) These defective approvals enabled Toll Brothers, Inc. and its contractors to offload an improperly constructed home to Counterclaim Plaintiff, with the City shielding them from inquiry.

Dahl's policies actively dissuaded further communication, citing dubious procedural justifications. (See ¶¶ 207-209, 234-244.) The City and CAA's approval of obvious code violations, contract falsities, and permitting irregularities demonstrates willful coordination with Toll Brothers, Inc. and its agents to suppress material evidence of fraud.

**C. Felten Group, Inc.**

Felten Group, Inc. ("Felten"), an Arizona Corporation, served as the engineer of record for the subject property and affixed its professional seal to structural documents that were later contradicted by field conditions — most notably, the discovery that an entire structural wall system was missing from the home as built. (See ¶¶ 57-62, 71-73, 82-84, 177.) This discrepancy

raises significant questions about both Felten's design process and its professional oversight obligations under state engineering laws.

When confronted with these issues, Felten officers David Sparks and Mark Matthews refused to provide the structural engineering plans, evading legitimate inquiries into how such a material discrepancy occurred. More troublingly, these individuals declined to identify which party it had contracted with, despite its role being central to the chain of accountability. This refusal to disclose its contractual counterparty—whether Toll Brothers Inc. or one of its many affiliated shell entities—suggests a deliberate effort to obstruct transparency and prevent discovery of who exercised operational control over engineering decisions. (See ¶¶ 177-184.)

Felten also failed to initiate any oversight or revision process when it became evident that a structural change order or revision plan was required—as would be standard practice when as-built conditions deviate so significantly from engineered drawings. (See ¶¶ 68, 86.) Its inaction in the face of such discrepancies implies either gross negligence or intentional complicity in a broader effort to paper over construction defects.

Felten's silence and inaction served not merely to obscure the truth, but to legitimize the defective conditions post hoc, by allowing its engineering seal to remain attached to structures it could not have reasonably reviewed or approved in their actual form. In this context, Felten's participation in the broader civil conspiracy is not passive but active—aiding in the laundering of liability and enabling the enforcement of flawed permitting and inspection regimes. By failing to disclose basic contractual facts, declining to provide engineering documentation, and remaining silent when engineering revisions were clearly mandated, Felten operated as a shield for builder misconduct rather than as an independent and professionally accountable engineer.

**D. Marsh & McLennan Companies, Inc. and Subsidiary Entities**

Marsh & McLennan Companies, Inc., along with its subsidiaries Marsh LLC and Marsh USA LLC (collectively, "Marsh"), played an instrumental role in facilitating the deception surrounding Toll Brothers, Inc's and subsidiaries' entity structure and liability practices. As the long-time insurance broker for Toll Brothers, Inc and its various subsidiaries, Marsh issued and distributed Certificates of Liability Insurance (COIs) that misrepresented the insured party, the insurable interest, and the very existence of certain entities involved in construction and development operations. (See ¶¶ 294-304.)

Most notably, Marsh repeatedly issued COIs that listed "Toll Brothers, Inc." as the insured entity in Colorado, despite the fact that Toll Brothers, Inc. was not registered to do business in the state. (See ¶¶ 297, 299, 300.) This practice persisted year after year, even though other subsidiaries such as Toll Southwest LLC were the actual signatories and counterparties on municipal agreements and recorded documents.

In some cases, the same policy number was reused across multiple distinct legal entities, creating the illusion that coverage applied universally, regardless of the actual corporate structure or licensing. Additionally, Marsh's COIs obtained always failed to disclose the "Producer" contact information required by industry and regulatory standards, obscuring the origin of the document and preventing proper verification of its authenticity or scope. (See ¶¶ 294-304.)

Marsh's persistent failure to accurately reflect the legal identity of the insured party was not an administrative oversight. It was part of a broader pattern of insurance documentation manipulation that allowed Toll Brothers, Inc. and subsidiaries to:

- Avoid municipal scrutiny;
- Pass permit and inspection hurdles under improper credentials;
- Represent to homeowners that a legitimate, parent-level entity stood behind construction obligations.

Despite the obvious discrepancies—ranging from nonexistent entities being listed as insureds, to missing producer fields, to boilerplate policy numbers recycled across companies—Marsh continued issuing and standing behind these documents without correction or withdrawal.

Their actions cannot be characterized as neutral third-party brokerage. Instead, Marsh acted as a knowledgeable enabler of the broader scheme, aware of the entity-switching, regulatory mismatches, and fictitious filings at play. Marsh's centrality to the insurance verification process made their complicity indispensable to the execution and concealment of Toll Brothers, Inc.'s misconduct across jurisdictions.

The Marsh-related entities—Marsh & McLennan Companies, Inc., Marsh LLC, and Marsh USA LLC—have operated as a unified, interdependent enterprise with no meaningful separation in management, function, or decision-making. Though nominally distinct legal entities, they share a single brand identity, common headquarters and regional offices, and IT operations, where they issued or enabled the issuance of materially misleading insurance certificates in connection with Toll Brothers' construction activities. (See ¶¶ 305-321.) Given the shared operations, branding, and knowing involvement in regulatory evasion, the corporate veil between Marsh & McLennan Companies, Inc., Marsh LLC, and Marsh USA LLC should be pierced, and all Marsh entities held jointly and severally liable for their role in the conspiracy to mislead regulators and consumers through deceptive insurance practices.

As such, Marsh is properly included as a co-conspirator in the civil conspiracy alleged herein. Without Marsh's ongoing assistance in laundering risk through misleading COIs, many of the downstream approvals and consumer transactions would not have been possible.

**E. The New Home Company, Inc. and Bert L. Howe & Associates, Inc.**

The New Home Company, Inc. ("TNHC") engaged in conduct that parallels Toll Brothers' operational model, using a multilayered subsidiary structure to confuse regulators and homebuyers about which legal entity bears responsibility for construction, warranties, and contractual representations. (See ¶¶ 505-514.) While marketing and communications uniformly brand the company as "New Home Co," contractual documents and regulatory filings shift liability onto entities such as TNHC Realty and Construction Inc. or The New Home Company Southern California LLC, often without disclosing this distinction to consumers. (See ¶¶ 353-356, 361.)

TNHC's refusal to identify which entity employed particular individuals—despite repeated, good-faith inquiries—mirrors Toll Brothers' tactic of shielding paper officers and rotating signatories across state-registered shell entities. (See ¶¶ 462-465.) Like Toll Brothers, Inc., TNHC deployed multiple cease-and-desist threats in response to these inquiries, weaponizing the legal process not to clarify but to further obscure corporate accountability. (See ¶¶ 364-374.)

Bert L. Howe & Associates, Inc. ("BHA") functions as an unlicensed inspection and consulting firm that has an arm's length relationship with TNHC via the law firm PHLK LLP. BHA acted in furtherance of a liability concealment strategy by providing a veneer of third-party credibility while in practice executing TNHC's interests and shielding it from direct construction defect liability. (See ¶¶ 203, 377.)

~~Critically, Toll Brothers, Inc., TNHC, and BHA appear to have coordinated efforts behind the scenes to suppress the Plaintiff's inquiries. Details about Counterclaim Plaintiff's situations with the latter two entities were later shared with Toll Brothers, Inc. and formed part of the pretext for Toll Brothers' trademark-based legal action. (See ¶¶ 361-362, 376-378.) This pattern reflects not independent corporate responses, but a coordinated industry pushback against an individual consumer exposing systemic corporate misconduct. The uniformity of tone, timing, and substance between the three companies' cease-and-desist communications and litigation narratives further underscores that these are not isolated actors, but rather entities operating from a shared playbook.~~

~~This alignment is no coincidence. Toll Brothers, Inc. and TNHC share a similar corporate DNA: rapid promotions of minimally experienced in-house counsel into General Counsel positions shortly after IPOs; the use of cease and desist letters and intimidation as a first-line defense mechanism; and systemic obfuscation of the identity and licensing status of subsidiaries. (See ¶¶ 203, 374, 422-425, 492-494, 505-514.) These shared characteristics suggest that their legal strategy is not merely parallel but potentially collaborative, coordinated either through shared outside counsel (perhaps via Melanie Woodfin of PHLK LLP), industry associations, or direct backchannel communication. (See ¶¶ 344, 365.)~~

~~Such alignment in behavior, legal posture, and information flow transcends coincidence and rises to the level of civil conspiracy, designed to insulate both parties from regulatory scrutiny, suppress consumer complaints, and discredit legitimate whistleblower efforts.~~

**D. Harm and Joint Liability**

These entities, through their coordinated silence, mutual reinforcement of each other's false authority representations, and suppression of complaints, engaged in a long-running civil conspiracy to:

- Misinform Counterclaim Plaintiff about the identity and legitimacy of his counterparty;
- Deflect liability through a maze of subsidiaries and recording false instruments;
- Leverage government actors to provide false credibility to improper work;
- Obscure material defects in engineering, permitting, construction, and insurance coverage; and
- Retaliate against those—such as Plaintiff—who challenged these arrangements; and
- Steal Counterclaim Plaintiff's purchase funds with spurious documents.

The consistency of conduct across unrelated jurisdictions and builders suggests not only shared strategies, but possible shared counsel, backchannel coordination, or industry-wide legal architecture designed for systemic fraud. As a direct, proximate, and foreseeable result of this civil conspiracy, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and stolen purchase funds.

**Count 4. Deceptive Trade Practices**

*Against Toll Brothers, Inc., Toll Southwest LLC, Toll Bros., Inc., Toll Holdings, Inc., Reginald Carveth, Westminster Abstract Company, and TB Proprietary Corp.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

The Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-105(1), prohibits a wide range of deceptive trade practices in the course of business, vocation, or occupation. The Act is intended to protect both consumers and the public interest by deterring unfair or misleading commercial conduct.

At all relevant times, Counterclaim Defendants Toll Brothers, Inc., TB Proprietary Corp., Toll Bros., Inc., Toll Holdings, Inc., Reginald Carveth, Westminster Abstract Company, and Toll Southwest LLC were engaged in the sale, marketing, contracting, and transfer of residential real estate in Colorado, including the property purchased by Plaintiff. (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161, 249.)

Counterclaim Defendants engaged in a deliberate and coordinated scheme to confuse and mislead consumers regarding the identity of the true seller, licensed contractor, steal purchase funds through recording of spurious documents, and responsible party at various stages of the residential purchase and construction process. (See ¶¶ 27-33, 278-285.)

Specifically, Counterclaim Defendants engaged in the following deceptive trade practices in violation of C.R.S. § 6-1-105(1):

**§ 6-1-105(1)(b)** – Either knowingly or recklessly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property. *Toll Brothers, Inc. and TB Proprietary Corp. marketed the homes and controlled the sales process but did not appear in the purchase agreements or deeds.* (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161, 251.) Reginald Carveth falsely represented on the Special Warranty Deed that he was an officer of Toll Southwest LLC and, thus, had no authority to do so. See ¶¶ 143-145.

**§ 6-1-105(1)(e)** – Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith. *Counterclaim Plaintiff was led to believe the home was being sold and warranted by Toll Brothers, Inc., when in fact responsibility was dispersed across entities with unclear governance.* (See ¶¶ 1-8, 27-35, 45, 47, 51-56, 119-120, 123-130, 152-161.) *Toll Brothers, Inc., Toll Southwest LLC, and Westminster Abstract Company provided an inaccurate and misleading Affiliated Business Arrangement Disclosure in violation of 12 C.F.R. § 1024.15(b)(1) about their corporate relationships in the Affiliated Business Arrangement Disclosure included in the Sales Agreement.* See ¶¶ 544-570. Reginald Carveth falsely represented on the Special Warranty Deed that he was an officer of Toll Southwest LLC and, thus, had no authority to do so. See ¶¶ 143-145.

**§ 6-1-105(1)(g)** – Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another. *Counterclaim Defendants failed to disclose structural construction issues and material changes and used Toll Brothers, Inc. and TB Proprietary Corp. copyrights and trademarks to falsely assure quality and oversight.* (See ¶¶ 12, 30-33, 53, 68, 86, 93, 154.)

**§ 6-1-105(1)(u)** – Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction. *Counterclaim Plaintiff was never informed that the seller was an obscure LLC, nor was he made aware of which entity held the contractor's license or warranty obligations.* (See ¶¶ 34-35, 278-

285.) *Toll Brothers, Inc., Toll Southwest LLC, and Westminster Abstract Company provided an inaccurate and misleading Affiliated Business Arrangement Disclosure in violation of 12 C.F.R. § 1024.15(b)(1) about their corporate relationships in the Affiliated Business Arrangement Disclosure included in the Sales Agreement.* See ¶¶ 544-570.

The misrepresentations and omissions were material, repeated, and part of a systemic business practice designed to shield Toll Brothers, Inc. and subsidiaries from direct accountability while still leveraging the brand for consumer trust and transaction facilitation. It also enabled Counterclaim Defendants to steal Counterclaim Plaintiff's purchase funds through improper land instruments.

~~Counterclaim Plaintiff reasonably relied on these representations and omissions, believing that he was contracting directly with a nationally recognized and publicly traded homebuilder, not a minimally capitalized subsidiary with no independent brand presence.~~

As a direct and proximate result of Counterclaim Defendants' deceptive and unauthorized conduct, Counterclaim Plaintiff has suffered actual damages in excess of $726,731 due to stolen purchase funds, earnest money deposits, and loan proceeds. See ¶ 119. ~~, including but not limited to loss of legal recourse, exposure to construction defects, and material misrepresentation of the nature and structure of the transaction. (See ¶¶ 27-28, 47, 68, 86, 211-214.)~~

Counterclaim Defendants' conduct has significantly impacted the public as actual or potential consumers of Counterclaim Defendants' homes in Colorado and elsewhere, satisfying the "public impact" requirement under Colorado law. (See ¶¶ 216-227, 254-255, 262-263, 535-570.)

**Count 5: Declaratory Judgment – Invalidity of Recorded Documents (28 U.S.C. § 2201; C.R.S. §§ 38-30-172 & 38-35-201 et seq.)**

*Against Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, Christopher Stull, and Rocket Mortgage, LLC (as Required Party / Servicer under Fed. R. Civ. P. 19(a)(1))*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Title 7 of the Colorado Revised Statutes discusses how corporate organizations should govern themselves. The following statutes in particular discuss Limited Liability Companies.

C.R.S. § 7-80-401(1) writes that

> Except as provided in subsection (2) of this section, decisions with respect to a limited liability company shall be made by a majority of the members or, if the limited liability company has one or more managers, by a majority of the managers.

And related to officers in such a company, C.R.S. § 7-80-403(2) holds that

> Officers and other agents may be given authority to do any act that is not in the ordinary course of the business of the limited liability company only with the consent of all of the members.

At all relevant times during the transaction for 5131 Vivian St, the designated managers of Toll Southwest LLC were Toll Brothers, Inc. executives or ex-executives Douglas Yearley, Richard Hartman (who retired from Toll Brothers, Inc. as a president and Chief Operating Officer on December 31, 2019, see ¶ 573, Exhibit 228 Hartman Retirement.pdf), and Martin Connor (who retired from Toll Brothers, Inc. as Chief Financial Officer on October 31, 2025, but is still listed outwardly on the Arizona Corporation Commission page for Toll Southwest LLC, see ¶¶ 574-575, Exhibit 231 Connor Retirement.pdf and Exhibit 232 AZ ACC Toll Southwest.pdf). See ¶

146, Exhibit 50 AZ Toll Southwest 2017.pdf. Mr. Hartman was removed as a manager of Toll Southwest LLC on April 6, 2023, a few months after the transaction for 5131 Vivian St occurred and more than 3 years after his retirement from Toll Brothers, Inc. See ¶ 576, Exhibit 49 AZ Toll Southwest LLC 2023.pdf. Mr. Connor has still not been removed as a manager of Toll Southwest LLC, despite his retirement from Toll Brothers, Inc. on October 31, 2025. See ¶ 576. Toll Southwest LLC's systematic, multi-year failure to maintain accurate public records of its primary governing managers directly supports the reasonable factual inference that the entity failed to execute, maintain, or update formal manager resolutions delegating signatory power to non-managers.

Toll Southwest LLC has never executed, maintained, or produced any written consent, manager resolution, or delegation from all or a majority of its managers authorizing Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, or Christopher Stull to execute Statements of Authority or instruments conveying, encumbering, or affecting title to real property, or naming these individuals Vice Presidents, Division Presidents, or Division Vice Presidents of Toll Southwest LLC. See ¶¶ 571–572, Exhibit 226 Toll Brothers Formal Legal Demand.pdf. It also never executed such an additional action for Reginald Carveth between September 21, 2020 and February 17, 2021, when he was apparently elevated from a Division *Vice President* of Toll Southwest LLC to a Division *President*. See ¶¶ 526-527, Exhibit 152 Statements of Authority.pdf.

C.R.S. § 38-35-201 defines a spurious document as "any document that is forged or groundless, contains a material misstatement or false claim, or is otherwise patently invalid." The various Statements of Authority delineated in ¶¶ 515-534 (Exhibit 152 Statements of Authority.pdf) clearly fit this statutory definition:

1. They were *groundless* because the signatory did not receive authorization by the managers (again, Mr. Yearley, Mr. Hartman, and Mr. Connor, see Exhibit 50 AZ Toll Southwest 2017.pdf) of Toll Southwest LLC to execute any given Statement of Authority;
2. They contained *material misstatements* and/or *false claims* because the individuals listed a) never held the corporate office or title within Toll Southwest LLC, (b) were never employees on the payroll of, nor maintained any bona fide agency relationship with, Toll Southwest LLC, and c) did not receive authorization by the managers of Toll Southwest LLC "to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of" Toll Southwest LLC; and
3. They were *patently invalid* because of the lack of consent granted to the signatories or listed individuals by the managers of Toll Southwest LLC to execute the statement itself or perform the functions listed therein.

Likewise, the Special Warranty Deed for 5131 Vivian St (see ¶¶ 142-143, Exhibit 48 5131 Vivian St Special Warranty Deed.pdf) fits under the definition of a spurious document for the following reasons:

1. It was *groundless* because Reginald Carveth never received the authority from the managers of Toll Southwest LLC to "grant, bargain, sell, convey and confirm" on behalf of Toll Southwest LLC;
2. It contained *material misstatements* and/or *false claims* because Reginald Carveth a) never held the corporate office or title of "Division President" of Toll Southwest LLC and b) was never an employee on the payroll of, nor maintained any bona fide agency relationship with, Toll Southwest LLC; and

3. It was *patently invalid* because of the lack of consent granted to Reginald Carveth by the managers of Toll Southwest LLC to execute the deed itself or perform the functions listed therein.

Because these recorded Statements of Authority and the Special Warranty Deed for 5131 Vivian St were executed without underlying manager authorization and the signatories acted *ultra vires*, the documents are void *ab initio*, and they are legally ineffective to establish conveyancing authority or rebut the defects in title.

Additional Counterclaim Defendant Rocket Mortgage, LLC (Rocket) is joined pursuant to Fed. R. Civ. P. 19(a)(1) as the current master loan servicer, administrative holder, and operational agent enforcing the promissory note and servicing the recorded Deed of Trust encumbering 5131 Vivian St (recorded at Reception No. 2023004044 Jefferson County Records). ¶¶ 608, 609, Exhibit 246 Freddie Mac.pdf, Exhibit 247 5131 Vivian Deed of Trust.pdf. Because the underlying Special Warranty Deed executed by Toll Southwest LLC is void *ab initio* for lack of conveyancing authority, the resulting Deed of Trust administered and serviced by Rocket encumbers legally defective and unmarketable title, creating an unperfected security interest. Rocket's presence is required to accord complete relief and ensure that any decree adjudicating, reforming, or quieting title to the property is fully binding upon the active servicer of the encumbrance.

As a direct and proximate result, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and civil theft in excess of **$726,731** in purchase funds, earnest money deposits, and loan proceeds. See ¶ 119, Exhibit 45 Final Closing Disclosure.pdf. An actual, justiciable controversy exists between the parties regarding the validity of these recorded instruments.

Pursuant to **28 U.S.C. § 2201**, Counterclaim Plaintiff is entitled to a judicial declaration that:

1. The recorded Statements of Authority involving Reginald Carveth (¶¶ 515–534, Exhibit 152 Statements of Authority.pdf) are spurious documents, void *ab initio*, and of no legal force or effect; and
2. The Special Warranty Deed for 5131 Vivian St (Exhibit 48 5131 Vivian St Special Warranty Deed.pdf) is a spurious document, void *ab initio*, and ineffective to convey lawful title.

**Count 6: Declaratory Judgment – Breach of Non-Delegable Duty to Perform Reasonable Examination (28 U.S.C. § 2201; C.R.S. § 10-11-106; 3 CCR 702-8-1-2 § 5(A))**

*Against Westminster Abstract Company and Chicago Title Insurance Company*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

An actual, justiciable controversy of immediate urgency exists between Counterclaim Plaintiff, issuing agent Westminster, and underwriter Chicago Title Insurance Company (Chicago Title) concerning their non-delegable statutory and regulatory duties to conduct a "reasonable examination" of title and determine insurability prior to issuing commitments, as well as the resulting cloud on title caused by their defective underwriting.

Under C.R.S. § 10-11-106(1) and 3 CCR 702-8-1-2 § 5(A), no title insurance company or its agent shall write, issue, or disburse on a title commitment or policy without first conducting a "reasonable examination" of property records and determining insurability in accordance with sound underwriting practices, retaining all supporting evidence in its files for not less than seven years. Pursuant to 3 CCR 702-8-1-2 § 5(H) and § 5(O)(3), Chicago Title is directly and

vicariously liable for the statutory noncompliance, omissions, and defective underwriting performed by its authorized policy-issuing agent, Westminster.

While C.R.S. § 10-11-106(2) provides that a title insurer is not obligated to disclose recorded documents that a reasonable examination reveals to be spurious documents under C.R.S. § 38-35-201, non-impairments under sound underwriting practices, or instruments that do not encumber the property, this narrow statutory safe harbor presupposes a lawful, competent examination under subsection (1). Here, Westminster and Chicago Title did not identify or exclude invalid instruments; instead, they affirmatively utilized an unexamined, defective record by citing and relying upon an obsolete 2019 Statement of Authority in Requirement 9 to manufacture the false appearance of insurability, while failing to disclose or cure its patent statutory invalidity under C.R.S. § 38-30-172(6)

Westminster and Chicago Title breached the "reasonable examination" standard under C.R.S. § 10-11-106(1) by issuing Commitment No. 132-22000532-TBI with a facially defective and incomplete Requirement 9 that terminated mid-sentence after a trailing colon, completely omitted any verified natural person authorized to execute conveyances, and sloppily misspelled the word "company" as "comapny" across multiple commitments. See ¶¶ 581–583, 607, Exhibit 233 Commitment Letter.pdf. Rather than conducting a reasonable examination, Westminster and Chicago Title failed to obtain, verify, or preserve in their statutory seven-year file any underlying Manager Resolution or written delegation executed by Toll Southwest LLC's actual governing Managers pursuant to C.R.S. § 7-80-401(1) and § 7-80-403(2). Instead, they affirmatively cited and relied upon an obsolete 2019 Statement of Authority signed by an ex-employee, Christopher Stull, who had departed the company over a year prior and whose authority had been objectively superseded four subsequent times on the Jefferson County public records in direct violation of

C.R.S. § 38-30-172(6), demonstrating a total failure to perform an updated grantor search. See ¶¶ 584–587, Exhibit 234 Jefferson County SOAs.pdf.

As a direct and proximate result of these statutory underwriting and examination failures, a defective Special Warranty Deed executed by an unverified signatory, Reginald Carveth, was recorded in Jefferson County without actual or verified authority under C.R.S. § 38-30-172, clouding title to 5131 Vivian St and directly facilitating the unauthorized, unlawful escrow disbursement of $726,731 in buyer purchase funds, earnest money, and loan proceeds.

Counterclaim Plaintiff respectfully requests a Declaratory Judgment against Westminster and Chicago Title: (a) declaring that both entities violated C.R.S. § 10-11-106(1) and 3 CCR 702-8-1-2 § 5(A) by failing to conduct a reasonable examination of title under sound underwriting principles; (b) declaring that Requirement 9 was facially defective and legally unsatisfied at closing; (c) declaring that the recorded Special Warranty Deed failed to convey marketable title and constitutes an unlawful cloud on title; (d) declaring Chicago Title vicariously and directly liable under 3 CCR 702-8-1-2 § 5(H) & (O)(3) for all damages resulting from the defective commitment; and (e) awarding Counterclaim Plaintiff his costs and all other just relief.

**Count 7: Declaratory Judgment – Breach of Fiduciary Duty and Unlawful Escrow Disbursement (28 U.S.C. § 2201; C.R.S. § 10-11-127(1); 3 CCR 702-8-1-3 § 5(D)(1); 3 CCR 702-8-1-2 § 5(K))**

*Against American Heritage Title Agency, Inc. and Fidelity National Financial, Inc.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

An actual, justiciable controversy exists between Counterclaim Plaintiff, settlement agent Heritage, and its corporate parent Fidelity National Financial, Inc. (FNF) regarding their non-

delegable statutory fiduciary obligations in holding and disbursing escrow trust funds under Colorado law.

Under C.R.S. § 10-11-127(1) and 3 CCR 702-8-1-4 § 5(A), (E), a title insurance entity and its affiliates or subsidiaries in possession of closing and settlement funds hold those monies strictly in a fiduciary trust capacity and are prohibited from disbursing them for any purpose other than as set forth in the written agreement. Furthermore, Colorado Division of Insurance Regulations 3 CCR 702-8-1-2 § 5(K) and 3 CCR 702-8-1-3 § 5(D)(1) establish that providing closing services without "written instructions from necessary all parties" or disbursing funds before "all necessary conditions" of the transaction have been satisfied constitutes a *per se* unlawful disbursement and breach of duty.

In direct violation of C.R.S. § 10-11-127(1), Heritage and controlling parent FNF breached their strict fiduciary duties on January 19, 2023, by releasing $726,731 in escrow trust funds without lawful authorization, ignoring express funding instructions from lender UWM, and disbursing without receiving any closing instructions whatsoever from seller Toll Southwest LL.. See ¶¶ 119, 588–607, Exhibit 45 Final Closing Disclosure.pdf and Exhibit 233 Commitment Letter.pdf, Exhibit 240 Heritage Demand Letter.pdf. Specifically, Heritage disbursed these trust funds *the very same day that Counterclaim Plaintiff signed closing documents* against the Title Commitment despite Requirement 9 remaining facially incomplete, unverified, and legally unsatisfied, a breach of UWM's instructions that stated they must disclose an error about "deed, note, security instrument and/or rider" "before proceeding" and "review the deed of record or the new deed being prepared with this mortgage/deed of trust for compliance with all applicable laws." See ¶¶ 577–587, 597-598, Exhibit 233 Commitment Letter.pdf. The Special Warranty Deed and Statement of Authority were erroneous and out of compliance for the reasons stated in

Count 5, *supra*. Additionally, UWM's binding instructions explicitly prohibited Heritage from closing the loan if the Title Commitment was dated more than thirty days prior to closing and required the commitment and policy to be issued on the current ALTA form or state-approved equivalent. However, Heritage hastily disbursed the purchase funds despite the facts that a) the October 27, 2022 Title Commitment was eighty-four (84) days old—nearly triple UWM's 30-day expiration threshold—mandating an immediate cessation of closing and b) the Title Commitment was prepared on a 2016 ALTA form that had been officially decertified by ALTA on December 31, 2022 (19 days before closing), and was no longer the current ALTA form in any case (having been superseded by the 2021 ALTA form). See ¶¶ 599-606, Exhibit 233 Commitment Letter.pdf, Exhibit 244 ALTA - Policy Forms and Related Documents.pdf.

Heritage and FNF further failed to obtain written closing instructions, a valid Title Clearance Letter, and/or recorded confirmation of authority of Reginald Carveth from Toll Southwest LLC before disbursing the escrow proceeds on January 19, 2023. See ¶¶ 403, 588–594. Rather than verifying compliance with C.R.S. § 38-30-172 on the public record—which would have revealed that the Title Commitment's cited 2019 Statement of Authority was signed by an ex-employee who had left the company for at least one year, Christopher Stull, and legally superseded by subsequent four Jefferson County recordings—Heritage improperly relied on unrecorded, private internal officer certificates to close the transaction off-record. Ibid.

As a direct and proximate result of Heritage and FNF's unauthorized and unlawful release of fiduciary funds, Counterclaim Plaintiff suffered substantial damages exceeding $726,731 and was subjected to civil theft and an unmarketable, clouded title delivered through an unauthorized conveyance.

Counterclaim Plaintiff respectfully requests a Declaratory Judgment against Heritage and FNF.: (a) declaring that Heritage and FNF violated C.R.S. § 10-11-127(1), 3 CCR 702-8-1-3 § 5(D)(1), and 3 CCR 702-8-1-2 § 5(K) by disbursing fiduciary trust funds before all necessary title conditions precedent were met; (b) declaring that the disbursement of $726,731 was unauthorized, unlawful, and an *ultra vires* act in breach of statutory fiduciary duties; (c) declaring FNF jointly liable as an affiliate and statutory fiduciary under C.R.S. § 10-11-127(1); and (d) awarding Counterclaim Plaintiff his costs and such other and further relief as the Court deems just and proper.

**Count 8: Statutory Liability for Recording Spurious Documents (C.R.S. § 38-35-109(3))**

*Against Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under C.R.S. § 38-35-109(3), Colorado law establishes statutory civil liability against any person who offers for recording, causes to be recorded, or places of record in the office of the county clerk and recorder any document purporting to create an interest in, or affect the title to, real property, knowing or having a reason to know that such document is forged, groundless, contains a material misstatement or false claim, or is otherwise invalid–in other words, "spurious." The statute explicitly mandates that any person who violates its provisions shall be liable to the owner of the real property for statutory damages, actual financial losses, costs, and reasonable attorney fees.

Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros., Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull directly breached C.R.S. § 38-35-109(3) by offering for recording and causing to be placed on record in the public land records facially defective, unauthorized, and groundless conveyancing instruments, including Statements of Authority and the Special Warranty Deed for 5131 Vivian St. These Counterclaim Defendants entered into a common, intentional, and unlawful combination and agreement to execute, deliver, and record these invalid instruments throughout the State of Colorado to systematically launder land documents through a captive title infrastructure, bypass statutory authority verification requirements mandated by C.R.S. Title 7, and obscure the true corporate entity structure and financial arrangements from property purchasers. See ¶¶ 142-143, 515–570, Exhibit 48 5131 Vivian St Special Warranty Deed.pdf, Exhibit 152 Statements of Authority.pdf.

At the time these instruments were offered for recording, Counterclaim Defendants knew or had reason to know that the Statements of Authority and resulting conveyances contained material misstatements regarding grantor authority and were groundless under C.R.S. Title 7, as no underlying Manager Resolution or written delegation had been executed by the actual Managers of Toll Southwest LLC. Moreover, the aforementioned refused to cure or release the said documents on request under C.R.S. § 38-35-109(3). See ¶¶ 571-572.

As a direct, proximate, and foreseeable result of this unlawful scheme, Counterclaim Plaintiff has suffered clouded title, statutory title defects, and economic damages in excess of **$726,731** due to stolen purchase funds, earnest money deposits, and loan proceeds, and is statutorily entitled to judgment against Counterclaim Defendants, jointly and severally, for statutory damages, actual damages, costs, and reasonable attorney fees. See ¶ 119, Exhibit 45 Final Closing Disclosure.pdf.

**Count 9: Civil Theft (C.R.S. §§ 18-4-405 and 13-21-125)**

*Against Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, Christopher Stull, Chicago Title Insurance Company, American Heritage Title Agency, Inc., and Fidelity National Financial, Inc.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under C.R.S. §§ 18-4-405 and 13-21-125, Colorado's Rights in Stolen Property statute establishes direct civil liability against any person who obtains, exercises control over, or deprives another of property "without authorization" or "through deception" and within "the mortgage lending process," as defined in C.R.S. § 18-4-401. The statute mandates that the rightful owner of property stolen, converted, or obtained may recover the property and treble damages (three times the amount of actual damages), together with costs and reasonable attorney fees, against any person who knowingly obtains or exercises control over the property without authorization or under deceptive pretenses.

Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros., Inc., Toll Southwest LLC, Chicago Title Insurance Company through its agent Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull, acting individually, collectively, and in unlawful cooperation and conspiracy with one another, knowingly obtained and exercised control over Counterclaim Plaintiff's purchase money and funds through deception, false pretenses, and the recording of spurious documents. These Counterclaim Defendants entered into a common, intentional, and

unlawful combination and agreement to execute, deliver, and record spurious conveyancing instruments throughout the State of Colorado to systematically launder land documents through a captive title agency, bypass statutory corporate authority delegation requirements mandated by C.R.S. Title 7, and obscure the true corporate entity structure and financial arrangements from Counterclaim Plaintiff in order to induce the release and transfer by Heritage of purchase funds of **$726,731**. See ¶¶ 119, 142-143, 515–570, Exhibit 48 5131 Vivian St Special Warranty Deed.pdf, Exhibit 152 Statements of Authority.pdf, Exhibit 45 Final Closing Disclosure.pdf.

Counterclaim Defendants Heritage and its controlling corporate parent FNF knowingly participated in, facilitated, and executed the unauthorized exercise of control and unlawful deprivation of Counterclaim Plaintiff's escrow funds in direct violation of C.R.S. § 18-4-401(1), C.R.S. § 10-11-127(1), and 3 CCR 702-8-1-3 § 5(D)(1). Heritage and FNF held Counterclaim Plaintiff's $726,731 strictly in a statutory fiduciary trust capacity and were legally prohibited from releasing those funds prior to the satisfaction of all requirements set out by lender UWM. See ¶¶ 119, 588–606, Exhibit 243 UWM Closing Instructions.pdf. Despite possessing actual and constructive knowledge (having facilitated sending it through a custom email for Toll Brothers, Inc., toll@heritagetco.com) that the Title Commitment and other ones for the same community were facially defective—terminating at a blank trailing colon in Requirement 9 and citing a legally obsolete and superseded 2019 Statement of Authority signed by a Toll Brothers, Inc. employee who left more than a year earlier—Heritage and FNF acted *ultra vires* and without written closing clearance by knowingly wiring and diverting Counterclaim Plaintiff's fiduciary funds to the builder defendants. See ¶¶ 577–587, 607. Rather than verifying compliance with C.R.S. § 38-30-172 on the public record—which would have revealed the Title Commitment's defects—Heritage improperly relied on unrecorded, private internal officer certificates to close

the transaction off-record. See ¶¶ 588–594, Exhibit 235 Heritage Toll Signing Authority.pdf. By executing this unauthorized release of trust monies pursuant to a shared, fast-tracked closing pipeline designed to harvest transactional fees while evading statutory examination and escrow mandates, Heritage committed statutory civil theft, and FNF is jointly and severally liable as an affiliate statutory fiduciary under C.R.S. § 10-11-127(1), as the controlling principal, and as an active co-conspirator under C.R.S. § 13-21-111.5(4).

The above listed Counterclaim Defendants' deceptive extraction and unauthorized exercise of control over Counterclaim Plaintiff's purchase funds and UWM loan proceeds occurred directly within the "mortgage lending process" as codified under C.R.S. § 18-4-401(9)(e)(I). By facilitating the use of the Title Commitment containing material omissions (Requirement 9 as recounted *supra*) and false and invalid Statements of Authority (citing an obsolete 2019 Statement of Authority executed by departed "officer" Christopher Stull), and by ignoring and/or concealing that the Title Commitment was eighty-four (84) days old and prepared on a decertified 2016 ALTA form in violation of mandatory UWM closing directives, Counterclaim Defendants committed theft by deception in the mortgage lending process under C.R.S. § 18-4-401(1)(a), (9)(c). Consequently, Counterclaim Plaintiff is entitled to the mandatory treble damages and statutory fee-shifting remedies codified in C.R.S. § 18-4-405

At all relevant times, these Counterclaim Defendants acted with the specific intent to permanently deprive Counterclaim Plaintiff of his money and purchase funds by presenting and recording Statements of Authority and Special Warranty Deed while knowing that no underlying C.R.S. Title 7 Manager Resolution or written delegation existed to authorize their conveyances or support the transaction for 5131 Vivian St and disbursing trust funds despite all lender instructions not being followed. As a direct, proximate, and foreseeable result of Counterclaim

Defendants' statutory civil theft under C.R.S. § 18-4-405, Counterclaim Plaintiff has suffered substantial financial losses in excess of **$726,731** and is statutorily entitled to judgment against Counterclaim Defendants, jointly and severally, for treble actual damages, costs, and reasonable attorney fees. See ¶ 119, Exhibit 45 Final Closing Disclosure.pdf.

**Count 10: Common Law Conversion**

*Against Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, Christopher Stull, Chicago Title Insurance Company, American Heritage Title Agency, Inc., and Fidelity National Financial, Inc.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under Colorado common law, conversion is defined as any distinct, unauthorized act of dominion or ownership exercised by one person or entity over personal property or specific, identifiable funds belonging to another, in denial of or inconsistent with the owner's rights therein. A cause of action for common law conversion arises when a party exercises wrongful dominion or control over specific, identifiable money without legal authority or under false pretenses, thereby depriving the rightful owner of immediate possession and use.

Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros., Inc., Toll Southwest LLC, Chicago Title Insurance Company through its agent Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull, acting individually, collectively, and pursuant to a common unlawful scheme and conspiracy, exercised distinct, unauthorized dominion and control over

Counterclaim Plaintiff's specific, identifiable purchase funds and wire proceeds in the amount of $726,731. Counterclaim Defendants committed overt, wrongful acts of dominion by manufacturing, executing, delivering, and recording facially defective and unauthorized conveyancing instruments throughout the State of Colorado to launder land documents through a captive title agency, bypass statutory corporate authority requirements mandated by C.R.S. Title 7 and C.R.S. § 38-30-172, and induce the unauthorized extraction and retention of Counterclaim Plaintiff's funds without delivering valid, unclouded legal title. See ¶¶ 142–143, 515–570, Exhibit 48 5131 Vivian St Special Warranty Deed.pdf, Exhibit 152 Statements of Authority.pdf.

Counterclaim Defendants Heritage and FNF directly committed, aided, abetted, and ratified this unlawful conversion by exercising distinct, unauthorized dominion over Counterclaim Plaintiff's specific, identifiable escrow funds held in trust. As statutory fiduciaries under C.R.S. § 10-11-127(1) and 3 CCR 702-8-1-4 § 5, Heritage and FNF had no legal right, authority, or discretion to exercise dominion over Counterclaim Plaintiff's $726,731 inconsistent with the terms of the closing escrow trust. By executing an *ultra vires* wire transfer and releasing these trust funds to the builder defendants without obtaining written closing authorization under 3 CCR 702-8-1-2 § 5(K) from the seller Toll Southwest LLC, without a valid Title Clearance Letter from Westminster, upon a facially defective Title Commitment that left Requirement 9 blank and wholly unverified, and without adhering to the instructions given by lender UWM, Heritage and FNF wrongfully diverted and converted Counterclaim Plaintiff's purchase proceeds in total derogation of his immediate possessory rights. See ¶¶ 119, 577–594. FNF is directly, vicariously, and jointly liable for this conversion through its statutory affiliate fiduciary status under C.R.S. § 10-11-127(1), its centralized corporate control over Heritage's settlement operations, and as a co-conspirator acting pursuant to a shared closing scheme under C.R.S. § 13-21-111.5(4).

At all relevant times, Counterclaim Plaintiff possessed the absolute, immediate, and unconditional right to his purchase funds and did not authorize the extraction, transfer, or retention of those funds pursuant to void, *ultra vires*, or defective conveyancing instruments. Each individual Counterclaim Defendant personally participated in, directed, authorized, or facilitated the conversion of Counterclaim Plaintiff's funds by executing unauthorized instruments, signing false Statements of Authority, or directing escrow and title operations to release and absorb the purchase money while knowing that no valid underlying corporate resolution or written delegation existed under Colorado law.

As a direct, proximate, and foreseeable result of Counterclaim Defendants' common law conversion, Counterclaim Plaintiff has suffered substantial direct and consequential damages in excess of **$726,731**. See ¶ 119, Exhibit 45 Final Closing Disclosure.pdf. Counterclaim Plaintiff is entitled to compensatory damages, pre- and post-judgment interest as provided by law, and judgment against Counterclaim Defendants, jointly and severally, under Colorado's Personal Participation Doctrine and civil conspiracy principles.

**Count 11: Underwriter Non-Delegable Supervision and Vicarious Liability (3 CCR 702-8-1-2 § 5(H), § 5(O)(3))**
*Against Chicago Title Insurance Company*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Under Colorado Division of Insurance Regulation 3 CCR 702-8-1-2 § 5(O)(3), every title insurance company bears an affirmative, non-delegable regulatory duty to exercise reasonable efforts to ensure that the acts of its authorized agents, including issuing title agencies and closing agents, comply with all statutes and regulations concerning the business of title insurance.

Furthermore, pursuant to 3 CCR 702-8-1-2 § 5(H), a title insurance company is expressly responsible to the proposed insured for all matters appearing on record prior to the time of recording whenever the title insurance company or its agent conducts settlement and closing services.

At all relevant times, Westminster acted as the authorized policy-issuing agent for underwriter Chicago Title in connection with Title Commitment No. 132-22000532-TBI, and Heritage acted as the closing and settlement agent. Under established Colorado common law agency principles and *respondeat superior*, the acts, omissions, statutory violations, and defective underwriting practices of Westminster and Heritage performed within the scope of their agency are directly imputed to Chicago Title as the disclosed underwriting principal.

Chicago Title breached its statutory and common-law supervisory obligations by failing to implement adequate underwriting controls and failing to review defective title commitments issued under its name. Specifically, Chicago Title allowed Westminster to issue a facially defective Commitment omitting authorized signatories on Requirement 9, relying on an obsolete and superseded 2019 Statement of Authority (Reception No. 2019051691) signed by an ex-employee, in direct contravention of C.R.S. § 10-11-106(1) and 3 CCR 702-8-1-2 § 5(A), permitting its FNF sister company Heritage to unlawfully disburse trust funds prior to the satisfaction of mandatory title conditions under 3 CCR 702-8-1-3 § 5(D)(1) and C.R.S. § 10-11-127. See ¶¶ 577-587.

As a direct and proximate result of Chicago Title's failure to supervise its authorized agents and its vicarious liability for their unlawful underwriting practices, Counterclaim Plaintiff sustained severe economic damages, including the unauthorized disbursement and loss of $726,731 in

purchase funds, earnest money deposits, and loan proceeds, as well as the delivery of clouded, unmarketable title.

~~**Count 5. Breach of Statutory Duty**~~
~~*Against the City of Wheat Ridge, Renee Meriaux, and Charles Abbot Associates, Inc.*~~

~~Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.~~

~~At all relevant times, Counterclaim Defendants City of Wheat Ridge, Gerald Dahl (in his official capacity as City Attorney), Renee Meriaux (in her official capacity as Chief Building Official), and Charles Abbott Associates, Inc. (the city's contracted plan review and inspection firm), owed clear statutory duties to the public under Colorado law and applicable building codes, including but not limited to:~~

- ~~Colorado Revised Statutes Title 24 (State and Local Government), including § 24-33.5 (concerning building safety),~~
- ~~The International Building Code (IBC) and International Residential Code (IRC), adopted by the City of Wheat Ridge (See ¶¶ 109-110.),~~
- ~~The City of Wheat Ridge Municipal Code~~

~~These statutory duties include:~~

- ~~Ensuring that permits are only issued to properly licensed and registered entities,~~
- ~~Validating the existence and legal status of applicants before approving construction agreements such as Subdivision Improvement Agreements (SIA),~~
- ~~Enforcing code compliance and plan consistency during inspections, and~~

- ~~Providing a pathway for post-construction redress and accountability when serious defects or permitting fraud are discovered.~~

~~The City of Wheat Ridge and its agents breached these statutory duties in multiple, material ways:~~

- ~~Permits were issued under the name “Toll Brothers”, a non-existent entity in the State of Colorado. This violated basic licensing requirements and created confusion over who bore legal responsibility for construction quality and code compliance. (See ¶¶ 275-285.)~~
- ~~The Subdivision Improvement Agreement (SIA) for the subject development was executed with “Toll Southwest LLC”, which was incorrectly represented as a Colorado LLC. In reality, Toll Southwest LLC is a foreign entity, organized in Delaware. Despite this, the City accepted the representation and approved the SIA without further inquiry, thereby facilitating a shell structure that denied Plaintiff and other residents clarity or legal recourse. (See ¶¶ 215-227.)~~
- ~~During the course of construction, major deviations from approved plans — including missing structural wall elements — were either missed or ignored by building officials and inspectors acting under the City’s authority. At no point were revised plans submitted, nor was any structural engineer signoff documented in accordance with Colorado building code and engineering statutes. (See ¶¶ 65-73, 86, 94-118.)~~
- ~~No plan corrections were issued, and the engineered structural drawings on file were never revised despite material changes to the field conditions. This is a clear violation of the International Residential Code (IRC) § R106.4, which requires updated documentation for changes to approved plans. (See ¶¶ 68, 86)~~

Following the discovery of major structural and permitting irregularities, Counterclaim Plaintiff submitted multiple formal inquiries and requests for redress. Each request was denied, ignored, or stonewalled, most notably by:

- Gerald Dahl, who obstructed access to redress by improperly shielding City officials from questions (See ¶¶ 204-210, 215-227, 234-237, 240-244.),
- Renee Meriaux, who refused to acknowledge any permitting or inspection error despite mounting evidence and indeed tried to cover up any irregularities (See ¶¶ 207, 211, 234-237.), and
- The City's contracted inspection agency, Charles Abbott Associates, Inc., which failed to enforce or document corrective action. (See ¶¶ 65-73, 94-118, 234-237.)

These cumulative actions represent a pattern of statutory breach, undertaken with willful disregard for Counterclaim Plaintiff's safety, property rights, and due process, and have deprived Counterclaim Plaintiff of meaningful access to regulatory relief.

As a direct and proximate result of these breaches, Counterclaim Plaintiff suffered tangible harm, including but not limited to:

- Occupancy of a home constructed with undisclosed structural deficiencies (See ¶¶ 99-110, 169-174),
- Loss of transparency and recourse due to fraudulent or improper entity designations (See ¶¶ 278-285.), and
- Emotional and financial distress associated with governmental failure to discharge its most basic regulatory functions.

Counterclaim Defendants' actions and omissions were not merely negligent but reckless and in bad faith, rising to a level of "willful and wanton" conduct under Colorado law and exempting them from the protections typically offered under the Colorado Governmental Immunity Act (CGIA), C.R.S. § 24-10-106(1)(e).

On July 21, 2025, Counterclaim Plaintiff timely submitted a Notice of Claim pursuant to C.R.S. § 24-10-109, properly identifying the City of Wheat Ridge and its agents as respondents and detailing the statutory violations, oversight failures, and municipal misconduct (See Exhibit 200 Wheat Ridge CGIA Notice of Claim.pdf). However, because the six-month statutory waiting period has not yet expired, Counterclaim Plaintiff respectfully requests that the Court stay or withhold judgment on any remedies governed by CGIA until the expiration of that period, at which point such claims may be amended or supplemented as necessary. Mr. Dahl notes receipt of the CGIA Notice of Claim in this letter. (See Exhibit 82 Wheat Ridge Cease Letter.pdf)

As a result, Counterclaim Plaintiff has suffered damages and is entitled to relief as set forth below.

**Count 6. Abuse of Process**

*Against Toll Brothers, Inc., Toll Southwest LLC, TB Proprietary Corp., The New Home Company, Inc., and Bert L. Howe & Associates, Inc.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

Counterclaim Defendants misused legal process—including cease-and-desist threats, coordinated vendor communications, and the instant litigation—not to resolve genuine claims, but to intimidate Counterclaim Plaintiff and suppress legitimate consumer complaints. (See ¶¶ 203, 344, 361-362, 365, 374, 377, 514.)

~~Toll Brothers, Inc. initiated and directed a campaign of threats against Counterclaim Plaintiff after he raised concerns about entity irregularities and construction defects. (See ¶¶ 169-173, 203.) Toll Southwest LLC, a subsidiary with no independent employees, was used as the nominal "seller" of the property and then invoked as Defendant despite lacking capacity to enforce the asserted marks. TB Proprietary Corp. was added as a plaintiff not to vindicate bona fide trademark rights, but to multiply pressure and intimidate Counterclaim Plaintiff into silence.~~

~~The New Home Company, Inc., itself a national builder, coordinated with Toll Brothers in this retaliatory campaign, sharing strategy and supporting cease-and-desist threats despite having no legitimate interest in the subject property or trademarks. Its vendor, Bert L. Howe & Associates, Inc., further lent its reports and correspondence to the effort, repurposing its role as an inspector into a tool of intimidation rather than neutral evaluation. (See ¶¶ 351-378, 514)~~

~~Together, these Counterclaim Defendants sought to leverage the machinery of litigation to chill Counterclaim Plaintiff's exercise of his First Amendment right to petition regulatory authorities and speak publicly about construction and permitting defects. Their misuse of legal process diverted the judicial forum away from legitimate dispute resolution and into a vehicle for harassment and retaliation.~~

~~As a result, Counterclaim Plaintiff has suffered damages and is entitled to relief as set forth below.~~

~~**Count 7. Negligence**~~
~~*Against the City of Wheat Ridge, Renee Meriaux, and Charles Abbot Associates, Inc.*~~

~~Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.~~

~~Counterclaim Defendants City of Wheat Ridge, Chief Building Official Renee Meriaux, and CAA each owed Counterclaim Plaintiff a duty of care in connection with the permitting, inspection, and approval of his residence. The City of Wheat Ridge, acting through Meriaux in her official capacity, was responsible for ensuring that permits, inspections, and Certificates of Occupancy complied with applicable building codes and Colorado statutes. CAA owed the same professional duty to exercise reasonable care, skill, and diligence in performing permitting duties, code inspections, and reporting deficiencies.~~

~~Each Counterclaim Defendant breached their duty of care by approving construction that contained framing violations, by issuing a Certificate of Occupancy under false pretenses, and by disregarding or failing to disclose material irregularities in contractor licensing, entity identification, and inspection documentation. Counterclaim Defendants further breached their duty by relying on incomplete or misleading certificates of insurance and corporate representations without conducting reasonable diligence, thereby enabling unlicensed or unauthorized entities to participate in the construction and sale of the home. (See ¶¶ 65-73, 94-118, 216-218, 278-285.)~~

~~These actions went beyond simple negligence. Counterclaim Defendants acted with gross negligence and reckless disregard for the health, safety, and property rights of Counterclaim Plaintiff. By ignoring glaring defects and relying on incomplete or misleading documents, they created an unreasonable and substantial risk of harm that they either knew about or should have known about. (See ¶¶ 65-73, 94-118, 169-173.)~~

~~On July 21, 2025, Counterclaim Plaintiff timely submitted a Notice of Claim pursuant to C.R.S. § 24-10-109, properly identifying the City of Wheat Ridge and its agents as respondents and~~

~~detailing the statutory violations, oversight failures, and municipal misconduct (See [Exhibit 200 Wheat Ridge CGIA Notice of Claim.pdf]). However, because the six-month statutory waiting period has not yet expired, Counterclaim Plaintiff respectfully requests that the Court stay or withhold judgment on any remedies governed by CGIA until the expiration of that period, at which point such claims may be amended or supplemented as necessary.~~

~~As a result, Counterclaim Plaintiff has suffered damages and is entitled to relief as set forth below.~~

~~**Count 8: Violation of First Amendment Rights (42 U.S.C. § 1983)**~~

~~*Against the City of Wheat Ridge, Gerald Dahl, Renee Meriaux, and Charles Abbot Associates, Inc.*~~

~~Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.~~

~~The First Amendment to the United States Constitution guarantees the right to free speech, to petition the government for redress of grievances, and to access public information necessary to exercise those rights. Counterclaim Plaintiff exercised these rights by submitting regulatory complaints, requesting building and permitting records, and raising concerns regarding construction defects and entity irregularities associated with the sale and permitting of his home. (See ¶¶ 176, 204, 212, 242, 278)~~

~~Counterclaim Defendants City of Wheat Ridge, City Attorney Gerald Dahl, and Chief Building Official Renee Meriaux responded not with transparency or neutral enforcement of law, but by obstructing and suppressing Counterclaim Plaintiff's speech and petitions. Specifically, Mr. Dahl~~

and Ms. Meriaux, acting under color of state law, refused to provide clear answers, misrepresented the City's permitting and inspection practices, and sought to chill further inquiry by characterizing Counterclaim Plaintiff's regulatory complaints as improper or harassing. (See ¶¶ 207, 223, 228-244.)

Counterclaim Defendant Charles Abbott Associates, Inc. is a private corporation acting under color of state law by virtue of its exclusive contractual delegation to perform building department services on behalf of the City of Wheat Ridge. CAA was instrumental in approving permits, inspections, and structural approvals that ultimately deprived Plaintiff of constitutionally protected rights under the First Amendment. CAA's coordinated efforts with municipal actors to obscure permitting fraud and deny redress constitute joint action under 42 U.S.C. §1983. (See ¶¶ 66, 234-237.)

Their actions were intended to deter Counterclaim Plaintiff from exercising his right to petition and to conceal municipal errors in granting a Certificate of Occupancy under false pretenses. As a direct and proximate result, Counterclaim Plaintiff suffered injury, including denial of access to truthful public information, chilling of speech, and ongoing financial and legal harm tied to defective construction approved by the City. (See ¶¶ 169, 203, 237, 240, 514.)

Counterclaim Plaintiff seeks judgment against the City of Wheat Ridge, Gerald Dahl, and Renee Meriaux under 42 U.S.C. § 1983 for violation of his First Amendment rights, and requests compensatory damages, punitive damages against the individual defendants, declaratory relief, and attorneys' fees under 42 U.S.C. § 1988.

**Count 9: Violation of Fourteenth Amendment Rights – Due Process and Equal Protection (42 U.S.C. § 1983)**

*Against the City of Wheat Ridge, Gerald Dahl, Renee Meriaux, and Charles Abbot Associates, Inc.*

Counterclaim Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

The Fourteenth Amendment to the United States Constitution prohibits states and their subdivisions from depriving any person of liberty or property without due process of law and from denying equal protection of the laws. Counterclaim Plaintiff has a protected property interest in his home and in the regulatory processes governing construction, permitting, and occupancy.

Counterclaim Defendants Mr. Dahl and Ms. Meriaux, acting under color of state law and in their official capacities with the City of Wheat Ridge, deprived Counterclaim Plaintiff of due process by:

1. Approving permits and Certificates of Occupancy without ensuring statutory compliance (See ¶¶ 64-70, 94-118, 123-130, 278-285.);
2. Refusing to provide meaningful explanations or corrective action once irregularities were identified (See ¶¶ 204-244.);
3. Interposing arbitrary and misleading statements designed to foreclose Plaintiff's ability to challenge the City's errors. (See ¶¶ 211-212.)

Counterclaim Defendants further violated Counterclaim Plaintiff's right to equal protection by selectively treating him differently from other homeowners and citizens who seek to raise

legitimate safety and licensing concerns, singling him out for obstruction and deflection rather than fair treatment. (See ¶¶ 232, 238, 240.)

These actions were not the product of mere negligence but deliberate indifference, motivated by a desire to shield the City and its private collaborators from liability. As a direct and proximate result, Counterclaim Plaintiff has been deprived of property protections guaranteed by law, exposed to unsafe living conditions, and subjected to economic and reputational harm.

Counterclaim Defendant Charles Abbott Associates, Inc. is a private corporation acting under color of state law by virtue of its exclusive contractual delegation to perform building department services on behalf of the City of Wheat Ridge. CAA was instrumental in approving permits, inspections, and structural approvals that ultimately deprived Plaintiff of constitutionally protected rights under the Fourteenth Amendment, including the right to due process and equal protection. CAA's coordinated efforts with municipal actors to obscure permitting fraud and deny redress constitute joint action under 42 U.S.C. §1983. (See ¶¶ 66, 234-237.)

Counterclaim Plaintiff seeks judgment against the City of Wheat Ridge, Gerald Dahl, and Renee Meriaux under 42 U.S.C. § 1983 for violation of his Fourteenth Amendment rights, and requests compensatory damages, punitive damages against the individual defendants, declaratory relief, and attorneys' fees under 42 U.S.C. § 1988.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Counterclaim Plaintiff respectfully requests that this Court enter judgment in his favor and against all Counterclaim Defendants, and grant the following relief:

### 1. Declaratory Relief

For a declaratory judgment pursuant to 28 U.S.C. § 2201 and C.R.S. § 13-51-101 et seq., determining at the earliest practicable stage of these proceedings the legal status and effect of Counterclaim Defendants' transactional documents under two distinct Colorado statutory frameworks.

First, Counterclaim Plaintiff requests a judicial declaration that the execution, recording, and conveyance of the Special Warranty Deed for 5131 Vivian, alongside the invalid Statements of Authority executed and recorded by the numerous unauthorized individuals named above acting on behalf of an entity with no active employees, violated C.R.S. § 38-30-172 and were spurious documents according to the definition under C.R.S § 38-35-201, rendering such recorded instruments spurious, defective, and void *ab initio* as a matter of law.

Second, Counterclaim Plaintiff requests a judicial declaration that Counterclaim Defendants are precluded from asserting the statutory real estate licensing exemption under C.R.S. § 12-10-201(6)(b) and CP-1. Specifically, the Court should declare that the CP-1 framework contemplates the active involvement of a licensed real estate broker to provide statutory oversight, and that Counterclaim Defendants' deliberate bypass of this independent gatekeeping function directly facilitated the execution of spurious, unscrutinized transactional documents.

Third, Counterclaim Plaintiff respectfully requests a Declaratory Judgment against Westminster Abstract Company and Chicago Title Insurance Company: (a) declaring that both entities

violated C.R.S. § 10-11-106(1) and 3 CCR 702-8-1-2 § 5(A) by failing to conduct a reasonable examination of title under sound underwriting principles; (b) declaring that Requirement 9 was facially defective and legally unsatisfied at closing; (c) declaring that the recorded deed failed to convey marketable title and constitutes an unlawful cloud on title; (d) declaring Chicago Title vicariously and directly liable under 3 CCR 702-8-1-2 § 5(H) & (O)(3) for all damages resulting from the defective commitment; and (e) awarding Counterclaim Plaintiff his costs and all other just relief.

Fourth, Counterclaim Plaintiff respectfully requests a Declaratory Judgment against American Heritage Title Agency, Inc. and Fidelity National Financial, Inc.: (a) declaring that Heritage and FNF violated C.R.S. § 10-11-127(1), 3 CCR 702-8-1-3 § 5(D)(1), and 3 CCR 702-8-1-2 § 5(K) by disbursing fiduciary trust funds before all necessary title conditions precedent were met; (b) declaring that the disbursement of $726,731 was unauthorized, unlawful, and an *ultra vires* act in breach of statutory fiduciary duties; (c) declaring FNF jointly liable as an affiliate and statutory fiduciary under C.R.S. § 10-11-127(1); and (d) awarding Counterclaim Plaintiff his costs and such other and further relief as the Court deems just and proper.

Because the legal validity of the recorded conveyances under C.R.S. §§ 38-30-172 and 38-35-109(3) and the availability of the statutory licensing exemption under C.R.S. § 12-10-201(6)(b) present threshold questions of law that directly govern the liability of the parties, an early declaratory ruling under 28 U.S.C. § 2201 will clarify the legal rights and relationships at issue, eliminate burdensome and unnecessary discovery, and promote judicial economy.

~~That the Court, at the earliest practicable stage of these proceedings, enter a declaratory judgment under 28 U.S.C. § 2201 and C.R.S. § 13-51-101 et seq. clarifying whether the~~

CP-1/C.R.S. § 12-10-201(6)(b) (2023) exemption under Colorado real estate licensing law applies to the transaction at issue. This determination is a threshold matter with direct consequences for the validity of Plaintiffs' claims and Defendant's counterclaims. Early resolution will narrow the scope of dispute, prevent unnecessary discovery disputes, and promote judicial economy.

**2. Injunctive Relief**

Issue appropriate injunctive orders restraining Counterclaim Defendants from further retaliation, unlawful restriction of speech or petitioning, or interference with Counterclaim Plaintiff's statutory and constitutional rights.

Counterclaim Plaintiff seeks an injunction or order directing the prompt recording of a corrective release or decree under C.R.S. §§ 38-30-172 and 38-35-109(3).

**3. Rescission or, in the Alternative, Compensatory Damages**

Rescission of the purchase agreement for the townhome, restoring Counterclaim Plaintiff to his pre-contract position, or, in the alternative, compensatory damages **in the amount of $380,792.37**inclusive of calculated interest of 8% per year **$418,133.16** plus statutory interest of **$78,090.80**, calculated at 8% per year. (See Exhibit 201 Toll Brothers Damages - Total Damages.pdf) See Exhibit 225 Total Damages.pdf.

In addition, as to Count 9 (Common Law Conversion) and the tortious extraction of purchase proceeds, compensatory damages for the unauthorized exercise of dominion and control over Counterclaim Plaintiff's specific, identifiable purchase funds and closing proceeds in the amount of **$726,731**, plus statutory pre- and post-judgment interest, entered jointly and severally against

all Counterclaim Defendants under Colorado's Personal Participation Doctrine and civil conspiracy principles.

**4. Mitigation Expenses**

Compensation for mitigation measures undertaken to address tenant harms arising from the defective Certificate of Occupancy and construction deficiencies, **in the amount of ~~$51,980.98~~ $61,992.99**. ~~(See Exhibit 201 Toll Brothers Damages - Total Damages.pdf)~~ See Exhibit 225 Total Damages.pdf.

Order that the sum of ~~**$51,980.98**~~ **$61,992.99**, representing mitigation damages for half of tenant rent paid under a defective Certificate of Occupancy, be placed into escrow under the supervision of the Court, to be held for the benefit of impacted tenants and disbursed upon further order of the Court.

**5. Statutory Damages**

The following itemized schedule sets forth the specific out-of-pocket transaction payments and settlement expenditures that comprise Counterclaim Plaintiff's actual pecuniary damages under the following statutes. Each payment, entrustment, and release was directly induced by Counterclaim Defendants' invalid conveyances and false representations of authority, establishing the concrete financial loss and statutory baseline for pre- and post-judgment interest calculations:

| **Name** | **Date Paid** | **Amount** | **Exhibit** |
| --- | --- | --- | --- |
| Property Sale Price | | $726,731.00 | Exhibit 45 |

| | | | |
|---|---|---|---|
| Earnest Money Initial Payment | 2/12/2022 | $33,475.00 | Exhibit 17 |
| Design Upgrade Payment | 4/18/2022 | $14,913.00 | Exhibit 224 |
| Paid at closing | 1/19/2023 | $24,285.00 | Exhibit 45 |
| Total Closing Costs | 1/19/2023 | $11,144.45 | Exhibit 45 |
| Loan Proceeds | 1/19/2023 | $654,058.00 | Exhibit 45 |

**C.R.S. § 38-35-109(3)**

As a direct and proximate result of the recordation of false, invalid, and unauthorized title instruments, Counterclaim Plaintiff sustained actual out-of-pocket pecuniary damages in the total amount of $737,875.45. These damages comprise the $726,731.00 purchase price—including $48,388.00 paid in earnest money and design upgrades paid prior to closing, $24,285.00 paid in entrustment at closing toward the down payment, and $654,058.00 in loan proceeds—along with $11,144.45 in closing costs paid as a necessary consequence of the transaction. These losses directly flow from the recorded instruments, which falsely represented that Reginald Carveth on behalf of Toll Southwest LLC possessed valid conveyancing authority and clear title, directly

inducing Heritage to complete the transaction and causing Counterclaim Plaintiff incur these substantial financial liabilities.

Pursuant to Colo. Rev. Stat. § 38-35-109(3), Counterclaim Plaintiff demands judgment against Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, and Christopher Stull for actual damages in the amount of $737,875.45 or, in the alternative, statutory damages of $1,000.00 for each qualifying invalid instrument, whichever is greater, together with reasonable attorney fees and costs of suit. Counterclaim Plaintiff further demands all additional relief authorized by law, including declaratory, corrective, rescissionary, and injunctive relief, without duplicative recovery of the same underlying loss. All claimed damages and expenditures are subject to pre- and post-judgment interest at the maximum statutory rate calculated from the specific transaction dates set forth herein.

**C.R.S. § 18-4-405**

As a direct and proximate result of Counterclaim Defendants' unauthorized conveyances, false-authority scheme, and statutory civil theft under Colo. Rev. Stat. § 18-4-405, Counterclaim Plaintiff sustained total actual out-of-pocket pecuniary losses in the amount of $737,875.45. These actual damages consist of $726,731.00 in total purchase funds obtained through the unauthorized transaction—comprising $48,388.00 paid in earnest money prior to closing, $24,285.00 paid in entrustment at closing toward the down payment, and $654,058.00 in loan proceeds transferred to fund the purchase—along with $11,144.45 in closing costs paid as an immediate and necessary consequence of the transaction.

The false authority representations directly induced Heritage to transfer these funds and cause Counterclaim Plaintiff incur liability in a real estate transaction that Counterclaim Defendants were not authorized to execute under C.R.S. Title 7. The purchase price funds and loan proceeds constitute property unlawfully obtained by deception and/or lack of authorization, while the settlement costs represent consequential economic harm directly flowing from that same statutory violation. Counterclaim Plaintiff seeks these amounts as actual pecuniary damages, together with any additional consequential damages proven at trial.

Pursuant to C.R.S. § 18-4-405, Counterclaim Plaintiff demands judgment against Counterclaim Defendants Toll Brothers, Inc., Toll Holdings, Inc., Toll Bros, Inc., Toll Southwest LLC, Westminster Abstract Company, Kenneth Greenspan, Mark Bailey, Reginald Carveth, Matt Foran, David Keller, Eric Hunter, Christopher Stull, Chicago Title Insurance Company, American Heritage Title Agency, Inc., and Fidelity National Financial, Inc. for the return of $737,875.45 and statutory treble damages equal to three times that amount in the sum of $2,213,626.35, or whatever remedy the Court determines applicable, plus costs of suit, and reasonable attorney fees. Counterclaim Plaintiff further demands pre- and post-judgment interest at the maximum statutory rate and all other relief authorized by law. These damages are pleaded without waiver of, and in addition to, any non-duplicative relief available under Counterclaim Plaintiff's fraudulent inducement, statutory, declaratory, rescission, and property-cloud claims.

**C.R.S. § 6-1-113**

For statutory, actual, and mandatory treble damages pursuant to the Colorado Consumer Protection Act, C.R.S. § 6-1-113. Counterclaim Plaintiff is entitled to statutory damages of not less than $500 per violation or actual damages, whichever is greater, for each distinct deceptive

trade practice committed under C.R.S. § 6-1-105(1). Counterclaim Defendants engaged in repeated, systemic misrepresentations by creating, executing, and recording spurious, unauthorized, and fabricated corporate documents—including defective deeds, fraudulent officer attestations, and false regulatory disclosures—to obscure the true identity of the selling principal and licensed contractor.

Because Counterclaim Defendants executed this scheme intentionally and in bad faith, utilizing spurious documentation and shell entity structures to mislead homebuyers and evade direct corporate accountability, Counterclaim Plaintiff is entitled to an award of statutory treble damages pursuant to C.R.S. § 6-1-113(2)(a)(III). Counterclaim Plaintiff further requests an award of mandatory reasonable attorney fees, court costs, and expenses pursuant to C.R.S. § 6-1-113(2)(b), along with pre-judgment and post-judgment interest as allowed by law.

**C.R.S. § 12-10-202**

For full equitable rescission and complete restitution pursuant to C.R.S. § 12-10-202. Under Colorado law, it is unlawful for any person, firm, partnership, limited liability company, association, or corporation to engage in the business or capacity of a real estate broker without first obtaining an active license from the Colorado Real Estate Commission. Counterclaim Defendants violated this statutory command by conducting real estate brokerage, sales negotiations, and transactional contracting through unlicensed shell entities, spurious corporate documentation, and unauthorized signatories lacking legal authority.

Because the underlying transaction was executed through unlawful real estate brokerage activities and deceptive corporate structures, the Purchase Agreement is voidable and subject to full equitable rescission. Counterclaim Plaintiff requests an order of rescission requiring

Counterclaim Defendants to restore the full purchase price paid for the real property in the sum of $418,133.16 plus statutory interest of $78,090.80, calculated at 8% per year **t**o restore the parties to their pre-contractual status. See Exhibit 225 Total Damages.pdf.

Counterclaim Plaintiff further requests restitution in the amount of **$61,992.99**, representing one-half of the tenant rents wrongfully collected under a defective Certificate of Occupancy, which was directly facilitated by Counterclaim Defendants' unlawful licensing, construction oversight, and governance practices as set forth in Exhibit 201. Counterclaim Plaintiff also requests pre-judgment and post-judgment interest at the statutory rate, costs of suit, and such other and further legal or equitable relief as this Court deems just and proper. See Exhibit 225 Total Damages.pdf.

~~Counterclaim Plaintiff further seeks statutory damages under Colorado law. Pursuant to the Colorado Consumer Protection Act, C.R.S. § 6-1-113 (2024), each deceptive trade practice committed by Counterclaim Defendants gives rise to statutory damages of not less than $500 per violation, or treble damages "if it is established by clear and convincing evidence that such person engaged in bad faith conduct." Counterclaim Defendants and their co-conspirators engaged in repeated misrepresentations regarding the identity of the selling principal, the validity of entity registrations, and the use of shell entities in consumer transactions. These practices were deliberate, systemic, and calculated for many decades to induce reliance by homebuyers, including Counterclaim Plaintiff.~~

~~In addition, under C.R.S. § 12-10-202 (2023), "It is unlawful for any person, firm, partnership, limited liability company, association, or corporation to engage in the business or capacity of real estate broker in this state without first having obtained a license from the commission." Counterclaim Plaintiff therefore requests rescission of the purchase contract in the amount of~~

**$380,792.37**, restitution of half of tenant rents wrongfully collected under a defective Certificate of Occupancy in the amount of **$51,980.98**, and such further remedies as this Court deems just and proper. (See Exhibit 201 Toll Brothers Damages - Total Damages.pdf)

**6. Punitive Damages**

Counterclaim Plaintiff further requests an award of punitive damages pursuant to Colorado law and 42 U.S.C. § 1983. Under C.R.S. § 13-21-102, punitive (exemplary) damages in the amount of $1,254,399.47 are warranted when a defendant's conduct is willful, wanton, or carried out in reckless disregard of the rights of others. See Exhibit 225 Total Damages.pdf. Likewise, punitive damages under § 1983 are available against individual officials where their actions were motivated by evil motive, intent, or deliberate indifference to constitutional rights.

The evidence demonstrates that Counterclaim Defendants did not merely make isolated errors; they engaged in a deliberate scheme of entity manipulation, misrepresentation, and concealment designed to obscure the true selling principal, evade licensing requirements, and suppress consumer complaints in order to steal purchaser funds. Municipal actors further reinforced these practices through stonewalling, selective enforcement, and concealment of public records, amounting to willful disregard for constitutional protections of due process and equal protection.

Such conduct was not accidental—it was systematic, repeated across multiple transactions, and supported by coordinated actions among national corporations, municipal actors, and professional vendors. These coordinated acts were aimed not only at Counterclaim Plaintiff but also at silencing and intimidating other consumers who might question Plaintiffs' practices.

The degree of planning and concealment warrants an award of punitive damages sufficient to deter similar misconduct in the future and to punish Counterclaim Defendants for their willful

violations of law and public trust. Counterclaim Plaintiff therefore seeks punitive damages in an amount to be determined at trial, consistent with statutory and constitutional standards, and proportionate to the gravity of Counterclaim Defendants' conduct.

**7. Attorneys' Fees and Costs**

Award reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988, C.R.S. § 13-17-102, C.R.S. § 18-4-405, and C.R.S. § 38-35-109(3), including expert witness fees, deposition costs, and related expenses.

**8. Additional Legal or Equitable Relief**

Grant such other and further relief—legal or equitable—as the Court deems just and proper, including declaratory relief and any additional orders necessary to prevent ongoing or future violations of Counterclaim Plaintiff's rights.

**VII. DEMAND FOR JURY TRIAL**

Counterclaim Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

_________________ August XX, 2026

Jeffrey Gu, Defendant and Counterclaim Plaintiff, Pro Se

**Notice of Electronic Filing**

Pursuant to Fed. R. Civ. P. 5(d) and D.C.COLO.LCivR 5.1, the Answer and Counterclaim in *Toll Brothers, Inc. et al v. Gu et al* was filed electronically on the Court's CM/ECF system ~~on August 18, 2026~~. All referenced exhibits (Exhibits 1–~~201~~230) are maintained on the electronic

docket and are accessible to all parties of record. A complete copy of the filing, including exhibits, may be obtained through the Clerk's Office or by accessing the docket via PACER.

Exhibit 1 Gmail - Toll Brothers Inc Thank you for your interest in The Ridge at Ward Station.pdf

Exhibit 2 Colorado Ops.pdf

Exhibit 3 Consumer Journey.pdf

Exhibit 4 tollbrothers.com whois.pdf

Exhibit 5 DE SOS Toll Brothers, Inc..pdf

Exhibit 6 Gmail - Toll Brothers Inc Best and Finals offers now open for Building 15.pdf

Exhibit 7 Colorado Toll Brothers License.pdf

Exhibit 8 Gmail - License Expiration Date Toll Brothers.pdf

Exhibit 9 Public License Lookup - DRE CA.pdf

Exhibit 10 Gmail - Toll Brothers Inc Received Your Offers.pdf

Exhibit 11 Agreement of Sale.pdf

Exhibit 12 DE SOS Toll Southwest.pdf

Exhibit 13 CO Toll Southwest LLC.pdf

Exhibit 14 5131 Walls In Question.png

Exhibit 15 Acknowledgment by Architect of Bedroom Walls.pdf

Exhibit 16 DJT Design Admitting Contract was with Toll Brothers Inc.pdf

Exhibit 17 Gmail - Toll Bros Receipt.pdf

Exhibit 18 Toll Integrated Systems, Inc.png

Exhibit 19 Gmail - Building #15 framing update 1.pdf

Exhibit 20 Toll Brothers Fortune 2022 Press Release.pdf

Exhibit 21 5-22-22 2nd floor.png

Exhibit 22 6-7-22 Roof.png

Exhibit 23 5131 Vivian Permit.pdf

Exhibit 24 Rough Frame Inspection 7-15-22.pdf

Exhibit 25 LinkedIn Andrew Haessler.pdf

Exhibit 26 Wheat Ridge CAA Contracts.pdf

Exhibit 27 Gmail - Change orders for 5131 Vivian St.pdf

Exhibit 28 8-7-22.png

Exhibit 29 Gmail - Pre-drywall walk.pdf

Exhibit 30 Busnardo Inspection.pdf

Exhibit 31 Gmail - Pre-drywall items mention of missing wall Megan.pdf

Exhibit 32 Electrical Inspection 1 9-21-22.pdf

Exhibit 33 Electrical Inspection 1 9-21-22 Note.pdf

Exhibit 34 9-24-22 No Wall Present.png

Exhibit 35 Electrical Inspection 2 9-26-22.pdf

Exhibit 36 Rough Frame Inspection 9-27-22.pdf

Exhibit 37 10-1-22 Wall Present.png

Exhibit 38 10-8-22 Wall Present 2.png

Exhibit 39 10-8-22 Wall Present 3.png

Exhibit 40 IRC 2018 R6026 Drilling and notching of studs.png.png

Exhibit 41 IRC 2021 R6026 Drilling and notching of studs diagram.png

Exhibit 42 5131 Vivian COO.pdf

Exhibit 43 Drywall Fastening Inspection 10-25-22.png

Exhibit 44 11-25-22 Stud Jutting Drywall.png

Exhibit 45 Final Closing Disclosure.pdf

Exhibit 46 Colorado CP-1 2022.pdf

Exhibit 47 Gmail -Colorado DRE CP-1 Comment.pdf

Exhibit 48 5131 Vivian St Special Warranty Deed.pdf

Exhibit 49 AZ Toll Southwest LLC 2023.pdf

Exhibit 50 AZ Toll Southwest 2017.pdf

Exhibit 51 Gmail - Helpful information about caring for your new home.pdf

Exhibit 52 Gmail - How was your Toll Brothers Home Building Experience?.pdf

Exhibit 53 tollbrothersinc.com whois.pdf

Exhibit 54 Gmail - Garage door wont properly close.pdf

Exhibit 55 Gmail - Large amount of LVP bubbling.pdf

Exhibit 56 Gmail - Re Large amount of LVP bubbling.pdf

Exhibit 57 Gmail - Re Large cracks in slab.pdf

Exhibit 58 Gmail - Garage door closes inconsistently.pdf

Exhibit 59 Toll Brothers CDARA Structure Letter.pdf

Exhibit 60 Toll Brothers CDARA Window Letter.pdf

Exhibit 61 2nd floor ceiling crack.jpeg

Exhibit 62 3rd floor carpet tenting.jpg

Exhibit 63 Renter noting larger crack.jpeg

Exhibit 64 Pennsylvania AG Confirmation Receipt.pdf

Exhibit 65 Gmail - Felten Group emails.pdf

Exhibit 66 Chris Ferguson not admitting employment.pdf

Exhibit 67 Toll Brothers Matt Care PA AG Response 1.pdf

Exhibit 68 Email Chain with Brian Murray 1.pdf

Exhibit 69 TB Formal CDARA Letter.pdf

Exhibit 70 Care, Matthew Charles.pdf

Exhibit 71 Toll CDARA Response.pdf

Exhibit 72 Gmail - Re_ Toll CDARA Response.pdf

Exhibit 73 Cease and Desist.pdf

Exhibit 74 Gmail - Toll Brother Inc Contractor Info.pdf

Exhibit 75 Wheat Ridge License.pdf

Exhibit 76 Gmail - Building plan CORA request.pdf

Exhibit 77 Gmail - Toll Brothers CORA Clarification.pdf

Exhibit 78 Gmail - Dahl Followup.pdf

Exhibit 79 Gmail - Toll Brothers in Colorado.pdf

Exhibit 80 CAA Snodgrass Email.pdf

Exhibit 81 Neighbor being treated normally Sept 10 2025.png

Exhibit 82 Wheat Ridge Cease Letter.pdf

Exhibit 83 Gmail - CORA Request for Directive.pdf

Exhibit 84 Gmail - CORA Request for Privilege Logs.pdf

Exhibit 85 Toll Brothers About.png

Exhibit 86 DE SOS TB Proprietary Corp.pdf

Exhibit 87 Corporate Hierarchy.pdf

Exhibit 88 Toll Brothers Registrations.xlsx

Exhibit 89 Toll Brothers Trademark.pdf

Exhibit 90 Americans Luxury Homebuilder Trademark.pdf

Exhibit 91 Toll Holdings 100 of Toll Bros.pdf

Exhibit 92 DE SOS Toll Holdings.pdf

Exhibit 93 Toll Brothers Inc 100 of Toll Holdings.pdf

Exhibit 94 Subsidiaries List.pdf

Exhibit 95 202102734 Contact Info.png

Exhibit 96 Wheat Ridge License.pdf

Exhibit 97 Gmail - Toll Brothers License CORA Request.pdf

Exhibit 98 Information to prove toll brothers permit.pdf

Exhibit 99 CO Douglas Registration 2025.PNG

Exhibit 100 Littleton Contractor License 2025.pdf

Exhibit 101 Erie Contractor License 2025.pdf

Exhibit 102 Aurora Contractor License 2025.png

Exhibit 103 Centennial Contractor License 2025.png

Exhibit 104 Colorado Springs Contractor License 2025.pdf

Exhibit 105 Littleton COI 2024.pdf

Exhibit 106 Wheat Ridge COI.pdf

Exhibit 107 CO Douglas COI 2024.pdf

Exhibit 108 Erie COI.pdf

Exhibit 109 Colorado Spring COI 2024.pdf

Exhibit 110 Centennial COI 2024.pdf

Exhibit 111 Superior COI Naming Toll Brothers Inc.pdf

Exhibit 112 AZ MARSH USA LLC.pdf

Exhibit 113 Marsh Homepage.png

Exhibit 114 MarshMcLennan Homepage.png

Exhibit 115 MM Trademark.pdf

Exhibit 116 marsh.com.pdf

Exhibit 117 marshmclennan.com.pdf

Exhibit 118 30 South 17th Street.png

Exhibit 119 1717 Arch Street.png

Exhibit 120 Toll Brothers Consumer Affairs.pdf

Exhibit 121 Toll Brothers Consumer Affairs Frequency.png

Exhibit 122 Medium North Carolina.pdf

Exhibit 123 Toll Brothers Reddit 1.pdf

Exhibit 124 Toll Brothers Reddit 2.pdf

Exhibit 125 Toll Brothers Northside Piers.pdf

Exhibit 126 129 Oakstone Grant Deed.pdf

Exhibit 127 Cease and Desist 1.pdf

Exhibit 128 20-21_Advertising_on_Vehicles.pdf

Exhibit 129 DRE Complaint Number.png

Exhibit 130 Cease and Desist 2.pdf

Exhibit 131 Cease and Desist 3.pdf

Exhibit 132 Cease and Desist 4.pdf

Exhibit 133 BHA Cease and Desist.pdf

Exhibit 134 LVP Warranty Text.pdf

Exhibit 135 Toll Brothers What Acquisitions Investor FAQ.png

Exhibit 136 About — The Manhattan Building Company.pdf

Exhibit 137 CamWest Press Release.pdf

Exhibit 138 CamWest Delinquencies after 2013 acquistion.pdf

Exhibit 139 Camwest Annual Reports.pdf

Exhibit 140 10-K 2012.pdf

Exhibit 141 AZ Daniel Rhea.pdf

Exhibit 142 Officers Cert 2024.pdf

Exhibit 143 Officers Cert 2022.pdf

Exhibit 144 Doulgas Yearley.png

Exhibit 145 Mark Bailey LinkedIn.pdf

Exhibit 146 Dan Rhea LinkedIn.pdf

Exhibit 147 Reggie Carveth LinkedIn.pdf

Exhibit 148 AZ Toll Bros Inc Annual Report 2017.pdf

Exhibit 149 IMG_8225.jpeg

Exhibit 150 IMG_8223.jpeg

Exhibit 151 IMG_8228.jpeg

Exhibit 152 Statements of Authority.pdf

Exhibit 153 Ken Greenspan LinkedIn.pdf

Exhibit 154 Greenspan Docs.pdf

Exhibit 155 Toll Directors and Officers Pages 1999 to 2021.pdf

Exhibit 156 Gary, Kenneth J. PA Bar.pdf

Exhibit 157 Toll Brothers (TOL) IPO Date.pdf

Exhibit 158 Ken Gary LinkedIn.pdf

Exhibit 159 Gary Announcement Beazer Homes 8-K 2005.pdf

Exhibit 160 Beazer Homes says fires general counsel.pdf

Exhibit 161 Gary Docs.pdf

Exhibit 162 Gary current work.png

Exhibit 163 Maryann Heatherby | LinkedIn.pdf

Exhibit 164 Crystal Vecchione | LinkedIn.pdf

Exhibit 165 Email - Receipt Employees’ Employer.pdf

Exhibit 166 Email - Employees’ Employer.pdf

Exhibit 167 Email - Employees’ Employer 2.pdf

Exhibit 168 Gmail - Nicole avoiding question.pdf

Exhibit 169 Gmail - Patricia Rice Notary CO.pdf

Exhibit 170 Toll Brothers Employee phone calls.pdf

Exhibit 171 Liz Stein Pennsylvania.pdf

Exhibit 172 Gmail - Employer Information Dave.pdf

Exhibit 173 Gmail - Employment Information Gilma.pdf

Exhibit 174 TNHC Realty License.pdf

Exhibit 175 Gmail - Gilma Current for sale homes.pdf

Exhibit 176 The New Home Company Inc.pdf

Exhibit 177 The New Home Company Southern California LLC.pdf

Exhibit 178 TNHC Realty and Construction Inc.pdf

Exhibit 179 Larry Webb | LinkedIn.pdf

Exhibit 180 New Home CIO Wayne Stelmar to Retire.pdf

Exhibit 181 WL Homes LLC Trademark.pdf

Exhibit 182 WL Homes LLC.pdf

Exhibit 183 John Laing Homes (California), Inc.pdf

Exhibit 184 JLH Realty and Construction Inc.pdf

Exhibit 185 JLH CSLB License.pdf

Exhibit 186 John Laing Homes Permits and Declarations.pdf

Exhibit 187 JLH DRE License.pdf

Exhibit 188 Webb Steps Down as CEO of John Laing Homes 2008.pdf

Exhibit 189 Wachovia v JLH.pdf

Exhibit 190 Home builder John Laing files for bankruptcy | Reuters.pdf

Exhibit 191 Miek Debeuckelaer Harbur Cali bar.pdf

Exhibit 192 NWHM IPO Date.pdf

Exhibit 193 Miek Harbur | LinkedIn.pdf

Exhibit 194 Combined SI-PT.pdf

Exhibit 195 Form SI-PT Info.pdf

Exhibit 196 New Home Co IPO Form 424B4 2019 Speaks sparingly of bankruptcy.pdf

Exhibit 197 Felten Plans First Page.pdf

Exhibit 198 CO Deed.pdf

Exhibit 199 PA Deed.pdf

Exhibit 200 Wheat Ridge CGIA Notice of Claim.pdf

Exhibit 201 Toll Brothers Damages - Total Damages.pdf

Exhibit 202 Jefferson Ridge Deeds.pdf

Exhibit 203 Jefferson Candelas Deeds.pdf

Exhibit 204 Boulder Deeds.pdf

Exhibit 205 Broomfield Deeds.pdf

Exhibit 206 Douglas Deeds.pdf

Exhibit 207 Adams Deed.pdf

Exhibit 208 Arapahoe Deed.pdf

Exhibit 209 Maricopa Deeds.pdf

Exhibit 210 Pinal Deeds.pdf

Exhibit 211 5131 Vivian Title Insurance.pdf

Exhibit 212 Westerminster Abstract Company ACC.pdf

Exhibit 213 Westerminster Whois.pdf

Exhibit 214 Steve Across States.pdf

Exhibit 215 Westminster Jobs.pdf

Exhibit 216 Toll Career Center numbers.pdf

Exhibit 217 1024.15 Disclosure Notice.pdf

Exhibit 218 ABA From Sales.pdf

Exhibit 219 ABA From Mortgage.pdf

Exhibit 220 Toll Brothers Mortgage Company ACC.pdf

Exhibit 221 TBMC Name Change.pdf

Exhibit 222 Demand Letter Proofs.pdf

Exhibit 223 Keller Delivery Attempt.pdf

Exhibit 224 Design Center Payment.pdf

Exhibit 225 Total Damages.pdf

Exhibit 226 Toll Brothers Formal Legal Demand.pdf

Exhibit 227 Baskerville Legal Demand Receipt.pdf

Exhibit 228 Hartman Retirement.pdf

Exhibit 229 ACC Toll Southwest LLC.pdf

Exhibit 230 Keller Receipt.pdf

Exhibit 231 Connor Retirement.pdf.

Exhibit 232 AZ ACC Toll Southwest.pdf.

Exhibit 233 Commitment Letter.pdf

Exhibit 234 Jefferson County SOAs.pdf

Exhibit 235 Heritage Toll Signing Authority.pdf

Exhibit 236 Heritage Toll email.pdf

Exhibit 237 Chicago Claim Text.pdf

Exhibit 238 Chicago Claim Acknowledgment.pdf

Exhibit 239 Heritage Title - About.pdf

Exhibit 240 Heritage Demand Letter.pdf

Exhibit 241 Heritage Demand Letter Response.pdf

Exhibit 242 Christopher Stull LinkedIn.pdf

Exhibit 243 UWM Closing Instructions.pdf

Exhibit 244 ALTA - Policy Forms and Related Documents.pdf

Exhibit 245 Neighbor Title Commitment.pdf

Exhibit 246 Freddie Mac

Exhibit 247 5131 Vivian Deed of Trust